**LITE DEPALMA GREENBERG & RIVAS, LLC**
Allyn Z. Lite (AL-6774)
Michael Patunas (MP-2306)
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003
(973) 623-3000

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| QLM ASSOCIATES, INC., on behalf of itself and all others similarly situated,<br><br>                               Plaintiffs,<br><br>                    v.<br><br>MARSH & MCLENNAN COMPANIES, INC., MARSH INC., MARSH USA INC., and SEABURY & SMITH, INC. d/b/a MARSH ADVANTAGE AMERICA,<br><br>                               Defendants. | Civil Action No. 0 4 - 51 8 4<br>(CFJH)<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, QLM Associates, Inc. ("Plaintiff"), with office at 470 Wall Street, Princeton, NJ 08540, individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following facts and claims upon knowledge as to matters relating to itself, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included among other things, a review of publicly available information, including information obtained by the Attorney General of the State of New York and set forth in a complaint, dated October 14, 2004, on behalf of the People of the State of New York against Marsh & McLennan Companies, Inc. and Marsh, Inc.

## INTRODUCTION

1.     This is a class action against defendants Marsh & McLennan Companies, Inc. ("MMC"), Marsh Inc., Marsh USA Inc. ("Marsh USA"), and Seabury & Smith, Inc. d/b/a Marsh Advantage America ("Marsh Advantage") (together, "Marsh") for injunctive relief and damages, brought by Plaintiff, on behalf of itself and a Class (defined below), which have retained Marsh as their insurance broker during the Class Period (defined below).

2.     Marsh is a global provider of insurance brokering services that has engaged and continues to engage in systematic fraud, anti-competitive conduct, restraint of trade, and a course of unfair, deceptive and wrongful conduct upon its clients, Plaintiff and the Class. Through its marketing and brokerage scheme, Marsh holds itself out to the public and its clients as an independent, experienced and trusted expert in risk exposure analysis and in the negotiation and placement of insurance. Marsh's clients retain Marsh to provide them with unbiased guidance and obtain for them the best insurance coverage in terms of service, coverage, and price. Marsh also holds itself out as a zealous and loyal advocate for its clients who will represent their interests in obtaining insurance policies.

3.     As an insurance broker, Marsh is in fact legally bound to abide by its fiduciary obligations and duties of loyalty to its clients, to exercise good faith in performing its services, and to act in accordance with its clients' best interests. It is with this expertise and fiduciary brokering advice and services that Plaintiff and the other Class members retained Marsh. Indeed, Marsh has claimed, "We are our clients' advocates, and we represent them in negotiations. We

don't represent the [insurance companies]." NYAG Compl. ¶ 6.[1]  Marsh has also stated:  "Our guiding principle is to consider our clients' best interest in all placements." NYAG Compl. ¶ 19.

4.     In truth, Marsh's "guiding principle" has been to advance its own interests at its clients' expense.  Unbeknownst to Plaintiff and the other Class members, Marsh breached its duties to them, deceived them, willfully acted against their interests and wrongfully enriched itself to their detriment.

5.     While purporting to provide independent and unbiased brokering services to them, Marsh failed and still fails to adequately disclose that it has entered into separate fee agreements, known as Placement Service Agreements, Market Services Agreements or Contingent Fee Agreements ("Contingent Fee Agreements") with certain insurance carriers. Through these Contingent Fee Agreements, Marsh receives kickback payments from insurance carriers as a reward for steering business to those carriers ("Contingent Fees" or "Kickbacks"). Marsh has also designed and implemented an elaborate and secret bid rigging scheme (the "Bid Rigging Scheme") to maximize its own Contingent Fees to the detriment of its clients.  As one Marsh executive stated to his subordinates, the size of the contingent commission payments to Marsh determined "who [we] are steering business to and who we are steering business from." NYAG Compl. ¶ 8.

6.     Rather than providing unbiased and independent brokering services to Plaintiff and the other Class members, Marsh caused them to purchase insurance from carriers to maximize its own Contingent Fees.  By failing to adequately disclose the Contingent Fee Agreements and its Kickbacks and causing Plaintiff and the Class to obtain insurance from these

---

[1]  References to "NYAG Compl. ¶ __" are to the complaint filed by the Office of the Attorney General of the State of New York on behalf of The People of the State of New York against Marsh & McLennan Company and Marsh, Inc., dated October 14, 2004, filed in the Supreme Court for the State of New York, County of New York.

insurance carriers, Marsh has been able to reap hundreds of millions of dollars at the expense of clients. Marsh continues to pocket these under-the-table payments and Kickbacks at Plaintiff's and the other Class members' expense.[2]

7.      As part of its Bid Rigging Scheme, Marsh solicited and obtained fictitious high quotes from insurance companies to deceive its own clients into the belief that true market competition had occurred. In order to effectuate its Bid Rigging Scheme and to maximize the Contingent Fees it received, Marsh also promised to protect certain insurance companies from competition, and did so — and threatened to hurt the business of other insurance carriers that truly thought of competing for particular pieces of business.

8.      Marsh's anti-competitive tactics have brought it tremendous revenue which it has attempted to keep secret. In 2003 alone, Marsh earned approximately $800 million from contingent commission payments. That year, Marsh reported approximately $1.5 billion in net income. Through its Contingent Fee Agreements, Bid Rigging Scheme, and threats, Marsh has corrupted the marketplace for insurance brokerage services, restrained competition and artificially inflated the price of insurance for Plaintiff and the Class. Plaintiff and the Class, rather than benefit from a truly competitive market for brokerage services and Marsh's supposed advocacy on their behalf, have paid and continue to pay more for less coverage than would be available in a truly competitive market.

---

[2] On October 18, 2004, Marsh stated that it would discontinue the practice of receiving Contingent Fees. *See* http://www.mmc.com.

