UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re INSURANCE BROKERAGE ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) | Civil Nos. 04-5184, 05-5743, 05-1064, 05-1079, 05-1167, 05-1168, 05-1169, 05-1214 (FSH)<br><br>MDL No. 1663<br><br>Hon. Faith S. Hochberg<br><br>JURY TRIAL DEMANDED |

**FIRST CONSOLIDATED AMENDED EMPLOYEE BENEFITS
CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................1

JURISDICTION AND VENUE ..........................................................................................7

PARTIES ............................................................................................................................8

    A.    THE PLAINTIFFS...........................................................................................8

    (1)    Employee Plaintiffs..........................................................................................8

    (2)    Employer Plaintiffs .......................................................................................10

    B.    THE DEFENDANTS....................................................................................13

    (1)    Broker Defendants .........................................................................................13

    (2)    Insurer Defendants .........................................................................................20

FACTUAL ALLEGATIONS ............................................................................................24

    A.    THE EMPLOYEE BENEFITS INSURANCE BROKERAGE MARKET ..........24

    (1)    Employee Benefit Programs ...........................................................................24

    (2)    Defendants' Fiduciary Duties and Relationship of Trust and Confidence
with Plaintiffs and Class Members ..................................................................25

    B.    DEFENDANTS' COMPENSATION AGREEMENTS......................................35

    (1)    Contingent Commission Agreements ...............................................................35

    (2)    Communication Fees .....................................................................................47

    (3)    Broker Bonuses.............................................................................................50

    C.    DEFENDANTS CONCEAL THE PAYMENTS FROM PLAINTIFFS
AND CLASS MEMBERS ...............................................................................51

    (1)    Defendants Fail to Disclose Payments in Marketing Materials,
Policyholder Agreements and Policyholder Communications .............................51

    (2)    Defendants Conceal Payments on Governmental Forms.......................................53

Page

D.     BROKER DEFENDANTS STEER BUSINESS TO INSURER DEFENDANTS ....................................................................................59

(1)    Steering ...............................................................................................59

(2)    "Low-Hanging Fruit" .........................................................................65

(3)    Defendants' Bid-Rigging Scheme .....................................................66

E.     WHOLESALE PAYMENTS....................................................................73

F.     REINSURANCE.......................................................................................75

G.     INVESTIGATIONS INTO DEFENDANTS' PRACTICES...................77

(1)    Government Investigations into Defendants' Practices......................77

(2)    Suspensions, Terminations and Resignations of Defendants' Employees ............80

(3)    Defendants Discontinue the Use of Contingent Commission Agreements ..........81

H.     CONSPIRACY ALLEGATIONS ...........................................................82

I.     ENTERPRISE...........................................................................................88

(1)    The Employee Benefits Insurance Enterprise....................................88

(2)    The Broker-centered Employee Benefits Enterprises.........................91

J.     RACKETEERING ACTIVITY ...............................................................93

(1)    Predicate Acts ....................................................................................93

(2)    Pattern of Racketeering Activity........................................................98

(3)    RICO Violations .................................................................................98

K.     EFFECTS OF DEFENDANTS' MISCONDUCT...................................99

L.     THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF.................100

M.     FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING ...............101

CLASS ACTION ALLEGATIONS ...................................................................103

**Page**

A. Class Definitions ................................................................................103

B. Rule 23(a) .......................................................................................106

C. Rules 23(b)(1), 23(b)(2) and 23(b)(3) ..............................................108

COUNT I ..................................................................................................109

Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18
U.S.C. §1962(c)  All Plaintiffs Against all Defendants ....................................109

ALTERNATIVE COUNT I .................................................................................109

Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18
U.S.C. §1962(c) Against All Defendants involved  in Broker-Centered
Conspiracies ................................................................................................109

COUNT II ..................................................................................................110

Violation of 18 U.S.C. §1962(c) All Plaintiffs Against all Defendants .............110

ALTERNATIVE COUNT II ................................................................................111

(Violation of 18 U.S.C. §1962(c) Against all Defendants in the Employee
Benefits Insurance Broker-Centered Enterprises) ................................................111

COUNT III .................................................................................................112

Injunctive and Declaratory Relief under RICO by  All Plaintiffs against all
Defendants ................................................................................................112

alternative count iii .....................................................................................112

Injunctive and Declaratory Relief under RICO against Defendants in the
Employee Benefits Insurance Broker-Centered Enterprises ...............................112

COUNT IV .................................................................................................113

Violation of the Sherman Act, 15 U.S.C. Section 1, All Plaintiffs Against
All Defendants ...........................................................................................113

COUNT V ..................................................................................................115

**Page**

Violation of Section 1 of the Sherman Act, Against Defendant Participants in the ULR-centered Conspiracy .........................................................115

COUNT VI...........................................................................................................118

Violation of Section 1 of the Sherman Act, Against Defendant Participants in the Marsh-centered Conspiracy ....................................................118

COUNT VII .........................................................................................................120

Violation of Section 1 of the Sherman Act, Against Defendant Participants in the Aon-centered Conspiracy..........................................................120

COUNT VIII........................................................................................................123

Violation of State Antitrust Laws All Plaintiffs Against All Broker Defendants ...........................................................................................123

COUNT IX...........................................................................................................127

Pursuant to ERISA Sections 1109 and 502(a)(2) ERISA Employer Subclass and ERISA Employee Subclass Against Insurer Defendants..............127

COUNT X.............................................................................................................130

Pursuant to ERISA Section 502(a)(3) ERISA Employer Subclass and ERISA Employee Subclass Against Insurer Defendants....................................130

COUNT XI...........................................................................................................130

Violation of State Antitrust Laws Non-ERISA Employee Subclass and Non-ERISA Employer Subclass Against Insurer Defendants............................130

COUNT XII ........................................................................................................135

Common Law Breach of Fiduciary Duty; All Plaintiffs Against the Broker Defendants ...........................................................................................135

COUNT XIII........................................................................................................138

Aiding and Abetting Breach of Fiduciary Duty Non-ERISA Employee Subclass and Non-ERISA Employer Subclass Against Insurer Defendants .......138

COUNT XIV........................................................................................................139

**Page**

Unjust Enrichment All Plaintiffs Against All Broker Defendants......................139

COUNT XV .........................................................................................................140

Unjust Enrichment Non-ERISA Employer Subclass and Non-ERISA
Employee Subclass Against Insurer Defendants ...................................140

prayer for relief ................................................................................................142

JURY DEMAND ................................................................................................146

Plaintiffs, by and through their undersigned attorneys, submit the following Consolidated Amended Class Action Complaint (the "Complaint"), upon their own knowledge, or where there is no personal knowledge, upon information and belief.

## NATURE OF THE ACTION

1.     This class action challenges Defendants' anti-competitive scheme and unlawful conspiracy to fraudulently market and sell insurance products and related services to and/or through employee benefit plans.   This nation's largest insurance brokers ("Broker Defendants") and insurance companies ("Insurer Defendants") (collectively "Defendants," described below) have conspired to manipulate the insurance market through undisclosed profit-sharing agreements and kickbacks in an effort to capture larger market shares and profits to the detriment of their unwitting clients and insureds.  Although the Broker Defendants are hired to find the best insurance coverage at the lowest price, the Insurer Defendants pay the Broker Defendants undisclosed or inadequately disclosed Contingent Commissions, Communication Fees, and other compensation so that the Broker Defendants will steer their clients to them.  Through these kickbacks, the Insurer Defendants have co-opted the Broker Defendants' fiduciary duties and responsibilities to their clients, and breached their own duties under the Employee Retirement Income Security Act of 1974 ("ERISA").

2.     On behalf of Plaintiffs and all those similarly situated, this nationwide class action seeks disgorgement of all undisclosed profit sharing and kickbacks, damages (including RICO and antitrust treble damages), punitive damages and prospective injunctive relief to put an end to defendants' fraudulent and anti-competitive practices.

3.     This action is brought by Plaintiffs representing two separate Classes, each with a subclass:

(a)     an Employee Class and a Non-ERISA Employee Subclass (together, the "Employee Plaintiffs"), and

(b)      an Employer Class and a Non-ERISA Employer Subclass (together, the "Employer Plaintiffs") (Employee and Employer Plaintiffs are collectively referred to as "Plaintiffs").

4.      The Employee Plaintiffs bring this nationwide Class action on behalf of themselves and all other ERISA and non-ERISA plan employees that have acquired or paid for, in full or in part, an insurance product and related services from the Insurer Defendants as part of an employee benefit plan with the direct or indirect help, assistance or involvement of any of the Broker Defendants and/or have paid for supplemental insurance coverage made available to the Employee Class by an Insurer Defendant and Broker Defendant in addition to the basic employee benefit plan insurance (the "Employee Classes").

5.      The Employer Plaintiffs bring this nationwide class action on behalf of themselves and all other ERISA and non-ERISA plan employers that have acquired or paid in full or in part for an insurance product for an employee benefit plan from the Insurer Defendants with the direct help, assistance or involvement of any of the Broker Defendants (the "Employer Classes").   The Employee and Employer Classes shall be referred to as the "Classes" or "Class Members."

6.      The Broker Defendants are insurance brokers that represent and advertise that they provide specialized advice, expertise and recommendations in the development, implementation and modification of employee benefit plans.  Their clients are all sizes of employers, associations and employees seeking to procure such products as group life and accidental death and dismemberment, long term disability, health, dental, vision and a supplemental insurance.  Plaintiffs use the Broker Defendants as their bargaining representatives to identify and determine which insurance products and services best fit their needs, and from which insurance carriers to purchase those products and services. The Broker Defendants also provide advice about the renewal or modification of insurance policies, and act as an intermediary between the employee benefit plan and the Insurer Defendants.

7.      Plaintiffs hire the Broker Defendants for their objective advice and their expertise in the complex area of employee benefit coverage.  As brokers, they owe fiduciary and other duties to Plaintiffs, including the duties to find superior insurance products at the lowest price, to put the interests of Plaintiffs and the Classes first, and to exercise the duties of loyalty, good faith, due care and full disclosure.

8.      Rather than providing independent and objective brokerage services and advice, the Broker Defendants have secretly conspired with the Insurer Defendants to steer Plaintiffs and members of the Classes to the Insurer Defendants in exchange for undisclosed fees, commissions and other kickbacks from the Insurer Defendants.

9.      These undisclosed Contingent Commissions corrupt the market for insurance and turn the broker-client relationship on its head.  Indeed, while the Broker Defendants are supposed to represent their clients, their duties to their clients have been co-opted by the Insurer Defendants. Plaintiffs are misled into believing that they are receiving impartial advice and the most economical and appropriate insurance products and services that are designed for their individual needs, when, in fact, the broker is simply steering them towards an insurance company and its products in order to maximize the broker's own profit – even if it is not in its client's best interest.

10.     The Risk and Insurance Management Society, Inc. ("RIMS") has acknowledged the effect that undisclosed Contingent Commissions have on the market:

> We believe that undisclosed contingency fees have the potential to compromise the very basis upon which this relationship is built.  In an effort to preserve the integrity of this relationship, RIMS strongly advocates for complete and full disclosure of compensation agreements without client request.

11.     In addition to the standard consulting fees or commissions, these Agreements provide that the Insurer Defendants will compensate the Broker Defendants based on: (a) the total volume of insurance placed by the Broker Defendants ("volume contingency"); (b) the renewal of that business ("persistency contingency"); and/or (c) its profitability (claims and loss ratios) ("profitability

contingency") (collectively "Contingent Commissions"). All of these factors are controlled by Defendants, who manipulate the insurance market to the detriment of Plaintiffs and the Classes. The Agreements are essentially profit-sharing agreements between and among Defendants and are one means through which Defendants implemented or effectuated their conspiratorial agreement.

12.     The Agreements constitute a blatant conflict of interest by all Defendants because the Broker Defendants have a financial interest in recommending only those insurance products offered by the Insurer Defendants. Also, they are financially motivated not to seek a reduction of premiums but to renew at a higher rate, and to discourage clients from filing policy claims to maximize profitability of the policies for purposes of calculating their Contingent Commissions.

13.     In addition to Contingent Commissions, the Broker Defendants have exacted compensation through other inadequately disclosed payments, namely "communication fees," "enrollment fees," "service fees," "finders fees" and/or "administration fees" (collectively, "Communication Fees").

14.     In connection with the basic insurance coverage offered to Plaintiffs and Class Members through their employers' benefit plans, the Insurer Defendants, through the Broker Defendants, offer directly to the employees optional supplemental insurance coverage, such as supplemental life or long-term disability. The undisclosed Communication Fees purportedly cover the Broker Defendants' costs in communicating with employees concerning the supplemental insurance coverage. The Employee Plaintiffs and the Employee Classes personally pay the premiums for this supplemental coverage, which is extremely profitable to the Broker Defendants because they receive Communication Fees. Supplemental coverage is also highly profitable for the Insurer Defendants because they can sell overpriced insurance coverage to a captive audience.

15.     The Insurer Defendants are willing and able to pay the Broker Defendants' Contingent Commissions, Communication Fees and other undisclosed kickbacks because it ensures

that the Insurer Defendants will maintain or increase their market share.  Plus, the Insurer Defendants simply build these costs into their premiums anyway.  Plaintiffs and Class Members are unaware that the Insurer Defendants capture the undisclosed compensation by charging them higher premiums, which results in overpriced insurance compared to what would otherwise be available on the open competitive market.

16.     In recent years, the Agreements have yielded over a billion dollars in Contingent Commissions for the Broker Defendants.  In 2003 alone, the Marsh Defendants and Aon Defendants (defined below) collected at least $850 million and $190 million, respectively, in Contingent Commissions.  Defendant Gallagher received Contingent Commissions of $39.5 million in 2004, $32.6 million in 2003, and $25.2 million in 2002.  Between 2000 and 2004, the ULR Defendants (defined below) collected $40,271,432 in Contingent Commissions and $18,986,403 in communications fees, representing over 62% of its total income during that time.

17.     As part of their scheme and conspiracy to manipulate the insurance market, Defendants also engage in an industry practice known as "low-hanging fruit," whereby the Insurer Defendants flip existing clients, with whom they have direct contracts (no broker involvement), to the Broker Defendants, enabling them to earn commissions.  In exchange the Broker Defendants agree to steer additional business to the Insurer Defendants.

18.     Defendants also have engaged in bid-rigging.  The Broker Defendants manipulate the bidding process by leaking their clients' current rates and policy terms to carriers that the Broker Defendants handpick to bid for the clients' accounts.  The Broker Defendants request other Insurer Defendants to submit artificially inflated or otherwise false or misleading bids in return for promised future business, ensuring that the predetermined preferred insurers win the business.  Bid-rigging allows the Broker Defendants to maximize their Contingent Commission income and the Insurer

Defendants to, *inter alia*, lock in renewal business at above market rates and capture larger market share.

19.    Further, the Defendants have entered into unlawful tying agreements under which the Broker Defendants steer primary insurance contracts to the Insurer Defendants on the condition that those insurers also use the Broker Defendants (or their reinsurance broker subsidiaries) for placing their reinsurance coverage with reinsurance carriers (many of whom are related entities) and thereby reaping additional improper revenue.  This unlawful tying also has the effect of increasing the price of reinsurance, with the increased costs being passed on to the Insurer Defendants' customers, including Plaintiffs and Class Members.

20.    Defendants' conduct has eliminated the trust and client-focus necessary for the proper conduct of the broker-client and insurer-insured relationship.  Defendants' conduct also has reduced the procurement of insurance to the level one would expect of a fungible commodity.  In essence, through their illicit conduct,  Defendants are colluding to place insurance to improperly maximize their own profit, rather than arriving at the selection of an insurance product and related services as part of a relationship based on trust and driven by what is in the clients' best interests.

(a)    This sentiment was recently expressed by Joseph Plumeri, the CEO of defendant Willis before an industry trade organization: "For too long, this business has been about the placement only – what I've come to call manufacturing . . . .  But this approach leads to the commoditization of insurance, and I don't think anyone in this room would equate insurance to soy beans."

21.    As a result of defendants' anti-competitive conduct and fraudulent scheme, Plaintiffs and the Classes have suffered substantial damages.  The Classes have been injured in fact by: (a) not being made aware of the Defendants' conflicts of interest, their undisclosed compensation arrangements and being afforded access to a competitive marketplace; (b) paying undisclosed fees

and other charges embedded in the premiums of the insurance products; (c) receiving insurance that was more expensive, provided reduced benefits, and/or was otherwise inferior to other available insurance products; (d) not being reimbursed for money improperly collected by insurers to pay kickbacks to brokers; and (e) not receiving the full benefits of their employment compensation or their compensation package offered to employees.

**JURISDICTION AND VENUE**

22.    This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962, 1964, and 28 U.S.C. §§1331, 1332, 1367 and 15 U.S.C. §15.  This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §1965(b) and (d).  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

23.    Venue is proper in this District pursuant to 18 U.S.C. §1965(a) because all the Defendants are found, do business, or transact business in this District.  In addition, venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

24.    The trade and interstate commerce relevant to this action is the purchase and sale of insurance policies and related services.

25.    During all or part of the period in which the events described herein, each of the Defendants sold insurance and/or provided advice regarding the procurement or renewal of insurance or claims administration relating thereto to Plaintiffs and other Class Members in a continuous and uninterrupted flow of interstate commerce.

26.    The activities of Defendants and their co-conspirators, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

## PARTIES

**A.      THE PLAINTIFFS**

> **(1)      Employee Plaintiffs**

27.      Plaintiff David Boros ("Boros") is a resident of Irvine, California.  Plaintiff Boros purchased group life insurance through the UCLA Alumni Association ("UCLA"), which retained Marsh to act as the broker for it and its alumni.  Marsh placed the life insurance purchased by Boros with defendant Hartford (as defined below) effective June 2000.  Plaintiff Boros was damaged by Defendants' conduct as alleged herein.

28.      Plaintiff Cynthia C. Brandes ("Brandes") is a resident of Maricopa County, Arizona, and has been employed by Intel, Inc. ("Intel") for over 20 years.  On behalf of its employees, including Brandes, Intel retained defendant ULR to act as a broker and advisor in connection with its ERISA employee benefit plan.  ULR placed Intel's group medical and dental plans with defendant CIGNA.  Plaintiff Brandes participated in these plans and contributed to the premium payments for this insurance through payroll deductions.  In addition to the basic employee benefit plans sponsored by Intel, Brandes sold supplemental insurance from defendant Unum, which also was brokered by ULR.  Plaintiff Brandes purchased supplemental life insurance and supplemental and dependent accidental death and dismemberment insurance from Unum and has paid 100% of the premiums for this insurance through payroll deductions.  At no time did ULR advise Brandes that it received Contingent Commissions and Communication Fees and other improper compensation from Cigna and Unum in connection with her insurance purchases.

29.      Plaintiff Alicia A. Pombo ("Pombo") is a resident of Los Angeles County, California, and was employed by BP Corporation North America Inc. ("BP Corp.") from July 16, 1984 until July 2003.  On behalf of its employees, including Pombo, BP retained defendant ULR to act as a broker and advisor in connection with its ERISA employee benefit plan.  ULR placed BP's basic life

insurance and occupational accidental death insurance plans with defendant MetLife (defined below). While she was a BP employee, Pombo received basic life insurance coverage through this plan and contributed to the premium payments for this insurance through payroll deductions. In addition to the basic life insurance plan sponsored by BP, Pombo was sold supplemental group life insurance from defendant MetLife, which also was brokered by ULR. Plaintiff Pombo purchased supplemental life insurance for herself and her two children. While a BP employee, she contributed to the premium payments for this insurance through payroll deductions. Since terminating her employment with BP, Pombo has kept these policies in force and has paid 100% of the premiums for this insurance. At no time did ULR advise Pombo that it had received Contingent Commissions, Communication Fees and other improper compensation from MetLife in connection with her insurance purchases.

30.     Plaintiff MaryAnn Waxman ("Waxman") is a resident of Boulder, Colorado, and has been employed by IBM for the past five years. On behalf of its employees, including Waxman, IBM retained a subsidiary of defendant Marsh (defined below) to act as a broker and advisor in connection with its ERISA employee benefit plan. Marsh placed IBM's supplemental group life insurance, dependent group life insurance and accidental death and dismemberment insurance with defendant MetLife. Plaintiff Waxman has purchased supplemental life insurance and accidental death and dismemberment insurance from MetLife and has paid 100% of the premiums for this insurance. At no time did Marsh or MetLife advise Waxman of the Contingent Commissions, Communication Fees and other improper compensation MetLife paid Marsh in connection with her insurance purchases.

31.     Plaintiff Richard H. Kimball ("Kimball") is a resident of Harris County, Texas. Until 2004, Kimball was employed by the Houston Independent School District ("HISD"). HISD sponsors a non-ERISA employee benefit plan under which its employees can purchase insurance

products, including group health, vision and dental insurance, group life insurance, disability insurance and accidental death and dismemberment insurance. On behalf of its employees, HISD retained Mercer, a subsidiary of Marsh, to act as its broker and advisor in connection with its employee benefit plan. Marsh has placed insurance on behalf of HISD with, among others, CIGNA and Aetna for health insurance, Spectra for vision insurance and National Pacific for dental insurance. While employed at HISD, Kimball has received health, vision and dental insurance through HISD's plan and contributed to the premium payments for this coverage through payroll deductions.

32.     The Employee Plaintiffs have been injured by Defendants' conduct by, *inter alia*, having been denied the benefit of unbiased brokerage advice, directly or indirectly, having paid higher insurance premiums and/or receiving lesser benefits and having lost the opportunity to purchase insurance in a free and truly competitive marketplace.

### (2)     Employer Plaintiffs

33.     Plaintiff City of Danbury, Connecticut ("Danbury") is a municipal corporation organized under the laws of the State of Connecticut. In January 2002, Danbury retained defendant Aon to act as a broker and advisor in connection with its non-ERISA employee benefit plan. In its response to Danbury's Request for Quotation, Aon agreed to perform an analysis in order to "uncover areas for improvement in [Danbury's] current programs whether they are financial, benefit structure, service or some combination of the three." Aon also agreed in its Letter of Understanding with Danbury that Aon's services would include review of current and proposed benefit program and financial arrangements in order to identify "cost efficiencies" and "obtain lower cost of coverage." Aon placed insurance on Danbury's behalf with, among others, Anthem for health Insurance, defendant MLIC (defined below) for life, dental, long term disability, and accidental death and dismemberment insurance. At Aon's urging, Danbury agreed that Aon would be compensated for its

services through commissions paid by insurers.  However, Aon did not disclose and/or inadequately disclosed that it received Contingent Commissions and engaged in other improper conduct with insurers that created clear conflicts of interest.  Indeed, despite requests from Danbury representatives, Aon refused to provide detailed information regarding the commissions it received as a result of placing insurance on behalf of Danbury, saying that it was not possible to do so.

34.     Plaintiff Connecticut Spring & Stamp Company ("Connecticut Spring") is a corporation organized under the laws of the State of Connecticut and has its headquarters in Farmington, Connecticut.   Connecticut Spring manufactures metal stampings, springs and subassemblies for use in a number of industries.  Connecticut Spring retained a subsidiary of defendant Marsh & McLennan to help select and place insurance for Connecticut Spring's ERISA employee benefit plans.  Marsh placed insurance on Connecticut Spring's behalf with, among others, ConnectiCare, Inc., for heath insurance; Delta Dental for dental insurance; and Highmark for life and disability insurance.  Plaintiff Connecticut Spring was damaged by Defendants conduct as alleged herein.  However, Marsh did not disclose and/or inadequately disclosed to Connecticut Spring that it received Contingent Commissions from insurers that created clear conflicts of interest.

35.     Plaintiff Fire District of Sun City West ("Fire District") is a municipal fire department located in Sun City West, Arizona.  Fire District operates three fire stations through which it provides fire protection and emergency services to the community of Sun City and surrounding portions of Maricopa County, Arizona.  Fire District utilized Marsh's services in selecting and placing insurance for its non-ERISA employee benefit plans.  Marsh placed insurance on the Fire District's and its employees behalf with, among others, the following insurers:  MetLife for dental insurance, life insurance and accidental death and dismemberment insurance;  Ameritas Life Insurance Corp. for dental insurance;  United Healthcare Ins. Co. for health insurance;  Blue Cross Blue Shield of Arizona for health insurance;  Standard Insurance for long term disability insurance;

Reliance Standard for life insurance, accidental death and dismemberment insurance, and long term disability insurance; and Guarantee Mutual Life Co.  However, Marsh did not disclose that it has received Contingent Commissions, Communication Fees and other compensation from insurers and engaged in other improper conduct that created clear conflicts of interest.

36.     Plaintiff Golden Gate Bridge, Highway and Transportation District ("Golden Gate") is a multi-county political subdivision of the State of California based in the city and county of San Francisco.  It operates the Golden Gate Bridge and two public transit systems: the Golden Gate Transit bus system and the Golden Gate Ferry.  Between 1994 and 2002,[1] Golden Gate retained William M. Mercer, Inc. (now Mercer Human Resource Consulting LLP for brokerage services. Mercer placed insurance on Golden Gate's behalf with, among others, the following insurers: Principal Mutual Life Insurance Company for life and accidental death and disability insurance; Blue Shield of California, Kaiser Health Plan; Ace as its medical stop loss insurer; and Health Plan of the Redwoods for health insurance.  However, Mercer did not disclose and/or inadequately disclosed that it received Contingent Commissions, Communication Fees and other compensation from insurers and engaged in other improper conduct that created clear conflicts of interest.

37.     Employer Plaintiffs have been injured by Defendants' conduct by, *inter alia*, having been denied the benefit of unbiased brokerage advice, having paid higher insurance premiums and/or received lesser benefits for the plans that it sponsors, and having lost the opportunity to purchase insurance in a free and truly competitive marketplace.

---

[1]     Towers Perrin replaced Mercer as Golden Gate's broker in July 2002.

**B.**     **THE DEFENDANTS**

**(1)**     **Broker Defendants**

38.     Defendant Aon Corporation ("Aon Corp.") is incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois.  Aon Corp. is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

39.     Defendant Aon Consulting Inc. ("Aon Consulting") is a wholly-owned subsidiary of defendant Aon Corp., and is headquartered at 200 East Randolph Street, Chicago, IL 60601.  Aon Consulting provides employee benefit consulting services to employers of all sizes.  Aon Corp. and Aon Consulting shall be referred to collectively herein as "Aon" or "Aon Defendants."

40.     Defendant Aon Broker Services, Inc. ("Aon Broker") is a corporation incorporated under the laws of Illinois and has its corporate headquarters in Chicago, Illinois.  Aon Broker is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

41.     Defendant Aon Risk Services Companies, Inc. ("Aon Risk") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois.  Aon Risk is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

42.     Defendant Aon Risk Services Inc. U.S. ("Aon Risk U.S.") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois.  Aon Risk U.S. is a subsidiary of and/or affiliated with Aon Corp. and Aon Risk, and provides customers with risk management and insurance brokering services.

43.     Aon Group, Inc. ("Aon Group") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois.  Aon Group is a subsidiary of

and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

44.     Aon Services Group, Inc. ("Aon Services") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois.  Aon Services is a subsidiary of and/or affiliated with Aon Corp. and Aon Group, and provides customers with risk management and insurance brokering services.

45.     Aon Re, Inc. ("Aon Re") is a corporation incorporated under the laws of Illinois and has its corporate headquarters in Chicago, Illinois.  Aon Re is a subsidiary of Aon Corp. and provides customers with reinsurance and brokerage services.

46.     Defendant Arthur J. Gallagher & Co. ("Gallagher") is incorporated under the laws of Delaware, its shares are listed and publicly traded on the New York Stock Exchange, and its corporate headquarters is in Itasca, Illinois.  Gallagher provides customers with risk management and insurance brokerage services.

47.     Defendant Gallagher Benefit Services, Inc. ("GBS") is a Delaware corporation with its principal place of business at 2 Pierce Place, Itasca, IL 60143.  A wholly-owned subsidiary of defendant Gallagher, GBS provides employee benefits consulting, planning, and acquisition services to employers.  Defendants Gallagher and GBS shall be referred to collectively as "Gallagher" or the "Gallagher Defendants."

