UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

——————————————————————— x

IN RE: INSURANCE BROKERAGE     :     MDL No. 1663
ANTITRUST LITIGATION     :
    :     Civil No. 04-5184 (FSH)
APPLIES TO ALL COMMERCIAL     :
INSURANCE BROKERAGE ACTIONS     :     Hon. Faith S. Hochberg
    :
    :     JURY TRIAL DEMANDED
    :

——————————————————————— x

## CORRECTED FIRST CONSOLIDATED AMENDED COMMERCIAL CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

NATURE OF THE CASE ....................................................................................1

JURISDICTION AND VENUE .........................................................................8

PARTIES ............................................................................................................8

A.      PLAINTIFFS ....................................................................................8

B.      DEFENDANTS ...............................................................................18

        **1.**      Broker-Defendants ................................................................18

        **2.**      Insurer Defendants. ..............................................................25

FACTUAL ALLEGATIONS .............................................................................41

II.     THE COMMERCIAL INSURANCE AND BROKERAGE MARKETS.........................41

III.    DUTIES OWED BY AN INSURANCE BROKER .........................................................42

IV.     DEFENDANTS' IMPROPER CONTINGENT COMMISSION AGREEMENTS..........49

A.      Broker Defendants Receive Undisclosed KickBacks From Insurer
Defendants ..........................................................................................49

B.      Methods of Calculating Contingent Commissions and Their Extraordinary
Impact on Defendants' Business.........................................................58

V.      BROKER DEFENDANTS IMPROPERLY STEER THEIR CLIENTS BASED
UPON CONTINGENT COMMISSION AGREEMENTS TO MAXIMIZE
PROFITS..................................................................................................................64

A.      Defendants' Collusive Bid-Rigging Scheme ........................................86

B.      Wholesale Payments ...........................................................................100

C.      Reinsurance..........................................................................................103

VI.     GLOBAL OR CENTRALIZED BROKING AS A MEANS TO FURTHER
DEFENDANTS' CONSPIRATORIAL CONDUCT .....................................................108

VII.    GOVERNMENTAL INVESTIGATIONS RELATING TO DEFENDANTS'
PRACTICES..............................................................................................................112

i

      A.     Suspensions, Terminations or Resignations of Defendants' Employees.............112

      B.     Certain Defendants Discontinue the Use of Contingent Commission Agreements ......................................................................................114

VIII.   CONSPIRACY ALLEGATIONS ................................................................117

IX.     RACKETEERING ALLEGATIONS ...........................................................126

      A.     THE COMMERCIAL INSURANCE ENTERPRISE .........................126

      B.     THE BROKER-CENTERED COMMERCIAL INSURANCE ENTERPRISES ....................................................................................128

      C.     PREDICATE ACTS .......................................................................130

X.      PATTERN OF RACKETEERING ACTIVITY .................................................134

XI.    RICO VIOLATIONS ..................................................................................134

XII.   FRAUDULENT CONCEALMENT .............................................................135

XIII.  THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF .............................135

XIV.  CLASS ACTION ALLEGATIONS ..............................................................136

          FIRST CLAIM FOR RELIEF ........................................................145

          SECOND CLAIM FOR RELIEF ....................................................147

          THIRD CLAIM FOR RELIEF ......................................................149

          FOURTH CLAIM FOR RELIEF (Violation of Section 1 of the  Sherman Act Against all Defendants)..................................................151

          FIFTH CLAIM FOR RELIEF (Violation of Section 1 of the Sherman Act Against Defendant Participants in the Commercial Insurance Broker-Centered Conspiracies)...............................................153

          SIXTH CLAIM FOR RELIEF (State Antitrust Laws against all Defendants).............................................................................155

          SEVENTH CLAIM FOR RELIEF (Breach of Fiduciary Duty Against the Broker Defendants on behalf of their Customers) ..................................160

          EIGHTH CLAIM FOR RELIEF (Aiding and Abetting Breach of Fiduciary Duty Against Insurer Defendants)...........................................161

ii

NINTH CLAIM FOR RELIEF (Unjust Enrichment Against all
      Defendants) ............................................................................................162

Plaintiffs, by and through their undersigned attorneys, allege upon their own knowledge, or where there is no personal knowledge, upon investigation of counsel or information and belief:

## NATURE OF THE CASE

1.      Plaintiffs' claims arise out of Defendants' massive scheme to manipulate the market for commercial insurance.  Defendants are the largest commercial insurance brokers ("Broker Defendants") and insurance companies ("Insurer Defendants") (collectively "Defendants", described below) in this country.  The Broker Defendants and Insurer Defendants engaged in a combination and conspiracy to suppress and eliminate competition in the sale of insurance by coordinating and rigging bids for insurance policies, allocating insurance markets and customers and raising, or maintaining or stabilizing premium prices above competitive levels.

2.      Defendants' conduct undermines the nature of the relationship that should exist between Defendants, plaintiffs and members of the Class, creates an overwhelming conflict of interest and breach of duties that have injured plaintiffs and the Class in their business and/or property, and has reduced or eliminated competition for insurance.  In this regard, Defendants have engaged in a common course of conduct, participated in the affairs of the enterprise (discussed more fully below) and conspired by engaging in the wrongful practices set forth herein that is clearly at odds with the Broker Defendants' duties and representations regarding the services and information they will provide to plaintiffs and the Class.  Broker Defendants have failed to disclose both their conflicts of interest and their joint conspiratorial motives with the Insurer Defendants.  As a result, Defendants have created the illusion of a competitive market for insurance, when, in fact, the selection, pricing and placement of the insurance products and

allocation of customers at issue in this litigation were the result of Defendants' collusion and anti-competitive conduct.

3.      Specifically, the Broker Defendants represent to their clients, which include plaintiffs and members of the Class, that they will provide unbiased advice and assistance in the selection of insurance products and services relating thereto, including claims administration. The Broker Defendants purport to offer independent expert brokering advice on such factors as coverage types and amounts, financial stability of carriers and overall cost of the insurance products, and thus act as a fiduciary as the agent of the client in this relationship, *i.e.*, considering its client's interest first in the placement of insurance.

4.      As set forth more fully below, contrary to these representations, the Broker Defendants do not represent their clients' best interests or act as fiduciaries in connection with the selection and placement of their clients' insurance.  The Insurer Defendants have improperly increased their profits and revenues by raising or maintaining premiums charged to (or by reducing the benefits or coverage received by) plaintiffs and the members of the Class. Together, the Broker Defendants and Insurer Defendants have acted in concert, conspired to reduce or eliminate competition for insurance and participated in the affairs of the enterprise.

5.      Defendants have effectuated their scheme through a variety of methods, including, *inter alia:*

- not disclosing or failing to adequately disclose payment to the Broker Defendants of contingent commissions (a.k.a. "overrides") which are based on such factors as the volume of insurance that the Broker Defendants place with a particular insurer ("volume contingency"), the renewal of that business ("persistency contingency"), and its profitability ("claims loss ratios contingency"), all of which the Broker Defendants, in concert with the Insurer Defendants, control, at least in part, by manipulating the market for insurance placed for their client;

2

- steering clients to "preferred" Insurer Defendants who participate in and further the scheme by paying exorbitant contingent commissions and other undisclosed kickbacks to the Broker Defendants;

- engaging in bid-rigging through the solicitation and manipulation of bids, including the submission of false or phony bids from the Insurer Defendants in order to obtain a preordained outcome of the client's selection of an insurer;

- unnecessarily placing insurance though wholly-owned wholesale entities which purport to act as intermediaries between the Broker Defendants and the Insurer Defendants, thereby enabling Defendants to collect additional improper fees;  and

- entering into unlawful tying agreements under which the Broker Defendants steer primary insurance contracts to the Insurer Defendants on the condition that those insurers also use the Broker Defendants (or their reinsurance broker subsidiaries) for placing their reinsurance coverage with reinsurance carriers (many of whom are related entities) and thereby reaping additional improper revenue.  This unlawful tying also has the effect of increasing the price of reinsurance, with the increased costs being passed on to the Insurer Defendants' customers, including plaintiffs and other members of the Class.

6.     The Broker Defendants hold themselves out as expert agents and therefore fiduciaries in the analysis, procurement and renewal of insurance for meeting a customer's insurance needs.  As brokers, they have a fiduciary duty to obtain the best coverage at the lowest cost and owe their clients the utmost duty of candor and full disclosure, including the duty to disclose the sources and amounts of all income received from any transactions involving their clients.  As a result, the Broker Defendants owe their clients the duties of loyalty and care to always put their clients' interests ahead of their own.  Clients, including plaintiffs and other members of the Class engage the Broker Defendants for their services based upon a belief in the Broker Defendants' expertise and promise of sound fiduciary brokerage advice.  At all times that such engagements were entered into by plaintiffs and other members of the Class, they did so unaware that the Broker Defendants have acted in concert with and conspired with the Insurer Defendants in order to induce and/or steer them to purchase and/or renew coverage with Insurer Defendants at inflated prices and/or reduced coverage and benefits.

3

7.     To facilitate their conspiratorial conduct and achieve their goal of increased profits and revenues at the expense of their clients' best interests and in contravention of their fiduciary obligations, Defendants used their participation in certain industry trade groups such as the Council of Insurance Agents & Brokers (the "Council") and its predecessors for the purpose of accomplishing the objective of their scheme.  The Council's members place 80 percent – well over $90 billion – of all U.S. insurance products and services protecting businesses, industries, the government and the public-at-large.  The Council of Insurance Company Executives ("CICE"), a standing Committee of the Council, is comprised of more than 65 of the top commercial insurers.  Collectively, CICE members are responsible for writing more than three-quarters of the nation's commercial insurance premiums.  CICE co-hosts the annual Insurance Leadership Forum at the Greenbrier in White Sulphur Springs, West Virginia, an annual meeting that connects all the leaders of the commercial insurance marketplace – the CEOs of the top insurance carriers and the leading executives from the top one percent of agencies and brokerages.  The meetings allow for small breakout conferences, ad hoc meetings and social and professional interaction among all those attending.

8.     In addition to the industry meetings at the Greenbrier, the Council also facilitates many other forums, including the National Insurance Leadership Symposium, chief financial officer workshops and conferences where CFO's of the major brokerage firms focus on the fundamental and strategic issues facing their businesses, Executive Liaison Committees, email exchanges, market surveys, the sharing of operating results and financial analyses, insurance company sponsorships, peer-to-peer networking, as well as teleconferences between brokers and insurers, which facilitate Defendants' conspiratorial conduct.

9.      Defendants' scheme has recently come to light following investigations undertaken by various Attorneys General and state insurance departments.  To date, ten individuals, including former employees of Defendants AIG, ACE, Zurich or Marsh, have plead guilty, *inter alia*, for their participation in a scheme to trick and deceive clients pursuant to a deceptive bidding process.  Additionally, New York Attorney General Eliot Spitzer has entered into settlement agreements or assurances of discontinuance, together with the Superintendent of Insurance of New York and various other state attorneys general, including Connecticut and Minnesota, with three Broker Defendants:  Marsh, Aon, and Willis.  Spitzer, along with the Director of Illinois Division of Insurance and other state agencies, similarly entered into a Stipulation and Consent Order with a fourth Broker Defendant -- Arthur J. Gallagher & Co. Each settlement agreement or assurance of discontinuance required, among other things, that each Broker Defendant provide full disclosure of all forms of compensation received from insurers.

10.      In fact, New York State Attorney General Eliot Spitzer, testifying before the New York State Assembly Standing Committee on Insurance regarding Contingent Commission Agreements, stated: "Contingent commissions have infected practically every line of insurance business we examined, including employee benefits, medical malpractice, property, casualty, excess and surplus lines, executive risk, personal lines, marine and aviation."

11.      The Insurer Defendants have acted in concert with and conspired with the Broker Defendants by agreeing to pay billions of dollars in commissions and other undisclosed remuneration to Broker Defendants for insurance placement, creating an undisclosed conflict of interest that destroys the Broker Defendants' objectivity and breaches the fiduciary relationship between the Broker Defendants and their clients.  For example, the chart below reflects the

amount of premiums received and contingent commissions paid in 2004 by certain of the Insurer

Defendants:

| P&C/COMMERCIAL DEFENDANTS 2004 CONTINGENT COMMISSIONS PAID (BY INSURER GROUP)[1] | | |
|---|---|---|
| **Insurer Defendant** | **Net Premiums** | **Net Contingent Commissions** |
| ACE INA Group | 3,432,114,000 | 29,859,390 |
| Allianz (Fireman's Fund) | 4,112,717,000 | 70,327,460 |
| American International Group Inc. ("AIG") | 27,972,154,000 | 159,441,270 |
| American Re Corporation Group | 1,583,531,000 | 25,969,900 |
| Crum & Forster | 918,300,000 | 12,000,000 |
| Berkshire Hathaway | 15,762,335,000[2] | 515,428,354 |
| RLI Corp. | 511,348,000 | 5,368,000 |
| Chubb Group of Insurance Cos | 9,536,873,000 | 222,209,140 |
| CNA Insurance Companies | 7,365,081,000 | 121,523,830 |
| Hartford Insurance Group | 8,876,260,000 | 143,795,410 |
| Liberty Mutual Ins. Cos. | 12,514,360,000 | 106,372,060 |
| Wausau Insurance Co. | 39,718,190,000 | 136,463,000 |
| St. Paul Travelers Companies | 6,767,574,000 | 98,129,820 |
| Travelers Prop. Cas. Group | 13,175,778,000 | 267,468,290 |
| XL America Group | 726,578,000 | 13,732,324 |
| Zurich/Farmers Group | 17,050,186,000 | 148,336,610 |
| | | |
| Total | 170,023,379,000 | 2,076,424,858 |

The Broker Defendants and Insurer Defendants have also conspired to raise, maintain or stabilize

the price of insurance paid by plaintiffs and other members of the Class at an artificially high

---

[1] These figures do not reflect the total contingent commissions paid by a particular Defendant (including subsidiaries and affiliated companies within a group or holding company) and do not include contingent commissions paid for other lines of insurance such as life, health and disability insurance.

[2] Figures are for 2003.

level, by allocating the placement of insurance customers' business through a pervasive bid-rigging scheme.

12.     Defendants' conduct has eliminated the trust and client-focus necessary for the proper conduct of the broker-client and insurer-insured relationship and essentially reduced the procurement of insurance to the level one would expect of a fungible commodity.  In essence, through their illicit conduct, Defendants are placing insurance in order to improperly increase their profits, rather than arriving at the selection of an insurance product as part of a relationship based on trust and driven by what is in the clients' best interests.  This is a sentiment recently acknowledged by Joseph Plumeri, the CEO of Broker Defendant Willis, before an industry trade organization:  "For too long, this business has been about the placement only – what I've come to call manufacturing …And, if contingents create the appearance of a conflict for some brokers, they create that appearance for every broker."

13.     By steering customers, engaging in bid-rigging, customer allocation in order to maintain or increase market share, and in unlawful tying, all Defendants have been and are able to maintain or increase their profits at their customers' expense.  Broker Defendants are able to reap substantial amounts of additional undisclosed fees, while purporting to provide independent and unbiased brokerage advice to their customers, and Insurer Defendants have been and are able to raise, maintain or stabilize at an artificially high level the price paid by plaintiffs and members of the Class for insurance and the services relating thereto.  Defendants' concerted actions and practices have been and are undertaken as part of a scheme, common course of conduct, and conspiracy with other insurance brokerage firms, insurers and their affiliates, industry trade associations and other entities.  The result of these practices has been Defendants' sustained action and participation in the conduct of an enterprise through a pattern of racketeering activity.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 18

U.S.C. §§1961, 1962, and 1964, 28 U.S.C. §§1331, 1332 and 1367, and 15 U.S.C. §15.  This

Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§1965(b) and (d).

This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

15.     Venue is proper in this district pursuant to 18 U.S.C. §1965(a), 28 U.S.C.

§1391(b), §12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391.

16.     The Defendants are found, do business or transact business within this district,

and conduct the interstate trade and commerce described below in substantial part within this

district.

17.     The trade and interstate commerce relevant to this action is the purchase and sale

of insurance policies and related services.

18.     During all or part of the period in which the events described in this First

Consolidated Amended Complaint occurred, each of the Defendants sold insurance and related

products and services and/or provided advice regarding the procurement or renewal of insurance

or claims administration relating thereto to plaintiffs and other members of the Class in a

continuous and uninterrupted flow of interstate commerce.

19.     The activities of Defendants and their co-conspirators, as described herein, were

within the flow of, and had a substantial effect on, interstate commerce.

## PARTIES

### A.     PLAINTIFFS

20.     Plaintiff OptiCare Health Systems, Inc. ("OptiCare") is a corporation incorporated

under the laws of Delaware and has its principal place of business in Waterbury, Connecticut.

OptiCare is an integrated eye care services company that, among other things, provides managed

vision and professional eye care products and services.  At all material times herein, OptiCare was a party to agreements with defendant Marsh USA Inc. (Connecticut) for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Marsh USA Inc. (Connecticut) placed insurance coverage on OptiCare's behalf with a number of insurance companies, including (1) Hartford Fire Insurance Company (a subsidiary of The Hartford Financial Services Group, Inc.), (2) Twin City Fire Insurance Co. (a subsidiary of The Hartford Financial Services Group, Inc.), (3) American International Specialty Lines Insurance Co. (a subsidiary of American International Group, Inc.), (4) Lexington Insurance Company (a subsidiary of American International Group, Inc.), (5) Travelers Indemnity Company (a subsidiary of St. Paul Travelers Cos.), and (6) Federal Insurance Co. (a subsidiary of Chubb Corp.).

21.    Plaintiff Comcar Industries, Inc. ("Comcar") is a corporation incorporated under the laws of Florida and has its principal place of business in Auburndale, Florida.  Comcar is a trucking company that, among other things, hauls commodities throughout the United States.  At all material times herein, Comcar was a party to agreements with defendant Marsh USA, Inc. for the provision of insurance brokerage services covering a variety of insurance needs and risks. Under these agreements, Marsh placed insurance coverage on Comcar's behalf with a number of insurance companies, including:  (1) American Alternative Insurance Corporation (a unit of American Re Corporation Group), (2) Birmingham Fire Insurance Company of Pennsylvania (a subsidiary of American International Group, Inc.), (3) Lexington Insurance Company (a subsidiary of American International Group, Inc.), (4) American Guarantee & Liability Insurance Co. (a subsidiary of Zurich American Insurance Co.), (5) American Home Assurance Company (a subsidiary of American International Group, Inc.), (6) National Union Fire Insurance

Company of Pittsburgh, Pa. (a subsidiary of AIG Inc.), (7) Insurance Co. of the State of

Pennsylvania (a subsidiary of American International Group, Inc.), and (8) Twin City Fire

Insurance Co. (a subsidiary of Hartford Financial Services Group, Inc.

      22.     Plaintiff QLM Associates, Inc. ("QLM"), at all material times herein, was a party

to agreements with Sedgwick of New Jersey, Inc. and Sedgwick Noble Lowndes (subsidiaries of

Defendant Marsh & McLennan Cos. which later merged into Marsh USA Inc.) for the provision

of the insurance brokerage services covering a variety of insurance needs and risks.  Under these

agreements, Sedgwick of New Jersey, Inc. and/or Marsh USA Inc. placed insurance coverage on

QLM's behalf with a number of insurance companies, including: (1) Zurich American Insurance

Co., and (2) Federal Insurance Co. (a subsidiary of Chubb Corp.).

      23.     Plaintiff Sunburst Hospitality Corporation ("Sunburst"), at all material times

herein, was a party to agreements with Marsh USA Inc., Aon Risk Services, Inc. of Maryland,

and Willis of New York, Inc. (formerly Willis Corroon Corp. of New York) for the provision of

insurance brokerage services covering a variety of insurance needs and risks.  Under these

agreements, Marsh USA Inc. placed insurance coverage with a number of insurance companies,

including (1) Lexington Insurance Co. (a subsidiary of American International Group Inc.), (2)

Crum & Forster, (3) Travelers, (4) Zurich American Insurance Company (a subsidiary of Zurich

Financial Services), (5) St. Paul Fire & Marine Insurance Co. (a subsidiary of St. Paul Travelers

Cos.), (6) Hartford, and (7) Westchester Surplus Lines Insurance Co. (a subsidiary of ACE Ltd.).

Aon Risk Services, Inc. of Maryland also placed insurance coverage with a number of insurance

companies, including (1) Wausau, (2) Gulf Insurance Co. (a subsidiary of St. Paul Travelers Cos.

Inc.), (3) Travelers, and (4) National Union Fire Ins. Co. (a subsidiary of American International

Group Inc.).  Willis Corroon Corp. of New York also placed insurance coverage with a number

10

of insurance companies, including (1) National Union Fire Ins. Co. (a subsidiary of American International Group Inc.), and (2) St. Paul Fire, (a subsidiary of St. Paul Travelers Cos.).

24.     Plaintiff Robert Mulcahy ("Mulcahy"), at all material times herein, was an independent contractor and a party to agreements with Arthur J. Gallagher & Co., through his employer Vestax Securities Corp., for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, Arthur J. Gallagher & Co. placed insurance coverage with a number of insurance companies, including National Union Fire Insurance Co. of Pittsburgh, Pa. (a subsidiary of American International Group Inc.).

25.     Plaintiff Accent on Eyes Corp. ("Accent"), at all material times herein, was a party to agreements with Marsh Affinity Group Services, a unit of Seabury & Smith, Inc., for the provision of insurance brokerage services.  Under these agreements, Marsh Affinity Group Services placed insurance coverage on Accent's behalf with a number of insurance companies, including Chicago Insurance Company, an affiliate of the Fireman's Fund Insurance Company.

26.     Plaintiff Golden Gate Bridge, Highway and Transportation District ("Golden Gate") is a multi-county political subdivision of the State of California.  It operates the Golden Gate Bridge and two public transit systems:  The Golden Gate Transit bus system and the Golden Gate Ferry.  At all material times herein, Golden Gate was a party to agreements with Marsh Risk & Insurance Services, a division of Marsh, Inc. for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, Marsh placed insurance coverage on Golden Gates's behalf with a number of insurance companies, including (1) American International Specialty Lines Insurance Co. (a subsidiary of American International Group, Inc.), (2) Illinois Union Insurance Co. (a subsidiary of ACE Ltd.), (3) Indemnity Insurance Co. of North America (a subsidiary of ACE Ltd.),  (4) Steadfast Insurance Co. (a

11

subsidiary of Zurich American Insurance Co.), (5) National Union Fire Insurance Co. of Pittsburgh, Pa. (a subsidiary of American International Group Inc.), (6) Lexington Insurance Co. (a subsidiary of American International Group Inc.), (7) American Home Assurance Co. (a subsidiary of American International Group Inc.), (8) Westchester Surplus Lines Ins. Co. (a subsidiary of ACE Ltd.), (9) Fidelity & Deposit Company of Maryland (a subsidiary of Zurich North America Insurance Co.), (10) Hartford Steam Boiler Inspection and Insurance Co. (a subsidiary of American International Group Inc.), (11) United States Fire Insurance Co. (a subsidiary of Crum & Forster Holdings Corp.), (12) Pacific Insurance Co., Ltd. (a subsidiary of Hartford Financial Services Group, Inc.), (13) Mt. Hawley Insurance Co. (a subsidiary of RLI Corp.), (14) Continental Insurance Co. (a subsidiary of CNA Financial Corp.), (15) Zurich American Insurance Company (a subsidiary of Zurich Financial Services), (16) Empire Fire & Marine Insurance Co. (a subsidiary of Zurich American Insurance Co.), and (17) St. Paul Mercury Insurance Co. (a subsidiary of St. Paul Travelers Cos.).

27.     Plaintiff Glenn Singer ("Singer") at all material times herein, was a party to agreements with Marsh USA Inc. for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Marsh placed insurance coverage on Singer's behalf with a number of insurance companies, including, among others: (1) American Home Assurance Company (a subsidiary of American International Group, Inc.), (2) American International Insurance Company (a subsidiary of American International Group, Inc.), (3) The Insurance Company of the State of Pennsylvania (a subsidiary of American International Group, Inc.), (4) AIU Insurance Company (a subsidiary of American International Group, Inc.), (5) Lexington Insurance Company (subsidiary of American International Group, Inc.), and (6) The Chubb Corporation.

28.     Plaintiff Priority Ultrasound Services ("Priority Ultrasound"), at all material times herein, was a party to agreements with Affinity Insurance Services, Inc., formerly known as Aon Direct Group, Inc. for the provision of insurance brokerage services.  Under these agreements, Aon placed insurance coverage on Priority Ultrasound's behalf with a number of insurance companies, including American Casualty Co. of Reading, PA (a subsidiary of CNA Financial Corp.).

29.     Plaintiff Redwood Oil Company ("Redwood"), at all material times herein, was a party to agreements with Gallagher Hefferman Insurance Brokers, a division of Arthur J. Gallagher & Co., for the provision of insurance brokerage services.  Under these agreements, Arthur J. Gallagher & Co. placed insurance coverage on Redwood's behalf with a number of insurance companies, including (1) Commerce and Industry Insurance Co. (a subsidiary of American International Group, Inc.), and (2) New Hampshire Insurance Company (a subsidiary of American International Group, Inc.).

30.     Plaintiff The Omni Group of Companies ("Omni") is an affiliation of businesses with its principal place of business in Phoenix, Arizona.  For purposes of this complaint, Omni includes its affiliated companies, namely Dominion Pacific Commercial, L.L.C., a construction company offering consultation, cost analysis, construction drawing supervision, design/build and turnkey construction for ground-up commercial buildings and commercial tenant improvements. Omni is a full service real estate firm that also provides assistance to institutions turning around troubled properties for leasing or sale.  Omni was a party to agreements with defendant Acordia for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, Acordia placed insurance coverage on Omni's behalf with a number of insurance companies, including (1) Fireman's Fund Insurance Company (a subsidiary of Allianz

AG), (2) RLI Insurance Company (a subsidiary of RLI Corp.), and (3) Mt. Hawley Insurance Co. (a subsidiary of RLI Corp.).

31.     Plaintiff Bayou Steel Corporation ("Bayou"), at all material times herein, was a party to agreements with Aon Risk Services, Inc. of Louisiana, Aon Risk Services of Texas, Inc. and Marsh USA Inc., for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, Aon Risk Services Inc. of Louisiana and/or Aon Risk Services of Texas, Inc. placed insurance coverage on Bayou's behalf with a number of insurance companies, including:  (1) ACE USA, Inc. (a subsidiary of ACE Ltd.), (2) American Guarantee & Liability Insurance Co. (a subsidiary of Zurich American Insurance Co.), (3) American International Specialty Lines Insurance Co. (a subsidiary of American International Group Inc.), (4) Executive Risk Indemnity Inc. (a subsidiary of Chubb Corp.), (5) Federal Insurance Co. (a subsidiary of Chubb Corp.), (6) Gulf Insurance Co. (a subsidiary of St. Paul Travelers Cos.), (7) National Union Fire Insurance Co. of Louisiana (a subsidiary of American International Group Inc.), (8) Nutmeg Insurance Co. (a subsidiary of Hartford Financial Services Group Inc.), (9) St. Paul, (10) Greenwich Insurance Co. (a subsidiary of XL Capital Ltd.), and (11) Indian Harbor Insurance Co. (a subsidiary of XL Capital Ltd.).  Also, Marsh USA Inc. placed insurance coverage on Bayou's behalf with a number of insurance companies, including:  (1) ACE American Insurance Co. (a subsidiary of ACE Ltd.), (2) ACE USA, Inc. (a subsidiary of ACE Ltd.), (3) American Guarantee & Liability Insurance Co. (a subsidiary of Zurich North America Insurance Co.), (4) Commerce and Industry Insurance Co. (a subsidiary of American International Group Inc.), (5) Executive Risk Indemnity Inc. (a subsidiary of Chubb Corp.), (6) Federal Insurance Co. (a subsidiary of Chubb Corp.), (7) Gulf Insurance Co. (a subsidiary of St. Paul Travelers Cos. Inc.), (8) Lexington Insurance Co. (a subsidiary of American

14

International Group Inc.), (9) Liberty Mutual Insurance Co., (10) National Union Fire Insurance. Co. of Pittsburgh, Pa. (a subsidiary of American International Group Inc.), (11) National Union Fire Insurance Co. of Louisiana (a subsidiary of American International Group Inc.), (12) St. Paul Fire and Marine Insurance Co. (a subsidiary of St. Paul Travelers Cos.),  (13) Twin City Fire Insurance Co. (a subsidiary of Hartford Financial Services Group Inc.), (14) Wausau Underwriters Ins. Co. (a subsidiary of Liberty Mutual Insurance Co.), and (15) Indian Harbor Insurance Co. (a subsidiary of XL Capital Ltd.).

      32.    Plaintiff Clear Lam Packaging, Inc. ("Clear Lam"), at all material times herein, was a party to agreements with Arthur J. Gallagher Risk Management Services, Inc., for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, Arthur J. Gallagher placed insurance coverage on Clear Lam's behalf with a number of insurance companies, including: (1) Travelers Casualty & Surety Company of America (a subsidiary of St. Paul Travelers Cos.), (2) National Surety Corp. (a subsidiary Fireman's Fund Insurance Co.), (3) Twin City Fire Insurance Co. (a subsidiary of Hartford Financial Services Group Inc.), (4) Zurich American Insurance Company (a subsidiary of Zurich Financial Services), and (5) Liberty Mutual Fire Insurance Co. (a subsidiary of Liberty Mutual Insurance Co.).

      33.    Plaintiff Cellect, LLC ("Cellect"), at all material times herein, was a party to agreements with Marsh USA, Inc. for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, Marsh placed insurance coverage on Cellect's behalf with a number of insurance companies, including, among others:  (1) American International Group, Inc., (2) St. Paul, and (3) Zurich.

34.     Plaintiff The Enclave, LLC ("Enclave"), at all material times herein, was party to agreements with USI Insurance Services of Florida, Inc. (d/b/a/ USI Florida) for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, USI Insurance Services of Florida, Inc. placed insurance coverage on Enclave's behalf with a number of insurance companies, including Empire Indemnity Insurance Co. (a subsidiary of Zurich North America Insurance Co.).

35.     Plaintiff Gateway Club Apartments, Ltd. ("Gateway"), at all material times herein, was party to agreements with USI Insurance Services of Florida, Inc. (d/b/a/ USI Florida) for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, USI Insurance Services of Florida, Inc. placed insurance coverage on Gateway's behalf with a number of insurance companies, including (1) Federal Insurance Co. (a subsidiary of Chubb Corp.), (2) Lexington Insurance Co. (a subsidiary of American International Group Inc.), (3) Gulf Insurance Co. (a subsidiary of St. Paul Travelers Cos. Inc.), (4) Continental Casualty Co. (a subsidiary of CNA Financial Corp.), (5) Athena Assurance Company (a subsidiary of St. Paul Travelers Cos.), (6) American Guarantee & Liability Insurance Co. (a subsidiary of Zurich North America Insurance Co.), (7) Vigilant Insurance Co. (a subsidiary of Chubb Corp.), and (8) Mt. Hawley Insurance Co. (a subsidiary of RLI Corp.).

36.     Plaintiff Theodore S. Forman ("Forman"), at all material times herein, was a party to agreements with Summit Global Partners of Florida, Inc. for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Summit Global Partners of Florida, Inc. placed insurance coverage on Forman's behalf with a number of insurance companies, including Assurance Company of America (a subsidiary of Zurich North America Insurance Co.).

16

37.     Plaintiff Michigan Multi-King Inc. ("Michigan Multi-King"), at all material times herein, was a party to agreements with Aon Risk Services, Inc. of Michigan for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Aon Risk Services, Inc. of Michigan placed insurance coverage on Michigan Multi-King's behalf with a number of insurance companies, including:  (1) Travelers Casualty and Surety Company of America (a subsidiary of St. Paul Travelers Cos.), (2) St. Paul Fire and Marine Insurance Co. (a subsidiary of St. Paul Travelers Cos.), and (3) Federal Insurance Co. (a subsidiary of Chubb Corp.).

