Bryan L. Clobes
Ellen Meriwether
**MILLER FAUCHER AND CAFFERTY LLP**
One Logan Square
18th and Cherry Streets, Suite 1700
Philadelphia, PA 19103

Edith M. Kallas
Joseph P. Guglielmo
**MILBERG WEISS BERSHAD & SCHULMAN, LLP**
One Pennsylvania Plaza
New York, NY 10119-0165
Tel.: 212-594-5300

*Plaintiffs' Co-Lead Counsel*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| : | **Document Electronically Filed** |
| : |  |
| IN RE: INSURANCE BROKERAGE : | Hon. Faith Hochberg |
| ANTITRUST LITIGATION : |  |
| : | MDL No. 1663 |
| **APPLIES TO ALL ACTIONS** : |  |
| : | Civil Action No. 04-5184 (FSH) (PS) |
| : |  |
| : | **Return Date: February 27, 2006** |
| : |  |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE INDIVIDUAL AND OMNIBUS MOTIONS OF THE BROKER AND INSURER DEFENDANTS TO DISMISS THE CORRECTED FIRST CONSOLIDATED AMENDED COMMERCIAL CLASS ACTION COMPLAINT

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Summary of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Undisclosed Compensation and Steering Arrangements . . . . . . . . . . . . . . . . . . . . 7

    C.    Bid-rigging . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.    Undisclosed Compensation Received through the Broker
        Defendants' Resinsurance and Wholesaling Subsidiaries . . . . . . . . . . . . . . . . 14

    E.    Defendants Profited From Their Undisclosed Arrangements . . . . . . . . . . . . . 15

    F.    Governmental Investigations And Settlements . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I.    THE COMPLAINT ADEQUATELY STATES CLAIMS
    FOR RELIEF UNDER THE SHERMAN ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.    The Defendants' Activities Challenged in the Complaint
        are not Exempt from the Reach of the Antitrust Laws by
        Reason of the McCarran-Ferguson Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        1.    The purpose of the McCarran-Ferguson Act is
            to exempt from the antitrust laws conduct
            constituting the "business of insurance." . . . . . . . . . . . . . . . . . . . . . . 20

        2.    Defendants have not met their burden of showing that
            the conduct alleged is part of the business of insurance . . . . . . . . . . . 22

            a.    Defendants' collusive conduct to allocate
                customers and rig bids in return for kickbacks
                does not involve the spreading or transferring
                of policyholder risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   b.  The challenged conduct does not implicate the
     policy relationship between insurer and insured . . . . . . . . . . . 30

  3.  Defendants have not carried their burden of demonstrating
    that the challenged practices are regulated by state law . . . . . . . . . . . . . 32

  4.  Even if the conduct alleged constitutes the business of
    insurance, the complaints adequately plead boycott,
    coercion or intimidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B.  The Complaint's Conspiracy Allegations are Sufficiently Pled . . . . . . . . . . . . . 38

  1.  The complaint alleges the existence of a horizontal customer
    allocation conspiracy subject to *per se* condemnation under
    the antitrust laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

  2.  The antitrust claims satisfy the applicable pleading standards . . . . . . . 43

    a.  The antitrust claims satisfy easily the applicable
     requirements of Rule 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    b.  The heightened pleading requirements of Rule 9(b)
     do not apply to plaintiffs' Sherman Act claims . . . . . . . . . . . . 48

    c.  Defendants may not compartmentalize the
     complaint's conspiracy allegations but must
     address them in their entirety . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    d.  The alleged conspiracy makes perfect economic sense . . . . . . . 53

  3.  Plaintiffs have standing to assert Sherman Act claims and
    have suffered antitrust injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

II.  PLAINTIFFS RICO CLAIMS ARE NOT SUBJECT TO DISMISSAL . . . . . . . . . . . . . 58

A.  Plaintiffs have Standing to Assert RICO Claims . . . . . . . . . . . . . . . . . . . . . . . 59

B.  Plaintiffs' RICO Claims Are Not Barred
  by McCarran-Ferguson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

C.  Plaintiffs Have Adequately Pled a RICO Enterprise . . . . . . . . . . . . . . . . . . . . . 65

D.  Plaintiffs Have Pled Mail and Wire Fraud Claims
  With the Requisite Specificity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

1.   Defendants are on notice of the precise misconduct
with which they are charged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

2.   Plaintiffs have adequately alleged mail and wire fraud . . . . . . . . . . . . 74

3.   Plaintiffs' claims are sufficiently particular
as to all Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

4.   Leave to amend is fully granted to remedy any
pleading deficiency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

E.   The Complaint Adequately Alleges Proximate Cause . . . . . . . . . . . . . . . . . . . . 82

F.   Plaintiffs' RICO Conspiracy Claims Are Not Susceptible to Dismissal . . . . . . . 86

III.   PLAINTIFFS' STATE LAW CLAIMS ARE ADEQUATELY ALLEGED . . . . . . . . . . 88

A.   Defendants' conduct violates state antitrust statutes. . . . . . . . . . . . . . . . . . . . . . 88

1.   Plaintiffs have standing to assert state antitrust claims
against defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

2.   Defendants' State-specific contentions are without merit . . . . . . . . . . . 91

B.   Plaintiffs have stated claims for breaches of fiduciary duty
against the Broker Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

1.   Plaintiffs have pled the special and exceptional
circumstances necessary to hold the Broker Defendants
liable for breach of fiduciary duty in New York and Delaware . . . . . . . 94

2.   The Illinois Insurance Placement Liability Act does not bar
plaintiffs' breach of fiduciary duty claims in Illinois . . . . . . . . . . . . . . . 97

C.   Plaintiffs have stated claims for aiding and abetting breach
of fiduciary duty against the insurer defendants . . . . . . . . . . . . . . . . . . . . . . . . 98

D.   Plaintiffs have sufficiently pled a claim for unjust enrichment . . . . . . . . . . . . 101

IV.   THE ARGUMENTS RAISED IN DEFENDANTS'
SUPPLEMENTAL BRIEFS ARE WITHOUT MERIT . . . . . . . . . . . . . . . . . . . . . . . 102

A.   Plaintiffs have adequately alleged liability of the parent companies . . . . . . . . 102

B.  Defendants' improper reliance upon materials outside the four corners of the complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

C.  This court has personal jurisdiction over Metlife, Inc.  . . . . . . . . . . . . . . . . . . 107

D.  The timing of service on XL does not justify dismissal of the complaint against it  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

# TABLE OF AUTHORITIES

## FEDERAL CASES

*2660 Woodley Road Joint Venture v. ITT Sheraton Corporation*,
  369 F.3d 732 (3d Cir. 2004)............................................................................57

*Alcorn County v. U.S. Interstate Supplies*,
  731 F.2d 1160 (5th Cir. 1984) .......................................................................60

*America Buying Insurance Services v. S. Kornreich & Sons, Inc.*,
  944 F. Supp. 240 (S.D.N.Y. 1996) .................................................................60

*American Family Life Assur. Co. v. Planned Marketing Associates, Inc.*,
  389 F. Supp. 1141 (E.D. Va. 1974) ...............................................................31

*American Health System, Inc. v. Visiting Nurse Association, No. Civ. A. 93-542*,
  1994 WL 314313 (E.D. Pa. June 29, 1994) ...................................................45

*In re American Honda Motor Co, Inc. Dealerships Relations Litigation*,
  941 F. Supp. 528 (D. Md. 1996) ....................................................................85

*American Standard Life & Acc. Insurance Co. v. U.R.L. Inc.*,
  701 F. Supp. 527 (M.D. Pa. 1988) .................................................................31

*American Tobacco Co. v. United States*,
  328 U.S. 781 (1946)........................................................................................53

*Anderson v. Ayling*,
  396 F.3d 265 (3d Cir. 2005)...........................................................................63

*Arnold v. State Farm Fire & Casualty Co.*,
  277 F.3d 772 (5th Cir. 2001) .........................................................................94

*Associated General Contractors of California, Inc. v. California State Council of
  Carpenters*,
  459 U.S. 519 (1983).............................................................................56, 57, 86

*Automated Salvage Transport, Inc. v. NV Koninkluke KNP BT*,
  106 F. Supp. 2d 606 (D.N.J. 1999) ..............................................................105

*In re Automotive Refinishing Paint Antitrust Litigation*,
  358 F.3d 288 (3d Cir. 2004)..........................................................................108

*Ayers v. Thompson*,
  368 F.3d 356 (5th Cir. 2004) .........................................................................94

*Ballard v. Blue Shield of So. W. Va., Inc.*,
529 F. Supp. 71 (S.D.W.Va. 1981) ........................................................36

*Ballard v. Blue Shield of So. W. Va., Inc.*,
543 F.2d 1075 (4th Cir. 1976), *cert. denied*, 430 U.S. 922 (1977) ............36

