<u>FOR PUBLICATION</u>

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ———————————————— | : Hon. Faith S. Hochberg |
| IN RE: INSURANCE BROKERAGE | : |
| ANTITRUST LITIGATION | : |
|  | : MDL No. 1663 |
|  | : |
| **APPLIES TO ALL ACTIONS** | : Date: October 3, 2006 |
|  | : |
| ———————————————— | : **Civil Action No. 04-5184 (FSH)** |
|  | : |
| IN RE: EMPLOYEE-BENEFIT INSURANCE | : |
| BROKERAGE ANTITRUST LITIGATION | : |
|  | : |
|  | : |
| **APPLIES TO ALL ACTIONS** | : **Civil Action No. 05-1079 (FSH)** |
|  | : |
| ———————————————— | : |

## <u>HOCHBERG, District Judge</u>:

In this Multidistrict Litigation, 38 cases brought throughout the country have been assigned to this Court for all pretrial proceedings.  The Plaintiffs claim a vast conspiracy between insurance brokers and carriers to rig bids and to allocate or "steer" customers to defeat competition in the insurance market in exchange for high brokerage commissions.  This matter comes before the Court upon Defendants' Motion to Dismiss the First Consolidated Commercial Class Action Amended Complaint (the "Commercial Complaint") and the First Consolidated Employee Benefits Class Action Amended Complaint (the "Employee-Benefits Complaint") (together, "the Complaints") pursuant to Fed. R. Civ. P. 12(b)(6).  The Court has considered the

written submissions of the parties, and heard oral arguments on July 26, 2006.[1]

I.      **Background.**

A.  **The Parties**

The plaintiffs in the Commercial Case are businesses, individuals, and public entities who, between August 26, 1994 and the date of the class certification (the "Class Period"), have engaged the services of the Broker Defendants to obtain advice with respect to the procurement or renewal of commercial property and casualty insurance, and entered into or renewed a contract of insurance with one of the Insurer Defendants.

The plaintiffs in the Employee-Benefits Case purport to represent two distinct classes: (1) a class of employees (the "Employee-Plaintiffs") who obtained insurance from the Insurer Defendants through their employers' benefits plans, and purchased from them certain supplemental insurance coverages; and (2) a class of employers (the "Employers-Plaintiffs"), who, with the assistance of the Broker Defendants, contracted with the Insurer Defendants to provide group insurance coverage to their employees as part of their employee benefits plans.

The Complaints name two groups of defendants: a group of insurance brokers (the "Broker Defendants"), and a group of insurance carriers (the "Insurer Defendants"), described in the Complaints as the "nation's largest insurance brokers ... and insurance companies." Commercial Complaint ("Comm. Compl.") ¶ 1.  The Broker Defendants, together with their

---

[1] The Defendants have submitted two omnibus briefs, one on behalf of a group of insurance brokers (the "Broker Defendants"), and one on behalf of a group of insurance carriers (the "Insurer Defendants") (collectively, "the Defendants").  Several Defendants have also filed supplemental briefs, in which they expressly adopted the Brokers and Insurers' arguments, and set forth additional arguments for dismissal.  This Opinion addresses both the omnibus and the individual motions.

affiliates, provide their clients with risk management and insurance brokerage services,

including, *inter alia*, "analysis of risk and insurance options, procurement and renewal of

insurance, interpretation of insurance policies, monitoring the insurance industry on the client's

behalf, keeping clients informed as to developments in the insurance marketplace, and assisting

clients with the filing and processing of claims against the policies they place." *Id.* at ¶ 178.  The

Insurer Defendants and their subsidiaries develop, market and sell a variety of insurance and

reinsurance products for individuals and business clients, in the United States and abroad.

###### B.  Procedural History

On October 14, 2004, New York State Attorney General Eliot Spitzer ("NYAG") filed a

civil complaint in New York State Supreme Court against Marsh & McLennan ("Marsh"), one of

the Defendants in this action, alleging, among other things, that Marsh had solicited rigged bids

for insurance contracts, and had received improper contingent commission payments in exchange

for steering its clients to a select group of insurers.  *See People of the State of New York v. Marsh*

*& McLennan Cos., Inc.*, No. 04/403342 (N.Y. Sup. Ct., Oct. 14, 2004).  The NYAG Complaint

was followed by other governmental and regulatory investigations throughout the country, and

prompted the filing of several federal actions based on allegations similar to those raised in the

complaint against Marsh.  *See Opticare Health Systems, Inc. v. Marsh & McLennan Companies,*

*Inc., et al.*, C.A. No. 1:04-6954 (S.D.N.Y. 2004); *QLM Associates, Inc. v. Marsh & McLennan*

*Companies, Inc., et al.*, C.A. No. 2:04-5184 (D.N.J. 2004); *Accent On Eyes Corp. v. Marsh &*

*McLennan Companies, Inc., et al.*, C.A. No. 2:04-4535 (E.D.N.Y. 2004); *Eagle Creek, Inc. v.*

*ACE INA Holdings, et al.*, C.A. No. 2:04-5255 (E.D. Pa. 2004).

On February 17, 2005, the Judicial Panel on Multidistrict Litigation transferred these

cases to this Court for coordinated or consolidated pretrial proceedings pursuant to the

multidistrict litigation ("MDL") procedures set forth in 28 U.S.C. § 1407.  *See In re Insurance*

*Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371 (J.P.M.L. 2005) (establishing MDL No. 1663).

Since that time, additional "tag-along" actions have been conditionally transferred to this MDL.

By Order dated May 25, 2005, this Court directed Plaintiffs to sever their claims

involving commercial property and casualty insurance from their claims involving insurance sold

as part of an employee benefits plan, and on August 8, 2005, the Court consolidated the

transferred actions into two consolidated dockets, *In re Insurance Brokerage Antitrust*

*Litigation* (Civil No. 04-5184) (the "Commercial Case") and *In re Employee-Benefit Insurance*

*Brokerage Antitrust Litigation* (Civil No. 05-1079) (the "Employee-Benefits Case").  *See* Orders

No. 3 and 6.  Plaintiffs filed two Consolidated Amended Complaints on August 1, 2005,

followed by a 153-page Corrected Employee-Benefits Complaint on August 15, 2005, and a 173-

page Corrected Commercial Complaint on August 29, 2005.[2]

### C. Factual Allegations[3]

The thrust of Plaintiffs' Complaints is that Defendants have perpetrated a "massive

scheme to manipulate the market for commercial insurance," and have conspired to "fraudulently

market and sell insurance products and related services to and/or through employee benefits

---

[2] A group of Insurer Defendants has moved to strike the allegations of the Employee-Benefits Complaint concerning property and casualty insurance as immaterial and impertinent pursuant to Fed. R. Civ. P. 12(f).  This motion is denied.  The Court will consider Defendants' arguments as they relate to the sufficiency of the Complaint.

[3] The following is a summary of Plaintiffs' allegations as set forth in the Commercial and the Employee-Benefits Complaints.  The Court repeats these allegations for present purposes, but makes no findings of fact as to any of Plaintiffs' claims.

plans." Comm. Compl. ¶ 1; Employee-Benefits Complaint ("EB Compl.") ¶ 1. Plaintiffs allege

that "the Broker Defendants and Insurer Defendants engaged in a combination and conspiracy to

suppress and eliminate competition in the sale of insurance by coordinating and rigging bids for

insurance policies, allocating insurance markets and customers and raising, or maintaining or

stabilizing premium prices above competitive levels." Comm. Compl. ¶ 1. Through such

practices, according to the Complaints, the Brokers and the Insurers "have created the illusion of

a competitive market for insurance" while "the selection, pricing, and placement of the insurance

products at issue in this litigation were, in fact, the result of Defendants' collusion." *Id.* at ¶ 2.

Plaintiffs claim that as a result of the conspiracy, "the prices paid by plaintiffs and class

members were raised and maintained at artificially high, supra-competitive levels" and that

Plaintiffs "were deprived of the benefits of free and open competition in the purchase of

insurance." *Id.* at ¶ 532. Plaintiffs allege that the Broker Defendants profited from the

conspiracy through the receipt of "exorbitant contingent commissions" and "other undisclosed

kickbacks," and that the Insurer Defendants have improperly increased their profits and revenues

by raising and maintaining the premiums charged to Plaintiffs, without having to compete for

insurance business.

The Complaints rest on the general theory that Defendants' conduct has created "an

overwhelming conflict of interest and breach of duties" and has undermined the nature of the

broker-client and the insurer-insured relationships. Plaintiffs allege that, despite the Brokers'

representations "that they will provide unbiased brokering advice and assistance to their clients in

the selection of insurance products," the Brokers allegedly conspired with the Insurer Defendants

to steer their clients to purchase or renew coverage with the Insurers at inflated prices and/or

reduced coverage and benefits, "at the expense of their clients' best interests and in contravention

of their fiduciary obligations." *Id.* at ¶ 181.  Plaintiffs allege that the Brokers and the Insurer

Defendants have misled their clients into thinking that they are receiving the most economical

and appropriate insurance products, while in fact, the Brokers are steering them towards products

that will maximize the profit of the Defendants.

