## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ———————————————— | x | |
| In re:  INSURANCE BROKERAGE | : | Hon. Faith S. Hochberg |
| ANTITRUST LITIGATION | : | MDL No. 1663 |
| | : | |
| **APPLIES TO ALL ACTIONS** | : | **Civil Action No. 04-5184 (FSH)** |
| | : | |
| | : | |
| ———————————————— | x | |
| In re:  EMPLOYEE BENEFIT INSURANCE | : | |
| BROKERAGE ANTITRUST LITIGATION | : | |
| | : | **Civil Action No. 05-1079 (FSH)** |
| **APPLIES TO ALL ACTIONS** | : | |
| | : | |
| | : | |
| | : | |
| ———————————————— | x | |

## OPPOSITION TO PLAINTIFFS' APPEAL FROM THE ORDER ON
## INFORMAL APPLICATION REGARDING PRODUCTION OF DATA BY
## BROWN & BROWN, INC. AND BROWN & BROWN INSURANCE BENEFITS, INC.

Defendants Brown & Brown, Inc. and Brown & Brown Insurance Benefits, Inc.

(collectively, "Brown & Brown") respond in opposition to plaintiffs' appeal of Magistrate Judge

Shwartz's November 6, 2006 Order on Information Application (the "Order").

The Order denied plaintiffs' motion to compel Brown & Brown to produce

electronic transactional customer data from 30 of its profit centers rather than the ten profit

centers from which Brown & Brown had agreed to produce.  The Court found "that the dispute

concerning the production of data was known to the parties before the May 30, 2006 deadline to

raise discovery disputes," concluded that plaintiffs had "not provided good cause for the Court to

extend the deadline to raise this discovery dispute," and deemed their request for relief untimely.

Order at 2-3.

Plaintiffs appealed the Order on November 21, 2006.  Not only do plaintiffs rehash many of the same arguments that the Magistrate Judge rejected below, plaintiffs ignore the record of correspondence between the parties – and in particular a May 26 email exchange between plaintiffs and Brown & Brown – clearly reflecting the fact that a dispute was ripe between the parties prior to the May 30 discovery dispute deadline, an exchange which the Magistrate relied on in making her ruling.

A magistrate's adjudication of a non-dispositive motion will only be set aside if it is found to be "clearly erroneous or contrary to law."  *See Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1111, 1113 (3d Cir. 1986), *cert. denied*, 484 U.S. 976 (1987) (citing 28 U.S.C. § 636 (b)(1)(A)); Fed. R. Civ. P. 72(a); L. Civ. R. 72.1(c)).[1]  "The burden is on the moving party to demonstrate that the magistrate judge's finding is clearly erroneous or contrary to law."  *Exxon Corp. v. Halcon Shipping Co.*, 156 F.R.D. 589, 591 (D.N.J. 1994).  As this Court has held in prior discovery dispute appeals, merely reasserting arguments that were previously and extensively considered by the magistrate do not warrant the overturning of the magistrate's orders.  *See, e.g.*, Appeal Order (Hochberg, J.), Docket Entry No. 394, dated Sept. 1, 2006 (denying appeal of Magistrate's order).  Here, plaintiffs have not carried their burden to demonstrate that the Magistrate's decision was either clearly erroneous or contrary to law and plaintiffs' appeal must be denied.

## BACKGROUND

Brown & Brown is a highly-decentralized mid-sized broker that provides a variety of insurance and reinsurance products and services to corporate, public entity,

---

[1] "Under the clearly erroneous standard of review, the magistrate judge's findings should not be rejected even if a reviewing court could have decided the issue differently."  *Toth v. Alice Pearl, Inc.*, 158 F.R.D. 47, 50 (D.N.J. 1994).

institutional, trade, professional, association, and individual clients.  Headquartered in Daytona

Beach and Tampa, Florida, Brown & Brown operates over 160 separate profit centers located

across the United States.  Brown & Brown's offices are characteristically located in smaller

metropolitan markets where it can concentrate on middle market risks.  As a decentralized

operation, each profit center is individually responsible for maintaining its own records, data and

contracts, and maintaining its own computer network system.

