**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                            :
                                            :        MDL Docket No. 1663
**IN RE INSURANCE BROKERAGE** :
**ANTITRUST LITIGATION**            :        Civ. No. 04-5184 (FSH)
                                            :
_____:
                                            :        **MEMORANDUM OPINION**
                                            :
This Document Relates To:           :
                                            :
     **ALL ACTIONS**                     :
_____:

**BROWN, Chief Judge**

     This matter comes before the Court upon the motion of defendant Zurich Financial Services,

Zurich American Insurance Company, Steadfast Insurance Company, Fidelity and Deposit Company

of Maryland, Empire Fire and Marine Insurance Company, American Guarantee and Liability

Insurance Company, Empire Indemnity Insurance Company, and Assurance Company of America

(collectively, the "Zurich Defendants") for Final Approval of Class Action Settlement, the motion

of Plaintiffs for Final Approval of Settlement, and the brief of Intervenor Attorneys General[1] in

support of Final Approval of the Zurich Settlement.   A fairness hearing was held on January 26,

2007.  The Court, having considered the parties' written submissions and oral argument, and for the

reasons discussed herein, grants the Motion for Final Approval of the Class Action Settlement.

---

[1]  The Intervenor Attorneys General include the Attorneys General of the States of California,
Florida, Hawaii, Maryland, Oregon, Texas, West Virginia and the Commonwealths of
Massachusetts, Pennsylvania and Virginia.  The Intervenor Attorneys General appear pursuant to
the Court's September 18, 2006 Order permitting intervention for the limited purpose of
providing support for the approval of this Settlement.

I.     BACKGROUND

This action involves numerous class actions filed against various insurance brokers and insurers.  In August 2005, the Zurich Defendants were added to the class actions.  The class actions allege violations of federal and state antitrust laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO") and common law.  These class actions have been consolidated into the present action.  The Court is now called to consider the fairness of the proposed settlement in the amount of $121,800,000.

On May 25, 2006, the Court issued an Order appointing the law firms Milberg Weiss Bershad & Schulman LLP and Miller Faucher and Cafferty LLP as Co-Lead Counsel for Plaintiffs.  In a July 17, 2006 Order, the Court substituted the law firm of Whatley, Drake & Kallas, LLC for the law firm of Milberg Weiss Bershad & Schulman LLP as Co-Lead Counsel.  The May 25, 2006 Order provides that Co-Lead Counsel may conduct settlement negotiations on behalf of Plaintiffs in this action and enter into binding agreements with respect to settlement.

Plaintiffs filed an amended complaint on or about August 1, 2005 and a corrected amended complaint on or about August 15, 2005.  Plaintiffs make claims on behalf of a proposed class of insureds who purchased or renewed insurance policies with the Defendant insurers (including the Zurich Defendants) through the Defendant brokers.  Plaintiffs allege that the Defendants "engaged in a combination and conspiracy to suppress and eliminate competition in the sale of insurance by coordinating and rigging bids for insurance policies, allocating insurance markets and customers and raising, or maintaining or stabilizing premium prices above competitive levels."  Corrected First Consolidated Amended Commercial Class Action Compl., ¶ 1.

The Zurich Defendants were also the subject of investigations conducted by numerous state

attorneys general and state departments of insurance based upon the same alleged practices in the marketing and sale of commercial insurance. On October 14, 2005, the Zurich Defendants and Plaintiffs entered into a Memorandum of Understanding (the "MOU") setting forth the principal terms of a settlement of the action. The MOU was subject to completion of full confirmatory discovery, and Plaintiffs reserved the right to terminate the MOU if, upon completion of the confirmatory discovery, they and Co-Lead Counsel reasonably and in good faith did not believe that the terms of the settlement were fair, reasonable and adequate. The MOU provided for a resolution of all claims for the class period of August 26, 1994 through September 1, 2005, as well as for the creation of a settlement fund of $100,000,000 payable to Settlement Class Members. With certain exceptions as set forth in the Settlement Agreement, the Settlement Class is comprised of "all individuals or entities, who during the Settlement Class Period, engaged the services of (i) one of the Broker Defendants or any subsidiary or affiliate of a Broker Defendant in connection with a Settlement Class Policy Purchase from any Zurich Insurer, any Insurer Defendant or any insurance company that is not an affiliate or subsidiary of a Zurich Insurer, or (ii) any other broker (which, for the avoidance of doubt, shall have the same meaning as in Section III.4.c of Exhibit B to the Multi-State Agreement) in connection with a Settlement Class Policy Purchase from any Zurich Insurer . . . ." Settlement Agreement, § I.A.58.

The MOU was contingent upon several events, including successful resolution of the Governmental Investigations and successful negotiation and execution of a stipulation of settlement by the Zurich Defendants and Plaintiffs. In March 2006, certain of the Zurich Defendants entered into settlements that resolved the majority of the pending Governmental Investigations that had been initiated by state attorneys general. One of the agreements, the Multi-State Agreement, required

certain of the Zurich Defendants to pay or cause to be paid $51,700,000 (in conjunction with the settlement relief to be provided pursuant to the Settlement Agreement). This amount shall, upon Court approval of the Settlement Agreement, be distributed to Settlement Class Members pursuant to the Plan of Allocation that will also be adopted in connection with the Court's approval of the Settlement Agreement. In addition, certain Zurich Defendants reached settlements with certain state departments of insurance, some of which contain parallel provisions to those contained in the Multi-State Settlement Agreement. On March 27, 2006, certain of the Zurich Defendants executed a settlement with the Office of the Attorney General of the States of New York, Connecticut and Illinois and with the Superintendent of Insurance for the State of New York (collectively, the "Three-State Agreement"). Pursuant to this agreement, the Zurich Defendants are to set up an $88,000,000 settlement fund to provide relief to a specific group of policyholders. This distribution will be made separately from any distributions made in connection with the Settlement Agreement.

Thus, through the Settlement Agreement and the Multi-State Agreement, Zurich Defendants are creating a $121,800,000 settlement fund. The Settlement Agreement requires the Zurich Defendants to pay $100,000,000 to policyholders who fall within the definition of the Settlement Class. However, some of the potential Settlement Class Members (those identified in the Three-State Agreement) might receive settlement relief under the Three-State Agreement rather than under the Settlement Agreement. Therefore, the Settlement Agreement provides that the Zurich Defendants would initially fund the class action settlement in the amount of $70,100,000 and would be required to fund the balance of the $100,000,000 settlement amount (i.e. $29,900,000) only if the Zurich Defendants failed to distribute at least that amount to policyholders (all of whom fall within the definition of the Settlement Class) pursuant to the Three-State Agreement. The Zurich

Defendants have committed to pay $29,900,000 to policyholders (all of whom would otherwise be Settlement Class Members) under the Three-State Agreement. The Multi-State Agreement requires the Zurich Defendants to create a $51,700,000 settlement fund that will be distributed in conjunction with the fund created under the Settlement Agreement. Thus, the Zurich Defendants will create a settlement fund pursuant to the Settlement Agreement and Multi-State Agreement in the amount of $121,800,000 and have committed to pay $29,900,000 to policyholders who fall within the definition of Settlement Class, but who have elected to receive relief pursuant to the Three-State Agreement rather than under the Settlement Agreement. The Zurich Defendants will also pay all the administrative costs associated with implementing the Settlement Agreement in addition to the amounts described above. The administrative costs include the cost of printing and mailing notices, publishing the summary notice, staffing a toll-free telephone center and creating and maintaining a website. Upon approval of the settlement, the Zurich Defendants will also incur the costs associated with distributing settlement relief to Settlement Class Members.

