UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ x | | |
| IN RE: INSURANCE BROKERAGE | : | MDL No. 1663 |
| ANTITRUST LITIGATION | : | |
| | : | Civil No. 04-5184 (GEB) |
| APPLIES TO ALL COMMERCIAL | : | |
| INSURANCE BROKERAGE ACTIONS | : | Hon. Garrett E. Brown |
| | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| _____ x | | |

**THIRD AMENDED COMMERCIAL INSURANCE PLAINTIFFS' RICO CASE
STATEMENT PURSUANT TO LOCAL RULE 16.1(B)(4)**

Pursuant to the Court's Order of April 5, 2007[1], Plaintiffs respectfully submit this

Third Amended RICO Case Statement under Local Civil Rule 16.1(B)(4).

1.      **State whether the alleged unlawful conduct is in violation of 18 U.S.C. § 1962(a), (b), (c) and/or (d).**

Plaintiffs assert violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).  There

are no alleged violations of 18 U.S.C. § 1962(a) or 18 U.S.C. § 1962(b).

2.      **List each Defendant and state the alleged misconduct and basis of liability of each defendant.**

**<u>MARSH ENTERPRISE DEFENDANTS:</u>**

---

[1] Pursuant to Order No. 1, dated March 11, 2005, Plaintiffs previously submitted a Joint RICO Case Statement, which addressed both commercial insurance allegations and employee benefit allegations.  Plaintiffs submitted an Amended RICO Case Statement on August 15, 2005.  Likewise, pursuant to an Order dated October 3, 2006, Plaintiffs submitted a Second Amended RICO Case Statement on October 25, 2006.

Defendants Marsh[2], ACE[3], AIG[4], Axis[5], Chubb[6], CNA[7], Crum & Forster[8], Fireman's Fund[9], Hartford[10], Liberty Mutual[11], Munich[12], St. Paul Travelers[13], XL[14] and Zurich[15] (herein referred to collectively as the "Marsh Enterprise Defendants") formed an

---

[2] "Marsh" collectively refers to the Defendants identified in Paragraphs 24 and 25 of the Second Consolidated Amended Commercial Class Action Complaint.

[3] "ACE" collectively refers to the Defendants identified in Paragraphs 39 and 40 of the Second Consolidated Amended Commercial Class Action Complaint.

[4] "AIG" collectively refers to the Defendants identified in Paragraphs 37 and 38 of the Second Consolidated Amended Commercial Class Action Complaint.

[5] "Axis" collectively refers to the Defendants identified in Paragraphs 62 and 63 of the Second Consolidated Amended Commercial Class Action Complaint.

[6] "Chubb" collectively refers to the Defendants identified in Paragraphs 48 and 49 of the Second Consolidated Amended Commercial Class Action Complaint.

[7] "CNA" collectively refers to the Defendants identified in Paragraphs 56 and 57 of the Second Consolidated Amended Commercial Class Action Complaint.

[8] "Crum & Forster" collectively refers to the Defendants identified in Paragraphs 50 and 51 of the Second Consolidated Amended Commercial Class Action Complaint.

[9] "Fireman's Fund" collectively refers to the Defendants identified in Paragraphs 52 and 53 of the Second Consolidated Amended Commercial Class Action Complaint.

[10] "Hartford" collectively refers to the Defendants identified in Paragraphs 41 and 42 of the Second Consolidated Amended Commercial Class Action Complaint.

[11] "Liberty Mutual" collectively refers to the Defendants identified in Paragraphs 60 and 61 of the Second Consolidated Amended Commercial Class Action Complaint.

[12] "Munich" collectively refers to the Defendants identified in Paragraphs 58 and 59 of the Second Consolidated Amended Commercial Class Action Complaint.

[13] "St. Paul" collectively refers to the Defendants identified in Paragraphs 43 and 44 of the Second Consolidated Amended Commercial Class Action Complaint.

[14] "XL" collectively refers to the Defendants identified in Paragraphs 54 and 55 of the Second Consolidated Amended Commercial Class Action Complaint.

[15] "Zurich" collectively refers to the Defendants identified in Paragraphs 45-47 of the Second Consolidated Amended Commercial Class Action Complaint.

association in fact enterprise (the "Marsh Enterprise") and participated in or conducted the affairs of the Marsh Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), utilizing interstate mail and wire in furtherance of the scheme. Marsh and the Marsh Enterprise Insurers likewise conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

Based on Marsh's relationship with its clients, its fiduciary duty and its representations, Marsh had a duty to fully disclose any conflicts of interest it had in providing services to its clients as well as any material information that might impact its ability to act in its client's best interest.  Instead, the Marsh Enterprise Defendants engaged in a scheme whereby the Marsh Enterprise Defendants engaged in steering and other practices in order to maximize the volume of insurance placed with the Insurer Defendants and maximizing the volume of renewal business placed with the Insurer Defendants. In furtherance of the scheme, the Marsh Enterprise Defendants knowingly and intentionally concealed the following material matters from Marsh's clients who paid for the kickbacks through higher premiums:

- that Marsh was not acting in the best interest of its clients but was instead acting on behalf of the Marsh Enterprise Insurers and in furtherance of its own financial interests;

- the true nature of the association and agreements between Marsh and the Marsh Enterprise Insurers;

- the conflict of interest inherent in the agreements between Marsh and the Marsh Enterprise Insurers;

- Marsh's consolidation of its insurance markets to a few select strategic partners;

- Marsh's steering of insurance placements to Marsh Enterprise Insurers;

- that Marsh was protecting Marsh Enterprise Insurers from competition;

- the rigging of bids by Marsh and Insurer Defendants AIG, ACE, Axis, Chubb, XL, Munich/AmRe, Liberty Mutual, St. Paul Travelers, Fireman's Fund and Zurich in furtherance of the scheme and to prevent disclosure;

- that Marsh Enterprise Insurers kick back a substantial portion of their increased profits to Marsh in the form of contingent commissions, loans, subsidies and payments for "services" as well as other agreements and tying arrangements that serve the same function;

- that the Marsh Enterprise Insurers factor the kickbacks paid to Marsh into the cost of Plaintiffs' and Class Members' insurance, resulting in injury to Plaintiffs' and Class Members' business and property.

The Marsh Enterprise Defendants' fraudulent scheme violated 18 U.S.C. 1962(c) and (d).

In addition, as set forth in response to Question 14, Marsh violated 18 U.S.C. 1962(d) by conspiring with Aon, Willis, Gallagher, Wells Fargo/Acordia, and HRH to prevent detection of each broker's fraudulent scheme.

**AON ENTERPRISE DEFENDANTS:**

Aon[16], ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, St. Paul Travelers, XL and Zurich (herein referred to collectively as the

---

[16] "Aon" collectively refers to the Defendants identified in Paragraphs 26 and 27 of the Second Consolidated Amended Commercial Class Action Complaint.

"Aon Enterprise Defendants") formed an association in fact enterprise (the "Aon Enterprise")
and participated in or conducted the affairs of the Aon Enterprise through a pattern of
racketeering activity in violation of 18 U.S.C. § 1962(c), utilizing interstate mail and wire
in furtherance of the scheme.  The Aon Enterprise Defendants likewise conspired to
violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

        Based on Aon's relationship with its clients, its fiduciary duty and its
representations, Aon had a duty to fully disclose any conflicts of interest it had in
providing services to its clients as well as any material information that might impact its
ability to act in its client's best interest.  Instead, the Aon Enterprise Defendants engaged
in a scheme whereby the Aon Enterprise Defendants engaged in steering and other
practices in order to maximize the volume of insurance placed with the Insurer
Defendants and maximizing the volume of renewal business placed with the
Insurer Defendants. In furtherance of the scheme, the Aon Enterprise Defendants
knowingly and intentionally concealed the following material matters from Aon's clients
who paid for the kickbacks through higher premiums:

- that Aon was not acting in the best interest of its clients but was instead acting
  on behalf of the Aon Enterprise Insurers and in furtherance of its own
  financial interests;

- the true nature of the association and agreements between Aon and the Aon
  Enterprise Insurers;

- the conflict of interest inherent in the agreements between Aon and the Aon
  Enterprise Insurers;

- Aon's consolidation of its insurance markets to a few select strategic partners;

6

- Aon's steering of insurance placements to the Aon Enterprise Insurers;

- that Aon was protecting the Aon Enterprise Insurers from competition;

- that the Aon Enterprise Insurers kick back a substantial portion of their increased profits to Aon in the form of contingent commissions, loans, subsidies and payments for "services" as well as other agreements and tying arrangements that serve the same function;

- that the Aon Enterprise Insurers factor the kickbacks paid to Aon into the cost of Plaintiffs' and Class Members' insurance, resulting in injury to Plaintiffs' and Class Members' business and property.

The Aon Enterprise Defendants' fraudulent scheme violated 18 U.S.C. 1962(c) and (d).

In addition, as set forth in response to Question 14, Aon violated 18 U.S.C. 1962(d) by conspiring with Marsh, Willis, Gallagher, Wells Fargo/Acordia, and HRH to prevent detection of each broker's fraudulent scheme.

**WILLIS ENTERPRISE DEFENDANTS:**

Defendants Willis[17], ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, St. Paul Travelers and Zurich (herein referred to collectively as the "Willis Enterprise Defendants") formed an association in fact enterprise (the Willis Enterprise) and participated in or conducted the affairs of the Willis enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), utilizing interstate mail and wire in furtherance of the scheme.  The Willis Enterprise Defendants likewise conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

---

[17] "Willis" collectively refers to the Defendants identified in Paragraphs 28 and 29 of the Second Consolidated Amended Commercial Class Action Complaint.

Based on Willis's relationship with its clients, its fiduciary duty and its representations, Willis had a duty to fully disclose any conflicts of interest it had in providing services to its clients as well as any material information that might impact its ability to act in its client's best interest.  Instead, the Willis Enterprise Defendants engaged in a scheme whereby the Willis Enterprise Defendants engaged in steering and other practices in order to maximize the volume of insurance placed with the Insurer Defendants and maximizing the volume of renewal business placed with the Insurer Defendants. In furtherance of the scheme, the Willis Enterprise Defendants knowingly and intentionally concealed the following material matters from Willis's clients who paid for the kickbacks through higher premiums:

- that Willis was not acting in the best interest of its clients but was instead acting on behalf of the Willis Enterprise Insurers and in furtherance of its own financial interests;

- the true nature of the association and agreements between Willis and the Willis Enterprise Insurers;

- the conflict of interest inherent in the agreements between Willis and the Willis Enterprise Insurers;

- Willis's consolidation of its insurance markets to a few select strategic partners;

- Willis's steering of insurance placements to the Willis Enterprise Insurers;

- that Willis was protecting the Willis Enterprise Insurers from competition;

- that Willis Enterprise Insurers kick back a substantial portion of their increased profits to Willis in the form of contingent commissions, loans,

8

subsidies and payments for "services" as well as other agreements and tying

arrangements that serve the same function;

- that the Willis Enterprise Insurers factor the kickbacks paid to Willis into the

    cost of Plaintiffs' and Class Members' insurance, resulting in injury to Plaintiffs'

    and Class Members' business and property.

The Willis Enterprise Defendants' fraudulent scheme violated 18 U.S.C. 1962(c) and (d).

In addition, as set forth in response to Question 14, Willis violated 18 U.S.C.

1962(d) by conspiring with Marsh, Aon, Gallagher, Wells Fargo/Acordia, and HRH to

prevent detection of each broker's fraudulent scheme.

**GALLAGHER ENTERPRISE DEFENDANTS:**

Gallagher[18], AIG, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford and

St. Paul Travelers (herein referred to collectively as the "Gallagher Enterprise Defendants")

formed an association in fact enterprise (the Gallagher Enterprise) and participated in or

conducted the affairs of the Gallagher enterprise through a pattern of racketeering activity

in violation of 18 U.S.C. § 1962(c), utilizing interstate mail and wire in furtherance of the

scheme. Gallagher Enterprise Defendants likewise conspired to violate 18 U.S.C. §

1962(c) in violation of 18 U.S.C. § 1962(d).

Based on Gallagher's relationship with its clients, its fiduciary duty and its

representations, Gallagher had a duty to fully disclose any conflicts of interest it had in

providing services to its clients as well as any material information that might impact its

ability to act in its client's best interest. Instead, the Gallagher Enterprise Defendants

engaged in a scheme whereby the Gallagher Enterprise Defendants engaged in steering

---

[18] "Gallagher" collectively refers to the Defendants identified in Paragraphs 30-33 of the Second Consolidated Amended Commercial Class Action Complaint.

and other practices in order to maximize the volume of insurance placed with the Insurer Defendants and maximizing the volume of renewal business placed with the Insurer Defendants. In furtherance of the scheme, the Gallagher Enterprise Defendants knowingly and intentionally concealed the following material matters from Gallagher's clients who paid for the kickbacks through higher premiums:

- that Gallagher was not acting in the best interest of its clients but was instead acting on behalf of the Gallagher Enterprise Insurers and in furtherance of its own financial interests;

- the true nature of the association and agreements between Gallagher and the Gallagher Enterprise Insurers;

- the conflict of interest inherent in the agreements between Gallagher and the Gallagher Enterprise Insurers;

- Gallagher's consolidation of its insurance markets to a few select strategic partners;

- Gallagher's steering of insurance placements to the Gallagher Enterprise Insurers;

- that Gallagher was protecting the Gallagher Enterprise Insurers from competition;

- that the Gallagher Enterprise Insurers kick back a substantial portion of their increased profits to Gallagher in the form of contingent commissions, loans, subsidies and payments for "services" as well as other agreements and tying arrangements that serve the same function;

- that the Gallagher Enterprise Insurers factor the kickbacks paid to Gallagher into the cost of Plaintiffs' and Class Members' insurance, resulting in injury to Plaintiffs' and Class Members' business and property.

The Gallagher Enterprise Defendants' fraudulent scheme violated 18 U.S.C. 1962(c) and (d).

In addition, as set forth in response to Question 14, Gallagher violated 18 U.S.C. 1962(d) by conspiring with Marsh, Aon, Willis, Wells Fargo/Acordia, and HRH to prevent detection of each broker's fraudulent scheme.

## HRH ENTERPRISE DEFENDANTS:

Defendants HRH, CNA, Hartford and St. Paul Travelers (herein referred to collectively as the "HRH Enterprise Defendants") formed an association in fact enterprise (the HRH Enterprise) and participated in or conducted the affairs of the HRH enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), utilizing interstate mail and wire in furtherance of the scheme.  The HRH Enterprise Defendants likewise conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

Based on HRH's relationship with its clients, its fiduciary duty and its representations, HRH had a duty to fully disclose any conflicts of interest it had in providing services to its clients as well as any material information that might impact its ability to act in its client's best interest.  Instead, the HRH Enterprise Defendants engaged in a scheme whereby the HRH Enterprise Defendants engaged in steering and other practices in order to maximize the volume of insurance placed with the Insurer Defendants and maximizing the volume of renewal business placed with the Insurer Defendants. In furtherance of the scheme, the HRH Enterprise Defendants

11

knowingly and intentionally concealed the following material matters from HRH's clients who paid for the kickbacks through higher premiums:

- that HRH was not acting in the best interest of its clients but was instead acting on behalf of the HRH Enterprise Insurers and in furtherance of its own financial interests;

- the true nature of the association and agreements between HRH and the HRH Enterprise Insurers;

- the conflict of interest inherent in the agreements between HRH and the HRH Enterprise Insurers;

- HRH's consolidation of its insurance markets to a few select strategic partners;

- HRH's steering of insurance placements to HRH Enterprise Insurers;

- that HRH was protecting the HRH Enterprise Insurers from competition;

- that the HRH Enterprise Insurers kick back a substantial portion of their increased profits to HRH in the form of contingent commissions, loans, subsidies and payments for "services" as well as other agreements and tying arrangements that serve the same function;

- that the HRH Enterprise Insurers factor the kickbacks paid to HRH into the cost of Plaintiffs' and Class Members' insurance, resulting in injury to Plaintiffs' and Class Members' business and property.

