UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ x | | |
| IN RE: INSURANCE BROKERAGE | : | MDL No. 1663 |
| ANTITRUST LITIGATION | : | |
| | : | Civil No. 04-5184 (GEB) |
| APPLIES TO ALL COMMERCIAL | : | |
| INSURANCE BROKERAGE ACTIONS | : | Hon. Garrett E. Brown, Jr. |
| | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| _____ x | | |

**SECOND CONSOLIDATED AMENDED**
**COMMERCIAL CLASS ACTION COMPLAINT**

**\* \* REDACTED VERSION \* \***

TABLE OF CONTENTS

1) INTRODUCTION. ...................................................................................................1

2) JURISDICTION AND VENUE ..............................................................................1

3) PARTIES ..................................................................................................................2

   1    Plaintiffs ...........................................................................................................2

   2    Defendants ........................................................................................................9

         a)    Broker Defendants ..................................................................................9

         b)    Insurer Defendants ...............................................................................12

A. STATEMENT OF FACTS ......................................................................................18

   1)    The Antitrust Claims ...................................................................................18

         a)    Overview of the Antitrust Claims .........................................................18

         b)    The Commercial Brokerage and Insurance Markets in the United States ........................................................................................20

         c)    The Rise of Contingent Commissions and Their Role in the Customer Allocation Schemes Alleged Herein .................................23

         d)    Overview of the Conspiracies ...............................................................26

         e)    Operation of the Broker Centered Conspiracies .................................30

             (1)    The Marsh Broker-Centered Conspiracy ......................................30

                  (a)    Participants in the Conspiracy .........................................30

                  (b)    Operation of the Conspiracy  ...........................................31

                        (i)    The Participants in the Marsh Broker-Centered Conspiracy Agreed that the Bulk of Marsh's Customers would be Allocated to the Conspiring Insurers ...........................................32

(ii)    The Participants in the Marsh Broker-Centered Conspiracy Agreed not to Compete for each others' Customers ....................................................35

(iii)    Marsh and Its Preferred Carriers Conspired to Protect Each Other's Incumbent Business Through Bid-Rigging and Other Overt Acts .......................37

(iv)    Marsh and Its Preferred Carriers Agreed that In Return for Contingent Commission Payments, The Insurer Would Be Guaranteed Access to a Specific Amount of Premium Volume .................42

(v)    The Insurer Defendants Understood their Role in the Conspiracy and Were Disciplined if they Did Not Go Along .................44

(vi)    Communications Among the Participants in the Marsh Broker-Centered Conspiracy Facilitated By Marsh Furthered the Conspiracy .....................45

(vii)    The Co-Conspirators benefited from The Operation of the Conspiracy ...........................48

(2)    The AON Broker-Centered Conspiracy ...........................................49

    (a)    Participants in the Conspiracy ...........................................49

    (b)    Operation of the Conspiracy ...............................................49

        (i)    The Participants in the Aon Broker-Centered Conspiracy Agreed that the Bulk of Aon's Book of Business Would Be Allocated to Aon's Strategic Partners in Exchange for Contingent Commission Payments .......................50

        (ii)    The Insurer Participants Agreed to Refrain from Competing for Each Others' Customers and Expected Aon to Protect their Renewal Business from Competition ....................................................53

(iii)    The Participants Agreed that in Return for their Contingent Commission Payments, They Would Be Guaranteed Access to a Minimum Amount of Premium Volume ...................................................54

(iv)    Aon Monitored and Enforced the Terms of the Conspiracy ........................................58

(v)    Communications Among the Participants in the Aon Broker-Centered Conspiracy, Facilitated by Aon, Made the Conspiracy Plausible ...................................................58

(vi)    The Co-Conspirators Benefited from the Operation of the Conspiracy ................................60

(3)    The Wells Fargo/Acordia Broker-Centered Conspiracy ...............60

(a)    Participants in the Conspiracy ...........................................60

(b)    Operation of the Conspiracy ...............................................61

(i)    The Participants in the Wells Fargo/Acordia Broker-Centered Conspiracy Agreed that a Substantial Portion of its Customers would be Allocated to the Conspiring Insurers ................61

(ii)    The Conspiring Insurers Agreed not to Compete With Each Other for the Wells Fargo/Acordia Business ........................................64

(iii)    The Insurer Defendants Knew Each Others' Roles in the Conspiracy ..........................65

(iv)    The Co-Conspirators Benefited from The Wells Fargo/Acordia Conspiracy ..................67

(4)    The HRH Broker-Centered Conspiracy ........................................68

(a)    Participants in the Conspiracy ...........................................68

(b)    Operation of the Conspiracy ...............................................68

(i)    The Participants in the HRH Broker-Centered Conspiracy Agreed that a Large Portion of HRH's Customers Would be Allocated to the Conspiring Insurers .................................................. 69

(ii)    The Three Conspiring Insurers Agreed not to Compete with Each Other for the HRH Business .................................................. 70

(iii)    The Insurer Defendants Knew Each Others' Role in the Conspiracy .......................... 72

(iv)    The Co-Conspirators Benefited From the Operation of the Conspiracy ................. 74

(5)    The Willis Broker-Centered Conspiracy ....................................... 75

(a)    Participants in the Conspiracy ........................................... 75

(b)    Operation of the Conspiracy ................................................ 75

(i)    The Participants in the Willis Broker-Centered Conspiracy Agreed that a Substantial Portion of its Customers would be Allocated to the Conspiring Insurers .................................................. 76

(ii)    The Conspiring Insurers Agreed not to Compete With Each Other for the Willis Business ....................................................... 81

(iii)    Willis and its Co-Conspirators Agreed that in Return for Contingent Commissions, the Insurers Would be Guaranteed Access to Premium Volume ................................................ 82

(iv)    Insurers Understood Their Role And Were Disciplined By Willis If They Did Not Participate ....................................................... 85

(v)    Communications among the Participants in the Willis Broker-Centered Conspiracy were Facilitated by Willis ....................................... 85

(vi)   The Co-Conspirators Benefited from the Willis Conspiracy ................................................. 86

(6)   The Gallagher Broker-Centered Conspiracy ................................ 88

(a)   Participants in the Conspiracy ........................................... 88

(b)   Operation of the Conspiracy ........................................... 88

(i)   The Participants in the Gallagher Broker-Centered Conspiracy Agreed that the Bulk of Gallagher's Customers would be Allocated to the Conspiring Insurers ................................................. 89

(ii)   The Participants in the Gallagher Broker-Centered Conspiracy Agreed not to Compete for each other's Customers .......... 90

(iii)   Communications Among the Participants In the Gallagher Broker-Centered Conspiracy Facilitated By Gallagher Furthered the Conspiracy ..................................... 93

(iv)   The Co-Conspirators benefited from the Operation of the Conspiracy .......................... 94

f)   The Global Conspiracy ........................................ 94

g)   The Conspiracies Raised Premium Levels To All Members Of The Class ................................... 99

2)   The RICO Claims ........................................ 100

a)   Overview of the RICO Claims ................................ 100

b)   The Broker Defendants' Duties, Fiduciary Status and Representations to Their Clients ................................... 101

c)   Defendants' Fraudulent Scheme ........................................ 105

(1)   Defendants' Active Concealment Practices ................................ 108

(a)   The Broker Defendants and Insurer Defendants Agreed to Keep Their Contingency Commission Arrangements Secret ..................................... 109

(b)    Defendants Fail to Disclose That The Cost of
Contingent Commissions Was Built Into the Price
of Premiums ..................................................................120

(c)    The Broker Defendants' Concerted Actions to
Prevent Meaningful Disclosure of Their
Contingent Commission Arrangements Is
Built Into the Price of Premiums ....................................123

(d)    Recent Regulatory Investigations Reveal
The Misleading Nature of Defendants'
Representations and Disclosure Practices........................133

d)    Racketeering Allegations .........................................................142

(1)    Enterprise ........................................................................143

(2)    Alternative Enterprise Allegations..................................146

(a)    The CIAB Enterprise .......................................146

(3)    Predicate Acts .................................................................152

e)    Conspiracy Allegations.............................................................155

f)    Injury ........................................................................................157

3)    FRAUDULENT CONCEALMENT ....................................................158

4)    CLASS ACTION ALLEGATIONS.....................................................158

COUNT I - Violation of Section 1 of the Sherman Act By the
Marsh Broker-Centered Class Against the Marsh
Broker-Centered Defendants ....................................................161

COUNT II - Violation of Section 1 of the Sherman Act By the
Marsh Broker-Centered Class Against the Marsh
Broker-Centered Excess Casualty Defendants ........................162

COUNT III - Violation of Section 1 of the Sherman Act By the
Aon Broker-Centered Class Against the Aon
Broker-Centered Defendants ....................................................163

COUNT IV - Violation of Section 1 of the Sherman Act By the
    Wells Fargo/Acordia Broker-Centered Class Against
      the Wells Fargo/Acordia Broker-Centered Defendants .......................................164

COUNT V - Violation of Section 1 of the Sherman Act
    By the Gallagher Broker-Centered Class Against
    the Gallagher Broker-Centered Defendants ............................................................165

COUNT VI - Violation of Section 1 of the Sherman Act
    By the HRH Broker-Centered Class Against
    the HRH Broker-Centered Defendants ...............................................................166

COUNT VII - Violation of Section 1 of the Sherman Act
    By the Willis Broker-Centered Class Against
    the Willis Broker-Centered Defendants ..............................................................166

COUNT VIII - Violation of Section 1 of the Sherman Act
    Against All Defendants ..................................................................................167

COUNT IX - Violation of 18 U.S.C. § 1962(c) Against
    Defendants Associated with the Marsh Enterprise ...............................................168

COUNT X - Violation of 18 U.S.C. § 1962(c) Against
    Defendants Associated with the Aon Enterprise ..................................................169

COUNT XI - Violation of 18 U.S.C. § 1962(c) Against
    Defendants Associated with the Willis Enterprise................................................170

COUNT XII - Violation of 18 U.S.C. § 1962(c) Against
    Defendants Associated with the Gallagher Enterprise........................................171

COUNT XIII - Violation of 18 U.S.C. § 1962(c) Against
    Defendants Associated with the Wells Fargo/Acordia Enterprise....................172

COUNT XIV - Violation of 18 U.S.C. § 1962(c) Against
    Defendants Associated with the HRH Enterprise ...............................................173

COUNT XV - Violation of 18 U.S.C. § 1962(d) Against
    Defendants Associated with the Marsh Enterprise .............................................174

COUNT XVI - Violation of 18 U.S.C. § 1962(d) Against
    Defendants Associated with the Aon Enterprise ................................................175

COUNT XVII - Violation of 18 U.S.C. § 1962(d) Against
    Defendants Associated with the Willis Enterprise.............................................175

COUNT XVIII - Violation of 18 U.S.C. § 1962(d) Against
      Defendants Associated with the Gallagher Enterprise...................................176

COUNT XIX - Violation of 18 U.S.C. § 1962(d) Against
      Defendants Associated with the Wells Fargo/Acordia Enterprise....................177

COUNT XX - Violation of 18 U.S.C. § 1962(d) Against
      Defendants Associated with the HRH Enterprise .................................178

COUNT XXI - Violation of 18 U.S.C. § 1962(d) Against
      All Broker Defendants ...................................................179

COUNT XXII - Violation of 18 U.S.C. § 1962(c)
      Against All Defendants ...................................................179

COUNT XXIII - Violation of 18 U.S.C. § 1962(d)
      Against All Defendants ...................................................180

COUNT XXIV - State Law Antitrust .................................................181

COUNT XXV - Breach of Fiduciary Duty Against the Broker Defendants .............186

COUNT XXVI - Aiding and Abetting Breach of Fiduciary Duty
      Against the Insurer Defendants.....................................187

COUNT XXVII - Unjust Enrichment Against the Broker and Insurer Defendants...................188

Plaintiffs, pursuant to the Order of the Court dated April 5, 2007, by and through their undersigned attorneys, allege upon their own knowledge, or where there is no personal knowledge, upon investigation of counsel or information and belief:

**1)** **INTRODUCTION**

1.    Plaintiffs, individually and on behalf of the classes defined below, hereby bring the following claims arising under the Sherman Act, the Racketeering Influenced and Corrupt Organizations Act ("RICO"), the antitrust laws of various states, and state common law.

**2)** **JURISDICTION AND VENUE**

2.    This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962 and 1964, 28 U.S.C. §§1331, 1332 and 1367, and 15 U.S.C. §15.  This Court has personal jurisdiction over the defendants pursuant to 18 U.S.C. §§1965(b) and (d). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

3.    Venue is proper in this district pursuant to 18 U.S.C. §1965(a), 28 U.S.C. §1391(b), §12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391 because some of the Defendants are found, do business or transact business within this district, and conduct the interstate trade and commerce described below in substantial part within this district.

4.    The trade and interstate commerce relevant to this action is the purchase and sale of insurance policies and related services.

5.    During all or part of the period in which the events described in this Complaint occurred, each of the defendants sold insurance and related products and services and/or provided advice regarding the procurement or renewal of insurance or claims administration relating thereto to plaintiffs and other members of the classes in a continuous and uninterrupted flow of interstate commerce.

6.      The activities of defendants and their co-conspirators, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

**3)      PARTIES**

**a)      Plaintiffs**

7.      Plaintiff OptiCare Health Systems, Inc. ("OptiCare") is a corporation incorporated under the laws of Delaware and has its principal place of business in Waterbury, Connecticut. OptiCare is an integrated eye care services company that, among other things, provides managed vision and professional eye care products and services.  At all material times herein, OptiCare was a party to agreements with defendant Marsh USA Inc. (Connecticut) ("Marsh Connecticut") and Hilb Rogal & Hobbs Company ("HRH") for the provision of insurance brokerage services covering a variety of insurance needs and risks.   Under these agreements, Marsh USA Inc. (Connecticut) placed insurance coverage on OptiCare's behalf with a number of insurance companies, including (1) Hartford Fire Insurance Company (a subsidiary of The Hartford Financial Services Group, Inc. ["Hartford"]) ( "Hartford Fire"), (2) Twin City Fire Insurance Co. (a subsidiary of Hartford.) ( Twin City"), (3) American International Specialty Lines Insurance Co. (a subsidiary of American International Group, Inc.["AIG"]) ( "American Specialty"), (4) Lexington Insurance Company (a subsidiary of AIG ) ("Lexington"), (5) Travelers Indemnity Company ("Travelers Indemnity") a subsidiary of St. Paul Travelers Cos., now known as The Travelers ["Travelers']) ("Travelers Indemnity"), and (6) Federal Insurance Co. (a subsidiary of Chubb Corp. ["Chubb"]) ("Federal Insurance").

8.      Plaintiff Comcar Industries, Inc. ("Comcar") is a corporation incorporated under the laws of Florida and has its principal place of business in Auburndale, Florida.  Comcar is a trucking company that, among other things, hauls commodities throughout the United States.  At all material times herein, Comcar was a party to agreements with defendant Marsh USA, Inc.

2

("Marsh USA") for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Marsh USA placed insurance coverage on Comcar's behalf with a number of insurance companies, including:  (1) American Alternative Insurance Corporation (a unit of American Re Corporation Group) ("American Alternative"), (2) Birmingham Fire Insurance Company of Pennsylvania (a subsidiary of AIG) ("Birmingham Fire"), (3) Lexington , (4) American Guarantee & Liability Insurance Co. (a subsidiary of Zurich American Insurance Co.["Zurich"]) ("American Guarantee"), (5) American Home Assurance Company (a subsidiary of AIG) ("American Home"), (6) National Union Fire Insurance Company of Pittsburgh, Pa. (a subsidiary of AIG) ("National Union Pittsburgh"), (7) Insurance Co. of the State of Pennsylvania (a subsidiary of AIG) ("Insurance of Pennsylvania"), and (8) Twin City.

9.    Plaintiff Sunburst Hospitality Corporation ("Sunburst"), at all material times herein, was a party to agreements with Marsh USA , Aon Risk Services, Inc. of Maryland ("Aon Risk Maryland"), and Willis of New York, Inc. (formerly Willis Corroon Corp. of New York and hereafter " Willis New York") for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Marsh USA placed insurance coverage with a number of insurance companies, including (1) Lexington, (2) Crum & Forster (a subsidiary of Crum & Forster Holdings Corp. ("Crum & Forster Holdings"), (3) Travelers, (4) Zurich, (5) St. Paul Fire & Marine Insurance Co. (a subsidiary of Travelers) (" St. Paul Fire"), (6) Hartford, and (7) Westchester Surplus Lines Insurance Co. (a subsidiary of ACE Ltd.["ACE"]) ("Westchester Surplus").  Aon Risk Maryland also placed insurance coverage with a number of insurance companies, including: (1) (a) Wausau Insurance Companies; (b) Wausau Underwriters Insurance Company; and (c) Employers Insurance of Wausau (all subsidiaries

3

and/or affiliates of Liberty Mutual Holding Company, Inc. ("Liberty Mutual Holdings"), (2) Gulf Insurance Co. (a subsidiary of Travelers) ("Gulf"), (3) Travelers, and (4) National Union Fire Ins. Co. (a subsidiary of AIG) ("National Union").  Willis New York also placed insurance coverage with a number of insurance companies, including (1) National Union, and (2) St. Paul Fire.

10.    Plaintiff Robert Mulcahy ("Mulcahy"), at all material times herein was an independent contractor and a party to agreements with Arthur J. Gallagher & Co. ("AJG"), through his employer Vestax Securities Corp., for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, AJG placed insurance coverage with a number of insurance companies, including National Union Pittsburgh.

11.    Plaintiff Golden Gate Bridge, Highway and Transportation District ("Golden Gate") is a multi-county political subdivision of the State of California.  It operates the Golden Gate Bridge and two public transit systems:  The Golden Gate Transit bus system and the Golden Gate Ferry.  At all material times herein, Golden Gate was a party to agreements with Marsh Risk & Insurance Services, a division of Marsh, Inc. ("Marsh Risk") for the provision of insurance brokerage services covering a variety of insurance needs.  Under these agreements, Marsh Risk placed insurance coverage on Golden Gates's behalf with a number of insurance companies, including (1) American Specialty , (2) Illinois Union Insurance Co. (a subsidiary of ACE) ("Illinois Union"), (3) Indemnity Insurance Co. of North America (a subsidiary of ACE) ("Indemnity Ins."), (4) Steadfast Insurance Co. (a subsidiary of Zurich   ("Steadfast"), (5) National Union Pittsburgh, (6) Lexington, (7) American Home, (8) Westchester Surplus, (9) Fidelity & Deposit Company of Maryland (a subsidiary of Zurich) ("Fidelity & Deposit"), (10) Hartford Steam Boiler Inspection and Insurance Co. (a subsidiary of AIG ("Hartford

Steam"), (11) United States Fire Insurance Co. (a subsidiary of Crum & Forster Holdings ("US Fire"), (12) Pacific Insurance Co., Ltd. (a subsidiary of Hartford) ("Pacific Ins."), (13) Mt. Hawley Insurance Co. (a subsidiary of RLI Corp. ["RLI"]) ("Mt. Hawley"), (14) The Continental Insurance Co. (a subsidiary of CNA Financial Corp. ["CNA"]) ("Continental Ins."), (15) Zurich, (16) Empire Fire & Marine Insurance Co. (a subsidiary of Zurich) ("Empire Fire"), and (17) St. Paul Mercury Insurance Co. (a subsidiary of Travelers ("St. Paul Mercury").

12.    Plaintiff Glenn Singer ("Singer") at all material times herein was a party to agreements with Marsh USA for the provision of insurance brokerage services covering a variety of insurance needs and risks.  Under these agreements, Marsh USA placed insurance coverage on Singer's behalf with a number of insurance companies, including, among others:  (1) American Home, (2) American International Insurance Company (a subsidiary of AIG) ("American International"), (3)  Insurance of Pennsylvania (AIG, (4) AIU Insurance Company (a subsidiary of AIG), ("AIU") (5) Lexington  and (6)  Chubb. .

13.    Plaintiff Redwood Oil Company ("Redwood"), at all material times herein, was a party to agreements with Gallagher Hefferman Insurance Brokers, a division of AJG, for the provision of insurance brokerage services.   Under these agreements, AJG placed insurance coverage on Redwood's behalf with a number of insurance companies, including (1) Commerce and Industry Insurance Co. (a subsidiary of AIG) ("Commerce and Industry"), and (2) New Hampshire Insurance Company (a subsidiary of AIG) ("NH Insurance").

14.    Plaintiff The Omni Group of Companies ("Omni") is an affiliation of businesses with its principal place of business in Phoenix, Arizona.  For purposes of this Complaint, Omni includes its affiliated companies, namely Dominion Pacific Commercial, L.L.C., a construction company offering consultation, cost analysis, construction drawing supervision, design/build and

turnkey construction for ground-up commercial buildings and commercial tenant improvements. Omni is a full service real estate firm that also provides assistance to institutions turning around troubled properties for leasing or sale. Omni was a party to agreements with Acordia, Inc. ("Acordia") for the provision of insurance brokerage services covering a variety of insurance needs. Under these agreements, Acordia placed insurance coverage on Omni's behalf with a number of insurance companies, including (1) Fireman's Fund Insurance Company (a subsidiary of Allianz AG) ("Fireman's Fund"), (2) RLI Insurance Company (a subsidiary of RLI), and (3) Mt. Hawley.

15.    Plaintiff Bayou Steel Corporation ("Bayou"), at all material times herein, was a party to agreements with Aon Risk Services Inc. of Louisiana ("Aon Risk Louisiana"), Aon Risk Services of Texas, Inc. ("Aon Risk Texas") and Marsh USA, for the provision of insurance brokerage services covering a variety of insurance needs. Under these agreements, Aon Risk Louisiana and/or Aon Risk Texas placed insurance coverage on Bayou's behalf with a number of insurance companies, including: (1) ACE USA, Inc. (a subsidiary of ACE ) ("ACE USA"), (2) American Guarantee, (3) American Specialty, (4) Executive Risk Indemnity Inc. (a subsidiary of Chubb) ("Executive Risk"), (5) Federal Insurance (6) Gulf), (7) National Union Fire Insurance Co. of Louisiana (a subsidiary of AIG) ("National Union Louisiana"), (8) Nutmeg Insurance Co. (a subsidiary of Hartford) ("Nutmeg Ins."), (9) St. Paul Fire, (10) Greenwich Insurance Co. (a subsidiary of XL Capital Ltd. ["XL]) ("Greenwich Ins."), and (11) Indian Harbor Insurance Co. (a subsidiary of XL) ("Indian Harbor"). Also, Marsh USA placed insurance coverage on Bayou's behalf with a number of insurance companies, including: (1) ACE American Insurance Co. (a subsidiary of ACE) ("Ace American"), (2) ACE USA, (3) American Guarantee, (4) Commerce and Industry Co., (5) Executive Risk, (6) Federal

Insurance, (7) Gulf, (8) Lexington, (9) National Union Pittsburgh, (10) National Union Louisiana, (11) St. Paul Fire, (12) Twin City, (13) Wausau Underwriters Insurance Company and Employers Insurance of Wausau, and (14) Indian Harbor.

16.    Plaintiff Clear Lam Packaging, Inc. ("Clear Lam"), at all material times herein was a party to agreements with Arthur J. Gallagher Risk Management Services, Inc. (AJG Risk"), a subsidiary of AJG ("AJG Risk"), for the provision of insurance brokerage services covering a variety of insurance needs. Under these agreements, AJG Risk placed insurance coverage on Clear Lam's behalf with a number of insurance companies, including: (1) Travelers Casualty & Surety Company of America (a subsidiary of Travelers) ("Travelers Casualty"), (2) National Surety Corp. (a subsidiary Fireman's Fund) ("National Surety"), (3) Twin City, (4) Zurich , and (5) Liberty Mutual Fire Insurance Company (a subsidiary of Liberty Mutual Holding) ("Liberty Mutual Fire").

17.    Plaintiff Cellect, LLC ("Cellect"), at all material times herein, was a party to agreements with Marsh USA for the provision of insurance brokerage services covering a variety of insurance needs. Under these agreements, Marsh placed insurance coverage on Cellect's behalf with a number of insurance companies, including, among others: (1) AIG, (2) Travelers, and (3) Zurich.

18.    Plaintiff The Enclave, LLC ("Enclave"), at all material times herein, was party to agreements with USI Insurance Services of Florida, Inc., d/b/a/ USI Florida ("USI") for the provision of insurance brokerage services covering a variety of insurance needs. Under these agreements, USI placed insurance coverage on Enclave's behalf with a number of insurance companies, including Empire Indemnity Insurance Co. (a subsidiary of Zurich) ("Empire Indemnity").

19.    Plaintiff Gateway Club Apartments, Ltd. ("Gateway"), at all material times herein, was party to agreements with USI for the provision of insurance brokerage services covering a variety of insurance needs.    Under these agreements, USI placed insurance coverage on Gateway's behalf with a number of insurance companies, including (1) Federal Insurance, (2) Lexington, (3) Gulf., (4) Continental Casualty Co. (a subsidiary of CNA) (Continental Casualty"), (5) Athena Assurance Company (a subsidiary of Travelers ("Athena Assurance"), (6) American Guarantee, (7) Vigilant Insurance Co. (a subsidiary of Chubb) ("Vigilant Ins."), and (8) Mt. Hawley.

20.    Plaintiff Michigan Multi-King Inc. ("Michigan Multi-King"), at all material times herein, was a party to agreements with Aon Risk Services, Inc. of Michigan ("Aon Risk Michigan") for the provision of insurance brokerage services covering a variety of insurance needs and risks.    Under these agreements, Aon Risk Michigan placed insurance coverage on Michigan Multi-King's behalf with a number of insurance companies, including:  (1) Travelers Casualty & Surety Company of America (a subsidiary of Travelers) ("Travelers Casualty"), (2) St. Paul Fire, and (3) Federal Insurance.

21.    Plaintiff City of Stamford ("Stamford") is a municipal corporation incorporated under the laws of the State of Connecticut.  At all material times herein, Stamford was a party to agreements with defendant Marsh USA., and/or Marsh McLennan, Inc., (collectively in this paragraph "Marsh") for the provision of insurance brokerage services covering a variety of insurance needs and risks.    Under these agreements, Marsh placed insurance coverage on Stamford's behalf with a number of insurance companies, including, among others: (1) American International Marine Agency of NY (a division of AIG), (2) Hartford Fire, (3) The

Hartford Fidelity and Bonding (a subsidiary of Hartford) ("Hartford Fidelity"), (4) Lexington,

(5) St Paul Fire, (6) Travelers Casualty, (7) Westchester Surplus, and (8) Zurich.

22.    Plaintiff Belmont Holdings Corporation ("Belmont"), or a predecessor, affiliated

company R.P.G. Holding Inc., at all material times herein, was a party to agreements with Willis

Group Holdings Limited for the provision of insurance brokerage services covering a variety of

insurance needs and risks.    Under these agreements, Willis Group Holdings Limited ("Willis

Group") placed insurance coverage on Belmont's behalf with a number of insurance companies,

including (1) National Union Pittsburg , (2) American Home  (3) Insurance of Pennsylvania, (4)

Birmingham Fire (5) Illinois National Insurance Company (a subsidiary of AIG) ("Illinois

National"), (6) National Union Louisiana, and (7) Westchester Fire Insurance Company (a

subsidiary of ACE) ("Westchester Fire").

23.    Plaintiff Tri-State Container Corporation ("Tri-State") is a manufacturer of

corrugated cartons located at 1440 Bridgewater Road, Bensalem, Pennsylvania.    Hilb, Rogal,

Hamilton Co. of Philadelphia (now HRH) provided insurance brokerage services for Tri-State to

cover a variety of needs.    On Tri-State's behalf, HRH placed insurance with a number of

insurance companies, including: (1) American Insurance Company (a subsidiary of Fireman's

Fund) (2) Executive Risk; and (3) Federal Insurance.

   **b)**   <u>**Defendants**</u>

    **1**   <u>**Broker Defendants**</u>

24.    Defendant Marsh & McLennan Companies, Inc. ("Marsh & McLennan") is a

corporation incorporated under the laws of Delaware with corporate headquarters in New York,

New York.    Marsh & McLennan is a global corporation and the parent of various subsidiaries

that provide clients with analysis, advice and transactional services in connection with the procurement and servicing of insurance, as well as investment management and consulting.

25.    Marsh & McLennan's subsidiaries and related companies that are defendants herein are Marsh Inc., Marsh USA, Marsh Connecticut and Seabury & Smith, Inc. ("Seabury & Smith").  A description of each of these entities is set forth in Exhibit A.  Defendants Marsh & McLennan, Marsh Inc., Marsh USA, Marsh Connecticut and Seabury & Smith shall be referred to collectively herein as "Marsh."

26.    Defendant Aon Corporation ("Aon Corp.") is a corporation incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois.  Aon Corp. is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

27.    Aon Corp.'s subsidiaries and related companies that are defendants herein are Aon Broker Services, Inc. ("Aon Broker"), Aon Risk Services Companies, Inc. ("Aon Risk"), Aon Risk Services Inc. U.S. ("Aon Risk U.S."), Aon Risk Maryland, Aon Risk Louisiana, Aon Risk Texas, Aon Risk Michigan, Aon Group, Inc. ("Aon Group"), Aon Services Group, Inc. ("Aon Services") and Affinity Insurance Services, Inc. ("Affinity").   A description of each of these entities is set forth in Exhibit A.  Defendants Aon Corp., Aon Broker, Aon Risk, Aon Risk U.S., Aon Risk Maryland, Aon Risk Louisiana, Aon Risk Texas, Aon Risk Michigan, Aon Group, Aon Services and Affinity shall be referred to collectively herein as "Aon."

28.    Defendant Willis Group is a corporation incorporated under the laws of Bermuda with its corporate headquarters in London, England.  Willis Group is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services,

consulting, and insurance underwriting.  Willis Group is the third largest global brokerage firm in the world.

29.   Willis Group's subsidiaries and related companies that are defendants herein are Willis Group Limited ("Willis Ltd."), Willis North America, Inc. ("Willis NA") and Willis New York.  A description of each of these entities is set forth in Exhibit A.  Defendants Willis Group, Willis Ltd., Willis NA and Willis New York shall be referred to collectively herein as "Willis."

30.   Defendant AJG (sometimes referred to herein as "Gallagher") is a corporation incorporated under the laws of Delaware with its corporate headquarters in Itasca, Illinois. Gallagher provides customers with risk management and insurance brokerage services. Gallagher is the fourth largest global insurance broker by 2003 revenue, providing customers with risk management and insurance brokerage services worldwide.

31.   AJG and its subsidiary and related company Arthur J. Gallagher Risk Management Service, Inc. ("Gallagher Risk") are defendants herein.  A description of Gallagher Risk is set forth in Exhibit A.

32.   Defendants Gallagher and Gallagher Risk shall be referred to collectively herein as "Gallagher."

33.   Gallagher and certain of the Plaintiffs entered into a Stipulation of Settlement Between Class Plaintiffs and Arthur J. Gallagher Co. Defendants on December 29, 2006 (the "Gallagher Settlement Agreement"). The Gallagher Settlement Agreement, as amended, received preliminary approval from the Court on April 13, 2007 and is pending final approval. If the Gallagher Settlement Agreement is approved by the Court and becomes final, Gallagher will be dismissed as defendants from this Complaint.

11

34.  Defendant Wells Fargo & Company ("Wells Fargo") is a corporation incorporated under the laws of Delaware with its corporate headquarters in San Francisco, California. Wells Fargo is the parent company of Wells Fargo Insurance Services, Inc., formerly known as Acordia.  Wells Fargo provides customers with risk management and insurance brokerage services through two separate insurance operations:  (i) Wells Fargo Insurance Services, and (ii) Acordia (now known as Wells Fargo Insurance Services, Inc.), a Wells Fargo subsidiary. Collectively, Wells Fargo Insurance and Wells Fargo/Acordia (defined in the next paragraph) comprise the fifth largest broker in the United States, garnering $800.5 million revenues in 2003.

35.  Wells Fargo's subsidiary and related company that is a Defendant herein is Acordia, Inc., now known as Wells Fargo Insurance Services, Inc. ("Wells Fargo/Acordia").   A description of Wells Fargo/Acordia is set forth in Exhibit A.  Defendants Wells Fargo and Wells Fargo/Acordia shall be referred to collectively as "Wells Fargo."

36.  Defendant HRH (sometimes referred to herein as "Hilb") is a corporation incorporated under the laws of Virginia with its corporate headquarters in Glen Allen, Virginia. HRH provides customers with risk management and insurance brokerage services.

## 2    Insurer Defendants

37.  Defendant AIG is a corporation incorporated under the laws of Delaware with its corporate headquarters in New York, New York.  AIG and its related companies are the largest underwriters of commercial and industrial insurance in the United States.

38.  AIG subsidiaries and related companies that are defendants herein are Lexington, American  Specialty, Birmingham Fire , American Home , National Union Pittsburgh, National Union Louisiana, American International, Insurance of Pennsylvania, AIU, Commerce Insurance, NH Insurance, Hartford Steam, Illinois National, and American General Corporation

("American General"). A description of each of these entities is set forth in Exhibit A. Unless otherwise stated, defendants AIG, Lexington, Birmingham Fire, American Home, National Union Pittsburgh, National Union Louisiana, American International, AIU, Commerce Insurance, NH Insurance, Hartford Steam, Illinois National and American General shall be referred to collectively as "AIG."

39.    Defendant ACE is a corporation incorporated under the laws of the Cayman Islands with its corporate headquarters in Hamilton, Bermuda. ACE owns ACE INA Holdings, Inc. ("ACE INA Holdings") and Ace Group Holdings, Inc. ("ACE Group Holdings"). As described by ACE itself, the "ACE Group of Companies is one of the world's largest providers of insurance and reinsurance."

40.    ACE's subsidiaries and related companies that are defendants herein are ACE INA Holdings, ACE USA, ACE American Insurance Company ("ACE American"), Westchester Surplus, Illinois Union, Indemnity Insurance Company of North America ("Indemnity Ins."), ACE Group Holdings, Inc. ("ACE Group Holdings"), ACE US Holdings, Inc. ("ACE US Holdings"), Westchester Fire, INA Corporation ("INA Corp."), INA Financial Corporation ("INA Financial"), INA Holdings Corporation ("INA Holdings"), ACE Property and Casualty Insurance Company ("ACE Property and Casualty") and Pacific Employers Insurance Company ("Pacific Employers"). A description of each of these entities is set forth in Exhibit A. Unless otherwise stated, defendants ACE, ACE INA Holdings, ACE USA, ACE American, Westchester Surplus, Illinois Union Indemnity Ins., ACE Group Holdings, ACE US Holdings, Westchester Fire, INA Corp., INA Financial, INA Holdings, ACE Property and Casualty and Pacific Employers shall be referred to collectively herein as "ACE."

41.    Defendant Hartford is one of the largest investment and insurance companies in the United States.  Hartford is a corporation incorporated under the laws of Delaware with its corporate headquarters in Hartford, Connecticut.  Hartford represents that it "is a leading provider of investment products, life insurance and group and employee benefits; automobile and homeowners' products; and business insurance."

42.    Hartford's subsidiaries and related companies that are defendants herein are Hartford Fire, Twin City, Pacific, Nutmeg Ins. and Hartford Fidelity.  A description of each of these entities is set forth in Exhibit A.   Unless otherwise stated, defendants Hartford, Hartford Fire, Twin City, Pacific Ins., Nutmeg Ins. and Hartford Fidelity shall be referred to collectively as "Hartford."

43.    Defendant Travelers is a corporation incorporated under the laws of Minnesota with its corporate headquarters in St. Paul, Minnesota.  Travelers was formed from a 2004 merger between Travelers Property Casualty Corp. ("TPC") and The St. Paul Companies, Inc.  The merger created the second largest commercial insurance company in the United Sates offering a variety of property and casualty insurance products through its various subsidiaries.  Travelers describes itself as "a leading provider of property casualty insurance and surety products and of risk management services to a wide variety of business and organizations and to individuals" whose products are distributed through "independent insurance agents and brokers."

44.    Travelers' subsidiaries and related companies that are defendants herein are St. Paul Fire Gulf, St. Paul Mercury, Travelers Casualty, Travelers Indemnity, Athena Assurance, and TPC.  A description of each of these entities is set forth in Exhibit A.  Unless otherwise stated, defendants Travelers, St. Paul Fire, Gulf., St. Paul Mercury, Travelers Casualty, Travelers Indemnity, Athena Assurance and TPC shall be referred to collectively herein as "Travelers."

14

45.    Defendant Zurich Financial Services Group ("Zurich Financial") is a corporation incorporated under the laws of Switzerland with its corporate headquarters in Zurich, Switzerland.

46.    Zurich Financial's subsidiaries and related companies that are defendants herein are Zurich, Steadfast, Fidelity & Deposit, Empire Fire, American Guarantee, Empire Indemnity and Assurance Company of America ("Assurance Co."). A description of each of these entities is set forth in Exhibit A. Unless otherwise stated, defendants Zurich Financial, Zurich , Steadfast, Fidelity & Deposit, Empire Fire, American Guarantee, Empire Indemnity and Assurance Co. shall be referred to collectively herein as "Zurich."

47.    Zurich and certain of the plaintiffs entered into a Stipulation of Settlement, dated July 29, 2006 (the "Zurich Settlement Agreement"). The Zurich Settlement Agreement, as amended, received preliminary approval from the Court on November 8, 2006 and final approval from the Court February 16, 2007. If the Zurich Settlement Agreement becomes final, Zurich will be dismissed as defendants from this Complaint.

48.    Defendant Chubb is a corporation incorporated under the laws of New Jersey with its headquarters in Warren, New Jersey. Chubb is one of the ten largest property and casualty insurance providers in the United States. Chubb provides its insurances lines through a family of insurance subsidiaries known informally as the "Chubb Group of Insurance Companies."

49.    Chubb's subsidiaries and related companies that are defendants herein are Federal Insurance, Executive Risk, Vigilant Insurance, and Chubb and Son. A description of each of these entities is set forth in Exhibit A. Unless otherwise stated, defendants Chubb, Federal Insurance, Executive Risk and Vigilant Ins. shall be referred to collectively herein as "Chubb."

50.    Defendant Crum & Forster Holdings is a corporation incorporated under the laws of Delaware with its corporate headquarters in Morristown, New Jersey. Crum & Forster Holdings represents that it is "a national property and casualty insurance group providing a broad range of standard and specialty insurance products."

