**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————— :
                                                  :         MDL Docket No. 1663
**IN RE INSURANCE BROKERAGE** :
**ANTITRUST LITIGATION**          :         Civ. No. 04-5184 (GEB)
————————————————————:
                                                  :
**IN RE EMPLOYEE-BENEFIT**        :
**INSURANCE BROKERAGE**           :         Civ. No. 05-1079 (GEB)
**ANTITRUST LITIGATION**          :
————————————————————:
                                                  :
**This Document Relates To:**      :         **O P I N I O N**
                                                  :
  **ALL ACTIONS**                  :
————————————————————:

**BROWN, Chief Judge**

This matter is before the Court on motions (collectively, "Motions") submitted by defendants consisting of various insurance carriers and insurance brokerages (respectively, "Insurer-Defendants" and "Broker-Defendants," and, collectively, "Defendants") seeking to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' claims alleging Defendants' violations of the Racketeering Influence and Corrupt Organization Act (hereinafter "RICO"), 18 U.S.C. § 1961, et seq., as set forth in Plaintiffs' Second Consolidated Amended Commercial Class Action Complaint and Second Consolidated Amended Employee-Benefit Class Action Complaint (collectively, "Complaints").

The instant opinion addresses solely Plaintiffs and Defendants' arguments that pertain to Plaintiffs' RICO claims. For the reasons discussed below, Defendants' Motions are GRANTED, and Plaintiffs' claims alleging Defendants' RICO violations under 18 U.S.C. §§ 1962(c), (d) are DISMISSED WITH PREJUDICE.

### TABLE OF CONTENTS

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
I.      Elements Subject to Rule 8 Pleading Requirements . . . . . . . . . . . . . . . . . . . 9
II.     Elements Subject to Rule 9 Pleading Requirements . . . . . . . . . . . . . . . . . . . . 11
LEGAL FRAMEWORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
I.      The Scope of RICO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
II.     Elements of a 1962(c) Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        A.      The "Enterprise" Element . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
                1.      The "Structure/Unity" Factor . . . . . . . . . . . . . . . . . . . . . . . 17
                2.      The "Continuity" Factor . . . . . . . . . . . . . . . . . . . . . . . . . . 19
                3.      The "Distinctiveness" Factor . . . . . . . . . . . . . . . . . . . . . . 19
        B.      The "Conduct/Participate" Element . . . . . . . . . . . . . . . . . . . . . 22
III.    A Subsection 1962(d) Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        I.      A Review of Plaintiffs' Contentions . . . . . . . . . . . . . . . . . . . . . . . . . 25
        II.     "Broker-Centered" Enterprises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
                A.      The Court's Previous Ruling . . . . . . . . . . . . . . . . . . . . . . . . . . 31
                B.      Summary of Plaintiffs' Instant Pleadings . . . . . . . . . . . . . . . . . 32
                        1.      Instant Allegations as to the "Conduct/Participate" Element . . . . 33
                        2.      Instant Allegations as to the "Enterprise" Element . . . . . . . . . . 34
                C.      Plaintiffs' Pleadings Fail to State Allegations
                        Cognizable as a RICO Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
                        1.      Plaintiffs' Factual Assertions and Deductions Are Flawed . . . . . . 36
                                a.      Plaintiffs' Conceptual Deductions Are
                                        Not Supported by Facts . . . . . . . . . . . . . . . . . . . . . . . 36
                                b.      Other Incongruities and Logical Flaws in Plaintiffs' Allegations
                                        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
                        2.      Plaintiffs' Legal Arguments Do Not Salvage Their Claims . . . . . 47
                                a.      Plaintiffs' Allegations Fail to State
                                        the "Enterprise" Element . . . . . . . . . . . . . . . . . . . . . . 47
                                b.      Plaintiffs' Allegations Fail to State
                                        the "Conduct" Element . . . . . . . . . . . . . . . . . . . . . . . 59
        III.    CIAB as an Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
        IV.     Plaintiffs' Claims Raised Under 18 U.S.C. § 1962(c) and (d) . . . . . . . . . . . . 64
        IV.     Leave to Amend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
        I.      Civil Action No. 04-5184 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
        II.     Civil Action No. 05-1079 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

## PROCEDURAL HISTORY

Plaintiffs in these actions include businesses, public entities and private individuals who, seeking to purchase commercial and/or property insurance coverage and/or group insurance coverage for their employees, or primary insurance coverages through their employers' benefits plans, or supplemental insurance coverages, contracted with the Insurer Defendants through the Broker-Defendants.  See In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at * 36 (D.N.J. Oct. 3, 2006) (detailing the parties to this action).  The relationship between Plaintiffs and Defendants stemmed from the fact that

> [t]he Broker-Defendants, together with their affiliates, provide[d Plaintiffs] with risk management and insurance brokerage services, including, inter alia, analysis of risk and insurance options, procurement and renewal of insurance, interpretation of insurance policies, monitoring the insurance industry on [Plaintiffs'] behalf . . . and assisting [Plaintiffs] with the filing and processing of claims against the policies they place.  The Insurer-Defendants and their subsidiaries, [operating through the Broker-Defendants,] develop[ed], market[ed] and [sold to Plaintiffs] a variety of insurance and reinsurance products for individual[] and business [uses].  . . .  [After the] New York State Attorney General . . . filed a civil complaint . . . against [one of the Broker-Defendants in this action alleging that this defendant] had solicited rigged bids for insurance contracts and . . . received improper contingent commission payments in exchange for steering its clients to a select group of [insurance carriers, Plaintiffs began filing, in various federal districts, class] actions based on allegations similar to those raised in the complaint [of New York State Attorney General.]  On February 17, 2005, the Judicial Panel on Multidistrict Litigation transferred these cases to [the District Court for the District of New Jersey] for coordinated or consolidated pretrial proceedings pursuant to . . . procedures set forth in 28 U.S.C. § 1407. . . .  Since that time, [numerous] "tag-along" actions have been conditionally transferred to [the District of New Jersey and have been consolidated into the present action].

See id. at 37-39 (citations and quotation marks omitted).  All initial complaints alleged that

> Defendants . . . misled [Plaintiffs] into thinking that [Plaintiffs were] receiving the most economical and appropriate insurance products, while in fact, Broker [Defendants were] steering [Plaintiffs] towards products that . . . maximize[d] the profit of . . . Defendants.

See id. at 41-42 (citations and quotation marks omitted).

> Plaintiffs further alleged that

> the Broker-[Defendants] and the Insurer-[Defendants aimed to create and] created the illusion of a competitive market for insurance . . . . [In order to create such illusion,] the Broker-Defendants and Insurer-Defendants engaged in a combination and conspiracy to suppress and eliminate competition in the sale of insurance by coordinating and rigging bids for insurance policies, allocating insurance markets and customers and raising, or maintaining or stabilizing premium prices . . . .

See id. at 41 (citations and quotation marks omitted).

After the original complaints were filed between October 22, 2004, see Civil Action No. 04-5184, Docket Entry No. 1, and February 24, 2005, see Civil Action No. 05-1079, Docket Entry No. 1, and the actions were aligned and severed into two types of matters (one involving commercial property and casualty insurance coverages ("Commercial Case") and the other involving employee benefits insurance plans ("Employee-Benefits Case")), the Court consolidated all actions into two accordingly aligned dockets.  See Civil Action No. 04-5184, Docket Entry No. 118; Civil Action No. 05-1079, Docket Entry No. 20.

On August 1, 2005, Plaintiffs filed their consolidated amended complaints, see Civil Action No. 04-5184, Docket Entries Nos. 174-75; Civil Action No. 05-1079, Docket Entry No. 18, and then their corrected consolidated amended complaints on August 15, 2005.   See Civil Action No. 04-5184, Docket Entry No. 183; Civil Action No. 05-1079, Docket Entry No. 21.  Then, on August  29, 2005, Plaintiffs filed another corrected consolidated amended complaint.  See Civil Action No. 04-5184, Docket Entry No. 201.  Together, these complaints asserted six causes of action: (1) RICO violations, pursuant to 18 U.S.C. § 1961, et seq.; (2) violations of Section 1 of the Sherman Act, 15 U.S.C. § 1; (3) violation of the antitrust laws of forty eight states and the District of Columbia; (4)

breaches of statutory and common-law-based fiduciary duties; (5) aiding and abetting breach of fiduciary duty; and (6) unjust enrichment. See In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at * 53-54.

In November of 2005, various Defendants began filing their motions to dismiss Plaintiffs' corrected consolidated amended complaints. See, e.g., Civil Action No. 04-5184, Docket Entries Nos. 253, 272-73, 277, 279-82, 285, 288-90, 292, 294, 298, 338; Civil Action No. 05-1079, Docket Entries Nos. 89, 90-91, 98-100, 102, 105, 113. In response to these motions to dismiss, the Court issued an order and accompanying opinion finding, inter alia, that the allegations set forth in Plaintiffs' corrected consolidated amended complaints, as supplemented by Plaintiffs' RICO Case Statement, failed to sufficiently assert Plaintiffs' RICO claims and directed Plaintiffs to file  amended RICO Case Statements and supplemental Statements of Particularity clarifying and supporting allegations set forth in Plaintiffs' corrected consolidated amended complaints. See In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at * 85-97, 103-04. Both dockets in this matter were transferred to the undersigned on February 16 and 22, 2007. See Civil Action No. 04-5184, Docket Entry No. 1009; Civil Action No. 05-1079, Docket Entry No. 544. Pursuant to the Court's order, Plaintiffs filed their amended RICO Case Statement and supplemental Statements of Particularity. See, e.g., Civil Action No. 04-5184, Docket Entries Nos. 843, 844, 845; Civil Action No. 05-1079, Docket Entries Nos. 479-80.

In response to Plaintiffs' filing of these documents, Defendants renewed their motions to dismiss Plaintiffs' corrected consolidated amended complaints. See, e.g., Civil Action No. 04-5184, Docket Entry No. 846; Civil Action No. 05-1079, Docket Entries No. 481.

On April 5, 2007, this Court issued two sets of orders and accompanying opinions granting Defendants' renewed motions to dismiss Plaintiffs' corrected consolidated amended complaints, as clarified by Plaintiffs' amended Case Statements and Statements of Particularity, but permitted Plaintiffs the opportunity to file second consolidated amended complaints and revised Statements of Particularity. See In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 25632 and 2007 U.S. Dist. LEXIS 25633 (D.N.J. Apr. 5, 2007). Pursuant to this Court's orders, Plaintiffs filed their Second Amended Complaints (collectively, "Complaints") on June 29, 2007, accompanied by their revised Statements of Particularity. See Civil Action No. 04-5184, Docket Entries Nos. 1239-1240; Civil Action No. 05-1079, Docket Entries Nos. 675-677.

On June 21 and 22, 2007, Defendants filed their instant Motions to dismiss SAC, as clarified by Plaintiffs' revised Statements of Particularity. See, e.g., Civil Action No. 04-5184, Docket Entries Nos. 1221, 1223-23; Civil Action No. 05-1079, Docket Entries Nos. 658, 661, 664, 666, 677.[1] Plaintiffs filed their oppositions to Defendants' motions to dismiss SAC on July 19, 2007. See, e.g., Civil Action No. 04-5184, Docket Entry No. 1264; Civil Action No. 05-1079, Docket Entries Nos. 685-87. Defendants filed their replies to Plaintiffs' opposition on July 31, 2007. See, e.g., Civil Action No. 05-1079, Docket Entries Nos. 692-94.

---

[1]

The filings made by parties in the instant matters were, unfortunately, so executed that clarifying--or even responsive--documents were frequently entered into the docket *prior* to entries of the very documents that were being clarified or responded to. In addition, addressing different lines of claims docketed under their respective docket numbers, e.g., antitrust matters and those of RICO, parties, on certain occasions, filed documents addressing both lines of claims only in one matter, or docketed their RICO documents in the antitrust matter, and vice-versa. In view of such errors in docketing, this Court's brief overview of procedural history refers only to the key entries and does not aim to provide exhaustive discussion of over two thousand documents filed in both dockets as of the date of this Opinion.

## STANDARD OF REVIEW

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief may be granted.  See Fed. R. Civ. P. 12(b)(6).  Since the purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case, see Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993), the court considering a motion to dismiss brought under Rule 12(b)(6) accepts all facts and allegations listed in the complaint.  See H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249 (1989); Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989); D.P. Enter. v. Bucks County Community College, 725 F.2d 943, 944 (3d Cir. 1984). Therefore, a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, plaintiff is not entitled to relief. See Oran v. Stafford, 226 F.3d 275, 279 (3d Cir. 2000); Langford v. City of Atlantic City, 235 F.3d 845, 850 (3d Cir. 2000); Turbe v. Government of the Virgin Islands, 938 F.3d 427, 428 (3d Cir. 1991) (citing Unger v. Nat'l Residents Matching Program, 928 F.2d 1392, 1394-95 (3d Cir. 1991)); Bartholomew v. Fischl, 782 F.2d 1148, 1152 (3d Cir. 1986); see also Langford, 235 F.3d at 850; Dykes v. Southeastern Pa. Transp. Auth., 68 F.3d 1564, 1565 n.1 (3d Cir. 1995), cert. denied, 517 U.S. 1142 (1996); Piecknick v. Commonwealth of Pennsylvania, 36 F.2d 1250, 1255 (3d Cir. 1994); Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (citation omitted); see also Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997) (stating that "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss"); In re Burlington Coat Factory Securities Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997) (same, quoting

Glassman v. Computervision Corp., 90 F.3d 617, 628 (1st Cir. 1996)); Amiot v. Kemper Ins. Co., 122 Fed. App. 577, 579 (3d Cir. 2004); see also Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1997) (noting that courts, when examining 12(b)(6) motions, have rejected "legal conclusions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law," or "sweeping legal conclusions cast in the form of factual allegations"); Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996) ("[W]hile the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice"); Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993) ("Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss"). The principal reasons for Rule 12 balance between taking properly asserted facts as true and dismissal of bald assertions is to avoid delay incident to successive motions prolonging final disposition of case, and to eliminate frivolous claims expeditiously. See Neifeld v. Steinberg, 438 F.2d 423, 427 (3d Cir. 1971); see also Sadler v. Penn. Refining Co., 33 F. Supp. 414, 415 (D.S.C. 1940); accord Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1347.

## I.    Elements Subject to Rule 8 Pleading Requirements

Even if heightened pleading requirements are inapplicable, and a plaintiff's claim is subject to

ordinary notice-pleading standards set forth in Rule 8,

> the "short and plain statement" [required by Rule 8] must provide the defendant with
> "fair notice of what the plaintiff's claim is and the grounds upon which it rests."
> Conley v. Gibson, 355 U.S. 41, 47 (1957). [While Rule 8] pleading [requirements]
> are not meant to impose a great burden upon a plaintiff, [see] Swierkiewicz v. Sorema
> N. A., 534 U.S. 506, 513-15 (2002)[,] . . . it should not prove burdensome for a
> plaintiff . . . to provide a defendant with some indication of the [facts] that the plaintiff
> has in mind. . . . [A]llowing a plaintiff to forgo giving any indication of the [facts] that
> the plaintiff has in mind would . . . permit a plaintiff "with a largely groundless claim
> to simply take up the time of a number of other people, with the right to do so
> representing an in terrorem increment of the settlement value, rather than a reasonably
> founded hope that the [discovery] process will reveal relevant evidence." Blue Chip,
> 421 U.S. at 741.

Dura, 544 U.S. at 588-89; accord Burlington, 114 F.3d at 1429 (courts are not required to credit bald

assertions or legal conclusions improperly alleged in the complaint); Nice, 135 F. Supp. 2d at 565

(legal conclusions draped in the guise of factual allegations may not benefit from the presumption of

truthfulness).

Recently, the Supreme Court further elaborated on the requirements associated with the

relaxed notice-pleading standard of Rule 8.   See Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955

(2007).  In this seven-to-two opinion, the Court explained that Rule 8 pleadings must provide

"enough factual matter" to suggest that the alleged fact took place.  See id. at 1965.  While the

Supreme Court left it to the district courts to determine, on a case-by-case basis, how much factual

matter is "enough," the Court unambiguously indicated that represented litigants alleging wrongs

other than violations of their civil rights cannot satisfy Rule 8 pleading requirements by invoking the

overly lenient regime of "pure notice" originated in Conley, 355 U.S. 41, a case decided half a century

ago.[2]  In fact, the Court explicitly disavowed the oft-quoted statement in Conley of "'the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,'" stating that the "no set of facts" language "has earned retirement" and "is best forgotten."  Bell Atlantic, 127 S. Ct. at 1968-69 (quoting Conley, 355 U.S. at 45-46).

Moreover, the Court, using a variety of phrases, indicated that more than a "speculation of a claim" is needed to allege a commercial violation.  For example, the Court required represented plaintiffs to set forth "allegations plausibly suggesting (not merely consistent with)  [plaintiff's deductions]," a "plain statement" with "enough heft" to show entitlement to relief, and "enough facts to state a claim to relief that is plausible on its face."  Id. at 1969-74.  Moreover, the Court unambiguously stated that the line "between the factually neutral and the factually suggestive . . . must be crossed [by allegations made in plaintiff's pleadings] to enter the realm of plausible liability," id. at 1966 n.5, and explaining that "factual allegations must be enough to raise a right to relief above the speculative level."  Id.  at 1964-65.  In sum, while a plaintiff need not state with particularity all facts setting forth an element of the offense subject to Rule 8 pleading requirements, the plaintiff's complaint will survive dismissal only if it contains "enough [factual] heft" rather than plaintiff's conjecture or self-serving interpretations of actual events.  See Bell Atlantic, 127 S. Ct. at 1965-69; Dura, 544 U.S. at 588-89.

---

[2]

The Supreme Court's decision in Bell Atlantic did not disturb the allowances traditionally provided by federal courts to civil rights litigants proceeding pro se.  See Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (reaffirming the traditional principle under which a plaintiff proceeding pro se may expect that his pleading would be liberally construed and his complaint, "however inartfully pleaded, [would] be held to less stringent standards than formal pleadings drafted by lawyers").

