FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | : | |
| | : | |
| IN RE INSURANCE BROKERAGE | : | MDL No. 1663 |
| ANTITRUST LITIGATION | : | |
| | : | Civil Action No. 04-5184 (CCC) |
| APPLIES TO ALL ACTIONS. | : | OPINION |
| | : | |

**CECCHI**, District Judge.

This matter comes before the Court upon Plaintiffs' Motion for Final Approval of the proposed Settlement Agreement[1] and Class Counsel's Motion for attorney fees, reimbursement of expenses, and service award payments to the named Plaintiffs. Signum, LLC ("Signum"), a Tag-Along party to this multidistrict litigation, also filed a Motion for Injunctive Relief and Protective Order. The Court conducted a Fairness Hearing on September 14, 2011. Now, having considered the arguments by all parties to this matter, including the objectors, the Court sets forth its findings below.[2]

## I.   BACKGROUND

This matter involves several class actions filed by Plaintiffs in 2004 against various insurance companies and broker firms. Plaintiffs allege violations of federal antitrust laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), various state statutes and common law. The class actions were consolidated by the Judicial Panel on Multidistrict

---

[1] The Settling Defendants are listed in Exhibit A hereto.

[2] The Court considers any new arguments not presented by the parties in their papers or at the Fairness Hearing to be waived. See Brenner v. Local 514, United Bhd. of Carpenters & Joiners, 927 F.2d 1283, 1298 (3d Cir. 1991) ("It is well established that failure to raise an issue in the district court constitutes a waiver of the argument.").

Litigation into MDL 1663, <u>In Re Insurance Brokerage Antitrust Litigation</u>, and transferred to the District of New Jersey for coordinated pretrial proceedings.  Pursuant to the Court's Orders, the law firms of Miller Faucher and Cafferty LLP (now Cafferty Faucher LLP) and Whatley, Drake & Kallas, LLC were appointed Class Counsel for Plaintiffs.

In August 2005, Plaintiffs filed a First Consolidated Amended Commercial Class Action Complaint.  On November 29, 2005, Defendants filed various motions to dismiss.  On October 3, 2006, Judge Faith S. Hochberg dismissed Plaintiffs' federal antitrust and RICO claims and required Plaintiffs to file a "Supplemental Statement of Particularity" and an Amended RICO Case Statement.  (Opinion, dated October 3, 2006.)  Plaintiffs filed the required pleadings, adding a Council of Insurance Agents & Brokers-based ("CIAB") RICO claim.  On December 21, 2006, Defendants once again moved to dismiss.  On April 5, 2007, Chief Judge Garrett E. Brown, Jr. ("Judge Brown") granted Defendants' dismissal motions and ordered Plaintiffs to re-plead their antitrust and RICO claims.  <u>See</u> <u>In re Ins. Brokerage Antitrust Litig.</u>, MDL No. 1663, 2007 WL 1062980 (D. N.J. Apr. 5, 2007) and <u>In re Ins. Brokerage Antitrust Litig.</u>, MDL No. 1663, 2007 WL 1100449 (D. N.J. Apr. 5, 2007).

On May 22, 2007, Plaintiffs filed a Second Amended Complaint, Revised Statement of Particularity and a Third Amended RICO Case Statement.  Judge Brown dismissed Plaintiffs' federal antitrust and RICO claims.  (Opinions, dated August 31, 2007 and September 28, 2007.)  Judge Brown also declined to exercise supplemental jurisdiction over Plaintiffs' state law claims.  (<u>Id.</u>)  On appeal, the Third Circuit reversed the: (1) dismissal of Plaintiffs' federal antitrust claim against certain insurer Defendants relating to an alleged Marsh-Brokered Excess Casualty Insurance conspiracy; (2) dismissal of the RICO claim based on an alleged Marsh-centered commercial enterprise (with respect to the same insurer Defendants); and (3) dismissal of the

2

RICO claim based on the alleged CIAB enterprise (with respect to the Defendant brokers).  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 383 (3d Cir. 2010).  The Third Circuit also vacated Judge Brown's decision not to exercise supplemental jurisdiction over Plaintiffs' state law claims.  The Third Circuit affirmed the dismissals in all other respects and remanded the remaining claims.  In late 2010, Defendants filed various motions to dismiss the remanded claims.  Id.  On June 20, 2011, Judge Brown administratively terminated Defendants' motions to dismiss.  (Order, dated June 20, 2011.)  On October 21, 2011, Defendants re-filed their motions to dismiss.

The parties engaged in a settlement mediation process, under the auspices of former federal Judge Layn Phillips, and submitted to the Court a Settlement Agreement for preliminary approval in May 2011.  The Court had previously approved three related settlements in this action, in an aggregate amount of $218,825,769.42, with the Zurich, Gallagher and Marsh Defendants (the "Zurich Settlement," "Marsh Settlement" and "Gallagher Settlement," respectively).  In re Ins. Brokerage Antitrust Litig, 579 F.3d 241 (3d Cir. 2009).  The approvals of the Zurich and Gallagher Settlements were affirmed by the Third Circuit.  Id.  The appellants in the Marsh Settlement appeal dismissed their appeal. (Pls.' Mot. Br. at 1.)

On June 28, 2011, Judge Brown entered an Order preliminarily approving the proposed settlement and preliminarily certifying a class for settlement purposes (the "Preliminary Approval Order").  (Order, dated June 28, 2011.)  Class Counsel filed an application for an award of attorney fees and reimbursement of litigation expenses.  Class Counsel also applied for service awards for each named Plaintiff.

In June 2011, this MDL was transferred to this Judge.  (Order Transferring Case to Judge Claire C. Cecchi, dated June 27, 2011.)  On September 6, 2011, Plaintiffs filed their Motion for

Final Approval of the Proposed Settlement. In response thereto, the Court received objections and requests for exclusion from the Settlement.

This Court held a Fairness Hearing on September 14, 2011. Having considered the arguments and submissions in support of and in opposition to the preliminarily-approved Settlement Agreement, and having conducted the Fairness Hearing as required by Fed. R. Civ. P. 23(e)(2), the Court grants Plaintiffs' Motion for Final Approval of the Settlement Agreement, certifies the Settlement Class for purposes of settlement only, and approves the requested attorney fee award, service awards, and reimbursement of litigation expenses. The Court also denies Signum's Request for a Preliminary Injunction and Protective Order.

## II. TERMS OF SETTLEMENT

With some exceptions, the Settlement Class consists of "all persons and entities that, during the period from January 1, 1998 through December 31, 2004, inclusive, purchased commercial insurance policies from any of the Insurer Defendants through any of the Broker Defendants, or from another insurer after soliciting insurance policy quotes or indications from any of the Insurer Defendants through any of the Broker Defendants." (Settlement Agreement at 6.)

The Settling Defendants deposited a settlement payment totaling $41 million into an interest-bearing account (the "Settlement Fund") that is being administered pursuant to an escrow agreement. (Pls.' Mot. Br. at 6.) The costs of implementing and administering the Settlement Agreement have been paid from the Settlement Fund.

According to the Settlement Agreement's Plan of Allocation (Settlement Agreement, Ex. 7), all Settlement Class members who purchased excess casualty insurance policies from AIG, AXIS, Fireman's Fund, Liberty Mutual, Travelers and XL, or any subsidiaries or affiliates of

these entities, through Marsh & McLennan Companies, Inc. or any of its subsidiaries or affiliates (the "Excess Casualty Claimants"), will receive 85% of the Settlement Fund.   (Id.)[3]   The remaining 15% of the Settlement Fund will be used to fund a cy pres award that will be divided between "Consumer Action" and the "Public Entity Risk Institute," two charitable organizations that serve the interests of Settlement Class members.  (Pls.' Mot. Br. at 7.)   Consumer Action is focused on individual consumers and small businesses. The Public Entity Risk Institute is focused on public entities, municipalities, and non-profit organizations.  (Fairness Hearing Tr. 23-24.)  Both entities indicate that they will use the cy pres funds for educational purposes or to fund other organizations that will benefit insurance policyholders.  (Id.)

Class Counsel filed an application for an award of attorney fees in the amount of $10.25 million, which is approximately 25% of the Settlement Fund, and for reimbursement of litigation expenses in the amount of $394,192.76.  (Plaintiffs' Motion for Attorney Fees, Reimbursement of Expenses and Service Award Payments to Named Plaintiffs.)  Class Counsel also applied for service awards of $5,000 for each named Plaintiff.  Plaintiffs seek to have the attorney fees, litigation expenses, and service awards paid solely from the Settlement Escrow Account. (Pls.' Mot. Br. at 6.)

## III.   NOTICE

The names and addresses of the Settlement Class members were obtained through a reasonable search by the Settling Insurer Defendants of their records relating to commercial

---

[3] Payments will be made to the Excess Casualty Claimants, pro-rata, based on the premiums they paid for their excess casualty policies.  (Id. at 7-9.)  AIG and Travelers previously entered into settlement agreements with regulatory authorities ("Regulatory Settlements") for related claims. (Id.)  Pursuant to the Regulatory Settlements, AIG and Travelers paid and obtained releases from the majority of claimants that purchased excess casualty policies from them.  (Id.)  Thus, the Excess Casualty Claimants are further subdivided into two groups, those that previously settled in the Regulatory Settlements and those that did not.  The former will be allocated approximately 25% of 85% of the Settlement Fund, and the latter will receive 75% of 85% of the Settlement Fund.  (Id.)

insurance placed from January 1, 1998 through December 31, 2004.  (Settlement Agreement at 15.)

Notice of the Settlement was disseminated to the Settlement Class as follows: (1) "Long Form Postcards" were sent to the Excess Casualty Claimants (Id., Ex. 3); (2) "Short Form Postcards" were sent to Settlement Class members who are not Excess Casualty Claimants (Id., Ex. 4); (3) a "Detailed Notice" (Id., Exhibit 5) was posted on the website www.insurancebrokeragesettlement.com and Class Counsel's firm websites; and (4) a "Publication Notice" (Id., Ex. 6) was published two times in all editions of *The New York Times*, *The Wall Street Journal*, *USA Today*, and *Business Insurance*, and one time in *RM Magazine*. All notices were mailed by August 4, 2011.  (Pls.' Mot. Br. at 9-10.)

The Notices explained that any Settlement Class members desiring to be excluded from or object to the fairness, reasonableness or adequacy of the Settlement Agreement, Plan of Allocation, or any terms of the Settlement Agreement should file their requests for exclusion or objections no later than fifteen days before the Fairness Hearing.  (Preliminary Approval Order at 16-19.)   There are eighty requests for exclusion from the Settlement Class.   (Daniel Coggeshall Decl.)  Seven objections were initially filed to the Settlement Agreement, one of which was later withdrawn and another was filed only as an alternative to exclusion.[4] They are addressed below.

---

[4] The objections were filed by Huntsman Entities ("Huntsman"), Gourmet Catalog, Inc. ("Gourmet Catalog"), Palm Tree Computer Systems, Inc. ("Palm Tree"), Signum, Donald R. Pierson ("Pierson"), Fortune Brands, Inc. ("Fortune Brands") and N. Albert Bacharach, Jr. ("Bacharach").  (Pls.' Mot. Br. at 11.)  Huntsman filed a conditional objection only as an alternative to exclusion.  Because Huntsman has been excluded from the Settlement Class, its objection need not be addressed.  (See Daniel Coggeshall Decl. containing the list of timely exclusions.)   Nevertheless, the substance of Huntsman's generalized objection (which is duplicative of other objections) is addressed below in the context of other objections.  Fortune Brands filed a conditional objection that it subsequently withdrew on September 9, 2011.

## IV.   FINAL APPROVAL

Under Federal Rule of Civil Procedure 23(e), approval of a class settlement is warranted only if the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(4).  Acting as a fiduciary responsible for protecting the rights of absent class members, the Court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." In re Cendant Corp. Litig., 264 F.3d 201, 231 (3d Cir. 2001) (quoting In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785 (3d Cir. 1995)). This determination rests within the sound discretion of the Court.  Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975).   In Girsh, the Third Circuit identified nine factors to be utilized in the approval determination. Girsh, 521 F.2d at 157.  These factors include:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through the trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; (9) and the range of reasonableness of the
> settlement fund to a possible recovery in light of all the attendant
> risks of litigation. Id.

