# UNITED STATES DISTRICT COURT FOR
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Avery Dennison Corporation, ) ) ) ) ) | |
| Plaintiff, ) ) ) ) ) | AVERY DENNISON CORPORATION'S FIRST AMENDED COMPLAINT |
| v. ) ) | Civil Action No. 04-5184 (MDL No. 1663) |
| Marsh & McLennan Companies, Inc., Marsh Inc., Marsh USA Inc., d.b.a. Marsh Risk and Insurance Services, Hilb, Rogal & Hobbs Co., d.b.a. Insurance Services, Inc., ACE Limited, ACE INA Holdings, Inc., ACE USA, Inc., ACE American Insurance Co., American International Group, Inc., AIU Insurance Co., National Union Fire Ins. Co. of Pittsburgh, Pa., Liberty Mutual Holding Company, Inc., Liberty Mutual Insurance Co., Liberty Insurance Underwriters, Inc., St. Paul Travelers Companies, Inc., and St. Paul Fire & Marine Insurance Co. ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Avery Dennison Corporation ("Avery") by its attorneys, brings this antitrust action for injunctive relief and damages against defendants Marsh & McLennan Companies, Inc.("Marsh & McLennan"), Marsh Inc. ("Marsh Inc."), and Marsh USA Inc., d.b.a. Marsh Risk and Insurance Services ("Marsh USA"), and Hilb, Rogal & Hobbs Company, d.b.a. Insurance Services, Inc. ("HRH"), ACE Limited ("Ace Ltd."), ACE INA Holdings, Inc. ("ACE INA"), ACE USA, Inc. ("ACE USA"), ACE American Insurance Co. ("ACE American"), American International Group, Inc. ("AIG, Inc."), AIU Insurance Co. ("AIU"), National Union Fire Ins. Co. of Pittsburgh, Pa. ("National Union"), Liberty Mutual Holding Company, Inc. ("Liberty Mutual Holding"), Liberty Mutual Insurance Co. ("Liberty Mutual Ins."), Liberty Insurance Underwriters, Inc. ("LUI"), St. Paul Travelers Companies, Inc. ("St. Paul Travelers"), and St. Paul Fire & Marine Insurance Co. ("St. Paul Fire") for a trial by jury and states as follows:

**PARTIES**

1.      Plaintiff Avery is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in California.  In 2001, Avery acquired Dunsirn Industries, Inc. ("Dunsirn") (Avery and Avery as successor-in-interest to Dunsirn are referred to collectively as "Avery.")

**Broker Defendants**

2.      Defendant Marsh & McLennan is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1166 Avenue of the Americas, New York, NY 10036.  Marsh & McLennan is the parent of various subsidiaries that provide clients with analysis, advice and transactional services in connection with the procurement and servicing of insurance, as well as investment management and consulting.

2

3.      Defendant Marsh Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1166 Avenue of the Americas, New York, NY 10036.  Marsh Inc. is a Marsh & McLennan operating unit and provides insurance brokerage services through various subsidiaries of its own.

4.      Defendant Marsh USA is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1166 Avenue of the Americas, New York, NY 10036.  Marsh USA is a subsidiary of Marsh Inc. and provides insurance brokerage services.  Marsh USA entered into the agreements with Avery to provide insurance brokerage services.  Defendants Marsh & McLennan, Marsh Inc. and Marsh USA are referred to collectively as "Marsh."

5.      Defendant HRH is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business at 4951 Lake Brook Drive, Suite 500, Glen Allen, VA 23060-9273.  HRH provided insurance brokerage services to Dunsirn Industries, Inc. ("Dunsirn") which was acquired by Avery in 2001.  Marsh and HRH are referred to collectively as the "Broker Defendants."

**Insurer Defendants**

6.      Defendant ACE Ltd. is a corporation organized and existing under the laws of the Cayman Islands with its principal place of business at 17 Woodbourne Avenue, P.O. Box HM 1015, Hamilton, HMDX Hamilton HM08 Bermuda.  ACE Ltd. owns ACE INA.

7.      Defendant ACE INA is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 436 Walnut Street, Philadelphia, PA 19106-3703.  ACE INA oversees global insurance

3

operations and, through its operating companies, including ACE USA, is a leading provider of insurance and reinsurance.

8.      Defendant ACE USA is an operating company of ACE INA and is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 436 Walnut Street, Philadelphia, PA 19106-3703. ACE USA operates through several insurance companies using a network of offices throughout the United States.

9.      Defendant ACE American is a subsidiary of ACE Ltd. and is organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 436 Walnut Street, Philadelphia, PA 19106-3703. Defendant ACE American issued excess liability insurance policies to Avery.

10.     Defendant AIG, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 70 Pine Street, New York, NY 10028.  AIG, Inc. and its related companies are the largest underwriters of commercial and industrial insurance in the United States.

11.     Defendant AIU is a corporation organized and existing under the laws of the State of New York with its principal place of business at 70 Pine Street, New York, NY 10270.  Defendant AIU issued excess liability insurance policies to Avery.

12.     Defendant National Union is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 70 Pine Street, New York, NY 10270.  Defendant National Union issued excess liability insurance policies to Avery.

13.     Defendant Liberty Mutual Holding is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business at 175 Berkeley Street, Boston, MA 02117.

14.    Defendant Liberty Mutual Ins. is a subsidiary of Liberty Mutual Holding and is organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business at 175 Berkeley Street, Boston, MA 02117.  Defendant Liberty Mutual Ins. issued excess liability insurance policies to Avery.

15.    Defendant LIU is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business at 175 Berkeley Street, Boston, MA 02117.  Defendant LIU issued excess liability insurance policies to Avery.

16.    Defendant St. Paul Travelers is a corporation organized and existing under the laws of the State of Minnesota with its principal place of business at 385 Washington St., St. Paul, MN, 55102.  St. Paul Travelers was formed from a 2004 merger between Travelers Property Casualty Corp. and the St. Paul Companies, Inc.  The merger created the second largest commercial  insurance company in the United States

17.    Defendant St. Paul Fire is a corporation organized and existing under the laws of the State of Minnesota with its principal place of business at 385 Washington St., St. Paul, MN, 55102.  Defendant St. Paul Fire issued excess liability insurance policies to Avery.  Defendant St. Paul Travelers also issued commercial general liability policies to Dunsirn to which Avery is the successor-in-interest.  Defendants St. Paul Travelers and St. Paul Fire are referred to collectively as the "St. Paul Defendants."

18.    ACE Ltd., ACE INA, ACE USA, ACE American, AIG, Inc., AIU, National Union, Liberty Mutual Holding, Liberty Mutual Ins., LUI, St. Paul Travelers, and St. Paul Fire are collectively referred to as the "Insurer Defendants."

19.    The Insurer Defendants and the Broker Defendants are collectively referred to as the "Defendants."

5

## JURISDICTION AND VENUE

20.    Because this civil action arises under the Sherman Act, 15 U.S.C. § 1, this Court has subject matter jurisdiction pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, section 16 of the Clayton Act, 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367.

21.    Defendants Marsh & McLennan, Marsh Inc., Marsh USA, HRH, ACE Ltd., ACE INA, ACE USA, ACE American, AIG, AIU, National Union, Liberty Mutual Holding, Liberty Mutual Ins., LIU, St. Paul Travelers and St. Paul Fire are subject to personal jurisdiction in this district because they engage in systematic and regular business in this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

22.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 15 and 22 because Defendants Marsh & McLennan, Marsh Inc., Marsh USA, HRH, ACE Ltd., ACE INA, ACE USA, ACE American, AIG, AIU, National Union, Liberty Mutual Holding, Liberty Mutual Ins., LIU, St. Paul Travelers and St. Paul Fire are subject to personal jurisdiction in this district and because a substantial part of the events giving rise to the claims occurred in this district.