## THE PARTIES

**Plaintiff**

9.    Plaintiff, QLM Associates, Inc. is a corporation organized under the laws of Delaware, with its principal place of business located at 470 Wall Street, in Princeton, New Jersey 08540. Plaintiff obtained insurance during the Class Period through Marsh.

**Defendants**

10.    Defendant MMC is a corporation organized under the laws of Delaware, with its principal place of business located at 1166 Avenue of the Americas, New York, New York 10036, and provides insurance brokerage services.

11.    Defendant Marsh Inc. is a corporation organized under the laws of Delaware, with a place of business located at 300 Broadhollow Road, Suite 201, Melville, New York 11747. Marsh Inc. is a subsidiary of MMC, and provides insurance brokerage services.

12.    Defendant Marsh USA is a corporation organized under the laws of Delaware, with a place of business located at 300 Broadhollow Road, Suite 201, Melville, New York 11747. Marsh USA is a subsidiary of MMC, and provides insurance brokerage services.

13.    Defendant Marsh Advantage is a corporation organized under the laws of Idaho, with a place of business located at 44 Whippany Road, Morristown, New Jersey 07962. Marsh Advantage is a subsidiary of MMC, and provides insurance brokerage services.

## JURISDICTION AND VENUE

14.    This action is instituted under Sections 4 and 16 of the Act of Congress of October 14, 1914, C. 323, 38 Stat. 731 (15 U.S.C. §§ 15 and 26), commonly known as the Clayton Act, to recover damages and costs of suit, including reasonable attorneys' fees, against Marsh for the injuries sustained by Plaintiff and the members of the Class by reason of the

violations, as hereinafter alleged, of Section 1 of the Act of Congress of July 2, 1890, C. 467, 26 Stat. 209 (15 U.S.C. § 1), commonly known as the Sherman Act.

15.     This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

16.     Additionally, this action is instituted pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d).

17.     This action is also instituted pursuant to the New Jersey Antitrust Act (N.J. Stat. Ann. § 56:9-1, *et seq.*), the Donnelly Act (N.Y. Gen. Bus. Law § 340, *et seq.*) and common law.

18.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

19.     With respect to the claims set forth in Counts V through IX, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over Marsh because Marsh maintains offices, has agents, transacts business or is found within this judicial district; the causes of action alleged herein arose in part within this district, and Marsh inhabits or may be found in this district. The interstate trade and commerce described herein is and has been carried out in part within this district.

21.     Venue is laid in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b) and (c).

## THE RELEVANT MARKET

22.     To the extent applicable to the claims alleged herein, the relevant market is the market for insurance brokerage services.

23.     The relevant geographic market is the United States and its territories as a whole.

6

24.     During the Class Period, Marsh entered into agreements and engaged in conduct which unreasonably restrained and continue to restrain trade in the relevant market and geographic markets.

## TRADE AND COMMERCE

25.     At all relevant times, Marsh engaged in trade and commerce across state lines to United States clients located outside the state of origin.

26.     During the Class Period, in connection with the purchase of Marsh's insurance brokerage services, monies as well as contracts, bills and other forms of business communications and transactions were transmitted across state lines and national boundaries.

27.     During the Class Period, various means and devices were used to effect the unlawful restraint of trade alleged herein, include the United States mail, interstate and foreign travel, interstate and foreign telephone commerce and other forms of interstate and foreign electronic communications.  Marsh's conduct, alleged herein, was and is within the flow of and has substantially affected interstate commerce.

## FACTS

**A.     Marsh Falsely Presents Itself As Its Clients' Trusted Advisor And Representative**

28.     Marsh provides insurance brokering services for various types of clients, including businesses, public entities, associations, professional services organizations, private clients, and individuals and families.

29.     Marsh's brokering services include recommending solutions to address its clients' risk exposures and assisting its clients in procuring insurance.

30.     In 2003, MMC's total revenue was $11.6 billion, including over $5 billion from insurance brokering services.

31.     Marsh holds itself out to the public and its clients as a highly-skilled insurance brokering expert, with special knowledge, experience and expertise needed to understand and analyze the risks faced by its clients and obtain the corresponding insurance products that best suit its clients' needs.

32.     Marsh encourages its clients to retain it for its proffered special knowledge, experience and expertise for assessing their risk exposures and in negotiating and procuring insurance coverage.

33.     Marsh also claims to have superior access to insurance carriers in the marketplace.

34.     Marsh's insurance brokering services are intended to match its clients with insurance carriers so that its clients obtain the best insurance coverage at the lowest price.

35.     In performing its insurance brokering services for its clients, Marsh enters into agency relationships with them.

36.     Marsh is the agent of its clients, and its clients are, in turn, Marsh's principals.

37.     As the agent of its clients, Marsh owes duties to act in its clients' best interests; to be loyal to their interests; to exercise good faith; not to act in a manner against their interests or to gain at their expense; and to fully, clearly and completely disclose to its clients any conflict of interest that Marsh has with them.

38.     Marsh and its clients also enter into fiduciary relationships.

39.     Marsh's clients repose their trust and confidence in Marsh and its proffered and actual superior knowledge, experience and expertise.

40.     Marsh holds itself out to its clients as their advocate and trusted advisor who will represent their interests in obtaining insurance policies.

8

41.     Marsh encourages, fosters and maintains this fiduciary relationship with its clients.

42.     As the fiduciary of its clients, Marsh similarly owes duties to act in its clients' best interests; to be loyal to their interests; to exercise good faith; not to act in a manner against their interests or to gain at their expense; and to fully, clearly and completely disclose to its clients any conflict of interest that Marsh has with them.

43.     Marsh emphasizes to its own clients that it works for them, not for insurance carriers.

44.     In a document created to assist employees in responding to client questions, Marsh has written:  "Our guiding principle is to consider our client's best interest in all placements.  We are our clients' advocates and we represent them in negotiations.  We don't represent the [insurance companies]."  NYAG Compl. ¶ 19.