48.     Defendant BB&T Corporation ("BB&T Corp.") is incorporated under the laws of North Carolina, its shares are listed and publicly traded on the New York Stock Exchange, and its corporate headquarters is in Winston Salem, North Carolina.  BB&T Corp. conducts its business operations primarily through its commercial banking subsidiaries, including Branch Banking and Trust Company.  Through its subsidiaries and affiliates, BB&T Corp. provides customers with risk management and insurance brokerage services.

49.     Defendant BB&T Insurance Services, Inc. ("BB&T Insurance") is incorporated under the laws of North Carolina and its corporate headquarters is in Raleigh, North Carolina.  BB&T Insurance is a principal operating subsidiary of parent BB&T Corp.'s largest subsidiary, Branch Bank.  BB&T Insurance provides customers with risk management and insurance brokerage services.  Defendants BB&T Corp. and BB&T Insurance shall be referred to collectively as "BB&T" or the "BB&T Defendants."

50.     Defendant Brown & Brown, Inc. ("Brown") is incorporated under the laws of Florida and its corporate headquarters is in Daytona Beach, Florida.  Brown's shares are listed and publicly traded on the New York Stock Exchange.  Brown provides customers with risk management and insurance brokerage services.

51.     Defendant Brown & Brown Insurance Benefits, Inc. ("Brown Benefits") is a Florida corporation located in Daytona Beach, Florida.  Brown Benefits promotes and advertises itself as a national consulting company that provides employee benefit brokering advice.  Defendants Brown and Brown Benefits shall be referred to collectively as "Brown."

52.     Defendant Hilb Rogal, & Hobbs Company ("Hilb Rogal") is incorporated under the laws of Virginia and its corporate headquarters is in Glen Allen, Virginia.  Hilb Rogal's shares are listed and publicly traded on the New York Stock Exchange.  Hilb Rogal provides customers with risk management and insurance brokerage services and describes itself as the nation's seventh largest insurance and risk management intermediary.

53.     Defendant Frank F. Haack & Associates ("Haack") is an insurance brokerage and employee benefits consulting operation incorporated under the laws of the State of Wisconsin.  In 2004 Haack was acquired by Hilb Rogal and is part of Hilb Rogal's Midwest region.

54.     Defendant O'Neill, Finnegan & Jordan Insurance Agency, Inc. ("OFJ") is incorporated under the laws of Massachusetts and its principal place of business is in Boston,

Massachusetts.  OFJ provides employee benefits consulting and brokerage services to public and private employer entities.  Defendants Hilb Rogal, Haack, and OFJ shall be referred to collectively as "Hilb," "HRH," the "Hilb Defendants" or the "HRH Defendants."

55.     Defendant HUB International Limited ("HUB") is incorporated under the laws of Ontario, Canada and has its corporate headquarters in Chicago, Illinois.  Its shares are listed and publicly traded on the New York Stock Exchange.  HUB provides customers with risk management and insurance brokerage services.

56.     Defendant Talbot Financial Corporation ("Talbot") is incorporated under the laws of the State of Washington and has its corporate headquarters in Albuquerque, New Mexico.  Talbot is a subsidiary of HUB.  As described by Talbot itself, the "Talbot Financial Corporation is a diversified distributor of financial products and services, specializing in insurance and annuities. [Talbot is] one of the nation's top twenty insurance brokers and one of the country's largest distributors of investment products through banks, thrifts, and credit unions."  Defendants HUB and Talbot shall be referred to collectively as "HUB" or the "HUB Defendants."

57.     Defendant Marsh & McLennan Companies, Inc. ("MMC" or "Marsh & McLennan") is incorporated under the laws of Delaware and has its corporate headquarters in New York City, New York.  Its shares are listed and publicly traded on the New York Stock Exchange.  MMC is a global corporation and the parent of various subsidiaries that provide clients with analysis, advice and transactional services in connection with the procurement of insurance, as well as investment management and consulting.

58.     Defendant Marsh Inc. ("Marsh Inc.") is a corporation incorporated under the laws of Delaware and its corporate headquarters is in New York, New York.  Marsh Inc. is a primary subsidiary of MMC and an entity through which risk and insurance services, such as insurance and

reinsurance brokerage, are provided.  Marsh Inc. is considered a MMC operating unit and provides insurance brokerage through various subsidiaries of its own, including Marsh USA Inc.

59.    Defendant Marsh USA, Inc. is incorporated in Delaware and provides customers with risk management and insurance brokering services.

60.    Defendant Mercer, Inc. ("Mercer") is incorporated under the laws of the State of Delaware and its corporate headquarters is in New York, New York.  Mercer is considered a MMC operating unit and operates as a "family" of specialized consulting firms.

61.    Defendant Mercer Human Resource Consulting, LLP ("Mercer Human Resource") is a corporation organized under the laws of the state of Delaware, and maintains an office in Norwalk, Connecticut.  As a subsidiary of Mercer, Inc., it provides consulting regarding, among other things, employee benefit plans.

62.    Defendant Seabury & Smith, Inc. ("Seabury & Smith") is a corporation incorporated under the laws of Delaware and its corporate headquarters is in New York, New York, and is one of a number of corporations operating under the "Seabury & Smith, Inc." name.  Seabury & Smith is a subsidiary of MMC and provides brokerage services for employee benefits programs through its Marsh@WorkSolutions[SM] unit, as well as Marsh Affinity Group Services and Marsh Advantage America division.

63.    Defendants Marsh & McLennan, Marsh Inc., Marsh USA Inc., Mercer, Mercer Human Resource and Seabury & Smith shall be referred to collectively herein as "Marsh" or the "Marsh Defendants."

64.    Defendant Universal Life Resources ("ULR") is a California Limited Partnership with its principal place of business in California.  It is located at 12264 El Camino Real, Suite 303, San Diego, California.  ULR promotes and advertises itself as a national group life, accident and disability consulting company that provides broker services to its clients – employers ands

employees.  ULR advertises through brochures, marketing materials, solicitations and its website that it helps "employers develop and implement improved plans that reduce costs for both the employer and its employees."  Effective July 10, 2005, ULR began "transitioning" its consulting, service and support responsibilities for its customers to Trion Group, Inc.  After October 31, 2005, ULR claims it will no longer assume responsibility for its clients' benefit plans.

65.     Defendant ULR Insurance Services, Inc. ("ULR Insurance"), is a California corporation that maintains its home offices and principal place of business in San Diego, California.

66.     Defendant Benefits Commerce is a California corporation.  It shares its corporate headquarters with ULR at 12264 El Camino Real, Suite 303, San Diego, California 92130.  Benefits Commerce is also an employee benefits consultant.

67.     Defendant Doug P. Cox is a resident of California.  Cox is the principal shareholder and President of defendant Universal Life Resources, Inc.  Defendants ULR, ULR Insurance Services, Inc., Benefits Commerce and Doug Cox shall be referred to collectively as "ULR" or the "ULR Defendants."

68.     Defendant USI Holdings Corporation ("USI") is incorporated under the laws of Delaware and has its corporate headquarters in Briarcliff Manor, New York.  Its shares are listed and publicly traded on the NASDAQ National Market.  USI provides customers with risk management and insurance brokerage services.

69.     Defendant USI Consulting Group ("USI Consulting") is headquartered in Glastonbury, Connecticut. USI Consulting is a subsidiary of USI Holdings Corporation.  USI Consulting is one of the nation's largest benefits consulting firms serving mid-sized organizations offering services in employee benefits.

70.     Defendant USI Insurance Services Corporation ("USI Insurance") is the sixth largest insurance brokerage firm in the nation with its headquarters in New York, New York.  USI

Insurance is a subsidiary of USI Holdings Corporation.  USI Insurance is a nationwide brokerage/consulting firm specializing in commercial insurance, employee benefits and financial services.  Defendants USI, USI Consulting and USI Insurance shall be referred to collectively as "USI."

71.     Defendant Wells Fargo & Company ("Wells Fargo") is incorporated under the laws of Delaware and has its corporate headquarters in San Francisco, California.  Its shares are listed and publicly traded on the New York Stock Exchange.  Wells Fargo provides customers with risk management and insurance brokerage services through two separate insurance operations: (a) Wells Fargo Insurance Services, and (b) Acordia, Inc., a Wells Fargo subsidiary.

72.     Defendant Acordia, Inc. ("Acordia") is incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois.  Acordia provides customers with risk management and insurance brokerage services.  Acordia is a subsidiary of defendant Wells Fargo.  Defendants Wells Fargo and Acordia shall be referred to collectively as "Wells Fargo."

73.     Defendant Willis Group Holdings Limited ("Willis Group") is incorporated under the laws of Bermuda and its corporate headquarters is in London, England.  Its shares are listed and publicly traded on the New York Stock Exchange.  Willis Group is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

74.     Defendant Willis North America, Inc. ("Willis NA") is incorporated under the laws of Delaware and has its corporate headquarters in New York, New York.  Willis NA is a subsidiary of Willis Group, and provides customers with risk management and insurance brokering services.  Willis Group and, in turn, Willis NA provide their insurance brokering services and operate principally through the offices of their subsidiaries and affiliates.  Defendants Willis Group and Willis NA shall be referred to collectively as "Willis."

(2)     **Insurer Defendants**

75.     Defendant ACE Limited ("ACE Ltd.") is incorporated under the laws of the Cayman Islands, its shares are listed and publicly traded on the New York Stock Exchange, and its corporate headquarters is in Hamilton, Bermuda.  ACE Ltd. owns ACE INA Holdings, Inc.  As described by ACE Ltd., the "ACE Group of Companies is one of the world's largest providers of insurance and reinsurance."

76.     Defendant ACE USA is an operating company of ACE INA, incorporated under the laws of Delaware and headquartered in Philadelphia, Pennsylvania.  ACE USA operates through several insurance companies using a network of offices throughout the United States.  ACE USA's operations "provide a broad range of P&C insurance and reinsurance products to a diverse group of commercial and non-commercial enterprises and consumers.  These products include excess liability, excess property, workers' compensation, general liability, automobile liability, professional lines, aerospace, accident and health (A&H) coverages and claim and risk management products and services."

77.     Defendant Insurance Company of North America ("INA") is a subsidiary of ACE.  INA is incorporated under the laws of the State of Pennsylvania and has its headquarters in Philadelphia, Pennsylvania.  INA offers life and disability insurance.  Defendants ACE Ltd., ACE USA and INA shall be referred to collectively as "ACE" or the "ACE Defendants."

78.     Defendant American International Group, Inc. ("AIG Inc.") is incorporated under the laws of Delaware and its corporate headquarters is in New York, New York.  AIG Inc.'s shares are listed and publicly traded on the New York Stock Exchange.

79.     Defendant AIG Life Insurance Company ("AIG Life") is headquartered in Wilmington Delaware.

80. Defendant American Home Assurance Co. ("American Home") is incorporated under the laws of New York and is owned by defendant AIG. Defendants AIG Inc., AIG Life and American Home shall be referred to collectively as "AIG" or the "AIG Defendants."

81. Defendant Connecticut General Life Insurance Company ("Connecticut General") is a publicly held subsidiary of CIGNA Corporation and is incorporated and headquartered in Connecticut. Connecticut General had over $6.3 billion in net premiums written as of July 2004.

82. Defendant Life Insurance Company of North America ("LINA") is a subsidiary of CIGNA Corporation, incorporated and headquartered in Pennsylvania. LINA operates as an underwriter of various lines of insurance, including life insurance. Defendants Connecticut General and LINA shall be referred to collectively as "CIGNA" or the "CIGNA Defendants."

83. Defendant Hartford Financial Services Group, Inc. ("Hartford Financial") is one of the largest investment and insurance groups in the United States. Hartford Financial is incorporated under the laws of Delaware, its shares are listed and publicly traded on the New York Stock Exchange, with its corporate headquarters in Hartford, Connecticut. Hartford Financial represents that it "is a leading provider of investment products; life insurance and group and employee benefits; automobile and homeowners products; and business insurance."

84. Defendant Hartford Life & Accident Insurance Company ("Hartford Life & Accident") is a wholly owned subsidiary of defendant Hartford Financial. Hartford Life & Accident is incorporated under the laws of Connecticut and is headquartered in Simsbury, Connecticut. Hartford Life & Accident provides life, medical stop loss, and supplemental health insurance to businesses and individuals. Hartford Life & Accident Insurance had over $2.2 billion in net written premiums as of July 2004.

85. Defendant Hartford Life Group Insurance Company ("Hartford Group") is a wholly owned subsidiary of defendant Hartford Financial with its headquarters in Chicago, Illinois. Hartford Group provides group accident and health insurance to employers.

86. Defendant Hartford Life Insurance Company ("Hartford Life") is a subsidiary of Hartford Financial. Hartford Life is incorporated under the laws of Connecticut, and is headquartered in Simsbury, Connecticut. Hartford Life offers group life insurance to employers and had over $9.7 billion in net written premiums as of July 2004. Hartford Group paid at least $434 million in commissions in 2003, and its 2004 revenue exceeded $5.6 billion. Defendants Hartford Financial, Hartford Life & Accident, Hartford Group, and Hartford Life shall be referred to collectively as "Hartford" or the "Hartford Defendants."

87. Defendant Metropolitan Life Inc. ("MetLife Inc.") is a publicly held company, incorporated in the State of Delaware and headquartered in the State of New York. MetLife Inc. designs, develops, markets and sells insurance products for individuals and business clients.

88. Metropolitan Life Insurance Company ("MLIC") also is a publicly held company, incorporated and headquartered in New York. Metropolitan Life Insurance Company ranked first in the nation for net premiums written as of July 2004, with over $28 billion in net written premiums.

89. Defendant Paragon Life Insurance Company ("Paragon") is incorporated under the laws of the State of Missouri with its corporate headquarters in St. Louis, Missouri. Paragon is a subsidiary of MetLife Inc. Paragon offers group and supplemental life insurance products. Defendants MetLife Inc., MLIC and Paragon shall be referred to collectively as "MetLife" or the "MetLife Defendants."

90. Defendant Prudential Financial, Inc. ("Prudential Financial") is a publicly held company incorporated in the State of New Jersey and headquartered in Newark, New Jersey.

Prudential Financial designs, develops, markets and sells insurance products for individuals and business clients.

91.    Defendant Prudential Insurance Company of America ("Prudential Insurance") is a subsidiary of Prudential Financial.  Prudential Insurance is incorporated in the State of New Jersey, with its headquarters in Newark, New Jersey.  Prudential Insurance offers life insurance and annuities.  It ranked fourth in the nation for net premiums written – nearly $14 billion – as of July 2004.  Defendants Prudential Financial and Prudential Insurance shall be referred to collectively as "Prudential" or the "Prudential Defendants."

92.    Defendant UnumProvident Corporation ("UnumProvident") is a publicly held company incorporated in the State of Delaware with its headquarters in Tennessee.  UnumProvident is a leading provider of group long term, short term and individual disability income products in the United States.  Through its subsidiaries, UnumProvident claims to insure more than 25 million people.  UnumProvident had over $2.7 billion in net premiums written as of July 2004.

93.    Defendant Provident Life and Accident Insurance Company ("Provident") is a subsidiary of UnumProvident.  Provident is a Tennessee corporation, with its headquarters in Chattanooga, Tennessee. Provident provides disability, life and accident insurance and services to individuals, both directly and through their employers.

94.    Defendant Unum Life Insurance Company of America ("ULICA") is a wholly owned subsidiary of UnumProvident.  Headquartered in Portland, Maine, ULICA provides group and long-term disability insurance, employee benefits and individual disability insurance.  Defendants UnumProvident, Provident and ULICA shall be referred to collectively as "Unum" or "UnumProvident."

## FACTUAL ALLEGATIONS

### A.    THE EMPLOYEE BENEFITS INSURANCE BROKERAGE MARKET

#### (1)    Employee Benefit Programs

95.    Employee benefit programs are integral to the success of American businesses.  The overwhelming majority of Americans purchase insurance through their employers.  Employers seek to offer lucrative benefit plans to recruit and retain employees in a highly competitive marketplace.  In a 2004 study conducted by MetLife, 65% of employees reported benefits as an extremely important factor in making employment decisions, second only to job satisfaction.  The Broker Defendants recognize this and use it in their marketing.  For example, Broker Defendant Haack acknowledges that, "the right kind of compensation package can attract and retain the best employees."  Haack also notes that employee turnover costs can be exorbitant – "the average cost of turnover is 25% of an employee's annual salary plus 25% of the cost of benefits.  Benefits can amount to 30% of wages."

96.    Given the importance of employee benefit plans, employers typically hire insurance brokers, agents, producers or consultants ("brokers") to advise them how to design, obtain and modify their employee benefit insurance programs offered to their employees and prospective employees.

97.    Employee benefit plans typically include group life, accidental death and dismemberment, long-term disability, group health, vision and/or dental insurance.  In addition to basic or regular coverage provided under the plan, employees are marketed by Defendants' supplemental coverage, particularly supplemental life and disability insurance, including group universal life.  The Broker Defendants received Communication Fees and other compensation on the supplemental coverage.

98.     The Broker Defendants and Insurer Defendants dominate the employee benefits insurance market.  In controlling the employee benefits insurance market and participating in the anticompetitive conduct, Broker Defendants and Insurer Defendants at times acted against their individual economic interests.

**(2)     Defendants' Fiduciary Duties and Relationship of Trust and Confidence with Plaintiffs and Class Members**

**(a)     The Broker Defendants Are Fiduciaries**

99.     The Broker Defendants represent that they are highly skilled and independent insurance brokerage experts that possess the special knowledge and expertise necessary to interpret and understand the complex and sophisticated business risks and employee benefits needs faced by their clients and to determine which corresponding insurance products and insurance companies best fit their clients' needs.

100.    Broker Defendants encourage their clients to rely on their widely purported knowledge, independence and expertise in procuring insurance coverage.  Broker Defendants counsel their clients concerning the complex and specialized insurance clients seek to purchase. Broker Defendants create a confidential and/or fiduciary relationship with their customers based on their role as brokers and their common, uniform representations to their clients, like plaintiffs, that they will provide unbiased, independent expert insurance brokering advice on the most efficient and cost effective insurance products available.

101.    The sole purpose of the Broker Defendants' role is to act on behalf of and provide Plaintiffs and Class Members with unbiased advice concerning the type, amount and level of insurance needed, as well as to provide sound and accurate advice and information regarding the insurance companies they recommend.

102.    Plaintiffs and other members of the Classes rely upon the sophistication and expertise of the Broker Defendants – derived from Broker Defendants' familiarity with the Insurance

Defendants, the overall marketplace, as well as customs and practices of the insurance industry – to make informed independent decisions when formulating strategies concerning their insurance needs. Plaintiffs and Class Members have therefore engaged the services of the Broker Defendants to assist them in meeting many different aspects of their insurance needs, including but not limited to insurance procurement and/or renewal and filing and processing claims on existing insurance policies.

103.     In their standard contracts with clients, including Plaintiffs and Class Members, the Broker Defendants agree that: (i) they will solely represent the interests of their clients in transactions with insurers; (ii) they will act on behalf of their clients in the selection and placement of insurance and the negotiation of terms; (iii) they will act on behalf of their clients in connection with the filing and processing of claims; and (iv) they will act as the exclusive insurance broker for their clients.

104.     Broker Defendants represent themselves as fiduciaries and, in fact, have created a fiduciary relationship with Plaintiffs and the Classes based on the trust imparted on them by Plaintiffs and the Classes and their perceived ability to provide unbiased, independent, and expert insurance brokerage advice.  Such representations are made through advertisements, brochures, internet websites and other promotional materials disseminated in interstate commerce, including through the United States mails and interstate wires.

105.     For example, Marsh's 2004 Annual Report highlights its "strengths" which include: "highly specialized knowledge, access to global insurance capacity, and industry expertise in all the major categories of risk."

106.     In responding to client questions, Marsh employees are instructed to respond: "Our guiding principle is to consider our client's best interest in all placements.  We are our clients' advocates and we represent them in negotiations.  We don't represent the [insurance companies]."

107.    Marsh's website states, "Our mission is 'To create and deliver risk services that make our clients more successful.'"  The website also adds:  "Our clients benefit from the total capabilities of Marsh, Inc. and Marsh & McLennan Companies, Inc . . . . This systematic structure provides a breadth and depth of risk solutions unavailable from any other single source."

108.    Aon's 2004 Annual Report states:  "Our clients trust us to provide expertise, value and innovative solutions.  Expertise is the foundation for our effectiveness . . . ."  The Report further states that "our clients value our expertise and trust that all work is done on their behalf."  Aon goes on to state that it "aims to be the world's most responsive, client-focused insurance and consulting services company in the world."  According to a sales brochure, Aon states that: "Our mission is simply this, 'To provide our clients with the highest level of service.'  Our employees work for you with your goals and objective always at the forefront."  Aon insists that its clients' goals are realized "by placing our clients first at all times."

109.    Similarly, Willis has included on its website a client bill of rights, which misleadingly states: "Willis represents the **_client's best interests_** through our client advocacy model.  Willis' global resources and services are committed to understanding the client's company, its industry and its individual needs.  Willis' customized recommendations and solutions will be driven by what is in the client's best interests.   This is the centerpiece of the value Willis provides its clients."[2]  Moreover, in Willis' Global Policy Manual, the company states that Willis associates "should act in good faith and in the interests of their clients at all times. . ." and that they should "provide objective and impartial advice in the interests of our clients."

---

[2]      Unless otherwise noted herein all emphasis is added.

110.    Likewise, Gallagher's "Client Commitment" document posted on its website states:

"*We always recommend that which is in the client's best interest, even if it diminishes our revenues*."

111.    Acordia's official website similarly describes Acordia's promise to provide open and honest advice to its clients:

Acordia's Commitment:

Acordia's core values center around doing what is ethical and what is right for the customer.  If it is right for the customer it is right for Acordia.  We are leaders during periods of change.  We maintain the highest standards with our customers and believe in taking the steps to follow these values:

1.    Value and reward open, honest, and two-way communication.

2.    Be accountable for and proud of your conduct and decisions.

3.    Do what's right for the customer.

4.    Talk and act with the customer in mind.

5.    Exceed the expectations of customers.

112.    Acordia's website further states that Acordia "[p]roved[es] our customers with full disclosure on the revenue, including Contingent Commissions we earn at the beginning of our relationship and at the time of policy renewal" and that it "mak[es] insurance placements in the best interest of our customers.

113.    Brown & Brown similarly describes itself on its website as "an independent insurance intermediary organization that provides a variety of insurance products and services to corporate, institutional, professional and individual clients."  Brown & Brown has represented that its services include "the efficient management of risk and its related costs, meeting the business insurance needs or companies ranging from small retail establishments to multinational corporations."

114.    ULR's website likewise boasts that "[t]he services we offer are unique and highly specialized."  It professes to objectively canvas a broad array of insurance companies for superior

yet economical insurance coverage.  And that it provides its "client and prospective clients the 'best in class' consulting information."  ULR's website also claims: "Our focus is to assist clients in the design, implementation and management of Group Life and Accident Insurance programs to achieve cost efficiencies and plan improvements."

115.    Hilb Rogal has represented "we make it our business to understand our clients' businesses, employees and risks, as well as the insurance and financial markets, so that we can find them the carriers and coverages that best fit their needs."  Its website states that "an insurance relationship, more than any other business relationship, is built on trust.  You either have it or you don't."  The website further warrants, "Specialist Knowledge: We use our knowledge to solve problems for the benefit of our clients.  From Fortune 500 companies to trade associations, individuals and small businesses, at HRH we provide tailor-made risk management solutions based on expert advice and customized risk assessment."

116.    BB&T's website similarly states that, its mission is "[h]elping our *Clients* achieve economic success and financial security" and its purpose is "providing excellent service to our clients, as our *Clients* are our source of revenues."

117.    In Willis' Global Policy Manual, the company states that Willis associates "should act in good faith and in the interests of their clients at all times . . ." and that they should "provide objective and impartial advice in the interests of our clients."

118.    Likewise, Gallagher's "Client Commitment" document posted on its website states that Gallagher will "always recommend that which is in the client's best interest, even if it diminishes our revenues."

119.    Employers like plaintiffs Danbury, Connecticut Spring, the Fire District, and Golden Gate, hire insurance brokers to advise them on how to design, obtain and modify their employee

benefit packages which may include group life, accidental death and dismemberment, long term disability, group health insurance, and dependant coverages.

120.    Plaintiffs and Class Members retain the Broker Defendants to locate insurance carriers that offer superior insurance coverage and benefits at the lowest possible price.  To do this, the Broker Defendants are to solicit quotes from insurers, present insurers' proposals to their clients, recommend the optimal proposal for their clients and represent the clients in negotiations with the insurer.

121.    As ULR outlines to its clients, the brokers' duties include the following:

- undertaking to "[b]uild an RFP to support plan and pricing objectives";

- distribute it to all "qualified carriers";

- gather "all pertinent financial documents" from the insurers;

- interview responsible insurer personnel;

- review the insurers' pricing methodology;

- "evaluate all RFP responses";

- use "proprietary ULR tools to facilitate . . . selection";

- help the client select the carrier; and

- "negotiat[e] the final terms and conditions."

122.    The Broker Defendants also provide advice about the renewal of insurance policies and act as an intermediary between the client and the insurance carrier.  The Broker Defendants further assist employers and employees in filing claims, making eligibility payments, and providing other support services.

123.    Upon being designated as consultant or broker of record, the Broker Defendants request and obtain confidential, proprietary, sensitive and personal information relating to their clients, including financial and medical information.

124.     For these services, the broker is typically paid a standard commission or an agreed-to fee by the employer and its employees through the employee benefit plan.  This is the only compensation that is disclosed to Plaintiffs and Class Members.  Employers pay a portion or all of the premiums to the insurance company for the selected basic coverages and/or services.  Employees may pay a portion of the premiums for the basic coverages and, as direct purchasers, pay the entire premium amount for any supplemental coverage they elect to purchase through the plan.

125.     The Broker Defendants are fully aware that the proposals they prepare and submit are intended for the benefit of their clients' employees.

126.     Defendants aggressively solicit employees, such as plaintiffs Boros, Brandes, Kimball, Pombo, and Waxman, to purchase expensive supplemental coverage, particularly supplemental life and disability insurance, which is paid for by the employee, typically through an employer-sponsored payroll deduction.

127.     Based on the conduct and representations described above, the Broker Defendants are common law fiduciaries to Plaintiffs and Class Members, and therefore owe Plaintiffs and Class Members: (a) a duty of loyalty to act in the best interests of their clients and to always put their clients' interests ahead of their own; (b) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Broker Defendants – including the duty to disclose the sources and amounts of all income they receive in or as a result of any transaction involving their clients; (c) a duty of care in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants; (d) a duty to provide impartial advice in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants – including to find superior coverage at the lowest price; and (e) a duty of good faith and fair dealing.

128.    Broker Defendants breached these duties by failing to disclose and accepting Contingent Commissions, Communication Fees, overrides, kickbacks and other compensation from the Insurer Defendants in exchange for steering business to them.  Thus, rather than providing objective, impartial advice which was in their clients' best interests, the Broker Defendants maximized their Contingent Commission and other compensation from kickbacks, at the expense of their clients.  Indeed, they were being compensated on both ends of the transaction but failed to disclose this to Plaintiffs and Class Members.

**(b)       The Insurer Defendants Are Fiduciaries**

129.    The Insurer Defendants are fiduciaries vis-à-vis ERISA Plaintiffs within the meaning of 29 U.S.C. §1002(21)(A) by virtue of their exercise of discretionary authority, control and responsibility over the management and disposition of plan assets.  The employee benefit plans' asset is a group insurance policy issued by the Insurer Defendants.  The premiums collected from employee participants and employer sponsors are also assets of the Plans.  The Insurer Defendants retain authority to determine whether a claim is paid and are ERISA fiduciaries by virtue of such authority.  The Insurer Defendants also assume some of the duties associated with plan administration, such as providing notice and disclosure of information required under ERISA.

130.    The Insurer Defendants breached these duties when, *inter alia*, they agreed or conspired to pay the ULR Defendants undisclosed or inadequately disclosed compensation in the form of overrides, Communication Fees, and other forms of remuneration in connection with Plaintiffs' and the Class Members' employee benefit plans.  These fees were built into the cost of the policies and resulted in higher premium costs to Plaintiffs and Class Members.  These fees are not reasonable expenses related to services needed for administering the plan.