38.     Plaintiff City of Stamford ("Stamford") is a municipal corporation incorporated under the laws of the State of Connecticut.  At all material times herein, Stamford was a party to agreements with defendant Marsh USA, Inc., and/or Marsh McLennan, Inc., (collectively "Marsh") for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Marsh placed insurance coverage on Stamford's behalf with a number of insurance companies, including, among others:  (1) American International Marine Agency of NY (a division of AIG), (2) Hartford Fire Insurance Company (a subsidiary of Hartford Financial Services Group, Inc.), (3) The Hartford Fidelity and Bonding (a subsidiary of Hartford Financial Services Group, Inc.), (4) Lexington Insurance Company (a subsidiary of AIG), (5) St Paul Fire & Marine (a subsidiary of St. Paul Travelers Cos.), (6) Traveler's Casualty & Surety Company of America (a subsidiary of St. Paul Travelers Cos.), (7) Westchester Surplus Lines Insurance Company (a subsidiary of ACE Ltd.), and (8) Zurich American Insurance Company (a subsidiary of Zurich Financial Services Group).

B.      **DEFENDANTS**

1.      **Broker-Defendants**

39.     Defendant Marsh & McLennan Companies, Inc. ("Marsh & McLennan") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in New York, New York. Marsh & McLennan is a global corporation and the parent of various subsidiaries that provide clients with analysis, advice and transactional services in connection with the procurement and servicing of insurance, as well as investment management and consulting.

40.     Defendant Marsh Inc. ("Marsh Inc.") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in New York, New York. Marsh Inc. is a primary subsidiary of Marsh & McLennan and an entity through which risk and insurance services, such as insurance and reinsurance brokerage, are provided. Marsh Inc. is considered a Marsh & McLennan operating unit and provides insurance brokerage through various subsidiaries of its own.

41.     Defendant Marsh USA Inc. ("Marsh USA") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in New York, New York. Marsh USA is a subsidiary of Marsh Inc. and provides insurance brokerage services.

42.     Defendant Marsh USA Inc. (Connecticut) ("Marsh Connecticut") is a corporation incorporated under the laws of Connecticut and has its corporate headquarters in New York, New York, and is one of a number of corporations under the name "Marsh USA Inc." incorporated in various states. Marsh Connecticut is a subsidiary of Marsh & McLennan and provides insurance brokerage services.

43.     Defendant Seabury & Smith, Inc. ("Seabury & Smith") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in New York, New

York, and is one of a number of corporations under the name "Seabury & Smith, Inc." incorporated in various states.  Seabury & Smith is a subsidiary of Marsh & McLennan and provides  brokerage services through its Marsh Affinity Group Services unit.

44.     Defendants Marsh & McLennan, Marsh Inc., Marsh USA, Marsh Connecticut and Seabury & Smith shall be referred to collectively herein as "Marsh."

45.     Defendant Aon Corporation ("Aon Corp.") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois.  Aon Corp. is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

46.     Defendant Aon Broker Services, Inc. ("Aon Broker") is a corporation incorporated under the laws of Illinois and has its corporate headquarters in Chicago, Illinois. Aon Broker is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

47.     Defendant Aon Risk Services Companies, Inc. ("Aon Risk") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois. Aon Risk is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

48.     Defendant Aon Risk Services Inc. U.S. ("Aon Risk U.S.") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois. Aon Risk U.S. is a subsidiary of and/or affiliated with Aon Corp. and Aon Risk, and provides customers with risk management and insurance brokering services.

49.     Defendant Aon Risk Services, Inc. of Maryland ("Aon Risk Maryland") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in

Chicago, Illinois. Aon Risk Maryland is a subsidiary of Aon Corp., and provides customers with risk management and insurance brokering services.

50.     Defendant Aon Risk Services, Inc. of Louisiana ("Aon Risk Louisiana") is a corporation incorporated under the laws of Louisiana and has its corporate headquarters in Chicago, Illinois. Aon Risk Louisiana is a subsidiary of Aon Corp., and provides customers with risk management and insurance brokering services.

51.     Defendant Aon Risk Services of Texas, Inc. ("Aon Risk Texas") is a corporation incorporated under the laws of Texas and has its corporate headquarters in Chicago, Illinois. Aon Risk Texas is a subsidiary of Aon Corp., and provides customers with risk management and insurance brokering services.

52.     Defendant Aon Risk Services, Inc. of Michigan ("Aon Risk Michigan") is a corporation incorporated under the laws of Michigan and has its corporate headquarters in Chicago, Illinois. Aon Risk Michigan is a subsidiary of Aon Corp., and provides customers with risk management and insurance brokering services.

53.     Aon Group, Inc. ("Aon Group") is a corporation incorporated under the laws of Maryland and has its corporate headquarters in Chicago, Illinois. Aon Group is a subsidiary of and/or affiliated with Aon Corp. and provides customers with risk management and insurance brokering services.

54.     Aon Services Group, Inc. ("Aon Services") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois. Aon Services is a subsidiary of and/or affiliated with Aon Corp. and Aon Group, and provides customers with risk management and insurance brokering services.

55.     Aon Re, Inc. ("Aon Re") is a corporation incorporated under the laws of Illinois and has its corporate headquarters in Chicago, Illinois.  Aon Re is a subsidiary of Aon Corp. and provides customers with reinsurance and brokerage services.

56.     Defendant Affinity Insurance Services, Inc. ("Affinity") is a subsidiary of Aon Corp. and is incorporated under the laws of Pennsylvania, with headquarters in Chicago, Illinois. Affinity provides its customers with risk management and insurance brokering services.

57.     Aon Re Worldwide, Inc. ("Aon Re Worldwide") is a subsidiary of Aon Corp. and is incorporated under the laws of Delaware with headquarters on Chicago, Illinois.  Aon Re Worldwide provides customers with reinsurance coverage and is the largest reinsurance brokerage business in the U.S.

58.     Defendants Aon Corp., Aon Broker, Aon Risk, Aon Risk U.S., Aon Risk Maryland, Aon Risk Louisiana, Aon Risk Texas, Aon Risk Michigan, Aon Services, Aon Re, Affinity, and Aon Re Worldwide shall be referred to collectively herein as "Aon."

59.     Defendant Willis Group Holdings Limited ("Willis Group") is a corporation incorporated under the laws of Bermuda whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in London, England.  Willis Group is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.  Willis Group is the third largest global brokerage firm in the world, with over $212 billion in revenues in 2003 alone.

60.     Defendant Willis Group Limited ("Willis Ltd.") is a private limited company registered in England and Wales with corporate headquarters in London, England.  Willis Ltd. is a subsidiary of Willis Group and provides insurance services through subsidiaries of its own.

61.     Defendant Willis North America, Inc. ("Willis NA") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in New York, New York.  Willis NA is a subsidiary of Willis Ltd., and provides customers with risk management and insurance brokering services.  Willis Ltd. and, in turn, Willis NA provide their insurance brokering services and operate principally through the offices of their subsidiaries and affiliates.

62.     Defendant Willis of New York, Inc. ("Willis NY") is a subsidiary of and is incorporated under the laws of New York with headquarters in New York, New York.  Willis provides customers with risk management and insurance brokering services.

63.     Defendant Stewart Smith Group ("Stewart Smith"), was a wholly owned subsidiary of Willis Ltd. with its headquarters in New York, New York.  Stewart Smith is the third-largest wholesale intermediary for commercial lines of insurance in the United States, writing over $1 billion in premium in 2003.  It claims to specialize in hard-to-place, unique, difficult, and specialty businesses.

64.     Willis Re Inc. ("Willis Re") is a wholly owned subsidiary of Willis Ltd. with its headquarters in New York, New York.  Willis Re provides its customers with reinsurance brokering services.  Willis Re describes itself as "one of the world's premier global reinsurance broker."

65.     Defendants Willis Group, Willis Ltd., Stewart Smith, Willis NA, Willis NY, Stewart Smith and Willis Re shall be referred to collectively herein as "Willis."

66.     Defendant Arthur J. Gallagher & Co. ("Gallagher Co." or "AJG") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Itasca, Illinois.  Gallagher provides customers with risk management and insurance brokerage services.  Gallagher is the fourth

22

largest global insurance broker by 2003 revenue, providing customers with risk management and insurance brokerage services worldwide.

67.     Defendant Arthur J. Gallagher Risk Management Service, Inc. ("Gallagher Risk") is a subsidiary of Gallagher, and is incorporated under the laws of Illinois, with headquarters in Itasca, Illinois.  Gallagher Risk provides customers with property/casualty brokerage, risk management and consulting services.

68.     Defendants Gallagher Co. and Gallagher Risk shall be referred to collectively herein as "Gallagher."

69.     Defendant Wells Fargo & Company is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in San Francisco, California.  Wells Fargo & Company provides customers with risk management and insurance brokerage services through two separate insurance operations:  (i) Wells Fargo Insurance Services, and (ii) Acordia, Inc., a Wells Fargo subsidiary.  Collectively, Wells Fargo Insurance and Acordia/Wells Fargo compromise the fifth largest broker in the United States, garnering $800.5 million revenues in 2003.

70.     Defendant Acordia, Inc. ("Acordia/Wells Fargo") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois. Acordia/Wells Fargo provides customers with risk management and insurance brokerage services.

71.     Defendants Wells Fargo & Company and Acordia/Wells Fargo shall be referred to collectively as "Wells Fargo."

72.     Defendant Brown & Brown, Inc. ("Brown") is a corporation incorporated under the laws of Florida whose shares are listed and publicly traded on the New York Stock Exchange

23

and has its corporate headquarters in Daytona Beach, Florida.  Brown provides customers with risk management and insurance brokerage services.

73.     Defendant Hilb, Rogal & Hobbs Company ("Hilb" or "HRH") is a corporation incorporated under the laws of Virginia whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Glen Allen, Virginia.  HRH provides customers with risk management and insurance brokerage services.

74.     Defendant BB&T Corporation ("BB&T Corp.") is a corporation incorporated under the laws of North Carolina whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Winston-Salem, North Carolina.  BB&T Corp. is a financial holding company that conducts its business operations primarily through its commercial banking subsidiaries, including Branch Banking and Trust Company.  Through its subsidiaries and affiliates, BB&T Corp. provides customers with risk management and insurance brokerage services.

75.     Defendant Branch Banking and Trust Company ("Branch Bank") is a corporation incorporated under the laws of North Carolina and has its corporate headquarters in Winston-Salem, North Carolina.  Branch Bank is BB&T Corp.'s largest subsidiary, which, through one of its own principal operating subsidiaries, BB&T Insurance Services, Inc., provides customers with risk management and insurance brokering services.

76.     Defendant BB&T Insurance Services, Inc., ("BB&T Insurance") is a corporation incorporated under the laws of North Carolina and has its corporate headquarters in Raleigh, North Carolina.  BB&T Insurance provides customers with risk management and insurance brokerage services.

77.     Defendants BB&T Corp., Branch Bank and BB&T Insurance shall be referred to collectively as "BB&T."

78.     Defendant U.S.I. Holdings Corporation ("USI Holding") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the NASDAQ National Market and has its corporate headquarters in Briarcliff Manor, New York. USI provides customers with risk management and insurance brokerage services.

79.     Defendant Summit Global Partners of Florida, Inc. ("Summit Global") is a subsidiary of USI, and is incorporated under the laws of Florida with headquarters in Boca Raton, Florida.  Summit Global provides customers with risk management and insurance brokerage services.

80.     Defendant USI Insurance Services of Florida, Inc., d/b/a USI Florida ("USI Florida") is a subsidiary of USI, and is incorporated under the laws of Florida, with headquarters in Plantation, Florida.  USI Florida provides customers with risk management and insurance brokerage services.

81.     Defendants USI Holdings, Summit Global and USI Florida shall be referred to collectively as "USI."

82.     Defendant Hub International Limited ("Hub") is a corporation incorporated under the laws of Ontario, Canada, whose shares are listed and publicly traded on the New York Stock Exchange with its corporate headquarters in Chicago, Illinois.  Hub provides customers with risk management and insurance brokerage services.

### 2.      Insurer Defendants.

83.     Defendant American International Group, Inc. ("AIG Inc.") is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange with its corporate headquarters in New York, New York.  As described by

25

AIG, Inc. itself, "AIG member companies serve commercial, institutional and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer." AIG, Inc. and its related companies are the largest underwriters of commercial and industrial insurance in the United States.

84.     Defendant Lexington Insurance Company ("Lexington") is a subsidiary of AIG Inc. and is also partly owned by National Union Fire Insurance Company of Pittsburgh, PA, The Insurance Company of the State of Pennsylvania and Birmingham Fire Insurance Company of Pennsylvania, which are all subsidiaries of AIG Inc. as well. Lexington is incorporated under the laws of Delaware with headquarters in Boston, Massachusetts. Lexington operates as an underwriter of managed care professional liability insurance.

85.     Defendant American International Specialty Lines Insurance Co. ("AISPLIC") is a subsidiary of AIG Inc. and is incorporated under the laws of Alaska with headquarters in Jersey City, New Jersey. AISPLIC operates as an underwriter of liability, property, casualty and marine insurance.

86.     Defendant Birmingham Fire Insurance Co. of Pennsylvania ("Birmingham Fire") is a subsidiary of AIG Inc. and is incorporated under the laws of Pennsylvania with headquarters in New York, New York. Birmingham Fire operates as an underwriter of property and casualty insurance.

87.     Defendant American Home Assurance Co. ("American Home") is a subsidiary of AIG Inc. and is incorporated under the laws of New York with headquarters in New York, New York. American Home operates as a provider of commercial umbrella/excess liability and primary and excess workers' compensation insurance.

88.     Defendant National Union Fire Insurance Co. of Pittsburgh, Pa. ("National Union Pittsburgh") is a subsidiary of AIG Inc. and is incorporated under the laws of Pennsylvania with headquarters in New York, New York.  National Union Pittsburgh operates as a provider of liability products and services.

89.     Defendant National Union Fire Insurance Co. of Louisiana ("National Union Louisiana") is a subsidiary of AIG Inc. and is incorporated under the laws of Louisiana with headquarters in Baton Rouge, Louisiana.  National Union Louisiana operates as a provider of liability products and services.

90.     Defendant American International Insurance Co. ("American Int'l") is a subsidiary of AIG Inc. and is incorporated under the laws of New York with headquarters in New York, New York.  American Int'l operates as an underwriter of property and casualty insurance.

91.     Defendant The Insurance Company of the State of Pennsylvania ("Ins. Co. PA") is a subsidiary of AIG Inc. and is incorporated under the laws of Pennsylvania with headquarters in Harrisburg, Pennsylvania.  Ins. Co. PA operates as an underwriter of property and casualty insurance.

92.     Defendant AIU Insurance Co. ("AIU") is a subsidiary of AIG Inc. and is also partly owned by Ins. Co. PA, National Union Pittsburgh and Birmingham Fire, which are all subsidiaries of AIG Inc. as well.  AIU is incorporated under the laws of New York with headquarters in New York, New York.  AIU operates as an underwriter of property and casualty insurance.

93.     Defendant Commerce and Industry Insurance Co. ("Commerce & Industry") is a subsidiary of AIG Inc., and is incorporated under the laws of New York with headquarters in

27

New York, New York.  Commerce & Industry operates as an underwriter of property and casualty insurance.

94.     Defendant New Hampshire Insurance Co. ("NH Ins.") is a subsidiary of AIG Inc., and is incorporated under the laws of Pennsylvania, with headquarters in Harrisburg, Pennsylvania.  NH Ins. operates as an underwriter of property and casualty insurance.

95.     Defendant Hartford Steam Boiler Inspection and Insurance Co. ("Hartford Steam") is a subsidiary of AIG Ins, and is incorporated under the laws of Connecticut, with headquarters in Hartford, Connecticut.  Hartford Steam describes itself as "a global specialty insurer and reinsurer" offering "a range of specialty coverages, engineering-based risk management, and loss reduction services."

96.     Defendants AIG Inc., Lexington, AISPLIC, Birmingham Fire, American Home, National Union Pittsburgh, National Union Louisiana, American Int'l, Ins. Co. PA, AIU, Commerce & Industry, NH Ins. and Hartford Steam shall be referred to collectively as "AIG."

97.     Defendant ACE Limited ("ACE Ltd.") is a corporation incorporated under the laws of the Cayman Islands whose shares are listed and publicly traded on the New York Stock Exchange with its corporate headquarters in Hamilton, Bermuda.  ACE Ltd. owns ACE INA Holdings, Inc.  As described by ACE Ltd. itself, the "ACE Group of Companies is one of the world's largest providers of insurance and reinsurance."

98.     Defendant ACE INA Holdings, Inc. ("ACE INA"), is a U.S. based insurance organization incorporated under the laws of Delaware and is headquartered in Philadelphia, Pennsylvania.  ACE INA oversees insurance operations that span the globe and, through its operating companies, including ACE USA, Inc., is a leading provider of insurance and reinsurance.

28

99.     Defendant ACE USA, Inc. ("ACE USA") is an operating company of ACE INA and is a corporation incorporated under the laws of Delaware and is headquartered in Philadelphia, Pennsylvania.  ACE USA operates through several insurance companies using a network of offices throughout the United States.  ACE USA's operations "provide a broad range of P&C insurance and reinsurance products to a diverse group of commercial and non-commercial enterprises and consumers.  These products include excess liability, excess property, workers' compensation, general liability, automobile liability, professional lines, aerospace, accident and health (A&H) coverages and claim and risk management products and services."

100.     Defendant ACE American Insurance Co. ("ACE American") is a subsidiary of ACE Ltd. and is incorporated under the laws of Pennsylvania, with headquarters in Philadelphia, Pennsylvania.  ACE American operates as an underwriter of property and casualty insurance.

101.     Defendant Westchester Surplus Lines Insurance Co. ("Westchester Surplus") is a subsidiary of ACE Ltd. and is incorporated under the laws of Georgia with headquarters in Philadelphia, Pennsylvania.  Westchester Surplus operates as a provider of specialty property and casualty insurance and services.

102.     Defendant Illinois Union Insurance Co. ("Illinois Union") is a subsidiary of ACE Ltd. and is incorporated under the laws of Illinois, with headquarters in Chicago, Illinois.  Illinois Union operates as an underwriter of property and casualty insurance.

103.     Defendant Indemnity Insurance Co. of North America ("Indemnity Ins.") is a subsidiary of ACE Ltd. and is incorporated under the laws of Pennsylvania, with headquarters in Philadelphia, Pennsylvania.  Indemnity Ins. operates as an underwriter of property and casualty insurance.

104.    Defendants ACE Ltd., ACE INA, ACE USA, and ACE American, Westchester Surplus, Illinois Union and Indemnity Ins. shall be referred to collectively herein as "ACE."

105.    Defendant The Hartford Financial Services Group, Inc. ("Hartford Financial") is one of the largest investment and insurance companies in the United States.  Hartford is a corporation incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York Stock Exchange and has its corporate headquarters in Hartford, Connecticut. Hartford represents that it "is a leading provider of investment products, life insurance and group and employee benefits; automobile and homeowners products; and business insurance."

106.    Defendant Hartford Fire Insurance Co. ("Hartford Fire") is a subsidiary of Hartford Financial and is an incorporated under the laws of Connecticut with headquarters in Hartford, Connecticut.  Hartford Fire operates as an underwriter of property and casualty insurance.

107.    Defendant Twin City Fire Insurance Co. ("Twin City") is a subsidiary of Hartford Financial and is incorporated under the laws of Indiana with headquarters in Hartford, Connecticut.  Twin City operates as an underwriter of property and casualty insurance.

108.    Defendant Pacific Insurance Co., Ltd. ("Pacific Ins.") is a subsidiary of Hartford Financial and is incorporated under the laws of Connecticut, with headquarters in Boston, Massachusetts.  Pacific Ins. operates as an underwriter of property and casualty insurance.

109.    Defendant Nutmeg Insurance Co. ("Nutmeg Ins.") is a subsidiary of Hartford Financial and is incorporated under the laws of Connecticut, with headquarters in Hartford, Connecticut.  Nutmeg Ins. operates as an underwriter of property and casualty insurance.

110.    Defendant The Hartford Fidelity & Bonding Co. ("Hartford Fidelity") is a subsidiary of Hartford Financial and is incorporated under the laws of Connecticut, with

30

headquarters in Hartford, Connecticut.  Hartford Fidelity operates as an underwriter of property and casualty insurance.

111.    Defendants Hartford Financial, Hartford Fire, Twin City, Pacific Ins., Nutmeg Ins. and Hartford Fidelity shall be referred to collectively as "Hartford."

112.    Defendant Munich Reinsurance Co. ("Munich Re") is a provider of reinsurance, primary insurance and asset management services.  Munich Re is a German corporation with headquarters in Munich, Germany.  Munich Re's shares are traded on several German stock exchanges.  Munich Re describes itself as "one of the world's largest reinsurers."

113.    Defendant American Re Corporation ("American Re") is a subsidiary of Munich Re and is incorporated in the State of Delaware and headquartered in Princeton, New Jersey. American Re is one of the leading providers of reinsurance in the United States.  Through its subsidiaries, American Re writes treaty and facultative reinsurance, insurance, and provides related services to insurance companies, other large businesses, government agencies, pools and other self-insurers.

114.    Defendant American Re-Insurance Co. ("American Re-Insurance") is a wholly owned subsidiary of American Re and is incorporated under the laws of Delaware and headquartered in Princeton, New Jersey.  American Re-Insurance is a provider of treaty and facultative reinsurance, insurance and related services to insurance companies, large businesses and government agencies.

115.    Defendant American Alternative Insurance Corp. ("American Alternative") is a unit of American Re and is incorporated under the laws of Delaware and headquartered in Princeton, New Jersey.  American Alternative is a provider of property and casualty insurance.

116.    Defendant Munich-American Risk Partners, Inc. ("Munich-American") is a wholly owned subsidiary of American Re and is incorporated under the laws of Delaware and headquartered in Princeton, New Jersey.  Munich American develops custom risk transfer, risk sharing and risk managing solutions that preserve and enhance the assets and operations of its clients.

117.    Defendants Munich Re, American Re, American Re-Insurance, American Alternative and Munich-American, shall be referred to collectively herein as "Munich."

118.    Defendant St. Paul Travelers Companies, Inc. ("St. Paul Travelers") is a corporation incorporated under the laws of Minnesota and has its corporate headquarters in St. Paul, Minnesota.  St. Paul Travelers was formed from a 2004 merger between Travelers Property Casualty Corp. and The St. Paul Companies, Inc.  The merger created the second largest commercial insurance company in the United Sates offering a variety of property and casualty insurance products through its various subsidiaries.  St. Paul Travelers describes itself as "a leading provider of property casualty insurance and surety products and of risk management services to a wide variety of business and organizations and to individuals" whose products are distributed through "independent insurance agents and brokers."

119.    Defendant St. Paul Fire & Marine Insurance Co. ("St. Paul Fire") is a subsidiary of St. Paul Travelers and is incorporated under the laws of Minnesota with headquarters in St. Paul, Minnesota.  St. Paul Fire operates as an underwriter of property and casualty insurance.

120.    Defendant Gulf Insurance Co. ("Gulf Ins.") is a subsidiary of St. Paul Travelers, and is incorporated under the laws of Connecticut with headquarters in New York, New York. Gulf Ins. operates as an underwriter of property and casualty insurance.

32

121.    Defendant St. Paul Mercury Insurance Co. ("St. Paul Mercury") is a subsidiary of St. Paul Travelers, and is incorporated under the laws of Minnesota, with headquarters in St. Paul, Minnesota.  St. Paul Mercury operates as an underwriter of property and casualty insurance.

122.    Defendant Travelers Casualty & Surety Co. of America ("Travelers Casualty") is a subsidiary of St. Paul Travelers, and is incorporated under the laws of Connecticut, with headquarters in Hartford, Connecticut.  Travelers Casualty operates as an underwriter of property and casualty insurance.

123.    Defendant Travelers Indemnity Company ("Travelers Indemnity") is a subsidiary of St. Paul Travelers and is incorporated under the laws of Connecticut with headquarters in Hartford, Connecticut.  Travelers Indemnity operates as an underwriter of property and casualty insurance.

124.    Defendant Athena Assurance Co. ("Athena Assurance") is a subsidiary of St. Paul Travelers, and is incorporated under the laws of Minnesota, with headquarters in St. Paul, Minnesota.  Athena Assurance operates as an underwriter of property and casualty insurance.

125.    Defendants St. Paul Travelers, St. Paul Fire, Gulf Ins., St. Paul Mercury, Travelers Casualty, Travelers Indemnity and Athena Assurance shall be referred to collectively herein as "St. Paul."

126.    Defendant Berkshire Hathaway Inc. ("Berkshire Hathaway") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Omaha, Nebraska. Berkshire Hathaway, through its more than fifty domestic and international subsidiaries and affiliates comprised under Berkshire Hathaway Insurance Group provides insurance and reinsurance services.

127.    Defendant Berkshire Hathaway Insurance Group ("Berkshire Hathaway Insurance") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Omaha, Nebraska.  Berkshire Hathaway Insurance provides insurance and reinsurance services through four entities: General Re, GEICO, Berkshire Hathaway Reinsurance Group and Berkshire Hathaway Primary Group.

128.    Defendant General Re Corporation ("General Re") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Stamford, Connecticut. General Re is a reinsurance unit and wholly owned subsidiary of Berkshire Hathaway and provides its customers global reinsurance and related operations.  Gen Re is one of the four largest reinsurers worldwide and is market leader in the U.S. and is represented in all major reinsurance markets worldwide.

129.    Defendant General Reinsurance Corp. ("General Reinsurance") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Stamford, Connecticut.  General Reinsurance is a reinsurance unit and wholly owned subsidiary of Berkshire Hathaway and provides its customers global reinsurance and related operations.

130.    Defendants Berkshire Hathaway, Berkshire Hathaway Insurance, General Re and General Reinsurance are collectively referred to as "General Re."

131.    Defendant Zurich Financial Services Group ("Zurich Financial") is a corporation incorporated under the laws of Switzerland.  Zurich Financial has its corporate headquarters in Zurich, Switzerland, and describes itself as "an insurance-based financial services provider with an international network" with "key markets" in "North America and Europe."

132.    Defendant Zurich American Insurance Co. ("Zurich American") is a corporation incorporated under the laws of New York and headquartered in Schaumburg, Illinois.  Zurich

34

American is an indirect wholly owned subsidiary of Zurich Financial, and represents that it is a "leading commercial property-casualty insurance provider serving the global corporate, middle market, small business, specialties and program sectors in the United States and Canada."

133.    Defendant Steadfast Insurance Co. ("Steadfast") is a subsidiary of Zurich American, and is incorporated under the laws of Delaware, with headquarters in Schaumburg, Illinois.  Steadfast operates as an underwriter of property and casualty insurance.

134.    Defendant Fidelity & Deposit Company of Maryland ("Fidelity & Deposit") is a subsidiary of Zurich American, and is incorporated under the laws of Maryland, with headquarters in Schaumburg, Illinois.  Fidelity & Deposit operates as an underwriter of property and casualty insurance.

135.    Defendant Empire Fire & Marine Insurance Co. ("Empire Fire") is a subsidiary of Zurich American, and is incorporated under the laws of Nebraska, with headquarters in Schaumburg, Illinois.  Empire Fire operates as an underwriter of property and casualty insurance.

136.    Defendant American Guarantee & Liability Insurance Co. ("American Guarantee") is a subsidiary of Zurich American, and is incorporated under the laws of New York, with headquarters in Schaumburg, Illinois.  American Guarantee operates as an underwriter of property and casualty insurance.

137.    Defendant Empire Indemnity Insurance Co. ("Empire Indemnity") is a subsidiary of Zurich American, and is incorporated under the laws of Oklahoma, with headquarters in Omaha, Nebraska.  Empire Indemnity operates as an underwriter of property and casualty insurance.

138.    Defendant Assurance Company of America ("Assurance Co.") is a subsidiary of Zurich American, and is incorporated under the laws of New York, with headquarters in

Schaumburg, Illinois.  Assurance Co. operates as an underwriter of property and casualty

insurance.

139.    Defendants Zurich Financial, Zurich American, Steadfast, Fidelity & Deposit,

Empire Fire, American Guarantee, Empire Indemnity and Assurance Co. shall be referred to

collectively  herein as "Zurich."

140.    Defendant The Chubb Corporation ("Chubb Corp.") is a corporation incorporated

under the laws of New Jersey and has its corporate headquarters in Warren, New Jersey.  Chubb

Corp. is one of the ten largest property and casualty insurance providers in the United States,

with 2004 assets of $44.3 billion and revenues of $13.2 billion.  Chubb Corp. provides its

insurances lines through a family of insurance subsidiaries known informally as the "Chubb

Group of Insurance Companies."

141.    Defendant Federal Insurance Co. ("Federal Ins.") is a subsidiary of Chubb Corp.

and is incorporated under the laws of Indiana with headquarters in Warren, New Jersey.  Federal

Ins. operates as an underwriter of property and casualty insurance.

142.    Defendant Executive Risk Indemnity Inc. ("Executive Risk") is a subsidiary of

Chubb Corp. and is incorporated under the laws of Delaware, with headquarters in Warren, New

Jersey.  Executive Risk operates as an underwriter of property and casualty insurance.

143.    Defendant Vigilant Insurance Co. ("Vigilant Ins.") is a subsidiary of Chubb Corp.

and is incorporated under the laws of New York, with headquarters in New York, New York.

Vigilant Ins. operates as an underwriter of property and casualty insurance.

144.    Defendants Chubb Corp., Federal Ins., Executive Risk and Vigilant Ins. shall be

referred to collectively herein as "Chubb."

145.    Defendant Crum & Forster Holdings Corp. ("Crum & Forster Holdings") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Morristown, New Jersey. Crum & Forster Holdings represents that it is "a national property and casualty insurance group providing a broad range of standard and specialty insurance products."

146.    Defendant United States Fire Insurance Co. ("US Fire") is a subsidiary of Crum & Forster Holdings, and is incorporated under the laws of Delaware, with headquarters in Morristown, New Jersey.  US Fire operates as an underwriter of property and casualty insurance.

147.    Defendants Crum & Forster Holdings and US Fire shall be referred to collectively herein as "Crum & Forster."

148.    Defendant Fireman's Fund Insurance Co. ("Fireman's Fund Ins.") is a subsidiary of Allianz AG, and is incorporated under the laws of California, with headquarters in Novato, California.  Fireman's Fund operates as an underwriter of property and casualty insurance.

149.    Defendant Chicago Insurance Co. ("Chicago Ins.") is a pooling affiliate of Fireman's Fund Ins. and a subsidiary of Allianz AG.  Chicago Ins. is incorporated under the laws of Illinois, with headquarters in Chicago, Illinois.  Chicago Ins. operates as an underwriter of property and casualty insurance.

150.    Defendant National Surety Corp. ("National Surety") is a pooling affiliate of Fireman's Fund Inc., and is incorporated under the laws of Illinois, with headquarters in Chicago, Illinois.  National Surety operates as an underwriter of property and casualty insurance.

151.    Defendants Fireman's Fund Ins., Chicago Ins. and National Surety shall be referred collectively herein as "Fireman's Fund."

152.    Defendant RLI Corporation ("RLI Corp.") is a corporation incorporated under the laws of Illinois, whose shares are listed and publicly traded on the New York Stock Exchange,

with its corporate headquarters in Peoria, Illinois.  RLI Corp. is a holding company that underwrites selected property and casualty insurance through its insurance subsidiaries.