*Beck v. Prupis*,
529 U.S. 494 (2000) ..............................................................................87

*Big Apple BMW, Inc. v. BMW of N. America, Inc.*,
974 F.2d 1358 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993) ........ 41-42

*Biovail Corp. International v. Hoechst A.G.*,
49 F. Supp. 2d 750 (D.N.J. 1999) ..........................................................46

*Blue Cross & Blue Shield of N.J., Inc. v. Phillip Morris, Inc.*,
36 F. Supp. 2d 560 (E.D.N.Y. 1999) ................................................60, 83

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995), *cert. denied*, 516 U.S. 1184 (1996) ............40

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982) ..............................................................................57

*Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*,
296 F.3d 164 (3d Cir. 2002) ................................................................106

*Brader v. Allegheny General Hospital*,
64 F.3d 869 (3d Cir. 1995) ....................................................................45

*In re Brand Name Prescription Drugs*,
123 F.3d 599 (7th Cir. 1997), *cert. denied*, 522 U.S. 1040 (1998) ............43

*Bridgeport  Music, Inc. v. 11C Music*,
154 F. Supp. 2d 1330 (M.D. Tenn. 2001) ................................................93

*In re Bridgestone/ Firestone Inc.*,
205 F.R.D. 503 (S.D. Ind. 2001), *reversed on other grounds*, 288 F.3d 1012
(7th Cir. 2002) ......................................................................................94

*Briskin v. Glickman*,
267 F. Supp. 600 (S.D.N.Y. 1967) ..........................................................94

*Buckley v. Goldman, Sachs & Co.*, No. 02-CV-11497RGS
2005 WL 1206865 (D. Mass. May 20, 2005) ........................................101

*Brunson Communications, Inc. v. Arbitron, Inc.*,
    239 F. Supp. 2d 550 (E.D. Pa. 2002) .................................................................55

*In re Burlington Coat Factory Sec. Litigation*,
    114 F.3d 1410 (3d Cir. 1997).................................................................82

*In re Buspirone Patent Litigation*,
    185 F. Supp. 2d 363 (S.D.N.Y. 2002).................................................................91

*California Public Employees' Retirement System v. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004).................................................................101

*In re Carbon Black Antitrust Litigation*, No. 03-10191-DPW, MDL No. 1543
    2005 WL 102966 (D. Mass. Jan. 18, 2005) .................................................................53

*In re Cardizem CD Antitrust Litigation*,
    332 F.3d 896 (6th Cir. 2003) .................................................................89

*Carpenter v. United States*,
    484 U.S. 19 (1987).................................................................85

*Centennial School District v. Independence Blue Cross*, No. 93-3456
    1994 WL 62016 (E.D. Pa. February 28, 1994).................................................................24

*Children's Seashore House v. Waldman*,
    197 F.3d 654 (3d Cir. 1999).................................................................106

*In re Ciprofloxacin Hydrochloride  Antitrust Litigation*,
    261 F. Supp. 2d 188 (E.D.N.Y. 2003) .................................................................41

*In re Citric Acid Litigation*,
    191 F.3d 1090 (9th Cir. 1999), *cert. denied*, 529 U.S. 1037 (2000).................................................................53

*Commander Leasing Co. v. Transamerica Title Insurance Co.*,
    477 F.2d 77 (10th Cir. 1973) .................................................................23

*Conley v. Gibson*,
    355 U.S. 41 (1957).................................................................44

*In re Consumer Credit Counseling Serv. Antitrust Litigation*, Nos. MDL
    97MS233, 97-CV-1741, 1997 WL 755019 (D.D.C. December 4, 1997).................................................................52

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962).................................................................52-53

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ................................................................40

*Coyer v. Hemmer*,
   901 F. Supp. 872 (D.N.J. 1995) ...............................................106

*Cullen v. Whitman Medical Corp.*,
   188 F.R.D. 226 (E.D. Pa. 1999)................................................83

*Cunningham v. New Jersey*,
   230 F.R.D. 391 (D.N.J. 2005)..................................................109

*Danvers Motor Co., Inc. v. Ford Motor Co.*,
   432 F.3d 286 (3d Cir. 2005).................................................60, 61

*Davies v. Centennial Life Insurance Co.*,
   128 F.3d 934 (6th Cir.1997) ....................................................25

*Dornberger v. Metropolitan Life Insurance Co.*,
   961 F. Supp. 506 (S.D.N.Y. 1997) .......................................95, 96

*In re Electrical Carbon Products Antitrust Litigation*,
   333 F. Supp. 2d 303 (D.N.J. 2004) ...........................................45

*Eli Lilly & Co. v. Roussel Corp.*,
   23 F. Supp. 2d 460 (D.N.J. 1998) ...........................................107

*Emcore Corp. v. PriceWaterhouseCoopers*,
   102 F. Supp. 2d 237 (D.N.J. 2000) ...........................................70

*Erie  Forge & Steel, Inc. v. Cyprus Minerals Co., No. Civ. A. 94-404*,
   1994 WL 485803 (W.D. Pa. June 7, 1994)..................................45

*Escrow Disbursement Insurance Agency, Inc. v. American Title & Insurance Co.,
   Inc.*,
   550 F. Supp. 1192 (S.D. Fla. 1982) ......................................24, 33

*Expediters International of Washington, Inc. v. Direct Line Cargo Management
   Serv., Inc.*,
   995 F. Supp. 468 (D.N.J. 1998) ..............................................105

*FMC v. Boesky*,
   852 F.2d 981 (7th Cir. 1988) ...................................................90

*Fallick v. Nationwide Mutual Insurance*,
   162 F.3d 410 (6th Cir. 1998) ...................................................92

*Fanty v. Pa. Department of Public Welfare*,
    551 F.2d 2 (3d Cir. 1977) ..................................................................................90

*In re Fine Paper Antitrust Litigation*,
    685  F.2d 810 (3d Cir. 1982) ............................................................................52

*In re Freuhauf Trailer Corp.*,
    250 B.R. 168 (D. Del. 2000) ..........................................................................101

*Frontier Management Co., Inc. v. Balboa Insurance Co.*,
    658 F. Supp. 987 (D. Mass. 1986) ...............................................................103

*Fry v. Trump*,
    681 F. Supp. 252 (D.N.J. 1988) ...................................................................100

*Fuentes v. South Hills Cardiology*,
    946 F.2d 196 (3d Cir. 1991) .............................................................45, 46, 48

*Garot Anderson Marketing, Inc. v. Blue Cross & Blue Shield United of Wis.*,
    772 F. Supp. 1052 (N.D. Ill. 1990) ...............................................................32

*General Glass Co. v. Globe Glass & Trim Co.*, No. 71 C 921
    1978 WL 1331 (N.D. Ill. April 25, 1978) .....................................................36

*Ghaleb v. U.S. Ship Management*, No. 84(JCL)
    2005 WL 1225177 (D.N.J. May 6, 2005) ....................................................110

*Goren v. New Internt'l, Inc.*,
    156 F.3d 721 (7th Cir. 1998) .........................................................................80

*Grant v. Erie Insurance Exchge.*,
    542 F. Supp. 457 (M.D. Pa. 1982), *aff'd without published opinion*, 716 F.2d
    890 (3d Cir. 1983) ..........................................................................................24

*Grider v. Keystone Healthplan Central, Inc.*, No. 2001-05641
    2003 WL 22182905 (E.D. Pa. Sep. 18, 2003) ..............................................63

*Griffin v. Dugger*,
    823 F.2d 1476 (11th Cir. 1987) ....................................................................91

*Group Life & Health Insurance Co. v. Royal Drug Co.*,
    440 U.S. 205 (1979) .........................................................................21, 23, 24, 30

*Hanna v. Plumer*,
    380 U.S. 460 (1965) ........................................................................................94

*Hartford Fire Insurance Co. v. California,*
509 U.S. 764 (1993)......................................................................................20

*Holmes v. Securities Investor Protection Corp.,*
503 U.S. 258 (1992)..............................................................................84, 86

*Hollis-Arrington v. PHH Mortgage Corp.,* No. 05-2556FLW
2005 WL 3077853 (D.N.J. November 15, 2005) ......................................68

*Humana, Inc. v. Forsyth,*
525 U.S. 299 (1999)..............................................................................64, 65

*In re Hydrogen Peroxide Antitrust Litigation, No. Civ.A. 05-666,*
2005 WL 3149133 (E.D. Pa. Nov. 22, 2005) ............................................46

*ITT World Communications, Inc. v. Western Union Telegraph Co.,*
524 F. Supp. 702 (S.D.N.Y. 1981) ............................................................53

*Ice Cream Liquidation Inc. v. Land O' Lakes, Inc.,*
253 F. Supp. 2d 262 (D. Conn. 2003)..................................................47, 53

*J.J. White, Inc. v. William A. Graham Co.,* No. 96-6131
1997 WL 134896 (E.D. Pa. March 17, 1997)............................................32