Plaintiffs contend that the Defendants implemented the conspiracy through two main

schemes: (1) the kickback and steering scheme and (2) the bid-rigging scheme.

### 1. The Kickback and Steering Scheme

The Complaints allege that the Broker Defendants have received undisclosed kickbacks

from the Insurers in the form of contingent commissions (also known as "overrides"), and in

return, have agreed to steer their clients to purchase insurance from certain "preferred" Insurers

with whom the Brokers had the most profitable arrangements.  As the Complaints explain, the

payment and amount of contingent commissions are based on factors such as: (i) the volume of

insurance that the Brokers place with a particular Insurer ("volume contingency"); (ii) the

renewal of that business ("persistency contingency"); and (iii) the profitability of that business

("claims loss ratios contingency").  *Id.* at ¶ 202.  Contingent commissions are often memorialized

in written agreements between brokers and insurers referred to as "placement service

agreements" ("PSAs"), "override agreements," or "market service agreements."  The Complaints

describe several examples of contingent commission agreements.  *Id.* at ¶ 224-231.

Plaintiffs claim that the Defendants have fraudulently misrepresented and failed to

adequately disclose these contingent commission agreements.  In particular, Plaintiffs allege that

the Defendants have failed to disclose (a) the existence, source, and amount of the contingent

commissions; (b) the material impact of contingent commissions on Defendants' profitability; (c) that Plaintiffs ultimately pay the cost of these undisclosed fees through higher premiums; and (d) that contingent commissions have created economic incentives for the Defendants to act contrary to their contractual and fiduciary duties to the Plaintiffs.  While Plaintiffs acknowledge that some of the Defendants have begun to take steps to disclose the payment and receipt of contingent commissions, they assert that many Defendants continue to make inadequate disclosures of their contingent commission agreements.

Plaintiffs allege that the Broker Defendants improperly steer their clients to certain preferred insurers to maximize contingent commission revenues.  In support of their allegations, Plaintiffs point to several statements allegedly made by some broker executives.  *See, e.g.*, Comm. Compl. ¶ 240 (alleging that a former managing director with Marsh stated that "some [contingent commission agreements] are better than others ... I will give you clear direction on who [we] are steering business to and who we are steering business from."); *Id.* at ¶ 259 (alleging that a former Aon executive stated: "With our override agreements with Chubb and Fire Fund, we need to direct all new business exclusively to them for the next month and beyond."); *Id.* at ¶ 271 (alleging that a Chief Marketing Officer at Willis wrote in an email: "Don't forget the advantages of placing as much business as possible with the carriers we have negotiated special deals with, as you look for ways to maximize revenues the last few months of this year and into 2000."); *Id.* at ¶ 268 (alleging that a managing Director of Willis stated: "Special attention is being given to St. Paul, Chubb, Liberty Mutual, Hartford and Crum & Forster due to special [PSA] agreements."); *Id.* at ¶ 281 (stating that "a Gallagher executive instructed his managers to 'pump additional premium volume' to those carriers with whom it had contingent commissions

agreements."); *Id.* at ¶ 294 (alleging that "USI employees were told, at monthly department meetings, to 'stick with the higher commission carriers.'").

The Complaints further allege that the Brokers provided "financial incentives" to employees who maximized contingent commission revenues by steering clients to the preferred insurers, and "reprimanded" their employees for failing to steer business to those insurers. *See, e.g.*, *id.* at ¶ 246 (alleging that one Marsh employee was elevated to vice president in part because he had been able to renew a client's business by "moving" that client to an insurer with which Marsh had a PSA). Plaintiffs also claim that some Insurers agreed to pay the salaries of certain Brokers' employees, as well as "hiring subsidies," in exchange for the Brokers' promise to steer new business to the Insurers. *See, e.g.*, *id.* at ¶ 287 (alleging that Chubb, an insurance company, agreed to pay a hiring subsidy to a broker, Gallagher, and that an internal document stated that "in return for Chubb's contribution to individuals salary, [Gallagher's unit] was required to meet specific new business goals with Chubb.")

The Complaints assert that those insurers who refused to pay contingent commissions were "left out of the game." *See, e.g.*, *id.* at ¶ 249 (alleging that in 2003, Aon steered business away from Hartford in retaliation for Hartford's decision to use a different broker for its own directors and officers policies; Aon allegedly decided to examine all placements with Hartford and recommended that Aon keep clients with Hartford on the lines that paid contingent commissions); *Id.* at ¶ 245 (describing a report from Marsh's Los Angeles office which directed the brokers to temporarily stop selling personal coverage lines from AIG because Marsh did not want to exceed an annual cap on policies with AIG in states with a high risk of earthquakes and hurricanes, since exceeding the limit could reduce contingent commissions to Marsh).

In addition to contingent commissions, Plaintiffs claim that the Brokers obtained undisclosed compensation from the Insurers through "unlawful tying arrangements" under which the Brokers steered primary insurance contracts to the Insurers on the condition that those Insurers use the Brokers' reinsurance subsidiaries for their reinsurance business. Plaintiffs allege that such arrangements allowed the Brokers "to reap additional improper revenue," and "had the effect of increasing the price of reinsurance," with the increased costs being passed on to the policyholders. *See, e.g.*, *id.* at ¶ 359 (quoting a letter from a Gallagher executive, in which he stated that he would "try and leverage the specific companies [AIG, Chubb and Hartford] for more of their reinsurance business."); *Id.* at ¶ 363-67 (alleging that Aon promised to steer business to AIG, Liberty Mutual Group, and Chubb in return for their commitment to use Aon's reinsurance services); *Id.* at ¶ 368-71 (describing Aon's alleged practice of entering into "clawback" agreements, under which Aon's reinsurance subsidiary would discount its reinsurance brokerage commissions, and in return, would steer retail insurance business to certain insurers).

Finally, Plaintiffs contend that the Brokers received additional income (known as "wholesale payments") by placing their clients' business with insurers through related wholesale entities "purport[ing] to act as intermediaries between the Broker Defendants and the Insurer Defendants." *Id.* at ¶ 348. According to the Plaintiffs, wholesale payments create the same incentives as contingent commissions, and are part of the same scheme and conspiracy under which the Brokers mislead their clients into believing that they provide independent brokerage advice. These allegations of the Complaint only focus on one Broker Defendant, Willis. *Id.* at ¶ 349-53 (claiming that Willis placed its clients' business through its wholesaler, Stewart Smith, to

generate additional commissions, and that between 2002 and 2004, Stewart Smith paid Willis over $62 million for brokering business originated by Willis through Stewart Smith.).

### 2.   The Bid-Rigging Scheme

The Complaints allege that "the Defendants colluded in a bid-rigging scheme to allocate customers and to deceive Plaintiffs into believing that the Broker Defendants were obtaining competitive insurance bids from the Insurers on behalf of their clients."  Comm. Compl. ¶ 307. The bid-rigging allegations fall into two categories: (a) allegations against the Brokers; (b) allegations against the Insurers.[4]

#### a.   Allegations Against the Brokers

Plaintiff claim that the bid-rigging was "facilitated by the Broker Defendants, who solicited and obtained fictitious high quotes from the Insurer Defendants to guarantee that certain preferred insurers would win the bidding competition, and by determining the terms of the winning and losing bid."  According to the Complaints, the Brokers arranged for fictitious quotes (referred to as "A quotes," "B quotes," and "C quotes") to be submitted to the client. "A quotes" refers to the quotes solicited by a broker when the broker had an incumbent carrier for one of its

---

[4] As clarified by Plaintiffs at oral argument, Plaintiffs "[do not] have bid-rigging allegations against each and every defendant in this case" and only purport to assert bid-rigging against Defendants Aon, Gallagher, HRH, Marsh, ULR, Willis, ACE, AIG, Chubb, CNA, Fireman's Fund, Hartford, Munich, St. Paul Travelers, and UnumProvident. *See* July 26, 2006 Transcript of Oral Argument ("Tr.") at 54; Plaintiffs' August 4, 2006 Submission at 2. This does not preclude, however, other Defendants from being named as participants in bid-rigging if and when there is a good faith factual basis to support it.

As set forth in the Complaints and at oral argument, the gist of Plaintiffs' contention is that there were two primary schemes for suppressing competition in the insurance market – "bid-rigging" and "steering."  In subsequent correspondence, Plaintiffs appear to restate their theory as a conspiracy to allocate customers using a variety of manipulative devices, including "bid-rigging."  For current purposes, this is a distinction without importance.

clients whose insurance policy was up for renewal; if the insurer agreed to make a quote at the targeted premium and policy terms demanded by the broker, the insurer was guaranteed the policy renewal.  "B quotes" (also known as "backup quote" or "accommodation quote") refers to "phony" quotes solicited from non-incumbent insurers with the understanding that these insurers would not submit a competitive bid; "B quotes" were used to ensure that the incumbent carrier would get its policy renewed, and the "B quote" insurers allegedly knew that "their turn would come later."  "C quotes" refers to the quote solicited from insurers when there was no insurance carrier "to protect."