On January 6, 2006, plaintiffs served their first requests for production of data,

seeking the production of a wide array of customer-specific transactional data relating to the

placement of insurance policies.  Given Brown & Brown's highly decentralized operations,

plaintiffs' data requests would have required Brown & Brown to pull customer-specific data

from each and every one of its 160+ profit center locations around the country where such

customer-specific data is maintained on a variety of different computer.  Because of the

tremendous burden, Brown & Brown objected to the initial data requests on February 8, 2006,

stating:

> To the extent data regarding premiums paid by particular Brown & Brown
> customers to particular carriers are maintained, such data typically are maintained
> at the profit center level.  Furthermore, profit centers utilize a variety of different
> electronic systems to record data regarding premiums.  Obtaining the highly
> detailed data requested by Plaintiffs from all Brown & Brown profit centers or
> even any particular profit center (such as Brown Benefits), broken down on a
> customer-by-customer and carrier-by-carrier basis, and further broken down by
> type and line of insurance and by whether a particular placement was a new or
> renewal policy, all as requested by Plaintiffs, would be extraordinarily
> burdensome, would cause substantial disruption and damage to Brown & Brown's
> business, and is infeasible and unreasonable.

Ex. A at pp. 6-9 (Responses and Objections).

In light of the burden associated with plaintiffs other discovery requests, Brown &

Brown had made similar objections with respect to requests for company documents and emails.

After several meet and confers, plaintiffs and Brown & Brown agreed that Brown & Brown

would produce hard-copy and electronic documents and emails from a subset of custodians primarily located at a sample set of ten profit centers – all of which (both custodians and profit centers) would be selected by plaintiffs for discovery "sampling" purposes.[2]

Prior to the May 30, 2006 discovery dispute deadline, and in the course of finalizing the parties' agreement on this ten-office sampling protocol, plaintiffs expressed a view (with which Brown & Brown disagreed) that the sampling protocol did not govern data requests. *See*, *e.g.*, Ex. B (May 25, 2006 email).  In response to the May 25, 2006 email from plaintiffs (Ex. B), Brown & Brown responded with its position in a May 26 email:

> Our general understanding . . . is that the type of data requested is not maintained at the corporate level.  We are determining what accessible transactional data compilations, if any, exist at the profit center level.  In light of the fact that this issue likely will involve profit center level discovery (and that the data, if any, may vary widely among profit centers), **we wish to make clear that we have not agreed to search and produce from each and every profit center**.  **Rather, we would search each of the 10 offices that we have agreed to sample (and that you will designate) for other discovery purposes**, and will produce policy-level electronic transactional data that exists and is reasonably accessible

Ex. C (May 26, 2006 email) (emphasis added).  Plaintiffs responded in an email later that same day (Ex. D), stating:

> One point requiring further clarity will be how we resolve the transactional data issue.  I agree with your characterizations of the limitations you have shared with us. And, I believe it was me that wondered out loud whether data from the 10 selected profit centers would satisfy on a representative basis B & B's data obligations. But, the parties need further consultation from our consultants after plaintiffs learn more from you.
>
> We are not at this point willing to finalize an agreement that we will receive policy level data only from the 10 selected profit centers. We are in an agreement that we will not seek data from all of your offices. And, we are in an agreement that data from a subset of offices will likely prove satisfactory. We cannot say at this point that the subset must be limited to the 10 selected centers. It might be a hybrid selection of profit centers or other solutions that I am optimistic we will both find agreeable.

---

[2] The parties later agreed that Brown & Brown would produce hard-copy and electronic customer files from these ten profit centers as well.

Plaintiffs concluded their email by stating, "I maintain that this is not a dispute but an agreement in process." *Id.*

Rather than presenting what was clearly a ripe dispute to the Magistrate Judge as was required, plaintiffs attempted to unilaterally extend the deadline on this discovery dispute by labeling it "an agreement in process" (Ex. D), or as they termed it in their May 30, 2006 submission to Magistrate Judge Shwartz, "a work in progress."  Ex. E (May 30, 2006 letter from plaintiffs to Magistrate Judge Shwartz at p. 3).[3]

In the period following the May 30 discovery dispute deadline, the parties had several further discussions regarding the identity of the particular ten offices that would be used for discovery sampling purposes.  Plaintiffs ultimately selected the following ten offices: Daytona, Houston, Ft. Lauderdale, Bethlehem, Leesburg, Syracuse, Tampa, Sarasota, Las Vegas, and Phoenix.  Thereafter, plaintiffs selected Brown & Brown custodians for document production purposes, with plaintiffs making their final custodian selection on July 31, 2006.  *See* Ex. F (July 31, 2006 email).  However, at no time after May 30, 2006, in these meet and confer discussions or otherwise, did Brown & Brown ever agree to produce data from offices other than the ten agreed-upon sample set of offices.