Prior to reaching an agreement and executing the MOU, Co-Lead Counsel and other counsel for the class (collectively, "Class Counsel"), obtained approximately 11 million pages of documents from various defendants, including the Zurich Defendants. After executing the MOU, Class Counsel conducted confirmatory discovery, which included obtaining approximately 2.5 million pages of additional documents, meeting with the Zurich Defendants' Counsel to discuss the claims and interviewing four individuals, including three senior executives of Defendant Zurich American Insurance Company. Class Counsel also continued to engage in discovery with respect to the other defendants in the class action and third parties. As of the execution date of the Settlement Agreement, Class Counsel had obtained in excess of 26.5 million pages of documents (including

5

voluminous electronic and data files) and deposed or interviewed over 90 individuals.

The deadline for the MOU was April 14, 2006. After several Court-approved extensions of this deadline, Plaintiffs and the Zurich Defendants entered into a Stipulation of Settlement on July 26, 2006.  The terms of this settlement fully settle all claims that have been asserted or that could be asserted in this action as to the Zurich Defendants.  Plaintiffs and the Zurich Defendants entered into a First Amendment to Stipulation of Settlement that corrected certain exhibits and made modifications to several definitions.  The Stipulation of Settlement, the First Amendment to Stipulation of Settlement and their exhibits are collectively referred to herein as the "Settlement Agreement."

On November 6, 2006, the Court held a Preliminary Approval Hearing to determine whether, among other things, to certify a class preliminarily for settlement purposes and to authorize the issuance of notice to members of the Settlement Class.  On November 8, 2006, the Court entered Findings and Order Preliminarily Certifying a Class for Settlement Purposes and Preliminarily Approving Proposed Settlement.  Pursuant to this Court's November 8 Order, notice was mailed to over 3,790,000 Settlement Class Members by an Administrator, Complete Claims Solutions, Inc. The individual notice included as appendices the text of the release and the plan of allocation, as well as detailed information about the class action, the available settlement benefits, the right to object to the agreement and to appear at the fairness hearing and the right to request exclusion from the Settlement Agreement.  The fairness hearing was scheduled for January 26, 2007, and all objections were due on or before January 11, 2007.  The Administrator also published a notice of the settlement hearing two times in all editions of *The New York Times*, *The Wall Street Journal* and *USA Today*, one time in the newspaper with the highest circulation in each of the 50 states and in the District of

Columbia, and in *Business Insurance* and *RM Magazine*. Further, the Administrator posted pertinent information and documents on the website created for the settlement, www.insurancebrokerageantitrustlitigation.com. Notice materials were also published on Co-Lead Counsel's website, certain of Class Counsel's websites and at www.zurichna.com. The Administrator established a toll-free telephone bank to respond to inquiries by Settlement Class Members.

## II.    DISCUSSION

### A.    Fairness of Class Action Settlement and Plan of Allocation

#### 1.    Standard for Judicial Approval of Settlement in Class Action

Under Federal Rule of Civil Procedure 23(e), the district court must approve any settlement in a class action, and direct reasonable notice to all class members who may be bound by such settlement. FED. R. CIV. P. 23(e). Approval is warranted only if the settlement is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e). Acting as a fiduciary responsible for protecting the rights of absent class members, the court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." In re Cendent Corp. Litig., 264 F.3d 201, 231 (3d Cir. 2001)(quoting In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 782 (3d Cir. 1995)). This determination rests within the sound discretion of the court. Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975).

In Girsh, the Third Circuit identified nine factors that a district court should consider when determining whether a proposed class action settlement warrants approval. Girsh, 521 F.2d at 157.

7

These factors include: (1) "the complexity, expense and likely duration of the litigation"; (2) "the reaction of the class to the settlement"; (3) "the stage of the proceedings and the amount of discovery completed"; (4) "the risks of establishing liability"; (5) "the risks of establishing damages"; (6) "the risks of maintaining the class action through the trial"; (7) "the ability of the defendants to withstand a greater judgment"; (8) "the range of reasonableness of the settlement fund in light of the best possible recovery"; (9) "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." Id. at 157. The burden of proving that these factors weigh in favor of approval rests on the proponents of a settlement. The Girsh factors, however, "do not provide an exhaustive list of factors to be considered when reviewing a proposed settlement." In re AT&T Corp. Secs. Litig., 455 F.3d 160, 165 (3d Cir. 2006)(citing In re Prudential Ins., 148 F.3d 283, 323 (3d Cir. 1998)).[2] The Court may take these other factors into consideration, if appropriate, in order to determine whether final approval is warranted.

## 2. Application of Girsh Factors

Based on the facts and circumstances of this case, the Court concludes that factors one through five overwhelmingly weigh in favor of approval of settlement, and factors six through nine weigh slightly or moderately in favor of approval. Significantly, the Court finds that none of the

---

[2] Other relevant factors include: "[T]he maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved - or likely to be achieved - for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable." In re Prudential Ins., 148 F.3d at 323.

<u>Girsch</u> factors suggest that the proposed settlement should not be approved.  The Court will now discuss its reasons for arriving at this conclusion.

### a. *Complexity, Expense and Likely Duration of the Litigation*

The first factor concerning the complexity, expense and duration of litigation, is considered to evaluate "the probable costs, in both time and money, of continued litigation."  Cendant Corp. Litig., 264 F.3d 201, 233 (3d Cir. 2001) (quoting GM Trucks, 55 F.3d at 812).  This action involves federal and state antitrust laws, RICO and common law.  An antitrust action is clearly a complex action to prosecute.  In re Linerboard Litig., No. MDL 1261, 2004 U.S. Dist. LEXIS 10532, *34 (E.D. Pa. June 2, 2004).  In addition, the claims involve  alleged conspiracy violations by dozens of large brokerage and insurance companies.  Thus, this case involves highly complex legal and factual issues.  The case has been litigated for over two years, and this Settlement was reached with one of 25 defendant groups after extensive negotiations.  As of the execution of the Settlement Agreement, over 26.5 million pages of documents were produced to Plaintiffs, and Class Counsel conducted over 90 depositions.  To proceed with litigation of this matter would undoubtedly become a costly and lengthy process for all parties.  See In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535-36 (3d Cir. 2004) (finding this factor weighed in favor of settlement because "continuing litigation through trial would have required additional discovery, extensive pre-trial motions addressing complex factual and legal questions and ultimately a complicated, lengthy trial").  This proposed settlement provides an immediate benefit to the Plaintiffs.  Accordingly, the Court finds that the first <u>Girsch</u> factor weighs strongly in favor of approval.