HRH Enterprise Defendants' fraudulent scheme violated 18 U.S.C. 1962(c) and (d). In addition, as set forth in response to Question 14, HRH violated 18 U.S.C. 1962(d) by conspiring with Marsh, Aon, Willis, Gallagher and Wells Fargo/Acordia to prevent detection of each broker's fraudulent scheme.

**WELLS FARGO/ACORDIA ENTERPRISE DEFENDANTS:**

Wells Fargo/Acordia, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, St. Paul Travelers (herein referred to collectively to as the "Wells Fargo/Acordia Enterprise Defendants") formed an association in fact enterprise (the Wells Fargo/Acordia Enterprise) and participated in or conducted the affairs of the Wells Fargo/Acordia Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), utilizing interstate mail and wire in furtherance of the scheme. The Wells Fargo/Acordia Enterprise Defendants likewise conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

Based on Wells Fargo/Acordia's relationship with its clients, its fiduciary duty and its representations, Wells Fargo/Acordia had a duty to fully disclose any conflicts of interest it had in providing services to its clients as well as any material information that might impact its ability to act in its client's best interest. Instead, the Wells Fargo/Acordia Enterprise Defendants engaged in a scheme whereby the Wells Fargo/Acordia Enterprise Defendants engaged in steering and other practices in order to maximize the volume of insurance placed with the Insurer Defendants and maximizing the volume of renewal business placed with the Insurer Defendants. In furtherance of the scheme, the Wells Fargo/Acordia Enterprise Defendants knowingly and intentionally concealed the following material matters from Wells Fargo/Acordia's clients who paid for the kickbacks through higher premiums:

- that Wells Fargo/Acordia was not acting in the best interest of its clients but was instead acting on behalf of the Wells Fargo/Acordia Enterprise Insurers and in furtherance of its own financial interests;

- the true nature of the association and agreements between Wells Fargo/Acordia and the Wells Fargo/Acordia Enterprise Insurers;

- the conflict of interest inherent in the agreements between Wells Fargo/Acordia and the Wells Fargo/Acordia Enterprise Insurers;

- Wells Fargo/Acordia's consolidation of its insurance markets to a few select strategic partners;

- Wells Fargo/Acordia's steering of insurance placements to the Wells Fargo/Acordia Enterprise Insurers;

- that Wells Fargo/Acordia was protecting the Wells Fargo/Acordia Enterprise Insurers from competition;

- that the Wells Fargo/Acordia Enterprise Insurers kick back a substantial portion of their increased profits to Wells Fargo/Acordia in the form of contingent commissions, loans, subsidies and payments for "services" as well as other agreements and tying arrangements that serve the same function;

- that the Wells Fargo/Acordia Enterprise Insurers factor the kickbacks paid to Wells Fargo/Acordia into the cost of Plaintiffs' and Class Members' insurance, resulting in injury to Plaintiffs' and Class Members' business and property.

The Wells Fargo/Acordia Enterprise Defendants' fraudulent scheme violated 18 U.S.C. 1962(c) and (d).

In addition, as set forth in response to Question 14, Wells Fargo/Acordia violated 18 U.S.C. 1962(d) by conspiring with Marsh, Aon, Willis, Gallagher and HRH to prevent detection of each broker's fraudulent scheme.

**3.     List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.**

14

Additional wrongdoers not named as defendants include Karen Radke, Jean-Baptiste Tateossian, Carlos Coello and James Mohs of AIG; Patricia Abrams of ACE; John Keenan, Edward Coughlin and James Spiegel of Zurich American Insurance Company; Kevin Bott of Liberty Mutual and Robert Stearns, Joshua Bewlay, Kathryn Winter, Regina Hatton, Nicole Michaels, Jason Monteforte, Todd Murphy, Peter Andersen, and Mark Manzi of Marsh. These individuals have pleaded guilty to criminal charges for their involvement in a bid-rigging scheme. The following persons have also been the subject of criminal investigations which led to indictments: Greg Doherty, Kathleen Drake, William Gilman, Thomas T. Green, Edward Keane Jr., William McBurnie, Edward McNenny, and Joseph Peiser.

**4.      List the alleged victims and state how each victim was allegedly injured.**

Plaintiffs and Class Members are victims of Defendants' pattern of racketeering activity and conspiracies. Plaintiffs and Class Members were injured because Defendants' illegally increased profits were imbedded in the premiums all Plaintiffs and Class Members paid for insurance; accordingly, Defendants' control of the enterprises through the pattern of racketeering and their conspiracy regarding the fraudulent scheme and concealment of the scheme proximately caused the cost of insurance obtained by all Plaintiffs and Class Members to increase, thereby injuring them in their business and property.

**5      Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim. A description of the pattern of racketeering shall include the following information:**

> **a.      List the alleged predicate acts and the specific statutes which are allegedly violated;**

Defendants have engaged in numerous predicate acts of mail and wire fraud.  In carrying out these overt acts and fraudulent schemes described throughout this Amended RICO Case Statement, Defendants have violated federal laws including mail and wire fraud, 18 U.S.C. §§ 1341 and 1343.  These predicate acts constitute a pattern of racketeering through which defendants have violated 18 U.S.C. 1962(c) and (d).

>    **b/c.    Provide the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts; If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, provide the "circumstances constituting fraud or mistake [which] shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Identify the time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made;**

**Mail and Wire Fraud:**

**<u>MARSH ENTERPRISE DEFENDANTS:</u>**

The Marsh Enterprise Defendants have violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 by utilizing or causing the use of the United States postal service,  commercial interstate carrier, wire or other interstate electronic media in furtherance of their fraudulent scheme.

Defendants have engaged in a scheme whereby Marsh would allocate business to a limited number of partner Insurer Defendants in exchange for kickbacks in the form of contingent commissions and/or other payments which were factored into the premiums paid by plaintiffs and class members.  Specifically, as set forth in further detail in the Revised Particularized Statement and the Second Amended Complaint, Marsh in conjunction with the Marsh Insurer Defendants engaged in the following conduct:

-    Marsh significantly consolidated the number of carriers to which it would market its clients' business.

- Marsh entered into "strategic partnerships" with the Marsh Enterprise Defendants to which Marsh agreed to steer the bulk of its business.

- As strategic partners, the Marsh Enterprise Defendants would be given access to a guaranteed flow of premium volume from Marsh, as well as protection from normal competition from both inside and outside of the strategic partnership for renewal of each Insurer Defendant's own business.

- In order to accomplish this, the Marsh Enterprise Defendants engaged in a number of practices specifically set forth in the Revised Particularized Statements including bid rigging, agreements not to bid renewals competitively, limiting the marketing of renewals, disclosing other carriers' bids and other actions designed to maximize the volume of insurance placed with the Marsh Enterprise Insurers.

- In exchange for being given these unfair competitive advantages, the Marsh Enterprise Insurers agreed to pay kickbacks to Marsh.

In furtherance of the scheme, the Marsh Enterprise Defendants have sent matters and things through the mail and wire or have known that mail or wire would be used in furtherance of the scheme.  Materials sent by mail or wire have included correspondence, emails, faxes, marketing materials, contracts or agreements between Marsh and the client, requests for proposals, policies and policy materials, insurance quotes, contingent commission agreements, insurance binders, commission schedules, invoices to clients and payments from insurers to brokers.

The Marsh Enterprise Defendants have frequently communicated with each other by mail and/or wire in furtherance of the scheme.  Such communications have included

17

contingent commission agreements, letters, faxes and emails memorializing various agreements between Marsh and the Marsh Enterprise Insurers and details regarding consolidation, requests for bids and bids, invoices, and contingent payments.  Many instances of these types of communications are further detailed in the Revised Particularized Statement and the Second Amended Complaint.

Defendants' scheme conflicts with Marsh's duties and representations to its clients. Marsh is retained by its clients, including Plaintiffs and Class Members, for the sole purpose of acting on behalf of and providing the clients with unbiased advice concerning the type, amount and level of insurance needed, as well as to provide sound and accurate advice regarding the insurance companies they recommend.

Additionally, Marsh is a fiduciary of its clients, and therefore owes its clients, including Plaintiffs and other members of the Class: (i) a duty of loyalty to act in the best interests of its clients and to always put its clients' interests ahead of its own; (ii) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Marsh, including the duty to disclose the source and amounts of all income it receives in or as a result of any transaction involving its clients; (iii) a duty of care in connection with any insurance-related products purchased by its clients or services rendered by Marsh; (iv) a duty to provide impartial advice in connection with any insurance-related products purchased by its clients or services rendered by Marsh; (v) a duty to use its best business judgment in connection with any insurance-related products or services purchased by its clients–in other words to find the best coverage at the lowest price; and, (vi) a duty of good faith and fair dealing.

In his 1998 speech to RIMS, Roger Egan recognized that Marsh has "a duty to fully disclose [its] income." Since the announcement of the investigation by Attorney General Spitzer, Marsh has yet again acknowledged and affirmed its duty to act on behalf of its clients. In a October 29, 2004 letter to "the Clients of Marsh" from Michael G. Cherkasky, Chairman and Chief Executive Officer of Marsh Inc., Cherkasky stated, "We must reaffirm our commitment to you and provide you with complete assurance that we will execute transactions in your best interest and in accordance with the highest professional and ethical standards." Marsh then reaffirmed, "There are more than 42,000 colleagues at Marsh who believe–as they always have–that the clients' interests must come first." In a document created to assist employees in responding to client questions regarding regulatory investigations, Marsh wrote: "Our guiding principle is to consider our client's best interest in all placements. We are our clients' advocates and we represent them in negotiations. We don't represent the markets."

As a result of the nature of the relationship between Marsh and its clients, as a result of Marsh's fiduciary status and as a result of Marsh's representations, Marsh had a duty to fully disclose any conflicts of interest it had in providing services to its clients as well as any material information that might impact its ability to act in its client's best interest. Marsh, however, did not disclose its conflicts of interest, its allocation of business to a limited number of insurer partners or the resulting harm to its clients.

Throughout the Class Period, Marsh regularly disseminated materials by mail and wire wherein Marsh routinely represented that Marsh was acting on the client's behalf and not on behalf of the insurer, that Marsh was functioning as the client's broker, that Marsh would keep the client informed and that Marsh would use its "best efforts" on behalf of the

client.  To the extent Marsh provided any information regarding contingent commission income or Marsh's relationship with the Marsh Enterprise Insurers the information was either materially false or misleading.  Marsh's communications with its clients, including Plaintiffs, which contained material misrepresentations and/or omissions are evidenced by the examples set forth herein. For example, on or about January 1, 1995, Marsh & McLennan, Inc. and the Golden Gate Bridge, Highway and Transportation District entered into a "Contract for Professional Services" wherein Marsh agreed to act as an "advisor and broker" for Golden Gate.  The agreement contained no reference to contingent commissions.  Marsh made the following misrepresentations in brokerage agreements with Plaintiffs Bayou Steel and City of Stamford:

> This agreement reflects our understanding with you regarding our services on your behalf.  We will act as your representative to the world insurance market with the objective of presenting to you an insurance placement opportunity which you regard as appropriate considering cost, coverage and continuity.  We are first and foremost your representative in this function.  As such, we do not speak for and are not bound to utilize any particular insurance company. It is our responsibility to negotiate on your behalf with your insurance company and to keep you informed of significant developments in those negotiations which are likely to have a bearing on your insurance program. It is our practice to make placements with insurance companies that meet prevailing guidelines established by us from time to time as circumstances and markets consideration may warrant.

On or about September 21, 1999 Marsh USA Inc. sent Plaintiff Bayou Steel Corporation ("Bayou Steel") a Brokerage Services Agreement containing this language.  The agreement was signed by Robert C. Hill on behalf of Marsh USA Inc. and by Brian P. Verrette on behalf of Bayou Steel.  Marsh likewise sent the City of Stamford an executed version of this form agreement on or about July 1, 2001 signed by Chad F. Marrison.  Marsh and the City of Stamford entered an agreement with the same or substantially similar terms

effective June 28, 2004, again signed by Chad F. Marrison on behalf of Marsh.  The document contained only the following reference to contingent commissions: "As used in this paragraph, the term 'commissions' does not include contingent payments or allowances by markets based on our overall book of business or its performance."  This statement was insufficient to fully disclose Marsh's compensation arrangements with the Marsh Enterprise Insurers, noting only that commissions does not include contingent payments while failing to provide any information regarding the strategic partnerships that Marsh had entered into with the Marsh Enterprise Insurers or the significance these partnerships and the contingent payment arrangements had on the insurance placement process and the premiums charged.

The Engagement Letter or Client Service Agreement sent to Plaintiffs Cellect, Comcar, Golden Gate, Opticare and Sunburst likewise reassured them that Marsh was acting in their best interest as their insurance, risk management and risk financing advisor and insurance broker, performing the following services:

- Identify and negotiate on your behalf with insurers and keep you informed of significant developments.  Marsh will be authorized to represent and assist you in all discussions and transactions with all insurers, provided that Marsh will not place any insurance on your behalf unless authorized by you.

- Use its best efforts to place insurance on your behalf, if so instructed by you.

- Keep you information of significant changes and/or trends in the insurance marketplace.

- Provide you with detailed invoices, except in the case of direct billing by insurers.

- Act as a liaison between you and insurers.

21

-   Develop a mutually agreeable renewal action plan and timeline that highlights accountability and meets your objectives.

Marsh also continued to assure clients that "Marsh does not speak for any insurer, is not bound to utilize any particular insurer, and does not have the authority to make binding commitments on behalf of any insurer."

The following explanation regarding compensation was included in the agreements which were commission based:

> Marsh will be compensated for the services outlined in this letter through commissions received from insurance companies.  In addition as is the custom in Marsh's industry, Marsh has agreements with certain insurers under which Marsh may receive payments based upon such factors as the overall book of business placed by it and its affiliates, the performance of that book or the aggregate commissions paid for that book.  Such 'placement service revenue' would be in addition to any other compensation Marsh may receive such as retail, excess and surplus lines and wholesale brokerage fees or commissions, administrative fees and similar items.  At your request, Marsh will provide additional information in this regard.

The fee based version of the agreement contained this explanation:

> With respect to insurance placed by Marsh on your behalf, Marsh will disclose to you any commissions received by Marsh and credit them against the annual fee.  Such commissions do not include: wholesale brokerage fees or commissions; administrative fees and similar items; or payments that Marsh may receive, in accordance with the custom of its industry, under agreements with certain insurers that provide for payments based upon such factors as the overall book of business placed by Marsh and its affiliates the performance of that book or the aggregate commissions paid for that book.  At your request, Marsh will provide additional information in this regard.