51.    Crum & Forster Holdings and its subsidiary and related company, United States Fire Insurance Company ("US Fire"), are defendants herein.  A description of each of these entities is set forth in Exhibit A.  Defendants Crum & Forster Holdings and US Fire shall be referred to collectively herein as "Crum & Forster."

52.    Defendant Fireman's Fund is incorporated under the laws of California, with headquarters in Novato, California.  Fireman's Fund operates as an underwriter of property and casualty insurance.

53.    Fireman's Fund's subsidiaries and related companies that are Defendants herein are Chicago Insurance Co. and National Surety Corp.  Unless otherwise stated, defendants Fireman's Fund, Chicago Ins. and National Surety shall be referred collectively herein as "Fireman's Fund."

54.    Defendant XL is a corporation incorporated under the laws of the Cayman Islands with its corporate headquarters in Hamilton, Bermuda. XL is a provider of insurance and reinsurance services.

55.    XL's subsidiaries and related companies that are defendants herein are Greenwich Ins., Indian Harbor, XL America and XL Insurance America.   A description of each of these entities is set forth in Exhibit A. Unless otherwise stated herein, Defendants XL, Greenwich Ins., Indian Harbor, XL America and XL Insurance America shall be referred to collectively herein as "XL Capital" or "XL."

16

56.   Defendant CNA is a corporation incorporated under the laws of Delaware with its headquarters in Chicago, Illinois.   CNA is an insurance holding company whose primary subsidiaries consist of property and casualty insurance companies.

57.   CNA's subsidiaries and related companies that are Defendants herein are Continental Insurance, American Casualty Co. of Reading, PA ("American Casualty") and Continental Casualty.   A description of each of these entities is set forth in Exhibit A. Unless otherwise stated, defendants CNA, Continental Insurance, American Casualty and Continental Casualty shall be referred to collectively herein as "CNA."

58.   Defendant Munich Reinsurance Co. ("Munich Re") is a provider of reinsurance, primary insurance and asset management services.   Munich Re is a German corporation with headquarters in Munich, Germany.   Munich Re's shares are traded on several German stock exchanges.

59.   Munich Re's subsidiaries and related companies that are defendants herein are American Re Corporation, now known as Munich Re America Corporation, ("American Re"), Munich-American Risk Partners, Inc. ("Munich-American"), American Re-Insurance Co., now known as Munich Reinsurance America, Inc., ("American Re-Insurance") and American Alternative.   A description of each of these entities is set forth in Exhibit A.   Defendants Munich Re, American Re, American Re-Insurance, American Alternative and Munich-American, shall be referred to collectively herein as "Munich."

60.   Defendant Liberty Mutual Holding is a corporation incorporated under the laws of Massachusetts, with headquarters in Boston, Massachusetts. Liberty Mutual Holding operates as a mutual holding company structure, owned by its policyholders, and includes three principal insurance companies in the group – Liberty Mutual Insurance Company ("Liberty Mutual Ins."),

17

Liberty Mutual Fire  Insurance Company ("Liberty Mutual Fire"), and Employers Insurance Company of Wausau – each of which are stock insurance companies under the ownership of Liberty Mutual Holding.

61.  Liberty Mutual Holding's subsidiaries and related companies that are defendants herein are Liberty Mutual Ins., Liberty Mutual Fire, Wausau Insurance Companies, Wausau Underwriters Insurance Company, Employers Insurance of Wausau, Employers Insurance Company of Wausau, Wausau Business Insurance Company and Wausau General Insurance Company.  A description of each of these entities is set forth in Exhibit A.  Unless otherwise stated, these defendants shall be referred to collectively herein as "Liberty Mutual."

62.  Defendant AXIS Capital Holdings Limited ("AXIS Capital") is a corporation incorporated under the laws of Bermuda.  It provides specialty insurance and treaty reinsurance on a global basis through operating subsidiaries and branch networks.  It is the indirect parent of AXIS U.S. Subsidiaries and is subject to the insurance holding company laws of Connecticut, New York and Illinois.

63.  AXIS Capital's subsidiaries and related companies that are defendants herein are AXIS Specialty Insurance Company ("AXIS Specialty") and AXIS Surplus Insurance Company ("AXIS Surplus").  A description of each of these entities is set forth in Exhibit A.  AXIS Capital, AXIS Specialty and AXIS Surplus are referred to herein as "AXIS."

A.    **STATEMENT OF FACTS**

    1)    **The Antitrust Claims**

        a)    **Overview of the Antitrust Claims**

64.  The defendants named above (the "Defendants") engaged in a series of unlawful horizontal conspiracies, the purpose and effect of which were to reduce or eliminate competition among members of the various conspiracies described herein, by among other things, allocating

customers to and among members of the conspiracies and protecting those conspirators from competition for those customers' business.  Defendants' customer allocation agreements and other schemes were naked restraints of trade in violation of section 1 of the Sherman Act.

65.   Defendants organized and operated their unlawful horizontal schemes through six "Broker-Centered" conspiracies, in each of which a Broker Defendant coordinated a horizontal agreement among rival Insurer Defendants.   The Defendants also organized and operated a "Global" conspiracy in which the Broker Defendants agreed horizontally not to compete for each others' customers by disclosing the existence and adverse premium price impact of their rivals' Broker-Centered schemes.

66.   The purpose and effect of each unlawful Broker-Centered scheme was to illegally reduce or even eliminate competition for Plaintiffs' business that would otherwise have existed among the conspiring insurers in a way that enabled the conspiring Brokers and Insurers to secure and then share in resulting supra-competitive profits.  The method by which the horizontal conspirators minimized competition for customers and created and shared resulting supra-competitive profits was twofold.   First, in exchange for the payment by the insurer co-conspirators of special commissions (known as contingent commissions), the participants in each Broker-Centered Conspiracy agreed with each other that the Broker would allocate the bulk of its customers' business to the conspiring insurers.  By this process – called "carrier consolidation" -- the Brokers thus protected the conspiring Insurers from having to compete with hundreds of other non-conspiring insurers, which were deprived access to most of the Broker's customers.

67.   As a second step in Defendants' unlawful scheme, the participants in each Broker-Centered Conspiracy agreed to reduce or eliminate competition among the conspiring insurers themselves as to that secured book of business.   Specifically, the Insurer Defendants agreed

horizontally with each other not to compete for each other's existing customers and the Broker Defendants facilitated that agreement through methods such as bid-rigging, "last looks" and other incumbent protection devices.  Moreover, the illegal customer allocation schemes also included horizontal agreements among the conspiring Insurers that the Insurers would be guaranteed access to minimum amounts of the Broker Defendants' book of business, and that the Broker Defendants would protect the conspiring insurers from competition for that business.

68.    These horizontal agreements reduced or eliminated competition among the conspiring insurers for both new and renewal business controlled by the conspiring brokers. Freed from the costs and constraints of ordinary competition, the insurers were able to charge higher premiums and achieve supra-competitive profits.  For their roles in orchestrating the scheme, and in delivering "competition-free" business to their respective insurer co-conspirators, brokers were kicked-back a portion of the insurers' supra-competitive profits in the form of contingent commissions.

69.    The Broker-Centered and Global agreements described herein are naked restraints among horizontal competitors with the purpose and effect of raising prices and/or reducing output in order to increase profits. The agreements among the Broker and Insurer Defendants to allocate business to the conspiring insurers, and the Broker Defendants' conduct to protect its co-conspirators from competition for that business, deprived insurance customers – the Plaintiff classes herein – from the prices they would have been able to obtain in a truly competitive marketplace.

    b)    **The Commercial Brokerage and Insurance Markets in the United States**

70.    "Commercial" insurance consists of roughly two dozen lines of insurance policies that cover a variety of commercial property and casualty risks.  Commercial insurance includes

general property and casualty, workers compensation, products liability, surety, boiler and machinery, directors and officers' liability, professional malpractice, and commercial auto, fire, and marine policies, among others. The top ten lines account for approximately 85% of the commercial premium written in the United States.

71.    Although the precise policy terms will vary depending on the type of covered event, the fundamental nature of the contract between the insured and insurer is the same: the insured pays a premium to transfer the risk defined in the policy to the insurer in the expectation that the insurer will make payment if the covered loss occurs. Due in part to the fungibility of risk, the pricing of different types of commercial insurance is closely aligned, such that a catastrophic event like a flood will typically raise premiums not just for the directly affected lines of coverage but for other product lines as well.

72.    While insurance contracts are executed between the insured and the insurer, insurance brokers serve a critical intermediary function in the commercial insurance marketplace, matching their clients – insurance purchasers – with sellers, the insurers. The Broker Defendants were retained by members of the class to act as expert advisors in the procurement of insurance for their clients, and they were duty bound to obtain the best coverage at the lowest price. Standard brokerage contracts and other communications sent by the Broker Defendants to their clients provide that the broker will solely represent the client's interest in selecting and negotiating the terms of insurance polices. The services brokers provide include analyzing the client's risk, assessing the type of insurance needed, comparing and interpreting policies and, importantly, providing unbiased, sound and accurate advice regarding the insurance marketplace and the insurers they recommend.

73.   The extreme reliance commercial insureds place on their brokers has resulted in an extraordinary level of longevity in broker/client relationships, with the same broker placing business for the same clients year after year.  This quality of "stickiness" is natural to the broker's consultative role and stems in part from the fact that it costs clients money to change brokers.  The close bond between broker and client gives brokers tremendous influence, and often decisive control, over the placement of their clients' insurance business.  Given the high degree of financial investment and trust placed in their broker, clients will rarely if ever seek quotes from insurers other than those recommended by the broker.

74.   The Broker Defendants dominate the commercial insurance brokerage sector in the United States.  The top four firms (Defendants Marsh, Aon, Willis and Gallagher) alone account for 55% of commercial brokerage revenue nationwide. Those Defendants, together with Broker Defendants Wells Fargo/Acordia and HRH, account for 60.3% of commercial brokerage revenue nationwide.

75.   Concentration of the brokerage business arose in part from a long series of acquisitions by which the largest firms bought up their competitors.  Of the top twenty U.S. commercial brokers in 1989, fourteen were acquired by either Marsh or Aon.  Between 1997 and 2003, Gallagher and HRH consumed 59 and 28 North American competitors, respectively. These consolidations have resulted in a small, highly concentrated group of powerful brokerage firms, each representing thousands of dedicated clients.  In part because of their size, each of these brokers is able to place virtually any line of commercial coverage.

76.   The segment of commercial insurers is considerably less concentrated than commercial brokers.  The insurers are therefore largely dependent on the largest brokers to assure access to business.  Despite the somewhat fragmented nature of the insurance

underwriting industry, the Insurer Defendants' market shares have remained remarkably stable.

The eight largest Insurer Defendant Groups[1] wrote between 38.4% and 40.4% of the total

commercial written premium every year from 1999 through 2003.  The Insurer Defendants in

this case wrote over $65 billion in collective net premium in 2003.

c)    <u>The Rise of Contingent Commissions and Their Role in the Customer
Allocation Schemes Alleged Herein</u>

77.    Historically brokers were paid in the form of "standard commissions," which were

usually a fixed 3% to 20% of the written premium, depending on the product line, and averaged

about 10% across all commercial product lines.    Over time, "contingent commission"

arrangements were implemented whereby brokers often gave up some percentage of their

standard commission in exchange for bonuses the insurers paid largely based on the profitability

of the business the broker placed**.**  Typically, these profit-driven contingent commission

agreements set target "loss ratio" thresholds that were a function of the dollars of claims paid by

the insurer compared to the premium dollars received.  If the insurer achieved, for example, a

loss ratio of less than 65% in a given year on its policies with insureds that were placed by the

broker, the insurer would pay the broker a contingent commission at year end of an additional

1% to 2% above the broker's fixed standard commission.  If the target loss ratio was not

achieved for the policy year, the broker would receive only its standard commissions.

78.    Eventually, by the late 1990s these profit-driven contingent commission agreements

were supplemented or replaced by contingent commission arrangements that were based in large

measure on the sheer volume of premiums placed or renewed with the insurers rather than solely

---

[1] Commercial insurance lines are written by "Property & Casualty" companies, which are
frequently organized as affiliated entities in separate states or offering different lines of insurance
but controlled by a single parent company.  Affiliated insurers are recognized in the industry as a
single "Group" and are tracked collectively by their Group identification numbers

on profitability.   Under these agreements, insurers paid extraordinarily lucrative contingent commissions – as high as 8% or more above the brokers' standard commissions – in exchange for the brokers' deliverance of specified volumes of their clients' business.  For example, if the contingent commission agreement provided for a broker to meet a $10,000,000 threshold in premium volume (meaning the broker would have to deliver customers to the insured who collectively purchased policies costing that amount), a broker that would earn only a 10% standard commission by delivering $9,000,000 in business could instead earn 18% in total commissions if it delivered $10,000,000.   Thus, a broker that would earn $900,000 on a $9,000,000 book of business (plus perhaps another point or two if the book was profitable) could now earn double that amount − $1,800,000 − in commissions for delivering a $10,000,000 book, regardless of profitability.

79.   The volume-driven contingent commission agreements that arose in the mid-1990s also sometimes contained what were known as "retention" or "persistency" thresholds for renewal business.   These components of commission agreements established dollar volume thresholds consisting of the percentage of premium that the insurer's existing customers renewed from the prior year.   In most cases, however, to qualify for the renewal volume contingent commissions the brokers also had to meet "rate change" thresholds, which meant the brokers were required to deliver the policy renewals at premium rates that were favorable to the prior year's (i.e., without significant discounting).   The higher the renewal year premium compared to the prior year, the larger the contingent commission to which the broker became entitled.   Thus, if a broker had clients coming up for renewal with $10,000,000 in business and the insurer could redeliver those clients at a $10,000,000 or $11,000,000 premium level the broker would be paid

24

a persistency contingent commission, but if the broker only delivered $9,000,000 of the eligible renewal business it would receive no payment beyond its standard commission.

80.    The rise of these primarily volume-driven contingent commission agreements coincided with the advent of the customer allocation schemes and other restraints of trade described herein and served as a facilitating mechanism for the schemes. The extraordinarily lucrative volume-based contingent agreements provided the motive – greed – that incentivized the Brokers to ignore their duty to find for their clients the best policies at the best price and, instead, to allocate large volumes of their customers' premium dollars to the few Insurers who agreed to pay the largest contingent commissions. The lure of additional profit that these contingent commission agreements promised also incentivised the Brokers to take steps to minimize or eliminate competition for the business slotted for a particular Insurer, thus ensuring that the premium-delivery thresholds required to trigger the contingent payments were met. The Insurers, on their part, accepted the arrangement as it freed them from the normal rigors of competition and allowed them to charge supra-competitive prices.

81.    Between 1998 and 2004 – when the market allocation schemes were abruptly halted by the investigations of New York Attorney General Eliot Spitzer and various other state attorneys general – the Insurer Defendants paid, and the Broker Defendants received ever increasing amounts of contingent commissions. From 1998 to 2004, the Broker Defendants in this case (excluding Defendant Gallagher) received nearly **1.9 billion dollars** in contingent commissions from insurers, nearly 70% of which were paid by the Insurer Defendants herein. In 2003 alone, the last full year where contingent commissions were collected, the Broker Defendants in this case collected more than **half a billion dollars** in contingent commission

payments from insurers, more than 70% of which were paid by the Insurer Defendants in this case.

82.    In sum, the broker consolidations of the 1980s and 1990s combined with the advent of volume-driven contingent commission agreements gave rise to a market structure conducive to the operation of the Broker-Centered Conspiracies alleged herein.  Brokerage is an essential mechanism for the Insurer Defendants to access commercial customers and premiums, and the Broker Defendants controlled sufficient premium volume to effectively coordinate a market allocation scheme.  Conversely, the fragmented nature of the insurance underwriting industry made the insurers dependant upon the major brokers for a flow of premium volume.  Thus, industry conditions and circumstances were ripe for both the Broker and Insurer Defendants to conspire to divvy up the Brokers' customers and premiums in a manner that maximized the conspirators' profits at the expense of their customers, the Classes herein.

### d)    Overview of the Conspiracies

83.    Beginning in the mid-to late 1990s, each of the Broker Defendants undertook a dramatic change in their method of doing business.  Instead of shopping their clients' business to 30 or 40 different insurance companies or more, each began to form so-called "strategic partnerships" with certain insurance companies, to which it would then allocate the bulk of its business.

84.    By this process, known as "market consolidation"[2] or "carrier consolidation," the Broker Defendants determined that by delivering their business to a relatively small number of "strategic partners" they could extract increased payments from those insurers in exchange for the resulting stabilization of market share and reduced pressure on the Insurers to compete based

---

[2] The word "market" is commonly used by industry participants as a synonym for "insurer."

upon price.  They also determined that the historical practice of paying contingent commissions would provide a convenient vehicle to extract this added compensation from insurers.

85.    The strategic partnerships thus formed by the Broker Defendants grew into classic "hub and spoke" conspiracies, with the Broker Defendants, acting as the "hub," coordinating an illegal horizontal agreement among its Insurer Defendant "spokes."   In each of these Broker-Centered "hub and spoke" conspiracies, the Broker and Insurer Defendants all agreed with one another (a) that those insurers outside of the Broker-Centered Conspiracy would be excluded from accessing the bulk of the Broker's customers, and (b) that competition among the Insurers within each Broker-Centered Conspiracy would be minimized or eliminated.  As detailed below, the Defendants in this case formed six Broker-Centered Conspiracies lead by the following brokers: Marsh, Aon, HRH, Willis, Gallagher and Wells Fargo/Acordia.

86.    Insurers were invited to be among a Broker Defendant's strategic partners, and therefore a member of a Broker-Centered Conspiracy, when they entered into lucrative contingent commission arrangements with the brokers and agreed to make contingent commission payments in return for access to the broker's book of business.  In return for the payment of these contingent commissions and their elevation to "preferred status," the Insurer Defendants agreed with the Broker Defendants and with each other insurer in the conspiracy that they would receive access to a guaranteed flow of premium volume, as well as protection of their own business from competition from other insurers both within and outside of the preferred group.

87.    Within each Broker-Centered Conspiracy, the participants agreed that the bulk of the business controlled by the broker, as much as 70-85%, would be divided among the "strategic partner" insurers in the conspiracy.   The method by which premium volume was

allocated among the participants in each Broker-Centered Conspiracy was loosely determined by the structure and content of the contingent commission agreements executed by the parties. These agreements required the payment of additional contingent commissions to the broker, based on the achievement of business thresholds measured by premium volume. Many contingent commission agreements also rewarded Brokers for "persistency" *i.e.*, retention of renewal business by an insurer. Because of the importance of renewal business (which was, on average, more than 70% of each Broker Defendants' book of business), the insurers in each Broker-Centered Conspiracy agreed with each other that each of them would be allowed to retain those customers whose policies they wished to renew, and each expected and received from the Brokers protection from competition from other Insurers for that business.

88.    The participants in each Broker-Centered Conspiracy engaged in a variety of anticompetitive and exclusionary practices designed to carry out the aims of the conspiracy. For instance, as detailed below, in order to maximize their receipt of contingent commissions and deliver the premium volume expected by their "partners," the Broker Defendants agreed with their insurer conspirators to "shift" or "roll" entire blocks of business to preferred insurers without the benefit of any competitive bidding. In addition, Broker Defendants shielded their insurer partners from normal competition by agreeing not to bid renewals competitively, or by limiting the circumstances under which renewals could be marketed. Broker Defendants also routinely promised to provide competitive advantages to Insurer partners, by disclosing other carriers' bids, providing first or last looks, and other methods.

89.    Insurer Defendants, on their part expected an unfair competitive advantage and protection from competition as a result of their arrangements with their Broker partners. Moreover, each insurer in each Broker-Centered Conspiracy was aware that each of the other

insurer members of the conspiracy was also receiving access to a guaranteed flow of premium volume and protection from competition in return for its contingent payments.  Each insurer conspirator, moreover, accepted and agreed to engage in the Broker-Centered business allocation scheme based on, and because, each of the other Insurer Defendants had also agreed to participate in the scheme.   In this way, the Broker Defendants orchestrated a horizontal agreement among rival Insurers not to compete for each others' customers.

90.   Defendants' horizontal agreements to allocate premium volume among the insurer co-conspirators and not to compete for each other's renewal business, was successful.  Over time, an increasing percentage of each Broker Defendants' business was concentrated in the hands of the Insurer Defendants.   Moreover, the Broker Defendants' renewal rates with Defendant Insurers were consistently higher than their renewal rates with non-Defendant insurers.

91.   The facts alleged below illustrate how a conspiracy among all of the participants in each Broker-Centered Conspiracy was plausible. In each Broker-Centered Conspiracy, the brokers facilitated an exchange of information among the participants in the conspiracy so that each conspiracy could operate.  Each of the Broker Defendants coordinated the dissemination of information to and among the insurer conspirators about, among other things: who the other strategic partner insurers were; details of the contingent commission arrangements that other insurer partners had with the Broker Defendants; the amount of contingent commissions paid by other insurer partners; and the amount of premium volume delivered or expected to be delivered to other insurer partners.

92.   In addition to the "hub and spoke" Broker-Centered Conspiracies described herein, each of the Broker Defendant "hubs" participated (with the complicity of the Insurer Defendants)

29

in a broader, common horizontal anticompetitive agreement. Specifically, in this Global Conspiracy, each Broker Defendant agreed not to compete with the other Broker Defendants by disclosing any competing broker's contingent commission arrangements, or the consequent premium price impact of those arrangements, in an effort to win those other brokers' customers' business. That is, the Broker Defendants expressly or tacitly agreed horizontally among themselves not to disclose their contingent commission agreements and resulting supra-competitive premiums to rival brokers' customers. The Broker Defendants made this unlawful horizontal agreement to further a common, mutual goal of maintaining their independent anticompetitive schemes and not having their supra-competitive profits undermined by a competing broker's truthful price disclosures or advertising.

93. The Broker Defendants' agreement not to disclose their excessive contingent commission agreements and resulting profits was a naked horizontal restraint of informational output that directly affected the price of insurance, and therefore violated the antitrust laws.

94. The Defendants' customers, the Classes herein, were damaged in their business or property by Defendants' anticompetitive horizontal agreement.

<b>e)    <u>Operation of the Broker-Centered Conspiracies</u></b>

<b>(1)    <u>The Marsh Broker-Centered Conspiracy</u></b>

<b>(a)    <u>Participants in the Conspiracy</u></b>

95. During the Class Period, from January 1, 1998 through December 31, 2004, participants in the Marsh Broker-Centered Conspiracy have included Marsh and Insurer Defendants AIG, ACE, CNA, Chubb, Crum & Forster, Hartford, Liberty Mutual, Travelers, Zurich, Fireman's Fund, Munich, XL and Axis. ("the Marsh Broker-Centered Defendants").

30

**(b)     Operation of the Conspiracy**

96.     Marsh allocated its customer base to and among its conspiring insurers in two steps. First, Marsh and each of its co-conspirators agreed, and Marsh's conspiring insurers horizontally agreed among themselves, that Marsh would "consolidate" its business by directing as much as 80-95% of its commercial business to its "preferred carriers," co-conspirators AIG, ACE, CNA, Chubb, Crum & Forster, Hartford, Liberty Mutual, Travelers, Zurich, Fireman's Fund, Munich, XL and Axis, thereby eliminating hundreds of other insurers from competing equally with the conspiring Insurers for a substantial portion of Marsh's business.    As a second step in Defendants' unlawful scheme, Marsh and each of its conspirators agreed, and Marsh's co-conspiring insurers horizontally agreed, to reduce or eliminate competition among the conspiring insurers themselves as to that secured book of business.    The key aspect of these defendants' agreement in this regard was that each conspiring insurer would be permitted to keep its own incumbent business, and that Marsh would protect that business from competition, using a variety of incumbent protection devices, including the solicitation of false bids.    As described below, Marsh and its insurer co-conspirators each understood and agreed that incumbent protection was a necessary element in its scheme to allocate Marsh's premium volume in the manner calculated to achieve the highest profits, both for Marsh and its co-conspirator insurers. Because, on average, more than ___ of Marsh's premium volume was renewal business, the co-conspirators "incumbent protection racket" effectively reduced or eliminated competition for the bulk of Marsh's business.

       **(i)**      **<u>The Participants in the Marsh Broker-Centered
Conspiracy Agreed that the Bulk of Marsh's
Customers would be Allocated to the Conspiring
Insurers</u>**

97.    In the early to mid 1990s, in an effort to maximize its contingent commission
revenue and increase its profits, Marsh agreed with certain carriers that it was going to place the
bulk of its business with a limited number of "preferred" or "partner" insurers.  Carriers were
selected to be a "preferred market" or a "market partner" as it was sometimes called, when they
agreed to pay Marsh contingent commissions based primarily on the volume of the business
steered to the carriers.  Marsh referred to the contingent commission agreements as placement
service agreements or "PSA's."

98.    As part of this consolidation effort, in the early to mid 1990's, Marsh created and
developed a special division designed to bring the marketing of its insurance brokerage services
under one centralized department -- the Global Broking Division ("Global Broking").  Global
Broking concentrated the marketing and negotiating power of all Marsh regional and local
brokers into a single set of offices headquartered in New York City.  _____

_____

_____    With the establishment of
Global Broking, the responsibility for negotiating PSA's was put into the hands of a small group
of people who were then in the position to control insurance placement so as to maximize
Marsh's contingent revenue.  As Bill Gilman, Executive Marketing Director at Global Broking
Excess Casualty, explained:

> If we had control over the business then we could make the insurance companies
> give us lucrative placement service agreements we would have the ability to
> reward them or take the business way.  We had control over whether or not they
> got the business**.**

99.    Global Broking handled more than half of the insurance placements for Marsh,

including excess casualty, healthcare, FINPRO, environmental, property and middle market. Each of these lines of business was headed by a managing director. Global Broking Excess Casualty, for example, was run by a Global Excess Casualty Placement Leader and was organized by Global Broking Coordinators ("GBC's") and by placement teams (also referred to as Local Broking Coordinators) ("LBC's"). The GBC's held senior level, leadership roles within Global Broking and were responsible for groups of regional offices. The GBC's coordinated the insurance program for the client including the development of the "broking plan" which set forth the name of the incumbent carrier as well as the insurance companies to approach for protective quotes.

100. LBC's were dedicated to Marsh's "preferred markets," that is, those carriers with which Marsh had its most lucrative contingent commission agreements. LBC's dealt directly with the underwriters of the preferred markets and would not allow Marsh's Client Advisors (CA's) to communicate directly with the carrier. In fact, an underwriter quoting "directly" to a Marsh client advisor interfered with the operation of the conspiracy because it prevented Global Broking from ensuring "that the incumbent who hits a target and provides the coverages requested is protected."

101. Marsh Global Broking closely monitored and controlled the placement of premium with its preferred carriers. Its Middle Market division, for example, grouped its preferred insurers into three tiers, classified as A, B and C tiers, based on how much they were paying in contingent commissions. Tiers A and B were the more preferred markets to which the bulk of premium was allocated. In fact, a Marsh internal document entitled "Rules of Engagement" states: _____

_____

_____

102. To further its effort to allocate premium to its Tier A and B insurers, Marsh Global Broking Middle Market created "Tiering Reports" as a tool to monitor premium placements with its preferred carriers. According to a 2003 Marsh Tiering Report "the purpose of this exercise was two fold: _____ _____ All of the participants in the Marsh Broker-Centered Conspiracy enjoyed either Tier A or Tier B status at various times during the class period.

103. Success at Marsh Global Broking was defined as placing as much premium as possible with partner markets. Global Broking employees were required to evaluate themselves in documents entitled "Balanced Scorecard." Many of these self-evaluations included the employees' success in moving business to Marsh's partner markets. For example, the self evaluation for _____ (former GBC in Global Broking Excess Casualty) described that he "direct[ed] business to partner markets that respond to our marketing philosophy." Similarly, the self evaluation for _____ (former LBC in Global Broking Excess Casualty) described how she "[s]upported key partner markets AIG & Zurich, [and] actively directed business to 'new' partner markets, e.g., ACE (Holman), St. Paul (Turner & Lend Lease)."

104. Because of these efforts, Marsh was successful in allocating the bulk of its premium volume to its preferred carriers. By 1999, Marsh had consolidated 80%-85% of the premium paid within its top 12 markets. The concentration of premium volume in its preferred markets continued throughout the Class Period (as defined below), as insurers paid higher and higher contingent commissions for a guaranteed flow of premium. Furthermore, Marsh's reports on its

annual contingent commissions from 1999 to 2003 show that its contingent commission income

from national commercial PSA's grew from _____ in 1996 to _____ in 1999 to

_____ in 2003.

> **(ii)**      **The Participants in the Marsh Broker-Centered Conspiracy Agreed not to Compete for each Other's Customers**

105. A central element of the agreement among the participants in the Marsh Broker-

Centered Conspiracy was that each insurer would be permitted to keep its incumbent business,

and that Marsh would protect that business from competition, both from insurers inside and

outside of the arrangement.  Marsh facilitated this horizontal agreement among its insurer co-

conspirators with a variety of devices designed to protect its co-conspirators' incumbent status,

including the solicitation of collusive, protective quotes.  As described below, Marsh and its co-

conspirators understood and agreed that incumbent protection was a necessary element in its

scheme to allocate its premium volume in the manner calculated to achieve the highest profits,

both for itself and its co-conspirators.  As an employee of Munich ruefully observed "*the

incumbent protection racket works great when you're the one being protected.  Conversely, when

you're on the outside looking in, it creates a barrier to entry on new accounts.*"

106. Numerous employees of Marsh acknowledged Marsh's objective to protect its co-

conspirators incumbent business.  For example, Kathryn Winter acknowledged that Marsh

protected the incumbent insurers' renewal business if they hit a target price set by Marsh.  As

Ms. Winter stated:  "if the incumbent markets meet their target price and does [sic] the coverage

we want, *[Marsh Global Broking] will protect them and make sure they get the business*."

107. The insurer partners were aware of and agreed horizontally to participate in the

incumbent protection scheme.  An email between employees at Zurich, bearing the subject

"Protection," demonstrates this complicity:  "We need and expect to be protected on our renewals just like AIG is protected on theirs."  The email further states:

> The only solution I see if we can not get protection against the AWAC's and ACE's of the world who have not been there for MMGB in the past when needed favors, is to go after AIG leads which we are very prepared to do.  If we can not get proper protection, we will go hard after AIG leads that we feel you are protecting.  We will no longer provide you with protective quotes for AIG but will put out quotes that you will be forced to release, just like you tell me you are forced to release AWAC and ACE quotes.

> I do not think we are asking for the moon.  We just want the same protection given to AIG and MMGB is definitely not doing that for Zurich now.

108.  A former ACE employee also acknowledged that Marsh's system of protecting the incumbent allowed insurer carriers, like ACE, to obtain last looks on placements and avoid real competition.  According to this former ACE employee, "Marsh [Global Broking] preferred incumbents to remain on placements, so . . . if you were the incumbent on the game plan, you would get last shot," meaning that the incumbent would be "protect[ed] from competition."

109.  According to this former employee, ACE understood that Marsh would protect the incumbent of an excess casualty risk by not sending submissions on that risk "out to competition," or by getting "quotes from other carriers that would support the incumbent as being the best price."  ACE indicated its willingness to accept these terms from Marsh and provided losing quotes, so long as "the Ace renewals with Marsh will equally be 'protected.'"

110.  CNA acknowledged the benefits of incumbent protection, including the receipt of "last looks."  In describing CNA's relationship with Marsh, a CNA employee stated "we have a preferred relationship with Marsh.  Our results with a $90 million GWP increase attest to this.  This frequently results in 'last look' pre-notification of terms and conditions and selected new business submissions."

36

111.  Axis was well aware of how Marsh's incumbent protection system worked after being informed by Bill Gilman that "*he [Gilman] could keep business with incumbents by allocating the business among underwriters if he could get renewals without an outside competitive presence*."

112.  A former AIG underwriter, Karen Radke, who pled guilty to a scheme to defraud in connection with the regulatory action against AIG, stated that Bill Gilman told her about the "Marsh system" and that it was very important that she "not compete for other business" in order to retain her business when her accounts were up for renewal.

113.  Chubb similarly agreed to eliminate competition by conspiring with Marsh and the other preferred insurers.  In an April 1998 "Joint To Do List" from a meeting between Chubb and Marsh, Chubb notes that Marsh and Chubb branches "will meet on the top 5-7 renewals for each branch (beginning with May renewals) to discuss pricing and strategy to retain the accounts *without marketing them*."

        **(iii)**      **<u>Marsh and Its Preferred Carriers Conspired to Protect Each Other's Incumbent Business Through Bid-Rigging and Other Overt Acts</u>**

114.  As detailed in the Revised Particularized Statement, on numerous occasions, insurer conspirators in the Marsh Broker-Centered Conspiracy provided alternative quotes at Marsh's request to protect the incumbent status of a rival insurer or to support the placement of the business with another conspiring insurer.  The conspiring insurers engaged in this conduct in furtherance of a common scheme to allocate Marsh's customers to the incumbent Insurer, and protect those Insurers from having to compete for this business.  Because, on average, more than __ of Marsh's premium volume was renewal business, the co-conspirators "incumbent protection racket" effectively reduced or eliminated competition for the bulk of Marsh's business.

115.  Kathryn Winter admitted that "the primary goal of th[e] scheme was to maximize Marsh's profits by controlling the market, and protecting incumbent insurance carriers when their business was up for renewal."  In fact, Ms. Winter stated that the agreement among Marsh and its preferred insurers to protect the incumbent required the conspiring Insurers to "artificially" provide "quotes . . . that were non-competitive."

116.  Marsh's preferred insurers colluded with Marsh to supply these losing quotes so that they would be protected from competition when their own business was up for renewal. These non-competitive fictitious quotes were also known as, "alternative quotes," "B Quotes," "B's," "phony quotes," "false quotes," "fake quotes" "protective quotes," "throwaway quotes," "bullshit quotes" and "backup quotes."

117.  These quotes were often part of the "broking plans" that the GBC's prepared when an account was up for renewal.  The broking plans assigned the business to a specific insurer at a target price and outlined the coverage.  The broking plans also included instructions as to which preferred Insurers would be asked to provide alternative quotes.  If the incumbent Insurer hit the "target", it would get the business and then the LBC's would solicit "alternative", "B" or non-competitive quotes from other members of the conspiracy.

118.  It was rare for a broking plan to request a competitive quote from a non-incumbent insurer.  Rather, the "alternative" carrier was directed as to what quote to provide, invariably a non-competitive quote designed to make the incumbent's quote look attractive.  If the non-incumbent Insurers did not comply with the broking plan and provided a competitive quote, Marsh harshly retaliated.  As Bill Gilman stated:

> Important to give alternative market the expiring and target.  Thus, if an alternative quotes below then they have made a conscious decision to quote below the market and pull the market down.  **If that happens, then (according to Bill) we will put this guy in open competition on every acct. and CRUCIFY him.**

**Further, we must make sure incumbent keeps this (or another market) and NOT give it to the alternative and reward them**.

119. AIG, for example, provided protective quotes when requested, knowing it would be shielded from normal competition when its business was up for renewal. AIG employee Karen Radke stated that she provided protective quotes when the broking plan called for it "[t]o show, to pretend to show competition where there is none." Radke was told by Bill Gilman that AIG should provide protective quotes so that AIG would not face competition on its own renewals.

120. In exchange for providing losing quotes, AIG, as promised, was protected on its own renewals by other members of the conspiracy. For instance, ACE was asked by Marsh to submit a fictitious quote so that AIG would not lose an account: "We were more competitive than AIG in price and terms. [Marsh] requested we increase premium to $1.1M to be less competitive, so AIG does not lose the business." ACE complied.

121. As detailed in the Revised Particularized Statement, other insurer co-conspirators submitted "accommodation quotes" in order to protect the business of a rival carrier and receive similar protection on their own business. For example, on three occasions in late 2001, Munich provided quotes that were intentionally higher than the quotes submitted by AIG, in order to protect AIG's incumbent status on the accounts.

122. Liberty Mutual also provided protective quotes when the broking plan called for it. According to Kevin M. Bott, an Assistant Vice President Underwriter in the excess casualty division at Liberty Mutual, Marsh brokers asked Mr. Bott "to submit protective quotes on certain pieces of business where Marsh had predetermined which insurance carrier would win the bid." Mr. Bott "understood that such quotes were intended to allow Marsh to maintain its control of the market and to protect the incumbent." Additionally, Mr. Bott "understood that Liberty benefited from this scheme; when Liberty submitted a 'B quote' on the lead layer of insurance,

Marsh often allowed Liberty either to renew its place on the excess layer or to gain new business."  In furtherance of the scheme, Liberty Mutual provided losing quotes at Marsh's request.

123.  Travelers submitted a "B quote" in order to protect the business of XL in the Schmidt Baking account.  Its cooperation paid off when its own renewal was protected despite a significant rate increase.  In order to convince its client that the increase was justified, Marsh reached out to Zurich and ACE to provide higher non-competitive bids.  As a Marsh executive wrote to Zurich:

> *I need a protective quote.*
>
> Please email me indicating you would need a 2mm per occurrence, and make your premium for [the layer] unattractive, St. Paul is the incumbent and they offered [the layer for] $351,000 . . .

124.  XL, on its part, not only received protection of its incumbent status, but provided such protections as well.  The head of XL's U.S. Excess Casualty Unit, Diane Amodeo, described her unit's working relationship with Marsh as follows:  "We [XL Excess Casualty] are generally cooperative in providing 'backup' quotes to protect incumbents when required to do so."  Indeed, XL was repeatedly asked by Marsh to provide "B quotes" to support the proposed insurer in the broking plan and often did.  For example, in connection with the State Farm account on which the incumbent AIG had hit the target, Marsh requested and received a losing quote from XL.

125.  Chubb also participated in the scheme by providing protective quotes in return for protection of its own status.  When asked for a "bullshit" quote to support the AIG lead, Chubb complied with an uncompetitive number and the business was retained by AIG.  Chubb also accommodated Marsh and an incumbent rival by declining to bid when asked to do so.  Joshua

Bewlay emailed Kathy Drake, LBC team leader for Chubb on February 27, 2001: "Need Chubb to say no thank you on a lead basis and excess basis." Chubb responded just a few hours later with a declination and the client ended up purchasing its primary layer of insurance with AIG. In return for its cooperation, Chubb was often protected when its business was up for renewal. Chubb won the renewal in the Basic American account after Marsh asked Liberty Mutual and Zurich to provide B quotes. Additionally, Chubb was rewarded with a protective quote from XL, which supported that Chubb's "pricing is comparable to the market."