## II.   Elements Subject to Rule 9 Pleading Requirements

If the offense at issue involves the element of fraud, Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead fraud with particularity sufficient to place the defendant on notice of the precise misconduct with which they are charged, and to protect defendants from spurious charges of fraudulent behavior.  See Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984), cert. denied, 469 U.S. 1211 (1985); see also Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity").  Therefore, pleading the fraud element, a plaintiff must specify "'the who, what, when, where, and how: the first paragraph of any newspaper story.'" Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).  The Court of Appeals for the Third Circuit clarified that,

> [a]lthough Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."

Rockefeller Ctr. Props. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002); see also Lum v. Bank of Am., 361 F.3d 217, 225 (3d Cir.) ( citing Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 659 (3d Cir. 1998)), cert. denied, 543 U.S. 918 (2004).[3]

---

[3]

In Rolo, 155 F.3d 644, the plaintiffs made "quite detailed" allegations regarding the fraudulent scheme and described the contents of the mailings in "reasonably specific terms."  Id. at 658.  The Rolo Court held, nevertheless, that the plaintiffs failed to plead mail fraud with particularity because the complaint did not specify "when, by whom, and to whom a mailing was sent, and the precise content of each particular mailing."  Id. at 659.  Similarly, in Warden v. McLelland, 288 F.3d 105 (3d Cir. 2002), the Court found the complaint insufficient, even though the complaint provided a "reasonably clear overall picture of what had been alleged," explaining that the complaint was defective since it did "not state clearly how [the communications alleged to constitute wire fraud] were false or misleading or how they contributed to the alleged fraudulent scheme."  Id. at 114.

## LEGAL FRAMEWORK

### I.      The Scope of RICO

Congress enacted the RICO statute in 1970, as part of the Organized Crime Control Act of 1970.  See Pub. L. No. 91-452, 84 Stat. 922 (1970).  While the prime congressional purpose in enacting RICO was "to seek the eradication of organized crime in the United States," see id. at 922-23, Congress mandated that RICO "be liberally construed to effectuate its remedial purposes."[4]  See id. at 942.  Therefore, RICO is liberally applied, and its mandate reach includes legitimate businesses and enterprises, operating with and without a profit motive.  See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499 (1985).  However, while the Supreme Court has reaffirmed its reliance on the "liberal construction" clause of RICO, see Reves v. Ernst & Young, 507 U.S. 170, 183 (1993), the Court clarified that the "liberal construction" clause was "not an invitation to apply RICO to new purposes that Congress never intended."  See id.; see also University of Md. v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1538-39 (3d Cir. 1993) (plaintiff's factual allegations were insufficient because plaintiff's interpretation of RICO unduly extended the statutory reach); Durant v. ServiceMaster Co., 159 F. Supp. 2d 977, 981 ( E.D. Mich. 2001) ("Because of the opprobrium that a RICO claim brings to a defendant, however, courts should eliminate frivolous RICO claims at the earliest stage of litigation"), aff'd in relevant part, remanded on other grounds, 109 Fed. Appx. 27, 2004 U.S. App. LEXIS 16728 (6th Cir. 2004).

---

[4]

Thus, in addition to criminal actions, RICO permits private plaintiffs and the government to seek redress in civil actions in either state or federal court, see 18 U.S.C. § 1964(b); Tafflin v. Levitt, 493 U.S. 455, 458 (1990) (holding state and federal courts have concurrent jurisdiction over claims arising under § 1964(c)) to obtain treble damages, as well as equitable relief through divestiture of the defendant's interest in the enterprise, restrictions on future activities or investments, and dissolution or reorganization of the enterprise.  See 18 U.S.C. § 1964(a).

## II.   Elements of a 1962(c) Claim

Subsection 1962(c) of the RICO statutes provides, in relevant part, that:

it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

18 U.S.C. § 1962(c).

"To allege a RICO claim, the plaintiff must plead [the following elements:] (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, [plus (5) an] injury to property or business." Lum, 361 F.3d at 223 (quoting Sedima, 473 U.S. at 496) (citations and quotation marks omitted). The term "racketeering activity" refers to the list of enumerated federal and state crimes provided in § 1961(1) of the RICO statute and includes, inter alia, mail fraud and wire fraud. See 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud) and § 1346 (scheme or artifice to defraud).

Thus, where a RICO plaintiff relies on mail and wire fraud as a basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), i.e., the plaintiff must allege who made a misrepresentation to whom and sufficiently set forth the general content of the misrepresentation, see Rolo, 155 F.3d at 658-59; Klein v. General Nutrition Cos., 186 F.3d 338, 345 (3d Cir. 1999), and plead with particularity "the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."[5] Seville, 742 F.2d at 791.

---

[5] However, the Court of Appeals clarified that, while one method a RICO plaintiff could employ to properly plead the "when and where" of the alleged fraud is by stating the date, place and time of fraudulent activity, see Seville, 742 F.2d at 791 ("It is certainly true that allegations of 'date, place or time' fulfill these functions"), "nothing in the rule requires [plaintiffs to allege these particular factors, and] plaintiffs are free to use alternative means of injecting precision . . . into their allegations

By contrast, the heightened pleading requirement of Rule 9(b) appears to be inapplicable to RICO elements other than a fraudulent predicate offense.[6]  In that case, the Federal Rules of Civil Procedure merely require that a complaint contain pleadings meeting the requirement posed by Rule 8, as clarified in <u>Bell Atlantic</u>, 127 S. Ct. at 1965-69, and <u>Dura</u>, 544 U.S. at 588-89.  <u>See</u> <u>Scibelli v. Leb. County</u>, 2007 U.S. App. LEXIS 5481, at *2 (3d Cir. Pa. Mar. 7, 2007); <u>Richmond v. Nationwide Cassel L.P.</u>, 52 F.3d 640, 645 (7th Cir. 1995); <u>Towers Financial Corp. v. Solomon</u>, 126 F.R.D. 531, 536 (N.D. Ill. 1989)("Rule 9(b) applies to plaintiffs' RICO claim only to the extent that the claim is based on racketeering acts involving fraud. [The pleading standard of Rule 8] applies to [the remainder of] plaintiffs' RICO claim").

### A.    The "Enterprise" Element

Subsection 1962(c) prohibits a person associated with an enterprise from conducting the affairs of that enterprise through a pattern of racketeering activity.  <u>See</u> 18 U.S.C. § 1962(c).  RICO defines the term "enterprise" to "include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18

---

of fraud."  <u>Id.</u>; <u>accord</u> <u>Rockefeller Ctr. Props. Sec. Litig.</u>, 311 F.3d 198, 216 (3d Cir. 2002) (discussing the working of Rule 9(b) in context of a securities fraud claim and stating that, "[a]lthough Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use alternative means of injecting precision and some measure of substantiation into their allegations of fraud") (citation and quotation marks omitted).

[6]

Of course, if a plaintiff's claims as to any element other than the predicate offense are so interwoven with the allegations setting forth defendant's alleged fraudulent conduct, <u>i.e.,</u> if the sufficiency of the "who, what, when, where, and how" aspect of the plaintiff's fraud pleading is inherently interrelated with the plaintiff's allegations as to the defendant's use of the alleged enterprise- -it would indeed be anomalous for the plaintiff to assert that it need not state the "who, what, when, where, and how" while pleading the enterprise element, but plead the very same "who, what, when, where, and how" with particularity in setting forth plaintiff's claims as to the alleged fraud, since the facts with respect to both elements must be pled in the same complaint.

U.S.C. § 1961(4).  This broad definition includes both legitimate and illegitimate, formal and informal organizations, see United States v. Turkette, 452 U.S. 576, 587 (1981), and it is immaterial whether the defendant has a stake in the operation of the enterprise because individuals outside the enterprise may assist the enterprise in attaining its illegal goals.  See, e.g., United States v. Mokol, 957 F.2d 1410, 1417 (7th Cir. 1992).  A combination of different entities, including a group of corporations or partnerships, may constitute an enterprise within the meaning of RICO.  See, e.g., MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 62 F.3d 967, 978-79 (7th Cir. 1995) (treating corporation and union as an enterprise); United States v. Stolfi, 889 F.2d 378, 380 (2d Cir. 1989) (finding local union and its welfare benefit fund a RICO enterprise); United States v. London, 66 F.3d 1227, 1243 (1st Cir. 1995) (holding bar and check-cashing business comprise association-in-fact enterprise under RICO).  Therefore, to establish a RICO enterprise, a plaintiff must plead factual evidence that the various associates function as a single enterprise.  See Turkette, 452 U.S. at 583.

When a plaintiff identifies a legitimate business or organization as the relevant enterprise, the need to allege and prove the existence of enterprise structure can be met without great difficulty, since all aspects of the enterprise element, including the structure aspect, are satisfied by the mere proof that the entity does in fact have a legal existence.  See Webster v. Omnitrition Intern., Inc., 79 F.3d 776, 786 (9th Cir. 1996) ("[C]orporate entities have a legal existence . . . , and the very existence of a corporation meets the requirement for a separate structure"); see also Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 268 (3d Cir. 1995).  The existence of an association-in-fact, however, is more difficult to assert.  See United States v. Riccobene, 709 F.2d 214, 221 (3d Cir. 1983) ("[J]udges and commentators [are] concern[ed] that the concept of 'illegal enterprise' could be construed [unduly] broadly [and] concluded that, without further refinement of

the term, the statute could be extended to situations far removed from those actually contemplated by Congress, and that [plaintiffs] could use the law to invoke an additional penalty whenever they had a case involving the commission of two offenses that, coincidentally, were among those listed as racketeering activities") (citations and quotation marks omitted).

Recognizing the issue, the Supreme Court articulated, in United States v. Turkette, certain criteria that might be applied by the courts in assessing the sufficiency of plaintiff's pleading of an association-in-fact type of enterprise. See Turkette, 452 U.S. at 583.  The criteria, commonly known as "Turkette factors," have been described differently by various courts, but generally include the following inquiries: (1) whether the association has an ascertainable structure, (2) whether the association is continuous, and (3) whether the association is distinct from the alleged underlying pattern of racketeering.  In Riccobene, 709 F.2d 214, the Court of Appeals for the Third Circuit expressly adopted the Turkette factors, stating as follows:

> Each of the elements enumerated by the Supreme Court [in the Turkette decision] describes a separate aspect of the life of the enterprise.  The ongoing organization requirement relates to the superstructure or framework of the group.  The second necessary element for an enterprise under RICO is that the various associates function as a continuing unit. . . .  The third and final element in establishing the enterprise is that the organization must be an entity separate and apart from the pattern of activity in which it engages.

Riccobene, 709 F.2d at 222-24 (citations and quotation marks omitted).[7]

---

[7]

However, the fact that the Court of Appeals in Riccobene adopted the Turkette factors indicates merely the Court of Appeals' conclusion that allegations of facts corresponding to the Turkette factors would per se meet plaintiff's pleading burden.  The holding of Riccobene does not stand for the proposition that a RICO plaintiff cannot meet plaintiff's Rule 8(a) pleading burden with respect to the enterprise element by stating facts other than those corresponding to the Turkette factors.  *If the plaintiff actually alleges sufficient facts* indicating that the various associates functioned as a enterprise (instead of relying on "unsupported allegations," "bald assertions," or "legal conclusions" dressed as facts), such pleadings would be proper even if the alleged facts address

1.    THE "STRUCTURE/UNITY" FACTOR

The Court of Appeals stated that a RICO plaintiff choosing to allege the existence of a "superstructure" must plead facts indicating the presence of an umbrella "structure . . . for the making of decisions." Riccobene, 709 F.2d at 222-23; Merriam-Webster Online Dictionary <<http://www.m-w.com/ dictionary/structure>> (defining "structure" as "the aggregate of elements of an entity in their relationships to each other" or "organization of parts as dominated by the general character of the whole"); compare Canadian-American Oil Co. v. Delgado, 1997 U.S. App. LEXIS 5120, at *3-4 (9th Cir. Cal. Mar. 14, 1997) ("The . . . complaint alleges that defendants 'associated together' and 'consensually agreed' to commit racketeering activities, and that certain defendants were 'management' while others were 'backers.' Such conclusory statements . . . do not suffice to avoid dismissal under Rule 12(b)(6)") (quoting Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.), cert. denied, 454 U.S. 1031 (1981)).

In other words, the sufficiency of plaintiff's structure-related allegations turns on plaintiff's pleading of facts indicating the presence of a web of "solid lines" interrelating the entire alleged enterprise, and pleading merely that certain entities had business dealings with each other does not suffice, even if the business dealings at issue involved illegal activities. See Stachon v. United Consumers Club, Inc., 229 F.3d 673, 676 (7th Cir. 2000) (a wholesale "buying club," its franchisees, manufacturers, wholesalers, and club members comprised merely a "a string of participants lacking any distinct existence and structure" of an enterprise, it merely verified the fact that the members of the alleged group had business dealings with one another over many years); Simon v. Value Behavior

_____

aspects other than the Turkette factors. See Seville, 742 F.2d at 789-791; Hollis-Arrington v. PHH Mortg. Corp., 2006 U.S. App. LEXIS 27021 (3d Cir. Oct. 31, 2006).

Health Inc., 208 F.3d 1073, 1083 (9th Cir. 2000) (finding that health plans and insurance companies that allegedly collaborated in scheme to defraud plan beneficiaries did not constitute enterprise for purposes of RICO, where plaintiff stated no facts indicating the structure of alleged collusion); VanDenBroeck v. Commonpoint Mortgage, 210 F.3d 696, 699 (6th Cir. 2000) (concluding that a sub-prime mortgage lender working with various secondary lenders to which it sold customers' loans did not constitute an enterprise because there was no minimal level of organizational structure between the entities); Richmond, 52 F.3d at 646 (upholding dismissal of a RICO complaint for failure to allege sufficient links between the various legal entities forming the alleged enterprise and pointing out that the mere "naming of a string of entities does not allege adequately an enterprise"); Broad, Vogt & Conant, Inc. v. Alsthom Automation, Inc., 200 F. Supp. 2d 756 (E.D. Mich. 2002) (where plaintiffs' allegations merely delineate strings of entities allegedly comprising an enterprise but lack any facts suggesting that these entities had any type of single organizational structure for decision-making and conducting the group's affairs, such bare allegations are insufficient to state a claim); Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc., 165 F. Supp. 2d 514, 539 (S.D.N.Y. 2001) (finding that an association-in-fact was not adequately pled where the plaintiff "failed to present specific details of any hierarchy, organization, or unity among the various alleged conspirators"); In re MasterCard Int'l Inc. Internet Gambling Litig., 132 F. Supp. 2d 468 (E.D. La. 2001) (plaintiff's pleading of a "random intersection" of on-line casinos, credit card companies and issuing banks fails to indicate an enterprise); First Nationwide Bank v. Gelt Funding, Corp., 820 F. Supp. 89, 98 (S.D.N.Y. 1993) (allegations that disparate parties were associated by virtue of their involvement in the real estate market are insufficient to maintain a RICO enterprise); Moll, 654 F. Supp. at 1031 (allegations referring to a "group of attorneys . . . abstractors and other individuals and

corporations . . . engaged in the real estate settlement industry" are insufficient to establish an enterprise). In sum, it is insufficient for the plaintiff to describe "what may appear to be an enterprise from the outside, if the collection of the [allegedly conspiring] entities and individuals contains no organizational structure on the inside." In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig., 2006 U.S. Dist. LEXIS 35980, at *21-22 (E.D. Pa. June 2, 2006) (plaintiff's complaint did not permit an inference that the alleged enterprise had a structure where the complaint provided allegations that the defendants played particular roles and were aware of each other's actions but failed to allege how various associates of the enterprise were interrelated amongst themselves through a common decision-making); accord VanDenBroeck, 210 F.3d at 699-700 (alleged enterprise "too unstable and fluid an entity to constitute a RICO enterprise" since the complaint failed to show any type of mechanism by which this alleged group conducted its affairs or made its decisions, and allegations that certain parties did business with one another, or even allegations that they conspired together, were "not enough to trigger [RICO liability] if the parties [were] not organized in a fashion that would enable them to function as a racketeering organization for other purposes").

## 2. THE "CONTINUITY" FACTOR

"Earmarks" of association are "continuity, unity, shared purpose, and identifiable structure." United States v. Gray, 137 F.3d 765, 772 (4th Cir. 1998); see also Riccobene, 709 F.2d at 222-24. The Court of Appeals in Riccobene unambiguously explained that "the mechanism for controlling and directing the affairs of the group . . . must exist on an ongoing basis." 709 F.2d at 222. "The point of the 'not ad hoc' requirement is to distinguish between a . . . RICO enterprise and an ordinary set of co-conspirators." United States v. Fernandez, 388 F.3d 1199, 1223 n. 14 (9th Cir. 2004), cert.

denied sub nom, Arevalo v. United States, 546 U.S. 923 (2005) (citation omitted).  Therefore, a plaintiff's pleading of the "enterprise" element must include facts suggesting not only the presence of a structured relationship during certain "snap-shots" of time, but also those facts that indicate a systemic continuity of the relationship during a measurable period of time.  See, e.g., In re Managed Care Litig., 135 F. Supp. 2d 1253, 1322 (S.D. Fla. 2002) (explaining that allegations as to the existence of an enterprise requires "'evidence that the various associates function as a continuing unit'") (quoting Turkette, 452 U.S. at 583); see also Montesano v. Seafirst Commercial Corp., 818 F.2d 423 (5th Cir. 1987) (concluding that a RICO complainant's failure to plead facts indicating that the associated individuals of the alleged enterprise operated as a structured ongoing continuing unit rendered the claim legally insufficient).