Additionally, a presumption of fairness exists where a settlement has been negotiated at arm's length, discovery is sufficient, the settlement proponents are experienced in similar matters and there are few objectors.  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004).  Finally, settlement of litigation is especially favored by courts in the class action setting. "The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."   In re General

<u>Motors</u>, 55 F.3d 768, 784 (3d Cir. 1995); <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d at 535 (explaining that there is an "overriding public interest in settling class action litigation, and it should therefore be encouraged").

Turning to each of the <u>Girsh</u> factors, the Court finds as follows:

## A. Complexity, Expense and Likely Duration of the Litigation

The first factor, the complexity, expense and likely duration of the litigation, is considered to evaluate "the probable costs, in both time and money, of continued litigation." <u>Cendant</u>, 264 F.3d at 233 (quoting <u>In re General Motors</u>, 55 F.3d at 812). An antitrust action is a complex action to prosecute. <u>In re Linerboard Antitrust Litig.</u>, MDL No. 1261, 2004 U.S. Dist. LEXIS 10532 at *34 (E.D. Pa. June 2, 2004).

This litigation involves federal and state antitrust claims, as well as alleged RICO and conspiracy violations, by numerous brokerage and insurance companies. Over the course of this seven year litigation, Class Counsel have reviewed over sixty million pages of documents and taken over 200 depositions. (Pls.' Mot. Br. at 4.) There are over seventy Settling Defendants. Further, as stated above, settlements have already been achieved and approved with the Zurich, Marsh and Gallagher Defendants. <u>See</u> <u>In re Ins. Brokerage Antitrust Litig.</u>, 579 F.3d 241 (3d Cir. 2009).

By reaching a favorable Settlement with most of the remaining Defendants prior to the disposition of Defendants' renewed dismissal motions or even an eventual trial, Class Counsel have avoided significant expense and delay, and have also provided an immediate benefit to the Settlement Class. A trial on the merits would entail considerable expense and would not necessarily end the litigation. As explained by the Court in the prior three settlements, "[t]o proceed with litigation of this matter would undoubtedly become a costly and lengthy process for

all parties." In re Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *4; 2007 WL 2589950, at *4; and 2007 WL 542227, at *4; see also Hall v. AT&T Mobility, No. 07-5325, 2010 WL 4053547, at *7 (D. N.J. Oct. 13, 2010) ("Importantly, of course, settlement also provides the Class with immediate, definite relief.").

As a result, this factor weighs strongly in favor of approval of the Settlement. See In re Warfarin Sodium Antitrust Litig., 391 F.3d at 535-36 (finding that the first Girsh factor weighed in favor of settlement because "continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial").

### B.  Reaction of the Class to the Settlement

In determining the reaction of the class to the settlement, this second factor "attempts to gauge whether members of the class support the settlement." In re Lucent Techs, Inc., Sec. Litig., 307 F. Supp. 2d 633, 643 (D. N.J. 2004) (internal quotation omitted).  There are only eighty Settlement Class members, out of approximately 1.2 million, that have elected to exercise their opt-out rights.  In addition, only seven potential Settlement Class members filed objections. As explained above, out of these seven, one objector (Fortune Brands) subsequently withdrew its objection and another objector (Huntsman) opted out of the Settlement.  As the Third Circuit articulated in In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 305 (3d Cir. 2005), "such a low level of objection is a 'rare phenomenon.'"  Consequently, the Court concludes that the small number of objections by Class Members to the Settlement weighs in favor of approval. In re Ins. Brokerage Antitrust Litig., 2007 WL 2589950, at *5 (approving the Gallagher settlement where only two class members filed objections and noting that such a small number of objections strongly weighs in favor of approval).

## C. The Stage of the Proceedings and the Amount of Discovery Completed

The Court should consider the stage of the proceedings and the amount of discovery completed in order to evaluate the degree of case development that Class Counsel have accomplished prior to settlement.  Through this lens, courts can determine whether Class Counsel had an "adequate appreciation of the merits of the case before negotiating." Cendant, 264 F.3d at 235 (quoting In re General Motors, 55 F.3d at 813).  The Court notes that this action has been vigorously litigated for over seven years.  During that period, a considerable amount of time, money and effort has been expended by all parties.  Indeed, as stated above, the parties deposed nearly 200 persons, and produced over sixty million pages of documents.  (Pls.' Mot. Br. at 9-10.)  There has been substantial discovery and motion practice.  Based upon the amount of time Class Counsel expended in the discovery process, in responding to motions to dismiss, and in negotiations, the Court concludes that Class Counsel had a thorough appreciation of the merits of the case prior to settlement.  Accordingly, the Court determines that this factor weighs strongly in favor of settlement.  See In re Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *5; 2007 WL 2589950, at *5; and 2007 WL 542227, at *6.

## D. Risks of Establishing Liability

This risks of establishing liability should be considered to "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." Cendant, 264 F.3d at 237 (quoting In re General Motors, 55 F.3d at 814).  "The inquiry requires a balancing of the likelihood of success if 'the case were taken to trial against the benefits of immediate settlement.'" In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 89 (D. N.J. 2001) (quoting In re Prudential Ins. Co. America Sales Practice Litig. Agent Action, 148 F.3d 283, 319 (3d Cir. 1998)).

To succeed at trial, Plaintiffs must prove the elements of their various claims, which include federal antitrust, RICO and state law claims. Defendants have re-filed their motions to dismiss and this Court has yet to consider Defendants' arguments. In addition, possible appeals, summary judgment motions and trial still remain. As explained in connection with approval of the Marsh, Gallagher and Zurich settlements, "this case involves difficult factual and legal issues which would have translated into protracted litigation and accumulating expenses, in both time and money." In re Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *6; 2007 WL 2589950, at *6; and 2007 WL 542227, at *6. Accordingly, the Court concludes that this factor weighs in favor of approval.

### E. Risks of Establishing Damages

This factor, which measures the risks of establishing damages, also "attempts to measure the expected value of litigating the action rather than settling it at the current time." Cendant, 264 F.3d at 239 (quoting In re General Motors, 55 F.3d at 816). Plaintiffs' allegations of damages would require a complicated analysis involving sophisticated expert opinions. Defendants would likely counter with their own experts and a "battle of the experts" would ensue. See In re Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *6; 2007 WL 2589950, at *6; and 2007 WL 542227, at *7. Plaintiffs acknowledge the inherent risks this situation presents. (Pls.' Mot. Br. at 19-20.) Thus, significant risks exist in establishing both liability and damages and this factor weighs strongly in favor of approval.

### F. Risks of Maintaining Class Action Status through Trial

The Court also finds that the sixth factor, the risk of maintaining class action status through trial, weighs in favor of approval of the Settlement. "Because the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from

11

the [class] action, this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." In re Warfarin Sodium Antitrust Litig., 391 F.3d at 537. The Settlement Class has been preliminarily certified for settlement purposes only (Preliminary Approval Order at 7-9), and if this case were to proceed to trial, Plaintiffs acknowledge that Defendants will "undoubtedly" contest class certification on various grounds. (Pls.' Mot. Br. at 20.) Thus, Plaintiffs concede that "the eventual outcome of litigating class certification remains uncertain." (Pls.' Mot. Br. at 20.)

### G. The Settling Defendants' Ability to Withstand a Greater Judgment

In Cendant, the Third Circuit interpreted this factor as concerning "whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." 264 F.3d at 240. While Plaintiffs might concede that Defendants could withstand a larger judgment, they do submit that many settlements are approved even where a settling party has the ability to pay a greater amount. (Pls.' Mot. Br. at 21.) See, e.g., In re Warfarin Sodium Antitrust Litig., 391 F.3d at 538; Yong Soon Oh v. AT&T Corp., 225 F.R.D. 142, 150-51 (D. N.J. 2004). In light of this consideration, the Court concludes that this factor weighs in favor of approval.

### H. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The eighth and ninth factors, the range of reasonableness of the Settlement Fund in light of the best possible recovery and the attendant risks of litigation, also weigh in favor of settlement. "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. The percentage recovery, rather must represent a material percentage recovery to plaintiff in light of all the risks considered under Girsh." In re Cendant Corp. Sec.

Litig., 109 F. Supp. 2d 235, 263 (D. N.J. 2000) (emphasis added) (citations omitted) (internal quotations marks omitted).  Plaintiffs argue that the significant and immediate monetary and non-monetary benefits that will accrue to Settlement Class members outweigh the risks and uncertainties that Plaintiffs will face at trial.  (Pls.' Mot. Br. at 21-22.)  Plaintiffs also submit that Class Counsel engaged economic experts to evaluate the possible range of damages and that $41 million represents a material percentage considering the significant risks if litigation proceeds. (Id.)  Therefore, the Court finds that these factors favor settlement.

## I.  Summary of Girsh Factors

In conclusion, the Court holds that the nine Girsh factors weigh in favor of approval.  The Settlement Agreement was reached after arm's-length negotiations between experienced counsel after completion of a significant amount of discovery and motion practice.  Therefore, the Court concludes that the settlement of $41 million represents a reasonable and adequate result for the Settlement Class considering the substantial risks Plaintiffs face and the immediate benefits provided by the Settlement.

## J.  Plan of Allocation

The Court must determine whether the Plan of Allocation contemplated in the Settlement Agreement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  As noted above, the Settlement Agreement creates a Settlement Fund of $41 million, 85% of which will be distributed to the Excess Casualty Claimants.  (Settlement Agreement, Ex. 7.)  The remaining 15% will be used to fund a cy pres award that will be paid to charitable organizations.   (Id.) Taking into consideration the objections to the Plan of Allocation, which are discussed in detail below, this Court concludes that the Plan satisfies the standard set forth in Rule 23(e).

## V.   CLASS CERTIFICATION

On June 28, 2011, the Court preliminarily approved the proposed Settlement Agreement and preliminarily certified the Settlement Class.  Rule 23 of the Federal Rules of Civil Procedure requires the Court to engage in a two-step analysis to determine whether to certify a class action for settlement purposes.   First, the Court must determine if Plaintiffs have satisfied the prerequisites for maintaining a class action as set forth in Rule 23(a).  If Plaintiffs can satisfy these prerequisites, the Court must then determine whether the alternative requirements of Rule 23(b) are met.  See Fed. R. Civ. P. 23(a) advisory committee's note.  "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial."  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997).  Rule 23(a) provides that class members may maintain a class action as representatives of a class if they show that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

### A.  Rule 23(a) Factors

#### 1.  Numerosity

Courts will ordinarily discharge the prerequisite of numerosity if "the class is so numerous that joinder of all members is impracticable."   Fed. R. Civ. P. 23(a)(1); see also Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).  Plaintiffs "need not precisely enumerate the potential size of the proposed class, nor [are] plaintiff[s] required to demonstrate that joinder would be impossible."  Cannon v. Cherry Hill Toyota, Inc., 184 F.R.D. 540, 543 (D.

N.J. 1999) (citation omitted). "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001) (citation omitted).

Here, Settlement Class members number more than 1.2 million. (Pls.' Mot. Br. at 25.) The Claims Administrator retained by Class Counsel mailed 1,159,148 postcard notices to potential Class Members. (Pls.' Mot. Br. at Ex. 1.) "There can be no serious question that joinder of all these parties, geographically dispersed throughout the United States, would be impracticable." In re Corrugated Container Antitrust Litig., 80 F.R.D. 244, 247 (S.D. Tex. 1978). The Settlement Class thus easily satisfies the numerosity requirement, as "numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the [numerosity] requirement." Weiss v. York Hosp., 745 F.2d 786, 808 n.35 (3d Cir. 1984); see also In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 342 (3d Cir. 2010) (affirming the district court's certification of the settlement class where the class included "thousands of consumers").

## 2. Commonality

Plaintiffs must demonstrate that there are questions of fact or law common to the class to satisfy the commonality requirement. Fed. R. Civ. P. 23(a)(2). The Supreme Court recently clarified the standard, emphasizing that a plaintiff must show that class members "have suffered the same injury," not merely a violation of the same law. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011) (quoting Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 157, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). Furthermore, the Court held that "commonality is satisfied where common questions generate common *answers* 'apt to drive the resolution of the litigation.'" Wal-Mart, 131 S. Ct. at 2551 (emphasis added). "Their claims must depend upon a common contention[,] . . . [which] must be of such a nature that it is capable

15

of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551. Still, "commonality does not require an identity of claims or facts among class members[;]" rather, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001) (citation omitted).