## SUMMARY OF CLAIMS

23.    This is an action for treble damages and attorneys' fees under the Sherman Act, for treble damages and attorneys' fees under the Cartwright Act (California Business and Professions Code Sections 16700 et seq.), and for forfeiture of compensation, restitution, damages, punitive damages, prejudgment interest, injunctive relief and attorneys' fees under state law.

24.    During the period from 1998 to 2005, Marsh received substantial compensation for serving as Avery's insurance broker. Under annual Client

6

Service Agreements ("CSAs") between Marsh and Avery, Marsh agreed that its compensation for placing Avery's excess liability policies would be limited to the large annual flat fees paid by Avery and that Marsh would not receive commissions on those policies. From 1998 to 2005 Avery paid in excess of $4 million in insurance premiums for excess liability insurance policies to the Insurer Defendants. Marsh promised Avery during this period that it would act in the best interests of Avery to obtain cost-effective insurance but failed to do so.

25.    During the period from, at least, 1998 to 2001, HRH received substantial compensation for serving as Dunsirn's insurance broker. From 1998 to 2001, Dunsirn paid substantial premiums to Zurich American Insurance Company ("Zurich"), and Defendants St. Paul Travelers, and St. Paul Fire for workers compensation and/or commercial general liability insurance policies. HRH promised Dunsirn during this period that it would act in the best interests of Dunsirn to obtain cost-effective insurance but failed to do so.

26.    Avery's claims arise out of the Defendants' massive scheme to manipulate the market for commercial insurance. The Defendants participated in a combination and conspiracy to suppress and eliminate competition in the sale of insurance by coordinating and rotating and rigging bids for insurance policies, allocating insurance markets and customers, including Avery, and raising, or maintaining or stabilizing premium prices above competitive levels.

27.    Avery is informed and believes, and on that basis alleges, that Marsh, through the actions of its Global Broking unit in New York engaged in bid rigging and bid rotation through the solicitation and manipulation of bids, including the submission on false bids from excess casualty insurers, including each of the Insurer Defendants, in order to obtain a preordained outcome of Avery's selection of an insurer charging noncompetitive inflated premiums.

7

28.     Avery is informed and believes, and on that basis alleges, that despite Marsh's promises to limit its compensation to the flat fees identified in its PSAs with Avery, Marsh secretly received undisclosed "front-end" commissions from the Insurer Defendants for each excess liability policy purchased by Avery.

29.     Avery is further informed and believes, and on that basis alleges, that the Broker Defendants misrepresented the amount and nature of the compensation they received as Avery's insurance brokers by not disclosing or failing to adequately disclose their receipt of secret contingent commissions (a.k.a. "overrides") which are based on such factors as the volume of insurance that the Broker Defendants place with a particular insurer ("volume contingency"), the renewal of that business ("persistency contingency"), and its profitability ("claims loss ratios contingency"), all of which the Insurer Defendants, in concert with the Broker Defendants, control, at least in part, by manipulating the market for insurance placed for their client.  Avery is further informed and believes, and on that basis alleges, that the Broker Defendants "steered" it to "preferred" Insurer Defendants who participate in and further the scheme by paying exorbitant contingent commissions and other undisclosed kickbacks to the Broker Defendants.

30.     As a direct and proximate result of the Defendants' illegal conspiracies described herein, Avery has been injured and financially damaged in its business or property.

## FACTS

### Avery's Relation with the Broker Defendants

31.     The Broker Defendants served as Avery's insurance brokers for many years.  The Broker Defendants represented to their clients, including Avery, that they would provide unbiased advice and assistance in the selection of insurance products and services relating thereto, including claims administration.  The

8

Broker Defendants purport to offer independent expert brokering advice on such factors as coverage types and amounts, financial stability of carriers and overall cost of the insurance products, and thus act as fiduciaries as the agents of the client (Avery) in this relationship.  Indeed, the Broker Defendants represent themselves to their clients, including Avery, as fiduciaries and, in fact, have created fiduciary relationships with their clients, including Avery, based on the trust imparted to the Broker Defendants by their clients, including Avery, and the Broker Defendants' perceived ability to provide unbiased, independent and expert insurance brokerage advice.  Such representations are made through advertisement, brochures, internet websites and other promotional materials disseminated in interstate commerce, including through the United States mails and interstate wires.

32.    For example, Marsh's website has stated: "Our mission is 'To create and deliver risk services that make our clients more successful'" and that "[o]ur clients benefit from the total capabilities of Marsh, Inc. and Marsh & McLennan Companies, Inc. . . .  This systematic structure provides a breadth of depth of risk solutions unavailable from any other single source."

33.    HRH has represented on its website that "An insurance relationship, more than any other business relationship, is built on trust.  You either have it or you don't."  It was further stated, "Specialist Knowledge:  We use our knowledge to solve problems for the benefit of our clients.  From Fortune 500 companies to trade associations, individuals and small businesses, at HRH we provide tailor-made risk management solutions based on expert advice and customized risk assessment."

34.    In addition, Marsh entered annual Client Service Agreements ("CSAs") in which it agreed, among other things, that for a flat fee, it would use its best efforts to place insurance on Avery's behalf.

35.     Avery relied upon the representations of the Broker Defendants including their representations that they would provide unbiased advice and assistance in the selection of insurance products and services relating thereto, including claims administration, and that they would offer independent expert brokering advice on such factors as coverage types and amounts, financial stability of carriers and overall cost of the insurance products, and thus act as fiduciaries of Avery in this relationship.

36.     Based upon the representations made by the Broker Defendants, Avery relied upon the sophistication and expertise of the Broker Defendants – derived from the Broker Defendants' familiarity with the Insurer Defendants, the overall marketplace, as well as customs and practices of the insurance industry – to make decisions when formulating strategies concerning Avery's insurance needs. As Avery's insurance brokers, the Broker Defendants claimed to act in Avery's best interest for the express purpose of purchasing cost-effective insurance.

37.     As Avery's insurance brokers, the Broker Defendants had a responsibility to provide services and advice for the benefit of Avery including finding the most favorable insurance coverage available.

38.     As Avery's insurance brokers, the Broker Defendants agreed to represent Avery and not the insurance companies.  The Broker Defendants further agreed that they would negotiate on Avery's behalf with the insurance companies and keep Avery informed of any significant developments.

39.     However, instead of acting on Avery's behalf, as described above, the Broker Defendants colluded with the Insurer Defendants to improperly steer business and unlawfully rig bids and fix prices in order to maximize the amount of the commissions that the Broker Defendants would receive as Avery's insurance brokers.  The Broker Defendants did not represent Avery's best interests or act as fiduciaries in connection with the selection and placement of Avery's insurance.

Further, Avery is informed and believes and based thereon alleges that the Insurer Defendants have improperly increased their profits and revenues by raising or maintaining premiums charged to (or by reducing the benefits or coverage received by) Avery.  Together, the Broker Defendants and the Insurer Defendants have acted in concert, conspired to reduce or eliminate competition for insurance and otherwise harmed competition.

### The Marsh-Centered Bid-Rigging Scheme

40.    Avery is informed and believes, and on that basis alleges, that Marsh and the Insurer Defendants have conspired to raise, maintain or stabilize the price of insurance paid by Avery and other consumers at an artificially high level by allocating the placement of insurance customers' business through a pervasive bid-rigging or bid-rotating scheme.  Avery is further informed and believes, and on that basis alleges, that since 1998 or earlier and continuing to the present, Marsh and certain carriers, including the Insurer Defendants, agreed to rotate and rig the bids that the carriers made for casualty insurance coverage in the United States.  Specifically, the Insurer Defendants agreed with Marsh and among themselves that the Insurance Defendants would each submit fake bids (sometimes referred to as "A Quotes," "B Quotes," "C Quotes," or "backup") so that the incumbent insurance carrier would retain the business of a particular customer and receive an inflated and noncompetitive premium.  Marsh orchestrated these bid-rigging agreements among the carriers because the inflated premiums resulted in the payment of correspondingly inflated commissions to Marsh.  The Insurer Defendants agreed to submit losing bids to help other Insurer Defendants to retain their incumbent business at artificially high rates because they expected reciprocal bid-rigging assistance in defrauding their own incumbent insureds.