45.     This purported "guiding principle" is prominent in Marsh's marketing materials.

46.     In Marsh's "Response to RFP" for the Greenville County School District in South Carolina – where Marsh's steering and bid manipulation were plainly evident – Marsh provided a graphic titled, "Client Loyalty Pyramid."  The document states that its "approach to client service begins with establishing credibility and trust…."  Marsh also refers to itself in these materials as Greenville County's "trusted business partner" and "not simply an insurance agent." NYAG Compl. ¶ 19.

47.     To the contrary, as demonstrated herein, Marsh's "guiding principle" has been to promote its own financial interests through its Contingent Fee Agreements and Bid Rigging Scheme.

9

**B.      Marsh's Disclosure Of Its Contingent Fee Agreements Is False And Misleading**

48.      Marsh maintains Contingent Fee Agreements with certain carriers pursuant to which the carriers pay Marsh Contingent Fees or Kickbacks as a reward for steering its clients' business to them.

49.      During the Class Period, Marsh profited from the Contingent Fee Agreements in at least three ways:  First, Marsh steered business to its favored insurance carriers with which it had Contingent Fee Agreements and those insurance carriers, in turn, paid Kickbacks to Marsh for the increased volume of business.  Second, if those carriers retained their existing business at renewal time, they paid Marsh higher Contingent Fees for the renewals.  Third, if Marsh steered more profitable business (policies with low claims ratios) to those favored insurance carriers, those carriers in turn paid Marsh higher Kickbacks for the profitable business.

50.      While Marsh has disclosed the existence of Contingent Fee Agreements since at least 1998, it has consistently concealed their true nature.  Marsh describes Contingent Fee Agreements (which Marsh now calls "Market Service Agreements" or "MSAs") to its clients and the public as follows:

> Market Services Agreements (MSAs) are agreements that cover payment for the value brokers provide to insurance carriers and are based primarily on premium volume or growth.  Brokers principally provide insurers with distribution networks, which facilitate the delivery of business, and are also uniquely positioned to provide insurers with intellectual capital, product development, technology, and other administrative and information services.  These capabilities make the overall marketplace more efficient and competitive, which, in turn, benefits Marsh's clients.  ["Market Service Agreements" at www.msa.marsh.com]

51.      These "services" are illusory.  The "distribution network" Marsh cites is not a "service" but rather a necessary concomitant of Marsh going to the market on behalf of its

clients, something that Marsh is duty bound to do as its clients' agent and fiduciary – and for which Marsh is compensated by legitimate fees and commissions from its clients.

52. The fact that Marsh's clients ultimately buy insurance from the insurers creates no additional "service" by Marsh to insurers. Certainly, the other vague "services" mentioned (such as "intellectual capital") do not justify any of the $800 million that Marsh received last year in Contingent Fees.

53. In reality, the "service" that Marsh provides pursuant to its Contingent Fee Agreements is to steer business to favored insurance carriers for its own benefit.

54. Contingent Fees have an enormous impact upon which insurance carrier Marsh will choose to provide insurance to its client.

55. Marsh's disclosure is silent as to the actual purpose and effect of its Contingent Fee Agreements.

56. To the extent that Marsh has mentioned these Contingent Fee Agreements to Class members, Marsh still failed and continues to fail to adequately disclose material facts to them regarding the agreements and Marsh's conflict-of-interest, including:

> (a) the insurance carriers with which it had these agreements;
>
> (b) how the amount of Marsh's payments from those carriers would be calculated pursuant to the agreements;
>
> (c) the precise terms and conditions of Marsh's agreements with insurance carriers;
>
> (d) the amount of the fees that Marsh already received from insurance carriers for placing their insurance;
>
> (e) whether Marsh received or will receive extra fees from an insurance carrier in connection with the sale of any particular insurance carrier;

(f) that Marsh had and has incentive to recommend or obtain insurance coverage based upon, in whole or part, whether the carrier would pay Marsh fees for doing business with them;

(g) that Marsh had and has incentive to recommend or obtain insurance coverage for them based upon, in whole or part, the amount of fees the carrier would pay it;

(h) that Marsh in fact recommended and procured insurance coverage from a specific insurance carrier in order to receive fees from the carrier for their business;

(i) that Marsh in fact had received fees from the insurance carrier which it chose it to provide insurance; and/or

(j) the amount of the fees that Marsh received from the insurance carrier.

**C.   Marsh's Business Plan Has Been To Increase Its Contingent Fees By Steering Its Clients To Favored Insurance Carriers**

57.     Beginning in the late 1990s, Marsh assumed greater control over the placement of insurance.  Marsh created an office in Manhattan that came to be called Marsh Global Broking, which oversaw policy placement decisions in Marsh's major business lines.

58.     Marsh also began internally rating insurance companies based on the amount they paid Marsh pursuant to their Contingent Fee Agreements.

59.     In February 2002, a Marsh Global Broking managing director in the Healthcare group provided nine of his colleagues with a list of the insurance companies that were paying Marsh pursuant to Contingent Fee Agreements.  He cautioned, however, that "Some [contingent commission agreements] are better than others," and said that soon Marsh would formally "tier" the insurance companies.  Then, he said, "I will give you clear direction on who [we] are steering business to and who we are steering business from."  NYAG Compl. ¶ 33.

60.    Marsh circulated a "tiering report" to Marsh Global Broking executives, listing insurance companies as belonging to tiers depending on how profitable the carriers' Contingent Fee Agreements were to Marsh.

61.    Marsh also instructed its managers who received the list to "monitor premium placements" to assure that Marsh obtained "maximum concentration with Tier A & B" insurance companies, *i.e.*, those with Contingent Fee Agreements most favorable to Marsh.  NYAG Compl. ¶ 34.  For example, in a September 2003 e-mail, a Marsh Global Broking executive stated:  "We need to place our business in 2004 with those that have superior financials, broad coverage **and pay us the most**."  NYAG Compl. ¶ 34 (emphasis added).