131.    The Insurer Defendants concealed or failed to disclose compensation paid to the Broker Defendants to Plaintiffs and the Class, as well as to governmental agencies as alleged herein, even though the information was subject to disclosure under ERISA's reporting requirements.

132.    The Insurer Defendants encouraged and compensated the Broker Defendants for attempting to influence claims-loss ratios, claims filing, and renewal of policies.  Such compensation agreements resulted in actions adverse to the interest of Plaintiffs and Class Members.  The override agreements described herein created a system of incentives for the Broker Defendants that harmed Plaintiffs and Class Members by denying them the full benefit of their employee benefit plans.

133.    As detailed above, the Insurer Defendants also engaged in the practice of "low-hanging" fruit, bid-rigging, and other anti-competitive conduct.  These practices placed the financial interest of the Insurer Defendants ahead of the interests of the employee participants and beneficiaries, such as Plaintiffs and the Class.  As ERISA fiduciaries, the Insurer Defendants were obligated to refrain from the conduct that was harmful to their interests.

134.    The Insurer Defendants profited as a result of the scheme with the Broker Defendants to overcharge expenses paid by Plaintiffs and Class Members.  The Insurer Defendants received business that they would not otherwise have received in the absence of the Agreements with the Broker Defendants.  The conduct of the Insurer Defendants violated the sole interest and exclusive purpose duties of 29 U.S.C. §1104.  The Insurer Defendants engaged in deceptive conduct to overcharge Plaintiffs and the Class.  Such conduct is inconsistent with the duty of loyalty imposed under ERISA.

135.    Insurer Defendants also held and hold a relationship of trust and confidence with Plaintiffs and Class Members as a result of the following:

- Insurer Defendants cultivated a relationship of trust and confidence with Plaintiffs and Class Members by selling them insurance products that purportedly met their insurance needs;

- Insurer Defendants represent that the premium rates charged to Plaintiffs and Class Members are based on a complex mixture of risk factors and market demands, not illegal kickbacks and other undisclosed compensation paid to the Broker Defendants and Plaintiffs had no means of ascertaining otherwise;

- Insurer Defendants had access to Plaintiffs and Class Members' confidential, personal and proprietary information; and

- Insurer Defendants are characterized by elements of public interest which subject them to more stringent standards of conduct than those normally arising out of contract.

136. Based on the foregoing, Insurer Defendants owe Plaintiffs and Class Members fiduciary duties, including the duty of good faith and fair dealing, the duty of full and fair disclosure, the duty of loyalty and the duty of care arising out of their relationship with Plaintiffs and Class Members.

137. Insurer Defendants have a duty to provide complete and truthful information to Plaintiffs and Class Members when selling policies, including, without limitation, disclosing the source and amount of all compensation paid to the Broker Defendants and otherwise complying with full disclosure laws and curing any prior misrepresentations or omissions. Insurer Defendants also have a duty to fully disclose all compensation paid on Forms 5500, filed with the I.R.S. and the D.O.L.

138. In addition, Insurer Defendants have an independent duty to disclose information to Plaintiffs and Class Members by virtue of their special relationship with them. Insurer Defendants have sole knowledge of the source and amount of all income paid and received through their compensation agreements, and of their steering, bid-rigging, market allocation, and other wrongdoing.

139. Insurer Defendants breached these duties by conspiring to pay and paying kickbacks to the Broker Defendants in exchange for steering the Brokers' clients to them even when to do so was not in the clients' best interests. Defendants were aware that Plaintiffs and Class Members had

no access to the foregoing information and therefore could not evaluate the accuracy of the information provided to them.  In paying such kickbacks the Insurer Defendants manipulated the market for insurance and co-opted the Broker Defendants' duties, fiduciary and otherwise, to their clients.

**B.      DEFENDANTS' COMPENSATION AGREEMENTS**

140.    Pursuant to Defendants' conspiracy, scheme and common course of conduct, the Broker Defendants solicit business from employers interested in purchasing group insurance on behalf of and for their employees.  The Broker Defendants also directly solicit the employees to purchase supplemental insurance.  The Broker Defendants steer them to purchase insurance from the Insurer Defendants and other carriers, with whom the Broker Defendants have entered into the Agreements, so that the Broker Defendants can receive undisclosed compensation, including Contingent Commissions, Communication Fees and other kickbacks.  All Defendants ratified, adopted and knowingly participated in this scheme through the payment of undisclosed compensation and imposition of the undisclosed fees and costs resulting in injury to Plaintiffs and the Classes.  Indeed, all Defendants sought to maximize the payment of such kickbacks without properly disclosing such compensation to Plaintiffs and the Classes.

**(1)      Contingent Commission Agreements**

141.    Contingent Commission agreements provide that Insurer Defendants will pay undisclosed fees to the Broker Defendants based on (a) the volume of premium generated by the sales of Broker Defendants' products , (b) the renewal of existing business (persistency), and (c) the profitability of the book of business (or premium amount) purchased by Plaintiffs and Class Members (*i.e.*, a favorable claims and loss ratio).  These agreements are referred to in the industry as "override agreements" "extra compensation agreements," "special producer agreements," "preferred broker compensation plans" and "brokerage house agreements" (collectively, "Agreements"), which

provide for Contingent Commissions (a.k.a. overrides) and other undisclosed or inadequately disclosed compensation to the Broker Defendants.

142.    Contingent Commissions often are based on a percentage of the entire "book of business" that a broker places with a particular carrier in any given year.  For example Marsh receives Contingent Commissions based on the volume of business Marsh places for a particular carrier in a particular year.  Thus, Contingent Commissions received from the insurance carriers are aggregated over the entire "book of business" placed with a specific insurance carrier and typically not collected in an account-specific manner, that it, Contingent Commissions received from defendant AIG are paid based on the total amount of business Marsh steers to AIG, not individually for each Marsh individual client account steered to AIG.  This was confirmed by Marsh CEO Jeffrey Greenberg:  "We don't break out contingent commissions.  That is not separately enumerated because it is part of our business model . . . ."  However, the business placed by a Broker Defendant can be determined on a client-by-client basis.

143.    Similarly, at Willis Contingent Commissions are paid at the end of the year, if the broker meets the minimum volume and loss ratio calculations.  These payments average between 5%-15% of the broker's annual commissions for the book of business placed.  Contingent Commissions are paid to brokers in exchange for two benefits to the insurance carrier: The first is to encourage brokers to steer a high volume of business and the second is for brokers to place higher-quality business, meaning policies and clients with fewer "claims experience" that ultimately result in higher profits for the insurance carrier.   The lower the loss ratio, the higher the carrier's profit. Insurer Defendants are willing to share a percentage of profits with brokers as a reward for not placing business that does not add to the Insurer Defendants' margin.

144.    Broker Defendants also received Contingent Commissions based on either the rate at which their clients renew their policies with the Insurer Defendants, or by meeting a threshold level

of business with the carrier.  For example, AIG's 2003 Agreement with Marsh provided Marsh with a bonus of 1% of all renewal premiums if its clients renewed with AIG at a rate of 85% or higher.  If the renewal rate was 90% or higher, Marsh received 2% of the renewal premium, and if the rate was 95% or higher, Marsh received 3%.

145.    Similarly, Aon entered into Performance Enhance Fund ("PEF") agreements, which provide that Aon received as a commission approximately 17% of the premium on new business and 10% on renewed business placed with an insurer.  When Aon reaches the threshold of $10 million of business with a carrier, Aon receives an additional 1.5% of all the business done with that carrier for that year.  Financial Services Group in New York is the main decision maker who ultimately decides which carriers get the contracts to insure a client, based on which carriers are closer to the threshold by which Aon receives a kickback of 1.5%, retroactive for the year.  The carrier is chosen by Aon based on either the PEF or the highest commission, regardless of the clients' best interest.

146.    Hartford's agreements with Gallagher provide for a straight 14% commission for writing business, and a 5% override at the end of the year for writing a specified volume of business.

147.    MetLife and Cigna agreed with Hilb based on projected production goals whereby Hilb would later receive additional compensation in the form of Contingent Commissions if production goals were met.  None of these agreements were disclosed to clients.

148.    The Broker Defendants also are compensated by the profitability of the policies, *i.e.*, the lower the claims the more fees that are earned.  Hilb receives Contingent Commissions based on profitability, premium growth, total premium volume or some combination of these factors. Similarly, Wells Fargo receives Contingent Commissions based upon both the volume of the book of business placed by Wells Fargo with an individual carrier, as well as the "loss ratio" associated with that book.

149.    Contingent Commissions, also known as "override fees," can sometimes be as much as 15% of the total amount of business that the broker places in an entire year.  For instance, Marsh announced on October 18, 2004, that it received at least $845 million in Contingent Commissions in 2003 alone, accounting for 7% of its overall revenue of $11.6 billion and almost 50% of its net income.   Additionally, from January 2004 through June 2004, Marsh reported revenue from Contingent Commissions that totaled approximately $420 million.

150.    Aon's Contingent Commissions for the 12 months ended September 30, 2004, were approximately $117 million and Aon continued to receive Contingent Commissions in the fourth quarter of 2004, they would have recorded approximately $50 million of additional revenue.  Aon received an additional $91 million in "other compensation for services to underwriters" for the nine months ended September 30, 2004.

151.    Brown & Brown states that for the first three months of 2005 it collected almost $29 million in Contingent Commissions from insurance companies based primarily on the volume of business placed, retention ratios and profitability of the aggregate business written.

152.    Similarly, Gallagher and ULR received $33 million and $11.5 million, respectively, in Contingent Commissions in 2003 alone, accounting for nearly half of ULR's total revenues for 2003.  And, Willis announced that on October 21, 2004, it obtained an estimated $160 million in 2004 from the use of Contingent Commissions.

153.    The Broker Defendants put their interests ahead of their clients by refusing to place their business with insurance carriers that do not pay overrides even if that insurance carrier would provide the most cost-effective or superior coverage.

154.    For example, Aetna's refusal to pay undisclosed Contingent Commissions has had a direct result on its business with brokers: "Attached is our agreement with Aon's suggested revisions . . . .  They also made it clear that the lack of an override puts us at a severe disadvantage.  This is

evidenced by the fact that we haven't written a case with them in several years."  Aetna also explained:  "Our SE Regional Broker Conference at the Cloister was a great success . . . [a]fter a nice exchange of comments one of the brokers made a comment that changed the direction of the discussion. . . 'you guys just don't get [it], price and ease of administration is not the issue. . . it's my compensation.'"  (Emphasis in original).  Similarly, Aetna states:  "[A broker] indicated that he had 400+ . . . accounts and that half used to be with Aetna . . . til they made cutbacks in Commissions . . . .  Now Aetna has none.  He indicated that [Aetna] had the lowest rates in the county [sic] . . . but he gave business to BXBS [Blue Cross Blue Shield] because of commissions.  He told us to load our rates 5-10% (give him ½) and we'd get all of his business."

155.   Defendants conspired to build Contingent COmmissions into the cost of the plans that the Insurer Defendants offered to the Broker Defendants' clients.  Therefore, Plaintiffs and the Class ultimately pay the cost of these undisclosed fees through higher policy premiums and/or reduced benefits.  For example, a study by the Consumer Federation of America found that Contingent Commissions account for 1.67 % of the premiums charged by Hartford.

156.   Yet, the Insurer Defendants fail to disclose to Plaintiffs and the Classes the conflict of interest created by Contingent Commissions.  Although the Insurer Defendants are parties to the Agreements, the specific amount of compensation received by the Broker Defendants and the amount charged to the clients to cover the fees is not disclosed in any meaningful way to Plaintiffs and Class Members.  Indeed, the Insurer Defendants actively take part in and cooperate with the Broker Defendants in their effort to conceal the Agreements, and the revenue generated pursuant thereto, from their respective clients.

157.   The concerted lack of disclosure is exemplified by The Group Insurance Commission of Massachusetts' ("GIC") purchase of Unum group life insurance in 2001 through Broker Defendant OFJ.  GIC seeks to reduce unnecessary costs by refusing to pay commissions or other

sales add-ons with respect to insurance policies it purchases.  GIC likewise employs its "no commissions" policy vis-a-vis the insurance carriers that provide coverage to GIC members to prevent any actual or apparent conflicts of interest by its consultants.

158.    Notwithstanding OFJ's certification to the client that OFJ "will not receive commissions, either directly or indirectly, for any work we do in connection with this [GIC] engagement," OFJ received payments from Unum directly attributable to GIC's purchase of Unum group life insurance.  Although OFJ instructed Unum not to pay base commissions attributable to the GIC purchase (approximately $28,000), OFJ continued to solicit and receive commissions pursuant to its Special Producer Agreement ("SPA") with Unum specifically attributable to GIC's purchase (over $400,000 in 2001 alone).

159.    Neither Unum nor OFJ disclosed to GIC, either at the consulting contract stage, the life insurance contract stage, or when Unum made payments to OFJ based on the GIC purchase, the existence of the Unum/OFJ SPA (or any other compensation agreement), or that Unum paid OFJ more than $400,000 in "new business" compensation as a result of the GIC purchase.

160.    However, in January 2003, GIC learned, for the first time, that Unum was paying OFJ compensation directly attributable to the GIC policy.  GIC promptly demanded that Unum stop paying OFJ on the GIC policy.  Unum and OFJ ultimately assured GIC that Unum's payments would cease and that Unum would "recoup" its previous payments to OFJ.

161.    In the absence of proper disclosure of the conflict of interest created by Contingent Commissions and other bonuses, Plaintiffs and Class Members justifiably relied on the Broker Defendants' representations that they were providing independent expertise to their clients and representing their clients' interests in accordance with their contractual, fiduciary and other duties as alleged herein.  Plaintiffs and Class Members also justifiably relied upon the Broker Defendants' representations in connection with the insurance policies and services they purchased.

162.     As a result of the Commission Agreements, the Broker Defendants have breached their fiduciary and other duties owed to Plaintiffs and Class Members through steering (the placement of Broker Defendants' clients' business with the participating insurers) and bid-rigging (the manipulation of the purportedly competitive bidding process whereby the Broker Defendants utilize phony bids to ensure that a particular insurer will get the business at above market rates).

163.     As a result of the Contingent Commission steering, bid rigging, market allocation and other wrongful conduct, Plaintiffs and Class Members have paid insurance premiums in excess of what they would have paid had Defendants not engaged in such conduct.   The Defendants are fully aware that these Contingent Commissions and other kickbacks will impact all consumers' insurance and increase the cost of insurance.  According to Marsh: "***No client could be made to believe that this cost is not additive to the gross premium–hence we are indeed adding to the clients [sic] cost of risk.***"

### (a)     CIGNA's Contingent Commission Agreements

164.     Illustrative of Defendants' scheme and the consequences to Plaintiffs and the Classes is CIGNA's broker bonus plan whereby CIGNA pays an override commission based on the entire book of business placed by the broker in a given year.  For any broker to sell through CIGNA, it must sign a Blanket Commission Agreement ("BCA"), identifying the various types of benefits coverage for which the broker will solicit clients and sell policies.  For each type of plan CIGNA offers, the BCAs identify a "commission scale" that CIGNA will pay the Broker Defendants.

165.     In early 2003, CIGNA offered a "broker incentive plan," whereby brokers could accumulate points by selling plans for more than one line of coverage.  By placing business in multiple lines with CIGNA, brokers are entitled to another percentage point of commission on the entire book sold.  All information, advertisements and brochures disseminated to brokers throughout

the country were printed and mailed from CIGNA's home office marketing department in Philadelphia.

166.    As part of its 2004 Rewards Program, CIGNA compensated brokers for policy renewals as follows:

| Persistency Level | Renewal Commission Incentive Payments |
|:---:|:---:|
| 95% - 100% | 20% |
| 90% - 94.9% | 15% |
| 85% - 89.9% | 10% |

167.    Further, CIGNA's 2004 Commissions & Incentives materials disseminated to brokers contains a bolded heading: ***Incentives for Renewals with Rate Increases***.  Underneath the text reads: "You will earn one Coverage Credit for each policy renewal with a rate increase.  To be eligible, renewal rate increases must be effective 2/01/2004 to 01/31/2005.  The Coverage Credits you earn for these sold rate increases will help increase your eligibility for the New Sales Incentive payment." In addition, CIGNA enters into case-specific commission agreements with brokers to compensate them for delivering certain accounts to CIGNA.

168.    CIGNA provides brokers with printed promotional materials detailing how CIGNA will reward brokers with compensation and incentives that are "meaningful" to the brokers and that demonstrate CIGNA's appreciation.  As explained in CIGNA's "2004 Commissions and Incentives" brochure, these extra payments to the brokers are designed to "make it easy for [the broker] to recommend CIGNA to their clients."

169.    CIGNA's promotional materials also state:

As you know, our program rewards you for both new and renewal Group Insurance business as well as retention of in-force business.  And, with our program, ***there are no caps***, so you will be rewarded for your total results.

170.    Emphasizing "additional compensation" and "no caps" throughout, CIGNA's broker materials demonstrate CIGNA's incentives to producers go considerably beyond standard commissions, providing an unlimited amount of compensation and kickbacks to brokers.

171.    Within CIGNA, the overrides serve to "create a partnership with brokers," whereby the broker assists CIGNA in persuading Plaintiffs and Class Members to place new business with CIGNA and to remain insured by CIGNA instead of bidding out the policies to other insurance carriers.

172.    CIGNA also encourages brokers to participate in reducing claims.  It tallies the "claims experience" of each broker's accounts in monthly reports.  These reports are used by brokers to encourage employers, and thus employees, to limit claims experience, including not reporting all covered claims.  Reduction of claims is specifically connected to the profitability of the business for both CIGNA and the broker of record.

173.    Brokers that are successful in maintaining and increasing volume year after year are denoted by CIGNA in its written Agreements as "Platinum Brokers."

### (b)    Hartford's Contingent Commission Agreements

174.    As with other Insurer Defendants, Hartford pays overrides to brokers based on: (a) total dollar amount of new business placed, (b) amount of retained premium (renewed policies), and (c) profitability of the broker's book of business.  Hartford sets "new business targets" or "growth incentives" for brokers to qualify for an override in a given year.  Hartford also sets "retention targets" based on the percentage of existing business that the broker renews or maintains with Hartford.  Further, Hartford requires a certain percentage amount of profitability for the broker's book of business based on the claims experience of the premium paid, *i.e.*, the profitability or "loss ratio" of the book of business.  Hartford's standard Agreements require "[s]uccessful results in all three categories . . . for any compensation to be payable."  Thus, even if a broker meets the

overall volume target, it does not qualify for an override payment if it fails to renew a specified percentage of policies with Hartford.

175.    For example, Hartford's 2003 and 2004 "VIP Management Expense Allowance Program Agreements" provided that ULR would receive overrides if it met the following requirements:

- New Business:

  - Standard Compensation is 1% of premium dollars received in new business.

  - Incentive Compensation is an additional .50% for every premium dollar beyond $25 million in new business.

- Existing Business:

  - Standard Compensation is 1% of premium paid for existing business.

  - Persistency Incentive Compensation is an additional .50% if a minimum of 90% of ULR's book of business remained with Hartford throughout the term of the agreement.

  - Profitability Incentive Compensation is an additional .50% if the Actual to Expected (A/E) loss ratio is 96% or less. However, no compensation based on profitability is paid if the persistency drops below 88%.

176.    If a broker meets Hartford's production thresholds, it may be designated a "platinum broker," "gold broker" or "high impact broker." Each of these designations determines the "profit sharing formula" incorporated into Hartford's override agreements. "Platinum brokers" are those that steer the greatest amount of premium dollars annually to Hartford. Consequently, such brokers receive the most preferential treatment and the greatest percentage amounts of overrides from Hartford. Marsh and Aon both qualified as "platinum brokers."

177.    Hartford recoups the cost of paying overrides by building it into the "expense ratio," or the overall costs of administering the policies sold. This expense ratio is captured as part of the premiums charged for its insurance products and services, and therefore such overrides are ultimately paid by Plaintiffs and the Class.

### (c)    MetLife's Contingent Commission Agreements

178.    MetLife's national broker contracts provide for a gross premium override of between 2% and 5%, as well as an annual producer bonus and marketing service fees based on profitability and the amount of business generated.  For example, MetLife's compensation to ULR (beyond standard commissions) has been memorialized in their Preferred Broker Compensation Plan II ("PBCP II") each year.  Under the 1998 PBCP II, ULR earned override compensation, based on its sale of MetLife's Group Universal Life ("GUL") policies to at least five new customers in a given year, totaling at least $25 million.  The override percentages were as follows:

- 1% of annual premiums for cases written with a non-participating financial arrangement to which PBCP II applied;

- sliding scale from .25% to .5% for cases with a participating financial arrangement to which PBCP II applied.

Per-case maximum payment was $200,000.  In addition to those payments, ULR was eligible for an asset trailer of 15 basis points on the cash accumulation account of each GUL policy to which PBCP II was applicable.

179.    MetLife has had a number of Agreements in addition to its Standard Broker Agreement, including the Single Case Commission Agreement (Non-Standard Agreement), Producer Agreements, Brokerage House Agreements (Overrides) and Preferred Broker Compensation Plans. At best, Plaintiffs and Class Members are informed only of the Standard Broker Agreement commissions.  In addition, MetLife field executives have requested modifications to existing broker compensation arrangements based on the needs of the broker, rather than the insured.  Although requests for modifications were sometimes based on errors in the compensation agreements, typically such requests involved rebates, also known as "back-end sweeteners."

180.    MetLife has acknowledged that it made override payments to brokers totaling approximately $25 million for business sold and serviced in 2003, alone.

181.   MetLife recouped the cost of broker commissions by dramatically increasing its rates on renewal.  In fact, MetLife's renewal rates sometimes increased by as much as 40%-50%.  Similar to the Cigna "Partnering Program," the brokers help ensure Plaintiffs and Class Members will renew with MetLife, despite high renewal premium rates.  One way they do this is by bid-rigging – directing non-incumbent insurance carriers to submit high bids, thereby making MetLife appear competitive.

182.   However, when MetLife was confronted with the question about whether its Agreements with certain brokers translated into higher premium rates, a MetLife representative responded: "I am not going to tell you that, I'm not in a position to have that discussion."

### (d)   Prudential's Contingent Commission Agreements

183.   The Agreements between Prudential and brokers are titled Quality Business Incentive Award Agreements ("QBIAAs").  The QBIAAs are customized agreements in lieu of Prudential's standard producer incentive awards and are the sum of the Persistency Award plus the New Business Award, capped at $500,000 per account.

184.   Prudential's persistency awards are calculated both regionally and nationally.  Prudential's Regional New Business Awards required at least $5 million in new premiums and National New Business Awards required at least $10 million in aggregated regional new sales.

185.   The 1998 QBIAA provided for 1% overrides on annual premiums of at least $1 million; 2% on annual premiums of at least $2 million, and 3% on annual premiums of at least $3 million.

### (e)   UnumProvident's Contingent Commission Agreements

186.   UnumProvident enters into Special Producer Agreements ("SPAs") with certain brokers each year.  By express terms, the SPAs provide compensation to brokers for providing one or more of the following: "consulting, brokerage intermediary assistance, billing/premium

administration, claims administration and fiduciary assistance on specified insurance products." Compensation for any of those services is described as "Extra Compensation."

187.    Under UnumProvident's 2000 SPA, it paid ULR 2% of annualized new sales premiums, provided ULR brought in three new lines of coverage and $3 million in premiums.

**(2)    Communication Fees**

188.    Communication Fees (a.k.a. "enrollment fees" or "service/administrative fees"), are simply another form of undisclosed, kickbacks relating to supplemental group life, disability and/or other insurance sold directly to employees.

189.    Defendants promote the supplemental benefits to employees since such coverage is profitable to both the Insurer and Broker Defendants.  The promotions and advertisements are referred to as "communications."  The communication materials are usually designed to look like they were issued by the employer using the employer's logo or color scheme and often accompanied by a cover letter from an executive of the employer.  Occasionally, they are issued under the insurance carrier's letterhead.  This is because employers generally prefer to have a "single source" talking to their employees about insurance.  The fees are based on the total number of employees, not  just those employees who pay for supplemental coverage.

190.    For example, MetLife and ULR had an "Ad Hoc Consulting Service Agreement" for 1998-2000, which provided as follows with regard to customers to whom ULR sold GUL plans:

- ULR will run implementation meetings for each customer, and

- ULR will design, print and distribute employee communication material.

MetLife compensated ULR ***$10.00 per employee*** in the first year of each GUL plan, or ***$20.00*** for Group Variable Universal Life ("GVUL") plans.

191.    Communication Fees are extremely lucrative.  A ULR invoice for Communication Fees to MetLife for nearly $150,000 showed that the cost to ULR in providing these

"implementation and enrollment" services amounted only to $65,000, netting ULR nearly $85,000 in profit. Thus, while purporting to be a "communication fee," the claimed services are either illusory or bear no relation to the amount of such fees.

192.     Whether the insurance carrier or broker ultimately provides the communications, the Communication Fees are paid by the Insurer Defendants to the Broker Defendants and recaptured in the premium rates charged to the employees and their dependents who choose optional or supplemental insurance coverage (including dependent coverage).

193.     For example, a September 12, 2002 ULR e-mail regarding bidding on the Cummins' account states: "During the conference calls with the insurance carriers please have all rates include a flat 3% commission level and they are to include a $5 per employee communications fee for ULR."

194.     The Insurer Defendants did just that – including Communication Fees in the premiums charged Plaintiffs and Class Members. In March 2004, for example, an employee benefits broker who represented retail giant Wal-Mart e-mailed Prudential to inquire whether Prudential included a communication fee in its premium rates for employee supplemental coverage. The Prudential executive responded:

> [W]e do build in the cost of communication materials. . . . The WalMart rates are not be (sic) reduced any further.

195.     Similarly, when the same questions were posed by the broker to a MetLife executive, also in connection with Wal-Mart, MetLife's response, similar to Prudential's, demonstrates the Insurer Defendants' collusion with the broker:

> The communications we are paying on Wal-Mart . . . is included in the rates that we have offered.  If you were to ask us to pay communications cost of $3 or $6 per employee, *we would build the additional expenses . . . into our rates*.

At that time, MetLife was paying $10 per employee in Communication Fees to ULR.  When later asked why MetLife paid these fees, which resulted in higher rates to ULR's clients – the insured – the same MetLife executive responded, "*[w]e build this in because the Broker [ULR] tells us to.*"

196.    Defendants conceal the Communication Fees from Plaintiffs and the Class.  For example, in January 2003, when soliciting a proposal from CIGNA, the ULR Defendants instructed CIGNA that "[T]he communications fees . . . should not be communicated to the client without ULR's prior consent."

197.    Even when confronted by the client, Defendants falsely deny such fees.  For instance, when ULR client Chevron/Texaco inquired about the existence and/or impact of Communication Fees on their premium rates, both the head of Sales and head of Product Development at MetLife adamantly and falsely denied that any Communication Fees were built into the policy rates.  In fact, MetLife paid ULR nearly $300,000 for Communication Fees in connection with the Chevron/Texaco account that year and its 2002-2003 undisclosed compensation agreement with ULR provided that these fees would "be included in [MetLife's] rates charged to employees."

198.    The Broker Defendants' agreements with their clients also conceal Communication Fees.   ULR's agreement with Safeway, for example, states that the insurance carrier (UnumProvident) will pay a $50,000 fee for RFP, and that the costs of ULR "implementing and communicating the new plan" are "included in the RFP cost."  In fact, ULR levied a communication fee of $10 per employee for supplemental life insurance and $5 per employee for supplemental disability insurance for that plan.  Again, this fee was passed along to Safeway's employees through higher premiums and/or lower benefits.  In addition, UnumProvident paid ULR overrides based on a percentage of the total premium for delivering Safeway's insurance business.

199.    The Insurer Defendants collude with the Broker Defendants and pay Communication Fees even though they acknowledge they are outrageous.  For example, a UnumProvident executive

noted: "In the past year, we have paid Doug Cox/ULR several million dollars and we don't have a lot of formal documentation other than e-mail messages and invoices."   From 2000 to 2003, UnumProvident paid ULR $3.5 million in Communication Fees which UnumProvident has admitted were "excessive" and "outrageous."