153.    Defendant RLI Insurance Co. ("RLI Ins.") is a subsidiary of RLI Corp., and is incorporated under the laws of Illinois, with headquarters in Peoria, Illinois.  RLI Ins. is a provider of property and casualty insurance.

154.    Defendant Mt. Hawley Insurance Co. ("Mt. Hawley") is a subsidiary of RLI Corp., and is incorporated under the laws of Illinois, with headquarters in Peoria, Illinois.  Mt. Hawley is a provider of property and casualty insurance.

155.    Defendants RLI Corp., RLI Insurance and Mt. Hawley shall be referred to collectively herein as "RLI."

156.    Defendant XL Capital Ltd. ("XL Capital") is a corporation incorporated under the laws of the Cayman Islands and has its corporate headquarters in Hamilton, Bermuda and whose shares are listed and publicly traded on the New York Stock Exchange.  XL Capital is a provider of insurance and reinsurance services.

157.    Defendant Greenwich Insurance Co. ("Greenwich Ins.") is a subsidiary of XL Capital and is incorporated under the laws of Delaware, with headquarters in Stamford, Connecticut.  Greenwich Ins. is a provider of property and casualty insurance.

158.    Defendant Indian Harbor Insurance Co. ("Indian Harbor") is a subsidiary of XL Capital and is incorporated under the laws of North Dakota, with headquarters in Stamford, Connecticut.  Indian Harbor is a provider of property and casualty insurance.

159.    Defendants XL Capital, Greenwich Ins. and Indian Harbor shall be referred to collectively herein as "XL Capital" or "XL."

160.     Defendant CNA Financial Corp. ("CNA Financial") is a corporation incorporated under the laws of Delaware, whose shares are listed and publicly traded on the New York Stock Exchange, with its corporate headquarters in Chicago, Illinois.  CNA Financial is an insurance holding company whose primary subsidiaries consist of property and casualty insurance companies.

161.     Defendant The Continental Insurance Corp. ("Continental Ins.") is a subsidiary of CNA Financial and is incorporated under the laws of South Carolina, with headquarters in Chicago, Illinois.  Continental Ins. is a provider of property and casualty insurance.

162.     Defendant American Casualty Co. of Reading, PA ("American Casualty") is a subsidiary of CNA Financial and is incorporated under the laws of Pennsylvania, with headquarters in Chicago, Illinois.  American Casualty is a provider of property and casualty insurance.

163.     Defendant Continental Casualty Co. ("Continental Casualty") is a subsidiary of CNA Financial and is incorporated under the laws of Illinois, with headquarters in Chicago, Illinois.  Continental Casualty is a provider of property and casualty insurance.

164.     Defendants CNA Financial, Continental Ins., American Casualty and Continental Casualty shall be referred to collectively herein as "CNA."

165.     Defendant Liberty Mutual Holding Company, Inc. ("Liberty Mutual Holding") is a corporation incorporated under the laws of Massachusetts, with headquarters in Boston, Massachusetts. Liberty Mutual Holding operates as a mutual holding company structure, owned by its policyholders, and includes three principal insurance companies in the group – Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company and Employers Insurance

Company of Wausau – each of which are stock insurance companies under the ownership of Liberty Mutual Holding.

166.    Defendant Liberty Mutual Insurance Co. ("Liberty Mutual Ins.") is a subsidiary of Liberty Mutual Holding, and is incorporated under the laws of Massachusetts, with headquarters in Boston, Massachusetts.  Liberty Mutual operates as a provider of fire, marine, life and casualty insurance services.

167.    Defendant Liberty Mutual Fire Insurance Co. ("Liberty Mutual Fire") is a subsidiary of Liberty Mutual Holding, and is incorporated under the laws of Massachusetts, with headquarters in Boston, Massachusetts.  Liberty Mutual Fire operates as an underwriter of property and casualty insurance.

168.    Defendant Wausau Underwriters Insurance Co. ("Wausau") is a subsidiary of Employers Insurance Co. of Wausau, which is a subsidiary of Liberty Mutual Holding, and is incorporated under the laws of Wisconsin, with headquarters in Wausau, Wisconsin.  Wausau operates as an underwriter of property and casualty insurance.

169.    Defendants Liberty Mutual Holding, Liberty Mutual Ins., Liberty Mutual Fire and Wausau shall be referred to collectively herein as "Liberty Mutual."

170.    Defendant AXIS Specialty Insurance Company ("AXIS Specialty") is a Connecticut-domiciled insurer that transacts property, casualty and surplus lines insurance.

171.    Defendant AXIS Surplus Insurance Company ("AXIS Surplus") is an Illinois-domiciled insurer that transacts property, casualty and surplus lines insurance.

172.    Defendant AXIS Reinsurance Company ("AXIS Re") is a New York-domiciled insurer that transacts property and casualty insurance and reinsurance.

173.    Collectively, AXIS Specialty, AXIS Surplus, and AXIS Re are referred to herein as "AXIS."  AXIS wrote $188,761,000 in net premiums as of 2003, with $325,842,000 in direct premiums written.  Defendant Willis has identified AXIS as a top insurer of its clients between 2002 and 2004.

## FACTUAL ALLEGATIONS

## II.    THE COMMERCIAL INSURANCE AND BROKERAGE MARKETS

174.    The market for commercial property and casualty insurance brokering in the United States features economic conditions that are consistent with and conducive to the conspiracy alleged herein.  The industry for commercial insurance brokering is highly concentrated, with the Defendant Brokers controlling most of the assets in the market.  In fact, 9 of the top 10 brokers in the United States are Defendants here:  Marsh, Aon, Gallagher, Willis, Wells Fargo, BB&T, Hilb, Brown & Brown and USI.

175.    During the Class Period, Broker Defendants and their co-conspirators dominated and controlled the brokering market for commercial property and casualty insurance.  They exercised their market power by rigging bids, allocating customers and insurance markets, demanding contingent fees, stabilizing, raising or maintaining premium prices at a supra-competitive level, coercing insurers to participate in the anticompetitive conduct, and boycotting insurers who refused to participate.

176.    Likewise, the Insurer Defendants dominate the commercial property and casualty insurance market with over $65 billion in collective net premiums written.  The Insurer Defendants exercise their insurance market power by rigging bids, allocating customers and the commercial insurance market, paying contingent fees, raising, stabilizing or maintaining premium prices at a supra-competitive level, coercing brokers to participate in the anticompetitive activity, and boycotting brokers who refused to participate.  In controlling the

41

commercial insurance market and participating in the anticompetitive conduct, Broker

Defendants and Insurer Defendants at times acted against their individual economic interests.

III.    **DUTIES OWED BY AN INSURANCE BROKER**

177.    The Broker Defendants hold themselves out as providing, and do in fact provide,

insurance brokerage services for businesses, individuals, public entities, associations,

professional services organizations, private clients and many others.  Broker Defendants are

leaders in the insurance brokerage industry and their business clearly comprises the

overwhelming majority of the insurance brokerage market in the U.S.

178.    The services that the Broker Defendants provide to their clients include, *inter alia*,

analysis of risk and insurance options, procurement and renewal of insurance, interpretation of

insurance policies, monitoring the insurance industry on the client's behalf, keeping clients

informed as to developments in the insurance marketplace, and assisting clients with the filing

and processing of claims against the policies they place.  It is because they offer these services

that customers, like plaintiffs and other members of the Class, seek out Broker Defendants for

their expertise, skill and experience.

179.    In this capacity, Broker Defendants broker a wide range of insurance lines,

including traditional property-liability insurance, business entity liability insurance, casualty

insurance in a multitude of forms, workers compensation surplus, reinsurance, personal lines,

mortgage guarantee, fidelity and surety, which their customers ultimately purchase.

180.    In their marketing materials and agreements with clients, Broker Defendants

represent that they are highly skilled and independent insurance brokerage experts and possess

the special knowledge and expertise necessary to interpret and understand the complex and

sophisticated business and personal risks faced by their clients and to determine which

corresponding insurance products, services and insurance companies best fit their clients' needs.

181.    Broker Defendants encourage their clients to rely on their widely purported knowledge, independence and expertise in procuring insurance coverage.  Broker Defendants counsel their clients concerning the complex and specialized insurance they are purchasing. Broker Defendants create a confidential and/or fiduciary relationship with their customers based on their role as brokers and their common, uniform representations to their clients, like plaintiffs, that they will provide unbiased, independent expert insurance brokering advice on the most efficient and cost effective insurance products available.

182.    The sole purpose of the Broker Defendants' role is to act on behalf of and provide plaintiffs and members of the Class with unbiased advice concerning the type, amount and level of insurance needed, as well as to provide sound and accurate advice regarding the insurance companies they recommend.

183.    Plaintiffs and other members of the Class rely upon the sophistication and expertise of the Broker Defendants -- derived from Broker Defendants' familiarity with the Insurance Defendants, the overall marketplace, as well as customs and practices of the insurance industry -- to make informed independent decisions when formulating strategies concerning their insurance needs and risks.  Plaintiffs and other members of the Class have therefore engaged the services of the Broker Defendants in order to assist them in meeting many different aspects of their insurance needs, including but not limited to risk assessment, insurance procurement and/or renewal and the filing and processing of claims on existing insurance policies.

184.    In their standard contracts with clients, including plaintiffs, the Broker Defendants agree:  (i) that they will solely represent the interests of their clients in transactions with insurers; (ii) that they will act on behalf of their clients in the selection and placement of insurance and the negotiation of terms; (iii) that they will act on behalf of their clients in connection with the filing

43

and processing of claims; and (iv) that they will act as the exclusive insurance broker for their clients.

185.    Broker Defendants represent themselves to their clients as fiduciaries and, in fact, have created a fiduciary relationship with their clients based on the trust imparted on them by their clients and their perceived ability to provide unbiased, independent, and expert insurance brokerage advice.  Such representations are made through advertisements, brochures, internet websites and other promotional materials disseminated in interstate commerce, including through the United States mails and interstate wires.

186.    For instance, the New York Attorney General's Complaint against Marsh cites a Marsh document created to assist its employees in responding to client questions.  It reads: ***"Our guiding principle is to consider our client's best interest in all placements.  We are our clients' advocates and we represent them in negotiations.  We don't represent the [insurance companies]."***

187.    Marsh's website states: "Our mission is 'To create and deliver risk services that make our clients more successful.'"  The website also adds: "Our clients benefit from the total capabilities of Marsh, Inc. and Marsh & McLennan Companies, Inc…. This systematic structure provides a breadth of dept of risk solutions unavailable from any other single source."

188.    Similarly, Aon's official website states, "One of our core values is always maintaining a client focus . . .  By truly listening to our clients and working with them as a partner, we can best develop solutions that work seamlessly with their business."  *Available at* www.aon.com/about/aon_corporation/default.jsp (last visited on July 31, 2005).  Furthermore, Aon's Code of Ethics states:  "Satisfied clients are the key to Aon's success.  Earn our clients' continued loyalty every day by treating them fairly, delivering the products and services they

want and exceeding their expectations."  Additionally, according to a sales brochure, Aon states: "Our mission is simply this, 'to provide our clients with the highest level of service.'  Our employees work for you with your goals and objective always at the forefront."  Aon insists that its clients' goals are realized "by placing our clients first at all times."

189.    Similarly, Willis has included on its website a client bill of rights, which misleadingly states: "Willis represents the *client's best interests* through our client advocacy model.  Willis' global resources and services are committed to understanding the client's company, its industry and its individual needs.  Willis' customized recommendations and solutions will be driven by what is in the client's best interests.  This is the centerpiece of the value Willis provides its clients."  *Available at* http://willis.com (last visited July 31, 2005). Moreover, in Willis' Global Policy Manual, the company states that Willis associates "should act in good faith and in the interests of their clients at all times. . ." and that they should "provide objective and impartial advice in the interests of our clients."  *Available at* http://willis.com/whoweare/corporategovernance/ethicalcode.pdf (last visited July 31, 2005)

190.    Likewise, Gallagher's "Client Commitment" document posted on its website states:  "*We always recommend that which is in the client's best interest, even if it diminishes our revenues*."  *Available at* http://www.ajg.com/portal/communities/community (last visited July 31, 2005) [Emphasis added.]

191.    Acordia's official website (*available at* http://www.acordia.com, last visited July 31, 2005) similarly describes Acordia's promise to provide open and honest advice to its clients:

> Acordia's Commitment:
>
> Acordia's core values center around **doing what is ethical and what is right for the customer.  If it is right for the customer it is right for Acordia**.  We are leaders during periods of change.  We maintain the highest standards with our customers and believe in taking the steps to follow these values:

45

1.      *Value and reward open, honest, and two-way communication*.

2.      Be accountable for and proud of your conduct and decisions.

3.      *Do what's right for the customer*.

4.      Talk and act with the customer in mind.

5.      Exceed the expectations of customers.

[Emphasis added].

192.    Acordia's website further states that Acordia "[p]roved[es] our customers with full disclosure on the revenue, including contingent commissions we earn at the beginning of our relationship and at the time of policy renewal" and that it "mak[es] insurance placements in the best interest of our customers."

193.    Brown & Brown similarly describes itself on its website (*available at* http://www.bbinsurance.com, last visited June 31, 2005), as "an independent insurance intermediary organization that provides a variety of insurance products and services to corporate, institutional, professional and individual clients."  Brown & Brown has represented that its services include "the efficient management of risk and its related costs, meeting the business insurance needs or companies ranging from small retail establishments to multinational corporations."

194.    Similarly, the official Hub website (*available at* http://www.hubinternational. com, last visited July 31, 2005) states, "Hub International is dedicated to maintaining and upholding the highest standards of ethical conduct and integrity in all of our dealings with you, our client.  We want to be your trusted risk advisor, and as such, we need to earn your confidence.  So we are making a promise."  Hub's website goes on to state, "We are open and honest as to how we are paid for placing your insurance."

46

195.    In USI's 2004 Annual Report, the company states its "goal has been to become a trusted advisor to our clients.  With each passing year, we continue to gain strength – through acquisitions, new business and education – and we continue to consistently deliver on commitments."  Moreover, a letter from USI's Chairman, President and Chief Executive Officer to the Shareholders in the 2004 Annual Report states:

> USI Holdings Corporation is a human capital business.  We understand the value of people and we are committed to the people and institutions that make our business successful – our clients, our associates, our carrier relationships and our shareholders.
>
> …
>
> We are committed to providing each of our clients with knowledgeable service professionals who are connected to local and national markets and have access to sophisticated solutions.

196.    USI has also represented on its website (*available at* http://www.usi.bix.com, last visited July 31, 2005) that "USI clients enjoy convenient access to a broad spectrum of flexible, cost-effective products and strategically enhanced services for insurance, risk management, financial management, employee benefits and asset management programs tailored to their unique needs."

197.    HRH has stated on its website (*available at* http://www.hrh.com, last visited July 31, 2005): "An insurance relationship, more than any other business relationship, is built on trust. You either have it or you don't."  It further warrants, "Specialist Knowledge: we use our knowledge to solve problems for the benefit of our clients.  From Fortune 500 companies to trade associations, individuals and small businesses, at HRH we provide tailor-made risk management solutions based on expert advice and customized risk assessment."

198.    BB&T's website similarly states that, our mission is "[h]elping our ***Clients*** achieve economic success and financial security" and our purpose is "providing excellent service

47

to our clients, as our *Clients* are our source of revenues." *Available at* http://www.bbandt.com (last visited July 31, 2005).

199.     Based on the nature of the relationship between the parties and the representations described herein, the Broker Defendants are common law fiduciaries to plaintiffs and members of the Class, and therefore owe their clients, including plaintiffs and other members of the Class: (i) a duty of loyalty to act in the best interests of their clients and to always put their clients' interests ahead of their own; (ii) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Broker Defendants, including the duty to disclose the source and amounts of all income they receive in or as a result of any transaction involving their clients; (iii) a duty of care in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants; (iv) a duty to provide impartial advice in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants; (v) a duty to use their best business judgment in connection with any insurance-related products or services purchased by their clients – in other words to find the best coverage at the lowest price; and, (vi) a duty of good faith and fair dealing.

200.     The Broker Defendants breached these duties by accepting Contingent Commissions and other kickbacks from the Insurer Defendants in exchange for steering business to them.  Thus, rather than providing objective, impartial advice which was in their clients' best interest, the Broker Defendants maximized their Contingent Commissions and other compensation, at the expense of their clients.

## IV.  DEFENDANTS' IMPROPER CONTINGENT COMMISSION AGREEMENTS

### A.  Broker Defendants Receive Undisclosed KickBacks From Insurer Defendants

201.    Although Broker Defendants receive a flat fee or standard commission from either their clients and/or the Insurer Defendants, they have also knowingly and willfully conspired to enter into undisclosed fee agreements with the Insurer Defendants for other types of compensation and remuneration.  Pursuant to Defendants' scheme and common course of conduct, the Broker Defendants steer their clients to purchase insurance from the Insurer Defendants, with whom the Broker Defendants have entered into such agreements, so that the Broker Defendants can receive undisclosed compensation.  All Defendants ratified and adopted this scheme through the payment of and/or receipt of undisclosed compensation and the imposition of the undisclosed fees and costs resulting in injury to plaintiffs and members of the Class.

202.    Pursuant to such Contingent Commission Agreements, certain insurance companies, including Insurer Defendants, pay fees to Broker Defendants based on (i) the *volume* of premiums generated by Broker Defendants' sales of Insurer Defendants' products, (ii) the growth of business and *renewal* of existing business, and (iii) the *profitability* of the book of business purchased by Broker Defendants' clients, *i.e.*, agreed upon favorable total claims/loss ratios with a particular insurer  ("Contingent Commissions").

203.    Contingent Commissions were often memorialized by the Broker Defendants in, *inter alia*, "placement service agreements" ("PSAs"), "override agreements," "millennium agreements," "extra compensation agreements," "producer compensation agreements" or, more recently, "market service agreements" ("MSAs") or "Compensation for Services to Underwriters" ("CSUs").  This transparent change in nomenclature was motivated by increased

49

scrutiny of the compensation practices at issue in this litigation.  Collectively, these Contingent

Commission agreements will be hereinafter referred to as "Contingent Commission Agreements"

or "Agreements").

204.    Pursuant to Defendants' conspiracy and common scheme, the Broker Defendants

solicit business from individuals and entities interested in purchasing insurance and steer them to

purchase insurance from the Insurer Defendants and other carriers, with whom the Broker

Defendants have entered into PSAs or other profit sharing agreements so that the Broker

Defendants can receive undisclosed compensation, including Contingent Commissions and other

kickbacks.  The PSA's were a means of implementing or effectuating the conspiratorial

agreement of the Defendants as all Defendants ratified, adopted and knowingly participated in

this scheme through the payment and receipt of undisclosed compensation and the imposition of

the undisclosed fees and costs, resulting in injury to plaintiffs and members of the Class.

205.    Defendants either fail entirely to disclose the Contingent Commission

Agreements or fail to adequately disclose them.  These undisclosed fees, coupled with

Defendants' anti-competitive steering, bid-rigging and tying arrangements (described below),

mean that plaintiffs and members of the Class are not aware of their existence, operation or

effect.  Taken together, Defendants breached the duties owed to their clients/insureds, including

plaintiffs and Class members, by failing to fully and accurately disclose, *inter alia*, the

following:

        (a)    the existence, source and amount of their Contingent Commissions;

        (b)    the material impact of the Contingent Commissions on their overall

profitability;

(c)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their fiduciary duties to plaintiffs and members of the Class;

(d)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their duty of care to plaintiffs and members of the Class;

(e)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their duty of loyalty to plaintiffs and members of the Class;

(f)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their duty to provide impartial advice to plaintiffs and members of the Class;

(g)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their duty to exercise their best judgment on behalf of plaintiffs and members of the Class;

(h)     that the Contingent Commissions have created economic incentives for Defendants to act contrary to their duty of candor and full disclosure to plaintiffs and the members of Class; and

(i)     that the Contingent Commissions have created economic disincentives for Defendants to carry out their contractual obligations to plaintiffs and members of the Class.

206.    In the absence of proper disclosure of the Contingent Commissions, plaintiffs and members of the Class justifiably relied, to their detriment, on Broker Defendants' representations that they were providing independent expertise and representing their clients' interests in accordance with their contractual, fiduciary and other duties as alleged above.  Plaintiffs and members of the Class also justifiably relied upon Defendants' representations in connection with the insurance policies they purchased.

51

207.    Defendant Marsh continued to fail to adequately disclose Contingent Commission

Agreements following the investigations of various state attorneys generals of the insurance

industry in 2004.  For example, Marsh posted a Frequently Asked Questions page on MSAs on

its website in 2004 (which Marsh has subsequently removed), saying that it had no conflicts with

clients because of MSAs:

> Our guiding principle is to consider our clients' best interests in all
> placements. We are our clients' advocate and represent clients in
> our negotiations.  We don't represent the markets.  We work
> closely with clients on the design of their risk transfer program to
> address the complexity of decisions that have to be taken into
> account, such as market financial strength, a market's expertise in
> the line of coverage needed, its claims-paying history, clients'
> service requirements, breadth of coverage, pricing, and other terms
> and conditions.  We also work with insurers, and part of what an
> insurer pays us for is an iterative planning and communications
> process that allows the insurer to create more competitive
> proposals for our clients, which of course benefits those clients. In
> all cases, clients retain the final decision on the market chosen to
> handle its business.

As Marsh's subsequent settlement conceded, however, among other things, Marsh did not act in

its clients' best interests, did not advocate fairly on their behalf, and failed to provide clients with

the information needed to make informed placement decisions.  Moreover, as J.P. Morgan noted

in a 2004 report on the use by brokers of Contingent Commissions, "when we have pushed back

in an attempt to determine the size and source of offsetting expenses [for such commissions], no

significant, valid offsets were presented.…  We are hard-pressed to describe any material cost

associated with these revenues."  Hugh Warns et al., Insurance-Non-Life: Contingents May Be

Smaller, But More Prominent in 2004, US Equity Research J.P. Morgan Sec., Inc. (Jan. 13,

2004).

208.    Additionally, in the fall of 2004, for property and casualty lines, Marsh briefly

posted on its website a list of Insurer Defendants it had Contingent Commission Agreements

with, including  American International Group, ACE Group, Allianz Group, Axis Group,

Berkshire Hathaway, Chubb Group, CNA, The Hartford Financial Services Group, Liberty

Mutual Group, Munich Re Group, St. Paul Travelers Companies, XL Capital and Zurich

Financial Services.

209.    Similarly, when the New York AG began investigating the insurance industry,

Aon's CEO, Patrick G. Ryan, was reported as being "not fazed" by the investigations and as

being "very comfortable" with the conduct of Aon's employees.  In an SEC Form 8-K filed on

December 6, 2004, Ryan backtracked, claiming he was misquoted on the first point and that he

had been wrong on the second.  As part of Aon's settlement with various state attorneys generals,

Ryan was ultimately compelled to issue a public apology for the misdeeds of the company.

210.    Those misdeeds included false postings on Aon's use of CSUs on its website in

2004.  Aon misleadingly stated that CSUs are compensation for valuable services performed:

"Aon performs activities and provides services of value to insurers, including providing access to

its substantial distribution networks, pre- and post-placement technical services, sharing of Aon's

knowledge and expertise as an industry leader, policy design and review, research and

development, risk analysis, claims management, administration and other underwriting-related

activities.  Providing these services ultimately benefits our clients, the insurance markets and

Aon."

211.    Gallagher also engaged in similar false statements.  On October 19, 2004, J.

Patrick Gallagher, Jr. issued a memorandum to all employees distinguishing its conduct from

Marsh's.  The memorandum explained:

> Gallagher's business model is structured to enable our producers
> and account managers to put the interests of our clients first. This
> is reinforced in the following ways: - Our Mission Statement states
> that Gallagher succeeds by placing the needs of our clients first. -

> We have professional standards in place that govern how we
> interact with our clients and the insurance companies. These
> standards are reviewed and updated often and we audit our
> compliance with those standards frequently. - The Gallagher Code
> of Conduct requires that we conduct ourselves professionally and
> ethically. - And, the Gallagher Way spreads the word about our
> Shared Values – it is our culture to operate under the highest moral
> and ethical behavior. We spend considerable time and energy
> conveying to our employees that we must do the right thing for our
> clients, even if it means less profits for Gallagher.

This statement was belied by Gallagher's Stipulation and Consent Order with the Illinois State

Attorney General and Illinois Department of Insurance on May 18, 2005, which disclosed that

Gallagher systematically steered clients to insurers who paid it the largest kickbacks.

212.    Following increased scrutiny of the insurance industry in 2004, including the

investigation by New York Attorney General Eliot Spitzer and California Insurance

Commissioner John Garamendi, Defendants began adding disclosure information to their

websites acknowledging that the Contingent Commission Agreements between brokers and

insurers created a conflict of interest.  However, many Defendants continued to make inadequate

disclosures, by failing to disclose the steering, bid-rigging and other improper practices described

below.

213.    Defendants agreed to build Contingent Commissions into the cost of insurance

and services relating thereto that the Insurer Defendants offer to Broker Defendants' clients.

Therefore, plaintiffs and other members of the Class ultimately pay the cost of these undisclosed

fees through higher premiums.  It is Defendants' policy and practice not to disclose to plaintiffs

and other members of the Class that additional fees will be paid by Insurer Defendants and

factored into the cost of clients' plans.

214.    Indeed, so pervasive have Marsh's efforts been to hide from its clients the amount

of compensation it receives from placing its clients' insurance that it directed employees to

redact and "white-out" the commission income identified in the insurance "binders," *i.e.*, the temporary insurance contracts, prepared by the insurance carrier and sent to Marsh for transmittal to the client/insured.

215.    In one instance, a senior vice president at Defendant Munich was reprimanded by Marsh for referring to the Placement Service Agreement between Munich and Marsh in certain correspondence.  Munich immediately attempted to salvage the situation:  "We acknowledge that this was inappropriate behavior and will do the necessary to eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the PSA.  I apologize for the consternation that this has caused within the Marsh organization."

216.    Marsh's policy of misleading clients about the payment and receipt of Contingent Commissions recently came to light in the guilty plea of a former Marsh managing director, Joshua M. Bewlay, who plead guilty to a felony charge of scheming to defraud on February 14, 2005.  Mr. Bewlay's testimony revealed that Marsh established a procedure or a "protocol" intended to "discourage the client from obtaining an answer on how Marsh received compensation from insurance companies.  Mr. Bewlay's testimony states the following, in relevant part:

> Finally, during my employment, I was made aware of a Marsh protocol designed to prevent Marsh's clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client in addition to any fee or commission paid. ***The protocol required multiple layers of inquiry to discourage the client from obtaining an answer***.  Also that all inquiries be channeled through a single Marsh employee who directed the answer to the inquiry.  [Emphasis added.]

Finally, the percentage or ratio that Marsh used when it responded to a client's inquiry concerning placement service or PSA or MSA revenue significantly understated the amount of PSA or MSA revenue earned with respect to a particular client.[3]  In my department, Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a particular client.

When I was told that a client inquired as to the amount of PSA revenue Marsh earned from an insurance carrier, I responded that the Marsh employee follow Marsh's protocol, including that the client only speak to the Marsh employee designated to respond to such inquiries. [*People of the State of New York v. Joshua Bewlay*, Plea Testimony (Feb. 15, 2005) at p. 11-12.]

217.   Mr. Bewlay similarly admitted in his plea agreement that he made misleading statements about the amount of compensation Marsh received from insurers.  Mr. Bewlay's plea agreement states, in relevant part:

From in and before 1999 through 2004, Mr. Bewlay engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property, namely insurance premiums, commissions and fees, from ten or more persons, to wit, clients of Marsh, by false and fraudulent pretenses, representations and promises, to wit, misleading statements about the amount of compensation Marsh derived from insurance carriers, and so obtained property from one or more such person, in that *Mr. Bewlay referred client inquiries for disclosure of such compensation to a designated Marsh employee, knowing that said employee would provide misleading information concerning Marsh's compensation to the clients.*  [Emphasis added.]  [Joshua Bewlay Plea Agreement (filed Feb. 14, 2005) at ¶5.]

---

[3] According to the criminal complaint against Mr. Bewlay, "the protocol," directed Marsh employees to tell inquiring clients that Marsh received up to 1% to 2% in PSAs/MSA as a bonus from insurers, when, in fact, Marsh sometimes earned as much as 10% to 15%.  *People of the State of New York v. Joshua Bewlay* (filed Feb. 22, 2005).

218.    The other Broker Defendants similarly fail to disclose or sufficiently disclose the existence of Contingent Commissions and other compensation in their client contracts and proposals.  For instance, neither Wells Fargo nor Willis ever advised insured clients of the amounts of contingency fees paid by the Insurer Defendants.  Indeed, although Willis has claimed "to disclose such arrangements to clients in contracts," its 2001 contract with 3M Company does not make any discernable disclosure about Willis' receipt of Contingent Commissions.

219.    Similarly, Willis' 2002 contract with Allina Hospitals & Clinics ("Allina") does not disclose Willis' Contingent Commission Agreements even though it details Willis' fee structure and schedule.  In fact, the Allina contract provides explicitly for Willis to be paid a fee in quarterly installments by Allina, and that such fees "are in lieu of any commissions on any policy described or referred to in this section."  The contract further requires that if Willis' agreements with any "insurers, surplus line brokers, wholesalers, reinsurers, intermediaries or other third parties require WILLIS to receive commissions on any policy described or referred to in this section . . . WILLIS will credit such commissions received against this fee."  However, on information and belief, Willis received Contingent Commissions in connection with Allina's account but did not either disclose or credit those amounts to the client.

220.    Similarly, Gallagher failed to disclose the existence of Contingent Commissions, at least in property, liability, D&O and umbrella coverage areas.  A former Gallagher employee stated that Gallagher "avoid[e]d sharing these at all costs" with clients.  This former employee noted that not sharing this information with clients was possible since the clients typically paid the entire premium to the insurer who would then forward the commission to Gallagher.

57

221.     Similarly, when employees at USI were asked by clients whether USI received commissions, employees were told to say that the agency was compensated "accordingly."

222.     Likewise, a former HRH employee stated that if certain projected production goals were met, HRH would receive additional compensation in terms of Contingent Commissions, which were often not disclosed to clients.

**B.     Methods of Calculating Contingent Commissions and Their Extraordinary Impact on Defendants' Business**

223.     The Contingent Commissions were imposed on all product lines of insurance for which the Broker Defendants provide insurance brokering services, including, *inter alia*, professional liability (such as directors and officers liability and errors and omissions liability); workers compensation; and property and casualty and life.

224.     Contingent Commissions are often based upon a percentage of the entire "book of business" that a broker places with a particular carrier in any given year.  For example, at Wells Fargo, the amounts of Contingent Commissions were based upon both the volume of all the insurance placed by Wells Fargo with an individual carrier, as well as the "loss ratio" associated with that entire book.

225.     Similarly, at Willis, Contingent Commissions are paid at the end of the year, if the broker met the volume and loss ratio calculations.  These payments averaged between 5%-15% of the broker's annual commissions for the entire book of business placed with a given carrier.  Contingent Commissions are paid to Willis brokers in exchange for two benefits to the insurance carrier.  The first benefit is that brokers are thereby encouraged to steer a high volume of business (*i.e.*, premiums).  The second is that brokers are encouraged to place higher-quality business, meaning clients with fewer "claims experience," that ultimately results in higher profits for the insurance carrier or, in the worst cases, actively encouraged, to the client's detriment, to

58

not submit claims or to assist the Insurer Defendants in denying claims.  The lower the loss ratio, the higher the carrier's profit.