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.,*
190 F.3d 775 (7th Cir. 1999) ..............................................................43, 55

*In re K-Dur Antitrust Litigation,*
338 F. Supp. 2d 517 (D.N.J. 2004).................................92, 94, 96, 102, 105

*Kartell v. Blue Shield of Mass.,*
542 F. Supp. 782 (D. Mass. 1982) ............................................................24

*Klay v. Humana,*
382 F.3d 1241 (11th Cir. 2004) ................................................................84

*Kristiansen v. John Mullins & Sons,*
59 F.R.D. 99 (E.D.N.Y. 1973)..................................................................94

*Kronfeld v. First Jersey National Bank,*
638 F. Supp. 1454 (D.N.J. 1986)..............................................................81

*Kwan-Tai Corp. v. Mastercraft Printers, Inc.,*
No. 00-3160, 2001 WL 487329 (E.D. La. My 7, 2001) ............................61

*Leatherman v. Tarrant County Narcotics Intelligence & Coordinating Unit*,
     507 U.S. 163 (1993)................................................................................44

*LePage's, Inc. v. 3M, No. Civ. A. 97-3983*,
     1997 WL 734005 (E.D. Pa. Nov. 14, 1997) ...............................................46

*Lepage's Inc. v. 3M*,
     324 F.3d 141 (3d Cir. 2003)....................................................................52

*In re Linerboard Antitrust Litigation, No. MDL 1261*,
     2000 WL 1475559 (E.D. Pa. Oct. 4, 2000)................................................45

*Liu v. Beth Israel Medical Ctr.*, No. 2 Civ. 2034
     2003 WL 21488081 (S.D.N.Y. June 26, 2003) ......................................102

*In re Lower Lake Erie Iron Ore Antitrust Litigation*,
     998 F.2d 1144 (3d Cir. 1993)...................................................................83

*Lum v. Bank of America*, No. 00-223(FSG)
     2001 WL 34059378 (D.N.J. November 29, 2001) ....................................68

*Lum v. Bank of America*,
     361 F.3d 217 (3d Cir. 2004).................................................49, 50, 51, 79

*Maio v. Aetna, Inc.*,
     221 F.3d 472 (3d Cir. 2000)....................................................61, 62, 63

*In re Magnetic Audiotape Antitrust Litig.*,
     No. 99 Civ. 1580 (LMM), 2002 WL 975678 (S.D.N.Y. May 9, 2002)......................47

*Malley-Duff & Associates, Inc. v. Crown Life Insurance Co.*,
     734 F.2d 133 (3d Cir.), *cert. denied*, 469 U.S. 1072 (1984).......................................36

*Manasen v. California Dental Services*,
     638 F.2d 1152 (9th Cir. 1979) ..................................................................35

*Mayor and Council of the Borough of Rockaway v. Klockner & Klockner*,
     811 F. Supp. 1039 (D.N.J. 1993) ...........................................................80

*MCI Telecomms. Corp. v. Teleconcepts, Inc.*,
     71 F.3d 1086 (3d Cir. 1995)..................................................................110

*McIlhenny v. American Title Insurance Co.*,
     418 F. Supp. 364 (E.D. Pa. 1976) ...........................................................23

*In re Mercedes-Benz Antitrust Litigation*,
     157 F. Supp. 2d 355 (D.N.J. 2001) .........................................41, 47, 49, 51

*Metropolitan Express Services Inc. v. Kansas City,*
    23 F.3d 1367 (8th Cir. 1994) ...................................................................96

*Mid-West Paper Products Company v. Continental Group, Inc.,*
    596 F.2d 573 (3d Cir. 1979).....................................................................58

*Motorola, Inc. v. Airdesk, Inc., No. Civ.A. 04-4940,*
    2005 WL 894807 (E.D. Pa. April 15, 2005) ...........................................100

*In re NAHC, Inc. Sec. Litigation,*
    306 F.3d 1314 (3d Cir. 2002)...................................................................82

*Naporano Iron & Metal Co. v. American Crane Corp.,*
    79 F. Supp. 2d 494 (D.N.J. 1999) ............................................................80

*Nappier v. PricewaterhouseCoopers  LLP,*
    227 F. Supp. 2d 263 (D.N.J. 2002) ..........................................................82

*Neder v. United States,*
    527 U.S. 1 (1999).....................................................................................84

*New Jersey Carpenters Health Fund v. Phillip Morris,,*
    17 F. Supp. 2d 324 (D.N.J. 1998) ............................................................83

*Nielson v. Union Bank of California,*
    290 F. Supp. 2d 1101 (C.D. Cal. 2003) ..................................................101

*Odesser v. Continental Bank,*
    676 F. Supp. 1305, 1314 (E.D. Pa. 1987) ................................................87

*Okmyansky v. Herbalife International of America, Inc.,*
    415 F.3d 154 (1st Cir. 2005).................................................................102

*Oskoian v. Canuel,*
    269 F.2d 311 (1st Cir. 1959)...................................................................94

*Owens v. Aetna Life & Casualty Co.,*
    654 F.2d 218 (3d  Cir. 1981)..............................................22, 26, 27, 28

*PBA Local No. 38 v. Woodbridge Police Department,*
    134 F.R.D. 96 (D.N.J. 1991)....................................................................91

*Palmer v. BRG of Ga., Inc.,*
    498 U.S. 46 (1990)...................................................................................41

*Paper Systems, Inc. v. Nippon Paper Industries, Co.,*
    281 F.3d 629 (7th Cir. 2002) ................................................................59

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,*
    998 F.2d 1224 (3d Cir.), *cert. denied*, 510 U.S. 994 (1993) .....................56

*Phoenix Canada Oil Co. v. Texaco, Inc.,*
    842 F.2d 1466 (3d Cir. 1988)..............................................................105

*Pinker v. Roche Holdings, Ltd.,*
    292 F.3d 361 (3d Cir. 2002)...............................................................108

*Poling v. K. Hovnanian Enterprises,*
    99 F. Supp. 2d 502 (D.N.J. May 24, 2000) ........................................79, 80

*In re Pressure Sensitive Labelstock Antitrust Litigation,*
    356 F. Supp. 2d 484 (M.D. Pa. 2005) ....................................................50

*In re Prudential Insurance Co. of America Sales Practices Litigation,*
    148 F.3d 283 (3d Cir. 1998)..............................................................85, 91

*Prudential Insurance Co. of America v. United States Gypsum Co.,*
    828 F. Supp. 287 (D.N. J. 1993) ........................................................84, 85

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979).............................................................................60

*In re Remeron Antitrust Litigation,*
    335 F. Supp. 2d 522 (D.N.J. 2004) .......................................................52

*Resources Ventures, Inc. v. Resources Management International Inc.,*
    42 F. Supp. 2d 423 (D. Del. 1999)......................................................102

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993).............................................................................70

*Rolo v. City Investing Co. Liquidating,*
    845 F. Supp. 182 (D.N.J. 1994) ............................................................68

*Rolo v. City Investing Co. Liquidating Trust,*
    155 F.3d 644 (3d Cir. 1998)..................................................................73

*Rose v. Bartle,*
    871 F.2d 331 (3d Cir. 1989)..................................................................87

*Rossi v. Standard Roofing, Inc.,*

156 F.3d 452 (3d Cir. 1998)....................................................................41

*SEC v. National Securities Inc,*
393 U.S. 453 (1969)......................................................21, 23, 31

*SEC v. Variable Annuity Life Insurance Co.,*
359 U.S. 65 (1959)...................................................................23

*Sabo v. Metropolitan Life Insurance Co.,*
137 F.3d 185 (3d Cir. 1998)....................................................66

*Salinas v. United States,*
522 U.S. 52 (1997)..................................................................88

*Saporito v. Combustion Engineering, Inc.,*
843 F.2d 666 (3d Cir. 1988), *vacated on other grounds,* 489 U.S. 1049 (1989).......101

*Schmuck v. United States,*
489 U.S. 705 (1989).................................................................75

*Schwartz v. Celestial Seasonings, Inc.,*
124 F.3d 1246 (3d Cir. 1997)....................................................105

*Sedima, S.P.R.L. v. Imrex Co.,*
473 U.S. 479 (1985).................................................................60

*Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,*
742 F.2d 786 (3rd Cir. 1984), *cert. denied,* 464 U.S. 1211 (1985)............67, 68, 73, 79

*Shaw v. Dallas Cowboys Football Club, No. Civ. A. 97-5184,*
1998 WL 419765 (E.D. Pa. June 23, 1998), *aff'd,* 172 F.3d 299 (3d Cir. 1999).........46

*Shearin v. E.F. Hutton Group, Inc.,*
885 F.2d 1162 (3d Cir. 1989).....................................................87