  In support of their bid-rigging allegations against the Brokers, Plaintiffs rely extensively on the guilty pleas of several executives from Marsh and other insurance and brokerage companies who acknowledged that they had submitted false quotes and participated in a bid-rigging scheme.  *Id.* at ¶ 311 (citing the guilty plea of an AIG executive, John Mohs, which states, in relevant part: "Marsh and AIG personnel periodically instructed Mohs to submit specific quotes for insurance rates that Mohs believed: (a) were higher than those of incumbent carriers; (b) were designed to ensure that the incumbent carriers would win certain business; and (c) resulted in clients being tricked and deceived by this deceptive biding process.").  Plaintiffs also explain how Aon allegedly used Zurich and other insurers to inflate bids, and assert that Aon ordered its brokers on several occasions to contact Insurer Defendants AIG, CNA and Zurich to inform them of a competitor's bid.  *Id.* at ¶ 337-42.  They further describe: (a) HRH's alleged practice of providing a "last look" to the incumbent insurance company;  *Id.* at ¶ 343; (b) Gallagher's alleged practice of informing insurance companies "what price they had to beat" and that they could secure "whatever they wanted" from Gallagher; *Id.* at ¶ 344; and (c) Willis'

alleged practice of soliciting false bids from CNA and Zurich.  *Id.* at ¶ 345.

### b.  Allegations Against the Insurers

Plaintiffs contend that the Insurer Defendants colluded with the Brokers in the bid-rigging scheme "because they were promised protection from competition in other bids when their business was up for renewal."  *Id.* at ¶ 307.  Plaintiffs also maintain that "bid-rigging enables the Insurer Defendants to keep premium prices high," and allows them to recoup the cost of contingent commissions paid to the Brokers.  EB Compl. ¶ 266.  Relying primarily on the NYAG Complaint against Marsh, Plaintiffs describe several instances where certain Insurers allegedly complied with a Broker's request to submit false bids.  *See* Comm. Compl. ¶ 310-36 (alleging that "Munich complied with Marsh's request to submit a B quote so that the incumbent, AIG, would get the business."); *Id.* at ¶ 93 (quoting an ACE's executive as stating: "Marsh is constantly asking us to provide what they refer to as 'B' quotes for a risk.  They openly acknowledge we will not bind these 'B' quotes in the layers we are be [sic] to quote by that they 'will work us into the program' at another point.").

### D. Legal Claims

The Commercial Complaint asserts six causes of action: (1) Violation of the Racketeering Influence and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d) (Counts I, II, and III); (2) Unlawful conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Counts IV and V); (3) Violation of the antitrust laws of forty eight states and the District of Columbia (Count VI); (4) Breach of fiduciary duty (against the Broker Defendants only) (Count VII); (5) Aiding and abetting breach of fiduciary duty (against the Insurer Defendants only) (Count VIII); and (6) Unjust enrichment (Count IX).  The Employee-Benefits

Complaint alleges the same causes of action, with the exception of claims asserted against the Insurer Defendants on behalf of the Employee-Plaintiffs for breaches of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), Section 502(a)(2), 29 U.S.C. § 1132(a)(2).[5]

Plaintiffs seek restitution, compensatory, punitive and treble damages, disgorgement, injunctive and declaratory relief, and attorneys' fees and costs.  Defendants move to dismiss the Complaints on multiple grounds.  Each ground will be discussed together with the law applicable to a motion to dismiss on such ground.

## II.    <u>Standard of Review.</u>

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) should be granted "if it appears to a certainty that no relief could be granted under any set of facts which could be proved."  *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).  While a court need not credit a complaint's "bald assertions" or "legal conclusions," it is required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff.  *Id.* (citing *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989)); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997).   In evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court may consider only the Complaint, exhibits attached to the Complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based on those documents.

---

[5] While the Employee-Benefits Complaint asserts ERISA claims on behalf of both the Employer-Plaintiffs and the Employee-Plaintiffs, Plaintiffs have expressly withdrawn the ERISA claims brought on behalf of the Employer-Plaintiffs.  *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Employee-Benefits Complaint at 60 n.32.

*Pension Guaranty Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1992).

**III.    Analysis.**

**A.  Motion to Dismiss Federal Antitrust Claims**

Defendants argue that (1) Plaintiffs' federal antitrust claims are barred by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 et seq.; and (2) the Complaints fail to allege facts sufficient to state a claim under Section 1 of the Sherman Act.

**1.  The McCarran-Ferguson Act**

The McCarran-Ferguson Act ("the Act"), enacted in 1945, provides for a limited, conditional exemption from federal antitrust laws.  Section 1012(b) of the Act states, in relevant part:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee of tax upon such business, unless such Act specifically relates to the business of insurance ....; *Provided* that ... the Sherman Act shall be applicable to the business of insurance to the extent that such business is not regulated by State law, ...."  15 U.S.C. § 1012(b) (emphasis in original).

Section 1013(b) provides that: "Nothing contained in this Chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."  15 U.S.C. § 1013(b).  Therefore, the McCarran-Ferguson exempts from federal antitrust liability conduct that (1) is part of the "business of insurance;" (2) is "regulated by state law;" and (3) does not constitute a "boycott, coercion or intimidation."

The Court first considers whether the challenged practices are "the business of insurance."  "The process of deciding what is and what is not the business of insurance is inherently a case-by-case problem."  *Group Life v. Health Insurance Co. v. Royal Drug Co.*, 440

-14-

U.S. 205, 252 (1979) (Brennan, J., dissenting) ("Royal Drug").  While the Act does not define "business of insurance," the case law has developed a series of guidelines and principles to consider in determining whether a particular practice falls within the reach of the McCarran-Ferguson exemption.  Initially, the Supreme Court adopted a rather expansive interpretation of "business of insurance," addressing the issue in terms of "issuance of policies," "contracts," and payment of insurance claims.  *See Prudential Insurance Co. v. Benjamin*, 328 U.S. 408, 416-17 n. 15 (1946).  The Court subsequently clarified its understanding of the "business of insurance" in *National Securities*, where it instructed that the focus be upon "the relationship between the insurance company and the policyholder."  *Securities and Exchange Commission v. National Securities, Inc.*, 393 U.S. 453, 460 (1969) ("The relationship between the insurer and the insured, the type of policy which could be issued, its reliability, interpretation and enforcement – these were the core of the 'business of insurance.'").

Two later decisions further refined the *National Securities* definition of "business of insurance" in the antitrust context.  First, in *Royal Drug*, the Court emphasized that the McCarran-Ferguson Act exempts insurance "activities", rather than insurance "companies", from federal antitrust laws.  *Royal Drug*, 440 U.S. at 210-11 (holding that "the statutory language in question here does not exempt the business of insurance companies from the scope of the antitrust laws.  The exemption is for the "business of insurance," not the "business of insurers ...."); *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 783 (1993) (citing *Royal Drug*, 440 U.S. at 232-33) ("the McCarran-Ferguson Act immunizes activities rather than entities ....").  *Royal Drug* involved an alleged conspiracy to fix the price of prescription drugs.  *Royal Drug*, 440 U.S. at 207.  The plaintiffs, a group of independent pharmacies, claimed that the "Pharmacy

agreements" between Blue Shield, an health insurer, and three participating pharmacies allowed the participating pharmacies to offer prescription drugs to customers at a lower price than the independent pharmacies could.  *Id.* at 207.  The Supreme Court held that the Pharmacy agreements were not part of the "business of insurance" and thus were not exempt from federal antitrust laws.  *Id.* at 214-34.  In so holding, the Court reasoned that these agreements did not concern the underwriting or spreading of risk because they were "legally indistinguishable from countless other business arrangements" between any two parties.  *Id.* at 215.  The Court also found that the Pharmacy agreements were "not 'between insurer and insured,'" but rather, "separate contractual arrangements" between Blue Shield and the participating pharmacies.  *Id.* at 216.  Noting that the Act did not create a "blanket exemption from the antitrust laws," the Court finally explained that the Act's legislative history demonstrated that such collateral agreements were not intended to qualify as "business of insurance" as Congress was primarily concerned with the underwriting of risks and with permitting intra-industry cooperation for statistical and rate-making purpose.  *Id.* at 221-22.

Reaffirming its holding in *Royal Drug*, the Supreme Court in *Pireno* enumerated three specific criteria for determining whether a particular conduct constitutes "the business of insurance:" "*first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry."  *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982) ("Pireno"); *U.S. Dept. of Treasury v. Fabe*, 508 U.S. 491, 497 (1993) (applying *Pireno*'s "tripartite standard for divining what constitutes the 'business of insurance.'").  The Court cautioned, however, that

-16-

none of the three factors is a litmus test, and that the practice at issue should be examined "with respect to all three criteria." *Pireno*, 458 U.S. at 129 (stating that "[n]one of these criteria is necessarily determinative in itself.").