During the late summer, consistent with the Magistrate Judge's order to prioritize discovery needed for depositions, Brown & Brown devoted substantial efforts to producing hard-copy and electronic documents and emails related to the depositions scheduled to commence in September.  However, plaintiffs also requested that Brown & Brown commence production of data by producing from three of the ten profit centers – Daytona, Phoenix, and Ft. Lauderdale.

---

[3] Contrary to what plaintiffs have stated in their appeal papers, plaintiffs' May 30, 2006 letter to Magistrate Judge Shwartz was not a joint submission.  *See* Ex. E at pp. 3-4 (submission by plaintiffs' counsel only).

*See* Ex. G (August 2, 2006 letter from M. Fessenden at p. 2).  Brown & Brown produced the data

on September 11, 2006.

On October 6, 2006, having heard nothing from plaintiffs regarding data since the

September 11 production, Brown & Brown wrote plaintiffs as follows:

> As you will recall, we agreed to resolve Brown & Brown's
> objections to the burden and expense of producing voluminous
> hard copy customer files by production of a files from 10
> customers (to be designated by plaintiffs' counsel) from each of
> the 10 offices previously agreed upon for other sampling purposes
> (which offices were previously selected for email custodian
> purposes as referenced in your email agreement of July 31, 2006).
> We await your designation of customers from the Daytona,
> Phoenix, and Ft. Lauderdale offices . . . .
>
> In the meantime, we are working toward extraction and production
> of customer data from the remaining seven sample set offices, so if
> you have determined you no longer desire the production of that
> data, please inform us immediately.

*See* Ex. H (October 6, 2006 email).  In a telephone conversation on October 12, 2006, plaintiffs

notified Brown & Brown that while the ten offices previously selected by plaintiffs was

sufficient for all other discovery purposes, they wanted data from 30 offices.  In an email sent to

plaintiffs the following day, counsel for Brown & Brown reiterated that simply listening to

plaintiffs' proposal and agreeing to discuss it with Brown & Brown should not be construed as a

change in position:

> We have agreed to discuss these proposals with our client.
> However, our discussion of these proposals with our client should
> in no way be interpreted by plaintiffs as any indication that we
> have modified our longstanding position that production of data
> from 10 profit centers is the absolute maximum given the
> unreasonable burden and cost of plaintiffs' request.

*See* Ex. I (Oct. 13, 2006 email).[4]  On October 16, 2006, Brown & Brown telephoned plaintiffs and reconfirmed its position that Brown & Brown would only agree to produce from the original sample set of ten profit centers.  Plaintiffs thereafter moved to compel.

After the parties briefed the issue by way of joint submission on November 2, 2006, Magistrate Judge Shwartz issued her ruling on November 6, 2006, determining, *inter alia*, that:

- "the dispute concerning the production of data was known to the parties before the May 30, 2006 deadline to raise discovery disputes," Order at 2-3;

- plaintiffs had "not provided good cause for the Court to extend the deadline to raise this discovery dispute," *id.*; and

- plaintiffs request for relief was "untimely," *id.*

## ARGUMENT

**I.    The discovery dispute was ripe prior to the May 30, 2006 deadline.**

Plaintiffs' appeal hinges on the contention that there was no ripe dispute prior to the May 30 discovery dispute deadline imposed by the Court.  Plaintiffs argue that "[t]he parties did not have knowledge of a defined dispute regarding transactional data on May 30, 2006." Plaintiffs' Appeal at 4.