### b. *Reaction of the Class to the Settlement*

Notices of the settlement were mailed to 3,799,213 class members on a rolling basis between

December 5, 2006 and December 11, 2006.   Declaration of Charlene Young, ¶¶ 3-5.   Notice was published two times in all editions of *The New York Times*, *The Wall Street Journal* and *USA Today*, one time in the newspaper with the highest circulation in each of the 50 states and in the District of Columbia, and in *Business Insurance* and *RM Magazine*.   The Administrator posted pertinent information and documents on the website created for the settlement as well as on Co-Lead Counsel's website, certain of Class Counsel's websites and at www.zurichna.com.  The Administrator also established a toll-free telephone bank to respond to inquiries by Settlement Class Members.   In response, 1,067 Settlement Class Members excluded themselves from the Settlement and only fifteen class members filed objections.[3]   Notably, few of these objections questioned  the settlement amount, and several objections concerned the attorneys fees which this Court will consider separately.   As the Third Circuit articulated in Rite Aid Corp. Securities Litigation, 396 F.3d 294, 305 (3d Cir. 2005), "such a low level of objection is a 'rare phenomenon.'"   Consequently, the Court concludes that the small number of objections by  Class Members to the settlement award, more specifically, to the calculation of the settlement award and damages resulting from the conduct of the Zurich Defendants, strongly weighs in favor of approval.

In addition, the Attorneys General of Texas and Pennsylvania, parties to the Multi-State Agreement, supported the Settlement Agreement at the November 6, 2006 hearing.   The Chief Counsel for the Illinois Division of Insurance also attended the hearing and conveyed support for the Settlement Agreement on behalf of fifteen state departments of insurance.   Further, the Intervenor Attorneys General submitted a brief in support of this Settlement.   Beginning in November 2004, a multi-state group of twelve Attorney General offices, augmented by several insurance departments,

---

[3] See Section A.4.

began investigating the alleged bid rigging and steering activities in the property and casualty insurance industry of brokers and insurers, including the Zurich Defendants. In the MOU, the Class Plaintiffs and Zurich Defendants acknowledged that a plan of allocation would be prepared in consultation with the Attorneys General and/or other governmental entities. The Intervenor Attorneys General conducted a fifteen-month investigation as well as arm's length negotiations with Zurich Defendants before reaching a settlement. On March 20, 2006, Zurich and the Intervenor Attorneys General entered into a Settlement Agreement with the Offices of the Attorneys General (the Multi-State Agreement). The Settlement has been reviewed and accepted by the Intervenor Attorneys General, as well as fifteen state Departments of Insurance.

<b>c.</b>   <b><i>The Stage of the Proceedings and the Amount of Discovery Completed</i></b>

 The Court should consider this factor to evaluate "the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." <u>Cendant</u>, 264 F.3d at 235 (quoting <u>GM Trucks</u>, 55 F.3d at 813). The Court notes at the outset that this action has been vigorously litigated for over two years. During this time, a considerable amount of time, money and effort was expended by all parties in litigating the action.

The parties engaged in extensive discovery. Plaintiffs reviewed over 26.5 million pages of documents from the various defendants, including the Zurich Defendants, conducted 90 depositions in general discovery and four interviews of Zurich witnesses during confirmatory discovery. Based upon the amount of time Counsel expended in negotiations and the extent of the discovery process, the Court finds that Counsel had a thorough appreciation for the merits of the case prior to settlement. Accordingly, the Court concludes that this factor cuts strongly in favor of settlement.

11

### d.    *Risks of Establishing Liability*

This factor should be considered to "examine what potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." Cendant, 264 F.3d at 237 (quoting GM Trucks, 55 F.3d at 814). "The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.'" In re Safety Components Int'l, Inc. Secs. Litig., 166 F.Supp. 2d 72, 89 (D.N.J. 2001) (quoting Prudential Ins., 148 F.3d at 319).

To succeed at trial, Plaintiffs must prove the elements of their federal antitrust and RICO claims. While Plaintiffs' claims against the Non-Settling Defendants have survived motions to dismiss, Plaintiffs have been required to submit a supplemental statement of particularity for the federal antitrust claims and an amended RICO statement. Defendants have renewed their motions to dismiss, claiming that Plaintiffs have failed to adequately plead RICO and antitrust claims under Rule 9(b), failed to state a RICO claim because they have not alleged a proper enterprise or a conspiracy to engage in RICO violations, and failed to state a federal antitrust claim because they have not alleged an industry-wide horizontal conspiracy and that Plaintiffs lack standing. Aside from these motions to dismiss, Plaintiffs contend that other substantial obstacles to resolution still remain, including class certification, summary judgment motions and trial.

This case involves difficult factual and legal issues which would have translated into protracted litigation and accumulating expenses, in both time and money. Accordingly, the Court finds that this Girsch factor weighs strongly in favor of approval.

### e.    *Risk of Establishing Damages*

This factor also "attempts to measure the expected value of litigating the action rather than

12

settling it at the current time." Cendant, 264 F.3d at 238 (quoting GM Trucks, 55 F.3d at 816). Zurich Defendants contend that Plaintiffs' allegations of damages would require a complicated analysis involving sophisticated expert opinions, countered by Zurich Defendants' own experts and resulting in a battle of the experts. Plaintiffs acknowledge the risk that they may not recover, or may recover only a limited amount. Thus, the Court agrees that a significant risk exists in establishing both liability and damages, and concludes this factor weighs in favor of approval.

###### f.   *Additional Girsch Factors*

The sixth factor concerns the risks of maintaining the class action through the trial and weighs somewhat in favor of approval of the settlement. The class has been certified for settlement purposes only, and if this case were to proceed to trial Zurich Defendants contend that they would contest class certification on various grounds. The Non-Settling Defendants have filed an opposition to Plaintiffs' motion for class certification. Defendants claim that even if Plaintiffs obtain certification, the risk remains that the class could be decertified at a later stage. Plaintiffs acknowledge Defendants' arguments in opposition to the motion for class certification, including that the class is unmanageable, Plaintiffs cannot establish a common antitrust impact, the proposed class representatives are not adequate and the RICO claims require individualized inquiry. Pl.'s Br. at 23. Plaintiffs contend that they are confident that they will be successful with class certification, however, since the motions have not been ruled upon by this Court, the outcome is still uncertain.

The seventh factor concerning the ability of defendants to withstand a greater judgment also slightly favors approval. In Cendant, the Third Circuit interpreted this factor as concerning "whether the defendants could withstand a judgment for an amount sufficiently greater than the Settlement." Cendant, 264 F.3d at 240. Plaintiffs do not contend that the Zurich Defendants could not withstand

a larger judgment, however, they submit that many settlements are approved even where a settling party has the ability to pay a greater amount.  See, e.g. Warfarin Sodium, 391 F.3d at 538; Yong Soon Oh v. AT&T Corp., 225 F.R.D. 142, 150-51 (D.N.J. 2004).  The Zurich Defendants, in addition to the multi-million dollar settlement amount, have committed to pay Class Counsel's fees and expenses and the expenses associated with implementing the Settlement Agreement.  In light of these considerations, the Court finds that this factor weighs slightly in favor of approval.