This statement was insufficient to fully disclose Marsh's compensation arrangements with the Marsh Enterprise Insurers, noting only that Marsh "may receive" additional compensation from "certain insurers" while failing to provide any information regarding the strategic partnerships that Marsh had entered into with the Marsh Enterprise Insurers

or the significance these partnerships and the contingent payment arrangements had on

the insurance placement process and the premiums charged.  On or about September 10,

2003, Marsh USA Inc. sent Plaintiff Cellect, LLC ("Cellect") a sample of this "Engagement

Letter" for fee based accounts and on or about September 22, 2003, Marsh sent Cellect a

completed version of the letter signed by Michael Swan on behalf of Marsh and Scott

Smith on behalf of Cellect.   Margaret Groenendyke sent Comcar an executed

commission based version of the agreement on or about November 1, 2002 and again on

or about November 19, 2003 directed to the attention of Susie Kirkland.  Likewise,

pursuant to its November 5, 2003 agreement with Golden Gate, Marsh agreed to "use its

best efforts to place insurance" on behalf of Golden Gate and assured the client that Marsh

"does not speak for any insurer, is not bound to utilize any particular insurer, and does not

have the authority to make binding commitments on behalf of any insurer."  The Client

Service Agreement executed by Stephen G. Geib on behalf of Marsh on November 15,

2002 and William A. Blaskiewiez on behalf of Opticare on December 15, 2002 also

contained the promises and the compensation "disclosure" set forth above as did the

agreement between Marsh USA and Opticare dated October 1, 2003.  The agreement

between Sunburst and Marsh which was effective December 31, 2002 that was signed by

Gregory A. Wager on behalf of Marsh and by Pamela M. Williams on behalf of Sunburst

likewise contained this language.

   Marsh also sent invoices to its clients which included the excess premiums

resulting from Defendants' scheme without a separate accounting of the excess amount

being invoiced.  In the invoices forwarded to clients, Marsh noted only that it "may have"

agreements with insurers "pursuant to which Marsh may derive compensation contingent

upon such factors as size, growth and/or overall profitability of an entire book of business placed by marsh with such insurers." This statement was insufficient to fully disclose Marsh's compensation arrangements with the Marsh Enterprise Insurers, noting only that Marsh "may have" agreements with insurers from which Marsh "may" derive additional income while failing to provide any information regarding the strategic partnerships that Marsh had entered into with the Marsh Enterprise Insurers or the significance these partnerships and the contingent payment arrangements had on the insurance placement process and the premiums charged.  Marsh sent such invoices to Plaintiff Bayou Steel on August 10, 2001, October 3, 2001 and October 2, 2002; to Plaintiff Cellect on September 30, 2003, October 1, 2003 and October 31, 2003; to Plaintiff Comcar on November 6, 2001, November 7, 2001, December 31, 2001, January 24, 2002, January 31, 2002, March 4, 2202, April 2, 2002, April 11, 2002, May 2, 2002, and August 6, 2002; to Plaintiff Golden Gate on January 23, 2001, March 1, 2001, March 2, 2001, April 3, 2001, February 13, 2002, July 2, 2002, July 3, 2002,  and July 3, 2003; to Plaintiff Opticare on August 10, 2000, August 17, 2000, October 4, 2000, October 10, 2000, October 25, 2000, November 2, 2000, December 27, 2000, December 29, 2000, August 12, 2002, May 5, 2003 and May 7, 2003; to Plaintiff City of Stamford on July 10, 2000, July 28, 2000, July 2, 2003 and July 7, 2003 and to Plaintiff Sunburst on May 2, 2002, June 13, 2002, January 10, 2003 and May 2, 2003.

During the relevant time period, Marsh also transmitted to its clients, including Plaintiffs, various other communications relating to its provision of brokerage services. For example, on May 22, 2001 Marsh USA Inc. sent Comcar Industries, Inc. a letter setting forth a risk management consulting and insurance brokerage services proposal.

The letter stated that Marsh U.S.A. would "position Comcar with the underwriters very early and in a way that gives you maximum leverage to get the best results." On May 31, 2001, Marsh USA Ins. sent Comcar a "Marsh Risk Management Services Engagement Letter" reiterating how much Marsh appreciated Comcar's "confidence and trust." On or about June 17, 2003, in response to Golden Gate's "Request for Proposal for Insurance Broker Services," Marsh submitted a Proposal for a 3 year contract which stated, inter alia, "Through strong working relationships with the market leaders, Marsh is able to maintain the best terms and conditions for the pricing."  Marsh USA Inc. transmitted to Plaintiff Singer insurance policies and various other communications related to those policies, including summaries of insurance transmitted on January 9, 2004 and again in 2004 or 2005.  Marsh USA Inc. also sent Sunburst Hospitality Corp. various summaries and other descriptions of insurance.  These were typically direct to Chuck Warczak, its Chief Financial Officer and/or Candi Tamar, its Manager of Risk Management.  In 2003, Marsh also sent Sunburst a presentation touting its ability to "negotiate the best deal for Sunburst by accessing key carrier contacts and using our relationships and premium leverage in the marketplace."

Marsh did not disclose the following material facts in any of its communications with clients:

- that Marsh was not acting in the best interest of its clients but was instead acting on behalf of itself and its partner carriers to further their financial interests at the expense of Marsh's clients;

- the true nature of the association and agreements between Marsh and the Marsh Enterprise Insurers;

- the conflict of interest inherent in the agreements between Marsh and the Marsh Enterprise Insurers;

- Marsh's consolidation of its insurance markets to a few select strategic partners;

- Marsh's steering of insurance placements to the Marsh Enterprise Insurers, its strategic partners;

- that Marsh was protecting the Marsh Enterprise Insurers from competition;

- the rigging of bids by Marsh and Insurer Defendants AIG, ACE, Chubb, XL, Munich/AmRe, Liberty Mutual, St. Paul Travelers, Fireman's Fund and Zurich in furtherance of the scheme and to prevent disclosure;

- that the Marsh Enterprise Insurers kick back a substantial portion of their increased profits to Marsh in the form of contingent commissions, loans, subsidies and payments for "services" as well as other agreements and tying arrangements that serve the same function;

- that the kickbacks to Marsh are factored into the cost of Plaintiffs and Class Members' insurance, resulting in injury to Plaintiffs' and Class Members' business and property.

Marsh's misrepresentation of its allegiance to its client's interests and concealment of Marsh's allocation of business to a limited number of partner Insurer Defendants was necessary to encourage clients to retain Marsh, to conceal the scheme, to lull clients, including Plaintiffs and Class Members, into a false sense of security and to assure payment of the excess premiums.  Likewise, inclusion of the excess amount of premium resulting from Marsh and the Insurer Defendants' scheme in invoices forwarded to each

Plaintiff without explanation or a separate accounting for the excess premium was necessary to conceal the scheme and to assure payment of the entire invoice amount.

The fraudulent scheme and the conspiracy in furtherance of the scheme proximately caused the cost of insurance obtained by Plaintiffs and Class Members to increase because the kickbacks paid to Marsh were included in the price of insurance paid by Plaintiffs and Class Members. In addition, Plaintiffs and Class Members reasonably relied on Marsh's representations and the Defendants' omissions in paying higher premiums that included the kickbacks to Marsh.

Despite Marsh's duties to its clients, despite Marsh's acknowledgement of its obligations and despite Marsh's representations, Marsh did not act in its clients' best interests but instead engaged in a fraudulent scheme designed to increase the profits of Marsh and its insurer partners at the expense of its clients.

## AON ENTERPRISE DEFENDANTS:

The Aon Enterprise Defendants have violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 by utilizing or causing the use of the United States postal service, commercial interstate carrier, wire or other interstate electronic media in furtherance of their fraudulent scheme.

The Aon Enterprise Defendants have engaged in a scheme whereby Aon would allocate business to a limited number of partner Insurer Defendants in exchange for kickbacks in the form of contingent commissions and/or other payments which were factored into the premiums paid by plaintiffs and class members. Specifically, as set forth in further detail in the Revised Particularized Statement and the Second Amended Complaint, Aon in conjunction with the Aon Enterprise Insurers engaged in the following conduct:

- Aon significantly consolidated the number of carriers to which it would market its clients' business.

- Aon then entered into "strategic partnerships" with the Aon Enterprise Insurers to which Aon agreed to steer the bulk of its business.

- As strategic partners, the Aon Enterprise Insurers would be given access to a guaranteed flow of premium volume from Aon, as well as protection from normal competition from both inside and outside of the strategic partnership for renewal of each Insurer Defendant's own business.

- In order to accomplish this, the Aon Enterprise Defendants engaged in a number of practices specifically set forth in the Revised Particularized Statements including "book rolls", agreements not to bid renewals competitively, limiting the marketing of renewals, disclosing other carriers'

28

bids and other actions designed to maximize the volume of insurance placed with the Aon Enterprise Insurers.

- In exchange for being given these unfair competitive advantages, the Aon Enterprise Insurers agreed to pay kickbacks to Aon.

In furtherance of the scheme, Aon and the Aon Enterprise Insurers have sent matters and things through the mail and wire or have known that mail or wire would be used in furtherance of the scheme.  Materials sent by mail or wire have included correspondence, emails, faxes, marketing materials, contracts or agreements between Aon and the client, requests for proposals, policies and policy materials, insurance quotes, contingent commission agreements, insurance binders, commission schedules, invoices to clients and payments from insurers to brokers.

The Aon Enterprise Defendants have frequently communicated with each other by mail and/or wire in furtherance of the scheme.  Such communications have included contingent commission agreements, letters, faxes and emails memorializing various agreements between Aon and its partner markets and details regarding consolidation, requests for bids and bids, invoices, and contingent payments.  Many instances of these types of communications are further detailed in the Revised Particularized Statement and the Second Amended Complaint.

The Aon Enterprise Defendants' scheme conflicts with Aon's duties and representations to its clients.  Aon is retained by its clients, including Plaintiffs and Class Members, for the sole purpose of acting on behalf of and providing the clients with unbiased advice concerning the type, amount and level of insurance needed, as well as to provide sound and accurate advice regarding the insurance companies they recommend.

Additionally, Aon is a fiduciary of its clients, and therefore owes its clients, including Plaintiffs and other members of the Class: (i) a duty of loyalty to act in the best interests of its clients and to always put its clients' interests ahead of its own; (ii) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Aon, including the duty to disclose the source and amounts of all income it receives in or as a result of any transaction involving its clients; (iii) a duty of care in connection with any insurance-related products purchased by its clients or services rendered by Aon; (iv) a duty to provide impartial advice in connection with any insurance-related products purchased by its clients or services rendered by Aon; (v) a duty to use its best business judgment in connection with any insurance-related products or services purchased by its clients–in other words to find the best coverage at the lowest price; and, (vi) a duty of good faith and fair dealing.

As a result of the nature of the relationship between Aon and its clients, as a result of Aon's fiduciary status and as a result of Aon's representations, Aon had a duty to fully disclose any conflicts of interest it had in providing services to their clients as well as any material information that might impact their ability to act in its client's best interest. Aon, however, did not disclose its conflicts of interest, its allocation of business to a limited number of insurer partners or the resulting harm to its clients.

Aon has acknowledged and reaffirmed its duties to its clients. For example, Aon sent the following letter to "Valued Aon Clients" dated 20 October 2004 signed by Patrick G. Ryan, Chairman and CEO:

> Aon has a clear code of conduct that all employees are expected to follow. Integrity is our most important company value, followed closely by a commitment to being Client Centric. We expect our colleagues to drive for the best terms for the clients using the highest ethical standards–that's

> fundamental to the way we do business. Aon colleagues are expected to put our clients first–to focus on what is best for you, understanding your issues and bringing you solutions.

This simply echoes previous Aon statements:

> We are a service organization committed to putting our clients first.  We provide advice, service and consulting as the industry's leading global distribution organization.  Everything we do is ultimately focused on creating value for our clients. Acting as advocates for our clients, we offer them our specialized skills, industry experience and knowledge, innovative technology and professionalism.

Throughout the Class Period, Aon regularly disseminated materials by mail and wire wherein Aon reinforced Aon's commitments and routinely represented that Aon was functioning as the client's broker. Aon's communications with its clients, including Plaintiffs, which contained material misrepresentations and/or omissions are evidenced by the examples set forth herein.  For example, on or about August 19, 1999, Aon sent Plaintiff Bayou Steel a Service and Retainer Agreement whereby Aon undertook  to "develop, recommend, negotiate, and place insurance" and to "administer all aspects of relationship with insurance companies." On or about February 16, 2000, Aon sent Plaintiff Sunburst a Service Agreement whereby Aon likewise indicated that it would "develop, recommend, negotiate, and place insurance" and "administer all aspects of Sunburst Hospitality Corporation's relationship with insurance companies." In 1998, Aon sent Sunburst a Service Agreement indicating that Aon would "negotiate and place insurance" for Sunburst.

To the extent Aon provided any information regarding contingent commission income or Aon's relationship with the Aon Enterprise Insurers the information was either materially false or misleading.  For example, with respect to Aon's compensation, each of these agreements provided that "any revenue" Aon "might be entitled to from third parties

due to contingencies, override, bonus commissions, and/or administrative expense reimbursements are strictly for the benefit of Aon. This statement was insufficient to fully disclose Aon's compensation arrangements with the Aon Enterprise Insurers, noting only that Aon 'might be entitled' to additional compensation from 'third parties' while failing to provide any information regarding the strategic partnerships that Aon had entered into with the Aon Enterprise Insurers or the significance these partnerships and the contingent payment arrangements had on the insurance placement process and the premiums charged. On or about June 20, 2002, Aon sent Plaintiff Michigan Multi-King, Inc. an 'Insurance and Risk Management Proposal' wherein Aon represented that Aon will 'serve our clients' needs' and that Aon has "access to virtually every major insurance company and desirable specialty companies." Aon sent similar proposals to Michigan Multi-King on June 6, 2000; April 6, 2001; April 4, 2002; April 7, 2003; June 13, 2003; March 29, 2004; October 12, 2004 and September 27, 2005.

Aon also sent invoices to its clients which included the excess premiums resulting from Defendants' scheme without a separate accounting of the excess amount being invoiced. For example, on our about June 22, 2001, Aon sent Bayou Steel an invoice for payment of insurance premiums. This invoice contained the following boilerplate language on the reverse side:

### Regarding Compensation

Subsidiaries of Aon Corporation receive revenue in several forms. For its insurance companies, premium is received on which underwriting and investment income is realized. For the subsidiaries of Aon Group, Inc., which provide insurance and reinsurance brokerage, risk management, underwriting management, captive management and benefits consulting, remuneration may be received as commissions paid by an insurer; fees paid by a client in lieu of, or in addition to, commissions; and investment income on premiums, claim payments and return premiums

temporarily held as fiduciary funds.  In certain circumstances, one or more of these subsidiaries may also receive compensation in the following forms: commissions or fees paid to reinsurance brokerage or captive management companies for placement or management of reinsurance of a client's risk; commissions paid to a managing general agent to whom a risk has been referred for placement; contingent commissions paid by an insurer based on aggregate loss experience; overrides paid by an insurer/reinsurer based on services performed and the volume of business placed with the insurer/reinsurer; fees paid for premium financing; and fees paid for performance of technical or other services.

If you have any questions regarding the nature or amount of the compensation paid to any Aon Group company on your account, please contact the President of the Aon office that services the account.

Aon sent Bayou Steel similar invoices on November 1, 1998; October 1, 1999; October 30, 1999; November 1, 1999; January 1, 2000; April 1, 2000; November 6, 2000; November 7, 2000; December 1, 2000; February 1, 2001; October 26, 2001; November 1, 2001; November 19, 2001; December 3, 2001; December 12, 2001; November 5, 2002; November 6, 2002; November 12, 2002; November 21, 2003;  and April 6, 2004.

On our about April 9, 2001, Aon sent Michigan Multi-King an invoice for payment of insurance premiums.  This invoice contained the following boilerplate language on the reverse side:

### Regarding Compensation

Subsidiaries of Aon Corporation receive revenue in several forms. For its insurance companies, premium is received on which underwriting and investment income is realized.  For the subsidiaries of Aon Group, Inc., which provide insurance and reinsurance brokerage, risk management, underwriting management, captive management and benefits consulting, remuneration may be received as commissions paid by an insurer; fees paid by a client in lieu of, or in addition to, commissions; and investment income on premiums, claim payments and return premiums temporarily held as fiduciary funds.  In certain circumstances, one or more of these subsidiaries may also receive compensation in the following forms: commissions or fees paid to reinsurance brokerage or captive management companies for placement or management of reinsurance of a client's risk; commissions paid to a managing general agent to whom a risk

33

has been referred for placement; contingent commissions paid by an insurer based on aggregate loss experience; overrides paid by an insurer/reinsurer based on services performed and the volume of business placed with the insurer/reinsurer; fees paid for premium financing; and fees paid for performance of technical or other services.