126. Fireman's Fund was asked for protective quotes in return for protection of its own status. When requested to assist in the protection of an incumbent Insurer, Fireman's Fund provided a "declination" to the LBC, allowing the incumbent to retain the business. When its own accounts were up for renewal, Fireman's Fund was in turn protected with B quotes from AIG, ACE, Liberty Mutual and Zurich, among others.

127. Axis has admitted that it provided protective quotes to Marsh. In a letter to the Connecticut Insurance Department dated January 14, 2005, Axis stated that Axis employees submitted quotes that were "higher than one or more quotes that may have been, or were anticipated to be submitted on the same account by another insurance company," and that the underwriters who submitted the quotes knew they "would not be chose[n] for the primary layer of coverage on that account."

128. Marsh also invited other members of the conspiracy to collude. For example, on at least two occasions, in 2001 and 2002, Marsh requested false quotes from CNA. Specifically Marsh requested CNA to provide a quote which is "reasonably competitive, but will not be a winner" and listed the quotes provided by ACE and Zurich.

> **(iv)** **Marsh and Its Preferred Carriers Agreed that In Return for Contingent Commission Payments, The Insurer Participants Would Be Guaranteed Access to a Specific Amount of Premium Volume**

129.  The customer allocation scheme included agreements among the conspiring insurers that they would be guaranteed access to a specific amount of Marsh's business.  Indeed, Marsh made explicit premium commitments to its preferred insurers, promising, for example, to give ACE $100M in excess casualty business for 2003 and $175M in excess casualty business in 2004.

130.  The amount of premium promised to each conspiring insurer was determined by the premium threshold levels negotiated in the PSA's between Marsh and its partners.  Indeed, more than 80% of Marsh's PSA agreements established a volume floor for contingent commission payments, with the consequence thatt Marsh would receive no payment at all unless it placed a minimum volume of premium with that particular insurer.   These volume threshold commitments reflected a tacit agreement among the conspiring parties that Marsh was guaranteeing the delivery of a specified minimum amount of premium volume.  For example, when Marsh and Zurich negotiated its PSA for excess casualty in 2003, Zurich expected to be delivered premium volume sufficient to meet the negotiated threshold.  It also understood that the premium volume delivered to Marsh's other preferred insurers for Marsh's excess casualty business would be based upon the premium thresholds set forth in those agreements.

131.  To meet the premium threshold levels promised in the agreements, Marsh steered business, with little or no competition, to its insurer co-conspirators.  As one Global Broking Manager said: "*Some PSAs are better than others.  Shortly we will tier our market and I will give you clear direction on who we are steering business to and who we are steering business from.*"

132.  For example, as described more fully in the Revised Particularized Statement:

- Marsh steered business to Chubb as one of its preferred carriers, in order to trigger a PSA payment: "As [Marsh has] stated before, they are anxious to undertake 'Operation Switzerland'…their term for moving [Zurich] business to us."

- Marsh steered business to Crum & Forster, in order "to break through the $50m threshold."

- Marsh steered business to Liberty Mutual, and protected Liberty from having to compete for it: "See what coaching and/or pricing info we can get from Marsh before releasing our quote. *They are supposedly going to try and steer the business our way*."

- Marsh steered business to Travelers, because "St. Paul recently did big favors for Marsh." Marsh also stated that Travelers should be put in broking plans for any new business so that they could be awarded the business "if they meet the target."

- Marsh steered business to XL. Kathryn Winter was advised to direct new business to XL by the end of 2002 in return for favors that XL had provided to Marsh. Ms. Winter's notes from a Monday morning meeting held on November 25, 2002 state that XL should be given four new leads on new business and put in the broking plans so that they can get the accounts if they meet the target prices.

- Marsh steered business to Axis in order "to get over 40mm bar" and asked its employees to make "bigger push."

- Marsh steered business to Hartford because Hartford was at ___ growth and Marsh would "get an extra point on all business above ____."

133. To meet the promised volume thresholds, the preferred insurers expected and received competitive advantages and protection from competition. The conspiring insurers' expectations in this regard are illustrated in an email written by Liberty Mutual's Patrick O'Connor: "again DEMAND, that marsh gives [Liberty Mutual] property *the consideration and preference we mutually and formally agreed to via the psa agreement.*" Liberty also made clear that with its PSA, it "expect[s] preferential treatment in return."

134. Fireman's Fund also expected greater business in return for its PSA with Marsh. The "Bottom Line" is that "Marsh Brokers should only be sending us business (Primary and

Excess) that are within our appetite – and that we should also be awarded our fair share of that business."

**(v)    The Insurer Defendants Understood their Role in the Conspiracy and Were Disciplined if they Did Not Go Along**

135.  As in all effective conspiracies, participants who did not play ball were disciplined. Marsh's message was loud and clear that if an insurer did not have a PSA with Marsh, it would not receive any business and would not be protected from competition.

136.  Chubb learned as much in 1999, when it refused to pay Marsh the contingent commissions it sought.  As a result, Chubb was informed that it was "no longer a preferred market" and that "all Chubb renewals will be marketed with the implication that the book will be depopulated."  When Chubb business was subsequently moved, Chubb was advised that it was being "punished."

137.  Marsh used the situation with Chubb as a threat to other insurers, promising ACE and Fireman's Fund similar treatment if they did not stay in line.  CNA also recognized that defiance would be punished:  "Marsh is saying that they are not happy with this agreement for open brokerage and is already threatening to not place business with us.  If we cannot work out an agreement with Marsh, they likely would reduce their writing."

138. Liberty Mutual also learned that it was "not on marsh's 'preferred partner list' because of [its] refusal to do a psa in 2002," and that Marsh was steering business away from Liberty.   When Liberty Mutual "lost a renewal account after matching terms/conditions requested by the broker," it questioned Marsh as to why, to which Marsh responded, "no PSA." Liberty was so unhappy with its "dismal" 2002 results that it agreed to a PSA with Marsh for

2003.  As soon as Liberty confirmed its intention to proceed with a 2003 PSA, Marsh made clear that Liberty Mutual was again a market Marsh would use.

139.  Likewise, XL knew that a PSA was a "prerequisite" for doing business with Marsh and that PSA payments determined the level of business that XL could expect from Marsh.  One XL executive stated:  "We know they [Marsh] will move even more business away from XL unless we provide them some incentive to continue."

140.  As AIG observed:  "Because we incent Marsh to write more business through us through a PSA, we expect to get more business as compensation levels are based on growth thresholds."

<b>(vi)    Communications Among the Participants in the Marsh Broker-Centered Conspiracy Facilitated By Marsh Furthered the Conspiracy</b>

141.  Marsh shared information with its preferred insurers in order to ensure that the conspiracy would operate successfully.  In particular, Marsh told its preferred insurers who the other conspiring insurers were; details of the contingent commission arrangements that the other insurers had with Marsh; the amount of contingent commissions paid by other insurers; and the amount of premium volume delivered or expected to be delivered to other partner insurers.

142.  The conspiring insurers were aware, for instance, not only what tier or level they were on, but which other insurers shared their status.  For example, a September 1997 internal Chubb memo shows that Chubb discussed with Marsh:  "who the top ten carriers are, the nature of the placement agreement they have with them, the names of the carriers they expect to close out in 98…and a review of how their other major carriers are handling the roll in."

143.  Details of competitor's PSA's were freely shared among the co-conspirators.  Marsh told ACE that Marsh would be "candid and absolutely honest about where [ACE's] PSA

45

stands relative to similar partners in terms of both %'s and growth thresholds." The conspiring Insurers also had access to the proprietary information of their rivals, including "key components" of PSA's, and a comparison of payouts based on a uniform set of premium and expense factors.

144. Documents in Crum & Forster's possession also show that it had access to competitor's proprietary information. A 1999 email entitled "PSAs – The Competition" includes comparative information on the key components of PSA's offered by seven of Crum & Forster's competitors, and a comparison of payouts of twelve competitors based on a uniform set of premium and expense factors.

145. Global Broking also told Munich the details of how much the other preferred insurers paid in contingent commissions, advising Munich of the terms of AIG's and other insurer's PSA's. In fact, the insurer conspirators communicated with one another about the terms of their PSA arrangements with Marsh. A Munich employee wrote: "AIG does it this way and I spoke with ACE and they do something similar." Indeed, the exchange of this type of information permitted the conspirators to monitor not only what their co-conspirators were paying for their premium volume, but also, what they were receiving in return.

146. Marsh provided Liberty Mutual confidential information about the business of other carriers, including how Liberty Mutual's hit ratios (sales/proposals) compared to those of other carriers. Marsh also advised Liberty Mutual it "is one of [Marsh's] top 9 preferred markets; that it is "ranked about 5th; but "other than AIG, there's a very small % difference … that separates the 2nd - 6th ranked carriers."

147. Marsh also shared detailed information with its conspiring Insurers regarding upcoming renewals. This information was detailed in charts, entitled "Account Logs" or

"Account Assignments" and contained information regarding proposed game plans on accounts, whether the Insurer would be needed to provide non-competitive quotes and other information regarding the other preferred Insurers.

148. For example, on June 16, 2003, Greg Doherty, Marsh's LBC for ACE, sent an email to underwriters at Liberty Mutual *and* ACE, among others, attaching a chart entitled "Doherty Account Assignments."  The chart included information concerning the accounts where ACE or Liberty Mutual will provide alternative quotes.  The chart also included the terms of the incumbent Insurer's lead quote.

149. Mr. Doherty sent similar account logs to ACE and/or Liberty Mutual on other occasions.  On each occasion, the account log outlined proposed game plans for a number of accounts and detailed whether ACE would be providing "B" quotes on certain renewals.

150. Marsh also disclosed to the conspiring insurers information about the amount of premium Marsh delivered to other conspiring insurers.  ACE for example was aware that AIG was "Marsh's clear number one market" for excess casualty (with about $800M in premiums) and that Zurich premium was about $200M.  Marsh likewise told AIG that ACE wrote "just under $200M in excess casualty business."

151. Marsh facilitated the exchange of information about co-conspirator status by sponsoring meetings that its preferred insurers attended.  Frequent meetings at the annual CIAB conference at The Greenbrier also afforded Marsh the opportunity to share information about its arrangements with its preferred carriers and to compare notes on the terms and profitability of the various contingent commission arrangements.  There, Marsh routinely held both private meetings with carriers as well as meetings with groups of carriers.

152.  In addition to facilitating the exchange of information at The Greenbriar, Marsh and its most senior executives exchanged information with the executives of its preferred Insurers about the status of the other preferred insurers, at meetings that were referred to as "Executive Partnership Meetings."  These meetings provided a forum for review and discussion concerning the status of the relationship and to comment on the quality of the PSA agreements.   In preparation for these meetings, Marsh compiled briefing materials for its attendees which included, *inter alia*, a list of PSAs with the carrier, the quality of the PSA as compared to other Marsh preferred carriers, and information regarding how to meet thresholds in the PSAs.

> **(vii)**     **The  Co-Conspirators  benefited  from  the Operation of the Conspiracy**

153.  Both Marsh and its conspiring insurers profited handsomely from their anticompetitive arrangement.  Marsh saw its contingent commission revenue for Global Broking skyrocket from _____ in 1992 to _____ in 1999.  In 2001, Global Broking's contingent commission revenue reached _____ and by 2003, Global Broking's contingent commission revenue reached _____.

154.  Marsh's insurer co-conspirators saw their gross written premium skyrocket as well. As Liberty Mutual acknowledged, "I do believe [that] our PSA played a role in seeing our book of business nearly double with Marsh from 1999 to 2002."  In fact, Liberty Mutual's book of business with Marsh grew by 73% from 2000 to 2002, while paying $1.45 million in contingent commissions which was a "small price for $80M in additional revenue!"

155.  Travelers characterized its success with Marsh in 2002 and 2003 as "dramatic" as its book of business with Marsh increased almost 900%, growing from _____ in 2001 to _____ in 2002 to _____ in 2003.  Likewise, ACE's gross written premium with Marsh grew from $3.95 million in the first half of 2002 to over $34 million in the same period in

2003, an 860% increase; Crum & Forster's gross written premium with Marsh more than quadrupled from 2000 to 2004, from $35 million to over $170 million; and Fireman's Fund's gross written premium grew from $142,000 in 1997 to $2.6 million in 2001.

156.  The Marsh Broker-Centered Defendants understood that it was the clients who paid the price for this increase in the profitability of the conspirators.  As one Marsh manager wrote to an insurer complaining about the size of the commissions:  "In answer to your question 'does Marsh understand that the PSA is an expense load to the premium', their answer is absolutely. And ever [sic] other market has to cope with the same expense load components as part of their overall premium 'equation.'"

(2)    <strong>The Aon Broker-Centered Conspiracy</strong>

(a)    <strong>Participants in the Conspiracy</strong>

157.  During the Class Period, from January 1, 1998 through December 31, 2004, participants in the Aon Broker-Centered Conspiracy have included Aon and its Insurer Defendants ACE, AIG, AXIS, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, Travelers, XL and Zurich (the "Aon Broker-Centered Defendants").

(b)    <strong>Operation of the Conspiracy</strong>

158.  Aon allocated its customer base to and among its conspiring insurers in two steps. First, Aon and each of its co-conspirators agreed, and each of the conspiring insurers horizontally agreed, that Aon would "consolidate" its business by directing the bulk of its premium volume to its "strategic partner" co-conspirators, thereby eliminating hundreds of other insurers from competing equally with the conspiring insurers for the majority of Aon's business.  As a second step, the Insurers members of the Aon Broker-Centered Conspiracy all agreed with Aon, and agreed horizontally among themselves, to reduce or eliminate competition for that secured

business among the conspiring insurers.  One aspect of the conspirators' agreement was that each conspiring insurer would be able to keep its own incumbent business, and that Aon would protect that business from competition by using a variety of incumbent protection devices.  Because more than half of Aon's premium volume was renewal business, the Insurer Defendants' agreements not to compete for each other's customers, in return for protection of their own business from competition, effectively reduced or eliminated competition for the bulk of the insurance placed by Aon on behalf of Aon's clients.

**(i)      The Participants in the Aon Broker-Centered Conspiracy Agreed that the Bulk of Aon's Book of Business Would Be Allocated to Aon's Strategic Partners in Exchange for Contingent Commission Payments**

159.  Beginning at a time unknown, but certainly by the late 1990s, Aon saw an opportunity to maximize its contingent commission revenue by placing the majority of its business with a small number of "strategic" or "premiere" partners with whom it had its most lucrative contingent commission arrangements.   In return for their contingent commission payments, these "strategic partners" were allocated a guaranteed flow of premium dollars and were protected from competition from those outside of the arrangement.   The insurer co-conspirators were kept abreast of the terms of the agreements that other members had with Aon, and shared competitive information that would have been economically irrational to share in the absence of a conspiracy.

160.  Aon's consolidation efforts were extensive and well coordinated, and were overseen at the highest levels of the company.   Aon's two top executives, Patrick Ryan (the founder, chairman of the board and then-CEO) and Michael O'Halleran (the chief operating officer), were

50

both focused on the consolidation of markets and movement of business to Aon's conspiring Insurers.

161. Its efforts in this regard were communicated to its Insurer co-conspirators. A Chubb document from 1997 notes:

> Aon Group, has formed a new subsidiary, Aon Enterprise Insurance Services, Inc. into which it will consolidate more than $300 million in gross premiums to Aon Group's smaller accounts. This business will be served by four carriers: Chubb, Kemper Insurance, Wausau Insurance Company (a division of Liberty) and Virginia Surety (an Aon subsidiary)…. [W]e were selected as one of the four partners in the new venture.

Aon not only identified the four partner insurers to Chubb, but also allocated a substantial premium volume to Chubb. The Chubb document continues:

> Our participation in Aon Enterprise will result in more than $70 million of new premiums to Chubb in the short term as Aon Group consolidates its book.

Prior to this consolidation the business was written by over 1000 carriers.

162. To carry out its agreement with its conspiring Insurers to consolidate its business with them and allocate business among them, Aon concentrated control over national contingent commission agreements in the hands of a small group of executives known as the Syndication Group. The Syndication Group's mandate was to "drive further market consolidation to achieve . . . improve revenue management . . . [and] greater market leverage."

163. In keeping with the mandate of Aon's Syndication Group, Aon executive Bruce O'Neil, directed Aon's senior executives to "urge marketing departments to use the 'Big 10' carriers" so that Aon could "receive the largest commission possible." These Aon senior executives were also instructed "to consolidate business with Strategic Partners and move away from some of the smaller lines we use." Joseph Lombardo, a senior executive with Aon Risk Services ("ARS"), wrote that "[w]e absolutely, undoubtedly, without question, should not be

51

doing business with the number of markets that we currently do."  Lombardo estimated that Aon would be able to "knock off about 20 carriers" in the course of its consolidation effort.

164. In 2000, Aon named as its strategic partners AIG, Royal, Travelers, Hartford, Zurich, Chubb, Kemper and CNA.  A chart from June of 2001 shows that Aon was tracking its national agreements with ten "Strategic Partners":  CNA, Chubb, Fireman's Fund, Hartford, Kemper, Liberty Mutual (through Wausau), Royal, Travelers, and Zurich. Nearly two years later Aon's core cast of strategic partners looked quite similar, and included ACE Bermuda, CNA, Chubb, Hartford, Liberty Mutual, Traveler's, XL/ELU and Zurich.

165. Senior ARS executive Tom Rodell explained the plan of consolidation and allocation succinctly:  "Our vision is that for each product/industry, we would have a relatively small number of selected strategic partners where we would place the majority of our business, and we would have appropriate PEF [a form of contingent commission] Agreements."

166. Consolidation continued until the end of the relevant time period.  When AXIS wanted to increase its revenue related to smaller, mid-size business, it learned that Aon had allocated those clients to AIG, Chubb and Travelers. An AXIS internal memorandum from 2004 reported that Aon was "considering adding additional partners" in connection with this business. While AXIS had "stated [its] interest in participating as a preferred market…Aon has not concluded their internal conversations as to whether they will be adding markets or not." Eventually, because Aon concluded that AXIS had one of the best PSAs, they were granted entry to the conspiracy and included in Aon's list of "top ten" carriers.

167. The 2004 ARS business plan confirms that the conspirators' market consolidation efforts continued into 2004:  "Our Leading Carriers have been condensed into seven carriers, down from nine, where we enjoy National Professional Enhancement Fund [PEF] Agreements

with a defined placement strategy.  These carriers are Chubb, Hartford, Travelers, St. Paul, CNA, Liberty Mutual and Zurich.  Our strategy in middle market is to create a condensed group of markets that can handle 80-90 percent of our business obtaining cost efficiencies in dealing in this market segment."

**(ii)**      **The Insurer Participants Agreed to Refrain from Competing for Each Other's Customers and Expected Aon to Protect their Renewal Business from Competition**

168. The Insurer co-conspirators knew of and understood their role in the conspiracy. Each was a "strategic partner" of Aon during the relevant time period and each received the guaranteed premium allocation and the protection from competition that status afforded.  Each Insurer co-conspirator agreed to refrain from competing for other Insurer's incumbent business and each expected Aon to protect that renewal status.

169.  One of the mechanisms for allocating premium that was agreed upon by Aon and its conspiring insurers was very simple:  protection of incumbent business.  Members of the Aon Broker-Centered Conspiracy understood and agreed that when one of their accounts was due for renewal, Aon would take steps to keep that account with the incumbent insurer.   Aon accomplished this by failing to seek competitive bids, giving the incumbent a "last look" on the account, and/or providing other anticompetitive information and advantages.

170.  Aon employees oversaw the incumbent protection aspect of the conspiracy.  For example, Rhonda Rayha wrote to Carol Spurlock about an "incident" where Travelers "brought to my attention that we are not protecting our incumbent, premiere markets."  The email went on to note that "[i]n addition to our Syndication colleagues I have communicated to the Region our commitment to our 'premier-market' relationships."

53

          **(iii)**      **The Participants Agreed that in Return for their Contingent Commission Payments, They Would Be Guaranteed Access to a Minimum Amount of Premium Volume**

171. The insurer co-conspirators also agreed that access to new business would be protected from competition, and that they would be allocated a guaranteed level of both types of business. As an employee of Chubb noted, "Chubb is Aon's preferred market for all new business. We will get first look and be guided as to how we stack up against the competition…he has steered several new lines our way."

172. ACE understood the competitive advantages of being a strategic partner, noting that "high front end commissions" were necessary to "focus" Aon's brokers on providing "value" to ACE in the form of placements. According to a memo, Aon's National Property Practice leader met with ACE and "re-committed to increase submissions to ACE."

173. Aon regularly tracked the premium levels directed to its insurer co-conspirators in order to allocate business in accordance with the thresholds embodied in the contingent commission agreements. For example, ARS employees corresponded about the progress of allocating the agreed level of premium to Zurich: "Attached is a spreadsheet showing our production results as of Dec. 17th. Aon's net premium now stands at slightly more than $82.5 million. Getting very close to the next threshold now. Only $7.5 million to go."

174. Steering business to conspiring insurers was a well-accepted and important element of the agreements among Aon and its co-conspirators. In August 2000, Bruce O'Neil wrote to Patrick Ryan and Michael O'Halleran:

> Suggest we use Atlantic Mutual and CGU to "payoff" Chubb to secure $4,300,000 agreement or 1% override (see May 18, 2000 agreement) for our entire Chubb ARS book.

In other words, Aon would transfer business from carriers who were not conspiring insurers in order allocate premium in the agreed-upon amounts.

175.  As ARS entered into agreements to allocate business in place with various conspiring insurers, it disseminated internally a mandate to deliver on promises that were made to steer business to those insurers.  Carol Spurlock wrote to a colleague:  "Going forward, we are going to push Zurich.  I just today negotiated our incentive so that we will get paid next year."

176.  The effort to allocate business according to the agreements between the co-conspirators continued.  After a 2003 conference call about the status of production to various strategic partners, Spurlock noted:  "St. Paul does not have a last look on Kemper business.  We own the business, preference is to place with Chubb when we can.  . . . Need to continue to replace Royal business with partner carrier.  Working on a National deal with C&F.  Mainly to receive payment on what we have with them.  Not necessarily to push business there.  Need to push Hartford and Wausau on that business."

177.  ARS also provided financial incentives to employees who steered placements to the insurer co-conspirators.  Needle told one insurer that "[i]nsurer incentives are a key factor in the property bonus pool."   This message was reiterated by Needle's subordinates.   As Carol Spurlock explained to an insurance company executive:

> Let me further confirm our ability to effect [sic] placement behaviors. . . This is a measurable, compensated item that each syndicator is financially motivated to drive.

178.  Aon and its strategic partners often agreed to allocate business based another form of contingent compensation:  reinsurance brokerage fees.  Aon's reinsurance brokerage affiliates, known generally as Aon Re, charged hefty brokerage fees to retail insurers when those retail insurers used Aon to place their own reinsurance programs.   Aon's strategic partners often

agreed to use Aon Re to purchase their own reinsurance (and thus to pay Aon Re's high brokerage fees) in exchange for an allotment of business from Aon's retail brokerage affiliates.

179.  In the fall of 2000, for example, Aon allotted retail business to AIG in exchange for AIG's agreement to use Aon Re.  AIG had indicated that it was considering handling in-house a particular reinsurance program called CCA, but the parties instead agreed that AIG would gave the business to Aon Re – and pay Aon Re approximately $750,000 in brokerage fees -- in exchange Aon steering $10 million in new retail business to AIG.  An Aon executive explained:

> In return for a commitment of $10,000,000 in new gross premium from ARS US, AIG has agreed to appoint Aon Re for an additional 2.5% placement of the CCA program, which [AIG] has indicated is worth $750,000 in commission for Aon Re.

180. The practice of steering retail business to strategic partners in exchange for brokerage fees to Aon Re became so common within the Aon broker-centered conspiracy that the conspirators began memorializing those arrangements in a variety of contracts known informally as "clawbacks."

181.  Many of these clawbacks shared a similar pattern.  Aon Re would offer to discount its reinsurance brokerage commissions to the strategic partner.  To help Aon Re recover the compensation lost by the discount, Aon Re and its strategic partner would agree to a "clawback," allowing Aon Re to reduce or eliminate the reinsurance brokerage discounts by steering an allocated amount of retail insurance business to the insurer.

182.  Significantly, these "clawback" arrangements remained subject to confidentiality agreements and, as a result, Aon's retail clients were not informed that Aon steered, or had incentives to steer, business to selected insurers to recoup the discounts Aon Re offered to these insurers on the brokerage reinsurance account.

183. Liberty Mutual gave its reinsurance brokerage contract to Aon Re in 2000. In 2002 and 2003, the parties agreed to a clawback arrangement. Aon agreed to steer retail insurance premiums to Liberty Mutual in exchange for keeping Aon Re as its property reinsurance broker. Moreover, Aon agreed to reduce the brokerage commission but negotiated a provision that allowed it to recapture the discount if Aon met specified targets based on the volume or premiums for Liberty Mutual on its retail insurance business (i.e., clawback).

184. By 2003, even the relative newcomer to the conspiracy, AXIS, had a clawback in place with Aon.

185. Aon allocated premiums to its conspiring insurers in a number of other ways. In at least two instances, Aon's willingness to place its own interests and that of its co-conspirators ahead of its clients led it to manipulate the bidding process and cause insurers to submit higher bids than the insurer otherwise would have tendered.

186. In the first instance, Aon sought to help Zurich recoup funds Zurich had expended on the Pearlstine Distributors account. Aon's opportunity to reimburse Zurich came at the expense of Fieldstone Investment Corp., which had retained ARS. Shortly after Zurich's initial bid was submitted, ARS told Zurich it could raise its quote without losing the bid. Zurich won the account after raising its quote by nearly $45,000.

187. After the account was bound with Zurich, Aon explained what had occurred:

> We came back to [Zurich] and allowed [it] to increase [its] initial WC quote to approx. same as expiring, $283,532. We allowed Zurich to get more money on this. . . . This is an example of AON letting Zurich have more rate and premium when we could have held them at a cheaper price.

A later Aon internal email noted that the inflated bid not only settled the Pearlstine debt to Zurich but helped Aon get closer to achieving payout on its contingent commission goal.

188. In the second instance, Aon encouraged Zurich to raise its bid on coverage for Pitcairn Properties, Inc. from the mid-60s to just over $90,000. Zurich provided a formal quote to ARS of $92,497. Although Zurich still had the lowest quote, ARS advised Pitcairn to reject Zurich and take a higher AIG quote of $99,519. ARS justified the recommendation by telling Pitcairn that Zurich had refused to cover certain disposal sites, even though Zurich had agreed orally to cover the sites.

### (iv)    Aon Monitored and Enforced the Terms of the Conspiracy

189. During the Class Period, Aon monitored the conspiracy by cutting off premium volume supply to insurers that did not live up to their end of the bargain. As one ARS executive informed an insurer that had not yet signed a contingent commission agreement:

> We have been operating on the good faith that this [contingent commission agreement] would be mutually agreed quickly after our meeting here in NY. Based on the fact that we are almost halfway through the year, I will be advising our people in the field that we in fact don't have a [contingent commission agreement] with [Industrial Risk].

190. Aon denied premium flow to carriers who would not cooperate with the aims of the conspiracy. Munich was told that contingent commission agreements were critical to receiving any business from Aon: "As they have previously, Aon re-emphasized that all business will be placed through the newly formed Syndication unit. For a market to see any new or renewal business we must have PSA in place."

### (v)    Communications Among the Participants in the Aon Broker-Centered Conspiracy, Facilitated by Aon, Made the Conspiracy Plausible

191. The insurer co-conspirators were aware of their status with Aon, were advised of the status of other conspiring insurers, and all agreed to the corresponding allocation of business

to and among them.  Fireman's Fund was aware of the terms that Chubb, Travelers and Liberty Mutual had agreed to with Aon.

192.  Aon provided Chubb their carrier Contract Checklist, noting that "most of our strategic partner carriers were interested" in the list.  Aon also provided Chubb with copies of its agreements with its other preferred partners.  Competitive information also flowed to Aon.  Aon knew the terms of Chubb's deal with Marsh and suggested to Chubb:  "Alternatively, you could give us the Marsh deal."

193.  Aon's top executives passed information about compensation agreements between the conspiring insurers.  An email from XL's top executive, who wrote to Michael O'Halleran and referenced their discussions about compensation agreements with other insurers, stated: "Mike this is in line with our discussions and agreements with other carriers."

194.  In another email exchange, Carol Spurlock made it clear to Liberty Mutual which other insurers had access to Aon's business and why.  Liberty Mutual asked, "Is this an exclusive offer to Wausau or is this out with every carrier?"  Spurlock responded with the identities of some of Aon's other conspiring insurers, saying:  "We have had discussion with Chubb and Hartford.  Chubb has picked up some of the business, not allot [sic] of movement . . .  We went to them because our agreement is more favorable.  . . . We are having preliminary conversations with CNA and St. Paul."

195.  Aon's information-sharing role is clear in an email regarding AIG:  "PEF is in draft form and Ken has agreed in principle to our terms.  . . .They should be falling all over you guys to reward your placement and encourage you to continue to place business with them.  You can also mention that all their competitors pay us 12 to 13 points on placement."

196.  The sharing of detailed competitive information is set forth in a Crum & Forster report respecting a visit with Aon.  Aon informed Crum & Forster that its contingency agreement was "average within the industry" and that Hartford, Royal and Chubb had better plans.  The report notes that Aon "will share competitor . . . plan information with us (we met off-site)."

(vi)    **The Co-Conspirators Benefited from the Operation of the Conspiracy**

197.  Liberty Mutual recognized the positive impact of the conspiracy on its bottom line, forwarding the latest Liberty Mutual/Aon contingent commission agreement with the note "we would like to execute, announce and get it into play quickly so as to start impacting results."

198.  Aon knew that the concentration of premium in the preferred partners would make money for Aon:  "[O]ur arrangement with CNA will be quite lucrative to ARS, therefore we need to carefully yet aggressively be certain all casualty syndicators understand this is a preferred market."

199.  Aon's partnership with XL was profitable for both companies.  By 2002 Bob Needle reported that "with XL America, we grew 82% from $121 million in 2001 to $220 million for 2002."  As a result, Aon's "XL override for 2002 was $7 million[.]"

200.  Indeed, payments from the individual insurer co-conspirators, on an annual basis, were substantial.  For example, in 2004 alone, each of Aon's strategic partners paid more than a million dollars in contingent commissions to Aon, with Chubb and AIG each topping $6 million dollars, and Travelers exceeding a whopping $10 million dollars.

(3)    **The Wells Fargo/Acordia Broker-Centered Conspiracy**

(a)    **Participants in the Conspiracy**

201.  During the period from January 1, 1998 through December 31, 2004, participants in the Wells Fargo/Acordia Broker-Centered Conspiracy included Wells Fargo/Acordia and Insurer

Defendants Chubb, Travelers, Hartford, CNA and Fireman's Fund ("The Wells Fargo/Acordia Broker-Centered Defendants").

<b>(b)    Operation of the Conspiracy</b>

202.  Wells Fargo/Acordia allocated its customer base to and among its conspiring insurers in two steps.  First, Wells Fargo/Acordia and each of its co-conspirators agreed, and the conspiring insurers agreed among themselves, that Wells Fargo/Acordia would "consolidate" its business by directing a significant portion of its business to Chubb, Travelers, Hartford, CNA and Fireman's Fund, thereby eliminating hundreds of other insurers from competing equally with the five conspiring insurers for virtually 100% of its small business customers and a substantial portion of Wells Fargo/Acordia's total commercial customers.  Second, Wells Fargo/Acordia and its conspiring insurers agreed that each of these five insurers would be allocated specific business for which they would not have to compete among themselves.

<b>(i)    The Participants in the Wells Fargo/Acordia<br>Broker-Centered Conspiracy Agreed that a<br>Substantial Portion of their Customers would be<br>Allocated to the Conspiring Insurers</b>

203.  Beginning in 1997, Wells Fargo/Acordia embarked on a plan to maximize its contingent commission revenue by placing a substantial portion of its business with a small number of "partner" insurance carriers with whom it had contingent commission agreements.  As early as October 1997, top Wells Fargo/Acordia executives met with counterparts at Chubb for a "Chubb – Acordia Partnering Workshop" at which they indicated that Wells Fargo/Acordia was in the process of "consolidating its business with carriers, preferring to place the majority of its business with a small number of carriers."

204. In early March 1998, Wells Fargo/Acordia hired Charles Ruoff "to drive their initiative of consolidating their middle to [small] business markets" on a nationwide basis.  By

61

the following January, Wells Fargo/Acordia had _____ to which it would primarily seek to allocate business in 1999.

205. On March 15, 1999, Mr. Ruoff wrote an email titled "Millennium Agency System Partnership" noting that because the five insurers had agreed to pay Wells Fargo/Acordia purely volume-based overrides on gross written premium placed with them over the next three years, "they need[ed] to be given priority in our marketing plans."

206. By mid-1999, Wells Fargo/Acordia implemented a "Millennium Partnership Program" in order to "leverage [its] major [insurer] relationships." Wells Fargo/Acordia expected this program to generate millions of dollars from "Preferred Market Partners" over the next three years. The program was designed to consolidate business with a small number of conspiring insurers by giving them "the inside track for future business development."

207. From 1999 to the end of 2001, "Millennium Partner" insurers paid Wells Fargo/Acordia a __ override on total gross written premium, *plus* "growth incentives" of __ to _____ for "new business allocated to them *and* ___ to ___ for total "national growth" in overall premium delivered. Chubb, Travelers and Hartford became Millennium Partners in 1999, and CNA became one in 2000. Each of these insurer co-conspirators entered into additional contingent commission deals with Wells Fargo/Acordia in 2003 through 2004. Fireman's Fund became a "Key Partner" of Wells Fargo/Acordia and paid Wells Fargo/Acordia substantial contingent commissions during the Class Period.

208. Wells Fargo/Acordia allocated the very significant segment of its business consisting of small commercial clients virtually entirely to two Insurer Defendants – Hartford and Travelers. Both Hartford and Travelers knew of the allocation and acquiesced in the arrangement. An August 1999 Hartford document indicates that only it and "*Travelers will be a*

*mkt [market]*" and that "*other carriers [will] not [be] in direct competition.*"

209.  Hartford reported that "Acordia has made a decision that _____

will be moved with '*implied consent*' to partner carrier[s] with customer centers.  We will work

with Tom Hite [of Acordia] to facilitate the movement of business to The Hartford."

210.  Materials exchanged between Wells Fargo/Acordia and Hartford noted that the

parties would work together to _____

_____    The parties agreed that

they would  _____

_____.

211.  Wells Fargo/Acordia shared its consolidation plan with its other strategic partners.

A Travelers executive, for instance, wrote to Mr. Ruoff to confirm that that "[b]y the middle of

October [1999], each Acordia agency location will provide Acordia, Inc. a business plan

outlining their strategy to achieve growth with the Millennium Partners."

212.  The insurer co-conspirators agreed to pay significant contingent commissions to

Wells Fargo/Acordia in order to receive their premium allocations.  Travelers, for example,

advanced Wells Fargo/Acordia _____ in early 2000, _____ in 2001, and _____ in 2002,

giving Wells Fargo/Acordia a strong incentive to steer business to Travelers so that it could

avoid repaying these advances, i.e., to "incent the proper national and local commitment to the

program."  Wells Fargo/Acordia responded by making certain that Travelers business with Wells

Fargo/Acordia increased.

213.  The participants in the Wells Fargo/Acordia Broker-Centered Conspiracy explicitly

recognized the conspiracy's anticompetitive effects, because Wells Fargo/Acordia was moving

its customers' business to the Millennium Partners even if those insurers did not offer

63

competitive products.  An October 2001 Wells Fargo/Acordia report noted: "We're probably about 30-40% into our book roll [in the Columbus, Ohio office] since we're finding it hard to convert multi-year policies with other carriers to either Travelers or Hartford.  *They are just not competitive.  However, as these policies fully expire, they will be moved.*"

214.  Acordia's Pittsburgh office noted that it "has been a big supporter of the Hartford over the past several years . . . [and] supported their efforts to grow key accounts (and other areas) *when their pricing was greater than market*, … and we supported their position on increased pricing during late 1998 and early 1999 (way earlier that [sic] our other markets) when the market was still extremely soft."

215.  In January 2000, Hartford and Wells Fargo/Acordia agreed at a partnership meeting that Wells Fargo/Acordia would participate in "*selling higher increases then [sic] needed.*"

216.  The Wells Fargo/Acordia conspiracy to consolidate and allocate business with and to its Millennium Partner insurers, in exchange for sharing in the insurers supra-competitive profits by way of increased contingent commissions, continued from 1999 through 2004.

**(ii)     The Conspiring Insurers Agreed not to Compete With Each Other for the Wells Fargo/Acordia Business**

217.  In addition to agreeing that Wells Fargo/Acordia would allocate new customers and premium volume to Chubb, Hartford, CNA, Travelers and Fireman's Fund, Wells Fargo/Acordia and its co-conspirators agreed that the conspiring insurers would not compete for each others' customers.

218.  Wells Fargo/Acordia and the conspiring insurers' efforts, made with the full knowledge of all participants, included engaging in initiatives to "migrate business" and to accomplish "book rolls" – mass transfers of business based on their contingent commission deals.  Documents detail Wells Fargo/Acordia's agreement with Hartford and Travelers to

64

prevent "extensive quoting between both of us" and to facilitate the "split of accounts or books" between them.

219. Hartford noted that it "will vie for all business under $2000 per account in commission revenue" with primarily only one other insurer, Travelers, and that those two insurers would not competitively bid for the business but, instead, select which customer accounts to take on "first look" basis: "*Our primary competitor will be the Travelers for this business.  FIRST COME FIRST SERVE would be an appropriate description here.*"

220. Further, Wells Fargo/Acordia agreed not to expose ___ or more of those protected accounts to outside competition.  For example, in 2001, Wells Fargo/Acordia and Travelers expressly "*agree[d] that no more than___ of Travelers renewals will be marketed unless at the sole direction of the client.*"

221. Wells Fargo/Acordia gave its Millennium Partners that were exposed to any outside competition at all both a first and last opportunity to secure certain pieces of business.  In February 2001, Chubb noted that "[w]e are a preferred market at Wells Fargo/Acordia NY and we get first shot (and last look) at their business."