### 3.   The "Distinctiveness" Factor

The Supreme Court explained that the "conduct or participation" element requires a plaintiff to show that each defendant who, allegedly, was part of the enterprise, participated in the operation or management of the enterprise and asserted some control over the enterprise.  See Reves, 507 U.S. at 185; accord Peat, Marwick, 996 F.2d at 1539; Guar. Residential Lending, Inc. v Int'l Mortg. Ctr., Inc., 305 F. Supp. 2d 846 (N.D. Ill. 2004).  Consequently, the "enterprise" element cannot be satisfied by plaintiff's mere reliance on--or paraphrasing of--plaintiff's allegations with respect to the pattern of the alleged racketeering activity, since such argument would allow "every pattern of racketeering activity to [become] an enterprise whose affairs are conducted through the pattern of racketeering." Chang v. Chen, 80 F.3d 1293, 1298 (9th Cir. 1996); see United States v. Bledsoe, 674 F.2d 647, 664 (8th Cir.), cert. denied sub nom., Phillips v. United States, 459 U.S. 1040 (1982)

(explaining that a plaintiff may plead the enterprise element sufficiently only if the plaintiff asserts

facts that would, if true, operate as a "proof of some structure . . . separate from the racketeering

activity and distinct from the organization which is a necessary incident to the racketeering").

   The Court of Appeals explained, and other courts agreed, that a RICO plaintiff cannot satisfy

the plaintiff's pleading requirements with respect to the "enterprise" element by pleading the pattern

of the enterprise activity.  See Riccobene, 709 F.2d at 222 (clarifying that "the enterprise must be

shown to have an existence 'separate and apart from the pattern of activity in which it engages'"

(quoting Turkette, 452 U.S. at 583); see also Seville, 742 F.2d at 790; Canadian-American, 1997

U.S. App. LEXIS 5120, at *5 ("The . . . complaint . . . alleges no specific facts to show that an

ongoing association existed apart from the [illegal] acts . . . that defendants allegedly performed. With

no separate ongoing association alleged, the . . . complaint does not state a cognizable RICO

enterprise"); Union Fed. Bank v. Howard, 2005 U.S. Dist. LEXIS 17887, at *12 (N.D. Ind. Aug. 23,

2005) (where a RICO plaintiff attempts to characterize the language that merely describes the alleged

enterprise's activities as language which identifies the structure of the enterprise, such allegations are

insufficient to plead a RICO claim) (citing Stachon, 229 F.3d at 676; Slaney v. Int'l Amateur Ath.

Fed'n, 244 F.3d 580, 600 n. 11 (7th Cir. 2001); ABN AMRO Mortg. Group, Inc. v. Maximum

Mortg., Inc., 2005 U.S. Dist. LEXIS 17612, at *10-11 (N.D. Ind. May 16, 2005)).

## B.     The "Conduct/Participate" Element

Presuming that a RICO plaintiff sufficiently alleged the structure and, therefore, existence of the enterprise, the plaintiff must also allege some facts indicating that each defendant conducted, or participated in the operation or management of, the enterprise through the enterprise structure.  See Reves, 507 U.S. at 184-85; Peat, Marwick, 996 F.2d at 1539.  It follows that, in order to commit a RICO violation, a defendant must have had some part in directing or conducting the  affairs of the enterprise, not just the defendant's own affairs.  See id.; see also United States v. Urban, 404 F.3d 754, 769 (3d Cir. 2005); United States v. Castro, 89 F.3d 1443, 1452 (11th Cir. 1996).

Consequently, the Court of Appeals has applied Reves to limit RICO liability to those instances where there is "'a nexus between the [defendant] and the conduct in the affairs of an enterprise,'" Parise, 159 F.3d at 796 (quoting Peat, Marwick, 996 F.2d at 1539),  and plaintiffs' allegation would be deemed insufficient

> [i]f the plaintiffs . . . nowhere averred that [the defendant] had any part in operating or managing the affairs of [its alleged enterprise associate, but merely] ma[d]e much ado about how important and indispensable [defendant's] services were to [to this alleged enterprise, since] the same can be said of many who are connected with [the alleged enterprise but are not part of it.  Therefore it] cannot be said that, by merely performing what are generic . . . services to [the alleged enterprise, the defendant] has opened itself to liability under the federal racketeering statute.

Peat, Marwick, 996 F.2d at 1539-40.

Given the many offenses that are classified as "racketeering violations," see 18 U.S.C. § 1961, the aforesaid limitation has been rigorously enforced to prevent an explosion of RICO civil strike suits targeting business disputes in which the plaintiff simply pleads the existence of a business relationship between the alleged wrongdoer-defendant and some third party.  See Peat, Marwick, 996 F.2d at 1539 ("Simply because one provides goods or services that ultimately benefit the enterprise does not

mean that one becomes liable under RICO as a result"); <u>see also</u> <u>Brittingham v. Mobile Corp.</u>, 943

F.2d 297, 301 (3d Cir. 1991) (the enterprise "must be more than an association of individuals or

entities conducting the[ir] normal affairs"), <u>overruled on other grounds</u>, <u>Jaguar Cars</u>, 46 F.3d at 258;

<u>Howard</u>, 2005 U.S. Dist. LEXIS 17887, at *37 ("The critical distinction is whether the corporation

is conducting the distinct affairs of another corporation or some separate new enterprise, or whether

the corporation is simply using another organization to assist the corporation in its own affairs, legal

or otherwise"); <u>accord</u> <u>Bennett v. Berg</u>, 710 F.2d 1361 (8th Cir.) (defendant's participation must be

in conduct of affairs of RICO enterprise, which ordinarily will require some participation in operation

or management of enterprise itself), <u>cert. denied,</u> 464 U.S. 1008 (1983); <u>Jubelirer v. Mastercard Int'l</u>,

68 F. Supp. 2d 1049 (W.D. Wis. 1999) (merely having business relationship with and performing

services for an enterprise, including financial, accounting, and legal services, does not support RICO

liability because performance of such services is not equivalent of participation in operation and

management of enterprise, and this is true even though the service provider knows of the enterprise's

illicit nature or performs improper acts itself); <u>Fidelity Fed. Sav. & Loan Ass'n v. Felicetti</u>, 830 F.

Supp. 257 (E.D. Pa. 1993) (motion to dismiss is granted where allegedly misleading and fraudulent

real estate appraisals were provided to savings and loan association, since, even if proven, such

influence does not rise to level of participation in management or operation of enterprise required to

attach RICO liability to those merely associated with enterprise and not participating in it).

### III.   A Subsection 1962(d) Claim

Subsection 1962(d) makes it unlawful to "conspire to violate any of the provisions of subsections (a), (b) or (c)."[8]  See 18 U.S.C. § 1962(d).

The governing precedents for the purposes of this Court's Subsection 1962(d) inquiry are Salinas v. United States, 522 U.S. 52 (1997); Smith v. Berg, 247 F.3d 532 (3d Cir. 2001); and Rose v. Bartle, 871 F.2d 331 (3d Cir. 1989).  Read jointly, these cases  indicate that a particular defendant need not have violated the substantive provision in order to be liable himself or herself under the conspiracy provision, so long as:  (a) some other defendant is liable under the substantive provision, see Salinas, 522 U.S. 52; Berg, 247 F.3d 532, and (b) a plaintiff's § 1962(d) allegations against the defendant not liable under § 1962(c) are pled with sufficient specificity and particularity.  See Rose, 871 F.2d at 366 ("Only allegations of conspiracy which are particularized, such as those addressing the period of the  conspiracy, the object of the conspiracy, and *certain actions of the alleged conspirators taken to achieve that purpose*, will be deemed sufficient. . . . [A]n inference of conspiracy  from the Complaint is no substitute for the requirement that the circumstances of the conspiracy be pleaded with specificity") (quoting Kalmanovitz v. G. Heileman Brewing Co., 595 F. Supp. 1385, 1400-01 (D. Del. 1984), aff'd, 769 F.2d 152 (3d Cir. 1985), and citing Seville, 742 F.2d at 792 n.8) (original brackets omitted, emphasis supplied).

However,  in the event *all* substantive RICO claims in the action are dismissed, a plaintiff cannot bring a § 1962(d) claim based on a non-RICO claim.  See Beck v. Prupis, 529 U.S. 494, 505

---

[8]

As mentioned above, Subsection 1962(c) makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

(2000).  "[An] injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO . . . is not sufficient to give rise to a cause of action . . . for a violation of § 1962(d)." Id.  "[A] RICO conspiracy plaintiff must allege injury from an act. . . that is independently wrongful under RICO."  Id.; see also Rehkop v. Berwick Healthcare Corp., 95 F.3d 285, 290 (3d Cir. 1996).


## DISCUSSION

### I.    A Review of Plaintiffs' Contentions

Plaintiffs' factual allegations, as stated in their previous corrected consolidated amended complaints, were detailed in In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at *40-53, and could be summarized as follows:

> Plaintiffs allege that the Broker-Defendants and Insurer Defendants engaged in a combination and conspiracy to suppress and eliminate competition in the sale of insurance . . . .  Plaintiffs contend that the Defendants implemented the conspiracy through two main schemes: (1) the [K]ickback and [S]teering [S]cheme and (2) the [B]id-rigging [S]cheme. [Under the alleged] Kickback and Steering Scheme[,] . . . the Broker-Defendants have received undisclosed kickbacks from the Insurers in the form of contingent commissions . . . , and in return, have agreed to steer their clients to purchase insurance from certain "preferred" Insurers with whom the Brokers had the most profitable arrangements. . . . [Under the alleged] Bid-rigging Scheme[,] . . . the Defendants . . . deceive[d] Plaintiffs into believing that the Broker-Defendants were obtaining competitive insurance bids from the Insurers on behalf of their clients. . . . Plaintiffs claim that the bid-rigging was facilitated by the Broker-Defendants, who solicited and obtained fictitious high quotes from the Insurer Defendants to guarantee that certain ["]preferred["] insurers would win the bidding competition, and by determining the terms of the winning and losing bid. . . . Plaintiffs contend that the Insurer Defendants colluded with the Brokers in the [B]id-rigging [S]cheme because they were promised protection from competition in other bids when their business was up for renewal.  Plaintiffs also maintain that bid-rigging enables the Insurer Defendants to keep premium prices high, and allows them to recoup the cost of contingent commissions paid to the Brokers.

Id. (citations and quotation marks omitted).

In those previous corrected consolidated amended complaints, Plaintiffs initially alleged the existence of two alternative types of enterprises: a "global" enterprise and six "broker-centered" enterprises of another type.  See id. at 86-87, and n.14 (clarifying that, for the purposes of 18 U.S.C. §§ 1962(c) and (d) analysis, Plaintiffs' enterprise-related allegations in the Commercial Case were qualitatively indistinguishable from Plaintiffs' allegations made in the Employee-Benefit Case).

Following the Court's October 3, 2006 dismissal of Plaintiffs' previous corrected consolidated amended complaints and direction to "re-amend" Plaintiffs' pleadings once again by filing amended RICO Case Statements and supplemental Statements of Particularity, Plaintiffs alleged

> fourteen enterprises that could roughly be subdivided into three alternative types: (1) the enterprise consisting of the Council of Insurance Agents and Brokers (hereinafter "CIAB"), alleged by Plaintiffs in the Commercial Case only; (2) three "Strategic Partnership Enterprises," each of which [was] a "global" enterprise (one alleged in the Commercial Case and two in the Employee-Benefit Case) ; and (3) ten broker-centered enterprises (a series of seven alleged in the Commercial Case, and a series of three, qualitatively indistinguishable, alleged in the Employee-Benefit Case).

In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 25632, at *92-93.

Qualitatively, Plaintiffs' "Strategic Partnership Enterprises" alleged in Plaintiffs' amended RICO Case Statements and supplemental Statements of Particularity mimicked Plaintiffs' "global" enterprise alleged in their corrected consolidated amended complaints, and the ten "broker-centered" enterprises set forth in Plaintiffs' amended RICO Case Statements and supplemental Statements of Particularity were qualitatively indistinguishable from the "broker-centered" enterprises outlined in Plaintiffs' corrected consolidated amended complaints. Compare In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 25632, at *92-93, to In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at *40-53.  The sole substantial "re-amendment" was limited to Plaintiffs' assertion of CIAB as an enterprise.  See id.  "The total list of Defendants named by Plaintiffs as members of

all enterprises listed in Plaintiffs' amended RICO Case Statements and supplemental Statements of

Particularity was "about three dozen brokerage houses and six dozen insurance carriers, depending

on Plaintiffs' mode of reference."   In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS

25632, at *93.

Following this Court's April 5, 2007 dismissal without prejudice of Plaintiffs' corrected

consolidated amended complaints, as "re-amended" by Plaintiffs' amended RICO Case Statements

and supplemental Statements of Particularity, Plaintiffs' "re-re-amended" their pleadings one more

time and submitted their instant Complaints and new amended Case Statements, outlining the nature

of Plaintiffs' RICO claims as follows:

> Defendants . . . engaged in a series of fraudulent schemes whereby they have made
> material misrepresentations and omissions regarding: (i) the nature of the services
> provided by the Broker-Defendants and the conflicts of interest that exist between the
> Broker-Defendants and their clients; (ii) the financial relationships and agreements
> between the Broker-Defendants and . . . Insurer-Defendants that impact the basis
> upon which insurance placements and renewals are made; and (iii) the kickbacks paid
> by the Insurer Defendants to the Broker-Defendants in exchange for having business
> allocated to them . . . .   In order to prevent Plaintiffs . . . from discovering the
> foregoing . . . , Defendants took the following steps: (i) the Broker-Defendants agreed
> with . . . Insurer Defendants that . . . their Contingent Commission agreements would
> be kept confidential and . . . kept [this] secret from their clients; (ii) the Insurer
> Defendants built the cost of the kickbacks they paid to the Broker-Defendants into the
> premiums they charged their clients . . . ; (iii) the Insurer Defendants falsely . . .
> reported . . . the amount of commissions and fees received; and (iv) the Broker-
> Defendants issued . . . misleading statements regarding the compensation they
> received from the Insurer Defendants . . . concealing . . . the amounts they were . . .
> paid by them.

Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 373-74; Civil Action No. 05-1079, Docket

Entry No. 675, ¶¶ 339-40.

Following this Court's According to Plaintiffs,

> Each Broker-Defendant significantly consolidated the number of carriers to which it
> would market its clients' business.  Each Broker-Defendant then entered into [de facto

agreements]  with a limited number of Insurer Defendants to which the Broker-Defendant agreed to steer the bulk of its business. Insurer Defendants would be given access to a guaranteed flow of premium volume from the Broker-Defendants . . . for renewal of each of the insurer's own business. . . . Defendants engaged in . . . practices . . . including "book rolls," agreements not to bid renewals competitively, limiting the marketing of renewals, disclosing other carriers' bids, [etc.].

Civil Action No. 04-5184, Docket Entry No. 1240, ¶ 396.[9]

Plaintiffs now allege the existence of two alternative types of enterprises: (1) a "global" enterprise centered around CIAB (in the Commercial Case), and (2) the total of eleven "broker-centered" enterprises, six of which are alleged in the Commercial Case and five in the Employee-Benefit Case.  See Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 502-31; Civil Action No. 05-1079, Docket Entry No. 675, ¶¶ 523-33.   Each of Plaintiffs' eleven alleged "broker-centered" enterprises includes, respectively, the following members ("Members Lists"):

---

[9]

Plaintiffs' allegations in the Employee-Benefit Case do not contain corresponding allegations. See generally, Civil Action No. 05-51079, Docket Entry No. 675.  However, Plaintiffs' allegations in both the Commercial and Employee-Benefit Cases contain the following supplemental allegations, largely reiterating the fact that, on some occasions, Plaintiffs were not availed to competitive bids by the information provided by the Broker-Defendants:

Defendant . . . concealed [(a)] that Broker-Defendants . . . were . . . acting on behalf of the Insurer Defendants and in furtherance of [Broker-Defendants'] own financial interests; [(b)] agreements between the Broker-Defendants and the Insurer Defendants; [(c)] the conflict of interest inherent in the agreements between the Broker-Defendants and Insurer Defendants; . . . [(d))] the Broker-Defendants' steering of insurance placements [and renewals] to the Insurer Defendants [hence, protecting the Insurer Defendants from potential competition in exchange for] kick back[s] . . . paid to the Broker-Defendants . . . .

Civil Action No. 04-5184, Docket Entry No. 1240, ¶ 399; Civil Action No. 05-51079, Docket Entry No. 675, ¶ 376.

a.   Broker-Defendant Marsh and thirteen Commercial Insurer Defendants, namely, ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, Munich, Travelers, XL, and Zurich (collectively "Marsh Commercial Enterprise");

b.   Broker-Defendant Marsh and six Employee-Benefit Insurer Defendants, namely, AIG, CIGNA, Hartford, MetLife, Prudential and Unum (collectively "Marsh EB Enterprise");

c.   Broker-Defendant Aon and twelve Commercial Insurer Defendants, namely, ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, Travelers, XL (collectively "Aon Commercial Enterprise");

d.   Broker-Defendant Aon and five Employee-Benefit Insurer Defendants, namely, CIGNA, Hartford, MetLife, Prudential and Unum (collectively "Aon EB Enterprise");

e.   Broker-Defendant Willis and eleven Commercial Insurer Defendants, namely, ACE, AIG, Axis, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, Liberty Mutual, Travelers, and Zurich (collectively "Willis Commercial Enterprise");

f.   Broker-Defendant Willis and five Employee-Benefit Insurer Defendants, namely, CIGNA, Hartford, MetLife, Prudential and Unum (collectively "Willis EB Enterprise");

g.   Broker-Defendant Gallagher and seven Commercial Insurer Defendants, namely, AIG, Chubb, CNA, Crum & Forster, Fireman's Fund, Hartford, and Travelers (collectively "Gallagher Commercial Enterprise");

h.   Broker-Defendant Gallagher and six Employee-Benefit Insurer Defendants, namely, AIG, CIGNA, Hartford, MetLife, Prudential and Unum (collectively "Gallagher EB Enterprise");

i.   Broker-Defendant Wells Fargo/Acordia and five Commercial Insurer Defendants, namely, Chubb, CNA, Fireman's Fund, Hartford, and Travelers (collectively "Wells Fargo Commercial

Enterprise");

j.     Broker-Defendant HRH and three Commercial Insurer Defendants, namely, CNA, Hartford, and Travelers (collectively "HRH Commercial Enterprise");

k.     Broker-Defendant ULR and five Employee-Benefit Insurer Defendants, namely, CIGNA, Hartford, MetLife, Prudential and Unum (collectively "ULR EB Enterprise").