Due to the conspiratorial nature of allegations in antitrust and RICO actions, such cases often present common questions of law and fact and are frequently certified as class actions. See, e.g., In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 478 (W.D. Pa. 1999) (noting that "allegations concerning the existence, scope and efficacy of an alleged conspiracy present questions adequately common to class members to satisfy the commonality requirement") (citation omitted); Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207, 231-32 (D. N.J. 2005) (noting that "even a few common issues can satisfy this requirement where their resolution will significantly advance the litigation" and finding commonality satisfied in a RICO class action) (citation omitted); Hoffman Elec., Inc. v. Emerson Elec. Co., 754 F. Supp. 1070 (W.D. Pa. 1991) (finding commonality where both named plaintiffs and class members sought to bring RICO and breach of fiduciary claims).

In this case, there are many common questions of law and fact. These include, inter alia: (a) whether the Settling Defendants engaged in a contract, combination or conspiracy to allocate the market for the sale of insurance; (b) whether the Settling Defendants' contract, combination or conspiracy reduced and unreasonably restrained competition in the sale of insurance; (c) whether the Settling Defendants participated in a pattern of racketeering activity; and (d) whether

16

the Settling Defendants violated RICO.  (Pls.' Mot. Br. at 25-26.)  The commonality requirement is therefore clearly satisfied.  See In re Pet Food Prods. Liab. Litig., 629 F.3d at 342-43 (affirming the district court's certification of the settlement class where the commonality prong was satisfied based on the district court's finding that several questions of law and fact were common to the class).

### 3.  Typicality

Rule 23(a)(3) requires that a representative plaintiff's claims be "typical of the claims . . . of the class."  "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals."  Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir. 1998)(citation omitted), cert denied, 526 U.S. 1114 (1999).  As with numerosity, the Third Circuit has "set a low threshold" for satisfying typicality, holding that "[i]f the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established..." Newton, 259 F.3d at 183-84; see also Baby Neal, 43 F.3d at 58.  The typicality requirement "does not mandate that all putative class members share identical claims."  Newton, 259 F.3d at 184; see also Hassine v. Jeffes, 846 F.2d 169, 176-77 (3d Cir. 1988).

Here, the named Plaintiffs' claims are typical of those brought by the Settlement Class members at large.  See, e.g., In re Pet Food Prods. Liab. Litig., 629 F.3d at 342 (affirming the district court's certification of the settlement class where "the claims of the class representatives [were] aligned with those of the class members since the claims of the representatives ar[ose] out of the same conduct and core facts"); Grasty v. Amalgamated Clothing and Textile Workers Union, 828 F.2d 123, 130 (3d Cir. 1987), cert. denied, 484 U.S. 1042 (Jan. 25, 1988) (finding the typicality requirement met because the claims brought by the named plaintiffs and those brought

on behalf of the class "stem from a single course of conduct"). The claims at issue arise from the same course of conduct by the Settling Defendants. See In re Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *11; 2007 WL 2589950, at *11; and 2007 WL 542227, at *14 (stating that "the claims made by named Plaintiffs and those made on behalf of Settlement Class members are indistinguishable, encompassing identical allegations" that the Settling Defendants violated federal and state antitrust laws, RICO and common law fiduciary duty); see also In re Ins. Brokerage Antitrust Litig., 579 F.3d at 265.

### 4. Adequacy of Representation

Finally, the Court must consider adequacy of representation both as to the named Plaintiffs and their Class Counsel under Rules 23(a) and (g). The class representatives should "fairly and adequately protect the interests of the class." Georgine v. Amchem Products, Inc., 83 F.3d 610, 630 (3d Cir. 1996). Such class representatives must not have interests antagonistic to those of the class. Id. In order to find an "antagonism between [named] plaintiffs' objectives and the objectives of the [class]," there would need to be a "legally cognizable conflict of interest" between the two groups. Jordan v. Commonwealth Fin. Sys., Inc., 237 F.R.D. 132, 139 (E.D. Pa. 2006). In fact, courts have found that a conflict will not be sufficient to defeat a class action "unless [that] conflict is apparent, imminent, and on an issue at the very heart of the suit." In re Flat Glass Antitrust Litig., 191 F.R.D.. at 482 (citing In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 513 (S.D.N.Y. 1996)).

Here, there is no indication that the named Plaintiffs' interests are antagonistic to those of the absent class members. "The central questions in this case . . . animate[] in an identical fashion the claims of both groups. In addressing these common questions, the named Plaintiffs have advocated as vigorously for the absent class members as they have for themselves." In re

Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *11; 2007 WL 2589950, at *11; and 2007
WL 542227, at *15.

     As to Class Counsel's adequacy, the Court has already found that the two firms serving
as Plaintiffs' Class Counsel have "successfully prosecuted numerous antitrust actions," and that
the individual attorneys representing these firms, Edith Kallas and Bryan Clobes, are "clearly
well qualified and experienced class action attorneys who have been involved in similar . . .
litigation around the country."  In re Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *11;
2007 WL 2589950, at *11; and 2007 WL 542227, at *14 (citations omitted); see also In re Pet
Food Prods., 629 F.3d at 343, fn.15; In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 257 (3d
Cir. 2009).

     With this last requirement satisfied, it is clear that the Settlement Class in this case has
demonstrated compliance with the elements of Rules 23(a) and (g).

### B. Rule 23(b)(3) Factors

     The Court must next address the question of whether the class action also comports with
the requirements of Rule 23(b).  Under 23(b)(3), the Court must find both that "the questions of
law or fact common to the members of the class predominate over any questions affecting only
individual members, and that a class action is superior to other available methods for the fair and
efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3); (Pls.' Mot. Br. at 29.)  As
explained below, the class action in this case readily meets these requirements of predominance
and superiority.

### 1.  Questions of Law and Fact Common to the Class Predominate

     To satisfy the predominance requirement, parties must do more than merely demonstrate
a "common interest in a fair compromise"; instead, they must provide evidence that the proposed

class is "sufficiently cohesive to warrant adjudication by representation." <u>Amchem Prods., Inc.</u> <u>v. Windsor</u>, 521 U.S. 591, 623, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).  However, the "presence of individual questions . . . does not mean that the common questions of law and fact do not predominate." <u>Eisenberg v. Gagnon</u>, 766 F.2d 770, 786 (3d Cir. 1985) (finding that, in the context of a securities class action, even the presence of individual questions as to the reliance of each individual class member did not negate the predominance of the class' common claims).  Given that antitrust class action suits are particularly likely to contain common questions of fact and law, it is not surprising that these types of class actions are also generally found to meet the predominance requirement.  In <u>Amchem</u>, the Supreme Court noted that "[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." 521 U.S. at 625.  The Third Circuit has also indicated that because the clear focus of an antitrust class action is on the allegedly deceptive conduct of the defendant, and not on the conduct of individual class members, common issues necessarily predominate.  <u>In re Warfarin</u> <u>Sodium Antitrust Litig.</u>, 391 F.3d at 528-29; <u>accord</u> <u>In re Linerboard Antitrust Litig.</u>, 305 F.3d 145, 162 (3d Cir. 2002), <u>cert. denied</u>, 538 U.S. 977 (2003).

Here, as discussed in the sections on commonality and typicality, the claims of both the named Plaintiffs and the absent class members arise from the same set of facts regarding the alleged collusive and anti-competitive behavior of the Settling Defendants.  In affirming the prior settlements, the Third Circuit found that common issues predominated.  <u>See</u> <u>In re Ins. Brokerage</u> <u>Antitrust Litig.</u>, 579 F.3d at 269 (explaining that "whether the named plaintiffs and absent class members were proximately injured by the conduct of the Zurich Defendants is a question that is capable of proof on a class-wide basis").  Consequently, the predominance requirement is satisfied.

### 2.  A Class Action is Superior to Other Available Methods

To demonstrate that a class action is "superior to other available methods" for bringing suit in a given case, the Court must "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." Georgine, 83 F.3d at 632 (citing Katz v. Carte Blanche Corp., 496 F.2d 747, 757 (3d Cir. 1974) (en banc), cert. denied, 419 U.S. 885 (1974)).  One consideration is the economic burden class members would bear in bringing suits on a case-by-case basis.  Class actions have been held to be especially appropriate where "it would be economically infeasible for [individual class members] to proceed individually."  Stephenson v. Bell Atl. Corp., 177 F.R.D. 279, 289 (D. N.J. 1997). Another consideration is judicial economy.  In a situation where individual cases would each "require[] weeks or months" to litigate, would result in "needless duplication of effort" by all parties and the Court, and would raise the very real "possibility of conflicting outcomes," the balance may weigh "heavily in favor of the class action."  In re Corrugated Container Antitrust Litig., 80 F.R.D. 244, 252-53 (S.D. Tex. 1978); See also Klay v. Humana, Inc., 382 F.3d 1241, 1270 (11th Cir. 2004) (finding a class action to be the superior method because it would be costly and inefficient to "forc[e] individual plaintiffs to repeatedly prove the same facts and make the same legal arguments before different courts"); Sollenbarger v. Mountain States Tel. & Tel. Co., 121 F.R.D. 417, 436 (D. N.M. 1988) (finding that, in contrast to the multiple lawsuits that members of a class would have to file individually, the "efficacy of resolving all [of] plaintiffs' claims in a single proceeding is beyond discussion").

To litigate the individual claims of even a fraction of the potential class members would place a heavy burden on the judicial system and require unnecessary duplication of effort by all parties.  It would not be economically feasible for the Settlement Class members to seek

individual redress.  The litigation of all claims in one action is far more desirable than numerous, separate actions and therefore the superiority requirement is met.

## VI.   NOTICE AND OBJECTIONS RELATED TO NOTICE

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class."  In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 306 (3d Cir. 1998) (citation omitted).  Under Federal Rule of Civil Procedure 23(c), notice must be disseminated by "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B);  See also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 175-76, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974) (finding that Rule 23 (c) includes an "unambiguous requirement" that "individual notice must be provided to those class members who are identifiable through reasonable effort").

Additionally, in this case, where a settlement class has been provisionally certified and a proposed settlement preliminarily approved, proper notice must meet the requirements of Federal Rules of Civil Procedure 23(c)(2)(B) and 23(e).  Larson v. Sprint Nextel Corp., No. 07-5325, 2009 U.S. Dist. LEXIS 39298, 2009 WL 1228443, at *2 (D. N.J. April 29, 2009) (Linares, J.). 23(c)(2)(B)-compliant notice must inform class members of: (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) the class member's right to retain an attorney; (5) the class member's right to exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment on class members under Rule 23(c)(3).  Id. at *7; Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).  Rule 23(e) notice must contain a

summary of the litigation sufficient "to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections." <u>In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions</u>, 177 F.R.D. at 231.

The Court finds that the parties complied with the requirements set forth by Rules 23(c)(2)(B) and 23(e). The notice plan was thorough and included all of the essential elements necessary to properly apprise absent Settlement Class members of their rights. The Postcard Notices included: (1) the nature of the action and the class claims; (2) a description of the class; (3) a description of the Settlement and the benefits provided to class members; (5) the deadline to object to the Settlement or request exclusion from the class; (6) the consequences of requesting exclusion or not doing so; (7) how to get more information about the Settlement; (8) the date of the Fairness Hearing; (9) and other information regarding the Fairness Hearing. (Pls.' Mot. Br. at 57.) The Publication Notice also contained all of this information. Settlement Class members were also directed to a website and phone number for more details regarding the Settlement, Plan of Allocation, procedures for exclusion or objection, and the documents relating to the Settlement. (<u>Id.</u> at 57-58.) Further, the Postcard Notices, Detailed Notice and Publication Notice were written simply and plainly. The notice methodology was reasonable, and adequate and sufficient notice was given to all persons entitled to be provided with notice. Finally, the notice plan was consistent with those of numerous other class actions. <u>See, e.g.</u>, <u>In re Linerboard Antitrust Litig.</u>, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004); <u>In re Toys 'R' Us Antitrust Litig.</u>, 191 F.R.D. 347, 350-51 (E.D.N.Y. 2000).