41.    Instead of acting on Avery's behalf to obtain competitive bids for casualty insurance, Marsh orchestrated and implemented the issuance of fictitious

and artificially inflated quotes ("A Quotes," "B Quotes," "C Quotes," or "backup") from the Insurer Defendants in order to steer Avery's business to preselected insurers for inflated premiums while providing the illusion of competitive bidding.

42.    At least three of the Marsh executives involved in the placement of Avery's insurance, Robert J. Stearns, Joshua Bewlay, and Edward McNenny, were indicted in New York for bid rigging.  Stearns and Bewlay both entered plea agreements with the State of New York in which they admitted their participation in a Marsh-centered bid rigging scheme designed to inflate Marsh's commissions. Stearns, Bewlay, and McNenny were all executives in the Global Broking unit in Marsh's New York office ("Marsh NY").

43.    The Marsh-orchestrated scheme to eliminate competition in the placement of Avery's insurance is evident in a flurry of emails reflecting Marsh NY's efforts to conceal their anticompetitive manipulation from Avery and from Bruce Griffin, a Client Advisor ("CA") in Marsh's San Francisco office ("Marsh SF") after Griffin had raised questions regarding the premium quotes Marsh Global Broking had obtained from its "preferred" insurer AIG.

44.    In a January 27, 2004 email to James Olensky (Marsh NY) responding to an AIG premium quote to Avery, Bruce Griffin (Marsh SF) expressed shock at the steep increase in premium: "I hope we have a Plan B, as this will never fly. What was AIG thinking? . . . Avery understands that the form will change, and that higher attachment points may be necessary, pricing will increase, etc., but the pricing below does not come close to reflecting the (general) conversations that took place in Los Angeles between AIG (David Perez, Karen Radke and Kirk Stone), Marsh and Avery Dennison. We all knew that Avery would experience a pricing increase, but at no point were we led to believe that the pricing would increase this significantly."

12

45.     The January 27, 2004 response from James Olensky (Marsh NY), explained that the proposed AIG premium increase was not based on AIG's independent underwriting decision but, instead, was "formulated" by Marsh Global Broking:  "[T]his is NOT an indication from AIG.  This is a Marsh indication formulated by Marsh colleagues . . . . So I guess, in the end, you are not questioning AIG, but rather Marsh's evaluation of the expected lead premium – an evaluation that has pretty much been agreed upon by Marsh NY and Marsh LA."

46.     A February 24, 2004 email from Global Broking executive Joshua Bewlay to Jason Monteforte, a Marsh NY Local Broking Coordinator ("LBC") responsible for placing insurance with AIG, and copied to Robert Stearns (Marsh NY) and others, praised Bewlay for "handling" Avery's risk Manager, Jim Durree, and convincing him not to move Avery's (incumbent) business away from AIG: "Jason, I wanted to take a moment to thank you for handling Jim Durree so well last week in our offices.  GB [Global Broking] has always been a question-mark for this client.  He's typically skeptical of the value we bring to the table and he's one of those guys who's always concerned that we 'work for the carrier' and not the client. Anyway, I've heard that you hosted an excellent AIG meeting.  The client was predisposed to replace AIG prior to going into that meeting, but changed his mind during your meeting."

47.     Bewlay's February 24, 2004 email to Monteforte also explained that Avery's risk manager wanted to cut out Global Broking coordinators (such as Stearns) from Avery's insurance placement process and have Marsh's California-based Client Advisors (Bruce Griffin and Carmella Garcia) deal directly with Monteforte and the LBCs responsible for other insurers providing quotes for Avery:  "[B]ecause of your great response, the client truly believes you have his interests at heart.  So much so, that he wants to cut the coordinator out of the deal

13

and have Bruce Griffin and Carmelly [sic] Garcia deal directly with you and the LBCs."

48.    In a March 1, 2004 email to Monteforte and other LBCs involved in Avery's account, Stearns instructed that Marsh NY would only present the false appearance of honoring Avery's request to cut Global Broking coordinators (i.e., Stearns) out of the process of placing Avery's insurance:  "OK…here is the real deal. You can all speak with Bruce Griffin but I want everything MATERIAL run past me."

49.    When Bruce Griffin (Marsh SF) attempted to obtain a competitive bid for Avery from Starr Excess Liability Insurance Company ("Starr Excess") in San Francisco, he caused an uproar at Marsh NY and Marsh Bermuda.   Specifically, on March 3, 2004, Griffin emailed Stearns (Marsh NY) and Monteforte (Marsh NY) asking them to send a submission for Avery's renewal to Ellen Lindberg at Starr Excess in San Francisco.  Before responding, Stearns emailed Joe LaRocco (Marsh Bermuda) and Edward McNenny (Marsh NY): "My understanding is that we only access Starr from Bermuda.  Ellen Lindberg … has really been beating the bushes with the Marsh offices and telling them to send submissions direct to her. What should I tell Bruce [Griffin]?"

50.    LaRocco responded strongly: "This crap has to stop once and for all. Bob [Stearns] please call Bruce and tell him that if Avery would like a Starr Excess quote it will be generated out of Bermuda.  Please send a submission to Fred Knight."

51.    An April 1, 2004 email from McNenny (Marsh NY) to Geoff Smith (AIG) reveals that the conspirators' were concerned that Ellen Lindberg's direct efforts would reduce the manipulated profit on the Avery account.   McNenny stated that Ellen Lindberg needed to be "shut down" because she "has a personal agenda which is in conflict with our long standing and extremely successful

14

relationship" because she "has and will continue to tell our brokers that she can do a better a better job (i.e. cheaper/broader/faster)."  When Smith snapped back "Police your own system," McNenny assured him: "We will police ourselves. This is not a reflection of our partnership with Starr. . . . This is not the time that we should start pointing fingers or questioning eachothers commitments.  If we see intermediation I would like to know about it from you.  We both have a lot to lose if it becomes a trend."

52.     Meanwhile, after Avery's request for a Starr Excess quote was diverted from Ellen Lindbergh (Starr Excess SF) to Fred Knight (Marsh Bermuda), Knight emailed Stearns (Marsh NY) asking "What exactly is the plan for Starr?" and Stearns responded "Purely backup.  I will send you the original plan."

53.     In his subsequent email to Knight, Stearns stated "Here is the plan. This is an unbelievably complicated where CA is coordinating (at least in the client's eyes) with me keeping it all together in the background…. don't ask, I'll save this one for over a beer."

54.     When Knight (Marsh Bermuda) in turn sent the Avery quote request to Michael Costello (Starr Excess Bermuda) for a "backup" quote, Costello responded in a March 16, 2004 email: "For 4/1/04 we have received two submissions that came with the caveat of 'back up status' for Starr opportunity. These submissions were for Holly Corp. and Avery Dennison.  While we always appreciate new opportunities we find it difficult to determine what to do with 'back up' submissions that come with limited U/W information and no direction (plan)."

55.     Knight explained in a March 18, 2004 email to Costello that Marsh did not want Starr Excess Bermuda to provide a legitimate quote for Avery: "I think we agree that when I send a submission as 'back-up', I mean that unless I can develop additional information subsequent to my submission to change the situation, I do not expect any action out of Starr. . . . In the meantime, I will

15

continue to send submissions as 'back-up' with the expectation that you won't put much work into them until new information becomes available that creates a real opportunity for Starr."

56.     The Marsh-centered bid-rigging scheme is also evidenced by a February 10, 2004 email from Vincent Guarino (Marsh NY), an LBC responsible for placing insurance with Swiss Re, to James Olensky (Marsh NY) in which Guarino complains that Marsh's "plan" for Avery did not include a real opportunity for Swiss Re: "You putting Swiss Re on the plan as a back-up???? I got them all pumped up for the 'new & kinder' Jim Olensky."