62.    As set forth in paragraphs 37 through 40 of the New York Attorney General's complaint against Marsh, dated October 14, 2004, Marsh (a) praised and rewarded its employees for increasing business with favored carriers and admonished those employees who failed to do so, and (b) expressly informed insurance carriers that participated in its Bid Rigging Scheme that they would receive Marsh's business over their competitors as long as they participated in the Bid Rigging Scheme.

**D.    Marsh's Bid Rigging Scheme**

63.    Marsh also secretly profited at the expense of its clients by engaging in an elaborate Bid Rigging Scheme by which it artificially inflated bids for insurance for its clients or concocted fake bidding wars (in which it designated a favored carrier as the winner) to increase its Contingent Fees.

64.    While Marsh states that it is its client who makes the final decision on choosing its insurance coverage, in many instances, their client is making a misinformed "final decision" on insurance coverage.

65.     As set forth below, Marsh has provided clients with false, inflated and rigged price quotes.

66.     Marsh designated a "winner" in the purported bidding process and then solicited inflated bids from other insurance companies, who provided such bids, knowing that later they themselves will have a turn to get business from Marsh without meaningful competition.

67.     Examples of Marsh's Bid Rigging Scheme are set forth below:

**AIG**

68.     American International Group, Inc. ("AIG") is a publicly traded company with approximately 86,000 employees and over $81 billion in annual revenues.  Among its insurance lines is excess insurance which covers losses over and above the amounts covered by the insured's primary insurance policies.

69.     Beginning in or around 2001 until at least the summer of 2004, Marsh Global Broking's Excess Casualty Group and AIG's American Home Excess Casualty division (AIG's principal provider of commercial umbrella or excess liability and excess worker's compensations insurance) engaged in systematic bid manipulation.

70.     If AIG was an incumbent carrier and its policy was up for renewal, Marsh solicited what was called an "A Quote" from AIG, whereby Marsh provided AIG with a target premium and the policy terms for the quote.

71.     If AIG agreed to quote the target provided by Marsh, AIG kept the business, regardless of whether it could have quoted more favorable terms or premiums.

72.     If another carrier was the incumbent, Marsh requested AIG to submit what was variously referred to as a "backup quote," "protective quote" or "B Quote," telling AIG that it would not get the business.

73.    Marsh also provided AIG with a target premium and the policy terms for the quotes.

74.    AIG understood that the target premium set by Marsh was higher than the quote provided by the incumbent, and that AIG should not bid below the Marsh-supplied target.

75.    In October 2003, an underwriter at AIG described a particular quote that he had provided as follows: "This was not a real opportunity.  Incumbent Zurich did what they needed to at renewal.  We were just there in case they defaulted.  Broker... said Zurich came in around $750K & wanted us to quote $900K."  NYAG Compl. ¶ 46.

76.    Even when AIG could have quoted a premium that was lower than the target, it rarely did so.  Instead, AIG provided a quote that was consistent with the target premium set by Marsh, thereby rigging the bid.

77.    Marsh also asked AIG to provide B Quotes when AIG was not supposed to get the business, but Marsh did not set a particular target.

78.    In B Quote situations, AIG considered the expiring policy terms and premium and provided a quote high enough to ensure that (a) the quote would not be a winner, and (b) in the rare case where AIG did get the business, it would make a comfortable profit.

79.    In B Quote situations, AIG also did not do a complete underwriting analysis.

80.    If AIG inadvertently won B Quote business (because the incumbent was not able or willing to meet Marsh's target), AIG personnel would "back fill" the underwriting work on the file – that is, prepare the necessary analysis after the fact.

81.    Finally, Marsh came to AIG for a "C Quote", when there was no incumbent carrier to protect.  Although Marsh often provided premium targets in these business situations, it was understood that there was the possibility of real competition.

82.   Marsh strictly enforced its A, B and C Quote System.

83.   Marsh refused to allow AIG to put in competitive quotes in B Quote situations and threatened AIG that AIG would lose its entire book of business with Marsh if it did not provide B Quotes.

84.   As one Marsh executive has stated:  Marsh "protected AIG's ass" when it was the incumbent carrier, and it expected AIG to help Marsh "protect" other incumbents by providing B Quotes.  NYAG Compl. ¶ 50.

### ACE

85.   ACE Ltd. is a Bermuda corporation that trades on the New York Stock Exchange. ACE USA ("ACE") is part of a group of subsidiaries that forms the ACE Insurance North America business division of ACE Ltd.

86.   In 2002, ACE decided to enter the excess casualty market by creating a separate division, called the Casualty Risk Department.

87.   ACE signed a Contingent Fee Agreement to gain access to the business Marsh controlled.

88.   ACE also repeatedly provided the same type of B Quotes that AIG provided.

89.   The B Quotes that ACE gave to Marsh were often in prices requested by Marsh, even though a lower quote would have been justified by an underwriting analysis.

90.   As ACE's President of Casualty Risk summarized:

> Marsh is consistently asking us to provide what they refer to as "B" quotes for a risk.  They openly acknowledge we will not bind these "B" quotes in the layers we are be [sic] asked to quote but that they 'will work us into the program' at another attachment point.  So for example if we are asked for a "B" quote for a lead umbrella then they provide us with pricing targets for that "B" quote.  It has been inferred that the 'pricing targets' provided are designed to ensure underwriters 'do not do anything stupid' as respects pricing.

16

NYAG Compl. ¶ 52. In this same e-mail, the ACE executive wrote that he "support[ed]" Marsh's business model, which he described as "unique." NYAG Compl. ¶ 52.

91.     The operation of Marsh's Bid Rigging Scheme is exemplified by a bid for the insurance business of Fortune Brands, Inc. ("Fortune"). On December 17, 2002, an ACE underwriting executive sent a facsimile to a Marsh executive, quoting an annual premium of $990,000 for a policy for Fortune. NYAG Compl. ¶ 53. Later that day, ACE raised its bid to $1,100,000. On the facsimile cover sheet with the revised bid, the ACE's executive wrote: "Per our conversation attached is revised confirmation. All terms & conditions remain unchanged." NYAG Compl. ¶ 53.