200.     The Insurer Defendants do not absorb these "outrageous" fees – Plaintiffs and Class Members do.

201.     The other Broker Defendants also accepted Communication Fees from Insurer Defendants.  For example, Gallagher and USI both advertise on their websites that they provide communications to employees.

**(3)     Broker Bonuses**

202.     Insurer Defendants also pay special "Broker Bonuses," which are additional undisclosed kickbacks to brokers for delivering certain volumes of business and, in certain cases, specific accounts.

203.     Additionally, Insurer Defendants also sponsor regional and local paid trips for brokers and all expense-paid corporate functions and seminars at luxury resorts for certain broker.  Eligibility for the trips is based on certain volumes of premium placed with Insurer Defendants, as well as number of cases or volume of certain lines of insurance.

204.     For example, one insurer announced to Aon producers that "[we] want your business! In exchange for your business, we want you to be our guest at a [company] Platinum Rewards event in 2004.  Based on the total number of new or retained [company] Members you write this year you can qualify to join us at one of these three great destinations."

205.     Insurer Defendants also set aside "entertainment budgets" for sponsoring trips and other incentives.  Once again, like other kickbacks provided to brokers, these expenses are embedded

in the carriers' administrative expenses and thus recaptured within the premium rates charged or

benefits provided to Plaintiffs and the Classes.

## C.   DEFENDANTS CONCEAL THE PAYMENTS FROM PLAINTIFFS AND CLASS MEMBERS

### (1)   Defendants Fail to Disclose Payments in Marketing Materials, Policyholder Agreements and Policyholder Communications

206.   While the Broker Defendants purport to represent their clients and their employees

and to act in their best interests, the Broker Defendants fail to disclose in their advertisements,

brochures or otherwise that they have been appointed as agents on behalf of the Insurer Defendants.

This undisclosed conflict and dual remuneration breaches the Broker Defendants' fiduciary duties.

For example, ULR executive, Douglas Cox, is authorized to sell insurance on behalf of MetLife,

Prudential, LINA, Provident and UnumProvident.  Thus, while the Broker Defendants represent to

their clients that they are acting on their behalf as their agent of record or consultant in obtaining the

most appropriate and cost-effective insurance policies by objectively canvassing the market, they are

in fact simply delivering to Plaintiffs and the Classes the insurance carriers that have appointed them

to solicit and sell employee benefit plans.

207.   Broker Defendants do not disclose to Plaintiffs and the Classes that additional fees

will be paid by the Insurer Defendants and factored into the cost of their employee benefit plans.  In

fact, Defendants actively conceal this information.

208.   For example, Marsh's policy of misleading clients about Contingent Commissions

recently came to light in the guilty plea of a former Marsh managing director, Joshua M. Bewlay,

who pleaded guilty to a felony charge of scheming to defraud on February 14, 2005, testified that

Marsh established a procedure or a "protocol" intended "to discourage the client from obtaining an

answer" on how Marsh received compensation from insurance companies.  Indeed, Mr. Bewlay

testified that the "Marsh protocol required multiple layers of inquiry to discourage the client from obtaining the answer."

209.   Marsh also directs employees to redact and "white-out" the commission income identified in the insurance "binders," *i.e.*, the temporary insurance contracts, prepared by the insurance carrier and sent to Marsh for transmittal to the client/insured.

210.   In one instance, a senior vice president at Munich was reprimanded by Marsh for referring to the Agreement between them in correspondence.  Munich immediately attempted to salvage the situation:  "We acknowledge that this was inappropriate behavior and will do the necessary to eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the PSA.  I apologize for the consternation that this has caused within the Marsh organization."

211.   The other Broker Defendants also fail to disclose, or sufficiently disclose, the existence of Contingent Commissions and other compensation in their client contracts and proposals. Neither company ever advised insured clients of the amounts of Contingent Commissions paid although commissions and Contingent Commissions were the two largest single items of revenue.

212.   Similarly, a former Gallagher employee stated that Gallagher "avoid[e]d sharing these [commissions] at all costs" with clients.  This former employee noted that not sharing this information with clients was possible since the clients typically paid the entire premium to the insurer who would then forward the commission to Gallagher.

213.   On March 30, 2005, UnumProvident announced it would change its disclosure practices relating to broker compensation.  Without detailing its present disclosure practices, if any, UnumProvident said that, "going forward," "customers can obtain from producers information about all compensation paid to the producer.  As part of the changes to its policies and procedures, the company will provide appropriate notices to customers stating its policy surrounding disclosure and

will provide information on its website about its producer compensation programs."  The press release further states, "Other changes include requiring customer approval of compensation paid by UnumProvident to the producer when the customer is also paying a fee to the producer, and strengthening certain policies and procedures associated with new business and quoting activities." This partial corrective action – which can only be verified through discovery – demonstrates that UnumProvident previously had not provided customers with appropriate information about compensation paid to brokers and had not informed customers that it compensated producers who had already been compensated by the customer, and that certain UnumProvident's practices to garner new business were improper.

214.    Prospective injunctive relief is necessary and proper to insure: (i) that Defendants fully disclose all compensation paid to the Broker Defendants and any agreements between the Broker Defendants and the Insurer Defendants, and (ii) that Defendants do not later abandon such corrective action.

215.    Insurer Defendants also have conspired to conceal from Plaintiffs and Class Members compensation they pay to the Broker Defendants.  For example, in response to an inquiry by ULR client International Truck and Engine Corporation ("International Truck"), MetLife falsely stated in a December 9, 2003 letter to ULR that "Universal Life Resources is acting on behalf of the group customer in the above named case and is not acting on behalf of MetLife and is not receiving compensation from MetLife."  This was patently false.  That same year, ULR and MetLife had an override agreement in place under which ULR Defendants received $8.5 million for 2003, part of which is attributed to the International Truck account.

### (2)    Defendants Conceal Payments on Governmental Forms

216.    Under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), insurance carriers have a duty to disclose to the employee benefit plan administrator all commissions

and fees paid to brokers, agents and other persons on the Form 5500, filed with the IRS and DOL. Under 29 U.S.C. §1023(a), insurance companies must disclose "all commissions and administrative service or other fee" paid to the broker that placed the employee benefit plan.

217.    Department of Labor ("DOL") regulations (29 C.F.R. §2520.103-5(d)(1)) require insurance carriers to certify the accuracy and completeness of the disclosed compensation in a written declaration on a Form 5500.  Every individual or entity subject to Form 5500 filing requirements must maintain records that sufficiently verify, explain and/or clarify the disclosed information.  The underlying records must be available for examination for at least six years after the filing date.

218.    The DOL has stated: "29 C.F.R. §2520.103-1 and the instructions for the Schedule [A] require the plan administrator filing an annual report using the Form 5500 to . . . report information about each agent, broker, and other person who was paid commissions or fees, including the amount of commissions and fees paid."  DOL Op. 2005-02A.  Further, the scope of this requirement includes "all fees and commissions directly or indirectly attributable to a contract between a plan and insurance company."  As made explicit by the DOL: "This includes commissions and fees paid by an insurance company, where the broker's, agent's or other person's eligibility for the payment or the amount of the payment is based, in whole or in part, on the value (*e.g.*, policy amounts, premiums) of contracts or policies (or classes thereof) placed with or retained by an ERISA plan, including, for example, persistency and profitability bonuses."  *Id.*  As such, the DOL explicitly found Contingent Commissions were and had been subject to the Form 5500 disclosure rules.

219.    The DOL further specified that "non-monetary forms of compensation, such as prizes, trips, cruises, gifts or gift certificates, club memberships, vehicle leases, and stock awards, must be reported if the entitlement to or the amount of the compensation was based, in whole or in part, on policies or contracts placed with or retained by ERISA plans."  DOL Op. No. 2005-02A.  Finally,

"[f]inder's fees and other similar payments made by a third party to brokers, agents, and others in connection with an insurance policy must be disclosed by the [insurance carrier] where the [insurance carrier] reimburses the third party for the payment either separately or as a component of fees paid by the [insurance carrier] to the third party." *Id.*

220.    Section 501 of ERISA makes it criminal to willfully violate ERISA's disclosure requirements, as well as the DOL's regulations, promulgated there under, and violators are subject to a $100,000 fine and imprisonment for up to 10 years in the case of an individual, and a $500,000 fine for entities.

221.    The payment and receipt of Contingent Commissions, Communication Fees and other undisclosed compensation clearly fall within these Form 5500 reporting requirements.  Defendants have intentionally and willfully failed to disclose and conspired to conceal the Contingent Commissions, Communication Fees and other compensation paid on the Report 5500 (and Schedule A thereto).  Indeed, the Broker Defendants have directed insurers not to report the amounts and nature of compensation paid for specific client accounts.  For example, at a major meeting between brokers and insurers in September 2003, the Broker Defendants requested that "the expenses/funding not appear on the 5500 form."

222.    ULR has similarly requested the concealment of such fees in connection with its client Rubicon.  When asked by Prudential: "[T]he amount of commissions reported on the Report on Form 5500 is less than what was received in 2003.  How would you like us to proceed?"  Rob Combi of ULR responded, "Just leave alone.  Thanks."

223.    Similarly, the Special Producer Agreements between ULR and UnumProvident state: "Extra compensation will not be reflected on ERISA Schedule A Reports" submitted to ULR's clients for filing with the IRS and DOL.

224.    Attempting to justify its earlier participation in the concealment of kickbacks, UnumProvident's Vice President of Distribution Strategy & Compensation stated to certain brokers that: "[p]ractices that may have been acceptable in the past need to be reviewed on an ongoing basis, and if necessary changes to be compliant with the strict dictates of today's business world."  The letter continued: "It has come to our attention that provision 5b of your Special Producer Agreement is one such provision that should not be contained in the document.  It states that: 'Extra Compensation will not be reflected on ERISA Schedule A reports. . . .'  ERISA requires us to report broker fees and commissions on ERISA covered cases to the Plan Administrator. . . .  Accordingly, we are asking for your cooperation and understanding in the deletion of section 5b . . . ."  UnumProvident thereby acknowledges that it knowingly conspired with Defendants not to disclose such compensation on the Report on Form 5500.

225.    CIGNA also conceals Contingent Commissions, Communication Fees and other kickbacks to brokers from Plaintiffs and Class Members on the Form 5500, whether based on CIGNA's broker bonus plans or broker-specific "national override agreements."

226.    Similarly, Hilb failed to disclose its Contingent Commissions to brokers on the Form 5500.  A former employee of both Wells Fargo and Willis likewise confirms that he never saw any Form 5500 disclosures Wells Fargo or Willis regarding the amounts of Contingent Commissions received for purposes of reporting on Form 5500.

227.    And, Mercer complained about one insurer's bonus program agreement in particular because it did not sufficiently conceal the Contingent Commissions.  Mercer stated that it had been told that "the '2004 Producer Administrative Agreement' would be the type of document we would want if we did not want to have client-specific, disclosed compensation showing up on [Forms 5500].  In fact, we don't want it appearing on [Forms 5500] since we have communicated to all our clients that overrides are used to offset certain costs of doing business which our [sic] common to all

of our client relationships."  Mercer added that having overrides on the 5500 "is not ideal for us because overrides and regular commissions might be combined on one amount, raising questions from clients on why our commission disclosures are less than [Form 5500] commission...Is this a requirement that is set in stone or not?  This could be a potential deal-breaker for us . . . ."

228.    Most insurance companies comply with the brokers' demands and will do whatever is necessary to conceal their conspiracy.  As one insurance company informed Mercer: "The full amount will be 5500 reportable . . .  If this does not work, we can provide alternative options, such as a producer administrative agreement . . . ."

229.    This "option" became quite popular.  According to the Connecticut Attorney General Richard Blumenthal's ("Connecticut A.G." or "Blumenthal") complaint against Marsh, one insurer stated that: "Marsh is interested in having most of their bonus off of the 5500" and that according to an internal company e-mail, "[w]e are encouraging our Producers to be paid MORE off of the 5500. I thought it was [the company's] position to have bonus reportable."  According to the Connecticut AG Complaint, Marsh and other Broker Defendants were all receiving checks clearly identified as non-disclosed under Form 5500.

230.    Marsh is not the only Broker Defendant to direct Insurer Defendants to falsify federal disclosure forms.  A former employee at MetLife was asked by an associate sales manager in Chicago to delete the information concerning an override payment to Aon so that the sales manager might maintain his relationship with Aon.  When the former employee refused, he was told by the Chicago sales manager that "[t]his is not going to be good for me because I did not disclose this information on the front end."  The former employee was subsequently asked to leave the company.

231.    Defendants also have conspired to falsify information about legitimate commissions on governmental forms to avoid alerting Plaintiffs and Class Members to other undisclosed compensation agreements.  For instance, ULR's bid for Dell's employee life insurance coverage

claimed that its only compensation was a $120,000 payment from the insurance carrier that was ultimately selected.  ULR indicated to UnumProvident that it would receive the Dell account, but UnumProvident represented to ULR that it could only submit the low bid if ULR waived the $120,000 RFP fee.  ULR agreed but required UnumProvident to falsely report the commission on Dell's Schedule A Report because otherwise the failure to pay and report that commission would raise "red flags," because Dell had already authorized the payment.  A UnumProvident employee explained:

> We removed the commissions so that we could get to the pricing of one of our competitors, ***but the client, probably not aware of broker override programs***, would find it fishy if there were no commissions paid to ULR for the marketing.  So we are ***making this arrangement so that we facilitate the [Schedule A] expectations from the client.  We do not, however, wish to involve Dell in these discussion [sic] at all***.

232.    Owing to the obvious illegality of this practice, certain insurers have balked at the Broker Defendants' requests.  As early as 2001, one Aetna e-mail said of Marsh that "[a] BIG issue we will have with the [large brokers] is 'what do we do with those accounts where we are not currently paying any commission (client is paying them directly) . . . plus the issue of these monies now possibly showing up on a 5500."

233.    Further, in the wake of the brokerage scandal, some insurance carriers have changed their practices with respect to the Form 5500 disclosures.  For example, Defendant UnumProvident recently admitted that it was "struggling with [ULR's] request to pay non-reportable fees" to ULR, that is, paying ULR Defendants compensation that was not reported on the Form 5500.  ULR Defendants' response in May 2004 was to revive defendant Benefits Commerce, a previously dormant corporation, as a receivership for undisclosed fees.  ULR has admitted that the purpose in doing so was to avoid having UnumProvident report ULR's Communication Fees.

**D.      BROKER DEFENDANTS STEER BUSINESS TO INSURER DEFENDANTS**

**(1)      Steering**

234.      Driven by consolidation in the brokerage industry, brokers have been able to exert considerable market power and influence in the insurance marketplace.

235.      The Broker Defendants use their position of influence to maximize the undisclosed revenue they receive from the Insurer Defendants by steering their clients to purchase policies from those insurance carriers, including the Insurer Defendants herein, with which they have negotiated the highest Contingent Commissions and other forms of undisclosed kickbacks.  The Broker Defendants also specifically recommend those policies and terms that they believe will generate the highest amount of compensation from the insurance carrier.

236.      For example, based entirely on maximizing Contingent Commissions, Marsh dictated to its brokers which insurance companies' policies they were to sell.  This was confirmed by allegations in the New York Attorney General's ("N.Y.A.G.") Complaint and documents attached thereto, wherein a managing director within Marsh advised colleagues that:  "Some [Contingent Commission agreements] are better than others. . . .  I will give you clear direction on who [we] are steering business to and who we are steering business from."

237.      Marsh's Global Brokering executives also used a "tiering report" that segregated insurance companies by how favorable their Agreements were to Marsh.  The tiering report instructed recipients to "monitor premium placements" so that Marsh obtained "maximum concentration with Tier A and B"– the insurance companies with which Marsh had the most favorable Agreements.  One Marsh executive put it quite plainly in September 2003:  "We need to place our business in 2004 with those that . . . pay us the most."

238.      The increased revenues Marsh gained from its relationship with its stable of preferred insurance companies, including MetLife, was explained by Marsh in a July 2000 memorandum

entitled "BUSINESS DEVELOPMENT STRATEGIES," describing one of the insurance companies with which Marsh had an Agreement:  They have gotten the 'lions [sic] share' of our Environmental business PLUS they get an unfair 'competitive advantage['] as our preferred [sic] [insurance company]."

239.    Internally, Marsh rewards employees who maximize its Contingent Commission revenue by steering clients to insurance companies with which it has Contingent Commission Agreements.  One Marsh employee was elevated to vice president, in part because he renewed a client's business "by moving" that client to an insurance company with which Marsh had a Contingent Commission Agreement (noting "Neighborhood Health Partnership Estimated Revenue – $390,000.").  Among his "[f]inancial success[es]" the soon-to-be vice president "was responsible for the renewal of a large HMO in Miami and was successful with placing of this account with a [Contingent Commission insurance company]–Increased revenue from $120,000 to $360,000 (estimated)."  In critiquing himself on a 2003 self appraisal form, the now vice president stated:

> Renewed large account with [Contingent Commission insurance company] to demonstrate our willingness to continue our relationship.  ***Moved a number of accounts to [contingent commission agreement carriers] for the sole reason to demonstrate partnership***.

Other employees were similarly praised in performance evaluations for increasing Marsh's Contingent Commission income from insurance companies "***by achieving budgeted tiering goals***."

240.    Further support for Marsh's scheme to generate the highest Contingent Commissions is a report from Marsh's Los Angeles office describing that in late 2003 brokers in Marsh's Los Angeles office were ordered to temporarily stop selling personal coverage lines from AIG because doing so could reduce commission payments to Marsh.  One broker said "[t]he whole department couldn't believe it. We kept saying, 'If this ever gets out, [the company would] be in so much trouble.'"  The brokers said that they were told that Marsh did not want to exceed an annual cap on policies with AIG in states with a high risk of earthquakes, hurricanes or other costly disasters

because exceeding the limit could reduce Contingent Commissions that Marsh expected to receive from AIG.

241.    Similarly, other Broker Defendants went to great lengths to instruct their employees to recommend those policies and terms that would generate the highest Contingent Commissions. Contingent Commission incentives offered by insurance carriers to Willis have become more important to Willis' profitability, causing more focus and concerns about potential for meeting the required volume necessary to qualify for contingent payments.

242.    Both Willis and Wells Fargo ran financial reports to determine volumes of business sold for individual carriers.  The purpose of these reports were for Willis and Wells Fargo to analyze where they could get "the most bang for the buck" toward the end of the year by steering business toward a carrier where there was the best opportunity for the greatest Contingent Commission. Indeed, Wells Fargo issued directives to its employees emphasizing particular carriers and was considered a "premier provider" with certain insurers.  Additionally, Willis hosted weekly or bi-weekly conference calls, attended by managers of each outlying Willis office, where corporate accounting updated Willis' financial positions with respect to individual carriers and informed the field of which carriers to favor.

243.    Willis and Wells Fargo also held monthly customer service representative meetings at each local office.  Since the customer representatives dealt directly with the insureds and the carriers, they were informed by marketing about the brokers' proximity to receiving override payments, so they could help facilitate the placement of policies with specific carriers, in order to meet the threshold target.

244.    USI also dictated to its brokers which insurance companies' policies they were to sell. For instance, USI employees were told not to move business from certain carriers, including

defendant Hartford, because the commissions were higher.  Furthermore, at monthly department meetings, USI employees were told to "stick with the higher commission carriers."

245.    Aon also steered clients to certain insurers.  As reported in the New York Times, by a person close to the N.Y.A.G.'s investigation into Aon, investigators have found documentation of brokers steering business to insurers that paid Aon incentives.  In fact, the Chicago Tribune reported a specific instance of steering involving ISMIE Mutual Insurance Co., Illinois' largest medical malpractice insurer and a client of Aon's reinsurance business.  During the mid-1990s, Aon brokers began directing their clients away from ISMIE to competing firms.  ISMIE's chief operating officer met with representatives of Aon's reinsurance brokerage and threatened to fire Aon as its reinsurance broker unless Aon brokers stopped taking their clients to ISMIE competitors.  Aon insurance brokers were subsequently told to stop redirecting their clients away from ISMIE.

246.    HUB also exerted pressure on its regional brokers to steer clients to preferred insurers in order to maximize the company's Contingent Commissions.  According to a former HUB employee who worked as a business manager for three HUB offices, HUB would send monthly statements to the local managers stating the level of commitment HUB had made to certain insurers, and detailing how much business the local manager had given to that insurer to date, and that HUB needed to fulfill its commitment.  According to this former employee, "business is driven to specific carriers because of commitments made on contingent arrangements."  HUB's vice-president of marketing, John Curran, was responsible for entering into such Agreements with carriers such as Chubb, St. Paul Travelers, and Hartford, and ensuring that HUB maximized its Contingent Commissions with the insurers.  As Curran explained in an insurance industry journal entitled Rough Notes, "[w]e work with insurance companies to develop a business plan that will help us both accomplish our objectives."  According to the former HUB employee, "[i]f John Curran calls and

says what have you got to give to Chubb – [some people] may place a piece of business with Chubb because John asked them to."

247.    Gallagher also provided its brokers a list of approved insurers from which they could place insurance, including Hartford and AIG.

248.    A former Brown employee acknowledged that steering took place with specific insurers such as Hartford which provided end of year bonuses and kickbacks based on volumes of business placed.  Moreover, Brown put pressure on carriers so that it could earn more contingent commissions and volume based agreements.  In fact, Brown management would hand out documents to personnel specifically identifying the names of carriers Brown had volume agreements ranked according to the volume agreements and fees the company would receive.

249.    And, ULR steers more than 90% of its business to CIGNA, MetLife, Prudential, UnumProvident and their subsidiaries and/or affiliates.  For example, MetLife and ULR have entered into "Preferred Broker Compensation Plans," in which ULR can secure a 50% increase in its overrides if it meets a "New Business threshold."  To meet this threshold, the broker must place one of every three accounts that MetLife prices "competitively."  Not surprisingly, MetLife receives approximately 50% of ULR's business.  In 2003 alone, MetLife paid ULR over $8.5 million in overrides.

250.    The Insurer Defendants realize that the Broker Defendants steer them business only because they have agreed to pay the Broker Defendants for the business.  Accordingly UnumProvident, "to play with (ULR), we need the overrides."

251.    Consequently, the Insurer Defendants have directed brokers to steer business in their direction through special incentive programs.  For example, Hartford encourages brokers to produce more business by designating them "platinum broker," "gold broker" or "high impact broker."  Such designations result in "more preferential treatment" and "better contingency contracts" (*i.e.*, higher

override payments and other monetary and non-monetary remuneration at the expense of the insured).

252.    CIGNA encourages brokers to sell disability insurance to its clients by awarding the brokers twice as much Contingent Commission credit: "Our Short Term Disability programs can only be purchased in connection with our Long Term Disability insured program.  That means you earn two Coverage Credits on each new . . . Disability sale."

253.    In an effort to maximize the business it receives through steering, at its February 2004 New Orleans National Sales Conference MetLife introduced the "Broker Producer Bonus System," which is a computer program designed to help producers calculate the threshold amounts needed to qualify for bonuses.

254.    In addition to steering clients to carriers that pay them the highest overrides and away from carriers that refuse to pay overrides or submit false bids, the Broker Defendants steer Class Members toward certain types of plans that permit Defendants to more easily conceal compensation received from or paid by Insurer Defendants.

255.    For example, ULR encourages Class Members to place their employee benefit plans with "non-participating" insurance carriers ("non-par"), versus "participating" insurance carriers ("par") that pay dividends to their policyholders.  The former do not report the specific components that are included in the pricing of the policyholder's premium such as compensation paid to ULR Defendants, while the latter must provide such information.  To maximize their undisclosed fees, Broker Defendants steer Class Members toward non-participating plans.

256.    The Broker Defendants have been able to ensure others' participation in the conspiracy by leveraging the Agreements for greater amounts of Contingent Commissions and market share.  On November 7, 2003, a Marsh executive described his experience with the President of ACE as follows: "I made it clear that if ACE wants us to meet significant premium growth targets

then ACE will have to pay 'above market' for such [a] stretch . . . ." Similarly, a former AIG employee noted that a large majority of AIG's accounts were controlled by Marsh and Aon and that "those accounts are pretty complex and mean so much to the company that they would do anything to keep them."

257. The Connecticut AG Complaint against Marsh and ACE includes another example of Marsh's influence over the Insurer Defendants. It describes how one insurance company found itself shut out by Marsh and found it necessary to use override agreements simply to get business: "We are now being heavily penalized by Marsh for not having the [PSA] agreement signed. We are being systematically excluded from . . . placements that we would otherwise like the chance to write." Another insurance executive noted: "With Marsh if we don't have an override we should not call on them . . . they flat out told us if we want to write business we need to have an override end of story."

258. Finally, some of the Broker Defendants control the competitive process by demanding higher Contingent Commissions on renewal. For example, ULR advised UnumProvident that it would "need to comp[ensate] them [ULR] not to shop enforce [sic] accounts[]."

259. As a corollary, the Insurer Defendants are able to garner huge profits by conspiring with the Broker Defendants for their clients' business. For example, MetLife received $565.6 million in premiums for policies placed in 2003 by ULR. That same year, Prudential and UnumProvident received $214.3 million and $101.6 million, respectively, in business from ULR.

### (2) "Low-Hanging Fruit"

260. One of the most egregious steering practices in which Defendants engage is known as "low-hanging fruit." Insurer Defendants commonly obtain additional business by "flipping" (providing) existing clients with which they have direct insurance contracts (*i.e.*, who are purchasing insurance without a broker) to the Broker Defendants with the understanding that the brokers will

steer other accounts to the insurance carriers.  Broker Defendants then are able to earn Contingent Commissions and other undisclosed compensation from the Insurer Defendants on the "flipped" clients.

261.    Defendants' "low-hanging fruit" steering practices are exemplified by CIGNA's "flipping" Honeywell to the ULR Defendants.  CIGNA was already Honeywell's insurance carrier, but later designated ULR the broker of record.  ULR did not replace any prior broker.  Honeywell's employee benefit policies were worth $15 million, with a 1% override that was paid to ULR Defendant, unbeknownst to Honeywell and its employees.

262.    Further, Prudential's Quality Business Incentive Award Agreement with ULR provided for low-hanging fruit compensation in the following provision:

> Inforce and new premium consideration for this award will be "net" totals.  ***Should the Producer be named broker of record or retained in a consulting capacity by an inforce Prudential account, the value of that account will be included in the (override) award calculation***.

Thus, Prudential contemplated situations where an insured would have an existing policy with Prudential.  Prudential subsequently would designate ULR as broker or consultant even though ULR had not placed that insured with Prudential, and Prudential would count that insured's premium toward ULR's override.

263.    The other Defendants have also engaged in low-hanging fruit steering arrangements.

**(3)    Defendants' Bid-Rigging Scheme**

264.    Defendants also have conspired and engaged in bid-rigging practices to steer Plaintiffs' and Class Members' accounts to certain Insurer Defendants in return for Contingent Commissions.

265.    Among other things, bid-rigging enables the Insurer Defendants to keep premium prices high.  Through their bid-rigging conspiracy, Defendants were able to, *inter alia*, increase their insureds' premiums at the time of policy renewal to recoup broker fees and achieve higher profit

margins.  For example, MetLife and Cigna have increased their renewal premiums by as much as 40%-50% for some accounts.  To maintain the business with the incumbent carrier and capitalize on the persistency prong of the override agreements, the Broker Defendants direct non-incumbent insurance carriers to submit quotes that are higher than the quotes they might otherwise have provided.

266.    Intrinsic in Defendants' bid-rigging scheme is the sharing of the details of the Broker Defendants' clients' current rates and policy terms to insurance carriers involved in the manipulation of the bids.  The Broker Defendants leak the details of their client's current rates and policy terms to the preferred carrier that the Broker Defendants handpick for bidding out the client's account to ensure the pre-determined preferred insurer wins the business.  In doing so, the Broker Defendants share their clients' confidential information, unbeknownst to the clients.

267.    The Insurer Defendants knowingly boycotted certain client accounts by submitting losing, non-competitive bids in certain Requests for Proposals ("RFP"), knowing that their turn to submit the winning bid would come in another RFP.  The Insurer Defendants benefited from colluding in the Broker Defendants' bid-rigging scheme because they did not have to compete with one another on price and other terms.  Absent such collusion among the Broker Defendants and Insurer Defendants, each Insurer Defendant would have priced their bids more competitively, instead of supporting artificially inflated premiums.