226.    The Broker Defendants, including Marsh, Aon and Willis, also received Contingent Commissions based on the rate at which their clients renew their policies with the insurance carriers, which increased as the threshold level of business with the carrier increased. For example, Defendant AIG's 2003 Agreement with Marsh provided Marsh with a bonus of 1% of all renewal premiums if its clients renewed with AIG at a rate of 85% or higher.  If the renewal rate was 90% or higher, Marsh received 2% of the renewal premium, and if the rate was 95% or higher, Marsh received 3%.  Thus, the more clients the Broker Defendants could get to renew their policies, the more Contingent Commissions they would receive.

227.    Aon entered into performance enhance fund agreements, which provided that Aon would receive as a commission approximately 17% of the premium on new business and 10% on renewed business placed with an insurer.  When Aon reached the threshold of $10 million of business with a carrier, Aon would retroactively get an additional 1.5% bonus based on all the business done with that carrier for that year.  Aon would ultimately decide which carriers it would steer insurance business to based on whichever of those insurers were closer to the threshold by which Aon would get a kickback of 1.5% retroactive for the year.  The carrier thus would be chosen by Aon based on either the agreement or the highest commission it could obtain, regardless of the client's best interest.

228.    Gallagher has also admitted that it "may also receive contingent commissions which are based on the estimated profit the underwriting insurance company earns and/or the overall volume of business placed by Gallagher in a given period of time.  Occasionally, Gallagher shares commissions with other brokers who have participated with Gallagher in

59

placing insurance or servicing insureds."  Thus, Gallagher has publicly conceded that it has horizontal agreements with other brokers to share Contingent Commissions.

229.    Similarly, a former Wells Fargo employee stated that Contingent Commission Agreements were executed and monitored at corporate offices, not at individual outlying offices. As revealed in the West Virginia AG's complaint, Acordia/Wells Fargo's national Contingency Fee agreements were called "Millennium Agreements," and pursuant to those national agreements, Acordia/Wells Fargo was paid overrides for insurance business placed by its various branches throughout the United States.

230.    Willis entered into Contingent Commission Agreements with Defendant Hartford not only on the national level but also on the local level.  In an email dated February 2, 2004, Craig Pankow, Regional Marketing Officer for the Northwest, addresses three local offices: "I have been talking with Hartford with respect to our contingency agreements for the [Northwest Region] . . . .  We have been offered VIP status if we hit $3,500,000 on a combined basis.  VIP status increases our potential income on premium by several points."  Pankow concluded that the local offices should "combine" their Contingency Fee agreements so that they would earn additional points for "the combined new business over $250,000."

231.    Further examples of the Insurer Defendants' Contingent Commission Agreements with the Broker Defendants include:  agreements between Gallagher and Hartford providing for a straight 14% commission for writing insurance business and a 5% override at the end of the year for obtaining a specified volume of business; profit-sharing agreements between Gallagher and Chubb providing for a 5% override on all new business if it achieved a $1 million threshold written in a six-month period; agreements between Marsh and AIG for Contingent Commissions in connection with renewal of policies in 2003; agreements between Wells Fargo and Hartford to

accept Contingent Commissions and bonuses; and agreements between Hilb and various insurers for negotiated up-front commissions with favored insurers based on projected production goals. None of these agreements were disclosed to clients.

232.    Defendant Marsh's investment subsidiary, MMC Capital, has invested at least $1.7 billion in more than 30 companies offering insurance, reinsurance, and claims administration services since 1985, including the AXIS parent holding company, AXIS Capital Holdings, Ltd.  Marsh owns 9.7% of AXIS Capital Holdings Ltd. through direct stock ownership in its stake in a private-equity partnership called Trident II that is managed by MMC Capital.

233.    While investing in AXIS, Marsh also generated revenue for AXIS while acting as its broker.  For example, AXIS used Defendant Marsh and Guy Carpenter & Co., Marsh's reinsurance unit, for 38 percent of its gross written premiums in 2002, according to an AXIS filing with the U.S. Securities and Exchange Commission.

234.    AXIS has received subpoenas from the Office of the Attorney General of the State of New York seeking information regarding incentive commission agreements, fictitious and inflated quotes, conditioning direct insurance on the placement of reinsurance and related matters.  In addition, AXIS has received subpoenas and requests for information from various state insurance regulators regarding these same matters.  AXIS has admitted that, "[c]onsistent with long-standing and wide-spread industry practice," it has entered into incentive arrangements, but claims to have ceased entering into such arrangements and to have ceased making payments under such arrangements.

235.    After New York Attorney General Elliot Spitzer criticized the conflict of interest, steering and self-dealing posed by brokers such as defendant Marsh owning insurance and

61

reinsurance companies, Marsh sold 3.7 million shares of its interest in AXIS. However, Marsh retained about 50% of its interest in AXIS.

236.    Contingent Commissions can be exorbitant, as demonstrated by the following:

- Contingent Commissions paid to Marsh, in addition to standard commissions, are typically a flat percentage of up to 5% of the total premiums written with an insurance carrier and paid directly to Marsh. Marsh announced on October 18, 2004 that it received *$845 million* in Contingent Commissions in 2003 alone, accounting for 7% of its overall revenue of $11.6 billion. Additionally, from January 2004 through June 2004, Marsh reported revenue from contingency commissions that totaled approximately *$420 million*.

- Aon's 10-Q filed with the SEC on November 9, 2004 reported that Contingent Commissions for the 9 months ended September 30, 2004 were approximately *$117 million*, and had Aon continued to receive Contingent Commissions in the fourth quarter of 2004, they would have recorded approximately *$50 million* of additional revenue. New York Attorney General Eliot Spitzer's complaint against Aon ("Aon AG Complaint") alleges that Aon generated about *$170 million* from contingent commissions in 2003, a quarter of the company's $663 million net income that year.

- Similarly, Willis announced on October 21, 2004, when it pledged to end the practice of receiving Contingent Commissions, that it had expected to generate an estimated *$160 million* worldwide in 2004 from Contingent Commissions. Of this amount, $35 million was attributable to North American accounts.

- In an October 19, 2004 letter, Gallagher's CEO Patrick Gallagher told employees that Gallagher received approximately *$33 million* in contingent commissions in 2003, representing 2% of its gross revenues that year.

- Additionally, Willis and Wells Fargo depended on the receipt of Contingency Commissions for maintaining their profitability. The two largest single items for revenue were commissions and Contingent Commissions. At Wells Fargo, Contingent Commissions on the P&C side of the business amounted to nearly 50% of the commission revenue for those lines.

- In a recent conference call, BB&T reported revenues of over *$22 million* from Contingent Commissions in 2004.

- In Brown & Brown's 10-Q filed with the SEC on May 10, 2005, the Company reported that for the first three months of 2005 it collected almost *$28 million* in Contingent Commissions.

- For some brokers, obtaining revenue from Contingent Commissions continues unabated, despite their promises to cease insisting upon such commissions.

Several Defendants are still earning millions of dollars in Contingent
Commissions on client contracts entered into in the past.  For example, in a 2005
Sandler O'Neill presentation, Gallagher said it earned *$20.7 million* in the first
quarter of 2005 in Contingent Commission contracts.  Likewise, Aon, in its May
2005 SEC Form 10-Q, said it earned *$13 million* in contingent commissions in
the first quarter of 2005.

237.   Illustrative of the incentive relationship between the Broker Defendants and

Insurer Defendants is Hartford's business model, whereby Hartford pays Contingent

Commissions based on three typical contingency requirements and ranks its brokers based on

whether and how well they meet these requirements.  The first requirement, the "new business

target," also known as Hartford's "growth incentive," requires a certain volume of new business

to be placed by the broker.  The second requirement, the volume of retained premium, or the

"retention target," is based on a percentage of existing business renewed or maintained with

Hartford by the broker.  And the third requirement is based on the profitability of the total book

of business placed with Hartford.  If a broker met the overall volume criteria but fell short in one

of the three categories -- new business, retention, or profitability -- there were penalties built into

the compensation formula which included either no payment at all, or a certain percentage of full

payment after all penalties were assessed.  Additionally, Hartford would not make a contingency

payment unless the total claims experience fell below a particular percentage of the premium

paid, or the "loss ratio."

238.   Brokers that meet Hartford's requirements are classified as "platinum brokers,"

"gold brokers" or "high impact brokers."  Hartford encourages brokers to produce more business

for Hartford, and thereby reap the rewards of moving up the ladder of the different

classifications.  The larger and more profitable business placed with Hartford results in "more

preferential treatment" and "better contingency contracts."  Marsh and Aon both qualified as

Hartford's "platinum brokers."  Hartford recoups the cost of paying Contingent Commissions by

building it into the "expense ratio" or the overall costs of administering policies sold.  This

expense ratio is captured as part of the premiums charged for its insurance products and services.

## V.   BROKER DEFENDANTS IMPROPERLY STEER THEIR CLIENTS BASED UPON CONTINGENT COMMISSION AGREEMENTS TO MAXIMIZE PROFITS

239.    To maximize the undisclosed revenue the Broker Defendants receive from the

Agreements and in furtherance of Defendants conspiracy to maintain and/or increase market

share, Broker Defendants steer their clients, including plaintiffs and members of the Class, to

Insurer Defendants in return for Contingent Commissions.

*240.*    For example, Marsh and the other Broker Defendants dictated to its brokers which

insurance companies' policies they were to sell.  A managing director within Marsh advised

colleagues that "Some [Contingent Commission Agreements] are better than others . . . . ***I will***

***give you clear direction on who [we] are steering business to and who we are steering business***

***from.***"  [Emphasis Added.]

241.    Marsh's Global Broking executives also used a "tiering report" that segregated

insurance companies by how favorable their Agreements were to Marsh.  The tiering report

instructed recipients to "monitor premium placements" so that Marsh obtained "maximum

concentration with Tier A and B" – the insurance companies with whom Marsh had the most

favorable Agreements.  One Global Broking executive put it quite plainly in a September 2003

email: "We need to place our business in 2004 with those that have superior financials, broad

coverage and ***pay us the most***."  [Emphasis in original].

242.    The increased revenues Marsh gained from its relationship with its stable of

preferred insurance companies, including Insurer Defendants, was explained in a July 2000

Marsh memorandum entitled, "BUSINESS DEVELOPMENT STRATEGIES," describing one

of the insurance companies with which Marsh had an Agreement: "They have gotten the 'lions

[sic] share' of our Environmental business PLUS **they get an unfair 'competitive advantage[']
as our preferred [sic] [insurance company].**"

243.    Further evidence of the conspiratorial conduct between the Insurer Defendants
and Broker Defendants is an email dated November 7, 2003, from a Marsh Global Broking
executive which states, "I made it clear that if ACE wants us to meet significant premium growth
targets then ACE will have to pay 'above market' for such [a] stretch ...."

244.    Another example of Marsh's influence on the Insurer Defendants was further
revealed in the Connecticut AG Complaint against Ace which further illustrated how one
insurance company found itself shut out by Marsh and found it necessary to enter into
Contingent Commission Agreements simply to get business, stating: "We are now being heavily
penalized by Marsh for not having the [PSA] agreement signed.  We are being systematically
excluded from…placements that we would otherwise like the chance to write."  Another
insurance executive noted: "With Marsh if we don't have an override we should not call on them
. . . they flat out told us if we want to write business we need to have an override, end of story . . .
without them we are letting business walk away."

245.    Further demonstrating their disregard of their clients' interests, Marsh would
avoid placing insurance with an insurer if doing so would put its receipt of Contingent
Commissions at risk.  For example, a report from Marsh's Los Angeles office describes that in
late 2003, brokers in Marsh's Los Angeles office were ordered to temporarily stop selling
personal coverage lines from AIG in order to avoid reducing commission payments to Marsh.
Marsh did not want to exceed an annual cap on policies with AIG in states with a high risk of
earthquakes, hurricanes or other costly disasters, since exceeding the limit could reduce
contingency commissions that Marsh expected to receive from AIG.  As reported in the Los

65

Angeles Times, one broker stated "[t]he whole department couldn't believe it. We kept saying, 'If this ever gets out, [the company would] be in so much trouble."

246.    Internally, Marsh rewards employees who maximize their contingent commission revenue by steering clients to only insurance companies with which it has Contingent Commission Agreements.  One Marsh employee was elevated to vice president, in part because he had been able to renew a client's business "by moving" that client to an insurance company with which Marsh had a PSA (noting "Neighborhood Health Partnership Estimated Revenue – $390,000.").  Among his "[f]inancial success[es]" the soon-to-be vice president "was responsible for the renewal of a large HMO in Miami and was successful with placing of this account with a [contingent commission insurance company] – increased revenue from $120,000 to $360,000 (estimated)."  In critiquing himself on a 2003 self appraisal form, the now vice president stated:

> Renewed large account with [contingent commission insurance company] to demonstrate our willingness to continue our relationship.  *Moved a number of accounts to [contingent commission agreement carriers] for the sole reason to demonstrate partnership*. [Emphasis added.]

Other employees were similarly praised in performance evaluations for increasing Marsh's contingent commission income from insurance companies *"by achieving budgeted tiering goals."* [Emphasis added.]

247.    Aon also engaged in numerous instances of steering business to maximize Contingent Commissions and in other conduct that exploited its position of trust with a client for its own benefit.  Exemplifying Aon's practice of steering business to insurers is a statement made by one of the leading executives of Aon's Syndication Group, Robert Needle, to his subordinates at a Syndication Operations Meeting: "[w]e should continue to grow our book with Chubb and also Hartford and Wausau based on our favorable contingency agreements."

66

248.     Similarly, in March 2003, Aon's head of Middle Markets, Carol Spurlock, also highlighted Aon's efforts to direct business to certain insurers when she responded to a colleague's email regarding whether Aon should direct business to Zurich, since Zurich had not paid Contingent Commissions to the division in 2002: "Going forward, we are going to push Zurich.  I just today negotiated our incentive so that we will get paid next year."  A month later, she described the relationship to another colleague:

> We have always had an extremely nice contingency with the
> excess folks at Zurich.  We received a huge check from them on
> umbrella business last year.  We did not have a middle market
> contingency last year, we do this year.  So yes place lotz [sic] of
> business with Zurich . . .

249.     Indeed, Defendant Aon Risk Services ("ARS") used its ability to steer as a means of pressuring insurers.  For example, in December 2003, ARS steered business away from Hartford in retaliation for Hartford's decision to use a different broker for its own D&O policies.  Hartford's officials offered to "make it up to Aon" by using Aon as its broker on Hartford's property insurance, which had previously been placed without the use of a broker.  Michael O'Halleran (Aon's Chief Operating Officer) was not satisfied with the offer.  In a December 1, 2003 email to Needle, O'Halleran stated, "[i]s this a good tradeoff.  Let's also take some business from them."  In response, Needle examined all placements with Hartford and recommended that Aon only keep clients with Hartford on the lines that paid Contingent Commissions.  Needle wrote the following email in December 2003:

> In terms of taking business from [Hartford] our commercial
> [contingent commission] is favorable and I don't want to
> negatively impact.  However, the D&O [Director and Officer] deal
> is not that attractive and Eric [Andersen, co-head of the Financial
> Services Group] and I have discussed trying to drive more end of
> the year premium to our major partners in that line – AIG, XL and
> Chubb.

250.    ARS provided financial incentives to employees who steered placements to insurers that paid ARS Contingent Commissions.  Needle told one insurer that, "Insurer incentives are a key factor in the property bonus pool."  Similarly, Eric Andersen, co-head of Aon's Financial Services Group, stated:

> To provide commentary on the [contingent commissions].  The revenue that arrives from the [contingent commissions] are [sic] integral to our budget and profit derived from FSG [Financial Services Group].  When we are being evaluated, they look at the full picture of earnings.  Our bonus pool is set as a percentage of revenue. . . If our [contingent commissions] fall, our ability to use the percents that we use to pay individual brokers would need to be changed.  In short, it is a critical factor in our business and has a direct impact on how much we can pay people in FSG.

251.    Furthermore, in an email to Anderson and Ronald Moyer, Managing Director of Aon Financial Services Group, regarding a proper response to: "what is in it for them" or "what does this money get used for," Moyer responded:

> As far as the "what's in it for me" question, I would like to know the names of the people that actually ask that question.  That said, I think it is safe to say that, over the past couple of years, [*the PSA money] has funded our entire bonus pool* as well as our investment hires and still contributed significantly to the bottom line of the company.  Anyone who does not see that as advantageous for them personally is looking through the wrong end of their telescope.  [Emphasis added].

252.    Aon's Private Risk Management Unit ("APRM"), which sells personal lines insurance products to individual clients, also engaged in steering practices.  In 2000, APRM began to steer all new business to Chubb and/or Fireman's Fund.  This was due in part to a new "Syndication Master Plan" and Chubb and Fireman's agreements to pay the salaries of Aon brokers pursuant to "producer funding agreements."

68

253.     The "Syndication Master Plan," under the direction of Bruce Macbeth, called for APRM to consolidate its high net worth clients with the two insurers that paid APRM the highest contingent commissions: Chubb and Fireman's Fund.

254.     Pursuant to the "producer funding agreements," Chubb and Fireman's would fund up to 50% of the salary and benefits of certain Aon personal lines brokers for the purpose of selling insurance.  As described in the Aon AG Complaint, the Aon brokers held themselves out as Aon employees in every respect without disclosing that insurers were funding their salaries as part of an Aon commitment to steer business to those insurers.

255.     As part of its investment, Chubb was actively involved in selecting Aon producers, often hand-picking new Aon employees based on their previous demonstrated commitment to Chubb.  In 1999, a Florida recruiting firm charged Chubb $18,800 in fees for finding "just the right person" to staff a personal lines position in Aon's Chicago office.  Another producer hired in Cleveland to fill a Chubb funded position was told that he would receive an annual bonus once he exceeded the annual sales goal of $300,000 in new Chubb Personal Line premiums.  In the first year of his employment, the same Cleveland producer was instructed by his supervisors that he should only offer Chubb insurance to prospective clients.  Other insurance could be sold, but only if Chubb insurance was not available.  Similar producer funding agreements were in place in Aon's New York, Illinois, Oregon and Florida offices.

256.     The producer funding agreements were part of Aon's overall strategy to steer business to its strategic partners, Chubb and Fireman's Fund, in return for high Contingent Commissions.  In Aon's Illinois office, Chubb promised increased Contingent Commissions to Aon for writing automobile policies, and bonuses of $1,000 or $2,000 to the Chubb/Aon producer, the Chubb/Aon producer's supervisor and other Aon staff if personal lines growth

69

exceeded 8%. A December 22, 1999 letter memorializing a national Chubb/Aon producer funding agreement stated: "Aon agrees to give Chubb & Son first right of refusal to personal lines business written through the Aon Private Client Group at the assigned offices." And in 2001, Chubb loaned Aon $500,000 to "assist in building your personal lines operation. The agreement forgave the loan if Aon produced 13% premium growth to Chubb in 2001 and provided for an additional contribution of $250,000 if Aon achieved 15% growth.

257.    Aon and Chubb's Contingent Commission Agreement supported their steering behavior. For example, on November 13, 2001, Carton Brydon (an Aon executive) sent his staff an email noting that "we need to get $3,000,000 in written premium with Chubb by years end - a daunting task no doubt - but it means $500,000 to APRM if we do." Brydon further instructed: "[w]hen we get a good AIG quote, we should share it with Chubb and [Fireman's] Fund as a last look. ***They are paying us to be in this position; we need to force them to act.***" [Emphasis added]. Brydon concluded his email by saying that doing business with AIG was not financially advantageous to Aon given the contingent commission monies available from Chubb and Fireman's Fund.

258.    On November 20, 2001, Bruce Macbeth echoed Brydon's previous email regarding the need to steer business to Chubb to meet the Chubb contingent commission goals:

> One of the issues we need to address on Monday is in the short term, we need to steer all submissions to Chubb. I am finding that most submissions are submitted to all three carriers and we all know what AIG will do to buy market share. We need to emphasize that AIG should only be used if there is an underwriting issue with Chubb, which we can address. If we approach AIG on all submissions, the reason for carrier chosen will always be rate and it will slow submission process.

259.    On November 25, 2001, Macbeth sent Brydon another email highlighting his speaking points for an upcoming conference call among APRM's executives:

> *With our override agreements with Chubb and Fire Fund, we need to direct all new business exclusively to them for the next month and beyond.* Chubb should be the first chose for any risk with Fireman's Fund a second thought. [Emphasis added].

260.   Brydon added the following comment to Macbeth's proposed speaking points:

> While I agree in principal [sic], I really do not want to say this. We certainly need to get everything we possibly can with Chubb as their carrot will disappear if we don't hit the numbers - however, with Fund, they are paying us both to hire new personnel and for growth, and even if we don't hit the numbers, the carrot doesn't disappear. Thus, let's don't go on record with putting Chubb 1st and Fund 2nd. They should be equal. *We should just push Chubb a little harder behind the scenes to get them the business.* [Emphasis added].

261.   Macbeth's email also noted that they have developed a "pipeline report" to ensure that business is directed to Chubb and Fireman's Fund.  The pipeline report would track and control the process to these insurers.  Macbeth describes that "[t]he purpose of this report is not only to be sure we are placing risks properly to the right markets, but to be certain that they are giving us full consideration even on the more difficult risk, not just 'cherry-picking' the simple ones, which anyone can do."

262.   Furthermore, with respect to AIG, Macbeth's email repeated Aon's concern that doing business with AIG at that time was not as lucrative as doing business with Chubb and Fireman's Fund, since AIG was not providing any Contingent Commissions:

> We must use them only for the complex accounts, which generate over $35,000 in premium.  If we submit all risks to them, they will write a majority of them because of their rate flexibility.  In addition, we do not have any overrides for growth, nor we will get any in the foreseeable future, just standard brokerage commissions.

263.   AIG, however, changed its tune in 2003 and entered into a contingent commission agreement with APRM.  Therefore, APRM refined its approach and quoted all new business to Chubb, Fireman's Fund, *and* AIG.

71

264.    Aon also reprimanded its brokers for failing to steer to the preferred list of insurers.  Astonishingly, Aon executives reprimanded brokers who exercised independent judgment on behalf of their clients in the placement process.  In a May 2003 email, Brydon complained that an Aon broker was going to move an account from Chubb to AIG "without giving Chubb a chance to get a last look" and noting that "[t]his is unacceptable."  Brydon further stated:  "[I]t is time for consequences.  No commission for the sale . . . regardless of what happens.  He needs to be written up."

265.    At Willis, override revenue was a primary focus at all levels – nationally, regionally, and locally.  According to a former Willis employee, overrides were important to maintaining Willis' profitability, especially in the P&C area, thereby resulting in a company-wide focus on meeting volume and persistency thresholds set forth in its Contingent Commission Agreements with carriers.

266.    As revealed by the Assurance of Discontinuance filed on April 7, 2005 ("Willis Assurance of Discontinuance"), and as further described below, beginning in 2003, Willis centralized its push to maximize override revenues through a national office, called Willis Global Markets.

267.    According to the Willis Assurance of Discontinuance, in an April 4, 2004 e-mail, James Drinkwater, Managing Director of Willis Global Markets, explained that "our PSA's [Contingent Commission Agreements] are a reward for services that we provide to carriers such as carrier advocacy . . . .  Carrier Advocacy includes transparency into our organization and our book, access to our leadership and our clients, ***an unfair competitive advantage*** as well as other benefits that partnership brings."  In a May 15, 2003 e-mail, he further explained that Willis would attract greater Contingency Commission revenue by "driving business to these carriers."

268.    In a September 2003 internal Report, Drinkwater identified which carriers Willis should steer business towards, stating: ***"Special attention is being given to St. Paul, Chubb, Liberty Mutual, Hartford and Crum & Forster due to special [PSA] agreements."*** [Emphasis added].  Similarly, an October 17, 2003 email from Drinkwater to Regional Marketing Officers stated: "I want to see you directing the flow of business to these companies ["Partner Markets" Crum & Forster, Chubb, St. Paul and Hartford, insurers with which Willis had contingent revenue agreements]." *See* Willis Assurance of Discontinuance.  As he explained, "moving business wherever possible to our Partner Markets ... will have significant revenue implications to the Group."  *Id*.

269.    In accordance with Drinkwater's directive, a November 1, 2003 email from Northwest Regional Executive Director, Chris Engstrom, to local brokers, instructed: "Please review the attached strategy ... which is being driven and supported by marketing at a local, regional and national level."  The attached memo stressed that one of Willis' "KEY OBJECTIVES" was to "[m]aximize premium volume flow to key carriers with most attractive contingent income agreements."  Willis Assurance of Discontinuance.  Indeed, as noted previously, Willis hosted weekly or bi-weekly conference calls, attended by managers of each outlying Willis office, where corporate accounting updated Willis' financial positions with respect to individual carriers and informed the field of which carriers to favor.

270.    Further, to meet persistency targets, Willis created a list of its top 200 accounts which were up for renewal at the time "to ensure the appropriate Marketing and Income Strategy is in place to maximize revenue to the group."

271.    Willis' mantra for increasing undisclosed Contingent Commissions was constantly pushed on its brokers.  As revealed in the Willis Assurance of Discontinuance, a

November 11, 2003 email from Willis North America's Chief Marketing Officer emphasized: "Don't forget the advantages of placing as much business as possible with the carriers we have negotiated special deals with, as you look for ways to maximize revenues the last few months of this year and into 2004."

272.     Further, in a December 8, 2003 email entitled, "Fourth Quarter Push," the CEO of Willis North America, Mario Vitale, rallied Willis brokers, stating: "The 2003 production year is quickly coming to a close, but we have a very long way to go."  He continued: "***Staying consistent with our mantra, let's try to: Keep what clients you already have; Get more from existing clients; Open more new accounts … [and] Maximize contingent income."***  [Emphasis added].

273.     Willis conspired with carriers to steer business their way in exchange for the Contingency Fees.  While negotiating their 2004 override agreement with ACE, James Drinkwater stated in a December 11, 2003 email to Susan Rivera, ACE's President: "One final comment, and possibly most importantly, the quicker I can get word to our offices that we have agreed to a partnership for 2004 the more opportunity that we may have to get off to a good start in 2004 and focus on writing January 1st business."  *See* Willis Assurance of Discontinuance.

274.     The Contingent Commission incentives offered by insurance carriers to Willis have become more important to Willis' profitability, especially in the P&C area, causing more focus and concerns about potential for meeting the required volume necessary to qualify for contingent payments.

275.     Gallagher also engaged in improper steering practices.  For example, Gallagher brokers were provided a list of approved insurers from which brokers should place insurance,

including, *inter alia*: CNA, Hartford, Audubon (a division of AIG), St. Paul Travelers, and Zurich.  Of course, the brokers were rewarded for steering business to these "partner" carriers.

276.    Gallagher steered business to insurance companies with whom they entered into Contingent Commission Agreements, dating back to at least 1997.  As detailed in the Arthur J. Gallagher & Co. Assurance of Voluntary Compliance, filed on May 18, 2005 ("Gallagher Assurance"), on March 14, 1997, Craig Van der Voort, an executive of Gallagher-Great Lakes, Inc., sent a memorandum to Gallagher-Great Lakes managers informing them of a lucrative agreement with Chubb.  This memorandum urged managers not only to direct new business to Chubb, but also to consider redirecting business then currently placed with other insurers.  The memorandum states, in relevant part:

> Chubb recently agreed to one of the most lucrative New Business Incentives that I have ever seen . . .
>
> We really have to take advantage of this opportunity and shoot for net new Chubb business in excess of $1,000,000.  That would pay us an extra 10% on **everything** and this bonus does not go through a production formula, it goes straight to the bottom line.
>
> Managers, please watch over the marketing in your units and direct our "new/new" placements to Chubb when feasible…[We] may, in fact, want to move business from some of the companies that are **not** major players in our office….Also, this agreement should not be discussed outside the office or with other markets. [Emphasis in original]

277.    Gallagher's relationship with Chubb continued.  As described in the Gallagher Assurance, Van der Voort and a Gallagher Regional Manager met with Chubb representatives in early 2001 and discussed how the contingent commissions were designed to "drive" business to Chubb.  In the spring of 2001, Van der Vort urged branch managers of Arthur J. Gallagher Risk Management Services in Chicago to meet Chubb contingency targets:

> We had incentive deal that would have paid a 5% override on all new business if wrote $1,000,000 of new business between

75

> October 1, 2000 and April 1, 2001.  We actually wrote about
> $750,000 so we did not make it.  The same offer has been made for
> the period April 1 through September 30, 2001.  Let's try to make
> something of this.  Every AJGRMS Division has lines of business
> that match up with Chubb.  Get the word out to your production
> staff.

278.    In September 2001, Van der Voort wrote the following email to branch managers

of Arthur J. Gallagher Risk Management Services in Chicago, again advising them to place

business with those insurance carriers with whom they have Contingent Commission

Agreements:

> We have other special bonus agreements in place with markets like
> Chubb, Fireman's Fund, and Hartford . . . We are expected to seek
> out these special agreements and support them so that additional
> revenues can be earned.  Please do what you can in your respective
> divisions to support our "partner" markets and any bonus plans.

279.    The Gallagher Assurance revealed that Chubb, however, was not the only insurer

Gallagher steered business to in return for Contingent Commissions.  As openly acknowledged

in an internal correspondence dated July 8, 2002, Van der Voort told Gallagher managers that the

purpose of Gallagher's override agreement with carrier Crum & Forster was "*to reward

continued growth with C&F*."  [Emphasis added.]  Incidentally, under the terms of the override

agreement with Crum & Forster, Gallagher would receive 2% additional commissions if it placed

$15 million of premiums with Crum & Forster and as much as 3% additional commissions if it

placed $25 million.  To guarantee that managers met Crum & Foster thresholds, the Vice

President of Gallagher's' Market Relations told all branch and regional managers: "Through

October, our national Crum & Forster volume is almost $23 million.  We need to surpass $25

million in order to qualify for a full 4% on our total volume.  Let's make sure that happens over

the final 2 months of the year."

280.    On December 4, 2003, Van der Voort urged Gallagher managers to "pump" up

the volume of its business placed with Crum & Forster and other carrier partners, stating:

> With year-end approaching, *it is our last chance to pump*
> *additional premium volume into these markets* so that it is
> included in the 2003 contingent income calculation.  Some of our
> more lucrative incentive programs are in place with these
> companies
>
> | | | |
> |---|---|---|
> | 1 | Crum & Forster | (National) |
> | 2 | Hartford | (National) |
> | 3 | St. Paul | (Local) |
> | 4 | CNA | (Local) |
> | 5 | Chubb | (Local) |
> | 6 | Travelers | (Local) |
> | 7 | Wausau | (National) |
>
> Any opportunity which you or your staff have to support these
> markets, either through renewal retention or new business, will
> help generate additional revenue for AJG.  If we can have a strong
> finish with Crum & Forster, it is possible for AJG to meet a
> threshold, which pays Gallagher 4% of our eligible C&F
> premiums.  *See* Gallagher Assurance.  [Emphasis Added].

281.    Similarly, Gallagher steered large amounts of business to Hartford.  The

Gallagher Assurance reveals that on February 14, 2003, the CEO of Gallagher and others were

informed by Van der Voort that Hartford paid a $1.8 million dollar "bonus" under their profit-

sharing agreement.  Van der Voort encouraged managers to continue steering business to

Hartford:  "The same plan is in place for 2003 and we need to get our branches to take advantage

and work more closely with Hartford.  We have a strong relationship at the top and they want to

grow with us."  As revealed in the Gallagher Assurance of Voluntary Compliance ("Gallagher

Assurance"), Gallagher made it a company-wide policy to focus on obtaining Contingent

Commissions.  In a July 21, 2003 meeting of Gallagher top executives, CEO Patrick Gallagher

made it clear that the Company should push Contingent Commissions.  As memorialized in the

minutes afterwards: "Contingents are important and we want people fighting for them."

282.     The Insurer Defendants with whom Gallagher received Contingent Commissions from were clear in what they expected from Gallagher in return.  For example, Chubb "intended to reward [one other Gallagher subsidiary] for the production of profitable new business to Chubb."  *See* Gallagher Assurance.