*Sikes v. Teleline, Inc.,*
281 F.3d 1350 (11th Cir. 2002) ..................................................84

*Slagle v. ITT Hartford,*
102 F.3d 494 (11th Cir. 1996) ...................................................29

*Smith v. Berg,*
247 F.3d 532 (3d Cir. 2001)......................................................88

*Sparks v. Allstate Insurance Co.,*
98 F. Supp. 2d 933 (W.D. Tenn. 2000)..........................................93

*St. Paul Fire & Marine Insurance Co. v. Barry,*
   438 U.S. 531 (1978)..................................................................25, 34, 35, 36, 37

*State of Maryland v. Blue Cross & Blue Shield Association,*
   620 F. Supp. 907 (D. Md. 1985)..................................................................27

*State of Ohio v. Ohio Medical Indemnity Inc.,* No. C 275-473
   1976 WL 1333 (S.D. Ohio September 16, 1976) ......................................34

*Steele v. Hospital Crp. Of America,*
   36 F.3d 69 (9th Cir. 1994) ........................................................................63

*Strauss v. City of Chicago,*
   760 F.2d 765 (7th Cir. 1985) ....................................................................46

*Swarthmore Radiation Oncology, Inc. v. Lapes,*
   812 F. Supp. 517 (E.D. Pa. 1992) ............................................................45

*Swierkiewicz v. Sorema, N.A.,*
   534 U.S. 506 (2002)..................................................................................44

*Systems Management, Inc. v. Loiselle,*
   303 F.3d 100 (1st Cir. 2002) ....................................................................84

*Tabas v. Tabas,*
   47 F.3d 1280 (3d Cir. 1995)................................................................75, 85

*In re Tamoxifen Citrate Antitrust Litigation,*
   429 F.3d 370 (2d Cir. 2005)......................................................................55

*In re Terazosin Hydrochloride Antitrust Litigation,*
   160 F. Supp. 2d 1365 (S.D. Fla. 2001) ....................................................91

*Texas Industries, Inc. v. Labtech Materials, Inc.,*
   451 U.S. 630 (1981)..................................................................................58

*Ticor Title Insurance Co. v. Federal Trade Commission,*
   998 F.2d 1129 (3d Cir. 1993)....................................................................23

*Toys "R" Us, Inc. v. Step Two, S.A.,*
   318 F.3d 446 (3d Cir. 2003)....................................................................109

*Twombly v. Bell Atlantic Corp.,*
   425 F.3d 99 (2d Cir. 2005)........................................................................45

*UNUM Life Insurance Co. of America v. Ward*,
   526 U.S. 358 (1999)................................................................................24

*Uniforce Temporary Personnel, Inc. v. National Council on Compensation*
   *Insurance, Inc.*,
   87 F.3d 1296 (11th Cir. 1996) ................................................................34

*Union Labor Life Insurance Co. v. Pireno*,
   458 U.S. 119 (1982)................................................ 20, 22, 23, 27, 29-30

*United States v. All Star Industrial*,
   962 F.2d 465 (5th Cir. 1992) .....................................................41, 42, 54

*United States v. Console*,
   13 F.3d 641 (3d Cir. 1993).....................................................................71

*United States v. De Peri*,
   778 F.2d 963 (3d Cir. 1986)...................................................................88

*United States v. Koppers Co., Inc.*,
   652 F.2d 290 (2d Cir. 1981)...................................................................43

*United States v. Microsoft Corp.*,
   87 F. Supp. 2d 30 (D.D.C. 2000) ............................................. 88-89, 93

*United States v. Oreto*,
   37 F.3d 739 (1st Cir. 1994) ...................................................................69

*United States v. Parise*,
   159 F.3d 790 (3d Cir. 1998)...................................................................71

*United States v. Pearlstein*,
   576 F.2d 531 (3d Cir. 1978)...................................................................76

*United States v. Pelullo*,
   964 F.2d 193 (3d Cir. 1992)...................................................................72

*United States v. Riccobene*,
   709 F.2d 214 (3d Cir. 1983), overruled on other grounds by *Griffin v. United*
   *States*, 502 U.S. 46 (1991) .........................................................67, 68, 88

*United States v. Topco*,
   405 U.S. 596 (1972)..........................................................................40, 41

*United States v. South-Eastern Underwriters Association*,
   322 U.S. 533 (1944)..........................................................................20, 21

*United States v. Turkette,*
    452 U.S. 576 (1981)............................................................................67, 71

*In re Urethane Antitrust Litigation,* No. 04-MD-1616-JWL
    2006 WL 133434 (D. Kan. Jan. 18, 2006)..................................................46

*In re Vitamins Antitrust Litigation, No. Misc. 99-197 (FTH),*
    2000 WL 1475705 (D.D.C. May 9, 2000)..................................................47

*Von Bulow v. Von Bulow,*
    634 F. Supp.1284 (S.D.N.Y. 1986) ..........................................................73

*In re Warfarin Sodium Antitrust Litigation,*
    212 F.R.D. 231 (D. Del. 2002), *aff'd,* 391 F.3d 516 (3d Cir. 2004) ...........89

*Weatherby v. RCA Corp.,* Nos. 85-CV-1615, 85-CV-1613, 85-CV-1614
    1986 WL 21336 (N.D.N.Y May 9, 1986)............................................. 37-38

*William Goldman Theatres, Inc. v. Loews, Inc.,*
    150 F.2d 738 (3d Cir. 1945).....................................................................46

*Williams v. Aetna Life Ins. Co.,* No. 04-2851B
    2005 WL 3087861 (W.D. Tenn. Nov. 17, 2005).........................................92

*Wolfstein v. Docteroff,*
    133 F.3d 210 (3d Cir. 1997)...............................................................73, 80

*In re Workers' Compensation Antitrust Litigation,*
    867 F.2d 1552 (8th Cir.) ....................................................................29, 35

*Worldcom, Inc. v. Graphnet, Inc.,*
    343 F.3d 651 (3d Cir. 2003)...................................................................107

*Zavala v. Wal-Mart Stores, Inc.,*
    393 F. Supp. 2d 295 (D.N.J. 2005) ...........................................................88

*Zimmerman v. HBO Affiliate Grp.,*
    834 F.2d 1163 (3rd Cir. 1988) ...........................................................63, 90

### STATE CASES

*Aden v. Fortsh,*
    169 N.J. 64 (2001) .........................................................................94, 95

*Cox v. Microsoft Corp.,*

737 N.Y.S.2d 1 (N.Y. App. Div. 2002) ...................................................94

*Curtis Properties Corp. v. Greif Cos.*,
653 N.Y.S.2d 569 (N.Y. App. Div. 1997) .............................................102

*Grubaugh v. DeCosta*, Nos. 1 CA-CV 97-0477, 1 CA-CV 98-0060
1999 WL 137640 (Ariz. App. March 16, 1999) .....................................101

*Guice v. Charles Schwab & Co., Inc.*,
651 N.Y.S.2d 352 (N.Y. 1996) .......................................................97, 98

*Heikes v. Republic Insurance Co.*,
866 So. 2d 97 (Fla. 3d DCA 2004) .......................................................94

*Lozosky v. The State of Illinois*,
54 Ill. Ct. Cl. 470 (Ill. Ct. Cl. 2001) ...................................................98

*Meagher v. Metropolitan Life Insurance Co.*,
463 N.Y.S.2d 727 (N.Y. Sup. Ct. 1983) ...............................................96

*Murphy v. Kuhn*,
90 N.Y.2d 266, 660 N.Y.S.2d 371 (N.Y. 1997) .....................................96

*Myint v. Allstate Insurance Co.*,
970 S.W.2d 920 (Tenn. 1998) .............................................................93

*Newman v. Allstate Insurance Co.*,
42 S.W.3d 920 (Tenn. Ct. App. 2000) ...................................................93

*Sutton Park Development Corp. Trading Co., Inc. v. Guerin & Guerin Agency Inc.*,
745 N.Y.S.2d 622 (N.Y. App. Div. 2002) ...............................................96

*TPL Associate v. Helmsley-Spear, Inc.*,
536 N.Y.S.2d 754 (N.Y. App. Div. 1989) ...............................................97

*Tesoriero v. MetLife, Inc.*, No. 46200103
2004 WL 3086862 (N.Y. Sup. Ct. May 13, 2004).....................................96

*Wal-Mart Stores, Inc. v. AIG Life Insurance Co.*,
872 A.2d 611 (Del. Ch. 2005)............................................................96

## CONSTITUTION

U.S. Const. Art. III.......................................................................90, 91,

# FEDERAL STATUTES

15 U.S.C. § 1 .....................................3, 19, 20, 27, 31, 39, 41, 44, 48, 49, 50, 51, 52, 56, 89

15 U.S.C. § 1012 ..............................................................................................................20

15 U.S.C. § 1013(b) ....................................................................................................20, 34