Guided by these precedents, the Court's focus is not on the legality, but rather on the "quality of the practice."[6] *Hartford*, 509 U.S. at 782.  The Court first defines the "practices" at issue.  *Id.* (explaining that in *Pireno*, the Supreme Court "explicitly framed the question as whether a particular *practice* is part of the 'business of insurance' exempted from the antitrust laws ....") (emphasis in original) (internal citation and quotation marks omitted); *Id.* at 781 ("the 'business of insurance' should be read to single out one activity from others ....").[7]  As clarified at oral argument, the Complaints involve two types of practices: "bid-rigging" and "steering."  Bid-rigging is an agreement to manipulate bids for insurance contracts pursuant to which the Brokers solicit collusive, noncompetitive or inflated quotes from the insurers in order to ensure the placement or renewal of insurance policies with certain insurers.  Assuming the truth of

---

[6] The mere fact that the alleged steering and bid-rigging practices may be anti-competitive or illegal does not remove them from the "business of insurance."  As the Third Circuit noted in *Sabo v. Metropolitan Life Insurance Company*, "the language and purpose of the Act speak not of legal insurance transactions, but instead seek to allow states to regulate and enforce the insurance business without fear of unintended federal interference ... if we were to construe the 'business of insurance' phrase by reference to federal legality, the statute would be read out of existence."  137 F.3d 185, 192 (3d Cir. 1998); s*ee also Royal Drug*, 440 U.S. at 210 ("Whether the Agreements are *illegal* under the antitrust laws is an entirely separate question, not now before us.") (emphasis in original); *Hartford*, 509 U.S. at 782 n.10 ("The activities in question here, of course, are alleged to violate federal law, and it might be tempting to think that unlawful acts are implicitly excluded from the 'business of insurance.'  Yet [the MFA]'s grant of immunity assumes that acts which, but for that grant, would violate the Sherman Act ... are part of the 'business of insurance.'").

[7] Defendants argue that contingent commission agreements are part of the business of insurance because they relate to the policy relationship between the insurer and the insured; that rate-fixing constitutes the business of insurance.

Plaintiffs' allegations for purposes of the instant matters, steering consists of implicit and explicit agreements to allocate premium volume to certain preferred insurers for the purpose of increasing the amount of contingent commissions paid to the brokers.

Plaintiffs concede that the activities involved in this case are limited to entities within the insurance industry, but dispute Defendants' contention that these practices have "the effect of transferring or spreading a risk" and that they are "an integral part of the policy relationship between the insurer and the insured."  With respect to the first *Pireno* factor, Defendants explain that "transfer of risk occurs at a price, at a premium" and that under Plaintiffs' theory, Defendants' conduct causes "the risk [to be] transferred at a higher price than it would otherwise be transferred at."  Tr. at 14.  They also contend that the alleged practices involve the transfer or spread of policyholders' risk because, according to the Complaints, "the transfer of risk to the policyholder is happening ... as part of a fraudulent transaction."  *Id.*  Defendants argue that the bid-rigging and steering practices are, in essence, changing both "the terms and conditions of the transfer of the risk" and "the price at which risk is transferred."  *Id.* at 16.  Defendants further maintain that the second *Pireno* criterion is satisfied here because Plaintiffs' allegations "all relate directly to the policy relationship between the insurer and the insured," and more particularly, to "the pricing of insurance contracts between insurers and insureds, the methods for such pricing, and the system of compensation of brokers and its impact on insurance premiums."

While the alleged bid-rigging and steering practices indisputably take place within the insurance market, such practices do not transfer or spread risk.  As one Court held, "defendants must show more than a mere relationship to risk spreading in order to meet the first [*Pireno*] criteria."  *State of Md. v. Blue Cross and Blue Shield Ass'n*, 620 F. Supp. 907, 916 (D.C. Md.

1985).  The practices involved in this case are too remotely related to risk-allocation to satisfy the first prong of the *Pireno* test.  To establish that a particular practice has a substantial connection to the spreading and the underwriting of risk, more than a mere impact on the price of premiums must be demonstrated.  The concept of insurance involves three basic elements: (1) the undertaking of a "risk" by the insurer; (2) in exchange for the payment of a "premium;" (3) through a contract called the "policy."  *Royal Drug*, 440 U.S. 205, 212 n.7.  The premium is the cost of transferring the risk, the price paid in consideration of the insurer's promise to indemnify the insured upon the occurrence of a specified risk.  That the activity complained of may affect premium levels is certainly relevant to antitrust issues, such as standing or damages.  Yet, for purposes of applying the McCarran-Ferguson exemption, the effect on price is only part of the equation, and does not explain, in and of itself, whether a particular practice "has the effect of transferring or spreading a policyholder's risk."[8]

Secondly, the challenged practices are, at most, only tangentially related to the relationship between an insurer and insured.  The practices are directly between the broker and the carrier.  To the extent that Plaintiffs are policyholders, whose purported injury arose in connection with the sale of insurance, the allegations of the Complaints are certainly not indifferent to the contractual relationship with the brokers and the insurers.  However, the practices at issue here are not an "*integral* part of the *policy* relationship between the insurer and the insured."  *Pireno*, 458 U.S. at 129 (emphasis added).  Rather, accepting Plaintiffs' allegations

_____

[8] The fact that the transfer of risk allegedly occurs as part of a fraudulent scheme does not alter the analysis.  *See Royal Drug*, 440 U.S. at 214 n.12 (distinguishing between "risk underwriting" and "risk reduction").  The court does note, however, that these practices are claimed to interfere with the operation of normal market forces, thereby reducing the probability of risk to the insurance carriers that is not integrally related to "risk underwriting."

-19-

as true solely for purposes of the instant motion, the alleged bid-rigging and steering arrangements involve interactions between brokers and insurers, and constitute independent agreements between entities operating within the insurance industry, but outside the sphere of the insurer/insured relationship.

As the Supreme Court made clear in *National Securities*, "[t]he [McCarran-Ferguson Act] did not purport to make the States supreme in regulating all of the activities of insurance companies ... Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the statute apply." 393 U.S. 453, 459-60 (1969). Having examined the practices at issue in light of the three *Pireno* criteria, and mindful of the general principle that "exemptions from the antitrust laws are to be narrowly construed," *Royal Drug Co.*, 440 U.S. at 231, the Court finds that the alleged bid-rigging and steering activities do not constitute the "business of insurance."[9] Therefore, the McCarran-Ferguson exemption does not apply.

### 2. Sherman Act Section 1

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared illegal." 15 U.S.C. § 1. To properly plead a violation of Section 1, a plaintiff must allege "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was

---

[9] Because the Court finds that the alleged practices are not "the business of insurance," and thus do not fit within the McCarran-Ferguson exemption, the Court need not consider whether the practices are "regulated by state law" and whether the Complaints adequately alleges conduct constituting an agreement to, or an act of "boycott, coercion or intimidation." *See* 15 U.S.C. § 1012(b).

injured as a proximate result of the concerted action." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997).[10]

The first element, concerted action, constitutes the "very essence of a section 1 claim." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 998 (3d Cir. 1994) (noting that "unilateral action, no matter what its motivation, cannot violate [section] 1") (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110 (3d Cir. 1980)). As the Third Circuit has stated, "[a] general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action." *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 182 (3d Cir. 1988) ("*Zimmerman*"). Only "allegations of conspiracy which are particularized ... will be deemed sufficient." *Id.* at 181 (quoting *Garshman v. Universal Resources Holding, Inc.*, 641 F. Supp. 1359 (D.N.J. 1986); *Id.*

---

[10] The Court finds that Plaintiffs have alleged, at this stage of the litigation, sufficient antitrust injury to establish standing under the Sherman Act. "Private plaintiffs pursuing claims under § 1 have standing when they suffer an antitrust injury that is causally related to the defendants' allegedly illegal anti-competitive activity." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Plaintiffs must allege an injury "of the type for which the antitrust laws were intended to provide redress." *Angelico v. Lehigh Valley Hospital, Inc.*, 184 F.3d 268, 274 (3d Cir. 1998). Here, Plaintiffs allege that "the actions of the Defendants were all part of the same conspiracy to increase revenues and to suppress or eliminate competition." Comm. Compl. ¶ 407; EB Compl. ¶ 325. They claim that as a result of the alleged conspiracy, the "prices paid by plaintiffs and Class members for insurance were raised, maintained or stabilized at artificially high, supra-competitive levels." Comm. Compl. ¶ 532; EB Compl. ¶ 451 (alleging that Defendants' conduct had "the effect of inflating premiums above competitive levels."). As the Third Circuit has stated, albeit in a different context, "[i]t is difficult to imagine a more formidable demonstration of antitrust injury" than supra-competitive overcharges. *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000). Assuming the truth of Plaintiffs' allegations for purposes of the instant motion, Plaintiffs have properly alleged, for standing purposes, that Defendants' conduct has "a wider impact on the competitive market." *Eichorn*, 248 F.3d at 140.

at 182 (stating that plaintiffs must "present evidence 'that tends to exclude the possibility that the alleged conspirators acted independently.") (citations omitted).  To adequately allege concerted activity, Plaintiffs are not required, at this stage of the proceedings, to provide all the details of the alleged conspiracies.  *Id.* (quoting *Black & Yates v. Mahogany Ass'n*, 129 F.2d 227, 231-32 (3d Cir.1941)).  But they must, at a minimum, "plead the facts constituting the conspiracy, its object and accomplishment," such as "the date of the alleged conspiracy," or "its attendant circumstances."  *Id.*; *see also Mowrer v. Armour Pharmaceutical Co.*, Civ. A. No. 92-6905, 1993 WL 542541, at *3 (E.D. Pa. Dec. 30,1993) (holding that plaintiffs must plead "the general composition of the conspiracy, some or all of its broad objectives, and [each defendant's] general role in the conspiracy.")