This position is directly contrary to the evidence.  As noted above, in Brown & Brown's May 26, 2006 email to plaintiffs, Brown & Brown stated with respect to the production

---

[4] Plaintiffs state in their declaration attached to their appeal papers (*see* Plaintiffs' Appeal, Ex. E, Declaration of Martha J. Fessenden, at ¶ 8) that Brown & Brown's counsel "expressed some optimism about plaintiffs' proposal" that data be produced from 30 offices.  While it is not clear what counsel means by the characterization of the conversation as "expressing optimism," not once did Brown & Brown state that it was willing to produce customer-specific data from more than ten offices, and plaintiffs do not suggest to the contrary.

of customer-specific data that, "we wish to make clear that we have not agreed to search and produce from each and every profit center.  Rather, **we would search each of the 10 offices that we have agreed to sample (and that you will designate) for other discovery purposes**."  Ex. C (emphasis added).  Disagreeing with this position, plaintiffs in turn responded the same day by email:  "One point requiring further clarity will be how we resolve the transactional data issue. . . .  We are not at this point willing to finalize an agreement that we will receive policy level data only from the 10 selected profit centers."  Ex. D.

As Magistrate Judge Shwartz recognized, this was clearly a ripe discovery dispute on May 26 despite plaintiffs' attempted characterization of this as something other than a dispute:

> Although plaintiffs contend that they did not know before October 16, 2006 that the defendants did not intend to modify their offer to provide information from only 10 of its profit centers, see Joint Letters at 2, **this is the very position expressed to plaintiffs before the May 2006 deadline to raise discovery disputes**. Indeed, the attachment to the submission shows that defendants opposed the production of transactional data as requested but, as of May 2006, agreed to produce such information from 10 of its profit centers. Thus, the plaintiffs knew the defendants' position before the deadline to raise discovery disputes. If the plaintiffs disputed the sufficiency of this discovery response, then they should have sought intervention by the May 2006 deadline. They did not.

Order at 2 n.2 (citations omitted and emphasis added).  As the Magistrate Judge correctly found, Brown & Brown unambiguously stated that it would not agree to more than ten profit centers. Brown & Brown never wavered on this issue.

Despite plaintiffs' attempt to unilaterally extend the discovery dispute deadline by labeling the dispute an "agreement in progress" and submitting a "placeholder" letter to the Court on May 30, 2006, Magistrate Judge Shwartz rejected this approach:

> [T]he plaintiffs simply informed the Court by the May deadline that they were reserving their right to seek relief on this issue and

- 8 -

others. The Court set a deadline to raise disputes and the concept
of a "place holder" did not operate to extend the deadline. In its
June 22, 2006 Order, the Court clearly told the parties that its
"silence [regarding these issues] is not to be construed as an
extension of the deadline to raise unresolved discovery disputes"
and that to obtain an extension, the parties must present good
cause.

*Id.*

At bottom, plaintiffs' argument is that they disagree with Magistrate Judge

Shwartz's finding that the dispute was known and ripe and thus subject to the deadline. They

have failed, however, to show why this characterization is clearly erroneous or contrary to law,

especially given Brown & Brown's unambiguous refusal of their data request. Therefore,

plaintiffs have failed to sustain their burden required to overturn the Order, and their appeal must

be denied.

**II.      Brown & Brown's compromise of ten profit centers represented a reasonable
compromise to plaintiffs' unreasonable and tremendously burdensome data
requests.**

Plaintiffs argue that the Magistrate's Order "vitiates the meet and confer process."

Plaintiffs' Appeal at 8. In short, plaintiffs argue that there is good cause to extend the deadline

because of plaintiffs' diligence and good faith coupled with Brown & Brown's lack of good faith

in misusing the meet and confer process. Nothing could be further from the truth.

Plaintiffs' requests for the production of customer-specific data are tremendously

burdensome – especially with respect to Brown & Brown. As noted before, because Brown &

Brown is a highly decentralized mid-size broker, placement of insurance by various producers

and the record-keeping associated with such placements are local profit center activities.

Therefore, unlike many defendants in this litigation, customer-specific transactional data is not

maintained at the corporate offices of Brown & Brown.  Instead, the data that plaintiffs is seeking is located at each of Brown & Brown's 160+ profit center locations.

Since the very beginning of the parties' negotiations, Brown & Brown made it clear that extraction and production of customer-specific data is not as simple as pressing a button on a centralized computer system at a corporate headquarters.  The process of extracting and producing this data requires the installation of a computer program at each of the profit center locations from which the data is extracted.  While extraction is taking place, the company must significantly curtail user access to the system (a vital system used by Brown & Brown employees) – a factor which is extraordinarily disruptive to the company.  Further complicating the extraction of data, the company does not use the same computer system at each and every one of its profit centers.  With respect to the ten profit centers from which Brown & Brown had produced data, Brown & Brown has had to devise multiple protocols for these various profit centers.