Lastly, the eighth and ninth factors concerning the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation weigh in favor of settlement.  "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.  The percentage recovery, rather must represent a material percentage recovery to plaintiff in light of all the risks considered under Girsh."  In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citation and quotations omitted).  The Zurich Defendants contend that, in this case, the settlement amount is sizeable and the Agreement provides for prompt and definite benefits to the members of the Settlement Class.  Further, the relief provided to Class Members is not subject to reduction for administrative expenses and attorneys fees.  Plaintiffs submit that Class Counsel and the Settling Attorneys General engaged  economic experts to evaluate the possible range of damages, and that $121,800,000 represents a material percentage considering the significant risks faced by Plaintiffs if litigation proceeded.  As with the other factors, the Court finds that this favors settlement.

### 3.    Summary of Girsch Factors

In conclusion, the Court finds that factors one through five all weigh heavily in favor of

approval of the Settlement.  Factors six through nine weigh slightly or moderately in favor of approval.  The Settlement was reached after arm's-length negotiations between experienced, capable counsel after confirmatory discovery and in conjunction with the Intervenor Attorneys General who write separately to support this Settlement Agreement.  Consequently, the Court finds that none of the Girsch factors weigh against settlement.  As the above analysis demonstrates, the Court concludes that the settlement of $121,800,000 represents an excellent result for the Class considering the substantial risks Plaintiffs face, the immediate benefits provided and the absence of any guarantee of a favorable verdict.

### 4.    Objectors' Arguments

As stated above, the arguments set forth by the small number of objectors are not persuasive. Few objections were made concerning the total amount of the Settlement Agreement.  The Court does not deem it necessary to summarize and dismiss each and every objection because they do not raise questions as to whether the Settlement Agreement is fair, reasonable and adequate.  However, discussed below are the general areas of objections.  The objections involve the sufficiency of the notice, scope of the release and bar order, requirement for submitting claim forms, procedures for requesting exclusion, plan of allocation, class certification and attorneys fees.[4]

### a.    *Objections Regarding Notice*

Several objectors contend that the notice issued in this case was insufficient.  Objectors William J. Akers, Esq., Harold B. Wolfe and the Chaba Law Group ("Akers Objectors") submit that the notice was materially misleading, specifically the use of the term "broker."  According to the

---

[4] The Court has considered all objections, including the objection submitted by Garland Connor. The Court reviewed Mr. Connor's objection and finds that it is without merit.

Akers Objectors, the notice leads one to believe that they can only file a claim if the insurance was purchased through a "Broker Defendant" listed in the notice, and does not adequately address the potential claims of those who purchased insurance through "insurance producers." Akers Br. at 4-5. Further, the Akers Objectors argue that the term "broker" is misleading, as many states, including West Virginia, have abolished the difference between insurance agents and insurance brokers. These two groups are now referred to as "insurance producers." Akers Br. at 2-4.

The Zurich Defendants contend that the notice provides a full definition of the Settlement Class in Footnote 2 of Appendix B, and this definition defines the Settlement Class and Settlement Class Members to include purchasers of insurance through brokers and "for the avoidance of doubt" incorporates the definition of brokers in Section III.4.c of Exhibit B to the Multi-State Agreement. Zurich Def. Br. at 22. The definition states: "Broker or Agent means: an insurance producer as defined by (insert state statute reference) licensed to do business as such in any state within the United States . . ." The Court finds that this definition was available to all parties, as each page of the notice set forth the toll-free phone number, email address and website from which Class Members could access information or view documents.

Several objectors[5] also contend that the notice was inadequate because it lacked sufficient information regarding the likely recovery under the Settlement Agreement, it did not provide information regarding estimated damages and it did not provide sufficient information regarding the underlying claims. Regarding likely recovery, these objectors contend that the notice and

---

[5] Dan C.D. Sturdevant, Romero General Construction Corp., Anderson Excavating Company, Harold Folsom Jensen, Palomar Grading and Paving, Inc. and Emerald Financial Group, Inc. (the "Kennedy Objectors") and Shapiro & Lodwick Co. LPA, Sports & Spine Physical Therapy Inc., Irene Pekoe, Hoffman Legal Group, LLC, Lacy Redd and Sir and Cross (the "Shapiro & Lodwick Objectors")

16

accompanying documents on the website do not provide details about the size of the class and the actual individual settlement values.  Objectors also argue that the notice fails to inform the Class about the underlying claims in enough detail to determine whether the settlement is fair, adequate and reasonable. Emerald Financial Br. at 1.  Likewise, the Romero Objectors contend that the notice fails to inform Class Members of their total loss as a result of the wrongful conduct of the Defendants and expected gain from the Settlement.  Romero Br. at 8; Sturdevant Br. at 5-6; Shapiro Br. at 5.

The Zurich Defendants contend that these objections do not weigh against approval of the Settlement Agreement.  They submit that the notice provided the aggregate amount of the settlement amount and allocation plan, and that unknown variables exist that may have an impact on the ultimate distributions under the Agreement, such as premiums paid by each individual compared to the total premiums paid by all Class Members.  Plaintiffs contend that courts have held that it is sufficient to provide the total amount of the settlement relief and the method of calculating the recovery when final allocations depend on individual circumstances.  See Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1177-78 (9th Cir. 1977)(citing Cannon v. Texas Gulf Sulfur, 55 F.R.D. 308, 313 n. 2 (S.D.N.Y. 1972)).  The Zurich Defendants also address the claim that Class Members were not given information regarding potential damages, denying that they engaged in any wrongdoing and denying that the Settlement Class Members suffered any damages as a result of their conduct.  Zurich Def. Br. at 26.  Further, Zurich Defendants submit that damages have not yet been established at this stage of the litigation, and that a finding of liability and a determination of injury suffered would be required before an amount could be assessed.  The Zurich Defendants also address the objectors' argument that the notice did not provide sufficient details regarding the underlying

17

claims.  According to the Zurich Defendants, the Members were provided with the caption of the litigation, a short description of the claims as well as contact information for Class Counsel and information regarding how to obtain access to discovery materials.  Moreover, the documents in this case, including motions to dismiss and class certification are publicly available on the docket.

**b.**   ***Objections Regarding Whether Notice was the Best Practicable***

The Romero Objectors claim that the notice was inadequate because it was not the best practicable notice under the circumstances and was not provided to all Settlement Class Members. Romero Br. at 10.   The Romero Objectors contend that while Zurich sent out direct notices to all of its own eligible policyholders for which it had valid addresses, the Settlement contains numerous broker and insurer defendants.  Therefore, while many customers may no longer possess Zurich policies, it is likely that they use other insurers within the list or the same brokers.  Because many more class members could have received actual notice if Zurich used its list of insured and cross referenced it with the brokers or insurers, they contend that the notice provided was inadequate.  Id. Zurich Defendants argue that they mailed notice to over 3.7 million insureds that purchased insurance from one or more Zurich companies during the class period and published notice in major publications.  According to Zurich, the only Class Members who did not receive actual notice were those who had purchased insurance from a non-Zurich insurer.  Zurich Defendants contend that they do not possess information regarding these individuals, and the publication of the notice was sufficient to reach those Members.  Zurich Def. Br. at 28-29.  Zurich argues that best practicable notice does not require that each potential Settlement Class Member receive actual notice, rather Zurich was required to make an effort "reasonably calculated" to apprise a party of the action.  See e.g. Dusenbery v. United States, 534 U.S. 161, 170-71 (2002).