If you have any questions regarding the nature or amount of the compensation paid to any Aon Group company on your account, please contact the President of the Aon office that services the account.

Aon sent Michigan Multi-King similar invoices on April 10, 2001; February 3, 2004;

April 22, 2004; May 12, 2004; and May 27, 2004.

On or about January 28, 2000, Aon sent Sunburst an invoice for payment of

insurance premiums.  This invoice contained the following boilerplate language on the

reverse side:

### Regarding Compensation

Subsidiaries of Aon Corporation receive revenue in several forms. For its insurance companies, premium is received on which underwriting and investment income is realized.  For the subsidiaries of Aon Group, Inc., which provide insurance and reinsurance brokerage, risk management, underwriting management, captive management and benefits consulting, remuneration may be received as commissions paid by an insurer; fees paid by a client in lieu of, or in addition to, commissions; and investment income on premiums, claim payments and return premiums temporarily held as fiduciary funds.  In certain circumstances, one or more of these subsidiaries may also receive compensation in the following forms: commissions or fees paid to reinsurance brokerage or captive management companies for placement or management of reinsurance of a client's risk; commissions paid to a managing general agent to whom a risk has been referred for placement; contingent commissions paid by an insurer based on aggregate loss experience; overrides paid by an insurer/reinsurer based on services performed and the volume of business placed with the insurer/reinsurer; fees paid for premium financing; and fees paid for performance of technical or other services.

If you have any questions regarding the nature or amount of the compensation paid to any Aon Group company on your account, please contact the President of the Aon office that services the account.

In the invoices forwarded to clients, Aon noted only that "in certain circumstances" Aon "may receive" contingent commissions. This statement was insufficient to fully disclose Aon's compensation arrangements with the Aon Enterprise Insurers, failing to provide any information regarding the strategic partnerships that Aon had entered into with the Aon Enterprise Insurers or the significance these partnerships and the contingent payment arrangements had on the insurance placement process and the premiums charged.

During the relevant time period, Aon also transmitted to its clients, including Plaintiffs, various other communications relating to Aon's provision of brokerage services.

Aon did not disclose the following material facts in any of its communications with clients:

- that Aon was not acting in the best interest of its clients but was instead acting on behalf of itself and its partner carriers to further their financial interests at the expense of Aon's clients;

- the true nature of the association and agreements between Aon and the Aon Enterprise Insurers;

- the conflict of interest inherent in the agreements between Aon and the Aon Enterprise Insurers;

- Aon's consolidation of its insurance markets to a few select strategic partners;

- Aon's steering of insurance placements to the Aon Enterprise Insurers, its strategic partners;

- that Aon was protecting the Aon Enterprise Insurers from competition;

- that the Aon Enterprise Insurers kick back a substantial portion of their increased profits to Aon in the form of contingent commissions, loans, subsidies and payments for "services" as well as other agreements and tying arrangements that serve the same function;

- that the kickbacks to Aon are factored into the cost of Plaintiffs and Class Members' insurance, resulting in injury to Plaintiffs' and Class Members' business and property.

Aon's misrepresentation of its allegiance to its clients' interests and concealment of Aon's allocation of business to a limited number of partner Insurer Defendants was necessary to encourage clients to retain Aon, to conceal the scheme, to lull clients, including Plaintiffs and Class Members, into a false sense of security and to assure payment of the excess premiums. Likewise, inclusion of the excess amount of premium resulting from Aon and the Insurer Defendants' scheme in invoices forwarded to each Plaintiff without explanation or a separate accounting for the excess premium was necessary to conceal the scheme and to assure payment of the entire invoice amount.

The fraudulent scheme and the conspiracy in furtherance of the scheme proximately caused the cost of insurance obtained by Plaintiffs and Class Members to increase because the kickbacks paid to Aon were included in the price of insurance paid by Plaintiffs and Class Members. In addition, Plaintiffs and Class Members reasonably relied on Aon's representations and the Defendants' omissions in paying higher premiums that included the kickbacks to Aon.

Despite Aon's duties to its clients, despite Aon's acknowledgement of its obligations and despite Aon's representations, Aon did not act in its clients' best interests

but instead engaged in a fraudulent scheme designed to increase the profits of Aon and its insurer partners at the expense of its clients.

## THE WILLIS ENTERPRISE DEFENDANTS:

The Willis Enterprise Defendants have violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 by utilizing or causing the use of the United States postal service,  commercial interstate carrier, wire or other interstate electronic media in furtherance of their fraudulent scheme.

The Willis Enterprise Defendants have engaged in a scheme whereby Willis would allocate business to a limited number of partner Insurer Defendants in exchange for kickbacks in the form of contingent commissions and/or other payments which were factored into the premiums paid by plaintiffs and class members.  Specifically, as set forth in further detail in the Revised Particularized Statement and the Second Amended Complaint, Willis in conjunction with the Willis Enterprise Insurers engaged in the following conduct:

- Willis significantly consolidated the number of carriers to which it would market its clients' business.

- Willis entered into "strategic partnerships" with the Willis Enterprise Insurers to which Willis agreed to steer the bulk of its business.

- As strategic partners, the Willis Enterprise Insurers would be given access to a guaranteed flow of premium volume from Willis, as well as protection from normal competition from both inside and outside of the strategic partnership for renewal of each Insurer Defendant's own business.

-      In order to accomplish this, the Willis Enterprise Defendants engaged in a number of practices specifically set forth in the Revised Particularized Statements including 'book rolls', agreements not to bid placements or renewals competitively, limiting the marketing of renewals and other actions designed to maximize the volume of insurance placed with the Willis Enterprise Insurers.

-      In exchange for being given these unfair competitive advantages, the Willis Enterprise Insurers agreed to pay kickbacks to Willis.

In furtherance of the scheme, Willis and the Willis Enterprise Insurers have sent matters and things through the mail and wire or have known that mail or wire would be used in furtherance of the scheme.  Materials sent by mail or wire have included correspondence, emails, faxes, marketing materials, contracts or agreements between Willis and the client, requests for proposals, policies and policy materials, insurance quotes, contingent commission agreements, insurance binders, commission schedules, invoices to clients and payments from insurers to brokers.

The Willis Enterprise Defendants have frequently communicated with each other by mail and/or wire in furtherance of the scheme.  Such communications have included contingent commission agreements, letters, faxes and emails memorializing various agreements between Willis and its partner markets and details regarding consolidation, requests for bids and bids, invoices, and contingent payments.  Many instances of these types of communications are further detailed in the Revised Particularized Statement and the Second Amended Complaint.

Defendants' scheme conflicts with Willis' duties and representations to its clients. Willis is retained by its clients, including Plaintiffs and Class Members, for the sole purpose of acting on behalf of and providing the clients with unbiased advice concerning the type, amount and level of insurance needed, as well as to provide sound and accurate advice regarding the insurance companies they recommend.

Additionally, Willis is a fiduciary of its clients, and therefore owes its clients, including Plaintiffs and other members of the Class: (i) a duty of loyalty to act in the best interests of its clients and to always put its clients' interests ahead of its own; (ii) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Willis, including the duty to disclose the source and amounts of all income it receives in or as a result of any transaction involving its clients; (iii) a duty of care in connection with any insurance-related products purchased by its clients or services rendered by Willis; (iv) a duty to provide impartial advice in connection with any insurance-related products purchased by its clients or services rendered by Willis; (v) a duty to use its best business judgment in connection with any insurance-related products or services purchased by its clients–in other words to find the best coverage at the lowest price; and, (vi) a duty of good faith and fair dealing.

As a result of the nature of the relationship between Willis and its clients, as a result of Willis' fiduciary status and as a result of Willis' representations, Willis had a duty to fully disclose any conflicts of interest it had in providing services to its clients as well as any material information that might impact their ability to act in its client's best

interest.   Willis, however, did not disclose its conflicts of interest, its allocation of business to a limited number of insurer partners or the resulting harm to its clients.

Since the announcement of the regulatory investigations, Willis has acknowledged and reaffirmed its duty to act on behalf of its clients.  In an October 22, 2004 letter to "all Clients of Willis Group Holdings" Joseph J. Plumeri, Chairman and Chief Executive Officer of Willis Group Holdings Ltd. stated, "Willis continues to run its business by a basic principle: Our first priority is our clients. We represent you and conduct business in your best interest utilizing our global resources. Willis represents the client's best interests through a Client Advocate. Willis' recommendations and solutions will be driven by what is in the client's best interests." Willis also reaffirmed that the clients Willis represents are Willis' continuing priority in an October 27, 2004 communication to CEOs, CFOs, Treasurers, Risk Managers and Human Resource Managers.

Prior to the announcement of the investigations, Willis in a September 15, 2003 news release discussed its "client advocacy model", referring to clients as "partner[s] in the insurance placement process" and promising "access to the Markets on a worldwide basis" and "the best insurance program available from the worldwide insurance marketplace." Willis likewise lauded "constant coordination and communication between client, producer, marketer and carrier."

These statements echoed other communications from Willis to its clients such as statements that Willis would negotiate on behalf of clients and acknowledgements that Willis was acting in the capacity of a broker.  As indicated in correspondence sent via fax from Willis to Plaintiff Sunburst Hospitality Company (Sunburst) on December 21, 2000,

Willis acknowledge that it was functioning as Sunburst's broker with respect to property insurance and umbrella liability insurance. Willis Corroon Corp. sent an insurance proposal to Sunburst on or about November 12, 1998. Willis also sent invoices to its clients, including Plaintiff Sunburst, which included the excess premiums resulting from Defendants' scheme without a separate accounting of the excess amount being invoiced. For example, Willis sent such invoices to Plaintiff Sunburst on or about December 29, 1999, January 5, 2000, January 7, 2000, July 7, 2000, February 9, 2000, January 2, 2001, January 5, 2001, January 12, 2001, and January 17, 2001. The invoices sent from Willis to Sunburst failed to disclose compensation agreements between Willis and the Willis Enterprise Insurers that may have resulted in additional income in the form of contingent commissions paid by the Willis Enterprise Insurers to Willis.

Beginning in or about September 2001, the invoices sent by Willis to clients contained language stating only that 'It is possible' that Willis 'may receive contingent payments or allowances from insurers based on factors which are not client-specific, such as the size or performance of an overall book of business produced with an insurer by us.' This statement was insufficient to fully disclose Willis' compensation arrangements with the Willis Enterprise Insurers, noting only that 'it is possible' that Willis may have agreements with insurers from which Willis could derive additional income while failing to provide any information regarding the strategic partnerships and the contingent payment arrangements had on the insurance placement process and the premiums charged.

During the relevant time period, Willis also transmitted to its clients, including Plaintiffs, various other communications relating to Willis' provision of brokerage

services.  Willis disclosed none of the following material facts in any of its communications to clients:

- that Willis was not acting in the best interest of its clients but was instead acting on behalf of itself and its partner carriers to further their financial interests at the expense of Willis' clients;

- the true nature of the association and agreements between Willis and the Willis Enterprise Insurers;

- the conflict of interest inherent in the agreements between Willis and the Willis Enterprise Insurers;

- Willis' consolidation of its insurance markets to a few select strategic partners;

- Willis' steering of insurance placements to the Willis Enterprise Insurers, its strategic partners;

- that Willis was protecting the Willis Enterprise Insurers from competition;

- that the Willis Enterprise Insurers kick back a substantial portion of their increased profits to Willis in the form of contingent commissions, loans, subsidies and payments for "services" as well as other agreements and tying arrangements that serve the same function;

- that the kickbacks to Willis are factored into the cost of Plaintiffs and Class Members' insurance, resulting in injury to Plaintiffs and Class Members' business and property.

Willis' representation that Willis was acting on behalf of its client and concealment of Willis's allocation of business to a limited number of partner Insurer Defendants was necessary to encourage clients to retain Willis, to conceal the scheme, to lull clients,

including Plaintiffs and Class Members, into a false sense of security and to assure payment of the excess premiums.  Likewise, inclusion of the excess amount of premium resulting from Willis and the Insurer Defendants' scheme in invoices forwarded to each Plaintiff without explanation or a separate accounting for the excess premium was necessary to conceal the scheme and to assure payment of the entire invoice amount.

Despite Willis' duties to its clients, despite Willis' acknowledgement of its obligations and despite Willis' representations, Willis did not act in its clients' best interests but instead engaged in a fraudulent scheme designed to increase the profits of Willis and its insurer partners at the expense of its clients.

The fraudulent scheme and the conspiracy in furtherance of the scheme proximately caused the cost of insurance obtained by Plaintiffs and Class Members to increase because the kickbacks paid to Willis were included in the price of insurance paid by Plaintiffs and Class Members.  In addition, Plaintiffs and Class Members reasonably relied on the Willis's representations and the Defendants' omissions in paying higher premiums that included the kickbacks to Willis.

**GALLAGHER ENTERPRISE DEFENDANTS:**

The Gallagher Enterprise Defendants have violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 by utilizing or causing the use of the United States postal service,  commercial interstate carrier, wire or other interstate electronic media in furtherance of their fraudulent scheme.

The Gallagher Enterprise Defendants have engaged in a scheme whereby Gallagher would allocate business to a limited number of partner Insurer Defendants in exchange for kickbacks in the form of contingent commissions and/or other payments which were

factored into the premiums paid by plaintiffs and class members.  Specifically, as set forth in further detail in the Revised Particularized Statement and the Second Amended Complaint, the Gallagher Enterprise Insurers Defendants engaged in the following conduct:

- Gallagher significantly consolidated the number of carriers to which it would market its clients' business.

- Gallagher entered into "strategic partnerships" with the Gallagher Enterprise Insurers to which Gallagher agreed to steer the bulk of its business.

- As strategic partners, the Gallagher Enterprise Insurers would be given access to a guaranteed flow of premium volume from Gallagher, as well as protection from normal competition from both inside and outside of the strategic partnership for renewal of each Insurer Defendant's own business.

- In order to accomplish this, the Gallagher Enterprise Defendants engaged in a number of practices specifically set forth in the Revised Particularized Statements including "book rolls", agreements not to bid renewals competitively, limiting the marketing of renewals, disclosing other carriers' bids and other actions designed to maximize the volume of insurance placed with the Gallagher Enterprise Insurers.

- In exchange for being given these unfair competitive advantages, the Gallagher Enterprise Insurers agreed to pay kickbacks to Gallagher.

In furtherance of the scheme, the Gallagher Enterprise Defendants have sent matters and things through the mail and wire or have known that mail or wire would be used in furtherance of the scheme.  Materials sent by mail or wire have included

correspondence, emails, faxes, marketing materials, contracts or agreements between Gallagher and the client, requests for proposals, policies and policy materials, insurance quotes, contingent commission agreements, insurance binders, commission schedules, invoices to clients and payments from insurers to brokers.

The Gallagher Enterprise Defendants have frequently communicated with each other by mail and/or wire in furtherance of the scheme. Such communications have included contingent commission agreements, letters, faxes and emails memorializing various agreements between Gallagher and its partner markets and details regarding consolidation, requests for bids and bids, invoices, and contingent payments. Many instances of these types of communications are further detailed in the Revised Particularized Statement and the Second Amended Complaint.

Defendants' scheme conflicts with Gallagher's duties and representations to its clients. Gallagher is retained by its clients, including Plaintiffs and Class Members, for the sole purpose of acting on behalf of and providing the clients with unbiased advice concerning the type, amount and level of insurance needed, as well as to provide sound and accurate advice regarding the insurance companies they recommend.