### (iii)    The Insurers Defendants Knew Each Other's Role in the Conspiracy

222. Wells Fargo/Acordia's Millennium Partners knew of each others' involvement, and each clearly understood and agreed horizontally that they had entered into these arrangements with Wells Fargo/Acordia to purchase volumes of business for which they would not have to compete with one another or with non-conspiring insurers.

223. On or about June 3, 1999, Wells Fargo/Acordia wrote to Hartford and stated that they needed to "*balance*" their negotiations "*to the understandings with other markets,*" meaning Wells Fargo/Acordia's other Millennium Partners.  "It is very important to us that we treat all of

our Millennium market partners fairly" because "[b]usiness initiatives have begun with other partners."

224. In August 1999, Wells Fargo/Acordia sent a detailed memorandum titled "Millennium Agency System Partnership" to Wells Fargo/Acordia's "National P/C [Property/Casualty] Marketing Committee," with copies to each conspiring insurer – Chubb, CNA, Hartford, Travelers and Fireman's Fund – among other potential "Partners." The purpose of the memorandum was to make certain that each understood its role, Wells Fargo/Acordia's role, and the role of the other partner carriers in the conspiracy, and agreed to the same. The memo stated, among other things, that "a number of our national insurance company markets" had "readily agreed to what we called the Millennium Partnership" by which those insurers "offered supplement incentives to the Millennium override" and that, Wells Fargo/Acordia was "concentrating on the . . . initiatives put forward by [its] 'priority' markets to the exclusivity of all other markets."

225. Wells Fargo/Acordia and its conspiring insurers, moreover, agreed to meet and communicate with each about their conspiracy under the guise of a purported project to launch a technological "quoting system" platform for use by its Millennium Partners. CNA suggested calling a "technical interface meeting with all participating carriers," which a Wells Fargo/Acordia memorandum exposed was a ruse. The memo's author stated that as to CNA, *"[I] don't think technology is the issue here but they volunteered to set up a 'strawman' scenario for multiple market [i.e., Insurer-to-Insurer] discussions."*

226. Wells Fargo/Acordia and its conspiring insurers agreed and understood that they would be subject to discipline in the form of losing business if they did not cooperate in the conspiracy. When CNA and Fireman's Fund initially hesitated to join the conspiracy, Wells

Fargo/Acordia wrote to its sales staff that "that CNA and Fireman's Fund have declined to support our financial plan without profitability stipulations. We are therefore not inclined to support any business growth with them at the determent [sic] to our Priority Millennium Partners noted above. Please be guided accordingly in the future business plans within your region." After this message was communicated to CNA and Fireman's Fund, CNA became a Millennium Partner, and Fireman's Fund became a "Key Partner."

### (iv) The Co-Conspirators Benefited from the Wells Fargo/Acordia Conspiracy

227. Wells Fargo/Acordia and its co-conspirators enjoyed substantial profits as a result of their anticompetitive conspiracy. The Millennium Partners project generated nearly _____ _____ in added revenue for Wells Fargo/Acordia, nearly 10% of which was from Travelers, in the first eighteen months "with little, if any, associated expense."

228. In the small business segment, Acordia realized "roughly ___ in commission income, including 'kickers,' from this line."

229. In 1999, Wells Fargo/Acordia received _____ in contingent commissions from the Millennium Partnership, and a total of _____ in contingent commissions.

230. In 2000, Wells Fargo/Acordia received _____ in Millennium national overrides from Chubb; _____ from CNA; _____ from Hartford; and _____ from Travelers alone, totaling _____ in Millennium Partner overrides. Wells Fargo/Acordia also received an additional _____ in other contingent commissions from those insurers.

231. Those four Millennium Partners, together with Fireman's Fund, paid Wells Fargo/Acordia _____ in contingent commissions in 2001 and _____ in 2002.

232. Wells Fargo/Acordia's contingent commissions from its five conspiring insurers grew to _____ in 2003, and to _____ in 2004.

67

233.  Wells Fargo/Acordia's Millennium Partner Markets also "grew exceptionally well" from 1999 to 2001, and "outperformed [Wells Fargo/Acordia's] other markets."

234.  In 2002, Wells Fargo/Acordia delivered the following premium to its "priority markets":  Chubb - _____; Travelers - _____; Travelers - _____; CNA - _____; and Hartford - _____.

235.  The conspiring insurers increased their profits by charging increased premiums to the Wells Fargo/Acordia clients they were allocated.  In mid-2001, Chubb reported that its Millennium Partnership with Wells Fargo/Acordia had resulted in "two very good years in 1999 and 2000" in which Chubb enjoyed *a premium "rate increase of _____ on the entire book of business."*

### (4)     The HRH Broker-Centered Conspiracy

#### (a)     Participants in the Conspiracy

236.  During the period from January 1, 1998 through December 31, 2004, the participants in the HRH Broker-Centered Conspiracy included HRH and Insurer Defendants CNA, Hartford and Travelers.  ("The HRH Broker-Centered Defendants")

#### (b)     Operation of the Conspiracy

237.  HRH allocated its customer base to and among its conspiring insurers in two steps. First, HRH and each of its co-conspirators agreed, and the conspiring insurers agreed horizontally among themselves, that HRH would "consolidate" its business by directing a significant portion of its business to Hartford, CNA and Travelers, thereby eliminating hundreds of other insurers from competing equally with the three conspiring insurers for virtually 100% of its small business customers and at least 35% of HRH's total commercial customers.  Second, HRH and each of its conspiring insurers agreed, and the conspiring insurers agreed horizontally, that each of the three insurers would be allocated specific business for which they would not

have to compete among themselves.

**(i)      The Participants in the HRH Broker-Centered
Conspiracy Agreed that a Large Portion of
HRH's Customers would be Allocated to the
Conspiring Insurers**

238.  In or about late December 1996, HRH decided to consolidate the number of carriers with which it did business and to increase its profits by transferring, moving and otherwise directing and allocating large portions of its clients' business to a few "partner" carriers that would pay HRH large contingent commissions.  By August 5, 1997, HRH's Board of Directors decided to implement this plan, which it expected to double company-wide profit in three to five years.  HRH achieved and exceeded that profit target.

239. HRH initially consolidated the segment of its business consisting of small commercial clients generating less than $1,000 in annual commission revenue, which HRH called "Select Commercial" accounts.  Instead of attempting to find its Select Commercial clients the best policies at the best prices from among the dozens of insurers that had previously been serving those clients, HRH decided to "de-market" those accounts from their current carriers and to allocate them instead to Hartford, Travelers and CNA.  Each of those insurers agreed with HRH and among each other that in exchange for this business they would pay HRH contingent commissions of up to _____ above HRH's customary standard commissions.

240. By mid-1998, HRH's Select Commercial initiative was expanded to include its "Middle-Market" clients, which were the larger accounts that comprised the rest of HRH's commercial business customer base.  HRH formed a "Carrier Consolidation Task Force" to negotiate with prospective insurer "partners" in connection with virtually all of HRH's property and casualty lines.  HRH's "Carrier Consolidation Initiative" was focused on HRH's plan to allocate a large percentage of its commercial business to a few insurers rather than the hundreds

of insurers with which HRH's field offices had historically conducted business.

241. HRH's Carrier Consolidation Task Force met with several Insurer Defendants, including Hartford, CNA, Travelers, Fireman's Fund, Chubb and AIG, to discuss potential "partnerships" and by national contingent commission agreements.  Among other things, these discussions centered on the concept of a consortium of carriers that would "*quota share*" the majority of the existing HRH customers and receive the bulk of its new business.

242. By mid-1998, HRH reached arrangements to consolidate much of its business with Hartford, Travelers and CNA, which became known as the "Big 3," in exchange for enhanced contingent compensation.  The number of carriers to which HRH allocated its business was discussed among and agreed to by the three chosen insurers.  During its negotiations, HRH expressed its preference for four partner carriers but only selected three, a number that Travelers in particular preferred.

243. HRH's CEO memorialized HRH's national allocation scheme with Hartford, Travelers and CNA in a July 1998 memorandum, which, *inter alia*, directed HRH employees to move "business to these partners in an aggressive, orderly and disciplined manner, and in a fairly short time frame."

244. By moving existing books of business that had previously been placed with other insurers, HRH planned to increase its total business volume with its three co-conspirators from $150,000,000 to $300,000,000.  Given the contingent commission payments that Hartford, CNA and Travelers agreed to pay, HRH expected to realize $12,000,000 in additional profits over 18 months simply by rolling other carriers' books of business to its "Big 3" conspirators.

                                **(ii)**    **The Three Conspiring Insurers Agreed not to Compete with Each Other for the HRH Business**

245. In addition to agreeing that HRH would allocate new customers and premium

volume to Hartford, CNA and Travelers, HRH and its co-conspirators agreed to ensure that each of the allocated customers who sought to renew their policies remained customers of the previously designated conspiring insurer.   In November 1998, the head of HRH's Carrier Consolidation Task Force instructed HRH's nationwide field offices "to avoid situations where we move accounts from one of our three partners to another," and that "[n]o select customer business currently written by C.N.A. or the Travelers is to be moved to the Hartford."   This communication was sent to, and circulated within Travelers and, on information and belief, to Hartford and CNA as well.

246. Hartford and the other conspiring insurers knew which business was allocated to each partner.  Hartford understood it was positioned to be the "lead market on Select Customer business" and that it had been allocated "all accounts generating _____ of revenue and below," with "the only exceptions to this rule [being] accounts generating between _____

_____.

247. HRH's protection of its Big 3 Partners was embodied in its internal procedural manuals, which made clear that there were preferred market partners for Select Commercial business and that no customers placed with one of those insurers could later be moved without the local Agency President's consent.

248. HRH allocated premium volume to its conspiring insurers even if it caused an increase of its customers' insurance premiums.  HRH's 1998 Select Commercial Operations Procedures Manual instructed HRH's employees to allocate to Hartford all customers whose prior year premiums were below _____ even if Hartford more than doubled the premium.  To illustrate, the Manual explained:  "For example: a policy is currently written through another carrier at _____ and Hartford's minimum premium is ____.  The increase here is much higher

than _____ but Hartford will go ahead and issue the policy because it is subject to their minimum premium and falls below _____." HRH also allocated to Hartford any other select customer if Hartford's quote was "within ____ of the expiring premium for the total account." HRH's employees were not permitted to "request a cancellation from [Hartford] if one part [i.e., one policy][ of an account [wa]s more than ____ higher than expiring."

249. HRH provided financial incentives to its employees, at all levels, to move business to its Big 3 co-conspirators. In August 1998, HRH established an incentive bonus pool to be generated for each year based on the volume of new net business placed with HRH's Big 3 Partners. At least 50% of the 1998 bonus pool was to be paid to employees who had "a direct impact on moving business to the preferred carriers." Agency presidents were eligible for a maximum of 50% of the bonus pool remaining. HRH implemented similar incentive plans every year between 1999 and 2004.

**(iii)    The Insurer Defendants Knew Each Other's Role in the Conspiracy**

250. HRH's conspiring insurers knew of each others' involvement, and each clearly understood and agreed that they had entered into these arrangements with HRH to purchase volumes of business for which they would not have to compete with one another or with non-conspiring carriers.

251. A Travelers representative stated in July 1998 that "HRH will limit participation [for the commercial lines business] to a maximum of 3 national carriers with 'similar' programs." The representative continued: "[t]hese terms and conditions *assume a similarity of intent* with the strategic partners."

252. Travelers also knew that "the main thrust of HRH's small business strategy is to reduce the number of partners to three – Hartford, CNA and Travelers" and that "[t]he financial

72

program encourages HRH to consolidate a significant amount of this business with the Travelers and the other partners."  Travelers also reported that "*[t]o ensure a level playing field, each carrier agreed to the same financial program.*"

253.  When the arrangement was changed to include additional commercial lines, the conspiring insurers were aware of this as well.  A September 1, 1998 Travelers memorandum noted that the HRH "deal" had expanded from HRH's Select Commercial customers to include additional commercial lines, and it unambiguously set forth a conspiratorial plan for HRH to allocate "_____ of [its] national commercial property casualty" customers – representing _____ in premium – to Travelers, Hartford and CNA in exchange for contingent commission overrides.

254.  The Travelers memorandum also noted that HRH's corporate office intended to ensure compliance with the conspirators' program, and that "[f]ail safe systems are being designed to monitor individual [HRH employees'] performance to the plan complete with action steps to correct any volume movement concerns."

255.  Hartford communicated to its Regional Vice Presidents in September 1998 a similar understanding of the conspiracy with HRH and the other two insurer conspirators to its Regional Vice Presidents in September 1998, announcing that Hartford had "been selected as one of three National partner Carriers in conjunction with HRH Insurance's new strategic direction for Commercial . . . business," and that the agreement provided for an "enhanced Incentive Bonus" in "exchange for a significant premium commitment over the next several years."

256.  Hartford acknowledged that HRH would "[f]ocus on the movement of business to their trading partners . . . immediately," and that "[a]n Implementation Task Force consisting of four senior managers … has been formed to corporately manage this process."

73

257. CNA was fully aware that it was one of three carriers selected by HRH pursuant to its national "consolidation program." CNA knew that HRH was allocating competition-free premium volume to its conspiring insurers, CNA, Hartford and Travelers, in exchange for contingent commissions.  CNA knew that it would be penalized by HRH for non-compliance with the conspiracy in that HRH would move CNA business to Hartford and Travelers if CNA did not pay HRH the agreed upon contingent commissions.  In April 2002, a CNA officer wrote: "They [HRH] expressed that our changing anything, or requiring anything other than simply paying the 3.5% on the volume (assuming growth) will expressly jeopardize our relationship . . . , and that this would create a situation where their retail leaders would likely move some of the CNA business."

258. Other Insurer Defendants were also familiar with HRH's arrangements with its strategic partners.  Defendant Chubb met with HRH to confirm its understanding from the marketplace that HRH had, in fact, entered into strategic partnerships wherein they would allocate premium volume to their partners in exchange for enhanced compensation.

### (iv)    The Co-Conspirators Benefited From the Operation of the Conspiracy

259. HRH profited from its diversion of clients to its carrier co-conspirators.  An internal HRH document indicates that between 1997 and 2004, HRH benefited from its participation in the conspiracy and received approximately $188,738,000 in contingent commissions from its co-conspirators.  From 1998 through 2000, the Big 3 conspiracy produced approximately $7,500,000 in annual contingent commission overrides for HRH; $27.7 million in 2001-2003 alone.  As HRH's President advised HRH's field office presidents, HRH's receipt of contingent commission overrides was pure profit for the company:  *These monies went straight to the bottom line and are a primary driver in our financial success.*

260. HRH's conspiring insurers similarly profited from their participation in the conspiracy. Not only did these insurers achieve the desired growth through increased premium volumes, they were able to drive profit improvement through price increases. Hartford, for example achieved ____ growth across all commercial lines with HRH during the first 11 months of 2002. Growth in HRH's Select Commercial accounts increased by ____ with Hartford over the same period. While achieving this growth, and paying the accompanying increasing contingent commissions to HRH, Hartford was simultaneously driving profit improvement by executing on its own strategy to not renew unprofitable accounts and to increase prices charged to consolidated accounts Hartford wished to maintain.

261. On information and belief, CNA and Travelers also reaped substantially increased revenues and profits from their participation in the conspiracy.

### (5)    The Willis Broker-Centered Conspiracy

#### (a)    Participants in the Conspiracy

262. During period from January 1, 1998 through December 31, 2004, participants in the Willis Broker-Centered Conspiracy included Willis and Insurer Defendants Travelers, Chubb, The Hartford, Zurich, AIG, CNA, Liberty Mutual, Ace, Axis, Crum & Forster, and Fireman's Fund. (The "Willis Broker-Centered Conspiracy").

#### (b)    Operation of the Conspiracy

263. During the relevant time period Willis was the third largest insurance broker in the United States.

264. Willis allocated its customer base to and among its conspiring insurers in two steps. First, Willis and each of its co-conspirators agreed, and the conspiring insurers agreed horizontally among themselves, that Willis would "consolidate" its business by directing a significant portion of its commercial business to Travelers, Chubb, The Hartford, Zurich, AIG,

CNA, Liberty Mutual, Ace, Crum & Forster, Fireman's Fund and Axis, thereby eliminating other insurers from competing equally with the conspiring insurers for a substantial portion of Willis' business. Second, Willis and each of its co-conspirators agreed, and the conspiring insurers horizontally agreed among themselves, to reduce or eliminate competition among the conspiring insurers through the allocation of specific business for which they would not have to compete among themselves.

265. One aspect of the conspiracy was the agreement that each conspiring insurer would keep its own incumbent business, and that Willis would protect that business from competition by using a variety of incumbent protection devices.

> (i) **The Participants in the Willis Broker-Centered Conspiracy Agreed that a Substantial Portion of their Customers would be Allocated to the Conspiring Insurers**

266. Starting in 1996, Willis began consolidating its insurer markets from 1700 carriers to fewer than 20. By 2001, Willis had devised a plan to align itself with a select few "key" carriers who would enter into agreements that would yield "improved commissions" and "improved contingents and overrides." These key carriers would benefit from the placement of Willis' business once they agreed to pay Willis contingent commissions or otherwise provide increased revenue to Willis.

267. Beginning in early 2003, Willis furthered its efforts to consolidate the carriers it used to maximize its contingent commission income by creating a department called the Global Markets - Carrier Relationship/Marketing Department ("Willis Global Markets"). The stated purpose of the Willis Global Markets was to "maximize group revenue" by maximizing commissions and contingent commissions.

268. Willis Global Markets maximized revenue by steering customers to its co-

76

conspirators regardless of the interests of clients.  Willis Global Markets "require[d] premium flows to be restructured to focus on Partner Markets and to de-emphasize non-Partner Markets."

269. James Drinkwater, Managing Director of Willis Global Markets described how Willis would partner with insurers who were willing to support it in return for steering business to the partner insurer:

> [Market] leverage can only be maximized by "Partnering" with a select number of carriers who share our vision, want to work with, and support the Group. Focusing on our 'partner' markets will require the management of our premium flows and the overall relationship.

270. As stated by Willis' Marketing Manager for its Portland, Oregon office, "the whole marketing concept was originally predicated on the fact that we would limit our markets to some strategic markets where we would place 80% of our business."

271. Willis Global Markets used Regional Marketing Officers ("RMOs"), responsible for each of Willis's regions, to communicate its corporate-wide mandate to concentrate business with specified market partners.  John Pearson, Chief Marketing Officer of Willis North America, reminded RMOs not to "forget the advantages of placing as much business as possible with the carriers we have negotiated special deals with, as you look for ways to maximize revenues the last few months of this year and into 2004."

272. Michael Mann, the RMO at Willis Global Markets for the Midwest, wrote in a February 23, 2004 email:  "Remember – It's all about increasing commission percentages (always ask for more), driving business to our Partner Markets and utilizing Group Resources. The RMOs will set expectations on an office by office basis and follow-up for results."

273. Willis directed the majority of its business to the co-conspirators.  Willis Global Markets exercised control over the "negotiation, collection and management of contingents in North America" and prohibited any region or local office of Willis to enter into any contingent

commission agreement without specific approval by Mr. Drinkwater.

274. The purpose of this control was to ensure "uniformity" and to "maximize premium volume flow to key carriers with most attractive contingent income agreements." Additionally, Willis employees were instructed to "monitor key renewal accounts" of the co-conspirators "and deliver Marketing resources where necessary to increase renewal retention percentages."

275. CNA and Zurich assisted Fireman's Fund in maintaining its insurance coverage to ABM Industries' airport parking facilities. In March 2001, Willis client, ABM Industries, was required to obtain three bids for insurance to cover ABM's new parking contract with Detroit Metro Airport, but Willis had previously placed an omnibus Fireman's Fund policy covering all of the ABM's other airport parking facility contracts. To enable Fireman's Fund to maintain coverage over this omnibus policy for the Detroit Metro parking facility, CNA and Zurich agreed to the request of Russell Kiernan of Willis' San Francisco office to submit bids with the understanding that they would not result in a placement. Willis provided them with the premium breakdown they needed to quote in order to be assured of losing the bid.

276. At a Greenbrier meeting with Zurich on October 13, 2003, it was reported that Zurich experienced a 50-60% growth rate from Willis in 2003, <u>principally driven by exposure, rather than rate</u>.

277. Willis agreed to shift blocks of premium to Hartford. This "share shift" plan involved the _____ The objectives of the share shift plan included: _____
_____

278. The share shift plan included a "prospecting process" with Willis offices in San Francisco, Bethesda, Radnor, Hunt Valley and Charlotte. Hartford representatives were allowed

to meet with Willis representatives of these offices to select the most profitable accounts for placement with Hartford in order to double the written premium placed with Hartford.

279. Hartford described how Willis and Hartford would work together to allocate customers:

_____
_____
_____


_____
_____
_____


_____
_____


_____
_____


_____
_____.

280. On December 11, 2003, Hartford sent out a memo to all Hartford field offices stating, in part:

A second key piece of the plan which we are now working on with Willis is _____.  We will score leads and distribute back to you and Willis for follow up.  The joint commitment is for Willis to _____

_____
_____
_____.

281. Willis also furnished Hartford with their entire account list for the _____

_____ companies with the understanding that "the joint commitment is for Willis to give Hartford _____."

282. Willis provided Liberty Mutual with information on potential clients to give it an "unfair advantage" in client placements. Willis provided Liberty Mutual with an account listing of prospective accounts. Liberty Mutual managers could "directly contact Willis RMOs and proactively ask for the specific accounts." In response to a request from Fred Frey of Liberty Mutual, a Willis RMO stated that he would check to determine if it was a "real opportunity" for Liberty Mutual to acquire the placement and, if so, would "make sure you have solid information, and an unfair advantage."

283. Willis provided Chubb with a list of clients for Chubb to review so Chubb could choose the accounts it wanted. As stated in a June 30, 1997 letter from Barbara Marshall, Chubb Senior Underwriter, to Willis, "Per our discussion of June 12, we have reviewed the business consolidation listing provided to us by Willis Corroon [Willis' predecessor]….We would like to pursue $7,950,545 of the list provided to us. This comprises approximately 78% of the $10,000,000 book consolidation effort."

284. ACE was provided with the opportunity to choose client business and developed a "target list." Kudret Oztap, head of Ace Global Energy, stated that Willis had placed with Ace "almost all of the WILLIS accounts in our target list in USA."

285. In return for Hartford Steam entering into a contingent commission agreement, Willis personnel were "mandated to place all [boiler and machinery] with" HSB.

286. In 2003 Willis provided a list of Royal accounts to John Echemendia of Crum & Forster and he informed James Drinkwater and John Pearson in which accounts Crum & Forster was interested. Drinkwater then informed Willis employees to "ensure that C&F is shown the accounts listed and they are given the best opportunity of writing the account." As a result of these actions, the contingent income received by Willis from C&F increased three-fold from

$76,422 in 2002 to $228,553 in 2003.

287.  Willis had a share shift plan with Travelers.

288.  Willis gave Fireman's Fund "last looks" on accounts.  On or around June 14, 2001, Willis provided Fireman's Fund *three* last looks on an account for _____.  According to an internal Fireman's Fund report documenting the telephone conversation between Fireman's Fund and Willis: "Willis came back and provided competitive information on AIG, Hartford and Royal (who quoted) at the direction of insured."

289.  In August 2002 Zurich requested that it be afforded a "last look on all renewal and new business," that Willis "pre-qualify accounts" representing new business, and proposed a joint Willis/Zurich Business Plan that provided for 90 percent "renewal retention ratio."

**(ii)  <u>The Conspiring Insurers Agreed not to Compete<br>With Each Other for the Willis Business</u>**

290.  Within Willis Global Markets, Carrier Advocates were responsible for overseeing and managing the relationship between Willis and their assigned "Partner Markets," i.e., conspiring Insurers  Carrier Advocates also worked to protect incumbent conspiring insurers from competition so that Willis would have the greatest leverage with which to increase the contingent commissions it was receiving from its co-conspirators.

291.  The Carrier Advocate assigned to Hartford listed several Hartford accounts up for renewal and asked the RMOs to "make sure that [those] renewals are put to be cleanly with Hartford."

292.  The conspiracy protected an incumbent co-conspirator on a renewal even when the client could have obtained a less expensive product.  In order to meet its retention contingency goals, Willis "went the extra mile to make sure that the incumbent, Chubb, retained [an] account" even though Willis had "obtain[ed] more favorable pricing from other carriers."

81

293. Incumbent protection was important to the insurer co-conspirators. Travelers provided for a contingent payment to Willis if it achieved _____ premium retention. ACE stated that renewal retention with Willis was "critical for the PSA." Willis agreed with Zurich to protect Zurich's incumbent business. Zurich's August 2002 proposed Joint Willis/Zurich/Business Plan provided for _____ "renewal retention ratio." A 2004 e-mail to Zurich from Drinkwater confirmed that incumbent protection was a part of their arrangement.

294. With respect to Liberty Mutual, Mr. Drinkwater instructed Willis' RMOs to "make sure that we protect the position and revenue that we have generated" and to "make sure that you know what you have renewing and manage the renewal process."

> **(iii)** **Willis and its Co-Conspirators Agreed that in Return for Contingent Commissions, the Insurers Would be Guaranteed Access to Premium Volume**

295. In addition to incumbency protection, Willis guaranteed its co-conspirators access to new premium as well.

296. In the fall of 1999 Willis directed that "business for the remainder of this year [will] be focused on 3 strategic partners: CNA, Hartford and St. Paul."

297. When Willis Global Markets was created in 2003, one of its purposes was to make sure that "premium flows" were managed so that premium was steered to conspiring insurers that had agreed to pay contingent commissions.

298. As part of Willis' 2003 $2.5 Million Revenue Strategy Willis instructed its people to give "special attention" to Chubb, along with Travelers, Liberty Mutual, Hartford and Crum & Forster "due to special agreements."

299. Willis agreed to try and "[d]ouble Hartford's P&C volume with Willis" by

_____."

300. Axis knew that the payment of contingents was the quid-pro-quo for premium flow from Willis. In late 2002, just prior to launching operations in the U.S. market, Axis planned its strategy. The Retail Property Business Plan (revised 11/02) for Axis Specialty Insurance Company stated, "[W]e will need to consider a profit sharing agreement with Marsh, and potentially other national brokers, as a price of entry into the marketplace." According to plan, Axis entered into an agreement with Willis in 2003.

301. In June 2003, Mr. Drinkwater directed Willis to send business to Axis and provided his internal directives to Jack Gressier, CEO and President of Axis Global Insurance.

302. In late 2003, Mr. Drinkwater stated that Willis Global Markets had to show that it was profitable for an insurer to be a Partner Market. In particular, Mr. Drinkwater explained that in return for Crum & Forster entering into a new contingent commission incentive agreement, Willis had to "move business" to Crum & Forster. On August 29, 2003, Pearson sent an email to Mr. Drinkwater and a Willis distribution list announcing the "NEW Crum & Forster / Willis Incentive Agreement." Pearson directed the recipients to "review [their] renewal book of business and pipeline of new opportunities for clients and prospects meeting C&F's guidelines." He further stated: "C&F is serious about growing with Willis. We must demonstrate our ability to bring significant opportunities to C&F before year end."

303. According to a September 2003 Willis email:

We all have some ability to direct premium to certain markets and there is a great deal of potential income to be made from the PSAs. Those of us who can direct premium need some "direction". . . . This way we will funnel premium to carriers with PSAs and achieve greater numbers of thresholds than we would with an "unfocused" approach. Look forward [to] . . . some direction to help us achieve income goals without having to produce one cent of new biz.

304. In an October 21, 2003 letter from Pearson to Willis CMOs, Office CEOs and

Marketing Heads regarding Willis' "growing relationship" with Hartford, he stated: "As a strategic partner, Hartford has shown a willingness to help Willis generate new-new business towards meeting our objective of _____ in new business in 2004. Consistent with this, we are working with them to provide access to our prospect pipeline."

305. In December 2003, Willis asked ACE for a $500,000 advance on Willis' expected 2004 contingent commissions and represented that if ACE paid the advance, Willis would "guarantee" significant new premium for 2004.

306. Wausau, a division of Liberty Mutual ("Wausau"), entered into a "sweetener" agreement to pay additional contingent commission in return for Willis delivering added premium during the fourth quarter of 2003. The Willis Carrier Advocate for the Wausau account instructed the RMOs that they "really need to make a push and reach the $4M goal." Michael Mann noted that they would "only need to generate an additional $1,250,000 in new business premium to Wausau in order to hit the 1% contingency on the book of business" and that meeting this goal would be a "slam dunk" "[c]onsidering that there are 7 offices in the Midwest Region with business that Wausau can write."

307. On April 4, 2004, Mr. Drinkwater explained that as a "reward" for entering into a contingent commission agreement with Willis, an insurer would be provided with "access" to Willis' clients, among other benefits, that together added up to "*an unfair competitive advantage*."

308. In May 2004, Mark Butler, Liberty Mutual's Executive Vice President, Sales and Service Department, National Markets, wrote:

> I don't believe in PSA's but they are a fact of life. With that said, we set the expectations with regards to new business, retention, growth that WE must have for our business, not theirs. Each represent [sic] the majority of our market. I simply want a bigger piece of what they already have. They deliver, we pay.

They don't deliver, we don't.

                       **(iv)**    **Insurers Understood Their Role and were Disciplined by Willis if they Did Not Participate**

309.  The insurer co-conspirators knew that failure to participate in the conspiracy would result in disfavor and would lead to the elimination or severe reduction of business from Willis.

310.  In December 2003, William Curcio, President of the Ace Risk Management reported that Mario Vitale, then CEO of Willis, told him that to meet a Willis income deficiency in 2003, he needed $500,000, and that Vitale was going "to approach a couple of 'partner markets' that he would then 'guarantee' significant new business growth into '04.  Those who did not choose to help him as a partner now would not be designated as a 'favored' market."

                       **(v)**    **Communications among the Participants in the Willis Broker-Centered Conspiracy were Facilitated by Willis**

311.  The insurer co-conspirators were aware of each other's participation in the conspiracy.  In many instances Willis shared details of one conspiring insurer's agreements with other insurer co-conspirators.

312.  Willis shared information with Chubb regarding its contingent commission plans with Royal, Hartford and Travelers.

313.  Willis advised Travelers in December 2003 that it would be on an "equal footing" with Chubb and Hartford with respect to its contingent commission agreement.

314.  Hartford knew that CNA was a "Top Carrier" and "key market" for Willis.

315.  Willis gave Crum & Forster information concerning other insurer co-conspirators' renewal retentions.

316.  In December 2003, Michael Mann, informed Liberty Mutual that Willis would "be able to deliver results for our key Partner Markets on an unprecedented basis."

(vi)    **The Co-Conspirators Benefited from the Willis Conspiracy**

317.  Both Willis and its co-conspirators benefited from participating in the conspiracy.

318.  In April 4, 2004, Mr. Drinkwater explained how an insurer would benefit from having a PSA agreement with Willis:

> Underwriters [insurers] need to realise [sic] that our PSA's are a reward for services that we provide to carriers such as carrier advocacy . . .  Carrier Advocacy includes transparency into our organisation [sic] and our book, access to our leadership and our clients, *an unfair competitive advantage* as well as other benefits that partnerships bring.  While the downside of not partnering with us is impossible to calculate I think that Hartford, Axis, Ace, St. Paul would all advocate the value and the positive effect that it has on our business. (emphasis added).

319.  Chubb recognized that its participation would result in "the movement of approx. $20 million of existing Willis business from current markets to Chubb over the next 12 to 18 months."  In order to receive these benefits Chubb agreed that "[s]tandard commissions will stay in place though we will pay a consolidation fee, some form of profit sharing…and a new incentive."  Chubb agreed to pay an additional 5-10% incentive override to Willis, depending on the volume of premium written.

320.  Chubb was consistently one of Willis' top 5 carriers in terms of premium written and contingent commissions for 2002 through 2004.

321.  Willis planned to direct even more business to Axis in 2004 in exchange for contingent commissions and reinsurance opportunities.

322.  Willis did not meet the threshold for receiving contingent income from CNA in 2003.  Patricia Corrigan Johnston, the Willis Carrier Advocate responsible for CNA informed Mr. Drinkwater and others at Willis that "CNA is paying us $141,500 [as contingent commission income for 2003] which we are technically not owed.  I think these payments of good faith need

to be remembered.  We frequently discuss 'partner markets' and 'markets stepping up'. [sic] CNA is clearly putting their money where their mouth is in making a commitment to Willis." This information was subsequently communicated to CNA by Johnston:  "I feel strongly (and have conveyed my feeling to anyone who will listen!) that CNA is supporting Willis in a partner market fashion.  We, in turn, will support CNA and drive growth through our retail offices."

323.  Emails between Suzanne Douglas of Willis and CNA in January 2004 noted that for the Large Property operation, CNA's writings with Willis grew 60% in 2003 over 2002.  Willis earned approximately $185,000 in contingent payout for 2003.  In early 2004, Willis entered into a new contingent agreement with CNA.  The proposed deal for 2004 was a 5% contingent for all business over the highest threshold which had been met in 2003.  Michael Mann indicated that Willis should consider pushing CNA aggressively in the field because Willis would receive 5% on every dollar placed with CNA over the threshold.

324.  Willis had a "significant global business relationship with Ace as a Partner Market on a retail, wholesale and reinsurance basis."  "Willis North America retail grew at a 49% rate with ACE USA in 2003."

325.  In addition to the contingent commission agreements Willis had with Hartford Steam, AIG agreed to use Willis Re as its reinsurance broker, and listed Willis Re as an approved direct reinsurer for AIG underwriters to use.  In January 2002, AIG entered into a PSA with Willis Re providing contingent payments to Willis Re on its placements of reinsurance for AIG.  For 2002, AIG placed a total of $255,489,580 in premium with Willis Re, and a comparable amount for 2003.

### (6)    The Gallagher Broker-Centered Conspiracy

### (a)    Participants in the Conspiracy

326.  During the Class Period from January 1, 1998 to December 31, 2004, participants in the Gallagher Broker-Centered Conspiracy included Gallagher and Insurer Defendants Chubb, Hartford, Travelers, AIG, CNA, Fireman's Fund and Crum & Forster. (the "Gallagher Broker-Centered Defendants).

### (b)    Operation of the Conspiracy

327.  Gallagher allocated its customer base to and among its conspiring insurers in two steps.  First, Gallagher and each of its co-conspirators agreed, and the conspiring insurers agreed horizontally among themselves, that Gallagher would "consolidate" its business, allocating it to "preferred carriers," co-conspirators _____

_____, thereby eliminating other insurers from competing equally with the conspiring insurers for a substantial portion of Gallagher's business.  As a second step in the unlawful scheme, the conspiring insurers agreed, both with Gallagher and horizontally among themselves, to reduce or eliminate competition among the conspiring insurers as to that secured book of business.  An aspect of the agreement in this regard was that each insurer would be permitted to keep its own incumbent business, and that Gallagher would protect that business from competition using various incumbent protection devices, such as last look agreements.  Gallagher and its co-conspirators understood and agreed that incumbent protection was a necessary element in its scheme to allocate its premium volume in the manner calculated to achieve the highest profits, both for itself and itself co-conspirators.

**(i)**    **The Participants in the Gallagher Broker-Centered Conspiracy Agreed that the Bulk of Gallagher's Customers would be Allocated to the Conspiring Insurers**

328.  Gallagher's effort to consolidate its business with its partners in the conspiracy began at least as early as September of 1996, after Gallagher determined that by leveraging its relationships with certain insurers, it could maximize its commission revenue.  Gallagher identified its preferred insurers, often referred to as "partner markets," and created plans pursuant to which Gallagher would steer business to these insurers and away from other insurers.  Insurers were selected to be a "partner market" when they agreed to pay Gallagher contingent commissions based primarily on the volume of the business steered to the insurers.

329.    Gallagher's consolidation effort was to "maximize commission income, achieve leverage in the market place and control the relationship with the underwriter."  To implement this plan, Gallagher approached certain insurers and insisted on a commission/override and/or incentive agreements.  Likewise, Gallagher employees were told that "every effort must be made to place business with our preferred carriers."  The details of the contingent commission agreements were shared with Gallagher's sales managers so that all understood the financial benefits of placing business with these conspiring insurers.

330.    Gallagher successfully moved placements of insurance to its conspiring insurers and reduced the volume of business placed with non-conspiring insurers.  This was achieved by reinforcing the need to place business with the co-conspirators at, among other methods, Gallagher monthly Market Strategy Meetings, during which all renewals were discussed and business was targeted to be moved to Gallagher's conspiring insurers.

331.    Gallagher took steps to ensure that all branch offices focused on placing business only with its conspiring insurers.  Gallagher's senior management directed its branch managers

to create a "market consolidation plan" by which each office was directed to specify how it intended to grow with specific conspiring insurers and to determine whether the business of any particular carriers should be shifted to the conspiring insurers.

332.    As part of Gallagher's plan to increase and maximize contingent commission profits pursuant to the conspiracy, in 2001, Gallagher's corporate officers instructed Gallagher's employees to place business with Gallagher's conspiring insurers.  In 2001, the Gallagher sales force was told that Gallagher had "special bonus agreements in place with markets like _____ _____ and "so that additional revenues can be earned…[p]lease do whatever you can in your respective divisions to support our 'partner' markets and any bonus plans."

333.    In 2003, Gallagher continued to direct the regional and branch managers to steer business to conspiring insurers.  Gallagher's sales force was advised to pump premium volume into "strategic partner markets" for 2003 contingent income calculation.  Gallagher identified __ _____ as having the most lucrative financial incentives for placing business.

334.    Because of these efforts, Gallagher was successful in allocating the bulk of its premium volume to its conspiring insurers.  The concentration of premium volume with its conspiring insurers continued throughout the Class Period, as the Insurer Defendants paid ever increasing contingent commissions for a guaranteed flow of premium.

(ii)    **The Participants in the Gallagher Broker-Centered Conspiracy Agreed not to Compete for each other's Customers**

335.    A central element of the agreement among the participants in the Gallagher Broker-Centered Conspiracy was that each insurer would be permitted to keep its incumbent business, and that Gallagher would protect that business from competition, both from insurers inside and outside of the arrangement.  Gallagher facilitated this agreement with a variety of

devices designed to protect its co-conspirators' incumbent status, including the solicitation of accommodation quotes.