Civil Action No. 04-5184, Docket Entry No. 1240, ¶ 502; Civil Action No. 05-1079, Docket Entry No. 675, ¶ 523.

The Members List allows, inter alia, for the following four statistical observations:

(1)    Defendant-Broker Marsh conducted the affairs of the two largest alleged enterprises, jointly involving the total of seventeen Defendants-Insurers, while Defendant-Broker Gallagher directed the affairs of the two smallest alleged enterprises involving, nonetheless, the total of twelve Defendants-Insurers, all of which were also part to Marsh's two Enterprises.

(2)    Defendant-Insurer Hartford was simultaneously operating all eleven alleged enterprises;

(3)    Defendants-Insurers Travelers and CNA simultaneously operated the affairs of all six alleged Commercial Enterprises, while Defendants-Insurers CIGNA, MetLife, Prudential and Unum participated simultaneously in operations of all five alleged EB Enterprises. Defendant-Insurer Munich was the sole insurer operating only one alleged Commercial Enterprise.  Not a single insurer operating an alleged EB Enterprise limited itself to only one such Enterprise.

(4)    Defendant-Insurer AIG was made part of six alleged Enterprises.  Although being included in both Marsh Commercial and Marsh EB Enterprises, as well as in Gallagher Commercial and Gallagher EB Enterprises, AIG was, somehow, included by Aon and Willis only in their Commercial Enterprises but excluded by Aon and Willis from their EB Enterprises.

## II.    "Broker-Centered" Enterprises

### A.    The Court's Previous Ruling

This Court's previous opinion addressed Plaintiffs' allegations that

> each Broker-centered Enterprise ha[d] a largely hierarchical structure for decision
> making with the Broker-Defendant directing and coordinating the affairs of the
> Enterprise[;] that each Broker-centered Enterprise [was] oversee[ing], coordinat[ing]
> and facilitat[ing] the commission of numerous predicate offenses.

In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 25632, at *104 (quoting Civil Action

No. 04-5184, Docket Entry No. 850, at 22-23).

> Upon assessing such assertions, the Court concluded that, while

> Plaintiffs' reference to a "largely hierarchical" structure provide[d] . . . nothing but a
> repeat of a factless generalized term used by the Court of Appeals in Riccobene, 709
> F.2d at 222-23, . . . , Plaintiffs' allegations contain[ed] *some* facts about the enterprise
> structure since they might be interpreted as setting forth seminal "hub-and-spokes"
> relationships [in view of the fact that]

>> Plaintiffs claim that the [B]id-rigging [Scheme] was facilitated by . . . Broker-
>> Defendants[] who solicited and obtained fictitious ["A" or "B"] quotes from
>> . . . Insurer Defendants to guarantee that . . . ["]preferred["] insurers would
>> win the bidding competition . . . by determining the terms of the winning and
>> losing bid. . . . "A quotes" refers to the quotes solicited by a broker when the
>> broker had an incumbent carrier for one of its clients whose insurance policy
>> was up for renewal; if the insurer agreed to make a quote at the targeted
>> premium and policy terms demanded by the broker, the insurer was
>> guaranteed the policy renewal.   "B quotes". . . refers to "phony" quotes
>> solicited from non-incumbent insurers with the understanding that these
>> insurers would not submit a competitive bid; "B quotes" were used to ensure
>> that the incumbent carrier would get its policy renewed, and the "B quote"
>> insurers allegedly knew that "their turn would come later."[10]

Id. at *105-07 (quoting  In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at *

---

[10]

In addition, Plaintiffs appear to allege that Broker-Defendants also solicited and obtained from
insurers, and submitted to clients bona fide quotes "when there was no incumbent insurance carrier
'to protect.'"  In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at *50-51.

50).    The hub-and-spokes enterprise structure suggested by Plaintiffs required, at the very least,

three types of participants, namely, a broker operating as a "hub," at least one incumbent insurer

providing "A quotes" (hereinafter "Incumbent Insurer"), plus at least one insurance carrier submitting

a "B quotes" that are less attractive than "A quotes" (hereinafter "Accommodating Insurer"), jointly

operating as two spokes.   See id. at *107-08.  However, Plaintiffs' allegations did not include any

facts suggesting such interaction and drew merely a swarm of "dotted" lines sporadically conjecturing

interrelations amongst Defendants.  See id.  Therefore, the Court dismissed Plaintiffs' previous round

of pleadings and invited Plaintiffs to "re-amend" Plaintiffs allegations one more time by stating *facts*

that might fill the holes in Plaintiffs' "dotted" lines and transform these speculative allegations into

fact-based "solid" links specifically interrelating Defendants within each alleged Broker-centered

Enterprise.   The Court explained to Plaintiffs that,

> [w]ithout any factual substantiation linking each Broker-Defendant to [every Insurer-Defendant in the alleged Enterprise and interlinking these Insurer-Defendants], Plaintiffs' . . . conclusions [if embraced by this Court, would automatically] transform RICO into a legal monster the drafters never envisioned.   If allegations about connections between "A," "B" and "C" can be allowed to stretch so as to encompass the entire alphabet on the grounds that all entries from "D" to "Z" are also English letters, such allegations would: (1) allow an anomalous scenario under which a handful of industry members accused of wrongdoing and connected amongst themselves by traceable [business] interactions could transfer an entire industry into a RICO enterprise . . . effectively eliminat[ing] the pleading requirement for all practical purposes of Rule 8(a).

Id.  at 110-11.


### B.    Summary of Plaintiffs' Instant Pleadings

Setting forth their instant allegations as to the existence of eleven Broker-centered

Enterprises, Plaintiffs begin by providing the Members Lists of seven Defendants-Brokers and

nineteen Defendant-Insurers comprising the alleged hub-and-spoke Broker-Centered Enterprises.[11]

See Civil Action No. 04-5184, Docket Entry No. 1240, ¶ 502; Civil Action No. 05-1079, Docket

Entry No. 675, ¶ 523.

1.    INSTANT ALLEGATIONS AS TO THE "CONDUCT/PARTICIPATE" ELEMENT

With respect to the "conduct/participate" element, Plaintiffs allege that

[Each of the] Broker-Defendants . . . participated in the operation or management of
[its respective] Enterprise [by]: consolidati[ng its] markets; reaching agreement[s]
with [each of] the Insurer Defendants [within the alleged Enterprise]  regarding
amount of contingent commissions to be paid to the Broker and the level of business
to be steered to each Insurer Defendant; . . . monitoring of current and new business;
. . . determining [which Insurer Defendant would] retain current business and [which
Insurer Defendant would have] new business . . . steered [to]; [executing such]
steering of business . . . ; collecti[ng] inflated premiums; and coordinating
concealment of the scheme. [Each of the] Insurer Defendants . . . participated in the
operation or management of [its respective] Enterprise [by]: reaching agreement with
the Broker-Defendants . . . regarding amount of contingent commissions to be paid
to the Broker and the level of business to be steered to each Insurer Defendant;

––––––––––––––––––––
11

The actual number of business *entities* comprising these seven Defendants-Brokers and
nineteen Defendant-Insurers is not an arithmetical sum of 7 and 19, but rather an unknown figure
running, apparently, well into hundreds.  To give an example, Defendant-Insurer AIG consists of 15
different business entities (some of which are listed by Plaintiffs as separate Defendant-Insurers, while
others, for the reasons unclear to this Court, are fused with AIG); Defendant-Broker Marsh is
comprised of eight different business entities; Defendant-Broker Willis is comprised of five entities;
and 102 different business entities comprise those "sixteen" Defendants-Insurers that were, allegedly,
members of Willis' two Enterprises, one Commercial and one employee-benefit.  See Civil Action No.
4-5184, Docket Entry No. 1240 ¶¶ 24-63; accord Civil Action No. 5-1079, Docket Entry No. 661
at 6, nn. 5-7.  In view of this very substantial discrepancy, Defendants note their confusion as to the
number of hub-and-spoke enterprises actually alleged by Plaintiffs.  See Civil Action No. 5-1079,
Docket Entry No. 661 at 6, n. 7 ("[T]here could be one Marsh "hub" consisting of all 8 Marsh
[business] entities in [both the Commercial, as well as in the Employee-Benefit Cases,] or two "hubs"
(one [in each Case]), or 8 "hubs" (one for each Marsh [business] entity [compiled by Plaintiffs into
what Plaintiffs' designated as Defendant-Broker Marsh), or 13 Marsh "hubs" (two for each of the 5
Marsh [business] entities named in both [Commercial and Employee-Benefit] Cases and one for the
3 [Marsh business entities] named only in the [Employee-Benefit] Case").

> monitoring and reporting of business levels; computati[ng] . . . premium levels to encompass contingent commissions; pay[ing] . . . kickbacks; and coordinating concealment of the scheme.

Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 506-07;  accord Civil Action No. 05-1079, Docket Entry No. 675, ¶¶ 528-29.

Plaintiffs' supplement that pleading by stating, without any factual elaboration, that each Defendant named as a member of a certain Broker-centered Enterprise conducted--or participated in--the affairs of that Enterprise simply because Plaintiffs assert that such Defendant was "associated with, participated in and controlled the affairs of" that Enterprise.  Civil Action No. 04-5184, Docket Entry No. 1239, ¶ 6(d); Civil Action No. 05-1079, Docket Entry No. 676, ¶ 6(d).

2.   INSTANT ALLEGATIONS AS TO THE "ENTERPRISE" ELEMENT

Detailing the "structure" of their eleven Broker-centered Enterprises, Plaintiffs allege that

> [t]he structure for decision-making within each enterprise includes . . . : (a) [unspecified] broker executives who . . . interfac[e] with the insurers to determine compensation [and] plan[,] . . . monitor and direct that business be retained or steered to [certain] insurer[s]; (b) [unspecified] broker account executives who implement direction [of these executives]; (c) [unspecified] executives at each [unspecified] insurer who . . . plan with the broker, . . . monitor the placement of business and . . . . determine compensation for the steering or retention of business; (d) [unspecified] employees of the insurer who [provide data] to [unspecified] insurer executives as well as the broker; (e) [unspecified] employees of the broker who keep[] track of [such data]; (f) [unspecified] employees who implement decisions regarding the placement of business; and (g) [unspecified] employees who factor[] the cost of the kickbacks into the insurance premiums paid by [insurance purchasers]. In addition, the ["]broker["] entity assumes primary responsibility for concealment of the scheme with support and assistance from the [unspecified] insurer . . . .

Civil Action No. 04-5184, Docket Entry No. 1239, ¶ 6(b); Civil Action No. 04-5184, Docket Entry No. 1240, ¶ 504; Civil Action No. 05-1079, Docket Entry No. 675, ¶ 525; Civil Action No. 05-1079, Docket Entry No. 676, ¶ 6(d).

As to the "distinctiveness" and "continuity/unity" factors of the "enterprise" element, Plaintiffs maintain that "[t]he Enterprises are separate and distinct from the pattern of racketeering activity. The members of each Enterprise share a common purpose and each Enterprise is [a] continuing [unit]." Civil Action No. 04-5184, Docket Entry No. 1240, ¶ 510; Civil Action No. 05-1079, Docket Entry No. 675, ¶ 532. In support of their allegations that the alleged Broker-centered Enterprises existed as systemic continuous units, Plaintiffs assert that: (1) each Broker-Defendant entered into a certain agreement with each Insurer-Defendant within its respective alleged Enterprise; (2) each of these agreements implied that the agreement would be kept secret; and (3) every member of the alleged Enterprise took certain measures to maintain the secrecy of the agreement, including, on certain occasions, such acts as (a) affixation of confidentiality clauses on contingent commission agreements between each Broker-Defendant and each Insurer-Defendant within that Broker's alleged Enterprise, (b) Insurer-Defendants' institution of policies preventing insurance purchasers from being informed about the contingent commission agreements, and (c) filing official reports misrepresenting contingent commissions actually paid. See Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 404-97; Civil Action No. 05-1079, Docket Entry No. 675, ¶¶ 366-518. Plaintiffs elaborate on the aforesaid allegations by stating that the alleged Broker-centered Enterprises are distinct from the alleged racketeering activity since "[t]he racketeering activity and the enterprise are separate. . . . The daily activities of the enterprise include some legitimate activities relating to the distribution of insurance on a competitive basis. The racketeering activity is comprised of a fraudulent scheme to allocate business on a noncompetitive basis resulting in additional profits for all Defendants as well as concealment of the scheme." Civil Action No. 04-5184, Docket Entry No. 1239, ¶¶ 7-8; Civil Action No. 05-1079, Docket Entry No. 676, ¶¶ 7-8.

C.   **Plaintiffs' Pleadings Fail to State Allegations Cognizable as a RICO Claim**

1.   PLAINTIFFS' FACTUAL ASSERTIONS AND DEDUCTIONS ARE FLAWED

a.   *Plaintiffs' Conceptual Deductions Are Not Supported by Facts*

Plaintiffs make the following seven conceptual deductions ("Deduction One," et seq.) while

maintaining that their allegations as to the existence of a RICO enterprise are

> sufficiently pled. [Plaintiffs contend that their pleadings meet Rule 8 requirement]
> because [they pled (1)] independent fraudulent schemes between [each] Broker and
> each Insurer [within each respective Enterprise, thus, defining] an ongoing
> organization [encompassing all Insurer-Defendants and Broker-Defendant within such
> alleged Enterprise. Plaintiffs believe that such pleadings indicate that each Enterprise
> has its own] common purpose [and each] operates as a continuing unit. [Plaintiffs also
> maintain that they sufficiently defined the "rim" of each such Enterprise inter-
> connecting all] Insurer-[Defendants within it because] Plaintiffs [pled that] each Insurer
> within [each] Broker-centered [E]nterprise [was (2)] aware that [the Insurer-
> Defendant was] a part of a larger structure, [(3)] kn[ew] the identity of the other
> members of the structure and [(4) knew] that it [would] benefit as a member[] in the
> structure.

Civil Action No. 04-5184, Docket Entry No. 1264; Civil Action No. 05-1079, Docket Entry No. 687

("Plfs.' Opp.") at 11.

> In addition, Plaintiffs maintain that

> [all] Insurer[-]Defendants and the Broker[-]Defendant [within each Enterprise]
> operate as a coherent unit [because they (5) are] bound together by common purposes
> that [could] only be realized through the combined and coordinated efforts of the
> Defendants. [(6) Each Insurer-Defendant is] a necessary component in achieving the
> [E]nterprise's goal . . . and [(7) each Insurer-Defendant] function[s] symbiotically with
> the other [Insurer-Defendants within the Enterprise because it] act[s] in the interest
> of the whole [by] protecting [all other Insurer-Defendants within the Enterprise] from
> competition . . . as well as protecting the scheme from discovery. [Therefore, the
> Court should conclude that] Plaintiffs have sufficiently alleged that the members of
> [each] Enterprise share[d] a common purpose, work[ed] together to achieve the goals
> and [sought] to benefit the Enterprise rather than simply themselves.

Id.  at 12.

The Court agrees that, at least with respect to certain Defendants, Plaintiffs pled facts supporting Plaintiffs' "Deduction One," namely, the presence of *independent* transactions involving a Broker-Defendant "X" and Insurer-Defendants "Y" and "Z" in a fashion loosely resembling Plaintiffs' originally alleged scheme based on bid-rotation.[12]   See Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 120-28 (Plfs.' Commercial Compl., "Antitrust Claims," stating facts indicating that "B" quotes of certain Insurer-Defendants acting as Accommodating Insurers were used, on certain occasions, by certain Broker-Defendants to secure winning bids based on "A" quotes submitted by other Insurer-Defendants who were, for the purposes of those transactions, acting as Incumbent Insurers).  However, these factual allegations provide no support to the remaining Deductions Two to Seven, since the picture drawn by Plaintiffs fails to depict eleven hub-and-spokes enterprises, each locked within its respective "rim."   Rather, Plaintiffs describe a bouquet of rimless pinwheel-like contraptions created out of multiple triangulated transactions joined in their respective apexes.  See id.  While each apex, representing, apparently, a Broker-Defendant, could be seen as the fulcrum of either a "hub-and-spoke" rimmed "wheel-like" enterprise *or* a rimless "pinwheel" not cognizable as a RICO enterprise, Plaintiffs' definitions of the links between Insure-Defendants as individualized transactions eliminates the unifying "rim" over the structure and transforms each transaction into a

---

[12]

The Court notes that Plaintiffs' extensive substitution of Plaintiffs' original bid-rotation allegations (which set forth a conceptually fathomable scheme, pursuant to which an Accommodating Insurer provided a "B" quote to allow an Incumbent Insurer's "A" quote appear the most advantageous to an insurance purchaser) by Plaintiffs' instant vague allegations as to Defendants' "steering" of business activities (which allow for Broker-Defendants' unilateral actions and, hence, state no enterprise allegations at all or--in a hypothetical most favorable to Plaintiffs-- might be read as an indication of a bilateral transaction between a certain Broker-Defendant and a certain Insurer-Defendant) largely eliminated even the theoretical possibility of a "hub-and-spokes" enterprise structure upon which Plaintiffs, nonetheless, keep insisting.

Page 37 of 73

triangulated "blade" of a "pinwheel," hence preventing an inference of a "hub-and-spokes" enterprise.[13]  See id.