### A. Pierson's Objection to Notice

There are only three objections to the notice. First, Pierson argues that the notice was inadequate because it did not provide information regarding the specific settlement benefits for

each party.  (Pierson Objection 2-3.)  The Court overrules this objection because the Plan of Allocation, available to both Pierson and his attorney, was sufficiently explained in the Detailed Notice.  More importantly, however, Rule 23(e) does not require that a notice contain every specific detail related to the settlement.  See, e.g., In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 124 (S.D.N.Y. 1997) ("Nor does the adequacy of notice turn on the ability of an individual Class Member to calculate the amount of his or her actual recovery under the settlement.").  Rather, "settlement notices need only describe the terms of the settlement generally."  In re Michael Milken & Assocs. Sec. Litig., 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (citations omitted).

### B.  Signum's Objection to Notice

Signum has also objected to the notice.  However, Signum also filed a Request for Exclusion.  The parties disagree as to whether Signum has standing to object to the Settlement Agreement based on its simultaneous Request for Exclusion.  (See Pls.' Mot. Br. at 41-42; Signum Objection 1 n.1; Aon Response 6-7; Fairness Hearing Tr. 33-34.)  The case law does not suggest that a class member requesting exclusion from a settlement may nonetheless object to that settlement.  Mayfield v. Barr, 985 F.2d 1090 (D.C. Cir. 1993) (explaining that individuals that opt out of a settlement have *no* standing to challenge the court's approval of a settlement agreement); Olden v. LaFarge Corp., 472 F. Supp. 2d 922, 931 (E.D. Mich. 2007) (explaining that to allow a class member to simultaneously opt-out of a settlement and object to the settlement "would countenance the practice of influencing litigation -- or attempting to do so -- in which the class member really has no stake"); Agretti v. ANR Freight Sys., Inc., 982 F.2d 242, 247 (7th Cir. 1992) (concluding that a non-settling *defendant* lacked standing to challenge settlement); In re School Asbestos Litig., 921 F.2d 1330, 1331 (3d Cir. 1990) (same); see also

24

Manual for Complex Litigation, § 21.643 (4th ed.) ("Any class member *who does not opt out* may object to a settlement, voluntary dismissal, or compromise that would bind the class.") (emphasis added).

In Mayfield, the class members requesting exclusion from the settlement attempted to argue that approval of the settlement would result in problems with "resource sharing," "broader discovery" and "bargaining power." Id. at 1093. In rejecting the class members' arguments, the court first explained the general rule that "nonsettling parties in multi-party cases lack standing to object to settlement agreements on appeal." Id. at 1092. The court then stated:

> An exception to the general rule is recognized for nonsettling parties who demonstrate "prejudice" from the settlement. "[P]rejudice" in this context means "plain legal prejudice," as when "the *settlement strips the party of a legal claim or cause of action*." (citations omitted) If [the class members who opted out]…had standing for the reasons they suggest, so would every other former member of a class. The sort of harm they identify is *no different than that experienced by any plaintiff who chooses to opt out of any class action and go it alone*. By fully preserving their right to litigate their claims independently, Mayfield and Edwards escaped the binding effect of the class settlement. To hold that they nevertheless retained standing to challenge the order approving the settlement and dismissing the class action would be to allow the exception to swallow the rule.

Id. at 1093 (emphasis added).

Signum has not provided any evidence that approval of the Settlement will result in prejudice to its claims against Aon Risk Services of the Carolinas ("ARS Carolinas"), a subsidiary of Defendant Aon. In fact, because Signum is not bound by the terms of the Settlement agreement, Signum remains free to pursue its claims against Defendant Aon and/or ARS Carolinas.[5]

Although the Court is not persuaded by Signum's argument that it has standing to object to the Settlement because the Settlement "legally prejudices Signum's class claims," it will nonetheless consider the merits of Signum's objections. (Signum Objection 1 n.1.) See Hall v.

---

[5] See discussion, infra, regarding Judge Brown's previous holding that Signum did not have a class preserved from prior litigation.

AT&T Mobility, LLC, No. 07-5325, 2010 WL 4053547, at *13 n.22 (D.N.J. Oct. 13, 2010).

According to Signum, the notice is defective because it does not contain the information needed to determine whether a person is a member of the Settlement Class, it does not provide the specific amount Defendant Aon is contributing to the Settlement Fund, and it fails to inform class members of the Daniel class action or Signum's purported class action. (Signum Objection 21-23.) The Court finds each of Signum's objections to the notice to be without merit.

With regard to Signum's objection that the notice does not contain the information needed to determine whether a person is a member of the Settlement Class, the Court finds that the notice identifies class members as persons and entities that "purchased commercial insurance policies from any of the Insurer Defendants through any of the Broker Defendants." (See, e.g., Settlement Agreement, Exhibits 3-6.) The notice further defines "Broker Defendants" as "Aon [] along with their related companies." (Id.) As explained by Judge Brown at the Preliminary Approval Hearing, it is clear that Plaintiffs and Defendants intended to include all subsidiaries, including ARS Carolinas, the defendant named in Signum's complaint, in the consolidated action. (Preliminary Approval Hearing Tr. 25.) Thus, the Court finds that the notice adequately describes the Settlement Class. As for the objection to the notice not providing information about Aon's contribution to the Settlement Fund, the Court fails to understand why Aon's specific contribution is relevant, nor does Signum provide any explanation.

Finally, with regard to notifying the Settlement Class of other cases, Signum has not convinced the Court that the notice must include either the Daniel class action,[6] a case that is

---

[6] In Daniel v. Aon Corporation, 99-CH-11893 (Cook Cnty., Ill. Ch. Ct.), a nationwide class of plaintiffs asserted breach of fiduciary duty and other claims against Defendant Aon relating to Defendant Aon's allegedly improper receipt of contingent commissions. (Aon Response to Signum Objection 2.) The Circuit Court of Cook County, Illinois, concluded that Signum itself was not a class member because ARS Carolinas, a former subsidiary of Defendant Aon and the entity from which Signum purchased its insurance, was not eligible to receive contingent

settled and closed, or Signum's purported class action lawsuit.  First, to the extent that Signum references its "class," Judge Brown has already held that there was no indication of a class retained by Signum from the <u>Daniel</u> class action.  (Preliminary Approval Hearing Tr. 25.) ("[T]here is no indication here that there is a class preserved of South Carolina individuals.") Second, according to Signum's own cited case, <u>Mirfasihi v. Fleet Mort. Corp.</u>, 356 F.3d 781, 785 (7th Cir. 2004), notice of another class action lawsuit is not required to obtain an acceptable settlement.  Finally, even assuming Signum had a certified class, notice of "a pending suit that might offer only remote prospects of success might confuse class members and precipitate imprudent opting out."  <u>Id.</u>[7]

## C. Bacharach's Objection to Notice

Bacharach previously appeared as a lawyer for objectors whose objections were overruled, and now objects on his own behalf.  (Pls.' Mot. Br. at 60.)  Bacharach argues that the notice "fails to inform class members regarding what percentage of class members are Excess Casualty Claimant subclass members, or why only Excess Casualty Claimant subclass members

---

commissions on any of the insurance that Signum purchased.  <u>Daniel v. Aon Corporation</u>, 99-CH-11893 (Cook Cnty., Ill. Ch. Ct. 2005).  The Illinois Appellate Court affirmed the trial court's holding that Signum was not a class member and therefore lacked standing to object to the class settlement.  <u>Daniel v. Aon Corporation</u>, 99-CH-11893 (Ill. App. Ct. 2008).  The Appellate Court stated that "[i]f Signum desires a separate class action on behalf of similarly situated policyholders, it may maintain one," but further cautioned that "[i]t is possible that the class definition approved by the trial court will preclude many policyholders from being a class member in a Signum-led class action."  <u>Id.</u> at 38.  The Appellate Court explained that "Signum specifically requested that the trial court find that Aon should be judicially estopped from asserting that other similarly situated policyholders are members of the class.  The trial court declined to extend its holding beyond Signum and this court will not second guess the trial court's decision."  <u>Id.</u>  All appeals of the <u>Daniel</u> judgment have been exhausted and the judgment is now final.

[7] Signum has also filed a Motion for Injunctive Relief and a Protective Order.  Signum's Motion repeats many of these same objections to the notice, and further states that the notice is defective because it does not identify "the potential for recovery and the differences in the remedies available under South Carolina law." (Signum Motion at 7.)   However, the class complaint does include a cause of action under South Carolina antitrust law (2d Consol. Am. Compl. ¶ 715), and thus would encompass those remedies.

27

get actual relief from the proposed settlement." (Bacharach Objection 2.) First, as discussed above, the Court finds that the notice is sufficient under the relevant law. Second, as detailed below, Plaintiffs have demonstrated a rational basis for the differing treatment of Settlement Class members under the Plan of Allocation.

In conclusion, the Court finds that the notice fully complied with all of the requirements of Rules 23(c)(2)(B) and 23(e).

## VII.   OBJECTIONS NOT RELATED TO NOTICE

There are only five remaining objections to the Settlement Agreement – those of Signum, Gourmet Catalog, Palm Tree, Bacharach and Pierson. These objections on grounds other than notice are discussed herein.

### A. Signum's Objection That Plaintiffs Do Not Have Standing to Represent Signum's Claims

Signum argues that Plaintiffs lack standing to represent Signum or the South Carolina class that Signum purports to represent because the named Plaintiffs did not purchase insurance from ARS Carolinas. (Signum Objection 5-7.) Signum argues that ARS Carolinas was named in Signum's South Carolina complaint, but not in Plaintiffs' consolidated complaint, and therefore "Signum and other South Carolina entities who purchased commercial insurance through broker services of Aon Risk Services Carolinas, Inc. are not members of the proposed settlement class." (Preliminary Approval Hearing Tr. 24-25.) The Court concludes that Plaintiffs have standing to represent Signum's claims.

First, Signum's South Carolina state law claims are based on the same factual predicate asserted by Plaintiffs, including an alleged conspiracy to profit from contingent commissions. (Pls.' Mot. Br. at 44-46.) See In re Prudential Ins. Co. Sales Practice Litig., 148 F.3d 283, 326

(3d Cir. 1998) (explaining that a court can approve a settlement that releases claims not specifically alleged in the complaint so long as they are based on the same factual predicate as those claims litigated and contemplated by the settlement); see also In re Ins. Brokerage Antitrust Litig., MDL No. 1663, 2007 WL 542227, at *10 (D.N.J. Feb. 16, 2007) ("In class action settlements, releases may include all claims that arise out of the same course of conduct alleged in the Complaint . . . releases of known and unknown claims . . . or even claims over which the court lacked jurisdiction.") (quoting Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D 207, 244 (D.N.J. 2005)), aff'd, 618 F.3d 300 (3d Cir. 2010).

Second, it is well established that each member of a conspiracy is jointly and severally liable for all damages resulting from the conspiratorial conduct. See Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 646 (1981); see also Paper Sys., Inc. v. Nippon Paper Indus., Co., 281 F.3d 629, 632 (7th Cir. 2002). Plaintiffs thus have standing to pursue claims against ARS Carolinas, even though this defendant was not specifically named in the consolidated Complaint, because ARS Carolinas was part of the alleged conspiracy. The consolidated complaint defined the "Aon Broker-Centered Class" as "all persons or entities who . . . engaged the services of any one of the AON Defendants, or any of their subsidiaries or affiliates, in connection with the purchase or renewal of insurance from an insurer." (2d Consol. Am. Compl. ¶ 555(b)).

As Judge Brown noted when granting preliminary approval of the Class Settlement, the Settling Defendants' affiliated individuals and entities, like ARS Carolinas, are properly included within the scope of a settlement release.[8] Judge Brown specifically stated that "if one accepts [Signum's] position, there really wouldn't be an MDL here because most,[] if not all, of the

---

[8] This is true even if, as Signum argues, Aon Risk Services is no longer an active subsidiary of Defendant Aon. (Signum's Motion at 8-9.)