57.     Marsh's bid rigging of Avery's account is also reflected in a February 10, 2005 Audit prepared by Marsh which checks the "Yes" box next to the question "Any reference to: 'A Quote,' 'B Quote,' 'C Quote,' 'Throwaway Quote,' or 'Drive-by Quote' or any similar phrases" and states that the "Broking plan refers to 'backup' . . . ."

58.     A March 8, 2004 email between Stearns (Marsh NY) and Mark Kaufman (Marsh NY), an LBC responsible for dealing with ACE, suggests that Marsh was in the process of obtaining fictitious bids from ACE in favor of AIG and that efforts were made to prevent Bruce Griffin (Marsh SF) and Carmella Garcia from interfering with the scheme by obtaining competitive bids:  "Where are you with ACE? . . . Bruce Griffin and Carmella Garcia are getting squirly [sic] on me and looking for solid ACE and AIG feedback." Concern that Griffin would interfere with getting fake bids from ACE is also reflected in a March 1, 2004 email from Stearns to Kaufman, Monteforte, McNenny, Bewlay and others: "ACE must quote.  Our biggest challenge here will be Bruce Griffin contacting Kevin Daley [at ACE] direct."  Similarly, on March 29, 2004, Monteforte emailed Stearns and others: "Is anyone going to control Bruce Griffin[?]"

16

59.    On March 17, 2004, Stearns (Marsh NY) sent himself an email with the subject "Controlling Avery" which stated "AIG is in the plan – preferred carrier . . . How to control ACE from pricing too aggressively?"

60.    By way of further example, in another internal communication, Marsh informed its brokers it "will need formal indications from carriers too regarding any pricing indications for B quotes."  In yet another internal communication, Marsh managers directed brokers to document the false and inflated quotes, stating that the insured "will be looking to receive copies of the carriers emails or faxes that you receive directly from the carrier that either state the carrier declining to quote or what the high pricing indication is that is provided and unacceptable to Marsh."

61.    The bid rigging coordinated by Marsh enabled Marsh and the Insurer Defendants to maximize their profits and raise, maintain or stabilize the price of insurance and deceived Avery into believing that the Marsh was obtaining competitive insurance bids from the Insurer Defendants on Avery's behalf.

62.    Marsh affirmatively concealed from Avery the unlawful combination, conspiracy and agreements and falsely represented to Avery that the bids provided were fair and competitive.

63.    Avery relied upon Marsh's representations concerning the bids in accepting the bids it used to place its insurance coverage with the Insurer Defendants.

64.    The true nature and extent of the fraud and deceit of Marsh as herein alleged was not discovered by Avery until, at the earliest, after it filed this action, in February 2007, and was able to review documents produced by Marsh in conjunction with litigation, but deliberately withheld from Avery despite Avery's requests for information concerning its account.  Further, Avery could not with due diligence discover the extent of the fraud and deceit of Marsh until after the

17

commencement of the trials of Marsh executives Edward McNenney and William Gilman in November 2007, when Avery was able to review testimony from certain individuals in conjunction with those trials. Avery had no way of knowing and could not determine the true nature of the fraud and deceit of Marsh until it was able to review documents withheld from it by Marsh and analyze those documents in conjunction with the trial testimony elicited in the McNenney and Gilman trials, commencing in or about November 2007. It was only through Avery's review of documents produced in this lawsuit and of the above-mentioned trial testimony that it began to learn the full extent of the Defendants' wrongdoing and that, over the years, the Defendants had taken numerous steps to conceal their actions.

### Misrepresenting the Amount of Compensation

65.    Through, among other things, the Client Service Agreements ("CSAs") Marsh expressly represented to Avery that its compensation for providing brokerage services in connection with the liability policies at issue would be limited to the annual flat fees paid by Avery and that Marsh would not receive commissions for those services. Unbeknownst to Avery, and despite Marsh's representation regarding compensation with respect to the Avery account, Marsh knowingly and willfully conspired to enter into undisclosed fee agreements with the Insurer Defendants for other types of compensation and remuneration. Marsh and the Insurer Defendants concealed these fee agreements from Avery.

66.    Specifically, Avery is informed and believes, and on that basis alleges, that despite the CSAs, Marsh received significant undisclosed front-end commissions on Avery's policies in addition to the annual flat fees paid by Avery. Josh Bewlay (Marsh NY) testified in the fall of 2007 that Marsh would receive a 15% commission on all policies regardless of whether the insured had a commission account or flat fee account with Marsh. In his November 2007 testimony Robert Stearns (Marsh NY) explained that when the client had a flat fee

18

account, Marsh would nevertheless receive a 15% commission, but that commission would not be separately broken out or identified on the quote received by the client.

67.     Pursuant to the Defendants' schemes and common course of conduct, the Broker Defendants steer their clients to purchase insurance from the Insurer Defendants at artificially inflated and noncompetitive prices so that the Broker Defendants can receive larger undisclosed compensations.  All Defendants ratified and adopted the scheme through the payment of and/or receipt of undisclosed compensations and the imposition of the undisclosed fees and costs resulting in injury to Avery.

68.     Avery is informed and believes, and on that basis alleges that, pursuant to various contingent commission agreements described below, certain insurance companies, including the Insurer Defendants, pay fees to the Broker Defendants based on (i) the volume of premiums generated by the Broker Defendants' sales of the Insurer Defendant's products; (ii) the growth of business and renewal of existing business; and (iii) the profitability of business purchased by the Broker Defendants' clients, *i.e.,* agreed upon favorable total claims/loss ratios with a particular insurer ("Contingent Commissions").

69.     Avery is informed and believes, and on that basis alleges, that Contingent Commissions were often memorialized by the Broker Defendants in, among other things, "placement service agreements ("PSAs"), "override agreements," "millennium agreements," "extra compensation agreements," "producer compensation agreements," "market service agreements" ("MSAs") or "Compensation for Services to Underwriters" ("CSUs").   These Contingent Commission agreements are collectively referred to as "Contingent Commission Agreements" or "Agreements."

70.    Avery is informed and believes, and on that basis alleges, that, pursuant to the Defendants' conspiracy and common scheme, the Broker Defendants solicit business from individuals and entities interested in purchasing insurance and steer them to purchase insurance from the Insurer Defendants and other carriers, with whom the Broker Defendants have entered into PSAs or other profit sharing agreements so that the Broker Defendants can receive undisclosed compensations, including Contingent Commissions and other kickbacks.  The PSAs are a means of implementing or effectuating the conspiratorial agreement of the Defendants as all Defendants ratified, adopted and knowingly participated in the scheme through the payment and/or receipt of undisclosed compensation and the imposition of the undisclosed fees and costs, resulting in injury to Avery.

71.    Avery is informed and believes, and on that basis alleges, that the Broker Defendants failed to adequately disclose the Contingent Commission Agreements.  Avery was thus not aware of the nature, extent, operation or effect of these undisclosed fees, and the Defendants' anti-competitive steering, bid-rigging and buying arrangements.  Taken together, the Broker Defendants breached the duties owed to Avery by failing to fully and accurately disclose, among other things, the following:

(a)    the nature and amount of their Contingent Commissions;

(b)    the material impact of the Contingent Commissions on their overall profitability;

(c)    that the Contingent Commissions have created economic incentives for the Broker Defendants to act contrary to their fiduciary duties to Avery;

(d)    that the Contingent Commissions have created economic incentives for the Broker Defendants to act contrary to their duty of care to Avery;

20

(e)     that the Contingent Commissions have created economic incentives for the Broker Defendants to act contrary to their duty of loyalty to Avery;

(f)     that the Contingent Commissions have created economic incentives for the Broker Defendants to act contrary to their duty to provide impartial advice to Avery;

(g)     that  the Contingent Commissions have created economic incentives for the Broker Defendants to act contrary to their duty to exercise their best judgment on behalf of Avery;

(h)     that the Contingent Commissions have created economic incentives for the Broker Defendants to act contrary to their duty of candor and full disclosure to Avery; and

(i)     that the Contingent Commissions have created economic disincentives for the Broker Defendants to carry out their contractual obligations to Avery.