92.     In an e-mail later that day, the ACE executive explained the bid revision to another ACE executive as follows: "Original quote $990,000.... We were more competitive than AIG in price and terms. MMGB requested we increase to $1.1M to be less competitive, so AIG does not loose [sic] the business...." NYAG Compl. ¶ 53.

93.     Marsh lured insurance carriers into its Bid Rigging Scheme with financial rewards.

94.     As a Marsh executive wrote in a June 20, 2003 e-mail to the same ACE executive: "Currently, we have about $6M in new business [with ACE] which is the best in Marsh Global Broking so I do not want to hear you are not doing 'B' quotes or we will not bind anything." NYAG Compl. ¶ 54.

95.     The bidding process for insurance for another company, Brambles, USA ("Brambles"), further demonstrates Marsh's Bid Rigging Scheme.

96.     In June of 2003, ACE learned that Brambles was unhappy with AIG, the carrier that was presently providing it insurance.  Marsh demanded ACE to refrain from submitting a competitive bid because Marsh wanted the incumbent, AIG, to keep the business.

97.     An ACE underwriting executive wrote to the ACE President of Risk and Casualty as follows:

> Our rating has a risk at $890,000 and I advised MMGB NY that we could get to $850,000 if needed.  Doherty [a Marsh executive] gave me a song & dance that game plan is for AIG at $850,000 and to not commit our ability in writing.

NYAG Compl. ¶ 55.

98.     ACE continued to provide Marsh with inflated quotes into 2004.

**Hartford**

99.     Marsh did not limit its Bid Rigging Scheme practices to its large corporate clients.

100.    Marsh also engaged in its Bid Rigging Scheme with The Hartford Financial Services Group ("Hartford") – a provider of life group benefits, auto, home ownership and business insurance – with respect to Marsh's "Middle Market" and small business clients.  NYAG Compl. ¶ 58.

101.    During 2003 and 2004, Marsh employees demanded two Hartford underwriters assigned to provide an inflated quote or "indication" (non-binding proposed price) for insurance coverage for a small business.  NYAG Compl. ¶ 59.

102.    Marsh instructed Hartford's underwriters to price the quote or indication 25% above a particular number, and that by doing so, Hartford need not worry that it would get the business.

103.    Beginning at least in 2000, Marsh demanded Hartford to provide inflated quotes or indications in a manner similar to the process described above.  NYAG Compl. ¶ 60.

104.    Marsh also provided Hartford with a spreadsheet showing the accounts for which it wanted Hartford to provide a losing quote or indication, along with other insurers' quotes.

105.    Marsh instructed Hartford to quote some percentage, typically 25%, above the other insurers' quotes on the spreadsheet to ensure that Hartford would not get the business. These quotes were referred to as "Throwaway Quotes." NYAG Compl. ¶ 60.

**E.    Plaintiff And The Class Retained Marsh As Their Insurance Broker**

106.    During the Class Period, Plaintiff and the Class retained Marsh as its insurance broker.

107.    Plaintiff and each of the other members of the Class were Marsh's clients.

108.    Plaintiff and the other Class members expected Marsh to research the market fully, provide unbiased advice regarding their risk exposures, present a range of insurance options based on impartial and objective analysis, and to negotiate on their behalf and obtain for them insurance coverage that best met their needs in terms of scope and cost.

109.    As Plaintiff and the Class members' broker, Marsh was obligated to research the market fully, provide unbiased advice regarding their risk exposures, present a range of insurance options based on impartial and objective analysis, and to negotiate on their behalf and obtain for them insurance coverage that best met their needs in terms of scope and cost.

110.    Marsh failed to adequately disclose to Plaintiff and the other Class members its Contingent Fee Agreements and did not disclose its Bid Rigging Scheme.

111.    Marsh failed to provide the Class with impartial guidance regarding their risk exposures and impartial recommendations for their insurance options.

112.    Marsh provided biased advice that was based on its own desire to obtain and maximize its Contingent Fees.

19

113.    Marsh guided Plaintiff and the Class members to obtain insurance from insurance carriers with which Marsh had Contingent Fee Agreements and/or which participated in Marsh's Bid Rigging Scheme so that Marsh could earn extra profits for the placement, regardless of whether the insurance provided Plaintiff and the other Class members the best coverage at the lowest cost.

## TOLLING OF STATUTE OF LIMITATIONS

114.    Marsh has affirmatively and fraudulently concealed its unlawful scheme and course of conduct from Plaintiff and the Class.

115.    Plaintiff had no knowledge of Marsh's fraudulent scheme and could not have discovered that Marsh's representations were false, or that Marsh had concealed information and materials, until shortly before the filing of this Complaint.  Additionally, Marsh's unlawful activity was of a self-concealing nature.

116.    Accordingly, the statute of limitations has been tolled with respect to any claims which Plaintiff has brought as a result of the unlawful and fraudulent conduct alleged herein.

## CLASS ACTION ALLEGATIONS

117.    This suit is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a Class, consisting of:

> All entities and persons (excluding defendants and their parents, subsidiaries, affiliates, officers, directors, agents and co-conspirators) which retained Marsh as their insurance broker during the period commencing six years from the filing of this complaint to the present (the "Class Period").

118.    The Class is so numerous that joinder of its members is impracticable.

119.    The exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery.

120.   Based upon the nature of the trade and commerce involved and Plaintiff's knowledge of Marsh's brokerage business, Plaintiff and the Class members are geographically dispersed throughout the United States.

121.   The Class is ascertainable in that the names and addresses of all Class members can be identified in business records maintained by Marsh.