268.    The Broker Defendants also have ignored low bids in favor of the Insurer Defendant with which Broker Defendants have conspired to steer business pursuant to override agreements and other forms of undisclosed remuneration.

269.    ULR's bidding out of Marriott International, Inc.'s employee life and disability insurance in December 2002 is illustrative.  ULR sought proposals from certain insurance carriers, including the "finalist," defendant UnumProvident, which pursuant to Defendants' scheme placed

one of the three low bids.  Thereafter, Marriott added a condition that rendered the account sufficiently unprofitable for UnumProvident.  UnumProvident indicated to ULR Defendants that it would have to withdraw the bid.  ULR was loath to see UnumProvident withdraw because another insurance carrier, Aetna, with which ULR did not have an override agreement at the time, would have become a finalist.  Accordingly, ULR encouraged UnumProvident to maintain the bid.  A UnumProvident employee relayed the arrangement as follows:

> I did speak with [ULR] . . . and confirmed . . . that we would meet their request of the .107 rate . . . under the condition that we could not sell the case at this rate based on our concern about the expected lower volume creating a shortfall for us.  He reiterated and assured me that we would not win this business at these rates due to the significant disparity between our offer and Prudential's.  He understands that we are doing him a favor and is suggesting that he will reciprocate.

Not surprisingly, UnumProvident landed a large account through ULR shortly thereafter.  In February 2003, ULR placed Marriott's employee disability insurance coverage with UnumProvident.

270.    A second illustration concerning Massachusetts's Group Insurance Commission ("GIC") 2001 group life procurement demonstrates how the Broker and Insurer Defendants mutually benefited from bid-rigging.  Even though the GIC followed a process designed to ensure fairness to all bidders by posting all information related to the procurement and all responses to bidder inquiries on the Commonwealth's procurement website, OFJ provided Unum with information that assisted Unum in preparing its bid, its Best and Final Offer ("BAFO"), and its presentations to GIC, including detailed pricing information on the principal competing bid.

271.    Unum's internal communications during the bid process confirm the value of the information from OFJ.  For example:

(a)    On December 21, 2000, UnumProvident e-mailed the UnumProvident bid team concerning a conversation with Hilb Rogal principals: "[Hilb Rogal] certainly gave us some great information yesterday."    Hilb Rogal had disclosed to UnumProvident that "we [UnumProvident] are $1.07M higher on basic life" and $900,000 lower" on optional life, and had

proposed a strategy for what is needed for UnumProvident to win the bid.  No other bidders, UnumProvident was told, were receiving this type of "behind the scenes" information from Hilb Rogal.  Hilb Rogal disclosed to UnumProvident what were supposed to be the secret identities of the finalist bidders, and provided UnumProvident with feedback on the client's impressions of UnumProvident's bid presentation.

(b)     In the same December 12, 2000 e-mail, UnumProvident wrote that Hilb Rogal provided explicit instructions for the second bid offering: "Per [Hilb Rogal], the [client] is happy with our [supplemental] rates, but they are not satisfied with our basic life rates with the active [employees] at this time.  They made it very clear what we should do: 1)  Drop our basic rates on the actives to at least where Cigna is now (1.05 - per [Hilb Rogal]); 2) Keep the basic rate on RMT as is – we are fine here. 3) If at all possible, lower our optional rates by 1% to 3%.  If nothing else, we need to look long and hard at lowering the base rate to 1.05 or lower.  I know this is a lot, but this will be what it takes to get the business."

(c)     On December 28, 2000, as the second bid deadline approached, a UnumProvident sales manager e-mailed the UnumProvident bid team that UnumProvident sales personnel "have heard again from the consultant (Hilb Rogal) that we will not write this case at current pricing levels.  Cigna has communicated to [Hilb Rogal] that they will be making an adjustment to their pricing with a focus on the [supplemental] life during this 'BAFO' round. [Hilb Rogal] wants us to get this business.  They have communicated clearly that we are $1,070,000 (only 3 to 4% of total case premium) higher than Cigna on the basic Life Insurance.  [Hilb Rogal] recommends . . .  We need to come in at 1.04/$1,000 which is .01 below in force but over Cigna's current pre-BAFO bid."

(d)     On December 15, 2000 UnumProvident's sales personnel explained in an e-mail that Hilb Rogal had provided instructions on how to make the computer/website portion of

UnumProvident's presentation most effective, by focusing on UnumProvident's vision for future web capabilities. "This is coming straight from the broker's mou[th] – she really wasn't supposed to be telling me this, but she is trying to give us the edge."

(e)    On January 4, 2001, three UnumProvident sales executives met with three Hilb Rogal principals at the Ritz Carlton in Boston. At least one Hilb Rogal principal was directly involved in the client's life insurance procurement on behalf of Hilb Rogal and had provided UnumProvident information that helped UnumProvident's bid.

(f)    In written materials provided to Hilb Rogal, UnumProvident provided a comparison of Hilb Rogal's "2000 override plan" with UnumProvident's proposal. The comparison showed that UnumProvident' proposal could significantly increase Hilb Rogal's compensation from selling UnumProvident's products.

(g)    On January 8, 2001, Hilb Rogal asked that UnumProvident restructure the proposal to reward renewal of policies in addition to generating new business: "We recommend a reconfiguration of your suggested SPA illustration which will provide ongoing financial consideration for maintenance of the book of business along with an annual bonus that reflects the net new business growth of the book." This reconfiguration would greatly benefit Hilb Rogal because it effectively stretched over five years Hilb Rogal's compensation attributable to the client's premiums, instead of a one-time new sales commission.

(h)    UnumProvident agreed to restructure the proposal to pay compensation for "block management" as well as new sales. Unbeknownst to the client, Hilb Rogal and UnumProvident thus negotiated the proposal at the same time that Hilb Rogal was to be providing the client with objective consulting advice.

272.    As further illustrated by Marsh's "A," "B" and "C" tiered quotes, Defendants' systematic bid-rigging is achieved through multiple levels of manipulation.

273. **The "A Quote."**  If Marsh had an incumbent carrier for one of its clients, whose insurance policy was up for renewal, Marsh would  solicit what was known as an "A Quote" from that insurer.  If the insurer agreed to make a quote at the targeted premium and policy terms demanded by Marsh, regardless of its ability to quote more favorable terms or premiums, the insurer was guaranteed the policy renewal.

274. **The "B Quote."**  At the same time, in order to deceive customers into believing that Marsh was obtaining competitive bids and to ensure that the incumbent carrier would get its policy renewed, Marsh would solicit non-incumbent insurers to submit what was known as a "B Quote" (a phone quote which also was known as a "backup quote," "protective quote" or "throwaway quote"), with the understanding that these other insurers would not actually be making competitive bids.  "B Quote" insurers, including MetLife, knew and understood that their turn would come later.  Marsh often provided these other insurers with target quotes to be made, regardless of the insurers' ability to quote a lower premium below the target bid.

275. For instance, in October 2003, an AIG underwriter stated that with regard to a B Quote he had provided to Marsh: "This was not a real opportunity.  Incumbent Zurich did what they needed to do at renewal.  We were just there in case they defaulted.  Broker . . . said Zurich came in around $750K & wanted us to quote around $900K."

276. As ACE explained:  "[I]f we were asked for a 'B' quote for a lead umbrella then they provided us with pricing targets for that 'B' quote.  It has been inferred that the 'pricing targets' provided are designed to ensure underwriters 'do not do anything stupid' as respects pricing."

277. Indeed, in those instances where an insurer provided a B Quote that was too competitive to ensure its loss, Marsh would ask the insurer to submit a higher quote.  According to ACE on one such occasion, the "[o]riginal quote [was] $990,000 . . . .  We were more competitive

than AIG in price and terms.  [Marsh] requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business."

278.    In instances where the Insurer Defendants were not provided with a specific target B Quote but were nonetheless expected to lose the bidding competition, the insurer would simply look at the expiring policy terms and premium, and provide a quote high enough to ensure that they would not be the winner or that they would make a comfortable profit in the rare instances where such B Quotes were awarded the contract.

279.    In the rare situation where a B Quote inadvertently was awarded a contract in a competitive bid, it likely was because the incumbent insurer was unable or unwilling to meet Marsh's A Quote target price.  As further evidence of Marsh's manipulation of the bidding process, since the successful B Quote bidder in such situations had not completed any underwriting analysis (since it had no intention of winning the contract), the insurer would "back fill" the underwriting analysis in its file, *i.e.*, prepare the necessary analysis after the fact.

280.    **The "C Quote."**  When there was no incumbent insurance carrier to protect, Marsh would solicit insurers for "C quotes."  Although it was understood that real competition was a possibility in such situations, Marsh often still provided premium targets to the insurers.

281.    In conspiring with insurers to rig insurance contract bids and allocate customers, Marsh completely disregarded the interests of the client and the possibility that another insurer may offer a better deal for that client.  Instead, Marsh pursued its own self interest in rigging the purported competitive bidding process.  For instance, in June 2003, when ACE learned that a Marsh client, Brambles, USA, was unhappy with its incumbent carrier, AIG, Marsh nonetheless wanted AIG to keep the business.  ACE stated, "Our rating has a risk at $890,000 and I advised [Marsh] that we could get to $850,000 if needed.  [Marsh] gave me a song & dance that game plan is for AIG at

$850,000 and to not commit our ability in writing." As a result, ACE maintained its practice over the following year of providing Marsh with inflated quotes.

282.    Marsh engaged in the collusive bidding on a massive scale. For example, Hartford Financial – which shared office space with Marsh in Lake Mary, Florida and Los Angeles, California – was asked on virtually a daily basis by Marsh employees for inflated quotes, referred to as "throwaway quotes," or "indications" (non-binding proposed prices) for insurance coverage. Hartford underwriters were told to price the quote or indication typically at 25% above the other insurers' quotes. In the Los Angeles offices, Marsh even provided Hartford with a spreadsheet showing the accounts for which it wanted Hartford to provide a losing quote or indication, along with the other insurers' quotes. Hartford provided the inflated quotes.

283.    The other Defendants have also engaged in bid-rigging practices.

**E.    WHOLESALE PAYMENTS**

284.    In addition to the improper practices described above, Broker Defendants received additional income by improperly placing their clients' business with insurers through related wholesale entities that purport to act as intermediaries between broker and insurer, and receive commissions ("Wholesale Payments") from the insurers for placing the business of the clients of the brokers. As a result of these relationships, the Wholesale Payments are channeled to Defendants in whole or in part.

285.    For example, Willis placed its clients' business through its wholesaler, Stewart Smith, to generate additional commission, even where an intermediary was unnecessary. As described in an email dated April 9, 2004, from James Drinkwater to a regional director: "If we are to sustain and grow world class … we must support them [Stewart Smith and other subsidiaries] so that they can in turn support us in growing our revenues …." He stressed that it was only appropriate to use a non-owned intermediary where "properly authorized and we must have made every effort, used every

resource and relationship to place the business internally …."  Further, "[i]f a business unit fails to comply with this simple protocol … commissions that would have been earned by our Owned Wholesale Entity will be deducted from the business unit concerned."

286.     Similarly, a memorandum dated October 31, 2003, instructed brokers to "[m]aximize a new volume bonus arrangement with Stewart Smith by moving accounts to Stewart Smith that are written net of commission (fee).  Craig will send a list of possible accounts to each CEO."  In addition, the memo instructed that brokers must: "Identify key accounts, both new and renewal, which will maximize income from the utilization of Willis Group resources including Stewart Smith …."  In this manner, Willis generated additional commissions through its subsidiary wholesaler, unbeknownst to its clients and contrary to its fiduciary obligations.

287.     On April 9, 2004, James Drinkwater - the Managing Director of Willis Global Markets – instructed Randy Pugh in an email, that before a "non-owned intermediary" could be used, he "must have made every effort, used every resource and relationship to place the business internally …."  Further, he warned that if a business unit did not comply with "this simple protocol," "commissions that would have been earned by our Owned Wholesale Entity will be deducted from the business unit concerned."

288.     As set forth in the Willis Assurance of Discontinuance, a December 1, 2003 email from the Director of Marketing in Florida stated that "after negotiating acceptable premiums, we ran this [client account] through Stewart Smith [Willis' wholesaler] for additional income to group of more than $156,000.  Fee Account."  [Willis's wholesaler]  That email also described another account that was "renew[ed] with AIG, via Stewart Smith (versus direct), [generating] additional income to group of $100,000.  Fee account."

289.     Between 2002 and 2004, Stewart Smith paid Willis over $62 million for brokering business originated by Willis through Stewart Smith.  The carriers that sold insurance to Willis' clients with Stewart Smith as an intermediary include: ACE, Hartford and AIG.

290.     While serving the interests of Defendants, the wholesale entities do not serve the interest of Defendants' clients.  Specifically, the Wholesale Payments create similar undisclosed conflicts of interest and economic disincentives as Contingent Commissions for Broker Defendants to fulfill their legal and contractual duties to their clients, including Plaintiffs and Class Members.

## F.    REINSURANCE

291.     The Broker Defendants utilized their improper steering practices to obtain additional fees by tying the purchase of primary insurance with the placement of such coverage with reinsurance carriers through the Broker Defendants' reinsurance broker subsidiaries.  Plaintiffs and the Classes are injured by the improper tying arrangements in that ultimately the cost of the reinsurance Contingent Commissions paid by the Insurer Defendants (both primary and reinsurance) to the Broker Defendant's (through their reinsurance, broker subsidiaries and affiliates) included in the inflated premiums and/or reduced coverages provided to Plaintiffs and the Class Members.

292.     Gallagher utilizes its relationships with its "preferred" carriers to obtain additional fees for its reinsurance subsidiaries.  For example, in a letter dated May 7, 2002, VP of Market Relations for the Brokerage Services Division, Craig Van der Voort stated to Executive VP of Brokerage Services, James Gault, that he would "***try and leverage the specific companies [AIG and Hartford] for more of their reinsurance business***."  (Gallagher Assurance at 9).

293.     Similarly, Willis engaged in improper tying and collection of additional fees through its reinsurer Willis Re.  Specifically, an email dated November 3, 2003 from the head of Willis' Northeast Marketing instructed brokers to: "get Willis Re [reinsurance] involved in any accounts possible." (Willis Assurance at 7).

294.   Willis employee Tony Ainsworth coordinated the effort to leverage Willis' relationship with insurers to generate reinsurance business.  Mr. Ainsworth prepared spreadsheets on a monthly basis to demonstrate Willis' success in this area.

295.   After these illegal activities came to light, Willis scrambled to minimize its documentation of such practices.  In a November 15, 2004 email, Ainsworth stated that management:

> have decided to suspend all e mail and/or written correspondence between Willis Re Fac [Facultative] and Willis Retail/Wholesale effective immediately.  This will mean that we will no longer track [retail] broker / share renewal / leverage business, etc. . . .  ***It does not mean that we will not be working with Retail/Wholesale on accounts but more in a low key manner.  Keep talking to our friends and find out where business is being sent . . . just do it verbally or in person!*** [Willis Assurance].

296.   Aon promised to steer retail business to AIG in return for AIG's commitment to use Aon Re's reinsurance services.  In the fall of 2000, AIG indicated that it was considering handling in-house a particular reinsurance program called CCA.  In a November 27, 2000 email to top Aon executives on both the retail and reinsurance sides of the business, an Aon executive explained: "In return for a commitment of $10,000,000 in new gross premium from ARS US, AIG has agreed to appoint Aon Re for an additional 2.5% placement of the CCA program, which [AIG] has indicated is worth $750,000 in commission for Aon Re.

297.   Similarly, in February 2000, Aon also promised Liberty Mutual Group retail business if Liberty Group used Aon Re for Liberty Mutual Group's reinsurance needs.  Scott Clark (the head of Aon Re's Property Practice Group) attended a meeting with Liberty Mutual executives during the week of February 14, 2000, and later summarized the meeting on an e-mail dated February 23, 2000 as follows:

> I told them we are best qualified to handle their corporate reinsurance program. Reinsurance is extremely important to Aon and without it we just won't grow as well as with it.  I told them if we don't get their reinsurance there is no point in these "love ins."  Needless to say I got their attention, some say I was too strong but we

have got to stop screwing around with the interdependence message, especially to those that can give us their reinsurance, depend on Aon for production and have mediocre brokers . . . ."

Subsequently, Aon Re obtained Liberty Mutual's reinsurance business. Liberty Mutual depended on Aon for production and apparently did not want to risk losing retail business.

298.     Aon memorialized these arrangements in what became known as "clawbacks." Many of these clawbacks shared a similar pattern: initially, the insurer would express displeasure at Aon Re's brokerage commissions and would threaten to shop around for competitive rates. However, to further their conspiratorial conduct, Aon Re would offer the insurer an incentive by heavily discounting its reinsurance brokerage commissions. To recover the compensation lost by the discount, Aon Re would negotiate a "clawback," allowing it to reduce or eliminate the reinsurance brokerage discounts by steering retail insurance business to the insurer.

299.     Significantly, these "clawback" arrangements remained subject to confidentiality agreements and, as a result, Aon's retail clients were not informed that Aon steered, or had incentives to steer, business to selected insurers to recoup the discounts Aon Re offered to these insurers on the brokerage reinsurance account.

300.     Furthermore, Aon Re provided direct financial incentives for the Broker Defendants steer reinsurance to preferred reinsurers in exchange for Contingent Commissions. For example, Aon Re paid an additional bonus to its brokers "as an incentive for having placed business with Kemper last year." According to the Aon AG Complaint, "Kemper paid Aon Re reinsurance contingent commissions of $557,934.50 in 1997, $570,000 in 1998 and $2.5 million in 1999."

## G.     INVESTIGATIONS INTO DEFENDANTS' PRACTICES

### (1)     Government Investigations into Defendants' Practices

301.     A large number of state attorneys general, and federal and state regulators have commenced investigations concerning the Defendants' practices identified above. Settlement

agreements or assurances of discontinuances have been entered into by the New York Attorney General, together with the Superintendent of Insurance of New York as well as various other state attorneys generals including Connecticut and Minnesota, with three Broker Defendants: Marsh, Aon, and Willis. Spitzer, along with the Director of Illinois Division of Insurance and other state agencies similarly entered into a Stipulation and Consent Order with a fourth Broker Defendant - Defendant Arthur J. Gallagher & Co. Finally, the Massachusetts Attorney General entered into a settlement with Hilb and UnumProvident for undisclosed payments of Contingent Commissions. Each settlement agreement or assurance of discontinuance agreed to a prohibition of receiving contingent compensation from insurers and required, among other things, that each Broker Defendant provide full disclosure of all forms of compensation received from insurers. Cigna also agreed to settle allegations by Connecticut that it concealed Contingent Commissions.

302.    Further, state insurance departments have launched investigations and/or filed suit. For example, California Insurance Commissioner John Garamendi filed an action to enjoin ULR, MetLife, Cigna, Prudential, UnumProvident and Hartford from violating certain provisions of the California Insurance Code.

303.    Subpoenas have been issued to almost every other defendant including, Ace, AIG, Aon, BB&T, Brown & Brown, Cigna, Gallagher, Hartford, Hilb Rogal, HUB, Marsh, MetLife, UnumProvident, USI, Wells Fargo, and Willis. Numerous state Attorney Generals, including Connecticut, Florida, California, Illinois, New York, North Carolina, Massachusetts, Minnesota, Missouri and West Virginia have subpoenaed Defendants concerning their Contingent Commission Agreements and/or bid-rigging practices.

304.    On November 16, 2004, the Senate Governmental Affairs subcommittee held a hearing to address the issue of illegal broker fees. At the hearing, Spitzer, Garamendi, and Blumenthal testified about their investigations and findings. In addition, Senate Banking Committee

Chairman Richard Shelby (R-Ala.) stated that he plans to hold hearings on issues uncovered by the insurance broking investigations.

### (e) Guilty Pleas of Defendants' Employees

305.   Several of Defendants' employees have pled guilty to criminal charges.

306.   On October 13, 2004, Karen Radke, a manager at American Home, a division of AIG, entered into a cooperation and plea agreement with the State, wherein she agreed to plead guilty to the Scheme to Defraud and admitted she "participated in a scheme with individuals at Marsh & McLennan . . . . [to] allow[] Marsh to control the market and to protect incumbent insurance carriers when their business was up for renewal." She admitted that "Bill Gilman, Ed McNenny, and others at Marsh periodically instructed [her] and others at AIG to submit specific quotes for insurance rates that [she] believed: a. were higher than those of the incumbent carriers, b. were designed to ensure that the incumbent carriers would win certain business, and c. resulted in clients being tricked and deceived by a deceptive bidding process."

307.   On January 19, 2005, Carolos Coello, an underwriter at AIG, entered into a cooperation and plea agreement with New York, wherein he agreed to plead guilty to the crime of Scheme to Defraud in the Second Degree. On January 25, 2005, John Mohs, an Assistant Manager of AIG's Underwriting Unit, entered into a similar cooperation and plea agreement, wherein he also agreed to plead guilty to the Scheme to Defraud in the First Degree.

308.   On February 15, 2005, the N.Y.A.G.'s office announced that Joshua Bewlay, a former Marsh executive, pled guilty to a felony count of a scheme to defraud and admitted to engaging in a bid-rigging scheme. Bewlay's plea agreement states, in relevant part:

> From approximately 1998 through 2003, Mr. Bewlay engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property . . . by false and fraudulent pretenses, representations promises, to wit, noncompetitive quotes from insurance carriers that Marsh conveyed to Marsh clients . . . in that Mr. Bewlay and others at Marsh regularly instructed insurance carriers to submit noncompetitive quotes, that were

presented to clients as competitive, thus ensuring that the client would select the carrier, typically the incumbent, that Marsh had pre-determined should win the business.

309.    And, on February 24, 2005, Marsh managing director Kathryn Winter pled guilty to a felony charge of scheming to defraud.  She similarly admitted that she "participated in a scheme with individuals at various insurance companies" where the "primary goal of th[e] scheme was to maximize Marsh's profits by controlling the market, and protecting incumbent insurance carriers when their business was up for renewal."

### (2)    Suspensions, Terminations and Resignations of Defendants' Employees

310.    Numerous employees of both the Broker Defendants and Insurer Defendants have either been fired or have resigned from their positions.

311.    On October 20, 2004, Marsh suspended four employees whose names surfaced as a result of the investigations into the company's Contingent Commissions and bid-rigging practices. The four employees include William Gilman, executive director of marketing at Marsh Global Broking and a managing director of Marsh; Greg Doherty, a senior vice president in Marsh Global Broking's excess casualty division; Edward McNenney, a brokerage executive; and Samantha Gilman, Mr. Gilman's daughter.  William Gilman, Doherty, McNenney, and Glenn Boshardt, a Marsh executive, were ultimately dismissed from Marsh.

312.    On October 25, 2004, Marsh's Chairman and Chief Executive Officer, Jeffrey Greenberg resigned.  Michael G. Cherkasky replaced Mr. Greenberg as Chairman and Chief Executive Officer.

313.    On November 8, 2004, Roger E. Egan, President and Chief Operating Officer of Marsh Inc., Marsh's risk and insurance services subsidiary, Christopher M. Treanor, Marsh Inc.'s Chairman and Chief Executive Officer of Global Placement; and William L. Rosoff, Senior Vice President and General Counsel of Marsh, were asked to step down from their positions.

**(3)      Defendants Discontinue the Use of Contingent Commission Agreements**

314.    As a result of the governmental investigations into Defendants' compensation practices, several Defendants including, *inter alia*, Marsh, Aon, Gallagher, UnumProvident, Willis, Liberty Mutual, AIG and ACE have discontinued the use of Contingent Commission Agreements and instituted other reforms designed to avoid conflicts of interests in the brokerage industry.  For example, as part of its settlement with Spitzer, Marsh agreed to a prohibition of receiving contingent compensation from insurance carriers.  Marsh also agreed to provide clients with a comprehensive disclosure of all forms of compensation received from insurers and to adopt and implement company-wide, written standards of conduct for the placement of insurance.

315.    Likewise, as part of their settlement agreement and/or assurances of discontinuance with various state attorney generals, Aon, Willis and Gallagher agreed to prohibition of accepting or requesting of any insured any Contingent Compensation.

316.    And, pursuant to its settlement with the California Commissioner of Insurance, on November 18, 2004, ULR agreed to cease accepting commission payments from insurers and fully disclose to its clients any remuneration it receives.

317.    On March 30, 2005, CIGNA announced that it is "sorting out" its relationship with brokers and its compensation arrangements with them, but has set no date to complete the review.

318.    And, in its June 24, 2005 Prospectus, MetLife discussed how the investigations into Contingent Commissions may dramatically affect the way it conducts business:

> One possible result of [the AG] investigations and attendant lawsuits is that many insurance industry practices and customs may change, including, but not limited to, the manner in which insurance is marketed and distributed through independent brokers and agents. Our business strategy contemplates that we will rely heavily on both intermediaries and our internal sales force to market and distribute insurance products. We cannot predict how industry regulation with respect to the use of intermediaries may change. Such changes, however, could adversely affect our ability to implement our business strategy, which could materially affect our growth and profitability.

319.     Although certain Defendants have discontinued the use of Contingent Commissions, many others continue to use Contingent Commissions.  For example, BB&T and HUB recently stated that they will continue to pay and accept Contingent Commissions.  Hilb Rogal recently stated that they will "not renounce overrides or contingent commissions," and Haack continues to accept them.

## H.     CONSPIRACY ALLEGATIONS

320.     Broker and Insurer Defendants have engaged in a common course of conduct and conspiracy to manipulate the market for insurance products, generating enormous profits for themselves at the expense of Class Members.  Defendants' conduct creates a conflict of interest and is clearly at odds with the Defendants' representations regarding the services they will provide as well as the duties inherent in the relationship that exists between Class Members and Defendants.

321.     Although Defendants have created the illusion of a competitive market for insurance, the selection, pricing and placement of the insurance products at issue in this litigation were, in fact, the result of Defendants' collusion.

322.     The common scheme and conspiracy involves all of the Broker Defendants and the Insurer Defendants, as well as other brokers and insurers who have undertaken the wrongful conduct set forth herein and other entities that have facilitated the conspiracy.

323.     The purpose and effect of the conspiracy is to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.  As a result of the conspiracy, Insurer Defendants did not have to compete for insurance business on the basis of price or other terms and this lack of competition enabled them to charge premiums that were higher than they would have been in the absence of the conspiracy.  The Broker Defendants, in turn, profited from the conspiracy

through the receipt of Contingent Commissions, overrides, communications fees, and other compensation.

324.   The actions of the Defendants were all part of the same conspiracy to increase revenues and to suppress or eliminate competition.  Each Defendant understood the nature of this conspiracy, understood its role in facilitating the objectives of the conspiracy, and agreed, whether implicitly or expressly, to participate in the conspiracy.  In addition, each enjoyed supra-competitive profits as a result of the conspiracy, to the detriment of Plaintiffs and the Class.

325.   Each Defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objective of the conspiracy.

326.   Each Defendant and member of the conspiracy, with knowledge and intent, has committed acts of fraud in furtherance of this conspiratorial objective.

327.   In furtherance of the conspiracy, Defendants and other members of the conspiracy have agreed to implement and use the same or similar devices and fraudulent tactics against their clients, including Plaintiffs and Class Members.