283.     Furthermore, in lieu of or in addition to formal override agreements, Gallagher has entered into subsidy arrangements with certain Insurer Defendants, including AIG, Chubb, and Hartford, unbeknownst to its clients.  Illustrative of AIG and Gallagher's arrangement is a September 25, 2002 memo addressed to Gallagher's CEO which stated: "While AIG avoids discussions of incentive income or contingent payments, they seem agreeable to supporting expense subsidies when it benefits their growth as well."

284.     Consequently, AIG rewarded Gallagher with $2 million worth of subsidies in 2002 and an additional $2.5 million in subsidies in 2003.  On August 18, 2004, Van der Voort notified CEO Patrick Gallagher and President of Brokerage Services, James Gault, of these subsidies and told them they could discuss the arrangement with AIG CEO Hank Greenberg.  *See* Gallagher Assurance.

285.     AIG's subsidies sometimes took the form of "hiring subsidies."  AIG offered to pay the annual salary of certain Gallagher brokers in exchange for Gallagher's promise to grant AIG an exclusive "first right of refusal" for prospective insurance business.  According to documents produced in the Illinois AG's investigation, "AIG only offers a subsidy when they believe it is an investment that will be paid back many times over in the form of new business."  *Id*.  Subsequently, the companies arranged to place an AIG-funded broker in Gallagher's Chicago office.  In a June 16, 2004 email, Van der Voort assured AIG that the branch manager "understands that in recognition of a hiring subsidy from AIG World Source, you would expect

78

to get the first look at qualifying submissions and as a result, write a significant percentage of their applicable business."  In correspondence to the relevant managers, Van der Voort instructed: "Keep in mind, AIG World Source . . . will expect their fair share of business in return and it will be up to you to make sure that actually happens."

286.    All of these arrangements were concealed from Gallagher's clients.    The Gallagher Assurance reveals that on May 26, 2004, a Vice-President in the Brokerage Services Division represented to a client that AIG has "no need to offer incentives to anyone. Historically, they **never** have incentivized anyone to do business with their firm and it is a philosophy and model they continue to incorporate in todays [sic] marketplace."  [Emphasis in original]

287.    Similarly, Chubb agreed to pay a hiring subsidy, as set forth in a March 4, 2004 document that explained: "The advanced pay out is to support hiring of staff within [Gallagher's] unit that will specifically support Chubb production."  "[I]n return for Chubb's contribution to individuals salary, [Gallagher's unit] was required to meet specific new business goals with Chubb."  *See* Gallagher Assurance.

288.    Hartford also paid the salaries of certain Gallagher brokers and it is believed that other Insurer Defendants have done so as well.

289.    According to a former Gallagher employee, certain Gallagher producers were "spotlighted" at monthly meetings for writing large volumes of new business.  Additionally, rewards would go directly to managers who oversaw individual brokers.  As described in the Gallagher Assurance, branch managers were informed that they could personally receive potential bonuses for maximizing contingent income:

> Keep in mind that contingent income is very important to the BSD
> [Brokerage Services Divisions] and each branch will be given

credit on the monthly Board Report for the proportionate share of contingent income they help generate with a market in a given year. *The actual allocated branch contingent results also have a big effect on individual branch manager bonuses and performance evaluations so your results will be tracked and they do make a difference.* [Emphasis added.]

290.    Indeed, on April 6, 1998, branch managers of the Gallagher Brokerage Service Divisions were praised for their "efforts to move and offer new business to Chubb," receiving up to $19,300 bonuses each in April 1998 for placing new business with Chubb and moving existing business from other carriers to Chubb.

291.    Other Broker Defendants went to great lengths to instruct their employees to recommend those policies and terms that would generate the highest Contingent Commissions. For example, Wells Fargo ran financial reports to determine volumes of business sold for individual carriers.  These reports allowed Wells Fargo to analyze where they could get "the most bang for the buck" toward the end of the year by steering business toward a carrier offering the best opportunity for the greatest contingency commission.  Indeed, Wells Fargo issued directives to its employees emphasizing particular carriers and was considered a "premier provider" with certain insurers.  Wells Fargo steered business towards those carriers with which it had Contingent Commission Agreements, including St. Paul Travelers, CNA and Hartford.

292.    Wells Fargo also held monthly customer service representative meetings at each local office.  Since the customer representatives dealt directly with both the insureds and the carriers, they were informed by in-house marketing about the brokers' proximity to receiving override payments in order to help facilitate the placement of policies with specific carriers, toward the goal of meeting a threshold target.

293.    As described in the West Virginia AG's Complaint, Acordia/Wells Fargo's had national agreements with certain "Millennium Partners," or carriers, to which it would direct its

80

local branches to steer business towards in exchange for Contingency Fees.  In entering into such agreements, Acordia/Wells Fargo executives focused on securing the greatest amount of Contingent Commission revenue, or "getting in the money," as one executive put it. Acordia/Wells Fargo had "Millenium" Agreements with Chubb, Hartford and St. Paul Travelers, among others.  Its "Millenium Partners" did not offer "free money," but rather they expected preferential treatment in the placement and renewal of policies brokered by Acordia/Wells Fargo for their Contingency Fee "kickers."  Indeed, due to those "kickers," Acordia/Wells Fargo steered its clients to purchase insurance policies at artificially high prices with the terms favorable, not to the client, but to Acordia/Wells Fargo's "Partner" carriers.

294.    USI also dictated to its brokers which insurance companies' policies they were to sell.  For instance, a former USI employee explained that USI brokers were told not to move business from certain carriers, including Defendant Hartford, because the commissions were higher.  Furthermore, at monthly department meetings, USI employees were told to "stick with the higher commission carriers."

295.    Hub brokers were similarly told to steer business to certain preferred insurance carriers.  According to a former Hub employee, Hub management would instruct its brokers to steer business to Chubb because of the incentives Chubb had to offer.  When this former employee asked why Hub gave so much business to Chubb, her account manager informed her that "that's where they [Hub] wanted to the business, even though it wasn't the best thing for the client."  Another former Hub employee described that management instructed him to send business to Hartford and to do "everything [he] could to give it to Hartford in order to get [Hub] over a certain threshold."

296.     Similarly, office managers at Hub received monthly reports which reflected brokers' progress in channeling business to certain insurers, namely, Chubb, St. Paul and Hartford.

297.     Brokers at HRH were also specifically told to direct business to those insurance carriers with which HRH had negotiated the highest Contingent Commissions, regardless of the impact on clients.  Indeed, brokers at HRH were told to place insurance with certain insurance carriers, including CNA, since there was a "deal" with CNA.

298.     A former Brown & Brown employee acknowledged that steering took place with specific insurers such as Hartford which provided end of year bonuses and kickbacks based on volumes of business placed.

299.     Moreover, Brown & Brown put pressure on carriers so that it could earn more contingent commission and volume based income.  In fact, Brown & Brown management would hand out documents to personnel specifically identifying the names of carriers Brown & Brown had volume agreements and ranking those carriers according how lucrative the volume agreements and fees were.  Brown & Brown's agreements with Insurer Defendants included CNA and St. Paul on property & casualty business as well as certain others on the life and health business.

300.     As detailed herein, the Contingent Commissions are maximized by the Broker Defendants steering their clients, including plaintiffs and other members of the Class, to purchase only policies issued by the Insurer Defendants, in return for the Contingent Commissions.  The Broker Defendants place their clients' business predominantly with the Insurer Defendants to maximize the Contingent Commissions they receive at the expense of their clients and in breach of their fiduciary duties.  Contrary to the expectations of their clients,

Broker Defendants' financial interests are thus in direct conflict with their clients' interests.  The Broker Defendants' duties owed to their clients have been co-opted by the Contingent Commission Agreements, and the steering and bid-rigging resulting therefrom.

301.    The Insurer Defendants likewise fail to adequately disclose to plaintiffs and members of the Class the existence of Contingent Commissions and the impact those commissions have on insurance arrangements.  Instead, the Insurer Defendants actively take part in and cooperate with the Broker Defendants in their effort to conceal the Contingent Commission Agreements, and the revenue generated pursuant thereto, from their respective clients.

302.    The industry itself has recognized that undisclosed Contingent Commissions corrupt the whole process.  Clients are misled into thinking they are receiving impartial advice and the most economical and appropriate insurance products and services when, in fact, the broker is steering them towards products that will maximize the profits of the broker and insurer, to the detriment of the client.  As the Risk and Insurance Management Society, Inc. ("RIMS") stated in a press release dated August 24, 2004:

> We believe that undisclosed contingency fees have the potential to compromise the very basis upon which this relationship is built.  In an effort to preserve the integrity of this relationship, RIMS strongly advocates for complete and full disclosure of compensation agreements without client request.

303.    In fact, following the investigation by various state attorneys general into Contingent Commission Agreements between insurance brokers and insurers, Defendants have also acknowledged that receipt or payment of Contingent Commissions are inherently wrong. For example, Joe Plumeri, the CEO of Willis, who had been an active proponent of his company's expanding use of contingent commissions, conceded in an April 2005 speech to RIMS:

83

For too long, this business has been about the placement only – what I've come to call manufacturing.  Under this model, getting the placement at the right price and the right coverage is all that matters.  But this approach leads to the commoditization of insurance, and I don't think anyone in this room would equate insurance to soy beans.

This approach also invites the perception of conflict that comes with contingent commissions; that's inconsistent with the principle of client advocacy and therefore is unacceptable.

It must be 100% clear who the broker is working for.  That means a broker can only be paid by one party in any transaction.

It's time we step up to a higher standard. Contingents should be abolished throughout the industry.  Carriers shouldn't pay them.  Brokers shouldn't accept them.

If anyone says, "But we're an agent (rather than a broker): surely we can get contingents based on the profitability of the carrier's book?"  To them I say, "That's fine, just make it 100% clear – up front - that you are acting for the carrier, and not the client."

Some times when you are up against it, you have to get creative.

Faced with the loss of contingent commissions, the sight of the gallows should focus our minds.  Brokers should focus less on finding a way to simply replace the lost revenue and more on what is really important – having the integrity to work harder to deliver creative solutions and bring real value.  Anybody think that's a big idea?

And, if contingents create the appearance of a conflict for some brokers, they create that appearance for every broker. Why is my cholesterol bad but for the others it is good? It doesn't matter whether the broker is global, regional or local – based in the U.S., London, or anywhere around the world. It's time to say "enough."

Contingent commissions.  Over.  Done.  Finished.

304.     The volume of Contingent Commissions together with the Wholesale Payments that are received by Broker Defendants have a material impact on their overall profitability.  The Contingent Commissions payable under the Agreements have resulted in a conspiracy between and among the Defendants to engage in steering, bid-rigging and illegal tying arrangements, in

order to allocate customers and maintain market share because the Agreements are intended to and do create an incentive for Broker Defendants to:

(a)     maximize the volume of insurance placed with the Insurer Defendants, parties to the Agreements;

(b)     maximize the volume of renewal business placed with the Insurer Defendants;

(c)     fail to seek, on behalf of their clients, the most advantageous terms on the insurance coverage;

(d)     fail to advise their clients to negotiate reductions of premiums payable through adjustments of terms, such as deductibles, in order to maximize the profitability of those policies for purposes of calculating the Contingent Commissions payable under the applicable Agreements; and

(e)     discourage clients from filing certain claims or assisting the Insurer Defendants in denying or reducing claims under their policies in order to maximize the profitability of those policies for purposes of calculating the Contingent Commissions payable under the applicable Agreements.

305.     As a result of the Contingent Commissions, plaintiffs and members of the Class have paid insurance premiums in excess of what they would have paid had Broker Defendants acted in accordance with (i) the terms of their contracts, (ii) their fiduciary and other duties, and (iii) their representations to their clients.

306.     Through Defendants' fraudulent misrepresentations and failure to make adequate disclosure of the Contingent Commissions as set forth above, Defendants have knowingly misled and continue to mislead and deceive their clients, including plaintiffs and members of the Class,

into believing that they provide independent, unbiased and expert brokerage services tailored to the needs of their clients.

### A.    Defendants' Collusive Bid-Rigging Scheme

307.    To maximize their profits and raise, maintain or stabilize the price of insurance, as part of their steering practices, Defendants colluded in a bid-rigging scheme to allocate customers and deceive plaintiffs and Class members into believing that the Broker Defendants were obtaining competitive insurance bids from the Insurer Defendants on behalf of their clients. The bid-rigging was facilitated by the Broker Defendants, who solicited and obtained fictitious high quotes from Insurer Defendants to guarantee that the predetermined preferred insurer would win the bidding competition, and by determining the terms of the winning and losing bid.  These fictitious quotes were often referred to as "A Quotes," "B Quotes," and "C Quotes."  The Insurer Defendants colluded with the Broker Defendants in the bid-rigging scheme because they were promised protection from competition in other bids.  This systemic bid-rigging by the Broker Defendants and Insurer Defendants was achieved through multiple levels of manipulation.

308.    Defendants' bid-rigging scheme involved the Broker Defendants hand picking Insurer Defendants for bidding out the client's account, and providing the hand picked Insurer Defendants with information regarding that client's current rates and policy terms to ensure that the selected insurer would receive the business at a particular price.  In manipulating the bidding process therefore, the Broker Defendants shared their clients' confidential information, unbeknownst to the clients.

309.    Although discovery in this action has not yet commenced, significant details of Broker Defendant Marsh's bid-rigging schemes have been made public as a result of the investigation by the New York Attorney General.  Moreover, following the filing of the Marsh AG Complaint, Marsh engaged Davis Polk & Wardwell ("DPW") and Kroll, Inc., ("Kroll") to

conduct an internal investigation into the bid-rigging activities and other unlawful conduct alleged in the Marsh AG Complaint.

310. To date, ten individuals have plead guilty to criminal charges for their involvement in the bid-rigging scheme. This includes four AIG executives (Karen Radke, Jean-Baptist Tateossian, Carlos Coello and John Mohs) who have plead guilty to felony or misdemeanor charges of scheming to defraud; a vice president with ACE (Patricia Abrams) who has plead guilty to a misdemeanor charge of attempting to restrain trade and competition; two executives from Zurich (John Keenan and Edward Coughlin) who have plead guilty to attempting to restrain trade and competition; three executives from Marsh, including a senior vice president (Robert Stearns) who has plead guilty to a felony charge of scheming to defraud; and two senior managing directors (Kathryn Winter and Joshua Bewlay) who have also plead guilty to felony charges of scheming to defraud.

311. Each of the individuals at ACE, AIG and Zurich who have so far plead guilty have acknowledged that they have submitted false quotes, in participation in a scheme with individuals at Marsh, to allow Marsh to control the market. In turn, the insurance carriers were promised protection from competition in other bids when their business was up for renewal. The guilty plea of one AIG executive, illustrative of the guilty pleas of the other AIG, ACE and Zurich individuals, states the following, in relevant part:

> During his career at AIG, Mr. Mohs and other AIG employees participated in a scheme with individuals at Marsh Inc. ("Marsh"), an insurance brokerage also based in Manhattan. The goals of this scheme included allowing Marsh to control the market and to protect incumbent insurance carriers, including AIG, when their business was up from renewal.
>
> During this time period, Marsh and AIG personnel periodically instructed Mohs to submit specific quotes for insurance rates that Mr. Mohs believed:

      a.      were higher than those of incumbent carriers,

      b.      were designed to ensure that the incumbent carriers would win certain business, and

      c.      resulted in clients being tricked and deceived by this deceptive bidding process.  [John Mohs Plea Agreement (filed Jan. 27, 2005)].

312.    Robert Stearns, one of the Marsh individuals who plead guilty to a felony charge of scheming to defraud on January 4, 2004, similarly admitted that from about September 2002 through 2004, he participated in a scheme with individuals at various insurance companies, including Defendants AIG, ACE, and Zurich.  The goals of the scheme included allowing Marsh to control the market, to protect incumbent insurance carriers when their business was up for renewal, and to maximize Marsh's profits."  Robert Stearns Plea Agreement (filed Jan. 4, 2005).

313.    Another Marsh managing director who plead guilty to a felony charge of scheming to defraud on February 14, 2005, also admitted to engaging in a bid-rigging scheme. Mr. Bewlay's plea agreement states, in relevant part:

> From approximately 1998 through 2003, Mr. Bewlay engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property… by false and fraudulent pretenses, representations promises, to wit, noncompetitive quotes from insurance carriers that Marsh conveyed to marsh clients. . . *in that Mr. Bewlay and others at Marsh regularly instructed insurance carriers to submit noncompetitive quotes, that were presented to clients as competitive, thus ensuring that the client would select the carrier, typically the incumbent, that Marsh had pre-determined should win the business.*  [Joshua Bewlay Plea Agreement (filed Feb. 15, 2005)].

314.    Additionally, Kathryn Winter, another Marsh managing director who plead guilty to a felony charge of scheming to defraud on February 24, 2005, similarly admitted that she "participated in a scheme with individuals at various insurance companies, including AIG, ACE and Zurich," where the "primary goal of th[e] scheme was to maximize Marsh's profits by

88

controlling the market, and protecting incumbent insurance carriers when their business was up for renewal." Kathryn Winter Plea Agreement (filed Feb. 18, 2005).

315.   **The "A Quote."**  If Marsh had an incumbent carrier for one of its clients whose insurance policy was up for renewal, Marsh would solicit what was known as an "A Quote" from that Insurer Defendant.  If the Insurer Defendant agreed to make a quote at the targeted premium and policy terms demanded by Marsh, regardless of its ability to quote more favorable terms or premium, the Insurer Defendant was guaranteed the policy renewal.

316.   **The "B Quote."**  At the same time, to deceive customers into believing that Marsh was obtaining competitive bids and to ensure that the incumbent carrier would get its policy renewed, Marsh would solicit non-incumbent Insurer Defendants to submit what was known as a "B Quote" (a phony quote which also was known as a "backup quote," "protective quote" or "throwaway quote"), with the understanding that these other insurers would not actually submit competitive bids.  "B Quote" insurers knew and understood that their turn would come later.  According to the DPW memo released by Marsh, there were "widespread instances in which Marsh Inc. brokers solicited so-called 'B quotes' from various insurance carriers." Marsh often provided these other insurers with target quotes to be made, regardless of the insurers' ability to quote a lower premium below the target bid.  The insurers, including the Insurer Defendants, complied because Marsh would protect them when they were the incumbent carrier up for renewal.

317.   **The "C Quote."**  When there was no incumbent insurance carrier to protect, Marsh would solicit insurers for "C Quotes."  Although it was understood that real competition was a possibility in such situations, Marsh often still provided premium targets to the insurers.

318.     Illustrative of Marsh's false quote scheme is Marsh's agreement with Zurich. Brokers at Marsh instructed senior underwriters at Zurich to submit protective quotes on business where Marsh predetermined which insurance carrier would win the bid.  Understanding that the quotes were intended to allow Marsh to control the bidding process, protect the incumbent and convince the insured that the incumbent had the best bid, underwriters at Zurich complied with Marsh's requests by submitting their quotes, thereby allowing Marsh to obtain property in the form of millions of dollars in commissions and fees from each of numerous policyholders and insurance companies.  The Zurich underwriters engaged in this scheme knowing that they would benefit from the scheme when Zurich was the incumbent insurance company.  Underwriters at ACE and AIG also engaged in similar schemes with Marsh, by complying with Marsh's instructions to submit false quotes to clients.  On information and belief, the other Insurer Defendants have also engaged in a similar scheme with Marsh as well as the other Broker Defendants.

319.     Marsh's process for obtaining false quotes from Insurer Defendants was highly systematic.  For instance, on October 29, 2003, the former Marsh executive, Robert Stearns, who plead guilty to a felony charge of scheming to defraud, sent an email to five of his colleagues at Marsh's Global Broking Unit, attaching a document that outlined some of the ". . . very specific protocols on how we place business. . ."  The document provides that: "Request 'B' quotes early b/c last week of every month markets only focus on 'live' opportunities v. quoting B's (careful that alternative 'B' doesn't beat incumbents quote -- it's not always price, it could be attachment point or coverage)."  *People of the State of New York v. Robert Stearns* (filed Nov. 16, 2004).

320.     Marsh often directed the selected insurers to submit A, B, and C Quotes.  For instance, in October 2003, an underwriter for AIG stated that with regard to a B Quote he had

provided to Marsh: "This was not a real opportunity.  Incumbent Zurich did what they needed to do at renewal.  We were just there in case they defaulted.  Broker ... said Zurich came in around $750K & wanted us to quote around $900K."

321.   Similarly, in an email dated March 5, 2004 from a Marsh employee to an AIG employee, the Marsh employee stated that another insurance company, Zurich, "has released a quote of $173,720 . . . Please have AIG provide an email indication for $50mm xP." Subsequently, the Marsh employee informed the AIG employee that "[T]he incumbent hit the target . . ." and instructed the AIG employee, ". . . need an indication for $50mm at $200,000." The AIG employee replied that he would send such an indication under a separate email, and a minute later he sent an e-mail containing the quote requested by Marsh and AIG did not get the account.  *People of the State of New York v. Jean-Baptist Tateossian* (filed Oct. 10, 2004).

322.   Likewise, as explained by the President of Casualty Risk for ACE: "[I]f we were asked for a 'B' quote for a lead umbrella then they provide us with pricing targets for that 'B' quote.  It has been inferred that the 'pricing targets' provided are designed to ensure underwriters 'do not do anything stupid' as respects [sic] pricing."

323.   Munich was also continuously asked by Marsh to submit "false quotes" to "manipulate market pricing and present other carriers' quotes in a more favorable light."  In fact, in an email from a Marsh senior vice president to a Munich regional manager, Munich was asked for a "non-quote" on a particular account, which meant Munich was to either decline the risk altogether or submit a higher quote than the incumbent carrier's.  For instance, as set forth in the Marsh AG Complaint, in September 2001, where AIG was the incumbent carrier, Munich complied with Marsh's request to submit a B quote so that the incumbent, AIG, would get the business.

324.     Another illustration of Munich's participation in the scheme to submit B quotes was detailed in the criminal complaint filed against one of the Marsh managing directors, Mr. Bewlay, who plead guilty to the crime of scheme to defraud.  According to the criminal complaint against Mr. Bewlay, Munich complied with Marsh's requests to submit false bids, with the understanding that Munich would be protected when it was up for renewal.  The complaint also illustrates Zurich's participation in the scheme.  The complaint states, in relevant part:

> [O]n March 4, 2002, defendant disseminated a broking plan to certain Marsh brokers in the Excess Casualty department for another piece of business, in which he instructed them to get "B quotes from MARP and Zurich," in order to protect the incumbent, AIG.  In subsequent e-mails, defendant reiterated his request for a B quote from Zurich and MARP, requested one from Kemper as well, and provided AIG's quote of $825,000 to ensure that the B quotes were less competitive.  Indeed, MARP complied with the request by indicating that they would be "well north of $1M" for the placement.  Zurich complied as well by submitting a quote of $1,045,000.  Defendant provides this information to the client through the Marsh Client Advisor, and the client ultimately bound the business with AIG.  [Bewlay Compl.]

325.     Therefore, in those instances where an Insurer Defendant provided a B Quote that was too competitive to ensure its loss, Marsh would ask the Insurer Defendant to submit a higher quote.  According to an email from an ACE assistant vice president to an ACE vice president of underwriting, it was explained that on one such occasion, the "[o]riginal quote [was] $990,000 ....  We were more competitive than AIG in price and terms.  *[Marsh] requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business*."

326.     In instances where the Insurer Defendants were not provided with a specific target B Quote but were nonetheless expected to lose the bidding competition, the Insurer Defendant would simply look at the expiring policy terms and premium, and provide a quote high enough to

ensure that they would not be the winner or that they would make a comfortable profit in the rare instances where such B Quotes were awarded the contract.

327.    In the rare situation where a B Quote was inadvertently awarded a contract in a competitive bid, it was likely because the incumbent insurer was unable or unwilling to meet the Broker Defendant's A Quote target price.  As further evidence of Defendants' manipulation of the bidding process, since the successful B Quote bidder in such situations had not completed any underwriting analysis (since it had no intention of winning the contract), the insurer would "back fill" the underwriting analysis in its file, *i.e.*, prepare the necessary analysis after the fact.

*328.*    From the Insurer Defendants' perspective, providing B Quotes only served to benefit their interests, as the Insurer Defendants' were promised future contracts in exchange for their collusion.  For example, ACE's President of Casualty Risk stated that he "support[ed]" Marsh's business model, explaining that "Marsh is constantly asking us to provide what they refer to as 'B' quotes for a risk.  They openly acknowledge we will not bind these 'B' quotes in the layers we are be [sic] to quote by that ***they 'will work us into the program' at another point.***"

329.    Another example of the Defendants' agreement and participation in the bid-rigging process is demonstrated by the communications from the former Executive Director of Marketing at Marsh Global Broking, William Gilman, who refused to allow AIG to submit a competitive quote when it was solicited for a "B Quote," and further warned AIG on a number of occasions that AIG would lose its entire book of business with Marsh if it failed to cooperate.  Gilman's description of the arrangement between broker and insurer – *i.e.*, Marsh "protected AIG's ass" when it was the incumbent carrier up for policy renewal, and in return, Marsh expected AIG to help Marsh "protect" other incumbents by providing higher bids – is a classic

example of Defendants' agreement and participation in the scheme, common course of conduct and conspiracy to manipulate the so-called "competitive" bidding.

330.    Indeed, in an email dated October 3, 2001, Mr. Bewlay sent an email to a broker on Marsh's AIG dedicated team informing him that if he provided AIG's quote before Friday, the Marsh managing director ***"c[ould] do a Type B on it and protect [him]."*** In subsequent emails, the AIG broker was provided with a quote of $79,750, thereby ensuring that no alternate quote would be more competitive. Zurich and Munich complied by submitting false quotes for $110,000 and $135,000 respectively, and the client ultimately bound with AIG. *See* Bewlay Compl.

331.    Moreover, Insurer Defendants were aware at all times that such conduct was anti-competitive. For instance, in an exchange dated November 3, 2003 between Geoffrey Gregory, the President of ACE's casualty unit in Philadelphia and Susan Rivera, the President and CEO of ACE, describing the arrangement of bids with Marsh, Gregory warned Rivera that the way the bids were being arranged "could potentially be construed as simply creating the appearance of competition." Despite this email discussion, ACE continued to provide Marsh with inflated quotes.

332.    Another illustration of Defendants' agreements and participation in the scheme is set forth in a June 20, 2003 email from an ACE assistant vice president of underwriting to another ACE vice president, which states: "Currently, we have about $6M in new business [with ACE] which is the best in Marsh Global Broking, so I do not want to hear that you are not doing 'B' quotes or we will not bind anything."

333.    Additionally, the felony complaint against Mr. Stearns describes how various Insurer Defendants, including Zurich, AIG, ACE and St. Paul, were involved in the bid-rigging

scheme with Marsh, even with respect to one single account.  A March 5, 2003 email from Mr.
Bewlay to Mr. Stearns states the following:  "Bob, could you get the quote from Pete.  AIG was
to hit 25 percent increase.  Then we need B quotes at the expiring attachments."  *The People of
the State of New York v. Robert Stearns*.   Further emails reflect that Zurich, ACE and St. Paul
subsequently offered losing quotes on this account.  In one email dated March 17, 2003, a Marsh
broker instructed an ACE underwriter: "need a 'B' for shits and giggles."  As a result, the client
renewed the insurance policy with AIG.  *Id.*

334.    St. Paul's participation in the bid-rigging scheme is further highlighted by a
March 11, 2003 email from Mr. Stearns to a Marsh broker to obtain an inflated "B" quote from
Zurich so that the business could be steered to St. Paul.  The email states: "Can you get me a B
from Zurich.  Client will be binding with [incumbent] St. Paul at $270,000 all coverages as
expiring.  $325,000 should work."  *Id.*

335.    Similarly, Defendant The Hartford – which shared office space in the same
facilities as Marsh in Lake Mary, Florida and Los Angeles, California – was asked on virtually a
daily basis by Marsh employees for inflated quotes or "indications" (non-binding proposed
prices) for insurance coverage, and they willingly complied.  The Hartford underwriters were
told to price the quote or indication at 25% above a particular number.  In the Los Angeles
office, Marsh even provided Hartford with a spreadsheet showing the accounts for which it
wanted Hartford to provide a losing quote or indication, along with the other insurers' quotes.
Hartford has received subpoenas from regulators in five states that are investigating bid-rigging
and information on compensation agreements.

336.    In conspiring with insurers to rig insurance contract bids and allocate customers,
Marsh completely disregarded the interests of the client and the possibility that another insurer

may offer a better deal for that client.  Instead, Marsh doggedly pursued its own self-interests and the interests of its co-conspirators in rigging the purported competitive bidding process.  For instance, in June 2003, when Insurer Defendant ACE learned that a Marsh client, Brambles, USA, was unhappy with its incumbent carrier, Insurer Defendant AIG, Marsh nonetheless wanted AIG to keep the business.  As detailed in a written communication by an ACE vice president of underwriting to the ACE President of Risk and Casualty: "Our rating has a risk at $890,000 and I advised [Marsh] that we could get to $850,000 if needed.  [Marsh] gave me a song & dance that game plan is for AIG at $850,000 and to not commit our ability in writing."  As a result, ACE maintained its practice over the following year of providing Marsh with inflated quotes.

337.   Other Broker Defendants have similarly engaged in this type of improper bid-rigging conduct as well.  For example, the Senior Vice President of Aon's Financial Services Group frequently ordered brokers to contact Insurer Defendants AIG, CNA, and/or Zurich and inform them of a competitor's bid.  This also occurred with Mass Mutual, wherein she was ordered to contact Frank Frieri at Zurich and give him the figures regarding the bid submitted by CNA.

338.   Further, Aon on at least two occasions recommended inflated bids, thereby placing Aon's interests above the interests of the client.  In September 2003, ARS instructed Zurich that its bid of $246,922 for the workers compensation business of Fieldstone Investment Corp. was too low and suggested that Zurich raise its bid before the bids were shown to the client.  By doing this, ARS wanted to help Zurich recoup funds Zurich had expended on an unrelated client's account, Pearlstine Distributors, Inc.

339.    After learning from ARS that it should raise its bid, on September 26, 2003, Zurich submitted a revised quote of $290,000 for the workers compensation portion.  Though the bid was subsequently raised to account for more employees, the inflated bid was never reduced and it remained artificially high.  On November 13, 2003, after the account was bound with Zurich, the ARS employee assigned to the Fieldstone account wrote Spurlock to explain what had occurred:

> We wanted to let you know that when we first started negotiating this deal with [the Zurich underwriter], his initial WC premium came in at $246,922. The expiring premium with the same payroll was $283,532.  He quoted $36,310 less than expiring.  We came back to him and allowed him to increase his initial WC quote to approx. same as expiring, $283, 532. We allowed Zurich to get more money on this . . . This is an example of Aon letting Zurich have more rate and premium when we could have held them at a cheaper price.

340.    The next day Spurlock wrote to the Zurich executive who had negotiated the agreement on the Pearlstine account and stated: "[t]his one deal gave you twice the amount compromised on the Pearlstine account.  Are we in agreement that we have now met that obligation[?]"  Spurlock wrote a subsequent email, noting that in additional to settling the Pearlstine debt to Zurich, the bid also helped Aon get closer to achieving payout on its contingent commission goal:

> Congrats again on Fieldstone.  Not only was that new nice hit, it certainly helped us on two fronts.  It obviously helps to get us closer to our premium goal with Zurich and also to make up the $18k in premium that they helped us out on [Pearlstine], go away. As I recall you were able to get them $36k more in premium than they originally quoted to more than make up for what we owed them.  ***That is the way a National operation should work***. [Emphasis added].