18 U.S.C. § 1962(c) ...............................................................................................86, 88, 89

18 U.S.C. § 1964(c) ...........................................................................................59, 60, 63, 83

28 U.S.C. § 1407 ............................................................................................................108

Fed. R. Civ. P. 8 ..............................................................................................................44

Fed. R. Civ. P. 9(b) ...........................................48, 49, 68, 73, 74, 79, 80, 81, 100, 105, 106

Fed. R. Civ. P. 12(b) ..............................................................................................27, 90, 107

Fed. R. Civ. P. 15(a) .........................................................................................................81

Fed. R. Civ. P. 23 .............................................................................................................91

Fed. R. Civ. P. 56 ...........................................................................................................107

# STATE STATUTES

735 Ill. Comp. Stat. § 5/2-2201(b) .....................................................................................98

Fla. Stat. § 624.155 ..........................................................................................................93

NY GBL § 340 ................................................................................................................94

T.C.A. § 47-18-101, *et. seq* ..........................................................................................92-93

T.C.A. §§ 47-18- 104(a) & -109(a)(1) ..............................................................................92-93

Vt. Stat. Ann. tit. 8, § 4726(c) ..........................................................................................92

Vt. Stat. Ann. tit. 9, § 2451a(b) ........................................................................................92

Vt. Stat. Ann. tit. 9, § 2451a(d)(5) ....................................................................................92

Vt. Stat. Ann. tit. 9, § 2465(a) ................................................................................92

## MISCELLANEOUS

5C Wright & A. Miller, *Federal Practice and Procedure*, § 1298, at 407 (1969) ............73

S. Rosenman, *The Public Papers and Addresses of Franklin D. Roosevelt*, 1944-
    1945 Vol., at p. 587 (1950) ...........................................................................22

*Nevada Attorney General Opinion, No. 80-43*,
    1980 WL 111125 (Nev. AG, Dec. 30, 1980) .................................................92

*Legal Principles Defining The Scope Of A Federal Antitrust Exemption For
    Insurance*, Statement of the Honorable Michael G. Oxley, Chairman,
    Committee on Financial Services, House of Representatives, 2005 WL
    516944 ..........................................................................................................28

Plaintiffs in the above captioned actions submit this memorandum of law in opposition to the individual and omnibus motions of the Broker Defendants and the individual and Omnibus motions of the Commercial Insurer Defendants to dismiss the Corrected First Consolidated Amended Commercial Class Action Complaint ("Complaint" or "Comp.").

## INTRODUCTION

The Defendants' primary bases for their motions to dismiss -- that the contingent commission arrangements at issue in this litigation are "longstanding and well-known practices in the insurance industry,"[1] "neither new nor recently brought to light," and an "entirely legal part of the insurance business"[2] -- are fundamentally flawed and provide no support for dismissal.

The practices described in the Complaint were neither "well-known" nor "legal." Rather, they were and continue to be an integral part of an industry-wide scheme and conspiracy between the Broker Defendants and Insurer Defendants and unnamed co-conspirators to handsomely profit at the expense of their clients, the Plaintiffs and the Class.

Indeed, these practices were clearly not considered to be publicly "well-known" and "legal" by the attorneys general and state insurance commissioners who brought a myriad of legal and regulatory actions against these Defendants for engaging in and concealing them. The very settlements and consent decrees entered into by certain of the Defendants acknowledge the wrongful nature of the practices and Defendants' active attempts to conceal their improper conduct from Plaintiffs and Class members. In fact, Defendants have acknowledged that their conduct corrupted the insurance market and certain Defendants have agreed to completely

_____

[1] Omnibus Memorandum of Law in Support of Broker Defendants' Motion to Dismiss ("Broker Mem.") at 1.

[2] Property & Casualty Insurer Defendants' Memorandum In Support of Motion to Dismiss Commercial Complaint ("Ins. Mem.") at 11.

discontinue these practices.  As is evidenced by the many guilty pleas and the settlements entered into by certain Defendants, this conduct was neither "well known" nor "legal."

This action does not challenge the ability of brokers to be compensated by insurers in a lawful manner for services rendered.  Rather, it is Defendants' improper use of contingent commission agreements in their scheme to manipulate the market for commercial insurance and to allocate insurance markets and customers, that is at the core of this litigation.   Plaintiffs allege that the Broker Defendants -- who were duty bound to represent their customers (the Plaintiffs and Class) in order to obtain the best price and terms in connection with the purchase of insurance -- engaged in a conspiracy with the Insurer Defendants, which was directed at Plaintiffs and the Class, to line their own pockets at the expense of their customers.  Specifically, Plaintiffs allege that Defendants engaged in a market and customer allocation scheme, whereby contingent commissions and other kick-backs, such as wholesaler and reinsurance commissions, were paid by the Insurer Defendants to the Broker Defendants in return for steering business to participating insurers, protecting market share and otherwise insulating the insurers from normal competitive forces.   The purpose and effect of Defendants' conspiracy was to reduce or eliminate true competition for insurance products, raising the price of such products to Plaintiffs and the Class.

Defendants' fundamental misconstruction of Plaintiffs' claims is also demonstrated by their argument that Plaintiffs have failed to make specific allegations of bid-rigging or other activities relating to certain Defendants or certain Plaintiffs.  Plaintiffs' theories of liability do not depend upon every Defendant having committed, or every Plaintiff having been subjected to, each and every wrongful practice described in the Complaint.  Instead, Plaintiffs allege that all Plaintiffs and members of the Class have been harmed by the scheme and conspiracy entered

into by all Defendants, a scheme and conspiracy to allocate markets and customers, and to fraudulently breach their obligations to Plaintiffs and the Class. Participation in the scheme may take many forms, including committing actual bid-rigging or other specific forms of steering, but does not require that any given participant has engaged in every type of such activities. Further, Plaintiffs need not have purchased insurance through a transaction that itself is shown to be the result of bid-rigging, as they have been injured by purchasing insurance in market tainted by the wrongful conduct alleged in the complaint, of which bid-rigging is just an example. Accordingly, when Defendants complain that there are no allegations of bid-rigging as to a given Defendant, or no allegations that a given Plaintiff's purchase of insurance was pursuant to bid-rigging, they again miss the mark.

The legal bases upon which Defendants rely to support their motions to dismiss are likewise flawed. The Complaint adequately alleges facts supporting Defendants' violations of the Sherman Act, RICO, and various state laws.

When viewed in light of the facts actually pled, Defendants' motions to dismiss must fail. The detailed allegations of the Complaint, and the relevant case law, establish that Plaintiffs have easily satisfied the applicable pleading requirements.

## I.      STATEMENT OF FACTS

### A.      Summary of Facts

As set forth fully in the Complaint, Plaintiffs' claims arise out of Defendants' massive scheme to manipulate the market for commercial insurance. Defendants are the largest commercial insurance brokers ("Broker Defendants") and insurance companies ("Insurer Defendants") (collectively "Defendants") in the United States. Comp. ¶ 1. The commercial insurance broking industry is highly concentrated, with the Broker Defendants controlling most

3

of the market.  In fact, nine of the ten largest brokers in the United States are named Defendants

in this action.  Comp. ¶ 174.  Likewise, the Insurer Defendants have written over $65 billion in

collective net premiums and include most of the largest domestic carriers.  Comp. ¶ 176.

The Complaint alleges that during the class period, the Broker Defendants and Insurer

Defendants and their co-conspirators dominated and controlled the market for commercial

insurance.  Comp. ¶¶ 175-176.  Defendants used their market power to allocate customers and

markets, and rig bids, so as to increase their profits at the expense of the Plaintiffs and the Class.

As detailed in the Complaint, in order to maximize revenue under their contingent commission

arrangements, the Broker Defendants steered customers to preferred insurers thereby protecting

the preferred insurers from normal competitive pressures.  *Id.*

The customer allocation scheme benefited both the Brokers Defendants and the Insurer

Defendants.  Facilitating the conspiracy aided the Broker Defendants because it allowed them to

maximize revenue by assuring that business was placed where it would be most lucrative for

them.  Comp. ¶¶ 200-201.  Participating in the conspiracy benefited the Insurer Defendants

because it allowed them to protect or increase market share by paying kickbacks, rather than by

price cutting or providing a superior product.  Comp. ¶¶ 176.

The Complaint alleges that the Defendants engaged in a common course of conduct and

conspired by engaging in certain undisclosed and wrongful practices that are clearly at odds with

their duties and representations regarding the services, information and products they provide to

Plaintiffs and the Class.  The Broker Defendants hold themselves out to their customers as expert

agents and therefore fiduciaries in analyzing, procuring and renewing commercial insurance.  As

brokers, they have a fiduciary duty to obtain the best coverage at the lowest cost and owe their

clients the utmost duty of loyalty, candor and full disclosure, including the duty to disclose the

sources and amounts of all income received from any transactions involving their clients.  The

Broker Defendants must always place their clients' interests ahead of their own.  Clients,

including Plaintiffs and the Class, rely on the Broker Defendants' expertise and duty to provide

professional and unbiased advice and services.  Rather than abiding by these sacred trusts,

Defendants' engineered an elaborate scheme to allocate customers and markets purely for their

own financial gain.  While Defendants collect the spoils, policyholders twist in the wind.