The requirement that conspiracy allegations be pled with adequate specificity is not a mere technicality, but rather, is grounded in considerations of judicial economy and fairness to the defendants.  *See Zimmerman*, 836 F.2d at 182 ("It is simply not fair to the defendants, and it would be an onerous imposition on the judicial process, to permit litigation to go forward on the basis of [] conclusory and speculative allegations."); *see also* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1409, at 55 (2003) ("Conspiracy allegations frequently name one or two specific persons or firms and also sweep in other unnamed conspirators.  The openness of the charge invites confusion where only a few of the possible conspirators have engaged in readily proved collaborative conduct."); *see finally In re Tower Air*, 416 F.3d 229, 237 (3d. Cir. 2005) ("[e]ven at the pleading stage, a defendant deserves fair notice of the general factual background for the plaintiff's claims.").

This requirement is also particularly important where, as here, Plaintiffs' conspiracy

claims are predicated on fraud, and thus, are subject to Fed. R. Civ. P. 9(b) ("Rule 9(b)").[11]  In

*Lum v. Bank of America*, the Third Circuit held that antitrust and RICO claims based on theories

of fraud are subject, like explicit fraud claims, to the heightened pleading requirement of Rule

9(b).  361 F.3d 217, 228-29 (3d Cir. 2004) ("*Lum*").  The Court noted that "generally, the

pleading standard for Section 1 claims is the short and concise statement standard of Rule 8(a),"

but stated: "Because plaintiffs allege that the defendants accomplished the goal of their

conspiracy through fraud, the Amended Complaint is subject to Rule 9(b)."  *Id.* at 228

(emphasizing that under Rule 9(b), "*all* averments of fraud ... shall be stated with particularity.")

(emphasis in original).

Plaintiffs argue that the particularity requirement of Rule 9(b) does not apply to their

Sherman Act claims because these claims "do not sound in fraud."  They also seek to distinguish

*Lum* on the ground that in *Lum*, the antitrust conspiracy "was alleged to have been carried out by

fraud," while here, in contrast, the Complaints allege that the acts of fraud were perpetrated

merely "to conceal" the antitrust violation.  Plaintiffs offer no legal support for such an

interpretation.  In *Lum*, the Court did not limit its holding to instances in which fraud is the

necessary element of a claim, but stated more generally that Plaintiffs' claims were subject to

Rule 9(b) because Plaintiffs were "alleging that the defendants carried out [the alleged] plan,

scheme, and conspiracy *through fraud*."  *Id.* (emphasis added); *Id.* at 229 (describing plaintiffs'

complaint as asserting an "antitrust claim predicated on fraud," and applying Rule 9(b) where

plaintiffs had alleged fraud "as a basis for their antitrust cause of action.").  Plaintiffs' contention

---

[11] Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

that their Sherman Act claims "do not sound in fraud" is also belied by the specific allegations of the Complaints, which assert, in relevant part that: "Each Defendant and co-conspirator has committed *acts of fraud* in furtherance of this conspiratorial objective."  (Comm. Compl. ¶ 409) (emphasis added); "*In furtherance of the conspiracy*, Defendants and co-conspirators have agreed to implement and use the same or similar devices and *fraudulent tactics* against their clients ...." (*Id.* at ¶ 410) (*id.*); "Each Defendant and member of each [broker-centered] conspiracy, with knowledge and intent, *has committed acts of fraud*." (*Id.* at ¶ 433) (*id.*); "Through Defendants' *fraudulent misrepresentations* and failure to make adequate disclosure of the Contingent Commissions ... Defendants have knowingly misled and continue to mislead and deceive their clients ..." (*Id.* at ¶ 306) (*id.*);  "Defendants have affirmatively and *fraudulently concealed* their unlawful scheme, course of conduct and conspiracy from plaintiffs.  In fact, *as part of the conspiracy*, Defendants went to great lengths to create the appearance of a competitive market for insurance coverage, where no such competitive market existed." (*Id.* at ¶ 465) (*id.*); "Plaintiffs had no knowledge of Defendants' *fraudulent scheme* and could not have discovered that Defendants' representations were false or that Defendants had concealed information and materials until shortly before the filing of this Complaint." (*Id.* at ¶ 466) (*id.*); *see also id.* at ¶ 358 (alleging a "fraudulent scheme"); EB Compl.  ¶ 21.  Contrary to Plaintiffs' assertion, these allegations demonstrate that Plaintiffs' claims are not merely allegations of fraudulent concealment, but rather allegations of a conspiracy to defraud.  Accordingly, the Court examines the sufficiency of Plaintiffs' conspiracy allegations under Rule 9(b).

The Complaints allege the existence of a "global, single conspiracy" (the "Global Conspiracy") or alternatively, of six "broker-centered conspiracies" (the "Broker-Centered

Conspiracies").

### a. The Global Conspiracy

Plaintiffs allege that the "Broker Defendants and the Insurer Defendants have

engaged in a conspiracy and common course of conduct to restrain trade in the market for

commercial insurance," and that they "conspired to rig bids, allocate customers and to maintain

the price of insurance products in these markets at supra-competitive levels."  Comm. Compl. ¶

405; EB Compl. ¶ 323 ("[t]he common scheme and conspiracy involves all of the Broker

Defendants and the Insurer Defendants, as well as other brokers and insurers who have

undertaken the wrongful conduct set forth herein and other entities that have facilitated the

conspiracy.").  The Complaints assert that "[t]he actions of the Defendants were all part of the

same conspiracy to increase revenues and to suppress or eliminate competition," Comm. Compl.

¶ 407, EB Compl. ¶ 325, and that "[e]ach Defendant and co-conspirator has agreed to the overall

objective of the conspiracy" and "has committed acts of fraud in furtherance of the conspiratorial

objective." Comm. Compl. ¶¶ 408-409; *see also* EB Compl.¶ 326-327.  In their Complaints,

Plaintiffs further allege that "[t]he same pattern and cause of conduct and activity and similar

facts, which evidence the existence of a conspiracy, exist among all Defendants and co-

conspirators," including "similar agreements and policies among the Broker Defendants and the

Insurer Defendants regarding concealment of their conflicts of interest and wrongful conduct,"

"similar agreements regarding Contingent Commissions," "similar practices regarding the

reporting of their arrangements," "similar tactics for steering customers" and "for coercing

submission of false bids, client steering, allocation of markets and customers, and stabilizing,

raising or maintaining premium prices above competitive levels."  Comm. Compl. ¶ 411; EB

Compl. ¶ 329.

The Court finds that these allegations have insufficient particularity to demonstrate "concerted action" by all of the Defendants under the Sherman Act.  The alleged conspiracy of bid-rigging does aver collusion between a limited subset of brokers and insurers, but this group is far fewer in number than the entire group of defendants.  While the conduct of bid-rigging has been stated with particularity, the pleadings must identify the purported subset of conspirators in this conduct and the nature and scope of each alleged conspirator's role.  With respect to the global "steering" conspiracy, Plaintiffs do not explain how such a large and diverse group of Defendants acted, combined or conspired as part of a single conspiracy.  *See In re Elec. Carbon Products Antitrust Litigation*, 333 F. Supp. 2d 303, 312 (D.N.J. 2004) ("Simply using the "global term 'defendants' to apply to numerous parties without any specific allegations" that would tie each particular defendant to the conspiracy is not sufficient.").  Plaintiffs' broad allegations sweep together more than a hundred defendants, other unnamed brokers and insurers as well as "other entities" without alleging any facts to show that an implied or express agreement existed between the alleged conspirators.  The Complaints merely aver that the Defendants "would not have undertaken the practices alleged [in the Complaints] absent and agreement among all Defendants" and that "[t]his parallel conduct would not have occurred absent either an explicit or tacit agreement among the Defendants,"  Comm. Compl. ¶ 412-13; EB Compl. ¶ 330, but plead no facts positively establishing collusion between the members of the purported conspiracy.  The only allegations of concerted activity are Plaintiffs' general assertions that the Defendants have communicated and shared information through various industry trade groups and conferences.  Comm. Compl. ¶ 414; EB Compl. ¶ 331.  Yet, while these allegations may demonstrate an

"opportunity to conspire," they fall short of averring actual concert of action among the

Defendants.  *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d

1224, 1235 (3d Cir. 1993) (citing *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 894 (3d

Cir. 1981) ("Proof of opportunity to conspire, without more, will not sustain an inference that a

conspiracy has taken place."); Areeda & Hovencamp, *Antitrust Law*, ¶ 1417, at 105 ("Some

conspiracy complaints make much of the defendants' opportunity to conspire ... Such proof

satisfies the necessary precondition of any traditional conspiracy that the parties have the

opportunity to conspire.  But it remains the plaintiff's burden to prove that the defendant

succumbed to temptation and conspired.").