Brown & Brown's position that the sampling protocol (the agreement by which Brown & Brown agreed to produce hard-copy and electronic documents, email, and customer files from ten profit centers) included the production of data was memorialized in Brown & Brown's May 26 email to plaintiffs.  *See* Ex. C ("Rather, we would search each of the 10 offices that we have agreed to sample (and that you will designate) for other discovery purposes, and will produce policy-level electronic transactional data that exists and is reasonably accessible."). This represented a fair offer of compromise given the heavy burden that plaintiffs' data requests placed on Brown & Brown.

Despite plaintiffs' characterization of Brown & Brown's efforts as not working in good faith with plaintiffs, Brown & Brown has more than complied with its obligations in the

discovery process.  Brown & Brown has produced:  (1) premium and commission reports for all profit centers from 2002 to 2005; (2) contingent commission reports for all profit centers from 1995 to 2005; and (3) over 5,000 profit-center specific financial data reports for 2003 to present. Furthermore, Brown & Brown has now – contrary to plaintiffs' representations (and as will be discussed in more detail below) – gathered and produced customer-specific data from the ten profit centers.  Brown & Brown produced over 1.7 gigabytes of customer and company data.  In addition, Brown & Brown has produced over 3.99 million pages of hard-copy and electronic documents, email, and customer files.

Particularly in light of the fact that there is nothing connecting Brown & Brown to any global conspiracy, bid-rigging, or broker-centered conspiracy, Brown & Brown finds it objectionable that plaintiffs are pushing for more and more discovery in an area that would cause so much burden to Brown & Brown.  Brown & Brown has more than met its discovery obligations and respectfully seeks the assistance of the Court in curtailing what has been little more than a wild fishing expedition.

**III.    Plaintiffs failed to demonstrate good cause to extend the discovery dispute deadline.**

Despite having knowledge of a ripe discovery dispute by May 26 at the latest, plaintiffs neglected to bring the dispute before the Magistrate Judge prior to the May 30 deadline. They have presented no persuasive excuse for their failure to abide by the deadline, and their attempt to shift the blame to Brown & Brown is unavailing.

Brown & Brown unambiguously stated that it was only willing to produce data for more than ten profit centers on May 26.  Plaintiffs had sufficient notice to bring this discovery dispute before the magistrate prior to the deadline.  Had plaintiffs been diligent, they

- 11 -

would have done so.  Yet they waited five months after the deadline to bring the dispute to the attention of the magistrate.  This cannot be characterized as diligence.

Plaintiffs have not provided a valid excuse for their failure to abide by the May 30 deadline for bringing discovery disputes.  Magistrate Judge Shwartz declined to extend the deadline, finding that there was no good cause for doing so.  Plaintiffs have not established that the refusal was clearly erroneous, much less contrary to law.  Therefore, their appeal to overturn the Order should be denied.

## IV.    Plaintiffs' raising of new issues on appeal should be denied.

In an attempt to buttress their appeal, plaintiffs put forth new arguments that they did not present before the Magistrate Judge.  They contend that on May 30 the parties "**jointly** reported to the Court that no dispute existed."  Plaintiffs' Appeal at 10 (emphasis added).  Plaintiffs also argue in their appeal papers that "under Order No. 9, the instant dispute 'arose' after May 30 and therefore could only be subject to the newly imposed April 6, 2007 deadline.  In keeping with the Court's directives to not allow discovery disputes to linger, however, plaintiffs promptly arranged to submit the issue to the Court for decision."  *Id.*

These argument were not raised by the plaintiffs below and cannot now be heard on appeal.  *See Koch Materials Co.*, 216 F.R.D. 301, 306 (D.N.J. 2003) ("[A] party is not entitled as of right to present arguments to the District Court on appeal which were not seasonably presented to the Magistrate Court.").  However, even were the Court to entertain these argument now, this further attempt to rewrite the events prior to the May 30 discovery dispute deadline should be denied.