Upon consideration, and in light of the Court's finding above that the Settlement Agreement is fair, reasonable and adequate, the objections regarding the adequacy of the notice do not persuade this Court that the Settlement should be rejected.

### c.   *Objections Regarding the Release*

Several objectors contend that the release is overly broad because it attempts to release claims of which Class Members are not aware and usurps state law regarding breadth of releases.  Kennedy Br. at 1; Romero Br. at 13; Prestige Br. at 5.   The Zurich Defendants claim these objections are without merit.  "In class action settlements, releases may include all claims that arise out of the same course of conduct alleged in the Complaint . . .  releases of known and unknown claims . . .  or even claims over which the court lacked jurisdiction. Varacallo v. Massachusetts Mutual Life Ins. Co., 226 F.R.D. 207, 244 (D.N.J. 2005) (citing Prudential, 148 F.3d at 326). A release may also "bar future claims for conduct that occurred in the past that are based upon the same factual predicate as those claims [in the current action]."  Varacallo, 226 F.R.D. at 244.   While releases may affect certain state law claims, the Zurich Defendants contend that a Class Member may opt out of the Settlement Class and pursue its state and federal law claims.   Moreover, the Zurich Defendants submit that if defendants in class actions could not receive a complete release of claims during the settlement process, there would be little incentive for settlement.  GM Trucks, 55 F.3d at 784 ("the law favors settlements, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation").  The Court finds that the release is not unduly broad and that the objectors' arguments are not persuasive.

### d.   *Objections Regarding the Claim Forms*

The objectors contend that the claims form procedure is unnecessary, overly burdensome and

19

designed to limit the "take rate" of the Class Members.   Romero Br. at 10.   More specifically, the objectors find the claim forms unnecessary as every member of the Class can be readily identified from either a broker or one of the insurers.   The objectors also find the amount and type of information required to be burdensome.   The Zurich Defendants, however, argue that the claims process is not designed to minimize participation, as none of the settlement amount will revert back to the Zurich Defendants.   Thus, the actual rate of participation does not have any impact on Zurich's obligations.   The Zurich Defendants also contend that the claim forms are only required for Settlement Class Members who purchased insurance from a non-Zurich insurer through a broker Defendant.   Zurich Br. at 32.   All other Settlement Class Members will automatically receive benefits from the Settlement Agreement.

In addition, the objectors claim that the Settlement Agreement does not set forth the manner in which the listed premium amounts will be checked for accuracy and how the administrator will calculate the payout for class members who don't list or inflate their policy premiums.   Romero Br. at 11.  The Zurich Defendants offer the language of the claim form itself to counter these arguments, as the form states that "[t]he Settlement Agreement is authorized to request, from persons or entities submitting this form, any documentation necessary to verify all information appearing in the Claim Form or to prevent consideration of duplicate claims submitted by or on behalf of a class member . . ."  According to Zurich, the claim form requires the submitter to certify the statements "under penalty of perjury."  In addition, the objectors request additional time to submit claims forms, which would delay the final calculation of the amount of settlement relief to be distributed to Settlement Class Members.   Claims forms are to be mailed by June 12, 2007 - five months after the last day to request exclusion from the Settlement Agreement.   The Court finds that this is a reasonable amount

20

of time in which to submit claim forms.  Moreover, because only those Class Members who purchased insurance through a non-Zurich insurer though a broker Defendant are required to provide policy information in order to submit a claim, this Court find the claims process to be reasonable.

e.    <strong><em>Objections Regarding Exclusion</em></strong>

The objections regarding exclusion were raised by the McDermott Entities[6] and the Office Depot, both of which have requested and been granted exclusion from the Settlement Agreement by the settling parties.   Additionally, SCI International, Inc. filed a motion for an extension of time for exclusion.   On January 11, 2007, SCI submitted a brief contending that it did not receive the notice until recently, and requesting an extension.[7]  SCI contends it needs this additional time in order to review the legal and factual issues and determine whether including itself in the Settlement Agreement will materially affect its rights in the pending litigation in Illinois.  SCI Br. at 2.  The Court finds that SCI had ample time to investigate its rights and the impact of other litigation, and therefore denies SCI's request for an extension of time to opt out of the Settlement.

f.    <strong><em>Other Objections</em></strong>

The objections regarding allocation and class certification are set forth below.  The Court will address attorneys fees and the related objections separately.

**4.    Plan of Allocation**

In approving the Plan of Allocation of the Settlement ("Plan"), the Court must likewise

---

[6] McDermott International, Inc., BWX Technologies, Inc., J. Ray McDermott, Inc., B&W Fossil Power, Babcock & Wilcox Construction, Babcock & Wilcox Co., Babcock & Wilcox Canada, Ltd., Cinergy Miami Forth Unit 8 and McDermott, Inc.

[7] SCI submitted an amended motion [Docket No. 995] requesting another extension of time until March 12, 2007.

determine whether the Plan is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e). Plaintiffs submit that the proposed Plan was prepared by Class Counsel, with assistance of economic experts. The economic experts' findings were based on data from Zurich and other Defendants. The Settling Attorneys General and their economic experts also participated in the negotiation of the Plan, pursuant to the terms of the Multi-State Agreement, and agreed to the Plan. The Intervenor Attorneys General also support this Plan of Allocation, finding the Plan fair and reasonable and providing adequate compensation to all Settlement Class Members. According to the Intervenor Attorneys General, the Plan accurately reflects differences in the impact of the Defendants' conduct in certain lines of insurance during different years. The Intervenor Attorneys General employed experts who suggest that the degree of harm suffered by Settlement Class Members likely varies depending on the amount of contingent commissions paid in certain lines of coverage.[8]

The objections regarding allocation are not persuasive. For example, the Sturdevant Objector is concerned about the oversight of the performance of the Settlement. However, Plaintiffs submit that these concerns have been addressed in Section III.F.9 of the Settlement Agreement which provides that the Court will retain jurisdiction to resolve all controversies arising out of the Settlement, and Section XIV.K which repeats the oversight provision. The Road Commission Objector also seeks to modify the Plan with respect to those parties who have fixed fee agreements with their brokers for the years in question. According to the Road Commission Objector, there are two groups of insureds - the first group includes those Class Members who used insurance brokers

---

[8] The Plan provides 51.7% of the settlement recovery to class members who purchased excess casualty policies during the 2001-2004 time period. Zurich policyholders who purchased other lines of commercial insurance, or who purchased excess casualty policies in other time periods will share 33.9% of the Settlement fund. Those Settlement Class Members who are not Zurich policyholders will share 9% of the Settlement. Intervenor Attorneys General Br. at 7-8.

or agents on a commission basis, and the second group involves those who used brokers pursuant to a written contract which specified that fixed fees paid were to be total compensation in lieu of all commissions or other payments to the broker.  Accordingly, the Road Commission Objector claims that the first group of insureds did not suffer the overt fraud and double billing for brokerage services that affected the insureds whose contracts with their broker was breached by that broker.  The Road Commission Objector requests that proceeds be allocated with an additional equal portion provided for insureds that can demonstrate they had a written fixed fee agreement with their broker for the years at issue.   However, Plaintiffs contend that the Settlement is with an insurer, and brokers are not parties to this Settlement.  Plaintiffs claim that the parties involved with this Settlement do not have information regarding any such written fixed-fee agreements Settlement Class Members may have with their brokers.  According to Plaintiffs, to modify the Plan in this manner would require a creation of a claims process for purchasers of Zurich insurance products, which would greatly reduce participation in this Settlement.