Additionally, Gallagher is a fiduciary of its clients, and therefore owes its clients, including Plaintiffs and other members of the Class: (i) a duty of loyalty to act in the best interests of its clients and to always put its clients' interests ahead of its own; (ii) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Gallagher, including the duty to disclose the source and amounts of all income it receives in or as a result of any transaction involving its clients; (iii) a duty of care in connection with any insurance-

related products purchased by its clients or services rendered by Gallagher; (iv) a duty to

provide impartial advice in connection with any insurance-related products purchased by

its clients or services rendered by Gallagher; (v) a duty to use its best business judgment

in connection with any insurance-related products or services purchased by its clients–in

other words to find the best coverage at the lowest price; and, (vi) a duty of good faith

and fair dealing.

In a November 3, 2004 letter to Gallagher's "Valued Clients", J. Patrick Gallagher

reaffirmed Gallagher's duty to act on behalf of its clients:

> For 77 years, the leaders and employees of this company have always
> understood that to succeed as an enterprise we must put customers first. I'd
> like to take this opportunity to reiterate that we view ourselves as your
> advocates in the marketplace.  We want there to be absolutely no
> confusion about our priorities.  Our employees understand that clients
> come first at Gallagher.

As a result of the nature of the relationship between Gallagher and its clients, as a result

of Gallagher's fiduciary status and as a result of Gallagher's representations, Gallagher had

a duty to fully disclose any conflicts of interest it had in providing services to their clients

as well as any material information that might impact its ability to act in its client's best

interest.  Gallagher, however, did not disclose its conflicts of interest, its allocation of

business to a limited number of insurer partners or the resulting harm to its clients.

Instead, Gallagher in communications with clients simply reinforced that it was

acting in its clients' interests. Gallagher's communications with its clients, including

Plaintiffs, which contained material misrepresentations and/or omissions are evidenced

by the examples set forth herein.  Throughout the Class Period, Gallagher regularly

disseminated materials by mail and wire wherein Gallagher routinely represented that

Gallagher was acting on the client's behalf and not on behalf of the insurer, that Gallagher

was functioning as the client's broker, and that Gallagher would use its "best efforts" on behalf of the client. To the extent Gallagher provided any information regarding contingent commission income or Gallagher's relationship with the Gallagher Enterprise Insurers the information was either materially false or misleading. Gallagher routinely represented that it would use its "best efforts" in providing brokerage services to its clients. For example, on or about January 6, 2003, Arthur J. Gallagher ("Gallagher") sent Clear Lam a "Fee Agreement" stating that "Gallagher will provide insurance brokerage services to Client and will use its best efforts to secure insurance required for the proper administration of Client's business." The Fee Agreement further provides as follows:

> Gallagher shall receive its usual and customary brokerage commission for the services provided hereunder. Gallagher will be charging a fee of $29,766 for brokerage and administration services, in addition to 15% commission on boiler and machinery coverage, 7.5% on pollution liability and 1% commission on auto coverage (already included in the premiums proposed)...

> In addition to the fees (commissions) provided herein, it is understood and agreed that other parties, such as excess and surplus lines brokers, wholesalers, reinsurance intermediaries, underwriting managers, and similar parties, some of which may be owned in whole or in part by Gallagher's corporate parent, may earn and retain usual and customary commissions and fees in the course of providing insurance products to client pursuant to this Agreement. Any such fees or commission will not constitute compensation to Gallagher..

> Gallagher from time to time enters into arrangements with certain insurance carriers or those carriers' reinsurers providing for compensation, in addition to commissions, to be paid by such carriers or reinsurers to Gallagher or its affiliates based on, among other things, the volume of premium and/or underwriting profitability of the insurance coverages written through Gallagher by such carriers or reinsurers. In addition, Gallagher and its affiliates provide management and other services to, and receive compensation for those services from, certain reinsurers that reinsurer insurance coverages written through Gallagher by other insurance carriers. The insurance coverages you purchase through Gallagher might be issued by an insurance carrier or reinsured by a reinsurer that has such a relationship with Gallagher or its affiliates.

This statement was insufficient to fully disclose Gallagher's compensation arrangements with the Gallagher Enterprise Insurers, noting only that Gallagher has agreements with "certain" insurers and that the client's policies "might" be issued by one of those carriers while failing to provide any information regarding the strategic partnerships that Gallagher had entered into with the Gallagher Enterprise Insurers or the significance these partnerships and the contingent payment arrangements had on the insurance placement process and the premiums charged. Gallagher also sent Plaintiff Clear Lam an "Insurance Proposal" with an effective date of December 2003 in which Gallagher again indicated that it would "use its best efforts" on Clear Lam's behalf.

Gallagher also routinely sent invoices to its clients which included the excess premiums resulting from Defendants' scheme without a separate accounting of the excess amount being invoiced. For example, on April 4 and April 5, 2003, Gallagher transmitted invoices to Clear Lam which did not separately account for contingent commission payments and in no way referenced contingent commission income. Gallagher also transmitted invoices to Redwood Oil Co. on September 10, 1998, August 26, 1999, August 27, 1999, August 15, 2000, November 7, 2000 and December 6, 2000.

During the relevant time period, Gallagher also transmitted to its clients, including Plaintiffs, various other communications relating to Gallagher's provision of brokerage services. For example, Gallagher transmitted to plaintiff Mulcahy certificates of insurance and various other communications related to those policies. These included a Certificate of Insurance transmitted on or about February 25, 2004. During the time that Arthur J. Gallagher ("Gallagher") was the broker for plaintiff Redwood Oil Company ("Redwood Oil") Gallagher also transmitted various communications to Redwood Oil

including, for example, general summaries, titled "Summary of Insurance," such as those transmitted on or about August 13, 1995, and January 14, 1997.  On or about April 4, 2001, Gallagher transmitted a "Summary of Insurance" to Redwood Oil that contained the following statement:

> "ADDITIONAL DISCLOSURE–BROKER/CARRIER COMPENSATION
>
> Gallagher from time to time enters into arrangements with certain insurance carriers or those carriers' reinsurers providing for compensation, in addition to commissions, to be paid by such carriers or reinsurers to Gallagher or its affiliates based on, among other things, the volume of premium and/or underwriting profitability of the insurance coverages written through Gallagher by such carriers or reinsurers.  In addition, Gallagher and its affiliates provide management and other services to, and receive compensation for those services from, certain reinsurers that reinsure insurance coverages written through Gallagher by other insurance carriers.  The insurance coverages you purchase through Gallagher might be issued by an insurance carrier or reinsured by a reinsurer that has such a relationship with Gallagher or its affiliates."

This statement was insufficient to fully disclose Gallagher's compensation arrangements with the Gallagher Enterprise Insurers, noting only that Gallagher has agreements with "certain" insurers and that the client's policies "might" be issued by one of those carriers while failing to provide any information regarding the strategic partnerships that Gallagher had entered into with the Gallagher Enterprise Insurers or the significance these partnerships and the contingent payment arrangements had on the insurance placement process and the premiums charged.

Gallagher did not disclose the following material facts in any of its communications to clients:

- that Gallagher was not acting in the best interest of its clients but was instead acting on behalf of itself and its partner carriers to further their financial interests at the expense of Gallagher's clients;

- the true nature of the association and agreements between Gallagher and the Gallagher Enterprise Insurers;

- the conflict of interest inherent in the agreements between Gallagher and the Gallagher Enterprise Insurers;

- Gallagher's consolidation of its insurance markets to a few select strategic partners;

- Gallagher's steering of insurance placements to the Gallagher Enterprise Insurers, its strategic partners;

- that Gallagher was protecting the Gallagher Enterprise Insurers from competition

- that the Gallagher Enterprise Insurers kick back a substantial portion of their increased profits to Gallagher in the form of contingent commissions, loans, subsidies and payments for "services" as well as other agreements and tying arrangements that serve the same function;

- that the kickbacks to Gallagher are factored into the cost of Plaintiffs and Class Members' insurance, resulting in injury to Plaintiffs' and Class Members' business and property.

Gallagher's misrepresentation of its allegiance to its clients' interests and concealment of Gallagher's allocation of business to a limited number of partner Insurer Defendants was necessary to encourage clients to retain Gallagher, to conceal the scheme, to lull

clients, including Plaintiffs and Class Members, into a false sense of security and to assure payment of the excess premiums.  Likewise, inclusion of the excess amount of premium resulting from Gallagher and the Insurer Defendants' scheme in invoices forwarded to each Plaintiff without explanation or a separate accounting for the excess premium was necessary to conceal the scheme and to assure payment of the entire invoice amount.

The fraudulent scheme and the conspiracy in furtherance of the scheme proximately caused the cost of insurance obtained by Plaintiffs and Class Members to increase because the kickbacks paid to Gallagher were included in the price of insurance paid by Plaintiffs and Class Members.  In addition, Plaintiffs and Class Members reasonably relied on Gallagher's representations and the Defendants' omissions in paying higher premiums that included the kickbacks to Gallagher.

Despite Gallagher's duties to its clients, despite Gallagher's acknowledgement of its obligations and despite Gallagher's representations, Gallagher did not act in its clients' best interests but instead engaged in a fraudulent scheme designed to increase the profits of Gallagher and its insurer partners at the expense of its clients.

## HRH ENTERPRISE DEFENDANTS:

The HRH Enterprise Defendants have violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 by utilizing or causing the use of the United States postal service,  commercial interstate carrier, wire or other interstate electronic media in furtherance of their fraudulent scheme.

Defendants have engaged in a scheme whereby HRH would allocate business to a limited number of partner Insurer Defendants in exchange for kickbacks in the form of

51

contingent commissions and/or other payments which were factored into the premiums

paid by plaintiffs and class members.  Specifically, as set forth in further detail in the

Revised Particularized Statement and the Second Amended Complaint, the HRH

Enterprise Defendants engaged in the following conduct:

-    HRH significantly consolidated the number of carriers to which it would

     market its clients' business.

-    HRH entered into "strategic partnerships" with the HRH Enterprise Insurers to

     which HRH agreed to steer the bulk of its business.

-    As strategic partners, the HRH Enterprise Insurers would be given access to a

     guaranteed flow of premium volume from HRH, as well as protection from

     normal competition from both inside and outside of the strategic partnership

     for renewal of each Insurer Defendant's own business.

-    In order to accomplish this, HRH and the HRH Enterprise Insurers engaged in

     a number of practices specifically set forth in the Revised Particularized

     Statements including "book rolls", agreements not to bid renewals

     competitively, limiting the marketing of renewals and other actions designed

     to maximize the volume of insurance placed with the HRH Enterprise

     Insurers.

-    In exchange for being given these unfair competitive advantages, the HRH

     Enterprise Insurers agreed to pay kickbacks to HRH.

        In furtherance of the scheme, the HRH Enterprise Defendants have sent matters

and things through the mail and wire or have known that mail or wire would be used in

furtherance of the scheme.  Materials sent by mail or wire have included correspondence,

emails, faxes, marketing materials, contracts or agreements between HRH and the client, requests for proposals, policies and policy materials, insurance quotes, contingent commission agreements, insurance binders, commission schedules, invoices to clients and payments from insurers to brokers.

The HRH Enterprise Defendants have frequently communicated with each other by mail and/or wire in furtherance of the scheme. Such communications have included contingent commission agreements, letters, faxes and emails memorializing various agreements between HRH and its partner markets and details regarding consolidation, requests for bids and bids, invoices, and contingent payments. Many instances of these types of communications are further detailed in the Revised Particularized Statement and the Second Amended Complaint.

Defendants' scheme conflicts with HRH's duties and representations to its clients. HRH is retained by its clients, including Plaintiffs and Class Members, for the sole purpose of acting on behalf of and providing the clients with unbiased advice concerning the type, amount and level of insurance needed, as well as to provide sound and accurate advice regarding the insurance companies they recommend.

Additionally, HRH is a fiduciary of its clients, and therefore owes its clients, including Plaintiffs and other members of the Class: (i) a duty of loyalty to act in the best interests of its clients and to always put its clients' interests ahead of its own; (ii) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by HRH, including the duty to disclose the source and amounts of all income it receives in or as a result of any transaction involving its clients; (iii) a duty of care in connection with any insurance-

related products purchased by its clients or services rendered by HRH; (iv) a duty to provide impartial advice in connection with any insurance-related products purchased by its clients or services rendered by HRH; (v) a duty to use its best business judgment in connection with any insurance-related products or services purchased by its clients–in other words to find the best coverage at the lowest price; and, (vi) a duty of good faith and fair dealing.

As a result of the nature of the relationship between HRH and its clients, as a result of HRH's fiduciary status and as a result of HRH's representations, HRH had a duty to fully disclose any conflicts of interest it had in providing services to its clients as well as any material information that might impact their ability to act in its client's best interest. HRH, however, did not disclose its conflicts of interest, its allocation of business to a limited number of insurer partners or the resulting harm to its clients.

Throughout the Class Period, HRH regularly disseminated materials by mail and wire wherein HRH routinely represented that HRH was acting on the client's behalf, using, among others, the following phrases:

- 'We work for our customers, literally. We're paid by them. We have to listen to them entirely.'

- 'your advocate in the negotiation of claim settlements'

- 'an objective and unbiased evaluation of the various coverage terms, conditions and exclusions'

- 'represent the financial interest of our clients. Our very existence and continued success is wholly dependent upon meeting the needs and expectations of our clients'

- 'Everything we do, everything we are and everything we're going to be is driven by our clients'

- 'HRH Claims Professionals work for you'

- 'We want you to have confidence that our recommendations are driven by your needs, not our own'

- 'We want to represent you in the marketplace'

- 'functioning as your broker, we will negotiate with all companies on your behalf and protect your interests'

- 'We negotiate ethically and tirelessly on your behalf'

- 'We advocate our clients [sic] needs and desires first and foremost'

Following institution of the regulatory investigations, HRH determined that phrases that suggest that HRH is a "selfless, disinterested party working for the client" would no longer be "allowed". Yet HRH's Chairman and Chief Executive Officer Martin L. (Mell) Vaughan, III in a news release on or about October 26, 2004 reiterated HRH's 'longstanding commitment to serve [HRH's] clients in accordance with the highest professional and ethical standards."

To the extent HRH provided any information regarding contingent commission income or HRH's relationship with the HRH Enterprise Insurers the information was either materially false or misleading. HRH's statement that it 'may have' contingent fee agreements with insurance carriers was insufficient to fully disclose HRH's compensation arrangements with the HRH Enterprise Insurers, noting only that HRH "may have" agreements with insurers from which HRH "may" derive additional income while failing to provide any information regarding the strategic partnerships that HRH had entered into

with the HRH Enterprise Insurers or the significance these partnerships and the contingent payment arrangements had on the insurance placement process and the premiums charged.

HRH also sent invoices to its clients, including Plaintiffs Tri-State and Opticare, which included the excess premiums resulting from Defendants' scheme without a separate accounting of the excess amount being invoiced as well as policies and other communications relating to HRH's provision of brokerage services.

HRH did not disclose the following material facts in any of its communications with clients:

- that HRH was not acting in the best interest of its clients but was instead acting on behalf of itself and its partner carriers to further their financial interests at the expense of HRH's clients;

- the true nature of the association and agreements between HRH and the HRH Enterprise Insurers;

- the conflict of interest inherent in the agreements between HRH and the HRH Enterprise Insurers;

- HRH's consolidation of its insurance markets to a few select strategic partners;

- HRH's steering of insurance placements to the HRH Enterprise Insurers, its strategic partners;

- that HRH was protecting the HRH Enterprise Insurers from competition;

- that the HRH Enterprise Insurers kick back a substantial portion of their increased profits to HRH in the form of contingent commissions, loans,

subsidies and payments for "services" as well as other agreements and tying

arrangements that serve the same function;

- that the kickbacks to HRH are factored into the cost of Plaintiffs and Class

Members' insurance, resulting in injury to Plaintiffs' and Class Members'

business and property.