336.    Participants in the Gallagher Broker-Centered Conspiracy provided alternative quotes at Gallagher's request to protect the incumbent status of a conspiring insurer or to support the placement of the business with a conspiring insurer.  An example of this conduct occurred when AIG assisted Gallagher in protecting the renewal business of a rival carrier.  In June 2004, a Gallagher employee summed up this effort as follows::

> [W]e will submit to: ACE (Lou Caparelli) and AIG (Brad Smith) with the understanding that we are approaching AIG only to block Shepard Reilly here. ACE should come up with a real quote and per our conference call with Lou, they have been very competitive with Travelers lately.  Definitely want to do what we can to retain with St. Paul Travelers.

337. Gallagher protected its co-conspirators' incumbent status with a variety of other devices such as "first look," "rights of first refusal" and "last look" agreements.  By virtue of these agreements, conspiring insurers were able to review the other bids of other carriers and bid to retain the business without having to provide their best, most competitive prices.  Gallagher recognized that the significant amount of contingent commissions it could earn from Chubb warranted giving Chubb a "first opportunity" on business and a "last shot" before business went to another insurer

338.  Once an insurer qualified as a strategic partner, it was standard operating procedure to direct insurance placements to those conspiring insurers and insulate them from competition. A December 1998 "Partner Market" meeting with Chubb, Gallagher explained to Chubb that as a partner market, "Team Gallagher becomes locked in and competitors become locked out."

339.  Gallagher, in implementing its market consolidation, pushed or steered business to its conspiring insurers and insulated them from outside competition.

340.  In November 2003, to ensure the receipt of extra commissions from AIG, Gallagher placed a client's insurance with AIG for a premium of _____ when the insurance could have been placed with a competitor for _____.

341.  In November 2002, a Gallagher executive urged that insurers be steered to Crum & Forster in order to get an incentive payment.  Gallagher was _____ short of qualifying for a full incentive commission.  He directed Gallagher personnel to jointly address the renewal of all existing Crum & Forster business and to provide Crum & Forster with new opportunities as well.

342.  Similarly, Gallagher steered business to Hartford.  In 1997, Gallagher received _____ from Hartford for 1996 business, which Gallagher acknowledged was received as a result of pushing new business to Hartford.  Gallagher management stated:  "We have got to try and stabilize our book with Hartford, or better, grow it. …We cannot afford to lose that kind of revenue."

343.  Similar efforts were made with regard to strategic partner Travelers.  In July 1998, Gallagher CEO J. Patrick Gallagher announced a new National Incentive Agreement with Travelers for that year and advised all Gallagher employees to "do all we can to crank up the production into St. Paul."

344.  Gallagher steered business to Chubb in April 1997 based upon new override agreements with them.  In June 1997, Gallagher recognized that the significant amount of contingent commissions it could earn from Chubb warranted giving Chubb a "first opportunity" on business and a "last shot" before business went to another insurer.

345.  To assure that Gallagher would continue to steer placements to it, in 2003, CNA paid an incentive payment to Gallagher pursuant to their National Incentive Agreements even

though Gallagher failed to meet the thresholds for payment, because, as CNA recognized, failing to pay would strain the parties' relationships.

> **(iii)** **Communications Among the Participants in the Gallagher Broker-Centered Conspiracy Facilitated By Gallagher Furthered the Conspiracy.**

346.  Gallagher shared information with its conspiring insurers in order to ensure that the conspiracy would operate successfully.

347.  In June 1997, Hartford met with Gallagher to discuss "the potential identification of markets for consolidation" in exchange for _____ _____.  A part of those discussions were the financial incentives that would best motivate Gallagher to drive business to Hartford.

348.  In December 1998, Gallagher held a "Partner Market" meeting with Chubb at which Gallagher dictated its "Partner Market Requirements."  Those requirements included having a "mutual commitment to grow," "mutual commitment to change the rules," "maximum commission," and "top overrides/incentives."

349.  Gallagher made the conspiring insurers aware of the *quid pro quo* for becoming and remaining a "Partner Market": to reap the benefits of more placements, insurers would have to provide Gallagher with substantial contingent commission income.

350.  Gallagher shared the identity of its partner carriers with other partner carriers, which served to diminish competition as each partner carrier became aware that it would not have to compete with said carriers.

351.  Gallagher also exchanged the terms of its contingent commission agreements with its conspiring insurers.  Gallagher gave Hartford data on its agreements with fellow co-conspirators: Chubb, Travelers and CNA.

        **(iv)**     **The Co-Conspirators benefited from the Operation of the Conspiracy**

352. Both Gallagher and its conspiring insurers profited from their anticompetitive arrangement. Gallagher's anticompetitive agreements with its conspiring insurers resulted in growth in contingent commissions at the expense of its clients' best interests. From 1997 to 1998, Gallagher received _____ more in incentive commissions due to placing more business with its partner markets - Chubb, Hartford, Fireman's Fund, and CNA. From 2002 to 2004, Gallagher earned over _____ in contingent commissions from its conspiring insurers.

        **f)**     **The Global Conspiracy**

353. In addition to the "hub and spoke" Broker-Centered conspiracies described above, each of the Defendant Broker "hubs" participated (with the complicity of the Insurer Defendants) in a broader, common horizontal anticompetitive scheme.

354. Specifically, while engaging in their separate "hub and spoke" schemes to create supra-competitive premiums and contingent commissions, each of the Broker "hubs" simultaneously agreed horizontally not to compete with each other by disclosing any competing broker's contingent commission arrangements, or the consequent premium price impact of those arrangements, in an effort to win those brokers' customers' business.

355. Through a variety of industry-wide contingent commissions studies and from communicating with each other, each Broker Defendant knew that the other Broker Defendants had "consolidated" their markets and allocated business to insurers in exchange for contingent commissions. From the same sources and from information received from their conspiring insurers, each Broker Defendant also knew generally the percentages of the contingent commissions each other Broker Defendants were receiving and the resulting supra-competitive premiums the brokers' customers were paying. The Broker Defendants all also knew that

exposing another broker's contingent commission arrangements to the other broker's customers would lead to retaliation, thereby threatening the first broker's own contingent commission scheme and supra-competitive profits.

356. Therefore, the Broker Defendants expressly or tacitly agreed among themselves not to disclose the existence of the contingent commission agreements and resulting supra-competitive premiums to rival brokers' customers.  The Broker Defendants reached this horizontal anticompetitive agreement in order to further a common, mutual goal of maintaining their independent anticompetitive schemes and not having their supra-competitive profits undermined by truthful price disclosures or advertising.

357. It would be economically irrational absent a conspiracy for any Broker Defendant not to disclose that a customer's existing broker is scheming with the customer's insurers in a way that causes the customer to pay supra-competitive premiums.  Because of customers' natural "stickiness" and loyalty to their brokers, an economically rational broker in a truly competitive environment would maximize its opportunity to increase market share by telling its rivals' otherwise loyal customers that they are paying too much for their insurance.  That the Defendant Brokers uniformly did not do so can only be explained by the existence of a horizontal conspiracy not to compete by making such truthful price related disclosures.

358. The Broker Defendants' agreement not to disclose their excessive contingent commission agreements and resulting profits was a naked horizontal restraint of informational output that directly affected the price of insurance.  As such, the Broker Defendants' agreement not to disclose or advertise truthful pricing information and to limit consumer information about price, violated the antitrust laws.

359. The Insurer Defendants also agreed, both with their respective Broker Defendant "hubs" and horizontally with each other, not to disclose the Broker-Centered Conspiracies and resulting supra-competitive premiums to the brokers' customers. Hence the Insurer Defendants likewise violated the antitrust laws by participating in the Global Conspiracy.

360. Defendants had ample motive to enter into the horizontal conspiracy. They were obtaining supra-competitive profits from operating their independent Broker-Centered Conspiracies that they wanted to protect. Prices for services in competitive markets are a function of the marginal cost of providing those services. But the contingent commission-related profits the Broker Defendants were receiving (and the supra-competitive premium prices the Insurer Defendants were consequently charging), were well above the brokers' marginal costs. As a prominent insurance industry analyst confirmed in a 2004 report on contingent commissions: "when we have pushed back in an attempt to determine the size and source of offsetting expenses [for such commissions], *no significant, valid offsets* were presented.… We are *hard-pressed to describe any material cost associated with these revenues*." Hugh Warns et al., *Insurance-Non-Life: Contingents May Be Smaller, But More Prominent in 2004*, US Equity Research J.P. Morgan Sec., Inc. (Jan. 13, 2004) (emphases added).

361. Defendants, moreover, knew full well that disclosure of their supra-competitive profits to the brokers' customers would lead to decreased income. While it is commonsense that a consumer that is advised it is paying above-market prices will demand a price reduction, the Broker Defendants commissioned a survey to estimate the price impact such disclosure would have. In the wake of the Regulatory Investigations the Defendants, through the Council of Insurance Agents and Brokers ("CIAB"), engaged an industry consultant to gauge the expected

effects of "compensation transparency" and related issues. Based upon extensive interviews of broker and insurer executives, the study concluded that:

> The consensus of opinion within the insurance brokerage business is that compensation will decline if a transition occurs from an undisclosed commission basis to a disclosed commission or fee basis. … *compensation will decline if disclosed and believe reductions will generally fall 5% to 25%.*

362. The Broker Defendants' decision to consolidate their markets and drive business to a few insurers that paid high contingent commissions was a departure from their past methods of doing business. Each Broker Defendant engaged in this consolidation of business to their insurer co-conspirators at the same time and for the same purpose, that is, to increase their leverage and their contingent commission revenues. Not one Broker Defendant deviated from that course of conduct. In each Broker-Centered Conspiracy, as described above, the Broker Defendants, together with the Insurer Defendants, engaged in the same types of anticompetitive and exclusionary practices, all designed to protect the conspiring Insurer Defendants from having to compete with non-conspiring insurers and with each other for the Broker's customers. The Broker-Centered schemes were very successful and yielded enormous profits. The Broker and Insurer Defendants were thus heavily invested in their Broker-Centered schemes during the Class Period and did not want to risk losing their resulting profits by disclosing their schemes to each others' customers. Therefore they agreed horizontally not to do so.

363. The existence of the Defendants' agreement not to disclose their anticompetitive contingent commission arrangements and supra-competitive profits to their customers is well documented. As described below, Broker Defendants agreed with their conspiring insurers that the terms of the contingent commission arrangements they had entered into would not be disclosed to their customers. Defendants, in fact, incorporated standardized confidentiality clauses in their contingent commission agreements prohibiting such disclosure.

97

364.  Moreover, as detailed below, Defendants' membership in the CIAB afforded them many opportunities to exchange information and allowed Defendants to adopt collective policies towards nondisclosure of rival brokers' contingent commissions.

365.  In sum, during the Class Period, significant information asymmetry existed in the insurance market between the buyers of insurance, on the one hand, and the Defendant Brokers and insurers, on the other, concerning the comparative price and quality of insurance products. This asymmetry of information as to relative price and quality rendered the insurance market susceptible to collusion, and it facilitated the Broker and Insurer Defendants' ability to charge supra-competitive prices, because their customers, the consumers of insurance, tended not to know if the insurers recommended by their Brokers were offering a competitive price.

366.  Once the insureds committed to a broker the cost of switching brokers was high, leading to the "stickiness" of broker-client relationships and great reliance by insureds on brokers that characterized the commercial insurance brokering industry.

367.  The Defendants exploited both the asymmetry of information and their customers' loyalty to erect an industry structured around Broker-Centered "hub and spoke" conspiracies that enabled the Defendants to reap huge supra-competitive profits.  Broker Defendants and their co-conspiring Insurer Defendants agreed horizontally to not disclose their contingent commission-driven schemes to their customers in order to protect those profits.

368.  The Defendants' customers, the Global Class (described below), were accordingly damaged in their business or property by Defendants' anticompetitive horizontal agreement not to compete for each others' customers by disclosing or advertising the supra-competitive nature of their co-conspirators prices.

g)    **The Conspiracies Raised Premium Levels To All Members Of The
Class.**

369. The anticompetitive schemes described above had the purpose and effect of
reducing competition and raising the insurance premiums paid by all members of the classes

370. Through a process known as "premium buildup" the contingent commissions paid
by insurers to the Broker Defendants (nearly 2 billion dollars since 1998), were built into the
rates used by insurers to derive premiums charged to Plaintiffs and the Classes. "Premium
buildup" refers to the process, well-known in actuarial science, of combining expenses, an
insurer's expected losses (claims), and a reasonable profit, into a formula that results in the
creation of a "rate." That rate is in turn used to derive premium.

371. Contingent commissions, which are a type of budgeted "acquisition expense" or
"variable expense" incurred by insurers, are included in each insurer's ratemaking formulas and
are consequently "built" into every commercial premium for commercial insurance products.
insurers annually budget the amount of expected contingent commission payments and recoup a
pre-determined percentage of this total annual budget in the rates utilized to price every
commercial insurance premium. The expense factor used to load the cost of contingent
commissions into the rate-making formula is a standard factor across all lines of insurance
Defendants' practices increased premium levels for all commercial insurance without regard to
whether a contingent commission was collected with respect to any specific policy.

372. Defendants recognized that the contingent commissions paid by insurers, were built
into the premiums charged to members of the classes. Marsh recognized as much when it said to
a complaining insurer that it understood that "the PSA was an expense load to premium, "and
that "ever[y] other [insurer] has to cope with the same expense load component as part of their
overall premium equation."

2)    **The RICO Claims**

a)    **Overview of the RICO Claims**

373.  In addition to the antitrust violations alleged above, Defendants have also engaged in a series of fraudulent schemes whereby they have made material misrepresentations and omissions regarding:  (i) the nature of the services provided by the Broker Defendants and the conflicts of interest that exist between the Broker Defendants and their clients; (ii) the financial relationships and agreements between the Broker Defendants and their strategic partner Insurer Defendants that impact the basis upon which insurance placements and renewals are made; and (iii) the kickbacks paid by the Insurer Defendants to the Broker Defendants in exchange for having business allocated to them and having competition reduced, which result in increased premiums.

374. In order to prevent Plaintiffs and members of the Class from discovering the foregoing, and lulling them into believing that the Broker Defendants were acting in their best interests, Defendants took the following steps: (i) the Broker Defendants agreed with their strategic partner Insurer Defendants that the details of the terms of their contingent commission agreements would be kept confidential and took steps to ensure that they were kept secret from their clients; (ii) the Insurer Defendants built the cost of the kickbacks they paid to the Broker Defendants into the premiums they charged their clients, without disclosing that the premiums were inflated by these amounts; and (iii) the Broker Defendants issued vague and misleading statements regarding the compensation they received from the Insurer Defendants which were designed to create the illusion of transparency, while concealing their true relationships with the Insurer Defendants and the amounts they were being paid by them.

375. Defendants have carried out their schemes through six separate Broker-Centered Enterprises, as described further below, each consisting of a Broker Defendant and those Insurer Defendants with which it has entered into a strategic partnership. Defendants in each of these enterprises have participated in the enterprise's affairs through a pattern of racketeering activity consisting of multiple acts of mail and wire fraud.[3]

376. The Broker Defendants have conspired with one another to implement substantially similar disclosures regarding their contingent commission arrangements with the Insurer Defendants and/or to take steps to prevent any of the Broker Defendants from having to make meaningful disclosures of these arrangements to their clients. The Broker Defendants have been able to carry out this conspiracy through their membership in the CIAB, which has allowed them to speak with one voice to create the perception that "full disclosure" was the industry standard, when, in fact, it was not.

377. As a result of the foregoing, Plaintiffs and members of the classes have been injured by having paid more for the insurance they procured through the Broker Defendants than they otherwise would have. Defendants' conduct constitutes actionable violations of 18 U.S.C. §§ 1962(c) and 1962(d).

        b)        **The Broker Defendants' Duties, Fiduciary Status and Representations to Their Clients**

378. The Broker Defendants hold themselves out as providing, and do in fact provide, insurance brokerage services for businesses, individuals, public entities, associations, professional services organizations, private clients and many others. As alleged above, the Broker Defendants are leaders in the commercial insurance brokerage industry and their business comprises the overwhelming majority of the insurance brokerage market in the U.S.

---

[3] Alternatively, Plaintiffs allege that Defendants carried out their scheme through the CIAB-Enterprise described below.

379.  As also alleged above, the Broker Defendants broker a wide range of commercial insurance lines, including traditional property-liability insurance, business entity liability insurance, casualty insurance in a multitude of forms, workers compensation, surplus, fidelity and surety, which their customers purchase.   The Broker Defendants counsel their clients concerning the complex and specialized insurance they are purchasing.

380.  The services that the Broker Defendants provide to their clients include, *inter alia*, analysis of risk and insurance options, procurement and renewal of insurance, interpretation of insurance policies, monitoring the insurance industry on the client's behalf, keeping clients informed as to developments in the insurance marketplace, and assisting clients with the filing and processing of claims against the policies they place.

381. The Broker Defendants are retained by their clients, including Plaintiffs and members of the classes, for the sole purpose of acting on behalf of and providing the clients with unbiased advice concerning the type, amount and level of insurance needed, as well as to provide sound and accurate advice regarding the insurance companies they recommend.

382. The Broker Defendants serve as common law fiduciaries to their clients, and therefore owe their clients, including Plaintiffs and other members of the classes: (i) a duty of loyalty to act in the best interests of their clients and to always put their clients' interests ahead of their own; (ii) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by clients or services rendered by Broker Defendants, including the duty to disclose the source and amounts of all income they receive in or as a result of any transaction involving their clients; (iii) a duty of care in connection with any insurance-related products purchased by their clients or services rendered by Broker Defendants; (iv) a duty to provide impartial advice in connection with any insurance-related products purchased by their

clients or services rendered by Broker Defendants; (v) a duty to use their best business judgment in connection with any insurance-related products or services purchased by their clients – in other words to find the best coverage at the lowest price; and, (vi) a duty of good faith and fair dealing.

383. The Broker Defendants represent themselves to their clients as being committed to acting in their clients' best interests and encourage their clients to rely on their purported knowledge, independence and unbiased expertise in procuring insurance coverage.   Such representations are made through broker service agreements and engagement letters, requests for proposals, letters to customers, invoices, advertisements, brochures, and other marketing and promotional materials, including information on internet websites, disseminated in interstate commerce, including through the United States mails and interstate wires.

384. As set forth in further detail in the Second Amended RICO Case Statement (the "RICO Case Statement"), in these materials, the Broker Defendants represent that they will: (i) solely represent the interests of their clients in transactions with insurers; (ii) act on behalf of their clients in the selection and placement of insurance and the negotiation of terms; (iii) act on behalf of their clients in connection with the filing and processing of claims; and (iv) act as the exclusive insurance broker for their clients.   The Broker Defendants represent that they are highly skilled and independent insurance brokerage experts and possess the special knowledge and expertise necessary to interpret and understand the complex and sophisticated business and personal risks faced by their clients and to determine which corresponding insurance products, services and insurance companies best fit their clients' needs.

385. As set forth in further detail in the RICO Case Statement, the Broker Defendants' representations have been couched in phrases such as "serve our clients' needs," "negotiate on

the Client's behalf with insurers," "best efforts to place insurance on behalf of the client," "act as your representative to the world insurance market,"  and "we are you representative…and although we are licensed agents of various insurance companies with whom we have contracts it is our basic responsibility and obligation to be your advocate, your representative."

386.  Following the commencement of an action against Marsh by the New York State Attorney General, Marsh, Aon, Willis, and Gallagher each acknowledged and reaffirmed their duty to act on behalf of their clients.

387.  On October 20, 2004, Aon sent a letter to its clients signed by Aon's CEO, in which he stated that Aon's employees were expected to "strive for the best terms for the client using the highest ethical standards" and are "expected to put our clients first, to focus on what is best for you."

388.  Two days later, on October 22, 2004, Willis sent a letter to its clients signed by Willis's CEO in which he reaffirmed that Willis "represent[s] you and conduct[s] business in your best interest utilizing global resources."

389.  On October 29, 2004, Marsh sent a letter to its clients signed by its CEO in which he reaffirmed both Marsh's commitment to "execute transactions in your best interest" and Marsh's "principle of transparency and disclosing our sources of income."

390.  On November 3, 2004, Gallagher sent a letter to its clients signed by its CEO in which he stated that Gallagher served as its clients' "advocates in the marketplace" and that Gallagher's "employees understand that clients come first at Gallagher."

391.  Acordia sent communications to its clients reaffirming its obligations and duties. Acordia sent a document to its clients in which it emphasized its commitment to doing what "is right for the customers," which includes "[p]roviding [its] customers with full disclosure on the

revenue, including contingent commissions we earn at the beginning of our relationship and at the time of policy renewal" and "[m]aking insurance placements in the best interest of [its] customers."

392.  HRH reaffirmed its obligations to its clients through materials it has sent to them in which it has stated "[w]e advocate our clients [sic] needs and desires first and foremost" and that "our recommendations are driven by your needs, not our own."

393.  As a result of the nature of the relationship between the Broker Defendants and their clients, the Broker Defendants had a duty to disclose any conflicts of interest they had in providing services to their clients as well as any material information that might impact their ability to act in their clients' best interests.   This duty to disclose further arises out of both:  (i) the Broker Defendants' fiduciary status; and (ii) the representations made by the Broker Defendants.

<b>c)    Defendants' Fraudulent Scheme</b>

394.  In direct contravention of the Broker Defendants' representations, fiduciary duties and disclosure obligations, Defendants have engaged in a scheme whereby the Broker Defendants would allocate business to a limited number of partner Insurer Defendants in exchange for kickbacks in the form of contingent commissions and/or other payments which were factored into the premiums paid by Plaintiffs and Class Members.

395.  Specifically, as set forth in further detail in the Revised Particularized Statement, each of the Broker Defendants, in conjunction with certain of the Insurer Defendants with which they had entered into strategic partnerships, engaged in steering and other practices in order to

105

maximize the volume of insurance placed with the Insurer Defendants and maximize the volume

of renewal business placed with the Insurer Defendants.[4]

396.  Specifically, as set forth in further detail above and in the Revised Particularized

Statement, Defendants engaged in the following conduct:

- Each Broker Defendant significantly consolidated the number of carriers to which it would market its clients' business.

- Each Broker Defendant then entered into "strategic partnerships" with a limited number of Insurer Defendants to which the Broker Defendant agreed to steer the bulk of its business.

- Insurer Defendants would be given access to a guaranteed flow of premium volume from the Broker Defendants with which they had partnered, as well as protection from normal competition from both inside and outside of the strategic partnerships for renewal of each of the insurer's own business.

- To accomplish this, Defendants engaged in a number of practices specifically set forth in the Revised Particularized Statements including "book rolls," agreements not to bid renewals competitively, limiting the marketing of renewals, disclosing other carriers' bids and other actions designed to maximize the volume of insurance placed with the Insurer Defendants and maximize the volume of renewal business placed with the Insurer Defendants.

397.  In exchange for being given these unfair competitive advantages, the Insurer

Defendants agreed to pay kickbacks to the Broker Defendant with which they had partnered in

the form of contingent commissions.

398.  None of the communications mailed or faxed to any Plaintiff from a Broker

Defendant disclosed any of the foregoing conduct.  Rather, as set forth herein and in the RICO

Case Statement, Defendants have made material misrepresentations and omissions, designed to

knowingly misled and deceive their clients, including Plaintiffs and members of the Class, into

---

[4] As alleged above, this conduct constituted a market allocation scheme in violation of the antitrust laws.  However, even if the antitrust laws had not been violated, this conduct was contrary to the Broker Defendants' representations and fiduciary obligations and gives rise to actionable claims of mail and wire fraud.

believing that they provide independent, unbiased and expert brokerage services tailored to the needs of their clients.

399. Defendants concealed the following material matters from insurance purchasers who unknowingly paid for the kickbacks through higher premiums:

- that the Broker Defendants were not acting in the best interest of their clients but were instead acting on behalf of the Insurer Defendants and in furtherance of their own financial interests;

- the true nature of the association and agreements between the Broker Defendants and the Insurer Defendants;

- the conflict of interest inherent in the agreements between the Broker Defendants and Insurer Defendants;

- the Broker Defendants' consolidation of their insurance markets to a few select strategic partners;

- the Broker Defendants' steering of insurance placements to the Insurer Defendants;

- that the Broker Defendants were protecting their strategic partner Insurer Defendants from competition, and in the case of Marsh, that it engaged in rigging of bids with AIG, ACE, Chubb, XL, Munich/Am Re, Liberty Mutual, Travelers, Fireman's Fund and Zurich;

- that the Insurer Defendants kicked back a substantial portion of their increased profits to the Broker Defendants in the form of contingent commissions and other forms of compensation; and

- that the Insurer Defendants factor the kickbacks paid to the Broker Defendants into the cost of Plaintiffs' and Class Members' insurance, resulting in injury to Plaintiffs' and Class Members' business and property.

400. Misrepresentation of the Brokers Defendants' allegiance as well as concealment of their relationships with, and allocation of business to, the Insurer Defendants was necessary to encourage retention of the brokers, to conceal the scheme, to lull clients, including Plaintiffs and Class Members, into a false sense of security and to assure payment of the excess premiums. Likewise, inclusion of the excess amount of premium resulting from Defendants' scheme in

invoices forwarded to each Plaintiff without explanation or a separate accounting for the excess premium was necessary to conceal the scheme and to assure payment of the entire invoice amount.

401. As a result of the conduct alleged herein, Plaintiffs and members of the Class have paid insurance premiums in excess of what they would have paid had Broker Defendants acted in accordance with their fiduciary and other duties, and their representations to their clients.

## (1)    Defendants' Active Concealment Practices

402. Defendants understood that full disclosure of the amount and significance of contingent compensation arrangements between the Broker Defendants and the Insurer Defendants would result in insurance buyers becoming aware of the existence of the conflicts of interest created by the true relationships between the brokers and their strategic partner carriers, which would result in their scheme unraveling.   In order to prevent detection, Defendants engaged in the following practices:  (i) the Broker Defendants agreed with their strategic partner carriers that the terms of contingent commission agreements would be kept secret from clients and included confidentiality clauses in many of the contingent commission agreements prohibiting such disclosure; (ii) the Insurer Defendants built the cost of contingent commission payments into the premiums charged to  insurance purchasers, and agreed that they would not disclose that the premiums were inflated to include the kickbacks; and (iii) the Broker Defendants mutually agreed to act in concert to thwart detection of the significance of the contingent commissions and their resulting unlawful practices by, among other things, adopting substantially similar vague and incomplete disclosure (or non-disclosure) policies regarding contingent compensation matters and by publicly responding with one voice through the Council of Insurance Agents and Brokers (the "CIAB" of the "Council") regarding these issues.

403. These practices furthered Defendants' improper scheme by concealing material information regarding the significance and impact of the contingent commission payments to the placement process, while creating the appearance of transparency and allowing Defendants to maintain their illicit and improper gains from their conspiracy.

(a)   **The Broker Defendants and Insurer Defendants Agreed to Keep Their Contingency Commission Arrangements Secret**

404. As an initial matter, each Broker Defendant agreed with its strategic partner carriers that the terms of the contingent commission arrangements that they had entered into would not be disclosed to their customers.  In this regard, the Broker Defendants made clear to their strategic partners that they would not disclose the details of any of their contingent commission agreements to their clients, while the Insurer Defendants uniformly took the position that they were not obligated to make any disclosures to their policyholders regarding contingent commission payments.

405. In furtherance of these understandings, Defendants incorporated standardized confidentiality clauses in their contingent commission agreements that prevented the terms of the agreements from being disclosed to third parties, including purchasers of insurance (even though Defendants would share information with one another regarding these agreements).

406. The following are typical examples of confidentiality clauses included in the contingent commission agreements between Broker Defendants and their strategic partner Insurer Defendants:

- A 1997 contingent commission agreement between Aon and Chubb providing that, "[t]he terms of this agreement are confidential and shall not be disclosed by either party except as may be required by law."

- A 1998 Commission Override Agreement between HRH and Travelers providing that:  "All terms and conditions of this Agreement, including any

109

communications between Travelers and HRH that led to the formation of this Agreement shall be kept confidential by HRH as against third parties, unless disclosure is required pursuant to process of law. Disclosing or using aforementioned information for any purpose beyond the scope of this Agreement is expressly forbidden without Travelers prior written consent."

- A 1999 PSA agreement between Marsh and Hartford providing that: "The terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law."

- A 2000 PSA between Gallagher and Chubb providing that: "The terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law."

- A 2000 PSA agreement between Marsh and Liberty providing that, "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law."

- A 2001 PSA between Aon and Crum & Forster providing that the parties agree "to maintain the confidentiality of the existence and terms of this Agreement."

- A 2001 PSA between Marsh and Crum & Forster providing that, "[e]ach of the parties shall . . . (ii) maintain the confidentiality of the existence and terms of this Agreement," and a 2003 agreement providing that, "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law and to a party's respective legal and accounting advisers."

- A 2001 Insurance Placement Compensation Agreement between Aon and CNA, and in a 2003 PSA between Marsh and CNA, both providing that: "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law."

- A 2001 and a 2003 PSA between Marsh and Fireman's Fund providing that, "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as maybe required by law."

- A 2002 PSA between Willis and Ace providing that, "[t]he terms of this agreement are confidential and shall not be disclosed by either party except as may be required by law" and a 2003 agreement between Willis and Ace providing that, "[th]e terms of this Agreement are confidential and may not be disclosed to any person or organization, except as required by law."

- A 2002 PSA between Marsh and AIG providing that, "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law."

- A 2002 Incentive Compensation Agreement between Acordia and Travelers providing that, "[t]he terms of this agreement are confidential and shall not be disclosed by either party except as may be required by law."

- A 2003 agreement between Aon and Axis providing that, "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law."

407. As demonstrated by the foregoing examples, the use of standardized confidentiality clauses in contingent commission agreements between the Broker Defendants and the Insurer Defendants was widespread and grew throughout the Class Period. For example, in June 2003, Marsh Global Broking Inc. disseminated instructions that the following language was mandatory in all contingent commission agreements: "Confidentiality: The terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law and to a party's respective legal and accounting advisers."

408. The Broker Defendants relied on the confidentiality clauses as a reason why they could not disclose any information regarding the contingent commission arrangements with their strategic partner Insurer Defendants. Demonstrating that this is the case, following investigations commenced by regulators in 2004 into broker compensation practices, Aon had to send out requests to its partner carriers to get their permission just to disclose the existence of contingent commission agreements to its customers. In responding to inquiries from several carriers as to what information it would be disclosing, Aon made clear that it was only intending to state that a contingent commission agreement existed with particular insurers, without volunteering any details about the agreements.

409. The Insurer Defendants likewise instituted policies that prevented insurance purchasers from being properly informed as to the details of their relationships with the Broker

Defendants, taking the position that they would not disclose information regarding contingent commission arrangements.  For example, an internal Chubb memorandum states:

> We **do not** advise producer's regarding disclosure of Chubb's contingent arrangements to insureds – we consider that to be an agency/customer issue that we are not party to [emphasis in original].

410.  An internal Liberty Mutual email dated August 2004 written in the wake of the regulatory investigations going on at that time illustrates the Insurer Defendants' intent to withhold this information from insurance purchasers:

> I suggest you show as little knowledge of these agreements as possible.  You sure don't want to be subpoenaed.
>
> **The issue is really between brokers and their clients.**  The agreements are between us and brokers and are proprietary.  **We would not release the details to any customer.**  They are not party to the contract.  [emphasis added].

411.  In some instances, the carriers went so far as to include clauses requiring that the brokers indemnify them in the event that they were sued as a result of the failure to disclose their contingent commission arrangements.  For example, following the August 25, 1998 enactment of New York Insurance Department Circular Letter No. 22 concerning the disclosure of compensation terms, in addition to a confidentiality clause, Travelers included a provision in its PSAs that made it the broker's responsibility to comply with the Letter's disclosure requirement. Other Insurer Defendants included similar clauses in addition to the confidentiality clauses in the contingent commission agreements that they entered into with the Broker Defendants.

412.  Regardless of whether a confidentiality clause was included in a particular agreement, the Broker Defendants and Insurer Defendants took steps internally to assure that the details of their contingent commission arrangements were not disclosed.

413.  For example, Marsh's policy of misleading clients about the payment and receipt of contingent commissions came to light in the guilty plea of a former Marsh managing director,

Joshua M. Bewlay, who pled guilty to a felony charge of scheming to defraud on February 14, 2005.  Mr. Bewlay's testimony revealed that Marsh established a procedure or a "protocol" intended to "discourage the client from obtaining an answer" on how Marsh received compensation from insurance companies.  Mr. Bewlay's testimony states the following, in relevant part:

> Finally, during my employment, I was made aware of a Marsh protocol designed to prevent Marsh's clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client in addition to any fee or commission paid. ***The protocol required multiple layers of inquiry to discourage the client from obtaining an answer.***  Also that all inquiries be channeled through a single Marsh employee who directed the answer to the inquiry.  [Emphasis added.]

> Finally, the percentage or ratio that Marsh used when it responded to a client's inquiry concerning placement service or PSA or MSA revenue significantly understated the amount of PSA or MSA revenue earned with respect to a particular client. In my department, Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a particular client.

> When I was told that a client inquired as to the amount of PSA revenue Marsh earned from an insurance carrier, I responded that the Marsh employee follow Marsh's protocol, including that the client only speak to the Marsh employee designated to respond to such inquiries. [*People of the State of New York v. Joshua Bewlay*, Plea Testimony (Feb. 15, 2005) at p. 11-12.]"

414. Mr. Bewlay similarly admitted in his plea agreement that he made misleading statements about the amount of compensation Marsh received from insurers.  Mr. Bewlay's plea agreement states, in relevant part:  "From in and before 1999 through 2004, Mr. Bewlay engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property, namely insurance premiums, commissions and fees, from ten or more persons, to wit, clients of Marsh, by false and fraudulent pretenses, representations and promises, to wit, misleading statements about the amount of compensation Marsh derived from insurance carriers, and so obtained property from one or more such person, in that ***Mr.***

***Bewlay referred client inquiries for disclosure of such compensation to a designated Marsh
employee, knowing that said employee would provide misleading information concerning
Marsh's compensation to the clients.***  [Emphasis added.]  [Joshua Bewlay Plea Agreement
(filed Feb. 14, 2005) at ¶5.]"

415. An internal Marsh document entitled "PSA Primer" dated July 1999 further
describes Marsh's misleading policies on disclosing the amounts received from contingent
commission agreements.  Under the heading "PSA General Discussion" the document states:
"***There is no necessity to divulge the particulars of any PSA either to clients or other
individuals within Marsh Inc.*** who are not involved in either their negotiation or ongoing
administration.  In fact, doing so would constitute a breach of the confidentially clause contained
in the agreement between us and the carrier.  Requests for disclosure by clients or other parties
will be referred to the appropriate U.S. Region Head for review and disposition."  (Emphasis
added).

416. Even when a client attempted to understand the compensation practices at issue,
Marsh intentionally failed to disclose the substance of its contingent commission arrangements
or that such agreements were the basis for Marsh's scheme to allocate customers to Marsh's
partners or preferred markets.  The following internal Marsh email dated January 31, 2002,
exemplifies the response given when clients inquired as to compensation related to PSAs: "As a
matter of corporate policy, Marsh does not make available any specific information relating to
Placement Service Agreements.  This includes information relating to any revenue earned or
other details on a contract or market specific basis.  These two party agreements contain
confidentiality clauses which prohibit either party from disclosing any details as to the operation
of such PSA's."

417. Consistent with its corporate policy on disclosure, Marsh sent the following response to another client inquiry regarding Marsh's PSA's:   "Chris has asked me to respond to your questions regarding PSA disclosure to the client.  As a matter of corporate policy, we don't provide any details on PSA formulas or confirm which product lines are covered.  All of the PSA's contain confidentiality clauses which legally prohibit the disclosure of any details of these contracts by either the carrier or Marsh.  In accordance with our 1999 agreement with RIMS, Marsh will advise which of the markets participating on a clients risk we have PSA's in force (but not by product line)."

418. The other Broker Defendants took similar steps to prevent information regarding its contingent commission arrangements from being disclosed.  For example, when an Aon client asked for details of revenues derived from contingent commissions, overrides, bonuses or similar types of third party arrangements, Eric Anderson of Aon stated: "we do not disclose the national amounts we received.  As I am sure you can understand, that is extremely confidential information.  Other major brokers will not disclose their figures (this had played out many times).  If his concern is that we are not steering business to insurers to maximize our income, we can certainly address that this is absolutely not the case."

419. In an email to AON, Axis employee Dennis Reding wrote, "There will be no general communication of this agreement within our companies or outside."  Similarly, an email from Axis employee Marshall Turner in February, 2004, stated, "Please delete all references to the 2003 AON incentive.  This is confidential information not to be share beyond Dennis, you and me."

420. HRH likewise adopted a national firm-wide policy prohibiting disclosure of its agreements with its partner carriers and assured its partners that it would not to disclose their

contingent commission arrangements.  In connection with HRH's carrier "Consolidation Initiative" designed to "leverage" HRH's ability to allocate business in exchange for contingent commission payments, a Travelers senior vice president wrote to an HRH executive, stating:

> Travelers & HRH agree terms and conditions will be handled with **ABSOLUTE CONFIDENTIALITY** . . . . These terms and conditions assume a similarity of intent with the strategic partners [emphasis in original].

421.  The Assurance of Discontinuance that Travelers recently entered into with the Attorneys General of New York, Connecticut and Illinois further states that once HRH's agreements with its strategic partners were in place, "HRH began systematically to identify customers whose business could be switched to Travelers and the other selected insurers," yet kept telling its clients that it was in their "best interest" to move to one of the "Big 3" carriers while "***never disclos[ing]*** its own financial motives for the switch."  (emphasis added).

422.  HRH's non-disclosure policy is illustrated in an email exchange between Carolyn Jones, SVP, CFO and Treasurer of HRH, and Ned Kirklin of HRH/Kirklin & Co., LLC, regarding concerns raised by Ernst & Young about the necessity of disclosing a financial relationship between HRH and an underwriter that was receiving placements from HRH.  Mr. Kirklin unequivocally states that "***there is no obligation to divulge this information just like HRH has no obligation to divulge its profit sharing arrangements with carriers.***"  (Emphasis added).