Specifically, there are no factual allegations supporting Plaintiffs' "Deduction Two" and "Deduction Three," i.e., that each Insurer-Defendant within the Broker-centered Enterprise was aware that it was a party to a certain "enterprise," and that this "enterprise" was a "larger structure." Plaintiffs' pleadings merely suggest that an Insurer-Defendant "X" could *speculate* about the presence of a certain "agreement" between a Broker-Defendant and an Insurer-Defendant "Y" in the event Insurer-Defendant "X" was requested by the Broker-Defendant to provide a "B" quote to secure a win by Insurer-Defendant "Y" with respect to a particular transaction.  See generally, Civil Action No. 04-5184, Docket Entries Nos. 1239-40; Civil Action No. 05-1079, Docket Entries Nos. 675-76. However, Insurer-Defendant "X's" speculation as to the "agreement" between the Broker-Defendant and Insurer-Defendant "Y" neither verifies the existence of such agreement, nor makes "X" a party to that agreement, nor creates a structured enterprise out of these three players.     See id.

Plaintiffs, nonetheless, insist that the alleged Broker-Centered Enterprises should be deemed structured because each Defendant knew the identities of other Defendants.  See id.  The Court sees no merit to this argument.  It would be indeed anomalous if Defendants did not know each other's

---

[13]

Moreover, while the total number of such pinwheel-like rimless contraptions should be, theoretically, eleven (to correspond to each alleged Broker-centered Enterprise), the actual number of these "pinwheels" is unclear since, according to Plaintiffs, only Broker-Defendant Marsh had a "Global Broking Division," that is, a body (a) designated to perform what appears to be an oversight of many entities designated by Plaintiffs under the collective term "Broker-Defendant Marsh" and, thus (b) potentially operating as the fulcrum of "Marsh Commercial pinwheel" and "Marsh Employee-benefit pinwheel."  See Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 98-103.  All other Broker-Defendants, each consisting of multiple business entities, see id.  ¶¶ 27-35, had no such "Global Broking" and, therefore, the total amount of "pinwheels" is not amenable to counting.

identity, granted the fact that Defendants were the largest insurance carriers and brokers in the nation and had to deal--or compete--with each other on a regular basis.  For instance, (1) the fact that Insurer-Defendant Hartford knew the identities of Insurer-Defendants Travelers, CNA, CIGNA, MetLife, Prudential and Unum cannot, per se, signify that Hartford knew it was involved in six alleged Enterprises with Travelers and CNA, plus in five other Enterprises with CIGNA, MetLife, Prudential and Unum, and (2) Plaintiffs fail to state any other reason for Hartford's knowledge as to the enterprises it was allegedly operating.[14]  See generally, Civil Action No. 04-5184, Docket Entries Nos. 1239-40; Civil Action No. 05-1079, Docket Entries Nos. 675-76.     In sum, the fact that Defendants knew each other's identity signifies nothing more than Defendants' knowledge that they were part of the insurance industry as a whole.[15]

Similarly, Plaintiffs' "Deduction Four," i.e., that each Defendant-Insurer knew it would benefit as a member in the structure, appears to be contrary to the gist of Plaintiffs' factual allegations suggesting that the business culture within the insurance industry has been such that *any* Insurer-Defendant was effectively willing to "accommodate," on occasion, *any* Broker-Defendant (by providing that Broker-Defendant with the Insurer-Defendant's letterhead carrying any "B" quote that

---

[14]

Moreover, it is unclear how Hartford was even able to distinguish between the Enterprises involving both Hartford and an identical set of other Insurer-Defendants but differing in the Broker-Defendants that were the alleged "hubs" in these Enterprises. See generally, Civil Action No. 04-5184, Docket Entries Nos. 1239-40; Civil Action No. 05-1079, Docket Entries Nos. 675-76.   Taken to their logical conclusion, Plaintiffs' allegations suggest that Hartford (as with other Insurer-Defendants) participated in the operation and management of a series of "enterprises," the existence of which, the number of which--and which lists of members--Hartford could not have known of with any degree of certainty until Plaintiffs filed their Complaints and, hence, enlightened Hartford.

[15]

Consequently, Plaintiffs' "Deduction Two" employing the term "larger structure" appears to refer to the entire industry.  However, such "larger structure" does not qualify as a cognizable RICO enterprise.  See In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 25632, at *109.

the Broker-Defendant requested), so long as the Insurer-Defendant generating such "B" quotes gets its occasional "piece of pie."  See e.g., Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 105-352.  In other words, Plaintiffs' pleadings suggest that each Insurer-Defendant knew that it would benefit from adopting an ethically questionable and potentially illegal business practice, rather than from being a member of a particular "enterprise."  Hundreds of pages of Plaintiffs' pleadings depict this "I'll wash your back if you wash mine" practice manifested in transactions involving every possible combination of Defendants but lacking any discernable system as to how these combinations were generated.  See id.  Moreover, the Complaints unambiguously indicate that an Insurer-Defendant "X" cared little which other Insurer-Defendant would be "accommodated" by its "B" quotes and whether these "B" quotes would actually be used at all by the requesting Broker-Defendant; the sole point of "X's" interest was to ensure that "X" would be rewarded for "W's" willingness to generate "B" quotes by its share of business advantages from the Broker-Defendant achieved by the latter through "whatever" means, be they fair business practices, or "steering," or "bid-rigging" with assistance of any other insurance carrier, etc. See, e.g., Civil Action No. 04-5184, Docket Entry No. 1239, ¶ 109 (quoting an email from Insurer-Defendant Zurich to Broker-Defendant Marsh, which indicated that Insurer-Defendant Zurich (a) was seeking the same business advantages that Broker-Defendant Marsh was providing to certain other Insurer-Defendants in exchange for Zurich's willingness to generate "B" quotes upon Marsh's request, and (b) neither specified--nor even indicated any interest in--how Marsh should go about arranging for Zurich's advantages while simultaneously catering to competing interests of other Insurer-Defendants that, apparently, were seeking same advantages).

Likewise, Plaintiffs' "Deduction Five" and "Deduction Six," namely, that each Insurer-

Defendant was a necessary component in achieving the "common goals" of its respective Enterprise's and "functioned symbiotically" with all other Insurer-Defendants within its respective Enterprise, are analogously contradicted by Plaintiffs' own factual contentions.  Plaintiffs' facts make it apparent that each Insurer-Defendant was an ad hoc participant in each particular "triangulated" transaction, since-- in the picture painted by Plaintiffs--a refusal by Insurer-Defendant "X" to provide "B" quotes to the requesting Broker-Defendant was of little substantive consequence to consummation of such transaction because alternative "B" quotes were readily available to the Broker-Defendant from a range of other Insurer-Defendants seeking to assure that they would, at some point, get their "piece of pie."  See e.g., Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 105-352.  Therefore, each Insurer-Defendant could not have been a "necessary" component in its respective Enterprise nor did that Insurer-Defendant function symbiotically with its alleged Enterprise.  Rather, it appears that Insurer-Defendants (recognizing that they were fungible to Broker-Defendants) were seeking to benefit themselves only and neither intended nor created any interdependencies amongst themselves.

Consequently, while Plaintiffs' "Deduction Seven" is that all Defendant-Insurers in each alleged Enterprise had the goal, which could only be realized through the combined and coordinated efforts of all Defendants involved in the Enterprise, the facts asserted by Plaintiffs suggest no "common goals" but rather a panoply of non-systemic "triangulated" transactions conceived and executed on an ad hoc basis and having their own goals, individualized to every transaction.  The "commonality" aspect is limited to (a) the goal of increasing one's profit common to the entire business universe rather than to a particular RICO enterprise, and (b) the mere observation that all transactions followed, more or less, the same conceptual format.   See id.  However, execution of similarly-fashioned transactions by various groups of entities neither lumps all these entities into one

enterprise nor creates an interdependency or common goal between the members of these groups; it merely indicates an industry practice.

      b.    *Other Incongruities and Logical Flaws in Plaintiffs' Allegations*

In addition to the shortcomings in Plaintiffs' conceptual deductions discussed <u>supra</u>, the facts alleged by Plaintiffs depict a picture logically incongruent with Plaintiffs' interpretations and even lending support to the conclusion that the alleged Broker-centered Enterprises could not exist at all. For instance, Defendants properly note that Plaintiffs unduly populate their alleged Broker-centered Enterprises with Insurer-Defendants operating in entirely different lines of insurance, or even Broker-Defendants and Insurer-Defendants handling entirely different lines of business, <u>i.e.</u>, business entities having no possible business use of each other.[16] <u>See</u> Civil Action No. 04-5184, Docket Entry No. 1264; Civil Action No. 05-1079, Docket Entry 661 ("Defs.' Mot."), at 16 and n. 13 (citing Civil

---

[16]

      It might be hypothesized that Plaintiffs' rationale is based on the "enterprise as a 'one-stop-shop'" concept. However, such reasoning could only explain why each *Broker-Defendant*--rather than an "enterprise"--might want to operate or develop into such "one-stop-shop" (since Broker-Defendants might wish to branch out in every line of business and have simultaneous relationships with at least two Insurer-Defendants per every type of insurance in order to have readily available "B" quotes for every type of insurance policy requested by the purchaser). The "one-stop-shop" hypothesis fails to supply any business incentive for the Insurer-Defendants operating in different lines of business to join the *same* RICO enterprise (since these Insurer-Defendants cannot possibly obtain a useful "B" quote from each other). The same logical incongruence applies to Broker-Defendants that did not wish to branch out into all areas of insurance and elected to concentrate on a few lines of services: such Broker-Defendants could not possibly use any "B" quotes from--or "steer" any business to--Insurer-Defendants operating in other lines of insurance. Needless to say, Defendants are entirely correct observing that there could be no logical connection between a Broker-Defendant operating in one line of insurance and a *consulting firm* offering its services with respect to the matters involving a *totally different* line of insurance. <u>See</u> Defs.' Reply, at 5, n. 6 (citing Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 4-5; Civil Action No. 05-1079, Docket Entry No. 675, ¶¶ 15, 17). Plaintiffs' insistence on lumping incompatible businesses into an enterprise of "symbiotic" interrelationships lacks any merit.

Action No. 04-5184, Docket Entry No. 1240, ¶ 38); Civil Action No. 04-5184, Docket Entry No.

1283; Civil Action No. 05-1079, Docket Entry 693 ("Defs.' Reply"), at 5, n. 6).

> Defendants observe that
>
> > the terms of the [alleged] contingent commission agreements which lie at the heart of Plaintiffs' "steering" allegations [are based on] different compensation triggers and thresholds (such as volume, growth [and] renewals). [Plaintiffs allege that a Broker-Defendant operated its Enterprise while being guided by these three different and often conflicting triggering considerations, but Plaintiffs' allegations do not explain how the Broker-Defendant could] "steer" the business to meet one insurer's premium threshold for paying a contingent commission [and yet simultaneously "steer" the same business] to another insurer whose threshold has just been met [and] who [was offering the Broker-Defendant to] pay a better overall contingent commission rate[.] Similarly, [Plaintiffs' facts do not explain how that Broker-Defendant could] seek to renew a client's policy with the incumbent [Insurer-Defendant who was] hoping to achieve some renewal rate trigger [and yet, simultaneously, steer the same business] to a non-incumbent who [was offering to pay] a high rate on gross volume, or a bonus for new business[.]

Defs.' Reply. at 6 (citing Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 78, 79, 87; Civil

Action No. 05-1079, Docket Entry No. 675, ¶¶ 5, 81, 83, 99).   The Court agrees with this

observation.  Plaintiffs' pleadings are silent as to any clear explanation why, on some occasions,

certain Insurer-Defendants were allowed to retain their pieces of business while, on other occasions,

Broker-Defendants elected to transfer qualitatively identical pieces of business from the same Insurer-

Defendants to other Insurer-Defendants.  See e.g., Civil Action No. 04-5184, Docket Entry No.

1239, at 67-68; Civil Action No. 05-1079, Docket Entry No. 676, at 57-68 (defining non-systemic

unilateral decisions by Broker-Defendants).  Rather, Plaintiffs' extensive discussion of the alleged

"steering" practices, plus Plaintiffs' examples of "bid-rigging" transactions, appear to depict a panoply

of Broker-Defendants' unilateral ad hoc decisions based, effectively, on each Broker-Defendant's

conclusions as to which particular "trigger" among the many offered by Insurer-Defendants would

be preferable to the Broker-Defendant in each particular situation.  See generally, Civil Action No.

04-5184, Docket Entry No. 1240; Civil Action No. 05-1079, Docket Entry No. 675    .  The sole "linkage" between Insurer-Defendants mentioned by Plaintiffs is limited to the fact that, occasionally, the "triggering" competition among Insurer-Defendants resembled the bidding process at an open auction.  See id.  However, habitual attendances of--and bidding at--open auctions by various members of the general public does not transform the general public into enterprise "spokes" or the auctioneer into a "hub."

In addition to the foregoing, Plaintiffs' allegations contain other logical flaws.  For instance, it appears inexplicable that Insurer-Defendant AIG was included by Broker-Defendants Marsh and Gallagher in their Commercial Enterprises, as well as Employee-Benefit Enterprises yet, somehow, was permitted by Broker-Defendants Aon and Willis to partake only in their Commercial Enterprises but not their Employee-Benefit Enterprises.  See Civil Action No. 04-5184, Docket Entry No. 1240, ¶ 502; Civil Action No. 05-1079, Docket Entry No. 675, ¶ 523.  Since (a) AIG's alleged participation in Marsh and Gallagher's Employee-benefit Enterprises suggests that AIG was suitable for participation in an employee-benefit scheme, and (b) Aon and Willis' alleged inclusion of AIG in their Commercial Enterprises suggests that Aon and Willis deemed AIG suitable to participate in "an" enterprise; Aon and Willis' alleged  exclusion of AIG from their respective Employee-Benefit Enterprises lacks rational explanation.

Similarly, Plaintiffs' allegations that Broker-Defendants kept reaching bilateral agreements with each Insurer-Defendant with respect to each particular transaction (instead of attempting multi-lateral agreements with all Insurer-Defendants systemizing who acts as an Accommodating Insurer

to whom) suggests against inference of any "enterprises."[17]  See generally, Civil Action No. 04-5184, Docket Entry No. 1240; Civil Action No. 05-1079, Docket Entry No. 675.    In sum, the picture painted by Plaintiffs' factual allegations depicts a kaleidoscope of entities out of which Plaintiffs carve, wholly artificially, groups which Plaintiffs term as "Broker-centered Enterprises."  The picture is equally amenable to any other mode of "carving."  For instance, it could be conceptualized that Insurer-Defendant Hartford operated an "Insurer-centered Enterprise" which included all Broker-Defendants (and, through them, all other Insurer-Defendants).  Analogously, the same "Insurer-centered Enterprises" could be drawn around Insurer-Defendants Travelers, CNA, CIGNA, MetLife, Prudential, Unum and so on (and then enlarged to include all other Broker-Defendants and, in turn, all other Insurer-Defendants, so to cover the entire industry).

In other words, Plaintiffs' rationale is such that any Defendant could be running a RICO enterprise, and such "enterprise" could include any number of entities, ranging from two businesses to the entire industry.  Since the "links" selected by Plaintiffs to connect the entities within their respective alleged Enterprises are merely business-contact or business-acquaintance types of links typical to any industry, all entities could be re-shuffled at will into an infinite combination of speculative "enterprises."  However, such exercises in creative re-shuffling cannot substitute for the lack of actual interrelationships between the cards in the deck.

---

[17]

The Court also notes logic in Defendants' observation that Plaintiffs' pleading of Broker-Defendants' utilization of such devices as "first look" and "last look" "actually *promotes* competition between [Insurer-Defendants, and thus, is] inconsistent with" Plaintiffs' argument that Insurer-Defendants within each alleged Enterprise worked toward achieving a "common goal."  Defs.' Reply at 7, n.  9 (emphasis in original).

**Page 45 of  73**

"As drafted, Plaintiffs' pleading[s] . . . depict [nothing more than] a pernicious industry practice."  In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 25632, at 141.  While there is no doubt in this Court's mind that some of the specific acts alleged by Plaintiffs signify, if true, a pernicious industry practice, the mandate of 18 U.S.C. § 1961, et seq., and the interpreting precedents do not define the practitioners of a pernicious industry practice as a RICO enterprise.  Had it been otherwise, any or all car dealers in the nation who took used cars to crooked mechanics for "odometer clocking," or "fences" who purchased stolen goods from burglars, or doctors or lawyers engaging in insurance fraud, etc., could be shuffled into artificially lumped-together groups labeled "RICO enterprises." Clearly, such reading of the "enterprise" would grossly violate the congressional mandate since it would allow a plaintiff injured by any act representing any wide-spread societal ill to initiate and successfully prosecute a RICO action by merely alleging that mutually-acquainted members of an industry performed a number of questionable transactions  having analogous  modi operandi.  See Reves, 507 U.S. at 183 (noting that the "liberal construction" clause was "not an invitation to apply RICO to new purposes that Congress never intended"); Peat, Marwick, 996 F.2d at 1538-39 (plaintiff's factual allegations were insufficient because plaintiff's interpretation of RICO unduly extended the statutory reach).

Therefore, the Court concludes that the totality of Plaintiffs' factual allegations, limited to mere naming of a string of Defendants and a number of unrelated transactions, fails to suggest that actual RICO enterprises were in existence.  Accord Stachon, 229 F.3d at 676 ("a string of participants lacking any distinct existence and structure" merely verified that the alleged group had business dealings with one another); VanDenBroeck, 210 F.3d at 699 (same); Simon, 208 F.3d at 1083 (same); Moll, 654 F. Supp. at 1031 (same); Richmond, 52 F.3d at 646 ("naming of a string of

entities does not allege adequately an enterprise"); In re MasterCard Int'l Inc. Internet Gambling

Litig., 132 F. Supp. 2d 468 (a "random intersection" of mutually-acquainted business entities fails to

indicate a RICO enterprise).

              2.        P<small>LAINTIFFS</small>' L<small>EGAL</small> A<small>RGUMENTS</small> D<small>O</small> N<small>OT</small> S<small>ALVAGE</small> T<small>HEIR</small> C<small>LAIMS</small>

              a.      *Plaintiffs' Allegations Fail to State the "Enterprise" Element*

Plaintiffs maintain that it is

> clearly set forth in Plaintiffs' pleadings [that] the Insurer-Defendants are neither
> unrelated nor independent [because] Plaintiffs . . . alleged [that] each [Insurer-
> Defendant] within the [B]roker[-]centered [E]nterprise is aware that it is a part of a
> larger structure, knows the identity of the other members of the structure and that it
> will benefit as a membership in the structure. . . .  In the scheme Plaintiffs . . . alleged,
> the Insurer Defendants and the Broker-Defendant . . . operate as a coherent unit,
> bound together by common purposes that can only be realized through the combined
> and coordinated efforts of the Defendants.