29

defendants, seem to act through local subsidiaries.  And if you say the local subsidiaries cannot and were not intended to be included in the MDL, then it would seem that we have a nullity." (Preliminary Approval Hearing Tr. 11.)  See also In re Prudential Ins. Co. Sales Practices Litig., 962 F. Supp. 450, 559 (D.N.J. 1997) ("A settlement with Prudential alone would lack finality because if dissatisfied policyholders sued Prudential agents, the agents would likely turn to Prudential for indemnity or contribution.").  Therefore, Judge Brown concluded that there was no intent to carve out ARS Carolinas from the Settlement and that Signum's position with regard to standing was "without merit."  (Preliminary Approval Hearing Tr. 25-26.) ("I can't find that there was an intent here to carve out the Aon Risk Services Carolinas, Inc. from this settlement.")

Accordingly, the Court finds that Plaintiffs have standing to pursue Signum's claims against ARS Carolinas.

## B. Signum's Objection Related to ARS Carolinas and Compliance with Rule 23

Signum's argument focuses on the fact that Plaintiffs did not have direct dealings with ARS Carolinas.  (Signum Objection 8-15.)  In connection with this, Signum argues that the Settlement Class lacks Rule 23's requirements of commonality, typicality, adequacy of representation and predominance.  (Signum Objection 8-15.)  Although the Court has already detailed the factors in support of certification of the Settlement Class, the Court will briefly address Signum's arguments.

### 1. Rule 23(a)(2): Commonality

Plaintiffs have alleged a conspiracy to profit from contingent commissions.  Numerous common questions of law and fact arise from Plaintiffs' transactions with the Settling

Defendants and/or their local affiliates and subsidiaries. (See, e.g., 2d Consol. Am. Compl. ¶ 560.)  As this Court has already concluded on three separate occasions, "[d]ue to the conspiratorial nature of allegations in antitrust and RICO actions, such cases often present common questions of law and fact and are frequently certified as class actions." In re Ins. Brokerage Antitrust Litig., No. 04-5184, 2009 WL 411877, at *10 (D.N.J. Feb. 17, 2009); In re Ins. Brokerage Antitrust Litig., No. 04-5184, 2007 WL 2589950, at *10 (D.N.J. Sept. 4, 2007); In re Ins. Brokerage Antitrust Litig., No. 04-5184, 2007 WL 542227, at *13 (D.N.J. Feb. 16, 2007).

Signum argues that the class lacks commonality because Signum's claims arise under South Carolina law. (Signum Objection 8-11.)  However, Signum ignores the fact that that the consolidated complaint includes a cause of action under South Carolina antitrust law. (2d Consol. Am. Compl. ¶ 715.)  In addition, Signum overlooks the commonality of the federal RICO claims shared by all class members.[9]  Finally, the Third Circuit has explained that state law differences will not preclude certification of a nationwide class unless there is clear evidence of a conflict of interest. See In re Pet Food, 629 F.3d at 348–49.  Thus, the Court finds that the factual predicate underlying Plaintiffs' claims meets the commonality requirement.

### 2. Rule 23(a)(3): Typicality

Similarly, Signum asserts that Plaintiffs cannot satisfy the typicality requirement because ARS Carolinas is not a named defendant in the consolidated action. (Signum Objection 11-12.) But, as addressed above, ARS Carolinas is one of the affiliates of Defendant Aon. Judge Brown specifically found that the MDL would be a nullity if local subsidiaries of Defendants, such as

---

[9] During the Fairness Hearing, Signum also argued that the remaining CIAB-RICO claims were insufficient to provide commonality and predominance to the claims of the Settlement Class. (Fairness Hearing Tr. at 58-61.)  In the Zurich Settlement, commonality, typicality and adequacy were found based on the very same CIAB-RICO claims. (Id.)

ARS Carolinas, were not included in the action.  (Preliminary Approval Hearing Tr. 11.)  Judge Brown therefore concluded that there was no intent to carve out ARS Carolinas from the Settlement.  Thus, because the typicality requirement "does not mandate that all putative class members share identical claims," In re Ins. Brokerage Antitrust Litig., No. 04-5184, 2009 WL 411877, at *10 (D.N.J. Feb. 17, 2009) (quoting Newton, 259 F.3d at 183), and because ARS Carolinas is properly included in the Settlement, Plaintiffs' claims meet the typicality requirement.

### 3.   Rules 23(a)(4) and (g): Adequacy

Signum argues that the named Plaintiffs cannot adequately represent Signum, or the South Carolina class that Signum purports to represent, based on the fact that none of the Plaintiffs purchased insurance through ARS Carolinas.  (Signum Objection 12-13.)  As explained above with respect to standing, Plaintiffs are able to represent Signum because: 1) Signum's South Carolina state law claims are based on the same factual predicate asserted by the MDL Plaintiffs; 2) ARS Carolinas, as a member of the alleged conspiracy, is jointly and severally liable for all damages resulting from the conspiratorial conduct; and 3) Judge Brown found that all local affiliates and subsidiaries of the Settling Defendants were properly included in the MDL.  (See supra, Section VII(A).)   Thus, the named Plaintiffs can adequately represent Signum.

Further, courts look to two factors in determining whether the named Plaintiffs will fairly and adequately protect the interests of the Settlement Class: (i) plaintiffs must be represented by counsel that is "qualified, experienced, and generally able to conduct the proposed litigation" and (ii) plaintiffs "must not have interests antagonistic to those of the class."  In re Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *11 (quoting Hoxworth v. Blinder, Robinson & Co., 980

F.2d 912, 923 (3d Cir.1992)).   The Court finds that both of these factors are met and thus the named Plaintiffs adequately represent the Settlement Class.   Signum has not presented any arguments to persuade the Court otherwise.

### 4.   Rule 23(b)(3): Predominance

Signum argues that common questions of law and fact do not predominate over the Settlement Class because the only remaining federal antitrust claim in the MDL is the alleged Marsh-Brokered Excess Casualty Insurance conspiracy.   (Signum Objection 13-15.)   However, as explained above, Signum overlooks the federal RICO claims shared by all class members. Both this Court and the Third Circuit have held that the RICO claims asserted in this litigation give rise to predominant questions of law and fact.   See In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 269–70 (3d Cir. 2009).   Specifically, the Third Circuit stated that "[b]ased on our analysis of the essential elements of the plaintiffs' federal claims [including RICO], we agree with the District Court's conclusion that common questions of law and fact predominate over any individual ones, and therefore the predominance requirement of Rule 23(b)(3) is satisfied." Id. at 270.   Moreover, the Rule 23(b)(3) predominance inquiry tests whether the proposed classes are "sufficiently cohesive to warrant adjudication by representation."   Amchem, 521 U.S. at 623; In re Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *12.   Thus, "[t]he presence of individual questions . . . does not mean that the common questions of law and fact do not predominate . . ."   In re Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *12. (quoting Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d. Cir. 1985)).   Here, as discussed in the sections on commonality and typicality, the claims of the class members arise from the same set of facts regarding the alleged collusive and anti-competitive behavior of the Settling Defendants.   In affirming the prior settlements, the Third Circuit found that common issues predominated.   This

Court concludes so as well.  Accordingly, the predominance requirement of Rule 23 is satisfied.

### C. Gourmet Catalog, Palm Tree and Bacharach's Generalized Objections Concerning Compliance with Rule 23

Gourmet Catalog, Palm Tree and Bacharach raise blanket objections to certification of the Settlement Class.  (Gourmet Catalog Objection 3-8; Palm Tree Objection 2-3; Bacharach Objection 2.)   Gourmet Catalog and Palm Tree merely incorporate the briefs of the remaining parties on this subject. (Gourmet Catalog Objection 2; Palm Tree Objection 2.)   For example, Gourmet Catalog states that "[t]his proposed Settlement Class does not meet the certification requirements of Federal Rule of Civil Procedure 23.  It lacks commonality, typically [sic], adequacy of representation and predominance of common issues." (Gourmet Catalog Objection 2.) Palm Tree has the identical statement in its objection. (Palm Tree Objection 2.)  Bacharach argues that the "class is not certifiable as a trial class or a settlement class." (Bacharach Objection 2.)   The Court finds these objectors' general arguments to be without merit.   As detailed above, the Settlement Class fully satisfies Rule 23.

### D. Signum, Palm Tree and Gourmet Catalog's Objections Concerning Subclasses

Signum, Palm Tree and Gourmet Catalog all assert that there are two "subclasses" – the Excess Casualty Claimants and the non-Excess Casualty Claimants.   The former purchased excess casualty insurance policies from AIG, AXIS, Fireman's Fund, Liberty Mutual, Travelers and XL, or a subsidiary or affiliate of these entities, through Marsh & McLennan Companies, and will receive 85% of the Settlement Fund.   The latter purchased insurance policies from Defendants Aon and Willis/HRH and will receive 15% of the Settlement Fund in the form of a cy pres award. (Signum Objection 16-20; Palm Tree Objection 2-3; Gourmet Catalog Objection

34

3-6.)  All three objectors claim that the Excess Casualty and non-Excess Casualty Claimants have interests different from and antagonistic to each other and thus require separate representation.

The Court's decision on whether to create subclasses is governed by Fed. R. Civ. P. 23(c)(5), which allows a class to be divided into subclasses "when appropriate."  See In re Prudential Ins. Co. America Sales Practice Litig.. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998) (noting that subclasses are necessary where certain class members "require specialized or distinct treatment" so that they "differ from other class members").  Subclasses are not required simply because various groups have differing legal theories or bases for relief.  See 7AA Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1790 (3d ed. 2006); see also In re Pet Food, 629 F.3d at 347-48 (affirming the district court's decision not to create subclasses because objectors did not present evidence of conflicts of interests); Ortiz v. Eichler, 616 F. Supp. 1046 (D. Del. 1985) (declining to create subclasses where different groups of a potential class sought recovery under different legal theories, as no divergent interests existed among class members); In re: Deutsche Telekom AG Secs. Litig., 229 F. Supp. 2d 277, 283 (S.D.N.Y. 2002) (holding that subclasses would not be created despite the fact that the class encompassed plaintiffs whose claims arose from two different disclosures by defendants, as the respective claims arose out of "a common core of facts and legal issues, deal[t] with overlapping or intertwined defendants, and attack[ed] various aspects of a uniform course of conduct").

The Court's treatment of similar objections in the prior three settlements is instructive. Indeed, the Court previously held that subclasses were not necessary in the circumstances of this litigation.  See In re Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *14 ("A class need not be divided into subclasses merely because different groups have alternative legal theories for

recovery, or because those groups have different factual bases for relief.") (citations omitted); accord In re Ins. Brokerage Antitrust Litig., 579 F.3d at 269. In connection with the Marsh Settlement, the Court held that the particular objector desiring separate subclasses "failed to raise, let alone describe, any divergent or antagonistic interests between the two groups, as is required in order for subclasses to be mandated." In re Ins. Brokerage Antitrust Litig., 2009 WL 411877, at *14. Instead, the objector argued only that "the proposed settlement's Plan of Allocation distribute[d] different percentages of the Settlement Fund between the Marsh and Non-Marsh Claimants." Id. The Court explained that even if "the relief sought may vary among named representatives and members of the class," this "does not, however, show conflicting or antagonistic interests." Id.

The objections focus on the Plan of Allocation and the differing treatment of Settlement Class members with regard to monetary compensation. (Signum Objection 16-20; Palm Tree Objection ar 2-3; Gourmet Catalog Objection 3-6.) As explained below, the Plan of Allocation is based on the relative strengths of the Settlement Class members' claims. Other than generalizations that the named Plaintiffs and Class Counsel are advancing their own interests, and an overall disappointment with the size and allocation of the settlement award, the objectors do not provide specific evidence of any conflicts of interest or self-dealing. In particular, there is no evidence that the allocation of settlement proceeds derives from inadequate representation. See In re Pet Food, 629 F.3d at 347-49 (explaining that the fact that the settlement fund allocates a larger percentage of the settlement fund to class members with stronger claims did not demonstrate a conflict between groups); In re AT&T Mobility Wireless Data Servs. Sales Tax Litig., 789 F. Supp. 2d 935, 979 (N.D. Ill. 2011) ("[T]here is no rule that settlements benefit all class members equally . . . as long as the settlement terms are 'rationally based on legitimate

36

considerations.'") (citations omitted; ellipse in original).

Thus, the Court holds that separately represented subclasses are not required.