72.     In the absence of proper disclosure of the Contingent Commissions, Avery justifiably relied, to its detriment, on the Broker Defendants' representations that they were providing independent expertise and representing Avery's interests in accordance with the Broker Defendants' contractual, fiduciary and other duties as alleged above.  Avery also justifiably relied upon the Broker Defendants' representations in connection with the insurance policies it purchased.

73.     Marsh continued to fail to adequately disclose Contingent Commission Agreements following the investigations of various state attorneys generals of the insurance industry in 2004.  For example, Marsh posted a Frequently Asked Questions page on MSAs on its website in 2004 (which Marsh has subsequently removed), saying that Marsh had no conflicts with clients due to MSAs:

21

> Our guiding principle is to consider our client's best interests in all placements. We are our clients' advocate and represent clients in our negotiations. We don't represent the markets. We work closely with clients on the design of their risk transfer program to address the complexity of decisions that have to be taken into account, such as market financial strength, a market's expertise in the line of coverage needed, its claims-paying history, client's service requirements, breadth of coverage, pricing, and other terms and conditions. We also work with insurers, and part of what an insurer pays us for is an iterative planning and communications process that allows the insurer to create more competitive proposals for our clients, which of course benefits those clients. In all cases, clients retain the final decision on the market chosen to handle its business.

As Marsh's subsequent settlement conceded, however, among other things, Marsh did not act in its clients' best interests, did not advocate fairly on their behalf, and failed to provide clients with the information needed to make informed placement decisions. Moreover, as J.P. Morgan noted in a 2004 report on the use by brokers of Contingent Commissions, "when we have pushed back in an attempt to determine the size and source of offsetting expenses [for such commissions], no significant, valid offsets were presented . . . . We are hard-pressed to describe any material cost associated with these revenues." Hugh Warns et al., Insurance-Non-Life: Contingents May Be Smaller, But More Prominent in 2004, US Equity Research J.P. Morgan Sec., Inc. (Jan. 13, 2004).

74.    Additionally, in the fall of 2004, for property and casualty lines, Marsh briefly posted on its website a list of Insurer Defendants with which it had Contingent Commission Agreements including each of the Insurer Defendants.

75.    Avery is informed and believes, and on that basis alleges, that, in order to hide the amount of compensation it receives, Marsh has directed

22

employees to redact and "white-out" the commission income identified in the insurance "binders," *i.e.*, the temporary insurance contracts, prepared by the insurance carrier and sent to Marsh for transmittal to the client/insured.

76.     In one instance, a senior vice president at an insurer was reprimanded by Marsh for referring to the Placement Service Agreement between that insurer and Marsh in certain correspondence.  The insurer responded and assured Marsh: "We acknowledge that this was inappropriate behavior and will do the necessary to eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the PSA.  I apologize for the consternation that this has caused within the Marsh organization."

77.     Marsh's policy of misleading clients about the payment and receipt of Contingent Commissions came to light in the guilty plea of a former Marsh managing director, Joshua M. Bewlay, who pled guilty to a felony charge of scheming to defraud on February 14, 2005.  Mr. Bewlay's testimony revealed that Marsh established a procedure or a "protocol" intended to discourage the client from obtaining an answer on how Marsh received compensation from insurance companies.   Mr. Bewlay's testimony states, in relevant part:

> Finally, during my employment, I was made aware of a Marsh protocol designed to prevent Marsh's clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client in addition to any fee or commission paid.  **The protocol required multiple layers of inquiry to discourage the client from obtaining an answer.**  Also that all inquiries be channeled through a single Marsh employee who directed the answer to the inquiry.  [Emphasis added.]
>
> Finally, the percentage or ration that Marsh used when it responded to a clients' inquiry concerning placement

service or PSA or MSA revenue significantly understated the amount of PSA or MSA revenue earned with respect to a particular client.[1]  In my department, Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a particular client.

When I was told that a client inquired as to the amount of PSA revenue Marsh earned from an insurance carrier, I responded that the Marsh employee follow Marsh's protocol, including that the client only speak to the Marsh employee designated to respond to such inquiries. [*People of the State of New York v. Joshua Bewlay*, Plea Testimony (Feb. 15, 2005) at p. 11-12.]

78.    Mr. Bewlay similarly admitted in his plea agreement that he made misleading statements about the amount of compensation Marsh received from insurers.  Mr. Bewlay's plea agreement states, in relevant part:

From in and before 1999 through 2004, Mr. Bewlay engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property, namely insurance premiums, commissions and fees, from ten or more persons, to wit, clients of Marsh, by false and fraudulent pretenses, representations and promises, to wit, misleading statements about the amount of compensation Marsh derived from insurance carriers, and so obtained property from one or more such person, in that **Mr. Bewlay referred client inquiries for disclosure of such compensation to a designated Marsh employee, knowing that said employee would provide misleading information concerning Marsh's**

---

[1] According to the criminal complaint against Mr. Bewlay, "the protocol" directed Marsh employees to tell inquiring clients that Marsh received up to 1% to 2% in PSAs/MSA as a bonus from insurers, when, in fact, Marsh sometimes earned as much as 10% to 15%.  *People of the State of New York v. Joshua Bewlay* (filed Feb. 22, 2005).

**compensation to the clients.** [Emphasis added.] [Joshua Bewlay Plea Agreement (filed Feb. 14, 2005) at ¶5.]

79.    HRH has stated that it will "not renounc[e] overrides or contingent commissions" and that it will "stop accepting volume based contingent commissions but will continue to take profit-based contingent commissions from insurers."

80.    As discussed above, the Contingent Commissions are maximized by the Broker Defendants steering their clients, including Avery, to purchase policies issued by the Insurer Defendants at inflated prices, in return for the Contingent Commissions.  Avery is informed and believes, and on that basis alleges, that the Broker Defendants place their clients' business predominantly with certain insurers, including the Insurer Defendants, to maximize the Contingent Commissions they receive at the expense of their clients, including Avery, and in breach of their fiduciary duties.  Contrary to Avery's expectations, the Broker Defendants' financial interests are in direct conflict with Avery's interests.  The Broker Defendants' duties to Avery have been co-opted by Contingent Commission Agreements, and the steering and bid-rigging resulting therefrom.

81.    The Insurer Defendants likewise failed to adequately disclose to Avery the existence of Contingent Commissions and the impact those commissions have on insurance arrangements.  Instead, the Insurer Defendants actively took part in and cooperated with the Broker Defendants in their effort to conceal the Contingent Commission Agreements, and the revenue generated pursuant thereto, from their respective clients.

82.    The industry itself has recognized that undisclosed Contingent Commissions corrupt the whole process.  Clients are misled into thinking they are receiving impartial advice and the most economical and appropriate insurance

products and services when, in fact, the broker is steering them towards products that will maximize the profits of the broker and insurer, to the detriment of the client.  As the Risk and Insurance Management Society, Inc. ("RIMS") stated in a press release dated August 24, 2004:

> We believe that undisclosed contingency fees have the potential to compromise the very basis upon which the relationship is built.  In an effort to preserve the integrity of this relationship, RIMS strongly advocates for complete and full disclosure of compensation agreements without client request.

83.    Avery is informed and believes, and on that basis alleges, that the volume of Contingent Commissions together with the Wholesale Payments that are received by the Broker Defendants have a material impact on their overall profitability and therefore, place the Broker Defendants' financial interests in direct conflict with Avery's interests.  The Contingent Commissions payable under the Agreements are part of the conspiracy between and among the Defendants, which has resulted in, among other things, steering, and bid-rigging in order to allocate customers and maintain market share, all of which have the effect of restraining trade and competition in the insurance market and have led the Broker Defendants to:

    (a)    maximize the volume of insurance placed with the Insurer Defendants, who are parties to the Agreements;

    (b)    maximize the volume of renewal business placed with the Insurer Defendants;

    (c)    fail to seek, on behalf of their clients, including Avery, the most advantageous terms on the insurance coverage;

    (d)    fail to advise their clients, including Avery, to negotiate reductions of premiums payable through adjustments of terms,

such as deductibles, in order to maximize the profitability of those policies for purposes of calculating the Contingent Commissions payable under the applicable Agreements; and

(d)     discourage clients, including Avery, from filing certain claims or assist the Insurer Defendants in denying or reducing claims under their policies in order to maximize the profitability of those policies for purposes of calculating the Contingent Commissions payable under the applicable Agreements.