122.   There are numerous questions of law and fact that are common to the claims of all Class members as set forth above, including:

(a) whether Marsh agreed to represent the best interests of its clients in connection with insurance brokerage services;

(b) whether Marsh represented and marketed itself as representing the best interests of its clients in connection with insurance brokerage services;

(c) whether Marsh contracted to receive Contingent Fees from insurers based on the volume of business Marsh steered to those insurers, the number of renewals those insurers had, and/or the profitability of the business Marsh steered to those insurers;

(d) whether the Contingent Fees/Kickbacks created conflicts of interests for Marsh that gave Marsh a compelling disincentive to fulfill its duties to Plaintiff and the Class;

(e) whether Marsh failed to adequately disclose the Contingent Fee Agreements and/or their amount, extent, and impact upon Marsh's ability to fulfill their duties to Plaintiff and the Class;

(f) whether Marsh breached its duties of loyalty to Plaintiff and the Class as their agent;

(g) whether Marsh breached its fiduciary duties to Plaintiff and the Class;

(h) whether Marsh was unjustly enriched at the expense of Plaintiff and the Class;

(i)  whether Marsh's Bid Rigging Scheme and other unlawful conduct violated Section 1 of the Sherman Act;

(j)  whether Marsh's Bid Rigging Scheme and other unlawful conduct violated RICO;

(k)  whether Marsh's Bid Rigging Scheme and other unlawful conduct violated the New Jersey Antitrust Act;

(l)  whether Marsh's Bid Rigging Scheme and other unlawful conduct violated the Donnelly Act;

(m) whether Plaintiff and the Class are entitled to injunctive, declaratory, and/or other equitable relief;

(n)  whether Plaintiff and the Class are entitled to damages and if so, what amount;

(o)  whether Marsh must make an accounting of all ill-gotten gains, monies and profits wrongfully derived from its unlawful conduct described in this Complaint; and

(p)  whether Marsh must pay restitution for and disgorge all ill-gotten gains, monies and profits wrongfully derived from its unlawful conduct described in this Complaint.

123.  The claims of Plaintiff are typical of those of the Class it represents.

124.  The claims of Plaintiff and the Class members have a common origin and share a common basis. Their claims originate from the same unlawful and anti-competitive conduct on the part of Marsh.

125.  Plaintiff states claims for which relief may be granted that are typical of those of the absent Class members. If brought and prosecuted individually, the claims of each Class

22

133.    Marsh's unlawful scheme to obtain Contingent Fees and profit from its Bid Rigging Scheme creates an ongoing problem that will continue to cause Plaintiff and the members of the Class economic losses and threaten their ability to obtain appropriate insurance coverage at a fair price.

134.    A monetary judgment in this case will only compensate Plaintiff and members of the Class for past losses. A monetary judgment will not cure the inherent and irreconcilable conflict of interest between Marsh and its clients, created by the Contingent Fees and Bid Rigging Scheme, as set forth above.

135.    Marsh's Contingent Fee Agreements and the Bid Rigging Scheme constitute contracts, combinations or conspiracies that unfairly fix, peg, or rig the prices of insurance policies in *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and also constitute an unreasonable restraint of trade under a rule of reason analysis in violation of said statute.

136.    Marsh's Contingent Fee Agreements and the Bid Rigging Scheme constitute contracts, combinations or conspiracies that unfairly restrain trade in the market for the purchase of insurance policies in *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and also constitute an unreasonable restraint of trade under a rule of reason analysis in violation of said statute.

137.    Marsh's overall conduct, described above, also constitutes a contract, combination or conspiracy to unfairly fix, peg, or rig the prices of insurance policies and/or unreasonably restrain trade in *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and also constitute an unreasonable restraint of trade under a rule of reason analysis in violation of said statute.

member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

126.   Plaintiff's claims are sufficiently aligned with the interests of the absent members of the Class to ensure that the universal claims of the Class will be prosecuted with diligence and care by Plaintiff as representative of the Class.

127.   Plaintiff will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other members of the Class.

128.   Plaintiff is willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

129.   Plaintiff has retained the services of counsel indicated below. Such counsel are experienced in complex class-action litigation, will adequately prosecute this action, and will assert, protect, and otherwise represent Plaintiff and all absent Class members.

130.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that Marsh has acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

131.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the questions of law and fact that are common to members of the Class predominate over any questions affecting only individual members.

## COUNT I
## PERMANENT INJUNCTION PURSUANT
## TO SECTION 1 OF THE SHERMAN ACT

132.   Plaintiff repeats and realleges the preceding allegations of the Complaint as if fully set forth herein.

138.   Plaintiff and the Class have no adequate remedy at law.

139.   By virtue of the foregoing, Marsh must be permanently enjoined from participating in the Contingent Fee Agreements and the Bid Rigging Scheme, as described above.

**COUNT II**
**<u>VIOLATION OF SECTION 1 OF THE SHERMAN ACT</u>**

140.   Plaintiff repeats and realleges the preceding allegations of the Complaint as if fully set forth herein.

141.   Marsh's Contingent Fee Agreements and the Bid Rigging Scheme constitute contracts, combinations or conspiracies to unfairly fix, peg, or rig the prices of insurance policies in *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and also constitute an unreasonable restraint of trade under a rule of reason analysis in violation of said statute.

142.   Marsh's Contingent Fee Agreements and the Bid Rigging Scheme constitute contracts, combinations or conspiracies that unfairly restrain trade in the market for the purchase of insurance policies in *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and also constitute an unreasonable restraint of trade under a rule of reason analysis in violation of said statute.

143.   Marsh's overall conduct, described above, also constitutes a contract, combination or conspiracy to unfairly fix, peg, or rig the prices of insurance policies and/or unreasonably restrain trade in *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and also constitute an unreasonable restraint of trade under a rule of reason analysis in violation of said statute.

144.   As a direct and proximate result of Marsh's conduct as described above, Plaintiff and the Class have been injured in their business and property and suffered damages.