328.   The same pattern and cause of conduct and activity and similar facts, which evidence the existence of a conspiracy, exist among all Defendants and co-conspirators, including:

(a)   similar agreements and policies among the Broker Defendants and the Insurer Defendants regarding concealment of their conflicts of interest and wrongful conduct;

(b)   similar agreements between the Broker Defendants and their clients which include either no language or vague, misleading, and incomplete language purporting to disclose compensation, steering, and bid-rigging arrangements between and among the Broker Defendants and the Insurer Defendants;

(c)   similar agreements regarding Contingent Commissions and other payments between and among the Broker Defendants and the Insurer Defendants;

(d)      similar practices regarding the reporting of their arrangements;

(e)      similar agreements regarding Wholesale Payments between and among Defendants;

(f)      similar tactics for steering customers to the Insurer Defendants and for placement of the Insurer Defendants products;

(g)      similar tactics for coercing submission of false bids, client steering, allocation of markets and customers, and stabilizing, raising or maintaining premium prices above competitive levels;

(h)      similar tactics for boycotting or refusing to deal with insurers who refused to participate in the conspiracy;

(i)      similar agreements and policies among the Broker Defendants and the Insurer Defendants regarding concealment of their conflicts of interest and wrongful conduct;

(j)      similar agreements regarding Contingent Commissions and other payments between and among the Broker Defendants and the Insurer Defendants;

(k)      similar plans and methods for the Insurer Defendants to recapture the undisclosed or inadequately disclosed compensation paid to the Broker Defendants from Plaintiffs and Class Members;

(l)      similar plans and methods for concealing the compensation and fees from Plaintiffs and Class Members (and their agent employers), including the underreporting of such compensation on Reports on Form 5500 and other certification requirements under ERISA;

(m)      the retention by former employees of the Insurer Defendants and/or manipulation of Insurer Defendants' employees by the Broker Defendants and vice versa; and

(n)      similar arrangements for tying primary employee benefit coverage to the purchase of reinsurance by the Insurer Defendants through the Broker Defendants.

329.    Defendants would not have undertaken the practices alleged herein absent an agreement among all Defendants.  Paying brokers significant additional commissions and fees is not in the individual best interests of the Insurer Defendants unless the other Insurer Defendants also agreed to participate in the scheme.

330.    The conspiracy has been conducted, implemented and facilitated through various mechanisms including direct communications among Defendants, sharing of information between Defendants and movement of employees among Defendants as well as through other means such as industry trade groups such as the Council of Insurance Agents & Brokers ("The Council") and its predecessors the National Association of Casualty and Surety Agents ("NASCA") and the National Association of Insurance Brokers ("NAIB"), The American Insurance Association ("AIA"), and the Reinsurance Association of America ("RAA").

331.    The Council, founded in 1913 to represent larger metropolitan agencies, represents the top tier of commercial insurance brokers in the United States in both property/casualty and the benefits sectors. The association's roots have always been in larger commercial agents and brokers. In fact, only the top one percent of all agents and brokers qualify.  The Council's members place 80 percent - well over $90 billion - of all U.S. insurance products and services protecting business, industry, government and the public-at-large and they administer billion of dollars in employee benefits.

332.    Professional networking is at the very heart of The Council.  It is a major part of who The Council is and what it does.  The Council orchestrates the industry's most important market meetings - the number one expectation of members.

333.    The Council of Insurance Company Executives, a standing Committee of The Council, is comprised of more than 65 of the top commercial insurers.  Collectively, CICE members

are responsible for writing more than three-quarters of the nation's commercial business insurance premiums.

334.   The Council of Insurance Company Executives and The Council of Employee Benefits Executives co-sponsor the Employee Benefits Leadership Forum at the Greenbrier, an employee benefits marketing meeting.   The conference at The Greenbrier brings together key insurance brokers who handle benefits lines with the leading insurance carriers in the country to discuss critical issues in the benefits sector.

335.   In addition to the industry meetings at The Greenbrier, The Council also facilitates many other forums including meetings of employee benefit executives, employee benefits executive roundtables, regional meetings relating to employee benefits, Chief Financial Officers workshops and conferences where CFO's of the major brokerage firms focus on the fundamental and strategic issues facing their business, Executive Liaison Committees, e-mail exchanges, market surveys, the sharing of operating results and financial analyses, insurance company sponsorships, peer-to-peer networking, as well as teleconferences between brokers and insurers. The Council operates in a strategic alliance with the American Insurance Association ("AIA") and the Reinsurance Association of America.  ("RAA").

336.   As a result of Defendants' conspiracy, Plaintiffs and Class Members have made payments for insurance and other "services" beyond what those payments would have been absent the conspiracy.  In addition, Plaintiffs and Class Members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

337.   The Broker Defendants and the Insurer Defendants are also engaged in a number of separate but parallel conspiracies, each involving a Broker Defendant and the insurance companies with which such Broker Defendant had Contingent Commission arrangements.

338.   At a minimum, three broker-centered conspiracies exist, including the following:

- A ULR-centered conspiracy consisting of defendant ULR and the insurance companies with which it had Contingent Commission arrangements, including defendants UnumProvident, CIGNA, Prudential, MetLife and Hartford and others (the "ULR-centered Broker Conspiracy").

- A Marsh-centered conspiracy consisting of Marsh and the insurance companies with which it had Contingent Commission arrangements, including defendant MetLife, Cigna, AIG, ACE, Hartford and others (the "Marsh-centered Broker Conspiracy").

- An Aon-centered conspiracy consisting of Aon and the insurance companies with which it had Contingent Commission arrangements, including defendant MetLife, ACE, AIG, Cigna, Hartford, Metlife, UnumProvident and others (the "AON-centered Broker Conspiracy").

339.    The purpose and effect of the conspiracies is to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.  As a result of the conspiracies, Insurer Defendants did not have to compete for insurance business on the basis of price or other terms, and this lack of competition enabled them to charge premiums that were higher than they would have been in the absence of the conspiracy.

340.    Each Defendant and member of the broker-centered conspiracy, with knowledge and intent, has agreed to the overall objective of the conspiracy.

341.    Each Defendant and member of the broker-centered conspiracy, with knowledge and intent, has committed acts of fraud in furtherance of this conspiratorial objective.

342.    As a result of Defendants' conspiracies, Plaintiffs and Class Members have made payments for insurance and other "services" beyond what those payments would have been absent the conspiracy.  In addition, Plaintiffs and Class Members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

## I.      ENTERPRISE

343.    Plaintiffs, Class Members and Defendants are "persons" within the meaning of 18 U.S.C. §1961(3).

### (1)      The Employee Benefits Insurance Enterprise

344.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of persons and entities associated-in- fact, hereinafter referred to in this Complaint as "The Employee Benefits Insurance Enterprise":

(a)      Defendants;

(b)      wholesale entities, whether affiliated with Defendants or not, which receive Wholesale Payments and transmit those payments in whole or in part to Defendants;

(c)      other insurers that pay Contingent Commissions, Wholesale Payments, and other improper fees and compensation;

(d)      other brokers, intermediaries, agents, reinsurers and other insurance entities that received or have received undisclosed compensation;

(e)      other entities that engage or have engaged in steering practices, "low-hanging fruit" and/or bid rigging;

(f)      other insurance brokerage and insurance industry groups, such as The Council, the AIA and the RAP, Integrated Benefits Institution and others as described above.

345.    The Employee Benefits Insurance Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce.

346.    Defendants have directed and controlled the ongoing organization necessary to implement their profit-making scheme and illicit business practices, for example, through numerous meetings and other communications described herein.

347.    The enterprise functions by providing insurance consultation, advice and related services as well as insurance products.  Many of these services and products are legitimate and non-fraudulent.  Normally, the activities of the enterprise involve recommendations and the provision of insurance products which best meet the needs of the insured.  However, the Defendants through the enterprise have engaged in a pattern of racketeering activity which involves a fraudulent scheme to increase premium revenue for the Insurer Defendants through steering and bid-rigging arrangements, and additional revenue for the Broker Defendants from inadequately disclosed overrides, communication fees, commissions, charges and other remuneration.

348.    Through the Employee Benefits Insurance Enterprise, Defendants engage in consensual decision making regarding the implementation of their fraudulent scheme and function as a continuing unit for the common purpose of increasing compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.

349.    While Defendants participate in and are members of the Employee Benefits Insurance Enterprise, they also have an existence separate and distinct from the enterprise.

350.    To establish and maintain the system of Contingent Commissions, Communication Fees, other undisclosed compensations and Wholesale Payments and to conceal the system and the inherent conflicts of interest it creates, Defendants were required to participate in the conduct of an to exercise control over the Employee Benefits Insurance Enterprise.

351.    Defendants have substantially participated in the conduct of and have exercised control and operated the affairs of the Employee Benefits Insurance Enterprise in at the least the following ways:

(a)      by entering into Contingent Commission arrangements and Wholesale Payment arrangements with the expectation and understanding that both the brokers and insurers would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

(b)      by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

(c)      by sharing and disseminating information about their practices and about Plaintiffs and Class Members, including confidential personal and proprietary information;

(d)      by formalizing relationships among participants in the Employee Benefits Insurance Enterprise for the payment of undisclosed compensation;

(e)      by uniformly recommending insurance products of the Insurer Defendants in order to maximize Contingent Commissions, Communication Fees and Wholesale Payments;

(f)      by sharing management and employees between and among the Broker Defendants and the Insurer Defendants;

(g)      by utilizing and supporting industry association as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme;

(h)      by submitting false or misleading information to plaintiffs and Class Members regarding the existence and nature of compensation paid by Insurer Defendants to ULR Defendants;

(i)      by engaging in "low-hanging fruit" practices;

(j)      by meeting to discuss the Broker Defendants' employee benefits brokering practices and Insurer Defendants' participation in those practices and to collude regarding the level of compensation contained in the Agreements; and

(k)      by developing and implementing responses to reporting requirements that conceal Defendants' scheme.

352.    The Employee Benefits Insurance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

**(2)      The Broker-centered Employee Benefits Enterprises**

353.    Each Broker Defendant and the insurers with which each had Contingent Commission agreements constitute a group of persons and entities associated-in-fact, referred to collectively in this Complaint as the "Broker-centered Employee Benefits Enterprises."  At a minimum, three such enterprises exist:

(a)      ULR and the insurers, including the Insurer Defendants, with which ULR had Contingent Commission Agreements;

(b)      Marsh and the insurers, including the Insurer Defendants, with which Marsh had Contingent Commission Agreements;

(c)      Aon and the insurers, including the Insurer Defendants, with which Aon had Contingent Commission Agreements;

354.    Through each of the Broker-centered Employee Benefits Enterprises, Defendants engage in consensual decision making regarding the implementation of their fraudulent scheme and function as a continuing unit for the common purpose of increasing compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.

355.    While Defendants participate in and are members of the Broker-centered Employee Benefits Enterprises, they also have an existence separate and distinct from the enterprise.

356.    In order to establish and maintain the system of Contingent Commissions and Wholesale Payments, while concealing the system and the inherent conflicts of interest it creates, Defendants were required to participate in the conduct of an to exercise control over the Broker-centered Employee Benefits Enterprises.

357.    Defendants have substantially participated in the conduct of and have exercised control over and operated the affairs of the Broker-centered Employee Benefits Enterprises in at the least the following ways:

(a)     by entering into Contingent Commission arrangements and Wholesale Payment arrangements with the expectation and understanding that both the brokers and insurers would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

(b)     by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

(c)     by sharing and disseminating information about their practices and about Plaintiffs and Class Members, including confidential personal and proprietary information;

(d)     by formalizing relationships among participants in the Employee Benefits Insurance Enterprise for the payment of undisclosed compensation;

(e)     by uniformly recommending insurance products of the Insurer Defendants in order to maximize Contingent Commissions, Communication Fees and Wholesale Payments;

(f)     by sharing management and employees between and among the Broker Defendants and the Insurer Defendants;

(g)     by utilizing and supporting industry association as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme;

(h)      by submitting false or misleading information to plaintiffs and Class Members regarding the existence and nature of compensation paid by Insurer Defendants to ULR Defendants;

(i)      by engaging in "low-hanging fruit" practices;

(j)      by meeting to discuss the Broker Defendants' employee benefits brokering practices and Insurer Defendants' participation in those practices and to collude regarding the level of compensation contained in the Agreements; and

(k)      by developing and implementing responses to reporting requirements that conceal Defendants' scheme.

358.    The Broker-centered Employee Benefits Enterprises have an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

## J.    RACKETEERING ACTIVITY

### (1)    Predicate Acts

359.    Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud), 18 U.S.C. §1343 (relating to wire fraud) or 18 U.S.C. §1954.  As set forth below, Defendants have engaged in and continue to engage in conduct violating each of those laws in order to effectuate their scheme.

360.    In addition, to make their scheme effective, each of the Defendants sought to and did aid and abet the others in violating the above laws within the meaning of 18 U.S.C. §2, which conduct is also indictable under 18 U.S.C. §§1341,1343 and 1954.

361.    To carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or official depositories of the United States Postal Service matter and things to be delivered by the Postal Service, caused matter and things to be delivered by commercial

interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including, but not limited to, agreements, correspondence, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Defendants' wrongful conduct, claims, responses to claims, and coverage letters, false information intended to be included in filings with the Internal Revenue Service and Department of Labor, and employee benefit descriptions that constituted the fruits of Defendants' wrongful conduct.

362.    To carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. §1343, transmitted and received by wire, matters and things including, but not limited to, agreements, correspondence, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Defendants' wrongful conduct, claims, responses to claims, and coverage letters, false information intended to be included in filings with the Internal Revenue Service and Department of Labor, and employee benefit descriptions that constituted the fruits of Defendants' wrongful conduct.

363.    The matters and things sent by Defendants via the Postal Service, commercial carrier, wire or other interstate electronic media include, among other things:

(a)    materials containing false and fraudulent misrepresentations that the Broker Defendants would represent their clients' interests in the placement of insurance on behalf of Plaintiffs;

(b)    materials that concealed or failed to disclose the existence and effect of the Contingent Commissions, Commercial Fees, other undisclosed monetary and non-monetary compensation and the Wholesale Payments, including the conflict of interests that Defendants had created between their legal and contractual obligations to their clients and the economic disincentives to honor those obligations from the unlawful payments and as part of the conspiracy;

(c)      virtually uniform misleading materials intended to induce clients to accept more expensive and lesser coverage from the Insurer Defendants than might be otherwise available in order to maximize premium revenue and to maximize Contingent Commissions, Communication Fees, other compensation and/or Wholesale Payments to the Broker Defendants;

(d)      materials uniformly intended to encourage and induce plaintiffs and Class Members to purchase optional or "supplemental" coverage from Insurer Defendants as part of the employee benefit plan;

(e)      materials intended to discourage clients from the aggressive pursuit of claims;

(f)      invoices and payments related to Defendants' improper scheme; and

(g)      information regarding compensation to the Broker Defendants listed on Forms 5500.

364.    As an example of Defendants' fraudulent use of the wires on May 30, 2002, David MacLean of MetLife wrote to Cox stating: "Enclosed is Universal Life's 2001 override calculation in support of the wire transfer of $2,815,982.50.  Please accept our sincere gratitude for your role in our success."

365.    Defendants' corporate headquarters have communicated by United States mail and by facsimile with various regional offices and subsidiaries, divisions and other insurance entities in furtherance of their schemes.

366.    Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and Class Members and assuring Insurer Defendants of the placement of business and enabling Broker Defendants to collect Contingent Commissions, Communication Fees and Wholesale Payments.  Specifically these misrepresentations, acts of concealment, and failures to disclose include but are not limited to:

(a)      the Broker Defendants holding themselves out as trusted advisors that can help clients assess their insurance needs and locate the best available insurance while in fact participating in self dealing, conspiratorial activities aimed at maximizing profits at the expense of their clientele;

(b)      the Broker Defendants' representations that they work for their clients and not the insurance companies;

(c)      failure to disclose Defendants' conflicts of interest;

(d)      failure to disclose that an integral part of the Broker Defendants' business philosophy is to promote the interest of insurance companies in order to maximize revenue from Contingent Commission agreements.  Therefore, the Broker Defendants steer business to favored insurers from whom they receive higher fees, and away from insurers who refuse to engage in the anticompetitive conduct;

(e)      failure to disclose the nature of the services the Broker Defendants provide to warrant their compensation fees and commissions;

(f)      failure to disclose that the Broker Defendants are directing their clients to Insurer Defendants based not on their merit, but rather on the kickbacks and Contingent Commissions they are able to structure;

(g)      failure to accurately disclose Broker Defendants' compensation on Forms 5500; and

(h)      contrivance, falsification, and/or manipulation of insurance bids to create the illusion of a competitive bidding process.

367.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and Class Members relied on the misrepresentations and omissions.    Plaintiffs and the Classes rely upon Defendants'

misrepresentations and omissions by retaining and continuing to retain the Broker Defendants and by purchasing Defendants' insurance products at higher rates than Plaintiffs would have paid absent Defendants' fraud.

368.     As a result, Plaintiffs and Class Members have been injured in their business or property by Defendants' overt acts of mail and wire fraud and by their aiding and abetting each others' acts of mail and wire fraud in furtherance of the conspiracy.

369.     Defendants have also repeatedly violated 18 U.S.C. §1954 by accepting and/or paying undisclosed compensation with the intent of influencing the actions, decisions and/or conduct of the Broker Defendants with respect to the purchase of insurance by employers and employees, the administration of such employee insurance policies and/or the renewal of such policies.  The Broker Defendants act as agents for employers and their employees who are covered under an employee welfare benefit plan and/or provide benefit services to such plans.  The Broker Defendants provide advice to employers concerning matters and/or questions concerning employee benefit plans including, but not limited to, formation of such plans.  The Broker Defendants' position as advisor and broker allowed them to exercise influence over matters concerning employee benefit plans by advising and/or persuading employers to purchase and/or renew policies from the Insurer Defendants.  The Broker Defendants' acceptance and the participating insurers' payment of undisclosed compensation influenced the Broker Defendants' actions, decisions and/or conduct with respect to such employee benefit plans.  The sale and/or renewal of group insurance policies are matters concerning an employee benefit plan.  Additionally, the Broker Defendants and the Insurer Defendants failed to disclose to the plan administrators of such employee benefit plans and to the employee participants the payment of additional compensation.  The failure to disclose additional compensation was a matter concerning an employee benefit because the plan administrator and/or participants are legally entitled to such disclosures.  The Broker Defendants accepted and the Insurer

Defendants paid monies and/or things of value in violation of 18 U.S.C. §1954 on multiple occasions.  Further, the Broker Defendants and the Insurer Defendants failed to disclose to the employee benefit plan administrators that the Contingent Commissions were passed through to the employers and their employees.

### (2)    Pattern of Racketeering Activity

370.    Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity (*i.e.*, indictable violations of 18 U.S.C. §§1341,1343 and 1954 as described above) within the past ten years.

371.    In fact, each Defendant has committed or aided and abetted in the commission of thousands of acts of racketeering activity.

372.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including Plaintiffs and Class Members.

373.    The multiple acts of racketeering activity, which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other in furtherance of the scheme described above, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as described in 18 U.S.C. §1961(5).

### (3)    RICO Violations

374.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

375.    Through the pattern of racketeering activity described above, Defendants have conducted or participated in the conduct of the affairs of the enterprises and, accordingly, have violated §1962(c).

376.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

377.    Defendants' conspiracy to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business by abandoning their duties to Plaintiffs and the Classes, and to conceal their fraudulent scheme as described above accordingly violates 18 U.S.C. §1962(d).

## K.    EFFECTS OF DEFENDANTS' MISCONDUCT

378.    Because Defendants failed to adequately disclose their payment and/or acceptance of Contingent Commissions, Communication Fees and other kickbacks, Plaintiffs and the Classes were not aware of their existence, operation or effect on the insurance market.

379.    Moreover, as a result of Defendants' scheme and common course of misconduct, Plaintiffs and Class Members have and continue to suffer injuries in their business or property. The Employer Plaintiffs and Employer Classes pay excessive premiums for the basic insurance coverage contained in the employee benefit plan, and undisclosed fees and other charges embedded in the premiums of the insurance products, pay for non-existent services and are not reimbursed for money improperly collected. The Employee Plaintiffs and Employee Classes pay greater basic insurance co-pays, pay more for supplemental insurance, pay for non-existent services and/or receive inferior insurance coverage than they would have in the absence of the improper conduct described herein. Defendants' fraudulent scheme and common course of conduct constitutes an ongoing threat to Plaintiffs and Class Members and will continue to cause economic losses and threaten their ability to obtain appropriate insurance coverage at a fair price unless enjoined by this Court.

380.    By engaging in the course of conduct set forth above, Defendants have breached and continue to breach their contractual, fiduciary and other duties to Plaintiffs and Class Members by omitting and failing to disclose numerous material facts as alleged above, including that they acted in coordination with others in the insurance brokerage industry, despite a duty to do so.

381.    Moreover, the Broker Defendants have breached and continue to breach their obligations, fiduciary and otherwise, to represent the best interests of their clients, including Plaintiffs and Class Members.

382.    The Broker Defendants have profited enormously by inducing clients to use their insurance brokerage services, by fraudulently misrepresenting how they formulate their insurance brokerage advice and by failing to disclose the existence and operation of the Contingent Commissions and Communication Fees paid.  Likewise, the Insurer Defendants have profited enormously by receiving the business of the Broker Defendants' clients through Defendants' collective fraudulent acts.

## L.    THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF

383.    Defendants' fraudulent and unlawful scheme to steer business, place insurance and pay/obtain kickbacks, Contingent Commissions, Communication Fees, and other undisclosed compensation creates an ongoing problem that will continue to cause Plaintiffs and Class Members economic losses and jeopardize the qualified status of their benefit plan contributions.

384.    A monetary judgment will only compensate Plaintiffs and Class Members for past losses.  A monetary judgment will not cure the inherent and irreconcilable conflict of interest between Defendants' payment and/or receipt of kickbacks, overrides, Communication Fees and other undisclosed compensation on the one hand and the legal and contractual duties undertaken by Defendants as set forth above, nor will it correct the anticompetitive effects of Defendants' bid-rigging and market allocation.

385.    Further, because a substantial number, if not a majority, of the insurance brokers and carriers are involved in this scheme, the entire employee benefits insurance market has been manipulated and is no longer competitive.  Thus, a monetary judgment will not restore the fundamental competitive nature of the market nor cure future manipulations of the market as a result of Defendants' fraudulent scheme and common course of action.

386.    No individual client of any defendant has an adequate remedy, either administrative or at law, to recapture future losses associated with Defendants' fraudulent conduct and breaches of fiduciary and other duties set forth above.  The cost of pursuing such claims on an ongoing basis exceeds the amount at issue.

387.    Even a class action, such as this, is a significant undertaking that cannot be pursued on a regular or ongoing basis.

388.    Because of the need for multiple lawsuits to redress repeated and ongoing wrongs, Plaintiffs and Class Members have no adequate remedy at law and would suffer irreparable harm in the absence of injunctive relief.

## M.    FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

389.    Defendants affirmatively and fraudulently concealed their unlawful scheme, conspiracy and course of conduct from Plaintiffs and the Classes.

390.    For example, the Broker Defendants structured the Contingent Commissions and other forms of compensation so as to make it impossible for Plaintiffs and Class Members to discover the extent of compensation received by the Broker Defendants or the material disincentive that compensation creates to the Broker Defendants to fulfill their legal and contractual duties.

391.    Defendants also have engaged in an elaborate series of affirmative acts, including bid-rigging, to create the illusion of a competitive market.

392.     In addition, Defendants have agreed amongst themselves to conceal the overrides, Communication Fees, and other Contingent Commissions paid to the Broker Defendants by the Insurer Defendants and ultimately recouped from Plaintiffs and the Classes in the form of increased premium rates on the Insurer Defendants' insurance products.

393.     Defendants did not disclose their practices in any of their policies or sales and marketing materials provided to Plaintiffs and the Classes.

394.     Defendants also acted to ensure Plaintiffs and Class Members could not learn of their unlawful scheme, conspiracy and course of conduct from other informational sources.  For example, Defendants uniformly trained their sales force and other representatives not to disclose their acceptance of compensation or other fraudulent practices as described herein.

395.     Defendants also engaged in a systematic effort to conceal from governmental agencies and on public records the amount and nature of compensation paid to the Broker Defendants by the Insurer Defendants.

396.     Further, Defendants are in sole possession of the truthful and accurate information concerning the components of the premiums and policy rates.  And, Defendants have uniformly refused to provide accurate policy information to Plaintiffs and Class Members upon request, including information about whether overrides and communications are built into the price of the plan.

397.     As a result of the foregoing, Plaintiffs and Class Members could not reasonably discover from the Defendants or any other source the deceptive and anti-competitive practices and Plaintiffs did not do so until just recently.  For the reasons alleged above, the vast majority of Class Members still do not know that they have been and continue to be injured by Defendants' conduct.

398.     Defendants' conduct is continuing in nature.  Defendants decided to engage in and conceal the scheme, conspiracy and course of misconduct alleged herein including, *inter alia*, the

override and communications fee agreements, steering practices, and bid-rigging, over a decade ago. Continuously thereafter, Defendants have continued to engage in and conceal their fraudulent scheme to pay improper overrides and other fees and recoup them from Plaintiffs and Class Members.

399.    There is a substantial nexus between the fraudulent and anti-competitive conduct accruing within two years of filing suit and the misconduct prior to that time.  The acts involve the same type of illicit practices and are recurring, continuous events.

400.    The statute of limitations applicable to any claims which Plaintiffs or other Class Members have brought or could bring as a result of the unlawful and fraudulent concealment and course of conduct described herein has been tolled as a result of Defendants' fraudulent concealment.  In addition, Plaintiffs and the Classes did not and could not have discovered their causes of action until the time alleged below, thereby tolling any applicable statute of limitations.

## CLASS ACTION ALLEGATIONS

**A.    Class Definitions**

401.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B), b(2), and (b)(3), on behalf of the following Classes:

*The Employee Classes*

All employees in the United States receiving employee benefits from a plan governed by ERISA, who, at any time from August 26, 1994 and the date of class certification, have (a) paid in full or in part for an insurance product acquired from one or more of the Insurer Defendants with the indirect help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates and/or (b) have paid for supplemental insurance coverage from one or more of the Insurer Defendants with the direct or indirect help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates ("Employee Class").

and

All employees in the United States receiving employee benefits from a plan not governed by ERISA, including, but not limited to, government employees and/or employees of religious organizations, who, at any time from August 26, 1994 and the

date of class certification, have (a) paid in full or in part for an insurance product acquired from one or more of the Insurer Defendants with the indirect help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates and/or (b) have paid for supplemental insurance coverage from one or more of the Insurer Defendants with the indirect help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates ("Non-ERISA Employee Subclass").

### The Employer Classes

All employers in the United States providing employee benefits through a plan governed by ERISA, that, at any time from August 26, 1994 and the date of class certification, have paid in full or in part for an insurance product acquired from the Insurer Defendants or any of their subsidiaries or affiliates with the direct help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates ("Employer Class").

and

All employers in the United States providing employee benefits through a plan not governed by ERISA, including, but not limited to, governmental and/or religious employers, that, at any time from August 26, 1994 and the date of class certification have paid in full or in part for an insurance product acquired from the Insurer Defendants with the direct help, assistance or involvement of any of the Broker Defendants or any of their subsidiaries or affiliates ("Non-ERISA Employer Subclass").

Excluded from all Classes are Defendants and their officers, affiliates, subsidiaries, directors and employees.

402.     The Classes are so numerous that joinder of their members is impracticable.

403.     The exact number of Class Members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery.

404.     The Classes are ascertainable in that the names and addresses of all Class Members can be identified in business records maintained by the Defendants.

405.     There are numerous questions of law and fact that are common to the claims of all Class Members as set forth above, including:

(a)      whether Defendants entered into a contract, combination or conspiracy to manipulate the price and other terms of insurance contract bids submitted to Plaintiffs and Class members and to allocate the market for the sale of insurance;

(b)      whether Defendants' contract, combination or conspiracy had the purpose and effect of reducing and unreasonably restraining competition in the sale of insurance;

(c)      the identity of the participants to the contract, combination or conspiracy;

(d)      the duration and extent of the contract, combination or conspiracy alleged in the Complaint;

(e)      the mechanisms used to accomplish the contract, combination or conspiracy;

(f)      whether Defendants' conduct violated §1 of the Sherman Act;

(g)      the effect upon and the extent of injuries sustained by Plaintiffs and Class Members;

(h)      the appropriate type and/or measure of antitrust damages;

(i)      whether injunctive relief is necessary to restrain future antitrust violations;

(j)      whether the Broker Defendants contracted to receive Contingent Commissions from insurers based on the volume of business the Broker Defendants placed with those insurers;

(k)      whether the Contingent Commissions created conflicts of interests for the Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual duties to their clients;

(l)      whether the Broker Defendants directed their subsidiaries and affiliates to engage in the conduct alleged in this Complaint;

(m)      whether the Broker Defendants fraudulently concealed or failed to disclose the Contingent Commissions and/or their amount, extent, and impact upon the Broker Defendants' ability to fulfill their legal and contractual duties to their clients;

- 105 -

(n)      whether Defendants' conduct breached their fiduciary duties to their clients;

(o)      whether Defendants engaged in mail and/or wire fraud;

(p)      whether Defendants engaged in a pattern of racketeering activity;

(q)      whether the Enterprises alleged herein are enterprises within the meaning of 18 U.S.C. §1961(4);

(r)      whether Defendants conducted or participated in the conduct of the affairs of the Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

(s)      whether Defendants conspired to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d);

(t)      whether Defendants' overt and predicate acts in furtherance of a conspiracy and/or direct acts in violation of 18 U.S.C. §1962(a) and (c) proximately caused injury to Plaintiffs' and the Class Members' business or property;

(u)      whether Plaintiffs and the Classes are entitled to injunctive, declaratory, and/or other equitable relief;

(v)      whether plaintiffs and the Classes are entitled to an award of attorneys' fees and expenses against Defendants;

(w)      whether Defendants violated RICO and state laws; and

(x)      whether Defendants fully disclosed the nature and extent of Contingent Commissions relating to the products and services provided.