341.    Aon frequently used Zurich to inflate bids, and Zurich willingly complied because it knew its turn would be coming.  On July 9, 2004, a syndicator in the ARS environmental unit

sent out requests for quotes from insurers for coverage of pollution liability on a condominium

project in New York City being developed by Pitcarin Properties, Inc.  Zurich's underwriter

determined that a reasonable quote for the coverage would be in the mid-sixty thousand dollar

range.  The Aon syndicator told him that his bid was too low and that he wanted Zurich to quote

in the upper ninety thousand dollar range.  The Zurich underwriter agreed to provide the higher

quote.  In an email to the Zurich underwriter, the Aon syndicator wrote: "[i]t was good talking to

you just now, and it was refreshing to hear some willingness to take this opportunity on . . . .

[t]he target is in the upper 90s."

342.    Four days after the conversation, Zurich provided a formal quote to ARS of

$92,497.  In its bid, however, Zurich failed to provide coverage for three scheduled non-owned

disposal sites, something the syndicator had indicated that Pitcarin required.  In a follow-up

conversation, the Zurich underwriter orally agreed to cover the disposal sites without increasing

its premium.  Although Zurich had the lowest quote, ARS advised Pitcarin to reject Zurich and

take a higher AIG quote of $99,519.  ARS justified the recommendation by telling Pitcarin that

Zurich had refused to cover the disposal sites.

343.    Similarly, at Defendant HRH, when new contract bids are solicited by the

insurance broker, it is customary practice to give a "last look" to the incumbent insurance

company.  The last look allows the incumbent to match the low bid.  Allowing the incumbent to

retain an existing contract can be beneficial to the client, but HRH perverted this practice by

giving the last look to companies that paid the greatest financial incentive, whether or not they

were the incumbent.

344.    Likewise, employees at Gallagher told CNA and Audobon "what price they had

to beat" and that they could secure "whatever they wanted" from Gallagher.  Gallagher

98

producers often placed clients with certain insurance carriers without shopping for additional insurance quotes.  In late 2004, Florida Attorney General Charlie Crist issued a subpoena to Gallagher investigating whether it engaged in illicit bid-rigging.

345.    Willis has also generated false bids from its preferred carriers.  In 2001, Willis solicited false bids from Zurich North America and CNA in connection with its client's ABM contract with the Detroit Airport.  Willis was required to obtain three bids for that proposal but only received a quote from the Fireman's Fund.  Thus, Willis asked Zurich and CNA to provide alternative bids as a favor.  In his solicitation of the bids, the Willis broker stated via email:

> [W]e need the alternative quotes to come in higher than [Fireman's Fund's] first dollar indication.  I have come up with a premium breakdown that follows, and need a quote letter from you so that ABM can meet the terms of the insurance requirement. [Willis Assurance at 9.]

Thereafter, Zurich and CNA submitted the false bids as requested.  These bids were submitted by Willis to the Detroit Metro Airport on behalf of its client ABM.

346.    There was also widespread use throughout the industry of "accommodation quotes."  It was common — within Marsh and throughout the industry — for brokers to solicit quotes, however high, from carriers that otherwise were disinclined to bid on a particular client's risk.  Such quotes were provided by the disinclined carriers as a favor or "accommodation" when a broker was unable otherwise to obtain a complement of quotes that was extensive enough to satisfy a client's expectations.  As with the "B quote" scenario discussed above, such "accommodation" requests were at times accompanied by a disclosure by the broker to the carrier of information concerning other carriers' bids.  The fact that such a quote was an "accommodation" quote was not something that brokers typically disclosed to clients.  Such "accommodation quotes" by insurance carriers helped further the conspiracy among the

Defendants to deceive plaintiffs and Class members into believing that the Broker Defendants were obtaining competitive insurance bids from the Insurer Defendants on behalf of their clients.

347.     On information and belief, the other Broker Defendants have also engaged in bid-rigging practices.

**B.     Wholesale Payments**

348.     In addition to the improper practices described above, Broker Defendants received additional income by improperly placing their clients' business with insurers through related wholesale entities that purport to act as intermediaries between broker and insurer, and receive commissions ("Wholesale Payments") from the insurers for placing the business of the clients of the brokers.  As a result of these relationships, the Wholesale Payments are channeled to Defendants in whole or in part.

349.     For example, Willis placed its clients' business through its wholesaler, Stewart Smith, to generate additional commission, even where an intermediary was unnecessary.  As described in an email dated April 9, 2004, from James Drinkwater to a regional director: "If we are to sustain and grow world class … we must support them [Stewart Smith and other subsidiaries] so that they can in turn support us in growing our revenues …."  He stressed that it was only appropriate to use a non-owned intermediary where "properly authorized and we must have made every effort, used every resource and relationship to place the business internally …."  Further, "[i]f a business unit fails to comply with this simple protocol … commissions that would have been earned by our Owned Wholesale Entity will be deducted from the business unit concerned."

350.     Similarly, a memorandum dated October 31, 2003 instructed brokers to "[m]aximize a new volume bonus arrangement with Stewart Smith by moving accounts to Stewart Smith that are written net of commission (fee).  Craig will send a list of possible

100

accounts to each CEO."  In addition, the memo instructed that brokers must: "Identify key accounts, both new and renewal, which will maximize income from the utilization of Willis Group resources including Stewart Smith ...."  In this manner, Willis generated additional commissions through its subsidiary wholesaler, unbeknownst to its clients and contrary to its fiduciary obligations.

351.    On April 9, 2004, James Drinkwater - the Managing Director of Willis Global Markets – instructed Randy Pugh in an email that before a "non-owned intermediary" could be used, he "must have made every effort, used every resource and relationship to place the business internally …."  Further, he warned that if a business unit did not comply with "this simple protocol," "commissions that would have been earned by our Owned Wholesale Entity will be deducted from the business unit concerned."

352.    As set forth in the Willis Assurance of Discontinuance, a December 1, 2003 email from the Director of Marketing in Florida stated that "after negotiating acceptable premiums, we ran this [client account] through Stewart Smith [Willis' wholesaler] for additional income to group of more than $156,000.  Fee Account."  That email also described another account that was "renew[ed] with AIG, via Stewart Smith (versus direct), [generating] additional income to group of $100,000.  Fee account."

353.    Between 2002 and 2004, Stewart Smith paid Willis over $62 million for brokering business originated by Willis through Stewart Smith.  The carriers that sold insurance to Willis' clients with Stewart Smith as an intermediary include: ACE USA, Hartford, Renaissance Re Group, XL Capital, AIG, Axis Capital, Liberty Mutual, St. Paul Travelers, and Zurich.

354.    While serving the interests of Defendants, the wholesale entities do not serve the interest of Defendants' clients.  Specifically, the Wholesale Payments create the same economic disincentives as Contingent Commissions for Broker Defendants to fulfill their legal and contractual duties to their clients, including plaintiffs and members of the Class.

355.    As a result of the Wholesale Payments, plaintiffs and members of the Class have paid insurance premiums in excess of what they would have paid had Broker Defendants acted in accordance with (i) the terms of their contracts, (ii) their fiduciary and other duties, and (iii) their representations to their clients.

356.    Through Defendants' fraudulent misrepresentations and failure to make adequate disclosure of the Wholesale Payments as set forth above, Broker Defendants have knowingly misled and continue to mislead and deceive their clients, including plaintiffs and members of the Class, into believing that they provide independent, unbiased and expert brokerage services tailored to the needs of their clients.

357.    In the absence of proper disclosure of the Wholesale Payments, plaintiffs and members of the Class justifiably relied on Broker Defendants' representations that they were providing independent expertise to their clients and representing their clients' interests in accordance with their contractual, fiduciary and legal duties, as alleged above.

358.    Broker Defendants have collected the Wholesale Payments as part of the same fraudulent scheme, course of conduct and conspiracy described above, under which Broker Defendants encourage reliance on their purported independent expertise while failing to disclose the inherent conflicts of interests they have created through the Contingent Commissions and the Wholesale Payments and acting in service of their own interests and at the expense of those of their clients.

C.      Reinsurance

The Broker Defendants utilized their improper steering practices to obtain additional fees by tying the purchase of primary insurance with the placement of such coverage with reinsurance carriers through the Broker Defendants' reinsurance broker subsidiaries.  Plaintiffs and the Class are injured by the improper tying arrangements, in that ultimately the cost of the reinsurance Contingent Commissions paid by the Insurer Defendants (both primary and reinsurance) to the Broker Defendants (through their reinsurance, broker subsidiaries and affiliates) is included in the inflated premiums and/or reduced coverages provided to plaintiffs and members of the Class.

359.    Gallagher utilizes its relationships with its "preferred" carriers to obtain additional fees for its reinsurance subsidiaries.  For example, in a letter dated May 7, 2002, VP of Market Relations for the Brokerage Services Division, Craig Van der Voort stated to Executive VP of Brokerage Services, James Gault, that he would "try and *leverage the specific companies [AIG, Chubb and Hartford] for more of their reinsurance business*."  (Gallagher Assurance at 9) (emphasis added).

360.    The foregoing example demonstrates Willis' improper tying and collection of additional fees through its wholesaler Stewart Smith as well as its reinsurer Willis Re. Specifically, an email dated November 3, 2003 from the head of Willis' Northeast Marketing instructed brokers to: "run all fee accounts through Stewart Smith, the Willis wholesaler, wherever possible,"… "feed our biggest contingency players, Hartford, St. Paul, Chubb and Liberty Mutual," and look to get Willis Re [reinsurance] involved in any accounts possible." (Willis Assurance at 7).

361.    As stated in the Willis Assurance of Discontinuance, Willis employee Tony Ainsworth coordinated the effort to leverage Willis' relationship with insurers to generate

103

reinsurance business.  Mr. Ainsworth prepared spreadsheets on a monthly basis to demonstrate

Willis' success in this area.

362.    After these illegal activities came to light, Willis scrambled to minimize its

documentation of such practices.  In a November 15, 2004 email, Ainsworth stated that

management:

> have decided to suspend all e mail and/or written correspondence
> between Willis Re Fac [Faculative] and Willis Retail/Wholesale
> effective immediately.  This will mean that we will no longer track
> [retail] broker / share renewal / leverage business, etc….***It does not
> mean that we will not be working with Retail/Wholesale on
> accounts but more in a low key manner.  Keep talking to our
> friends and find out where business is being sent ......just do it
> verbally or in person!*** [Willis Assurance (emphasis added)].

363.    There was massive steering of reinsurance between Aon and Chubb.  Specifically,

Chubb was alleged to not have lived up to its agreement to appoint Aon Re as the broker for

Chubb's reinsurance in exchange for Aon steering retail business to Chubb.   Executives at both

Chubb and Aon repeatedly met to discuss their Contingent Commission Agreements.  A memo

prepared for Chubb's CEO Dean O'Hare stated that "[w]e need to tell them [Aon] we are open

for business (*e.g.*, their new business production) and are ***paying*** them extra for it."  Thereafter,

O'Hare (against the advice of others at Chubb and without consulting with other Chubb staff)

had his secretary notify senior Chubb executives that Chubb had selected Aon Re for its D&O

reinsurance business.

364.    Notes of a meeting discussing this decision stated:

> Dean O'Hare has promised Pat Ryan Aon will get the lion share of
> [Chubb Executive Risk's] reinsurances.  Promise made some time
> ago and Ryan called Dean [O'Hare] in S.A. earlier this week to
> make sure promise being upheld.  Told Dean that Aon handling
> [reinsurance] is critically important to Aon and Chubb having
> positive relations and if Chubb give [reinsurance][sic] to Aon Ryan
> willing to put his personal credibility and friendship w/Dean on the
> line to make sure Chubb receive [sic] preferential treatment from

104

> Aon. [Four Chubb executives] all opposed to the decision but
> believe this is a done deal and do not believe they can convince
> Dean to change his mind.

365.    Over the next three years, an executive at Aon continued to monitor the

Aon/Chubb relationship.  A May 6, 2003 letter to the Aon executive stated "there is quite a bit of

attention being paid to the Chubb relationship.  We have 3 areas of focus and 3 corresponding

PSA agreements, notably in the commercial insurance, D&O and personal lines areas."  Later

correspondence to Chubb noted "I can tell you unequivocally that we [Aon] have maintained a

very aggressive pro-Chubb position as you have repositioned your book of business based on

your allocation position."

366.    Aon also promised to steer retail business to AIG in return for AIG's commitment

to use Aon Re's reinsurance services.  In the fall of 2000, AIG indicated that it was considering

handling in-house a particular reinsurance program called CCA.  In a November 27, 2000 email

to top Aon executives on both the retail and reinsurance sides of the business, an Aon executive

explained: "In return for a commitment of $10,000,000 in new gross premium from ARS US,

AIG has agreed to appoint Aon Re for an additional 2.5% placement of the CCA program, which

[AIG] has indicated is worth $750,000 in commission for Aon Re."

367.    Similarly, in February 2000, Aon also promised Liberty Mutual Group retail

business if Liberty Group used Aon Re for Liberty Mutual Group's reinsurance needs.  Since

Liberty Mutual had an affiliation agreement with Employers Insurance of Wausau, Liberty

Mutual Group undertook a review of its property reinsurance program.  Scott Clark (the head of

Aon Re's Property Practice Group) attended a meeting with Liberty Mutual executives during

the week of February 14, 2000 regarding whether Liberty Mutual should use Aon Re on Aon

produced business.  Clark wrote an email on February 23, 2000 to O'Halleran explaining what

he told Liberty Mutual at the meeting:

> I told them we are best qualified to handle their corporate
> reinsurance program.  Reinsurance is extremely important to Aon
> and without it we just won't grow as well as with it.  I told them if
> we don't get their reinsurance there is no point in these "love ins."
> Needless to say I got their attention, some say I was too strong but
> we have got to stop screwing around with the interdependence
> message, especially to those that can give us their reinsurance,
> depend on Aon for production and have mediocre brokers . . . ."

Following the 2000 review, Aon Re obtained Liberty Mutual's reinsurance business.  Liberty

Mutual depended on Aon for production and apparently did not want to risk losing retail

business.

368.    As stated in the Aon AG Complaint, Aon's practice of leveraging its retail

brokerage arrangements to obtain reinsurance business became so routine that it memorialized

these arrangements in what became known as "clawbacks."  Many of these clawbacks shared a

similar pattern: initially, the insurer would express displeasure at Aon Re's brokerage

commissions and would threaten to shop around for competitive rates.  However, to further their

conspiratorial conduct, Aon Re would offer the insurer an incentive by heavily discounting its

reinsurance brokerage commissions.  To recover the compensation lost by the discount, Aon Re

would negotiate a "clawback," allowing it to reduce or eliminate the reinsurance brokerage

discounts by steering retail insurance business to the insurer.

369.    Significantly, these "clawback" arrangements remained subject to confidentiality

agreements and, as a result, Aon's retail clients were *not* informed that Aon steered, or had

incentives to steer, business to selected insurers to recoup the discounts Aon Re offered to these

insurers on the brokerage reinsurance account.  *See* Aon AG Complaint.

370.    As noted above, Liberty Mutual gave its reinsurance brokerage contract to Aon

Re in 2000.  In 2002 and 2003, Aon negotiated a clawback arrangement with Liberty Mutual.

Aon orchestrated an agreement whereby Aon agreed to increase Liberty Mutual's retail

insurance premiums in exchange for keeping Aon Re as its property reinsurance broker. Moreover, as an added incentive, Aon agreed to reduce the brokerage commission but negotiated a provision that allowed it to recapture the discount if Aon met specified targets based on the volume or premiums for Liberty Mutual on its retail insurance business (*i.e*., clawback). The terms of this agreement were secret and not disclosed. *See* Aon AG Complaint.

371. Another example of a clawback agreement is between Aon and RLI Insurance. In 2001, Aon negotiated an agreement whereby Aon Re would pay RLI a 20% rebate on all brokerage RLI paid to Aon Re for placing its reinsurance agreements. Aon Re also promised to pay RLI an additional 5% rebate on its reinsurance brokerage commissions if Aon did not produce 20% growth in annual retail premium to RLI. In a July 27, 2001 letter, RLI's president and COO explained that linking the reinsurance rebate to retail growth provided "a very strong incentive for us to utilize Aon Re as our primary reinsurance intermediary."

372. Furthermore, on March 25, 2003, Aon Re "committed to [] delivering more [retail] business to RLI" in exchange for Aon's retention of RLI's reinsurance business. Pursuant to this commitment, Aon promised "to produce $25 million in retail premium production for the product line."

373. In addition, Aon Re provided direct financial incentives for the Broker Defendants steer reinsurance to preferred reinsurers in exchange for Contingent Commissions. For example, Aon Re paid an additional bonus to its brokers "as an incentive for having placed business with Kemper last year." According to the Aon AG Complaint, "Kemper paid Aon Re reinsurance contingent commissions of $557,934.50 in 1997, $570,000 in 1998 and $2.5 million in 1999."

107

VI.     **GLOBAL OR CENTRALIZED BROKING AS A MEANS TO FURTHER
        DEFENDANTS' CONSPIRATORIAL CONDUCT**

374.    In direct contrast to the purported purpose of the Broker Defendants -- to provide
honest and unbiased advice to plaintiffs and members of the class -- Defendants created
centralized internal departments for the purpose of monitoring, facilitating and advancing the
collection of Contingent Commissions, kickbacks and other improper fees though the conduct
described above.  For example, in the early 1990s, defendant Marsh created a "global broking"
division designed to bring the marketing of its insurance brokering services under one
centralized department -- the Global Broking Division ("Global Broking").  Global Broking was
used to facilitate the placement of all of Marsh's major business lines.  The Global Broking
Division was based out of Marsh's Manhattan office, with regional centers set up around the
country to ensure that field agents and brokers were placing their clients' insurance business with
Marsh's Global Broking's preferred carriers, including Defendants AIG, Hartford, ACE and
Munich.  Upon establishment of the Global Broking Division, Marsh centralized its Contingent
Commission Agreements, replacing separate agreements previously negotiated by Marsh's
regional and local offices and other undisclosed fees paid by Insurer Defendants.  In fact, and
contrary to their fiduciary duties owed to plaintiffs and members of the Class, Marsh's former
Chairman of U.S. Operations, Robert Newhouse stated that Global Broking's purpose was to
maximize revenues and that all Marsh employees and field agents were to abide by the Global
Broking system.

375.    To better centralize and control its relationships with the Insurer Defendants,
Global Broking took control of marketing and business development from field brokers and
agents and imposed stringent control over the placement of all insurance business with Marsh's
clients.  Global Broking internally rated the Insurer Defendants based on the contingent

commission and other undisclosed fee agreements.  Global Broking provided its brokers a "tiering report" to provide **"clear direction on who [we] are steering business to and who we are steering business from."**  *See* Marsh AG Complaint.  By no longer allowing the field agents and brokers to deal directly with the insurance carriers, Marsh was able to conceal its conduct, including the fraudulent agreements and bid-rigging (described above) with its preferred insurance companies, including Insurer Defendants.

376.    To counteract the adverse effect of Marsh's Global Broking on the revenues received by Marsh field agents and brokers, Marsh initiated a "revenue repatriation" program under which certain of Global Broking's national Contingent Commissions were shared with local and regional offices.  Nevertheless, when certain field agents, brokers and employees did not follow Global Broking's directives, they were reprimanded.  The head of Global Broking's Excess Casualty group responded in June 2003 to an employee in Marsh's Seattle office, criticizing her for placing insurance directly with a carrier on behalf of a client, thus denying a contingent commission to Global Broking:  "The GB repatriation dollars are no small component of your office's budget.  You have lowered that amount with this placement.  You may want to consider [that] in the future."

377.    Likewise, Willis as did many of the other Broker Defendant's established similar divisions or operating units.  As set forth in the Willis Assurance of Discontinuance, Willis had a division called Willis Global Markets North America to assist it in maximizing its profits and revenues through such undisclosed fees and used this entity to centralize the receipt of Contingent Commissions.

378.    According to the NY Attorney General's Complaint, Aon restructured its ARS business to consolidate control over Contingent Commissions in the hands of a small group of

executives known as the Syndication Group.  The leading executives were Robert Needle

(Managing Principal of Retail Syndication), Carol Spurlock (Managing Director of Commercial

Risks) and Ronald Moyer (Managing Director of Financial Services).  The Syndication Group

organized each product line into national units and oversaw the placements and negotiations of

new national Contingent Commissions agreements.

379.    To accomplish the goal of maximizing amounts received under the Contingent

Commission Agreements, the Syndication Group identified certain insurers as premier or

strategic market partners based on the profitability of the relationship with the insurer rather than

the quality and price of the financial product offered by the insurer.

380.    Aon's primary focus on maximizing profit was clearly articulated in a June 2001

proposed Syndication Master Plan.  The proposed master plan for the Private Risk Management

Group called for rating clients either A, B and C.  The proposal stated that "[c]leansing the

system of "C" clients is imperative, if we are to implement our new strategy."  C clients are the

lower premium clients and, as a result, less profitable for Aon and its strategic market partners.

Finally, the proposal noted the need to have a uniform contingent commission policy with the

strategic partners.

381.    Similarly, Wells Fargo Contingent Commission Agreements were executed and

monitored at corporate offices, not at individual outlying offices.

382.    Moreover, Hilb's national office negotiated all commission agreements with

favored insurance companies.  When a regional office put together a bid-proposal, Hilb's

national office would intervene and ensure that business was going to one of the favored

insurance companies.  A former Hilb employee who worked in one of Hilb's regional offices

often received calls from Hilb's national benefits administrator instructing him to place business

110

with one of the favored insurance companies when putting bids together.  This former employee noted that local producers resented the intervention of the national office as none of the up-front or contingent commissions ever "trickled down to their level."

383.   Similarly, BB&T's Contingent Commission Agreements were routed through BB&T's centralized marketing department where only the heads of marketing at BB&T, not the account managers, were allowed to contact insurers.

384.   Hub also had a corporate function in place whereby influence was exerted over regional brokers to steer clients to preferred insurers in order to maximize the company's contingent commissions.  According to a former Hub employee who worked as a business manager for three Hub offices, Hub would send monthly statements to the local managers stating the level of commitment Hub had made to certain insurers, and detailing how much business the local manager had given to that insurer to date, and that Hub needs to fulfill its commitment. According to this former employee, "business is driven to specific carriers because of commitments made on contingent arrangements."  Hub's vice-president of marketing, John Curran, was responsible for entering into such contingent arrangements with carriers such as Chubb, St. Paul Travelers, and Hartford, and ensuring that Hub maximized its Contingent Commission Agreements with the insurers.  As Curran explained in an insurance industry journal entitled *Rough Notes* "[w]e work with insurance companies to develop a business plan that will help us both accomplish our objectives."  According to the former Hub employee, "[i]f John Curran calls and says what have you got to give to Chubb – [some people] may place a piece of business with Chubb because John asked them to."

385.   Indeed, when brokers at Hub failed to meet certain directives at the corporate level, they were let go by the company.  For instance, Hub fired employees who refused to

jeopardize their relationships with a local client in order to fulfill Contingent Commission

Agreements made at the corporate level.

## VII.   GOVERNMENTAL INVESTIGATIONS RELATING TO DEFENDANTS' PRACTICES

386.    A very large number of state attorneys general, and federal and state regulators

have commenced investigations concerning the Defendants' practices identified above.

Settlement agreements or assurances of discontinuances have been entered into by the New York

Attorney General, together with the Superintendent of Insurance of New York as well as various

other state attorneys generals including Connecticut and Minnesota, with three Broker

Defendants:  Marsh, Aon, and Willis.  Spitzer, along with the Director of Illinois Division of

Insurance and other state agencies similarly entered into a Stipulation and Consent Order with a

fourth Broker Defendant - Defendant Arthur J. Gallagher & Co.  Each settlement agreement or

assurance of discontinuance agreed to a prohibition of receiving contingent compensation from

insurers and required, among other things, that each Broker Defendant provide full disclosure of

all forms of compensation received from insurers.

387.    Additionally, subpoenas have been issued to almost every other defendant

including, Ace, AIG, Aon, AXIS, BB&T, Brown & Brown, Chubb, CAN, Gallagher, General

Re, Hartford, Hilb, Hub, Liberty Mutual, Marsh, St. Paul Travelers, Twin City Fire, USI, Wells

Fargo, Willis and Zurich, NFP.

### A.    Suspensions, Terminations or Resignations of Defendants' Employees

388.     Numerous employees of both the Broker Defendants and Insurer Defendants

have either been fired or have resigned from their positions.

389.    On October 20, 2004, Marsh suspended four employees whose names surfaced as

a result of the investigations into the company's Contingent Commissions and bid-rigging

practices.  The four employees include William Gilman, executive director of marketing at
Marsh Global Broking and a managing director of Marsh; Greg Doherty, a senior vice president
in Marsh Global Broking's excess casualty division; Edward McNenney, a brokerage executive;
and Samantha Gilman, Mr. Gilman's daughter.  William Gilman, Doherty, McNenney, and
Glenn Boshardt, a Marsh executive, were ultimately dismissed from Marsh.

390.    On October 25, 2004, Marsh's Chairman and Chief Executive Officer, Jeffrey
Greenberg resigned.  Michael G. Cherkasky replaced Mr. Greenberg as Chairman and Chief
Executive Officer.

391.    On November 8, 2004, Roger E. Egan, President and Chief Operating Officer of
Marsh Inc., Marsh's risk and insurance services subsidiary, Christopher M. Treanor, Marsh
Inc.'s Chairman and Chief Executive Officer of Global Placement; and William L. Rosoff,
Senior Vice President and General Counsel of Marsh, were asked to step down from their
positions.

392.    On November 18, 2004, Marsh announced that five members of Marsh's Board of
Directors -- Mathis Cabiallavetta, Peter Coster, Ray J. Groves, Charles A. Davis, and A.J.C.
Smith -- were stepping down from the company.

393.    Patricia Abrams, a Vice President at ACE who pleaded guilty to charges of
attempting to restrain trade and competition on October 14, 2004 and admitted to submitting
inflated bids to Marsh on ACE's behalf, was fired from the company after having been
previously suspended.  Geoffrey G. Gregory, the president of ACE's casualty risk unit in
Philadelphia was also fired in early November.  Also in November 2004, ACE announced that it
suspended three unidentified employees, noting that the three worked on a team that did business
principally with Marsh's Global Broking Unit.  On January 4, 2004, ACE's CEO, Susan Rivera,

the recipient of an email from Mr. Gregory warning of possible anti-competitive practices, resigned from ACE.

394.    On November 11, 2004, Hartford fired two of its Los Angeles underwriters in connection with governmental investigations into Hartford's bid-rigging practices.

395.    On May 27, 2005, HRH announced that the company's president, Robert B. Lockhart, resigned as president and from the company's board of directors.  Another HRH employee has been fired and one placed on leave, in connection with an internal investigation in response to queries from regulators that the company may have received Contingent Commissions.

**B.    Certain Defendants Discontinue the Use of Contingent Commission Agreements**

396.    As a result of the governmental investigations into Defendants' compensation practices, several Defendants including, *inter alia*, Marsh, Aon, Gallagher, Willis, Liberty Mutual, AIG and ACE have discontinued the use of Contingent Commission Agreements and instituted other reforms designed to avoid conflicts of interests in the brokerage industry.  For example, as part of its settlement with Spitzer, Marsh agreed to a prohibition of receiving contingent compensation from insurance carriers.  Marsh also agreed to provide clients with a comprehensive disclosure of all forms of compensation received from insurers and to adopt and implement company-wide, written standards of conduct for the placement of insurance.

322.    Likewise, as part of their settlement agreement and/or assurances of discontinuance with various state attorney generals, Aon, Willis and Gallagher agreed to prohibition of accepting or requesting of any insured any Contingent Compensation.

114

397.    Similarly, following the filing of the New York Attorney General Complaint against Marsh, ACE/INA posted a response to the following question by the National Association of Insurance Commissioners' "NAIC" inquiry into contingent commissions:

> Q:     What additional requirements or safeguards should be in place to prohibit a producer from placing its own financial or other interests ahead of its customer's interests in an insurance transaction?

> A:     Ban on contingent commissions, brokers should be required to elect compensation from the insured or insurer; not both; all standard commission should be disclosed by broker and should be included on the copy of the policy delivered to the insured.

*Available at* http://www.naic.org/committee_activities/executive/docs/Comace2-2.doc. (last visited July 31, 2005).

398.    A Letter from Paul Mattera, Senior Vice President of Liberty Mutual, to NAIC Commissioner M. Diane Koken, dated March 9, 2005 regarding contingent commission is by far most telling of how a ban on contingent commissions is necessary to avoid conflicts of interests in the brokerage industry.  The letter states the following, in relevant part:

> Liberty Mutual believes that the cornerstone of good regulation and sound business practice is transparency in insurance transactions.  Our customers deserve to know whether the producer they are working with represents them or us.  All parties must be clear as to "who represents whom."  Thus, we support the application of disclosure requirements to agents and brokers. The integrity of the entire transaction flows from a clear understanding of whose interests are represented by the producer.

> …

> Prohibition of Broker Contingent Commissions

> While appropriate broker disclosure is in the customer's interest – and we strongly support it – disclosure alone is not enough.  Brokers can be conflicted when they receive payment from both buyers and sellers.  In fact, the concerns that give rise to the "best available insurer" requirements, discussed above, are ameliorated when contingent commissions are out of the buying and selling equation.

115

> Liberty Mutual believes broker "contingent commissions" are inappropriate and should be prohibited.  Brokers should be compensated only by a fee paid by the customer or by standard commission paid by the insurer as a percentage of the total cost of the policy purchased.  While there is nothing inherently wrong with contingent commissions, PSAs and MSAs, when brokers are paid in a manner that can lead to a misalignment of broker interests, the value of contingent commissions is outweighed by the need to assure an open, unconflicted market. In these circumstances, disclosure alone is not an adequate remedy.

*Available at* http://www.naic.org/committee_activities/executive/docs/Comlibmut2.doc. (last visited July 31, 2005)

399.    Although some Defendants have discontinued the use of contingent commissions following the investigators by various state attorney generals and other regulatory agencies, many other Defendants continue to use Contingent Commissions.  For example, BB&T and HRH recently disclosed that they will continue to accept Contingent Commissions.  BB&T has stated the following:

> We still have this under review, but we intend to play by the rules…If the rules remain the same – that profit-sharing agreements are legal – then we'll continue to accept them.

*Available at* http://www.sellingwithtechnology.com/newsletter%202005/articles%20021405/Insurance2.htm (last visited July 31, 2005)

400.    BB&T has also stated, in a conference call, that not only would BB&T not discontinue Contingent Commissions in the wake of recent scandals, but that it stood ready to become a beneficiary of the issues that are going on in the insurance business" since Marsh was expected to lose market share.

401.    Indeed, HRH recently stated that they will "not renounce[e] overrides or contingent commissions."  They stated that they will "stop accepting volume based contingent commissions but will continue to take profit-based contingent commissions from insurers."

402.    Similarly, Hub will continue to accept Contingent Commissions as it recently

detailed on its official website:

Will Hub continue to accept contingents and volume overrides from insurers?

A:      Yes, for now. We believe we are conducting our business fairly and do not
see a need to implement a significant change in our business practices
independent of any industry-wide changes.  However, we must be sure, if we
make any changes, that new practices are widely accepted and valued by
customers. As we indicated earlier, our task force is working to address a variety
of scenarios with respect to this issue. That being said, the situation is fluid - so
we will keep you informed.

*Available at* http://www.us.hubinternational.com/dbw/index.cfm?fuseaction=content.ga (last

visited July 31, 2005)

## VIII.   CONSPIRACY ALLEGATIONS

403.    Defendant Brokers and Insurers have engaged in a common course of conduct and

conspiracy which creates a conflict of interest clearly at odds with the Defendants'

representations regarding the services they will provide as well as the duties inherent in the

relationship which exists between Class Members and Defendants

404.    Although Defendants have created the illusion of a competitive market for

insurance, the selection, pricing and placement of the insurance products at issue in this litigation

were, in fact, the result of Defendants' collusion.