Defendants' undisclosed and pervasive conflict of interest and breach of duties reduced and/or

eliminated competition for insurance and injured Plaintiffs and the Class in their business and

property.

Plaintiffs allege a conspiracy involving Broker Defendants and Insurer Defendants and

other unnamed co-conspirators (the "global conspiracy").  In the alternative, Plaintiffs allege that

the Broker Defendants and the Insurer Defendants are engaged in a number of separate but

parallel conspiracies, each involving a Broker Defendant and the insurance companies with

which each had contingent commission agreements.[3]  Comp. ¶¶ 429, 443.

The conspiracies have been carried out through the use of, *inter alia*, similar agreements

and policies regarding concealment of conflicts of interest and wrongful conduct, similar tactics

for coercing the submission of false bids, steering clients, allocating markets and customers, and

---

[3] A minimum of six broker-centered conspiracies are alleged to exist, including the following:  a Marsh-centered conspiracy consisting of Marsh and the insurance companies with which Marsh had contingent commission agreements; an Aon-centered conspiracy consisting of Aon and the insurance companies with which Aon had contingent commission agreements; a Willis-centered conspiracy consisting of Willis and the insurance companies with which Willis had contingent commission agreements; a Gallagher-centered conspiracy consisting of Gallagher and the insurance companies with which Gallagher had contingent commission agreements; a Wells Fargo-centered conspiracy consisting of Wells Fargo and the insurance companies with which Wells Fargo had contingent commission agreements; and a USI-centered conspiracy consisting of USI and the insurance companies with which USI had contingent commission agreements. Comp. ¶¶ 430, 443.

boycotting or refusing to deal with insurers who refused to participate in the conspiracies.
Comp.¶ 411.

The conspiracies have been conducted, facilitated and implemented through various
mechanisms including direct communications, sharing of information, and movement of
employees between and among Defendants as well as through other means such as industry trade
groups like the Council of Insurance Agents and Brokers ("the Council") and its predecessors,
the National Association of Insurance Brokers ("NAIB"), the National Association of Casualty
and Surety Executives ("NASCE") and the National Association of Casualty and Surety Agents
("NASCA") as well as the American Insurance Association ("AIA") and the Reinsurance
Association of America ("RAA"), in which many Defendants are members.  Comp. ¶¶ 414-417.
Participation in these industry groups allows the Defendants and their executives to meet with
each other in small break out conferences, ad hoc and private meetings, and hold discussions
they would not otherwise have the ability and opportunity to convene.  Comp. ¶¶ 419-422.

For example, at the 2003 Annual Executive Conference of the Property/Casualty Industry
insurance company executives, which included representatives of the Insurer Defendants, agreed
to resist the temptation to compete on prices for commercial insurance.  Comp. ¶ 427.
Specifically, James Schiro, CEO of Zurich Financial Services admonished the other attendees
stating *"[l]et's not get pulled into a soft market.  We are not ready for a soft market and cannot
afford one ….  Let's not get in a race for marketshare."* *Id.* (emphasis added).  He added that
"we need several more years of profitability" -- a theme emphasized again and again by CEOs
speaking at the meeting.  Maurice Greenberg, Chairman and CEO of AIG, added that "*in a risk
business like ours, the pursuit of marketshare at the expense of earnings is not a great
strategy.*" *Id.* (emphasis added).  Following Mr. Greenberg's speech, William Berkley, chairman

and CEO of W.R. Berkley Corp., said during a discussion of capital strength that "the goal of any carrier should not just be to sell more insurance and get bigger, but to make more money on a risk-adjusted basis.  That requires adequate pricing."  *Id.*  Or, as Mr. Greenberg put it, "***We absolutely need to hold the line on pricing and not give in to the excessive competition.***"  *Id.* (emphasis added).

In order to reduce competition in favor of increasing profits, Defendants implemented a system of protecting incumbents on placements obtained as a result of kickbacks and tie-ins, because the incumbencies were spread around to different insurers by the conspiring brokers and insurers in a way that ensured profits for all.  *Id.*  The Complaint alleges that through such practices, Defendants have created the illusion of a competitive market for insurance, when, in fact, the placement of the insurance products are the result of Defendants' collusive and anti-competitive conduct.  Comp. ¶ 2**.**

As set forth in the Complaint and described below, the Broker Defendants do not represent their clients' best interests or act as fiduciaries in connection with the selection and placement of their clients' insurance.  Comp. ¶ 4.  The Insurer Defendants, in turn, avoid having to compete for policyholders' business and recoup the cost of the inappropriate commissions by increasing premiums.  Comp. ¶¶ 4, 406, 413.  Together, the Broker Defendants and Insurer Defendants have conspired to reduce or eliminate competition for commercial insurance and participated in the affairs of an enterprise through a variety of improper practices.  Comp. ¶ 4.

### B.   Undisclosed Compensation and Steering Arrangements

The Complaint details that Defendants have effected their scheme by not disclosing or failing to adequately disclose payment to the Broker Defendants of contingent commissions (a/k/a "overrides").  The payment and amount of these commissions are based on factors such as

the volume of insurance that the Broker Defendants place with a particular insurer ("volume contingency"), the renewal of that business ("persistency contingency"), and its profitability ("claims loss ratios contingency"), all of which the Broker Defendants, in concert with the Insurer Defendants, control, at least in part, by allocating and manipulating the market for insurance placed for their client.

This contingent compensation is often memorialized in written agreements between brokers and insurers referred to as, *inter alia*, "placement service agreements" ("PSA's"), "override agreements,"  "millennium agreements," "extra compensation agreements," "producer compensation agreements" or, more recently, "market service agreements" ("MSAs") or "Compensation for Services to Underwriters" ("CSUs").  Comp. ¶ 203.

Typical contingent commission agreements with Marsh provided that in addition to standard commissions, Marsh would be paid a flat percentage of up to 5% of the total premiums written with an insurance carrier.  Comp. ¶ 236.  Contingent commissions at Willis were paid at the end of the year averaging between 5%-15% of the broker's annual commissions for the entire book of business placed with a given carrier.  Comp. ¶ 225.  Aon's contingent commission agreements were based on either the agreement or the highest commission it could obtain. Comp. ¶ 227.  Likewise, contingent commissions at Gallagher were based on the estimated profit the underwriting insurance company earned and/or the overall volume of business placed by Gallagher in a given period of time.  Comp. ¶ 228.  For example, Gallagher's contingent commission agreement with the Hartford provided for a straight 14% commission for writing insurance business and a 5% override at the end of the year for obtaining a specified volume of business.  Comp. ¶ 231.  Examples of other Broker Defendants' contingent commission agreements are specifically detailed throughout the Complaint.  Comp. ¶¶ 207-222, 224-231.

As detailed below and throughout the Complaint, unbeknownst to Plaintiff and members of the Class, the Broker Defendants steered their clients, including Plaintiffs and members of the Class, to purchase only those policies issued by the Insurer Defendants, in return for contingent commissions.  Comp. ¶ 300.  The Complaint describes, in meticulous detail, numerous examples of the Broker Defendants improperly steering their clients to those Insurer Defendants who entered into contingent commission agreements with them.  For example, a former managing director within Marsh advised and directed company employees that "[s]ome [Contingent Commission Agreements] are better than others.... *I will give you clear direction on who [we] are steering business to and who we are steering business from.*"  Comp. ¶ 240 (emphasis added).  Similarly, an Aon executive stated: "With our override agreements with Chubb and Fire Fund, *we need to direct all new business exclusively to them for the next month and beyond.*"  Comp. ¶ 259 (emphasis added).  Likewise, a Gallagher executive instructed his managers to "pump additional premium volume" to those carries with whom it has contingent commissions agreements.  Comp. ¶ 281.[4]

---

[4] *See also* Comp. ¶ 241 (describing how a Marsh Global Broking executive admitted that "[w]e need to place our business in 2004 with those that have superior financials, broad coverage and **pay us the most**") (emphasis added); Comp. ¶ 248 (describing how an Aon executive acknowledged that "[g]oing forward, we are going to push Zurich.  I just today negotiated our incentive so that we will get paid next year"); Comp. ¶ 271 (describing how a Chief Marketing Officer at Willis stated: "*Don't forget the advantages of placing as much business as possible with the carriers we have negotiated special deals with,* as you look for ways to maximize revenues the last few months of this year and into 2000") (emphasis added); Comp. ¶ 268 (describing how Willis' managing director of Willis Global Markets stated: "Special attention is being given to St. Paul, Chubb, Liberty Mutual, Hartford and Crum & Foster due to special [PSA] agreements" and later explaining that "moving business wherever possible to our Partner markets . . . will have significant revenue implications to the Group"); Comp. ¶¶ 276-78 (describing how a Gallagher executive discussed with representatives of Chubb that contingent commissions were designed to "drive" business to Chubb and later told his branch managers: "we have other special bonus agreements in place with markets like Chubb, Fireman's Fund, and Hartford .... [w]e are expected to seek out these special agreements and support them so that additional revenues can be earned"); Comp. ¶ 291 (describing how Acordia/Wells Fargo steered

In order to secure the most lucrative contingent commission arrangements, the Broker Defendants abandoned their duties to their customers by engineering the placement of policies with the Insurer Defendants, thereby providing the preferred insurer with "an unfair competitive advantage." For example, the managing director of Willis Global Markets explained: "our PSA's are a reward for services that we provide to carriers such as carrier advocacy. . . . *Carrier advocacy includes transparency into our organization and our book, access to our leadership and our clients, an unfair competitive advantage as well as other benefits that partnership brings*." Comp. ¶ 267 (emphasis added).