Even at the dismissal stage, Plaintiffs must aver sufficient facts to make the existence of

the pleaded conspiracy among so great a number of alleged co-conspirators plausible.  *See*

*Twombly v. Bell Atlantic Corp.*, 425 F.3d 99, 114 (2d Cir. 2005) ("the pleaded factual predicate

must include conspiracy among the realm of 'plausible' possibilities in order to survive a motion

to dismiss.").

### b.  The Broker-Centered Conspiracies

"In the alternative," the Complaints allege the existence of a series of "separate but

parallel" conspiracies, "each involving a Defendant Broker and the insurance companies with

which each had Contingent Commission Agreements."  Comm. Compl. ¶ 429; EB Compl. ¶ 338.

In the Commercial Complaint, Plaintiffs allege that "a minimum of six broker-centered

conspiracies exist:" (1) "A Marsh-centered conspiracy consisting of Marsh and the insurance

companies with which Marsh had Contingent Commission Agreements;" (2) "An Aon-centered

conspiracy consisting of Aon and the insurance companies with which Aon had Contingent

Commission Agreements;" (3) "A Willis-centered conspiracy consisting of Willis and the

insurance companies with which Willis had Contingent Commission Agreements;" (4) "A

Gallagher-centered conspiracy consisting of Gallagher and the insurance companies with which

Gallagher had Contingent Commission Agreements;" (5) "A Wells Fargo-centered conspiracy

consisting of Wells Fargo and the insurance companies with which Wells Fargo had Contingent

Commission Agreements;" (6) "A USI-centered conspiracy consisting of USI and the insurance

companies with which USI had Contingent Commission Agreements."  Comm. Compl. ¶ 430.[12]

Plaintiffs do not specifically identify the entities which allegedly conspired with each

Broker Defendant, but vaguely refer to "the insurance companies with whom [the Broker

Defendant] had Contingent Commission Agreements."  *See Garshman v. Universal Resources

Holding Inc.*, 824 F.2d 223, 230 (3d Cir. 1987) (the "allegation of unspecified contracts with

unnamed other entities to achieve unidentified anticompetitive effects does not meet the

minimum standards for pleading a conspiracy in violation of the Sherman Act."); Areeda &

Hovencamp, *Antitrust Law*, ¶ 1410, at 59 ( "The first step should always be to identify with

maximum particularity the alleged conspirators and the subject matter of each conspiracy.").  Nor

do Plaintiffs adequately allege the role that each Defendant played in the conspiracy.  Plaintiffs

_____

[12] The Employee-Benefits Complaint alleges the existence of at least three broker-centered conspiracies: (1) "A ULR-centered conspiracy consisting of defendant ULR and the insurance companies with which it had Contingent Commission arrangements, including defendants UnumProvident, CIGNA, Prudential, MetLife and Hartford and others (the "ULR-centered Broker Conspiracy"); (2) "A Marsh-centered conspiracy consisting of Marsh and the insurance companies with which it had Contingent Commission arrangements, including defendant [sic] MetLife, Cigna, AIG, ACE, Hartford and others (the "Marsh-centered Broker Conspiracy"); (3) "A Aon-centered conspiracy consisting of Aon and the insurance companies with which it had Contingent Commission arrangements, including defendant [sic] MetLife, ACE, AIG, Cigna, Hartford, Metlife [sic], UnumProvident and others (the "Aon-centered Broker Conspiracy").  EB Compl. ¶ 339.

do not challenge the legality of contingent commissions.  The existence of contingent commission agreements between the Broker Defendant and other insurers shows that the parties engaged in a business relationship; but is not, without more, an allegation that the Defendants conspired among each others in violation of the Sherman Act.

Therefore, the Court concludes that Plaintiffs have not pled sufficient facts to adequately allege a Section 1 contract, combination or conspiracy.  Rather than requiring Plaintiffs to file a Second Amended Complaint, the Court will instead devise and implement a new procedural framework in the form of a "supplemental statement of particularity."  The Court believes that this device will promote efficiency by preserving judicial resources, reducing the expenses of the parties, and avoiding the delays associated with the filing of two voluminous amended complaints followed by a new round of motions to dismiss, in this large multidistrict litigation involving dozens of defendants.  Such device will also provide fairness to both sides, by giving Plaintiffs an opportunity to cure the deficiencies in their Complaints, and by allowing Defendants to file the appropriate motions should Plaintiffs fail to substantiate their conspiracy allegations.

The supplemental statement of particularity shall set forth, with the degree of particularity required under Rule 9(b), the identity of the conspirators and the role of each Defendant in the alleged conspiracies.  While Plaintiffs need not present proof of Defendants' conduct at this juncture of the case, they shall aver sufficient facts to inform each Defendant of its alleged participation in the conspiracies.  The supplemental statement of particularity must satisfy the requirements that apply to the filing of a complaint, and may be used by any Defendant as a pleading that may form the basis for (1) a subsequent Motion to Dismiss the Complaints with prejudice pursuant to Fed. R. Civ. P. 12(b)(6); (2) a Motion for Judgment on the Pleadings

pursuant to Fed. R. Civ. P. 12(c); or (3) a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, upon the completion of fact discovery.

**B. RICO Claims**

Plaintiffs allege violations of RICO, 18 U.S.C. § 1962(c) and RICO conspiracy, 18 U.S.C. § 1962(d), against all defendants.  The predicate acts alleged are wire and mail fraud in violation of 18 U.S.C. §§ 1341 and 1343.  Defendants seek dismissal of the RICO counts on the grounds that (1) Plaintiffs' RICO claims are barred by the McCarran-Ferguson Act;[13] (2) the Complaints fail to allege a substantive RICO violation under 18 U.S.C. § 1962(c); and (3) the Complaint fails to plead a RICO conspiracy under 18 U.S.C. § 1962(d).

---

[13] Defendants argue that the McCarran-Ferguson Act precludes Plaintiffs' RICO claims under both the second, antitrust-specific sentence of § 1012(b), as well as the first clause of § 1012(b).  The second clause of § 1012(b) deals specifically with antitrust immunity, whereas the first clause applies to federal laws more generally.  As the statute itself makes clear, the two clauses are two distinct provisions, which apply in different situations.  Accordingly, Plaintiffs' RICO claims are properly analyzed under the first clause of § 1012(b).

The first clause of § 1012(b) provides:

"No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).

In determining whether Plaintiffs' RICO claims are barred under § 1012(b), the "threshold question" is "whether the challenged conduct broadly constitutes the 'business of insurance' in the first place."  *Sabo v. Metropolitan Life Ins. Co.*, 137 F.3d 185, 190 (3d Cir. 1998) (quoting *National Securities*, 393 U.S. at 459-60) ("only when [insurance companies] are engaged in the business of insurance does the act apply.") (internal quotation marks omitted); *accord Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 166 (3d Cir. 2001) (citing *Sabo*, 137 F.3d at 190).  "If the Defendant's conduct does not constitute 'the business of insurance,' then there is no need to confront preclusion issues under § 1012(b)."  *Sabo*, 137 F.3d at 190.  For the reasons discussed above, the Court finds that the practices at issue here are not "the business of insurance."  The McCarran-Ferguson preemption analysis of the second clause of § 1012(b) is therefore inapplicable to Plaintiffs' RICO claims.

### 1. RICO Violation, § 1962(c)

Section 1962(c) of the RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..." 18 U.S.C. § 1962(c). To allege a violation of Section 1962(c), the plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Defendants challenge the sufficiency of Plaintiffs' RICO pleadings as to each element required to state a claim under Section 1962(c).

The Court first determines whether Plaintiffs have adequately pled the existence of a RICO enterprise. The RICO statute defines an "enterprise" as "[i]ncluding any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Here, Plaintiffs allege the existence of associated-in-fact enterprises. *See* Comm. Compl. ¶¶ 436, 443; EB Compl. ¶¶ 345, 354. An associated-in-fact enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). To establish an "association-in-fact" enterprise, a plaintiff must demonstrate that (1) the enterprise is an "ongoing organization, formal or informal;" (2) the members of the enterprise function as a "continuing unit" with established duties; (3) the enterprise is "separate and apart from the pattern of activity in which it engages." *Id.* Elaborating on the first element, the Third Circuit held in *Riccobene* that the enterprise must have "some sort of structure ... within the group for the making of decisions, whether it be hierarchical or consensual." *United States v.*

*Riccobene*, 709 F.2d 214, 222 (3d Cir. 1983).  While Plaintiffs need not show that "every

decision [is] made by the same person," the alleged structure should provide "some mechanism

for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis."