As noted before, the May 30 letter to Magistrate Judge Shwartz was not a joint letter.  The letter was signed by counsel for plaintiffs and them alone.  Furthermore, despite

- 12 -

plaintiffs' attempt to characterize the dispute as "an agreement in progress," or anything other than a ripe "dispute," Magistrate Judge Shwartz concluded otherwise.  In examining the May 30 letter, the Magistrate Judge noted that "the plaintiffs simply informed the Court by the May deadline that they were reserving their right to seek relief on this issue and others."  Order at 2 n.2.  Regardless of how plaintiffs characterize the data dispute, there was a dispute that "arose" prior to the initial May 30 deadline.

**V.      Plaintiffs are attempting to bring another untimely discovery dispute.**

        In the final footnote of their brief, plaintiffs stated that "Brown & Brown has completed production of transactional data from seven of ten profit centers designated by plaintiffs.  Brown & Brown has thus far refused to produce data from the three additional plaintiff-designated offices."  Plaintiffs' Appeal at 11 n.4.  Plaintiffs' have mischaracterized the facts.

        After the magistrate's November 6 ruling, Brown & Brown finalized production of customer data on November 14, 2006 from the ten profit centers that plaintiffs had selected for discovery-sampling purposes.  *See* Ex. J (production emails for ten profit centers).  The following day, plaintiffs seized upon certain language in Magistrate Judge Shwartz's Order to suggest that Brown & Brown had to produce data from three additional offices.  Plaintiffs stated, "[T]he Court's November 9 order states that 'Brown & Brown shall produce the requested transactional data of 10 profit centers that plaintiffs select.'"  *See* Ex. K (November 15, 2006 email) (seeking production from the Halcyon, MacDuff-Daytona, and Pinellas/Clearwater profit centers).  Plaintiffs claimed essentially that they could swap three profit centers from the original ten profit centers chosen for discovery-sampling purposes (Leesburg, Houston, and Tampa) for

three newly-designated profit centers.  This was despite the fact that Brown & Brown had already produced data from Leesburg, Houston, and Tampa.[5]

Plaintiffs' position distorts the record before Magistrate Judge Shwartz.  The Magistrate Judge specifically cited Brown & Brown's May 26 email in her Order which said, "[W]e wish to make clear that we have not agreed to search and produce from each and every profit center.  **Rather, we would search each of the 10 offices that we have agreed to sample (and that you will designate) for other discovery purposes,** and will produce policy-level electronic transaction data that exists and is reasonably accessible."  Ex. C (emphasis added).  At no time in the record before the Magistrate Judge did plaintiffs raise any issue regarding any right to select <u>different</u> offices for data-production purpose.  As a result, the issue of <u>which</u> ten offices plaintiffs would select for data purposes, and whether those ten were different from the ten offices plaintiffs had already selected for all other discovery purposes, was never before the Magistrate Judge.  Given Brown & Brown's clear statement in its May 26 email, the only reasonable interpretation of the phrase in the Order that "Brown & Brown shall produce the requested transactional data of 10 profit centers that plaintiffs select" was that these would be the offices that had been selected by plaintiffs for all other discovery sampling purposes.

Brown & Brown respectfully submits that as this issue has not been presented to the Magistrate Judge prior to plaintiffs' raising of the issue in their appeal papers, and, therefore, this issue is not ripe for decision.  Moreover, plaintiffs' attempt to raise the issue at this late date is untimely for the same reasons as set forth in the Order.

---

[5] Adding further to the confusion in plaintiffs' approach was the fact that one of the profit centers from which Brown & Brown produced data and which plaintiffs apparently had no interest in receiving was the Houston profit center, a/k/a, "Brown & Brown Benefits, Inc.," the only named Brown & Brown subsidiary in this litigation.

For the reasons stated herein, Brown & Brown respectfully request that plaintiffs' appeal of the Magistrate Judge's Order be denied.

Dated: New York, New York
       December 11, 2006

Respectfully submitted,

PAUL, HASTINGS, JANOFSKY &
WALKER LLP

By:    /s/ Theodore A. Kittila
     Barry G. Sher
     Kevin C. Logue
     Theodore A. Kittila
   75 E. 55th St.
   New York, New York, 10022
   (212) 318-6000

*Counsel for Brown & Brown, Inc. and
Brown & Brown Insurance Benefits, Inc.*

- 15 -

LEGAL_US_E # 73359785.6