Despite these few objections, for the reasons stated above, this Court concludes that the Plan satisfies the standard set forth in Federal Rule 23(e).

## B.   Class Certification for Purposes of Settlement

In its Order preliminarily approving the settlement agreement, the Court conditionally certified the Settlement Class, defined in the amended settlement agreement as:

> [A]ll individuals or entities who, during the period of time from August 26, 1994, through September 1, 2005, inclusive, engaged the services of (I) one of the Broker Defendants or any subsidiary or affiliate of a Broker Defendant in connection with a Settlement Class Policy Purchase from any Zurich Insurer, any Insurer Defendant or any insurance company that is not an affiliate or subsidiary of a Zurich Insurer, or (ii) any other broker in connection with a

23

Settlement Class Policy Purchase from any Zurich Insurer.

The Court also preliminarily approved the following as named Plaintiffs and class representatives (who are themselves represented by Class Counsel, a group of attorneys headed by Co-Lead Counsel, the law firms of Whatley, Drake & Kallas, LLC and Miller Faucher and Cafferty LLP):

> OptiCare Health Systems, Inc.; Comcar Industries, Inc.; Sunburst Hospitality Corporation; Robert Mulcahy; Golden Gate Bridge, Highway and Transportation District; Glenn Singer; Redwood Oil Company; Omni Group of Companies; Bayou Steel Corporation; Clear Lam Packaging, Inc.; Cellect, LLC; The Enclave, LLC; Gateway Club Apartments, Ltd.; Michigan Multi-King Inc.; and City of Stamford.

Rule 23 of the Federal Rules of Civil Procedure requires this Court to engage in a two-step analysis to determine whether it should certify a class action for settlement purposes. First, the Court must determine whether Plaintiffs have satisfied the prerequisites for maintaining a class action as set forth in Fed. R. Civ. P. 23(a). If Plaintiffs can satisfy these prerequisites, the Court must then determine whether the alternative requirements of Rule 23(b)(2) or 23(b)(3) are met.[9] See FED. R. CIV. P. 23(a) Advisory Committee's note. "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619 (1997).

## 1.    Rule 23(a) Requirements

Rule 23(a) provides that class members may maintain a class action as representatives of a

---

[9] Objections to class certification are discussed in Section B.3, at the conclusion of this Court's class certification analysis.

class if they show the court that:

    (a)    the class members are so numerous that joinder of all members is impracticable;

    (b)    the action addresses questions of law or fact common to the class;

    (c)    the claims or defenses of the class representatives are typical of the claims or defenses of the class; and

    (d)    the class representative parties will fairly and adequately protect the interests of the class.

### a.    *Numerosity*

Courts will ordinarily discharge the prerequisite of numerosity if the class is so large that "joinder of all members is impracticable." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). Plaintiffs "need not precisely enumerate the potential size of the proposed class, nor [are] plaintiff[s] required to demonstrate that joinder would be impossible." Cannon v. Cherry Hill Toyota, Inc., 184 F.R.D. 540, 543 (D.N.J. 1999).

In this case, 3.7 million notices were mailed to potential class members nationwide who purchased commercial insurance or reinsurance during the class period. "There can be no serious question that joinder of all these parties, geographically dispersed throughout the United States, would be impracticable." In re Corrugated Container Antitrust Litig., 80 F.R.D. 244, 247 (S.D. Tex. 1978). The class thus easily satisfies the numerosity requirement, as "numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the [numerosity] requirement." Weiss v. York Hosp., 745 F.2d 786, 808 n.35 (3d Cir. 1984).

### b.    *Commonality*

Plaintiffs must demonstrate that there are questions of fact or law that are common to the class to satisfy the commonality requirement, though the Third Circuit has determined that the

threshold to satisfy the requirement is "not high." FED. R. CIV. P. 23(a)(2);  In re School Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986).  "[C]ommonality does not require an identity of claims or facts among class members"; rather, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001) (citation omitted).  Class treatment is not precluded "[e]ven where individual facts and circumstances do become important to the resolution [of a case]."  Baby Neal v. Casey, 43 F.3d 48, 57 (3d Cir. 1994).

Due to the conspiratorial nature of allegations in antitrust and RICO actions, such cases often present common questions of law and fact and are frequently certified as class actions.  See, e.g., In re Flat Glass Antitrust Litigation, 191 F.R.D. 472, 478 (W.D.Pa. 1999) (noting that "allegations concerning the existence, scope and efficacy of an alleged conspiracy present questions adequately common to class members to satisfy the commonality requirement") (citation omitted); Varacallo, 226 F.R.D. at 231 (noting that "even a few common issues can satisfy this requirement where their resolution will significantly advance the litigation" and finding commonality satisfied in a RICO class action; Hoffman Elec., Inc. v. Emerson Elec. Co., 754 F.Supp. 1070 (W.D.Pa. 1991) (finding commonality where both named Plaintiffs and class members sought to bring RICO and breach of fiduciary claims).

In this case, there are many common questions of law and fact.  These include, *inter alia*, (1) whether the Zurich Defendants entered into a conspiracy to allocate the market for the sale of insurance; (2) whether the Zurich Defendants' alleged conspiracy had the purpose and effect of unlawfully restraining competition in the insurance industry; (3) whether the Zurich Defendants'

26

conduct violated Section 1 of the Sherman Act; (4) whether the Zurich Defendants' conduct breached their fiduciary duty to their clients; and (5) whether the actions of the Zurich Defendants violated the RICO statute.  The commonality requirement is clearly satisfied here.

### c.    *Typicality*

The typicality requirement "is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." FED. R. CIV. P. 23(a)(3).  As with numerosity, the Third Circuit has "set a low threshold for satisfying" typicality, holding that "[i]f the claims of the named plaintiffs and class members involve the same conduct by the defendant, typicality is established." Newton, 259 F.3d at 183-84; see also Baby Neal, 43 F.3d at 58.  The typicality requirement "does not mandate that all putative class members share identical claims." Newton, 259 F.3d at 84; see also Hassine v. Jeffes, 846 F.2d 169, 176-77 (3d Cir. 1988).

Here, the claims made by named Plaintiffs and those made on behalf of the Settlement Class Members are indistinguishable, encompassing identical allegations that the Zurich Defendants violated RICO, federal and state antitrust laws, and the common law obligation of fiduciary duty. These claims arise in each case from the same course of action taken by the Zurich Defendants. Consequently, the named Plaintiffs' claims are typical of those brought by the Settlement Class Members at large.  See, e.g., Bogosian Gulf Oil Corp., 561 F.2d 434, 449 (3d Cir. 1977) (finding that because "[t]he claims pressed by the representatives are identical to those which they press on behalf of the class generally," the named Plaintiffs' claims satisfied the typicality requirement); Grasty v. Amalgamated Clothing and Textile Workers Union, 828 F.2d 123, 130 (3d Cir. 1987), cert. denied, 484 U.S. 1042 (Jan 25, 1988) (finding the typicality requirement met because the claims brought by

the named Plaintiffs and those brought on behalf of the class "stemmed from a single course of conduct").