HRH's misrepresentation of its allegiance to its clients' interests and concealment of

HRH's allocation of business to a limited number of partner Insurer Defendants was

necessary to encourage clients to retain HRH, to conceal the scheme, to lull clients,

including Plaintiffs and Class Members, into a false sense of security and to assure

payment of the excess premiums.  Likewise, inclusion of the excess amount of premium

resulting from HRH and the Insurer Defendants' scheme in invoices forwarded to each

Plaintiff without explanation or a separate accounting for the excess premium was

necessary to conceal the scheme and to assure payment of the entire invoice amount.

The fraudulent scheme and the conspiracy in furtherance of the scheme

proximately caused the cost of insurance obtained by Plaintiffs and Class Members to

increase because the kickbacks paid to HRH were included in the price of insurance paid

by Plaintiffs and Class Members.  In addition, Plaintiffs and Class Members reasonably

relied on HRH's representations and the Defendants' omissions in paying higher premiums

that included the kickbacks to HRH.

Despite HRH's duties to its clients, despite HRH's acknowledgement of its

obligations and despite HRH's representations, HRH did not act in its clients' best interests

but instead engaged in a fraudulent scheme designed to increase the profits of HRH and

its insurer partners at the expense of its clients.

**WELLS FARGO/ACORDIA ENTERPRISE DEFENDANTS:**

The Wells Fargo/Acordia Enterprise Defendants have violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 by utilizing or causing the use of the United States postal service, commercial interstate carrier, wire or other interstate electronic media in furtherance of their fraudulent scheme.

Defendants have engaged in a scheme whereby Wells Fargo/Acordia would allocate business to a limited number of partner Insurer Defendants in exchange for kickbacks in the form of contingent commissions and/or other payments which were factored into the premiums paid by plaintiffs and class members.  Specifically, as set forth in further detail in the Revised Particularized Statement and the Second Amended Complaint, the Wells Fargo/Acordia Enterprise Defendants engaged in the following conduct:

-   Wells Fargo/Acordia significantly consolidated the number of carriers to which it would market its clients' business.

-   Wells Fargo/Acordia entered into 'strategic partnerships' with the Wells Fargo/Acordia Enterprise Insurers to which Wells Fargo/Acordia agreed to steer the bulk of its business.

-   As strategic partners, Wells Fargo/Acordia Enterprise Insurers would be given access to a guaranteed flow of premium volume from Wells Fargo/Acordia, as well as protection from normal competition from both inside and outside of the strategic partnership for renewal of each Insurer Defendant's own business.

-   In order to accomplish this, the Wells Fargo/Acordia Enterprise Defendants engaged in a number of practices specifically set forth in the Revised Particularized Statements including 'book rolls', agreements not to bid renewals

58

competitively, limiting the marketing of renewals, disclosing other carriers' bids and other actions designed to maximize the volume of insurance placed with the Wells Fargo/Acordia Enterprise Insurers.

-    In exchange for being given these unfair competitive advantages, the Wells Fargo/Acordia Enterprise Insurers agreed to pay kickbacks to Wells Fargo/Acordia.

In furtherance of the scheme, the Wells Fargo/Acordia Enterprise Defendants have sent matters and things through the mail and wire or have known that mail or wire would be used in furtherance of the scheme.  Materials sent by mail or wire have included correspondence, emails, faxes, marketing materials, contracts or agreements between Wells Fargo/Acordia and the client, requests for proposals, policies and policy materials, insurance quotes, contingent commission agreements, insurance binders, commission schedules, invoices to clients and payments from insurers to brokers.

The Wells Fargo/Acordia Defendants have frequently communicated with each other by mail and/or wire in furtherance of the scheme.  Such communications have included contingent commission agreements, letters, faxes and emails memorializing various agreements between Marsh and its partner markets and details regarding consolidation, requests for bids and bids, invoices, and contingent payments.  Many instances of these types of communications are further detailed in the Revised Particularized Statement and the Second Amended Complaint.

Defendants' scheme conflicts with Wells Fargo/Acordia's duties and representations to its clients.  Wells Fargo/Acordia is retained by its clients, including Plaintiffs and Class Members, for the sole purpose of acting on behalf of and providing

the clients with unbiased advice concerning the type, amount and level of insurance needed, as well as to provide sound and accurate advice regarding the insurance companies they recommend.

Additionally, Wells Fargo/Acordia is a fiduciary of its clients, and therefore owes its clients, including Plaintiffs and other members of the Class: (i) a duty of loyalty to act in the best interests of its clients and to always put its clients' interests ahead of its own; (ii) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Wells Fargo/Acordia, including the duty to disclose the source and amounts of all income it receives in or as a result of any transaction involving its clients; (iii) a duty of care in connection with any insurance-related products purchased by its clients or services rendered by Wells Fargo/Acordia; (iv) a duty to provide impartial advice in connection with any insurance-related products purchased by its clients or services rendered by Wells Fargo/Acordia; (v) a duty to use its best business judgment in connection with any insurance-related products or services purchased by its clients–in other words to find the best coverage at the lowest price; and, (vi) a duty of good faith and fair dealing.

As a result of the nature of the relationship between Wells Fargo/Acordia and its clients, as a result of Wells Fargo/Acordia's fiduciary status and as a result of Wells Fargo/Acordia's representations, Wells Fargo/Acordia had a duty to fully disclose any conflicts of interest it had in providing services to its clients as well as any material information that might impact its ability to act in its client's best interest.  Wells Fargo/Acordia, however, did not disclose its conflicts of interest, its allocation of business to a limited number of insurer partners or the resulting harm to its clients.

Wells Fargo/Acordia's form "Client Services Agreement" acknowledges that Wells Fargo/Acordia is acting as an "insurance broker" and will be providing "insurance brokerage services." This agreement, at least at times, contained the notation that Wells Fargo/Acorida has "agreements with certain insurers under which they may receive payments based upon factors that are not client specific such as the overall book of business placed and the performance of that book." This statement was insufficient to fully disclose Wells Fargo/Acordia's compensation arrangements with the Wells Fargo/Acordia Enterprise Insurers, noting only that Wells Fargo/Acordia "may receive" additional compensation from "certain insurers" while failing to provide any information regarding the strategic partnerships that Marsh had entered into with Wells Fargo/Acordia Enterprise Insurers or the significance these partnerships and the contingent payment arrangements had on the insurance placement process and the premiums charged.

During the relevant time period, Wells Fargo/Acordia also transmitted to its clients, including Plaintiffs, various other communications relating to its provision of brokerage services, including insurance policies, correspondence and quotes. Wells Fargo/Acordia also sent invoices to its clients which included the excess premiums resulting from Defendants' scheme without a separate accounting of the excess amount being invoiced. Wells Fargo/Acordia sent an invoice to Omni Group on or about August 2003.

Wells Fargo/Acordia did not disclose the following material facts in any of its communications with clients:

- that Wells Fargo/Acordia was not acting in the best interest of its clients but was instead acting on behalf of itself and its partner carriers to further their financial interests at the expense of Wells Fargo/Acordia's clients;

- the true nature of the association and agreements between Wells Fargo/Acordia and the Wells Fargo/Acordia Enterprise Insurers;

- the conflict of interest inherent in the agreements between Wells Fargo/Acordia and the Wells Fargo/Acordia Enterprise Insurers;

- Wells Fargo/Acordia's consolidation of its insurance markets to a few select strategic partners;

- Wells Fargo/Acordia's steering of insurance placements to the Wells Fargo/Acordia Enterprise Insurers , its strategic partners;

- that Wells Fargo/Acordia was protecting the Wells Fargo/Acordia Enterprise Insurers from competition;

- that the Wells Fargo/Acordia Enterprise Insurers kick back a substantial portion of their increased profits to Wells Fargo/Acordia in the form of contingent commissions, loans, subsidies and payments for "services" as well as other agreements and tying arrangements that serve the same function;

- that the kickbacks to Wells Fargo/Acordia are factored into the cost of Plaintiffs and Class Members' insurance, resulting in injury to Plaintiffs' and Class Members' business and property.

Wells Fargo/Acordia's misrepresentation of its allegiance to its clients interests and concealment of Wells Fargo/Acordia's allocation of business to a limited number of partner Insurer Defendants was necessary to encourage clients to retain Wells

Fargo/Acordia, to conceal the scheme, to lull clients, including Plaintiffs and Class

Members, into a false sense of security and to assure payment of the excess premiums.

Likewise, inclusion of the excess amount of premium resulting from Wells

Fargo/Acordia and the Insurer Defendants' scheme in invoices forwarded to each Plaintiff

without explanation or a separate accounting for the excess premium was necessary to

conceal the scheme and to assure payment of the entire invoice amount.

The fraudulent scheme and the conspiracy in furtherance of the scheme

proximately caused the cost of insurance obtained by Plaintiffs and Class Members to

increase because the kickbacks paid to Wells Fargo/Acordia were included in the price of

insurance paid by Plaintiffs and Class Members.  In addition, Plaintiffs and Class

Members reasonably relied on Wells Fargo/Acordia's representations and the Defendants'

omissions in paying higher premiums that included the kickbacks to Wells

Fargo/Acordia.

Despite Wells Fargo/Acordia's duties to its clients, despite Wells Fargo/Acordia's

acknowledgement of its obligations and despite Wells Fargo/Acordia's representations,

Wells Fargo/Acordia did not act in its clients' best interests but instead engaged in a

fraudulent scheme designed to increase the profits of Wells Fargo/Acordia and its insurer

partners at the expense of its clients.

### d.  State whether there has been a criminal conviction in regard to the predicate acts;

To date, there have been ten criminal convictions in connection with the

allegations in the complaints in the following proceedings:

a.  *People v. Patricia Abrams* (N.Y. County Supreme Court) (felony complaint against former ACE executive resulting in guilty plea entered on or about October 14, 2004);

      b.       *People v. Karen Radke* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about October 14, 2004);

      c.       *People v. Jean-Baptiste Tateossian* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about October 14, 2004);

      d.       *People v. John Keenan* (N.Y. County Supreme Court) (felony complaint against former Zurich American Insurance Company executive resulting in guilty plea entered on or about November 16, 2004);

      e.       *People v. Edward Coughlin* (N.Y. County Supreme Court) (felony complaint against former Zurich American Insurance Company executive resulting in guilty plea entered on or about November 16, 2004);

      f.       *People v. Robert Stearns* (N.Y. County Supreme Court) (felony complaint against former Marsh executive resulting in guilty plea entered on or about January 4, 2005);

      g.       *People v. Carlos Coello* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about January 19, 2005);

      h.       *People v. John Mohs* (N.Y. County Supreme Court) (felony complaint against former AIG executive resulting in guilty plea entered on or about January 25, 2005);

      i.       *People v. Joshua M. Bewlay* (N.Y. County Supreme Court) (felony complaint against former Marsh executive resulting in guilty plea entered on or about February 14, 2005); and

      j.       *People v. Kathryn Winter* (N.Y. County Supreme Court) (felony complaint against former Marsh executive resulting in guilty plea entered on or about February 18, 2005).

In addition, the following persons have now been indicted:

Kevin Bott

Greg Doherty

Kathleen Drake

William Gilman

Thomas T. Green

Regina Hatton

Edward Keane Jr.

William McBurnie

Edward McNenny

Nicole Michaels

Todd Murphy

Joseph Peiser

James Spiegel

**e.      State whether civil litigation has resulted in a judgment in regard to the predicate acts;**

Several Defendants have settled with regulators for the conduct at issue in this

case as set forth in the Second Amended Complaint.

**f.      Describe how the predicate acts form a "pattern of racketeering activity"; and**

Defendants' predicate acts form a "pattern of racketeering activity" consisting of

multiple related acts of racketeering activity since at least the mid to late 1990's.  Each

and every predicate act of mail and wire fraud was related in that the purpose of each was

to prevent detection of the scheme involving allocation of business to the insurer

Defendants.  Each predicate act involved the same or similar participants–the broker

Defendant and the Insurer Defendants associated with each broker-centered enterprise.

Each predicate act involved the same method of commission including the transmittal of

documents to the Broker Defendants' clients which included misrepresentations and

omissions aimed at preventing detection of the Defendants' scheme.  The predicate acts

had the similar result of obscuring Defendants' activities and impacted similar victims–the

clients of the Broker Defendants, including Plaintiffs and Members of the Class. The predicate acts amount to continued racketeering activity in that the predicate acts occurred repeatedly over an extended period of time, beginning in the mid to late 1990's. Accordingly, the predicate acts constitute a "pattern of racketeering activity."

       **g.** **State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe in detail.**

       The predicate acts of mail fraud and wire fraud were part of a common plan whereby the members of each broker-centered Enterprise engaged in numerous acts of mail and wire to conceal and prevent detection of a scheme whereby the broker defendants consolidated their markets and allocated their business to the Insurer Defendants associated with their Enterprise.

**6.** **State whether the existence of an "enterprise" is alleged within the meaning of 18 U.S.C. § 1961(4). If so, for each such enterprise, provide the following information:**

       Six association in fact enterprises are alleged.

       **a.** **State the names of the individuals, partnerships, corporations, associations or other legal entities, which allegedly constitute the enterprise.**

       Each of the following constitutes a group of persons or entities associated in fact:

       (1)    Marsh, ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, Munich, St. Paul Travelers, XL and Zurich (the "Marsh Enterprise"). The Marsh Enterprise is an ongoing organization which has existed continuously since the mid to late 1990's.

       (2)    Aon, ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, St. Paul Travelers, Zurich and XL (the "Aon Enterprise") The Aon Enterprise is an ongoing organization which has existed continuously since the mid to late 1990's.

       (3)    Willis, ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, St. Paul Travelers and Zurich (the "Willis Enterprise") The Willis Enterprise is an ongoing organization which has existed continuously since the mid to late 1990's.

(4)      Gallagher, AIG, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford and St. Paul Travelers (the "Gallagher Enterprise").  The Gallagher Enterprise is an ongoing organization which has existed continuously since the mid to late 1990's.

(5)      HRH, CNA, Hartford and St. Paul Travelers (the "HRH Enterprise"). The HRH Enterprise is an ongoing organization which has existed continuously since the mid to late 1990's.

(6)      Wells Fargo/Acordia, Chubb, CNA, Fireman's Fund, Hartford and St. Paul Travelers (the "Wells Fargo/Acordia Enterprise").  The Wells Fargo/Acordia Enterprise is an ongoing organization which has existed continuously since the mid to late 1990's.

**b.      Describe the structure, purpose, function and course of conduct of the enterprise;**

The purpose of each Enterprise is (1) to make money through the creation of a defined and limited group of insurance carriers to which the broker defendant steers the insurance business of class members with limited or no competition in exchange for sharing increased profits and (2) to conceal this scheme from customers.

The structure for decision-making within each enterprise includes the following: (1) one or more broker executives who have responsibility and authority for interfacing with the insurers to determine compensation, to plan for the steering or retention of business, and to monitor and direct that business be retained or steered to insurer members of the enterprise; (2) broker account executives who implement direction regarding the retention or steering of business; (3) one or more executives at each insurer who have the  responsibility and authority to plan with the broker, to monitor the placement of business and to determine compensation for the steering or retention of business; (4) an employee or employees of the insurer who monitor(s) and reports placement volume to insurer executives as well as the broker; (5) an employee or employees of the broker who keeps track of reports received from the insurers regarding

placement volume; (6) an employee or employees who implement decisions regarding the placement of business; and (7) an employee or employee who factor(s) the cost of the kickbacks into the insurance premiums paid by Plaintiffs and Class Members.   In addition, the broker assumes primary responsibility for concealment of the scheme with support and assistance from the insurer members of the enterprise.