423.  Willis also ensured that the details of its contingent commission arrangements were kept secret.  Internally, Willis bolstered its ability to maintain the secrecy of this information by limiting access to the details of these arrangements to a restricted group of employees within the company.  In this regard, according to a Willis Senior Vice President responsible for global market carrier advocacy, only approximately 20 employees within the company's entire global

organization were permitted to access these details via the company's intra-net system – and only

five employees within the company's Global Markets North America Group had the ability to

access this information.  Thus, Willis's marketing teams were only provided with enough details

concerning the company's contingent commission arrangements for them to understand where

placements should be allocated.  As explained by an Executive Vice President who worked on

the development of the company's "Marketing Desktop":

> [W]e would publish limited details about our contingents to our marketing teams
> (so that they understand the raison d'etre of preferred carriers) *but the full details*
> *of deals would only be available to senior management.*  [emphasis added]

424. Indeed, even following the onset of regulatory investigations of broker

compensation practices, Willis continued to refuse to disclose specific information regarding its

contingent commissions, even in response to specific inquiries.  For example, on April 7, 2004, a

Willis employee sent an email to James Drinkwater, managing director of Willis Global Markets

North America, requesting guidance on how to fulfill the company's obligation under a fee

agreement to disclose contingencies attributable to a client's placements.   In response, Mr.

Drinkwater stated as follows:

> All that I can tell you at this time is that we are negotiating contingent agreements
> with some of these carriers and *there would be no [ ] way for us to estimate any*
> *contingent payment at this time, or at a later date that are attributable to this*
> *specific insured.*  Contingent agreements are not reflective of individual accounts
> *they are reflective of services that we provide insurers* for our overall work on a
> book of business.  [emphasis added]

425. Gallagher similarly instituted polices that prevented its clients from obtaining

accurate or detailed information regarding its contingent commission arrangements.  Gallagher

likewise continued to adhere to these policies even after the regulatory investigations into broker

compensation practices began in 2004.

426.  For example, in May 2004, Gallagher received an inquiry from a client requesting confirmation that Gallagher was not accepting contingent payments on its business.  In making the inquiry, the client stated:  "It is clear that by accepting such fees, brokers would be in a conflict of interest situation when recommending insurance programs and structures."  In response, Craig M. Van der Voort, Gallagher's Vice President of Market Resources, instructed that the client be assured that "there is no conflict of interest when serving our client" resulting from Gallagher's contingent commission arrangements.  Mr. Van der Voort further instructed that the following response be given:

> Nothing in the calculation formula is account specific and since overall underwriting profitability is measured, the poor loss experience of clients can easily offset or reduce any potential bonus payment.  With all of the various components that are measured, ***it would be extremely difficult [to] determine what, if any, a specific client's placement might have yielded to the total calculation.***  [emphasis added]

427.  Wells Fargo/Acordia issued internal instructions that the details of its partnership arrangements be kept confidential, at the same time that it provided its managers with enough information to ensure that they maximized revenue from steering.  An October 8, 1999, email from Charles Ruoff, Acordia's Senior Vice President and Chief Marketing Officer, authorizes that certain information regarding Acordia's "Millennium Partnership Agreements" could be sent to some of the company's regional managing directors, with a copy to the company's Corporate Planning Committee, for the purpose of "maximiz[ing] the incentive payments."  The email concludes with the reminder:  "***confidential issue important as it could void our agreement if disclosed outside Acordia.***"  [emphasis added].

428.  The confidential nature of the contingent commission agreements were to be maintained at all costs and those who violated the confidentiality of the agreements were confronted with threats and dealt with harshly.  In early May of 2003, a Marsh Global Broking

employee learned that a Global Broking PSA was leaked from a front-line Munich Am-Re ("MARP") employee to a Marsh local office employee. Marsh chastised the MARP management. After finding out about this unauthorized discussion of the PSA, Mark Manzi of MGB wrote to the head of MARP GRM, saying that "[t]his is appalling and unacceptable!" He noted that the same thing happened last year, and asked what "Munich will do to rectify this very embarrassing situation." The head of MARP's Global Risk Management unit, John Schumacher, immediately responded to Marsh and acknowledged the violation of their agreement: "We acknowledge that this was inappropriate behavior and will do the necessary to eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the PSA. I apologize for the consternation that this has caused within the Marsh organization."

429.    Shortly thereafter, Schumacher sent out an email to his employees stating that the PSAs "have confidentiality provisions which we must abide by. Although we have broadly communicated certain information to ensure that we price appropriately, we cannot make any reference to this to anyone." The head of the Public and Non-Profit unit of MARP sent an email to his employees, stating, "[q]uotes we provide to any production source should not reference any applicable PSA percentage we included in our pricing. Furthermore, PSAs are never to be discussed with retail producers or clients."

430.    The importance of maintaining the secrecy of the contingent commission payments is further evidenced in an email from Acordia when one of its clients inadvertently learned from AIG that Acordia was to receive an _____ commission. In response to such inadvertent disclosure, Mark Dougherty wrote to Scott Isaacson, Acordia, Inc.'s Chief Marketing Officer: "HOWEVER, I would like to point out that AIG sent the raw feed to the client – IT STATES THE COMMISSION! The client has already called and is complaining about the _____

commission on our end.  We are now negotiating that and it looks like we are going to net this out and figure something in the fee range of _____.  I am not a greedy-guts - but if AIG did this to Marsh, Willis or AON I can only imagine what that conversation would be like."

431.    As a result of these established policies and practices, Defendants were able to conceal the true nature and scope of their contingent commission arrangements and their strategic partnerships that resulted in the customer allocation scheme and conspiracy alleged.

### (b)    Defendants Failed to Disclose That The Cost of Contingent Commissions Was Built Into the Price of Premiums

432. The Insurer Defendants built the cost of the contingent commission payments that they made to the Broker Defendants into the premiums that they charged for the insurance they provided.  As a result, the premiums Plaintiffs and Class Members paid were inflated in order to cover these costs.  Nevertheless, in their binders and invoices, the Insurer Defendants failed to disclose that the cost of contingent commission payments was imbedded into the premiums.  The Broker Defendants failed to disclose this to their clients as well.  In fact, the Broker Defendants would misleadingly take the position that contingent commissions were not attributable to any particular client's insurance placements.

433. Both the Broker Defendants and the Insurer Defendants knew that the cost of contingent commissions was included in the premiums that Plaintiffs and members of the Class were charged.  For example, in a November 11, 1994, letter from a Willis executive to a Chubb executive states:  "Imbedded in your rating structure is an expense allowance for contingency payments.  Its [sic] probably some sort of average across Chubb's book of business, based on historical experience."

434. This letter is consistent with other internal documents and the testimony of witnesses indicating that the cost of contingent commission payments is built into the premiums charged to insurance purchasers.

435. Nevertheless, the Broker Defendants and Insurer Defendants took steps to make sure that no information referencing the impact of contingent commissions on premiums was provided to insurance purchasers, and any inadvertent reference to such information in materials provided to insurance purchasers would be quickly eradicated.

436. For example, a May 15, 2003, email sent from Craig Smiddy, a Vice President of Munich Reinsurance, to all AMRE – PNP Managers contained the following directive:  "Please discuss with your team; *Quotes we provide to any production source should not reference any applicable PSA percentage we included in our pricing*.  Furthermore, PSA's are never to be discussed with retail producers or clients."  (Emphasis added).  As this email indicates, AMRE senior management clearly understood that PSA's increased the price of premiums, and that this information could not be disclosed to consumers, including Plaintiffs and other Class Members.

437. Similarly, in 2004, a "high level representative" of Marsh complained to the Chief Underwriting Officer of ACE WestChester's Proper unit, about the disclosure in WestChester's quotes and binders of its PSA with Marsh.  The chief underwriting officer promptly advised the head of the Property unit, and other management that their underwriters should "immediately refrain" from disclosing anything other than the percentage commission, and that referencing the Marsh PSA "is highly unacceptable."

438. _____

_____

_____

_____

_____

_____
_____
_____

_____
_____
_____
_____

_____

_____

439. Defendants understood that their failure to disclose the relationship between contingent commissions and premiums was deceiving to insurance purchasers.  A draft letter that AIG prepared in 1998 to send to its insureds stated that:  "[W]e agree with the New York Insurance Department that *failure to disclose how much we pay your broker is withholding critical information from you who ultimately pays for this compensation through its higher insurance premiums*." (Emphasis added).  The draft letter went on to commit, among other things, to: "[d]isclose to our New York insureds prior to their purchase of a new or renewal policy, the total compensation we are paying their broker, including contingent compensation arrangements or payments to the brokers' 'affiliate' organizations" and "[i]nclude as a factor in the establishment of our premium rates, all fees paid to your broker."

440. This letter was never sent to AIG's insureds and the "critical information" referred to in the letter regarding how much the brokers are paid and how contingent commissions impact premiums was never disclosed.

441. Although this draft letter was prepared by AIG, its reasoning applies equally to all Defendants and illustrates how they understood the manner in which they were deceiving their clients.

(c)    **The Broker Defendants' Concerted Actions to Prevent
Meaningful Disclosure of Their Contingent Commission
Arrangements is Built into the Price of Premiums**

442. The Broker Defendants mutually agreed to issue substantially similar incomplete and materially false and misleading disclosure statements regarding contingency compensation arrangements as well as other public statements, made through "CIAB", in order to create the illusion that the Broker Defendants' were acting in their clients' best-interests and were operating in an open and transparent manner.

443. In this regard, as described herein, during the mid-1990s, concerns were raised on several occasions over whether the large brokers, including the Broker Defendants, might be able to exploit their increasing market power at the expense of insurance purchasers. The Broker Defendants understood that these types of concerns could result in efforts by the insurance buying public and/or regulators to demand actual and complete disclosure of the manner in which the Broker Defendants were compensated by the Insurer Defendants. The Broker Defendants knew that it would be necessary to effectively fend off any such efforts, and CIAB served as a ready conduit employed by the Broker Defendants to accomplish this task.

444. For example, following concerns being raised over broker compensation issues in 1998, the Broker Defendants, operating through CIAB, determined that they needed to adopt a consistent position statement that would avoid insurance regulatory scrutiny and prevent any action that would result in meaningful disclosure to the Broker Defendants' customers.

445. Specifically, stating in an internal CIAB document that, "[u]nfortunately, this debate [over broker compensation disclosure issues] is not likely to go away anytime soon," the CIAB determined that it needed to adopt a position statement that was intended to stave off any meaningful regulatory disclosure requirements and reassure insurance purchasers that their

brokers were acting in their best interests. This statement began by stating that: "Council members [including all of the Broker Defendants] are committed to acting in their client's best interest by providing products and services that meet the clients' needs and desires." The statement then went on to discuss the purported "value" that contingent commission agreements have on a "broker's ability to access markets in the clients' interest." The position statement also recommended that brokers should disclose that they "*may* have compensation arrangements with some insurance carriers and give clients the opportunity to discuss the matter further if they have questions or concerns." (emphasis added).

446. The CIAB position statement was made available for review and editing by its members before being finally approved by CIAB's Executive Committee, which included executives from Marsh, Aon, and HRH. These Executive Committee members were also all officers of CIAB. Additionally, an executive of Willis was a member of CIAB's Industry Affairs Committee, which initially made the recommendation to issue a position statement. Further, one or more representatives of all of the Broker Defendants, or their predecessors, were on CIAB's Board of Directors at the time the CIAB position statement was issued.

447. The position statement was intended to create the impression with both regulators and clients that CIAB was effectively addressing the issue of compensation disclosure so there would be no need for any regulation on this issue.

448. Indeed, the CIAB position statement was issued following the New York State Insurance Department's issuance of Circular Letter 22, which imposed certain obligations on brokers to disclose certain compensation information. CIAB's true intent to prevent meaningful disclosure of compensation arrangements is reflected in the following statements contained in its internal meeting notes: "The Council is working with other interested trades to arrange a

meeting with the New York Insurance Department. At the meeting, *we will state opposition to the Letter* because it is too broad and without sufficient legal justification. *We will seek to have them rescind it and discuss a voluntary program of appropriate disclosure*." (Emphasis added).

449. Although CIAB was unsuccessful in its efforts to get Circular Letter 22 rescinded, it has consistently instructed its members that the letter "imposes additional obligations, which are not enforceable," that the letter "should be narrowly construed," and that disclosure that a broker "may" have contingent commission agreements with some carriers is all the brokers needed to say to comply with Circular Letter 22 or any other regulatory obligation.

450. The Broker Defendants have worked with CIAB to create the public impression that "full disclosure" is the industry standard. Illustrating this point, CIAB prepared an internal document entitled, "Suggested Talking Point for CIAB Members if Questioned on Contingency Fees," which was intended to help its members, including the Broker Defendants, deal with concern raised over broker compensation practices following the complaint filed by the New York Attorney General against March in October 2004. This document stresses that CIAB has operated under a disclosure policy "that has been on the books since 1998" and that, "[l]ong before contingency fees became an issue in the media, The Council and its members were reviewing disclosure policies to make sure that there was no question about where we stand."

451. Similarly, in a 1998 presentation before the Risk Insurance Management Society ("RIMS"), Roger Egan, a Managing Director at Marsh stated that Marsh "recognize[d] a duty to disclose" and described Marsh's policy to be one of "full disclosure." Similarly, Aon has described itself as "a full disclosure Insurance Broker."

452. Nevertheless, the Broker Defendants have either completely failed to provide any disclosures regarding their contingent commission arrangements or issued substantially similar purported "disclosure" statements modeled after the CIAB's position statement that were in and of themselves misleading and allowed Defendants to conceal their conspiratorial scheme. Over the course of the Class Period, the Broker Defendants have included these statements in numerous communications with clients such as invoices and agreements and other documents. For example, Marsh began incorporating the following language in materials disseminated to its clients:

> Marsh USA and its affiliated companies ("Marsh") *may* have agreements with insurers providing the coverage which is the object of this invoice pursuant to which Marsh *may* derive compensation contingent upon such factors as the size, growth, and/or overall profitability of an entire book of business placed by Marsh with such insurers. Such contingent compensation would be in addition to any other compensation Marsh may receive such as retail, excess and surplus lines and wholesale brokerage fees or commissions, administrative fees, etc. At your request, Marsh will provide additional information. [Emphasis added].

453. Similarly, Aon adopted the following official policy, which failed to disclose sufficiently the impact of the contingent commission agreements, stating:

> Aon is committed to acting in its clients' best interests by providing products and services designed to meet clients' risk financing and risk management objectives. It has been a long-standing practice in the insurance industry for carriers to have compensation arrangements with brokers, like Aon, who bring added value to the distribution system through their performance, expertise and efficiency. *We believe that such arrangements serve to enhance the brokers' ability to access insurance markets in their clients' interests*. . . . We believe that openness and honesty in our business relationships is a tenet to which Aon abides and, to that end, Aon notifies it clients in its service fee arrangements, its invoices, its website and other publications that it *may* have compensation arrangements with some insurance carriers, offers its clients the opportunity to discuss these matters further, and will, where applicable and available, provide its clients with information concerning compensation earned from such arrangements. [Emphasis added].

454. In accordance with this policy, Aon began including the following language in its invoices and service agreements:

In certain circumstances, one or more of these subsidiaries *may* also receive compensation in the following forms:  commissions or fees paid as reinsurance brokerage or captive management companies for placement or management reinsurance of a client's risk; commissions paid to excess and surplus lines brokerages; commission paid to managing general agent to whom a risk has been referred for placement; contingent commissions paid by an insurer based on aggregate loss experience; overrides paid by an insurer/reinsurer *based on service performed* and the volume of business placed with the insurer/reinsurer; fees paid for premium financing; and feed paid for performance of technical or other services.  [Emphasis added].

455. Willis likewise began including the following similar language in communications

with it clients:

In addition to the commissions received by us from Insurers for placement of your insurance coverages, other parties, such as excess and surplus lines brokers, wholesale brokers, reinsurance intermediaries, underwriting managers and similar parties (some of which may be owned in whole or in part by our corporate parents or affiliates), *may* earn and retain usual and customary commissions for their role in providing insurance products or services to you under their separate contracts with insurers or reinsurers.  Additionally, it is possible that we, or our corporate parents or affiliates, *may* receive contingent payments or allowances from Insurers based on factors which are not client-specific, such as the size or performance of an overall book of business produced with an insurer by us, our corporate parents or affiliates.  Upon written request, we will provide information regarding the compensation received by us or by our corporate parents or affiliates.  [Emphasis added]

456. Gallagher also began using the following similar language in its communications

with its clients:

Gallagher from time to time enters into arrangements with certain insurance carriers or those carriers' reinsurers providing for compensation, in addition to commissions, to be paid by such carriers or reinsurers to Gallagher or its affiliates based on, among other things, the volume of premium and/or underwriting profitability of the insurance coverages written through Gallagher by such carriers or reinsurers.  In addition, Gallagher and its affiliates provide management and other services to, and receives compensation for those services from, certain reinsurers that reinsure insurance coverages written through Gallagher by other insurance carriers.  The insurance coverages you purchase through Gallagher *might* be issued by an insurance carrier or reinsured by a reinsurer that has such a relationship with Gallagher or its affiliates.  [Emphasis added].

457. Wells Fargo/Acordia likewise began to use the following similar language in its communications with its clients:

> [Acordia] may have agreements with insurers providing the insurance coverage which is placed by Acordia pursuant to contingent agreements which may result in compensation.  These agreements are based upon such factors as the size, growth, and/or overall profitability of total business placed by Acordia with such insurers.  Such contingent compensation is considered an industry standard and would be in addition to any other compensation Acordia may receive such as retail and wholesale brokerage fees or commissions, administrative fees, etc."

458.  The foregoing disclosures were modeled after the CIAB position statement in order to create the impression of transparency, by stating that the brokers "may" have contingent commission agreements that might result in some additional revenue, while failing to disclose any information regarding the strategic partnerships that the Broker Defendants had entered into with the Insurer Defendants or the significance of these partnerships and the contingent payments arrangements had on the insurance placement process and the premiums charged. Moreover, regardless of the extent to which the Broker Defendants incorporated these statements in their own communications with their clients, the CIAB's campaign, which included the position statement and other similar statements, successfully prevented the Broker Defendants from having to make any meaningful disclosure for years.

459. Indeed, CIAB has routinely provided the Broker Defendants the opportunity to discuss and reach agreement on joint action in response to regulatory investigations and regarding disclosure issues in order to conceal Defendants' scheme and for furtherance of Defendants' fraud.   For example, in 2003, CIAB reiterated in an internal email that its position statement was "a generic disclosure that we think works and that should not cause too much consternation."   Similarly, a 2003 email sent by CIAB's General Counsel discusses revising a policy paper to eliminate a provision because it "could be read to require more contractual disclosure of the payment mechanism, which is exactly what we don't really want to get into."

460. More recently, the Council adopted "crisis communication plans . . . to respond to issues raised by the Spitzer Investigation."  CIAB members have held joint meetings with other insurance trade associations to consider the "industry-wide responses" to the investigations. CIAB has also issued statements to create the impression that is members were already making full disclosure of all compensation related matters

461. For example, in response to a regulator inquiry regarding contingency commissions, CIAB provided assurance that "they really have no impact on the amount insureds pay for coverage."  In a news release, Defendants through CIAB, assured the public that "disclosure is the industry standard" but also confirmed that they are acting in the client's best interest in the insurance marketplace:

> A broker is charged with finding the best risk coverage solutions for his or her commercial customers.  It is incumbent upon brokers to research the market fully and present a range of options, then work with their customers to find the coverage that meets their needs, both in terms of cost and scope….The best broker for a given customer or group of customers is the who one has a relationship with the carriers that have the products that serve those customers best.

462. For years the Broker Defendants, operating through CIAB, have consistently discussed and opposed any efforts to require meaningful disclosure of contingent commission arrangements and successfully fended off any regulatory action through the use of misleading and vague statements.

463. These type of statements issued by CIAB, as well as its position statements, which many of the Broker Defendants' echoed in their direct communications to their clients, were in and of themselves materially false and misleading in that they failed to disclose the scheme described above, including the true nature of the arrangements between the Broker Defendants and their strategic carrier partners, and attempted to lull insurance purchasers into believing that

the brokers were acting in their best interests and that contingent commission agreements furthered this purpose.

464.  An internal February 2004 Marsh email illustrates how Defendants acted to create the appearance of disclosure through the use of statements modeled after the CIAB position statement, which withheld material information and mislead insurance purchasers.  This email states:

> The monthly Statements and the Client Engagement agreement both refer to a document called "Our Business Practices and Principles" which is available on our Website and is normally sent with the Client Engagement Agreement, which refers to us receiving PSR's *but in a masterfully opaque way.* [emphasis added.]

465.  A series of emails among several Marsh employees underscores how the standardized disclosure position put forth by CIAB and adopted by the Broker Defendants was designed to mislead insurance purchasers.  In this exchange, Allison Muller, a Marsh employee, acknowledges that the substantial revenue brokers such as Marsh receive in the form of contingent commissions is not disclosed:  "*It's not a matter of client's [sic] knowing about PSAs, it's about how much $$ we make on them & don't disclose.*"  [emphasis added.] Responding to a statement by Marsh executive Edward Keane, who was subsequently indicted, that "pretty much every Broker has a PSA," Ms. Muller further explained:  "*The issue is not that we disclose the PSAs, but that we give clients such a shady answer when we do* 'Well, between $-$$ we make $$, but there's no way to know where you fall ....' . . . *If we actually disclose the real amounts to our clients & factor that into our total fee, I wouldn't be worried … but, we don't.*" (Emphasis added).  Ms. Muller concluded by stating that although Marsh benefited from its receipt of contingent commissions, "no one should be shocked when they bight [sic] us in the ass."   Although these conclusions were written by employees of Marsh, Ms. Muller's

explanation regarding Marsh's "shady" disclosures apply equally to the misleading nature of the disclosures involving the other Broker Defendants as well.

466. An internal AIG document which was attached to a 2002 PSA between AIG and Marsh, further illustrates the misleading nature of Defendants' limited disclosures regarding contingent commission information. This document states, in relevant part, as follows:

> However, the Client Service Agreement language *does not adequately disclose to insureds the compensation paid by the insurer to the broker*. The disclosure is inadequate because:
>
>> 1. it "discloses" only referencing the agreements in the negative – i.e., what commissions are not for purposes of the commission offset;
>>
>> 2. *it refers to the PSA monies as fees that the broker "may" receive, rather than as fees actually received*; and
>>
>> 3. most importantly, *it makes no attempt to describe or quantify the agreements or calculations themselves*.
>
> In order for the disclosure to be adequate:
>
>> 1. *The insurer should provide to the broker*, with the insurer's quote letter, a good faith estimate of the amount of *total compensation to be paid to the broker by the insurer in connection with the quote*.
>>
>> 2. *The broker is obligated to disclose to the insured*, at the time of delivery of the quote letter, (a) *the broker's estimate of such total compensation and (b) a detailed and complete description of the all compensation agreements (whether commission at inception or contingent compensation* based on such factors as size, growth and/or profitability of an entire book of business, or otherwise), between the broker and the insurer, including any formulas and calculations involved.
>>
>> 3. The disclosure must be sufficiently detailed so that an insured is able to understand it fully. While it may not be possible to predict exactly the amount of compensation that will be payable, the broker must estimate the amount based on past history and reasonable assumptions.

4.  The disclosure should be prominent and free standing and not part of some other documentation.  The broker should deliver the disclosure document with the insurer's quote letter.

5.  In addition to the disclosures set forth above, the broker must send a prominent disclosure notice to each insured at the time of actual calculation, stating the exact amount of compensation attributed to each insured.  [Emphasis added throughout].

467.  The foregoing letter demonstrates that Defendants understood the kind of information that was necessary to be provided to insurance purchasers, such as Plaintiffs and members of the Class, in order for their disclosures to be adequate.  Nevertheless, Defendants failed to make such disclosures and instead took steps to keep this information concealed as described above.

468.  It is only following the recent regulatory investigations involving the Broker Defendants, which have lead to criminal indictments as well as a number of regulatory settlements, that the misleading nature of the Broker Defendants' purported "disclosures" have come to light.  For example, in explaining why it had agreed with Marsh in 1999 that a disclosure protocol (which was substantially the same as CIAB's position statement), was adequate, RIMS recently stated:

The [1999 statement] was an appropriate response to this issue given the information we were provided at that time.  ***We were told that contingency fees comprised only a fraction of the overall revenue earned by brokers, and in no way influenced its work on behalf of their clients.  Years later, however, the reality of these arrangements came to light***.  [Emphasis added].

469.  Marsh's counsel, Davis Polk & Wardwell ("Davis Polk"), retained to represent it in connection with regulatory investigations commenced by New York State in 2004, concluded that the information that Marsh was disclosing pursuant to its 1999 agreement with RIMS was misleading.  In this regard, Davis Polk concludes that:

Marsh Inc. complied with the terms of the RIMS agreement; nonetheless, given the manner in which the calculations were performed pursuant to the protocol, the

amounts conveyed to clients could be viewed by certain clients as ***inaccurate or
misleading*** [emphasis added].

470. Defendants were able to conceal their scheme for years as a result of their
agreement to keep their contingent commission arrangements secret and engage in a public
relations campaign designed to create the appearance of transparency.  In the absence of proper
disclosure of the contingent commissions, Plaintiffs and members of the classes were prevented
from discovering the true nature of the relationships between the Broker Defendants and the
Insurer Defendants and relied, to their detriment, on Broker Defendants' representations that they
were providing independent expertise and representing their clients' interests in accordance with
their contractual, fiduciary and other duties as alleged above.  Plaintiffs and members of the
classes also justifiably relied upon Defendants' representations in connection with the insurance
policies they purchased.

> **(d)** **Recent Regulatory Investigations Reveal The
> Misleading Nature of Defendants' Representations and
> Disclosure Practices**

471.  Commencing in 2004, a large number of state attorneys general and state regulators
began conducting investigations concerning the Broker Defendants' compensation practices and
relationships with the Insurer Defendants.   As a result of these investigations, settlement
agreements or assurances of discontinuances have been entered into by various Attorneys
General, including New York, Connecticut, Illinois, Pennsylvania and Minnesota, with the
following Broker Defendants:  Marsh, Aon, Willis, Gallagher, and HRH, and the following
Insurer Defendants:  Travelers, Chubb, Ace, AIG, and Zurich.  These settlement agreements or
assurances of discontinuance included various restrictions on receiving contingent compensation
from insurers under certain circumstances and mandated, among other things, that the settling

defendants provide meaningful disclosures regarding forms of compensation paid by insurers to the brokers which were not previously made.

472. Even after these governmental and regulatory investigations got underway, however, a number of Defendants continued to issue materially false and misleading statements regarding their compensation practices and/or continued to fail to disclose these practices.

473. Following the investigations of various state attorneys generals of the insurance industry in 2004, Marsh continued to fail to adequately disclose contingent commission Agreements. In 2004, Marsh posted a "Frequently Asked Questions" page regarding MSAs on its website (which it has subsequently removed), stating that it had no conflicts with clients because of the MSAs:

> Our guiding principle is to consider our clients' best interests in all placements. We are our clients' advocate and represent clients in our negotiations. We don't represent the markets. We work closely with clients on the design of their risk transfer program to address the complexity of decisions that have to be taken into account, such as market financial strength, a market's expertise in the line of coverage needed, its claims-paying history, clients' service requirements, breadth of coverage, pricing, and other terms and conditions. We also work with insurers, and part of what an insurer pays us for is an iterative planning and communications process that allows the insurer to create more competitive proposals for our clients, which of course benefits those clients. In all cases, clients retain the final decision on the market chosen to handle its business.

474. As Marsh's subsequent settlement conceded, however, among other things, Marsh did not act in its clients' best interests, did not advocate fairly on their behalf, and failed to provide clients with the information needed to make informed placement decisions.

475. When the New York Attorney General began investigating the insurance industry in 2004, Aon's CEO, Patrick G. Ryan, was reported as being "not fazed" by the investigations and as being "very comfortable" with the conduct of Aon's employees. In an SEC Form 8-K filed on December 6, 2004, Ryan backtracked, however, claiming he was misquoted on the first point and that he had been wrong on the second. As part of Aon's settlement with various State Attorneys

General, Ryan was ultimately compelled to issue a public apology for the misdeeds of the company.

476. Those misdeeds included false postings on Aon's use of CSUs on its website in 2004. Aon misleadingly stated that CSUs are compensation for valuable services performed: "Aon performs activities and provides services of value to insurers, including providing access to its substantial distribution networks, pre- and post-placement technical services, sharing of Aon's knowledge and expertise as an industry leader, policy design and review, research and development, risk analysis, claims management, administration and other underwriting-related activities. Providing these services ultimately benefits our clients, the insurance markets and Aon."

477. Gallagher also continued to issue similar false statements after the regulatory investigations had begun. For example, on October 19, 2004, J. Patrick Gallagher, Jr. issued a memorandum to all employees distinguishing its conduct from Marsh's. The memorandum explained:

> Gallagher's business model is structured to enable our producers and account managers to put the interests of our clients first. This is reinforced in the following ways: - Our Mission Statement states that Gallagher succeeds by placing the needs of our clients first. - We have professional standards in place that govern how we interact with our clients and the insurance companies. These standards are reviewed and updated often and we audit our compliance with those standards frequently. - The Gallagher Code of Conduct requires that we conduct ourselves professionally and ethically. - And, the Gallagher Way spreads the word about our Shared Values – it is our culture to operate under the highest moral and ethical behavior. We spend considerable time and energy conveying to our employees that we must do the right thing for our clients, even if it means less profits for Gallagher.

478. This statement was belied by Gallagher's Stipulation and Consent Order with the Illinois State Attorney General and Illinois Department of Insurance on May 18, 2005, which

disclosed that Gallagher systematically allocated clients to insurers who paid it the largest kickbacks.

479.  As a result of the governmental investigations into broker compensation practices, several Defendants including, *inter alia*, Marsh, Aon, Gallagher, Willis, Liberty Mutual, AIG and ACE have discontinued the use of contingent commission agreements and instituted other reforms designed to avoid conflicts of interests in the brokerage industry.  For example, as part of its settlement with the New York State Attorney General, Marsh agreed to a prohibition of receiving contingent compensation from insurance carriers.  Marsh also agreed to provide clients with a comprehensive disclosure of all forms of compensation received from insurers and to adopt and implement company-wide, written standards of conduct for the placement of insurance.

480.  Similarly, in March 2005, Aon entered into a settlement agreement with the Attorneys General of New York, Connecticut, and Illinois, which was modeled after the agreement previously entered into with Marsh.  In connection with the settlement, Aon agreed, among other things to:  (i) eliminate contingent commissions; (ii) implement company-wide written standards of conduct regarding compensation from insurers; (iii) accept one payment only for an insurance contract at the time of placement, and (v) fully disclose its payments to and receive approval for these payments from its customers.

481.  In the wake of the regulatory investigations, a number of Defendants have admitted that they failed to disclose or failed to sufficiently disclose their contingent commission arrangements and preferred partnership agreements to insureds and/or took actions to provide disclosure.

482. On April 19, 2004, after having received letters from the New York State Insurance Department on March 3, 2004 and March 26, 2004, HRH finally agreed to disclose the existence of incentive compensation agreements to its insureds prior to the purchase of insurance.

483. Additionally, the settlement agreement that HRH entered into with Connecticut Attorney General Richard Blumenthal on August 31, 2005 required HRH to, among other things, cease accepting or requesting contingent compensation in connection with its brokerage business and make mandatory disclosure of any compensation attributable to a client when placing, renewing, consulting on, or servicing that client's insurance policy.

484. The settlement agreement that Gallagher entered into with the Illinois Attorney General and Illinois Department of Financial and Professional Regulation ("IDFPR"), Division of Insurance in 2005 required Gallagher to, among other things, no longer accept or request any contingent compensation and implement company-wide written standards regarding compensation from insurers.

485. Among other things, the Assurance of Voluntary Compliance that Gallagher entered into states that "for many years Gallagher entered into contingent commission agreements with several favored insurance companies" and therefore "allowed its revenue interest to potentially conflict with those of its clients because it received these commission only if it placed sufficient business with the favored insurers." The document provides a specific example in which Gallagher falsely assured its clients that no such conflict existed in connection with its receipt of expense subsidies in connection with AIG (in lieu of actual contingent payments):

> While Gallagher was instructing its managers that the AIG subsidiaries required the managers to "make sure" AIG received a share of Gallagher business, Gallagher told at least one of its clients that AIG created no incentives for Gallagher to commit business to AIG. On May 26, 2004, a Vice-President in the Brokerage Services Division advised a client that AIG has "no need to offer incentives to anyone. Historically they <u>never</u> have incentivized anyone to do

business with their firm and it is a philosophy and model they continue to incorporate in todays [sic] marketplace." Gallagher AoVC, ¶ 27.

486.  As part of the settlement, Gallagher assured its clients that it would never allow its own financial interests to conflict with its client's interests through a written statement published in a document entitled "Client Commitment."   Gallagher AVC, ¶ 3-5.

487.  The settlement agreement that Willis entered into with New York Attorney General and New York Department of Insurance, which was modeled after earlier agreements with Marsh and Aon, required Willis to, among other things, (i) no longer accept contingent commissions and only accept one payment for an insurance contract at the time of placement; this payment will be fully disclosed to and approved by its customers; and (ii) implement written standards of conduct, and train relevant employees in such subjects as business ethics, professional obligations, conflicts of interest, anti-trust and trade practices compliance, and record keeping.

488.  The settlement agreement that ACE entered into with the Attorneys General of Illinois, New York and Connecticut in April 2006 required ACE to, among other things, sharply curtail its use of "contingent commissions," and to stop paying contingent commissions on excess casualty insurance placements through 2008 and provide new disclosures about ranges of compensation paid to brokers and agents by insurance products on either a website or a toll-free telephone number and to make insureds aware of this by sending them a notice with their policies.

489.  In January 2006, AIG entered into a settlement agreement with the New York State Attorney General and New York State Department of Insurance pursuant to which AIG agreed, among other things:  (i) to sharply curtail its use of contingent commissions, and to stop paying contingent commissions on excess casualty insurance placements through 2008; and (ii) to

provide new disclosures about ranges of compensation paid to brokers and agents by insurance products on either a website or a toll-free telephone number and to make insureds aware of this by sending them a notice with their policies.

490. Similarly, the settlement agreement that Chubb entered into with the Attorneys General of Illinois, New York, and Connecticut in December 2006 required Chubb to forgo all contingent commissions and to undertake the same remedial measures related to disclosure as was required by ACE. The Assurance of Discontinuance that Chubb entered into in connection with this specifically stated that: "Since at least the mid-1990s, Chubb and other insurers have paid hundreds of millions of dollars in *undisclosed 'contingent commissions'* to the world's largest insurance brokers and agents." Chubb AoD, ¶ 1 (emphasis added).

491. The Assurance of Voluntary Compliance that Travelers entered into in connection with its settlement with the Attorneys General of New York, Connecticut and Illinois in July 2006 acknowledged that:

> St. Paul and Travelers entered into *a number of undisclosed contingent commission agreements* (also known as "override" agreements) with Producers, such as Marsh, Aon, Willis, HRH, Gallagher, and Acordia. As a result of these arrangements, the Producers steered insurance policies to St. Paul and Travelers to give them new business and to keep retention levels (that is the percentage of customers who elect to keep their insurer when a policy comes up for renewal) of existing St. Paul and Travelers policies above certain benchmarks. *Producers purported to offer unbiased recommendations to their clients about the selection of insurers* when, in many cases, the Producers' recommendations were biased in favor of insurers who paid contingent commission. Travelers AoD, ¶ 3.

492. As part of the settlement, Travelers agreed to sharply curtail its use of "contingent commissions," and to pay no contingent commissions on excess casualty insurance placements through 2008. Travelers also agreed to provide new disclosures concerning the ranges of compensation paid to brokers and agents on a special web site.

493. In 2005, following the investigations, Crum & Foster abandoned the use of confidentially provisions in its contingent commission agreements and included language requiring that the broker fully disclose to prospective and current insureds "the amount of compensation Producer will or may receive for placing business with [Crum & Forster]."

494. Additionally, numerous Defendants have made statements acknowledging that the contingent commission agreements between brokers and insurers created a conflict of interest.

495. For example, following the filing of the New York Attorney General Complaint against Marsh, ACE posted a response to the following question by the National Association of Insurance Commissioners' "NAIC" inquiry into contingent commissions:

> Q:    What additional requirements or safeguards should be in place to prohibit a producer from placing its own financial or other interests ahead of its customer's interests in an insurance transaction?
>
> A:    Ban on contingent commissions, brokers should be required to elect compensation from the insured or insurer; not both; all standard commission should be disclosed by broker and should be included on the copy of the policy delivered to the insured.

496. A letter from Paul Mattera, Senior Vice President of Liberty Mutual, to NAIC Commissioner M. Diane Koken, dated March 9, 2005 regarding contingent commission illustrates how inadequate and misleading disclosures regarding the use of contingent commissions have created conflicts of interests in the insurance brokerage industry. The letter states the following, in relevant part:

> Liberty Mutual believes that the cornerstone of good regulation and sound business practice is transparency in insurance transactions. Our customers deserve to know whether the producer they are working with represents them or us. All parties must be clear as to "who represents whom." Thus, we support the application of disclosure requirements to agents and brokers. The integrity of the entire transaction flows from a clear understanding of whose interests are represented by the producer.

> …

Prohibition of Broker Contingent Commissions

While appropriate broker disclosure is in the customer's interest – and we strongly support it – disclosure alone is not enough.  Brokers can be conflicted when they receive payment from both buyers and sellers.  In fact, the concerns that give rise to the "best available insurer" requirements, discussed above, are ameliorated when contingent commissions are out of the buying and selling equation.

Liberty Mutual believes broker "contingent commissions" are inappropriate and should be prohibited.  Brokers should be compensated only by a fee paid by the customer or by standard commission paid by the insurer as a percentage of the total cost of the policy purchased.  While there is nothing inherently wrong with contingent commissions, PSAs and MSAs, when brokers are paid in a manner that can lead to a misalignment of broker interests, the value of contingent commissions is outweighed by the need to assure an open, unconflicted market.  In these circumstances, disclosure alone is not an adequate remedy.