Plfs.' Opp. at 11-12.

      However, as the preceding discussion illustrates, Plaintiffs merely alleged their *conclusion* that

Insurer-Defendants within each Enterprise were interrelated and "bound together by common

purposes that can only be realized through the combined and coordinated efforts."   Plaintiffs'

pleadings do not contain any actual facts suggesting that Insurer-Defendants were interrelated.

      It appears that Plaintiffs are aware of this discrepancy, since Plaintiffs' Opposition (a) aims to

shift the emphasis from the lack of "rim" over the alleged pinwheel-like Enterprises to the fact that

each Broker-Defendant had decision-making power, and (b) injects a structure-resembling qualifier

by adding the word "centralized" to the term "decision-making," hence hinting that a "centralized

decision-making" resembles, somehow, a "hub-and-spokes" structure which, in turn, should indicate

the presence of a RICO enterprise.   See id.  In other words, Plaintiffs seek to equate a "wheel" with

a "pinwheel" by blurring out the "rim" aspect that distinguishes the former from the latter.  See id.
In support of this deduction, Plaintiffs cite nine cases that could roughly be subdivided into two
groups, first one consisting of AIU Ins. Co. v. Olmecs Med. Supply, Inc., 2005 U.S. Dist. LEXIS
29666 (E.D.N.Y. Feb. 22, 2005), Zito v. Leasecomm Corp., 2004 U.S. Dist. LEXIS 19778
(S.D.N.Y. Sept. 30, 2004), and In re Managed Care Litig., 185 F. Supp. 2d 1310 (S.D. Fla. 2002)
("First Group"), while the second one including Stachon, 229 F.3d 673, Cedar Swamp Holdings, Inc.
v. Zaman, 487 F. Supp. 2d 444 (S.D.N.Y. 2007), In re Am. Investors Life Ins. Co. Annuity Mktg.
& Sales Practices Litig., 2006 U.S. Dist. LEXIS 35980 (E.D. Pa. June 2, 2006). United States Fire
Ins. Co. v. United Limousine Serv., 303 F. Supp. 2d 432 (S.D.N.Y. 2004), In re Pharm. Indus.
Average Wholesale Price Litig., 263 F. Supp. 2d 172, 2003 U.S. Dist. LEXIS 8279 (D. Mass. 2003),
and New York Auto. Ins. Plan v. All Purpose Agency & Brokerage, 1998 U.S. Dist. LEXIS 15645
(S.D.N.Y. Oct. 2, 1998) ("Second Group").  See Plfs.' Opp.  at 11-15.  Plaintiffs dedicate about half
a page to the First Group of cases, saving the rest of their discussion for the Second Group, even
though the Second Group of cases consists solely of the matters where plaintiffs *failed* to allege a
cognizable RICO enterprise.  See id.

It appears that Plaintiffs' concentration on the cases where RICO enterprise was deemed
insufficiently pled is intended to supplement, somehow, Plaintiffs' argument that the holdings reached
in the Second Group of cases does

> *not preclude* [a finding of a RICO] enterprise with centralized decision[-]making.
> [These cases] simply hold that a central figure associated with unrelated "spokes" for
> the purpose of perpetrating parallel and independent frauds does not constitute an
> enterprise.

Id.  at 12-13 (emphasis supply).

Although Plaintiffs are correct in their argument that the Second Group of cases does not stand for the proposition that a finding of centralized decision-making necessarily *precludes* finding of a RICO enterprise (in fact, such conclusion would be wholly anomalous with respect to all RICO cases examining "hub-and-spokes" structures), Plaintiffs err in their following deduction, namely, that a finding of consistent decision-making by a certain entity involved in each alleged act qualifies that entity as a "hub" or draws any structural links other than independent connectors between this "quasi-hub" and other entities involved in that particular act. Contrary to Plaintiffs' belief, in order to draw a structure cognizable as a RICO enterprise, Plaintiffs have to assert actual facts drawing the "rim" interconnecting Insurer-Defendants, instead of merely stating Plaintiffs' conclusion that Insurer-Defendants must have been interconnected. See In re Pharm. Indus. Average Wholesale Price Litig., 263 F. Supp. 2d 172, 184 (D. Mass. 2003).

Therefore, seeing little reason for discussion of Plaintiffs' Second Group of cases (since the parenthetical explanations provided by Plaintiffs, read against Plaintiffs' factual assertions omitting the "rim" aspect, appear to state a strong case for Defendants and none for Plaintiffs), the Court turns to the three cases that Plaintiffs cite in support--rather than in condemnation--of their own pleadings, namely, AIU, Zito, and Managed Care. See Plfs. Opp. at 11-12, 14-15.

> Relying on AIU, Plaintiffs assert that the AIU court
>
> > determined that the [AIU] plaintiffs had sufficiently alleged an enterprise involving [fifteen members, namely, ten] prescribing doctors, [two] retailers and [three] wholesalers [because, unlike in a case where a RICO plaintiff merely alleges] "a series of 'single two-party conspiracies,' plaintiffs [in AIU] allege[d] a group of individuals sharing a common purpose to engage in a fraudulent course of conduct [and] describe[d] *in detail each defendant's necessary and symbiotic contribution to the overall scheme*."

Id. at 14-15 (quoting AIU, 2005 U.S. Dist. LEXIS 29666, at *22).

Plaintiffs, apparently, believe that the circumstances examined in AIU (a) were analogous to those at bar, and (b) aimed to establish a "hub-and-spokes" enterprise. See id. Plaintiffs err. The enterprise structure alleged in AIU by the plaintiffs was *not* a "hub-and-spokes" structure requiring factual allegations suggesting a "rim" around the enterprise.[18]  Moreover, and paramountly here, the AIU plaintiffs detail the inter-necessity or symbiosis among the defendants.  AIU, 2005 U.S. Dist. LEXIS 29666, at *22 (finding that the AIU plaintiffs described "in detail each defendant's necessary and symbiotic contribution to the overall scheme").  By contrast, in the Enterprises alleged by Plaintiffs in the instant action, all Insurer-Defendants were not only theoretically fungible and dispensable but also *actually treated by Broker-Defendants as such*.  Therefore, the facts offered by Plaintiffs resemble not those in AIU but those addressed in Moll v. U.S. Life Title Ins. Co., 654 F. Supp. 1012 (S.D.N.Y.1987), the case which the AIU court utilized in order to clarify that a "dismiss[al of a] complaint [is proper where the complaint merely] contain[s] allegations that [certain entities] provided [certain questionable services to other entities] and received kickbacks [in exchange for these services, but] fail[s] to 'specify how these [entities] *joined together as a group* to achieve these purposes.'"[19]  AIU, 2005 U.S. Dist. LEXIS 29666, at *22 (quoting Moll, 654 F. Supp. at

---

[18]

    In AIU, the defendants elected to deduce that the AIU plaintiffs were pleading a "hub-and-spokes" conspiracy and then converting the conspiracy allegation into a RICO enterprise structure. See AIU, 2005 U.S. Dist. LEXIS 29666, at *19-22.  The AIU plaintiffs, however, never made such allegations and vigorously resisted the defendants' deduction. See, e.g., AIU Ins. Co. v. Olmecs Med. Supply, Inc., 04-2934, Docket Entry No. 66 (plaintiffs' opposition to defendants' Rule 12 (b)(6) motion).

[19]

    While this Court notes the distinction drawn by the AIU court between a multi-party scenario presented in AIU and "a series of 'single two-party conspiracies,'" this Court refuses to read the AIU language as a finding that a series of "multi-actor" wrongs is so structurally different from a constellation of "two-party" wrongs that the latter must be excluded from the reach of RICO, while the former should be automatically swept under the umbrella of Section 1962.  Such anomalous

1031-32) (emphasis supplied).  Thus, <u>AIU</u> lends no support to Plaintiffs' claims.

Plaintiffs' reliance on <u>Zito</u> is equally misplaced.  Plaintiffs (a) expressly cite <u>Zito</u> for the proposition that a unitary enterprise is duly pled if a plaintiff alleges that the "hub" of the enterprise "centrally control[s] the enterprise and supervise[s] each [spoke], and . . . ma[kes] no secret of its business plan, which involved recruiting [other spokes] into [the enterprise]," Plfs.' Opp.  at 11-12 (quoting <u>Zito</u>, 2004 U.S. Dist. LEXIS 19778, at *27) (ellipsis entered by Plaintiffs, bracketed language supplied by the Court), and (b) supplement this contention by a block quote from <u>Zito</u> further elaborating on the "making no secret of the business plan" aspect.  <u>See</u> <u>id.</u>  at 12 (quoting <u>Zito</u>, 2004 U.S. Dist. LEXIS 19778, at *28).  What Plaintiffs, however, omit to notice is that the language in <u>Zito</u> which Plaintiffs chose to substitute by ellipsis, indicates that, in <u>Zito</u>, *each* of the three "spokes" alleged was actually "furthering [the] overall goals," <u>see</u> <u>Zito</u>, 2004 U.S. Dist. LEXIS 19778, at *27, an allegation not present in the case at bar.[20]

---

distinction (reading akin to an odd conclusion that the configuration of a dandelion must be qualitatively different from that of a rose simply because a rose has plump petals, while dandelion petals are narrow) puts form over substance and was unlikely the intended holding of the <u>AIU</u> court.

[20]

This Court also notes that the defendants in <u>Zito</u> challenged the existence of an enterprise on the grounds that, on occasion, two out of the three "spokes" alleged competed with each other for business with the single "hub" named in that case.  Responding to that argument, the court in <u>Zito</u> noted that the "defendants cite no authority holding that competition among participants in an enterprise will [necessarily] negate the existence of that enterprise, and the Court sees no reason that it should."  <u>Zito</u>, 2004 U.S. Dist. LEXIS 19778, at *26.  This Court agrees.  The sole fact that participants in an enterprise compete with each other should not necessarily negate the existence of that enterprise.  Indeed, finding so would be anomalous in view of the fact that multitudes of corporate employees compete on daily basis for promotions within their respective corporations by trying to impress their respective senior managements, yet this competition does not negate the fact that the competing employees and their management create a unitary enterprise in the form of their respective corporation and might be a RICO enterprise.  This type of competition corresponds to the one evaluated in <u>Zito</u>, where the scheme involved a single "hub" and three "spokes."

In the case at bar, however, the competition is of qualitatively different nature.  Plaintiffs' allegations setting forth a host of "quasi-hubs" and a horde of "quasi-spokes" depict a competition

Moreover, unlike Zito, the case at bar involves neither an express nor implied business plan encompassing any alleged Enterprise. Therefore, the simple "four players in one enterprise with a business plan" scenario in Zito and the holding of that case are inapposite to Plaintiffs' allegations depicting eleven Enterprises, which were sporadically sharing hundreds of participants.

Finally, Plaintiffs' citation to Managed Care, 185 F. Supp. 2d 1310, is wholly unwarranted, since the case could be utilized in this Circuit solely for the purposes of discussing a "nation-wide" enterprise. As the court in Managed Care clarified,

> [Only because plaintiffs' original pleadings were based on the] theory that "an entire nationwide or regional industry or profession may constitute an enterprise," [the court in Managed Care dismissed the original pleadings finding that the court could not] easily identify who c[ame] within the ambit of [the alleged] enterprises, or where [these enterprises did] begin and end." [Aside from this shortcoming, the court in Managed Care did not find any other flaws with plaintiffs' pleadings because] *there is . . . no strict "structure" requirement in the Eleventh Circuit.*

Managed Care, 185 F. Supp. 2d at 1323 (emphasis supplied).

Since the law in this Circuit is to the contrary, see Seville, 742 F.2d at 780-90; Riccobene, 709 F.2d at 222, Plaintiffs' citation to Managed Care is simply of no consequence for the purposes of this Court's inquiry into sufficiency of Plaintiffs' pleadings.[21]

---

akin to the one that typically occurs when multiple employers keep posting help-wanted ads for temporary positions in a certain line of employ, and a swarm of job-seekers keep submitting their resumes, taking interviews and negotiating their contracts. The competition involved in this mutual shopping process (a) qualitatively differs from the one among employees of a single ongoing corporation, and (b) suggests against finding of a unitary structure encompassing the entire job market, regardless of the fact that, during the process, all employers and job-seekers might become aware of each other's identities, business goals and qualification requirements.

[21] This Court is mindful of the fact that the Managed Care court also made a brief hypothetical assessment of the contentions made by the Managed Care plaintiffs under the pleading standard similar to the one employed in this Circuit. See Managed Care, 185 F. Supp. 2d at 1323-24 and n. 5. The court in Managed Care noted that,

In sum, Plaintiffs' legal arguments cannot redeem the shortcomings in their factual pleadings. Although Plaintiffs assert that they "have sufficiently alleged an [inter-]dependent and symbiotic relationship between the members of each [B]roker-centered [Enterprise]," Plfs.' Opp. at 15, they have failed to provide "factual allegations [which could] raise [their] right to relief above the speculative level." Bell Atlantic, 127 S. Ct. at 1964-65. The sole support for Plaintiffs' allegations is limited to Plaintiffs' self-serving conclusions. However, Plaintiffs' conclusions unsupported by facts state no RICO enterprise and should be dismissed. See Stachon, 229 F.3d at 676; VanDenBroeck, 210 F.3d at 699; Simon, 208 F.3d at 1083; Richmond, 52 F.3d at 646; Broad, Vogt, 200 F. Supp. 2d 756; MasterCard, 132 F. Supp. 2d 468; Nasik, 165 F. Supp. at 539; First Nationwide Bank, 820 F. Supp. at 98; Moll, 654 F. Supp. at 1031.

Plaintiffs' allegations with respect to the "continuity" factor fare no better. While Plaintiffs' Opposition neither elaborates on this particular factor nor cites any cases in support of Plaintiffs' position, see generally, Plfs.' Opp. at 10-15 (initially combining the "continuity" factor with that of "structure" but limiting the legal discussion solely to the latter), Plaintiffs' Complaints and revised

---

if the Court adopted [the pleading standard analogous to that employed in the Third Circuit], the Plaintiffs would likely prevail [because the] Plaintiffs . . . have not alleged a series of random contractual exchanges, but [rather alleged the existence of enterprises, each of which was a network of Defendant-entities, where] each Defendant *openly celebrates its respective network*, acknowledg[ing the network in each Defendant's] public relations vehicle.

Id. (emphasis supplied).

However, the facts presented in the case at bar indicate only random contractual exchanges, and Plaintiffs at no point allege that any Defendant ever "celebrated" its respective Enterprise. See generally, Civil Action No. 04-5184, Docket Entries Nos. 1239-40; Civil Action No. 05-1079, Docket Entries Nos. 675-76. Moreover, in view of the fact that all Insurer-Defendants (short of Insurer-Defendant Munich) allegedly belonged to multiple Enterprises, it is not entirely clear to this Court which particular Enterprise should have been the "respective network," which each Insurer-Defendants would "celebrate," had it chose to do so.

Statements of Particularity indicate that Plaintiffs equate the "continuity" factor with (a) Defendants' alleged efforts to conceal the wrongfulness of their acts, and (b) the fact that Defendants employed analogous transactional models to consummate the alleged wrongs and, in addition, utilized "mail and wire" modes of communication while arranging for and executing these wrongful transactions. See Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 374-511; Civil Action No. 04-5184, Docket Entry No. 1239, at 67-68; Civil Action No. 05-1079, Docket Entry No. 675, ¶¶ 340-532; Civil Action No. 05-1079, Docket Entry No. 676, at 60.

This Court is not convinced by Plaintiffs' equations. Unfortunately, since the beginning of time, it has not been uncommon for parties to a wrongful--or even a merely questionable--act to take all possible measures to keep the wrong concealed; and if a party is involved in a multitude of wrongful acts, that party is likely to keep concealing all such wrongs, regardless of whether these wrongs are part of an interrelated scheme or individual acts. Hence, the fact that all Defendants allegedly kept concealing all their wrongful acts cannot signify that Defendants did so because a certain "code of silence" was imposed upon them through the continuous existence of the alleged Enterprises. Rather, this fact--even if true--invites a far more plausible, although trivial, conclusion that none of the wrongdoers wanted to get caught with respect to each and every wrong they were involved in.

Similarly, the alleged fact that Defendants kept utilizing similar models to perform their transactions and conveying pertinent information through "mail and wire" modes of communication does not indicate the presence of a RICO enterprise but merely suggests that (a) pernicious practices of "steering" and "bid-rigging" may have become well-known business models in the insurance industry, and (b) over the last century, "mail and wire" communications effectively displaced all other

forms of information transmission.[22]  Guided by the Supreme Court's clarification that, in order to survive dismissal, Plaintiffs' factual allegations must cross the line "between the factually neutral and the factually suggestive," Bell Atlantic, 127 S. Ct. at 1966 n.5, this Court concludes that Plaintiffs' factual allegations fall short of meeting the pleading requirements with respect to the "continuity" factor of the "enterprise" element of Plaintiffs' RICO claim and, therefore, warrant a dismissal.

Finally, Plaintiffs' arguments with respect to the "distinctiveness" factor also fail to meet Rule 8 pleading requirements.  Plaintiffs maintain that (a) since the Court of Appeals for the Third Circuit stated that "it [was] not necessary [for a RICO plaintiff] to show that the enterprise has some function wholly unrelated to the  racketeering activity, but rather [it is sufficient for the plaintiff to assert that the enterprise] has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses, [e.g.,] the function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis," and (b) Plaintiffs actually used the phrase that "each Enterprise oversees, coordinates and facilitates the commission of numerous predicate off[ens]es," it must mean that "Plaintiffs have sufficiently alleged

---

[22]

As the Court of Appeals for the Seventh Circuit ("Seventh Circuit") observed, although with respect to a somewhat different aspect of the RICO inquiry, that

> "mail and wire fraud allegations are unique among predicate acts because the multiplicity of such acts may be no indication of the requisite continuity of the underlying [racketeering] activity.  Consequently, [the courts] do not look favorably on [allegations that] many instances of mail and wire fraud [should be read as an indication of continuous activity by the alleged enterprise]."