### E. Signum, Gourmet Catalog, Palm Tree and Bacharach's Objections Regarding the Plan of Allocation

The Plan of Allocation reflects the varying strengths of the Settlement Class members' claims against the Settling Defendants. (Pls.' Mot. Br. 34-36.) As explained above, the Excess Casualty Claimants will receive 85% of the Settlement Fund and the non-Excess Casualty Claimants will receive the remaining 15% of the Settlement Fund in the form of a cy pres award.

The Excess Casualty Claimants have additional claims not maintained by the non-Excess Casualty Claimants. The Third Circuit affirmed the dismissal of all federal antitrust claims in this case except for the claims arising out of the Marsh-centered Excess Casualty conspiracy. Such Marsh-centered Excess Casualty conspiracy claims apply only to the Excess Casualty Claimants, thereby weighing the settlement allocation in their favor. Class Counsel argue that these claims are the strongest meritorious claims in the case. (Pls.' Mot. Br. 34-36.)

In addition, there is only one remaining federal claim that applies to all members of the Settlement Class (both Excess Casualty and non-Excess Casualty Claimants) – a RICO claim based on the CIAB enterprise – as well as various state law claims. (Id.) Therefore, the Excess Casualty Claimants assert not only the CIAB and state law claims that the remaining Settlement Class members assert, but also the additional federal antitrust and RICO claims relating to the Marsh-centered Excess Casualty conspiracy. It is thus fair, reasonable and adequate for the Excess Casualty Claimants to receive 85% of the Settlement Fund.

Further, according to Class Counsel, a significant amount of the settlement proceeds from the previous Zurich, Gallagher and Marsh Settlements were allocated to non-Marsh Excess

Casualty policyholders.   (Fairness Hearing Tr. 15-16; 57-58.)   Accordingly, many of the Settlement Class members who will be receiving the cy pres award may have already received payments from these other three settlements.  (Id.)

Signum, Gourmet Catalog, Palm Tree and Bacharach also object to the fact that the non-Excess Casualty members will receive no monetary compensation from the Settlement and instead will only receive a cy pres award.  (Signum Objection 19-20; Gourmet Catalog Objection 3-8, Palm Tree Objection 2-3; Bacharach Objection 2.)   As explained above, 15% of the Settlement Fund will be used to fund a cy pres award that will be divided between Consumer Action and the Public Entity Risk Institute.   Consumer Action is focused on individual consumers and small business, while the Public Entity Risk Institute is focused on public entities, municipalities, and non-profits.  (Fairness Hearing Tr. 23-24.)   The entities will use the cy pres funds for educational purposes or to fund other organizations that will benefit insurance policyholders.  (Id.)

The Court overrules these objections to the cy pres award.   Given the large number of class members, distribution of the Settlement Fund to each member would be inefficient and ineffective.  (Fairness Hearing Tr. at 56-57).   Indeed, as explained by Class Counsel, the estimated administrative expenses associated with distribution of the settlement fund to the non-Excess Casualty Claimants would entirely absorb the amount available to each member.  (Pls.' Mot. Br. 38-39.); see also, e.g., Six Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1305 (9th Cir. 1990) ("Federal courts have frequently approved this remedy in the settlement of class actions where the proof of individual claims would be burdensome or distribution of damages costly.") (citation omitted); In re Metlife Demutualization Litig., 689 F. Supp. 2d 297, 343 (E.D.N.Y. 2010) ("A cy pres payment, as an adjunct to a payment by other means to some

members of the class, is warranted where the amount to be distributed to the remaining class members is small relative to the administrative costs of a direct distribution."); Catala v. Resurgent Capital Servs., No. 08-cv-2401, 2010 WL 2524158, at *4 (S.D. Cal. June 22, 2010) (finding cy pres distribution appropriate where the de minimus recovery of approximately thirteen cents per class member would make distribution to class members impracticable).   In addition, "courts are not in disagreement that cy pres distributions are proper in connection with a class settlement, subject to court approval of the particular application of the funds."  4 William B. Rubenstein, Alba Conte, & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 11.20 (4th ed. 2011); Perry v. FleetBoston Fin. Corp., 229 F.R.D. 105, 117 (E.D. Pa. 2005) (recognizing that cy pres distributions have obtained a stamp of approval as part of a class settlement).

The Court also finds no merit in the objectors' arguments that Class Counsel entered into this Settlement in order to obtain a significant fee for themselves.   (See Gourmet Catalog Objection 6; Signum Objection 19-20.)  As explained below, based on the length and complexity of this case, as well as the fee awards in the previous three settlements, Class Counsel's requested fee is noticeably modest.

Finally, Gourmet Catalog has also objected to utilizing Consumer Action and Public Entity Risk Institute as the proposed cy pres recipients.   (Gourmet Catalog Objection 7.) Gourmet Catalog asserts a lack of sufficient knowledge regarding these nonprofit organizations. (Id.)  As explained above, these organizations are focused on both small and large entities, thus benefitting the broad spectrum of the Settlement Class that are members of the cy pres group. The Court finds the objections to cy pres to be without merit.

Therefore, the Court holds that the Plan of Allocation of the Settlement Fund is fair and reasonable.

### F.  Conclusion

The Court finds that certification of the Settlement Class for settlement purposes is appropriate. The objectors have presented no facts, argument, or law that undermines this Court's overall conclusion.  The issue is not whether every class member will be completely satisfied with the Settlement, but whether the Settlement Class meets the requisite numerosity, commonality and typicality requirements, whether the Settlement Class will be fairly and adequately presented by the named Plaintiffs and Class Counsel, and whether the Plan of Allocation is fair and reasonable.  Having considered all of the arguments and pertinent evidence, the Court finds that the relevant factors have been met.  The Court also notes that if unsatisfied with the Settlement Agreement, these objectors were free to seek exclusion from the Settlement Class and to continue to pursue their individual claims against the Settling Defendants.

### VIII.   SIGNUM'S REQUEST FOR EXCLUSION

In addition to its objection, Signum has also filed a Request for Exclusion.  However, Signum argues that the requested information for exclusion is onerous, [10] violative of Due Process, and inconsistent with the Federal Rules.  (Signum Exclusion Request 2-3; Signum Objection 24 n.17.)  The purpose of the requested information is to accurately identify those Settlement Class members who seek to exclude themselves from the Settlement.  (Pls.' Mot. Br. 60-61.)  Requiring that opt-outs provide some proof of class membership is commonplace and not considered unduly burdensome.  In fact, Class Counsel noted that there was absolutely no

---

[10] The Class Notice provides that in order to request exclusion from the Settlement Class, the party must provide his name, address, telephone number and information respecting his purchase(s) of insurance that qualify him as one of the Settlement Class members (including (i) the identity of the insurer that issued each such insurance policy, (ii) the policy number of each such policy, (iii) the premium charged for each such policy, and (iv) the effective date and expiration date of each such policy).  (Settlement Agreement, Exhibits 3-6.)

indication that any entity was deterred from opting out of the Settlement based on the requested information. (Fairness Hearing Tr. at 44-46.) Finally, the Court assumes that the Settling Defendants do not dispute the validity of any individual opt-out that failed to provide the requested details, so long as that person or entity could be sufficiently identified. See In re Serzone Products Liab. Litig., 231 F.R.D. 221, 235 (S.D.W.Va. 2005) ("[A]s a practical matter, [defendant] has asserted that it does not dispute the validity of any opt-out based on a claimant's failure to provide such information in its entirety."). Accordingly, Signum's objection to the procedure for exclusion did not prevent it from opting out of the Settlement, and therefore also does not provide a basis to withhold approval of the Settlement.[11]

Signum's request seeks exclusion not only "on behalf of itself" but also on behalf of a "South Carolina Class." (Signum Exclusion Request 1.) The Court holds that Signum may exercise its own opt-out rights, but may not request exclusion on behalf of any other entity. First, "[o]pting out is an individual right [that] must be exercised individually." In re Diet Drugs Prods. Liab. Litig., 282 F.3d 220, 241 (3d Cir. 2002) (quoting district court). This is especially relevant here, where there is no certified class for Signum to opt out. See Berry Petroleum Co. v. Adams & Peck, 518 F.2d 402, 411-12 (2d Cir. 1975) ("It would make no sense to hold that the named Berry I plaintiffs, not yet officially representing the alleged class in Berry I, could request exclusion for prospective members of that class from the Land class action when the Berry I class had not yet been certified, when the prospective members of Berry I had not yet had an opportunity to opt out of Berry I and when the prospective members of Berry I had chosen not to request exclusion from Land following receipt of individual notice.")

Most importantly, this Court has repeatedly found that there is no class preserved from

---

[11] The Court notes that Signum is on the list of those timely excluded from the Settlement Class. (Daniel Coggeshall Decl.)

the Daniel lawsuit.  Based on the history of the Daniel case and in connection with Preliminary

Approval, Judge Brown specifically found no indication of a "class preserved of South Carolina

individuals."  (Preliminary Approval Hearing Tr. 25.)  Further, Judge Brown found that there

was no indication "that there [were] any others similarly situated" to Signum.  (Id.)[12]  Having

again considered Signum's arguments regarding a putative South Carolina class preserved from

Daniel, this Court holds that there is no indication of any class that was retained from the Daniel

lawsuit.  Thus, Signum may opt out of this Settlement Agreement, but may not request exclusion

on behalf of any other potential class members.[13]

## IX.   SIGNUM'S REQUEST FOR A PRELIMINARY INJUNCTION

In addition to its objection and its Request for Exclusion, Signum has also filed a Motion

for Injunctive Relief and Protective Order.  The Court finds this to be yet another vehicle through

which Signum attempts to block final approval of the Settlement.  Signum's request for

injunctive relief merely duplicates its objections, specifically those with regard to the notice.

(Signum Motion 4, 7-8).   Having fully addressed Signum's concerns above, the Court finds

Signum's Motion for Injunctive Relief to be without merit.  As a result, the Court denies

Signum's Request for a Preliminary Injunction.

## X.   ATTORNEY FEES

As stated above, Class Counsel filed an application for an award of attorney fees in the

amount of $10.25 million, which is 25% of the Settlement Fund, and for reimbursement of

---

[12] Judge Brown also determined that if anyone else wished to opt out, they could each do so.  (Id. at 25-26.)
[13] At the Fairness Hearing, Signum raised an argument not previously presented in its motion papers, that the Proposed Final Order (Settlement Agreement, Exhibit 9) could prevent it from pursuing its own class action.  (Fairness Hearing Tr. 46-50.)  The Court finds that Signum's contention is not an impediment to Final Approval of the Settlement.  To the extent that a potential Settlement Class member such as Signum opts out of the Settlement, that class member may proceed with its litigation.  On the other hand, Settlement Class members who do not opt out would be bound by the injunction in the judgment regarding settlement.

litigation expenses in the amount of $394,192.76.  Class Counsel also applied for service awards of $5,000 for each named Plaintiff.

The Court previously approved attorney fees, expenses, and incentive awards in connection with the Zurich, Gallagher and Marsh Settlements.  The Court found each request reasonable, and granted a total of $53,335,000 in attorney fees, expenses, and incentive awards in connection with the previous settlements.[14]  As stated above, the approvals of the Zurich and Gallagher Settlements were affirmed by the Third Circuit.  In re Ins. Brokerage Antitrust Litig., 579 F.3d 241 (3d Cir. 2009).

Plaintiffs request that the attorney fees, litigation expenses, and service awards be paid solely from the Settlement Fund.  (Pls.' Mot. Br. 6.)  The Settling Defendants do not oppose the sums requested by Class Counsel, and only Pierson has filed a general objection to the requested fees.  For the reasons that follow, the Court will grant the requested attorney fees, reimbursement of expenses and incentive award payments.