84.     Avery is informed and believes, and on that basis alleges, that, as a result of the Contingent Commissions, it has paid insurance premiums in excess of what it would have paid had the Broker Defendants acted in accordance with (i) the terms of their contracts, (ii) their fiduciary and other duties, and (iii) their representations to Avery.

85.     Avery is informed and believes and on that basis alleges, that through the Defendants' fraudulent misrepresentations and failure to make adequate disclosure of the Contingent Commissions as set forth above, the Defendants have knowingly misled and continue to mislead and deceive their clients, including Avery.

## CLAIMS AGAINST DEFENDANTS

## Count 1: Per Se Illegal Violation of Sherman Act § 1 (Marsh and the Insurer Defendants)

86.     Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

87.     Marsh and the Insurer Defendants have engaged in unlawful contracts, agreement combinations and conspiracies in violation of section 1 of the Sherman Act, 15 U.S.C. §1.

88.     The activities of Marsh and the excess casualty insurers, including the Insurer Defendants, that participated in the bid-rigging schemes as described in this Complaint were within the flow of, and substantially affected, interstate commerce.

89.     Marsh, in agreement with excess casualty insurers, including the Insurer Defendants, orchestrated and supervised a scheme among competing excess casualty insurers to engage in bid rigging.  The scheme included agreements the purpose and effect of which were to suppress or eliminate competition, and to fix the price that insureds, including Avery, paid for excess casualty coverage by rigging the bids submitted to Avery and other insureds.

90.     Marsh and the Insurer Defendants implemented the unlawful scheme by the following acts, among others:

•     Agreeing that Marsh would steer business to the Insurer Defendants in exchange for undisclosed fees, kickbacks and other payments from the Insurer Defendants;

•     Agreeing, through the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

•     Agreeing to engage in activities that give the appearance of competition where none existed;

•     Agreeing to allocate insurance contracts among the Insurer Defendants, denying customers, such as Avery, the benefits of free and open competition; and

•     Agreeing to the prices and the other terms to be submitted in collusive, fictitious and inflated bids for contracts of insurance.

91.    The unlawful agreements among Marsh and the Insurer Defendants, which constitute per se violations of section 1 of the Sherman Act, §15 U.S.C. §1, include unlawful bid rigging, customer allocation and price fixing.

92.    Marsh and the Insurer Defendants' agreements are per se violations of the section 1 of the Sherman Act, 15 U.S.C. § 1, and were they not, they would nonetheless violate section 1 of the Sherman Act under the Rule of Reason.

93.    The agreements that Marsh and the Insurer Defendants have entered into, maintained, renewed and enforced have had the purpose and effect of eliminating competition for excess casualty insurance.

94.    The bid-rigging agreements artificially inflated the Insurer Defendants' bids and thereby fixed and inflated the price that Avery paid for excess casualty insurance coverage.  The unlawful conduct by Marsh and the Insurer Defendants had the following effects, among others: (a) prices paid by Avery for insurance were raised, maintained or stabilized at artificially high, supra-competitive levels; and (b) Avery was deprived of the benefits of free and open competition in the purchase of insurance.

95.    As a direct and proximate result of Marsh and the Insurer Defendants' agreements in restraint of trade alleged in this Complaint, Avery suffered injury to its business and property in that it purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

## Count 2: Violation of Sherman Act § 1 (HRH and the St. Paul Defendants)

96.    Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

97.    HRH and the St. Paul Defendants have engaged in unlawful contracts, agreement combinations and conspiracies in violation of section 1 of the Sherman Act, 15 U.S.C. §1.

29

98.     The activities of HRH and the St. Paul Defendants described in this Complaint were within the flow of, and substantially affected, interstate commerce.

99.     HRH, in agreement with excess casualty insurers, including the St. Paul Defendants and Zurich, orchestrated and supervised a scheme among competing excess casualty insurers to restrict competition and artificially inflate the price that insureds, including Avery, paid for excess casualty coverage.

100.    HRH, the St. Paul Defendants and Zurich implemented the unlawful scheme by the following acts, among others:

•     Agreeing that the HRH would steer business to the St. Paul Defendants and Zurich in exchange for undisclosed fees, kickbacks and other payments from the St. Paul Defendants and Zurich;

•     Agreeing to engage in activities that give the appearance of competition where none existed; and

•     Agreeing to allocate insurance contracts among the St. Paul Defendants and Zurich, denying customers, such as Avery, the benefits of free and open competition.

101.    The agreements among HRH, the St. Paul Defendants and Zurich violate section 1 of the Sherman Act under the Rule of Reason.

102.    The agreements that HRH, the St. Paul Defendants and Zurich have entered into, maintained, renewed and enforced have had the purpose and effect of eliminating competition for excess casualty insurance.

103.    The unlawful conduct by HRH, the St. Paul Defendants and Zurich had the following effects, among others: (a) prices paid by Avery for insurance were raised, maintained or stabilized at artificially high, supra-competitive levels; and (b) Avery was deprived of the benefits of free and open competition in the purchase of insurance.

104.    As a direct and proximate result of the agreements in restraint of trade among HRH, the St. Paul Defendants and Zurich alleged in this Complaint, Avery suffered injury to its business and property in that it purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

**Count 3:  Violation of Cartwright Act (California Business & Professions Code Sections 16700 et seq. (Marsh and the Insurer Defendants)**

105.    Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

106.    Beginning as early as 1998 until at least 2005, the exact dates being unknown to Avery, Marsh, the Insurer Defendants, and their co-conspirators, each of them, entered into and formed a continuing contract, combination or conspiracy for the purpose of unreasonably restraining the market with respect to the sale of excess casualty insurance in violation of the Cartwright Act, Cal. Bus. & Prof. Code §16700 *et seq*.

107.    The contract, combination and conspiracy consisted of an agreement among Marsh, the Insurer Defendants, and their co-conspirators to allocate customers and fix, raise, stabilize or maintain artificially high level for the premiums charged for excess casualty insurance in California and in the United States.

108.    Avery is informed and believes, and based thereon alleges, that to implement and in furtherance of their illegal contract, combination and conspiracy, Marsh, the Insurer Defendants, and their co-conspirators engaged in wrongful acts, including bid rigging through the solicitation and manipulation of bids, including the submission of false bids from excess insurers, for the purpose and effect of suppressing and eliminating competition in the sale of insurance.  The conduct of Marsh and the Insurer Defendants has precluded and restricted competition in the

31

sale of insurance resulting in raising, stabilizing and maintaining insurance premiums above competitive levels and a reduction of consumer choice.

109.    The actions of Marsh, the Insurer Defendants, and each of them, should be evaluated under the *per se* rule because bid rigging and market allocation agreements, because of their pernicious effect on competition and lack of any redeeming value, are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or business excuse for them.