145.   By virtue of the foregoing, Plaintiff and the Class should be awarded damages in an amount to be determined at trial, trebled by virtue of the Clayton Act.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)

146.   Plaintiff repeats and realleges the preceding allegations of the Complaint as if fully set forth herein.

147.   Plaintiff, the Class members and defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

148.   Upon information and belief, the following group of persons constitutes an association-in-fact enterprise, hereinafter "Marsh Enterprise" (or "Enterprise"):

    (a) Marsh; and

    (b) AIG, ACE, Hartford and other insurers not named as defendants in this Complaint that participate in the Bid Rigging Scheme and the payment of Contingent Fees.

149.   The Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce.

150.   While Marsh participates in and is a member of the Enterprise, it also has an existence separate and distinct from the Enterprise.

151.   To establish and maintain the Bid Rigging Scheme and the payment of Contingent Fees, while concealing the system and the inherent conflict of interests it creates with its clients, including Plaintiff and the members of the Class, Marsh was required to participate in the conduct of and exercise control over the Enterprise.

152.   Marsh has participated in the conduct of, and controlled and operated the Enterprise as follows:

26

(a) by sharing and disseminating information regarding client contracting and client communications, insurance placement strategies, and relationships with insurers among other things;

(b) by repeatedly recommending insurance products of the insurer participants in the Enterprise; and

(c) by developing artificial competitive bidding processes.

153.    As set forth above, the Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Marsh has engaged.

154.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) or 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Marsh has engaged in and continues to engage in conduct violating each of these laws in order to effectuate the Contingent Fee Agreements, Bid Rigging Scheme and other alleged unlawful activity.

155.    In addition, in order to make the Bid Rigging Scheme and Contingent Fee Agreements effective, Marsh sought to and did aid and abet the others in violating the above laws within the meaning of 18 U.S.C. § 2, which conduct is also indictable under 18 U.S.C. §§ 1341 and 1343.

156.    To carry out or attempt to carry out its scheme to defraud or obtain money by means of false pretenses, representations or promises, Marsh, in violation of 18 U.S.C. § 1341, placed in post offices and/or official depositories of the United States Postal Service matter and things to be delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to agreements, correspondence, policy

27

materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Marsh's wrongful conduct, claims, responses to claims, and coverage letters.

157.   To carry out or attempt to carry out its scheme to defraud or obtain money by means of false pretenses, representations or promises, Marsh, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things including but not limited to agreements, correspondence, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Marsh's wrongful conduct, claims, responses to claims, and coverage letters.

158.   The matter and things sent by Marsh via the Postal Service, commercial carrier, wire or other interstate electronic media include, among other things:

(a) materials containing false and fraudulent misrepresentations that Marsh would represent its clients' interests in the placement of insurance on behalf of Plaintiff and members of the Class;

(b) materials that concealed or failed to disclose the existence and effect of the Bid Rigging Scheme and payment of Contingent Fees, including the conflict of interests that Marsh had created between its legal and contractual obligations to its clients and the economic disincentives to honor those obligations from the Bid Rigging Scheme;

(c) materials intended to induce clients to accept more expensive and lesser coverage from the insurers participating in the Enterprise than might otherwise be available in order to maximize premium revenue and to maximize Contingent Fees; and

(d) materials intended to discourage clients from the aggressive pursuit of claims.

159.   Marsh's misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiff and members of the Class and assuring insurers participating in the Enterprise of the placement of business and enabling Marsh to collect Contingent Fees.  Specifically, these misrepresentations, acts of concealment, and failures to disclose include but are not limited to:

(a) Marsh holding itself out as a trusted advisor that can help clients assess their insurance needs and locate the best available insurance while in fact participating in self dealing, conspiratorial activities aimed at maximizing profits at the expense of its clientele;

(b) Marsh's representations that it works for its clients and not insurance companies;

(c) failing to disclose that an integral part of Marsh's business philosophy is to promote the interest of insurance companies in order to maximize revenue from Contingent Fee Agreements.  Therefore, Marsh steers business to favored insurance companies from whom they receive higher fees;

(d) failing to disclose the nature of the services that Marsh provides in order to warrant its commissions;

(e) failing to disclose that Marsh is directing its clients to insurance companies based not on their merit, but rather on the web of kickbacks and contingent commissions they are able to structure; and

(f) contriving, falsifying and/or manipulating insurance bids to create the illusion of a competitive bidding process.

29

160.   Marsh either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiff and members of the Class relied on the misrepresentations and omissions as set forth above.

161.   As a result, Plaintiff and members of the Class have been injured in their business or property by Marsh's overt acts of mail and wire fraud and by its aiding and abetting other Enterprise members' acts of mail and wire fraud in furtherance of the aforesaid racketeering conspiracy.

162.   Marsh has engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity (i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above) within the past ten years.

163.   In fact, Marsh has committed or aided and abetted in the commission of thousands of acts of racketeering activity.

164.   Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including Plaintiff and members of the Class.

165.   The multiple acts of racketeering activity, which Marsh committed and/or conspired to commit or aided and abetted the commission of, were related to each other in furtherance of the scheme described above, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as described in 18 U.S.C. § 1961(5).

166.   Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect,

interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....."

167.    By reason of the foregoing, Marsh has conducted or participated in the conduct of the affairs of the Enterprise in violation of § 1962(c).

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)

168.    Plaintiff repeats and realleges the preceding allegations of this Complaint as if fully set forth herein.

169.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

170.    By reason of the foregoing, Marsh has conspired to conduct or participate in the conduct of the Enterprise's affairs in violation of § 1962(d).

## COUNT V
## VIOLATION OF THE NEW JERSEY ANTITRUST ACT
## (New Jersey Stat. Ann. § 56:9-1, *et seq.*)

171.    Plaintiff repeats and realleges the preceding allegations of the Complaint as if fully set forth herein.

172.    Marsh's acts are a *per se* violation of the New Jersey Antitrust Act.

173.    Alternatively, Marsh's acts violate the New Jersey Antitrust Act under a rule of reason analysis.

174.    As a direct and proximate result of Marsh's wrongful conduct, Plaintiff and the other members of the Class have been injured in their business and property and suffered damages.