## B.      Rule 23(a)

406.     The claims of the representative Plaintiffs are typical of those of the Classes they represent.

407.     Their claims originate from the same illegal, fraudulent conspiracy on the part of Defendants and Defendants' acts in furtherance of that conspiracy, including Defendants' own

fraudulent conduct, as well as conduct by Defendants that aided and abetted the fraudulent conduct of others.  Thus, if brought and prosecuted individually, the claims of each Class Member would require proof of the same material and substantive facts.

408.    Plaintiffs and Class Members also will seek the same relief.  All Class Members, like Plaintiffs, sustained antitrust injury as a result of Defendants' conspiracy, contract or combination in restraint of trade.  Plaintiffs and Class Members were damaged as a result of purchasing insurance directly from the Insurer Defendants or their co-conspirators at prices that were artificially inflated by the market allocation and bid-rigging scheme.  Plaintiffs and Class Members also were the victims of one or more of the illegal practices of one or more of the Defendants set forth above, including the false representations that Defendants would act in Plaintiffs' and Class Members' best interests in procuring insurance, concealing and failing to disclose the existence, extent and effect of the Contingent Commissions and the conflict of interests that Defendants created for themselves through the receipt of those Contingent Commissions and their steering and bid-rigging activities.

409.    The representative Plaintiffs will fairly and adequately protect the interests of the Classes and have no interest adverse to or which directly and irrevocably conflict with the interests of other members of the Classes.

410.    The representative Plaintiffs are willing and prepared to serve the Court and proposed Classes in a representative capacity with all of the obligations and duties material thereto.

411.    The interests of the named Plaintiffs are co-extensive with and not antagonistic to those of the absent Class Members.

412.    The named Plaintiffs have retained the services of counsel who are experienced in complex insurance litigation and antitrust class action litigation, will adequately prosecute this action, and will assert, protect and otherwise represent the named Plaintiffs and all absent Class members.

- 107 -

**C.      Rules 23(b)(1), 23(b)(2) and 23(b)(3)**

413.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(1)(B). The prosecution of separate actions by individual members of the Classes that would, as a practical matter, be dispositive of the interests of other members of the Classes who are not parties to the action or could substantially impair or impede their ability to protect their interests.

414.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for the parties opposing the Classes.  Such incompatible standards of conduct and varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow the existence of inconsistent and incompatible rights within the Classes.

415.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that Defendants have acted or refused to act on grounds generally applicable to the Classes, making final declaratory or injunctive relief appropriate.

416.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the questions of law and fact that are common to members of the Classes predominate over any questions affecting only individual members.

417.     Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint in that:

          (a)      individual claims by the Class members will be impracticable as the costs of pursuit would far exceed what any one Plaintiff or Class members has at stake;

          (b)      as a result, very little litigation has been commenced over the controversies alleged in this Complaint and individual members are unlikely to have interest in prosecuting and controlling separate individual actions;

(c)     the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

(d)     the proposed class action is manageable.

## COUNT I

### Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18 U.S.C. §1962(c) All Plaintiffs Against all Defendants

418.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

419.     This cause of action is brought pursuant to 18 U.S.C. §1964(c)

420.     As set forth above, in violation of 18 U.S.C. §1962(d), Defendants have conspired to violate 18 U.S.C. §1962(c).

421.     As a direct and proximate result, Plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs and Class Members have been injured by, among other things, paying more for insurance and other "services" in excess of the amounts they would have paid in the absence of the conspiracy.

422.     Accordingly, Defendants are liable to Plaintiffs and the Classes for three times their actual damages as proven at trial plus interest and attorneys' fees.

## ALTERNATIVE COUNT I

### Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18 U.S.C. §1962(c) Against All Defendants involved in Broker-Centered Conspiracies

423.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

424.     This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(d) by the following Plaintiffs against the following Defendants:

- ULR's clients (employers and the employees for whose benefit they acted) against the Defendants involved in the ULR-centered conspiracy;

- Marsh's clients against the Defendants involved in the Marsh-centered conspiracy; and

- Aon's clients against the Defendants involved in the Aon-centered conspiracy.

425.    As set forth above, in violation of 18 U.S.C. §1962(d), Defendants in each Employee Benefits Centered Conspiracy have conspired to violate 18 U.S.C. §1962(c).

426.    As a direct and proximate result, Plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs and Class Members have been injured by, among other things, paying more for insurance and other "services" than they would have paid in the absence of the conspiracy.

427.    Accordingly, Defendants in each of the Employee Benefits Insurance Broker-Centered Enterprises are liable to Plaintiffs and the Classes for three times their actual damages as proven at trial plus interest and attorneys' fees.

## COUNT II

### Violation of 18 U.S.C. §1962(c)
### All Plaintiffs Against all Defendants

428.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

429.    This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(c)

430.    As set forth above, in violation of 1962(c), Defendants have conducted or participated in the conduct of the affairs of the Employee Benefits Insurance Enterprise through a pattern of racketeering activity.

431.    As a direct and proximate result, Plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, plaintiffs and members of the Class have been injured in their business or property by,

among other things, paying more for insurance and other "services" than they would have paid absent Defendants' illegal conduct.

432.     Accordingly, Defendants are liable to Plaintiffs and the Classes for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## ALTERNATIVE COUNT II

### (Violation of 18 U.S.C. §1962(c) Against all Defendants in the Employee Benefits Insurance Broker-Centered Enterprises)

433.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

434.     This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(c) by the following Plaintiffs against the following Defendants:

- ULR's clients (employers and the employees on whose behalf they acted) against Defendants associated-in-fact in the ULR-centered Enterprise;

- Marsh's clients against Defendants associated-in-fact in the Marsh-centered Enterprise;

- Aon's clients against Defendants associated-in-fact in the Aon-centered Enterprise.

435.     As set forth above, in violation of 1962(c), Defendants in each of the Employee Benefits Insurance Broker-Centered Enterprises have conducted or participated in the conduct of the affairs of the Enterprises through a pattern of racketeering activity.

436.     As a direct and proximate result, Plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs and Class Members have been injured in their business or property by, among other things, paying more for insurance and other "services" than they would have paid absent Defendants' illegal conduct.

437.     Accordingly, Defendants in each of the Employee Benefits Insurance Broker-Centered Enterprises are liable to Plaintiffs and the Classes for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## COUNT III

### Injunctive and Declaratory Relief under RICO by
### All Plaintiffs against all Defendants

438.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

439.    This claim arises under 18 U.S.C. §1964(a), which authorizes this Court to enjoin violations of 18 U.S.C. §1962, and under 28 U.S.C. §2201, which authorizes associated declaratory relief.

440.    As set forth in Plaintiffs' First and Second Claims for Relief and in this Amended Complaint, Defendants have violated 18 U.S.C. §§1962(c) and (d) on a continuing basis and unless enjoined, will continue to do so in the future.

441.    As set forth above, Plaintiffs and the Classes have no adequate remedy at law to prevent future violations of 18 U.S.C. §§1962(c) and (d) in the absence of injunctive and declaratory relief.

442.    Accordingly, Plaintiffs and the Classes are entitled to declaratory relief declaring the illegal and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d), and injunctive relief enjoining Defendants from further violations of 18 U.S.C. §§1962(c) and (d).

## ALTERNATIVE COUNT III

### Injunctive and Declaratory Relief under RICO against Defendants
### in the Employee Benefits Insurance Broker-Centered Enterprises

443.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

444.    This claim arises under 18 U.S.C. §1964(a), which authorizes this Court to enjoin violations of 18 U.S.C. §1962, and under 28 U.S.C. §2201, which authorizes associated declaratory relief.

445.    As set forth in Plaintiffs' First and Second Claims for Relief and in this Amended Complaint, Defendants in the Employee Benefits Insurance Broker-Centered Enterprises and

Employee Benefits Insurance Broker-Centered Conspiracies have violated 18 U.S.C. §§1962(c) and (d) on a continuing basis and unless enjoined, will continue to do so in the future.

446.    As set forth above, Plaintiffs and the Classes have no adequate remedy at law to prevent future violations of 18 U.S.C. §§1962(c) and (d) in the absence of injunctive and declaratory relief.

447.    Accordingly, the following Plaintiffs and the Classes are entitled to declaratory relief declaring the illegal and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d), and injunctive relief enjoining the following Defendants from further violations of 18 U.S.C. §§1962(c) and (d):

- ULR's customers against Defendants associated-in-fact in the ULR-centered Enterprise and involved in the ULR-centered conspiracy;

- Marsh's customers against Defendants associated-in-fact in the Marsh-centered Enterprise and involved in the Marsh-centered conspiracy;

- Aon's customers against Defendants associated-in-fact in the Aon-centered Enterprise and involved in the Aon-centered conspiracy;

## COUNT IV

### Violation of the Sherman Act, 15 U.S.C. Section 1, All Plaintiffs Against All Defendants

448.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

449.    Defendants and their co-conspirators have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

450.    Specifically, Defendants have entered into agreements, the purpose and effect of which were to suppress or eliminate competition through bid-rigging and market allocation, and to allocate markets and customers, which had the effect of inflating premiums above competitive levels.

451.    Each of the Defendants has engaged in one or more overt acts in furtherance of the unlawful contract, combination or conspiracy.  Defendants implemented the unlawful scheme by the following acts, among others:

(a)    Agreeing to steer insurance business to Insurer Defendants and away from non-conspiring insurers in exchange for undisclosed fees, commissions and other kickbacks from the Insurer Defendants;

(b)    Agreeing, through the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

(c)    Agreeing to engage in activities that give the appearance of competition where none existed;

(d)    Agreeing to allocate insurance customers among the Insurer Defendants, denying such customers – such as Plaintiffs and Class Members – the benefits of free and open competition; and

(e)    Agreeing not to deal with insurers who refuse to participate in the unlawful schemes and conspiracies alleged in subsections (a)-(d) above.

452.    Defendants' activities as described above do not constitute the business of insurance as regulated under state law, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured. Moreover, the acts of the Broker Defendants both in establishing and then enforcing Contingent Commission agreements and other profit sharing arrangements in the insurance industry, including refusing to deal with insurers who do not participate in the anti-competitive conduct alleged herein, constitute coercion or boycott within the meaning of the McCarran-Ferguson Act.  15 U.S.C. §1012. In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants

participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

453.    The unlawful conspiracy alleged herein constitutes a per se violation of Section 1 of the Sherman Act and/or unreasonable restraint of trade under a rule of reason analysis.

454.    Various persons, not named as Defendants, participated as co-conspirators in the violations alleged, and performed acts and made statements in furtherance of that conspiracy.

455.    The aforesaid combination and conspiracy had the following effects, among others:

(a)    restraining and suppressing competition among the Insurer Defendants and their co-conspirators;

(b)    inflating premiums for insurance paid by Plaintiffs and Class Members to supra-competitive levels;

(c)    depriving Plaintiffs and Class Members of the benefits of free and open competition in the purchase of insurance; and

(d)    depriving Plaintiffs and Class Members of information concerning insurers who refused to participate in the unlawful schemes and conspiracies alleged herein, and effectively preventing Plaintiffs and Class Members from purchasing insurance products from those insurers.

456.    As a direct and proximate result of the contracts, combinations or conspiracies alleged in this Amended Complaint, Plaintiffs and Class Members were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than those prices and terms that would have been available in a competitive market.

## COUNT V

### Violation of Section 1 of the Sherman Act,
### Against Defendant Participants in the ULR-centered Conspiracy

457.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

- 115 -

458.    This claim is brought by the Plaintiffs and Class Members who purchased insurance products through ULR, against the ULR and the Insurer Defendant participants in the ULR-centered Broker Conspiracy.

459.    Each Defendant in the ULR-centered Broker Conspiracy has, with its co-conspirators, engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

460.    Specifically, Defendants entered into Agreements with their co-conspirators, the purpose and effect of which were to suppress or eliminate competition by rigging bids and allocating markets and customers, which inflated prices for insurance products in the United States above competitive levels.

461.    Each of the Defendants has engaged in one or more overt acts in furtherance of the unlawful contracts, combinations or conspiracies.  Defendants implemented the unlawful schemes by the following acts, among others:

(a)     Agreeing to steer business to the Insurer Defendant participants in the conspiracy and away from non-conspirator insurers in exchange for undisclosed fees, kickbacks and other payments from the Insurer Defendants;

(b)     Agreeing, though the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

(c)     Agreeing to engage in activities that give the appearance of competition where none existed;

(d)     Agreeing to allocate insurance customers among the conspiring Insurer Defendants, denying such customers – such as Plaintiffs and Class Members – the benefits of free and open competition; and

(e)     Agreeing not to deal with insurers who refuse to participate in the unlawful schemes and conspiracies alleged in subsections (a)-(d), above.

462.    Defendants' activities as described above do not constitute the business of insurance regulated under state law, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured. Moreover, the acts of the ULR Defendants in establishing and enforcing Contingent Commission arrangements in the insurance industry, including steering customers away from and refusing to deal with insurers who do not participate in the anticompetitive conduct alleged herein, constitutes coercion or boycott within the meaning of the McCarran-Ferguson Act, 15 U.S.C. §1012.   In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants that participated in the ULR-centered Broker Conspiracy participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

463.    The aforesaid combinations and conspiracies each had the following effects, among others:

(a)     restraining and suppressing competition among the Insurer Defendants and their co-conspirators;

(b)     inflating insurance premiums paid by Plaintiffs and Class Members above competitive levels;

(c)     depriving Plaintiffs and Class Members of the benefits of free and open competition in the purchase of insurance; and

(d)     depriving Plaintiffs and Class Members of information concerning insurers who refused to participate in the unlawful schemes and enterprise conspiracies alleged herein, and

effectively preventing Plaintiffs and Class Members from purchasing insurance products from those insurers.

464.     As a direct and proximate result of the ULR-centered contracts, combinations or conspiracies alleged in this Amended Complaint, Plaintiffs and Class Members were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

465.     The unlawful conspiracies alleged herein constitute a *per se* violation of Section 1 of the Sherman Act and/or unreasonable restraint of trade under a rule of reason analysis.

### COUNT VI

### Violation of Section 1 of the Sherman Act,
### Against Defendant Participants in the Marsh-centered Conspiracy

466.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

467.     This claim is brought by the Plaintiffs and Class Members who purchased insurance products through Marsh, against Marsh and the Insurer Defendant participants in the Marsh-centered Broker Conspiracy.

468.     Each Defendant in the Marsh-centered Broker Conspiracy has, with its co-conspirators, engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

469.     Specifically, Defendants entered into Agreements with their co-conspirators, the purpose and effect of which were to suppress or eliminate competition by rigging bids and allocating markets and customers, which inflated prices for insurance products in the United States above competitive levels.

470.     Each of the Defendants has engaged in one or more overt acts in furtherance of the unlawful contracts, combinations or conspiracies.  Defendants implemented the unlawful schemes by the following acts, among others:

(a)     Agreeing to steer business to the Insurer Defendant participants in the conspiracy and away from non-conspirator insurers in exchange for undisclosed fees, kickbacks and other payments from the Insurer Defendants;

(b)     Agreeing, though the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

(c)     Agreeing to engage in activities that give the appearance of competition where none existed;

(d)     Agreeing to allocate insurance customers among the conspiring Insurer Defendants, denying such customers – such as Plaintiffs and Class Members – the benefits of free and open competition; and

(e)     Agreeing not to deal with insurers who refuse to participate in the unlawful schemes and conspiracies alleged in subsections (a)-(d), above.

471.    Defendants' activities as described above do not constitute the business of insurance regulated under state law, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured. Moreover, the acts of Marsh in establishing and enforcing Contingent Commission arrangements in the insurance industry, including steering customers away from and refusing to deal with insurers who do not participate in the anticompetitive conduct alleged herein, constitutes coercion or boycott within the meaning of the McCarran-Ferguson Act.  In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants that participated in the Marsh-centered Broker Conspiracy participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

472.    The aforesaid combinations and conspiracies each had the following effects, among others:

(a)      restraining and suppressing competition among the Insurer Defendants and their co-conspirators;

(b)      inflating insurance premiums paid by Plaintiffs and Class Members above competitive levels;

(c)      depriving Plaintiffs and Class Members of the benefits of free and open competition in the purchase of insurance; and

(d)      depriving Plaintiffs and Class Members of information concerning insurers who refused to participate in the unlawful schemes and enterprise conspiracies alleged herein, and effectively preventing Plaintiffs and Class Members from purchasing insurance products from those insurers.

473.    As a direct and proximate result of the Marsh-centered contracts, combinations or conspiracies alleged in this Amended Complaint, Plaintiffs and Class Members were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

474.    The unlawful conspiracies alleged herein constitute a per se violation of Section 1 of the Sherman Act and/or unreasonable restraint of trade under a rule of reason analysis.

## COUNT VII

### Violation of Section 1 of the Sherman Act,
### Against Defendant Participants in the Aon-centered Conspiracy

475.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

476.    This claim is brought by the Plaintiffs and Class Members who purchased insurance products through Aon, against Aon and the Insurer Defendant participants in the Aon-centered Broker Conspiracy.

477.   Each Defendant in the Aon-centered Broker Conspiracy has, with its co-conspirators, engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

478.   Specifically, Defendants entered into Agreements with their co-conspirators, the purpose and effect of which were to suppress or eliminate competition by rigging bids and allocating markets and customers, which inflated prices for insurance products in the United States above competitive levels.

479.   Each of the Defendants has engaged in one or more overt acts in furtherance of the unlawful contracts, combinations or conspiracies.  Defendants implemented the unlawful schemes by the following acts, among others:

(a)    Agreeing to steer business to the Insurer Defendant participants in the conspiracy and away from non-conspirator insurers in exchange for undisclosed fees, kickbacks and other payments from the Insurer Defendants;

(b)    Agreeing, though the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

(c)    Agreeing to engage in activities that give the appearance of competition where none existed;

(d)    Agreeing to allocate insurance customers among the conspiring Insurer Defendants, denying such customers – such as Plaintiffs and Class Members – the benefits of free and open competition; and

(e)    Agreeing not to deal with insurers who refuse to participate in the unlawful schemes and conspiracies alleged in subsections (a)-(d), above.

480.   Defendants' activities as described above do not constitute the business of insurance regulated under state law, as they do not have the effect of transferring or spreading policyholder

risk, nor are they an integral part of the policyholder relationship between insurer and insured. Moreover, the acts of Aon in establishing and enforcing Contingent Commission arrangements in the insurance industry, including steering customers away from and refusing to deal with insurers who do not participate in the anticompetitive conduct alleged herein, constitutes coercion or boycott within the meaning of the McCarran-Ferguson Act.  In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants that participated in the Aon-centered Broker Conspiracy participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

481.    The aforesaid combinations and conspiracies each had the following effects, among others:

(a)    restraining and suppressing competition among the Insurer Defendants and their co-conspirators;

(b)    inflating insurance premiums paid by Plaintiffs and Class Members above competitive levels;

(c)    depriving Plaintiffs and Class Members of the benefits of free and open competition in the purchase of insurance; and

(d)    depriving Plaintiffs and Class Members of information concerning insurers who refused to participate in the unlawful schemes and enterprise conspiracies alleged herein, and effectively preventing Plaintiffs and Class Members from purchasing insurance products from those insurers.

482.    As a direct and proximate result of the ULR-centered contracts, combinations or conspiracies alleged in this Amended Complaint, Plaintiffs and Class Members were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

483.    The unlawful conspiracies alleged herein constitute a per se violation of Section 1 of the Sherman Act and/or unreasonable restraint of trade under a rule of reason analysis.

## COUNT VIII

### Violation of State Antitrust Laws
### All Plaintiffs Against All Broker Defendants

484.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

485.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Alaska Stat. §§45.50.562, *et seq.*

486.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§44-1401, *et seq.*

487.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ark. Code Ann. §§4-75-309, *et seq.* and Ark. Code Ann. §§4-75-201, *et seq.*

488.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§16700, 16720,, *et seq.* and Cal. Bus. & Prof. Code §§17000, *et seq.*

489.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Colo. Rev. Stat. §§6-4-101, *et seq.*

490.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §§35-26, *et seq.*

491.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code Ann. §§28-4503, *et seq.*

492.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Dela. Code Ann. tit. 6, §§2103, *et seq.*

493.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Fla. Stat. §§501.201, *et seq.*

494.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ga. Code Ann. §§16-10-22, *et seq.* and Ga. Code Ann. §§13-8-2, *et seq.*

495.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Haw. Rev. Stat. §§480-1, *et seq.*

496.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Idaho Code §§48-101, *et seq.*

497.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. §§10/1, *et seq.*

498.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ind. Code Ann. §§24-1-2-1, *et seq.*

499.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1, *et seq.*

500.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kan. Stat. Ann. §§50-101, *et seq.*

501.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ky. Rev. Stat. §§367.175, *et seq.*, and relief can be granted in accordance with Ky. Rev. Stat. §446.070.

502.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of La. Rev. Stat. §§51:137, *et seq.*

503.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. 10, §§1101, *et seq.*

504.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Md. Code Ann. Title 11, §§11-201, *et seq.*

505.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mass. Ann. Laws ch. 92 §§1, *et seq.*

506.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mich. Comp. Laws Ann. §§445.773, *et seq.*

507.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §§325D.52, *et seq.*

508.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Miss. Code Ann. §§75-21-1, *et seq.*

509.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mo. Stat. Ann. §§416.011, *et seq.*

510.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mont. Code Ann. §§30-14-101, *et seq.*

511.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Neb. Rev. Stat. §§59-801, *et seq.*

512.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§598A, *et seq.*

513.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.H. Rev. Stat. Ann. §§356:1, *et seq.*

514.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.J. Stat. Ann. §§56:9-1, *et seq.*

515.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.M. Stat. Ann. §§57-1-1, *et seq.*

516.     By reason of the foregoing, Defendants have entered into agreements in violation of N.Y. Gen. Bus. Law §340; N.Y. Ins. Law §2316(a).

517.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.C. Gen. Stat. §§75-1, *et seq.*

518.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.D. Cent. Code §§51-08.1-01, *et seq.*

519.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ohio Rev. Code Ann. §§1331.01, *et seq.*

520.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Okla. Stat. tit. 79 §§203(A), *et seq.*

521.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ore. Rev. Stat. §§646.705, *et seq.*

522.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws §§6-36-1, *et seq.*

523.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.C. Code §§39-3-10, *et seq.*

524.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.D. Codified Laws Ann. §§37-1, *et seq.*

525.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §§47-25-101, *et seq.*

526.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tex. Bus. & Com. Code Ann. §§15.01, *et seq.*

527.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§76-10-911, *et seq.*

528.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vt. Stat. Ann. 9 §§2453, *et seq.*

529.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Va. Code §§59-1-9.1, *et seq.*

530.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wash. Rev. Code §§19.86.010, *et seq.*

531.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of W.V. Code §§47-18-1, *et seq.*

532.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wis. Stat. §§133.01, *et seq.*

533.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wy. Stat. Ann. §§40-4-101, *et seq.*

## COUNT IX

### Pursuant to ERISA Sections 1109 and 502(a)(2) ERISA Employer Subclass and ERISA Employee Subclass Against Insurer Defendants

534.    Plaintiffs incorporate by reference all of the allegations above as if fully set forth herein.

535.    Employer Plaintiffs in the ERISA Employer Subclass are "fiduciaries" within the meaning of ERISA, 29 U.S.C. § 1002(21) and therefore have standing to assert the claim alleged herein.  Employee Plaintiffs in the ERISA Employee Subclass are "participants" in ERISA governed plans, and therefore have standing to assert the claims alleged herein.

536.    The Insurer Defendants are fiduciaries with respect to Plaintiffs within the meaning of 29 U.S.C. 1002(21)(A) by virtue of their exercise of discretionary authority, control or responsibility over the management of the Plan, and/or management or disposition of plan assets, and/or the administration of the plan.  The employee benefit plans' assets include group insurance policies that the Insurer Defendants issue for the purpose of providing insurance benefits to employees.  The premiums collected from employee participants and employer sponsors are also assets of the plans.

The Insurer Defendants retain and exercise authority to determine whether a participant is entitled to a benefit under the plans and the amount of the benefits payable to the participants. The Insurer Defendants also pay the benefits owed to participants under the plans. The Insurer Defendants also assume duties associated with plan administration, such as providing notice and disclosure of information required under ERISA.

537.   Pursuant to 29 U.S.C. §1104, the Insurer Defendants are obligated to act solely in the interest of Plaintiffs and the Class, as employee benefit plans' participants and beneficiaries, for the exclusive purpose of providing benefits to them, and to defray reasonable expenses of administering the plan.

538.   The Insurer Defendants breached their fiduciary under ERISA §§404 and 406, 29 U.S.C. §§104 AND 1106 duties by, among other things: (i) paying kickbacks and other non-disclosed or inadequately disclosed payments to the Broker Defendants, (ii) knowing and falsely certifying the amount of compensation paid to a party in interest, such that the plan's Form 5500 filings (Schedules A and C) did not accurately reflect the total compensation paid to parties in interest, (iii) causing and/or allowing the plan to engage the services of a party in interest; (iv) receiving consideration for its own personal account from a party in interest that dealt with the plan; and (v) acting contrary to the interests of plan participants and falsely communicating information to the plan participants about the plan.

539.   The Insurer Defendants built the kickbacks and other payments to brokers into the cost of the policies and resulted in higher premium costs to plaintiffs and Class Members. These fees are not reasonable expenses related to services needed for administering the plan.

540.   The Insurer Defendants concealed or failed to disclose compensation that they paid to parties in interest to Plaintiffs and the Class, as well as to governmental agencies as alleged herein, even though the information was subject to disclosure under ERISA's reporting requirements.

541.    The Insurer Defendants encouraged and compensated the Broker Defendants for attempting to influence claims-loss ratios, claims filing, and renewal of policies.  Such compensation agreements resulted in actions adverse to the interest of Plaintiffs and the Class.  The override agreements described herein created a system of incentives for the Broker Defendants that harmed Plaintiffs and the Class by denying the full benefit of their employee benefit plan.

542.    As detailed above, the Insurer Defendants also engaged in the practice of "low-hanging" fruit, bid-rigging, and other anti-competitive conduct.  These practices placed the financial interest of the Insurer Defendants ahead of the interests of the employee participants and beneficiaries, such as Plaintiffs and the Class.  As ERISA fiduciaries, the Insurer Defendants were obligated to refrain from the conduct that was harmful to their interests.

543.    The Insurer Defendants profited as a result of their breaches of fiduciary duty and scheme with the Broker Defendants to overcharge expenses paid by Plaintiffs and Class Members.  The Insurer Defendants received business that they would not otherwise have received in the absence of the Agreements.  The conduct of the Insurer Defendants violated the sole interest and exclusive purpose duties of 29 U.S.C. §1104.  The Insurer Defendants engaged in deceptive conduct to overcharge Plaintiffs and the Class.  Such conduct is inconsistent with the duty of loyalty imposed under ERISA.