405.    Broker Defendants and the Insurer Defendants have engaged in a conspiracy and

common course of conduct to restrain trade in the market for commercial insurance and

reinsurance.  Broker Defendants and Insurance Defendants conspired to rig bids, allocate

customers and to maintain the price of insurance products in these markets at supra-competitive

levels.

406.    The purpose and effect of the conspiracy is to increase compensation for the

Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or

117

eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.  As a result of the conspiracy, Insurer Defendants did not have to compete for insurance business on the basis of price or other terms and this lack of competition enabled them to charge premiums that were higher than they would have been absent the conspiracy.  The Broker Defendants, in turn, profited from the conspiracy through the receipt of Contingent Commissions and Wholesale Payments.

407.    The actions of the Defendants were all part of the same conspiracy to increase revenues and to suppress or eliminate competition.  Each Defendant was aware of the general nature of this scheme and its role in facilitating the objectives of the conspiracy.  Each enjoyed supra-competitive profits as a result of the conspiracy, to the detriment of plaintiffs and the other Class.

408.    Each Defendant and co-conspirator has agreed to the overall objective of the conspiracy.

409.    Each Defendant and co-conspirator has committed acts of fraud in furtherance of this conspiratorial objective.

410.    In furtherance of the conspiracy, Defendants and co-conspirators have agreed to implement and use the same or similar devices and fraudulent tactics against their clients, including plaintiffs and other members of the Class.

411.    The same pattern and cause of conduct and activity and similar facts, which evidence the existence of a conspiracy, exist among all Defendants and co-conspirators, including:

118

(a)      similar agreements and policies among the Broker Defendants and the Insurer Defendants regarding concealment of their conflicts of interest and wrongful conduct;

(b)      similar agreements between the Broker Defendants and their clients which include either no language or vague, misleading, and incomplete language purporting to disclose compensation, steering, and bid-rigging arrangements between and among the Broker Defendants and the Insurer Defendants;

(c)      similar agreements regarding Contingent Commissions and other payments between and among the Broker Defendants and the Insurer Defendants;

(d)      similar practices regarding the reporting of their arrangements;

(e)      similar agreements regarding Wholesale Payments between and among Defendants;

(f)      similar tactics for steering customers to the Insurer Defendants and for placement of the Insurer Defendants products.

(g)      similar tactics for coercing submission of false bids, client steering, allocation of markets and customers, and stabilizing, raising or maintaining premium prices above competitive levels;

(h)      similar tactics for boycotting or refusing to deal with insurers who refused to participate in the conspiracy.

412.    Defendants would not have undertaken the practices alleged herein absent an agreement among all Defendants.  Paying brokers significant additional commissions is not in the best individual interest of the Insurer Defendants.  The Insurer Defendants would agree to pay such fees only with a corresponding agreement of increased premium revenue and the participation of other insurers.

119

413.    This parallel conduct would not have occurred absent either an explicit or tacit agreement among the Defendants.  It is not in the individual best interests of an Insurance Company to pay huge Contingent Commissions to the Brokers with which it does business.  The Insurance companies would only agree to do so if they knew that these payments would be offset by the increased premiums they could charge on account of not having to compete for business and only if they knew that other insurance companies were likewise paying such commissions.

414.    The conspiracy has been conducted, implemented and facilitated through various mechanisms including direct communications among Defendants, sharing of information between Defendants and movement of employees among Defendants as well as through other means such as industry trade groups such as the Council of Insurance Agents and Brokers ("the Council") and its predecessors the National Association of Insurance Brokers ("NAIB"), the National Association of Casualty and Surety Executives (NASCE) and the National Association of Casualty and Surety Agents ("NASCA") as well as the American Insurance Association ("AIA") and the Reinsurance Association of America ("RAA").

415.    The Council, founded in 1913 to represent larger metropolitan agencies, represents the top tier of commercial insurance brokers in the United States in both property/casualty and the benefits sectors.  Defendants are well-represented in the Council.  The Council's Executive Committee includes representatives of the Broker Defendants including Marsh, Willis, Aon, Gallagher, Hilb, Brown & Brown, BB&T, Hub and USI.  The Council's Officers and Board of Directors includes representatives of the Broker Defendants also.

416.    The Council's roots have always been in larger commercial agents and brokers. In fact, only the top one percent of all agents and brokers qualify for membership.  The Council's members place 80 percent – well over $90 billion – of all U.S. insurance products and services

120

protecting business, industry, government and the public-at-large.  In 2004, The Council's Board

of Directors and officers included representatives of Broker Defendants Acordia, Aon, BB&T,

Brown & Brown, Gallagher, HRH, Marsh, USI and Willis.

417.    Professional networking is at the very heart of the Council and is a major part of

who the Council is and what it does.  The Council orchestrates the industry's most important

market meetings.  The Council's meetings "change the shape and scope and add to the bottom

line of already successful brokerage firms."

418.    The Council of Insurance Company Executives, a standing Committee of the

Council, is comprised of more than 65 of the top commercial insurers.  Collectively, CICE

members are responsible for writing more than 75% of the nation's commercial business

insurance premiums.  The CICE was formed when the Council assumed the "managerial

operations of its insurance association counterpart" -- the National Association of Casualty &

Surety Executives.  Prior to this time, the National Association of Casualty & Surety Executives

and the Council (previously the National Association of Casualty & Surety Agents) had met

annually and had worked cooperatively in addressing common problems.  In 2004, the leadership

of the CICE included members of Insurer Defendants ACE, Chubb and Zurich.

419.    The Council of Insurance Company Executives co-hosts the annual Insurance

Leadership Forum at the Greenbrier, an annual meeting that connects all the leaders of the

commercial insurance marketplace – the CEOs of the top insurance carriers and the leading

executives from the top one percent of agencies and brokerages.  Considered the premier

meeting of the commercial insurance marketplace, the event brings together all sectors of the

market including primary carriers, reinsurers, top intermediaries and third party firms.  For high-

volume commercial insurance brokerages and for every major carrier, there is no better place to

take the pulse of the commercial insurance market-place – and build important business bonds – than "Greenbrier."

420.    Attendees include executives from the brokerage firms and virtually every leading commercial insurer and reinsurer.  The Council boasts that this is the best opportunity in the industry for insurers, agents and brokers to meet and focus on where the industry is and where it is heading.

421.    The meetings allow for small breakout conferences, ad hoc meetings and social interaction among all those attending.  According to Council materials, Council members do more business at the Greenbrier meeting than at any other five-day stretch of the year.  Any industry leader truly concerned with the workings of the industry's production sector, with profitability, and with client service must attend.

422.    Attendees are able to hold discussions and meetings that they would not otherwise have the ability to hold.  The bottom line is that Council members go to the Greenbrier to have strategic conversations with insurers.

423.    In addition to the industry meetings at the Greenbrier, the Council also facilitates many other forums including the National Insurance Leadership Symposium, chief financial officer workshops and conferences where CFO's of the major brokerage firms focus on the fundamental and strategic issues facing their businesses, Executive Liaison Committees, email exchanges, market surveys, the sharing of operating results and financial analyses, insurance company sponsorships, peer-to-peer networking, as well as teleconferences between brokers and insurers.  For 2004-2005, the Council scheduled at least 17 different meetings across the country for its members, groups within its ranks and/or insurance carrier representatives.  The Council has also issued at least eight "Member Alerts" related to Contingent Commissions and related

lawsuits, including an October 17, 2005 member update on "Council strategy", lawsuit summary

and question and answer discussion.

424.    The Council operates in a strategic alliance with the American Insurance

Association ("AIA") and the Reinsurance Association of America. ("RAA"). Together, these

three associations lead the commercial insurance marketplace.

425.    The American Insurance Association is the leading property-casualty insurance

trade organization in the United States. The Reinsurance Association of America is the trade

association of reinsurers and reinsurance brokers.

426.    AIA and RAA have both acted as host sponsors for the Greenbrier conferences

and have been members of the Council's Leadership Circle, recognized industry leaders that

underwrite the Council's networking and professional development initiatives. The Council,

AIA and RAA also co-sponsor the National Insurance Leadership Symposium.

427.    There were other industry conferences where Defendants were present. At a 2003

Annual Executive Conference of the Property/Casualty Industry insurance company executives,

including Insurer Defendants, agreed to hold the line on underwriting discipline and resist any

temptation to prematurely soften property/casualty market prices. For example, James Schiro,

CEO of Zurich Financial Services said "Let's not get pulled into a soft market. We are not ready

for a soft market and cannot afford one.... Let's not get in a race for marketshare." Oversight

Hearing on the Insurance Brokerage Practices, Including Potential Conflicts of Interest and the

Adequacy of the Current Regulatory Framework Before the Senate Committee on Governmental

Affairs (Nov. 16, 2004) (statement of J. Robert Hunter, Director of Insurance) at 4. He added

that "we need several more years of profitability" --a theme emphasized again and again by

CEOs speaking at the meeting. Maurice Greenberg, chairman and CEO of AIG, added that "in a

123

risk business like ours, the pursuit of marketshare at the expense of earnings is not a great strategy." *Id*. at 4.  Following Mr. Greenberg's speech, William Berkley, chairman and CEO of W.R. Berkley Corp. said during a discussion of capital strength that "the goal of any carrier should not just be to sell more insurance and get bigger, but to make more money on a risk-adjusted basis. That requires adequate pricing." *Id*. at 4-5.  Or, as Mr. Greenberg put it, "We absolutely need to hold the line on pricing and not give in to excessive competition." *Id*. at 5. This mindset meant that insurers would support a system of protecting incumbents on placements obtained as a result of kickbacks and tie-ins, because the incumbencies were spread around to different insurers by the conspiring brokers and insurers in a way that ensured profits for all.

428.    As a result of Defendants' conspiracy, plaintiffs and other members of the Class have made payments for insurance and other "services" beyond what those payments would have been absent the conspiracy.  In addition, plaintiffs and Class members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

429.    In the alternative, the Broker Defendants and the Insurer Defendants are engaged in a number of separate but parallel conspiracies, each involving a Defendant Broker and the insurance companies with which each had Contingent Commission Agreements.

430.    A minimum of six broker-centered conspiracies exist, including the following:

(a)    A Marsh-centered conspiracy consisting of Marsh and the insurance companies with which Marsh had Contingent Commission Agreements;

(b)    An Aon-centered conspiracy consisting of Aon and the insurance companies with which Aon had Contingent Commission Agreements;

(c)     A Willis-centered conspiracy consisting of Willis and the insurance companies with which Willis had Contingent Commission Agreements;

(d)     A Gallagher-centered conspiracy consisting of Gallagher and the insurance companies with which Gallagher had Contingent Commission Agreements;

(e)     A Wells Fargo-centered conspiracy consisting of Wells Fargo and the insurance companies with which Wells Fargo had Contingent Commission Agreements; and

(f)     A USI-centered conspiracy consisting of USI and the insurance companies with which USI had Contingent Commission Agreements.

431.    The purpose and effect of each of these conspiracies is to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the Class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.  As a result of the conspiracies, Insurer Defendants did not have to compete for insurance business on the basis of price or other terms, and this lack of competition enabled them to charge premiums that were higher than they would have been in the absence of the conspiracy.

432.    Each Defendant and member of each such conspiracy, with knowledge and intent, has agreed to the overall objective of the conspiracy.

433.    Each Defendant and member of each such conspiracy, with knowledge and intent, has committed acts of fraud in furtherance of this conspiratorial objective.

434.    As a result of Defendants' conspiracy, plaintiffs and other members of the Class have made payments for insurance and other "services" beyond what those payments would have been absent each such conspiracy.  In addition, plaintiffs and other Class members have lost the opportunity to purchase insurance in a free and truly competitive marketplace.

IX.     **RACKETEERING ALLEGATIONS**

435.    Plaintiffs, Class members and Defendants are "persons" within the meaning of 18 U.S.C. §1961(3).

A.      **THE COMMERCIAL INSURANCE ENTERPRISE**

436.    Based upon plaintiffs' current knowledge, the following persons constitute a group of persons and entities associated-in-fact, hereinafter referred to in this Complaint as "The Commercial Insurance Enterprise":

(a)     Defendants;

(b)     wholesale entities, whether affiliated with Defendants or not, that receive Wholesale Payments and transmit those payments in whole or in part to Defendants;

(c)     other insurers that pay Contingent Commissions, Wholesale Payments, and other kickbacks;

(d)     other brokers, intermediaries, agents and other insurance entities that received or have received undisclosed compensation;

(e)     other entities that engage or have engaged in steering practices and/or bid rigging;

(f)     other insurance brokerage and insurance industry groups, such as the Council of Insurance Agents and Brokers, the American Insurance Association and Reinsurance Association of America.

437.    The Commercial Insurance Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce.

438.    Through the Commercial Insurance Enterprise, Defendants engage in consensual decision making regarding the implementation of their fraudulent scheme and function as a continuing unit for the common purpose of increasing compensation for the Broker Defendants

126

as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.

439.    While Defendants participate in and are members of the Commercial Insurance Enterprise, they also have an existence separate and distinct from the enterprise.

440.    To establish and maintain the system of Contingent Commissions and Wholesale Payments, while concealing the system and the inherent conflicts of interest it creates, Defendants were required to participate in an exercise to control the Commercial Insurance Enterprise.

441.    Defendants have participated in the conduct of and have controlled and operated the affairs of the Commercial Insurance Enterprise in at the least the following ways:

(a)    by entering into Contingent Commission Agreements and Wholesale Payment arrangements with the expectation and understanding that both the brokers and insurers would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

(b)    by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

(c)    by sharing and disseminating information;

(d)    by formalizing relationships among participants in the Commercial Insurance Enterprise for the payment of undisclosed compensation;

(e)    by uniformly recommending insurance products of the Insurer Defendants in order to maximize the value of Contingent Commissions and Wholesale Payments;

127

(f)      by sharing management and employees between and among the Broker Defendants and the Insurer Defendants;

(g)      by utilizing and supporting industry associations as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme;

(h)      by submitting false bids or misleading information to customers regarding the existence and nature of compensation paid by insurers to the Broker Defendants; and

(i)      by engaging in bid-rigging.

442.    The Commercial Insurance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

**B.     THE BROKER-CENTERED COMMERCIAL INSURANCE ENTERPRISES**

443.    Alternatively, each Defendant Broker and the insurers with which each had Contingent Commission Agreements constitute a group of persons and entities associated-in-fact, referred to collectively in this Complaint as the "Broker-Centered Commercial Insurance Enterprises."  At a minimum, six such enterprises exist:

(a)      Marsh and the insurers, including the Insurer Defendants, with which Marsh has Contingent Commission Agreements;

(b)      Aon and the insurers, including the Insurer Defendants, with which Aon had Contingent Commission Agreements;

(c)      Willis and the insurers, including the Insurer Defendants, with which Willis had Contingent Commission Agreements;

(d)      Gallagher and the insurers, including the Insurer Defendants, with which Gallagher had Contingent Commission Agreements;

(e)      Wells Fargo and the insurers, including the Insurer Defendants, with which Wells Fargo had Contingent Commission Agreements; and

(f)      USI and the insurers, including the Insurer Defendants, with which USI had Contingent Commission Agreements.

444.    Through each of Broker-Centered Commercial Insurance Enterprises, Defendants engage in consensual decision making regarding the implementation of their fraudulent scheme and function as a continuing unit for the common purpose of increasing compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business of the members of the class by, *inter alia*, allocating customers, dividing territories, bid-rigging and tying.

445.    While Defendants participate in and are members of the Broker-Centered Commercial Insurance Enterprises, they also have an existence separate and distinct from the enterprise.

446.    To establish and maintain the system of Contingent Commissions and Wholesale Payments, while concealing the system and the inherent conflicts of interest it creates, Defendants were required to participate in the conduct of an to exercise control over the Broker-Centered Commercial Insurance Enterprises.

447.    Defendants have participated in the conduct of and have controlled and operated the affairs of the Broker-Centered Commercial Insurance Enterprises in at the least the following ways:

(a)      by entering into Contingent Commission Agreements and Wholesale Payment arrangements with the expectation and understanding that both the brokers and insurers

would recognize increased profits and that the insurers would have insurance business steered to them without having to compete for that business;

(b)     by developing and competing in an artificial competitive bidding process designed to create the appearance of competition where none existed;

(c)     by sharing and disseminating information;

(d)     by formalizing relationships among participants in the Broker-Centered Commercial Insurance Enterprises for the payment of undisclosed compensation;

(e)     by uniformly recommending insurance products of the Insurer Defendants in order to maximize the value of Contingent Commissions and Wholesale Payments;

(f)     by sharing management and employees between and among the Broker Defendants and the Insurer Defendants;

(g)     by utilizing and supporting industry association as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme;

(h)     by submitting false bids or misleading information to customers regarding the existence and nature of compensation paid by insurers to the Broker Defendants; and

(i)     by engaging in bid-rigging.

448.     Broker-Centered Commercial Insurance Enterprises have an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

## C.     PREDICATE ACTS

449.     Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) or 18 U.S.C. §1343 (relating to wire fraud).  As set forth below,

Defendants have engaged in and continue to engage in conduct violating each of those laws to effectuate their scheme.

450.   In addition, to make their scheme effective, each of the Defendants sought to and did aid and abet the others in violating the above laws within the meaning of 18 U.S.C. §2, which conduct is also indictable under 18 U.S.C. §§1341 and 1343.

451.   To carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or official depositories of the United States Postal Service matter and things to be delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to agreements, correspondence, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Defendants' wrongful conduct, claims, responses to claims, and coverage letters.

452.   To carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. §1343, transmitted and received by wire, matters and things including but not limited to agreements, policy materials, binders, fee schedules, payments from clients and insurers that constituted the fruits of Defendants' wrongful conduct, claims, responses to claims, and coverage letters.

453.   The matters and things sent by Defendants via the Postal Service, commercial carrier, wire or other interstate electronic media include, among other things:

(a)      materials containing false and fraudulent misrepresentations that the Broker Defendants would represent their clients' interests in the placement of insurance on behalf of plaintiffs;

(b)      materials that concealed or failed to disclose the existence and effect of the Contingent Commissions, Wholesale Payments and other undisclosed compensation, including the conflict of interests that Defendants had created between their legal and contractual obligations to their clients and the economic disincentives to honor those obligations;

(c)      materials intended to induce clients to accept more expensive and lesser coverage from the Insurer Defendants than might be otherwise available in order to maximize premium revenue and to maximize Contingent Commissions, Wholesale Payments and other undisclosed compensation to the Broker Defendants;

(d)      materials intended to discourage clients from the aggressive pursuit of claims;

(e)      materials designed to encourage acceptance of new coverage or renewal of existing coverage;

(f)      materials designed to create the appearance of an active, open and free marketplace for pairmony coverage and reinsurance; and

(g)      invoices and payments related to Defendants' improper scheme.

454.    Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiffs and members of the Class and assuring Insurer Defendants of the placement of business and enabling Broker Defendants to collect Contingent Commissions and Wholesale Payments.  Specifically these misrepresentations, acts of concealment, and failures to disclose include but are not limited to:

132

(a)      the Broker Defendants holding themselves out as trusted advisors that can help clients assess their insurance needs and locate the best available insurance while in fact participating in self dealing, conspiratorial activities aimed at maximizing profits at the expense of their clients;

(b)      the Broker Defendants' representations that they work for their clients and not the insurance companies;

(c)      the failure to disclose Defendants' conflicts of interest;

(d)      the failure to disclose that an integral part of the Broker Defendants' business philosophy is to promote the interest of insurance companies to maximize revenue from Contingent Commission Agreements.  Therefore, the Broker Defendants steer business to favored insurance companies from whom they receive higher fees;

(e)      the failure to disclose the nature of the services the Broker Defendants provide in order to warrant their commissions;

(f)      the failure to disclose that the Broker Defendants are directing their clients to insurance companies based not on their merit, but rather on the web of kickbacks and Contingent Commissions and other undisclosed compensation they are able to structure; and

(g)      the contrivance, falsification and/or manipulation of insurance bids to create the illusion of a competitive bidding process.

455.      Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and plaintiffs and members of the Class relied on the misrepresentations and omissions.  Plaintiffs and the Class rely upon Defendants' misrepresentations and omissions by retaining and continuing to retain the Broker

Defendants and by purchasing Defendants' insurance products at higher rates than plaintiffs would have paid absent Defendants' conspiracy.

456.    As a result, plaintiffs and members of the Class have been injured in their business or property by Defendants' overt acts of mail and wire fraud and each others' acts of mail and wire fraud in furtherance of the conspiracy.

## X.    PATTERN OF RACKETEERING ACTIVITY

457.    Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5), by committing at least two acts of racketeering activity (*i.e.*, indictable violations of 18 U.S.C. §§1341 and 1343 as described above) within the past ten years.

458.    In fact, each Defendant has committed or aided and abetted in the commission of thousands of acts of racketeering activity.

459.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including plaintiffs and members of the Class.

460.    The multiple acts of racketeering activity, which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other in furtherance of the scheme described above, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as described in 18 U.S.C. §1961(5).

## XI.    RICO VIOLATIONS

461.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...."

462.    Through the pattern of racketeering activity described above, Defendants have conducted or participated in the conduct of the affairs of the enterprises.

463.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

464.    Defendants' conspiracy to increase compensation for the Broker Defendants as well as the premium revenues for the Insurer Defendants and to reduce or eliminate competition for the insurance coverage business by abandoning their duties to plaintiffs and the Class, and to conceal their fraudulent scheme as described above accordingly violates 18 U.S.C. §1962(d).

## XII.    FRAUDULENT CONCEALMENT

465.    Defendants have affirmatively and fraudulently concealed their unlawful scheme, course of conduct and conspiracy from plaintiffs.  In fact as part of the conspiracy, Defendants went to great lengths to create the appearance of a competitive market for insurance coverage, where no such competitive market existed.

466.    Plaintiffs had no knowledge of Defendants' fraudulent scheme and could not have discovered that Defendants' representations were false or that Defendants had concealed information and materials until shortly before the filing of this Complaint.

467.    Accordingly, the statute of limitations has been tolled with respect to any claims which plaintiffs have brought as a result of the unlawful and fraudulent conduct alleged herein.

## XIII.    THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF

468.    Defendants' fraudulent scheme to reduce of eliminate competition, earn higher premium revenues and profit from Contingent Commissions and profit from Wholesale Payments creates an ongoing problem that will continue to cause plaintiffs and members of the Class economic losses and threaten their ability to obtain appropriate insurance coverage at a fair price.  A monetary judgment in this case will only compensate plaintiffs and members of the

135

Class for past losses.  A monetary judgment will not restore competition, nor cure the inherent and irreconcilable conflict of interest created by the existence of the Contingent Commissions and Wholesale Payments.

469.   No individual client of any of the Defendants has an adequate remedy, neither administrative nor at law, to recapture future losses associated with Defendants' fraudulent and conspiratorial conduct, breaches of contract and fiduciary duty, and other duties set forth above. The cost of pursuing such claims on an ongoing basis exceeds the amount at issue.

470.   Even a class action such as is asserted in this case is a significant undertaking that cannot be pursued on a regular or ongoing basis.

471.   Because of the need for multiple lawsuits to redress repeated and ongoing wrongs, Plaintiffs have no adequate remedy at law and would suffer irreparable harm in the absence of injunctive relief.

## XIV.   <u>CLASS ACTION ALLEGATIONS</u>

472.   Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B), (b)(2), and/or (b)(3), on behalf of a nationwide Class consisting of all persons who between August 26, 1994 and the date of Class certification engaged the services of any one of the Broker Defendants or any of their subsidiaries or affiliates to obtain advice with respect to the procurement or renewal of insurance, and who entered into or renewed a contract of insurance with one of the Insurer Defendants.  Excluded from the Class are Defendants and their officers, affiliates, directors and employees.

473.   All Class members have suffered injury to their business or property by reason of Defendants' unlawful conduct as alleged herein.

474.   There are numerous questions of law and fact that are common to the claims of all class members as set forth above, including:

136

(a)     whether Defendants entered into a contract, combination or conspiracy to manipulate the price and other terms of insurance contract bids submitted to plaintiffs and Class members and to allocate the market for the sale of insurance;

(b)     whether Defendants' contract, combination or conspiracy had the purpose and effect of reducing and unreasonably restraining competition in the sale of insurance;

(c)     the identity of the participants to the contract, combination or conspiracy;

(d)     the duration and extent of the contract, combination or conspiracy alleged in the Complaint;

(e)     the mechanisms used to accomplish the contract, combination or conspiracy;

(f)     whether Defendants' conduct violated §1 of the Sherman Act;

(g)     the effect upon and the extent of injuries sustained by plaintiffs and Class members;

(h)     the appropriate type and/or measure of damages; and

(i)     whether injunctive relief is necessary to restrain future violations.

(j)     whether the Broker Defendants contracted to receive Contingent Commissions from insurers based on the volume of business Defendants placed with those insurers;

(k)     whether the Broker Defendants further arranged to receive Wholesale Payments from insurers indirectly through affiliated wholesale entities based on the business Defendants placed with those insurers;

137

(l)      whether the Contingent Commissions created conflicts of interests for the Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual duties to their clients;

(m)      whether the Wholesale Payments created conflicts of interests for the Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual duties to their clients;

(n)      whether the Broker Defendants directed their subsidiaries and affiliates to engage in the conduct alleged in this Complaint;

(o)      whether the Broker Defendants fraudulently concealed or failed to disclose the Contingent Commissions and/or their amount, extent, and impact upon the Broker Defendants' ability to fulfill their legal and contractual duties to their clients;

(p)      whether Defendants fraudulently concealed or failed to disclose the Wholesale Payments and/or their amount, extent, and impact upon the Broker Defendants' ability to fulfill their legal and contractual duties to their clients;

(q)      whether Defendants' conduct breached their fiduciary duties to their clients;

(r)      whether Defendants engaged in mail and/or wire fraud;

(s)      whether Defendants engaged in a pattern of racketeering activity;

(t)      whether the Enterprises alleged herein are enterprises within the meaning of 18 U.S.C. §1961(4);

(u)      whether Defendants conducted or participated in the conduct of the affairs of the Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

(v)      whether Defendants conspired to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d);

(w)      whether Defendants' overt and predicate acts in furtherance of a conspiracy and/or direct acts in violation of 18 U.S.C. §1962(a) and (c) proximately caused injury to plaintiffs' and the Class members' business or property;

(x)      whether plaintiffs and the Class are entitled to injunctive, declaratory, and/ or other equitable relief;

(y)      whether plaintiffs and the Class are entitled to an award of attorneys' fees and expenses against Defendants;

(z)      whether Defendants violated RICO and state laws;

(aa)      whether Defendants fully disclosed the nature and extent of Contingent Commissions relating to the products and services.

475.    All Class members have been damaged by the wrongful conduct of Defendants to the extent that, through the Contingent Commissions and Wholesale Payments, steering, bid-rigging and/or tying arrangements, Defendants have given themselves an incentive to distort the applicable marketplace for insurance products and services, increase premiums paid, fail to reduce such payments, impair coverage for clients, reduce client claims and/or cause clients to be placed with insurers of inferior financial quality or stability and acted on that incentive.

476.    The Class is so numerous that joinder of its members is impracticable.

477.    The exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery.

478.    The Class is ascertainable in that the names and addresses of all Class members can be identified in business records maintained by the Defendants.

479.    There are numerous questions of law and fact that are common to the claims of all Class members as set forth above, including:

(a)    whether the Broker Defendants contractually agreed to represent the best interests of their clients in connection with insurance matters;

(b)    whether the Broker Defendants represented and marketed themselves as representing the best interests of their clients in connection with insurance matters;

(c)    whether the Broker Defendants contracted to receive Contingent Commissions from insurers based on the volume of business Defendants placed with those insurers;

(d)    whether the Broker Defendants further arranged to receive Wholesale Payments from insurers indirectly through affiliated wholesale entities based on the business Defendants placed with those insurers;

(e)    whether the Contingent Commissions created conflicts of interests for the Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual duties to their clients;

(f)    whether the Wholesale Payments created conflicts of interests for the Broker Defendants that gave them a compelling disincentive to fulfill their legal and contractual duties to their clients;

(g)    whether the Broker Defendants directed their subsidiaries and affiliates to engage in the conduct alleged in this Complaint;

(h)    whether the Broker Defendants fraudulently concealed or failed to disclose the Contingent Commissions and/or their amount, extent, and impact upon the Broker Defendants' ability to fulfill their legal and contractual duties to their clients;

(i)        whether Defendants fraudulently concealed or failed to disclose the Wholesale Payments and/or their amount, extent, and impact upon the Broker Defendants' ability to fulfill their legal and contractual duties to their clients;

(j)        whether Defendants' conduct breached their legal and contractual duties to their clients;

(k)        whether Defendants engaged in mail and/or wire fraud;

(l)        whether Defendants engaged in a pattern of racketeering activity;

(m)        whether the Commercial Insurance Enterprise or the Commercial Insurance Broker Centered Enterprise is an enterprise within the meaning of 18 U.S.C. §1961(4);

(n)        whether Defendants conducted or participated in the conduct of the affairs of the BIE through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

(o)        whether Defendants conspired to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d);

(p)        whether Defendants' overt and predicate acts in furtherance of a conspiracy and/or direct acts in violation of 18 U.S.C. §1962(a) and (c) proximately caused injury to plaintiffs' and the Class members' business or property;

(q)        whether plaintiffs and the Class are entitled to injunctive, declaratory, and/ or other equitable relief;

(r)        whether plaintiffs and the Class are entitled to an award of attorneys' fees and expenses against Defendants;

(s)        whether the Broker Defendants steered their clients to the Insurer Defendants in return for Contingent Commissions and Wholesale Payments from the Insurer Defendants;

(t)      whether Defendants engaged in bid-rigging, involving the use of phony insurance quotes to plaintiffs and members of the Class;

(u)      whether the Insurer Defendants increased the premiums and/or reduced coverage and claim payments because of Contingent Commissions and Wholesale Payments;

(v)      whether the Insurer Defendants profited as a result of the increased premiums and/or reduced coverage and claims paid; and

(w)      whether the Insurer Defendants maintained or increased market share as a result of the unlawful activities described herein.

480.     The claims of the representative plaintiffs are typical of those of the Class they represent.

481.     Plaintiffs' antitrust claims are typical of the claims of Class members.  All of the Class members, like plaintiffs, sustained antitrust injury as a result of Defendants' conspiracy, contract or combination in restraint of trade.  Plaintiffs and Class members were damaged as a result of purchasing insurance directly from the Insurer Defendants or their co-conspirators at prices that were artificially inflated by the market allocation and bid-rigging scheme.

482.     The claims of the representative plaintiffs and the Class members have a common origin and share a common basis.  Their claims originate from the same illegal, fraudulent conspiracy on the part of Defendants and Defendants' acts in furtherance of that conspiracy, including Defendants' own fraudulent conduct. as well as conduct by Defendants that aided and abetted the fraudulent conduct of others.

483.     As such, plaintiffs have been the victim of one or more of the illegal practices of one or more of the Defendants set forth above, including the false representations that Defendants would act in the best interest of plaintiffs in the procurement of insurance for

142

plaintiffs, concealing and failing to disclose the existence, extent and effect of the Contingent Commissions and the Wholesale Payments, the conflict of interests that Defendants created for themselves through the receipt of those Contingent Commissions and Wholesale Payments, steering and bid-rigging.

484.    The named plaintiffs state claims for which relief may be granted that are typical of those of the absent Class members.  If brought and prosecuted individually, the claims of each Class member would require proof of the same material and substantive facts, and seek the same relief.

485.    The claims of the named plaintiffs are sufficiently aligned with the interests of the absent members of the Class to ensure that the universal claims of the Class will be prosecuted with diligence and care by plaintiffs as representative of the Class.