Similarly, in 2000, Marsh described one of its "Business Development Strategies" and the gains won by Insurer Defendants for entering into contingent commission agreements as follows: "They have gotten the 'lions [sic] share of our Environmental business PLUS *they get an unfair 'competitive advantage['] as our preferred [sic] insurance company."* Comp. ¶ 242.

The Complaint also alleges that those insurers who refused to pay contingent commissions (*i.e.*, "pay to play") were left out of the game. *See, e.g.*, Comp. ¶ 245 (describing a report from Marsh's Los Angeles office which details how Marsh brokers were ordered to temporarily stop selling personal coverage lines from AIG in order to avoid reducing commission payments to Marsh); Comp. ¶ 249 (describing how Aon steered business away from Hartford and decided to examine all placements with Hartford and recommend that Aon only keep clients with Hartford on the lines that paid contingent commissions). [5]

---

its clients to purchase insurance policies at artificially high prices to its "premier provider" such as CNA, Hartford and St. Paul Travelers); Comp. ¶ 294 (describing how USI dictated to its brokers which insurance companies' policies they were to sell and were told to "stick with the higher commission carriers").

[5] *See also* Comp. ¶ 262 (describing Aon's concern that doing business with AIG in 2001 was not as lucrative with doing business with Chubb and Fireman's Fund since AIG was not providing any contingent commissions and stating how Aon should only use AIG for certain accounts).

The Complaint also alleges that Defendants misrepresent and fail to disclose the contingent commission agreements and the impact those agreements have on Defendants' overall profitability.  Comp. ¶ 205.  For example, Marsh directed employees to redact and "white out" the commission income identified in the insurance "binders," *i.e.*, the temporary insurance contracts, prepared by the insurance carrier and sent to Marsh for transmittal to the client/insured.  Comp. ¶ 214.  A former Marsh managing director, Joshua M. Bewlay, who, last year, pled guilty to a felony charge of scheming to defraud, revealed that Marsh established a procedure or "protocol" intended to discourage the client from obtaining an answer on how Marsh was compensated by insurers.  Comp. ¶ 216.  Mr. Bewlay testified that he was "made aware of a Marsh protocol designed to prevent Marsh's clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue…." and that the "protocol required multiple layers of inquiry to discourage the client from obtaining an answer."  *Id*.  The protocol directed Marsh employees to tell inquiring clients that Marsh received up to no more than 1% to 2% under PSAs when in fact Marsh earned as much as 10% to 15% in this way.  Comp. ¶¶ 216-217.

By way of further example, neither Wells Fargo nor Willis ever advised their clients of the amounts of contingency fees received from insurers in exchange for the placement of their insurance business.  Comp. ¶ 218.  Similarly, the Complaint alleges that Gallagher avoided disclosing to clients the existence of contingent commissions "at all costs" and that USI and HRH likewise failed to disclose such arrangements to their clients.  Comp. ¶¶ 220-23.

**C.     Bid-rigging**

The bid-rigging conduct described in the Complaint was a further means by which Defendants concealed their blatant steering described above.  By submitting fake or "protective"

bids or quotes to the policyholder client, the Defendants were able to create the *illusion* of competition, while hiding the fact that the business was allocated by the broker to the preferred insurer. The bid-rigging conduct was simply one of many means to facilitate and achieve the overall objective of the conspiracy - that is, to increase profits by reducing competition. Each participant in the conspiracy is alleged to have shared this common purpose. Comp. ¶ 307.

The bid-rigging was facilitated by the Broker Defendants, who solicited and obtained fictitious high price quotes from Insurer Defendants to guarantee that certain other, predetermined preferred Insurer Defendants would win the fictitious bidding competition for a prearranged premium amount. *Id.* For example, the Complaint describes how various executives from Marsh and certain Insurer Defendants, including ACE, AIG, Zurich, St. Paul, Hartford, and Munich (many of whom have pled guilty to felony charges of scheming to defraud), participated in the bid-rigging scheme. Comp. ¶¶ 307-336. The guilty plea of an AIG executive, John Mohs, is illustrative of the guilty pleas of other AIG, ACE and Zurich employees:

> Marsh and AIG personnel periodically instructed Mohs to submit specific quotes for insurance rates that Mr. Mohs believed:
>
> (a)  were higher than those of incumbent carriers
> (b)  were designed to ensure that the incumbent carriers would win certain business and
> (c)  resulted in clients' being tricked or deceived by this deceptive bidding process.

Comp. ¶ 311.[6]

The Complaint sets forth specific additional allegations regarding the activities associated with Defendants' bid-rigging and how Broker Defendants arranged for noncompetitive quotes to

---

[6] *See also* Comp. ¶ 329 (guilty plea of another former AIG executive states how a former executive of Marsh Global Broking described how Marsh "protected AIG's ass" when it was the incumbent carrier up for policy renewal, and in return, Marsh expected AIG to help Marsh "protect" other incumbents by providing bids).

ensure that the client would select the carrier.  These include Aon's use of inflated bids with

CNA, AIG and Zurich (Comp. ¶¶ 337-342); HRH's practice to give a "last look" to the

incumbent insurance company allowing the incumbent to match the low bid (Comp. ¶ 343);

Gallagher's practice of informing insurance companies including CNA "what price they had to

beat" (Comp. ¶ 344); and Willis' practice of soliciting false bids from Zurich and CNA.  Comp.

¶ 345.

     Moreover, Plaintiffs allege specific, detailed facts concerning the Insurer Defendants'

participation in this bid-rigging scheme.  For example, the Complaint describes how another

Insurer Defendant, Munich, complied with Marsh's requests to submit false bids with the

understanding that Munich would be protected when its policies were up for renewal.  Comp.

¶¶ 323-324. [7]  Similarly, ACE's President of Casualty Risk stated they "support[ed]" Marsh's

business model, explaining that "Marsh is constantly asking us to provide what they refer to as

'B' quotes for a risk.  They openly acknowledge we will not bind these 'B' quotes in the layers

we are be [sic] to quote but that ***they 'will work us into the program' at another point.***"  Comp.

¶ 328 (emphasis added).  In an exchange between Geoffrey Gregory, the President of ACE's

casualty unit in Philadelphia and Susan Rivera, the President and CEO of ACE, describing the

arrangement of bids with Marsh, Gregory warned Rivera that the way the bids were being

arranged ***"could potentially be construed as simply creating the appearance of competition."***

Comp. ¶ 331 (emphasis added).

---

[7] *See also* Comp. ¶ 332 (former ACE assistant vice president stated: "Currently, we have about
$6M in new business which is the best in Marsh Global Broking, so I do not want to hear that
you are not doing 'B' quotes or we will not bind anything"); and Comp. ¶ 334 (email from
former Marsh executive in Marsh Global Broking to obtain an inflated "B" quote from Zurich so
that the business could be steered to St. Paul Travelers, stating: "Can you get me a B from
Zurich.  Client will be binding with [incumbent] St. Paul at $270,000 all coverages as expired.
$325,000 should work."). *Id.*

### D.   Undisclosed Compensation Received through the Broker Defendants Reinsurance and Wholesaling Subsidiaries

The Complaint sets forth how Broker Defendants obtained additional fees by conditioning the purchase of primary insurance on the placement of such coverage with reinsurance carriers through the Broker Defendants' reinsurance subsidiaries.  Comp. ¶ 358. Specifically, the Complaint alleges in detail how the head of Willis' Northeast Marketing Division instructed brokers to "run all fee accounts through Stewart Smith, the Willis wholesaler, wherever possible," to "feed our biggest contingency players, Hartford, St. Paul, Chubb and Liberty Mutual," and to "look to get Willis Re [reinsurance] involved in any accounts possible." Comp. ¶¶ 360, 362.[8]

Likewise, the Complaint alleges that Gallagher utilized its relationships with its "preferred" carriers to obtain additional fees for its reinsurance subsidiaries.  Comp. ¶ 359.  For example, in a letter dated May 7, 2002, VP of Market Relations for the Brokerage Services Division, Craig Van der Voort stated to Executive VP of Brokerage Services, James Gault, that he would "try and leverage the specific companies [AIG, Chubb and Hartford] for more of their reinsurance business." *Id.*  Aon also promised to steer retail business to AIG in return for AIG's commitment to use Aon Re's reinsurance services.  Comp. ¶ 366.  The Complaint includes additional allegations regarding Aon, Chubb, AIG, RLI and Liberty Mutual conditioning insurance purchases on the placement of reinsurance. Comp. ¶¶ 361-372.