*Id.*

Plaintiffs allege the existence of two alternative enterprises: the "Commercial Insurance

Enterprise" and, "at a minimum," six "Broker-centered Commercial Enterprises."[14]  According to

the Complaint, the Commercial Insurance Enterprise includes: "the Defendants;" wholesale

entities that receive wholesale payments and transmit those payments to the Defendants; "other

insurers that pay contingent commissions, wholesale payments and other kickbacks;" "other

brokers, intermediaries, agents and other insurance entities that have received undisclosed

compensation;" "other entities that engage in steering practices and/or bid-rigging;" "other

insurance brokerage and industry groups ...." Comm. Compl ¶ 436; RICO Case Statement at 33.[15]

The Complaint defines the six Broker-Centered Commercial Insurance Enterprises as:

- "Marsh and the insurers, including the Insurer Defendants, with which Marsh has Contingent Commission Agreements;"

- "Aon and the insurers, including the Insurer Defendants, with which Aon has Contingent

----

[14] Likewise, the Employee-Benefits Complaint alleges the existence of an "Employee-Benefits Insurance Enterprise" and alternatively, of three "Broker-centered Employee Benefits Enterprises."  EB Compl. ¶¶ 345, 354.  To the extent that Plaintiffs' RICO allegations contained in the two complaints are similar, the Court's analysis with respect to the Commercial Insurance Enterprise and the Broker-centered Commercial Enterprises shall apply with equal force to the Employee-Benefits Insurance Enterprise and the Broker-centered Employee Benefits Enterprises.

[15] When asked by the Court at oral argument to define the enterprise, Plaintiffs' Counsel stated: "The enterprise would be all the insurance companies who enter into contingent fee agreements, all the brokers who receive compensation using these types of agreements, all of the industry groups that have allowed facilitation of discussions and decision-making relating to those contingent fee agreements."  Tr. at 83.

Commission Agreements;"

- "Willis and the insurers, including the Insurer Defendants, with which Willis has Contingent Commission Agreements;"

- "Gallagher and the insurers, including the Insurer Defendants, with which Gallagher has Contingent Commission Agreements;"

- "Wells Fargo and the insurers, including the Insurer Defendants, with which Wells Fargo has Contingent Commission Agreements;"

- "USI and the insurers, including the Insurer Defendants, with which USI has Contingent Commission Agreements."  Comm. Compl. ¶ 443; RICO Statement at 33-34.


With respect to the Commercial Insurance Enterprise, the Complaint does not adequately set forth what organizational structure connects the Defendants, or how the Defendants were related to each other.  Except for the conclusory allegations that "the Commercial Insurance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged," nothing in the Complaint or in the RICO Case Statement suggests that the members of the Commercial Insurance Enterprise formed a continuing unit, an ongoing organization with "some sort of structure."  *See Riccobene*, 709 F.2d at 222.  While Plaintiffs need not allege in their Complaints facts sufficient to *prove* the existence of an enterprise, *see Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 790 (3d Cir. 1984), they must, at a minimum, *identify* the enterprise and provide details about its structure.  *See Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989) ("a plaintiff must plead specific facts, not mere conclusory allegations, which establish the existence of an enterprise."); *Segreti v. Lome*, 747 F. Supp. 484, 486 (N.D. Ill. 1990) (even at the pleading stage, "a plaintiff must *identify* the enterprise [and] such identification must necessarily include details about the structure of the enterprise.") (emphasis in original); *Begala v. PNC Bank, Ohio, Nat.*

*Ass'n*, 214 F.3d 776, 781-82 (6th Cir. 2000) (holding that the "complaint must contain facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit'....").

Pleading a RICO enterprise is not a mix-and-match game.  *See Glessner v. Kenny*, 952 F.2d 702, 714 (3d Cir. 1991).  Here, the Complaint does not even identify the members of the Commercial Insurance Enterprise, but only refer in vague terms to "the Defendants," "other insurers that pay contingent commissions, wholesale payments and other kickbacks," "other brokers," "other entities," and "other insurance brokerage and industry groups."  "Such a nebulous, open-ended description of the enterprise does not sufficiently identify this essential element of a RICO offense."  *Richmond v. Nationwide Cassel, L.P.*, 52 F.3d 640, 645 (7th Cir. 1995) ("naming of a string of entities does not allege adequately an enterprise"); *International Paint Co., Inc. v. Grow Group, Inc.*, 648 F. Supp. 729, 731 (S.D.N.Y. 1986) ("A general assertion that a group of defendants constituted an 'enterprise' does not suffice."); *In re American Investors Life Insurance Co. Annuity Marketing and Sales Practices Litigation*, MDL No. 1712, 2006 WL 1531152, at *9 (E.D. Pa. June 2, 2006) ("[w]hen it comes to associations in fact ... there is a greater risk that the RICO statute 'might be improperly employed to string together predicate acts by unconnected defendants.'") (citation omitted).

The six Broker-Centered Commercial Enterprises suffer from the same flaw.  The mere allegations that the Defendants did business with one another or contracted together does not suffice to establish the existence of an enterprise.  *See, e.g.*, *In re Mastercard Intern. Inc., Internet Gambling Litigation*, 132 F. Supp. 2d 468, 490 (E.D. La. 2001) (stating that "[a]llegations of a business relationship do not indicate that defendants took part in directing the

enterprise's affairs.").  In addition, Plaintiffs have not alleged, for each Broker-Centered

Enterprise, that the members of the enterprises have established any kind of decision-making

structure, independent from their regular business practices; the Complaint only states in

conclusory terms that "through each of Broker-Centered Commercial Insurance Enterprises,

Defendants engage in consensual decision-making regarding the implementation of their

fraudulent scheme ...."  Comm. Compl. ¶ 444.  Plaintiffs' RICO Case Statement, filed pursuant

to L. Civ. R. 16.1(b)(4), is similarly deficient, and merely restates, verbatim, the same general

enterprise allegations set forth in the Complaint.  *Comp.*, *e.g.*, Comm. Compl. ¶ 444 and Comm.

RICO Case Statement at 35.

        The Complaints also fail to allege any facts beyond the conclusory allegation that the

enterprise has "an existence separate and apart from the alleged pattern of racketeering activity."

*United States v. Riccobene*, 709 F.2d at 221 (citations omitted).  "It is an essential element of the

RICO cause of action that the 'enterprise' be apart from the underlying pattern of racketeering

activity."  *Seville*, 742 F.2d 786, 790 n.5; *United States v. Turkette*, 452 U.S. at 583 ("[t]he

'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the

pattern of activity in which it engages.").

        In the present case, the Complaints merely state, in a conclusory fashion, that "the

Commercial Insurance Enterprise has an ascertainable structure separate and apart from the

pattern of racketeering activity in which Defendants have engaged."  Comm. Compl. ¶ 442; EB

Compl. ¶ 353 ("The Employee-Benefits Insurance Enterprise has an ascertainable structure

separate and apart from the pattern of racketeering activity in which Defendants have

engaged.").[16]

In their RICO Case Statements, Plaintiffs explain that:

The enterprises function by providing insurance consultation, advice, and related services as well as insurance products. Many of these services and products are legitimate and non-fraudulent. Normally the activities of the enterprises involve recommendations and the provision of insurance products which best meet the needs of the insured. However, Defendants, through the Commercial Insurance Enterprise and the Broker-Centered Enterprise have engaged in a pattern of racketeering activity which involves a fraudulent scheme to increase premium revenue for the insurers and commissions and other revenue for the brokers through steering of customers, bid-rigging, and unlawful tying. Comm. RICO Case Statement at 37; EB RICO Case Statement at 33.

The RICO distinctiveness requirement cannot be met simply by alleging that the conduct of one aspect of Defendants' activities through fraud constitutes the racketeering activity. Rather, Plaintiffs must demonstrate that the enterprise, functioning as an independent, free-standing association-in-fact, engages in a pattern of activity which differs from the usual and daily activities of its members. Here, by alleging that the enterprise engages in the same business activities and provides the same services as the Defendants themselves, Plaintiffs have not sufficiently averred that the alleged enterprise has an existence of its own, and performs functions other than the perpetration of the predicate racketeering acts. *See Hollis-Arrington v. PHH Mortg. Corp.*, No. Civ.A. 05-2556FLW, 2005 WL 3077853, at *8 (D.N.J. Nov. 15, 2005) (finding no RICO enterprise where plaintiffs' allegations merely "refer to the functions of the individual members of the enterprise and not the functions of the enterprise as a whole" and

---

[16] Similarly, with respect to the Broker-Centered Enterprises, the Complaints states: "Broker-Centered Enterprises have an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged." Comm. Compl. ¶ 448; EB Compl. ¶ 359 ("The Broker-centered Employee-Benefits Enterprises have an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.").

where plaintiffs had failed to show that "the enterprise engaged in any activity as an enterprise");

*Parrino v. Swift*, Civil Action No. 06-0537 (DRD-SDW), 2006 WL 1722585, at *3 (D.N.J. June

19, 2006) (dismissing RICO claims where Plaintiffs had "alleged that the conspiracy to defraud

was the same thing as the enterprise"); *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993)

("[RICO] liability depends on showing that the defendants conducted or participated in the

conduct of the "*enterprise's* affairs," not just their *own* affairs.") (emphasis in original).