      **d.**    ***Adequacy of Representation***

The Third Circuit has held that the final requirement of Rule 23(a), that the class representatives "fairly and adequately protect the interests of the class," can be deemed met only after two factors are satisfied: (i) that counsel for the class is "qualified, experienced, and generally able to conduct the proposed litigation" and (ii) that the class representatives "must not have interests antagonistic to those of the class." Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 923 (3d Cir. 1992); accord Georgine v. Amchem Products, Inc., 83 F.3d 610, 630 (3d. Cir. 1996); Wetzel v. Liberty Mutual Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975).

As to the first factor, the named Plaintiffs' Co-Lead Counsel – the firms Whatley, Drake & Kallas, LLC, and Cafferty Faucher LLP – have successfully prosecuted numerous antitrust class actions, and the individual attorneys who represent each firm are well seasoned. Edith M. Kallas, who is in charge of the team from Whatley, Drake & Kallas, is a 1987 graduate of Benjamin N. Cardozo School of Law and has been active in complex litigation. In addition to her work on this case, Ms. Kallas serves as co-lead counsel in the Thomas et al. v. Blue Cross Blue Shield Association et al., a nationwide class action pending in the United States District Court for the Southern District of Florida that was brought on behalf of physicians and allied health service providers alleging violations of the RICO statute in insurer claims processing. She was also one of the principal representatives on behalf of nationwide classes of physicians and medical societies who negotiated recent settlements with Aetna, Cigna, Healthnet, Prudential, Wellpoint, and Humana that resulted in billions of dollars of practice reforms and monetary relief. Bryan L. Clobes, heading the

28

team from Cafferty Faucher LLP, is similarly experienced.  He is a 1988 graduate of Villanova Law School, and clerked for Judges Arlin M. Adams of the U.S. Court of Appeals for the Third Circuit, Mitchell H. Cohen of the U.S. District Court for the District of New Jersey, and Joseph Kaplan of the Maryland Circuit Court in Baltimore.  His class action litigation practice is extensive, and he has recently served as lead counsel for several other antitrust lawsuits, including cases alleging fraudulent marketing and sales against drug makers Abbott Laboratories, Takeda and TAP, and cases alleging restrictive rules regarding debit card acceptance against MasterCard and Visa.  These attorneys thus clearly "well qualified and experienced class action attorneys who have been involved in similar ... litigation around the country."  In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 250 (D. Del. 2002), aff'd, 391 F.3d 516 (3d Cir. 2004).

As to the second factor, in order to find an "antagonism between [named Plaintiffs'] objectives and the objectives of the [class]", there would need to be a "legally cognizable conflict of interest" between the two groups.  Jordan v. Commonwealth Financial Systems, Inc., 237 F.R.D. 132, 139 (E.D.Pa. 2006).  In fact, courts have found that a conflict will not be sufficient to defeat class action "unless [that] conflict is apparent, imminent, and on an issue at the very heart of the suit."  In re Flat Glass Antitrust Litigation, 191 F.R.D. 472, 482 (W.D.Pa. 1999) (citing In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 513 (S.D.N.Y.1996)).  Here, it is clear that the named Plaintiffs' interests are not antagonistic to those of the absent class members.  The central questions in this case regarding the Zurich Defendants' alleged conduct, and the impact of that conduct on both the named Plaintiffs and the absent class members, animates in an identical fashion the claims of both groups.  In addressing these common questions, the named Plaintiffs have advocated as vigorously for the absent class members as they have for themselves.  Consequently,

the adequacy requirement has been met.  With this last requirement satisfied, it is clear that the class

in this case has demonstrated compliance with each of the four prongs of Rule 23(a).

### 2.        The Requirements of Rule 23(b)(3)

The Court must next address the question of whether the class action also comports with the

requirements of either Rule 23(b)(3) or Rule 23(b)(2).  The named Plaintiffs have asked this Court

to consider only whether the class meets the standards set forth in Rule 23(b)(3), which requires the

court to find both that "the questions of law or fact common to the members of the class predominate

over any questions affecting only individual members" and that "a class action is superior to other

available methods for the fair and efficient adjudication of the controversy."  FED. R. CIV. P.

23(b)(3).  As explained below, the class action in this case readily meets these requirements of

predominance and superiority.

### a.        *Questions of Law and Fact Common to the Class Predominate*

To satisfy the predominance requirement, parties must do more than merely demonstrate a

"common interest in a fair compromise"; instead, they must provide evidence that the proposed class

is "sufficiently cohesive to warrant adjudication by representation."  Amchem Prod., Inc. v. Windsor,

521 U.S. 591, 623 (1997).  However, the "presence of individual questions . . . does not mean that

the common questions of law and fact do not predominate."  Eisenberg v. Gagnon, 766 F.2d 770,

786 (3d Cir. 1985) (finding that, in the context of a securities class action, even the presence of

individual questions as to the reliance of each individual class member did not negate the

predominance of the class's common claims).

Given that antitrust class action suits, as discussed above, are particularly likely to contain

common questions of fact and law, it is not surprising that these types of class action suits are also

generally found to meet the predominance requirement with ease.  In <u>Amchem</u>, the Supreme Court noted that "[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." 521 U.S. at 625.  Moreover, "[a]ntitrust actions involving common questions of liability for monopolization . . . have frequently been held to predominate for the preliminary stage of class certification." <u>In re Lorazepam & Clorazepate Antitrust Litigation</u>, 202 F.R.D. 12 (D.D.C. 2001).  The Third Circuit has agreed with this analysis, and has indicated that because the "clear[] focus" of an antitrust class action is "on the allegedly deceptive conduct of defendant" and not on "the conduct of individual class members," common issues necessarily predominate. <u>Warfarin Sodium</u>, 391 F.3d at 528; <u>accord</u> <u>In re Linerboard Antitrust Litig.</u>, 305 F.3d 145, 162 (3d Cir. 2002), <u>cert. denied</u>, 538 U.S. 977 (2003).

Here, as discussed in the sections on commonality and typicality, the identical claims of both the named Plaintiffs and the absent class members arise from the same set of facts regarding the alleged collusive and anticompetitive behavior of the Zurich Defendants.  Consequently, the predominance requirement is satisfied.

        **b.**     ***A Class Action is Superior to Other Available Methods***

To demonstrate that a class action is "superior to other available methods" for bringing suit in a given case, the Court must "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." <u>Georgine</u>, 83 F.3d at 632 (<u>citing</u> <u>Katz v. Carte Blanche Corp.</u>, 496 F.2d 747, 757 (3d Cir. 1974) (en banc), <u>cert. denied</u>, 419 U.S. 885 (1974)).  One consideration is the economic burden that class members would have to bear in bringing suits on a case-by-case basis; class actions have been held to be especially appropriate where it would be "it would be economically infeasible for [individual class members] to proceed

individually." Stephenson v. Bell Atlantic Corp., 177 F.R.D. 279 (D.N.J. 1997). Another consideration is judicial economy. In a case with many thousands or even millions of class members, whose individual cases would each "require[] weeks or months" to litigate, would result in "needless duplication of effort" by all parties and the court, and would raise the very real "possibility of conflicting outcomes," the balance may weigh "heavily in favor of the class action." In re Corrugated Container Antitrust Litigation, 80 F.R.D. 244, 252-53 (D.C. Tex. 1978). See also Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004) (finding a class action to be the superior method because it was costly, inefficient, and would burden the court system to "forc[e] individual plaintiffs to repeatedly prove the same facts and make the same legal arguments before different courts"); Sollenbarger v. Mountain States Tel. & Tel. Co., 121 F.R.D. 417, 436 (D.N.M. 1988) (finding that, in contrast to the multiple lawsuits that members of a class would have to file individually, the "efficacy of resolving all [of] plaintiffs' claims in a single proceedings is beyond discussion").