Each enterprise has undertaken a course of conduct to develop, coordinate, monitor and conceal the fraudulent scheme.

> **c.      State whether any defendants are employees, officers or directors of the alleged enterprise;**

Defendants are not employees, officers or directors of any of the Enterprises.

> **d.      State whether any defendants are associated with the alleged enterprise;**

The Marsh Enterprise Defendants associated with, participate in and control the affairs of the Marsh Enterprise.

The Aon Enterprise Defendants are associated with, participate in and control the affairs of the Aon Enterprise.

The Willis Enterprise Defendants are associated with, participate in and control the affairs of the Willis Enterprise.

The Gallagher Enterprise Defendants are associated with, participate in and control the affairs of the Gallagher Enterprise.

The HRH Enterprise Defendants are associated with, participate in and control the affairs of the HRH Enterprise.

The Wells Fargo/Acordia Enterprise Defendants are associated with, participate in and control the affairs of the Wells Fargo/Acordia Enterprise.

     **e.**    **State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise; and**

While these Defendants participate in and are members of each enterprise as indicated above, they have an existence separate and distinct from the enterprise.

     **f.**    **If any defendants are alleged to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.**

Defendants are perpetrators of the racketeering activity.

**7.**    **State and describe in detail whether you are alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

The racketeering activity and the enterprise are separate. The members of each Enterprise share a common purpose and each Enterprise is continuing and has a structure for decision-making and for oversight, coordination and facilitation of the predicate offenses. The pattern of racketeering activity includes numerous acts of mail and wire fraud in furtherance of a fraudulent scheme whereby each Broker Defendant allocates business to the Insurer members in exchange for kickbacks in the form of contingent commissions and/or other payments.

**8.**    **Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity. Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

Each Enterprise oversees, coordinates and facilitates the commission of numerous predicate offenses. The daily activities of the enterprise include some legitimate activities relating to the distribution of insurance on a competitive basis. The racketeering activity is comprised of a fraudulent scheme to allocate business on a noncompetitive basis resulting in additional profits for all Defendants as well as concealment of the scheme.

9.     **Described what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.**

Each Enterprise benefits from the pattern of racketeering through reduced

competition and additional profits as well as concealment of the scheme.

10.    **Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

Each Enterprise operates on a nation-wide basis and utilizes interstate

communications including United States mail and wire across state lines. The activities of

the enterprises are national in scope, affecting most of the commercial insurance market

in the United States.  The enterprises have a substantial impact upon the economy and

upon interstate commerce.

11.    **If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

Plaintiffs do not allege a violation of 18 U.S.C. § 1962(a).

a.     **State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

Not applicable.

b.     **Describe the use or investment of such income.**

Not applicable.

12.    **If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

Plaintiffs do not allege a violation of 18 U.S.C. § 1962(b).

13.    **If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

a.     **State who is employed by or associated with the enterprise; and**

Marsh, ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, Munich, St. Paul Travelers, XL and Zurich are associated with the Marsh Enterprise.

Aon, ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, St. Paul Travelers, Zurich and XL are associated with the Aon Enterprise.

Willis, ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, St. Paul Travelers and Zurich are associated with the Willis Enterprise.

Gallagher, AIG, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford and St. Paul Travelers are associated with the Gallagher Enterprise.

HRH, CNA, Hartford and St. Paul Travelers are associated with the HRH Enterprise.

Wells Fargo/Acordia, Chubb, CNA, Fireman's Fund, Hartford and St. Paul Travelers are associated with the Wells Fargo/Acordia Enterprise.

**b.     State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

The same entity is not both the liable person and the enterprise under § 1962(c).

**c.     Describe specifically how the defendant(s) participated in the operation or management of the enterprise.**

As set forth herein, each Defendant had officers and employees who had responsibility for participating in, operating and managing each enterprise. The Broker Defendants have participated in the operation or management of each Enterprise in at least the following ways:

a.     consolidation of the broker's insurance markets;

    b.      reaching agreement with the Insurer Defendants with whom the Broker

            Defendant is associated regarding amount of contingent commissions to be

            paid to the Broker and the level of business to be steered to each Insurer

            Defendant;

    c.      the monitoring of current and new business;

    d.      determining whether a partner carrier is to retain current business and the

            insurer partner to whom new business is to be steered;

    e.      steering of business to preferred partners;

    f.      collection of inflated premiums; and coordinating concealment of the scheme.

The Insurer Defendants have participated in the operation or management of each

Enterprise with which they are associated in at least the following ways:

    a.   reaching agreement with the Broker Defendants with whom the Insurer

        Defendant is associated regarding amount of contingent commissions to be paid

        to the Broker and the level of business to be steered to each Insurer Defendant;

    b.   monitoring and reporting of business levels;

    c.   computation of premium levels to encompass contingent commissions;

    d.   payment of kickbacks; and coordinating concealment of the scheme.


**ALTERNATIVE ENTERPRISE RESPONSES:**

**6.     State whether the existence of an "enterprise" is alleged within the meaning of 18 U.S.C. § 1961(4).   If so, for each such enterprise, provide the following information:**

    **a.     State the names of the individuals, partnerships, corporations, associations or other legal entities, which allegedly constitute the enterprise.**

CIAB is a legal entity which constitutes a RICO enterprise referred to herein at the "CIAB Enterprise."

**b.      Describe the structure, purpose, function and course of conduct of the enterprise;**

The purpose of the CIAB Enterprise is to further the interests of larger brokers generally and to further the Defendants' scheme specifically including implementation and concealment of the scheme.  The CIAB Enterprise has a structure for decision-making that includes an Executive Committee , Board of Directors and various other committees and decision-making structures as well as the Council of Insurance Company Executives.

**c.      State whether any defendants are employees, officers or directors of the alleged enterprise;**

Defendants are not employees of the CIAB Enterprise.  However, at times, Defendants or representatives of Defendants have served as officers or directors within the CIAB Enterprise.

**d.      State whether any defendants are associated with the alleged enterprise;**

Defendants are associated with the enterprises and participate and control the affairs of the CIAB Enterprise.  Defendants' control and participation in the enterprise is necessary for the successful operation of Defendants' scheme.  While Defendants participate in and are members of the Enterprise, Defendants also have an existence separate and distinct from the Enterprise.

**e.      State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise; and**

Defendants are members of the CIAB Enterprise but have an existence separate and distinct from the Enterprise.

      **f.**     **If any defendants are alleged to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.**

Defendants are perpetrators of the racketeering activity.

**7.**     **State and describe in detail whether you are alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

The CIAB enterprise is a legal entity that has an ascertainable structure separate and apart from the pattern of racketeering activity in which the defendants have engaged. The Defendants have engaged in continuing mail and wire fraud in order to further and to conceal their fraudulent scheme.

**8.**     **Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.  Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

Defendants have been enabled to commit the predicate offenses solely by virtue of their position in the CIAB Enterprise or involvement in or control over the affairs of the CIAB Enterprise.  Defendants were able to devise, implement and conceal their scheme through CIAB.  Concealment as well as controlled and coordinated representations and disclosures, which were crucial to the success of the scheme, could not have occurred absent the coordinating mechanism of CIAB.  Defendants not only used CIAB as the vehicle for developing, coordinating, monitoring and concealing the scheme but also to disseminate misrepresentations in furtherance of the scheme.  Absent the Defendants' participation in and control of CIAB, the Defendants would have been unable to perpetrate the fraudulent scheme and the attendant predicate acts.  CIAB provided Defendants the necessary mechanism for decision-making regarding the

fraudulent scheme, regarding concealment of Defendants' relationships and activities, and regarding controlled and coordinated representations and disclosures.  The CIAB Enterprise is separate and distinct from the pattern of racketeering activity.  However, the predicate offenses are related to the activities of the CIAB Enterprise.  The purpose of the CIAB Enterprise is furtherance of the interest of large brokers generally and furtherance of the Defendants' scheme more specifically.  Accordingly, the predicate acts taken in furtherance of the scheme necessarily relate to the CIAB Enterprise. The racketeering activity differs significantly from the usual and daily activities of the CIAB enterprise which include political advocacy and continuing education opportunities for member brokers.

**9.      Described what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.**

CIAB is a membership organization.  The members of CIAB benefit tremendously from the pattern of racketeering.  Likewise, members of CICE benefit from the pattern of racketeering.  Accordingly, CIAB benefits from the pattern of racketeering through continuing and increased participation by its most powerful and wealthy members and through continued sponsorship by the Insurer Defendants.

**10.      Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

The activities of the CIAB Enterprise are national in scope, affecting must of the commercial insurance market in the United States.  The CIAB Enterprise has a substantial impact upon the economy and upon interstate commerce.  The activities of the Enterprise were carried out through mail, wire and other facilities of interstate commerce.

**11.      If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

Plaintiffs do not allege a violation of 18 U.S.C. § 1962(a).

**a.      State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

Not applicable

**b.      Describe the use or investment of such income.**

Not applicable.

**12.    If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

Plaintiffs do not allege a violation of 18 U.S.C. § 1962(b).

**13.    If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

**a.      State who is employed by or associated with the enterprise; and**

The CIAB Enterprise has several employees.  The Broker Defendants and Insurer

Defendants are associated with the Enterprise.

**b.      State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

The same entity is not both the liable person and the enterprise under § 1962(c).

**c.      Describe specifically how the defendant(s) participated in the operation or management of the enterprise.**

The Broker Defendants have participated in the operation or management of the

CIAB Enterprise in the at least the following ways:

a.      through the positions held in CIAB by the Broker Defendants' employees and officers including board memberships, committee memberships and other influential positions and as a result of the power the Broker Defendants enjoyed in CIAB as a consequence of their size and market share;

b.      by developing methods for concealment of the fraudulent scheme;

c.      by submitting false or misleading information to customers;

d.      by consolidating markets and steering business to strategic insurance partners;

e.       in some instances by bid rigging; and

f.       by sharing information relating to such matters as market conditions, placements and payments.

The Insurer Defendants have participated in the operation or management of the Enterprise in at least the following ways:

a.       through their position in CICE, their sponsorship of CIAB, their attendance at the Insurance Leadership Forum at The Greenbrier and as a result of their importance to CIAB and CIAB's members

b.       by developing methods for concealment of the fraudulent scheme;

c.       by kicking back profits to the Broker Defendants;

d.       by submitting false or misleading information to customers or to brokers for submission to customers;

e.       by providing or withholding quotes as directed by Broker Defendants;

f.       by sharing information relating to such matters as market conditions, placements and payments.

**14.    If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.**

Since at least 1998, Marsh, Aon, Willis, Gallagher, HRH and Wells Fargo/Acordia have conspired to facilitate the scheme being operated through each of the Broker-Centered Enterprises and to further their common purpose of preventing detection of these schemes through misrepresentations, concealment and coordinated and controlled disclosures.  The Broker Defendants' conspiracy has been conducted, implement and facilitated through the sharing of information among the Broker Defendants and through their participation in CIAB.  The purpose and effect of the conspiracy was to prevent Plaintiffs and Members of the Class from becoming aware of the terms and the significance of the contingent commission agreements between the

Defendants and the conflicts of interest arising out of the Broker Defendants' strategic partnerships with the Insurer Defendants, thereby allowing the Broker Defendants to increase the compensation they received from the Insurer Defendants.  The Broker Defendants accomplished this by conspiring with one another to adopt substantially similar vague and incomplete disclosure (or non-disclosure) policies regarding contingent compensation matters modeled after CIAB's 1998 position statement and by employing CIAB to engage in a public relations campaign designed to create the impression that "full disclosure" was the industry standard and to oppose any efforts to require meaningful disclosure of contingent commission arrangements.  Through their coordinated efforts, the Broker Defendants were able to successfully prevent insurance purchasers from becoming aware of the true nature of the relationships between the Broker Defendants and the Insurer Defendants and from obtaining actual and complete disclosure of the manner in which the Broker Defendants were compensated by the Insurer Defendants. Each Broker Defendant was aware of the general nature of the conspiracy and its role in facilitating the objectives of the conspiracy.  Further, each Broker Defendant has agreed to the overall objective of the conspiracy.  Each Broker Defendant has committed overt acts in furtherance of the alleged conspiratorial objectives.  As a result of the Broker Defendants' conspiracy, Plaintiffs and other Members of the Class have paid more than they otherwise would have paid for insurance they procured through the Broker Defendants.

Additionally, the following broker-centered conspiracies have existed since the mid to late 1990's:

(1)     A conspiracy involving the Marsh Enterprise Defendants in furtherance of the fraudulent scheme and to conceal the scheme.

(2)     A conspiracy involving the Aon Enterprise Defendants in furtherance of the fraudulent scheme and to conceal the scheme.

(3)     A conspiracy involving the Willis Enterprise Defendants in furtherance of the fraudulent scheme and to conceal the scheme.

(4)     A conspiracy involving the Gallagher Enterprise Defendants in furtherance of the fraudulent scheme and to conceal the scheme.

(5)     A conspiracy involving the HRH Enterprise Defendants in furtherance of the fraudulent scheme and to conceal the scheme.

(6)     A conspiracy involving the Wells Fargo Enterprise Defendants in furtherance of the fraudulent scheme and to conceal the scheme.

The purpose and effect of each broker-centered conspiracy was to engage in a scheme whereby each Broker Defendant would steer business to its strategic partner Insurer Defendants and protect them from competition in exchange for increased compensation paid to the Broker Defendants in the form of contingent commissions, and to conceal the existence of the scheme from each Broker Defendant's clients.  Each Defendant within each broker-centered conspiracy was aware of the general nature of the conspiracy and its role in facilitating the objectives of the conspiracy.  Further, each Defendant within each broker-centered conspiracy has agreed to the overall objective of the conspiracy.  Each Defendant within each broker-centered conspiracy had committed overt acts in furtherance of the alleged conspiratorial objective.  As a result of the broker-centered conspiracies, Plaintiffs and other Members of the Class have paid more they otherwise would have for insurance that they procured through the Broker Defendants.

Alternatively, Plaintiffs allege that the Defendants have conspired to violate 18 U.S.C. § 1962(c). The conspiracy has been conducted, implemented and facilitated through CIAB.  The purpose and effect of the conspiracy was to prevent Plaintiffs and

Members of the Class from becoming aware of the terms and the significance of the contingent commission agreements between the Defendants and the conflicts of interest arising out of the Broker Defendants' strategic partnerships with the Insurer Defendants, thereby allowing the Broker Defendants to increase the compensation they received from the Insurer Defendants and the Insurer Defendants to increase the business they received from the Broker Defendants without competition. Each Defendant was aware of the general nature of the conspiracy and its role in facilitating the objectives of the conspiracy. Further, each Defendant has agreed to the overall objective of the conspiracy. Each Defendant has committed overt acts in furtherance of the alleged conspiratorial objectives. As a result of the Defendants' conspiracy, Plaintiffs and other Members of the Class have paid more than they otherwise would have paid for insurance they procured through the Broker Defendants.

**15.    Describe the alleged injury to business or property.**

Plaintiffs and Class Members have been injured in their business or property by paying excessive premiums for insurance.

**16.    Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

The fraudulent scheme and conspiracy involving each Broker Defendant and the Insurer Defendants associated in the broker-centered enterprise with the Broker Defendant and the conspiracy between Marsh, Aon, Willis, Gallagher, HRH and Wells Fargo/Acordia to prevent detection of each broker's fraudulent scheme proximately caused the cost of insurance obtained by Plaintiffs and Class Members to increase because the kickbacks paid to the Broker Defendant were included in the price of insurance paid by Plaintiffs and Class Members. In addition, Plaintiffs and Class

Members reasonably relied on the Broker Defendant's representations and omissions in paying higher premiums that included the kickbacks to the Broker Defendant.