497.  In fact, following the regulatory investigations some Defendants have gone so far as to state that the receipt or payment of contingent commissions is inherently wrong.  For example, Joe Plumeri, the CEO of Willis, who previously had been an active proponent of his company's expanding use of contingent commissions, stated in an April 2005 speech to RIMS as follows:

For too long, this business has been about the placement only – what I've come to call manufacturing.  Under this model, getting the placement at the right price and the right coverage is all that matters.   But this approach leads to the commoditization of insurance, and I don't think anyone in this room would equate insurance to soy beans.

This approach also invites the perception of conflict that comes with contingent commissions; that's inconsistent with the principle of client advocacy and therefore is unacceptable.

It must be 100% clear who the broker is working for.  That means a broker can only be paid by one party in any transaction.

It's time we step up to a higher standard.  Contingents should be abolished throughout the industry.  Carriers shouldn't pay them. Brokers shouldn't accept them.

If anyone says, "But we're an agent (rather than a broker): surely we can get contingents based on the profitability of the carrier's book?"  To them I say, "That's fine, just make it 100% clear – up front - that you are acting for the carrier, and not the client."

Some times when you are up against it, you have to get creative.

Faced with the loss of contingent commissions, the sight of the gallows should focus our minds. Brokers should focus less on finding a way to simply replace the lost revenue and more on what is really important – having the integrity to work harder to deliver creative solutions and bring real value. Anybody think that's a big idea?

And, if contingents create the appearance of a conflict for some brokers, they create that appearance for every broker. Why is my cholesterol bad but for the others it is good? It doesn't matter whether the broker is global, regional or local – based in the U.S., London, or anywhere around the world. It's time to say "enough."

Contingent commissions. Over. Done. Finished.

      **d)**     **Racketeering Allegations**

498. Plaintiffs, Class Members and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

499. Each Defendant has participated in the conduct of one or more of the alleged association-in-fact enterprise's affairs through a pattern of racketeering activity involving a scheme to defraud Plaintiffs and Class Members in violation of Section 1962(c), as described in detail below.

500. Each Defendant has violated federal laws including mail and wire fraud, 18 U.S.C. §§ 1341 and 1343 by utilizing or causing the use of the United States postal service, commercial interstate carrier, wire or other interstate electronic media in furtherance of their fraudulent scheme.

501. These predicate acts of mail and wire fraud were related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and members of the Class. The predicate acts of racketeering activity were related to each other in furtherance of the scheme described above and in the Revised Particularized Statements, amount to and pose a threat of continuing racketeering

activity and therefore constitute a pattern of racketeering through which Defendants have violated 18 U.S.C. § 1962(c).

### (1)    Enterprise

502.    Six association-in-fact, broker-centered enterprises exist:

a.   Marsh and ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, Munich, Travelers, XL, and Zurich, hereinafter referred to as the Marsh Enterprise. The Marsh Enterprise is an ongoing organization which has existed continuously since at least the mid to late 1990's. The Defendants associated with the Marsh Enterprise are referred to herein collectively as the "Marsh Enterprise Defendants."

b.   Aon and ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, Travelers, XL, and Zurich, hereinafter referred to as the Aon Enterprise. The Aon Enterprise is an ongoing organization which has existed continuously since at least the mid to late 1990's. The Defendants associated with the Aon Enterprise are referred to herein collectively as the "Aon Enterprise Defendants."

c.   Willis and ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, Travelers, and Zurich , hereinafter referred to as the Willis Enterprise. The Willis Enterprise is an ongoing organization which has existed continuously since at least the mid to late 1990's. The Defendants associated with the Willis Enterprise are referred to herein collectively as the "Willis Enterprise Defendants."

d.   Gallagher and AIG, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, and Travelers, hereinafter referred to as the Gallagher Enterprise. The Gallagher Enterprise is an ongoing organization which has existed continuously since at least the mid to late 1990's. The Defendants associated with the Gallagher Enterprise are referred to herein collectively as the "Gallagher Enterprise Defendants."

e.   Wells Fargo/Acordia and Chubb, CNA, Fireman's Fund, Hartford, and Travelers, hereinafter referred to as the Wells Fargo/Acordia Enterprise. The Wells Fargo/Acordia Enterprise is an ongoing organization which has existed continuously since at least the mid to late 1990's. The Defendants associated with the Wells Fargo/Acordia Enterprise will be referred to herein collectively as the "Wells Fargo/Acordia Enterprise Defendants."

f.   HRH and CNA, Hartford, and Travelers, hereinafter referred to as the HRH Enterprise. The HRH Enterprise is an ongoing organization which has existed continuously since at least the mid to late 1990's. The Defendants associated with the HRH Enterprise will be referred to herein collectively as the "HRH Enterprise Defendants."

503. The purpose of each Enterprise is: (1) to make money through the creation of a defined and limited group of insurance carriers to which the broker defendant steers the insurance business of Class Members with limited or no competition in exchange for sharing increased profits and (2) to conceal this scheme from customers.

504. The structure for decision-making within each enterprise includes the following: (1) one or more broker executives who have responsibility and authority for interfacing with the insurers to determine compensation, to plan for the steering or retention of business, and to monitor and direct that business be retained or steered to insurer members of the enterprise; (2) broker account executives who implement direction regarding the retention or steering of business; (3) one or more executives at each insurer who have the responsibility and authority to plan with the broker, to monitor the placement of business and to determine compensation for the steering or retention of business; (4) an employee or employees of the insurer who monitor(s) and reports placement volume to insurer executives as well as the broker; (5) an employee or employees of the broker who keeps track of reports received from the insurers regarding placement volume; (6) an employee or employees who implement decisions regarding the placement of business; and (7) an employee or employee who factor(s) the cost of the kickbacks into the insurance premiums paid by Plaintiffs and Class Members.   In addition, the broker assumes primary responsibility for concealment of the scheme with support and assistance from the insurer members of the enterprise.

505. Each Broker Defendant and the Insurer Defendants identified above are associated with, participate in and control the affairs of the broker-centered enterprise identified above.

506. The Broker Defendants have participated in the operation or management of each Enterprise in at least the following ways:

    a.   consolidation of the broker's insurance markets;

    b.   reaching agreement with the Insurer Defendants with whom the Broker Defendant is associated regarding amount of contingent commissions to be paid to the Broker and the level of business to be steered to each Insurer Defendant;

    c.   the monitoring of current and new business;

    d.   determining whether a partner carrier is to retain current business and the insurer partner to whom new business is to be steered;

    e.   steering of business to preferred partners;

    f.   collection of inflated premiums; and

    g.   coordinating concealment of the scheme.

507. The Insurer Defendants have participated in the operation or management of each Enterprise in at least the following ways:

    a.   reaching agreement with the Broker Defendants with whom the Insurer Defendant is associated regarding amount of contingent commissions to be paid to the Broker and the level of business to be steered to each Insurer Defendant;

    b.   monitoring and reporting of business levels;

    c.   computation of premium levels to encompass contingent commissions;

    d.   payment of kickbacks; and

    e.   coordinating concealment of the scheme.

508. These Defendants have conducted or participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity. While these Defendants participate in and are members of the Enterprises, they have an existence separate and distinct from the Enterprise.

509. Each Enterprise oversees, coordinates and facilitates the commission of numerous predicate offenses.

510. The enterprises are separate and distinct from the pattern of racketeering activity. The members of each Enterprise share a common purpose and each Enterprise is continuing and

has a structure for decision-making and for oversight, coordination and facilitation of the predicate offenses.  The pattern of racketeering activity includes numerous acts of mail and wire fraud in furtherance of a fraudulent scheme whereby the Broker steers business to the insurer members in exchange for kickbacks in the form of contingent commissions and/or other payments.

511. Each Enterprise operates on a nation-wide basis and utilizes interstate communications including United States mail and wire across state lines. The activities of the enterprises are national in scope, affecting most of the commercial insurance market in the United States.  The enterprises have a substantial impact upon the economy and upon interstate commerce.

### (2)    Alternative Enterprise Allegations

### (a)    The CIAB Enterprise

512.  Alternatively, Plaintiffs allege that CIAB is a legal entity which constitutes a RICO enterprise referred to herein as the "CIAB Enterprise."

513. Defendants were able to devise and implement their scheme through their participation in the CIAB Enterprise.  According to the Council, its members place 80 percent of the country's commercial insurance premiums.  The Council "represents the largest, most profitable of all commercial insurance agencies and brokerage firms."  "The Council's primary audience is CEOs and their management teams."  The Council "partner[s]" with its members and provides "not only vital intelligence on current market conditions and trends, but also solutions to the next challenge before the need arises."  CIAB provides Defendants with numerous opportunities to communicate, meet, use vital intelligence on market conditions that is shared with its partner members, and reach agreement on how they will address challenges in the

marketplace, such as the competition that had created the soft market from the mid-1980s well into the 1990s.

514.  The CIAB Enterprise has a structure for decision-making that includes an Executive Committee, Board of Directors and various other committees and decision-making structures as well as the Council of Insurance Company Executives.

515.  Defendants are associated with, participate in and control the affairs of the CIAB Enterprise.

516.  Since 1994, every Broker Defendant has been represented on the CIAB Board of Directors and at least the following have served on the Executive Committee:  Aon, Arthur J. Gallagher, HRH, and Marsh.

517.  The Insurance Leadership Forum at The Greenbrier is the joint annual conference of CIAB and The Council of Insurance Company Executives ("CICE"), a standing committee of CIAB.   The Leadership Forum is an annual meeting that connects all the leaders of the commercial insurance marketplace – the CEOs of the top insurance carriers and the leading executives from the top one percent of agencies and brokerages. Every Insurer Defendant has been represented at the Leadership Forum.  Only insurers who are members of the CICE are permitted to attend the Commercial Leadership Forum.  CICE is comprised of "more than 65 of the top commercial insurers.  Collectively, CICE members are responsible for writing more than three-quarters of the national's commercial business insurance premiums."  CICE "members include most of the large multi-line commercial insurance and employee benefits companies." "Membership is extended to an applicant's entire corporate economic family – all primary, reinsurance, subsidiary and/or other underwriting operations…belong as one member of CICE." The Council of Employee Benefits Executives is likewise a standing committee of CIAB and

membership is necessary for attendance at the Benefits Insurance Leadership Forum.  At least the following Insurer Defendants have "sponsored" CIAB, the Insurance Leadership Forum at the Greenbrier and other CIAB activities:  ACE, AIG, Chubb, CNA Fireman's Fund, Liberty Mutual, Travelers and Zurich.

518.  CIAB provides the Broker Defendants a forum to discuss and reach agreement with each other and with the Insurer Defendants regarding, among other things, compensation arrangements and other aspects of their relationships, what each wants and needs from the relationship, the market and market conditions, consolidation and disclosure.  An internal 1998 CIAB document notes that CIAB members want "dollars; access; recognition; alliances" and insurance carriers want "premiums; access; creativity; innovation, marketing."

519.  CIAB hosts "Executive Forums" where members "can brainstorm and share ideas about business opportunities and challenges."   The Executive Forums allow members the opportunity to "discuss common problems and solutions."  In 2000, when "[m]embers discussed the issue of possible conflicts in sharing information with competitors" they "agreed that anyone who does not participate fully should be asked to leave the sessions."

520.  CIAB also conducts "Executive Liaison Roundtable" meetings – "private, off-the-record conversations" between insurance company "brethren" and select members of CIAB to discuss "critical issues."  At least the following Broker Defendants have served on the Executive Liaison Committee:  Aon, Acordia, Gallagher, HRH, Marsh, and Willis. At a minimum, the following Insurer Defendants have participated in the Roundtable discussions:  ACE, AIG, American Re-Insurance Company, Chubb, CNA, Fireman's Fund, Hartford, Kemper, Travelers, XL, Zurich.  Issues discussed at Executive Liaison Roundtable meetings at least during the timeframe from 1996 to 2001 have included "industry consolidation," "contingency contracts,"

"agent/company relationships," "how the relationships were changing due to downsizing and consolidations throughout the industry," "distribution and the impact of aggregations of business on membership and suppliers of product." CIAB also facilitates "teleconference access to carrier CEOs as well as forums for in-depth discussion of critical issues."

521. As alleged above, CIAB has also provided Defendants the opportunity to discuss and reach agreement on joint action in response to the regulatory investigations and regarding disclosure issues. The Defendants, through CIAB, have developed "a set of resource tools for client service engagement letters and disclosures" for use by members.

522. CIAB has been a ready conduit for concealment of Defendants' scheme and for furtherance of Defendants' fraud. CIAB provides Defendants with numerous opportunities to communicate, meet, use vital intelligence on market conditions that is shared with its partner members, and reach agreement on how they will address challenges in the marketplace, such as the competition that had created the soft market from the mid-1980s well into the 1990s.

523. When faced with a soft market, these partners used vital intelligence gained through communications and meetings facilitated by CIAB and otherwise, including information about decreased profits and demand to devise a scheme using strategic partnerships – where each Broker restricted the insurers who obtained the vast majority of the Broker's book of business, and each insurer then shared the increased profits that resulted from reduced competition with the Broker through increased contingent commissions – to replace competition. The partners operating through the CIAB Enterprise reached consensus on how they would change the market and regarding non-disclosure.

524. The purpose of the CIAB Enterprise is to further the interests of larger brokers generally and to further the Defendants' scheme specifically including implementation and concealment of the scheme.

525. The Broker Defendants have participated in the operation or management of the CIAB Enterprise in the at least the following ways:

   a. through the positions held in CIAB by the Broker Defendants' employees and officers including board memberships, committee memberships and other influential positions and as a result of the power the Broker Defendants enjoyed in CIAB as a consequence of their size and market share;

   b. by developing methods for concealment of the fraudulent scheme;

   c. by submitting false or misleading information to customers;

   d. by consolidating markets and steering business to strategic insurance partners;

   e. by bid rigging; and

   f. by sharing information relating to such matters as market conditions, placements and payments.

526. The Insurer Defendants have participated in the operation or management of the Enterprise in at least the following ways:

   a. through their position in CICE, their sponsorship of CIAB, their attendance at the Insurance Leadership Forum at The Greenbrier and as a result of their importance to CIAB and CIAB's members

   b. by developing methods for concealment of the fraudulent scheme;

   c. by kicking back profits to the Broker Defendants;

   d. by submitting false or misleading information to customers or to brokers for submission to customers;

   e. by providing or withholding quotes as directed by Broker Defendants;

   f. by sharing information relating to such matters as market conditions, placements and payments.

527. Defendants have conducted or participated in the conduct of the affairs of the CIAB Enterprise through a pattern of racketeering activity.

528. While the Defendants participate in and are members of the CIAB Enterprise, they have an existence separate and distinct from the Enterprise.

529. Defendants have been enabled to commit the predicate offenses solely by virtue of their position in the CIAB enterprise or involvement in or control over the affairs of the CIAB Enterprise. Defendants were able to devise, implement and conceal their scheme through CIAB. Concealment as well as controlled and coordinated representations and disclosures, which were crucial to the success of the scheme, could not have occurred absent the coordinating mechanism of CIAB. Defendants not only used CIAB as the vehicle for developing, coordinating, monitoring and concealing the scheme but also to disseminate misrepresentations in furtherance of the scheme. Absent the Defendants' participation in and control of CIAB, the Defendants would have been unable to perpetrate the fraudulent scheme and the attendant predicate acts. CIAB provided Defendants the necessary mechanism for decision-making regarding the fraudulent scheme, regarding concealment of Defendants' relationships and activities, and regarding controlled and coordinated representations and disclosures.

530. The CIAB Enterprise is separate and distinct from the pattern of racketeering activity. However, the predicate offenses are related to the activities of the CIAB Enterprise. The purpose of the CIAB Enterprise is furtherance of the interest of large brokers generally and furtherance of the Defendants' scheme more specifically. Accordingly, the predicate acts taken in furtherance of the Defendants' interests and in furtherance of the scheme necessarily relate to the CIAB Enterprise.

531.  The activities of the CIAB Enterprise are national in scope, affecting much of the commercial insurance market in the United States.  The CIAB Enterprise has a substantial impact upon the economy and upon interstate commerce.

### (3)    Predicate Acts

532. Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 or 18 U.S.C. §1343.  As set forth herein, Defendants have engaged and continue to engage in conduct violating each of these laws.

533.  As set forth in detail in the RICO Case Statement, Defendants, in order to carry out their scheme to defraud or to obtain money by false pretenses, placed in post offices and/or official depositories of the United Sates Postal Service matters and things to be delivered by the Postal Service, caused matters and things to be delivered by commercial interstate carriers or knew that the mail would be used in furtherance of their scheme in violation of 18 U.S.C. §1341. Matters sent by mail included but were not limited to correspondence, marketing materials, contracts or agreements between the Broker Defendant and the client, requests for proposals, policies and policy materials, insurance quotes, contingent commission agreements, insurance binders, commission schedules, invoices to clients and payments from insurers to brokers.

534.  As set forth in detail in the RICO Case Statements, Defendants, in order to carry out their scheme to defraud or to obtain money by false pretenses, transmitted and received by wire, matters and things or knew that wire would be used in furtherance of their scheme in violation of 18 U.S.C. §1343.  Matters sent by wire included but were not limited to correspondence, emails, faxes, marketing materials, contracts or agreements between the Broker Defendant and the client, requests for proposals, policies and policy materials, insurance quotes, contingent commission

agreements, insurance binders, commission schedules, invoices to clients and payments from
insurers to brokers.

535. Defendants knowingly and intentionally made misrepresentations and concealed
material facts in furtherance of their scheme and for the purpose of deceiving Plaintiffs and Class
Members. As set forth in detail in the RICO Case Statement, the Broker Defendants regularly
disseminated materials by mail and wire wherein they routinely represented that they would act
in the best interests of their clients in providing unbiased advice and assistance in the selection of
insurance products and services relating thereto and that they would act as fiduciaries of their
clients in placing insurance on the best terms possible and at the best price available. They also
represented that they would access the market in placing insurance business. To the extent
Defendants provided any information regarding contingent commission income or regarding the
Broker Defendants' relationships with the Insurer Defendants the information was materially
false and misleading. In communications with clients, the Broker Defendants either concealed or
failed to disclose, among other things, the following:

- that the Broker Defendants were not acting in the best interest of their clients
  but were instead acting on behalf of themselves and the Insurer Defendants
  who were associated with the Broker's enterprise to further their financial
  interests at the expense of their clients;

- the true nature of the association and agreements between the Broker
  Defendants and the Insurer Defendants associated with the Broker's
  Enterprise;

- the Broker Defendants' consolidation of their insurance markets to a few
  select strategic partners;

- the conflict of interest inherent in the agreements between the Broker
  Defendants and its partner insurers;

- the steering of insurance placements from the Broker Defendants to the
  Insurer Defendants;

- that the Broker Defendants were protecting their strategic partner Insurer Defendants from competition, and in the case of Marsh, that it engaged in rigging of bids with AIG, ACE, Chubb, XL, Munich/Am Re, Liberty Mutual, Travelers, Fireman's Fund and Zurich;

- that the Insurer Defendant kick back a substantial portion of their increased profits to the Broker Defendants with whom they are associated in the form of contingent commissions, loans, subsidies and payments for "services" as well as other agreements and tying arrangements that serve the same function; and

- that the kickbacks to the Broker Defendants are factored into the cost of Plaintiffs and Class Members' insurance, resulting in injury to Plaintiffs' and Class Members' business and property.

536. Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material.

537. Misrepresentation of the Brokers Defendants' allegiance as well as concealment of their relationships with, and steering of business to, the Insurer Defendants was necessary to encourage retention of the brokers, to conceal the scheme, to lull clients, including Plaintiffs and Class Members, into a false sense of security and to assure payment of the excess premiums. Likewise, inclusion of the excess amount of premium resulting from Defendants' scheme in invoices forwarded to each Plaintiff without explanation or a separate accounting for the excess premium was necessary to conceal the scheme and to assure payment of the entire invoice amount.

538. The Defendants' fraudulent schemes and the conspiracies in furtherance of the schemes proximately caused the cost of insurance obtained by Plaintiffs and Class Members to increase because the kickbacks paid to Broker Defendants were included in the price of insurance paid by Plaintiffs and Class Members. In addition, Plaintiffs and Class Members reasonably relied on the misrepresentations and omissions in paying higher premiums that included the kickbacks to Broker Defendants. As a result, Plaintiffs and Class Members have

been injured in their business or property by Defendants' fraudulent scheme and overt acts of mail and wire fraud.

e)      **Conspiracy Allegations**

539. Since at least 1998, Marsh Aon, Willis, Gallagher, Acordia, and HRH, have conspired to facilitate the scheme being operated through each of the Broker-Centered Enterprises identified above and to further their common purpose of preventing detection of these schemes through misrepresentations, concealment and coordinated and controlled disclosures.

540. The Broker Defendants conspiracy has been conducted, implemented and facilitated through the sharing of information among the Broker Defendants and their participation in CIAB. As alleged above, during the Class Period, each of the Broker Defendants was a member of CIAB and served on its Board of Directors and/or as officers of CIAB.

541. The purpose and effect of the conspiracy was to prevent Plaintiffs and members of the Class from becoming aware of the terms and significance of the contingent commission agreements between Defendants and the conflicts of interest arising out of the Broker Defendants' strategic partnerships with the Insurer Defendants, thereby allowing the Broker Defendants to increase the compensation they received from the Insurer Defendants.

542. The Broker Defendants accomplished this by conspiring with one another to adopt substantially similar vague and incomplete disclosure (or non-disclosure) policies regarding contingent compensation matters modeled after CIAB's 1998 position statement and by employing CIAB to engage in a public relations campaign designed to create the impression that "full disclosure" was the industry standard and to oppose any efforts to require meaningful disclosure of contingent commission arrangements. As described above, through their

coordinated efforts, the Broker Defendants successfully were able to prevent insurance purchasers from becoming aware of the true nature of the relationships between the Broker Defendants and the Insurer Defendants and from obtaining actual and complete disclosure of the manner in which the Broker Defendants were compensated by the Insurer Defendants.

543. Each Broker Defendant was aware of the general nature of the conspiracy and its role in facilitating the objectives of the conspiracy. Further, each Broker Defendant has agreed to the overall objective of the conspiracy.

544. Each Broker Defendant has committed overt acts in furtherance of the alleged conspiratorial objectives.

545. As a result of the Broker Defendants' conspiracy, Plaintiffs and other members of the Class have paid more than they otherwise would have for insurance that they procured through the Broker Defendants.

**The Broker-Centered Conspiracies**

546. Additionally, the following broker-centered conspiracies have existed since at least 1998:

- A conspiracy involving Marsh and the Insurer Defendants in the Marsh Broker-Centered Enterprise.

- A conspiracy involving Aon and the Insurer Defendants in the Aon Broker-Centered Enterprise.

- A conspiracy involving Willis and the Insurer Defendants in the Willis Broker-Centered Enterprise.

- A conspiracy involving Gallagher and the Insurer Defendants in the Gallagher Broker-Centered Enterprise.

- A conspiracy involving Wells Fargo/Acordia and the Insurer Defendants in the Wells Fargo/Acordia Broker-Centered Enterprise.

156

- A conspiracy involving HRH and the Insurer Defendants in the HRH Broker-Centered Enterprise.

547. The purpose and effect of each broker-centered conspiracy was to engage in a scheme whereby each Broker Defendant would steer business to its strategic partner Insurer Defendants and protect them from competition in exchange for increased compensation paid to the Broker Defendant in the form of contingent commissions, and to conceal the existence of the scheme from the Broker Defendant's clients.

548. Each Defendant within each broker-centered conspiracy was aware of the general nature of the conspiracy and its role in facilitating the objectives of the conspiracy. Further, each Defendant within each broker-centered conspiracy has agreed to the overall objective of the conspiracy.

549. Each Defendant within each broker-centered conspiracy has committed over acts in furtherance of the alleged conspiratorial objectives.

550. As a result of the broker-centered conspiracies, Plaintiffs and other members of the Class have paid more than they otherwise would have for insurance that they procured through the Broker Defendants.

f)      **Injury**

551. The fraudulent scheme and conspiracy involving each Broker Defendant and its partner markers and the conspiracy between the Broker Defendants to prevent detection of each broker's fraudulent scheme proximately caused the cost of insurance obtained by Plaintiffs and Class Members to increase because the kickbacks paid to the Broker Defendants were included in the price of insurance paid by Plaintiffs and Class Members. In addition, Plaintiffs and Class Members reasonably relied on the Broker Defendants' representations and the Defendants'

concealment of the fraudulent scheme in paying higher premiums that included the kickbacks to the Broker Defendants.

**3)     FRAUDULENT CONCEALMENT**

552.  Defendants have affirmatively and fraudulently concealed their unlawful scheme, course of conduct and conspiracy from Plaintiffs.  In fact as part of the conspiracy, Defendants went to great lengths to create the appearance of a competitive market for insurance coverage, where no such competitive market existed.

553.  Plaintiffs had no knowledge of Defendants' fraudulent scheme and could not have discovered that Defendants' representations were false or that Defendants had concealed information and materials until shortly before the filing of this Complaint.

554.  Accordingly, the statute of limitations has been tolled with respect to any claims which Plaintiffs have brought as a result of the unlawful and fraudulent conduct alleged herein.

**4)     CLASS ACTION ALLEGATIONS**

555.  Plaintiffs bring this action, pursuant to Rule 23 of the federal Rules of Civil Procedure, on their own behalf and as representatives of the Classes as defined below.

a.  **Marsh Broker-Centered Class:** Plaintiffs Opticare, Bayou, Sunburst, Cellect, the City of Stamford, Comcar, Singer and Golden Gate (the "Marsh Broker-Centered Plaintiffs") bring this action on behalf of all persons or entities who between January 1, 1998 and December 31, 2004 engaged the services of any one of the Marsh Defendants, or any of their subsidiaries or affiliates, in connection with the purchase or renewal of insurance from an insurer ("Marsh Broker-Centered Class");

b.  **Aon  Broker-Centered Class:**  Plaintiffs Sunburst, Bayou and Michigan Multi-King (the "AON Broker-Centered Plaintiffs") bring this action on behalf of all persons or entities who between  January 1, 1998 and December 31, 2004 engaged the services of any one of the AON Defendants, or any of their subsidiaries or affiliates, in connection with the purchase or renewal of insurance from an insurer ("AON Broker-Centered Class");

c.  **Wells Fargo/Acordia Broker-Centered Class:** Plaintiff Omni (the "Wells Fargo/Acordia Broker-Centered Plaintiff") brings this action on behalf of all

persons or entities who between January 1, 1998 and December 31, 2004 engaged the services of any one of the Wells Fargo/Acordia Defendants, or any of their subsidiaries or affiliates, in connection with the purchase or renewal of insurance from an insurer ("Wells Fargo/Acordia Broker-Centered Class");

d. **HRH Broker-Centered Class:** Plaintiff Tri-State (the "HRH Broker-Centered Plaintiff") brings this action on behalf of all persons or entities who between  January 1, 1998 and December 31, 2004 engaged the services of any one of the HRH Defendants, or any of their subsidiaries or affiliates, in connection with the purchase or renewal of insurance from an insurer ("HRH Broker-Centered Class");  and

e. **Willis Broker-Centered Class:** Plaintiffs Sunburst and Belmont (the "Willis Broker-Centered Plaintiffs") brings this action on behalf of all persons or entities who between  January 1, 1998 and December 31, 2004 engaged the services of any one of the Willis Defendants, or any of their subsidiaries or affiliates, in connection with the purchase or renewal of insurance from an insurer ("Willis Broker-Centered Class"); and

f. **Gallagher Broker-Centered Class:**  Plaintiffs Mulcahy, Redwood and Clear Lam (the "Gallagher Broker-Centered Plaintiffs") bring this action on behalf of all persons or entities who between January 1, 1998 and December 31, 2004 engaged the services of any one of the Gallagher Defendants, or any of their subsidiaries or affiliates, in connection with the purchase or renewal of insurance from an insurer ("Gallagher Broker-Centered Class");

g. **Global Conspiracy Class:**  All Plaintiffs bring this action on behalf of all persons or entities who between January 1, 1998 and December 31, 2004 engaged the services of any one of the Broker Defendants, or any of their subsidiaries or affiliates, in connection with the purchase or renewal of insurance or reinsurance from an insurer ("Global Conspiracy Class").

556. The Marsh Broker-Centered Class, the AON Broker-Centered Class, the Wells Fargo/Acordia Broker-Centered Class, the Gallagher Broker-Centered Class, the HRH Broker-Centered Class, the Willis Broker-Centered Class, and the Global Conspiracy Class are referred to collectively as the "Classes".

557. The members of the Classes are so numerous that joinder of all Class Members of the Classes would be impracticable.  Due to the nature of the claims asserted herein, Plaintiffs believe that members of the Classes are located throughout the United States.  The exact number

of Class Members is unknown by Plaintiffs at this time, but Plaintiffs believe that the number of Class Members is in the millions and their identities can only be discovered through inspection of Defendants' records.

558.  Plaintiffs' claims are typical of the other Class Members because Plaintiffs and all Class Members were damaged by the same wrongful conduct of the defendants alleged herein. Plaintiffs and all members of the Classes purchased insurance policies at artificial and inflated prices as a result of the wrongful conduct alleged herein.

559.  Plaintiffs will fairly and adequately protect the interests of the Classes.   The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the Classes.   In addition, Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

560.  Questions of law and fact common to the members of the Classes predominate over questions which may affect only individual members, if any, in that Defendants have acted on grounds generally applicable to all Class Members.   Among the questions of law and fact common to the Classes are:

**ANTITRUST CLAIMS**:

- Whether Defendants violated Section 1 of the Sherman Act;

- Whether Defendants participated in a contract, combination or conspiracy in restraint of trade as alleged herein;

- Whether Defendants engaged in a scheme to allocate the market; and

- Whether Defendants' conduct impacted the members of the class and whether the prices paid by members of the class were higher than they would have been in the absence of the conduct.

**RICO CLAIMS**:

- Whether defendants engaged in a common and cumulative scheme that corrupted the marketplace for insurance;

- Whether defendants were associated with an enterprise; and

- Whether defendants used the mail or wire in executing their fraud.

**COMMON LAW CLAIMS**

- Whether the conduct of defendants is linked to an injury suffered by Class Members;

- Whether defendants breached their fiduciary duty to the Class Members; and

- Whether defendants were unjustly enriched by the conduct alleged herein.

561.  Class action treatment is superior to the alternative, if any, for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by certain Class Members, who could not afford to individually litigate an antitrust claim against large corporate defendants.

562.  Plaintiffs are not aware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**COUNT I**
Violation of Section 1 of the Sherman Act
By the Marsh Broker-Centered Class Against the Marsh Broker-Centered Defendants

563.  Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 372 above.

564. The Marsh Broker-Centered Defendants have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. §1.

565. Specifically, the Marsh Broker-Centered Defendants agreed to reduce and/ or eliminate competition among members of the Marsh Broker-Centered Conspiracy, by among other things, allocating customers to and among members of the conspiracy and protecting those conspirators from competition for those customers. The combinations contracts and conspiracies described above were naked restraints of trade among horizontal competitors, the purpose and effect of which were to raise prices and/or reduce output in order to increase profits for the co-conspirators.

566. As a direct and proximate result of the contracts, combinations or conspiracies alleged in this Complaint, Plaintiffs OptiCare, Comcar, Sunburst, Golden Gate, Singer, Bayou, Cellect, and Stamford and other members of Marsh Broker-Centered Class were injured in their business or property in that they paid higher prices than they would have paid in a truly competitive market.

## **COUNT II**
### Violation of Section 1 of the Sherman Act
### By the Marsh Broker-Centered Class
### Against the Marsh Broker-Centered Excess Casualty Defendants

567. The Marsh Excess Casualty Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 372 above.

568. This Count is brought by Opticare, Comcar, Sunburst, Golden Gate, Singer, Bayou, Cellect and Stamford (the "Marsh Excess Casualty Plaintiffs") on behalf of the Marsh Broker-Centered Class against the Marsh Broker-Centered Defendants, exclusive of Hartford (the "Marsh Broker-Centered Excess Casualty Defendants").

569. The Marsh Broker-Centered Excess Casualty Defendants have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

570. Specifically, the Marsh Broker-Centered Excess Casualty Defendants agreed to reduce and/ or eliminate competition among members of the Marsh Broker-Centered Conspiracy, by among other things, allocating customers to and among members of the conspiracy and protecting those conspirators from competition for those customers with respect to excess casualty insurance. The combinations contracts and conspiracies described above were naked restraints of trade among horizontal competitors, the purpose and effect of which were to raise prices and/or reduce output in order to increase profits for the co-conspirators.

571. As a direct and proximate result of the contracts, combinations or conspiracies alleged in this Complaint, the Marsh Excess Casualty Plaintiffs and other members of Marsh Broker-Centered Class were injured in their business or property in that they paid higher prices than they would have paid for excess casualty insurance in a truly competitive market.

## COUNT III
### Violation of Section 1 of the Sherman Act
#### By the Aon Broker-Centered Class Against the Aon Broker-Centered Defendants

572. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 372 above.

573. The Aon Broker-Centered Defendants have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. §1.

574. Specifically, the Aon Broker-Centered Defendants agreed to reduce and/ or eliminate competition among members of the Aon Broker-Centered Conspiracy, by among other

things, allocating customers to and among members of the conspiracy and protecting those conspirators from competition for those customers. The combinations contracts and conspiracies described above were naked restraints of trade among horizontal competitors, the purpose and effect of which were to raise prices and/or reduce output in order to increase profits for the co-conspirators.

575.    As a direct and proximate result of the contracts, combinations or conspiracies alleged in this Complaint, Plaintiffs Sunburst, Bayou, and Michigan Multi-King and other members of Aon Broker-Centered Class were injured in their business or property in that they paid higher prices than they would have paid in a truly competitive market.

**COUNT IV**
Violation of Section 1 of the Sherman Act
By the Wells Fargo/Acordia Broker-Centered Class Against the Wells Fargo/Acordia Broker-Centered Defendants

576.  Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 372 above.

577.  The Wells Fargo/Acordia Broker-Centered Defendants have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. §1.

578. Specifically, the Wells Fargo/Acordia Broker-Centered Defendants agreed to reduce and/ or eliminate competition among members of the Wells Fargo/Acordia Broker-Centered Conspiracy, by among other things, allocating customers to and among members of the conspiracy and protecting those conspirators from competition for those customers. The combinations contracts and conspiracies described above were naked restraints of trade among horizontal competitors, the purpose and effect of which were to raise prices and/or reduce output in order to increase profits for the co-conspirators.

579. As a direct and proximate result of the contracts, combinations or conspiracies alleged in this Complaint, Plaintiffs Omni and other members of Wells Fargo/Acordia Broker-Centered Class were injured in their business or property in that they paid higher prices than they would have paid in a truly competitive market.

**COUNT V**
Violation of Section 1 of the Sherman Act
By the Gallagher Broker-Centered Class Against the Gallagher Broker-Centered Defendants

580. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 372 above.

581. The Gallagher Broker-Centered Defendants have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. §1.

582. Specifically, the Gallagher Broker-Centered Defendants agreed to reduce and/ or eliminate competition among members of the Gallagher Broker-Centered Conspiracy, by among other things, allocating customers to and among members of the conspiracy and protecting those conspirators from competition for those customers. The combinations contracts and conspiracies described above were naked restraints of trade among horizontal competitors, the purpose and effect of which were to raise prices and/or reduce output in order to increase profits for the co-conspirators.

583. As a direct and proximate result of the contracts, combinations or conspiracies alleged in this Complaint, Plaintiffs Mulcahy, Redwood, and Clear Lam and other members of Gallagher Broker-Centered Class were injured in their business or property in that they paid higher prices than they would have paid in a truly competitive market.

## COUNT VI
### Violation of Section 1 of the Sherman Act
### By the HRH Broker-Centered Class Against the HRH Broker-Centered Defendants

584. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 372 above.

585. The HRH Broker-Centered Defendants have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. §1.

586. Specifically, the HRH Broker-Centered Defendants agreed to reduce and/ or eliminate competition among members of the HRH Broker-Centered Conspiracy, by among other things, allocating customers to and among members of the conspiracy and protecting those conspirators from competition for those customers. The combinations contracts and conspiracies described above were naked restraints of trade among horizontal competitors, the purpose and effect of which were to raise prices and/or reduce output in order to increase profits for the co-conspirators.

587. As a direct and proximate result of the contracts, combinations or conspiracies alleged in this Complaint, Plaintiffs OptiCare and Tri-State and other members of HRH Broker-Centered Class were injured in their business or property in that they paid higher prices than they would have paid in a truly competitive market.

## COUNT VII
### Violation of Section 1 of the Sherman Act
### By the Willis Broker-Centered Class Against the Willis Broker-Centered Defendants

588. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 372 above.

589. The Willis Broker-Centered Defendants have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. §1.

590. Specifically, the Willis Broker-Centered Defendants agreed to reduce and/ or eliminate competition among members of the Willis Broker-Centered Conspiracy, by among other things, allocating customers to and among members of the conspiracy and protecting those conspirators from competition for those customers. The combinations contracts and conspiracies described above were naked restraints of trade among horizontal competitors, the purpose and effect of which were to raise prices and/or reduce output in order to increase profits for the co-conspirators.

591. As a direct and proximate result of the contracts, combinations or conspiracies alleged in this Complaint, Plaintiffs Sunburst and Belmont and other members of Willis Broker-Centered Class were injured in their business or property in that they paid higher prices than they would have paid in a truly competitive market.

## **COUNT VIII**
### Violation of Section 1 of the Sherman Act Against All Defendants

592. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 372 above.

593. The Defendants have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. §1.

594. Specifically, the Defendants agreed to reduce and/ or eliminate competition among members of the Class, by among other things, allocating customers to and among members of the global conspiracy and protecting those conspirators from competition for those customers.

167

The combinations contracts and global conspiracies described above were naked restraints of trade among horizontal competitors, the purpose and effect of which were to raise prices and/or reduce output in order to increase profits for the co-conspirators.

595. As a direct and proximate result of the contracts, combinations or global conspiracies alleged in this Complaint, Plaintiffs and other members of the Class were injured in their business or property in that they paid higher prices than they would have paid in a truly competitive market.

### COUNT IX
### Violation of 18 U.S.C. § 1962(c)
### Against Defendants Associated with the Marsh Enterprise

596. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

597. This cause of action is brought by Plaintiffs Opticare, Bayou, Sunburst, Cellect, Stamford, Singer, Comcar, Golden Gate and Members of the Marsh Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(c) against Defendants associated with the Marsh Enterprise (the "Marsh Enterprise Defendants").