Jennings v. Auto Meter Prods., 2007 U.S. App. LEXIS 17618, at *20 (7th Cir. July 25, 2007) (quoting Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992)).
This Court finds the Seventh Circuit's caution with respect to plaintiffs' creative deductions from defendants' multiple usages of mail and wire quite persuasive.

that existence of [B]roker-centered [E]nterprises that [were] distinct and separate from the racketeering activity in which the [E]nterprises engaged." Plfs.' Opp.  at 17-18 (quoting Riccobene, 709 F.2d at 223, and citing Civil Action No. 04-5184, Docket Entry No. 1240, ¶ 509; Civil Action No. 04-5184, Docket Entry No. 1240, at 69; Civil Action No. 05-1079, Docket Entry Nos. 676, at 60).

The Court disagrees.  Plaintiffs cannot repackage their bald assertions into factual allegations, see Canadian-AMOCO v. Delgado, 1995 U.S. Dist. LEXIS 19132, at *5-6 (N.D. Cal. Dec. 13, 1995) (finding that dismissal is warranted if the "complaint contains [only] conclusory statements [since] these statements are not adequate substitutes for factual allegations") (citations omitted), aff'd, Canadian-American Oil Co. v. Delgado, 1997 U.S. App. LEXIS 5120; see also Papasan, 478 U.S. at 286; Morse, 132 F.3d at 906; Burlington Coat Factory, 114 F.3d at 1429-30; Amiot, 122 Fed. App.  at 579, nor can they substitute actual facts by Plaintiffs' bare recitals of the Court of Appeal's language.  See Broad, Vogt, 200 F. Supp. 2d at 759-61 (expressly noting that plaintiffs' allegations are insufficient if they "merely recite[] the elements of an association-in-fact without providing any factual basis for this allegation").  If Plaintiffs are aware of *facts* indicating that the alleged Enterprises existed distinctly from the alleged pattern of racketeering, "it should not prove burdensome for [P]laintiff[s] . . . to provide [D]efendant[s and this Court] with some indication of the [facts] that [P]laintiff ha[ve] in mind."  Dura, 544 U.S. at 588-89.  Conversely, apparent lack of "factual heft" indicates that Plaintiffs have no such facts and mandates dismissal of Plaintiffs' Complaints.  See Bell Atlantic, 127 S. Ct. at 1965-69; Dura, 544 U.S. at 588-89.

Plaintiffs try to cure the aforesaid deficiency by (a) divorcing Defendants' allegedly wrongful

Page 56 of  73

acts from Defendants' regular business activities, and (b) re-qualifying the latter into a "collective activity" to verify for the existence of the alleged Enterprises apart from the alleged predicate acts. See Civil Action No. 04-5184, Docket Entry No. 1239, at 69; Civil Action No. 05-1079, Docket Entry No. 676, at 60 ("The activities of the [E]nterprise include some legitimate activities [of Defendants] relating to the distribution of insurance on a [legally-proper] competitive basis"). However, Plaintiffs fail to observe that factual allegations related to Defendants' legitimate activities do *not* define acts conducted by an "enterprise" (in fact, Plaintiffs' pleadings elaborate little on these legitimate activities, largely leaving the matter to the reader's imagination), but suggest a panoply of legitimate activities undertaken by Defendants purely in their individual capacities. See generally, Civil Action No. 04-5184, Docket Entries Nos. 1239-40; Civil Action No. 05-1079, Docket Entries Nos. 675-76. In other words, just as the kaleidoscope of Defendants' allegedly wrongful transactions does not appear systemic or interrelated, the panoply of Defendants' implied legitimate acts does not seem to be interconnected in any fashion. See id. Consequently, Plaintiffs' allegations suggesting that Defendants conducted certain non-systemic legitimate activities distinguish Defendants' *individual* legitimate actions from Defendants' alleged *individual* wrongs, instead of distinguishing wrongs *of an enterprise* from that *enterprise's* legitimate conduct. Clearly, such allegations fail to satisfy the "distinctiveness" factor as to the alleged Enterprises.[23]

Finally, it appears that Plaintiffs attempt to plead their Enterprises without resorting to the

---

[23]

Moreover, granted the fact that Plaintiffs named virtually every notable insurance broker and insurance carrier as Defendants, it would be impossible for Defendants not to have legitimate business interactions with each other since, jointly, they amount to the national market almost in its entirety. Therefore, the Court is not impressed by Plaintiffs' allegations that, on certain occasions, certain Defendants were having legitimate business dealings with other Defendants.

<u>Turkette</u> factors by merely stating that, "[g]iven the complexity, the breadth, and the duration of the alleged schemes, significant oversight and coordination would have been essential to the success of each [E]nterprise." Plfs.' Opp.  At 18.  In other words, Plaintiffs invite this Court to infer a distinct RICO enterprise from the "oversight and coordination", that is, after "pre-inferring" such "oversight and coordination" from the "complexity and breadth" of the alleged scheme, that is, after "pre-pre-inferring" the "complexity and breadth" of the alleged scheme from Plaintiffs' factual allegation that the "steering" and "bid-rigging" practices were widespread.  <u>See id.</u>  A legal "adjudication cannot rest on any such 'house that Jack built' foundation, however."  <u>Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.</u>, 410 U.S. 719, 731 (1973).

In the case at bar, Plaintiffs' allegations offer nothing more than a kaleidoscope of acts executed by a kaleidoscope of actors, and combine Broker-Defendants and Insurer-Defendants in such a fashion that the Court is unable to discern any systemic permutation.  <u>See</u> <u>generally</u>, Civil Action No. 04-5184, Docket Entries Nos. 1239-40; Civil Action No. 05-1079, Docket Entries Nos. 675-76.  While discussing dozens of transactions and hundreds of actors, Plaintiffs fail to outline even a single set of actors that interacted with each other and executed their transactions *systemically*.  <u>See</u> <u>id.</u>  Therefore, the Court concludes that Plaintiffs failed to assert every factor of the "enterprise" element in a fashion sufficient to cross the line "between the factually neutral and the factually suggestive."[24]  <u>Bell Atlantic</u>, 127 S. Ct. at 1966 n.5.  Moreover, the Court finds that Plaintiffs' factual allegations are not "neutral" but rather suggest that the ills alleged by Plaintiffs were *not* a result of

---

[24]

It appears Plaintiffs vaguely suggest that, pursuant to <u>Seville</u>, 742 F.2d at 789-791, Plaintiffs duly asserted the existence of alleged Enterprises through means *other* than <u>Turkette</u> factors.  <u>See</u> Plfs.' Opp. at 11. However, Plaintiffs neither enlighten the Court about what are these other means nor specify which facts support the means, and the Court, on its own, was unable to detect any.

actions undertaken by any particular enterprise but rather manifestations of a claimed pernicious

industry practice that has allegedly been plaguing the insurance industry for a considerable time.[25]

           b.     *Plaintiffs' Allegations Fail to State the "Conduct" Element*

In order to meet their pleading requirements with respect to the "conduct" element of Section

1962, Plaintiffs have to assert facts indicating that each Defendant listed as a member of  a RICO

enterprise "participate[d] in the operation or management of [its respective] Enterprise." Reves, 507

U.S. at 185.  In other words, Plaintiffs' allegations should state facts suggesting that Defendants took

part in directing the affairs of an Enterprise, not just Defendants' own affairs.  See id.

According to Plaintiffs' pleadings, each Broker-Defendant and Insurer-Defendant participated

in the operation or management of each Enterprise "by developing methods for concealment" of the

alleged wrongs, "submitting false . . . information to customers," "sharing information relat[ed to]

market conditions, placements and payments" and "reaching agreements" linking individual Broker-

Defendants to individual Insurer-Defendants.  Civil Action No. 04-5184, Docket Entry No. 1239, at

71-72; Civil Action No. 05-1079, Docket Entry No. 676, at 62-63.

In addition to the foregoing, Plaintiffs maintain that Broker-Defendants conducted their

respective Enterprises through "monitoring current and new business," "determining [how to steer]

---

     [25]

       In that respect, the Court notes, in passing, Plaintiffs' statements indicating that (a) while twenty-two individuals within the insurance industry have been indicted on--and some of them pled guilty to--criminal charges factually related to the instant matter, none of these criminal indictments involved a corporate entity or (a group of corporate entities) named as a Defendant in this action, and (b) all such criminal actions were initiated as individualized matters against particular persons rather than a group of people.  See Civil Action No. 04-5184, Docket Entry No. 1239, at 63-65; Civil Action No. 05-1079, Docket Entry No. 676, at 53-55.

current [and] new business [and actually] steering business," "bid rigging," and "accepting compensation" from Insurer-Defendants in the form of commission that Plaintiffs believe to be unduly high. See id. Plaintiffs also contend that Insurer-Defendants conducted their respective Enterprises through the following actions: "kicking back [part of their] profits" to Broker-Defendants," "computing, offering and paying commissions" to Broker-Defendants, and "falsely certifying" certain documents in Insurer-Defendants' efforts to conceal the alleged wrongs. See id.

Plaintiffs argue that the above-listed allegations indicate that Defendants operated their respective Enterprises rather than Defendants' own affairs. See Plfs.' Opp. at 16. The Court, however, is not convinced. The actions listed by Plaintiffs appear to indicate the presence of either individual transactions executed by Broker-Defendants or bilateral transactions executed by Broker-Defendants jointly with one or two Insurer-Defendants. Moreover, it appears that each entity was engaging in such transactions solely for the purpose of furthering its own goals and merely utilized the other on an ad hoc basis. None of the actions listed by Plaintiffs suggest that one Defendant was managing the affairs of an "enterprise." While a chain of such transactions may certainly amount to a business relationship, the fact of a business relationship does not indicate that the entities involved in a business interaction are operating as a joint enterprise.[26]

While Plaintiffs contend that "each Defendant [was] not simply involved in its own affairs but

---

[26]

To illustrate, a butcher-wholesaler frequently offering its clients-restauranteurs tainted meats at a discount price has no more an enterprise with the restauranteurs who agree to purchase such meat (and turn it into their "daily specials") than it has with those restaurant owners who refuse the purchase. The fact that patrons get food poisoning, or the statements by dishonest restauranteurs to the butcher that they are interested in a "'good' deal," or the butcher's disclosure to restauranteurs that he is trying to "move the goods while he still can," does not alter the conclusion.

[was] a knowing and necessary participant in a fraudulent scheme which furthers the common goals of the members of the Enterprise," Plaintiffs' facts indicate that the activities of each Insurer-Defendant were not affected by activities of or interactions between other Insurer-Defendants. See generally, Civil Action No. 04-5184, Docket Entries Nos. 1239-40; Civil Action No. 05-1079, Docket Entries Nos. 675-76. For the purposes of each Insurer-Defendant, a "bid-rigging" transaction required the presence of any unspecified insurance carrier dealing in the same line of insurance, while the "steering" scheme did not require the presence of any insurance carriers, since it was a transactional barter between the Insurer-Defendant and any Broker-Defendant dealing in the same line of insurance. Moreover, the "system" offered no security to the Insurer-Defendant, since it could count with certainty on only one transaction, i.e., the particular one that has been expressly promised by the Broker-Defendant on an ad hoc basis.[27]

In sum, Plaintiffs' facts indicate that each Defendant elaborately conducted and directed its

---

[27]

Other interactions between Defendants do not alter this conclusion. Defendants correctly observe that

> [t]he business of Insurer[-]Defendants necessarily includes exchanging information with brokers about potential customers and general market conditions, deciding whether or not to quote on a piece of potential business, providing or withholding quotes, setting premium rates and compensating the broker involved in the [insurance] policies the Insurer[-]Defendant issue[s. Similarly, to maintain a prospering insurance business, it is expected of] Insurer[-]Defendants [to] attend . . . industry function[s] or sponsor[] the work of a trade association.

Defs.' Mot. at 24. Indeed, each Insurer-Defendant would be expected to perform exactly the same activities while conducting its *own* business. In order to suggest that Insurer-Defendants were conducting affairs of their respective Enterprises, Plaintiff had to assert at least one activity unrelated to or incompatible with Insurer-Defendants' own activities but necessary for the conduct of the entire Enterprise. Plaintiffs, however, failed to do so and attempted to compensate for this shortcoming by switching the emphasis to the fact that the "normal" activities of Insurer-Defendants were, allegedly, performed in a dishonest fashion. The latter, however, cannot substitute for the former.

own affairs but not those of any enterprise.  Therefore, Plaintiffs' allegations as to Broker-Centered

Enterprises fail to state a claim as required by section 1962.


## III.   CIAB as an Enterprise

Plaintiffs previously alleged that CIAB, a trade association, was a RICO "enterprise" because

[CIAB] represents the largest, most profitable of all commercial insurance agencies and brokerage firms. [CIAB] partners with its members and provides not only vital intelligence on current market conditions and trends, but also solutions to the next challenge before the need arises. CIAB provides Defendants with numerous opportunities to communicate, meet, use vital intelligence on market conditions that is shared with its partner members, and reach agreement on how they will address challenges in the marketplace. . . . CIAB provides . . . Defendants a forum to discuss and reach agreement with each other . . . . CIAB hosts Executive Forums where members can brainstorm and share ideas about business opportunities and challenges. . . . CIAB also conducts Executive Liaison Roundtable meetings [enabling the industry executives and CIAB officials] to discuss critical issues. . . . [I]n 1999, CIAB's members [unsuccessfully] opposed the guidelines issued by the New York Department of Insurance regarding disclosure of compensation arrangements. . . . [On other occasions, CIAB] adopted [a set of] crisis communication plans . .  and [together with] the American Insurance Association . . . draft[ed] . . . a white paper . . .  "The Role of the Intermediary" [the content of which suggested that the insurance] market [was] competitive. . . . [I]n response to a regulator inquiry regarding contingency commissions, CIAB [issued an opinion that such commissions] have no impact on the amount insureds pay for coverage.

In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 25632, at *93-95 (citation omitted).

After examining Plaintiffs' previous pleadings, the Court, relying on Provenzano, 688 F.2d

at 200,  Parise, 159 F.3d at 796; Schwartz v. Hospital of Univ. Pa., 1993 U.S. Dist. LEXIS 6108

(E.D. Pa. May 7, 1993), and Meridian Mortgage Corp. v. Spivak, 1993 U.S. Dist. LEXIS 7452, at

*18 (E.D. Pa. June 7, 1993), concluded that Plaintiffs failed to plead a claim based on CIAB as a

RICO "enterprise," since

[n]o fact stated in Plaintiffs' [previous] submissions indicate[d] that Defendants' alleged predicate acts of mail and wire fraud (aimed at Defendants' clients) were

related in any way to the activities of CIAB, or that Defendants committed the alleged predicate offenses through the means of CIAB, or that CIAB was somehow indispensable to Defendants in their alleged goal to commit the underlying predicate offenses.

Id. at *98 (emphasis in original).

In their current pleadings, Plaintiffs re-alleged CIAB as a RICO enterprise, maintaining that (1) "[a]bsent . . . Defendants' participation in and control of CIAB, . . . Defendants would have been unable to perpetuate the fraudulent scheme and attendant predicate acts," and (2) "[since t]he purpose of the CIAB Enterprise [was] furtherance of the interest of large brokers generally and furtherance of Defendants' scheme more specifically . . . , the predicate acts taken in furtherance of the scheme necessarily relate to the CIAB Enterprise."   Civil Action No. 04-5184, Docket Entry No. 1239, at 74-75.  Plaintiffs' second argument was exhaustively treated by this Court in its previous opinion and found patently meritless under the test set forth by the Court of Appeals in Provenzano, 688 F.2d at 200; that discussion requires no reiteration.  See In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 25632, at * 93-103.  Plaintiffs' first contention, namely, that Defendants, being the most notable insurance brokerage houses and insurance carriers in the nation and, jointly, constituting the bulk of national insurance industry, had to be unable to communicate with each other outside CIAB if they wanted to orchestrate the alleged numerous wrongful acts, appears to be mere  conjecture unsupported by any facts alleged by Plaintiffs.[28]

---

[28]

If this Court is to hypothesize that Defendants actually joined together, be it in small or in large groups, in order to achieve their wrongful acts, it appears highly doubtful that Defendants were enabled to do so solely because they were flashing their CIAB membership cards to each other or because they were making use of conference tables and Xerox machines at CIAB's facilities: Defendants were well aware of each others' identities and needed no mutual introductions, and they certainly could afford to meet at their own facilities or, at least, local coffee houses, pubs or public parks.

Therefore, Plaintiffs' allegations based on the "CIAB as a RICO Enterprise" theory are dismissed for failure to allege facts in support of the allegations.  See Bell Atlantic, 127 S. Ct. 1965-96.