Class Counsel submit that they have "expended tremendous effort and resources prosecuting the claims, including conducting extensive factual investigation and legal research, drafting and amending pleadings, and working on hard fought and complex discovery and motion practice involving over 100 defendants and numerous third parties, coordinating with

---

[14] The total $53,335,000 in attorney fees, expenses, and incentive awards granted to Class Counsel in connection with the Zurich, Gallagher and Marsh Settlements breaks down as follows:
(1) Zurich Settlement: Attorney Fees: $25,843,000, Expenses: $3,957,000, Incentives: $150,000, Total: $29,950,000 ("Zurich Fee Opinion").  In re Ins. Brokerage Antitrust Litig., 2007 WL 1652303, at *2, *11 (D.N.J. June 5, 2007).
(2) Gallagher Settlement: Attorney Fees: $6,221,480, Expenses: $2,413,520, Incentives: $250,000, Total: $8,885,000 ("Gallagher Fee Opinion").  In re Ins. Brokerage Antitrust Litig., 2007 WL 2916472, at *2, *9 (D.N.J. Oct. 5, 2007).
(3) Marsh Settlement: Attorney Fees: $12,180,804, Expenses: $1,999,196, Incentives: $320,000, Total: $14,500,000 ("Marsh Fee Opinion").  In re Ins. Brokerage Antitrust Litig., 2009 WL 411856, at *2, *10 (D.N.J. Feb. 17, 2009).

scores of individual, tag-long plaintiffs, and successfully prosecuting appeals after dismissal of the action." (Pls.' Fee Br. 2.)  Further, Class Counsel advise that they "expended approximately 427,411 hours litigating the Action against twenty-five groups of the largest insurers and brokers in the United States, accumulating a total lodestar in excess of $162 million and total expenses in excess of $8.75 million." (Id. 2-3.)  To further buttress their fee request and illustrate the magnitude of this litigation, Class Counsel also note that the case includes over 1,800 Docket Entries, and has involved hundreds of depositions and meet and confers, the production and review of millions of documents, complex dispositive and class certification motion practice, and briefing and arguing numerous discovery motions and appeals. (Id.)

In a written submission to the Court, the only objector as to fees, Pierson, argued that Class Counsel "only provided summaries of its lodestar and expenses and failed to provide the Court or class members with any summary of their efforts or qualifications." (Pierson Objection 3.)  Having reviewed the parties' submissions, the Court concludes, as discussed below, that Pierson's objection is without merit.  The sums requested by Class Counsel are reasonable and will be approved.

## A. Standard for Judicial Approval of Fees

The awarding of fees is within the discretion of the court, so long as the court employs the proper legal standards, follows the proper procedures, and makes findings of facts that are not clearly erroneous. In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 727 (3d Cir. 2001).  District courts are given deference in determining whether a request for attorney fees should be granted.

Notwithstanding this deferential standard, a district court is required by Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000) and its progeny to clearly

44

articulate the reasons that support its conclusion.  The Third Circuit has identified several factors

that a district court should consider, including: "(1) the size of the fund created and the number

of persons benefitted; (2) the presence or absence of substantial objections by members of the

class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the

attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiff's counsel; and (7) the awards in similar

cases."  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 301 (3d Cir. 2005) (citing Gunter, 223

F.3d 190, 195 n.1 (3d Cir. 2000)) (the "Gunter factors").  The district court need not apply these

fee award factors in a formulaic way, as certain factors may be afforded more weight than others.

In re Rite Aid, 396 F.3d at 301.  The district court should engage in a robust assessment of these

factors.  In re Rite Aid, 396 F.3d at 302; see also Gunter, 223 F.3d at 196 (vacating district

court's ruling because the fee-award issue was resolved in a "cursory and conclusory" fashion).

        This Court will review the fee application under a percentage of recovery analysis with a

lodestar cross-check.   "Relevant law evidences two basic methods for evaluating the

reasonableness of a particular attorney fee request – the lodestar approach and the percentage-of-

recovery approach.  Each has distinct attributes suiting it to particular types of cases."  Varacallo

v. Massachusetts Mut. Life Ins. Co., 226 F.R.D. 207, 248 (D.N.J. 2005) (citing In re Prudential

Ins. Co. of Am. Sales Practices Litig. (Prudential I), 962 F. Supp. 450, 478 (D.N.J. 1997)).  The

percentage-of-recovery method is used in common fund cases, as courts have determined that

"class members would be unjustly enriched if they did not adequately compensate counsel

responsible for generating the fund."  Varacallo, 226 F.R.D. at 249 (quoting In re AremisSoft

Corp. Sec. Litig., 210 F.R.D. 109, 128 (D.N.J. 2002)).  "While either the lodestar or percentage-

of-recovery method should ordinarily serve as the primary basis for determining the fee, the

Third Circuit has instructed that it is sensible to use the alternative method to double check the reasonableness of the fee." Varacallo, 226 F.R.D. at 249 (Prudential I, 962 F. Supp. at 478).

### B.  Relevant Factors

The Court finds that the totality of the Gunter factors weighs strongly in favor of approval of the fee award for the same reasons provided in this Court's analysis of the Girsh factors.  Given the similarity and overlap of the Gunter and Girsh factors, the Court incorporates by reference the reasons cited above under the Girsh test for approval of the Settlement Agreement.  The Court will now discuss additional reasons that support approval of attorney fees in this matter.

#### 1.  Size of the Fund Created and Number of Persons Benefitted

With regard to the size and nature of the Settlement Fund and the number of persons benefitted by the Settlement Agreement, Class Counsel were able to obtain a significant settlement of $41 million for the Settlement Class, despite the substantial risks of establishing liability.  Further, approximately 20,000 purchasers of excess casualty insurance will receive cash from the Settlement Fund, and "many of those purchasers will receive checks in excess of a thousand dollars."  (Pls.' Fee Br. 10-11.)  The remaining Settlement Class members will benefit from a significant cy pres award.  (Id.).  As such, this factor weighs in favor of approval.

#### 2.  Presence or Absence of Substantial Objections by Members of the Class to Settlement Terms and/or Fees Requested by Counsel

The absence of substantial objections by Settlement Class members to the fees requested by Class Counsel strongly supports approval.  As previously noted, only Pierson filed a general objection to the fees sought by Class Counsel.[15]  Although Pierson objected to the attorney fee

---

[15] Bacharach included a statement in his objection that "[b]ecause Objector and all other class

46

request because Class Counsel did not provide details of each attorney's lodestar, (Pierson Objection 3-6), the fee request contains the same support that was provided in the prior three settlements.  (Fairness Hearing Tr. 62-63.)  The District Court and the Third Circuit were satisfied with the support provided, as is the Court herein.  See Zurich, Gallagher and Marsh Fee Opinions; In re Ins. Brokerage Antitrust Litig., 579 F.3d 241 (3d Cir. 2009).  In addition, Plaintiffs have provided information that demonstrates a negative multiplier on Class Counsel's lodestar fees of .34.  (Pls.' Fee Br. 18-19.)  As such, the Court overrules Pierson's objection to the requested fees.

### 3.  Skill and Efficiency of Attorneys

Class Counsel include notably skilled attorneys with experience in antitrust, class actions and RICO litigation.  (Pls.' Fee Br. 11.)  The substantial settlement sum negotiated by Class Counsel, not only in this Settlement, but also in the Zurich, Gallagher and Marsh Settlements, further evidences their competence.  In re Warfarin Sodium Antitrust Litig, 212 F.R.D. 231, 261 (D. Del. 2002) (class counsel "showed their effectiveness . . . through the favorable cash settlement they were able to obtain").  Moreover, the Settling Defendants were represented by highly experienced attorneys from prominent firms with a broad background in these matters.  In re Warner Commc'n Sec. Litig., 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work.").  This factor also strongly favors approval of the fee award.

---

members who are not Excess Casualty Claimants appear not to be receiving any benefit, the attorney fees requested are unreasonable and excessive." (Bacharach Objection 2.)  Bacharach's objection to the attorney fees focuses on the fact that non-Excess Casualty Claimants are receiving only a cy pres award rather than on the requested fees themselves.  Having fully addressed the reasonableness of the Plan of Allocation above, the Court finds Bacharach's objection to be without merit.

### 4.  The Complexity and Duration of the Litigation

This action involves federal and state antitrust laws, RICO and common law.  An antitrust action is clearly a complex action to prosecute.  In re Linerboard Antitrust Litig., MDL 1261, 2004 U.S. Dist. LEXIS 10532 at *34 (E.D. Pa. June 2, 2004).  The claims include alleged conspiracy violations by dozens of large brokerage and insurance companies.  Class Counsel engaged in extensive discovery and motion practice, and the litigation of this matter has been a costly and lengthy process for all parties.  See In re Warfarin Sodium Antitrust Litig., 391F.3d 516, 535-36 (3d Cir. 2004).  In particular, Class Counsel have reviewed millions of documents, taken hundreds of depositions, participated in dozens of meetings with defense counsel, briefed several motions, prosecuted appeals, and finally, participated in complex multi-party mediation proceedings.  (Pls.' Fee Br. 12-13.)  Thus, this factor weighs heavily in favor of approval of the fee request.

### 5.  The Risk of Non-Payment

Class Counsel submit that they undertook this action on a contingent fee basis, assuming a substantial risk that they might not be compensated for their efforts.  (Pls.' Fee Br. 13.)  Courts recognize the risk of non-payment as a major factor in considering an award of attorney fees.  See In re Prudential-Bache Energy Income P'ships Sec. Litig., No. 888, 1994 U.S. Dist. LEXIS 6621 at *16 (E.D. La. May 18, 1994) (stating that "[c]ounsel's contingent fee risk is an important factor in determining the fee award.  Success is never guaranteed and counsel faced serious risks since both trial and judicial review are unpredictable.").  Class Counsel invested substantial effort and resources to reach this point and obtain this favorable Settlement Agreement.  Accordingly, this factor weighs in favor of approval.

48

### 6.   The Amount of Time Devoted to the Litigation

Class Counsel argue that they have devoted a tremendous amount of time to this litigation.  Specifically, through May 31, 2011, Class Counsel indicate that they have spent over 427,000 hours in prosecuting this case on behalf of the Settlement Class for an aggregate lodestar of approximately $162,663,305.  (Pls.' Fee Br. 15.)  Additionally, Class Counsel assert that they have incurred approximately $8.75 million in litigation expenses to date.  (Id.)  Throughout this action, over fifty law firms were involved on behalf of Plaintiffs and specific work was allocated to different firms to avoid duplication.  (Id.)  Based on the amount of time expended on this matter and the number of attorneys involved in the negotiation and ongoing litigation, this factor weighs strongly in favor of approval.

### 7.   Awards in Similar Cases

The Court must also take into consideration amounts awarded in similar actions when approving attorney fees.  Specifically, the Court must: (1) compare the actual award requested to other awards in comparable settlements; and (2) ensure that the award is consistent with what an attorney would have received if the fee were negotiated on the open market.  In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 U.S. Dist. LEXIS 27013, *42-46 (D.N.J. Nov. 9, 2005).  "Courts within the Third Circuit often award fees of 25% to 33 % of the recovery."  Id. at *42 (citing In re Linerboard Antitrust Litig., No. 1261, 2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004) (approving 30% fee of a $202 million settlement in an antitrust class action)); In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 822 (3d Cir. 1995) (explaining that in common fund cases "fee awards have ranged from nineteen percent to forty-five percent of the settlement fund"); Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 150 (E.D. Pa. 2000) (explaining that "the award of one-third of the fund for

49

attorneys' fees is consistent with fee awards in a number of recent decisions within this district");

In re Linerboard Antitrust Litig., No. 1261, 2004 U.S. Dist. LEXIS 10532 at *43 (citing with

approval a recent Federal Judicial Center study that found that "in federal class actions generally

median attorney fee awards were in the range of 27 to 30 percent").  The requested award in this

matter is 25%.  (Pls.' Fee Br. 1.)  This percentage is within or below the range found acceptable

in this District.

   The second part of this analysis addresses whether the requested fee is consistent with a

privately negotiated contingent fee in the marketplace.  The percentage-of-the-fund method of

awarding attorney fees in class actions should approximate the fee that would be negotiated if the

lawyer were offering the services in the private marketplace.  In re Remeron Direct Purchaser

Antitrust Litig., 2005 U.S. Dist. LEXIS 27013 at *46-7.  "The object . . . is to give the lawyer

what he would have gotten in the way of a fee in an arms' length negotiation, had one been

feasible."  In re Continental Illinois Sec. Litig., 962 F.2d 566, 572 (7th Cir. 1992); In re

Synthroid Marktg. Litig., 264 F.3d 712, 718 (7th Cir. 2001) ("[W]hen deciding on appropriate

fee levels in common-fund cases, courts must do their best to award counsel the market price for

legal services, in light of the risk of nonpayment and the normal rate of compensation in the

market at the time.").