110.    In furtherance of this combination and conspiracy, Marsh, the Insurer Defendants, and their co-conspirators did those things that they combined and conspired to do, including, among other things:

- Participating in meetings and conversations by telephone, facsimile and electronic mail, concerning the sale of excess casualty insurance sold in California and in the United States and elsewhere;

- Agreeing during those meetings and discussions that Marsh would steer business to the Insurer Defendants in exchange for undisclosed fees, commissions, kickbacks and other payments from the Insurer Defendants;

- Agreeing during those meetings and discussions to establish, increase, and control the price for excess casualty insurance;

- Agreeing, during those meetings and discussions to the use of collusive, fictitious and inflated bid prices and other terms of sale, to manipulate bids for insurance contracts;

- Agreeing during those meetings and discussions to engage in activities that give the appearance of competition where none existed;

- Agreeing during those meetings and discussions to allocate insurance contracts among the Insurer Defendants, denying customers, such as Avery, the benefits of free and open competition;

32

- Agreeing during those meetings and discussions to the prices and the other terms of excess casualty coverage to be submitted in collusive, fictitious and inflated bids for contracts of insurance;

- Agreeing during those meetings and discussions to not submit bids to customers, such as Avery, below the prices for excess casualty insurance agreed upon among Marsh and the Insurer Defendants;

- Submitting bids in accordance with the agreements reached;

- Selling excess casualty insurance pursuant to those agreements at collusive and noncompetitive prices; and

- Accepting payment for excess casualty insurance at collusive and noncompetitive prices.

111. The unlawful contract, combination or conspiracy of Marsh and the Insurer Defendants has had the following anticompetitive effects:

- Prices charged by the Insurer Defendants and their co-conspirators were fixed, raised, stabilized and maintained at artificially high and noncompetitive levels in California and the United States;

- Competition in the sale of excess casualty coverage in California and the United States has been and continues to be substantially and unreasonably restricted, lessened, foreclosed and eliminated;

- Customers of excess casualty coverage were allocated among the Insurer Defendants and their co-conspirators;

- Customers seeking excess casualty coverage, including Avery, were deprived of choice with respect to insurer and price, which deprivation would not exist in a competitive marketplace, unfettered by the collusive and unlawful activities of Marsh and the Insurer Defendants; and

- The sale of excess casualty coverage in California and the United States has been and will continue to be artificially restrained.

33

112.    By reason of, and as a direct and legal result of the violations alleged herein, Avery has suffered substantial financial injury in its business and property by the violations of the antitrust laws by Marsh, the Insurer Defendants, and their co-conspirators.  Beginning in 1998 and continuing at least through 2005, the conduct of Marsh and the Insurer Defendants was intentional and was calculated to eliminate competition in the excess casualty market.  As a result of Marsh and the Insurer Defendants' actions and conspiracy, Avery purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

**Count 4: Unfair Practices (Marsh and the Insurer Defendants)**

113.    Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

114.    Avery acted as a consumer for purposes of its purchase of insurance broking services through the Marsh.

115.    Marsh and the Insurer Defendants have acted improperly by enjoying a scheme involving soliciting noncompetitive bids from competing insurers; not disclosing or failing to adequately disclose payment of commissions and Contingent Commissions; steering clients to "preferred" Insurer Defendants who participate in and further the scheme by paying exorbitant Contingent Commissions and other undisclosed commissions and kickbacks to Marsh; engaging in bid rigging; unnecessarily placing insurance through wholly-owned wholesale entities; and entering into unlawful tying agreements.  Marsh and the Insurer Defendants employed deceptive acts and practices.

116.    Marsh and the Insurer Defendants' conduct violated the California Business & Professions Code, §§ 16720 *et seq.*, §§ 17000 *et seq.* and 17200 *et seq.*

117.    Avery was injured as a result of Marsh and the Insurer Defendants' violation by these acts.  Marsh and the Insurer Defendants acted with the intent,

34

purpose and effect of destroying competition and raising, maintaining or stabilizing prices for insurance products at artificially high levels.

118.   Marsh and the Insurer Defendants' unlawful actions were intentional and done with the purpose and effect of injuring Avery and destroying competition.

**Count 5: Breach of Fiduciary Duty (Marsh)**

119.   Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

120.   Marsh and Avery had fiduciary relationships in which Marsh had a responsibility to provide services and advice for the benefit of Avery.  Because of this relationship, Avery placed confidence and trust in Marsh, authorized Marsh to exercise discretionary functions for Avery's benefit, and relied on Marsh's superior expertise in risk management and the procurement of insurance.

121.   Marsh accepted and solicited that confidence and trust as described above in this Complaint.

122.   Based on the relationship between the parties and the representations described above, Marsh is a common law fiduciary to Avery, and therefore owes Avery:  (a) a duty of loyalty to act in Avery's best interests and to always put Avery's interests ahead of Marsh's own; (b) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by Avery or services rendered by Marsh, including the duty to disclose the source and amounts of all income Marsh receives in or as a result of any transaction involving Avery; (c) a duty of care in connection with any insurance-related products purchased by Avery or services rendered by Marsh; (d) a duty to provide impartial advice in connection with any insurance-related products purchased by Avery or services rendered by Marsh; (e) a duty to use Marsh's best business judgment in connection with any insurance-related products or services purchased by Avery –

35

*i.e.*, to find the best coverage at the lowest price; and (f) a duty of good faith and fair dealing.

123.    Marsh breached these duties by soliciting non-competitive bids from the Defendant Insurers, colluding with the Defendant Insurers to fix the price of excess casualty coverage at artificially inflated rates, submitting collusive, fictitious and inflated bids for contracts of insurance to Avery, and accepting undisclosed commissions and Contingent Commissions and other kickbacks from the Insurer Defendants in exchange for steering business to the Insurer Defendants. Thus, rather than providing objective, impartial advice which was in Avery's best interests, Marsh maximized its commissions, Contingent Commissions and other compensation at the expense of Avery.

124.    Accordingly, Marsh is liable for breach of fiduciary duty to Avery, and is liable for the damages suffered by Avery in an amount to be proved at trial

**Count 6: Breach of Fiduciary Duty (HRH)**

125.    Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

126.    HRH and Avery had fiduciary relationships in which HRH had a responsibility to provide services and advice for the benefit of Avery.  Because of this relationship, Avery placed confidence and trust in HRH, authorized HRH to exercise discretionary functions for Avery's benefit, and relied on HRH's superior expertise in risk management and the procurement of insurance.

127.    HRH accepted and solicited that confidence and trust as described above in this Complaint.

128.    Based on the relationship between the parties and the representations described above, HRH is a common law fiduciary to Avery, and therefore owes Avery:  (a) a duty of loyalty to act in Avery's best interests and to always put Avery's interests ahead of HRH's own; (b) a duty of full and fair disclosure and

36

complete candor in connection with any insurance-related products purchased by Avery or services rendered by HRH, including the duty to disclose the source and amounts of all income HRH receives in or as a result of any transaction involving Avery; (c) a duty of care in connection with any insurance-related products purchased by Avery or services rendered by HRH; (d) a duty to provide impartial advice in connection with any insurance-related products purchased by Avery or services rendered by HRH; (e) a duty to use HRH's best business judgment in connection with any insurance-related products or services purchased by Avery – *i.e.*, to find the best coverage at the lowest price; and (f) a duty of good faith and fair dealing.

129.   HRH breached these duties by accepting undisclosed Contingent Commissions and other kickbacks from the St. Paul Defendants and Zurich in exchange for steering business to the St. Paul Defendants and Zurich.  Thus, rather than providing objective, impartial advice which was in Avery's best interests, HRH maximized its Contingent Commissions and other compensation at the expense of Avery.

130.   Accordingly, HRH is liable for breach of fiduciary duty to Avery, and is liable for the damages suffered by Avery in an amount to be proved at trial.

**Count 7: Fraud (Marsh)**

131.   Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

132.   From 1998 to 2005, Marsh represented to Avery, that it would provide unbiased advice and assistance in the selection of insurance products and services relating thereto, including claims administration.  Marsh further represented to Avery that they would: (a) act in Avery's best interests and to always put Avery's interests ahead of Marsh's own; (b) disclose the source and amounts of all income Marsh receives in or as a result of any transaction involving Avery; (c) provide

37

impartial advice in connection with any insurance-related products purchased by Avery or services rendered by Marsh; and (d) use Marsh's best business judgment in connection with any insurance-related products or services purchased by Avery – *i.e.*, to find the best coverage at the lowest price.

133.    When Marsh made these representations, Marsh knew them to be false and made these representations with the intention to deceive and defraud Avery to act in reliance on these representations in the manner hereafter alleged, or with the expectation that it would so act.