175.    By virtue of the foregoing, Plaintiff and the Class should be awarded damages in an amount to be determined at trial.

31

## COUNT VI
## VIOLATION OF THE DONNELLY ACT
## (New York Gen. Bus. Law § 340, *et seq.*)

176.    Plaintiff repeats and realleges the preceding allegations of the Complaint as if fully set forth herein.

177.    Marsh's acts are a *per se* violation of the Donnelly Act.

178.    Alternatively, Marsh's acts violate the Donnelly Act under a rule of reason analysis.

179.    As a direct and proximate result of Marsh's wrongful conduct, Plaintiff and the other members of the Class have been injured in their business and property and suffered damages.

180.    By virtue of the foregoing, Plaintiff and the Class should be awarded damages in an amount to be determined at trial.

## COUNT VII
## BREACH OF AGENT'S DUTY OF LOYALTY

181.    Plaintiff repeats and realleges the preceding allegations of the Complaint as if fully set forth herein.

182.    Plaintiff and the Class requested Marsh to act on their behalf and negotiate for and obtain insurance for them, and Marsh agreed and manifested its consent to them.

183.    Marsh entered into agency relationships with Plaintiff and each of the other Class members.

184.    By its acts, practices and conduct described in this Complaint, Marsh breached its duties of loyalty to Plaintiff and each of the members of the Class.

185.    As a direct and proximate result of Marsh's wrongful conduct, Plaintiff and the other members of the Class have been injured in their business and property and suffered damages.

186.    By virtue of the foregoing, Plaintiff and the Class should be awarded damages in an amount to be determined at trial.

## COUNT VIII
## BREACH OF FIDUCIARY DUTY

187.    Plaintiff repeats and realleges the preceding allegations of the Complaint as if fully set forth herein.

188.    Marsh owed fiduciary duties to Plaintiff and each of the other Class members.

189.    By its acts, practices and conduct described in this Complaint, Marsh breached its fiduciary duties to Plaintiff and each of the other Class members.

190.    As a direct and proximate result of Marsh's wrongful conduct, Plaintiff and the other members of the Class have been injured in their business and property and suffered damages.

191.    By virtue of the foregoing, Plaintiff and the Class should be awarded damages in an amount to be determined at trial.

## COUNT IX
## UNJUST ENRICHMENT

192.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

193.    Plaintiff and the other Class members have conferred a financial benefit upon Marsh as a result of their purchasing of Marsh's insurance brokering services.  This benefit not only consists of the fees that they paid to Marsh for its services, but also the additional Contingent Fees and other profits that Marsh was able to receive (a) from insurance carriers with

which Marsh had Contingent Fee Agreements; and (b) by the Bid Rigging Scheme Marsh engaged in, as set forth above.

194.    Marsh has been financially enriched by the brokerage fees it received from Plaintiff and the other Class members and the Contingent Fees for providing those carriers' insurance to Plaintiff and the other Class members.

195.    Marsh obtained this financial enrichment to the detriment of and at the expense to Plaintiff and the Class.  Among other things, Plaintiff and the other Class members have paid more for insurance coverage than they would have otherwise had to pay and/or received less and/or inappropriate insurance coverage.

196.    It would be against equity and good conscience to allow Marsh to retain payments and proceeds that it derived and received, indirectly or directly, from the unlawful or inequitable acts, practices or conduct described in this Complaint.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Class, prays for relief as follows:

(a)    that the Court adjudicate and decree the instant action as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

(b)    that the Court enter judgment against Marsh, and in favor of Plaintiff and the Class on each of the causes of action asserted in this Complaint;

(c)    that the Court issue a permanent injunction, enjoining and restraining Marsh and its subsidiaries, affiliates, representatives and agents from engaging in the unlawful conduct set forth herein;

(d)    that the Court award Plaintiff and the Class the compensatory damages determined to have been sustained by them;

34

(e)     that the Court award Plaintiff and the Class trebled damages pursuant to Section 4 of the Clayton Act and Section 1964(c) of the RICO statute;

(f)     that the Court award Plaintiff and the Class attorneys' fees, expert fees, and costs;

(g)     that the Court direct and adjudge Marsh to engage in an accounting of its ill-gotten gains derived from its conduct as set forth in this Complaint;

(h)     that the Court direct Marsh to pay restitution for and to disgorge to Plaintiff and the Class all unlawfully or inequitably obtained monies and profits derived from its unlawful, fraudulent, and inequitable conduct that has damaged Plaintiff and the Class, as set forth in this Complaint; and

(i)     that the Court award Plaintiff and the Class such other and further relief as it shall deem just and appropriate.

## JURY DEMAND

Plaintiff and the Class respectfully demand a trial by jury of all claims so triable.

Dated: Newark, New Jersey
       October 22, 2004

LITE DEPALMA GREENBERG & RIVAS, LLC

By:  _____

Allyn Z. Lite (AL-6774)
Michael E. Patunas (MP-2306)
Two Gateway Center 12th Floor
Newark, NJ 07102
Telephone: (973) 623-3000
Fax: (973) 623-0211

Bernard Persky (BP 1072)
Hollis L. Salzman (HS 5994)
**GOODKIND LABATON RUDOFF
& SUCHAROW LLP**
100 Park Avenue
New York, New York 10017-5563
Telephone: (212) 907-0700
Fax: (212) 818-0477

L. Kendall Satterfield
Halley F. Ascher
**FINKELSTEIN, THOMPSON &
LOUGHRAN**
1050 30th Street N.W.
Washington, D.C. 20007
Telephone: (202) 337-8000
Fax: (202) 337-8090

*Attorneys for Plaintiff*