544.    As a result of Insurer Defendants' breaches of fiduciary duty imposed by ERISA, the Insurer Defendants were enriched at the expense of the ERISA plans and Plaintiffs and Class Members are entitled to equitable relief in the form of restitution and/or disgorgement of illegal profits pursuant to 29 U.S.C. §1132(a)(3).  Plaintiffs request that the Court impose a constructive trust on the amounts the Insurer Defendants collected pursuant to their fraudulent scheme.

545.    Plaintiffs are entitled to recover attorneys' fees pursuant to 29 U.S.C. §1132(g).

546.     Insurer Defendants are liable to make good to the Plan the losses suffered by the Plan on account of Defendants' fiduciary breaches.

## COUNT X

### Pursuant to ERISA Section 502(a)(3) ERISA Employer Subclass and ERISA Employee Subclass Against Insurer Defendants

547.     Plaintiffs incorporate by reference all of the allegations above as if fully set forth herein.

548.     As set forth more fully above, the Insurer Defendants have violated their fiduciary obligations under ERISA by, among other things, causing Plaintiffs and other Class Members in both the ERISA Employer Subclass and in the ERISA Employee subclass to pay excessive premiums for inferior insurance products, falsely certifying that the amount of compensation paid to a party in interest, such that the plan's Form 5500 filings (Schedules A and C) did not accurately reflect the total compensation paid to parties in interest, causing and/or allowing the plan to engage the services of a party in interest, receiving consideration for its own personal account from a party in interest that dealt with the plan and acting contrary to the interests of plan participants and falsely communicating information to the plan participants about the plan.

549.     Accordingly, Plaintiffs and other Class Members in both the ERISA Employer Subclass and the ERISA Employee Subclass are entitled to relief to enjoin the Insurer Defendants' conduct that is in violation of ERISA, and to obtain other appropriate equitable relief to redress such violations.

## COUNT XI

### Violation of State Antitrust Laws
### Non-ERISA Employee Subclass and Non-ERISA Employer Subclass Against Insurer Defendants

550.     Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

551.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Alaska Stat. §§45.50.562, *et seq.*

552.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ariz. Revised Stat. §§44-1401, *et seq.*

553.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ark. Code Ann. §§4-75-309, *et seq.* and Ark. Code Ann. §§4-75-201, *et seq.*

554.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§16700, *et seq.*, 16720, *et seq.* and Cal. Bus. & Prof. Code §§17000, *et seq.*

555.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Colo. Rev. Stat. §§6-4-101, *et seq.*

556.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §§35-26, *et seq.*

557.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code Ann. §§28-4503, *et seq.*

558.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Dela. Code Ann. tit. 6, §§2103, *et seq.*

559.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Fla. Stat. §§501.201, *et seq.*

560.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ga. Code Ann. §§16-10-22, *et seq.* and Georgia Code Ann. §§13-8-2, *et seq.*

561.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Haw. Rev. Stat. §§480-1, *et seq.*

562.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Idaho Code §§48-101, *et seq.*

563.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. §§10/1, *et seq.*

564.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ind. Code Ann. §§24-1-2-1, *et seq.*

565.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1, *et seq.*

566.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kan. Stat. Ann. §§50-101, *et seq.*

567.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ky. Rev. Stat. §§367.175, *et seq.*, and relief can be granted in accordance with Ky. Rev. Stat. §446.070.

568.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of La. Rev. Stat. §§51:137, *et seq.*

569.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. 10, §§1101, *et seq.*

570.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Md. Code Ann. Title 11, §§11-201, *et seq.*

571.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mass. Ann. Laws ch. 92 §§1, *et seq.*

572.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mich. Comp. Laws Ann. §§445.773, *et seq.*

573.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §§325D.52, *et seq.*

574.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Miss. Code Ann. §§75-21-1, *et seq.*

575.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mo. Stat. Ann. §§416.011, *et seq.*

576.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mont. Code Ann. §§30-14-101, *et seq.*

577.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Neb. Rev. Stat. §§59-801, *et seq.*

578.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§598A, *et seq.*

579.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.H. Rev. Stat. Ann. §§356:1, *et seq.*

580.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.J. Stat. Ann. §§56:9-1, *et seq.*

581.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.M. Stat. Ann. §§57-1-1, *et seq.*

582.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law §340; N.Y. Ins. Law §2316(a).

583.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.C. Gen. Stat. §§75-1, *et seq.*

584.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.D. Cent. Code §§51-08.1-01, *et seq.*

585.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ohio Rev. Code §§1331.01, *et seq.*

586.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Okla. Stat. tit. 79 §§203(A), *et seq.*

587.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ore. Rev. Stat. §§646.705, *et seq.*

588.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws §§6-36-1, *et seq.*

589.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.C. Code §§39-3-10, *et seq.*

590.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.D. Codified Laws Ann. §§37-1, *et seq.*

591.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §§47-25-101, *et seq.*

592.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tex. Bus. & Com. Code Ann. §§15.01, *et seq.*

593.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§76-10-911, *et seq.*

594.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vt. Stat. Ann. 9 §§2453, *et seq.*

595.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Va. Code §§59-1-9.l, *et seq.*

596.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wash. Rev. Code §§19.86.010, *et seq.*

597.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of W.V. Code §§47-18-1, *et seq.*

598.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wis. Stat. §§133.01, *et seq.*

599.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wy. Stat. Ann. §§40-4-101, *et seq.*

### COUNT XII

**Common Law Breach of Fiduciary Duty;
All Plaintiffs Against the Broker Defendants**

600.   Plaintiffs repeat and re-allege the allegations contained above as if fully stated herein.

601.   Broker Defendants represent that they are highly skilled and independent insurance brokerage experts and possess the special knowledge and expertise necessary to interpret and understand the complex and sophisticated business risks and employee benefits needs faced by their clients and to determine which corresponding insurance products and insurance companies best fit their clients' needs.  Such representations are made through advertisements, brochures, internet websites and other promotional materials disseminated in interstate commerce, including through the United States mail and interstate wires.

602.   The Broker Defendants encourage their clients (employers and the employees for whose benefit they are acting) to take advantage of this specialized knowledge and expertise in procuring insurance coverage.  Consequently, , Plaintiffs and Class Members reposed confidence and trust in the Broker Defendants, authorized the Broker Defendants to act on their behalf in the negotiation, procurement and renewal of their insurance coverage, and relied on the Broker Defendants' superior expertise in risk management and the procurement of insurance.  The Broker Defendants not only accepted but solicited that confidence and trust through virtually uniform misrepresentations in their publicly available materials and communications.

603.     Further, the Broker Defendants are insurance brokers characterized by elements of public interest which subjects the Broker Defendants to more stringent standards of conduct.  The Broker Defendants, in inducing Plaintiffs and Class Members to purchase certain policies, hold themselves out as confidants of Plaintiffs and Class Members, thereby encouraging Plaintiffs and Class Members to reveal confidential, personal and proprietary information, including financial and medical information.  This confidential and proprietary information includes that contained in financial statements, tax returns, medical records, driving records, claims history and numerous other documents and related business information.

604.     Based on the conduct and representations described above, the Broker Defendants are common law fiduciaries to Plaintiffs and Class Members, and therefore owe their clients, including Plaintiffs and Class Members: (a) a duty of loyalty to act in the best interests of their clients and to always put their clients' interests ahead of their own; (b) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Broker Defendants – including the duty to disclose the sources and amounts of all income they receive in or as a result of any transaction involving their clients, of which Defendants have sole knowledge; (c) a duty of care in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants; (d) a duty to provide impartial advice in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants – including to find the best coverage at the lowest price; and (f) a duty of good faith and fair dealing.

605.     In addition to their duties derived from their relationship of trust and confidence, the Broker Defendants have an independent duty to disclose information to Plaintiffs and Class Members because Plaintiffs and the Classes have no other independent means of ascertaining such

facts.  The Broker Defendants have sole knowledge of the source and amount of all income paid and received, including the overrides, Communication Fees and others.

606.    The Broker Defendants were aware that Plaintiffs and Class Members have no access to the foregoing information and, therefore, could not evaluate the accuracy of the information provided to them.  The Broker Defendants intentionally concealed this information and capitalized on their sole possession of material facts by providing Plaintiffs and Class Members with false, misleading and incomplete information in connection with their insurance plans.

607.    The Broker Defendants have breached those duties by acting in their own pecuniary interests in disregard of the interests of Plaintiffs and the Classes as set forth above.

608.    The Broker Defendants have also breached those duties by concealing and failing to disclose that they were being paid on both sides of the transaction and had engaged in illegal bid-rigging, steering, "low-hanging fruit" practices and other illicit Agreements.

609.    Plaintiffs and Class Members have been damaged by the Broker Defendants' breach of their fiduciary duties, *inter alia*, by (a) paying excessive premiums for basic and supplemental insurance, and undisclosed fees and another charges embedded in the premiums of the insurance products; (b) receiving insurance that was more expensive, provided less in benefits, and/or was otherwise inferior to other available insurance products; (c) not being reimbursed for money improperly collected; and (d) not receiving the full benefits of their employment compensation.  The Employer  Plaintiffs and the Classes have suffered substantial damages.  The Employee Plaintiffs and the Employee Classes have been injured in fact by: (a) not being made aware of the Defendants' undisclosed compensation arrangements and afforded access to a competitive marketplace;(b) paying excessive premiums for basic and supplemental insurance, and undisclosed fees and other charges embedded in the premiums of the insurance products; (c) receiving insurance that was more expensive, provided less in benefits, and/or was otherwise inferior to other available

insurance products; (d) not being reimbursed for money improperly collected by insurers to pay kickbacks to brokers; and (e) not receiving the full benefits of their employment compensation. The Employer Plaintiffs and the Employer Classes have been injured in fact by: (a) paying excessive premiums for the basic insurance coverage contained in the employee benefit plan, including undisclosed fees and other charges embedded in the premiums of the insurance products; (b) not being reimbursed for money improperly collected; and (c) not receiving the value of their employee benefit packages offered to recruit and retain qualified employees.

610.     The Broker Defendants are accordingly liable for breach of fiduciary duty to Plaintiffs and the Classes for the damages suffered by Plaintiffs and Class Members in an amount to be proved at trial.

611.     Plaintiffs and Class Members are further entitled to an accounting by the Broker Defendants with respect to all compensation paid or received by the Broker Defendants.

## COUNT XIII

### Aiding and Abetting Breach of Fiduciary Duty
### Non-ERISA Employee Subclass and Non-ERISA Employer Subclass
### Against Insurer Defendants

612.     Plaintiffs repeat and re-allege the allegations contained above as if fully stated herein.

613.     As alleged above, a fiduciary relationship existed between the Broker Defendants and their employer clients as well with as the employees on whose behalf the Broker Defendants undertook to procure insurance.

614.     The Broker Defendants breached their fiduciary duties by acting in their own pecuniary interests and in disregard of the best interests of Plaintiffs and Class Members by concealing and failing to disclose that they were being paid on both sides of the transaction and had engaged in illegal bid-rigging, steering, "low-hanging fruit" practices and other illicit Agreements.

615.    The Insurer Defendants knowingly substantially participated in that breach by, among other things, entering into undisclosed Contingent Commissions and Communication Fee Agreements with the Broker Defendants and surreptitiously increasing Plaintiffs and Class Members' premium rates to cover the commissions and fees paid; encouraging the Broker Defendants to steer Plaintiffs and the Classes' business to them by offering the Broker Defendants commissions, bonuses and other benefits based on the volume, persistency and profitability of business placed with the Insurer Defendants; engaging in "low-hanging fruit" practices; submitting "throw away" bids to enable the Broker Defendants to maximize their compensation and lock in renewal business at above market rates; concealing the commissions and other compensation paid to the Broker Defendants on governmental forms and in representations to Plaintiffs and the Classes.

616.    In so doing, the Insurer Defendants not only acted in concert with and substantially assisted the Broker Defendants breach of their fiduciary duties, but also breached their independent fiduciary duties to Plaintiffs and the Class Members as more particularly alleged.

617.    Non-ERISA Plaintiffs and the Non-ERISA Employer and Employee Subclasses have been damaged by the Insurer Defendants aiding and abetting of the Broker Defendants' breach of their fiduciary duties.

618.    Accordingly, the Insurer Defendants are liable to both the Non-ERISA Plaintiffs, Non-ERISA Employer Subclass and the Non-ERISA Employee Subclass for damages in an amount to be proven at trial.

## COUNT XIV

### Unjust Enrichment
### All Plaintiffs Against All Broker Defendants

619.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

620.    The Broker Defendants have benefited from their unlawful acts by receiving hundreds of millions of dollars in Contingent Commissions and other improper payments.  These payments

have been received by the Broker Defendants at the expense of Plaintiffs and other Class Members under circumstances where it would be inequitable for the Broker Defendants to be permitted to retain the payments.

621.    As a result of the relationships between the parties and the facts as stated above, a constructive trust should be established over the monies paid by Plaintiffs and other Class Members in the form of payments to the Broker Defendants.

622.    Plaintiffs and other Class Members have conferred a benefit on the Broker Defendants, and Broker Defendants had knowledge of this benefit and have voluntarily accepted and retained the benefit conferred on them.

623.    Broker Defendants will be unjustly enriched if they are allowed to retain such funds, and therefore, a constructive trust should be imposed on all monies wrongfully obtained by the Broker Defendants.

624.    Plaintiffs and Class Members have no adequate remedy at law.

625.    Plaintiffs and Class Members are entitled to the establishment of a constructive trust consisting of the benefit conferred upon the Broker Defendants in the form of their Contingent Commission payments and other improper payments received, from which Plaintiffs and Class Members may make claims for restitution on a *pro rata* basis.

626.    By reason of the foregoing, Plaintiffs and Class Members have been irreparably harmed and are entitled to imposition of a constructive trust as set forth above.

## COUNT XV

**Unjust Enrichment**
**Non-ERISA Employer Subclass and Non-ERISA Employee**
**Subclass Against Insurer Defendants**

627.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

628.    Insurer Defendants have benefited from their unlawful acts by receiving excessive premium revenue.  These payments have been received by Insurer Defendants at the expense of Plaintiffs and Class Members under circumstances where it would be inequitable for the Insurer Defendants to be permitted to retain the benefit.

629.    As a result of the relationships between the parties and the facts as stated above, a constructive trust should be established over the monies paid by Plaintiffs and other Class Members in the form of policy premiums, paid to the Insurer Defendants to the extent the total of those premium dollars were obtained or secured by means of Defendants' scheme and common course of conduct.

630.    Plaintiffs and other Class Members have conferred a benefit on the Insurer Defendants and Insurer Defendants had knowledge of this benefit and have voluntarily accepted and retained the benefit conferred on them.

631.    Insurer Defendants will be unjustly enriched if they are allowed to retain such funds, and, therefore, a constructive trust should be imposed on all monies wrongfully obtained by Insurer Defendants.

632.    Plaintiffs and Class Members have no adequate remedy at law.

633.    Non-ERISA Employer Subclass Plaintiffs and Non-ERISA Employee Subclass Plaintiffs are entitled to the establishment of a constructive trust consisting of the benefit inequitably conferred upon the Insurer Defendants in the form of their excessive premium revenue, from which Plaintiffs and other Sub-Class Members may make claims for restitution on a *pro rata* basis.

634.    By reason of the foregoing, Plaintiffs and Class Members have been irreparably harmed and are entitled to imposition of a constructive trust as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs David Boros, Cynthia C. Brandes, Alicia A. Pombo, MaryAnn Waxman and Richard H. Kimball, on behalf of themselves and other similarly situated employees, and the City of Danbury, Connecticut; Fire District of Sun City West; Connecticut Spring & Stamp Company; Golden Gate Bridge, Highway and Transportation District demand judgment against Defendants as follows:

A.      Certification of the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representative of the Classes, and designating their counsel as counsel for the Classes;

B.      A declaration that Defendants have committed the violations alleged herein;

C.      On Count I, against Defendants jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses.  On the Alternative Count I, against Defendants in each Employee Benefits Insurance Broker-centered Conspiracy, jointly and severally, in an amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses;

D.      On Count II, against Defendants jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses.  On the Alternative Count II, against the Defendants in each Employee Benefits Insurance Broker-centered Conspiracy, jointly and severally, in amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses;

E.      On Count III, for a declaratory judgment declaring the anticompetitive and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d) and granting

injunctive relief enjoining Defendants from further violations of 18 U.S.C. §§1962(c) and (d).  On the Alternative Count III, for a declaratory judgment declaring the anticompetitive and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d) and granting injunctive relief enjoining Defendants in each Employee Benefits Insurance Broker-Centered Conspiracy from further violations of 18 U.S.C. §§1962(c) and (d);

F.      On Count IV, against Defendants jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses;

G.      On Count V, against Defendants in the ULR-centered Employee Benefits Insurance Conspiracy, jointly and severally, in an amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses;

H.      On Count VI, against Defendants in the Marsh-centered Employee Benefits Insurance Conspiracy, jointly and severally, in an amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses;

I.      On Count VII, against Defendants in the AON-centered Employee Benefits Insurance Conspiracy, jointly and severally, in an amount equal to treble the amount of damages suffered by Plaintiffs and other Class Members as proven at trial, plus interest and attorneys' fees and expenses;

J.      On Count VIII; against Broker Defendants  jointly and severally, a judgment for damages sustained by Plaintiffs and other Class Members, and for any additional damages, injunctive relief, penalties, special or punitive damages, and other monetary relief provided by applicable law, including treble damages and attorneys' fees;

K.      On Count IX, in favor of the ERISA Employer Class Plaintiffs and the ERISA Employee Class Plaintiffs, and against the Insurer Defendants jointly and severally, to make good to

the ERISA Plans any losses suffered by the Plans on account of Defendants' wrongful conduct, plus such other equitable and remedial relief as this Court may deem appropriate;

L.      On Count X, in favor of the ERISA Employer Class and the ERISA Employee Class, and against the Insurer Defendants jointly and severally, to enjoin any act or practice that violates ERISA and to obtain other appropriate relief to redress such violations;

M.      On Count XI, in favor of the Non-ERISA Employee Subclass and Non-ERISA Employer Subclass as against Defendants jointly and severally, a judgment for damages sustained by Plaintiffs and other Class Members, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

N.      On Count XII, as against the Broker Defendants, jointly and severally, in the amount of damages suffered by Plaintiffs and Class Members as proved by trial plus interest;

O.      On Count XIII, in favor of the Non-ERISA Employee Subclass and Non-ERISA Employer Subclass as against the Insurer Defendants jointly and severally, in the amount of damages suffered by Plaintiffs and other members of the Subclasses as proven at trial plus interest;

P.      On Count XIV, as against the Broker Defendants, jointly and severally, for disgorgement of Defendants' unjust enrichment and/or imposing a constructive trust upon Defendants' ill-gotten monies, freezing Defendants' assets, and requiring Defendants to pay restitution to plaintiffs and the Class and to restore to the Class all funds acquired by means of any act or practice declared by this Court to be unlawful, deceptive, fraudulent or unfair, and/or a violation of laws, statutes or regulations;

Q.      On Count XV, in favor of the Non-ERISA Employee Subclass and Non-ERISA Employer Subclass as against the Insurer Defendants, jointly and severally for disgorgement of Defendants' unjust enrichment and/or imposing a constructive trust upon Defendants' ill-gotten monies, freezing Defendants' assets, and requiring Defendants to pay restitution to plaintiffs and the

Class and to restore to the Class all funds acquired by means of any act or practice declared by this Court to be unlawful, deceptive, fraudulent or unfair, and/or a violation of laws, statutes or regulations;

   R. An injunction preventing Defendants from engaging in future anticompetitive practices;

   S. Costs of this action, including reasonable attorneys' fees and expenses; and

   T. Any such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

DATED:  August 1, 2005

MILBERG WEISS BERSHAD
   & SCHULMAN LLP
EDITH M. KALLAS
JOSEPH P. GUGLIELMO
J. DOUGLAS RICHARDS
MICHAEL M. BUCHMAN
ELIZABETH ROSENBERG
LILI R. SABO


_____/S/ EDITH M. KALLAS_____
One Pennsylvania Plaza
New York, NY  10119
Telephone:  212/594-5300
212/868-1229 (fax)


MILLER FAUCHER AND CAFFERTY LLP
BRYAN C. CLOBES
ELLEN MERIWETHER
MICHAEL S. TARRINGER
MELODY FORRESTER
TIMOTHY FRASER


_____/S/ BRYAN C. CLOBES_____
One Logan Square
18th and Cherry Streets, Suite 1700
Philadelphia, PA  19103
Telephone:  215/864-2800
215/864-2810 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
THEODORE J. PINTAR
BONNY E. SWEENEY
JAMES D. MCNAMARA
MARY LYNNE CALKINS
RACHEL L. JENSEN


           /S/ JOHN J. STOIA, JR.
_____


401 B Street, Suite 1600
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN
ELAINE A. RYAN
PATRICIA N. HURD


         /S/ ANDREW S. FRIEDMAN
_____


2901 N. Central Avenue, Suite 1000
Phoenix, AZ  85012
Telephone:  602/274-1100
602/274-1199 (fax)

DRUBNER HARTLEY & O'CONNOR
JAMES E. HARTLEY, JR.
GARY O'CONNOR
CHARLES HELLMAN
500 Chase Parkway, 4th Floor
Waterbury, CT  06708
Telephone:  203/753-9291
203/753-6373 (fax)

WHATLEY DRAKE, LLC
JOE R. WHATLEY, JR.
CHARLENE FORD
RICHARD ROUCO
2323 Second Avenue North
Birmingham, AL  35203
Telephone:  205/328-9576
205/328-9669 (fax)

THE FURTH FIRM LLP
FREDERICK P. FURTH
MICHAEL P. LEHMANN
THOMAS P. DOVE
JULIO J. RAMOS
JON T. KING
225 Bush Street, 15th Floor
San Francisco, CA  94104
Telephone:  415/433-2070
415/982-2076 (fax)

FOOTE, MEYERS, MIELKE & FLOWERS
ROBERT M. FOOTE
416 South Second Street
Geneva, IL  60134
Telephone:  630/232-6333
630/845-8982 (fax)

LEVIN, FISHBEIN, SEDRAN & BERMAN
HOWARD J. SEDRAN
510 Walnut Street, Suite 500
Philadelphia, PA  19106
Telephone:  215/592-1500
215/592-4663 (fax)

FINE KAPLAN & BLACK
ROBERTA D. LIEBENBERG
1845 Walnut Street
Philadelphia, PA  19103
Telephone:  215/567-6566
215/568-5872 (fax)

THE FURTH FIRM, LLP
MICHAEL P. LEHMAN
THOMAS P. DOVE
JULIO J. RAMOS
JON T. KING
225 Bush Street, Suite 1500
San Francisco, CA  94104
Telephone:  415/433-2070
415/982-2076 (fax)

GRAY, WEISS AND WHITE
MARK K. GRAY
1200 PNC Plaza
Louisville, KY  40202
Telephone:  502/585-2060
502/581-1933 (fax)

HANZMAN & CRIDEN, P.A.
MICHAEL E. CRIDEN
KEVIN B. LOVE
220 Alhambra Circle, Suite 400
Coral Gables, FL  33134
Telephone:  305/357-9000
305/357-9050 (fax)

MEREDITH COHEN GREENFOGEL
  & SKIRNICK, P.C.
STEVEN J. GREENFOGEL
DANIEL B. ALLANOFF
Architects Building, 22nd Floor
117 South 17th Street
Philadelphia, PA  19103
Telephone: 215/564-5182
215/569-0958 (fax)

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC
MARY JANE EDELSTEIN FAIT
ADAM J. LEVITT
656 West Randolph Street
Suite 500 West
Chicago, IL  60661
Telephone:  312/466-9200
312/466-9292 (fax)

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC
FRED TAYLOR ISQUITH
270 Madison Avenue, 10th Floor
New York, NY  10016
Telephone:  212/545-4600
212/545-4653 (fax)

ZWERLING, SCHACHTER &
  ZWERLING, LLP
ROBERT S. SCHACHTER
STEPHEN L. BRODSKY
JUSTIN M. TARSHIS
41 Madison Avenue
New York, NY  10010
Telephone:  212/223-3900
212/371-5969 (fax)

ALEXANDER, HAWES & AUDET, LLP
WILLIAM M. AUDET
300 Montgomery Street, Ste. 400
San Francisco, CA  94104
Telephone:  415/982-1776
415/576-1776 (fax)

BEELER, SCHAD & DIAMOND, P.C.
LAWRENCE W. SCHAD
JAMES SHEDDEN
MICHAEL S. HILICKI
TONY H. KIM
332 South Michigan Avenue, Suite 1000
Chicago, IL  60604
Telephone:  312/939-6280
312/939-4661 (fax)

CHAVEZ LAW FIRM, P.C.
KATHLEEN C. CHAVEZ
P.O. Box 772
Geneva, IL  60134
Telephone:  630/232-4480
630/232-8265 (fax)

CHIMICLES & TIKELLIS LLP
NICHOLAS E. CHIMICLES
MICHAEL D. GOTTSCH
361 West Lancaster Avenue
Haverford, PA  19041
Telephone:  610/642-8500
610/649-3633 (fax)

COHN, LIFLAND, PEARLMAN,
  HERRMANN & KNOPF
PETER S. PEARLMAN
Park 80 Plaza West One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

COOPER & KIRKHAM, P.C.
JOSEF D. COOPER
655 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:  415/788-3030
415/882-7040 (fax)

LARRY D. DRURY, LTD.
LARRY D. DRURY
Two North LaSalle Street
Suite 700
Chicago, IL  60602
Telephone:  312/346-7950

FINKELSTEIN, THOMPSON
  & LOUGHRAN
BURTON H. FINKELSTEIN
L. KENDALL SATTERFIELD
HALLEY F. ASCHER
1050 30th Street, N.W.
Washington, D.C.  20007
Telephone:  202/337-8000
202/337-8090 (fax)

HANSON BRIDGES MARCUS VLAHOS
  RUDY LLP
DAVID J. MILLER
333 Market Street, 23rd Floor
San Francisco, CA  94105
Telephone:  415/777-3200
415/541-9366 (fax)

- 151 -

JANSSEN, MALLOY, NEEDHAM,
 MORRISON, REINHOLTSEN &
 CROWLEY, LLP
W. TIMOTHY NEEDHAM
730 Fifth Street, Post Office Drawer 1288
Eureka, CA  95502
Telephone:  707/445-2071
707/445-8305 (fax)

KLAFTER & OLSEN LLP
JEFFREY A. KLAFTER, ESQ.
1311 Mamaroneck Avenue, Suite 220
White Plains, NY  10602
Telephone:  914/997-5656
914/997-2444 (fax)

LITE DEPALMA GREENBERG
 & RIVAS, LLC
ALLYN Z. LITE
BRUCE D. GREENBERG
MICHAEL E. PATUNAS
Two Gateway Center, 12th Floor
Newark, NJ  07102
Telephone:  973/623-3000
973/623-0858 (fax)

JEFFREY J. LOWE, P.C.
JEFFREY J. LOWE
8235 Forsyth Blvd., Ste. 1100
St. Louis, MO  63105
Telephone:  314/721-3668
314/678-3401 (fax)

MAGER WHITE & GOLDSTEIN, LLP
JAYNE ARNOLD GOLDSTEIN
2825 University Drive, Suite 350
Coral Springs, FL  33065
Telephone:  954/341-0844
954/341-0855 (fax)

LAW OFFICES OF RANDY R. RENICK
RANDY R. RENICK
128 North Fair Oaks Avenue, Ste. 204
Pasadena, CA  91103
Telephone:  626/585-9600

SAVERI & SAVERI, INC.
GUIDO SAVERI
R. ALEXANDER SAVERI
GEOFFREY C. RUSHING
CADIO ZIRPOLI
One Eleven Pine, Suite 1700
San Francisco, CA  94111-5619
Telephone:  415/217-6810
415/217-6813 (fax)

LAW OFFICES OF FRANCIS O. SCARPULLA
FRANCIS O. SCARPULLA
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:  415/788-7210
415/788-0707 (fax)

SPARKMAN-ZUMMACH, P.C.
MARTIN W. ZUMMACH
P.O. Box 266
Southaven, MS  38671
Telephone:  662/349-6900
662/349-6800 (fax)

Attorneys for Plaintiffs

H:\NrPortbl\DOCS\JGUGLIELMO\300328_1.DOC