486.    The representative plaintiffs will fairly and adequately protect the interests of the Class and has no interests adverse to or which directly and irrevocably conflict with the interests of other members of the Class.

487.    The representative plaintiffs are willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

488.    The interests of the named plaintiffs are co-extensive with and not antagonistic to those of the absent Class members.

489.    The named plaintiffs have retained the services of counsel who are experienced in complex insurance and antitrust class action litigation, will adequately prosecute this action, and will assert, protect and otherwise represent the named plaintiffs and all absent Class members.

490.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(1)(B).  The prosecution of separate actions by individual members of the Class would

143

create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

491.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards of conduct and varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow the existence of inconsistent and incompatible rights within the Class.

492.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that Defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

493.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the questions of law and fact that are common to members of the Class predominate over any questions affecting only individual members.

494.    Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint in that:

(a)    individual claims by the Class members will be impracticable as the costs of pursuit would far exceed what any one plaintiff or Class member has at stake;

(b)    as a result, very little litigation has been commenced over the controversies alleged in this Complaint and individual members are unlikely to have interest in prosecuting and controlling separate individual actions;

144

(c)      the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

(d)      the proposed class action is manageable.

## FIRST CLAIM FOR RELIEF

**(Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18 U.S.C. §1962(c)
All Plaintiffs Against all Defendants)**

495.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

496.     This cause of action is brought pursuant to 18 U.S.C. §1964(c)

497.     As set forth above, in violation of 18 U.S.C. §1962(d), Defendants have conspired to violate 18 U.S.C. §1962(c).

498.     As a direct and proximate result, plaintiffs and members of the Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, plaintiffs and members of the Class have been injured by, among other things, paying excessive premiums for insurance and other "services" than they would have in the absence of the conspiracy.

499.     Accordingly, Defendants are liable to plaintiffs and the Class for three times their actual damages as proven at trial plus interest and attorneys' fees.

## ALTERNATIVE FIRST CLAIM FOR RELIEF

**(Conspiracy to Violate 18 U.S.C. §1962(d) by Conspiring to Violate 18 U.S.C. §1962(c) Against All Defendants involved in Broker-Centered Conspiracies)**

500.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

145

501.    This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(d) by the following plaintiffs against the following Defendants:

(a)    Marsh's customers against the Defendants involved in the Marsh -centered conspiracy;

(b)    Aon's customers against the Defendants involved in the Aon-centered conspiracy;

(c)    Willis's customers against the Defendants involved in the Willis-centered conspiracy;

(d)    Gallagher's customers against the Defendants involved in the Gallagher-centered conspiracy;

(e)    Wells Fargo's customers against the Defendants involved in the Wells Fargo-centered conspiracy; and

(f)    USI's customers against the Defendants involved in the USI-centered conspiracy.

502.    As set forth above, in violation of 18 U.S.C. §1962(d), Defendants in each Commercial Insurance Broker-Centered Conspiracy have conspired to violate 18 U.S.C. §1962(c).

503.    As a direct and proximate result, plaintiffs and members of the Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, plaintiffs and members of the Class have been injured by, among other things, paying excessive premiums for insurance and other "services" than they would have in the absence of the conspiracy.

146

504.    Accordingly, Defendants in each of the Commercial Insurance Broker-Centered Enterprises are liable to plaintiffs and the Class for three times their actual damages as proven at trial plus interest and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### (Violation of 18 U.S.C. §1962(c)
### All Plaintiffs Against all Defendants)

505.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

506.    This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(c).

507.    As set forth above, in violation of 1962(c), Defendants have conducted or participated in the conduct of the affairs of the Commercial Insurance Enterprise through a pattern of racketeering activity.

508.    As a direct and proximate result, plaintiffs and members of the Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, plaintiffs and members of the Class have been injured in their business or property by, among other things, paying more for insurance and other "services" than they would have paid absent Defendants' illegal conduct.

509.    Accordingly, Defendants are liable to plaintiffs and the Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## ALTERNATIVE SECOND CLAIM FOR RELIEF

### (Violation of 18 U.S.C. §1962(c) Against all Defendants in the Commercial Insurance Broker-Centered Enterprises)

510.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

511.     This cause of action is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(c) by the following plaintiffs against the following Defendants:

(a)      Marsh's customers against Defendants associated-in-fact in the Marsh-centered Enterprise;

(b)      Aon's customers against Defendants associated-in-fact in the Aon-centered Enterprise;

(c)      Willis's customers against Defendants associated-in-fact in the Willis-centered Enterprise;

(d)      Gallagher's customers against Defendants associated-in-fact in the Gallagher-centered Enterprise;

(e)      Wells Fargo's customers against Defendants associated-in-fact in the Wells Fargo-centered Enterprise; and

(f)      USI's customers against Defendants associated-in-fact in the USI-centered Enterprise.

512.     As set forth above, in violation of 1962(c), Defendants in each of the Commercial Insurance Broker-Centered Enterprises have conducted or participated in the conduct of the affairs of the Enterprises through a pattern of racketeering activity.

513.     As a direct and proximate result, plaintiffs and members of the Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, plaintiffs and members of the Class have been injured in their business or property by, among other things, paying more for insurance and other "services" than they would have absent Defendants' illegal conduct.

514.     Accordingly, Defendants in each of the Commercial Insurance Broker-Centered Enterprises are liable to plaintiffs and the Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## THIRD CLAIM FOR RELIEF

### (Injunctive and Declaratory Relief under RICO by All Plaintiffs against all Defendants)

515.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

516.     This claim arises under 18 U.S.C. §1964(a), which authorizes this Court to enjoin violations of 18 U.S.C. §1962, and under 28 U.S.C. §2201, which authorizes associated declaratory relief.

517.     As set forth in plaintiffs' First and Second Claims for Relief and in this Amended Complaint, Defendants have violated 18 U.S.C. §§1962(c) and (d) on a continuing basis and unless enjoined, will continue to do so in the future.

518.     As set forth above, plaintiffs have no adequate remedy at law to prevent future violations of 18 U.S.C. §§1962(c) and (d) in the absence of injunctive and declaratory relief.

519.     Accordingly, plaintiffs are entitled to declaratory relief declaring the illegal and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d), and injunctive relief enjoining Defendants from further violations of 18 U.S.C. §§1962(c) and (d).

### ALTERNATIVE THIRD CLAIM FOR RELIEF

### (Injunctive and Declaratory Relief under RICO against Defendants in the Commercial Insurance Broker-Centered Enterprises)

520.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

149

521.    This claim arises under 18 U.S.C. §1964(a), which authorizes this Court to enjoin violations of 18 U.S.C. §1962, and under 28 U.S.C. §2201, which authorizes associated declaratory relief.

522.    As set forth in plaintiffs' First and Second Claims for Relief and in this Amended Complaint, Defendants in the Commercial Insurance Broker-Centered Enterprises and Commercial Insurance Broker-Centered Conspiracies have violated 18 U.S.C. §§1962(c) and (d) on a continuing basis and unless enjoined, will continue to do so in the future.

523.    As set forth above, plaintiffs have no adequate remedy at law to prevent future violations of 18 U.S.C. §§1962(c) and (d) in the absence of injunctive and declaratory relief.

524.    Accordingly, the following plaintiffs are entitled to declaratory relief declaring the illegal and conspiratorial conduct alleged herein to be in violation of 18 U.S.C. §§1962(c) and (d), and injunctive relief enjoining the following Defendants from further violations of 18 U.S.C. §§1962(c) and (d):

(a)    Marsh's customers against Defendants associated-in-fact in the Marsh-centered Enterprise and involved in the Marsh-centered conspiracy;

(b)    Aon's customers against Defendants associated-in-fact in the Aon-centered Enterprise and involved in the Aon-centered conspiracy;

(c)    Willis's customers against Defendants associated-in-fact in the Willis-centered Enterprise and involved in the Willis-centered conspiracy;

(d)    Gallagher's customers against Defendants associated-in-fact in the Gallagher-centered Enterprise and involved in the Gallagher-centered conspiracy;

(e)    Wells Fargo's customers against Defendants associated-in-fact in the Wells Fargo-centered Enterprise and involved in the Wells-Fargo centered conspiracy; and

(f)     USI's customers against Defendants associated-in-fact in the USI-centered

Enterprise and involved in the USI-centered conspiracy.

## FOURTH CLAIM FOR RELIEF

### (Violation of Section 1 of the
### Sherman Act Against all Defendants)

525.     Plaintiffs repeat and reallege the allegations contained above as if fully stated

herein.

526.     Defendants and their co-conspirators have engaged in unlawful contracts,

combination or conspiracies in restraint of interstate trade and commerce in violation of section 1

of the Sherman Act, 15 U.S.C. §1.

527.     Specifically, Defendants have entered into agreements the purpose and effect of

which were to suppress or eliminate competition, and to raise, raise, maintain or stabilize prices

for insurance products in the United States at artificially high levels.

528.     Each of the Defendants has engaged in one or more overt acts in furtherance of

the unlawful contract, combination or conspiracy.  Defendants implemented the unlawful scheme

by the following acts, among others:

- Agreeing to steer business to Insurer Defendants in exchange for undisclosed fees,
  kickbacks and other payments from the Insurer Defendants;

- Agreeing, through the use of collusive, fictitious and inflated bid prices and other
  terms of sale, to manipulate bids for insurance contracts;

- Agreeing to engage in activities that give the appearance of competition where
  none existed;

- Agreeing to allocate insurance customers among the Insurer Defendants, denying
  such customers – such as plaintiffs and other members of the Class – the benefits
  of free and open competition; and

- Agreeing on the prices and the other terms to be submitted in collusive, fictitious
  and inflated bids for contracts for insurance;

529.    Defendants' activities as described above do not constitute the business of insurance regulated under state law, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured.  Moreover, the acts of the Broker Defendants in establishing and enforcing Contingent Commission Agreements in the insurance industry, constitutes coercion within the meaning of the McCarran-Ferguson Act.  In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants, in essence, participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

530.    Defendants' unlawful conspiracy constitutes a per se violation of section 1 of the Sherman Act, 15 U.S.C. §1.  Alternatively, their conduct violates the Sherman Act under a rule of reason analysis.

531.    Various persons, not named as Defendants, participated as co-conspirators in the violations alleged, and performed acts and made statements in furtherance of that conspiracy.

532.    The aforesaid combination and conspiracy had the following effects, among others:

- prices paid by plaintiffs and Class members for insurance were, raised, maintained or stabilized at artificially high, supra-competitive levels; and

- plaintiffs and other members of the Class were deprived of the benefits of free and open competition in the purchase of insurance.

533.    As a direct and proximate result of the contracts, combinations or conspiracies alleged in this Amended Complaint, plaintiffs and other members of the Class were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

## FIFTH CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Act Against Defendant Participants in the Commercial Insurance Broker-Centered Conspiracies)

534.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

535.    This claim is brought by the following plaintiffs against the following Defendants:

(a)    Marsh customers against the participants in the Marsh-centered broker conspiracy;

(b)    Aon customers against the participants in the Aon-centered broker conspiracy;

(c)    Willis customers against the participants in the Willis-centered broker conspiracy;

(d)    Gallagher customers against the participants in the Gallagher-centered broker conspiracy;

(e)    Wells-Fargo customers against the participants in the Wells-Fargo centered broker conspiracy; and

(f)    USI customers against the participants in the USI centered-broker conspiracy.

536.    Each Defendant in the broker-centered conspiracies has, with their co-conspirators, engaged in unlawful contracts, combination or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

537.    Specifically, these Defendants have entered into agreements with their co-conspirators, the purpose and effect of which were to suppress or eliminate competition, and to

153

raise, maintain or stabilize prices for insurance products in the United States at artificially high levels.

538.    Each of these Defendants has engaged in one or more overt acts in furtherance of the unlawful contract, combination or conspiracy.  Defendants implemented the unlawful scheme by the following acts, among others:

- Agreeing to steer business to the Insurer defendant participants in the conspiracy in exchange for undisclosed fees kickbacks and other payments from the Insurer Defendants;

- Agreeing, though the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

- Agreeing to engage in activities that give the appearance of competition where none existed;

- Agreeing to allocate insurance customers among the conspiring Insurer Defendants, denying such customers – such as plaintiffs and other members of the Class – the benefits of free and open competition; and

- Agreeing on the prices and the other terms to be submitted in collusive, fictitious and inflated bids for contracts for insurance;

539.    Defendants' activities as described above do not constitute the business of insurance regulated under state law, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured.  Moreover, the acts of the Broker Defendants in establishing and enforcing Contingent Commission Agreements in the insurance industry, constitutes coercion within the meaning of the McCarran-Ferguson Act.  In addition, by engaging in the bid-rigging scheme described above, the Insurer Defendants, in essence, participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

540.     Defendants' unlawful conspiracy constitutes a *per se* violation of section 1 of the Sherman Act, 15 U.S.C. § 1.  Alternatively, their conduct violates the Sherman Act under a rule of reason analysis.

541.     Various persons, not named as defendants, participated as co-conspirators in the Broker-centered conspiracies, and performed acts and made statements in furtherance of that conspiracy.

542.     The aforesaid combinations and conspiracies each had the following effects, among others:

- price competition among the Insurer Defendants and their co-conspirators for insurance was restrained and suppressed;

- prices paid by plaintiffs and Class members for insurance were raised, maintained or stabilized at artificially high, supra-competitive levels; and

- plaintiffs and other members of the Class were deprived of the benefits of free and open competition in the purchase of insurance.

543.     As a direct and proximate result of the Commercial Insurance Broker-Centered contracts, combinations and conspiracies alleged in this Amended Complaint, plaintiffs and other members of the Class were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

## SIXTH CLAIM FOR RELIEF

### (State Antitrust Laws against all Defendants)

544.     Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

545.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Alaska Stat. §§45.50.562 et seq.

155

546.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401 et seq.

547.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arkansas Stat. Ann. §§4-75-309 et seq. and Arkansas Stat. Ann. §§4-75-201 et seq.

548.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§16700 et seq., §§16720 et seq., and Cal. Bus. & Prof. Code §§17000 et seq.

549.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Colorado Rev. Stat. §§6-4-101 et seq.

550.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Connecticut Gen. Stat. §§35-26 et seq.

551.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code Ann. §§28-4503 et seq.

552.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Delaware Code Ann. tit. 6, §§2103 et seq.

553.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Florida Stat. §§501.201 et seq.

554.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Georgia Code Ann. §§16-10-22 et seq. and Georgia Code Ann. §§13-8-2 et seq.

555.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Rev. Stat. §§480-1 et seq.

156

556.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Idaho Code §§48-101 et seq.

557.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Comp. Stat. §§10/1 et seq.

558.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Indiana Code Ann. §§24-1-2-1 et seq.

559.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1 et seq.

560.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 et seq.

561.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kentucky Rev. Stat. §§367.175 et seq., and relief can be granted in accordance with Kentucky Rev. Stat. §446.070.

562.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Louisiana Rev. Stat. §§51:137 et seq.

563.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 et seq.

564.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maryland Code Ann. Title 11, §§11-201 et seq.

565.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Massachusetts Ann. Laws ch. 92 §§1 et seq.

566.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§445.773 et seq.

567.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§325D.52 et seq.

568.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§75-21-1 et seq.

569.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Missouri Stat. Ann. §§416.011 et seq.

570.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Montana Code Ann. §§30-14-101 et seq.

571.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§59-801 et seq.

572.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§598A et seq.

573.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Rev. Stat. Ann. §§356:1 et seq.

574.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Jersey Stat. Ann. §§56:9-1 et seq.

575.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§57-1-1 et seq.

576.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law §340 et seq., and N.Y. Ins. Law § 2316(a).

577.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 et seq.

578.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat.. §§75-1 et seq.

579.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§51-08.1-01 et seq.

580.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ohio Rev. Code §§1331.01 et seq.

581.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oklahoma Stat. tit. 79 §§203(A) et seq.

582.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Rev. Stat. §§646.705 et seq.

583.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Rhode Island Gen. Laws §§6-36-1 et seq.

584.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Carolina. Code §§39-3-10 et seq.

585.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§37-1 et seq.

586.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§47-25-101 et seq.

587.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Texas Bus. & Com. Code §§15.01 et seq.

588.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§76-10-911 et seq.

589.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§2453 et seq.

590.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Virginia Code §§59-1-9.2 et seq.

591.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Washington Rev. Code §§19.86.010 et seq.

592.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§47-18-1 et seq.

593.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 et seq.

594.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wyoming Stat. §§40-4-101 et seq.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty Against the
### Broker Defendants on behalf of their Customers)

595.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

596.    Each Broker defendant was a fiduciary to its own client plaintiffs.  Because of this, the plaintiffs placed confidence and trust in their Brokers, authorized them to exercise discretionary functions for their benefit, and relied on their superior expertise in risk management and the procurement of insurance.

597.    The Broker Defendants accepted and solicited that confidence and trust as described above.

160

598.    As fiduciaries of plaintiffs and members of the Class, the Broker Defendants were obligated to discharge their duties solely in the interests of their plaintiff clients, and specifically to find the best available coverage at the best price, exercising good faith and fair dealing, full and fair disclosure, care and loyalty to the interests of their client plaintiffs.

599.    Defendants have breached those duties by acting in their own pecuniary interests in disregard of the interests of their client plaintiffs as set forth above.

600.    Accordingly, Defendants are liable for breach of fiduciary duty to their client plaintiffs,  and are liable for the damages suffered by plaintiffs in an amount to be proved at trial.

601.    Plaintiffs and members of the Class are further entitled to an accounting by Defendants with respect to all Contingent Commissions, Wholesale Payments and other improper payments received by Defendants.

## EIGHTH CLAIM FOR RELIEF

### (Aiding and Abetting Breach of
### Fiduciary Duty Against Insurer Defendants)

602.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

603.    As alleged above, a fiduciary relationship existed between each Broker and its Plaintiff clients.

604.    The Broker Defendants breached this fiduciary duty by acting in their own pecuniary interests and in disregard of the interests of their client plaintiffs as set forth above.

605.    The Insurer Defendants knowingly participated in that breach by, among other things, engaging in the fraudulent and conspiratorial conduct described above.

606.    Plaintiffs have suffered damages proximately caused by the Insurer Defendants' participation in the Broker Defendants' breach.

607.    Accordingly, the Insurer Defendants are liable to plaintiffs for damages in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF

### (Unjust Enrichment Against all Defendants)

608.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

609.    Defendants have benefited from their unlawful acts by receiving excessive premium revenue and enormous Contingent Commissions and Wholesale Payments.  These payments have been received by Defendants at plaintiffs' expense, under circumstances where it would be inequitable for Defendants to be permitted to retain the benefit.

610.    Plaintiffs and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit conferred upon Defendants in the form of their excessive premium revenue and contingent commission and wholesale payments from which plaintiffs and the other Class members may make claims on a pro rata basis for restitution. .

**WHEREFORE**, plaintiffs, demand judgment against Defendants as follows:

(a)    Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying plaintiff as the representative of the Class, and designating its counsel as counsel for the Class;

(b)    A declaration that Defendants have committed the violations alleged herein;

(c)    On its First Claim for Relief, against Defendants jointly and severally in an amount equal to treble the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses.  On the Alternative First Claim for Relief against the Defendants in each Commercial Insurance Broker Centered Conspiracy

162

jointly and severally in an amount equal to treble the amount of damages suffered by plaintiffs

and members of the Class as proven at trial plus interest and attorneys' fees and expenses;

(d)     On its Second Claim for Relief, against Defendants jointly and severally in

an amount equal to treble the amount of damages suffered by plaintiffs and members of the Class

as proven at trial plus interest and attorneys' fees and expenses.  On the Alternative Second

Claim for Relief against the Defendants in each Commercial Insurance Broker Centered

Enterprise jointly and severally in an amount equal to treble the amount of damages suffered by

plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and

expenses;

(e)     On its Third Claim for Relief, for a declaratory judgment declaring the

anticompetitive and conspiratorial conduct alleged herein to be in violation of 18 U.S.C.

§§1962(c) and (d) and injunctive relief enjoining Defendants from further violations of 18 U.S.C.

§§1962(c) and (d).  On the Alternative Third Claim for Relief against the Defendants in each

Commercial Insurance Broker Centered Conspiracy and Enterprise for a declaratory judgment

declaring the anticompetitive and conspiratorial conduct alleged herein to be in violation of 18

U.S.C. §§1962(c) and (d) and injunctive relief enjoining Defendants from further violations of 18

U.S.C. §§1962(c) and (d);

(f)     On its Fourth Claim for Relief against Defendants jointly and severally in

an amount equal to treble the amount of damages suffered by plaintiffs and members of the Class

as proven at trial plus interest and attorneys' fees and expenses;

(g)     On its Fifth Claim for Relief, against Defendant participants in the

Commercial Insurance Broker-Centered Conspiracies jointly and severally in an amount equal to

treble the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses;

(h)     On its Sixth Claim for Relief, against the Defendants jointly and severally a judgment, for damages sustained by plaintiffs and members of the Class, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages plus interest and attorneys' fees and expenses;

(i)     On its Seventh Claim for Relief, against the Broker Defendants jointly and severally in the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest;

(j)     On its Eighth Claim for Relief, against Insurer Defendants jointly and severally, in the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest;

(k)     On it Ninth Claim for Relief, against Defendants jointly and severally, for disgorgement of Defendants' unjust enrichment and/or imposing a constructive trust upon Defendants' ill-gotten monies, freezing Defendants' assets, and requiring Defendants to pay restitution to plaintiffs and the Class and to restore to all funds acquired by means of any act or practice declared by this Court to be unlawful, deceptive, fraudulent or unfair, and/or a violation of laws, statutes or regulations;

(l)     An injunction preventing Defendants from engaging in future anticompetitive practices;

(m)     Costs of this action, including reasonable attorneys fees and expenses; and

(n)     Any such other and further relief as this Court deems just and proper.

164

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Dated: August 15, 2005

**MILBERG WEISS BERSHAD
  & SCHULMAN, LLP**

    /s/ *Edith M. Kallas*
Edith M. Kallas
Joseph P. Guglielmo
J. Douglas Richards
Michael M. Buchman
Elizabeth Rosenberg
Lili R. Sabo
One Pennsylvania Plaza
New York, NY  10119-0165
Tel.:  212-594-5300
Fax:  212-868-1229


**MILLER FAUCHER AND CAFFERTY LLP**

    /s/ *Bryan C. Clobes*
Bryan C. Clobes
Ellen Meriwether
Michael S. Tarringer
Melody Forrester
Timothy Fraser
One Logan Square
18th and Cherry Streets, Suite 1700
Philadelphia, PA  19103
Tel.:  215-864-2800
Fax:  215-864-2810

*Plaintiffs' Co-Lead Counsel*

**FOOTE, MEYERS, MIELKE & FLOWERS**
Robert M. Foote
416 South Second Street
Geneva, IL 60134
Tel.:  630-232-6333

**LEVIN, FISHBEIN, SEDRAN & BERMAN**
Howard J. Sedran
510 Walnut Street - Suite 500
Philadelphia, PA  19106

165

Tel.:  215-592-1500
Fax:  215-592-4663

*Plaintiffs' Executive Committee*

**LITE DEPALMA GREENBERG
  & RIVAS, LLC**
Allyn Z. Lite
Bruce D. Greenberg
Michael E. Patunas
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel.:  973-623-3000
Fax:  973-623-0858

*Liaison Counsel for Commercial Insurance
Litigation*

**BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.**
Andrew S. Friedman
Elaine A. Ryan
Patricia N. Hurd
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Tel.:  602-274-1100
Fax:  602-274-1199

*Liaison Counsel for Employee-Benefit Litigation*

**ALEXANDER, HAWES & AUDET, LLP**
William M. Audet
300 Montgomery Street, Ste. 400
San Francisco, CA 94104
Tel.:  415-982-1776
Fax:  415-576-1776

**BEELER, SCHAD & DIAMOND, P.C.**
Lawrence W. Schad
James Shedden
Michael S. Hilicki
Tony H. Kim
332 South Michigan Avenue, Suite 1000
Chicago, IL 60604
Tel.: 312-939-6280
Fax:  312-939-4661

166

**BONSIGNORE & BREWER**
Robert J. Bonsignore
Robin Brewer
Daniel D'Angelo
23 Forest Street
Medford, MA 02155
Tel.: 781- 391-9400
Fax: 781- 391-9496

**CHAVEZ LAW FIRM, P.C.**
Kathleen C. Chavez
P.O. Box 772
Geneva, IL 60134
Tel.:  630-232-4480
Fax:  630-232-8265

**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles
Michael D. Gottsch
361 West Lancaster Avenue
Haverford, PA  19041
Tel.:  610-642-8500
Fax:  610-649-3633

**COHN, LIFLAND, PEARLMAN,
   HERRMANN & KNOPF**
Peter S. Pearlman
Park 80 Plaza West One
Saddle Brook, NJ  07663
Tel.:  201-845-9600
Fax:  201-845-9423

**COOPER & KIRKHAM, P.C.**
Josef D. Cooper
655 Montgomery Street, 17th Floor
San Francisco, CA 94111
Tel.:  415-788-3030
Fax:  415-882-7040

**DRUBNER HARTLEY & O'CONNOR**
James E. Hartley, Jr.
Gary O'Connor
Charles S. Hellman
500 Chase Parkway, 4th Floor
Waterbury, CT 06708

167

Tel.:  203-753-9291
Fax:  203-753-6373

**FINE KAPLAN & BLACK**
Roberta D. Liebenberg
1835 Market Street, 28th Floor
Philadelphia, PA 19103
Tel.:  215-567-6565
Fax:  215-568-5872

**FINKELSTEIN, THOMPSON**
  **& LOUGHRAN**
Burton H. Finkelstein
L. Kendall Satterfield
Halley F. Ascher
1050 30th Street, N.W.
Washington, D.C.  20007
Tel.:  202-337-8000
Fax:  202-337-8090

**THE FURTH FIRM, LLP**
Michael P. Lehman
Thomas P. Dove
Julio J. Ramos
Jon T. King
225 Bush Street, Suite 1500
San Francisco, CA 94104
Tel.:  415-433-2070
Fax:  415-982-2076

**GRAY, WEISS AND WHITE**
Mark K. Gray
1200 PNC Plaza
Louisville, KY 40202
Tel.:  502-585-2060

**HANSON BRIDGES MARCUS VLAHOS**
  **RUDY LLP**
David J. Miller
333 Market Street, 23rd Floor
San Francisco, CA 94105
Tel.:  415-777-3200
Fax:  415-541-9366

168

**HANZMAN & CRIDEN, P.A.**
Michael E. Criden
Kevin B. Love
220 Alhambra Circle, Suite 400
Coral Gables, FL 33134
Tel.:  305-357-9000
Fax:  305-357-9050

**JANSSEN, MALLOY, NEEDHAM,**
  **MORRISON, REINHOLTSEN &**
  **CROWLEY, LLP**
W. Timothy Needham
730 Fifth Street, Post Office Drawer 1288
Eureka, CA 95502
Tel.:  707-445-2071
Fax:  707-445-8305

**JEFFREY LOWE, P.C.**
Jeff Lowe
8235 Forsyth Blvd., Ste. 1100
St. Louis, MO 63105
Tel.:  314-721-3668
Fax:  314-678-3401

**KLAFTER & OLSEN LLP**
Jeffrey A. Klafter
1311 Mamaroneck Avenue, Suite 220
White Plains, NY  10602
Tel.:  914-997-5656
Fax:  914-997-2444

**LARRY D. DRURY, LTD.**
Larry D. Drury
Two North LaSalle Street
Suite 700
Chicago, IL 60602
Tel.:  312-346-7950
Fax:  312-346-5777

**LAW OFFICES OF FRANCIS O. SCARPULLA**
Francis O. Scarpulla
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Tel.:  415-788-7210
Fax:  415-788-0707

169

**LAW OFFICES OF GARY H. SAPOSNIK**
Gary H. Saposnik
105 West Madison Street, Ste. 700
Chicago, IL 60602
Tel: 312- 357- 1777
Fax: 312- 606- 0413

**LAW OFFICES OF RANDY R. RENICK**
Randy R. Renick
128 North Fair Oaks Avenue, Ste. 204
Pasadena, CA 91103
Tel.:  626-585-9608
Fax:  626-585-9610

**LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS, LLP**
John J. Stoia, Jr.
Theodore J. Pintar
Bonny E. Sweeney
James D. McNamara
Mary Lynne Calkins
Rachel L. Jensen
401 B. Street, Suite 1600
San Diego, CA 92101
Tel.:  619-231-1058
Fax:  619-231-7423

**LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS, LLP**
Samuel H. Rudman
200 Broadhollow Road, Suite 406
Melville, NY 11747
Tel.:  631-367-7100
Fax:  631-367-1173

**LEVINE DESANTIS, LLC**
Mitchell B. Jacobs
150 Essex St., Ste. 303
Millburn, New Jersey 07041
Tel: 973-376-9050
Fax: 973-379-6898

**LOOPER, REED & MCGRAW**
James L. Reed, Jr.
Travis Crabtree
1300 Post Oak Blvd. Ste. 2000

170

Houston, TX 77056
Tel.: 713- 986- 7000
Fax: 713- 986- 7100

**MAGER WHITE & GOLDSTEIN, LLP**
Jayne Arnold Goldstein
2825 University Drive, Suite 350
Coral Springs, FL 33065
Tel.:  954-341-0844
Fax:  954-341-0855

**MEREDITH COHEN GREENFOGEL
   & SKIRNICK, P.C.**
Steven J. Greenfogel
Daniel B. Allanoff
Architects Building, 22nd Floor
117 South 17th Street
Philadelphia, PA 19103
Tel.:  215-564-5182
Fax:  215-569-0958

**SAVERI & SAVERI, INC.**
Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
One Eleven Pine, Suite 1700
San Francisco, CA  94111-5619
Tel.:  415-217-6810
Fax:  415-217-6813

**SHAHEEN & GORDON**
William Shaheen
D. Michael Noonan
140 Washington St., 2nd Fl.
P.O. Box 977
Dover, NH  03821-0977
Tel.: 603-749-5000
Fax: 603-749-1838

**SHERMAN, SILVERSTEIN, KOHL,
   ROSE & PODOLSKY**
Alan C. Milstein
Jeffrey P. Resnick
Fairway Corporate Center
4300 Haddonfield Road, Ste. 311

171

Pennsauken, NJ 08109
Tel: 856- 662- 0700
Fax: 856- 488- 4744

**SPARKMAN-ZUMMACH, P.C.**
Martin W. Zummach
P.O. Box 266
Southaven, MS 38671
Tel.:  662-349-6900
Fax:  662-349-6800

**TRUJILLO RODRIGUEZ & RICHARDS, LLP**
Lisa J. Rodriguez
8 Kings Highway West
Haddonfield, NJ 08033
Tel: 856-795-9002

**WHATLEY  DRAKE, LLC**
Joe R. Whatley, Jr.
Charlene Ford
Richard Rouco
Richard Frankowski
2323 Second Avenue North
Birmingham, AL 35203
Tel.:  205-328-9576
Fax:  205-328-9669

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**
Mary Jane Edelstein Fait
Adam J. Levitt
656 West Randolph Street
Suite 500 West
Chicago, IL 60661
Tel.:  312-466-9200
Fax:  312-466-9292

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**
Fred Taylor Isquith
270 Madison Avenue, 10th Floor
New York, NY 10016
Tel.:  212-545-4600
Fax:  212-545-4653

172

**ZWERLING, SCHACHTER &**
**ZWERLING, LLP**
Robert S. Schachter
Stephen L. Brodsky
Justin M. Tarshis
41 Madison Avenue
New York, NY 10010
Tel.: 212-223-3900
Fax: 212-371-5969

*Attorneys for Plaintiffs*

173