Broker Defendants received additional income by improperly placing their clients' business with insurers through related wholesale entities that purport to act as intermediaries between broker and insurer, and receive commissions, known as "wholesale payments" from the

---

[8] *See also* Comp. ¶¶ 363-371 (describing steering of reinsurance between Aon and various Insurer Defendants including Chubb, AIG, Liberty Mutual and RLI).

insurers for placing business. Comp. ¶ 348. The payments made to these wholesale entities create the same economic incentives as contingent commissions. Comp. ¶ 354. For instance, Willis placed its clients' business through its wholesaler, Stewart Smith, to generate additional commissions[9] and between 2002 and 2004, Stewart Smith paid Willis over $62 million for brokering business originated by Willis through Stewart Smith. Comp. ¶¶ 349, 353. The carriers that sold insurance to Willis' clients with Stewart Smith as an intermediary include, *inter alia*, ACE USA, Hartford, Renaissance Re Group, XL Capital, AIG, Axis Capital, Liberty Mutual, St. Paul Travelers and Zurich.[10] Comp. ¶ 353.

The wholesale payments to the Broker Defendants are part of the same scheme, course of conduct and conspiracy described above and throughout the Complaint, under which the Broker Defendants encourage reliance on their purported independent expertise while failing to disclose the inherent conflicts of interests they have created through the contingent commissions and wholesale payments. Comp. ¶ 358.

### E.    Defendants Profited From Their Undisclosed Arrangements

Defendants' concerted efforts to conceal their improper compensation arrangements resulted in significant improper revenues. Specifically, the Complaint details the amount of premiums received and contingent commissions paid in 2004 by certain of the Insurer Defendants.[11]   For example, in October 2004, when Willis pledged to end the practice of

---

[9] An email from the managing director of Willis Global Markets to another Willis employee states that before a "non-owned intermediary" could be used, he "must have made every effort, used every resource and relationship to place the business internally …" Comp. ¶ 351.

[10] An email from the Managing Director of Willis Global Markets to another Willis employee states that before a "non-owned intermediary" could be used, he must "have made every effort, used every resource and relationship to place the business internally. . . ." Comp. ¶ 351.

[11] AIG received $27,972,154,000 in net premiums and paid $159,441,270 in contingent commissions; Berkshire Hathaway received $15,762,335,000 in net premiums and paid $515,428,354 in contingent commissions; Chubb received $9,536,873,000 in net premiums and paid $222,209,140 in contingent commissions; and Liberty Mutual received 12,514,360,000 in

receiving contingent commissions, Willis announced that it had expected to generate an estimated $160 million worldwide in 2004 contingent commissions.  Comp. ¶ 236.

Both the Complaint and the RICO Case Statement allege, in great detail, that Defendants' fraudulent scheme was designed to increase revenue in the form of contingent compensation. The Broker Defendants benefit by reaping substantial amounts of additional undisclosed fees and the Insurer Defendants benefit by selling their products at above market rates.  RICO Case Statement at 38.  Defendants engaged in a conspiracy that creates a conflict of interest clearly at odds with the representations regarding the services they will provide as well as the duties inherent in the relationship which exists between Plaintiffs and the Class, on the one hand, and the Defendants, on the other.

### F.    Governmental Investigations and Settlements

Defendants' scheme has recently come to light following investigations undertaken by various attorneys general and state insurance departments.  To date, ten individuals, including former employees of Defendants AIG, ACE, Zurich or Marsh, have pled guilty, *inter alia*, for their participation in a scheme to trick and deceive clients pursuant to a deceptive bidding process.  Additionally, New York Attorney General Elliot Spitzer, together with the Superintendent of Insurance of New York and various other state attorneys general, including Connecticut and Minnesota, has entered into settlement agreements or assurances of discontinuance with Marsh, Aon, and Willis.  Similarly, Spitzer, along with the Director of the

---

net premiums and paid $106,372,060 in contingent commissions.  Comp. ¶ 11.   Marsh received $845 million in contingent commissions in 2003 alone, accounting for 7% of its overall revenue; Aon received approximately $117 million in contingent commission for the 9 months ended September 30, 2004 and approximately $170 million in contingent commissions in 2003 (a quarter of the company's $663 million net income that year); Gallagher received approximately $33 million in contingent commissions in 2003; BB&T reported revenues of over $22 million from contingent commissions in 2004; and Brown & Brown collected almost $28 million in contingent commissions for the first three months of 2005.  Comp ¶ 236.

Illinois Division of Insurance and other state agencies, entered into a Stipulation and Consent Order with Gallagher. Each settlement agreement or assurance of discontinuance required, among other things, that each Broker Defendant provide full disclosure of all forms of compensation received from insurers.

In fact, New York State Attorney General Elliot Spitzer, testifying before the New York State Assembly Standing Committee on Insurance regarding Contingent Commission Agreements, stated: "Contingent commissions have infected practically every line of insurance business we examined, including employee benefits, medical malpractice, property, casualty, excess and surplus lines, executive risk, personal lines, marine and aviation." Comp. ¶ 10.

Defendants, in entering into various settlements and consent decrees, have admitted to the wrongdoing alleged in the Complaint and have issued public apologies for their conduct. For example, Aon's settlement with various state attorneys generals included a public apology for the misdeeds of the company. Comp. ¶ 209. Moreover, Marsh, in connection with its settlement apologized "for the conduct that led to the actions filed by the New York State Attorney General and Superintendent of Insurance and that the recent admissions by former employees of Marsh and other companies have made clear that certain Marsh employees unlawfully deceived their customers. Such conduct was shameful, at odds with Marsh's stated policies and contrary to the values of Marsh's tens of thousands of other employees."

Additionally, Gallagher's Stipulation and Consent Order with the Illinois State Attorney General and Illinois Department of Insurance on May 18, 2005, disclosed that Gallagher systematically steered clients to the insurers that paid it the largest kickbacks. Comp. ¶ 211.

The Complaint further details Defendants' acknowledgment that they have promoted their profits over their fiduciary relationships with their clients. For example, Joseph Plumeri,

the CEO of Broker Defendant Willis, recently stated: "For too long, this business has been about the placement only - what I've come to call manufacturing.… And, if contingents create the appearance of a conflict for some brokers, they create that appearance for every broker." Comp. ¶ 12. Moreover, as a result of the governmental investigations into Defendants' compensation practices, several Defendants including, *inter alia*, Marsh, Aon, BB&T, HRH Gallagher, Willis, Liberty Mutual, AIG and ACE have discontinued the use of Contingent Commission Agreements and instituted other reforms designed to avoid conflicts of interest in the brokerage industry. Comp. ¶¶ 396, 399. Likewise, as part of their settlement agreement and/or assurances of discontinuance with various state attorney generals, Aon, Willis and Gallagher have also agreed to cease requesting or accepting any contingent compensation.

Insurers have also acknowledged the inherent conflict that exists. For example, a letter from Paul Mattera, Senior Vice President of Liberty Mutual, to NAIC Commissioner M. Diane Koken, dated March 9, 2005, regarding contingent commission, is by far most telling about why a ban on contingent commissions is necessary to avoid conflicts of interests in the brokerage industry. The letter states the following, in relevant part:

> Liberty Mutual believes that the cornerstone of good regulation and sound business practice is transparency in insurance transactions. Our customers deserve to know whether the producer they are working with represents them or us. All parties must be clear as to "who represents whom." Comp. ¶ 398. Thus, we support the application of disclosure requirements to agents and brokers. The integrity of the entire transaction flows from a clear understanding of whose interests are represented by the producer.…
>
> Prohibition of Broker Contingent Commissions
>
> While appropriate broker disclosure is in the customer's interest - and we strongly support it - disclosure alone is not enough. Brokers can be conflicted when they receive payment from both buyers and sellers. In fact, the concerns that give rise to the "best available insurer" requirements, discussed above, are ameliorated when contingent commissions are out of the buying and selling equation. **Liberty Mutual believes broker "contingent commissions" are inappropriate and**