Plaintiff have thus failed to plead an enterprise distinct from the Defendants and separate

from the alleged acts of racketeering, beyond simply stating that the distinctiveness requirement

is met.  The RICO case statement is intended to supplement the pleadings and enable Plaintiffs to

set forth how this requirement is met.  It has not done so.  *See Seville*, 742 F.2d at 790 n. 5 (by

"limiting its allegations of conspiracy to the underlying offenses," plaintiff "affirmatively negated

the existence of the third [*Riccobene*] factor: an enterprise separate and apart from the pattern of

activity in which it engages.").  The Court will reserve on this motion to dismiss the RICO counts

and a short extension file an Amended RICO case statement that must explicitly set forth the

facts which demonstrate the existence and function of the alleged enterprise.  The Court will

make a final ruling on the Motion to Dismiss with regard for Counts II and III of the Complaints

based on the sufficiency of that case statement.[17]

### 2. RICO Conspiracy, § 1962(d)

Count I alleges that the Defendants engaged in a conspiracy to violate RICO as prohibited

by 18 U.S.C. § 1962(d).  § 1962(d) states that it is "unlawful for any person to conspire to violate

---

[17] Although Plaintiffs' mail and wire fraud allegations fail to meet the strict and rigorous pleading requirements of Rule (9b), the Court does not reach that issue because of the deficiencies in their enterprise allegations.

any of the provisions of subsection ... (c) of this section." 18 U.S.C. § 1962(d).  "Any claim

under section 1962(d) based on a conspiracy to violate the other subsections of section 1962

necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v.*

*Witco Corp.*, 4 F.3d 1153, 1192 (3d Cir. 1993).  As with Counts II and III of the Complaint, the

Court will determine if Plaintiffs have alleged a substantive RICO violation under § 1962(c)

based on the sufficiency of the Amended RICO case statement that Plaintiffs must file, as

detailed above.

### C. ERISA Claims

The ERISA claims are brought against the Insurer Defendants on behalf of a purported

subclass of employees who acquired insurance "as part of an employee benefit plan."  Count IX

of the Employee-Benefits Complaint asserts a claim for breach of fiduciary duty under ERISA §

502(a)(2), 29 U.S.C. § 1132(a)(2).  Plaintiffs allege that the Insurer Defendants breached their

fiduciary duties by (1) "paying kickbacks and other non-disclosed or inadequately disclosed

payments to the broker defendants;" (2) "knowing and falsely certifying the amount of

compensation paid to a party in interest, such that the plan's Form 5500 filings ... did not

accurately reflect the total compensation paid to parties in interest;" (3) "causing and/or allowing

the plan to engage the services of a party of interest;" (4) "receiving consideration for its own

personal account from a party in interest that dealt with the plan;"and (5) "acting contrary to the

interests of plan participants about the plan."  EB Compl. ¶ 539.  Plaintiffs seek monetary relief

pursuant to ERISA § 502(a)(2) for damages equal to the losses allegedly sustained by various

ERISA benefit plans and for restitution, disgorgement of illegal profits and imposition of a

constructive trust pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  In Count X, Plaintiffs

also seek "other appropriate equitable relief" in the form of an injunction pursuant to ERISA § 502(a)(3).

In determining whether the Insurer Defendants have breached any fiduciary duty under ERISA, the threshold question is whether the Defendants are fiduciaries within the meaning of the statute.[18] A person is an ERISA fiduciary if he or she

> (i) [E]xercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) ... renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) ... has any discretionary authority or discretionary responsibility in the administration of such plan. 29 U.S.C. § 1002(21)(A).

Defendants argue that the Insurer Defendants did not act as ERISA fiduciaries in selling insurance to the plans because the insurers have no control over the employee benefit plan sponsors, and did not exercise any discretionary authority on behalf of the plans with respect to the plans' purchase of insurance. Plaintiffs respond that the Complaint adequately alleges that the Defendants have breached their fiduciary obligations under ERISA "by engaging in a scheme to pay concealed kickbacks to brokers in exchange for securing business that resulted in plan assets that they would not otherwise have received."

Merely selling insurance to a plan does not confer fiduciary status. *See Fechter v.*

---

[18] Plaintiffs' ERISA claims are brought under ERISA's fiduciary duty provisions and predicated upon the finding of fiduciary status. *See generally* ERISA § 404, 29 U.S.C. § 1104 (specifying duties of a "fiduciary with respect to a plan"). At oral argument, Plaintiffs' Counsel also invoked ERISA § 406, 29 U.S.C. § 1106, and maintained that even if the Court finds that the Insurer Defendants are not fiduciaries, the Defendants could still be liable under ERISA § 406 as parties in interest. Tr. at 88-89. However, paragraph 539 of the Complaint references § 406 as a means of breach of fiduciary duty and not as an independent basis for ERISA liability. The Complaint nowhere alleges that the Defendants are "parties in interest." *See* EB Compl. ¶¶ 535-550.

*Connecticut General Life Ins. Co.*, 800 F. Supp. 182, 197 (E.D. Pa. 1992) ("the courts have refused to impose fiduciary obligations on insurance companies who merely sell their products or services to a pension plan unless, under the terms of such contracts, the insurer assumes decision-making control over the administration of the plan or the disposition of its assets.").  In the present case, Plaintiffs allege that the Insurer Defendants are fiduciaries because they "retain and exercise authority to determine whether a participant is entitled to a benefit under the plans and the amount of the benefits payable to the participants."  Plaintiffs further allege that the Defendants "pay the benefits owed to participants under the plans," and "assume duties associated with plan administration, such as providing notice and disclosure of information required under ERISA."

Viewing these allegations in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, as this Court must, we conclude that Plaintiffs have at this stage of the litigation pled fiduciary status.  *See In re Polaroid ERISA Litigation*, 362 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) (holding that an ERISA complaint need 'do little more than track the statutory definition' to establish a defendant's fiduciary status in compliance with Rule 8."). Although Plaintiffs have set forth very few facts to establish fiduciary status, the dismissal of Plaintiffs' ERISA claims is not warranted at this early juncture in the case.  This issue will be more appropriately resolved upon motions for summary judgment.  *See, e.g., In re Cardinal Health, Inc. ERISA Litigation*, 424 F. Supp. 2d 1002, 1030 (S.D. Ohio 2006) (stating that "fiduciary status is a fact-intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss.") (internal quotation marks omitted).  As set forth more fully in the accompanying Order, the Court will set an expedited discovery schedule in order to finalize

-40-

discovery as to this issue and to ascertain whether a factual basis exists for Plaintiffs' fiduciary claims.

### D. State Law Claims

Plaintiffs allege that Defendants' activities violate the antitrust laws of forty eight states and the District of Columbia.  The Complaints also assert (a) claims for breach of fiduciary duty (against the Broker Defendants); (b) claims for aiding and abetting breach of fiduciary duty (against the Insurer Defendants); and (c) unjust enrichment (against all Defendants).

Because Plaintiffs have not alleged diversity jurisdiction, the sole basis for subject matter jurisdiction over these claims is supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Comm. Compl. ¶ 14; EB Compl. ¶ 22.  In the interests on judicial economy, this Court will reserve its judgment as to whether federal courts should exercise supplemental jurisdiction over the state law claims until it is determined what, if any, federal claims will be tried.  *See United Mine Workers of Amer. v. Gibbs*, 383 U.S. 715, 726 (1966).

## IV.   Conclusion.

The Court will set an expedited discovery schedule in order to ascertain whether a factual basis exists for Plaintiffs' ERISA fiduciary claims, and allow Defendants to file an appropriate Motion for Summary Judgment on this issue pursuant to Fed. R. Civ. P. 56.  The Court reserves on the motion to dismiss the RICO claims until after the supplemental RICO case statement is filed.  The Court will also require Plaintiffs to amend their Sherman Act claims by filing a supplemental statement of particularity.  The supplemental statement of particularity shall conform to the requirements of a pleading, and meet the particularity requirements of Rule 9(b). It may be used as a basis for either (1) a subsequent Motion to Dismiss the remaining counts of

the Complaints pursuant to Fed. R. Civ. 12(b)(6); (2) a Motion for Judgment on the Pleadings

pursuant to Fed. R. Civ. P. 12(c); or (3) a Motion for Summary Judgment pursuant to Fed. R.

Civ. P. 56, as the Defendants deem appropriate.  An appropriate order will issue.


/s/ Faith S. Hochberg
**Hon. Faith S. Hochberg, U.S.D.J.**