To litigate the individual claims of even a tiny fraction of the 3.7 million potential class members would place a heavy burden the judicial system and require unnecessary duplication of effort by all parties. In addition, hundreds of thousands of documents have been produced and hundreds of depositions have been taken to this point in the litigation; as such, it would also not have been economically feasible for most of the class members to seek individual redress. The litigation of such claims in one action is thus far more desirable than numerous separate actions litigating the same issues. The superiority requirement is therefore met in this case.

### 3.    Objections to Class Certification

Prior to making a final determination regarding class certification, the Court will address the

few arguments raised by certain Objectors that address aspects of the class certification analysis.

### a.    *General Objections to Certification*

The brief submitted by objector Van Enterprises, Inc. ("Van Enterprises Objector") argues that the settlement "lacks commonality, typicality, adequacy of representation and a predominance of common issues." Van Enterprises Br. at ¶ 2.  However, the objector provides no cogent argument or legal basis to support these assertions, failing to reference a <u>single</u> case, from this or any other Court, that might explain its allegations that the settlement fails to meet the requirements set forth in FED. R. CIV. P. 23.  The Court finds the objector's general arguments to with regard to commonality, typicality, adequacy of representation and predominance to be without merit; the objector's arguments with regard for the need for subclasses are addressed below.

### b.    *Subclasses*

Certain objectors to this settlement contend that subclasses must be utilized.  The Court's decision whether or not to create subclasses is governed by FED. R. CIV. P. 23(c)(4), which provides that subclasses are appropriate "[w]here a class is found to include subclasses divergent in interest" and that the resulting subclasses are considered separate classes, each of which must meet Rule 23's requirements.  FED. R. CIV. P. 23(c)(4), advisory committee note; <u>see</u> 7A C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1790, at 189 (1972); <u>see also</u> <u>In re Prudential Ins. Co.</u> <u>America Sales Practice Litigation Agent Actions</u>, 148 F.3d 283, 316 (3d Cir. 1998) (noting that subclasses are necessary where certain class members "require specialized or distinct treatment" so that they "differ from other class members").  A class need not be divided into subclasses merely because different groups have alternative legal theories for recovery, or because those groups have different factual bases for relief.  <u>See</u> 7AA C. Wright & A. Miller, Federal Practice and Procedure:

Civil § 1790 (2006); see also Ortiz v. Eichler, 616 F.Supp. 1046, (D.Del. 1985) (declining to create subclasses where different groups of a potential class sought recovery under different legal theories, as no divergent interests existed among class members); In re: Deutsche Telekom AG Secs. Litigation, D.C.N.Y.2002, 229 F.Supp.2d 277, 283 (holding that subclasses would not be created despite the fact that the class encompassed plaintiffs whose claims arose from two different disclosures by defendants, as the respective claims arose out of "a common core of facts and legal issues, deal[t] with overlapping or intertwined defendants, and attack[ed] various aspects of a uniform course of conduct").

The objection raised by Iaad O Inc., Trustee of 8 Pacific Street Trust and Zorkess LLC ("Iaad Objector") is emblematic of those objectors who suggest that subclasses are necessary because the allocation of funds differs between class members identified as Excess Claimants, Non-Excess Claimants, and Conspiracy Claimants. See Iaad O Inc. Br. at 2. Relying primarily on Smith v. Sprint Comms. Co., 387 F.3d 612 (7th Cir. 2004), the Iaad Objector contends that members of each of these three groups are entitled to separate "fair and adequate representation." Id. at 614, Iaad O Inc. Br. at 3. In Smith, the class was composed of landowners nationwide whose property was subject to railroad rights of way, along which defendant telecommunications companies had installed fiber-optic cables without plaintiffs' permission. Id. at 613. Two subgroups of plaintiffs, one set from Tennessee and one set from Kansas, argued that their interests were not adequately represented by the settling classes and that subclasses should be created for them. Id. at 614. The groups had already been certified as litigation classes in their respective states and were each on the eve of trial in separate cases when those cases were stayed pending a determination of whether the nationwide class should be certified. Id. In addition, the Tennessee class members had estimated their

34

compensatory damages as ten times greater than the upper limit provided by the nationwide settlement, and had indicated that they, unlike the rest of the class, might be able to claim punitive damages under Tennessee law.  Id.

The facts of this case vary significantly from those in Smith, as there is no parallel litigation where each proposed subgroup is its acting as its own class.  Moreover, the Iaad objector's contention that Smith stands for the proposition that a disparity in the distribution of funds between class members "is permissible in a class action settlement only where separate sub-classes have been established and are separately represented" is extremely misleading.  Iaad O Inc. Br. at 2.  While the court in Smith did state that the Tennessee class members were entitled to greater damages than other class members, the court emphasized that this was because that subgroup had already established liability for these claims under Tennessee law in parallel litigation.  See 387 F.3d at 614.  Clearly, the subgroups identified in Smith had interests divergent from the rest of the class based on their unique position due to the aforementioned parallel litigation.

Here, the Iaad Objector has failed to raise, let alone describe, any divergent or antagonistic interests between the three groups, as is required in order for subclasses to be mandated.  See FED. R. CIV. P. 23(c)(4).  Instead, the Iaad Objector states without explanation that these groups have "claims of varying merit" – a statement that appears to have been derived entirely from the fact that the Settlement's plan of allocation has chosen to distribute different percentages of the settlement monies to these groups.  That "the relief sought may vary among named representatives and members of the class does not, however, show conflicting or antagonistic interests and the court

finds none here." <u>Roe v. Operation Rescue</u>, 123 F.R.D. 500, 504 (E.D.Pa.1988).[10]

    **4.    Conclusion**

    Because the named Plaintiffs have satisfied all of the requirements under Fed. R. Civ. P. 23(a) and the requirements of Fed. R. Civ. P. 23(b)(3), this Court certifies the proposed class for purposes of this settlement.

**III.    CONCLUSION**

    For the foregoing reasons, the Court grants the Zurich Defendants' and Plaintiffs' Motion for Final Approval of Class Action Settlement and dismisses the Zurich Defendants from this case with prejudice. The appropriate form of Order accompanies this Memorandum Opinion.

Dated: February 16, 2007

                                                   s/ Garrett E. Brown, Jr.

                                               GARRETT E. BROWN, JR., U.S.D.J.

---

[10]An additional objection raised in the brief submitted by William J. Akers, Esq., Harold B. Wolfe, and the Chaba Law Group, contending that a subclass has been "omitted" due to the use of the term "broker" at certain points in the Settlement Agreement, is completely without merit.