**17.    List the damages sustained by reason of the violation of § 1962, indicating the amount for which each defendant is allegedly liable.**

Each and every Defendant is jointly and severally liable for treble the damages sustained by each Plaintiff and Class Member by paying higher premiums as a result of Defendants' fraud and conspiracy.

**18.    List all other Federal causes of action, if any, and provide the relevant statute numbers.**

The following additional Federal claim has been alleged in the actions currently pending before the Court:  Sherman Act, 15 U.S.C. § 1.

**19.    List all pendent state claims, if any.**

Plaintiffs allege several state claims for which independent jurisdiction existence pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. 1332(d)(2), *et seq*

These claims include claims for unjust enrichment and breach of fiduciary duty as well as for violations of the statutes listed below:

State Antitrust Laws

Alaska Sta. §§45.50.462 *et seq.*

Arizona Revised Stat. §§44-1401 *et seq.*

Arkansas Stat. Ann. §44-75-309 *et seq.*, §§4-75-201 *et seq.*

Cal. Bus.  Prof. Code §§16700 *et seq.*, §§17000 *et seq.*

Colorado Rev. Stat. §§6-4-101 *et seq.*

Connecticut Gen. Stat. §§35-26 *et seq.*

D.C. Code Ann. §§28-4503 *et seq.*

Delaware Code Ann. Tit. 6, §§2103 *et seq.*

Florida Stat. §§501-201 *et seq.*

Georgia Code Ann. §§16-10-22 *et seq*, §§ 13-8-2 *et seq.*

Hawaii Rev. Stat. §§480-1 *et seq.*

Idaho Code §§48-101 *et seq.*

740 Illinois Comp. Stat. §§10/1 *et seq.*

Indiana Code Ann. §§24-1-2-1 *et seq.*

Iowa Code §§553.1 *et seq.*

Kansas Stat. Ann. §§50-101 *et seq.*

Kentucky Rev. Stat. §§367.175 *et seq.*, §446.070

Louisiana Rev. Stat. §§55:137 *et seq.*

Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

Maryland Code Ann. Title 11, §§11-201 *et seq.*

Massachusetts Ann. Laws ch. 92 §§1 *et seq.*

Michigan Comp. Laws. Ann. §§445.773 *et seq.*

Minnesota Stat. §§325D.52 *et seq.*

Mississippi Code Ann. §§75-21-1 *et seq.*

Missouri Stat. Ann. §§416.011 *et seq.*

Montana Code Ann. §§30-14-101 *et seq.*

Nebraska Rev. Stat. §§59-801 *et seq.*

Nev. Rev. Stat. Ann. §§598A *et seq.*

New Hampshire Rev. Stat. Ann. §§356:1 *et seq.*

New Jersey Stat. Ann. §§56:9-1 *et seq.*

New Mexico Stat. Ann. §§57-1-1 *et seq.*

N.Y. Gen. Bus. Law §§340 *et seq.*

North Carolina Gen. Stat. §§75-1 *et seq.*

North Dakota Cent. Code §§51-08.1-01 *et seq.*

Ohio Rev. Code §§1331.01 *et seq.*

Oklahoma Stat. tit. 79 §§203(A) *et seq.*

Oregon Rev. Stat. §§646.705 *et seq.*

Rhode Island Gen. Laws §§6-36-1 *et seq.*

South Carolina Code §§39-1-10 *et seq.*

South Dakota Codified Laws Ann. §§37-1 *et seq.*

Tennessee Code Ann. §§47-25-101 *et seq.*

Texas Bus. & Com. Code §§15.01 *et seq.*

Utah Code Ann. §§76-10-911 *et seq.*

Vermont Stat. Ann. 9 §§2453 *et seq.*

Virginia Code §§59-1-9.2 *et seq.*

Washington Rev. Code §§19.86.010 *et seq.*

West Virginia §§47-18-1 *et seq.*

Wisconsin Stat. §§133.01 *et seq.*

Wyoming Stat. §§40-4-101 *et seq.*

**20.    Provide any additional information that you feel would be helpful to the Court in processing your RICO claim.**

Dated: May 22, 2007                          Respectfully submitted,

                                             **WHATLEY, DRAKE & KALLAS, LLC**

                                             ___/s/ *Edith M. Kallas*_____

Edith M. Kallas
Joseph P. Guglielmo
Elizabeth Rosenberg
Lili R. Sabo
1540 Broadway, 37th Floor
New York, NY 10036
Tel.:  212-447-7070
Fax:  212-447-7077

**CAFFERTY FAUCHER LLP**

_____/s/ Bryan L. Clobes_____

Bryan L. Clobes
Ellen Meriwether
Melody Forrester
Timothy Fraser
One Logan Square
18th and Cherry Streets, Suite 1700
Philadelphia, PA  19103
Tel.:  215-864-2800
Fax:  215-864-2810

_Plaintiffs' Co-Lead Counsel_

**FOOTE, MEYERS, MIELKE &
FLOWERS**
Robert M. Foote
416 South Second Street
Geneva, IL 60134
Tel.:  630-232-6333

**LEVIN, FISHBEIN, SEDRAN &
BERMAN**
Howard J. Sedran
510 Walnut Street - Suite 500
Philadelphia, PA  19106
Tel.:  215-592-1500
Fax:  215-592-4663

_Plaintiffs' Executive Committee_

**LITE DEPALMA GREENBERG
  & RIVAS, LLC**
Allyn Z. Lite
Bruce D. Greenberg
Michael E. Patunas
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel.:  973-623-3000
Fax:  973-623-0858

_Liaison Counsel for Commercial Insurance
Litigation_

**BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.**
Andrew S. Friedman
Elaine A. Ryan
Patricia N. Hurd
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Tel.:  602-274-1100
Fax:  602-274-1199

*Liaison Counsel for Employee-Benefit
Litigation*

**AUDET & PARTNERS, LLP**
William M. Audet
221 Main Street
Suite 1460
San Francisco, CA 94105
Tel.:  415-568-2555
Fax:  415-568-2556

**BEELER, SCHAD & DIAMOND, P.C.**
Lawrence W. Schad
James Shedden
Michael S. Hilicki
Tony H. Kim
332 South Michigan Avenue, Suite 1000
Chicago, IL 60604
Tel.: 312-939-6280
Fax:  312-939-4661

**BOLOGNESE & ASSOCIATES**
Anthony J. Bolognese
One Penn Center
1617 John F. Kennedy Boulevard
Suite 650
Philadelphia, PA 19103
Tel.: 215-814-6750
Fax.: 215-814-6764

**BONSIGNORE & BREWER**
Robert J. Bonsignore
Robin Brewer
Daniel D'Angelo
23 Forest Street
Medford, MA 02155
Tel.: 781- 391-9400
Fax: 781- 391-9496

**CAREY & DANIS L.L.C.**
Michael J. Flannery
James Rosemergy
8235 Forsyth Blvd.
Suite 1100
St. Louis, MO 63105
Tel.: 314-725-7700
Fax: 314-721-0905

**CHAVEZ LAW FIRM, P.C.**
Kathleen C. Chavez
P.O. Box 772
Geneva, IL 60134
Tel.: 630-232-4480
Fax: 630-232-8265

**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles
Michael D. Gottsch
361 West Lancaster Avenue
Haverford, PA  19041
Tel.: 610-642-8500
Fax: 610-649-3633

**COHN, LIFLAND, PEARLMAN,
  HERRMANN & KNOPF**
Peter S. Pearlman
Park 80 Plaza West One
Saddle Brook, NJ  07663
Tel.: 201-845-9600
Fax: 201-845-9423

**COOPER & KIRKHAM, P.C.**
Josef D. Cooper
655 Montgomery Street, 17th Floor
San Francisco, CA 94111
Tel.:  415-788-3030
Fax:  415-882-7040

**DOFFERMYRE SHIELDS CANFIELD
KNOWLES & DEVINE**
Kenneth S. Canfield
Ralph I. Knowles, Jr.
Martha J. Fessenden
Samuel W. Wethern
1355 Peachtree Street, Suite 1600
Atlanta, GA 30309
Tel.:  404-881-8900
Fax:  404-881-3007

**DRUBNER HARTLEY & O'CONNOR**
James E. Hartley, Jr.
Gary O'Connor
Charles S. Hellman
500 Chase Parkway, 4th Floor
Waterbury, CT 06708
Tel.:  203-753-9291
Fax:  203-753-6373

**EYSTER KEY TUBB WEAVER &
ROTH, LLP**
Nicholas B. Roth
Heather Necklaus Hudson
P.O. Box 1607
Decatur, AL 35602
Tel: 256- 353-6761
Fax: 256- 353-6767

**FINE KAPLAN & BLACK**
Roberta D. Liebenberg
1835 Market Street, 28th Floor
Philadelphia, PA 19103
Tel.:  215-567-6565
Fax:  215-568-5872

**FINKELSTEIN, THOMPSON**
**& LOUGHRAN**
Burton H. Finkelstein
L. Kendall Satterfield
Halley F. Ascher
1050 30th Street, N.W.
Washington, D.C.  20007
Tel.:  202-337-8000
Fax:  202-337-8090

**FURTH LEHMANN & GRANT, LLP**
Michael P. Lehmann
Thomas P. Dove
Julio J. Ramos
Jon T. King
225 Bush Street, Suite 1500
San Francisco, CA 94104
Tel.:  415-433-2070
Fax:  415-982-2076

**GRAY AND WHITE**
Mark K. Gray
1200 PNC Plaza
Louisville, KY 40202
Tel.:  502-585-2060

**HANSON BRIDGES MARCUS**
**VLAHOS**
 **RUDY LLP**
David J. Miller
333 Market Street, 23rd Floor
San Francisco, CA 94105
Tel.:  415-777-3200
Fax:  415-541-9366

**HANZMAN CRIDEN & LOVE, P.A.**
Michael E. Criden
Kevin B. Love
Plaza 57
7301 SW 57th Court
Suite 515
South Miami, Florida 33143
Tel.:  305-357-9010
Fax:  305-357-9050

**JANSSEN, MALLOY, NEEDHAM,
  MORRISON, REINHOLTSEN &
  CROWLEY, LLP**
W. Timothy Needham
730 Fifth Street, Post Office Drawer 1288
Eureka, CA 95502
Tel.:  707-445-2071
Fax:  707-445-8305

**JEFFREY BRODKIN**
1845 Walnut Street, 22nd Floor
Philadelphia, PA 19103
Tel.: 215-567-1234
Fax.: 609-569-0809

**JEFFREY LOWE, P.C.**
Jeff Lowe
8235 Forsyth Blvd., Ste. 1100
St. Louis, MO 63105
Tel.:  314-721-3668
Fax:  314-678-3401

**JOHN P. MCCARTHY**
217 Bay Avenue
Somers Point, NJ 08224
Tel.: 609-653-1094
Fax.: 60-653-3029

**KLAFTER & OLSEN LLP**
Jeffrey A. Klafter
1311 Mamaroneck Avenue, Suite 220
White Plains, NY  10602
Tel.:  914-997-5656
Fax:  914-997-2444

**LARRY D. DRURY, LTD.**
Larry D. Drury
205 West Randolph, Suite 1430
Chicago, IL  60606
Tel.:  312-346-7950
Fax:  312-346-5777

**LAW OFFICES OF GARY H.**
**SAPOSNIK**
Gary H. Saposnik
105 West Madison Street, Ste. 700
Chicago, IL 60602
Tel: 312- 357- 1777
Fax: 312- 606- 0413

**LAW OFFICES OF RANDY R. RENICK**
Randy R. Renick
128 North Fair Oaks Avenue, Ste. 204
Pasadena, CA 91103
Tel.:  626-585-9608
Fax:  626-585-9610

**LERACH COUGHLIN STOIA GELLER**
  **RUDMAN & ROBBINS, LLP**
John J. Stoia, Jr.
Theodore J. Pintar
Bonny E. Sweeney
James D. McNamara
Mary Lynne Calkins
Rachel L. Jensen
655 West Broadway
Suite 1900
San Diego, CA 92101
Tel.:  619-231-1058
Fax:  619-231-7423

**LERACH COUGHLIN STOIA GELLER**
  **RUDMAN & ROBBINS, LLP**
Samuel H. Rudman
200 Broadhollow Road, Suite 406
Melville, NY 11747
Tel.:  631-367-7100
Fax:  631-367-1173

**LEVINE DESANTIS, LLC**
Mitchell B. Jacobs
150 Essex St., Ste. 303
Millburn, New Jersey 07041
Tel: 973-376-9050
Fax: 973-379-6898

**LOOPER, REED & MCGRAW**
James L. Reed, Jr.
Travis Crabtree
1300 Post Oak Blvd. Ste. 2000
Houston, TX 77056
Tel.: 713- 986- 7000
Fax: 713- 986- 7100

**MAGER & GOLDSTEIN, LLP**
Jayne Arnold Goldstein
2825 University Drive, Suite 350
Coral Springs, FL 33065
Tel.:  954-341-0844
Fax:  954-341-0855

**MEREDITH COHEN GREENFOGEL**
  **& SKIRNICK, P.C.**
Steven J. Greenfogel
Daniel B. Allanoff
Architects Building, 22nd Floor
117 South 17th Street
Philadelphia, PA 19103
Tel.:  215-564-5182
Fax:  215-569-0958

**PHILIP STEINBERG**
124 Rockland Avenue
Bala Cynwood, PA 19004
Tel.: 610-664 3101
Fax.: 610-664-0972

**SAVERI & SAVERI, INC.**
Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
One Eleven Pine, Suite 1700
San Francisco, CA  94111-5619
Tel.:  415-217-6810
Fax:  415-217-6813

**SHAHEEN & GORDON**
William Shaheen
D. Michael Noonan
140 Washington St., 2nd Fl.
P.O. Box 977
Dover, NH  03821-0977
Tel.: 603-749-5000
Fax: 603-749-1838

**SHERMAN, SILVERSTEIN, KOHL,**
 **ROSE & PODOLSKY**
Alan C. Milstein
Jeffrey P. Resnick
Fairway Corporate Center
4300 Haddonfield Road, Ste. 311
Pennsauken, NJ 08109
Tel: 856- 662- 0700
Fax: 856- 488- 4744

**SPECTOR, ROSEMAN & KODROFF,**
**P.C.**
Theodore M. Lieverman
Eugene A. Spector
Jay S. Cohen
1818 Market Street, Suite 2500
Philadelphia, PA 19102
Tel.: 215-496-0300
Fax: 215-496-6611

**TRUJILLO RODRIGUEZ &**
**RICHARDS, LLP**
Lisa J. Rodriguez
8 Kings Highway West
Haddonfield, NJ 08033
Tel: 856-795-9002

**WHATLEY, DRAKE & KALLAS, LLC**
Joe R. Whatley, Jr.
Charlene Ford
Richard Rouco
2001 Park Place North
Suite 1000
Birmingham, AL 35203
Tel.:  205-328-9576
Fax:  205-328-9669

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**
Mary Jane Edelstein Fait
Adam J. Levitt
656 West Randolph Street
Suite 500 West
Chicago, IL 60661
Tel.:  312-466-9200
Fax:  312-466-9292

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**
Fred Taylor Isquith
270 Madison Avenue, 10th Floor
New York, NY 10016
Tel.:  212-545-4600
Fax:  212-545-4653

**ZWERLING, SCHACHTER &
  ZWERLING, LLP**
Robert S. Schachter
Susan Salvetti
Stephen L. Brodsky
Justin M. Tarshis
41 Madison Avenue
New York, NY 10010
Tel.:  212-223-3900
Fax:  212-371-5969

*Attorneys for Plaintiffs*