598. As set forth above and in the RICO Case Statement, the Marsh Enterprise Defendants have conducted or participated in conducting the Marsh Enterprise through a pattern of racketeering activity.

599. As a direct and proximate result, Plaintiffs Opticare, Bayou, Sunburst, Cellect, Stamford, Singer, Comcar, Golden Gate and Members of the Marsh Broker-Centered Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs Opticare, Bayou, Sunburst, Cellect, Singer, Comcar, Golden Gate and Members of the Marsh Broker-Centered Class have been injured in

their business or property by paying more for insurance than they would have absent the Marsh Enterprise Defendants' illegal conduct.

600. Accordingly, the Marsh Enterprise Defendants are liable to Plaintiffs Opticare, Bayou, Sunburst, Cellect, Stamford, Singer, Comcar, Golden Gate and Members of the Marsh Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

### COUNT X
### Violation of 18 U.S.C. § 1962(c)
### Against Defendants Associated with the Aon Enterprise

601. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

602. This cause of action is brought by Plaintiffs Sunburst, Bayou, Michigan Multi-King and the Members of the Aon Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(c) against Defendants associated with the Aon Enterprise (the "Aon Enterprise Defendants").

603. As set forth above and in the RICO Case Statement, the Aon Enterprise Defendants have conducted or participated in conducting the Aon Enterprise through a pattern of racketeering activity.

604. As a direct and proximate result, Plaintiffs Sunburst, Bayou, Michigan Multi-King and Members of the Aon Broker-Centered Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs Sunburst, Bayou, Michigan Multi-King and Members of the Aon Broker-Centered Class have been injured in their business or property by paying more for insurance than they would have absent the Aon Enterprise Defendants' illegal conduct.

605. Accordingly, the Aon Enterprise Defendants are liable to Plaintiffs Sunburst, Bayou, Michigan Multi-King and Members of the Aon Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

**COUNT XI**
Violation of 18 U.S.C. § 1962(c)
Against Defendants Associated with the Willis Enterprise

606. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

607. This cause of action is brought by Plaintiffs Belmont, Sunburst and the Members of the Willis Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(c) against Defendants associated with the Willis Enterprise (the "Willis Enterprise Defendants").

608. As set forth above and in the RICO Case Statement, the Willis Enterprise Defendants have conducted or participated in conducting the Willis Enterprise through a pattern of racketeering activity.

609. As a direct and proximate result, Plaintiffs Belmont, Sunburst and Members of the Willis Broker-Centered Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs Belmont, Sunburst and Members of the Willis Broker-Centered Class have been injured in their business or property by paying more for insurance than they would have absent the Willis Enterprise Defendants' illegal conduct.

610. Accordingly, the Willis Enterprise Defendants are liable to Plaintiffs Belmont, Sunburst and Members of the Willis Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

**COUNT XII**
Violation of 18 U.S.C. § 1962(c)
Against Defendants Associated with the Gallagher Enterprise

611.  Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

612.  This cause of action is brought by Plaintiffs Mulcahy, Redwood, Clear Lam and the Members of the Gallagher Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(c) against Defendants associated with the Gallagher Enterprise (the "Gallagher Enterprise Defendants").

613.  As set forth above and in the RICO Case Statement, the Gallagher Enterprise Defendants have conducted or participated in conducting the Gallagher Enterprise through a pattern of racketeering activity.

614.  As a direct and proximate result, Plaintiffs Mulcahy, Redwood, Clear Lam and Members of the Gallagher Broker-Centered Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, Plaintiffs Mulcahy, Redwood, Clear Lam and Members of the Gallagher Broker-Centered Class have been injured in their business or property by paying more for insurance than they would have absent the Gallagher Enterprise Defendants' illegal conduct.

615.  Accordingly, the Gallagher Enterprise Defendants are liable to Plaintiffs Mulcahy, Redwood, Clear Lam and Members of the Gallagher Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## COUNT XIII
### Violation of 18 U.S.C. § 1962(c)
### Against Defendants Associated with the Wells Fargo/Acordia Enterprise

616.  Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

617.  This cause of action is brought by Plaintiff Omni and the Members of the Wells Fargo/Acordia Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(c) against Defendants associated with the Gallagher Enterprise (the "Wells Fargo/Acordia Enterprise Defendants").

618.  As set forth above and in the RICO Case Statement, the Wells Fargo/Acordia Enterprise Defendants have conducted or participated in conducting the Wells Fargo/Acordia Enterprise through a pattern of racketeering activity.

619.  As a direct and proximate result, Plaintiff Omni and Members of the Wells Fargo/Acordia Broker-Centered Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, Plaintiff Omni and Members of the Wells Fargo/Acordia Broker-Centered Class have been injured in their business or property by paying more for insurance than they would have absent the Wells Fargo/Acordia Enterprise Defendants' illegal conduct.

620.  Accordingly, the Wells Fargo/Acordia Enterprise Defendants are liable to Plaintiff Omni and Members of the Wells Fargo/Acordia Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## COUNT XIV
### Violation of 18 U.S.C. § 1962(c)
### Against Defendants Associated with the HRH Enterprise

621.  Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

622.  This cause of action is brought by Plaintiffs Tri-State, Opticare and the Members of the HRH Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(c) and against Defendants associated with the HRH Enterprise (the "HRH Enterprise Defendants").

623.  As set forth above and in the RICO Case Statement, the HRH Enterprise Defendants have conducted or participated in conducting the HRH Enterprise through a pattern of racketeering activity.

624.  As a direct and proximate result, Plaintiffs Tri-State, Opticare and Members of the HRH Broker-Centered Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, Plaintiffs Tri-State, Opticare and Members of the HRH Broker-Centered Class have been injured in their business or property by paying more for insurance than they would have absent the HRH Enterprise Defendants' illegal conduct.

625.  Accordingly, the HRH Enterprise Defendants are liable to Plaintiffs Tri-State, Opticare and Members of the HRH Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## COUNT XV
### Violation of 18 U.S.C. § 1962(d)
### Against Defendants Associated with the Marsh Enterprise

626.  Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

627.  This cause of action is brought by Plaintiffs Opticare, Bayou, Sunburst, Cellect, Stamford, Singer, Comcar, Golden Gate and Members of the Marsh Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(d) against Defendants associated with the Marsh Enterprise (the "Marsh Enterprise Defendants").

628.  As set forth above and in the RICO Case Statement, the Marsh Enterprise Defendants have conspired to violate 18 U.S.C. § 1962(c).

629.  As a direct and proximate result, Plaintiffs Opticare, Bayou, Sunburst, Cellect, Stamford, Singer, Comcare, Golden Gate and Members of the Marsh Broker-Centered Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.   Specifically, Plaintiffs Opticare, Bayou, Sunburst, Cellect, Stamford, Singer, Comcar, Golden Gate and Members of the Marsh Broker-Centered Class have been injured in their business or property by paying more for insurance than they would have absent the Marsh Enterprise Defendants' illegal conduct.

630.  Accordingly, the Marsh Enterprise Defendants are liable to Plaintiffs Opticare, Bayou, Sunburst, Cellect, Stamford, Singer, Comcar, Golden Gate and Members of the Marsh Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## COUNT XVI
### Violation of 18 U.S.C. § 1962(d)
### Against Defendants Associated with the Aon Enterprise

631.  Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

632.  This cause of action is brought by Plaintiffs Sunburst, Bayou, Michigan Multi-King and the Members of the Aon Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(d) against Defendants associated with the Aon Enterprise (the "Aon Enterprise Defendants").

633.  As set forth above and in the RICO Case Statement, the Aon Enterprise Defendants have conspired to violate 18 U.S.C. § 1962(c).

634.  As a direct and proximate result, Plaintiffs Sunburst, Bayou, Michigan Multi-King and Members of the Aon Broker-Centered Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, Plaintiffs Sunburst, Bayou, Michigan Multi-King and Members of the Aon Broker-Centered Class have been injured in their business or property by paying more for insurance than they would have absent the Aon Enterprise Defendants' illegal conduct.

635.  Accordingly, the Aon Enterprise Defendants are liable to Plaintiffs Sunburst, Bayou, Michigan Multi-King and Members of the Aon Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## COUNT XVII
### Violation of 18 U.S.C. § 1962(d)
### Against Defendants Associated with the Willis Enterprise

636.  Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

637. This cause of action is brought by Plaintiffs Belmont, Sunburst and the Members of the Willis Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(d) against Defendants associated with the Willis Enterprise (the "Willis Enterprise Defendants").

638. As set forth above and in the RICO Case Statement, the Willis Enterprise Defendants have conspired to violate 18 U.S.C. § 1962(c).

639. As a direct and proximate result, Plaintiffs Belmont, Sunburst and Members of the Willis Broker-Centered Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs Belmont, Sunburst and Members of the Willis Broker-Centered Class have been injured in their business or property by paying more for insurance than they would have absent the Willis Enterprise Defendants' illegal conduct.

640. Accordingly, the Willis Enterprise Defendants are liable to Plaintiffs Belmont, Sunburst and Members of the Willis Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

### COUNT XVIII
### Violation of 18 U.S.C. § 1962(d)
### Against Defendants Associated with the Gallagher Enterprise

641. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

642. This cause of action is brought by Plaintiffs Mulcahy, Redwood, Clear Lam and the Members of the Gallagher Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(d) against Defendants associated with the Gallagher Enterprise (the "Gallagher Enterprise Defendants").

643. As set forth above and in the RICO Case Statement, the Gallagher Enterprise Defendants have conspired to violate 18 U.S.C. § 1962(c).

644. As a direct and proximate result, Plaintiffs Mulcahy, Redwood, Clear Lam and Members of the Gallagher Broker-Centered Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, Plaintiffs Mulcahy, Redwood, Clear Lam and Members of the Gallagher Broker-Centered Class have been injured in their business or property by paying more for insurance than they would have absent the Gallagher Enterprise Defendants' illegal conduct.

645. Accordingly, the Gallagher Enterprise Defendants are liable to Plaintiffs Mulcahy, Redwood, Clear Lam and Members of the Gallagher Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## COUNT XIX
### Violation of 18 U.S.C. § 1962(d)
### Against Defendants Associated with the Wells Fargo/Acordia Enterprise

646. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

647. This cause of action is brought by Plaintiff Omni and the Members of the Wells Fargo/Acordia Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(d) against Defendants associated with the Gallagher Enterprise (the "Wells Fargo/Acordia Enterprise Defendants").

648. As set forth above and in the RICO Case Statement, the Wells Fargo/Acordia Enterprise Defendants have conspired to violate 18 U.S.C. § 1962(c).

649. As a direct and proximate result, Plaintiff Omni and Members of the Wells Fargo/Acordia Broker-Centered Class have been injured in their business or property by the

predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiff Omni and Members of the Wells Fargo/Acordia Broker-Centered Class have been injured in their business or property by paying more for insurance than they would have absent the Wells Fargo/Acordia Enterprise Defendants' illegal conduct.

650. Accordingly, the Wells Fargo/Acordia Enterprise Defendants are liable to Plaintiff Omni and Members of the Wells Fargo/Acordia Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

**COUNT XX**
Violation of 18 U.S.C. § 1962(d)
Against Defendants Associated with the HRH Enterprise

651. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

652. This cause of action is brought by Plaintiffs Tri-State, Opticare and the Members of the HRH Broker-Centered Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(d) against Defendants associated with the HRH Enterprise (the "HRH Enterprise Defendants").

653. As set forth above and in the RICO Case Statement, the HRH Enterprise Defendants have conspired to violate 18 U.S.C. § 1962(c).

654. As a direct and proximate result, Plaintiffs Tri-State, Opticare and Members of the HRH Broker-Centered Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs Tri-State, Opticare and Members of the HRH Broker-Centered Class have been injured in their business or property by paying more for insurance than they would have absent the HRH Enterprise Defendants' illegal conduct.

655. Accordingly, the HRH Enterprise Defendants are liable to Plaintiffs Tri-State, Opticare and Members of the HRH Broker-Centered Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

### COUNT XXI
### Violation of 18 U.S.C. § 1962(d)
### Against All Broker Defendants

656. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

657. This cause of action is brought by Plaintiffs and Members of the Global Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(d) against all Broker Defendants.

658. As set forth above and in the RICO Case Statement, the Broker Defendants have conspired to violate 18 U.S.C. § 1962(c).

659. As a direct and proximate result, Plaintiffs and Members of the Global Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, Plaintiffs and Members of the Global Class have been injured in their business or property by paying more for insurance than they would have absent the Defendants' illegal conduct.

660. Accordingly, the Broker Defendants are liable to Plaintiffs and Members of the Global Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

### COUNT XXII
### Violation of 18 U.S.C. § 1962(c)
### Against All Defendants

661. Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

662.  This cause of action is brought by Plaintiffs and Members of the Global Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(c) against all Defendants.

663.  As set forth above and in the RICO Case Statement, the Defendants have conducted or participated in conducting the CIAB Enterprise through a pattern of racketeering activity.

664.  As a direct and proximate result, Plaintiffs and Members of the Global Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, Plaintiffs and Members of the Global Class have been injured in their business or property by paying more for insurance than they would have absent the Defendants' illegal conduct.

665.  Accordingly, the Defendants are liable to Plaintiffs and Members of the Global Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## COUNT XXIII
### Violation of 18 U.S.C. § 1962(d)
### Against All Defendants

666.  Plaintiffs incorporate herein and make a part hereof, their allegations contained in paragraphs 64 through 562 above.

667.  This cause of action is brought by Plaintiffs and Members of the Global Class pursuant to 18 U.S.C. § 1964(c) for violations of U.S.C. § 1962(d) against all Defendants.

668.  As set forth above and in the RICO Case Statement, the Defendants have conspired to violate 18 U.S.C. § 1962(c).

669.  The conspiracy has been conducted, implemented and facilitated through CIAB. The purpose and effect of the conspiracy was to prevent Plaintiffs and Members of the Class from becoming aware of the terms and the significance of the contingent commission agreements between the Defendants and the conflicts of interest arising out of the Broker Defendants'

strategic partnerships with the Insurer Defendants, thereby allowing the Broker Defendants to increase the compensation they received from the Insurer Defendants and the Insurer Defendants to increase the business they received from the Broker Defendants without competition.

670. Each Defendant was aware of the general nature of the conspiracy and its role in facilitating the objectives of the conspiracy.

671. Further, each Defendant has agreed to the overall objective of the conspiracy.

672. Each Defendant has committed overt acts in furtherance of the alleged conspiratorial objectives.

673. As a result of the Defendants' conspiracy, Plaintiffs and other Members of the Class have paid more than they otherwise would have paid for insurance they procured through the Broker Defendants.

674. As a direct and proximate result, Plaintiffs and Members of the Global Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity. Specifically, Plaintiffs and Members of the Global Class have been injured in their business or property by paying more for insurance than they would have absent the Defendants' illegal conduct.

675. Accordingly, the Defendants are liable to Plaintiffs and Members of the Global Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## COUNT XXIV
### State Law Antitrust
### Against All Defendants

676. Plaintiffs incorporate herein and make a part hereof, the allegations contained in paragraphs 64 through 562 above.

677.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Alaska Stat. §§45.50.562 et seq.

678.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401 et seq.

679.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arkansas Stat. Ann. §§4-75-309 et seq. and Arkansas Stat. Ann. §§4-75-201 et seq.

680.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§16700 et seq., §§16720 et seq., and Cal. Bus. & Prof. Code §§17000 et seq.

681.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Colorado Rev. Stat. §§6-4-101 et seq.

682.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Connecticut Gen. Stat. §§35-26 et seq.

683.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code Ann. §§28-4503 et seq.

684.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Delaware Code Ann. tit. 6, §§2103 et seq.

685.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Florida Stat. §§501.201 et seq.

686.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Georgia Code Ann. §§16-10-22 et seq. and Georgia Code Ann. §§13-8-2 et seq.

687. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Rev. Stat. §§480-1 et seq.

688. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Idaho Code §§48-101 et seq.

689. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Comp. Stat. §§10/1 et seq.

690. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Indiana Code Ann. §§24-1-2-1 et seq.

691. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1 et seq.

692. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 et seq.

693. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kentucky Rev. Stat. §§367.175 et seq., and relief can be granted in accordance with Kentucky Rev. Stat. §446.070.

694. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Louisiana Rev. Stat. §§51:137 et seq.

695. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 et seq.

696. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maryland Code Ann. Title 11, §§11-201 et seq.

697. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Massachusetts Ann. Laws ch. 92 §§1 et seq.

698.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§445.773 et seq.

699.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§325D.52 et seq.

700.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§75-21-1 et seq.

701.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Missouri Stat. Ann. §§416.011 et seq.

702.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Montana Code Ann. §§30-14-101 et seq.

703.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§59-801 et seq.

704.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§598A et seq.

705.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Rev. Stat. Ann. §§356:1 et seq.

706.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Jersey Stat. Ann. §§56:9-1 et seq.

707.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§57-1-1 et seq.

708.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law §340 et seq., and N.Y. Ins. Law § 2316(a).

709.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat.. §§75-1 et seq.

710.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§51-08.1-01 et seq.

711.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ohio Rev. Code §§1331.01 et seq.

712.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oklahoma Stat. tit. 79 §§203(A) et seq.

713.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Rev. Stat. §§646.705 et seq.

714.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Rhode Island Gen. Laws §§6-36-1 et seq.

715.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Carolina. Code §§39-3-10 et seq.

716.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§37-1 et seq.

717.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Texas Bus. & Com. Code §§15.01 et seq.

718.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§76-10-911 et seq.

719.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§2453 et seq.

720.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Virginia Code §§59-1-9.2 et seq.

721.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Washington Rev. Code §§19.86.010 et seq.

722.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§47-18-1 et seq.

723.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 et seq.

724.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wyoming Stat. §§40-4-101 et seq.

## COUNT XXV
### Breach of Fiduciary Duty
### Against the Broker Defendants

725.  Plaintiffs incorporate herein and make a part hereof, the allegations contained in paragraphs 64 through 562 above.

726.  Each Broker defendant was a fiduciary to its own client Plaintiffs.  Because of this, the Plaintiffs placed confidence and trust in their Brokers, authorized them to exercise discretionary functions for their benefit, and relied on their superior expertise in risk management and the procurement of insurance.

727.  The Broker Defendants accepted and solicited that confidence and trust as described above.

728.  As fiduciaries of Plaintiffs and members of the Class, the Broker Defendants were obligated to discharge their duties solely in the interests of their Plaintiff clients, and specifically

to find the best available coverage at the best price, exercising good faith and fair dealing, full and fair disclosure, care and loyalty to the interests of their client Plaintiffs.

729.  Defendants have breached those duties by acting in their own pecuniary interests in disregard of the interests of their client Plaintiffs as set forth above.

730. Accordingly, Defendants are liable for breach of fiduciary duty to their client Plaintiffs, and are liable for the damages suffered by Plaintiffs in an amount to be proved at trial. Plaintiffs and members of the Class are further entitled to an accounting by Defendants with respect to all Contingent Commissions, Wholesale Payments and other improper payments received by Defendants.

### COUNT XXVI
#### Aiding and Abetting Breach of Fiduciary Duty
#### Against the Insurer Defendants

731.  Plaintiffs incorporate herein and make a part hereof, the allegations contained in paragraphs 64 through 562 above.

732.  As alleged above, a fiduciary relationship existed between each Broker and its Plaintiff clients.

733.  The Broker Defendants breached this fiduciary duty by acting in their own pecuniary interests and in disregard of the interests of their client Plaintiffs as set forth above. The Insurer Defendants knowingly participated in that breach by, among other things, engaging in the fraudulent and conspiratorial conduct described above.

734.  Plaintiffs have suffered damages proximately caused by the Insurer Defendants' participation in the Broker Defendants' breach.

735. Accordingly, the Insurer Defendants are liable to Plaintiffs for damages in an amount to be proven at trial.

## COUNT XXVII
### Unjust Enrichment
### Against the Broker and Insurer Defendants

736.  Plaintiffs incorporate herein and make a part hereof, the allegations contained in paragraphs 64 through 562 above.

737.  Defendants have benefited from their unlawful acts by receiving excessive premium revenue and enormous Contingent Commissions and Wholesale Payments.  These payments have been received by Defendants at Plaintiffs' expense, under circumstances where it would be inequitable for Defendants to be permitted to retain the benefit.

738. Plaintiffs and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit conferred upon Defendants in the form of their excessive premium revenue and contingent commission and wholesale payments from which Plaintiffs and the other Class Members may make claims on a pro rata basis for restitution.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)    Certification of the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the Classes, and designating their counsel as counsel for the Class;

(b)    A declaration that Defendants have committed the violations alleged herein;

(c)    On Count I, for violation of Section 1 of the Sherman Act by the Marsh Broker-Centered Class against the Marsh Broker-Centered Defendants, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Marsh Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(d)    On Count II, Violation of Section 1 of the Sherman Act by the Marsh Broker-Centered Class against the Marsh Broker-Centered Excess Casualty Defendants, jointly and

severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Marsh Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(e)     On Count III, for violation of Section 1 of the Sherman Act by the Aon Broker-Centered Class against the Aon Broker-Centered Defendants, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Aon Broker-Centered Class Class as proven at trial plus interest and attorneys' fees and expenses;

(f)     On Count IV, for violation of Section 1 of the Sherman Act by the Wells Fargo/Acordia Broker-Centered Class against the Wells Fargo/Acordia Broker-Centered Defendants, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Wells Fargo/Acordia Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(g)     On Count V, for violation of Section 1 of the Sherman Act by the Gallagher Broker-Centered Class against the Gallagher Broker-Centered Defendants, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Gallagher Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(h)     On Count VI, for violation of Section 1 of the Sherman Act by the HRH Broker-Centered Class against the HRH Broker-Centered Defendants, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the HRH Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(i)     On Count VII, for violation of Section 1 of the Sherman Act by the Willis Broker-Centered Class against the Willis Broker-Centered Defendants, jointly and severally in an

amount equal to treble the amount of damages suffered by Plaintiffs and members of the Willis Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(j)    On Count VIII, for violation of Section 1 of the Sherman Act by all Plaintiffs against all Defendants, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Classes as proven at trial plus interest and attorneys' fees and expenses;

(k)    On Count IX, for violation of 18 U.S.C. § 1962(c) by Plaintiffs Opticare, Bayou, Sunburst, Cellect, City of Stamford, Singer and Golden Gate and members of the Marsh Broker-Centered Class against Defendants associated with the Marsh Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Marsh Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(l)    On Count X, for violation of 18 U.S.C. § 1962(c) by Plaintiffs Sunburst, Bayou, and Michigan Multi-King and members of the Aon Broker-Centered Class against Defendants associated with the Aon Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Aon Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(m)    On Count XI, for violation of 18 U.S.C. § 1962(c) by Plaintiff Belmont and members of the Willis Broker-Centered Class against Defendants associated with the Willis Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Willis Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(n)    On Count XII, for violation of 18 U.S.C. § 1962(c) by Plaintiffs Mulcahy, Redwood and Clear Lam and members of the Gallagher Broker-Centered Class against

Defendants associated with the Gallagher Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Gallagher Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(o)    On Count XIII, for violation of 18 U.S.C. § 1962(c) by Plaintiff Omni and members of the Wells Fargo/Acordia Broker-Centered Class against Defendants associated with the Wells Fargo/Acordia Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Wells Fargo/Acordia Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(p)    On Count XIV, for violation of 18 U.S.C. § 1962(c) by Plaintiff Tri-State and members of the HRH Broker-Centered Class against Defendants associated with the HRH Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the HRH Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(q)    On Count XV, for violation of 18 U.S.C. § 1962(d) by Plaintiffs Opticare, Bayou, Sunburst, Cellect, City of Stamford, Singer and Golden Gate and members of the Marsh Broker-Centered Class against Defendants associated with the Marsh Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the HRH Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(r)    On Count XVI, for violation of 18 U.S.C. § 1962(d) by Plaintiffs Sunburst, Bayou, and Michigan Multi-King and members of the Aon Broker-Centered Class against Defendants associated with the Aon Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Aon Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(s)     On Count XVII, for violation of 18 U.S.C. § 1962(d) by Plaintiff Belmont and members of the Willis Broker-Centered Class against Defendants associated with the Willis Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Willis Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(t)     On Count XVIII, for violation of 18 U.S.C. § 1962(d) by Plaintiffs Mulcahy, Redwood and Clear Lam and members of the Gallagher Broker-Centered Class against Defendants associated with the Gallagher Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Gallagher Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(u)     On Count XIX, for violation of 18 U.S.C. § 1962(d) by Plaintiff Omni and members of the Wells Fargo/Acordia Broker-Centered Class against Defendants associated with the Wells Fargo/Acordia Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Wells Fargo/Acordia Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(v)     On Count XX, for violation of 18 U.S.C. § 1962(d) by Plaintiff Tri-State and members of the HRH Broker-Centered Class against Defendants associated with the HRH Enterprise, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the HRH Broker-Centered Class as proven at trial plus interest and attorneys' fees and expenses;

(w)     On Count XXI, for violation of 18 U.S.C. § 1962(d) by all Plaintiffs and members of the Global Class against all Broker Defendants, jointly and severally in an amount equal to

treble the amount of damages suffered by Plaintiffs and members of the Global Class as proven at trial plus interest and attorneys' fees and expenses;

(x)    On Count XXII, for violation of 18 U.S.C. § § 1962(c) by all Plaintiffs and members of the Global Class against all Defendants, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Global Class as proven at trial plus interest and attorneys' fees and expenses;

(y)    On Count XXIII, for violation of 18 U.S.C. §  1962(d) by all Plaintiffs and members of the Global Class against all Defendants, jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and members of the Global Class as proven at trial plus interest and attorneys' fees and expenses;

(z)    On Count XXIV, for violation of state antitrust laws, jointly and severally in an amount equal to damages sustained as proven at trial, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages plus interest and attorneys' fees and expenses;

(aa)    On Count XXV, for Breach of Fiduciary Duty against the Broker Defendants, jointly and severally in an amount equal to damages sustained by Plaintiffs and members of the Class as proven at trial, and for an accounting by Defendants with respect to all Contingent Commissions, Wholesale Payments and other improper payments received by Defendants;

(bb)    On Count XXVI, for Aiding and Abetting a Breach of Fiduciary Duty against the Insurer Defendants, jointly and severally in an amount equal to damages sustained by Plaintiffs and members of the Class as proven at trial; and

(cc)    On their Count XXVII, Unjust Enrichment against the Broker and Insurer Defendants, jointly and severally for establishment of a constructive trust consisting of the

193

benefit conferred upon Defendants in the form of their excessive premium revenue and contingent commission and wholesale payments from which Plaintiffs and the other Class members may make claims on a pro rata basis for restitution;

(dd)    An injunction preventing Defendants from engaging in future anticompetitive and fraudulent practices;

(ee)    Costs of this action, including reasonable attorneys fees and expenses; and

(ff)    Any such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Date:  May 22, 2007                     *Respectfully submitted,*

**CAFFERTY FAUCHER LLP**

            */s/ Bryan L. Clobes*
Bryan L. Clobes
Ellen Meriwether
Melody Forrester
Timothy Fraser
1717 Arch Street, Ste. 3610
Philadelphia, PA  19103
Tel.:  215-864-2800
Fax:  215-864-2810

**WHATLEY, DRAKE & KALLAS, LLC**

           /s/ *Edith M. Kallas*
Edith M. Kallas
Joseph P. Guglielmo
Elizabeth Rosenberg
Lili R. Sabo
1540 Broadway, 37th Floor
New York, NY 10036
Tel.:  212-447-7070
Fax:  212-447-7077

*Plaintiffs' Co-Lead Counsel*


**FOOTE, MEYERS, MIELKE &
FLOWERS**
Robert M. Foote
28 North First Street, Suite 2
Geneva, IL 60134
Tel.:  630-232-6333
Fax: 845-8982

**LEVIN, FISHBEIN, SEDRAN &
BERMAN**
Howard J. Sedran
510 Walnut Street - Suite 500
Philadelphia, PA  19106
Tel.:  215-592-1500
Fax:  215-592-4663


*Plaintiffs' Executive Committee*

**LITE DEPALMA GREENBERG
  & RIVAS, LLC**
Allyn Z. Lite
Bruce D. Greenberg
Michael E. Patunas
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel.:  973-623-3000
Fax:  973-623-0858

*Liaison Counsel for Commercial Insurance
Litigation*


**BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.**
Andrew S. Friedman
Elaine A. Ryan
Patricia N. Hurd
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Tel.:  602-274-1100
Fax:  602-274-1199

*Liaison Counsel for Employee-Benefit
Litigation*


**AUDET & PARTNERS, LLP**
William M. Audet
221 Main Street
Suite 1460
San Francisco, CA 94105
Tel.:  415-568-2555
Fax:  415-568-2556

**BEELER, SCHAD & DIAMOND, P.C.**
Lawrence W. Schad
James Shedden
Michael S. Hilicki
Tony H. Kim
332 South Michigan Avenue, Suite 1000
Chicago, IL 60604
Tel.: 312-939-6280

Fax: 312-939-4661

**BOLOGNESE & ASSOCIATES**
Anthony J. Bolognese
One Penn Center
1617 John F. Kennedy Boulevard
Suite 650
Philadelphia, PA 19103
Tel.: 215-814-6750
Fax.: 215-814-6764

**BONSIGNORE & BREWER**
Robert J. Bonsignore
Robin Brewer
Daniel D'Angelo
23 Forest Street
Medford, MA 02155
Tel.: 781-391-9400
Fax: 781-391-9496

**CAFFERTY FAUCHER LLP**
Jennifer W. Sprengel
Nyran Rose Pearson
30 N. LaSalle Street, Suite 3200
Chicago, IL 60602
Tel: 312-782-4880
Fax: 312-782-4485

**CAREY & DANIS L.L.C.**
Michael J. Flannery
James Rosemergy
8235 Forsyth Blvd.
Suite 1100
St. Louis, MO 63105
Tel.: 314-725-7700
Fax: 314-721-0905

**CHAVEZ LAW FIRM, P.C.**
Kathleen C. Chavez
P.O. Box 772
Geneva, IL 60134
Tel.: 630-232-4480
Fax: 630-232-8265

**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles

Michael D. Gottsch
361 West Lancaster Avenue
Haverford, PA  19041
Tel.:  610-642-8500
Fax:  610-649-3633

**COHN, LIFLAND, PEARLMAN,
  HERRMANN & KNOPF**
Peter S. Pearlman
Park 80 Plaza West One
Saddle Brook, NJ  07663
Tel.:  201-845-9600
Fax:  201-845-9423

**COOPER & KIRKHAM, P.C.**
Josef D. Cooper
655 Montgomery Street, 17th Floor
San Francisco, CA 94111
Tel.:  415-788-3030
Fax:  415-882-7040

**DOFFERMYRE SHIELDS CANFIELD
KNOWLES & DEVINE**
Kenneth S. Canfield
Ralph I. Knowles, Jr.
Martha J. Fessenden
Samuel W. Wethern
1355 Peachtree Street, Suite 1600
Atlanta, GA 30309
Tel.:  404-881-8900
Fax:  404-881-3007

**DRUBNER HARTLEY & O'CONNOR**
James E. Hartley, Jr.
Gary O'Connor
Charles S. Hellman
500 Chase Parkway, 4th Floor
Waterbury, CT 06708
Tel.:  203-753-9291
Fax:  203-753-6373

**EYSTER KEY TUBB WEAVER &
ROTH, LLP**
Nicholas B. Roth
Heather Necklaus Hudson

P.O. Box 1607
Decatur, AL 35602
Tel: 256- 353-6761
Fax: 256- 353-6767

**FINE KAPLAN & BLACK**
Roberta D. Liebenberg
1835 Market Street, 28th Floor
Philadelphia, PA 19103
Tel.:  215-567-6565
Fax:  215-568-5872

**FINKELSTEIN, THOMPSON**
  **& LOUGHRAN**
Burton H. Finkelstein
L. Kendall Satterfield
Halley F. Ascher
1050 30th Street, N.W.
Washington, D.C.  20007
Tel.:  202-337-8000
Fax:  202-337-8090

**FURTH LEHMANN & GRANT, LLP**
Michael P. Lehmann
Thomas P. Dove
Julio J. Ramos
Jon T. King
225 Bush Street, Suite 1500
San Francisco, CA 94104
Tel.:  415-433-2070
Fax:  415-982-2076

**GRAY AND WHITE**
Mark K. Gray
1200 PNC Plaza
Louisville, KY 40202
Tel.:  502-585-2060

**HANSON BRIDGES MARCUS**
**VLAHOS**
  **RUDY LLP**
David J. Miller
333 Market Street, 23rd Floor
San Francisco, CA 94105
Tel.:  415-777-3200
Fax:  415-541-9366

**HANZMAN CRIDEN & LOVE, P.A.**
Michael E. Criden
Kevin B. Love
Plaza 57
7301 SW 57th Court
Suite 515
South Miami, Florida 33143
Tel.:  305-357-9010
Fax:  305-357-9050

**JANSSEN, MALLOY, NEEDHAM,
 MORRISON, REINHOLTSEN &
 CROWLEY, LLP**
W. Timothy Needham
730 Fifth Street, Post Office Drawer 1288
Eureka, CA 95502
Tel.:  707-445-2071
Fax:  707-445-8305

**JEFFREY BRODKIN**
1845 Walnut Street, 22nd Floor
Philadelphia, PA 19103
Tel.: 215-567-1234
Fax.: 609-569-0809

**JEFFREY LOWE, P.C.**
Jeff Lowe
8235 Forsyth Blvd., Ste. 1100
St. Louis, MO 63105
Tel.:  314-721-3668
Fax:  314-678-3401

**JOHN P. MCCARTHY**
217 Bay Avenue
Somers Point, NJ 08224
Tel.: 609-653-1094
Fax.: 609-653-3029

**KLAFTER & OLSEN LLP**
Jeffrey A. Klafter
1311 Mamaroneck Avenue, Suite 220
White Plains, NY  10602
Tel.:  914-997-5656
Fax:  914-997-2444

**LARRY D. DRURY, LTD.**
Larry D. Drury
205 West Randolph, Suite 1430
Chicago, IL 60606
Tel.: 312-346-7950
Fax: 312-346-5777

**LAW OFFICES OF GARY H.
SAPOSNIK**
Gary H. Saposnik
105 West Madison Street, Ste. 700
Chicago, IL 60602
Tel: 312-357-1777
Fax: 312-606-0413

**LAW OFFICES OF RANDY R. RENICK**
Randy R. Renick
128 North Fair Oaks Avenue, Ste. 204
Pasadena, CA 91103
Tel.: 626-585-9608
Fax: 626-585-9610

**LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS, LLP**
John J. Stoia, Jr.
Theodore J. Pintar
Bonny E. Sweeney
James D. McNamara
Mary Lynne Calkins
Rachel L. Jensen
655 West Broadway
Suite 1900
San Diego, CA 92101
Tel.: 619-231-1058
Fax: 619-231-7423

**LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS, LLP**
Samuel H. Rudman
200 Broadhollow Road, Suite 406
Melville, NY 11747
Tel.: 631-367-7100
Fax: 631-367-1173

**LEVINE DESANTIS, LLC**
Mitchell B. Jacobs

201

150 Essex St., Ste. 303
Millburn, New Jersey 07041
Tel: 973-376-9050
Fax: 973-379-6898

**LOOPER, REED & MCGRAW**
James L. Reed, Jr.
Travis Crabtree
1300 Post Oak Blvd. Ste. 2000
Houston, TX 77056
Tel.: 713- 986-7000
Fax: 713- 986-7100

**MAGER & GOLDSTEIN, LLP**
Jayne Arnold Goldstein
1640 Town Center Circle, Suite 216
Weston, FL 33326
Tel: 954-515-0123
Fax:  954-515-0124

**MEREDITH COHEN GREENFOGEL**
  **& SKIRNICK, P.C.**
Steven J. Greenfogel
Daniel B. Allanoff
Architects Building, 22nd Floor
117 South 17th Street
Philadelphia, PA 19103
Tel.:  215-564-5182
Fax:  215-569-0958

**PHILIP STEINBERG**
124 Rockland Avenue
Bala Cynwood, PA 19004
Tel.: 610-664 3101
Fax.: 610-664-0972

**SAVERI & SAVERI, INC.**
Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
One Eleven Pine, Suite 1700
San Francisco, CA  94111-5619
Tel.:  415-217-6810
Fax:  415-217-6813

202

**SHAHEEN & GORDON**
William Shaheen
D. Michael Noonan
140 Washington St., 2nd Fl.
P.O. Box 977
Dover, NH  03821-0977
Tel.: 603-749-5000
Fax: 603-749-1838

**SHERMAN, SILVERSTEIN, KOHL,
    ROSE & PODOLSKY**
Alan C. Milstein
Jeffrey P. Resnick
Fairway Corporate Center
4300 Haddonfield Road, Ste. 311
Pennsauken, NJ 08109
Tel: 856-662-0700
Fax: 856-488-4744

**SPECTOR, ROSEMAN & KODROFF,
P.C.**
Theodore M. Lieverman
Eugene A. Spector
Jay S. Cohen
1818 Market Street, Suite 2500
Philadelphia, PA 19102
Tel.: 215-496-0300
Fax: 215-496-6611

**TRUJILLO RODRIGUEZ &
RICHARDS, LLP**
Lisa J. Rodriguez
8 Kings Highway West
Haddonfield, NJ 08033
Tel: 856-795-9002

**WHATLEY, DRAKE & KALLAS, LLC**
Joe R. Whatley, Jr.
Charlene Ford
Richard Rouco
Richard Frankowski
2001 Park Place North
Suite 1000
Birmingham, AL 35203
Tel.:  205-328-9576

203

Fax:  205-328-9669

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLC**
Mary Jane Edelstein Fait
Adam J. Levitt
656 West Randolph Street
Suite 500 West
Chicago, IL 60661
Tel.:  312-466-9200
Fax:  312-466-9292

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLC**
Fred Taylor Isquith
Alexander Schmidt
270 Madison Avenue, 10th Floor
New York, NY 10016
Tel.:  212-545-4600
Fax:  212-545-4653

**ZWERLING, SCHACHTER &**
  **ZWERLING, LLP**
Robert S. Schachter
Susan Salvetti
Stephen L. Brodsky
Daniel Drachler
Justin M. Tarshis
41 Madison Avenue
New York, NY 10010
Tel.:  212-223-3900
Fax:  212-371-5969

*Attorneys for Plaintiffs*