IV.   **Plaintiffs' Claims Raised Under 18 U.S.C. § 1962(c) and (d)**

Having thoroughly examined Plaintiffs' Complaints, the Court concludes that Plaintiffs failed to meet their pleading burden under Rule 8(a) as to indispensable elements of their Subsection 1962(c) claims by failing to identify a cognizable RICO enterprise, or to state facts indicating that Defendants conducted or participated in the conduct of their respective enterprises.  Plaintiffs' 18 U.S.C. § 1962(c) claims, therefore, will be dismissed without a determination of whether Plaintiffs met their pleading burdens with respect to any other element of their Subsection 1962(c) claims.[29]

---

[29]
Making and responding to the Motions at hand, the parties dedicate substantial efforts to discussion of the underlying predicate acts.  See, e.g., Defs.' Mot. at 25-32, Plfs.' Opp. at 18-29.  It appears that, with respect to the "predicate offense" element, Plaintiffs mainly concentrate on Defendants' alleged failure to elaborate on the substantiality of contingent commissions paid by Insurer-Defendants to Broker-Defendants and potential conflicts of interest experienced by Broker-Defendants as a result of such allegedly exacerbate commissions.  See Plfs.' Opp. at 20.  While Plaintiffs qualify Defendants' failure to elaborate as "non-disclosure," "misrepresentation" or "concealment," Plaintiffs concede that Defendants did disclose the payments and receipts of such commissions.  See id.  Thus, it appears that Plaintiffs' key allegations are limited to Plaintiffs' disappointment with Defendants' non-characterization of the commissions as "kickbacks" or as a source of Broker-Defendants' "conflict of interests."  See Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 80, 400, 402, 458, 384; Civil Action No. 05-1079, Docket Entry No. 675, ¶¶ 93, 339, 349-357, 370, 372.  Defendants are correct that they "were not required to . . . characterize [their internal financial arrangements] in a pejorative fashion" when disclosing the commissions to insurance purchasers, Defs.' Mot. at 27, and Plaintiffs cite no authority to the contrary.  See Plfs.' Opp. at 20-22.  However, it could be fathomed that certain statements made by Defendants created such circumstances that Defendants' mere disclosure of the amounts paid and received might be qualified as a misrepresentation.  See Restatement (Second) of Torts § 551.  Thus, although Plaintiffs' Complaints do not state any *specific* statements made by Defendants which indicated that the prices charged to Plaintiffs were the "best" that Plaintiffs could obtain from vigorously competing Insurer-Defendants, or that contingent commissions charged by Broker-Defendants were the "lowest" that Broker-Defendants could receive from such competing Insurer-Defendants, the Court might

See 18 U.S.C. § 1962(c); Turkette, 452 U.S. at 587.

Plaintiffs' 18 U.S.C. § 1962(d) claims will be dismissed without evaluation since this Court cannot reach the issue as to whether Plaintiffs properly pled their Subsection 1962(d) claims in view of the fact that Plaintiffs failed to state a claim under Subsection 1962(c).  See Salinas, 522 U.S. 52; Berg, 247 F.3d 532.

## IV.   **Leave to Amend**

This Court now turns to the question of whether Plaintiffs shall be allowed to replead their claims for the fourth time.[30]  Ordinarily, the plaintiff may be granted "leave [to amend,] . . . when justice so requires."  See Foman v. Davis, 371 U.S. 178, 182 (1962); Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993).  However, "[a]llowing leave to amend where 'there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced' . . . would frustrate Congress's objective" to filter out lawsuits that have no factual basis.[31]  Chubb,

_____

hypothesize that Plaintiffs are aware of such facts.  Consequently, while not altering the current insufficiency of Plaintiffs' pleadings as to the "predicate offense" element, the Court's hypothesis (as well as lack of this Court's prior assessment of the issue) might warrant granting Plaintiffs leave to amend their Complaint in order to determine whether Plaintiffs actually have pertinent facts or merely make a claim on the basis of self-serving conjecture.  However, since Plaintiffs' pleading of the "enterprise" and "conduct" elements warrant dismissal without granting Plaintiffs leave to amend, see infra, this Opinion at 65-67, the Court need not consider the leave issue with respect to the "predicate offense" element.  See Turkette, 452 U.S. at 587.

[30]

If the Court is to count all de facto amendments made by Plaintiffs, the total number of amendments made thus far would be five.  Hence, the Court is effectively faced with the question whether to allow Plaintiffs their sixth amendment.

[31]

Federal Rule of Civil Procedure 15(a) provides that "a party may amend [its] pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  The Supreme Court has identified several factors to be considered when

394 F.3d at 164 (quoting GSC Partners CDO Fund, 368 F.3d at 246); accord Cybershop.com Sec. Litig., 189 F. Supp. 2d at 237 (The Rules "would be 'meaningless' if judges liberally granted leave to amend on a limitless basis") (citing Champion Enter., Inc., Sec. Litig., 145 F. Supp. 2d 871, 872 (E.D. Mich. 2001)). For instance, where the plaintiff had already amended plaintiff's complaint and yet failed to allege sufficient facts, the courts may find that "[t]hree bites at the apple is enough," and conclude that it is proper to deny leave to replead. Salinger v. Projectavision, Inc., 972 F. Supp. 222, 236 (S.D.N.Y. 1997) (citing Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996); American Express Co. Shareholder Litig., 39 F.3d 395, 402 (2d Cir. 1994); and Fisher v. Offerman & Co., Inc., 1996 U.S. Dist. LEXIS 14560 (S.D.N.Y. 1996)).

It is proper for a district court to deny the plaintiffs leave to amend their complaint if (a) the plaintiffs have been given three opportunities to state a claim upon which relief could be granted, but (b) in spite of the court's prior directives and the court giving the plaintiffs a detailed roadmap for curing deficiencies in their claims, failed to cure those deficiencies. See Chubb, 394 F.3d at 165-66;

---

applying Rule 15(a):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be "freely given."

Foman, 371 U.S. at 182; see also Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc., 663 F.2d 419, 425 (3d Cir. 1981), cert. denied, 455 U.S. 1018 (1982).
   Thus, while "Rule 15(a) gives the court extensive discretion to decide whether to grant leave to amend after the time for amendment as of course has passed," Charles Alan Wright et al., Federal Practice and Procedure: Civil 2d § 1486 (2d ed. 1990), the Rule 15(a) "generous standard is tempered by the necessary power of a district court to manage a case" in light of the factors listed in Foman. Shivangi v. Dean Witter Reynolds, Inc., 825 F.2d 885, 891 (5th Cir. 1987).

see also Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729 (9th Cir. 1987) (the court could

reasonably conclude that further amendment would be futile where the district court's written order

identified defects in the previous amended complaint, and the court permitted plaintiff to amend its

complaint once again, and yet the instant amended complaint did not cure deficiencies); Iron Workers

Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F. Supp. 2d 571 (E.D. Va. 2006) (same).


        In view of the facts that (a) this matter was initiated almost three years ago but (b) Plaintiffs,

even after substantial discovery and three previous rounds of extremely voluminous pleadings failed

to meet their pleading burden, the Court concludes that granting Plaintiff leave to amend would be

futile, unduly prejudicial to Defendant and not in the interests of justice.[32]   The Court, therefore,

---

[32]

        Since Plaintiffs have been consistently interpreting, as indications of "hub-and-spokes"
enterprises, the facts related to (a) ad hoc transactions between Broker-Defendant "X" and Insurer-
Defendant "Y" (or Broker-Defendant "X" and Insurer-Defendants "Y" and "Z"), and/or (b) business
interactions among the entities collectively designated by Plaintiffs as a single Defendant in this
action, e.g., Broker-Defendant Marsh, the Court could hypothesize that Plaintiffs might allege a
RICO enterprise either consisting of an individual Defendant "X" or based on a linear link between
Broker-Defendant "X" and Insurer-Defendant "Y" (or a triangulated scheme encompassing "X," "Y"
and "Z," or a similar graspable structure).  The facts asserted by Plaintiffs neither indicate the
presence of such "small-scale" enterprises nor expressly preclude them.  However, Plaintiffs' three
previous rounds of pleadings unambiguously indicate that Plaintiffs have no interest in asserting non-
overlapping enterprises based on Defendants interwoven solely into their own "small-scale"
structures.  See generally, Civil Actions Nos. 04-5184 and 05-1079, Dockets.  Moreover, were
Plaintiffs to develop a sudden interest in such allegations after three years of pleading a web of
overlapping enterprises and to "re-carve" their industry-wide Members List into a multitude of non-
overlapping "small-scale" enterprises, the number of such enterprises would run into hundreds, if not
thousands, and--as Defendants correctly observe-- cause decertification of Plaintiffs' class due to
elimination of the commonality and typicality factors.  See Defs.' Mot. at 18, n. 15.  Furthermore,
even if the likely fission of this action into a swarm of legal suits was not a concern, Plaintiffs do not
qualify for leeway at the instant juncture.  It would be indeed contrary to the Supreme Court's
guidance in Foman, 371 U.S. at 182, if this Court were to continue combing through Plaintiffs' every
round of pleadings in order to detect and piece together claims that might, somehow, pass muster
under the Rules of Federal Civil Procedure.  See Seville, 742 F.2d at 790 n.5 (rejecting plaintiffs

dismisses Plaintiffs' claims alleging violations of 18 U.S.C. §§ 1961, et seq. ("RICO Claims") with prejudice. See Chubb, 394 F.3d at 164; Rutman Wine, 829 F.2d 729.


## JURISDICTION

### I.    Civil Action No. 04-5184

In Civil Action No. 04-5184, the Commercial Case, Plaintiffs set forth twenty seven Counts for relief, the first twenty three of which are based on federal provisions, while Count Twenty-Four is based on multiple state law provisions, and the remaining three Counts are based on common law, the origin of which Plaintiffs did not specify. See Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 563-738.

Plaintiffs invoked this Court's federal jurisdiction over Civil Action No. 04-5184 pursuant to 15 U.S.C. § 15; 18 U.S.C. §§ 1961-62, 1964; and 28 U.S.C. §§ 1331-32, 1367, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1376. See Civil Action No. 04-5184,

---

"attempts to argue that it properly pleaded [many] enterprises . . ., and that its complaint should be read to allege as an enterprise any possible combination of the . . . named enterprises," and indicating that a RICO plaintiff has to allege an actual enterprise rather than to express willingness to assert whatever enterprise the court approves); Glessner v. Kenny, 952 F.2d 702, 714 (3d Cir. 1991) (observing that pleading a "RICO complaint is not [suppose to be] a mix and match game in which plaintiffs may . . . avoid dismissal").

Finally, the insufficiency of Plaintiffs' pleading of the "enterprise" and "conduct" elements is qualitatively different from the insufficiency of Plaintiffs' pleadings with respect to the underlying predicate offenses. See supra, this Opinion, n. 29. Plaintiffs' pleadings of the latter have invariably been *compatible* with the facts that this Court might hypothesize. See supra, this Opinion, n. 29. By contrast, Plaintiffs' instant--as well as all previous--pleadings as to the "enterprise" and "conduct" elements are *incompatible* with the Court's hypothetical. Therefore, while Plaintiffs' failure to meet their pleading burden as to the "predicate offense" element does not necessarily warrant dismissal with prejudice under the rule enunciated in Foman, 371 U.S. at 182, Plaintiffs' insufficient pleadings of the "enterprise" and "conduct" elements cannot benefit from the Court's hypothetical and warrant dismissal with prejudice.

Docket Entry No. 1240, ¶ 2.  Pursuant to 28 U.S.C. § 1331, a federal district court may exercise jurisdiction over matters involving a federal question.  See 28 U.S.C. § 1331.  Pursuant to 28 U.S.C. § 1332, a federal district court may exercise diversity jurisdiction in cases where the parties are citizens of different states and where the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs.  See 28 U.S.C. § 1332.  This statutory requirement "must be narrowly construed so as not to frustrate the congressional purpose behind it: to keep the diversity caseload of the federal courts under some modicum of control."  Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1044-45 (3d Cir. 1993) (citing Nelson v. Keefer, 451 F.2d 289, 293-94 (3d Cir. 1971)).

In the multi-district litigation at bar, Plaintiffs' pleadings are silent as to the issue of complete diversity between the parties, or as to the applicability of any exception to the complete diversity rule. See Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 2-6.  As drafted, Plaintiffs' instant Complaint (a) invokes this Court's federal question jurisdiction, pursuant to Section 1331, with respect to Plaintiffs' first twenty three Counts alleging violations of Titles XV and XVIII of the United States Code, see Civil Action No. 04-5184, Docket Entry No. 1240, ¶¶ 563-738, and (b) invokes supplemental jurisdiction, pursuant to Section 1376 (derivative from 28 U.S.C. § 1331 rather than from 28 U.S.C. § 1332), with respect to Plaintiffs' Counts Twenty-Four to Twenty-Seven, inclusive.

On August 31, 2007, this Court dismissed Plaintiffs' instant Complaint with respect to Plaintiffs' challenges based on Title XV.  See In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 64767 (D.N.J. Aug. 31, 2007).  Having Plaintiffs' claims based on Defendants' alleged violations of Title XVIII dismissed in the Order accompanying the instant Opinion, this Court disposes of Plaintiffs' Counts One to Twenty-Three and retains no federal question jurisdiction over

Civil Action No. 04-5184.  Having no other grounds for supplemental jurisdiction over Plaintiffs' state

law claims but Plaintiffs' bare reference to Section 1332, unsupported by any Plaintiffs' allegations

suggesting complete diversity between the parties or applicability of exceptions to the complete

diversity rule, the Court finds that Plaintiffs failed to make the necessary showing of complete

diversity, as explained in <u>Packard</u>, 994 F.2d at 1044-45, and therefore, dismisses Civil Action No. 04-

5184 in its entirety, for failure to state a claim with respect to the matters of federal law and because

the Court declines to exercise supplemental jurisdiction over a matter involving solely state law

claims.  Consequently, the Court dismisses all Plaintiffs' claims with respect to those Defendants

which were named in this matter as "Commercial Defendants," <u>i.e.</u>, Defendants named solely in the

Commercial Case, and will direct the Clerk to close the file in Civil Action No. 04-5184.[33]

---

[33]

       Plaintiffs may, if they so desire, have Civil Action No. 04-5184 reopened by submitting, within thirty days from the date of entry of this Opinion and accompanying Order, a LIMITED SUPPLEMENT to Plaintiffs' Second Consolidated Amended Commercial Class Action Complaint addressing only two issues: (1) the presence of complete diversity between the parties, pursuant to the requirement of Section 1332, or applicability of an exception to the rule of complete diversity, and/or (2) federal question basis, if any, underlying Plaintiffs' Counts Twenty-Five to Twenty-Seven, inclusive.  Such limited supplement to Plaintiffs' Second Consolidated Amended Commercial Class Action Complaint should not be utilized in lieu of an application available to Plaintiffs pursuant to Federal Rule of Civil Procedure 59(e) and Local Civil Rule 7.1(i).  In addition, such limited supplement should not include, either <u>de jure</u> or <u>de facto</u>, any claims *additional* to those actually made by Plaintiffs with respect to their Counts Twenty-Five to Twenty-Seven, or any claims *amending or otherwise altering* Plaintiffs' Counts Twenty-Five to Twenty-Seven.

II.    **Civil Action No. 05-1079**

In the Employee-Benefit Case, Civil Action No. 05-1079, Plaintiffs also set forth twenty seven Counts for relief, although only the first twenty-one of which are based on Titles XV and XVIII of the United States Code.  See Civil Action No. 05-1079, Docket Entry No. 675, ¶¶ 592-696. Plaintiffs' Count Twenty-Two is based on multiple state law provisions, while Count Twenty-Three is based on the Employee Retirement Income Security Act ("ERISA").  See id. ¶¶ 697-763. The remaining three Counts are based on common law the origin of which Plaintiffs did not specify.

In Civil Action No. 05-1079, as in Civil Action No. 04-5184, Plaintiffs invoked this Court's federal jurisdiction pursuant to 15 U.S.C. § 15; 18 U.S.C. §§ 1961-62, 1964; and 28 U.S.C. §§ 1331-32, 1367, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1376.  See Civil Action No. 05-1079, Docket Entry No. 675, ¶ 10. And, as in Civil Action No. 04-5184, Plaintiffs' pleadings in Civil Action No. 05-1079 are silent as to the issue of complete diversity between the parties, or as to the applicability of any exception to the complete diversity rule.  See Civil Action No. 05-1079, Docket Entry No. 675, ¶¶ 10-14. As drafted, Plaintiffs' instant Complaint invokes this Court with federal question jurisdiction, pursuant to Section 1331, with respect to Plaintiffs' first twenty one Counts alleging violations of Titles XV and XVIII of the United States Code, as well as Count Twenty-Three alleging violations of ERISA, plus supplemental jurisdiction, pursuant to Section 1376, with respect to Plaintiffs' Counts Twenty-Two and Twenty-Four to Twenty-Seven, inclusive.

On August 31, 2007, this Court dismissed Plaintiffs' instant Complaint with respect to Plaintiffs' challenges based on Title XV.  See In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 64767 (D.N.J. Aug. 31, 2007).  Plaintiffs' claims based on alleged Defendants' violations of

Title XVIII are dismissed in the Order accompanying the instant Opinion, and this Court dismisses Plaintiffs' Counts One to Twenty-One, inclusive.  The Court, however, has not yet addressed Plaintiffs' pending ERISA allegations raised in their Count Twenty-Three.  Consequently, the Court does not now address Plaintiffs' state law claims asserted in Counts Twenty-Two and Twenty-Four to Twenty-Seven, inclusive, of Civil Action No. 05-1079 which rely upon this Court's supplemental jurisdiction.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss will be GRANTED with respect to Plaintiffs' RICO Claims, and Plaintiffs' Second Consolidated Amended Commercial Class Action Complaint and Second Consolidated Amended Employee-Benefit Class Action Complaint will be DISMISSED WITH PREJUDICE with respect to these claims.

All Plaintiffs' state law claims with respect to those Defendants, which were named solely in the Commercial Case, Civil Action No. 04-5184, will be dismissed without prejudice because the Court declines to exercise supplemental jurisdiction over these solely state law claims.  Therefore, Plaintiffs' Second Consolidated Amended Commercial Class Action Complaint will be dismissed in its entirety.  All motions pending, as of the date of entry of the Order accompanying this Opinion, in Civil Action No. 04-5184 will be dismissed as moot.

The Court will direct the Clerk of the Court to close the file on Civil Action No. 04-5184.

Since the Court has yet to address the ERISA and supplemental state law claims asserted in Civil Action No. 05-1079, that file will remain open at this time.

An appropriate Order accompanies this Opinion.


    s/ Garrett E. Brown, Jr.    
**GARRETT E. BROWN, JR.**
**Chief Judge**
**United States District Court**


Dated: September 28, 2007