   To determine the market price for an attorney's services, the Court should look to

evidence of negotiated fee arrangements in comparable litigation.  Continental Illinois Sec.

Litig., 962 F.2d at 573 (stating that the judge must try to simulate the market "by obtaining

evidence about the terms of retention in similar suits, suits that differ only because, since they are

not class actions, the market fixes the terms").  "Attorneys regularly contract for contingent fees

between 30% and 40% with their clients in non-class, commercial litigation."  In re Remeron

Direct Purchaser Antitrust Litig., 2005 U.S. Dist. LEXIS 27013 at *46. See, e.g., In re Ikon Office Solutions, Inc.,194 F.R.D. 166, 194 (E.D. Pa. 2000); In re Orthopedic Bone Screws Prods. Liab. Litig., No. 97-381, 2000 U.S. Dist. LEXIS 15980 at *7 (E.D. Pa. Oct. 23, 2000); Durant v. Traditional Invest., Ltd., No. 88-9048, 1992 U.S. Dist. LEXIS 12273 at *7 n.7 (S.D.N.Y. Aug. 12, 1992). Accordingly, Class Counsel's requested fee amount is within the range of privately negotiated contingent fees.

### 8. Conclusion

In sum, for all the reasons stated above, the Court concludes that the requested fee by Class Counsel is fair and reasonable according to the Gunter factors.

### C. Lodestar Cross-Check

The Third Circuit has stated that when an award is based on a percentage of recovery, it is sensible to confirm the reasonableness of the award using the lodestar method. In re Rite Aid, 396 F.3d at 305-06. The lodestar analysis is performed by "multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." Id. at 305. When performing this analysis, the court "should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." Id. at 306. Thus, the lodestar multiplier is equal to the proposed fee award divided by the product of the total hours and the blended billing rate. If the lodestar multiplier is large, the award calculated under the percentage-of recovery method may be deemed unreasonable, and a trial judge may consider reducing the award appropriately. Id. at 306. The multiplier, however, "need not fall within any pre-defined range, provided that the [d]istrict [c]ourt's analysis justifies the award." Id. at 307. Further, the Court is not required to engage in this analysis with

mathematical precision or "bean-counting." Id. at 306. Instead, the Court may rely on summaries submitted by the attorneys and is not required to scrutinize every billing record. Id. at 306-07.

In the present case, the proposed fee award presented by Class Counsel is 25% of the Settlement Fund. Class Counsel submit that the total number of hours expended by the attorneys and paraprofessionals through May 31, 2011[16] is 427,000 hours. (Pls.' Fee Br. 15.) Class Counsel contend that their lodestar to May 31, 2011 was $162,663,305.25. (Id.) The Court further notes that this lodestar value is based on the blended billing rates of all attorneys and paraprofessionals who were involved with this case. Accordingly, the Court accepts these calculations as the basis for performing the lodestar cross-check. This results in a multiplier of .34. (Pls.' Fee Br. 18-19.) This negative multiplier is within the same range found to be acceptable by this Court in the Zurich Settlement. (Id.) See also In re Cendant Corp. PRIDES Litig., 243 F.3d at 734, 742 (approving a suggested multiplier of three and stating that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.")

The reasonable attorney rate is determined by reference to the marketplace. Missouri v. Jenkins, 491 U.S. 274, 285 (1989) (explaining that "we have consistently looked to the marketplace as our guide to what is 'reasonable'") (citation omitted). The Third Circuit, as well as other courts, have held that an attorney's customary billing rate is the proper starting point for

---

[16] The Court will rely upon the May 31, 2011 date in performing the lodestar cross-check. See Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207, 253 (D.N.J. 2005) (finding that the fee award will be the sole compensation for counsel "despite the continuing responsibilities [counsel] will have in responding to Class Member inquiries, assisting the Claim Evaluator, consulting on individual cases, and any post-judgment proceedings and appeals"); In re Remeron Direct Purchaser Antitrust Litig., 2005 U.S. Dist. LEXIS 27013 (D.N.J. 2005) ("Class Counsel will likely incur hundreds of additional hours in connection with administering the settlement, without prospect for further fees.").

calculating fees.  Cunningham v. City of McKeesport, 753 F.2d 262, 268 (3d Cir. 1985). However, the Third Circuit has determined that once a party meets its prima facie burden of establishing the "community market rate," and the opposing party does not produce contradictory evidence, the trial court does not have discretion to adjust the requested rate downward.  Washington v. Philadelphia County Court of Common Pleas, 89 F.3d 1031, 1036 (3d Cir. 1996).  The prevailing party must offer evidence that the attorney's usual rate is in line with the market rate in the community.  Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984). This evidence takes the form of affidavits from other counsel attesting to their rates or the prevailing market rate, Glover v. Johnson, 934 F.2d 703, 716 (6th Cir. 1991), and a court may not vary the rates competently set forth in uncontested affidavits.  Black Grievance Comm. v. Philadelphia Elec. Co., 802 F.2d 648, 652 (3d Cir. 1986) (vacated on other grounds, 483 U.S. 1015 (1987)). The market rate to be used is the current prevailing market rate at the time the request for fees is made.  Lanni v. New Jersey, 259 F.3d 146, 149-50 (3d Cir. 2001).

In their submissions, Class Counsel summarized the hours, costs, and their lodestar through May 31, 2011.  It appears that the hourly rate being used by Class Counsel is approximately $380.58.[17]   Based on only one objection to the attorney fees request, the experience of Class Counsel and the comparable hourly rates in the Marsh, Gallagher and Zurich Settlements, this Court will consider the approximate hourly rate as reasonable.

### D.  Pierson's Objection

As previously noted, Pierson objected to the aforementioned fee award.  Above, the

---

[17] The Court arrived at this rate by dividing the total lodestar amounts by the total hours worked. Through May 31, 2011, the total hours worked was 427,411.85 and the lodestar provided was $162,663,305.25. (Kallas and Clobes Decl. Ex. 1.)  The result is a rate of $380.58 per hour.  The hourly rate used by Class Counsel in the Marsh Settlement was approximately $378.60.  The hourly rate used by Class Counsel in the Gallagher Settlement was approximately $363.76.  The hourly rate used by Class Counsel in the Zurich Settlement was approximately $365.90.

Court details the reasonableness of the fee award sought by Class Counsel and explains that the fee request contains the same information provided to the Court in the prior three settlements. Thus, the Court finds that Pierson's objection lacks merit and requires no further discussion.

### E.  Expenses

Class Counsel also request reimbursement for expenses incurred during this litigation. Class Counsel seek reimbursement for $394,192.76[18] in litigation expenses.  (Pls.' Fee Br. 2.) "Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action."  In re Safety Components Int'l, 166 F. Supp. 2d 72, 108 (D.N.J. 2001) (citing Abrams v. Lightolier, Inc., 50 F.3d 1204, 1225 (3d Cir.1995)).  Class Counsel contend that these expenses reflect costs expended for the purposes of litigating this action, including fees for experts, costs associated with creating and maintaining electronic document databases, travel and lodging expenses, and photocopying, mailing, telephone and deposition transcription costs.  (Kallas and Clobes Decl.) The Court concludes that these expenses were reasonably and appropriately incurred during the prosecution of this case based on the summaries provided.  Consequently, the Court approves Class Counsel's request for reimbursement.

### F.  Incentive Awards

Class Counsel also request that the Court approve the payment of incentive awards to each named Plaintiff in the amount of $5,000.  The total incentive awards requested for all seventeen named Plaintiffs is therefore $85,000.  Class Counsel contend that the named Plaintiffs spent a significant amount of their own time and expense litigating these cases for the benefit of the absent members of the Settlement Class and should be compensated for their efforts.  See,

---

[18] This amount represents the total expenses incurred by Class Counsel since June 20, 2008, the date through which expenses were awarded with respect to the Marsh Settlement.  (Pls.' Fee Br. 2.)

e.g., In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 400 (D.D.C. 2002) ("Incentive awards are 'not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class.'"). Class Counsel also argue that the amount requested for each class representative is half the amount previously awarded to the named Plaintiffs in the Zurich, Marsh, and Gallagher Settlements. (Kallas and Clobes Decl.) Finally, Class Counsel argue that the amount requested is similar to awards granted by other courts in similar cases. See, e.g., Nichols, 2005 U.S. Dist. LEXIS 7061 at *64 (approving $5,000 to each third-party payor named plaintiff and $2,500 to each consumer named plaintiff); In re Linerboard Antitrust Litig., 2004 U.S. Dist. LEXIS 10532 at *58 (approving $25,000 to each representative of the class). No objections were made to the requested amount, and as such, this Court will approve the incentive awards for each named Plaintiff, totaling $85,000.

### G. Conclusion

For the foregoing reasons, the Court approves Class Counsel's request for attorney fees, reimbursement of expenses and incentive award payments.

## XI.  CONCLUSION

Because the named Plaintiffs have satisfied all of the requirements of Fed. R. Civ. P. 23, this Court certifies the proposed class for purposes of this Settlement and approves the Settlement Agreement. The Court also grants the applications of Class Counsel for attorney fees, reimbursement of expenses and incentive award payments. The Court denies Signum's Request for Injunctive Relief and a Protective Order. An appropriate Order accompanies this Opinion.

Dated: March  30, 2012

HON. CLAIRE C. CECCHI
United States District Judge

**Attachment A – Settling Defendants**

- AIG Defendants: American International Group, Inc., Chartis Specialty Insurance Company, Lexington Insurance Company, Chartis Property Casualty Company, American Home Assurance Company, National Union Fire Insurance Company of Pittsburgh, Pa., National Union Fire Insurance Company of Louisiana, 21st Century North America Insurance Company, The Insurance Company of the State of Pennsylvania, AIU Insurance Company, Commerce and Industry Insurance Company, New Hampshire Insurance Company, The Hartford Steam Boiler Inspection and Insurance Company, Illinois National Insurance Co., Chartis Excess Limited and AIG Life Holdings (US), Inc.

- Aon Defendants: Aon Corporation, Aon Broker Services, Inc., Aon Risk Services Companies, Inc., Aon Risk Services Inc. U.S., Aon Risk Services, Inc. of Maryland, Aon Risk Services, Inc. of Louisiana, Aon Risk Services of Texas, Inc., Aon Risk Services, Inc. of Michigan, Aon Group, Inc., Aon Services Group, Inc. and Affinity Insurance Services, Inc.

- AXIS Defendants: AXIS Capital Holdings Limited, AXIS Reinsurance Company, AXIS Specialty Insurance Co. and AXIS Surplus Insurance Co.

- CNA Defendants: CNA Financial Corp., The Continental Insurance Co., Continental Casualty Co. and American Casualty Co. of Reading, PA

- Crum & Forster Defendants: Crum & Forster Holdings Corp., United States Fire Insurance Company, The North River Insurance Company, Crum and Forster Insurance Company, Crum & Forster Indemnity Company and Crum & Forster Specialty Insurance Company

- Fireman's Fund Defendants: Fireman's Fund Insurance Company, Chicago Insurance Co. and National Surety Corp.

- Hartford Defendants: Hartford Fire Insurance Co., Twin City Fire Insurance Co., Pacific Insurance Co., Ltd., Nutmeg Insurance Co. and The Hartford Fidelity & Bonding Co.

- Liberty Mutual Defendants: Liberty Mutual Holding Company Inc., Liberty Mutual Insurance Co., Liberty Mutual Fire Insurance Co., Employers Insurance Company of Wausau, Wausau Underwriters Insurance Company, Wausau General Insurance Company, Wausau Insurance Companies, Employers Insurance of Wausau and Wausau Business Insurance Company

- Travelers Defendants: The Travelers Companies, Inc., St. Paul Fire and Marine Insurance Company, Gulf Insurance Company, St. Paul Mercury Insurance Company, Travelers Casualty and Surety Company of America, The Travelers Indemnity Company and Athena Assurance Company

- Willis/HRH Defendants: Willis Group Holdings Limited, Willis Group Limited, Willis North America, Inc., Willis of New York, Inc., Willis of Michigan, Inc. and Hilb, Rogal & Hobbs

- XL Defendants: Greenwich Insurance Company, Indian Harbor Insurance Company and XL Capital Ltd.