134.    The representations made by Marsh to Avery were in fact false.  In actuality, Marsh engaged in bid-rigging through the solicitation and manipulation of bids, including the submission on false bids from excess casualty insurers, including each of the Insurer Defendants, in order to obtain a preordained outcome of Avery's selection of an insurer.  Avery is further informed and believes, and on that basis alleges, that Marsh misrepresented the amount and nature of the compensation it received as Avery's insurance brokers by (a) receiving undisclosed front-end commissions despite agreeing in its CSAs with Avery that Marsh's compensation would be limited to the large annual flat fee paid by Avery; and (b) not disclosing or failing to adequately disclose Marsh's receipt of secret contingent commissions (a.k.a. "overrides") which are based on such factors as the volume of insurance that Marsh places with a particular insurer ("volume contingency"), the renewal of that business ("persistency contingency"), and its profitability ("claims loss ratios contingency"), all of which the Insurer Defendants, in concert with Marsh, control, at least in part, by manipulating the market for insurance placed for a client.  Avery is further informed and believes, and on that basis alleges, that Marsh "steered" it to "preferred" Insurer Defendants who participate in and further the scheme by paying exorbitant contingent commissions and other undisclosed kickbacks to Marsh.

38

135.    Avery, at the time these representations were made by the Marsh and at the time Avery took the actions herein alleged, was ignorant of the falsity of the Marsh's representations and believed them to be true.  In reliance on these representations, Avery was induced to and did purchase insurance coverage and continued its relationship with Marsh.  Had Avery known the actual facts, it would not have taken such action.  Avery's reliance on Marsh's representations was justified because Marsh was well known in the community and marketed itself throughout the world as an insurance brokering expert.

136.    The fraud and deceit of Marsh as herein alleged was not discovered by Avery until at the earliest, after it filed this action, in February 2007, and was able to review documents produced by Marsh in conjunction with this litigation, but deliberately withheld from Avery despite Avery's requests for information concerning its account.  Further, Avery could not with due diligence discover extent of the fraud and deceit of Marsh until after the commencement of the trials of Marsh executives Edward McNenney and William Gilman in November 2007 and Avery was able to review testimony from certain individuals in conjunction with those trials.  Avery had no way of knowing and could not determine the true nature of the fraud and deceit of Marsh until Avery was able to review documents withheld from it by Marsh and to analyze those documents in conjunction with the trial testimony elicited in the McNenney and Gilman trials, commencing in or about November 2007.

137.    As a direct and proximate result of Marsh's conduct, Avery suffered injury to its business and property in that it purchased insurance at higher prices and on terms less favorable than would have been available if not for Marsh's conduct.

138.   Marsh's conduct as set forth herein has been willful, fraudulent, oppressive and malicious.  Avery is therefore entitled to punitive and exemplary damages sufficient to serve as an example and punish Marsh.

**Count 8: Negligent Misrepresentation (Broker Defendants)**

139.   Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

140.   The Broker Defendants and Avery had relationships of trust in which the Broker Defendants had a responsibility to communicate accurate information.

141.   The Broker Defendants intentionally or negligently misrepresented material facts to Avery and concealed material facts from Avery.  Avery reasonably relied on the Broker Defendants' misrepresentations and omissions and suffered harm as a result.

**Count 9: Negligence (Broker Defendants)**

142.   Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

143.   As Avery's insurance brokers, the Broker Defendants failed to exercise reasonable diligence and perform with the skill or care ordinarily possessed by companies acting in their capacity.  As a result of the Broker Defendants' negligence, Avery suffered harm.

**Count 10: Intentional Interference with Prospective Business Relations**
**(Marsh)**

144.   Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

145.   Avery had a reasonable expectation of entering into a valid business relationship with a competitive insurance carrier upon submission of a competitive bid.

146.   Marsh knew that Avery anticipated entering into a valid business relationship with a competitive insurance carrier.  With knowledge and understanding of Avery's expectation, Marsh wrongfully interfered with Avery's prospective business relations.

147.   Avery is informed and believes and based thereon alleges, that Marsh intentionally, maliciously and improperly interfered with Avery's relationships with competitive insurance carriers by engaging in wrongful acts that Marsh knew would harm Avery.

148.   There was no privilege or justification for Marsh's conduct. Moreover, Marsh's actions also constitute wrongful conduct above and beyond the act of interference itself, including unfair competition, breach of fiduciary duty, breach of contract, and fraud as alleged elsewhere herein.

149.   As a direct and proximate result of Marsh's interference, Avery suffered harm.

150.   Marsh's conduct was willful, fraudulent, oppressive and malicious. Avery is therefore entitled to punitive and exemplary damages sufficient to serve as an example and to punish Marsh.

**Count 11: Negligent Interference with Prospective Business Relations (Marsh)**

151.   Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

152.   Avery had a reasonable expectation of entering into a valid business relationship with a competitive insurance carrier upon submission of a competitive bid.

153.   Marsh knew or reasonably should have known of Avery's expectations regarding entering into a valid business relationship with a competitive insurance carrier upon submission of a competitive bid.  As a result of its actions, Marsh wrongfully interfered with Avery's prospective business

41

relations.  Marsh interfered by engaging in wrongful acts that Marsh knew or should have known would harm Avery.

154.    As a result of Marsh's interference, Avery suffered harm.

**Count 12: Breach of Contract (Broker Defendants)**

155.    Avery repeats and incorporates the allegations made in the preceding paragraphs as if fully set forth herein.

156.    The Broker Defendants and Avery entered into contracts.

157.    Avery performed its conditions of the contracts.

158.    The Broker Defendants breached the contracts by failing to provide proper advice to assist Avery in managing insurance costs; by failing to represent the interests of Avery rather than the insurers; by failing to recommend, negotiate, and implement cost-effective insurance; by failing to negotiate on Avery's behalf; by failing to keep Avery informed of significant developments; by not disclosing or failing to adequately disclose their receipt of secret contingent commissions; and by failing to use their best efforts to place insurance on behalf of Avery.

159.    As a result of the Broker Defendants' obvious and flagrant breaches, Avery suffered harm.

## PRAYER FOR RELIEF

Plaintiff asks the Court to grant the following:

A.    Treble damages, and attorneys' fees and costs as remedies for the Defendants' violations of the Sherman Act and injunctive relief permanently enjoining the Defendants from violating section 1 of the Sherman Act through the conduct set forth herein;

42

765286.2

B.   Treble damages, and attorneys' fees and costs as remedies for Marsh and the Insurer Defendants' violations of the Cartwright Act and injunctive relief permanently enjoining Marsh and the Insurer Defendants from violating the Cartwright Act through the conduct set forth herein;

C.   Forfeiture of compensation retained by the Broker Defendants; restitution of payments received from Avery; damages caused by the Defendants' conduct; exemplary and punitive damages owing to the malicious, willful, and wanton nature of the Defendants' conduct; prejudgment interest; injunctive relief; and attorneys' fees as remedies for the Defendants' violations of state law; and

D.   All other relief that the Court deems just and proper.


Respectfully submitted,
/s/  Stephen V. Masterson
Stephen V. Masterson, Esq.
GLASER WEIL FINK JACOBS
   HOWARD AVCHEN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone:  (310) 553-3000
Facsimile:   (310) 556-2920

Attorneys for Plaintiff Avery Dennison Corporation

43

## JURY TRIAL

Plaintiff demands a trial by jury on all claims and causes of action alleged herein.

Respectfully submitted,


/s/  Stephen V. Masterson

Stephen V. Masterson, Esq.
GLASER WEIL FINK JACOBS
   HOWARD AVCHEN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone:  (310) 553-3000
Facsimile:   (310) 556-2920

Attorneys for Plaintiff Avery Dennison
Corporation

765286.2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 27, 2012, Avery Dennison's First Amended Complaint and Demand for Jury Trial was served upon Defendants' counsel of record via electronic mail.

/s/  Aida Ramos
Aida Ramos

45

765286.2