## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ : | | |
| IN RE: INSURANCE BROKERAGE | : | Master Docket No. 04-5184 (CCC) |
| ANTITRUST LITIGATION | : | |
| | : | Hon. Claire C. Cecchi |
| | : | |
| _____ : | | |
| | : | (filed in the United States District |
| NEW CINGULAR WIRELESS, LLC, | : | Court for the Northern District of |
| AS SUCCESSOR IN INTEREST TO | : | Georgia as Case No. 1:06-CV-0796 |
| AT&T WIRELESS SERVICES, INC.; | : | and transferred for pre-trial purposes |
| TYSON FOODS, INC.; TYSON FRESH | : | by the Judicial Panel on Multidistrict |
| MEATS INC., ON ITS OWN ACCOUNT | : | Litigation under MDL 1663) |
| AND AS SUCCESSOR IN INTEREST TO | : | |
| IBP INC.; TYSON INTERNATIONAL | : | |
| CO., LTD.; FOODBRANDS AMERICA, | : | |
| INC.; PUBLIC SERVICE ENTERPRISE | : | |
| GROUP; PUBLIC SERVICES ELECTRIC | : | |
| & GAS CO., INC.; PSEG RESOURCES, | : | |
| INC.; TEXAS INDEPENDENT ENERGY, | : | |
| LLP AND TEXAS INDEPENDENT | : | |
| ENERGY OPERATING CO., LLC, | : | |
| | : | |
| PLAINTIFFS, | : | |
| | : | |
| MARSH & MCLENNAN COMPANIES, | : | |
| INC.; MARSH INC.; MARSH | : | |
| PLACEMENT, INC.; MARSH GLOBAL | : | |
| BROKING, INC.; MARSH USA, INC.; | : | |
| AON CORPORATION; | : | |
| ACE AMERICAN INSURANCE | : | |
| COMPANY; ACE BERMUDA | : | |
| INSURANCE LTD.; ACE USA, INC.; | : | |
| THE CHUBB CORPORATION; | : | |
| FEDERAL INSURANCE COMPANY; | : | |
| CNA FINANCIAL CORPORATION; THE | : | |
| CONTINENTAL INSURANCE CO.; | : | |
| CONTINENTAL CASUALTY | : | |
| COMPANY; THE TRAVELERS | : | |
| COMPANIES, INC.; TRAVELERS | : | |
| CASUALTY & SURETY COMPANY | : | |
| OF AMERICA; GULF INSURANCE CO.; | : | |
| ST. PAUL MERCURY INSURANCE CO.; | : | |

TRAVELERS EXCESS & SURPLUS                 :
INSURANCE, THE TRAVELERS                   :
 INDEMNITY OF AMERICA;                :
TRAVELERS PROPERTY CASUALTY                :
INSURANCE COMPANY; ZURICH                  :
AMERICAN INSURANCE CO.;                    :
AMERICAN GUARANTEE AND                     :
LIABILITY; ZURICH AMERICAN OF              :
ILLINOIS; XL GROUP PLC;                    :
XL INSURANCE (BERMUDA)                     :
LTD.; XL INSURANCE COMPANY                 :
LTD.; XL INSURANCE AMERICA; XL             :
SPECIALTY INSURANCE COMPANY;               :
FIREMAN'S FUND INSURANCE CO.;              :
LIBERTY MUTUAL INSURANCE CO.;              :
LIBERTY INSURANCE                          :
UNDERWRITERS INC.; ALLIED                  :
WORLD ASSURANCE COMPANY;                   :
ARCH CAPITAL GROUP LTD.; ARCH              :
INSURANCE COMPANY; ARCH                    :
REINSURANCE LTD.; ARCH                     :
INSURANCE (BERMUDA) LTD.;                  :
LUMBERMENS MUTUAL                          :
CASUALTY; AMERICAN                         :
PROTECTION INSURANCE COMPANY               :
THE HARTFORD FINANCIAL                     :
SERVICES GROUP, INC.; TWIN CITY            :
FIRE INSURANCE CO.; NUTMEG                 :
INSURANCE CO.;                             :
CERTAIN UNDERWRITERS AT                    :
LLOYD'S LONDON, INCLUDING                  :
SYNDICATES NOS. 0190 FRW; 0282             :
LSM; 1211 SPL; 1511 MEP;                   :
2488 AGM; 5000 SPL; AND OTHER              :
UNNAMED CO-CONSPIRATORS,                   :
                                           :
             DEFENDANTS.       :
_____:

## SECOND AMENDED COMPLAINT
## OF THE NEW CINGULAR WIRELESS PLAINTIFFS

2

# TABLE OF CONTENTS

Nature of the Action.................................................................................................. 2

I.     The Parties ...................................................................................................... 3

       A.     The Plaintiffs.......................................................................................... 3

       B.     The Broker Defendants .......................................................................... 5

       C.     The Insurer Defendants .......................................................................... 5

II.    Jurisdiction and Venue.................................................................................. 13

III.   Background .................................................................................................... 14

       A.     The Plaintiffs are corporate insurance customers. ............................. 15

       B.     Defendants and Co-Conspirators were the Plaintiffs' Brokers and Insurers. ... 16

       C.     The Relevant Market............................................................................. 17

       D.     Trade and Interstate Commerce ........................................................... 17

       E.     The Genesis of the Illegal Conspiracies............................................. 18

IV.    Marsh Coordinated An Extensive Customer Allocation Scheme......................... 20

       A.     Marsh Made Promises to the Plaintiffs to Act in Their Best Interests, to Disclose Commissions and, on Some Product Lines, Not to Accept Payments from the Insurers..................................................................................... 20

       B.     As Early as the Mid-1990s, Marsh Established a "Pay-to-Play" System in Which It Directed Business to Insurers in Exchange for Secret Kickbacks. ............ 25

       C.     The Scheme Expanded to Include Customer Allocation and Steering, which Marsh Controlled and Policed. .................................................................. 32

              1.     Without Permitting Competition, Marsh Slated the Insurers to Win Each Layer of Its Customers' Business and Set the Prices............................................. 32

              2.     Marsh Obtained Fake B Bids and Sham Declinations to Create the Illusion of Competition........................................................................................ 36

              3.     Marsh Policed the Scheme and Disciplined Dissonance. ............................ 38

       D.     The Conspiring Insurers Knew of and Agreed to the Conspiracy. ................... 39

              1.     The Conspiring Insurers Knew the Terms of Each Others' Kickback Agreements. ...................................................................................... 42

              2.     The Conspiring Insurers Provided False B Bids and Sham Declinations to Protect Each Others' Business...................................................................... 44

              3.     The Conspiring Insurers Occasionally Communicated Directly with One Another. ........................................................................................... 63

              4.     Agents of Marsh and Many of the Conspiring Insurers Were Convicted of Criminal Conduct Relating to the Conspiracy...................................................... 65

E.    Marsh and the Conspiring Insurers Secreted the Kickback Arrangements from Marsh's Customers, Including the Plaintiffs. ............................................................ 66

    1.    Marsh and the Insurers Kept the Kickback Arrangements Secret. ............... 67

    2.    When Marsh Eventually Divulged the Existence of Contingent Commissions to the Plaintiffs, the Disclosures were Inaccurate and Misleading. ...................... 70

F.    Marsh's Scheme Directly Affected the Plaintiffs' Insurance Placements. ....... 72

G.    Marsh's Scheme Inflated Premiums. ............................................................. 78

H.    The Defendants Contemporaneously Tracked the Kickbacks Marsh Earned on Each Customer's Insurance Placements. ................................................................. 81

I.    Marsh Accepted Illicit Payments, Even on the Plaintiffs' Fee-Based Accounts ................................................................................................ 83

    1.    With the Insurers' Cooperation, Marsh Secretly Accepted Straight Commissions on the Plaintiffs' Fee-Only Accounts. .............................................. 84

    2.    Marsh Also Accepted So-Called Contingent Commissions that Were Directly Attributed to the Plaintiffs' Insurance Placements. ............................... 88

V.    Aon and the Conspiring Insurers Agreed to Stifle Competition By Allocating Insurance Business to the Insurers in Exchange for the Insurers' Payment of Secret Kickbacks to Aon. ......................................................................................................... 91

    A.    Aon Promised to Act in AT&T Wireless' Best Interests, to Disclose All Compensation and, for Certain Product Lines, Not to Accept Payment from the Insurers. .............................................................................................................. 91

    B.    As Early as 1997, Aon Systematically Allocated its Customers' Policies to the Insurers that Paid Maximum Secret Kickbacks. ........................................................ 94

    C.    Aon Expanded Its Scheme of Allocating Its Customers' Business to the Insurers that Paid the Highest Kickbacks. .............................................................. 98

    1.    Aon Placed Its Customers' Business Without Competition in Exchange for Kickbacks. .............................................................................................................. 98

    2.    Aon Developed Internal Corporate Mandates to Maximize Its Kickback Revenue. .............................................................................................................. 102

    3.    Aon Ensured that the Insurers Understood Aon Controlled the Flow of Insurance Business. .............................................................................................. 106

    4.    For Certain Business of Aon's Customers, the Insurers' *Quid Pro Quo* for Allocation of the Business Included Using Aon Re to Reinsure the Business... 110

    D.    Aon and the Conspiring Insurers Contemporaneously Tracked the Kickbacks Earned on Each Customer's Insurance Policies, including AT&T Wireless' policies. .............................................................................................................. 112

    E.    Aon Grew Fat on the Kickbacks. ................................................................. 113

    F.    Aon and the Conspiring Insurers Secreted Their Kickback Arrangements.... 116

G.   With the Conspiring Insurers' Assistance, Aon Violated Its Obligations to AT&T Wireless............................................................................................... 119

1.   Aon Did not Act in AT&T Wireless' Best Interests and Failed to Disclose the Kickbacks.................................................................................................. 119

2.   Aon Accepted Payment on AT&T Wireless' Fee-Only Placements. ......... 120

3.   Aon Misled AT&T Wireless About the Scheme and the Payments. .......... 121

H.   The Conduct of Aon and the Conspiring Insurers Harmed AT&T Wireless.  122

Causes of Action ......................................................................................................... 124

Suspension of the Statutes of Limitation Due to Fraudulent Concealment (By All of the Plaintiffs)..................................................................................................................... 172

Jury Trial Demanded.................................................................................................... 175

Plaintiffs New Cingular Wireless PCS, LLC, as successor in interest to AT&T Wireless Services, Inc. (collectively, "NCW"); Tyson Foods, Inc., Tyson Fresh Meats, Inc., on its own account and as successor in interest to IBP inc., Tyson International Co., Ltd. and Foodbrands America, Inc. (collectively "Tyson"); Public Service Enterprise Group, Public Services Electric & Gas Co., Inc. and PSEG Resources, Inc. (collectively "PSEG"); and Texas Independent Energy, LLP and Texas Independent Energy Operating Co., LLC (collectively "TIE") (NCW, Tyson, PSEG and TIE are collectively known as the "Plaintiffs"); by and through their attorneys, complain against Defendants Marsh & McLennan Companies, Inc., Marsh Inc., Marsh Placement, Inc., Marsh USA Inc., Marsh Global Broking, Inc., Aon Corporation, ACE American Insurance Company, Ace Bermuda Insurance, Ltd., ACE USA, Inc., The Chubb Corporation, Federal Insurance Company, CNA Financial Corporation, The Continental Insurance Co., Continental Casualty Company, The Travelers Companies, Inc., Travelers Casualty & Surety Company of America, Gulf Insurance Co., St. Paul Mercury Insurance Co., Travelers Excess & Surplus Insurance, The Travelers Indemnity of America, Travelers Property Casualty Insurance Company, Zurich American Insurance Co., American Guarantee and Liability, Zurich American of Illinois, XL Group plc, XL Insurance (Bermuda) Ltd., XL Insurance Company Ltd., XL Insurance America, XL Specialty Insurance Company, Fireman's Fund Insurance Co., Liberty Mutual Insurance Co., Liberty Insurance Underwriters Inc., Allied World Assurance Company, Arch Capital Group Ltd., Arch Insurance Company, Arch Reinsurance Ltd., Arch Insurance (Bermuda) Ltd., Lumbermens Mutual Casualty, American Protection Insurance Company, The Hartford Financial Services Group, Inc., Twin City Fire Insurance Co.,

Nutmeg Insurance Co., Certain Underwriters at Lloyd's, London, including Syndicates Nos. 0190 FRW, 0282 LSM, 1211 SPL, 1511 MEP, 2488 AGM, 5000 SPL, and other unnamed co-conspirators, as follows:

## NATURE OF THE ACTION

1.      This is an action by Plaintiffs, corporate insureds, against Defendants, Plaintiffs' insurance brokers[1] and the named insurers, for actual, treble, and punitive damages, disgorgement, restitution, injunctive and equitable relief, and attorneys' fees and costs for Defendants' (1) violations Section 1 of the Sherman Act, (2) violations of Sections 1962(c) & (d) of RICO, (3) breach of fiduciary duty, (4) inducement to breach fiduciary duty, (5) breach of contract, (6) tortious interference with contract, (7) unjust enrichment, (8) fraud, (9) consumer fraud, and (10) civil conspiracy.

2.      The conduct forming the basis of this complaint involves the Defendants' use of a variety of illegal schemes and practices designed to, among other things, allocate customers, steer business, and raise the prices of insurance products paid by the Plaintiffs for insurance products.  In addition, the Broker Defendants allocated policyholders' business to the Insurer Defendants—or refrained from moving the policyholders' business to other insurers—in exchange for the Insurer Defendants payment of substantial kickbacks to the brokers.  The net result of these practices is that competition for policyholders' business did not occur.  As a result, the Plaintiffs, as policyholders, either paid more for insurance products or received less beneficial terms than the competitive market would have provided.  The Insurer Defendants also induced

---

[1]     Plaintiff New Cingular, as a successor to AT&T Wireless, settled its claims with Marsh and does not assert claims against Marsh in this complaint.  It does assert claims against Aon and against all of the Insurer Defendants.

the Broker Defendants to breach their contractual and fiduciary obligations to the Plaintiffs by making substantial kickback payments to the Broker Defendants in exchange for allocating the Plaintiffs' insurance to them without competition.  Moreover, the Insurer Defendants provided illicit payments to influence the Broker Defendants' placement of the Plaintiffs' policies, *even where* the Plaintiffs had paid the Broker Defendants a flat fee in lieu of the Broker Defendants accepting payments from the Insurer Defendants.  The Defendants deceived and misled the Plaintiffs to prevent them from learning of the illegal practices.

## I.     THE PARTIES

### A.     The Plaintiffs

3.      Plaintiff New Cingular Wireless PCS, LLC ("New Cingular") is a Delaware limited liability company with its principal place of business in Georgia.

4.      Plaintiff New Cingular is the successor in interest by merger to AT&T Wireless Services, Inc.  AT&T Wireless, Inc. was a Delaware corporation with its principal place of business in Washington.  New Cingular and AT&T Wireless are collectively referred to as "NCW."

5.      Plaintiff Tyson Foods, Inc. is a Delaware corporation with its principal place of business in Arkansas.

6.      Tyson Fresh Meats, Inc. is a Delaware corporation with its principal place of business in Arkansas.  Tyson Fresh Meats, Inc. also is the successor in interest by merger to IBP inc.

7.      Plaintiff Tyson International Co., Ltd. is a foreign corporation organized under the laws of Bermuda.

8.      Plaintiff Foodbrands America, Inc. is a Delaware corporation with its principal place of business in Arkansas.

9.      Plaintiffs Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson International Co., Ltd. and Foodbrands America, Inc. are collectively referred to as "Tyson."

10.      Plaintiff Public Service Enterprise Group is a New Jersey corporation with its principal place of business in New Jersey.

11.      Plaintiff Public Service Electric & Gas Co., Inc. is a New Jersey corporation with its principal place of business in New Jersey.

12.      Plaintiff PSEG Resources, Inc. is a New Jersey corporation with its principal place of business in New Jersey.

13.      Plaintiff Texas Independent Energy, LLP was a Texas limited liability partnership with its principal place of business in Texas.  Its interests in this litigation are held by Public Service Enterprise Group.

14.      Plaintiff Texas Independent Energy Operating Co., LLC was a Texas limited liability partnership with its principal place of business in Texas.  Its interests in this litigation are held by Public Service Enterprise Group.

15.      Plaintiffs Public Service Enterprise Group, Public Service Electric & Gas Co., Inc., PSEG Resources, Inc., Texas Independent Energy, LLP, and Texas Independent Energy Operating Co., LLC are collectively referred to as "PSEG."

## B.    The Broker Defendants

16.    On information and belief, Defendant Marsh & McLennan Companies, Inc. ("MMC") is a Delaware corporation with its principal place of business in New York.

17.    On information and belief, Defendant Marsh Inc. ("Marsh Inc.") is a Delaware corporation with its principal place of business in New York.  On information and belief, Marsh Inc. is a wholly-owned subsidiary of MMC.

18.    On information and belief, Defendant Marsh Placement, Inc. is a Delaware corporation with its principal place of business in New Jersey. On information and belief, Marsh Placement, Inc. is a wholly-owned subsidiary of MMC.

19.    On information and belief, Defendant Marsh Global Broking, Inc. is a Texas corporation with its principal place of business in New Jersey.  On information and belief, Marsh Global Broking, Inc. is a wholly-owned subsidiary of MMC.

20.    On information and belief, Defendant Marsh USA Inc. is a Delaware corporation with its principal place of business in New York.

21.    Defendants MMC, Marsh Inc., Marsh Placement Inc., Marsh Global Broking Inc., and Marsh USA Inc. are collectively referred to here as "Marsh."

22.    On information and belief, Defendant Aon Corporation ("Aon") is a Delaware corporation with its principal place of business in Illinois.

## C.    The Insurer Defendants

23.    On information and belief, Defendant ACE American Insurance Company ("Ace American") is a subsidiary of ACE Ltd. and is incorporated under the laws of Pennsylvania with its principal place of business in Pennsylvania.

5

24.     On information and belief, Defendant ACE Bermuda Insurance Company Limited ("Ace Bermuda") is a subsidiary of ACE Ltd.. and is incorporated under the laws of Bermuda, with its principal place of business at 17 Woodbourne Avenue, Hamilton HM08, Bermuda.  At all times pertinent to this complaint, Ace Bermuda transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

25.     On information and belief, Defendant ACE USA, Inc. ("Ace USA") is incorporated under the laws of Delaware with its principal place of business in Pennsylvania.

26.     Defendants Ace American, Ace Bermuda and Ace USA are collectively referred to as "Ace."

27.     On information and belief, Defendant Chubb Corporation ("Chubb Corp.") is a corporation incorporated under the laws of New Jersey with its principal place of business in New Jersey.

28.     On information and belief, Defendant Chubb Group of Insurance Companies ("Chubb Group") is a corporation incorporated under the laws of New Jersey with its principal place of business in New Jersey.

29.     On information and belief, Defendant Federal Insurance Company ("Federal Insurance") is a subsidiary of Chubb Corp. and is incorporated under the laws of Indiana with its principal place of business in New Jersey.

30.     Defendants Chubb Insurance Corp., Chubb Group, and Federal Insurance are collectively referred to as "Chubb."

6

31.     On information and belief, Defendant CNA Financial Corporation ("CNA Financial") is a corporation incorporated under the laws of Delaware with its principal place of business in Illinois.

32.     On information and belief, Defendant The Continental Insurance Co. ("Continental Insurance") is a subsidiary of CNA Insurance Companies and is incorporated under the laws of South Carolina with its principal place of business in Illinois.

33.     On information and belief, Defendant Continental Casualty Company is a subsidiary of CNA Insurance Companies and is incorporated under the laws of Illinois, with its principal place of business in Illinois.

34.     Defendants CNA Financial, Continental Insurance and Continental Casualty Company are collectively referred to as "CNA."

35.     On information and belief, Defendant The Travelers Companies, Inc. ("Travelers"), formerly known as St. Paul Travelers Co., Inc., is incorporated under the laws of Minnesota with its principal place of business in Minnesota.

36.     On information and belief, Defendant Travelers Casualty & Surety Company of America ("Travelers Casualty") is a subsidiary of The Travelers Companies, and is incorporated under the laws of Connecticut with its principal place of business in Connecticut.

37.     On information and belief, Defendant Gulf Insurance Group ("Gulf Insurance") is a subsidiary of The Travelers Companies, and is incorporated under the laws of Connecticut with its principal place of business in New York.

38.     On information and belief, Defendant St. Paul Mercury Insurance Co. ("St. Paul Mercury") is a subsidiary of The Travelers Companies, and is incorporated under the laws of Minnesota with its principal place of business in Minnesota.

39.     On information and belief, Defendant Travelers Excess & Surplus Insurance is a subsidiary of The Travelers Companies, and is incorporated under the laws of Connecticut with its principal place of business in Connecticut.

40.     On information and belief, Defendant The Travelers Indemnity of America is a subsidiary of The Travelers Companies and is incorporated under the laws of Connecticut with its principal place of business in Connecticut.

41.     On information and belief, Defendant Travelers Property Casualty Insurance Company is a subsidiary of The Travelers Companies, and is incorporated under the laws of Connecticut, with its principal place of business in Connecticut.

42.     Defendants Travelers, Travelers Casualty, Gulf Insurance, St. Paul Mercury, Travelers Excess & Surplus Insurance, The Travelers Indemnity of America and Travelers Property Casualty Insurance Company are collectively referred to as "Travelers" or "St. Paul/Travelers."

43.     On information and belief, Defendant Zurich American Insurance Co. is a subsidiary of Zurich N.A. and is incorporated under the laws of New York, with its principal place of business in Illinois.

44.     On information and belief, Defendant American Guarantee and Liability is a subsidiary of Zurich N.A. and is incorporated under the laws of Illinois, with its principal place of business in Illinois.

45.    On information and belief, Defendant Zurich American of Illinois is a subsidiary of Zurich N.A. and is incorporated under the laws of Illinois, with its principal place of business in Illinois.

46.    Defendants Zurich American Insurance Co., American Guarantee and Liability, and Zurich American of Illinois are collectively referred to as "Zurich."

47.    On information and belief, Defendant XL Group plc ("XL Group") is incorporated under the laws of the Cayman Islands with its headquarters at One Bermudiana Road, Hamilton HM 08 Bermuda.  At all times pertinent to this complaint, XL Group transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

48.    On information and belief, Defendant XL Insurance (Bermuda) Ltd. ("XL Bermuda") is a subsidiary of XL Capital Ltd. and is incorporated under the laws of Bermuda, with its principal place of business in Bermuda.

49.    On information and belief, Defendant XL Insurance Company Limited is a subsidiary of XL Group, and is incorporated under the laws of the United Kingdom, with its headquarters at 70 Gracechurch Street, London, EC3V 0KL United Kingdom.  At all times pertinent to this complaint, XL Insurance Company Limited transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

50.    On information and belief, Defendant XL Insurance America is a subsidiary of XL Group and is incorporated under the laws of Delaware with its principal place of business in Connecticut.

9

51.     On information and belief, Defendant XL Specialty Insurance Company is a subsidiary of XL Group and is incorporated under the laws of Delaware with its principal place of business in Connecticut.

52.     Defendants XL Group, XL Bermuda, XL Insurance Company Limited, XL Insurance America and XL Specialty Insurance Company are collectively referred to as "XL."

53.     On information and belief, Defendant Fireman's Fund Insurance Co. ("Fireman's Fund") is a subsidiary of Allianz AG, and is incorporated under the laws of California, with its principal place of business in California.

54.     On information and belief, Defendant Liberty Mutual Insurance Co. ("Liberty Mutual") is a corporation incorporated under the laws of Massachusetts, with its principal place of business in Massachusetts.  On information and belief, it purchased Wausau Insurance Companies ("Wausau").

55.     Upon information and belief, Defendant Liberty Insurance Underwriters Inc. ("LIU") is incorporated under the laws of New York with its principal place of business in New York.

56.     Defendants Liberty Mutual and LIU are collectively referred to as "Liberty."

57.     On information and belief, Defendant Allied World Assurance Company ("AWAC") is a Bermuda-based insurance and reinsurance company with its headquarters at 27 Richmond Road, Pembroke HM 08 Bermuda.  At all times pertinent to this complaint, Allied World Assurance Company transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

10

58.     On information and belief, Defendant Arch Capital Group Ltd. is a Bermuda public limited liability company with its headquarters at 45 Reid Street, Hamilton HM 12 Bermuda.  At all times pertinent to this complaint, Arch Capital Group transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

59.     On information and belief, Defendant Arch Insurance Company is a subsidiary of Arch Capital Group and is incorporated under the laws of Missouri with its principal place of business in New York.

60.     On information and belief, Defendant Arch Reinsurance Limited is a subsidiary of Arch Capital Group and is incorporated under the laws of Bermuda with its principal place of business in Hamilton, Bermuda.  At all times pertinent to this complaint, Arch Reinsurance Limited transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

61.      On information and belief, Defendant Arch Insurance (Bermuda) is a subsidiary of Arch Capital Group and is incorporated under the laws of Bermuda with its principal place of business in Hamilton, Bermuda.  At all times pertinent to this complaint, Arch Insurance (Bermuda) transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

62.     Defendants Arch Capital Group Ltd., Arch Insurance Company, Arch Reinsurance Limited, and Arch Insurance (Bermuda) are collectively referred to as "Arch."

63.    On information and belief, Defendant Lumbermens Mutual Casualty ("Lumbermens") is a subsidiary of Kemper Corporation and is incorporated under the laws of Illinois with its principal place of business in Illinois.

64.    On information and belief, American Protection Insurance Co. ("American Protection") is a subsidiary of Kemper Corporation and is incorporated under the laws of Illinois with its principal place of business in Illinois.

65.    Lumbermens and American Protection are collectively referred to as "Kemper."

66.    On information and belief, Defendant The Hartford Financial Services Group Inc. is incorporated under the laws of Delaware with its principal place of business in Connecticut.

67.    On information and belief, defendant Twin City Fire Insurance Co. is a subsidiary of Hartford Financial Services Group Inc., and is incorporated under the laws of Indiana with its principal place of business in Connecticut.

68.    On information and belief, Defendant Nutmeg Insurance Co. is a subsidiary of Hartford Financial Services Group Inc., and is incorporated under the laws of Connecticut with its principal place of business in Connecticut.

69.    Defendants Hartford Financial Services Group Inc., Twin City Fire Insurance Co. and Nutmeg Insurance Co. are collectively referred to as "Hartford."

70.    The following Defendants, collectively referred to herein as "Certain Underwriters at Lloyd's" are foreign syndicates engaged in the business of underwriting insurance: Lloyd's, London Syndicates Nos. 0190 FRW, 0282 LSM, 1211 SPL, 1511 MEP, 2488 AGM, and 5000 SPL.

71.     The Defendants other than Marsh and Aon are sometimes referred to as "Insurer Defendants."

72.     The parent companies that did not issue insurance policies are named as Defendants in this complaint because they had knowledge of, acquiesced to, and participated in the conduct of their insurance carrier affiliates, as alleged in this complaint.  In fact, many of the employees of the insurance carrier affiliates that committed the wrongful acts alleged herein were also employees of the affiliates' parent companies. Thus, each such employee's actions are attributable to the affiliate's parent company.  Furthermore, the Broker Defendants often aggregated the kickbacks (as alleged herein) from the affiliated insurance carriers under each parent company's name in accounting for the kickbacks.  On information and belief, the Broker Defendants invoiced the parent companies for the kickbacks and the parent companies paid the kickbacks on behalf of their insurance carrier affiliates.  Representatives of the parent companies also participated in the negotiation the so-called "contingent commission agreements" and tracking of the kickbacks payable to the Broker Defendants under such arrangements.

## II.     JURISDICTION AND VENUE

73.     The United States District Courts have subject-matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331 and 1337.

74.     The United States District Court for the Northern District of Georgia has personal jurisdiction over each Defendant because each Defendant transacted business in the Northern District of Georgia by, among other things, providing either insurance brokerage services or general, property, casualty, excess, D&O, or a variety of other Insurance Products as defined herein.

13

75.    The United States District Court for the District of New Jersey has personal jurisdiction for pretrial proceedings under 28 U.S.C. § 1407(a).

76.    The United States District Court for the Northern District of Georgia is the proper venue pursuant to Sections 4, 12 & 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 & 26, 18 U.S.C. § 1965(a), and 28 U.S.C. § 1391(b), (c) & (d) because Defendants reside, transacted business, were or had agents in the Northern District of Georgia, and because a substantial portion of the affected interstate trade and commerce described herein, is and has been carried out in the Northern District of Georgia.

77.    The United States District Court for the District of New Jersey is the venue for pretrial proceedings under 28 U.S.C. § 1407(a).

## III.    BACKGROUND

78.    There are basically three types of entities in the corporate insurance market.  First, there are the customers: companies such as the Plaintiffs that seek to purchase Insurance Products for their businesses.  Second, there are brokers, consultants, and independent agents that customers hire to advise them as to needed coverage and to find insurers offering that coverage.  The brokers obtain price quotations, and present the quotations to the client.  Brokers—as opposed to consultants or independent agents—represent the customer.  Third, there are insurers.  They submit quotes to the brokers and, if selected by the customer, enter into a contract to provide insurance for that customer's risk.

79.    A company's primary insurance coverage—such as commercial general liability (CGL), property insurance or FINPRO (such as D&O)—will pay losses only to a specific limit.  To protect itself from higher losses, a large company will frequently buy an umbrella policy over the primary insurance that protects the company

from losses in excess of the primary limits. The first layer of umbrella coverage is often called the "lead umbrella" or "lead excess" policy and typically offers $25 million to $50 million of coverage beyond the primary insurance. The lead umbrella for casualty insurance sits atop general commercial, auto liability, and certain other types of insurance. Similarly, the lead umbrella for property insurance sits atop of the primary property. A large company will usually purchase additional layers of excess coverage above the lead umbrella to protect it in the event losses exceed the combined limits of the primary and the lead umbrella coverage.

## A.    The Plaintiffs are Corporate Insurance Customers.

80.    The Plaintiffs are corporate insurance customers. They purchased multiple layers of excess insurance over the primary insurance to protect themselves in the event of large losses.

81.    All of the Plaintiffs were clients of Marsh. All of the Plaintiffs are pursuing claims against Marsh, except Plaintiff NCW, as a successor to AT&T Wireless, which settled its claims with Marsh and does not assert claims against Marsh in this complaint. Plaintiff NCW, as a successor to AT&T Wireless, does assert claims against all of the Insurer Defendants. The other Plaintiffs are pursuing claims against Marsh and all Insurer Defendants.

82.    Plaintiff NCW, as a successor to AT&T Wireless, also was a client of Aon and is pursuing claims against Aon and all other Insurer Defendants.

83.    During the relevant time period covered by this Complaint, the Plaintiffs paid hundreds of millions of dollars in premiums to Ace, Chubb, CNA, Travelers, Zurich, XL, Fireman's Fund, Liberty, AWAC, Arch, Kemper, Hartford,

15

Certain Underwriters at Lloyd's, and the other Insurer Defendants for insurance policies brokered by the Broker Defendants.

**B.      Defendants and Co-Conspirators were the Plaintiffs' Brokers and Insurers.**

84.      For purposes of this Complaint, Marsh and Aon will be referred to collectively as the "Broker Defendants."

85.      Marsh is the largest provider of insurance brokerage and consulting services in the world.  Marsh's insurance brokerage business alone employed 42,000 employees in 410 offices located in over 100 countries during the relevant time covered by this Complaint. According to its 2003 financial statement, Marsh's insurance brokerage business generated annual revenues of over $6.9 billion.

86.      Aon is the second largest provider of insurance brokerage and consulting services in the world.  Aon employed approximately 47,000 employees in offices located across the world during the relevant time covered by this Complaint. According to its 2004 annual report, Aon's risk and insurance brokerage business generated annual revenues of over $5.7 billion.

87.      The remaining Defendants are insurers from whom the Plaintiffs purchased insurance policies during the relevant time and, for the purposes of this complaint, are collectively referred to as the "Insurer Defendants."

88.      The Plaintiffs paid significant amounts of money in premiums during the relevant time to each of the Insurer Defendants and each of the Insurer Defendants paid illegal kickbacks to the Broker Defendants in the form of so-called "contingent commissions."

89.      For purposes of this complaint, the Broker Defendants and the Insurer Defendants will be referred to collectively as the "Defendants."

16

90.     Various other persons, corporations, and other legal entities, not named as Defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

91.     Whenever reference is made in this complaint to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through one or more of its respective officers, directors, agents, employees or representatives while he, she, or they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

### C.     The Relevant Market

92.     For purposes of this complaint, the term "Insurance Products" means commercial insurance policies, including without limitation, excess casualty (including excess commercial general liability, workers' compensation and automobile) insurance, excess property insurance, and FINPRO (including directors and officers insurance, errors and omissions insurance and employment practices liability) insurance.

93.     For purposes of this complaint, the relevant market is the market for Insurance Products and insurance brokerage services for Insurance Products.

94.     For purposes of this Complaint, the relevant geographic market is the United States and its territories as a whole, as well insurance issued from abroad (such as from Bermuda and the United Kingdom) to cover the risks of U.S. companies and properties.

### D.     Trade and Interstate Commerce

95.     At all relevant times, the Insurer Defendants sold, and the Broker Defendants brokered, the sales of substantial quantities of Insurance Products in a continuous and uninterrupted flow of interstate commerce.

17

96.    The activities of Defendants and their co-conspirators, as described in this complaint, were within the flow of and substantially affected interstate commerce. The conduct of the Defendants and their co-conspirators foreseeably restrained interstate commerce.

97.    At all times pertinent to this complaint, the Defendants entered into agreements and engaged in conduct directly and as co-conspirators which unreasonably restrained trade in the relevant market and geographic markets.

**E.    The Genesis of the Illegal Conspiracies**

98.    Since at least the early 1990s, the Broker Defendants have solicited and the Insurer Defendants have offered payments based upon the volume of the customers' business the Broker Defendants steer to the Insurer Defendants. The amount of these so-called "contingent commissions" grew steadily until late 2004 and have resulted the Insurer Defendants paying the Broker Defendants in excess of a billion dollars.

99.    Over the years, the agreements by the Insurer Defendants to pay these illegal kickbacks to the Broker Defendants have gone by various names, including without limitation "contingent commission agreements," "placement service agreements" ("PSAs"), "market services agreements" ("MSAs"), "underwriter service agreements" ("USAs"), "special producer agreements," "quality business incentives awards," "preferred broker compensation plans," "competitive bonus programs," "extra compensation agreements," "professional enhancement fund" ("PEFs"), "overrides," and/or "bonuses." Despite the name or title, these agreements are kickbacks from the Insurer Defendants to the Broker Defendants.

18

100. In the early 1990s, Marsh developed a plan designed to centralize the marketing of its insurance brokering services – the Global Broking Division ("Global Broking"). Global Broking determined the placement of all of Marsh's major business lines, which includes Excess Casualty, Property, FinPro (Financial Products) and Middle Market (businesses paying less that $1 million in annual insurance premiums). Global Broking was based out of Marsh's New York office, with regional centers set up around the country to ensure that field agents and brokers were placing their clients' insurance business with Global Broking's preselected insurers. Over time, the Global Broking groups at Marsh consolidated all of Marsh's insurance placement activity for large commercial policyholders, such as the Plaintiffs. Marsh placed the allocated business with the Insurer Defendants that paid the biggest kickbacks.

101. Aon soon followed suit, establishing "Syndication Plans" to centralize its insurance placement and negotiate broad, global kickback agreements with the Insurer Defendants. Aon also directed its customers' insurance business to those Insurer Defendants that paid the biggest kickbacks.

102. Aon created lists of insurers whose products its employees were to sell more vigorously to customers, including the Plaintiffs. These lists were not based on price or service, but on the amount of kickbacks the Insurer Defendants would pay Aon.

103. The net results of the conduct were that (a) the Broker Defendants increased their net revenue through their receipt of undisclosed kickback payments; (b) the Insurer Defendants secured and retained policyholder business without actual competition and increased their premiums to build in the costs of these undisclosed kickback payments; (c) the Insurer Defendants secured even greater increases in

19

premiums due to the absence of competition; and (d) policyholder customers, including

the Plaintiffs, paid higher premiums for less advantageous coverage than that which

would have been available in a competitive market.

## IV.    MARSH COORDINATED AN EXTENSIVE CUSTOMER ALLOCATION SCHEME.

### A.    Marsh Made Promises to the Plaintiffs to Act in Their Best Interests, to Disclose Commissions and, on Some Product Lines, to Not Accept Payments from the Insurers.

104.    Marsh sought to become and remain the Plaintiffs' commercial

insurance broker.  On many occasions, Marsh assured its customers, including Plaintiffs,

that its "guiding principal is to consider our client's best interest in all placements."

Marsh represented to its customers, including the Plaintiffs, that "[w]e are our clients'

advocates, and we represent them in negotiations.  We don't represent the [insurance

companies]."

105.    Marsh further said that it was the world's largest insurance broker

and cited its size and sophistication as a primary reason to hire the company.  Marsh held

itself out to its customers, including the Plaintiffs, as a trusted expert in the analysis and

placement of Insurance Products and claimed to have the sophistication and market

expertise to advise the Plaintiffs in selecting their insurance policies.

106.    Once the Plaintiffs retained Marsh as their broker, Marsh worked

closely with them to identify their insurance needs, communicated with insurers on the

Plaintiffs' behalf, and provided advice to the Plaintiffs concerning which insurance

policies they should purchase.

107.    The Plaintiffs, in turn, relied on Marsh to assist and advise them in

securing commercial insurance.  Most significantly, the Plaintiffs trusted Marsh and

relied upon it to advise them on which insurance policies to purchase, including with

regard to the premiums they should pay and the coverage that would be appropriate.

108.    The Plaintiffs' relationship with and reliance on Marsh continued

for many years.  For example, Tyson has relied on Marsh as its insurance broker since

about 1980.  In November 1998, Marsh's predecessor, J&H Marsh & McLennan, Inc.,

sought to continue the long-standing relationships, writing to Tyson that "[a]ll of us at

J&H Marsh & McLennan, Inc. (J&H Marsh) are proud to have been entrusted with the

opportunity to act as the insurance broker for Tyson Foods for so many years."  Marsh

made similar statements to NCW and PSEG.  In 2004, Marsh referred to its relationship

with Tyson as "long-term" and reminded Tyson that "Tyson and Marsh have enjoyed a

quarter of a century relationship in which we have seen both organizations evolve and

grow."   Similarly, PSEG has relied on Marsh as its insurance broker for its casualty

insurance products since prior to 1991.

109.    Marsh entered into brokerage agreements, or "client service

agreements," with each of the Plaintiffs (in which each Plaintiff is identified as the

"Client") for Marsh to broker and place insurance products on the Plaintiffs' behalf.

Marsh offered the Plaintiffs the option of entering into annual fee-based brokerage

agreements for various insurance product lines under which Marsh would broker and

place the particular insurance product lines for a flat fee and promised that it would not

accept commissions—or, to the extent it did, that it would credit the commissions to the

Plaintiffs.  In each of the brokerage agreements, Marsh promised to disclose any

commissions it received.

21

110.    For example, in the August 1, 1999 brokerage agreement with PSEG, Marsh agreed to be PSEG's "exclusive insurance broker" on its D&O, fiduciary, workers' compensation and various other excess policies and to "act as PSEG's representative to the insurance market; establish appropriate marketing strategy considering cost, coverage, and continuity." In exchange, PSEG agreed to pay Marsh a flat fee of $225,000. In the agreement, Marsh "expressly acknowledge[d] that such fee is full commission for the services performed. . . and in lieu of commission to which [Marsh] would otherwise be entitled as Broker-of-Record of any insurance placed with the underwriters on PSEG's behalf." Marsh made no mention of the fact that it planned to extract so-called contingent commissions or other kickbacks from insurers for the placement of PSEG's insurance policies. Other than variations in the fee that PSEG paid Marsh, Marsh and PSEG entered the same agreement each year from 1992 through 2002.

111.    Marsh entered into similar agreements with Tyson and NCW. Although the form varied slightly over the years, Marsh promised in each to "negotiate on the Client's behalf with insurers," "to represent and assist the client in all discussions and transactions with the insurers" and to "[u]se its best efforts to place insurance on behalf of the Client." Marsh also agreed to "[a]ct as a liaison between the Client and the Insurers. . . ."

112.    On or about the effective date stated in each of the customer agreements with the Plaintiffs, Marsh sent the customer agreement to the Plaintiffs' risk management personnel. Marsh sent the customer agreements by U.S. mail, facsimile, and email. For example, on or about January 19, 2000, Marsh's John McMillin faxed Foodbrands America its Client Services Agreement. Similarly, on August 14, 2001,

Marsh's John "Barry" Kirkland emailed Tyson its Client Service Agreement, noting that "[a]n original with my signature is in the mail."

113.    In interacting with the Plaintiffs, Marsh personnel repeatedly indicated that they had been and would continue to seek the best insurance for the Plaintiffs at the lowest premium.  Indeed, this is the primary reason for engaging a broker.

114.    The Plaintiffs reasonably understood that Marsh would act in the Plaintiffs' best interests and seek the best insurance policies for the Plaintiffs at the lowest premium and that Marsh would not abuse its ability to control information and bidding to Plaintiffs' detriment.

115.    Marsh additionally promised that "[t]he Client is entitled to copies of reports and/or documents relating to its account."  In later years, Marsh added the qualification "(other than internal Marsh correspondence)," but continued to promise each of the Plaintiffs that they could access any documents relating to their account other than internal Marsh correspondence.

116.    Although Marsh was to broker and place a few of the Plaintiffs' insurance lines on a commission basis, most were to be brokered on a fee-only basis.  For example, Marsh agreed to broker NCW's excess casualty, employment practices (EPL) and directors & officers (D&O) insurance lines, among others, for a flat fee.  Likewise, Marsh agreed to broker Tyson's property and Finpro (which includes D&O, EPL, fiduciary, crime and special crime) product lines for a flat fee.

117.    In each of Tyson's and NCW's flat-fee agreements, Marsh promised either to not take commissions, or to credit or return any commissions to Tyson or NCW, as the customer.

118.    In all of the brokerage agreements, regardless of whether they were fee- or commission-based, Marsh promised to disclose "any commissions received by Marsh."

119.    Marsh owed the Plaintiffs an implied covenant of good faith and fair dealing under brokerage agreements.

120.    The Plaintiffs reasonably understood that Marsh had promised that it would act in the Plaintiffs' best interest in seeking insurance for the Plaintiffs and that Marsh would not abuse its ability to control information and bidding to the Plaintiffs' detriment.

121.    The Plaintiffs reasonably understood Marsh would not accept compensation on these fee-based accounts.  Marsh promised the Plaintiffs that it would pass on to the Plaintiffs any compensation received for broking or placing any insurance policies for which Marsh had entered a fee-only brokerage agreement.

122.    Marsh gave no indication to the Plaintiffs that it planned to receive kickbacks from the insurers to which it would allocate the Plaintiffs' insurance policies, nor that the kickback payments would far exceed the traditional "straight" commissions that Marsh had agreed to forego.  Marsh also failed to disclose the existence of "gross up" provisions (more fully described herein) in its PSA kickback agreements whereby the insurers would end up paying Marsh the equivalent of straight commissions even on the Plaintiffs' fee-only accounts.

123.    Under the circumstances, Marsh owed the Plaintiffs a fiduciary duty to act in their best interests in placing their insurance policies.

124.    Contrary to Marsh's representations and promises, as well as its fiduciary obligations, Marsh sought to enrich itself at the cost of its customers, including the Plaintiffs, by engaging in an extensive customer allocation scheme with certain insurers that focused on the excess insurance lines above various primary lines, including excess casualty (*i.e.,* the insurance over CGL), property and FINPRO (including D&O and EPL) insurance.  The conspiring insurers cooperated, induced, and encouraged Marsh and were, in turn, rewarded by Marsh at further expense to Marsh's customers, including the Plaintiffs.

125.    Furthermore, the Plaintiffs would not have used Marsh as their insurance broker—and, certainly, not paid Marsh a flat fee to act as their insurance broker—if they had known about the true nature and scope of the kickbacks and Marsh's breaches of its contractual and fiduciary obligations.

**B.    As Early as the Mid-1990s, Marsh Established a "Pay-to-Play" System in Which It Directed Business to Insurers in Exchange for Secret Kickbacks.**

126.    Marsh was effectively the sole communication conduit between its customers and the insurers with regard to the insurance product lines it that brokered for those customers.

127.    As early as the mid-1990s, Marsh began entering into agreements with so-called "preferred" insurers for the specific purpose of securing kickbacks in exchange for allocating increased and more profitable business to the selected insurers. Marsh and the participating insurers often referred to these kickbacks as contingent commissions, overrides, profit sharing agreement payments or PSA payments.

128.    These kickbacks were in addition to any regular – also called "brokerage" or "straight" – commission Marsh received on the accounts. Ace, Chubb, CNA, Travelers, Zurich, XL, Fireman's Fund, Liberty, AWAC, Arch, Kemper, Hartford, and Certain Underwriters at Lloyd's each entered a kickback agreement with Marsh.

129.    As a *quid pro quo* for conspiring insurers to kick back substantial portions of the customers' premiums, Marsh placed its customers' business with the conspiring carrier. And, the bigger the kickback the more business would be placed with that carrier at an inflated rate. As one Marsh executive explained to his subordinates, the size of the kickback payments to Marsh determined "who [we] are steering business to and who we are steering business from." Marsh did this without its customers' knowledge or consent, and with an express strategy of secreting this practice from its customers.

130.    For example, in October 1996, Marsh's William Gilman explained in an internal memorandum that he had signed so-called "contingent commission" agreements with Zurich, Tamarack, and Fireman's Fund for the excess casualty insurance lines placed in 1997. He directed that Marsh require all excess casualty business be placed with these insurers, "[p]lease mandate these carriers for all excess casualty business through" Marsh's Global Broking Unit.

131.    Likewise, Marsh's Kathryn Winter testified that at a meeting with Marsh employees, it was decided to "[t]ry to funnel new business" to an unnamed conspiring insurer. She also further testified that Marsh directed its employees to "not place business with [insurers] with which [Marsh] did not have [PSAs] unless [it] had to."

26

132.    Marsh continued to enlist insurers to pay significant kickbacks in exchange for allocating increased and desirable business.  For example, Marsh enlisted AIG into the scheme.  In October 1999, Marsh's Leslie Nylund remarked to her colleagues in Marsh's Global Broking Unit that "[w]e SHOULD be feeding AIG on excess umbrella. . . . It is VERY lucrative."  (capitalization in original.)

133.    Also in 1999, Marsh attempted to enlist Chubb into its kickback scheme.  Marsh demanded from Chubb a 9% kickback—referred to at the time as an "over-ride"—on all umbrella business, which would have left Chubb paying 17-1/2% of customers' premiums to Marsh.  Chubb initially refused to acquiesce to Marsh's demand.  Marsh's Mr. Gilman responded by threatening Chubb that Marsh would pull all excess coverage renewals from Chubb, worth at least $55 million.

134.    Mr. Gilman was true to his word.  Marsh established a boycott of Chubb that lasted about three months.  Marsh quickly moved renewal and potential new business away from Chubb to those insurers who had agreed to pay the kickbacks, mostly AIG and Zurich.  In fact, in just the three days from September 30, 1999 through October 1, 1999, Marsh moved $3 million of Chubb's $3.6 million in renewal business away from Chubb.  One of the Plaintiffs' policies, an excess policy issued to IBP, was among the renewals that Marsh moved from Chubb to pressure Chubb to agree to pay kickbacks.

135.    Chubb learned its lesson:  if it did not pay substantial kickbacks to Marsh, it would be cut out of all of Marsh's insurance programs.  In early November 1999, after enduring Marsh's punishment for only three months, Chubb

changed its position and agreed to pay Marsh a kickback of 15% on all "the 'Gilman'

excess umbrella book" retroactively back to January 1, 1999.

136.     Marsh used its ability to control which insurers would even have

an opportunity to bid on business to maintain its grip on the conspiracy.  As Marsh's

William Gilman explained, "If we had control over the business then we could make the

insurance companies give us lucrative placement service agreements we would have the

ability to reward them or take the business way. We had control over whether or not they

got the business."

137.     Marsh ensured that the insurers understood they would have to pay

kickbacks to receive desirable business—a classic "pay to play" scheme.  Marsh was

aggressive in broadcasting the story of its boycott of Chubb in the excess casualty line

among the insurers.  The insurers quickly understood this "pay to play" arrangement.

138.     Fireman's Fund executive Gil Benjamin succinctly described the

Marsh's approach as "[p]ay us for the book [of business], or suffer the consequences"

and assessed Fireman's Fund's decision to pay the kickbacks as "does FFIC [Fireman's

Fund] want to play or not under these apparent rules of engagement?"

139.     As XL's Chief Underwriter for Excess Casualty-Americas, Diane

Amodeo, explained to her colleagues in a 2001 internal email, "Generally speaking,

Marsh Global Braking [sic] considers the establishment of a PSA the minimum entry

requirement to placing Excess business."

140.     Likewise, as the year closed in 2003, Marsh's Joseph Peiser

approached Ace about paying higher kickbacks under the PSA agreement.  In his words,

he "made it clear that if ACE wants us to meet significant premium growth targets then

28

ACE will have to pay 'above market' for such stretch." He further noted that Ace had indicated it was "open to above market percentages for dramatic growth which is [its] goal."

141.    Also, in discussing Liberty's recent poor performance in umbrella product lines, Liberty's Vice President of its National Market Umbrella Unit, Doug Cauti, reported on January 10, 2003 that Marsh had told him it "won't do business with us without a volume agreement." Mr. Cauti referred to the 2003 PSA agreement Liberty was negotiating with Marsh, but explained that Marsh covered product lines other than umbrella lines.

142.    Marsh had various names by which it referred to the conspiring insurers, including the so-called "partner markets" and "strategic partners." Marsh allocated its customers' business among the conspiring insurers in exchange for kickbacks in not only the excess casualty product lines, but in other lines as well. As Marsh's Joseph Peiser explained in an internal memorandum, ACE provided PSA kickbacks to Marsh "across multiple lines."

143.    Marsh's Mark Rice made a presentation on September 23, 2002 in Marbella, Spain to the Executive Committee of Marsh's Global Broking group. The presentation included a chart entitled "2002 PSA Inventory" that detailed the product lines in which each carrier had agreed to pay kickbacks to Marsh. For example, the chart showed that Ace and its Bermuda affiliate, Arch Bermuda, CNA, Great American, St. Paul, XL Bermuda, and Zurich had agreed to pay the PSA kickbacks on the excess casualty, property and FINPRO (which includes D&O) product lines. Others, such as

Arch, Chubb, Hartford, Kemper, Liberty, and XL had agreed to pay the kickbacks on one or two of these product lines.

144.    Zurich admitted in its Assurance of Discontinuance & Voluntary Compliance that it signed with, among others, the New York, Illinois and Connecticut Attorneys General that its "participation and manipulation of the bidding process was not limited to either excess casualty insurance or its use of Marsh as the broker for the coverage."

145.    As with the excess casualty product lines, the insurers understood that Marsh would not steer other lines of business to them unless they had a PSA kickback agreement.  For example, as XL's Ms. Amodeo explained in a 2003 business plan, Marsh "controls 40% of the excess workers compensation market.  As with umbrella, PSA would be mandatory."

146.    Likewise, on May 11, 1999, Marsh's Ms. Nylund (the same Marsh representative who worked to enlist AIG into the conspiracy) and six of her Marsh colleagues met with Chubb personnel to discuss having Chubb pay kickbacks to Marsh on "multiline" insurance products.  In an "open and candid" discussion about how the two companies could go about "retaining business and growing together" in multiline insurance products, Chubb tellingly explained that its primary needs were to avoid competition and increase rates.  Marsh told Chubb that having the new "profit sharing agreement" or "PSA" kickback agreement in place "removes a major obstacle from our relationship."  As a result of the meeting, Marsh agreed to "action steps to address Chubb's needs," including eliminating competition.   Specifically, Marsh agreed to work with "Chubb, Client Execs, and clients" to induce Marsh "not to take these accounts to

30

market." At the same time, Marsh stated that it could secure a "3-5% aggregate rate increase" on Chubb's book of business. Despite Ms. Nylund's meeting with Chubb, however, Chubb did not sign a kickback agreement that was acceptable to Marsh until November 1999.

147.    LIU, a business unit of Liberty that provides specialty lines of insurance, did not have a PSA kickback agreement with Marsh in late 2003 for specialty lines. Thus, Marsh sent an unmistakable message to LIU. The day before a scheduled meeting with LIU to discuss providing insurance to Marsh's chemical industry customers, Marsh canceled the meeting and told LIU that the reason for the cancelation was that it "did not have a PSA."

148.    In 2002, Liberty's chief underwriting officer for its property lines, Patrick O'Connor, came to recognize that "we need a psa" for Liberty's property lines when he learned that Marsh had been "steering business away" from Liberty because it had refused to pay kickbacks to Marsh on property lines. In January 2003, Mr. O'Connor announced that Liberty had finalized a PSA kickback agreement with Marsh covering excess property lines and explained to his colleagues that "we agreed to a very, very attractive and lucrative plan and expect preferential treatment in return."

149.    Liberty received the preferential treatment for which it paid kickbacks. On February 23, 2003, Mr. O'Connor sent an internal email to his colleagues explaining that Marsh "is steering business our way." Just a few months later, Mr. O'Connor reiterated his understanding that payments to Marsh were the *quid pro quo* for obtaining business. On May 23, 2003, he sent an email stating that Liberty "is the; [sic] broker friendly, commission paying, psa paying, underwriting/engineering with the

common sense alternative to fmg [Farmers' Mutual Group].  we should be seeing every current marsh fmg account. . . ."

150.    The kickback scheme was highly lucrative for Marsh.  Marsh's Director of Global Property Placements, Bob Howe, and its Head of Market Relations, Adam Kagan, announced at a March 3, 2004 meeting with Liberty that Marsh's kickback scheme was "EXTREMELY successful in 2003" and that Marsh's revenue from the kickbacks had tripled from 2000 to 2003.  Just with regard to excess property lines booked through Marsh in 2003, about $3.8 billion of the $4.5 billion in premiums were subject to the kickback scheme.

151.    In 2003 alone, approximately $800 million of Marsh's net income were attributable to so-called "contingent commission" kickbacks.  That year, Marsh overall reported approximately $1.5 billion in net income.  Marsh, however, has never disclosed to its shareholders how the contingent commission kickbacks constitute the lifeblood of its business.  Jeffrey Greenberg, the Chief Executive Officer of Marsh, stated:  "We don't break out contingent commissions.  This is not separately enumerated because it is part of our business model. . . ."

**C.    The Scheme Expanded to Include Customer Allocation and Steering, which Marsh Controlled and Policed.**

**1.    Without Permitting Competition, Marsh Slated the Insurers to Win Each Layer of Its Customers' Business and Set the Prices.**

152.    Marsh's scheme expanded into a conspiracy among its conspiring insurers to allocate business and limit competition.  The conspiring insurers participating in the scheme included AIG, Ace, Chubb, CNA, Hartford, Fireman's Fund, Liberty, St. Paul/Travelers, XL and Zurich.

32

153.     Without seeking competitive bids, Marsh determined the insurance program for each customer, including which insurance carrier would get the business for each layer.  On renewals, Marsh generally selected the incumbent carrier when it was a conspiring insurer.  Marsh also set the "target prices" at which each layer of the excess coverage would receive its allocated business.  Marsh slated the target prices to be higher than a competitive market would have generated, but not so high as to raise serous suspicion among Marsh's customers or its Client Advisory Services, the portion of Marsh that dealt directly with customers.

154.     In fact, Marsh's Joshua Bewlay testified that the head of Marsh Global Broking's excess casualty group told him "that the right price is the highest bindable number.  And by that it means we wouldn't go for the lowest possible number we could get."

155.     Within Marsh, Global Broking Coordinators, or "GBCs," were responsible for running the scheme on a day-to-day basis.  They determined which conspiring insurer would win each layer of business and set the "target prices" for each customer's insurance layer.  The plan for each customer's insurance was called a "broking plan," which Marsh personnel sometimes called a "game plan."

156.     The GBC responsible for an insurance renewal would send the broking plan to Local Broking Coordinators, or "LBCs," at Marsh who communicated with the conspiring insurers to coordinate the bids.  Marsh assigned a small group of LBCs to be responsible for each conspiring insurer.  The LBCs provided the relevant portion of the broking plan, including the target prices for a given layer, to the conspiring insurer.  Often, the LBCs sent the entire broking plan to the conspiring insurers.

33

157.    As long as a given conspiring carrier bid the target price slated by Marsh, Marsh did not seek competitive bids for the layer.  As Marsh's Ms. Winter explained, "if the incumbent markets meet their target price and do[] the coverage we want, [Marsh] will protect them and make sure they get the business."

158.    Mark Manzi of Marsh, who has pled guilty to a scheme to defraud in a criminal investigation of Marsh regarding the conspiracies alleged herein, testified that conspiring insurers "were told what coverages on a whole they needed to provide, what policy forms, the timing that the quotes needed to be provided.  Business would be steered to them and they would be protected when they quoted per targets on their incumbent renewals."

159.    Initially, the broking plans were not formal documents and were often prepared solely in email form.  By 2001, however, Marsh was generally using a one- to two-page form for the broking plans.

160.    The use of broking plans or game plans to eliminate competition and fix prices became a standardized process.  For example, a May 19, 2003 presentation involving Marsh's Greg Doherty, Edward McNenney, Peter Anderson and Regina Fitzgerald (f/k/a Regina Hatton) described "how the process should work" for game plans.  In the "'Perfect World' Process," the "GBC creates the Game Plan" and the "LBC reviews the Game Plan."  Then, the "Markets follow the Game Plan and quotes are delivered to the GBC."  It is only when events do not go according to plan—termed "Variables to Successful Placements" that the "GBC declares open season on all markets."

34

161.    Likewise, Kevin Bott—an employee of Marsh who later went to work for Liberty—was told to make sure insurance companies without PSAs did not get business.  Mr. Bott testified that, while at Marsh, "[m]y job was to insure that once I did receive a renewal quote, I would pass it off to whomever was deemed to win that bid and to make sure that they had everything they needed in order to accomplish that.  I was told that I would be – my [expletive] ass would be fired if I placed a piece of business with [the insurers without PSAs]."

162.    During the criminal trial of Marsh's Mr. Gilman, AIG's Karen Jacobson (f/k/a Karen Radke) confirmed the scheme and explained how Marsh caused the customer to place its insurance with the carrier Marsh had slated to win.  She testified that, in 2001, she spoke with Mr. Gilman about the scheme.  Mr. Gilman told her about the "Marsh system" and lectured that it was very important AIG "stay in line" and "not compete for other business."  She further testified that Marsh would make quotes by AIG that were slated to win look like winning bids to customers by soliciting quotes from other insurers that were not competitive.

163.    The broking plans, of course, were kept secret from Marsh's customers and, often, even from Marsh's Client Advisory Services.

164.    Similarly, in an internal Marsh document entitled "GBC Renewal Process/Timeline," GBCs were warned "[i]f face to face client meeting [will be] involved, send out Broking Plan with target pricing to follow after meeting.  LCB's have a bad habit of pulling these out in front of clients."

165.    In exchange for limiting competition and protecting its conspiring insurers' business, Marsh received handsome compensation in the form of kickbacks, high commissions on re-insurance placed with Marsh's affiliates, and other payments.

166.    All of Marsh's conspiring insurers were aware of the scheme and agreed to participate in it.  They were also aware of the participation of the other conspiring insurers, who were ostensibly their competitors.

167.    At each insurance renewal, Marsh showed to the Plaintiffs quotations at or near target prices for the renewal.  The Plaintiffs did not know that Marsh had obtained the quotations without competition, but rather understood that the quotations represented the best insurance at the lowest premium.

## 2.    Marsh Obtained Fake "B Bids" and Sham Declinations to Create the Illusion of Competition.

168.    On certain occasions, Marsh felt the need to maintain the illusion for its customers or for its Customer Advisory Services that Marsh was diligently marketing its clients' business to competing insurers.  As Ms. Winter from Marsh testified, "in the event the client required additional quotations from other markets, we would ask those other markets to quote non-competitive quotes, protective quotes or B-quotes."

169.    To do this, Marsh sought and obtained false "B bids" or sham declinations from its conspiring insurers.  In fact, Marsh often included instructions in its broking plans asking the LBCs to obtain false B bids or sham declinations on business from conspiring insurers not slated to win that layer of business.  Marsh sometimes even provided the pricing at which the sham B bids were to be placed by one or more conspiring insurers, which were not slated to win.  In exchange for providing the false

B bids or sham declinations, conspiring insurers received assurances that their renewals would be protected when they were incumbents and they also often received placements in the excess layers of the coverage.

170.    The internal Marsh document entitled "GBC Renewal Process/Timeline" explains that "Back-up Quotes and B Quotes" are "Formal quotes/email indications to protect incumbent."  It directs GBCs to "Request 'B' quotes early b/c last week of every month markets only focus on 'live' opportunities vs. quoting B's" and reminds GBCs to be "careful that alternative 'B' doesn't beat incumbents['] quote—it's not always price, it could be attachment point or coverage."

171.    The insurers understood the scheme.  For example, as Ace's Geoffrey Gregory explained it in a November 3, 2002 email, Marsh personnel had been

> consistently asking us [Ace] to provide what they refer to as "B" quotes for risk.  They openly acknowledge we will not bind these "B" quotes in the layers we are be[ing] asked to quote but they "will work us into the program" at another attachment point.  So for example if we are asked for a "B" quote for a lead umbrella then they provide us with pricing targets for that "B" quote.  It has been inferred that the "pricing targets" provided are designed to ensure underwriters "do not do anything stupid" as respects pricing.

172.    Prior to producing this email in discovery to the CaseCentral MDL database, the Defendants redacted all information identifying the individuals involved in this incriminating email discussion.[2]  The Plaintiffs' counsel was only able to view an

---

[2]  Some of the documentary evidence cited in this Complaint comes from an on-line database maintained by CaseCentral under an order of this Court.  The Court's order requiring the use of this database, and most of the Defendants' production of documents into it, occurred before the Plaintiffs here filed their lawsuit.  While some documents in the database at the time of the drafting of this pleading were relevant to the Plaintiffs' claims, only some of the Defendants had produced documents that deal specifically with the Plaintiffs' insurance (indeed, the Court suspended discovery only five months after permitting the Plaintiffs to serve "narrow" and "limited" written discovery).  Moreover, the Plaintiffs have had no opportunity to question the form of the production.  As shown

unredacted copy of the email upon obtaining discovery material in early 2012 that had

been produced by five of the defendants in the *Office Depot v. Marsh* action, a closed suit

that had been filed in Florida state court.

### 3.    Marsh Policed the Scheme and Disciplined Dissonance.

173.    On the rare occasions when a conspiring insurer failed to act in

accordance with the customer allocation scheme, Marsh acted as a vicious, swift, and

unrelenting enforcer, immediately disciplining dissension.

174.    When a conspiring insurer even suggested that it might not want to

go along with the scheme, Marsh was quick to threaten it, as demonstrated by Marsh's

treatment of Chubb's excess casualty renewals in the Fall of 1999.  Likewise, when Ace's

James Williams hesitated to provide a sham B bid requested by Marsh, Marsh's Greg

Doherty forcefully responded, "[c]urrently we have about $6M in business which is the

best in Marsh Global Broking so I do not want to hear that you are not doing 'B' quotes

or we will not bind anything."

175.    Mr. Williams also testified that Marsh's Mr. Gilman told him that

Marsh "intended to punish those who didn't go along with their structure" and described

as an example how Marsh had punished Chubb for refusing to go along with the scheme.

176.    Not surprisingly, conspiring insurers rarely provided competitive

quotations on accounts where they were not slated by Marsh to win the business.  Marsh

colorfully explained what would happen if an "alternative market"—*i.e.*, a conspiring

---

by Mr. Gregory's email, the Defendants extensively redacted many of the documents.
Likewise, the database contains improperly gathered documents, making the documents
uninformative:  much of the production fails to identify attachments (parent/child
relationships); spreadsheets and databases are often produced so that each cell is a single
page; and entire file cabinets of paper documents have often been produced as a single
electronic document.

insurer that is not slated to win the bid—departed from the broking plan and provided a

competitive quotation:

> if an alternative [market] quotes below [the target price]
> then they have made a conscious decision to quote below
> the market and pull the market down.  If that happens, then
> (according to Bill [Gilman]) we will put this guy in open
> competition on every acct. and CRUCIFY him.  Further,
> we must make sure the incumbent keeps this (or another
> market) and NOT give it to the alternative and reward
> them.  (capitalization in original.)

177.    An unnamed insurer's Andrew Lennox clearly explained the

scheme to his colleagues, observing "the incumbent protection racket works great when

you're the one being protected.  Conversely, when you're on the outside looking in, it

creates a barrier to entry on new accounts."

### D.    The Conspiring Insurers Knew of and Agreed to the Conspiracy.

178.    AIG, Ace, Chubb, CNA, Hartford, Fireman's Fund, Liberty,

Travelers (which includes St. Paul), XL, Zurich, and other co-conspirators all agreed to

participate in the customer allocation conspiracy and each was aware of the other

conspiring insurers' participation in the scheme.

179.    All of the conspiring insurers understood that Marsh would

coordinate the conspiring insurers' cooperation to allocate the insurance business of

Marsh's customers.  On renewals, Marsh generally allocated its customers' business to

the incumbents when the incumbent was a conspiring carrier.

180.    Ace, however, was a relatively late entry into the excess casualty

market and, hence, did not have the incumbent position on many policies.  As James

Williams, Vice President of Ace's excess casualty broking group, acknowledged, Marsh

had "a 100% carrier retention goal.  Thus, ACE will not get on the 'Game Plan' until the

account is written or the incumbent decides to abandon the plan." In a telephone conversation on March 17, 2003, Marsh's Mr. Doherty assured Mr. Williams that Marsh would find business opportunities to allocate to Ace and would then protect Ace's position as the incumbent. On the basis of this and other promises, Ace agreed to participate in the scheme. As Mr. Williams put it, "I assume then the ACE renewals with Marsh will equally be 'protected' and we will be on the game plan." Elsewhere, Ace acknowledged the general conspiracy, that Marsh would not send submissions "out to competition" and would get "quotes from other carriers that would support the incumbent as being the best price."

181. Mr. Doherty began sharing with Ace—as well as with Ace's supposed competitors—the essentials of upcoming broking plans. For example, on June 16, 2003, Mr. Doherty forwarded an email to Mr. Williams and several other Ace employees along with a spreadsheet entitled "Doherty July August Account Log." Mr. Doherty also included as recipients on the email underwriters at Great American, Ohio Casualty Group, and Liberty, including Mr. Bott. The email was sent such that all of the recipients could all see that their supposed competitors were also recipients. The attached spreadsheet identified Marsh customers that had casualty insurance renewals in July and August 2003 and specified the "assigned markets"—*i.e.*, which insurer was slated to receive the business. It also included "comments" for many, including instructions as to which of the four insurers were to receive various layers of the business and what the target prices were to be. Mr. Doherty also specified for some of the entries whether the bid would be a "backup." On many, Mr. Doherty informed the supposed competitors that slated winners were "TBD" [an acronym for "to be determined"]

40

because he was "awaiting Broking Plan." NCW's 2003 excess casualty renewal appears on this chart and slates Great American, Liberty and Ohio Casualty to receive business, but notes that the specifics are to be determined.

182.    About half a year later, some Ace personnel questioned the legitimacy and legality of the so-called Marsh Global Broking "model." At a dinner in late October or early November 2003, Marsh's Joshua Bewlay, Edward McNenney and Greg Doherty discussed the scheme with Ace's Mr. Gregory and Jonathan Zaffino. The following week, on November 3, 2003, Mr. Gregory wrote an email labeled "Confidential" to the President of Ace USA, Susan Rivera, that the scheme had left him and Mr. Zaffino "feeling uneasy" and made them concerned "about potential legal issues for ACE." Mr. Gregory further explained that "our actions on 'B' quotes could potentially be construed as simply creating the appearance of competition." Mr. Gregory requested a meeting with Ms. Rivera and Ace's general counsel, stating his position that "[i]n my opinion, ACE cannot be seen as aiding [Marsh Global Broking] in providing quotations for 'competitive appearance purposes' only." Despite Mr. Gregory's articulated concerns, however, Ace remained a knowing and willing participant in the customer allocation and protection scheme.

183.    Proof of the conspiring insurers' knowledge of and agreement to the conspiracy may be found in several forms. The conspiring insurers knew of the terms of each others' kickback arrangements, they occasionally provided fake B bids or sham declinations to protect each others' business, they occasionally communicated directly with each other, and employees of many of the conspirators even pled guilty their participation in the antitrust conspiracy.

1.    **The Conspiring Insurers Knew the Terms of Each Others'
Kickback Agreements.**

184.    Marsh provided its conspiring insurers with information about the
identity of other insurers that had entered into the kickback arrangements.  For example,
Marsh not only informed Ace's Bermuda affiliate that its competitor, XL, had entered
into a kickback agreement with Marsh, Marsh actually sent a "sanitized" copy of the XL
kickback agreement to it.

185.    The sharing of competitors' kickback agreements were not isolated
events.  Marsh's Bill Roeder told representatives of Fireman's Fund in 2000 that exactly
what Hartford, Travelers, St. Paul, Chubb and Zurich were paying to Marsh in PSA
kickbacks and how much business Marsh had allocated to each carrier.

186.    Also, in a December 28, 2000 email, Mr. Roeder recounted to
Fireman's Fund representative Joe Maher, "I have shared details regarding our total book
of Excess, the top ten Markets, and what [Marsh] is receiving in Compensation from
these Markets.  [Fireman's Fund] current proposal places you at a distinct 'disadvantage',
and I am concerned that your current Excess book will not only not grow, but may even
shrink."  Mr. Roeder concludes that if Fireman's Fund agrees to the kickbacks proposed
by Marsh, Marsh "will work with [Fireman's Fund] very aggressively to achieve both
increased rate and retention goals."

187.    Numerous other examples exist of Marsh informing its conspiring
insurers of the terms and conditions of Marsh's kickback agreements with the other
conspiring insurers, including the identity of such conspirators.  For example, in April
2001, when Marsh was negotiating a PSA kickback for the business of its customer,
Healthspectrum, Marsh told an unnamed insurer that AIG paid Marsh a kickback of 4.5%

42

in gross premium and that most of its kickback arrangements were in the "6% to 6.5%

range." About a year later, in March 2002, a manager noted that the PSA kickback

arrangements Marsh had with other insurer conspirators for excess liability lines "tend to

run in a fairly tight band between 15% and 18%." This statistic presumably combines the

contingent commission kickback and the straight commission under a "gross up"

provision, which had become common in the PSA kickback agreements.

188.    Similarly, in a November 2000 meeting about the 2001 PSA

agreement, Marsh provided Fireman's Fund with information on the deals it had cut with

Fireman's Fund's competitors. According to a November 30, 2000 internal Fireman's

Fund email reporting on the meeting—which the Defendants redacted prior to producing

in discovery—Marsh informed Fireman's Fund of the details of its arrangements with

other conspiring insurers:

> Hartford will write $200 M[illion] with GB [Marsh's
> Global Broking] in 2000 and has offered a "guaranteed"
> override of 3% on the book for 2001, plus specific product
> incentives . . . Travelers will do $150 M[illion] with GB . . .
> next year they "guarantee" 3% on their GB book. St. Paul
> writes $75 M[illion] bolstered by their high tech product
> segment push … Chubb is back in [Marsh's] good graces
> and is guaranteeing [redacted] on next year's book. They
> do $135M[illion] down from $220M[illion] in '99 and are
> making money with GB.

189.    Likewise, as part of an attempt to convince Ace to pay higher

kickbacks at the end of 2003, Marsh's Mr. Peiser planned to tell Ace exactly what the

other conspiring insurers were paying in PSA kickbacks and how Ace would be punished

if it failed to make similar payments:

> We will be candid and absolutely honest about where their
> PSA stands relative to similar partners in terms of both %'s
> and growth thresholds. We will also be VERY CLEAR to

the ACE product line managers what the impact will be if
they are below market in terms of PSA.

190.    An executive at St. Paul (now part of Travelers) also admitted

under oath that brokers such as Marsh gave his company the opportunity to review the

kickback agreements between Marsh and other insurers, including in July 2002.

191.    St. Paul went so far as to keep a library of the other conspiring

insurers' "agency contracts, profit sharing contracts, commissions [sic] schedules and

preferred programs."  It obtained copies of the agreements directly from Marsh.

St. Paul's Charles Orbann instructed St. Paul employees that "[a] good time to ask your

agents" for the latest contracts between St. Paul's supposed competitors and the broker

was "when you are delivering their profit sharing checks."  He cynically added, "they

should be very accommodating since you are there to drop off a check."

192.    In 2004, Fireman Fund's John Hosbein told a colleague that he had

copies of the so-called "profit sharing plans" for Fireman Fund's competitors.

Recognizing that such horizontal communication might be improper, he wrote "I don't

distribute this to ANYONE in electronic form so it does not get out of [my] control."

**2.      The Conspiring Insurers Provided False "B Bids" and Sham
         Declinations to Protect Each Others' Business.**

193.    Although fake B bids and sham declinations are not central to the

customer allocation scheme, Marsh used them to prevent the discovery of the scheme.

Thus, Marsh occasionally sought fake B bids or sham declinations to create the illusion

that it was actively marketing its customers' business to a competitive marketplace.

194.    As alleged above, a "B bid" is a rigged bid designed to make the

slated winning bid look competitive.  A sham declination serves the same purpose.  It is

when Marsh would ask a carrier to decline to write the insurance, often upon a false

basis.  As Mr. Bewlay admitted during his deposition, declinations serve "the purpose of a B quote or to show that we went out and tried to market the account competitively.  A declination serves the same purpose as a quote that comes in higher or less competitive. It shows that you marketed it and the underwriter said, no."

195.    Insurers have no reason to provide fake B bids or sham declinations absent a conspiracy among them.  To the contrary, such conduct is strong evidence of a horizontal agreement among insurers to participate in an illegal customer allocation scheme.  Here, Marsh obtained false B bids and sham declinations to mislead those of its personnel who were not privy to the scheme or a customer, particularly when a customer might ask to see multiple bids or was faced an exceptional premium increase on renewal.

196.    Marsh's conspiring insurers shared this understanding of the false B bids and sham declinations.  Mr. Bott was Liberty's Assistant Vice President for Excess Casualty from January 2001 until he was forced to resign on June 24, 2005.  He candidly explained the use of B bids, or "B quotes," in sworn testimony:  "My understanding of a B-quote was a quote that would never win a piece of business.  At times, they were referred to as alternative quotes, backup quotes, protective quotes. . . ."

197.    Mr. Bott further testified to the Defendants' understanding of the *quid pro quo* nature of false B bids:

> The terminology B-quote meant that if there was again a predetermined winner for an insurance bid, a B-quote – if we were asked to provide a B-quote at Liberty, it was to be less attractive than that incumbents or understood winner of that bid.  Terms and conditions wise, coverage wise, limits wise, pricing wise…We would have the same protection, if you will, afforded to us on future deals.

45

198.    Examples of fake B bids and sham declinations by Marsh's conspiring insurers abound.

199.    Liberty overtly participated in the conspiracy.  Mr. Bott admitted to repeatedly providing sham B bids on behalf of Liberty in response to requests from Marsh.  He testified that in November 2003, Marsh's Mr. Doherty requested a sham B bid from Liberty on a cosmetic company's insurance business that Marsh's Ed Keane had already slated to go to AIG.  Mr. Doherty provided Mr. Bott with a false target price that was higher than AIG's bid.  In response, Mr. Bott provided Mr. Doherty a noncompetitive bid.

200.    Mr. Bott pled guilty in New York state court to acting in a combination of restraint of trade.  In his allocution, he admitted under oath that many times between January 2001 and June 2005, he provided fake B bids at Marsh's request.  Mr. Bott also explained that he understood the sham bids "were intended to allow Marsh to maintain control of the market and to protect the incumbent."

201.    For example, on October 21, 2003, Marsh's Nicole Michaels, forwarded an email to Mr. Bott regarding a November 1, 2003, renewal for Orius Corporation's lead umbrella excess and the fact that Marsh had slated AIG to win.  She told Mr. Bott to "[s]ee below and just say no, I mean give me a reason but say no (wink wink)."  Later that day, Mr. Bott complied by providing a sham declination.  He responded to Ms. Michaels, "[p]lease be advised that we aren't comfortable with quoting the lead umbrella in excess of the suggested" attachment points.

202.    Mr. Bott was by no means a maverick at Liberty.  For example, on February 27, 2001, Marsh slated the winners of Hexcel Corporations Marsh 1, 2001

46

excess casualty insurance renewal.  Marsh slated AIG to win the lead layer and Zurich to

win the next excess layer at pre-determined target prices.  Marsh's Joshua Bewlay

instructed Kathleen Drake, a Marsh LBC, to obtain a false bid from Chubb.  He told her

that he needed "Chubb to say no thank you on a lead basis and excess basis at the

numbers" Marsh had already determined for AIG and Zurich.  He also told Mr. Manzi,

another LBC, "I need another bad indication from Liberty."  Mr. Manzi promptly called

Liberty's Jason Monteforte to ask him to offer a B bid on the excess layer to protect

Zurich's slated price.  Later the same day, Mr. Monteforte complied, writing in an email

to Mr. Manzi "[a]s per our telecom this morning we can offer the following quotation"

and providing a price that was more than than three times higher than Zurich's slated

price.

203.    In another incident in March 2002, Marsh's Mr. Bewlay developed

a broking plan for the excess casualty renewal of a large customer, Signature Fruit, and

slated Zurich to win the lead layer.  According to Mr. Bewlay, the target price at which

he slated Zurich to win the lead layer represented a 72% increase over the previous year's

policy.  This was an especially surprising increase, given that the company's revenues

and work force had shrunk and its insurance needs were unremarkable  As Mr. Bewlay

explained, the customer is "a smaller company now" and its insurance coverage was

"nothing crazy."  To provide protection for Zurich's high renewal, Marsh wrote that

"Liberty is for type B only.  Lets [sic] send to ACE for B as well."  After Zurich bid the

target price, Marsh requested the sham B bid from Liberty.  As requested, Liberty

provided Marsh with a B bid that exceeded Zurich's bid.

204.    Ace also overtly participated in the conspiracy.  For example, in placing the renewal business for Fortune Brands' excess casualty insurance in December 2002, Marsh slated AIG to be the lead insurance layer.  Ace inadvertently underbid AIG at $900,000 and Marsh immediately returned to Ace asking it to *raise* its bid to allow AIG to be the low bidder.  Ace's Patricia Byrne complied on December 12, 2002, faxing a "revised confirmation" to Marsh's Mr. Doherty seeking a $1.1 million premium for the lead layer.  The following day, Ms. Byrne summarized the events in an email to her supervisor, Ace's James Williams, stating "We were more competitive than AIG in price and terms.  MMGM [Marsh's Global Broking] requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business."

205.    Likewise, in conjunction with an August 1, 2003 renewal on a large account, Marsh's Mr. Keane instructed his subordinate Heidi Haber to obtain a "B quote from ACE."  On July 29, 2003, Ms. Haber informed Curt Pontz at Ace that St. Paul had been allocated the lead position on the client's renewal business because St. Paul had "hit target of $200,000."  Ms. Haber requested that Ace provide a "back-up indication" at "approx. $460,000."  Later that same day, Mr. Pontz used a fresh email string and responded by stating that Ace's bid for the lead layer was at "about $450,000"— significantly higher than the $200,000 target hit by St. Paul.

206.    A similar situation occurred the following month with another renewal.  On August 26, 2003, Marsh's Mark Kaufman informed Mr. Pontz at Ace that AIG had bid $545,000 to be the lead insurer on a client's business and requested that Ace provided "an alternative lead" quotation.  The following day, Mr. Pontz sent email to

Mr. Kaufman—in a fresh email string—that Ace would agree to be lead "in the $650-$700mm range."

207.    After the several state Attorneys General began their criminal investigations, one Ace employee made the self-serving and incredible claim that he understood a request for a "B bid" to merely mean that Marsh was informing Ace that Ace had a low or "minimal" chance of winning the policy.  This same employee, however, admitted under oath that he also had understood Ace would win any insurance layer that Marsh had slotted Ace to receive in the game plan at the target price set in that game plan, and he did not expect any supposed competitor of Ace to underbid Ace's target price.  In other words, he knew that the game plan protected Ace from competition on its assigned layers.

208.    Ace entered the conspiracy later than most of the other conspiring insurers and, therefore, it was not the incumbent insurer on most renewals.  Marsh had to find opportunities for Ace to secure noncompetitive business and convince Ace that its kickbacks were well spent.  Therefore, Marsh's Mr. Doherty regularly sent a "report card" to Ace identifying the number of times when Ace had been slated to write business at above-market rates, which he identified as "Excellent Opportunities."  For example, Mr. Doherty steered Tyson's 2002 lead excess casualty renewal to Ace, netting Ace a premium of $1,720,450.  Mr. Doherty referred to the ratio of accounts actually written to "Excellent Opportunities" as the "Real Hit Ratio."  Mr. Doherty also tracked the number of false "'B' Quotations" Ace had provided at his request.  In July 2002, for example, Mr. Doherty showed Ace that Ace had a "Real Hit Ratio" of 100% and that Ace had offered 5 "'B' Quotations."

49

209.    Similarly, on January 16, 2003, Mr. Doherty circulated by email an account log to, among others, underwriters at both Liberty and Ace.  The account log included a list of client accounts on which Marsh would ask Liberty and/or Ace to bid in the coming months (although the attached document bears a date in 2002, the accounts were up for renewal in 2003).  The list included an explanation as to whether Marsh was seeking a B bid or providing a real opportunity for each part of the clients' business.  Importantly, both Liberty and Ace received copies of the email and the attached account log.  The personnel at both insurers could see that personnel at the other insurer had also received the material.

210.    On July 6, 2004, Mr. Doherty sent a similar account log to Ace, noting that Marsh had slated Ace to win a $50 million layer of NCW's excess casualty renewal for a premium of $675,000.

211.    XL overtly participated in the conspiracy.  For example, on April 5, 2003, XL's Chief Underwriter for Excess Casualty-Americas, Diane Amodeo, wrote to Marsh's Keith Fisher and Gary Bakalar in preparation for an upcoming meeting with Marsh's Joe Pieser at the next Risk and Insurance Management Society (RIMS) conference.  Ms. Amodeo bluntly stated "[w]e are generally cooperative in providing 'backup' quotes to protect incumbents when required to do so."

212.    XL regularly delivered on its offer.  On March 6, 2003, Marsh's Mr. Keane allocated a large insurance client's policy to AIG at a target price of $200,000.  However, Marsh's Client Advisory Services asked to see a competing bid from XL.  Recognizing that AIG has "hit the target premium of $200,000," Mr. Keane told his subordinate, LBC Leslie Lafrano, to "get a B Quote from [XL Insurance] for $230,000 or

50

higher."  A few business days later, XL's Assistant Vice President for Excess Casualty,

Jackie Petito, complied.  She provided an indication to Mr. Keane that XL would want a

premium of at least $275,000 on the policy.  Mr. Keane forwarded this false bid to the

broker Marsh's Client Advisory Services.

213.    St. Paul/Travelers also overtly participated in the conspiracy.  It

regularly provided false bids to Marsh to protect its co-conspirators.  For example, on

September 28, 2001, Marsh's Mr. Bewlay distributed a broking plan for a large real

estate broker's excess casualty renewal to, among others, Marsh LBC William McBurnie.

The broking plan called for Marsh to obtain "alternative quotes" from St. Paul/Travelers,

Liberty, Zurich, and Gulf Insurance.  Mr. McBurnie understood that a request for an

alternative quotes means "B-quotes or losing bids."  Thus, he forwarded the broking plan

to St. Paul/Travelers' Rick Rollins instructing Mr. Rollins "[d]on't do anything with this

as yet" because AIG was slated to win the business.  A few business days later,

Mr. McBurnie—acting on Mr. Bewlay's instruction—asked Mr. Rollins to supply a false

quote from St. Paul/Travelers to protect the incumbent, AIG, on the account.  In doing so,

Mr. McBurnie told Mr. Rollins the exact amount of the AIG bid that needed protection.

He further explained that Zurich was also providing a false B bid, writing "[n]eed your

quote/indication (e-mail is fine for now) for 25 X P on this large real estate developer

. . . ."  He further exmplained the AIG's lead umbrella layer 'is expiring at $42,500 for 25

X P, has quoted $79,750.  Zurich has quoted $110,000."   Mr. Rollins promptly complied

with a B bid, responding by email the next morning, "I can authorize 25 mil x/s U/L for a

premium of $100,000"—which was substantially less competitive than AIG's $79,750

bid he was to protect.

214.    Likewise, on February 28, 2002, Marsh's Todd Murphy emailed a broking plan to a number of other Marsh employees, including Mr. Mark Conklin. Mr. Murphy ordered Mr. Conklin to obtain a false bid from St. Paul/Travelers for the purpose of protecting Zurich's bid. Mr. Murphy instructed, "[p]lease sent [sic] to St. Paul for a B." Mr. Conklin sent the request to Mr. Rollins, who promptly responded by email with a B bid.

215.    On another occasion, Marsh's Annemarie Tobin wrote a March 5, 2004 internal email about insurance renewal for a large chemical manufacturer to, among others, Marsh LBC Ms. Michaels. Ms. Tobins explained that Zurich was slated to win the lead layer and had met its target price of $110,000. She attached the quotation from Zurich and requested, "[p]lease share with you [sic] markets. In addition to your excess quotes, I am looking for an alternative lead from St. Paul." Ms. Michaels then forwarded this internal email to Mr. Rollins and attached Zurich's on-target quotation. Ms. Michaels instructed Mr. Rollins to "drop me an email that outprices you or gives smaller scope of coverage on the lead, then we can proceed on the excess." Mr. Rollins complied, providing a false quotation from St. Paul/Travelers of $125,750, which was more than $15,000 higher than the Zurich quotation he had received. He also offered less attractive coverage than Zurich quotation.

216.    Likewise, during a policy renewal for a large bakery, Marsh's Nilda Janacek emailed St. Paul/Travelers' Francesca D'Angelo on January 21, 2003, asking St. Paul/Travelers to supply a false quotation to protect XL on the account. Ms. Janacek wrote, "The Lead was quoted by XL Winterthur 25x25 at $140,000. The coordinator, Maryann Baret, has asked that I get an e:mail price from you as an

52

alternative 'b'."  The next morning, Ms. Janacek forwarded the email to Mr. Rollins

asking him to handle the request.  Mr. Rollins complied almost immediately, providing a

B bid to Ms. Janacek that was more than 40% higher than the XL bid he was protecting.

217.    An unnamed insurer overtly participated in the conspiracy,

although some individuals at the insurer superficially bristled at it.  One manager wrote

notes in preparation for an April 2001 meeting with Marsh in which he complained that

he was being asked to participate in an illegal conspiracy and lie to Marsh's customers.

He explained:

> I am not some Goody Two Shoes who believes that truth is
> absolute but I do feel I have a pretty strict ethical code
> about being truthful and honest with people.  And when I
> am told I have to say certain things I know to be untrue . . .
> it is not I feel I should be asked to do or what this company
> stands for.  Yet it has already happened several times. . . .

The manager went on to describe the scheme in which the insure] was participating as a

horizontal, illegal conspiracy orchestrated by Marsh:

> And this idea of "throwing the quote" by quoting
> artificially high numbers in some predetermined
> arrangement for us to lose is repugnant to me, not so much
> because I hate to lose, but because it is basically dishonest.
> And I basically agree with the comments of others that it
> comes awfully close to collusion or price fixing in the
> broader usage at GB [Marsh's Global Broking].

Later in the same document, he notes that Marsh will be setting the target prices and asks,

"Are we to quote our numbers or what MGB wants us to quote"?

218.    Despite the manager's misgivings, the insurer continued to

participate in the conspiracy.  In connection with an October 2001 renewal of The Adams

Companies account, the unnamed insurer provided a false bid to allow AIG to keep the

business.  On September 4, 2001, Marsh's Mr. Bewlay sent an internal email to

53

Messrs. McBurnie and Conklin informing them that "AIG came in with a lead $25 million for $175,000." He then ordered them to get "a B quote from St. Paul and [another conspiring insurer]. Email will suffice." Mr. McBurnie duly sent an email to the insurer's Brian Shea providing him with AIG's quote and asking him for an "indication." Mr. Shea complied just 90 minutes later, providing a false bid that was $50,000 higher than the AIG quote that he was to protect.

219.    An unnamed conspiring insurer provided numerous other false bids to protect AIG. For example, Marsh's Mr. Murphy created a November 16, 2001 broking plan in connection with the December 31, 2001 renewal of a large electronics company's account. Mr. Murphy designated AIG to win the lead umbrella coverage at a targeted premium of $230,000, and slated Chubb and Zurich winning the excess coverage. He called on conspiring insurers Kemper, Liberty and another unnamed insurer as "Type B" alternatives. Marsh's Mr. McBurnie then asked the unnamed insurer for a false bid, and the insurer complied. Marsh's Ms. Michaels did the same with Liberty, which also provided a false bid.

220.    Similarly, on October 3, 2001—a Wednesday—Marsh's Mr. Bewlay pushed a Marsh LBC to get AIG to "quote by Friday" on a renewal for Thomas Development. Mr. Bewlay explained that if he received the quote by then "we can do a Type B on it and protect you." A week later, on October 10, 2001, Mr. Bewlay had grown concerned about the lack of false documentation for his renewal and sent an internal email to Messrs. McBurnie and Conklin, demanding "I need those emails from [an unnamed insurer] and St. Paul. This dates [sic] on Friday!" The very next day,

54

Mr. McBurnie came through with a false $135,000 B bid from the unnamed insurer, noting "[t]hey are not competitive with either AIG or Zurich."

221.    Unnamed conspiring insurers provided sham declinations as part of the conspiracy.  For example, one conspiring insurer produced an incomplete spreadsheet to the MDL database that internally tracked requests for quotations from Marsh in 2001. According to the partial spreadsheet, the insurer declined to provide quotations and sometimes included the reasons for such declination.  The insurer stated reason for one of the declinations was to "Protect Chubb."

222.    As alleged above, Chubb initially resisted joining Marsh's "pay to play" scheme in 1999 with regard to the excess casualty product lines.  After enduring Marsh's punishment for only three months, however, Chubb became an enthusiastic member of and willing participant in the customer allocation conspiracy.

223.    For example, in February 2001, Mr. Bewlay had prepared the broking plan for renewal of insurance for a carbon fiber manufacturing client and he slated AIG to win the lead umbrella.  By email, Mr. Bewlay circulated the plan and asked his subordinates to obtain sham declinations from Chubb and Liberty.  Marsh's Ms. Drake forwarded the email chain, including Mr. Bewlay's request for a sham declination, to John Updyke at Chubb.  Within the hour, Mr. Updyke replied to Ms. Drake, declining on behalf of Chubb to bid.  Ms. Drake forwarded Mr. Updyke's reply, which had attached the email string calling for a sham declination, to Mr. Bewlay. Knowing that the email string calling for a sham declination would reveal that Marsh had prevented competition for the business, Mr. Bewlay deleted the attached email string

containing his instruction to obtain a sham declination. He then forwarded Chubb's sham declination to the Customer Advisory personnel who worked with the client.

224.    Likewise, in November, 2001, Mr. Bewlay prepared a broking plan for a trucking company that called for Zurich to win the business. He instructed Marsh personnel, including Ms. Drake, to obtain "Type B" bids from Chubb, Kemper, St. Paul Liberty, AIG and another insurer. Ms. Drake stated that "[t]his will be a quick no from both Kemper and Chubb" and assigned the task to Marsh's Mike Yovino.    Just over one business day later, Chubb's Grace Hoffner complied by sending an email to Marsh stating that it was declining to bid.

225.    In mid-February 2002, Marsh's Mr. Bewlay prepared a broking plan for a new account. As part of the plan, Marsh assigned the lead layer to St. Paul/Travelers. To create an illusion of competition, the plan called for Marsh personnel to approach Liberty, Zurich, Kemper, Chubb and AIG for B bids on the lead. Upon receiving the plan, Marsh LBC Mr. McNenney, humorously responded, "Smells like honey…" Marsh personnel then forwarded the broking plan—which included both the target prices for the insurance business and the instruction to obtain B bids from Liberty, Zurich, Kemper, Chubb and AIG—to Chubb. The email, complete with the instruction to obtain B bids was found in Chubb's files.

226.    Fireman's Fund overtly participated in the conspiracy. In preparing for the January 2002 renewal of Union Bank of California account, Marsh's Mr. Murphy asked Marsh LBC Leslie Lafrano, to get a "type B alternative" from Fireman's Fund and Chubb. Ms. Lafrano sent a December 19, 2001 fax to Millie Valentine at Fireman's Fund providing the lead umbrella and asking for a quotation from

Fireman's Fund.  Five minutes later, Ms. Lafrano sent an email to Ms. Mvalenti asking

her to provide a false declination to give the fictitious appearance that the account was

placed in competition.  Specifically, Ms. Lafrano wrote: "Can you send me an email that

you are not interested in the $20m x $5m layer."  Unsurprisingly, all incumbents renewed

their respective layers.

227.    Similarly, when the Grosvenor account was up for renewal in

December 2001, Marsh's Mr. Murphy requested false quotes from St. Paul/Travelers,

Zurich, Fireman's Fund and Liberty.  Fireman's Fund complied, providing a sham

declination.

228.    When the Golden Gate Bridge account was up for renewal in July

2002, Marsh again asked Fireman's Fund, along with Ace, XL, Chubb and Zurich, to

provide false quotes.  Fireman's Fund again issued a sham declination.

229.    Although not named as a Defendant in this complaint, AIG also

participated in the conspiracy.  For example, in March 2002, Marsh turned to AIG to

provide a protective bid on excess casualty insurance for Intel that would be shown to the

customer.  In an internal email, Marsh's Mr. Murphy wrote that "Zurich quoted 50 x P

[*i.e.,* $50 million of insurance in excess of the primary layer] for $400,000. . . . We need a

type B alternative from AIG for 50 x P at same attachments for $600,000.  We need an

actual quote for this client. . . ."

230.    Zurich overtly participated in the conspiracy.  It enjoyed protection

from competition and, in turn, provided B bids to protect its competitors.  For example,

St. Paul/Travelers was the incumbent slated to win the 2003 excess casualty renewal for

HP Hood Inc.  St. Paul/Travelers proposed raising the premiums of the policy by over

40% from the prior year.  Marsh agreed to this drastic increase.  However, as Marsh's

Carrie Raspantini explained in an internal email, HP Hood's "Risk Manager has said that

she wants to see options other than [the] incumbent."  Thus, Marsh sought false bids from

Zurich and Ace to protect St. Paul/Travelers' position.  As Marsh's Ms. Hatton wrote to

Zurich's John Keenan:

> I need a protective quote.  Please email me indicating you
> would need a 2mm per occurrence, and make your
> premium for [the layer] unattractive, St. Paul is the
> incumbent and they offered [the layer for] $351,000.

Ms. Hatton email attached a copy of the broking plan.  On information and belief, Zurich

provided the requested false bid.

231.    Zurich also provided B bids to protect other conspiring insurers.  In

fact, Marsh's Ms. Winter testified that in the 2000 to 2001 timeframe, Zurich sometimes

provided sham B bids to protect AIG's lead umbrella quotations.  Likewise, Marsh LBC

Mr. Manzi testified that Zurich's Geri Mandel had once complained that Zurich's "hit

ratio" for excess casualty lines was becoming low.  Mr. Manzi responded by reminded

her that "there are a lot of accounts that she quoted that she didn't expect on writing or

want to write because they were Bs" and that looking just at the number of Zurich's bids

"is not really a true reflection of the amount of business that they're quoting to bound

[sic]."

232.    Zurich admitted in its Assurance of Discontinuance & Voluntary

Compliance that it signed with, among others, the New York, Illinois and Connecticut

Attorneys General that Zurich provided fake B bids to protect its supposed competitors

when the competitors were slated to win the lead excess layers.  For example, in July

2002, Marsh's Ms. Michaels sent an email to Zurich's underwriter Patrick Kenahan

asking Zurich to provide a fake B bid to protect a renewal that AIG was slated to win:

> AIG quoted this. . . they have quoted 47,500,000 xs
> 2,500,000/5mm/5mm=$600,000
> Please offer a higher protective quote on this.  You are
> slotted in the excess.

Shortly thereafter, Ms. Michaels learned that Mr. Kenahan was not in the office and, thus,

Zurich would not be able to provide a legitimate quote for the excess.  Ms. Michael still

needed a fake B bid and, therefore, forwarded the entire email string to Zurich's Roberta

Rudder:

> Please offer a protective quote, Patrick [Kenahan] will
> quote the excess when he returns.  I am faxing over a copy
> of AIG's lead, so you make sure you quote a protective.

Zurich has further admitted to the Attorneys General that it complied with the request for

a B bid and provided Marsh with a quotation that was higher than the $600,000 that AIG

quoted.

233.    Zurich admitted to other incidents in which it provided B bids to

protect AIG where Marsh had slated AIG to win the business.  In May 2003, Marsh again

wrote by email to Zurich for a fake bid:

> Can you give me a protective indication on this.  It is an
> AIG renewal and AIG already quoted it so just give me a
> bad price with higher per occ. attachment and then we can
> be done with this.

Marsh attached the AIG quotation so that Zurich would know the amount above which it

needed to bid.  Zurich has conceded that provided to Marsh the requested fake B bid.

234.    On June 17, 2003, Marsh circulated a broking plan for a policy for the Vivendi Universal account.  The broking plan read in part as follows: "Zurich to quote an alternate lead to AIG and possible 50 mil xs 50 mil."  AIG had been designated by Marsh to get the business.  Marsh's Ms. Winter, who authored this broking plan, testified that she sent by email a copy of the broking plan to Nicole Michaels on June 27, 2003, a Marsh LBC who worked with Zurich.  According to Ms. Winter, the purpose of this was "to get a B quote, a protective quote from Zurich and that is why I'm giving her, I'm outlining the entire AIG quote for her…so that Zurich can quote non-competitively, so they can give a higher quote or less attractive quote based on attachment points or limits or exclusions."  That same day, Ms. Michaels wrote to Ms. Rudder, an underwriter at Zurich, requesting as follows: "Can you email me a protective indication on this account.  AIG's pricing and attachments are below.  Thanks, Nicole."  In response, Ms. Rudder sent the protective quote Marsh requested within 30 minutes on June 27, 2003.

235.    On at least one occasion, Zurich's James Spiegel questioned whether Zurich was getting the same level of protection from its co-conspirators as it was giving to them.  In an email, bearing the subject "Protection," Mr. Spiegel acknowledged the company's practice of providing "protective quotes for AIG" and expressed frustration that Zurich may not be receiving the same protection from competition that AIG had enjoyed.  He stated that: "We need and expect to be protected on our renewals just like AIG is protected on theirs" and suggested that if Zurich did not feel it was getting equal protection from Marsh, it would issue real, competitive quotes—rather than protective quotes—on business slated by Marsh for AIG.  Zurich, however, remained in

the conspiracy and did not risk Marsh's ire by submitting competitive bids when Marsh asked for protective quotes or B bids.

236.    CNA, too, overtly participated in the conspiracy.  Marsh produced in discovery a hard copy a December 16, 2002 email from Marsh's Glenn Bosshardt to CNA in which he stated "we need a CNA proposal.  I will outline below the leading programs (ACE & Zurich).  I want to present a CNA program that is reasonably competitive, but will not be a winner."  Mr. Bosshardt then provided the details of the programs to be provided by Ace and Zurich for workers' compensation and general liability insurance for the policyholder.  The Defendants, however, redacted the names of all of the individuals at CNA who received Mr. Bosshardt's email, hampering the Plaintiffs' ability to determine whether CNA produced a copy of its response.  On information and belief, CNA complied with Mr. Bosshardt's request and supplied a sham bid for workers' compensation and general liability insurance that was less favorable to the policyholder than the programs offered by Ace and Zurich.

237.    CNA joined the conspiracy and agreed to pay kickbacks to Marsh in exchange for customer allocation and protection from competition.  Marsh, thus, drove business to CNA to maximize its kickbacks.  For example, in an October 31, 2003 email, Marsh's Mack Rice provided his colleagues—including Messrs. Peiser, Bewlay and McNenney—with scorecards that tracked the business Marsh had sent to CNA through September of that year and indicated that Marsh was "on track to earn approximately $8.2 million. . . ."  Mr. Rice advocated "influence[ing] our organization and drive additional premium in specific areas" so that the kickbacks "could grow to approximately

$13 million." In response, one of Mr. Rice's colleagues explained that he was "in regular discussion with our CNA counterparts to ensure we meet the next threshold."

238. In fact, CNA underwriters complained in a 2003 survey conducted by Marsh about Marsh's practice of collecting sham declinations from conspiring insurers. A CNA underwriter expressed frustration at the practice, complaining that "[s]everal submissions are sent with expectations of rejection; they [Marsh personnel] use these to support their marketing efforts." Another underwriter complained about the pay-to-play arrangement, this time in context of the middle market group—*i.e.*, the group of Marsh providing brokerage services for companies that were smaller than the "big relationships like Exxon Mobile, IBM, huge companies, Tyson Foods" handled by Mr. Doherty and his colleagues in Marsh's Global Broking groups. The CNA underwriter wrote, "I have been told that they [Marsh personnel] will only seriously do business with those carriers who are willing to pay them for placing business with them."

239. Hartford also overly participated in the conspiracy. As alleged below, Hartford sent representatives to a "Marsh Global Broking 2000 Planning Meeting" in Destin, Florida in 1999. Representatives from St. Paul/Travelers, Chubb, CNA, Fireman's Fun, and Liberty were also present at the meeting. During the meeting, the putative competitors discussed their strategies for 1999 and 2000, including how they could increase prices. All of the companies in attendance, including Hartford, agreed that they planned to lower their growth goals and instead focus on their profits.

240. Also as alleged below, on or just before June 1, 2004, Hartford personnel communicated directly with Waussau's Mr. Hanlon to confirm for Waussau how the Marsh pricing scheme worked.

241.    Marsh occasionally provided its conspiring insurers with lists of bids on account renewals to demonstrate to them that they were receiving protection from competition.  For example, Marsh LBC Ms. Lafrano provided XL's Ms. Amodeo with a "Submission Log" listing the next month's insurance renewals for various Marsh customers that had involved Chubb.  Ms. Lafrano invited XL to "let me know which ones you would like on a lead basis."  She also attached other spreadsheets, including one showing where other insurers had provided false bids to protect XL.

242.    Other incriminating documents exist in the CaseCentral MDL document database that the Defendants have redacted, such that one cannot tell which parties had the communications.  For example, the Defendants produced a heavily redacted hard copy of an email from a putative competitor of Zurich providing a false B bid to protect Zurich on a renewal.  All names have been redacted from this email— including any information concerning the author or the author's employer.  Although the Defendants did not preserve the date of the email, the email refers to a bid for a policyholder (whose name has also been redacted) and states that the bid is "DEAD – Eff 10/1/03."  The author then explains, "[t]his was not a real opportunity.  Zurich did what they needed to do at renewal.  Broker ([REDACTED]) said Zurich came in around $750K & wanted us to quote around $900K."

### 3.    The Conspiring Insurers Occasionally Communicated Directly with One Another.

243.    In addition, the conspiring insurers occasionally communicated directly with each other about the conspiracy.  For example, Andrew Lennox, who worked for an unnamed conspiring insurer,  shared with his colleagues that he had had discussions with supposed competitors about the Marsh-centered scheme: "AIG does it

this way and I spoke with ACE and they do something similar." Indeed this type of detailed information was routinely provided in the context of contingent commission kickback negotiations and permitted each conspirator to understand not only what its co-conspirators were paying for their premium volume, but also, what they were receiving in return.

244.    Similarly, in June 2004, Wausau Commercial Market, a division of Liberty, was preparing for a meeting with Marsh to discuss commercial business. Marsh told Wausau that it had "struck a deal" with some insurers that in exchange for only a small decrease in pricing—which was necessary in the face of a widely acknowledged "softening" market—Marsh would "not shop the risk." In other words, Marsh knew that its customers expected a decline in pricing across the board due to market conditions. Rather than open the customers' policies to competition, however, Marsh engineered a small, pre-set reduction with its conspiring insurers, avoiding a more significant decrease in pricing. Wausau then contacted several of its supposed competitors to confirm Marsh's representations about the pricing scheme. In a June 1, 2004 email, Wausau's Edward Hanlon wrote that "Hartford & Atlantic Mutual confirmed" the scheme.

245.    Marsh and its conspiring insurers also had many opportunities to communicate in person about the conspiracy. For example, in 1999, Marsh held a "Marsh Global Broking 2000 Planning Meeting" in Destin, Florida among Marsh and certain conspiring insurers. Representatives from St. Paul/Travelers, Chubb, CNA, Hartford, Fireman's Fund, and Liberty participated in the meeting. During the meeting, the putative competitors discussed how they could increase insurance prices. Minutes of the meeting included statements that a particular insurer is "trying to get rate increased"

64

or "[t]rying to get 'step' increases by year." Liberty commented that it had "low growth goals" and Marsh "asked if that was true of all carriers in room. Comment was made that growth goals have been slashed for 2000 – profit is [sic] what companies are focusing upon in 1999 and 2000. **All companies agreed** that was their strategy going forward." (emphasis added.)

246.    Likewise, at industry and trade association meetings, Marsh arranged high-level meeting with each of its conspiring insurers. The meetings occurred in a single conference room and, one after another, the conspiring insurers met with Marsh.

### 4.    Employees of Marsh and Employees of Many of the Conspiring Insurers Were Convicted of Criminal Conduct Relating to the Conspiracy.

247.    The State of New York indicted numerous individuals at the co-conspiring Defendants for crimes relating to the customer allocation scheme. Specifically, Patricia Abrams of Ace, Kevin Bott of Liberty, Edward Coughlin of Zurich, James Spiegel of AIG and formerly Zurich, John Keenan of AIG and formerly Zurich, Karen Radke of AIG, Jean-Baptiste Tateossian of AIG, John Mohs of AIG, Carlos Coello of AIG, Peter Anderson of Marsh, Joshua Bewlay of Marsh, MaryAnn Brainard-Baret of Marsh, Greg Doherty of Marsh, Kathleen Drake of Marsh, William Gilman of Marsh, Thomas Green of Marsh, Regina Hatton of Marsh, Edward Keane of Marsh, Mark Manzi of Marsh, William McBurnie of Marsh, Edward McNenney of Marsh, Nicole Michaels of Marsh, Jason Monteforte of Marsh, Todd Murphy of Marsh, Joseph Peiser of Marsh, Robert Stearns of Marsh and Katherine Winter of Marsh all faced criminal charges.

248.    As part of cooperation agreements, Ms. Abrams, Mr. Anderson, Mr. Bewlay, Mr. Bott, Ms. Brainard-Baret, Mr. Coello, Mr. Coughlin, Ms. Hatton, Mr. Keane, Mr. Keenan, Mr. Manz of Marsh, Ms. Michaels, Mr. Mohs, Mr. Monteforte, Mr. Murphy, Ms. Radke, Mr. Spiegel, Mr. Stearns, Mr. Tateossian, and Ms. Winter all pled guilty to criminal activity arising from the criminal charges and made admissions on the record of criminal behavior on behalf of their employers.  In several of these guilty pleas, the Defendants' employees specifically admitted to forming illegal combinations in restraint of trade and competition.

249.    Messrs. Gilman and McNenney stood trial and were convicted of conspiring to restrain trade and competition.  Although the charges have since been reversed on the basis of prosecutorial misconduct, the evidence gathered by the New York Attorney General, as well as the admissions by those defendants who pled guilty, provide compelling evidence of a conspiracy among Marsh and its conspiring insurers to restrain competition.

250.    Additional evidence of each conspiring insurers' knowledge of the conspiracy and conduct in furtherance of it exists, but need not be exhaustively listed at the pleadings stage.

E.    **Marsh and the Conspiring Insurers Secreted the Kickback Arrangements from Marsh's Customers, Including the Plaintiffs.**

251.    With the assistance and cooperation of its conspiring insurers, Marsh secreted its kickbacks and other compensation from its customers.  Marsh required that the insurers keep the kickback payment arrangements secret and, when reports of them later began to surface, Marsh under-reported the extent of the compensation it received from insurers.

66

1.      **Marsh and the Insurers Kept the Kickback Arrangements Secret.**

252.    Marsh and the insurers agreed to keep the kickbacks confidential. In fact, Marsh emphasized to its personnel that the kickback arrangements were to be kept secret.  In a PowerPoint presentation from meeting on May 12 and 13, 2003 of team leaders of Marsh's Global Broking Environmental group, the group's leader, Chris Smy, forcefully reminded his subordinates that "**PSA AGREEMENT DETAILS ARE STRICKLY** [sic] **CONFIDENTIAL**." (bold & capitalization in original.)

253.    As Mr. Manzi testified, Marsh had a policy throughout the company that Marsh personnel "were not allowed to share or disclose details of the PSA to anybody."  Rather, to the extent any inquiries arose, Marsh funneled them to a single point of contact in the company who, in turn, avoided providing any real information through obfuscation.

254.    Marsh also ensured that Ace, Chubb, CNA, Travelers, Zurich, XL, Fireman's Fund, Liberty, AWAC, Arch, Kemper, Hartford, and Certain Underwriters at Lloyd's kept the kickback arrangements secret.  Virtually every so-called "contingent commission" agreement—or, in Marsh's parlance, "Placement Service Agreement" or "PSA"—contained a secrecy provision requiring the parties to keep the terms of the agreement secret or confidential.

255.    For example, in the 2003 kickback agreement between Marsh and Liberty's umbrella division, the parties agreed that "[t]he terms of this agreement are confidential and shall not be disclosed by either party except as may be required by law." Likewise, Marsh and Zurich agreed in their 2001 PSA kickback agreement for umbrella, excess and buffer insurance product lines that "the terms of this Agreement are

67

confidential and shall not be disclosed by either party except as may be required by law."
The 2003 PSA kickback agreement between Marsh and AWAC contained an identical
provision.

256.    The secrecy provision of the contracts was more than a boilerplate.
Marsh scolded insurers that divulged any of the terms of the kickback arrangements, even
to colleagues at the carrier or Marsh.  For example, in March 2000, an unnamed
conspiring insurer mistakenly divulged the existence of a PSA agreement during
discussions about re-negotiating a Marsh customer's insurance business.  In an apologetic
email from the insurer to Marsh, a senior vice president at the insurer admitted that
"certain references were made to the MMGB [Marsh Global Broking] PSA, and
otherwise documented in correspondence to Marsh."  The insurer's senor vice president
then acknowledged "that this was inappropriate behavior" and promised to destroy the
evidence.  Specifically, the insurer executive wrote that we "will do the [sic] necessary to
eliminate all documentation, electronic or otherwise, that references or otherwise alludes
to the PSA."  Prior to producing a hard copy of the email in this MDL proceeding, the
insurer redacted all names, such that one cannot tell which senior vice president sent the
email or which Marsh representative received it.

257.    An unnamed conspiring insurer repeatedly warned its personnel
that the PSA kickback agreements were to be kept confidential.  In an May 8, 2002 email
with the subject line "Marsh Placement Services Agreements," the insurer's John
Schumacher warned his personnel that "[i]t is important to recognize and underscore the
'confidentiality' provisions that govern this Agreement."  He went on to explain, "[w]e

68

should not discuss these Agreements with anyone within Marsh, which would include Client Advisory personnel."

258.    Likewise, an unnamed insurer's Craig Smiddy sent an May 15, 2003 email to the insurer's underwriters that "PSA's are never to be discussed with retail producers [i.e., Client Advisory Services] or clients."  Later, in an on August 12, 2003 email, he reminded a colleague that "PSA agreements have confidentiality agreements, so you cannot discuss the PSA with the retail producer or the client."

259.    In an internal April 2004 email, Liberty's Fred Frey candidly described the so-called PSA payments as *quid quo pro* payments for allocating business to insurers and explained both Marsh's justification for hiding the arrangements from their customers:

> Ten or so years ago, a trend developed of clients and prospective clients asking brokers to fully disclose commission income derived from their business. That's when all the new "fancy" terms of Placement Service Agreements, Management Fee Agreements, etc. came into being. The common theme accompanying all of them was the word "commission" disappeared.
>
> The argument brokers could make in replying to clients inquiries is that they were no longer "commissions", the revenue they received from PSA's, et al. was not tied to any one client and they further muddied the waters by creating a laundry lists of services and efficiencies that earned them the payments. **Fact is, nothing really changed. To the best of my knowledge, in some fashion all of these agreements and payouts are based on favorable overall business outcomes between a broker and a carrier. The extra services and efficiencies are hocus pocus.**  (emphasis supplied.)

260.    Clearly, Mr. Frey and his colleagues at Liberty knew that the kickbacks were inappropriate and made a concerted effort to keep them secret.  In fact, as word of investigations by state regulators began to surface, Mr. Frey sent an August 25,

2004 email to two of his superiors, Greg Lamb and Ellen Pishenin, "suggest[ing] you completely avoid the subject [of kickback agreements].  If asked, you are 'vaguely aware' that we have a few in place, but know nothing of the details.  That's not only our corporate and SBU position, but a position that will help protect you from being subpoenaed."

> 261.    The other insurers also kept the kickback agreements secret.

> **2.    When Marsh Eventually Divulged the Existence of "Contingent Commission" Kickbacks to the Plaintiffs, the Disclosures were Inaccurate and Misleading.**

> 262.    Marsh continued to mislead its customers, including the Plaintiffs,

about the true nature and extent of the kickback arrangements even as late as September 2004.

> 263.    For example, after learning of the New York Attorney General

investigation of Marsh and numerous insurers, Tyson asked Marsh to explain the contingent commissions—at this point renamed "Market Service Agreements"—and to identify the amount of money Marsh had received in contingent commissions on Tyson's accounts.

> 264.    After an internal discussion at Marsh, Marsh's Barry Kirkland

responded by downplaying the contingent commissions and making a number of highly misleading statements.  He inaccurately claimed that Marsh's "client executives and advisory professionals do not know the terms of our MSA agreements and are not influenced by MSAs in assisting clients in the insurance-buying process."  Yet, numerous internal documents reveal that Marsh had engaged in a concerted effort over many years to ensure that its customers' business was placed with insurers to maximize Marsh's

kickbacks under the MSAs, PSAs, and other contingent commission kickbacks agreements.

265.    Indeed, in the situations where Marsh's Client Advisory Services personnel were unaware of which insurers would maximize Marsh's kickbacks, the placement decisions were effectively made by personnel at Marsh's Global Broking division, which orchestrated the kickback arrangements, either by directly making the carrier recommendations or by providing a fictitious market competition with broking plans.

266.    Mr. Kirkland also told Tyson that the kickbacks were something Marsh called "Market Service Revenue" or "MSR," and misleadingly claimed that they were payments by the insurers for otherwise uncompensated services provided by the Marsh, when in fact they were the *quid pro quo* for allocating its customers' business to those insurers.

267.    Mr. Kirkland further falsely reported to Tyson that the MSR could not be traced to specific customers' accounts.  He told Tyson "[i]n all cases, MSR is not specific to any particular client or placement transaction."  Yet, as alleged, numerous internal documents at Marsh and at the conspiring insurers show the conspirators contemporaneously tracked the kickbacks Marsh would earn on each account, down to the dollar.

268.    Finally, Mr. Kirkland provided a misleading estimation of the overall kickbacks it received in 2003, calling it an "average contingency factor," and claiming that it was only 1.8%.

269.    Although Marsh did not explain how it supposedly calculated this statistic, this statistic does not fairly represent the kickbacks Marsh received on its customers' accounts—including on Tyson's accounts, in particular.  For example, the statistic uses Marsh's revenue from all insurance lines and products as the denominator, rather than just those insurance lines that were subject to the so-called "contingent commissions," such as the Plaintiffs' policies.  Likewise, the statistic omits numerous kickbacks paid by the oversea affiliates of the conspiring insurers and further ignores the fact that Marsh received additional kickbacks in the form of lucrative reinsurance brokerage commissions.

270.    In fact, XL, one of Marsh's conspiring insurers, noted that Marsh personnel "are telling their clients that their average fee is 1.8%--very distorted since that seems to include lines of business that are not subject [to the kickback programs] and I suspect whole books of business from carriers that do not participate."

271.    On February 15, 2005, Marsh's Mr. Bewlay admitted in his guilty plea that during the 1999 to 2004 period Marsh gave clients misleading information when they asked Marsh about the amount of contingent commissions Marsh had received.

**F.    Marsh's Scheme Directly Affected the Plaintiffs' Insurance Placements.**

272.    Not only did Marsh's scheme generally drive up the cost of insurance in the market, Marsh placed the Plaintiffs' policies without meaningful competition on their accounts.  Even though the Plaintiffs have had almost no opportunity to develop evidence from the Defendants specific to the Plaintiffs' insurance policies, the Plaintiffs' counsel has already identified specific examples of the Defendants' conduct causing the Plaintiffs' direct harm.

273.    For example, Marsh created broking plans for the Plaintiffs' insurance renewals.  As previously alleged, the broking plans slated which of Marsh's conspiring insurers would win each layer of business without competition and what the target prices should be for the business.  On a few occasions, Marsh even sought fake B bids or sham declinations on the Plaintiffs' insurance policies.

274.    Preparing for the July 2002 renewal of NCW's excess casualty coverage, Marsh's Mr. Murphy created a broking plan that he distributed by email on May 22, 2002 to Edward McNenney, Kathleen Drake, Kathryn Winter, Regina Hatton, Joe LaRocco, Joshua Bewlay, Charles Ryland and Jen Giuliano.  Mr. Murphy listed the insurers slated to win NCW's renewal without competition.  He further instructed his Marsh subordinates to "Please send . . . to Zurich, AWAC, and PRB for backups."

275.    The following year Marsh again created a broking plan for NCW's 2003 excess casualty coverage, which Mr. Murphy created and circulated internally by email on or about June 4, 2003 to, among others, numerous Marsh employees who were criminally charged by the New York Attorney General.   Although NCW reduced the number of vehicles in its fleet by 28% and had no increase in its revenue or payroll, Marsh called for NCW to have significant increases in its excess casualty premiums. Marsh slated Zurich to receive a 23% premium increase in renewing its $50 million lead umbrella layer; another unnamed conspiring insurer, a more than 10% increase in the next $50 million layer; and Liberty, a 30% increase in the next 50 million layer.  In short, despite a reduction in NCW's risk profile, Marsh slated NCW for a $410,000 increase in premiums.

73

276.    To ensure it could give the false impression of competition if the increases were questioned by NCW or Client Advisory Services, Marsh solicited "back up" bids from AWAC, AIG and Great American.  Moreover, Marsh's internal records also reveal that Marsh planned to collect a 10% regular commission on these placements, despite its fee-only brokerage agreement with NCW.

277.    Likewise, Marsh learned of Tyson's plan to acquire IBP while Marsh was prepared the broking plan for IBP's 2001 excess casualty insurance.  Marsh's Mr. Bewlay therefore slated Zurich to win the lead umbrella because Zurich was the lead umbrella on Tyson's excess policy.  Mr. Bewlay did not plan to have any competition on the renewal, stating in a July 31, 2001 email, "I would describe this as a type B account – with Zurich as the lead.  (They currently write the lead [insurance] on Tyson and Tyson is planning on acquiring IBP.)"

278.    Marsh's Mr. Doherty testified that in 2000 and 2001 he worked as an LBC on Marsh team working with AIG to handle renewals for "big relationships like Exxon Mobile, IBM, huge companies, Tyson Foods."  This is the same team that orchestrated AIG's involvement in the scheme with regard to excess casualty lines.  In late 2003, Mr. Doherty was in charge of LBC responsibilities for, among others, Marsh's interaction with Ace (although he was later promoted to be a GBC).

279.    On November 25, 2003, the GBC responsible for Tyson's excess casualty renewal, Todd Murphy, created a broking plan, which he mailed to his colleagues in Global Broking, including Mr. Doherty.  This broking plan called for the incumbent on Tyson's lead umbrella layer, Ace, to renew with a double-digit increase in premium, up to $1.9 million (plus another $190,000 for punitive damage coverage).

Moreover, the broking plan called for the attachment point for Tyson's automobile liability coverage to be raised from $4 million to $5 million, representing an additional million dollar loss Tyson would have to cover out of its own pocket before the insurance coverage kicked in. Mr. Murphy instructed Mr. Doherty to communicate with Ace to get it to bid the target price.

280.    Marsh later adjusted the broking plan, calling for Ace to get the lead umbrella layer at an even higher premium of $2 million, which was a 14% increase in premium over the prior year. Even with this increase, Ace's Mr. Williams initially pushed Marsh to raise the premium even higher, to $2.29 million, claiming that the risk was underpriced. Mr. Doherty responded that Ace would have to bid either $2 million or, if it raised the automobile liability attachment from $4 million to $5 million, $1.9 million. Although Mr. Doherty's response might initially seem to benefit Tyson, Mr. Doherty explained in a December 10, 2003 email to Mr. Williams that the real reason for insisting on a lower premium than Ace desired: "these are the numbers that will sell."

281.    Mr. Doherty further revealed that he was not concerned with getting Tyson the best premium, but rather that his focus was on ensuring that Tyson did not catch on to the fact it was being fleeced, writing to Mr. Williams "[w]e are prepared to gradually help you out on this, but Marsh certainly can not be viewed as going way opposite of a softening market." Mr. Doherty confirmed that the layer of Tyson's insurance was being offered to Ace without competition when he then threatened Ace that if it did not agree to the target price, "Marsh Client Advisory will place this risk into open competition and AIG's year-end budget is hurting." Mr. Williams spoke with his

75

colleague, Kevin Daly, and just one hour later bid the target price, which prevented Tyson's renewal for its lead umbrella layer from seeing any competition.

282.    Mr. Doherty was well aware that a 14% increase was extraordinary, even in the less competitive market environment created by Marsh's kickback scheme.  In discussing the new policy with Ace's Mr. Williams, Mr. Doherty sent Mr. Williams a December 16, 2003 email in which Mr. Doherty reminded Mr. Williams that he had secured an above-market increase for Ace, with a 14% increase on Tyson's renewal "when the market is bearing around 5%. . . ."

283.    Marsh similarly placed the remaining layers of Tyson's excess insurance without competition.  Marsh created specific "game plan targets" for each carrier to bid at the various layers of coverage.  PRB and Great America were slated to insure the layer above Ace's lead coverage, also at increased premiums.  Marsh slated Liberty to win the excess layers between $75 million and $100 million, with premiums increased from $275,000 to $300,000.  Marsh's Ms. Michaels even forwarded the broking plan for Tyson's renewal to Liberty's Mr. Bott, informing him that the lower layers "quoted at the targets" and stating "[w]e are up next."  Less than two hours later, Mr. Bott bid the target slated for Liberty, responding, "[d]one.  Send it over."

284.    On another occasion, XL's Assistant Vice President for Excess Casualty, Jackie Petito, acknowledged in an October 14, 2004 email to her boss, Ms. Amodeo, that XL's bid for Tyson Foods' coverage that year had really been "Backup only."

285.    Furthermore, the Plaintiffs' policies appear on many of the lists showing where conspiring insurers had provided false bids to protect each other.  For

example, one of the spreadsheets provided by Marsh's Ms. Lafrano to XL's Ms. Amodeo recorded that two other insurance insurers had provided "Back Up" bids to protect XL on Tyson Foods' January 1, 2003 excess casualty insurance renewal.

286.    Moreover, many of the Defendants' agents who were charged with criminally conspiring to restrain competition were directly responsible for the Plaintiffs' accounts. For example, Marsh's Peter Anderson worked on the 2003 and 2004 renewals of NCW's excess casualty insurance. As part of his cooperation agreement, Mr. Anderson pled guilty to scheme to defraud in the first degree, a felony. Mr. Anderson participated in the scheme by ensuring that AIG bid the target price assigned to it by Marsh in a broking plan for the 2004 renewal of NCW's excess casualty insurance.

287.    Marsh's Joshua Bewlay was the GBC responsible for the 2001 excess casualty insurance renewal for IBP as well as NCW's 2002 excess casualty renewal. As part of his cooperation agreement, Mr. Bewlay pled guilty to scheming to defraud in the first degree, a felony.

288.    Liberty's Mr. Bott worked on Tyson's 2003 and 2004 excess casualty renewals. Mr. Bott pled guilty to combining to restrain trade and competition. Marsh's Ms. Michels and Mr. Manzi worked on insurance renewals for both IBP and Tyson. Ms. Michels pled guilty to combining to restrain trade and competition. Mr. Manzi pled guilty to scheming to defraud in the first degree, a felony.

289.    Similarly, AIG's Carlos Coello and Marsh's John Mohs, Robert Stearns, Katherine Winters, Todd Murphy, Edward Keane, Mark Manzi and Regina

Hatton all worked on insurance renewals for NCW and several also worked on insurance renewals for Tyson.  Each of them pled guilty to scheming to defraud.

**G.  Marsh's Scheme Inflated the Plaintiffs' Premiums.**

290.    There is no question that Marsh's scheme for obtaining and accepting secret kickbacks harmed its customers, including the Plaintiffs, in multiple ways.

291.    Ace, Chubb, CNA, Travelers, Zurich, XL, Fireman's Fund, Liberty, AWAC, Arch, Kemper, Hartford, and Certain Underwriters at Lloyd's inflated the premiums they charged the customers, such as the Plaintiffs, by at least the amount they kicked-back to Marsh.  Indeed, in March 2000, Marsh's Mr. McBurnie and Mr. Moll, who worked for an unnamed conspiring insurer, tried to settle on the amount the insurer owed Marsh for its 1999 PSA kickback in the excess casualty line.  The discussion became complicated, in part, due to the merger earlier in the year of the insurer with another insurance company.  As part of his argument for why two of Tyson's insurance policies and one for Wynn Dixie should not be included in the kickback calculation, Mr. Moll explained that the insurer needed to know before quoting whether "an individual insured's Buffer layer [was] included in the PSA" because "we would need to be able to gross-up our pricing by 16 - 17%.  You, in turn, would need to be able to sell this increase to our joint client."

292.    A few years later, Andrew Lennox, who worked for an unnamed conspiring insurer, bluntly acknowledged that "if we didn't have to factor in the PSA, I believe we would have been much more competitive. . . ."

293.    As a further proof that the kickbacks inflated premiums, XL's Chief Casualty Underwriter for the Americas, Ms. Amodeo, wrote a June 15, 2002 email

78

to her colleagues that Marsh was requesting a 15% contingent commission kickback,

which "[i]n combination with [a] contractual commission arrangement, [XL] would be

paying close to 20%." She expressed her agreement to pay this kickback "if all other

carriers on the placement" were also paying it, "but only if our premiums are adjusted to

contemplate the additional acquisition cost." (emphasis original.)

294. Likewise, as Liberty's Mr. Cauti explained in an October 2003

email, his excess casualty unit's PSA kickback agreement could lead Liberty to pay

Marsh as much as 18% of the gross written premium. Mr. Cauti explained that to fund

this kickback, "we have been including broker comm[ission] in our pricing even on those

deals where we aren't paying one, the $$ will go towards the PSA payment."

295. Liberty's property lines unit likewise folded the PSA kickbacks

into the premiums. In contemplating the PSA kickback agreement for 2003 property

lines, Liberty's John Lawlor wrote that "[w]e will need to either increase the price we

charge Marsh customers and/or reduce the retail where appropriate to recover these

additional costs."

296. In a May 2001 internal discussion at an unnamed conspiring

insurer about future kickback arrangements with Marsh, the insurer's Mr. Redington

wrote to his colleague John Alfieri that "[w]e could only include premiums which are

loaded for such, not from 1/1/2001 as suggested. . . ." Mr. Alfieri agreed, stating that "we

are trying to push it on new and renewal only where we can price for it." Leaving no

doubt of the insurer's intention to pass on the cost of the kickbacks to its insureds—and

Marsh's knowledge of this intention—Mr. Alfieri wrote the next month to Marsh's

Manuel Ribot that the new kickback agreement could only include future business

because "[i]t is not possible for us to include in force existing business that we have not made provisions to increase the cost. . . ."  He further explained that applying the kickbacks only to future business, "it would give us the ability to price for and monitor the agreement over time for our mutual benefit."

297.    Another unnamed conspiring insurer's Mr. Schumacher also explained in May 2002 that he had distributed the PSA kickback agreement to underwriters "so that we can make a provision for the same in the pricing of 'subject' business."

298.    Later, on May 15, 2003, an unnamed conspiring insurer's Mr. Smiddy instructed the insurer's underwriters that "[q]uotes we provide to any production source should not reference any applicable PSA percentage we included in our pricing."

299.    Additionally, Marsh's practice of placing insurance without meaningful competition generally drove up the market rates for insurance, injuring all its consumers of insurance, including the Plaintiffs.  In fact, Marsh's Mr. Bewlay testified that "throughout his entire career at Marsh" he had been instructed to place customers' insurance at "the highest bindable number that you can get—that you'll get the order to bind from the client."  After all, he explained, "that's why [insurers] signed a PSA with us."  Stated another way, Marsh and the insurers were systematically overcharging commercial policyholders up to the point at which the customers would not ask too many questions or be tempted to change brokers or insurers.

300.    The harm caused to the Plaintiffs by the artificial inflation of the market may be quantified through expert testimony.  Even in the absence of such

testimony, one can see quantitative evidence of the harm in the notes of Marsh's own

Ms. Winter.  According to her notes, the price of insurance to the Marsh customers in her

group increased by roughly 5 to 10% every year leading up to the New York Attorney

General's investigation of anticompetitive behavior.  The trend then reversed, with

Marsh's customers seeing a 5 to 10% annual decrease in prices.

> **H.     The Defendants Contemporaneously Tracked the Kickbacks Marsh
>          Earned on Each Customer's Insurance Placements.**

301.    Contrary to Marsh's pretention, the contingent commission

kickbacks can be attributed to individual customers' policies.  For example, the 1999

merger of two insurance companies led to a disagreement between the surviving insurer

and Marsh about whether or not specific insurance policies—including two issued to

Tyson—should be included in the calculation of American Re's 1999 PSA kickback to

Marsh.  Marsh's William McBurnie argued that Tyson's $168,000 premium for its 1999

general liability excess and its $592,000 premium for automobile excess should be

included in the calculation.  Mr. McBurnie recognized later in the argument that

discussion of specific policies undermined Marsh's pretention that contingent

commissions could not be attributed to specific policies.  Thus, he warned the insurer's

William Moll that "we must avoid account-specific discussions regarding PSAs."

Ultimately, Marsh and the insurer eventually "agreed to disagree" over whether to

include the premiums from Tyson and another company in the 1999 PSA kickback

calculation by having the insurer make a compromise payment.

302.    Likewise, in a February 3, 1999 email, Marsh's Mr. McBurnie

wrote that he had reviewed Marsh's spreadsheet tracking excess casualty policies that

Marsh had steered to an unnamed conspiring insurer.  Mr. McBurnie concluded that

81

Marsh should include a $1.5 million placement for Shell Oil in the business it allocated to

the insurer under the kickback agreement:

> A thorough reading of the [PSA] verbiage and the Excel file [tracking premium placements with the insurer] . . . leads to the following one-word conclusion:
>
> SHELL  SHELL  SHELL  SHELL  SHELL  SHELL  SHELL
> SHELL  SHELL  SHELL  SHELL  SHELL  SHELL  SHELL
> SHELL  SHELL  SHELL  SHELL  SHELL  SHELL  SHELL
> SHELL . . . . **[repeats "SHELL" 285 times]**
>
> Or, put another way:  With $1.5M Shell premium added to the pot, we make approximately $3M PSA.

303.    The conspiring insurance insurers also kept track of contingent

commission kickbacks that Marsh earned on accounts directly attributable to each of

Marsh's customers, including the Plaintiffs.

304.    For example, XL tracked on an individual basis—and attributed to

each specific customer—the policies on which it would owe Marsh contingent

commission kickbacks.  In calculating the 2003 kickbacks on umbrella policies placed

with XL by Marsh, XL listed the renewals of two different policies for Tyson Foods.

305.    Similarly, Marsh provided spreadsheets to Lloyds Syndicate 2488

AGM detailing the PSA kickbacks the syndicate owed to Marsh for property placements

under the companies' 2003 PSA agreement.  In a spreadsheet tracking the kickbacks for

October through December 2003, Marsh noted that the syndicate owed Marsh $50,547.24

in kickbacks on five placements of Tyson's 2003-2004 property insurance.

306.    Likewise, an unnamed insurer contemporaneously tracked, down

to the penny, the "PSA Commissions" that it would be required to pay Marsh on each

insurance policy, including policies for the Plaintiffs.

307.    On January 10, 2004, Ace communicated internally with its personnel about Tyson's 2004-2005 property policy.  Ace acknowledged in writing that the insurers would pay Marsh a 6.5% PSA kickback on each dollar of premium, in addition to a 5% straight commission.

**I.      Marsh Accepted Illicit Payments, Even on the Plaintiffs' Fee-Based Accounts.**

308.    Marsh secretly earned money on the Plaintiffs' accounts that it did not disclose to the Plaintiffs.  Indeed, in 1998, Tyson's risk manager, Carl Johnson, pressed Marsh to divulge all commissions it would receive as part of a new brokerage agreement.  Mr. Johnson's request sparked a frenetic debate within Marsh, resulting in Marsh's Mr. Kirkland advising his Marsh colleagues that the provisions requested by Mr. Johnson would "open wide the subject of Global Broking (GB) compensation, which I have successfully avoided up to this point."

309.    Mr. Kirkland was in panic mode.  He explained to his Marsh colleagues that Marsh had earned significant undisclosed money on Tyson's accounts. He warned that "[i]f we push this further, [Tyson's Carl Johnson] will want us to divulge in writing **all** income flowing in to J&H Marsh & McLennan, directly or indirectly, from Tyson.  It is not just the contingency arrangements we will have to explain, but also the wholesale income derived from our London and Bermuda GB operations.  Remember, London GB recently booked 5% of the three year prepaid primary premium paid to Lexington – that is 5% of $12 million or $600,000."  (emphasis in original.)

310.    Mr. Kirkland then reached a telling conclusion: "if [Mr. Johnson] had known up front what GB was set to make at [Tyson's] expense, he would not have done the deal.  Why make an issue of it now?"

      **1.**      **With the Insurers' Cooperation, Marsh Secretly Accepted Straight Commissions on the Plaintiffs' Fee-Only Accounts.**

311.     As alleged above, Marsh agreed to broker a number of the Plaintiffs' insurance lines on an annual, fee-only basis.  With the insurance insurers' acquiescence and cooperation, Marsh also surreptitiously accepted straight commissions on these placements.

312.     For example, Marsh agreed to broker Tyson's 2002 and 2003 property and casualty insurance lines, among others, in exchange for a flat fee.  Marsh repeatedly agreed either to credit any commission it received towards Tyson's annual fee or to not accept commissions on these lines.

313.     Yet, Marsh surreptitiously accepted straight commissions on Tyson's fee-only insurance placements.  For example, XL gave Marsh a 5% "straight" commission on a premium of $285,000 for its layer of Tyson's 2002-2003 property insurance.  Marsh did not report this premium to Tyson.

314.     A colorful example of Marsh secreting its kickbacks occurred in December 2002, during the renewal of Tyson's excess umbrella policy.  On December 31, 2002, Great American faxed a signed binder confirmation to Marsh on a portion of Tyson's 2003 excess umbrella policy (a casualty product insurance) for a premium of $425,000.  The binder showed that Great American was paying Marsh a premium of 10%, or $42,500.

315.     Recognizing that Tyson would see the binder confirmation and that the commission violated Marsh's agreement with Tyson, Marsh faxed the binder back to Great American the same day with a line drawn through the 10% commission.  The premium, however, remained $425,000.

316.    A few days later, Marsh's Mr. Green emailed the Marsh LBC responsible for Great American, Jonathan Stokes, ordering him to "get me a revised binder from GA [Great American] on Tyson that shows commission is NIL.  RIGHT AWAY!"  (capitalization in original.)  He also lectured the Marsh GBC responsible for the Tyson renewal, Mr. Doherty, "we have to get this shit right out of the gate.  this is a pain in the ass."

317.    Great American complied with Marsh's orders and re-issued the binder confirmation, this time showing a premium of 0%.  Significantly, the premium remained $425,000.  On information and belief, Marsh received the $42,500 commission from Great American.  In any event, Marsh and Great American deprived Tyson of the financial benefit of having entered a fee-only brokerage agreement.

318.    An almost identical situation existed with regard to Ace's renewal of Tyson's 2003 property insurance.  Ace issued a binder to Tyson that showed a 10% commission for Marsh in violation of Marsh's instructions that insurers not show commissions on the binders for fee-only accounts.  Marsh chastised Ace, telling it not to disclose a commission on this fee-only account.  Ace then revised the binder to remove reference to the 10% commission.  The total annual premium amount, however, remained unchanged.  On information and belief, Marsh secretly accepted the 10% commission from Ace on this policy.  In any event, Ace and Marsh deprived Tyson of the financial benefit of having entered a fee-only brokerage agreement.

319.    Travelers also paid Marsh a straight commission on its portion of this same property renewal.  On October 17, 2002, Travelers faxed to Marsh's Mr. Sparling a request for payment of a $90,811 premium on a layer of Tyson's 2002-

85

2003 property insurance. The payment request noted that Travelers was giving Marsh a 7.5% commission, a clear violation of Marsh's agreement to credit any commissions to Tyson. Marsh did not tell Tyson about this commission. Tyson, however, eventually learned as part of Marsh's settlement with the New York Attorney General that Marsh had charged Tyson the full $90,811 premium for Travelers' layer of the 2002-2003 property insurance, without crediting Tyson for the commission.

320.    On February 19, 2003, Lexington, a subsidiary of AIG, responded to Marsh's request for a quotation on a layer of one of Tyson's property policies. The quotation was for $135,000 and included a 12.5% commission that Lexington would pay to Marsh. Despite the fact that this was a fee-only account, Marsh's Mr. Sparling forwarded the quotation by fax on February 20, 2003, to Marsh's Client Advisory contact in the local Atlanta office informing her that the local office's cut of the commission would be 9.375%, which was consistent with the 25/75 split that Marsh's Global Broking office was taking on straight commissions, even on fee-only accounts.

321.    Marsh similarly accepted commissions on PSEG's fee-only accounts. For example, in a signed and dated February 18, 2000, document entitled "Marsh Global Broking Single/Multi Placement Summary," Marsh calculated a brokerage percentage of 5% ($6,416.65) was owed for placing PSEG Resources' insurance policies with two Lloyds syndicates. Notably, Marsh also indicated that it also expected the premiums of $128,333 to apply toward its PSA kickbacks from these Lloyds syndicates.

322.    In another document from a year later entitled "XLA Property Management Account as of October 1, 2001," Marsh recorded that it received a 10%

86

broker's commission of $36,025 on PSEG's insurance placement.  Also, Marsh counted

on receiving another 4%, or $14,410, PSA kickback for having made this placement.

>       323.    Marsh's practice of illicitly accepting commissions on fee-only

accounts was widespread.  Marsh even discussed its standard practice of secreting its

commissions on fee-only accounts from its clients at industry meetings.  For example, on

September 22, 2003, Marsh's John (J.C.) Sparling obtained a bid from Jason Mitchell,

who worked for an unnamed conspiring insurer, on the renewal of a layer of Tyson's

2003 property policy.  Mr. Mitchell provided a quote at $2,700,000 and included a

reference to both the straight commission and the PSA kickback that the unnamed

conspiring insurer would owe to Marsh.[3]

>       324.    Mr. Sparling responded by lecturing Mr. Mitchell and reminding

him of the instructions from a national trade meeting to prevent customers from seeing

the payments insurers were making to Marsh:

> > You need to remove any reference to PSA or any other
> > agreement with Marsh that relates to compensation.
> > **Clients get copies of quotes and binders they cannot
> > reference PSAs.  We brought it up at NAPSLO
> > ["National Association of Professional Surplus Lines
> > Offices"] last week and were assured it would not
> > happen going forward**.  On fee accounts, show NIL and
> > on commission based accounts please show 12.5%.  This is
> > a fee account.  (emphasis added.)

>       325.    Later that same day, Mr. Mitchell sent a new quote with the same

$2,700,000 premium, but without reference to the straight commission or the PSA

kickback agreement.

---

[3]  The attached spreadsheet, however, is unavailable to the Plaintiffs because
Commonwealth's production of emails to the CaseCentral MDL document did not
include attachments and, even then, only included the first page of many multipage
documents.

326.    The ensuing email discussion between Mr. Mitchell and
Mr. Sparling left little question of Marsh's intention to collect the compensation that was
now hidden from Tyson.  Mr. Sparling eventually told Mr. Mitchell to quote a different
layer and noted that the layer would have a commission "@ 7.5%."  On a hard copy of
the email that Mr. Mitchell printed, he expressed confusion at Marsh's duplicity, writing
"7.5%[.]  now this is commission based account??"

327.    To date, Marsh has not fully revealed the extent to which it has
received payments from insurers for placing the Plaintiffs' insurance policies.

2.    **Marsh Also Accepted So-Called "Contingent Commissions"
that Were Directly Attributed to the Plaintiffs' Insurance
Placements.**

328.    The Defendants' "contingent commission" kickbacks were directly
attributed to each customers' placements.  With the insurers' acquiescence and
assistance, Marsh accepted these contingent commission kickbacks regardless of whether
it had brokered the insurance coverage on a fee-only basis.

329.    As noted above, Marsh promised that it would disclose any
commissions it received and credit them against the annual fee.  While the later
brokerage agreements included a vague statement that Marsh might accept other
"customary" payments "based upon such factors as the overall book of business placed
by Marsh and its affiliates," Marsh failed to disclose the existence of such payments.
Moreover, Marsh did not reveal that the payments were directly attributed to specific
insurance policies.  And, while the percentage of the kickback theoretically could change
based upon the book of business' overall volume or profitability, Marsh controlled and
directed the amount and type of business it would steer to each conspiring carrier to
ensure it would meet specific targets to trigger pre-set percentages.  Thus, the

Defendants' public claims that so-called contingent commissions are not attributable to specific insurance policies are baseless.

330.    As alleged above, the Defendants contemporaneously maintained spreadsheets tracking the contingent commission kickbacks by each particular insurance placement.  Many of the Plaintiffs' insurance placements, even where they had a fee-only brokerage agreement, appear on these spreadsheets.

331.    For example, despite Marsh's promise to PSEG in the 2002 brokerage agreement that the flat fee would be Marsh's "full commission for the services performed. . . and in lieu of commission[,]" Marsh accepted a 15% PSA kickback from XL on PSEG's umbrella coverage.  In a document entitled "XL Insurance Marsh 2002 PSA YTD Dec 31, 2002," Marsh tracked that it had earned a 15% "gross PSA" kickback of $31,050 on the $207,000 annual umbrella premium it placed with XL on PSEG's behalf.

332.    Additionally, many of Marsh's PSA kickback agreements contained so-called "gross up" or "true up" provisions, under which the carrier agreed to pay Marsh contingent commission kickbacks and to also "gross up" the combined straight and contingent commissions to a higher percentage.  The higher percentage was generally equivalent to the percentage Marsh would have received if every placement (both fee- and commission-based) had been subject to a straight commission as well as the contingent commission kickback.  This had the effect of allowing Marsh to collect straight commissions on every insurance policy, even where Marsh had agreed not to collect commissions.

333.    For example, the 2003 PSA kickback agreement between AWAC and Marsh called for AWAC to pay up to a 15.75% "gross up" of all umbrella and excess casualty policies placed with AWAC by the Marsh's Bermuda, London and Dublin offices.  Likewise, the 2002 PSA agreement between Liberty and Marsh for casualty insurance lines called for Liberty to pay a 16% "gross up" of all casualty policies to Marsh.  Even though many of Marsh's customers had "fee-only" brokerage agreements with Marsh, Liberty was required to pay this gross up on all policies. The kickback agreement for 2003 between Marsh and Liberty's umbrella division had a similar "gross up" provision: it called for kickbacks combining the "straight" and "contingent" commissions as high as 19% of the gross written premium.    These agreements had the effect of adding a straight commission to the Plaintiffs' fee-only accounts.

334.    At least one Liberty employee recognized the gross-up provision for what it was.  After noting that the PSA in place for 2003 for excess and environmental insurance products lines would give Marsh an "effective total commission at 15.5%, before any placements done net of brokerage," Liberty's David Cohen wrote, "I have a hard enough time swallowing nondisclosed overrides on fee business, much less [an] effective override which would amount to a hidden retail brokerage commission."

335.    Marsh's Mr. Manzi revealed yet another method through which Marsh charged its customers additional hidden commissions, even on fee-only accounts. Under questioning from Marsh's own counsel, Mr. Manzi acknowledged that Marsh's Global Broking division "may have, from time to time, received a wholesale commission" and that this payment could vary "anywhere from two-and-a-half to seven-and-a-half percent, but probably [was] in the five percent or lower range."  Marsh

90

justified such commissions on the ephemeral basis that its customers dealt with Marsh's

Client Advisory Services and, therefore, Global Broking division—which ran the

placement of excess coverage—was a broker "in between the retail broker and the market

itself." Still, Mr. Manzi had to admit that "Marsh spent a lot of time trying to define what

a wholesale market was." Such hidden "wholesale commissions" were, of course, in

addition to any PSA kickback payments and any retail commissions that Marsh received.

336.    Even under enforcement agency scrutiny in late 2004, Marsh

continued to mislead its customers, including the Plaintiffs, about the nature and extent of

its kickback arrangements with insurers. For example, Marsh claimed that it had

revamped its so-called "contingent commission" arrangements to avoid creating a direct

conflict of its interests in maximizing its revenue with its customers' interests in getting

competitive insurance coverage. However, as one of its conspiring insurers noted, the

new program "is nothing more then [sic] the old program with a new look that would be

less objectionable if someone looked under the covers at Marsh."

## V.    AON AND THE CONSPIRING INSURERS AGREED TO STIFLE COMPETITION BY ALLOCATING INSURANCE BUSINESS TO THE INSURERS IN EXCHANGE FOR THE INSURERS' PAYMENT OF SECRET KICKBACKS TO AON.

### A.    Aon Promised to Act in NCW's Best Interests, to Disclose All Compensation and, for Certain Product Lines, Not to Accept Payment from the Insurers.

337.    Aon sought to become and remain NCW's commercial insurance

broker. On many occasions, Aon told NCW that it worked for its customers and not the

insurance companies.

338.    Aon held itself out to be an expert in commercial insurance and

further represented to NCW that it had the sophistication and market expertise to advise

NCW in selecting its insurance policies.  Once NCW retained Aon as its broker, Aon
worked closely with them to identify its insurance needs, communicated with insurance
insurers on its behalf and provided advice to NCW on which insurance policies it should
purchase.

339.    Aon made promises to NCW, both in written brokerage
agreements and in other representations.  Aon's promises included that it would act in
NCW's best interests, that it would disclose its compensation to NCW and, on certain
product lines, that it would not accept payment from the insurers for placing NCW's
insurance policies.

340.    For example, in a "Service and Retainer Agreement" signed by
Aon and NCW on or about April 2, 2004, Aon agreed to provide "insurance and risk/or
financial and risk management support services" to NCW.  In the agreement, NCW
agreed to appoint Aon as its broker of record and Aon promised it would "[a]ssist AT&T
Wireless [NCW] in developing underwriting submissions" and "[n]egotiate coverage
terms, conditions program structure and pricing with underwriters" for NCW.

341.    Aon also agreed to place NCW's property and executive risk
insurance policies for a flat fee.  For example, in 2003, NCW paid Aon $1,150,000 to
place its property insurance and $650,000 to place its executive risk insurance.  NCW
paid Aon similar amounts to place its 2004 insurance.  In exchange, Aon agreed that
these payments were "in lieu of Commissions which may normally be paid" to Aon by
the insurance insurers.  To the extent Aon nonetheless received commissions, it promised
to credit them to NCW.  Aon's agreements with NCW included an implied covenant of
good faith and fair dealing.

92

342.    Aon intended for NCW to rely on these promises and representations to induce it to designate Aon as its broker of record and to continue to retain Aon to broker its insurance.

343.    On or about the effective date stated in each of the customer agreements with NCW, Marsh sent the customer agreement to NCW's risk management personnel. On most occasions, Marsh sent the customer agreements by email, but on a few occasions may have sent the agreements by U.S. mail or by facsimile.

344.    In interacting with NCW, Aon personnel indicated that they had been and would continue to seek the best insurance for NCW at the lowest premium. Indeed, this is the primary reason for engaging a broker.

345.    NCW reasonably relied on these promises and representations in agreeing to have Aon broker its insurance policies. NCW reasonably understood that Aon would seek the best insurance coverage at the lowest prices and that Aon would not abuse its ability to control information and bidding to NCW's detriment.

346.    Moreover, under the circumstances, Aon owed NCW a fiduciary duty to act in its best interest in placing its insurance policies.

347.    Although Aon mentioned in the agreement that it "may be entitled" to unspecified "contingencies, overrides, bonus commissions and/or administrative expense reimbursements" from "third parties," Aon gave no indication to NCW that it planned to receive kickbacks from the insurers to whom it would allocate NCW's insurance policies, nor that the kickback payments would far exceed the traditional "straight" commissions Aon had agreed to forego. Aon also failed to disclose the existence of "gross up" provisions (more fully described herein) in its PSA kickback

agreements whereby the insurers would end up paying Aon the equivalent of straight commissions even on NCW's fee-only accounts.

348.    Aon betrayed the confidence and trust its customers placed in it by trading their business in exchange for secret kickbacks. Aon enlisted willing insurers in the scheme – these insurers were eager to pay a kickback to Aon in exchange for Aon protecting them from competition and permitting them to increase insurance premiums to policyholders. Aon also crafted and policed a plan to conceal its conduct, and it even fabricated stories to deceive inquiring policyholders, such as NCW. Aon's conduct on all fronts became bolder, more abusive, and more damaging over time.

**B.    As Early as 1997, Aon Systematically Allocated its Customers' Policies to the Insurers that Paid Maximum Secret Kickbacks.**

349.    Aon was effectively the sole communication conduit between its customers and the insurers with regard to the insurance product lines it brokered for those customers.

350.    At least as early as 1997, Aon began entering into so-called "contingent commission" agreements with "preferred" insurers for the specific purpose of securing various forms of kickbacks in exchange for allocating increased and more profitable business to the selected insurers.

351.    These kickbacks were in addition to any regular – or "straight" – commissions that Aon received on the accounts. Aon drove business to the conspiring insurers as the *quid pro quo* for these insurers kicking back substantial portions of the customers' premiums. Aon did this without its customers' knowledge or consent, and with an express strategy of secreting this practice from its customers.

352.    For example, in a September 12, 1997 memo, an executive at the Hartford wrote about a meeting he had had with Aon nine days earlier, explaining that "[w]e signed an incentive contract to pay AON Corporation a three point bonus commission . . . [*a*]*ll lines of business are included* with the agreement ending December 31, 1999."  (emphasis added.)

353.    In the years following the start of Aon's campaign to enter lucrative national kickback agreements, Aon continued on what it described internally in 1999 as an "aggressive program of increasing average commissions, market consolidation and contingent commission increase[s]" to maximize its profit.

354.    Aon's growing practice of allocating customers' business for the purpose of maximizing its kickbacks was widespread throughout Aon and ordered by many high-ranking executives of Aon.  Aon's management repeatedly directed its personnel to place insurance with so-called "Strategic Partners" –its term for the conspiring insurers who agreed to kickback the highest percentage of premiums to Aon. As Aon's Greg Golden explained Aon's motivation at January 11, 2000 internal executive meeting:  "by doing so, we will always get the best agency contract, have more leverage, *and receive the largest commission possible*."  (emphasis added.)

355.    Aon met with each of the conspiring insurers in late 1999 or very early 2000 and described the kickback scheme.  Aon then sent letters documenting the insurers' promises to give kickbacks to Aon.  In these letters, Aon disclosed to the conspiring insurers how other conspiring insurers had responded.  For example, on February 4, 2000, Aon's Executive Vice President, Bruce O'Neil, wrote to Hartford's Rex Sprunger explaining that Mr. O'Neil expected to see "written confirmation that you

agreed to give Aon your best agency contract," a euphemism for the heightened

kickbacks.  Mr. O'Neil then pasted into the letter responses from two other insurers

documenting their agreements to give Aon the enhanced kickbacks.  On information and

belief, Aon mailed this letter through the United States mails on or about February 4,

2000.

356.    Likewise, on February 17, 2000, Mr. O'Neil, wrote an internal

email divulging his plan to approach Chubb for a national agreement to kick back

"override" payments to Aon.  Mr. O'Neil explained that Aon should "press hard" for

such an agreement "because I believe folks like [Aon personnel] Mike Prins and John

Sullivan would move business to strategic partners who pay more"—in short, a

prototypical "pay-to-play" kickback scheme.

357.    Chubb joined the scheme and agreed to pay Aon large kickbacks

for Aon to steer business to it.  In August 2000, Aon executive Bruce O'Neil suggested to

Aon's most senior executives, Patrick Ryan and Michael O'Halleran, that Aon move its

customers' business away from two non-conspiring insurers to maximize the kickback

from Chubb:

> Suggest we use Atlantic Mutual and CGU to "payoff"
> Chubb to secure $4,300,000 agreement or 1% override (see
> May 18, 2000 agreement) for our entire Chubb ARS book.

358.    Aon formalized the allocating of its customers' business as the

company's business strategy.  Across Aon, its business units followed "syndication

master plans" to move their customers' business to the insurers willing to pay the highest

kickbacks.  For example, on June 6, 2001, Aon's Senior Vice President of Aon Private

Risk Management, Bruce Macbeth, wrote a memorandum about the "Syndication Master

Plan."  In his memorandum, Mr. Macbeth divided Aon's customers into A, B and C

categories based on premium amount and profitability, and he described how the more desirable customers' accounts should be moved to Aon's so-called "Strategic Insurance Partners," Chubb and Fireman's Fund. Mr. Macbeth distributed the memorandum by email on June 6, 2001.

359.    About half a year later, on November 24, 2001, Mr. Macbeth instructed one of his subordinates that Aon was to "steer all submissions to Chubb. I am finding that most submissions are submitted to all three insurers [AIG, Chubb and Fireman's Fund] and we all [k]now what AIG will do to buy market share. We need to emphasize that AIG should only be used if there is an underwriting issue with Chubb, which we can address." Days later, he ordered several of his subordinates to "direct all new business exclusively" to Chubb and Fireman's Fund because of "our override agreements with" them. He acknowledged that AIG had the ability to provide better prices for Aon's customers. Yet, he insisted that AIG not be given an opportunity to bid because it had not agreed to pay Aon additional "overrides for growth" and instead paid "just standard brokerage commissions." Mr. Macbeth was one of the account executives on NCW's account. Not surprisingly, he placed NCW's group personal excess liability insurance with Chubb.

360.    Only after the New York Attorney General's investigation of Aon, Aon acknowledged that Mr. Macbeth's allocation of the business of Aon's customers to maximize its contingent commissions was illegal and fired Mr. Macbeth in March 2005. Aon, however, inaccurately and self-servingly claimed that its employees had ignored the instructions of the Senior Vice President and that Mr. Macbeth's illegal conduct had not "harmed any client or in any way affected market placement behaviors. . . ." In fact,

97

customer allocation became widespread at Aon and was encouraged by its highest executives.

361.    By the end of 2003, Aon had entered into contingent commission kickback agreements with Ace, Arch, AWAC, Chubb, CNA, Fireman's Fund, Great American, Hartford, Kemper, Liberty/Wausau, St. Paul/Travelers, XL, Zurich and/or their affiliates.

### C.    Aon Expanded Its Scheme of Allocating Its Customers' Business to the Insurers that Paid the Highest Kickbacks.

362.    As Aon's revenue from the kickbacks grew, it refined and expanded the kickback scheme.  In doing so, Aon created an environment that eliminated or substantially reduced competition for its customers' insurance business.  To push insurers to join the scheme, Aon ensured that the insurers understood it controlled the flow of its customers' insurance business and that it would direct this business to ensure Aon received maximum revenue.

#### 1.    Aon Placed Its Customers' Business Without Competition in Exchange for Kickbacks.

363.    Aon offered an environment that eliminated or substantially reduced competition for the policies as an additional *quid pro quo* for kicking back substantial portions of the clients' premiums to Aon.

364.    In a redacted June 19, 2003 letter, an Aon representative outlined the conspiracy to an unnamed insurer to induce it to join.  The author wrote that becoming a so-called Strategic Partner meant that "First, you would enjoy favored treatment over non-strategic partners."  Aon also offered other benefits to insurers participating in this conspiracy, including "the first opportunity to quote and participate" in new customers' insurance programs and Aon's commitment to ensure that Strategic

Partners keep the renewal business they desire.  Of note, the Defendants redacted the author's and addressee's names from the letter prior to production and, thus, the Plaintiffs are currently unable to plead these details.  Tellingly, however, this letter appears in Chubb's document production even though it is a letter from Aon to a different insurance company.

365.    Another example of such "favored treatment" occurred in September 2003 when Zurich became concerned that it had provided coverage to a customer of Aon that Zurich later deemed to be too risky.  Thus, Zurich bought a $18,000 excess insurance policy on the risk.  Aon promised to make up the $18,000 to Zurich in a future transaction.  Shortly thereafter, Zurich bid on another customer's account.  Aon informed Zurich that it could raise its bid and still win the account.  Zurich therefore issued a revised bid, raising its quotation by more than $18,000 on the workers' compensation portion of customer's insurance.  As promised by Aon, Zurich still won the account at the inflated premium.

366.    On July 23, 2003, Rob Bednarik of Aon's Syndication Group met with Chubb's John Mizzi and Kenneth Chung.  Mr. Bednarik reports directly to Mr. Needle, the head of Aon Risk Services.  Mr. Bednarik told the Chubb representatives that Aon had "placed a moratorium on placing any new business with Atlantic" and "that Chubb is Aon's preferred market for all new business."  Furthermore, Mr. Bednarik promised that Chubb would "get first look and be guided as to how [Chubb] stack[ed] up against the competition."  Mr. Bednarik and Mr. Mizzi "struck" an agreement that Chubb could call Aon's Mr. Bednarik "on any piece of new business" where Chubb felt "that a

little pressure from him will swing the deal" to Chubb.  Also, Mr. Bednarik would give

Chubb advance warning "on any renewal that might be in jeopardy."

367.    Likewise, in late 2003, Aon's Bermuda affiliate was "on the cusp

of hitting the minimum threshold on the excess casualty PSA with ACE."  In a

November 4, 2003 email Aon's Bill Kasbeer turned to Mr. Needle for help in allocating

just "another $2 million" of customers' business to Ace so that Aon could "collect a PSA

of $1.4 million. . . ."  Mr. Kasbeer copied Aon's CEO, Michael O'Halleran, on the email.

368.    The insurers, for their part, understood that kickbacks were a part

of the deal with Aon.  If the carrier paid the right amount to Aon, Aon allocated

customers to it and the carrier would be immune from competition on this business.

Stated another way, the conspiring insurers would not compete for each other's business,

as long as the incumbent carrier had agreed to pay Aon sufficient kickbacks.

369.    Aon used its control over bidding opportunities to allocate

customers amongst the conspiring insurers.  Evidence of this can be found in the insurers'

tracking of their bidding opportunities on Aon-brokered insurance.  For example, Liberty,

one of Aon's so-called Strategic Partners, maintained spreadsheets of its business

opportunities.  In these spreadsheets, Liberty identified numerous Aon-brokered renewals

where Liberty acknowledged that it was being protected from competition explaining,

"no competition on this renewal" or "[r]enewed this account with accelerated payment

and double digit rate increase.  No competition."

370.    The insurers' internal records also show the flip side of this

allocation scheme.  Their records are riddled with explanations that Aon refused to allow

the companies to bid because Aon had slated the business to go to another carrier.  For

example, XL tracked these dead opportunities in various "activity summary reports," often noting that it did not submit bids because it was "dead – per AON will not move at this time," "dead - brokker [sic] didn't need us," or because it was "advised by broker [Aon] to 'deep six' the submission."

371.    Moreover, because Aon was in exclusive control of the customers' information, it could prevent insurers from bidding on a customers' policy by simply not giving them the file or not responding to the insurers' requests to bid. Time and again, XL's activity reports note that leads were dead because Aon cut off XL's ability to prepare a bid, giving explanations such as:

- "Dead –no response from broker"
- "Insufficient underwriting info"
- "Dead – UW [underwriting] strategy"
- "Dead – Broker did not forward complete submission"
- "Dead – never heard from broker"

372.    Aon's other conspiring insurers, including Chubb, maintained similar charts extensively documenting incidents where Aon preventing them from bidding.

373.    Significantly, Aon did not limit the "sale" of its customers' business at inflated premiums to the excess casualty product lines. Rather, this practice crossed all product lines, including property. For example, Senior Vice President of an unnamed insurer's Direct Property Insurance Operations, Tom Bonarrigo, revealed the purpose of the kickbacks the insurer proposed to pay Aon during his negotiation of the 2003 PSA agreement with Gary Marchitello and Arquita Trott, Aon's Senior Vice President/Property Manager. As Mr. Bonarrigo explained, the insurer's proposed kickbacks to Aon were "an attempt to significantly increase your [Aon's] revenue and

101

our [an unnamed insurer's] premium." Mr. Bonarrigo offered an additional kickback of up to five percent of total premiums, which was "in addition to the current PSA" that paid another one percent of total premium. This particular kickback agreement related to lines of property insurance.

374.    At each insurance renewal, Aon showed NCW quotations that had not been competitively marketed, but rather that were the result of its practice of allocating customers' policies among the insurers that had agreed to pay the kickbacks. NCW did not know that Aon had obtained the quotations without competition, but rather understood that the quotations represented the best insurance at the lowest premium.

## 2.    Aon Developed Internal Corporate Mandates to Maximize Its Kickback Revenue.

375.    Aon had become reliant upon the extra income it received from the kickback scheme and the desire for continued kickbacks drove Aon's behavior. Aon also ensured that its personnel were motivated to continue and grow the scheme.

376.    Aon institutionalized the practice of customer allocation in exchange for kickbacks. According to notes from the July 1, 2003 meeting of Aon's Syndication Operations—which Aon partially redacted before producing—Mr. Needle, explained that "[w]e should continue to grow our book with Chubb and also Hartford and Wausau based on our favorable contingency agreements." Wausau was a brand of Liberty.

377.    When Aon was presented with an offer from Aon to steer at least $12 million in new business to Wausau in exchange for a lucrative kickback, Wausau entered a PSA agreement with Aon. To ensure that Aon met its end of the bargain, Aon's Carol Spurlock emphasized to Aon personnel the importance of ensuring the allocation of

at least $12 million in business to Wausau. In an otherwise internal October 23, 2003 email that she shared with Wausau's Mr. Braxton, Ms. Spurlock ordered Aon employees to move insurance business from an unnamed insurer to Wausau to "push Wausau [policies] to hit that $12M new business number. This is a MEANINGFUL kick in our compensation when we hit $12M." (capitalization in orig.)

378. In December 2003, the Harford moved its own D&O policy away from Aon without explanation. Aon's President & Chief Operating Officer, Michael O'Halleran—in what he later claimed was "a fit of anger at the Hartford"—ordered Mr. Needle to punish the Hartford by moving commercial coverage business of Aon's customers away from the carrier. Mr. Needle promptly advised against this action, explaining that Aon received favorable financial payoffs from the Hartford on commercial coverage lines and, thus, Aon should leave those lines in place. Mr. Needle noted, however, that the Hartford paid lower kickbacks on D&O insurance, and thus, proposed disciplining the Hartford by moving the business of Aon's customers in that product line away from the Hartford.

379. In an email exchange in 2004, Aon's Regional Operations Manager/Director of Financial Services Group, Anna Adams, asked for the "top ten" list of the insurers offering the most lucrative kickbacks (termed PSA payments, in this instance) to Aon so that she could disseminate the information throughout the company. She further explained that she would need to tell Aon personnel "what is in it for them." An Aon Managing Director, Ronald Moyer, responded that the funds from the PSA arrangements constituted a large amount of money and provided for much of Aon's success; they entirely funded its bonus pool, "as well as our investment hires and still

contributed significantly to the bottom line of the company." He reacted sharply to those individuals who had asked the question "what's in it for me," demanding to see "the names of the people that actually ask" because they were "looking through the wrong end of their telescope." Eric Andersen, another Aon Managing Director, then emphasized Aon's dependence on the PSA payments kicked back from the insurers, saying that Ms. Adams' questions would be "a good opp[ortunity] to see just how far down we can drill the PSA goals to the teams."

380.    Allocating customers to the insurers offering the most lucrative payments even drove employees' compensation. For example, Aon's Gary Marchitello held a meeting on November 8, 2002 "with the management of the property group and other key senior property brokers to emphasize the importance of placing the maximum amount of business with our key partner markets."

381.    In an April 14, 2003 email entitled "AON Professional Enhancement Funds (PEF)," Aon's Carol Spurlock offered an unnamed insurer's McLaughlin the opportunity for the insurer to become a so-called "premiere [sic] market," telling him that the insurer would have to "[p]ay us percentages on the remainder of the book placed with [an unnamed conspiring insurer]." She proposed a national contingent commission kickback agreement, but stated that Aon was willing to enter into a series of regional agreements. Ms. Spurlock then assured Mr. McLaughlin that Aon could deliver on her promise of more desirable business for the insurer, explaining that Aon's brokers—called syndicators—were compensated based upon their ability to allocate business to maximize Aon's kickbacks. In her words, "[l]et me further confirm our ability to effect placement behaviors. Our syndicators are evaluated on the

percentage of their books that are with our 'premiere' [sic] markets. Each Regional

Director is held accountable as well. This is a measurable, compensated item that each

syndicator is financially motivated to drive."

382.    Likewise, in 2002, Aon Risk Services Managing Director, Gerald

Brown – a central figure in Aon's efforts to obtain the highest possible kickbacks –

explained to Aon's employees the importance of sending business to the insurers paying

Aon the most money in kickbacks:

> There is nothing more important than enjoying a favored status
> with the marketplace strategic partners as increased monetary
> rewards, enhancement of client's coverages and pricing, and
> gratuitous gestures are by-products of an executed strategy and
> business discipline. It is so vital that the execution of the PEF [the
> so-called "Professional Enhancement Fund"] plans by the assigned
> Aon FSG [Financial Services Group] designee should be a
> component of the Bonus pool.

Notably, the Aon Financial Services Group offered products outside of excess casualty

lines, including Property and specialty lines.

383.    Similarly, in April 2003, Ms. Spurlock told Wausau's Keith

Braxton that she would "influence the behaviors of the group" at Aon to meet or surpass

the goal of allocating $5 million of new business to Wausau, provided Wausau would

agree to pay an "incentive" kickback of five percent of all new business for the first half

of the year. After some negotiation over the exact amount of the kickback, Ms. Spurlock

also disclosed to Mr. Braxton that Aon had allowed Chubb and Hartford to cherry pick

business because they had entered "more favorable" kickback agreements.

384.    Aon also punished those of its employees who did not comply with

the corporate mandate to allocate its customers' business to maximize its kickbacks. For

example, around May 1, 2003, one of Aon's brokers awarded Trump's insurance policy

105

to AIG without giving Chubb "a chance to get a last look." Aon's Managing Director of Aon Risk Services-Private Risk Management, Carter Brydon, reacted strongly, telling Mr. Macbeth to "block the placement with AIG until CHubb [sic] gets a chance to look at it." He also stated that the situation was "unacceptable" and that Aon's brokers needed a "very stern" message to give preferential treatment to Chubb over AIG. To drive home the message and make sure that other Aon brokers understood the consequences of such conduct, Mr. Brydon punished the offending broker by taking away his personal commission on the insurance placement. The discipline to this Aon employee was direct, swift, and painful, and the intended effect was obvious—play by Aon's corporate rules or you will be reprimanded and financially punished.

### 3. Aon Ensured that the Insurers Understood that Aon Controlled the Flow of Insurance Business.

385. Aon made sure that insurers understood that Aon was able to control the flow of insurance to prevent the insurers from even getting a chance to compete for given business. Insurers that did not conspire had no chance of acquiring business. The conspiring insurers all accepted this arrangement and agreed to its essential terms. This is a classic customer allocation scheme.

386. In late September 2000, Aon sent form letters to its potential so-called "Strategic Partners" in advance of October 2, 2000, meetings with them at The Greenbrier Resort. Aon arranged for the meetings to occur one after another in the same conference room at the resort. As of August, 2000, Aon had already confirmed that it would meet with AIG, an unnamed insurer, Travelers, and St. Paul between 7:00 and 10:30 a.m., and Aon was trying to arrange for Hartford, Chub, Zurich, Kemper, and CNA to also join the meetings.

387.    In The GreenBrier meetings, Aon explained the concept of a "Strategic Partner" and that it included an insurer receiving preferential treatment in exchange for kickbacks.  Aon also disclosed that all of the conspiring insurers (*i.e.*, the insurers' supposed competitors) were kicking back an average of 14% of their premiums to Aon.  Aon's form letters further informed each insurer that efforts "to expand our relationship together" would be "enhanced with additional assistance" from the insurer and proposed that the insurer pay an additional "override" back to Aon on the insurers' entire book of business with Aon.

388.    Although the kickback arrangements were often discussed orally, Aon usually reduced them into writing under the guise of a "contingent commission" or "PSA" agreement.  One Aon executive threatened an insurer that had been slow to sign a contingent commission kickback agreement to which it had orally agreed:

> We have been operating on the good faith that this [contingent commission agreement] would be mutually agreed quickly after our meeting here in NY.  Based on the fact that we are almost halfway through the year, I will be advising our people in the field that we in fact don't have a [contingent commission agreement] with [Industrial Risk].

Aon heavily redacted the document before producing it, removing all names other than Bob Needle.

389.    Likewise, in April 2002, Aon invited its so-called "lead umbrella markets" to a high-level meeting in Chicago.  Aon told an unnamed conspiring insurer that Aon had invited St. Paul, Zurich, CNA, and Kemper because these insurers paid the highest kickbacks to Aon.  Aon also told the insurer that it was not invited because it had not paid kickbacks to Aon in the form of "PSA" or "PEF" payments.  Arguing that it had indeed been paying kickbacks to Aon, the insurer protested.  The insurer claimed that it

107

had provided large kickbacks directly to Aon's London affiliate and that it should not be penalized if Aon's London affiliate refused to share the kickbacks with Aon's U.S. operations.

390.    Another time, Aon told an unnamed conspiring insurer that Aon had stopped sending property insurance business to another insurance carrier–initially thought to be Arch–because it had not agreed to make lucrative kickbacks, then called "PSA payments," to Aon.  On October 3, 2003, the unnamed insurer's Business Development Officer, Larry Sorensen, reported that Aon's Managing Director for the National Property Syndication Group, Gary Marchitello, had instructed "his team that they avoid making any placement with one particular carrier (I guessed Arch, but Arch does give Aon a PSA – Bill [Kasbeer, of Aon] would not identify the company) that refuses to provide a PSA agreement."  Mr. Kasbeer, however, did lead Mr. Sorensen to believe he would share with [the insurer] a summary of what other insurers paid in kickbacks.

391.    Similarly, Aon threatened an unnamed conspiring insurer to force it to pay more in kickbacks.  Mr. Marchitello wrote in a March 11, 2004, email to the insurer that Aon would "make serious adjustment to the way [Aon] do[es] business with [the insurer]" unless it made material progress in finding "ways to enhance the compensation level" to Aon.  The insurer's personnel understood the threat exactly as Aon intended:  Aon would direct its customers' business away from the insurer unless the insurer agreed to pay kickbacks to Aon in the form of "PSA," or profit sharing agreement, payments.  The insurer received the message.  Just two days later, the insurer's Robert Mescher wrote to Vice President John Schumacher, "Looks like they are

getting serious about relegating [the insurer's] RiskPartners to the bottom of the pile if we aren't able to agree to a PSA of some sort."

392.    From time to time, Aon would tell its various insurance carrier contacts exactly what its plan was with another insurer carrier and even provide copies of those kickback agreements.  For example, in early 2003, Mr. Needle provided to Chubb copies of kickback agreements Aon had entered with Chubb's competitors and offered to provide additional ones.  In negotiating the 2003 kickback agreement with Chubb, Mr. Needle wrote to Chubb's William Tully that Chubb's most recent kickback proposal was "not competitive with any arrangements we have with our other major carriers.  I think you know that, from the agreements that were sent earlier. I would be glad to forward any of the others."

393.    Aon's efforts worked.  Its so-called Strategic Partners clearly understood the kickback scheme:  Aon would "sell" the customer's business to them in exchange for a payoff.  For this reason, Chubb's Chief Operating Officer, Tom Motamed, argued in an September 13, 2000, internal Chubb email that Chubb should pay *even higher* sums to Aon so that Chubb could tell Aon "we are open for business (e.g., their new business production) and are paying them [Aon] extra for it."  (emphasis in original.)

394.    Likewise, in September 2001, XL's Diane Amodeo explained to her colleagues that she had gathered "some market intelligence" and learned that "a PSA with AON will ultimately be required to ensure a healthy submission flow for lead umbrella and first layer excess."

4.    **For Certain Business of Aon's Customers, the Insurers' *Quid Pro Quo* for Allocation of the Business Included Using Aon Re to Reinsure the Business.**

395.    The so-called Strategic Partners' kickbacks to Aon were not limited to commissions.  Aon's Strategic Partners also provided kickbacks to Aon through another mechanism, high reinsurance brokerage fees to Aon's reinsurance affiliates, Aon Re.  Aon placed its customers' business with its Strategic Partners in exchange for their agreement to use Aon Re to provide reinsurance on the risks—and, of course, pay Aon Re additional commissions on the reinsurance placements.  Indeed, according to Aon, one of the criteria for defining a carrier as a "Strategic Partner" is that the carrier is a "[s]ubstantial client of Aon Re."

396.    As early as March 31, 2000, Chief Marketing Officer and Managing Director of Aon's Casualty Syndication, Joe Lombardo, humorously summarized this part of the kickback scheme:

> "What do you call a carrier who buys a little reinsurance from Aon Re?"  ----- "A strategic partner!"

397.    Acknowledging that Aon had been trading its customers' retail business in exchange for the carrier placing reinsurance with Aon's affiliate, Mr. Lombardo cautioned his colleagues that Aon should act strategically in coordinating the scheme.  In his words:

> More than once the success of a reinsurance effort imposed a commitment on the retail operations that was unrealistic and problematic. . . . The more troublesome activities have been where a reinsurance "hit" with a 2nd tier retail market is linked to a retail "promise."  These activities need to be better staged from the onset to avoid delivery failures.  If we could choreograph them to fill retail product/niche needs, we would turn these into win-wins [for Aon and the conspiring insurer].

110

398.    In a February 23, 2000, email, Aon's Scott Clark informed Mr. O'Halleran that he had met with representatives from Liberty and "told them Aon Specialty Re must place the fac [facultative reinsurance] on Aon produced business."  He went on to tell the Liberty personnel, "if we don't get their reinsurance there is no point to these 'love ins.'"  In short, a condition of getting the specialty insurance business of Aon's customers was the promise to place all of their reinsurance through Aon, giving Aon another set of commissions.

399.    Likewise, Aon allotted retail business to AIG in exchange for AIG's promise to use Aon Re to reinsure a risk, even though AIG had initially decided to retain the risk itself.  Aon promised to steer $10 million in new business to AIG in exchange for AIG agreeing to pay Aon Re $750,000 in reinsurance brokerage fees.  As an Aon executive explained the *quid pro quo* to Aon's CEO, Mike O'Halleran, and its Chairman, Patrick Ryan:

> In return for a commitment of $10,000,000 in new gross premium from ARS US [Aon Risk Services], AIG has agreed to appoint Aon Re for an additional 2.5% placement of the CCA program, which [AIG] has indicated is worth $750,000 in commission for Aon Re.

400.    Attempts to sell of the business of Aon's customers went to the very top of Aon.  Heavily redacted notes of a telephone conference between Aon's Chairman Patrick Ryan and Chubb Chairman and Chief Executive Officer Dean O'Hare show that Chubb promised Aon that "Aon will get the lion['s] share" of the reinsurance for one particularly large account.  Mr. Ryan told Mr. O'Hare that Aon's handling of the reinsurance "is critically important to Aon" and that Chubb would enjoy "positive relations" with Aon "if Chubb give[s] r/i [reinsurance] to Aon."  Mr. Ryan further stated

that he was "willing to put his personal credibility and friendship w/Dean on the line to

make sure Chubb receive[s] preferential treatment from Aon."

> **D.    Aon and the Conspiring Insurers Contemporaneously Tracked the Kickbacks Earned on Each Customer's Insurance Policies, including NCW's Policies.**

401.    Despite Aon's claims to the contrary in the *Daniels* litigation,[4] Aon

and the conspiring insurers contemporaneously tracked, often by customer and by policy,

the exact amount of contingent commission kickbacks Aon would be owed.

402.    For example, Aon maintained a spreadsheet tracking the net

premiums on its professional policy lines for its June 1, 2002, to June 1, 2003, PSA with

one of the conspiring insurers.  In it, Aon identified each policy, the customer, and the

exact amount each policy contributed toward its "net written premium" goals for the

kickback payments.  That year, Aon achieved an additional kickback of 2% of this

amount, which it added to the other commissions owed by the carrier, for a total kickback

of 8.76%.

403.    Aon kept numerous additional spreadsheets showing, by customer

and policy, the amount of kickbacks Aon earned from its so-called Strategic Partners,

including XL, Liberty, and Great American.  NCW's policies appear in many of these

spreadsheets.

404.    The insurers maintained similar spreadsheets.  For example, XL

kept contemporaneous spreadsheets for its property, casualty, and professional lines of

insurance calculating how each dollar of premium it received contributed toward the

---

[4]  *Daniels v. Aon* was a lawsuit in Illinois state court by a putative class of Aon's customers challenging the contingent commissions kickbacks.  In the lawsuit, Aon maintained to the state court that Aon could not determine what contingent commissions were attributable to each customer's policy.  Aon eventually settled with the class and NCW opted out of the settlement.

contingent commission kickbacks it would pay Aon. The spreadsheet tracked the customer, policy number, policy dates, and each policy's gross premium, as well as various ceding and brokerage commissions (which were deducted from the gross premium before calculating the kickback). XL then calculated the kickback amount it owed Aon for having steered the policies to XL.

405.    Likewise, Zurich maintained a spreadsheet for each quarter tracking by policy and customer the contingent commission kickback it owed Aon. Zurich's "Contingent Commission Agreement – 2004" chart for the 3rd quarter of 2004, tracked premium, the contingent commission percentage, and the kickback on each policy Zurich had written through Aon that quarter. A portion of NCW's 2004 D&O insurance policy appears in Zurich's chart. According to Zurich, NCW paid a premium of $190,000. In exchange for Aon allocating this layer of NCW coverage to Zurich, Zurich planned to pay Aon a kickback of $23,750, or 12.5% of the gross premium, leaving $166,250 for Zurich.

406.    Zurich also prepared a spreadsheet tracking the exact amount of the kickbacks it owed Aon for each policy under its 2003 kickback agreement. Policies for NCW repeatedly appear on the chart, contributing $210,875 in net written premiums toward the kickback Zurich would owe Aon for that year.

### E.    Aon Grew Fat on the Kickbacks.

407.    Over time, Aon received more and more money in illicit kickbacks. These kickback payments were in addition to "customary" or "straight" commissions and could equate to 15% or more of the customer's total premium. For example, in an early kickback agreement with Zurich, Aon was to receive a straight commission of 13.5% on all D&O, Fiduciary, Fidelity/Crime, Real Estate, E&O, and

employment practices liability insurance (EPLI) policies.  Zurich further would pay an

additional 2.5% as a "contingent commission" kickback, regardless of the amount of

premiums, for a total of 16% premium flowing back to Aon.  If Aon allocated $25

million in business to Zurich during the year, the "contingent commission" kickback

would increase to 3.5%, netting Aon a whopping 17% kickback of the customers'

premiums.

408.    Examples of similar arrangements with other insurers abound.

Aon promised not to reduce the overall volume of business with Ace's Bermuda affiliate

during the 2000 calendar year.  In exchange, the carrier agreed to pay a half-million

dollar kickback to Aon.  In addition to this payment, Ace's Bermuda affiliate promised to

pay Aon another 15% in commissions on new and renewal business (with the exception

of excess renewal business, on which it would pay between 12% and 15%).  On top of

those hefty kickbacks, the carrier promised Aon up to another 7% commission on excess

liability policies and 2 or 3% on professional policies.  In exchange, Aon promised the

carrier that Aon would "ensure that ACE has the last right of refusal on any renewal

business."

409.    The agreement with Ace also exposes another practice developed

by Aon and the insurers—many of the contingent commission kickback agreements

included a "true up" or "gross up" provision in which the carrier agreed to pay Aon

contingent commission kickbacks and to also "gross up" the combined straight and

contingent commissions to a higher percentage.  This had the effect of allowing Aon to

collect straight commissions on every insurance policy, even where Marsh had agreed not

to collect commissions.   Aon's kickback agreement with Ace's Bermuda affiliate for the

2000 calendar year included such a "gross up" provision that required the insurer to kick back to Aon up to another 6% of all property policies until Aon received an across-the-board 15% kickback, even on policies that Aon had promised to its customers that it would broker on a "fee-only" basis.

410.    Similarly, Aon arranged commissions for itself on the fee-based accounts it placed with XL's "Insurance American" division, violating the fee-based agreements it had made with many of its customers to not accept commissions on their lines of business.  In its 2003 PSA kickback agreement with Aon, XL agreed to pay Aon up to 7% in "wholesale" commissions on fee-based written premiums, which the agreement defined as "gross written premium on umbrella and excess liability policies written through XL Insurance Global Risk Excess Casualty Department where an agreement exists between the Broker and an Insured with respect to Broker Compensation and commission is not otherwise paid to the Broker by the Company." While Aon may not have accepted "retail" commissions on the fee-based premiums it passed on to XL, Aon still collected "wholesale" commissions from XL without its customers' knowledge or consent.  Aon also gathered up to 17.5% in commission payments on gross written premiums garnered from new business that were not restricted to a fee.

411.    Knowing that these types of provisions violated its fee-only brokerage agreements, Aon took steps to ensure its customers did not learn of these commissions by including a confidentiality provision in the agreement that required the conspirators to keep the kickbacks secret.

412.    The January 1, 2003, PSA kickback agreement for placements with AWAC by Aon's Bermuda office also called for Aon to receive a "gross up" on excess casualty, property, and professional lines (including D&O, EPLI and professional liability) of insurance.  This agreement, too, called for Aon and AWAC to keep the kickbacks secret.  This gross up was as high as 16% on property lines and 15% on the others.

413.    By 2004, the kickbacks had become so central to Aon's business model that Aon depended upon them for its profitability.  When Aon announced in October 2004 that "it would stop collecting so-called contingent commissions," it admitted that it had collected a stunning $200 million in such kickbacks in 2003 alone.  Aon also admitted that it had already collected $117 million in contingent commissions in just the first nine months of 2004 and expected to collect another $50 million in the fourth quarter of 2004.  This sum does not even include income Aon received under other programs with different names, including Aon's practice of allocating retail business to insurers that had agreed to have Aon Re, in turn, handle the wholesale brokerage.

414.    In February 2005, a few months after it stopped collecting the contingent commission kickbacks, Aon reported a double-digit percentage drop in its fourth quarter 2004 profits.  Aon attributed most of the loss to its discontinuance of the contingent commission kickbacks.

F.    **Aon and the Conspiring Insurers Secreted Their Kickback Arrangements.**

415.    Even though Aon and the conspiring insurers closely tracked the kickbacks Aon was to receive, they kept the existence and terms of their kickback agreements secret from customers.  In fact, virtually every one of the so-called

116

"contingent commission" agreements, or PSAs, contain a secrecy provision that prohibits the parties from revealing the terms of the agreement unless compelled to do so by a court.

416.    For example, Roland Bonitati, who worked for an unnamed conspiring insurer, signed an agreement effective on January 1, 2002, in which the insurer and Aon agreed that "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law." Likewise, the PSA kickback agreement between AWAC and Aon effective January 1, 2003, included an identical provision.

417.    In an October 23, 2003, meeting of Aon's most senior executives, Mr. O'Halleran discussed the fact that Marsh had been raking in more money in contingent commission kickbacks than Aon. Implicitly recognizing the illicit nature of these contingent commission kickbacks, Mr. O'Halleran addressed the question, "if we can't make up the difference, shouldn't we take the high ground and blow the whistle on them?" He argued, however, that Aon should not "take the high ground," because "if we 'blow the whistle' all relationships, all contingents and overrides will be out there for review." Although he self-servingly suggested Aon act "legitimately" to increase its kickbacks, he also recognized that customers would not approve of the kickbacks if they were to learn of them and explained that the a plan to increase the kickbacks should be undertaken "without highlighting it."

418.    Aon also instructed the conspiring insurers to avoid showing the PSA kickback percentages on insurance quotes—even though the insurers attributed them to every policy—and directed the conspiring insurers never to disclose the existence of

117

the kickback agreements to customers, or even Aon's retail brokers.  For example, in

May 2003, Craig Smiddy, who worked for an unnamed conspiring insurer, sent an email

to his colleagues instructing them to:

> Please discuss with your team:
> Quotes we provide to any production source should not
> reference any applicable PSA percentage we included in
> our pricing.
> Furthermore, PSA's are never to be discussed with retail
> producers or clients.

419.    Even as knowledge of the New York Attorney General's

investigation began to spread, Aon continued to mislead its customers about the extent

and nature of the kickbacks.  Aon made superficial changes to the kickback program to

mislead its customers their true nature.  For example, on March 1, 2004, Aon's David

Bolger instructed that the contingent commission kickbacks would now be called

"Compensation for Services to Underwriters (CSUs)," which falsely suggests that the

payments were for some service provided by Aon to the so-called Strategic Partners and

unrelated to the amount of premiums Aon drove to these insurers.  Mr. Bolger internally

explained the real reason for the name change, "[w]e would like to get away from the use

of terms like 'contingents,' 'overrides,' and 'PSAs' throughout Aon."  In fact,

notwithstanding the new name, the CSUs payments were still kickbacks by Aon's

Strategic Partners for allocating the business of Aon's customers to them.  Aon's

Chairman and CEO, Patrick Ryan, participated in this email conversation.

G.    **With the Conspiring Insurers' Assistance, Aon Violated Its Obligations to NCW.**

1.    **Aon Did Not Act in NCW's Best Interests and Failed to Disclose the Kickbacks.**

420.    Aon did not act in NCW's best interests.  Aon did not provide high quality work, nor did it did seek the best insurance coverage at the lowest prices.  To the contrary, Aon allocated NCW's insurance business to the insurers that had agreed to pay the highest kickbacks to Aon.

421.    Aon likewise did not inform NCW of the compensation, including the kickbacks, Aon received from the insurers in exchange for placing NCW's business with those insurers.

422.    One of Aon's so-called Strategic Partners even pointed out that Aon's approach was not in its customers' best interests.  Even after New York Attorney General Spitzer's antitrust investigation of the insurance industry had become public, Aon's Joe Rego became angry on December 3, 2004, when XL informed him that it would only pay a 4% commission on insurance for MARTA, Atlanta's public transportation system.  Mr. Rego threatened XL that "4% is unacceptable and therefore we will either have to gross up the quote to reflect our minimum requirement of 5% (which will be fully transparent) or market it to other carriers who hold us in higher value…."  XL pointed out that Aon was acting against its customer's interest, stating that it was "surprised to hear you say [] that you would market this to other carriers based on the fact that they pay a higher commission. . . ."  In what XL personnel later described as Mr. Rego "getting witty in his old age," Mr. Rego ironically shot back "[i]t's called competition. . . ."  Later, XL's Beth Piggott soberly described Mr. Rego's approach to brokering insurance as "just the sort of 'competition' that has gotten brokers and some

119

insurers in the midst of 'Hurricane Spitzer'.  What Joe [Rego] fails to realize is that he should be working in the best interest of the client, and that does not always equate to who pays the most commission to Aon."

423.    Furthermore, because Aon was keeping so much information from NCW, Aon did not provide "proper" renewal strategies to NCW, or discuss these strategies or changes in the marketplace with NCW in any meaningful way.  Indeed, Aon did not even act in compliance with applicable law.

**2.    Aon Accepted Payment on NCW's Fee-Only Placements.**

424.    Aon also violated its promises not to accept payments from the insurers for the placement of certain lines of NCW's insurance policies.  To the contrary, Aon secretly accepted both "straight" commissions and "contingent commission" kickbacks on such policies.

425.    For example, according to a contemporaneous spreadsheet prepared by Aon, Aon attributed some of its kickbacks to NCW's policies.  Aon's Bermuda affiliate placed a portion of NCW's 2003-2004 D&O insurance with an unnamed insurer at a gross premium of $211,125.  The insurer gave Aon's Bermuda affiliate a straight 5% commission of $10,556 and another 10% "resource commission" kickback of $21,113.  Aon then counted the net premium of $179,456 toward its contingent commission kickback.  Aon did not inform NCW of the payments it and its affiliate had accepted.

426.    The same spreadsheet reveals that Aon's Bermuda affiliate placed a portion of NCW's 2003-2004 property insurance with Ace's Bermuda affiliate.  Despite the fee-only brokerage agreement, Aon's Bermuda affiliate took a straight 5% commission of $4,450 and another 10% "resource commission" kickback of $8,900.  Aon

120

then counted the net premium of $120,150 toward its contingent commission kickback. Aon did not inform NCW of the payments it accepted.

427.    In addition, as alleged, the many of the PSA kickback agreements included so-called "gross up" or "true up" provisions, which had the effect of providing Aon with straight commissions even where it had agreed to broker NCW's on a fee-only basis.

### 3.    Aon Misled NCW About the Scheme and the Payments.

428.    Aon never truly disclosed to NCW the kickbacks Aon received in exchange for allocating NCW's business.  In fact, in October 2004 after the New York Attorney General's investigation became public, NCW's Craig Bartol asked Aon how much Aon had received from its so-called Strategic Partners in so-called "Compensation for Services to Underwriters" on NCW's accounts.  Despite Aon's internal acknowledgements that such payments were really "pay-to-play" kickbacks, Aon misleadingly characterized the payments as reimbursement for services that Aon supposedly provided to the insurers.

429.    Likewise, Aon inaccurately claimed that the payments "were not client specific." Aon also falsely claimed that providing an estimate was "difficult," even though it had contemporaneously tracked the contingent commission kickbacks it expected to receive on each of its customers' insurance placements.

430.    Moreover, when Aon responded to Mr. Bartol's question, it significantly understated the payments it had received.  For example, it omitted all payments that, while earned and owed, had not actually been transferred to Aon. Likewise, Aon had received payments for aviation insurance policies and payments under

121

various local contingent commission agreements, as opposed to company-wide agreements. Aon omitted all of these payments when it responded to Mr. Bartol.

### H. The Conduct of Aon and the Conspiring Insurers Harmed NCW.

431. There is no question that Aon's scheme for obtaining and accepting secret kickbacks harmed its customers, including NCW, in multiple ways.

432. <u>First</u>, the conspiring insurers increased the premiums they charged customers, such as NCW, by at least the amount they kicked back to Aon. As an unnamed insurer's Anthony Kuczinski explained to his colleague, John Phelan, when budgeting for the kickbacks the insurer planned to pay to the brokers in upcoming year, "you should be aware that [an unnamed insurer] also has agreements with Aon and others and you should also be aware that ***these are priced into our products*** within the pricing guidelines." (emphasis supplied.)

433. Aon and the conspiring insurers were well aware that the hidden kickbacks served to inflate the premiums of Aon's customers, but provided no added benefit to its customers. For example, as early as March 31, 2000, Mr. Lombardo, candidly acknowledged in an internal Corporate Marketing Memo:

> I'm concerned with even my own ability to put a positive, bullet proof, spin on some of what we'd like to do. Whether it's contingencies, profit-sharing, increased rates of commission, enhanced payment terms, "expense reimbursement" or expanded interdependent support – how does it translate to a client benefit?

Mr. Lombardo went on to admit that it had become "more difficult to deny that most of this is coming out of premium dollars."

434. Mr. Lombardo likewise acknowledged that Aon regularly engaged in "favors" or "accommodations" for the insurers that paid large kickbacks that were to the customers' detriment. As he explained in an internal email, "'[p]aybacks' often

introduce an element of conflict with another of our strong relationships, or worse, with a client objective."

435.    <u>Second</u>, the reduction or absence of vigorous competition caused by Aon's customer allocation scheme permitted the insurers to charge supra-competitive premiums.  This was true because the insurers knew that they would be shielded from competition and also caused premium inflation across the market, affecting all customers.  As Aon's Mr. Brown explained, the scheme permitted Aon's so-called Strategic Partners to enjoy "increased monetary rewards. . . ."  Moreover, Aon prevented vigorous competition—and, thus, better products at lower prices—when it allocated business based on which insurers would best line its pockets.

436.    The harm caused to NCW by the artificial inflation of the market may be quantified through expert testimony.  It can also be seen by comparing the premiums the insurers charged Cingular—which did not use Aon as its broker—to the premiums charged to AT&T Wireless for similar coverage in the years before AT&T Wireless merged with Cingular.  AT&T Wireless paid significantly more for its insurance than Cingular, although both companies were in the same business and of similar size, even after controlling for differences in the coverage, including the self-insured retention, and the minor differences in the companies' size and sales (or, in the case of property insurance, properties).

437.    <u>Third</u>, NCW was deprived of the benefit of having paid Aon a flat fee in exchange for broking NCW's insurance without commissions.  As shown, Aon continued to secretly accept both "straight" and "contingent" commissions for placing NCW's policies with the conspiring insurers.  Additionally, Aon accepted other forms of

payments from the insurers, including "gross ups" and wholesale brokerage commissions

through Aon Re, in exchange for "selling" NCW's insurance placements.

## CAUSES OF ACTION

### COUNT I
### *Per Se* Horizontal Marsh-Centered Conspiracy in Violation of
### Section 1 of the Sherman Act Against Marsh, Ace, Chubb, CNA, Hartford
### Fireman's Fund, Liberty, St. Paul/Travelers, XL and Zurich
### <u>(By All of the Plaintiffs)</u>[5]

438.    The Plaintiffs restate and incorporate by reference as if fully set

forth herein paragraphs 1 through 437.

439.    The Plaintiffs allege a *per se* violation of Section 1 of the Sherman

Act against Marsh, Ace, Chubb, CNA, Hartford, Fireman's Fund, Liberty,

St. Paul/Travelers, XL and Zurich for conspiring to restrain competition.  This count does

not rely upon fraud or misrepresentation by any of the Defendants, although such events

occurred, as described in other counts.

440.    These Defendants engaged in continuing illegal contracts,

combinations or conspiracies with respect to the sale of Insurance Products in the United

States in an unreasonable restraint of interstate trade and commerce, in violation of

Section 1 of the Sherman Act, 15 U.S.C. § 1, by, among other things:  (1) allocating

without competition the opportunities to sell, and the sale of, Insurance Products to

customers; (2) creating a scheme to pay Marsh to organize, implement and police the

unlawful conspiracy; and (3) providing customers seeking to purchase Insurance

Products, as well as Marsh's Customer Advisory Services, with collusive and non-

competitive bids or other terms of sale to prevent discovery of the conspiracy.

---

[5] As set forth above, Plaintiff New Cingular, as a successor to AT&T Wireless,
settled its claims with Marsh and does not assert claims against Marsh in this complaint.
It does assert claims against all of the Insurer Defendants.

441.    As described above, Marsh, Ace, Chubb, CNA, Hartford, Fireman's Fund, Liberty, St. Paul/Travelers, XL and Zurich, and their co-conspirators, overtly participated in the conspiracy and took acts in furtherance of it.

442.    The contracts, combinations or conspiracies described above were naked restraints of trade among horizontal competitors.

443.    The Defendants' acts complained of herein do not constitute the business of insurance regulated under state law.

444.    The purpose and effect of these Defendants' illegal contracts, combinations or conspiracies was to increase their profits by suppressing or eliminating competition and, thus, increasing prices for Insurance Products in the United States or maintaining them at artificially high levels.

445.    During and throughout the period of the conspiracies alleged in this Complaint, the Plaintiffs purchased Insurance Products from the participating insurance carrier Defendants (or their subsidiaries or controlled affiliates) and their co-conspirators at inflated and supra-competitive prices.

446.    As a direct and proximate result of the contracts, combinations or conspiracies alleged above, the Plaintiffs were injured in their business in that they paid higher prices than they would have paid for Insurance Products in a competitive market.

447.    These Defendants' acts are a *per se* violation of the Sherman Act. Alternatively, the Defendants' acts violate the Sherman Act under a rule of reason analysis.

448.    Various persons, not named as Defendants, participated as co-conspirators in the violations, and performed acts and made statements in furtherance of that conspiracy.

WHEREFORE, the Plaintiffs demand judgment against Marsh, Ace, Chubb, CNA, Hartford, Fireman's Fund, Liberty, St. Paul/Travelers, XL and Zurich, jointly and severally, as follows:

A.    For damages caused by these Defendants' violation of the Section 1 of the Sherman Act;

B.    For treble damages;

C.    Directing that these Defendants pay Plaintiffs' costs, including attorneys' fees as provided by law;

D.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

E.    Granting such other and further relief as may be just and proper.

**COUNT II**
**Marsh-Centered Conspiracy in Violation of**
**Section 1 of the Sherman Act**
**Against Marsh and All Insurer Defendants Under the "Rule of Reason" Analysis**
**(By All of the Plaintiffs)**

449.    The Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 448.

450.    The Plaintiffs allege in this count a violation of Section 1 of the Sherman Act against all Defendants other than Aon for conspiring to restrain competition.  This count does not rely upon fraud or misrepresentation by any of the Defendants, although such events occurred, as described in other counts.

126

451.    Each Defendant other than Marsh and Aon (*i.e.*, an "Insurer Defendant") is an insurance carrier that (1) agreed to pay Marsh kickbacks in exchange for Marsh allocating its customers' business to them, (2) received very significant sums–usually in the millions of dollars–of the Plaintiffs' insurance premiums brokered by Marsh as a result of the customer allocation scheme, (3) paid Marsh kickbacks in exchange for allocating the insurance business of Marsh's customers, including the Plaintiffs, to them without competition, (4) was aware that other insurers were also engaged in the scheme, (5) agreed to keep the scheme secret from Marsh's customers and, often, Marsh's Customer Advisory Services, and (6) did keep the scheme secret.

452.    As alleged in this complaint, the Insurer Defendants knew the terms of the contingent commission kickback agreements that their supposed competitors had entered into with Marsh.  Furthermore, as also alleged in this complaint, the Insurer Defendants generally refrained from attempting to win business that Marsh allocated to a supposed competitor.

453.    Marsh and the Insurer Defendants engaged in continuing illegal contracts, combinations or conspiracies with respect to the sale of Insurance Products in the United States in an unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by, among other things: (1) engaging in a customer allocation scheme in which Marsh assigned its customers' business to conspiring insurers without competition and (2) engaging in a "pay to pay" scheme in which Marsh sold customers' business to conspiring insurers to maximize the kickbacks the insurers offered and without regard for the price or quality of the insurance

product.  As a result, the Insurer Defendants increased the price of their Insurance

Products knowing that they would face little or no competition due to the schemes.

454.    These acts complained of herein do not constitute the business of

insurance regulated under state law.

455.    The purpose and effect of these Defendants' illegal contracts,

combinations or conspiracies was to increase their profits by suppressing or eliminating

competition and, thus, increasing prices for Insurance Products in the United States or

maintaining them at artificially high levels.

456.    During and throughout the period of the conspiracies alleged in

this complaint, the Plaintiffs purchased Insurance Products from the Insurer Defendants

(or their subsidiaries or controlled affiliates) and their co-conspirators at inflated and

supra-competitive prices.

457.    As a direct and proximate result of the contracts, combinations or

conspiracies alleged above, the Plaintiffs were injured in their business in that they paid

higher prices than they would have paid for Insurance Products in a  competitive market.

458.    Various persons, not named as Defendants, participated as co-

conspirators in the violations alleged, and performed acts and made statements in

furtherance of that conspiracy.

WHEREFORE, Plaintiffs demand judgment against Marsh and the Insurer

Defendants, jointly and severally, as follows:

A.    For damages caused by violation of the Section 1 of the Sherman

Act by Marsh and the Insurer Defendants;

B.    For treble damages;

128

C.    Directing that Marsh and the Insurer Defendants pay Plaintiffs'
costs, including attorneys' fees as provided by law;

D.    Directing such other equitable relief as may be necessary to redress
illegal conduct; and

E.    Granting such other and further relief as may be just and proper.

**COUNT III**
**Aon-Centered Conspiracy in Violation of**
**Section 1 of the Sherman Act**
**Against Aon, Ace, Arch, AWAC, Chubb, CNA, Hartford, Liberty, XL and Zurich**
**Under the "Rule of Reason" Analysis**
**(By NCW)**

459.    NCW restates and incorporate by reference as if fully set forth
herein paragraphs 1 through 458.

460.    NCW alleges in this count a violation of Section 1 of the Sherman
Act against Aon, Ace, Arch, AWAC, Chubb, CNA, Hartford, Liberty, XL and Zurich for
conspiring to restrain competition.  This count does not rely upon fraud or
misrepresentation by any of the Defendants, although such events occurred, as described
in other counts.

461.    Ace, Arch, AWAC, Chubb, CNA, Hartford, Liberty, XL and
Zurich (the "Aon Insurer Defendants") are each an insurance carrier that (1) agreed to
pay Aon kickbacks in exchange for Aon allocating its customers' business to them,
(2) received significant sums of NCW's insurance premiums brokered by Aon as a result
of the customer allocation scheme, (3) paid Aon kickbacks in exchange for allocating the
insurance business of Aon's customers, including NCW, to them without competition, (4)
was aware that other insurers were also engaged in the scheme, (5) agreed to keep the
scheme secret from Aon's customers, and (6) did keep the scheme secret.

129

462.    As alleged in this complaint, the Aon Insurer Defendants knew the terms of the contingent commission kickback agreements that the other Aon Insurer Defendants had entered into with Aon.  Furthermore, as also alleged in this complaint, the Insurer Defendants generally refrained from attempting to win business that Aon allocated to another Aon Insurer Defendant.

463.    Aon and the Aon Insurer Defendants engaged in continuing illegal contracts, combinations or conspiracies with respect to the sale of Insurance Products in the United States in an unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by, among other things: (1) engaging in a customer allocation scheme in which Aon assigned its customers' business to conspiring insurers without competition and (2) engaging in a "pay to pay" scheme in which Aon sold customers' business to conspiring insurers to maximize the kickbacks the insurers offered and without regard for the price or quality of the insurance product.  As a result, the Aon Insurer Defendants increased the price of their Insurance Products knowing that they would face little or no competition due to the schemes.

464.    These acts complained of herein do not constitute the business of insurance regulated under state law.

465.    The purpose and effect of these Defendants' illegal contracts, combinations or conspiracies was to increase their profits by suppressing or eliminating competition and, thus, increasing prices for Insurance Products in the United States or maintaining them at artificially high levels.

466.    During and throughout the period of the conspiracies alleged in this complaint, NCW purchased Insurance Products from the Aon Insurer Defendants (or

their subsidiaries or controlled affiliates) and their co-conspirators at inflated and supra-competitive prices.

467.    As a direct and proximate result of the contracts, combinations or conspiracies alleged above, NCW was injured in its business in that it paid higher prices than it would have paid for Insurance Products in a competitive market.

468.    Various persons, not named as Defendants, participated as co-conspirators in the violations, and performed acts and made statements in furtherance of that conspiracy.

WHEREFORE, NCW demands judgment against Aon and the Insurer Defendants, jointly and severally, as follows:

A.    For damages caused by violation of the Section 1 of the Sherman Act by Aon and the Insurer Defendants;

B.    For treble damages;

C.    Directing that Aon and the Aon Insurer Defendants pay NCW's costs, including attorneys' fees as provided by law;

D.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

E.    Granting such other and further relief as may be just and proper.

**COUNT IV**
**Marsh-Centered Conspiracy in Violation of the**
**RICO Act, 18 U.S.C. §§ 1962(c) & (d),**
**Against Marsh, Ace, Chubb, CNA, Hartford, Fireman's Fund, Liberty,**
**St. Paul/Travelers, XL and Zurich**
**(By All of the Plaintiffs)**

469.    The Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 468.

470.    The Plaintiffs allege a violation of 18 U.S.C. § 1962(c) against Marsh, Ace, Chubb, CNA, Hartford, Fireman's Fund, Liberty, St. Paul/Travelers, XL and Zurich (together, the "Marsh RICO Defendants") for conducting or participating in a criminal enterprise through a pattern of racketeering activity.  The Plaintiffs also allege that each of the Marsh RICO Defendants' agreement to participate in the unlawful operation of the enterprise to increase commissions and premiums, allocate customers, and to rig bids is a violation of 18 U.S.C. § 1962(d).

471.    The Marsh RICO Defendants formed an association-in-fact enterprise that provided Insurance Products to Marsh's customers sufficient to meet the customers' commercial insurance needs.  This enterprise, however, had a hidden purpose: to maximize the participants' profits by eliminating competition in the market for Insured Products, as described in this complaint.

472.    The enterprise essentially had a "hub and spokes" structure, with Marsh acting as the hub and coordinating most communication and the remaining Marsh RICO Defendants acting as spokes.  Each of the Marsh RICO Defendants knew of the existence and participation of the others—supplying the "rim"—as evidenced by the allegations in this complaint, including the sharing of information through Marsh about the terms of the co-conspirators participation in the conspiracy, the conspiring insurers' agreement to abstain from competitive bidding on business slated to go to co-conspirators, the occasional provision of false B bids and sham declinations to protect co-conspirators, and even direct communication among the conspiring insurers.

473.    As described in this complaint, Marsh coordinated the enterprise and drove most decision making, including slating which Marsh RICO Defendant would

win each layer of its customers' insurance. Marsh also established the target prices at which each policy would be placed. When necessary, Marsh solicited false B bids or sham declinations to give the fictitious appearance of competition. Marsh monitored and policed the conspiracy and occasionally disciplined or threatened to discipline other Marsh RICO Defendants that stepped out of line. While Marsh was the primary decision maker, it occasionally accepted feedback from the other Marsh RICO Defendants.

474.    As set forth in this complaint, Ace, Chubb, CNA, Hartford, Fireman's Fund, Liberty, St. Paul/Travelers, XL and Zurich—as well as other, unnamed co-conspirators—were insurers that participated in the conspiracy. Their role in the conspiracy consisted of (a) refraining from providing quotations for the business of Marsh's customers unless told to do so by Marsh, (b) providing quotations at or near Marsh's the target price selected by Marsh on business Marsh allocated to the carrier, (c) providing false B bids or sham declinations when requested by Marsh on accounts that Marsh had allocated to other conspiring insurers, (d) providing Marsh with significant contingent commission kickbacks and other payments, (e) illicitly providing Marsh with straight commissions on flat-fee accounts, and (f) secreting the existence of the conspiracy, including obscuring the true nature and extent of the contingent commission kickbacks and other payments.

475.    The enterprise was an ongoing organization engaging in activities that were within the flow of, and substantially affected, interstate commerce.

476.    The enterprise began in the mid- to late-1990s, although it continued became more defined and organized over time and, by 2001, had a very well defined and organized structure. The enterprise existed for several years, ending only in

2004 after the Marsh RICO Defendants learned of investigations launched by state attorneys general.

477.    As set forth in this complaint, the Marsh RICO Defendants committed at least two acts of racketeering activity within a ten year period, including numerous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343 in furtherance of the conspiracy.  For example, as set forth in this complaint and in furtherance of the scheme, Marsh used wire and mail:

   a)    to distribute the broking plans to insurers;

   b)    to solicit false B bids and sham declinations from insurers;

   c)    to obtain insurers' agreements to join the conspiracy;

   d)    to ensure that its personnel and its co-conspirators were secreting the contingent commission kickbacks and other payments;

   e)    to inform insurers of the amount of contingent commission kickbacks and other payments they owed;

   f)    to seek insurers' assistance in deceiving the Plaintiffs as to the existence of commissions payable to Marsh on the Plaintiffs' policies;

   g)    to communicate with the Plaintiffs to recommend the policies at inflated prices;

   h)    to mislead the Plaintiffs into believing competition had occurred for their insurance policies;

   i)    to mislead the Plaintiffs as to the amount of straight commissions, contingent commission kickbacks and other payments the insurers had or would make on the Plaintiffs' policies; and

   j)    to place Insurance Products with the Plaintiffs at inflated prices.

Marsh undertook these communications as part of its intentional scheme to defraud the Plaintiffs, and its other customers.  The communications either contained material misrepresentations, or the omission or concealment of material facts, or were in furtherance of them.  The communications were reasonably calculated to deceive the Plaintiffs, and Marsh's other customers, and did, in fact, deceive them.

478.    Likewise, as set forth in this complaint and in furtherance of the scheme, the Marsh RICO Defendants who were insurers used wire and mail:

a)      to respond to the broking plans with inflated bids;

b)      to provide false B bids and sham declinations;

c)       to agree to join the conspiracy;

d)      to agree (and sometimes disagree) with Marsh on the amount of the contingent commission kickbacks and other payments they owed;

e)      to ensure that its personnel were secreting the contingent commission kickbacks and other payments;

f)      to provide bids and quotations designed to deceive the Plaintiffs as to the existence of commissions payable to Marsh on the Plaintiffs' policies; and

g)      to provide Insurance Products at inflated prices to the Plaintiffs.

The Marsh RICO Defendants who were insurers undertook these communications as part of their intentional scheme to defraud the Plaintiffs, and Marsh's other customers. The communications either contained material misrepresentations, or the omission or concealment of material facts, or were in furtherance of them. The communications were reasonably calculated to deceive the Plaintiffs, and Marsh's other customers, and did, in fact, deceive them.

479.    The Marsh RICO Defendants also aided and abetted each other in acts of mail and wire fraud in violation of 18 U.S.C. § 2. These violations constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).

480.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including the Plaintiffs. For example, as alleged in this complaint, Marsh made misrepresentations in materials it disseminated by mail and wire wherein it routinely represented that it would act in the best interests of its

customers, including the Plaintiffs, in providing unbiased advice and assistance in

selecting and placing Insurance Products and that it would act as a fiduciary of its

customers, including the Plaintiffs, negotiating and placing insurance on the best terms

possible and at the best price available. All of the Marsh RICO Defendants also

knowingly and intentionally concealed facts material to the conspiracy, including the

facts that would reveal Marsh was allocating its customers' business in order to maximize

the profits of the Marsh RICO Defendants and Marsh was not acting in the best interests

of its customers, including the Plaintiffs. Furthermore, the insurers in the conspiracy

occasionally provided B bids and sham declinations by mail or wire to assist Marsh in

keeping the conspiracy secret.

481.    As described in the complaint, Marsh, Ace, Chubb, CNA,

Hartford, Fireman's Fund, Liberty, St. Paul/Travelers, XL and Zurich, and their co-

conspirators, overtly participated in the pattern of racketeering activity and took acts in

furtherance of the conspiracy.

482.    Each of the Plaintiffs is a "person" within the meaning of 18

U.S.C. § 1961(3).

483.    During and throughout the period of the conspiracy alleged in this

complaint, the Plaintiffs purchased Insurance Products from Ace, Chubb, CNA, Hartford,

Fireman's Fund, Liberty, St. Paul/Travelers, XL and Zurich (or their subsidiaries or

controlled affiliates) and their co-conspirators at inflated and supra-competitive prices.

As a result, the Plaintiffs have been injured in their business or property by the Marsh

RICO Defendants' overt acts of mail and wire fraud and by their aiding and abetting

others to commit such acts.

136

WHEREFORE, the Plaintiffs demand judgment against Marsh, Ace, Chubb, CNA, Hartford, Fireman's Fund, Liberty, St. Paul/Travelers, XL and Zurich, jointly and severally, as follows:

A.      For damages caused by the Marsh RICO Defendants' violation of 18 U.S.C. §§ 1962(c);

B.      For damages caused by the Marsh RICO Defendants' violation of 18 U.S.C. § 1962(d);

C.      For treble damages;

D.      Directing that the Marsh RICO Defendants pay the Plaintiffs' costs, including attorneys' fees as provided by law;

E.      Directing such other equitable relief as may be necessary to redress illegal conduct; and

F.      Granting such other and further relief as may be just and proper.

**COUNT V**
**Multiple Bilateral Conspiracies Between Marsh and Each of the Insurer Defendants**
**in Violation of the RICO Act, 18 U.S.C. §§ 1962(c) & (d),**
**Against Marsh and Each of the Insurer Defendants**
**(By All Plaintiffs)**

484.    The Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 483.

485.    The Plaintiffs allege a violation of 18 U.S.C. § 1962(c) against Marsh and each of the Insurer Defendants for conducting or participating in multiple criminal enterprises through a pattern of racketeering activity.  The Plaintiffs also allege that Marsh and the Insurer Defendants each agreed to participate in the unlawful operation of the enterprises to increase commissions and premiums and allocate customers is a violation of 18 U.S.C. § 1962(d).

137

486.    Marsh coordinated a "pay to play" scheme in which the insurers agreed to provide Marsh contingent commission kickbacks and other payments in exchange for allocating a portion of the business of Marsh's customers to them.  The insurers involved in the scheme were aware that Marsh had entered similar arrangements with their so-called competitors.  The Insurer Defendants each agreed with Marsh to participate in the pay to play scheme.

487.    Marsh and each Insurer Defendant formed a separate association-in-fact enterprise that provided Insurance Products to Marsh's customers sufficient to meet the customers' commercial insurance needs.  Each enterprise was had a bilateral structure, with Marsh acting as the leader and coordinating which business the carrier would receive.  Each of the Insurer Defendants knew of the existence and participation of the others in similar enterprises, although they may not have communicated directly with the members of the other bilateral enterprises about their scheme.

488.    The purpose of each enterprise was to maximize the participants' profits by eliminating competition in the market for Insured Products, as described in this complaint.

489.    As described in this complaint, Marsh coordinated each bilateral enterprise and made most of the decisions for that enterprise, including slating which Insurer Defendant would win each layer of its customers' insurance.  As the broker, Marsh had the ability to prevent any insurers from bidding on the insurance for Marsh's customers and could steer its customers toward any carrier it chose.

490.    Each Insurer Defendant participated in an enterprise with Marsh by agreeing to pay Marsh "contingent commission" kickbacks and other payments in

exchange for allocating a portion of the business of Marsh's customers to it. Each Insurer Defendant also knew that it would face little or no competition for the business that Marsh steered toward it. Each Insurer Defendant received significant insurance premiums from the Plaintiffs during the relevant time period, with most receiving well over $1 million in the Plaintiffs' premiums during the relevant time period.

491.    Each bilateral Marsh enterprise was an ongoing organization engaging in activities that were within the flow of, and substantially affected, interstate commerce.

492.    The bilateral enterprises began in the mid- to late-1990s and continued in existence for several years, ending only in 2004 after Marsh and the Insurer Defendants learned of investigations launched by state attorneys general.

493.    As set forth in this complaint, the participants in each of the bilateral enterprises committed at least two acts of racketeering activity within a ten year period, including numerous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343 in furtherance of the enterprise's conspiracy. For example, as set forth in this complaint and in furtherance of the scheme, Marsh used wire and mail:

   a)    to obtain insurers' agreements to join the conspiracy;

   b)    to inform insurers of the amount of contingent commission kickbacks and other payments they owed;

   c)    to seek insurers' assistance in deceiving the Plaintiffs as to the existence of commissions payable to Marsh on the Plaintiffs' policies;

   d)    to ensure that its personnel and its co-conspirators were secreting the contingent commission kickbacks and other payments;

   e)    to communicate with the Plaintiffs to recommend the policies at inflated prices;

   f)    to mislead the Plaintiffs into believing competition had occurred for their insurance policies;

139

g)      to mislead the Plaintiffs as to the amount of straight commissions, contingent commission kickbacks and other payments the insurers had or would make on the Plaintiffs' policies; and

h)      to place Insurance Products with the Plaintiffs at inflated prices.

Marsh undertook these communications as part of its intentional scheme to defraud the Plaintiffs, and its other customers.  The communications either contained material misrepresentations, or the omission or concealment of material facts, or were in furtherance of them.  The communications were reasonably calculated to deceive the Plaintiffs, and Marsh's other customers, and did, in fact, deceive them.

494.    Likewise, as set forth in this complaint and in furtherance of the scheme, the Insurer Defendants used wire and mail:

a)      to agree with Marsh on the amount of the contingent commission kickbacks and other payments they owed;

b)      to ensure that its personnel were secreting the contingent commission kickbacks and other payments;

c)      to provide bids and quotations designed to deceive the Plaintiffs as to the existence of commissions payable to Marsh on the Plaintiffs' policies; and

d)      to provide Insurance Products at inflated prices to the Plaintiffs.

The Insurer Defendants undertook these communications as part of their intentional scheme to defraud the Plaintiffs, and Marsh's other customers.  The communications either contained material misrepresentations, or the omission or concealment of material facts, or were in furtherance of them.  The communications were reasonably calculated to deceive the Plaintiffs, and Marsh's other customers, and did, in fact, deceive them.

495.    Marsh, on the one hand, and each Insurer Defendant, on the other, also aided and abetted each other in acts of mail and wire fraud in violation of 18 U.S.C. § 2.  These violations constitute patterns of racketeering activity as defined in 18 U.S.C. § 1961(5).

140

496.    Each enterprise's acts of racketeering activity were related, had a similar purpose, involved the same two participants and method of commission, had similar results, and impacted similar victims, including the Plaintiffs.  For example, as alleged in this complaint, Marsh made misrepresentations in materials it disseminated by mail and wire wherein it routinely represented that it would act in the best interests of its customers, including the Plaintiffs, in providing unbiased advice and assistance in selecting and placing Insurance Products and that it would act as a fiduciary of its customers, including the Plaintiffs, negotiating and placing insurance on the best terms possible and at the best price available.  Marsh and each of the Insurer Defendants also knowingly and intentionally concealed facts material to each of their conspiracies, including the facts that would reveal Marsh was allocating its customers business in order to maximize their profits and Marsh was not acting in the best interests of its customers, including the Plaintiffs.  Furthermore, the Insurer Defendants each assisted Marsh in keeping their conspiracy secret.

497.    As described in the complaint, the Insurer Defendants, and their co-conspirators, overtly participated in the pattern of racketeering activity and took acts in furtherance of the conspiracy.

498.    Each of the Plaintiffs a "person" within the meaning of 18 U.S.C. § 1961(3).

499.    During and throughout the period of the conspiracies alleged in this complaint, the Plaintiffs purchased Insurance Products from the Insurer Defendants (or their subsidiaries or controlled affiliates) at inflated and supra-competitive prices.  As a result, the Plaintiffs have been injured in their business or property by Marsh's and the

PageID: 49885

Insurer Defendants' overt acts of mail and wire fraud and by their aiding and abetting others to commit such acts.

WHEREFORE, the Plaintiffs demand judgment against Marsh and the Insurer Defendants, jointly and severally as between Marsh and each insurer, as follows:

A.      For damages caused by the Marsh's and the Insurer Defendants' violation of 18 U.S.C. § 1962(d);

B.      For treble damages;

C.      Directing that Marsh and the Insurer Defendants pay the Plaintiffs' costs, including attorneys' fees as provided by law;

D.      Directing such other equitable relief as may be necessary to redress illegal conduct; and

E.      Granting such other and further relief as may be just and proper.

**COUNT VI**
**Nine Bilateral Conspiracies Between Aon and Certain Insurer Defendants**
**in Violation of the RICO Act, 18 U.S.C. §§ 1962(c) & (d),**
**Against Aon, Ace, Arch, AWAC, Chubb, CNA, Hartford, Liberty, XL, and Zurich**
**(By NCW)**

500.     NCW restates and incorporates by reference as if fully set forth herein paragraphs 1 through 499.

501.     NCW alleges a violation of 18 U.S.C. § 1962(c) against Aon and Ace, Arch, AWAC, Chubb, CNA, Hartford, Liberty, XL and Zurich (these insurers were previously defined as the "Aon Insurer Defendants") for conducting or participating in twelve criminal enterprises through a pattern of racketeering activity. NCW also alleges that Aon and the Aon Insurer Defendants each agreed to participate in the unlawful operation of the enterprises to increase commissions and premiums and allocate customers is a violation of 18 U.S.C. § 1962(d).

502.    Aon coordinated a "pay to play" scheme in which the insurers agreed to provide Aon contingent commission kickbacks and other payments in exchange for allocating a portion of the business of Aon's customers to them.  The insurers involved in the scheme were aware that Aon had entered similar arrangements with their so-called competitors.  The Aon Insurer Defendants each agreed with Aon to participate in the pay to play scheme.

503.    Aon and each Aon Insurer Defendant formed a separate association-in-fact enterprise that provided Insurance Products to Aon's customers sufficient to meet the customers' commercial insurance needs.  Each enterprise was had a bilateral structure, with Aon acting as the leader and coordinating which business the carrier would receive.  Each of the Aon Insurer Defendants knew of the existence and participation of the others in similar enterprises, although they may not have communicated directly with the members of the other bilateral enterprises about their scheme.

504.    The purpose of each enterprise was to maximize the participants' profits by eliminating competition in the market for Insured Products, as described in this complaint.

505.    As described in this complaint, Aon coordinated each bilateral enterprise and made most of the decisions for that enterprise, including slating which Aon Insurer Defendant would win each layer of its customers' insurance.  As the broker, Aon had the ability to prevent any insurers from bidding on the insurance for Aon's customers and could steer its customers toward any carrier it chose.

506.     Each Aon Insurer Defendant participated in an enterprise with Aon by agreeing to pay Aon "contingent commission" kickbacks and other payments in exchange for allocating a portion of the business of Aon's customers to it.  Aon Insurer Defendant also knew that it would face little or no competition for the business that Aon steered toward it.  Each Aon Insurer Defendant received significant sums in insurance premiums from NCW during the relevant time period, with most receiving well over $1 million in NCW's premiums during the relevant time period.

507.     Each bilateral Aon enterprise was an ongoing organization engaging in activities that were within the flow of, and substantially affected, interstate commerce.

508.     The bilateral enterprises began in the mid- to late-1990s and continued in existence for several years, ending only in 2004 after Aon and the Aon Insurer Defendants learned of investigations launched by state attorneys general.

509.     As set forth in this complaint, the participants in each of the bilateral enterprises committed at least two acts of racketeering activity within a ten year period, including numerous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343 in furtherance of the enterprise's conspiracy.  For example, as set forth in this complaint and in furtherance of the scheme, Aon used wire and mail:

a)     to obtain insurers' agreements to join the conspiracy;

b)     to inform insurers of the amount of contingent commission kickbacks and other payments they owed;

c)     to seek insurers' assistance in deceiving NCW as to the existence of commissions payable to Aon on the NCW's policies;

d)     to ensure that its personnel and its co-conspirators were secreting the contingent commission kickbacks and other payments;

e)     to communicate with NCW to recommend the policies at inflated prices;

144

f)      to mislead NCW into believing competition had occurred for its insurance policies;

g)      to mislead NCW as to the amount of straight commissions, contingent commission kickbacks and other payments the insurers had or would make on NCW's policies; and

h)      to place Insurance Products with NCW at inflated prices.

Aon undertook these communications as part of its intentional scheme to defraud NCW, and its other customers. The communications either contained material misrepresentations, or the omission or concealment of material facts, or were in furtherance of them. The communications were reasonably calculated to deceive NCW, and Aon's other customers, and did, in fact, deceive them.

510.      Likewise, as set forth in this complaint and in furtherance of the scheme, the Aon Insurer Defendants used wire and mail:

a)      to agree with Aon on the amount of the contingent commission kickbacks and other payments they owed;

b)      to ensure that its personnel were secreting the contingent commission kickbacks and other payments;

c)      to provide bids and quotations designed to deceive NCW as to the existence of commissions payable to Aon on NCW's policies; and

d)      to provide Insurance Products at inflated prices to NCW.

The Aon Insurer Defendants undertook these communications as part of their intentional scheme to defraud NCW, and Aon's other customers. The communications either contained material misrepresentations, or the omission or concealment of material facts, or were in furtherance of them. The communications were reasonably calculated to deceive NCW, and Aon's other customers, and did, in fact, deceive them.

511.      Aon, on the one hand, and each Aon Insurer Defendant, on the other, also aided and abetted each other in acts of mail and wire fraud in violation of 18

145

U.S.C. § 2.  These violations constitute patterns of racketeering activity as defined in 18

U.S.C. § 1961(5).

512.    Each enterprise's acts of racketeering activity were related, had a

similar purpose, involved the same two participants and method of commission, had

similar results, and impacted similar victims, including NCW.  For example, as alleged in

this complaint, Aon made misrepresentations in materials it disseminated by mail and

wire wherein it routinely represented that it would act in the best interests of its

customers, including NCW, in providing unbiased advice and assistance in selecting and

placing Insurance Products and that it would act as a fiduciary of its customers, including

NCW, negotiating and placing insurance on the best terms possible and at the best price

available.  Aon and each of the Aon Insurer Defendants also knowingly and intentionally

concealed facts material to each of their conspiracies, including the facts that would

reveal Aon was allocating its customers business in order to maximize their profits and

Aon was not acting in the best interests of its customers, including NCW.  Furthermore,

Aon and the Aon Insurer Defendant each assisted Aon in keeping their conspiracy secret.

513.    As described in the complaint, Ace, Arch, AWAC, Chubb, CNA,

Hartford, Liberty, XL and Zurich, and their co-conspirators, overtly participated in the

pattern of racketeering activity and took acts in furtherance of the conspiracy.

514.    NCW is a "person" within the meaning of 18 U.S.C. § 1961(3).

515.    During and throughout the period of the conspiracies alleged in

this complaint, NCW purchased Insurance Products from Ace, Arch, AWAC, Chubb,

CNA, Hartford, Liberty, XL and Zurich (or their subsidiaries or controlled affiliates) at

inflated and supra-competitive prices.  As a result, NCW has been injured in its business

or property by Aon's and the Aon Insurer Defendants' overt acts of mail and wire fraud and by their aiding and abetting others to commit such acts.

WHEREFORE, NCW demands judgment against Aon, Ace, Arch, AWAC, Chubb, CNA, Hartford, Liberty, XL and Zurich, jointly and severally as between Aon and each carrier, as follows:

A.    For damages caused by the Aon's and the Aon Insurer Defendants' violation of 18 U.S.C. § 1962(c);

B.    For damages caused by the Aon's and the Aon Insurer Defendants' violation of 18 U.S.C. § 1962(d);

C.    For treble damages;

D.    Directing that Aon and the Aon Insurer Defendants pay NCW's costs, including attorneys' fees as provided by law;

E.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

F.    Granting such other and further relief as may be just and proper.

## COUNT VII
### Breach of Fiduciary Duty Against Marsh
### (By All of the Plaintiffs)

516.    The Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 515.

517.    This claim is brought by the Plaintiffs against Marsh for breach of fiduciary duty.

518.    Marsh knowingly and willingly assumed a fiduciary responsibility to its customers, including the Plaintiffs.  As the broker for the Plaintiffs, Marsh acted as a representative, agent, and fiduciary.  The Plaintiffs reasonably relied on Marsh to

147

inform them of the best possible competitively determined price for the Insurance Products they sought to purchase, any compensation Marsh would receive for its services, and what expenses the Plaintiffs would incur.

519.    Marsh was in a confidential fiduciary relationship with the Plaintiffs and owed the Plaintiffs the highest duties of due care, loyalty, honesty, and good faith and fair dealing.  Marsh was obligated to refrain from favoring its own interests or those of its co-conspirators over and to the detriment of the Plaintiffs' interests.

520.    The Plaintiffs placed trust and confidence in Marsh to deal fairly with them and to employ due diligence in obtaining Insurance Products for them.

521.    Federal and/or state common law required Marsh to deal fairly with the Plaintiffs in the procurement of Insurance Products.

522.    As the broker for the Plaintiffs, acting as their representative, agent and fiduciary, Marsh had a duty to disclose material facts to the Plaintiffs that were relevant to the parties' relationships.  Marsh was obligated to fully disclose to the Plaintiffs the existence of customer allocation and bid rigging schemes, and contingent commission kickbacks and other payments made by insurers which were material facts relating to and affecting the subject matter of the parties' relationships and the procurement of Insurance Products.

523.    As the broker for the Plaintiffs, acting as their representative, agent and fiduciary, Marsh had a duty to remit to the Plaintiffs any undisclosed profit Marsh collected in connection with or because of the procurement of Insurance Products on behalf of the Plaintiffs.

148

524.    Marsh violated the trust of its customers, including the Plaintiffs. As alleged in this complaint, Marsh did not consider the best interests of its customers, including the Plaintiffs, in all placements of Insurance Products.  Marsh did not act as the disinterested advocate of its customers, including the Plaintiffs, in its brokerage and/or placement of Insurance Products.

525.    As alleged in this complaint, Marsh breached the fiduciary duties it owed to the Plaintiffs, including the duties of good faith, loyalty and trust, the duty to disclose material facts and the duty to remit undisclosed profits by, *inter alia*:

    a.    Entering into undisclosed agreements with insurers for significant "contingent commission" kickbacks and other payments, thereby knowingly creating an obvious conflict of interest;

    b.    Secretly profiting at the expense of the Plaintiffs;

    c.    Failing to disclose to the Plaintiffs the existence of agreements with insurers for the payment of significant "contingent commission" kickbacks and other payments relating to the brokerage and/or placement of the Plaintiffs' insurance by Marsh;

    d.    Failing to remit to the Plaintiffs the undisclosed profits collected in connection with or because of the procurement of Insurance Products on behalf of the Plaintiffs; and

    e.    Facilitating the Plaintiffs' procurement of more expensive Insurance Products and services than necessary for the purpose of secretly profiting.

526.    As a direct and proximate result of Marsh's wrongful conduct, the Plaintiffs have suffered damages because they paid more for their Insurance Products than they would have if Marsh had not violated its duties.

527.    By virtue of the foregoing, the Plaintiffs should be awarded damages in an amount to be determined at trial.

528.    As a result of the breach of fiduciary duties owed to them by the Marsh, the Plaintiffs are entitled to the disgorgement of all profits or benefits received by Marsh in "contingent commission" kickbacks and other undisclosed payments by insurers.  Furthermore, the Plaintiffs are entitled to the disgorgement of the fees they paid to Marsh for advising and assisting the Plaintiffs in selecting their insurance policies.

529.    Marsh's conduct was intentional, willful, wanton, and specifically intended to cause harm to the Plaintiffs, and justifies an award of punitive damages.

WHEREFORE, the Plaintiffs demand judgment against Marsh as follows:

A.    Directing that Marsh disgorge to the Plaintiffs all fees collected from any source whatsoever that relate in any way to Insurance Products purchased by the Plaintiffs, including all fees paid by the Plaintiffs to Marsh and "contingent commission" kickbacks and other payments Marsh received from insurers on such placements;

B.    Directing that Marsh pay all restitution and damages caused, directly or indirectly, by its breaches of the fiduciary duty;

C.    Directing that the Marsh pay the Plaintiffs' costs;

D.    Awarding punitive damages against Marsh;

E.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

F.    Granting such other and further relief as may be just and proper.

## COUNT VIII
### Breach of Fiduciary Duty Against Aon
### (By NCW)

530.    NCW restates and incorporates by reference as if fully set forth herein paragraphs 1 through 529.

531.    This claim is brought by NCW against Aon for breach of fiduciary duty.

532.    Aon knowingly and willingly assumed a fiduciary responsibility to its customers, including NCW.  As broker for NCW, Aon acted as a representative, agent, and fiduciary.  NCW reasonably relied on Aon to inform it of the best possible competitively determined price for the Insurance Products it sought to purchase, any compensation Aon would receive for its services, and what expenses NCW would incur.

533.    Aon was in a confidential fiduciary relationship with NCW and owed NCW the highest duties of due care, loyalty, honesty, and good faith and fair dealing.  Aon was obligated to refrain from favoring its own interests or those of its co-conspirators over and to the detriment of NCW's interests.

534.    NCW placed trust and confidence in Aon to deal fairly with it and to employ due diligence in obtaining Insurance Products for it.

535.    Federal and/or State common law required Aon to deal fairly with NCW in the procurement of Insurance Products.

536.    As the broker for NCW, acting as its representative, agent and fiduciary, Aon had a duty to disclose material facts to NCW that were relevant to the parties' relationships.  Aon was obligated to fully disclose to NCW the existence of contingent fee kickbacks and other payments made by insurers which were material facts relating to and affecting the subject matter of the parties' relationships and the procurement of Insurance Products.

537.    As the broker for NCW, acting as its representative, agent and fiduciary, Aon had a duty to remit to NCW any undisclosed profit Aon collected in connection with or because of the procurement of Insurance Products on behalf of NCW.

538.    Aon violated the trust of its customers, including NCW.  As alleged in this complaint, Aon did not consider the best interests of its customers, including NCW, in all placements of Insurance Products.  Aon did not act as the disinterested advocate of its customers, including NCW, in its brokerage and/or placement of Insurance Products.

539.    As alleged in this complaint, Aon breached fiduciary duties it owed to NCW, including the duties of good faith, loyalty and trust, the duty to disclose material facts and the duty to remit undisclosed profits by, *inter alia*:

a.    Entering into undisclosed agreements with insurers for significant "contingent commission" kickbacks and other payments, thereby knowingly creating an obvious conflict of interest;

b.    Secretly profiting at the expense of NCW;

c.    Failing to disclose to NCW the existence of agreements with insurers for the payment of significant "contingent commission" kickbacks and other payments relating to the brokerage and/or placement of NCW's insurance by Aon;

d.    Failing to remit to NCW the undisclosed profits collected in connection with or because of the procurement of Insurance Products on behalf of NCW; and

e.    Facilitating NCW's procurement of more expensive Insurance Products and services than necessary for the purpose of secretly profiting.

540.    As a direct and proximate result of Aon's wrongful conduct, NCW has suffered damages.

541.    By virtue of the foregoing, NCW should be awarded damages in an amount to be determined at trial.

542.    As a result of the breach of fiduciary duties owed to it by the Aon, NCW is entitled to the disgorgement of all profits or benefits received by Aon in contingent fee kickbacks and other undisclosed payments by insurers.  Furthermore, NCW is entitled to the disgorgement of the fees it paid to Aon for advising and assisting NCW in selecting its insurance policies.

543.    Aon's conduct was intentional, willful, wanton, and specifically intended to cause harm to NCW, and justifies an award of punitive damages.

WHEREFORE, NCW demands judgment against Aon as follows:

A.    Directing that Aon disgorge to NCW all fees collected from any source whatsoever that relate in any way to Insurance Products purchased by NCW, including all fees paid by NCW to Aon and "contingent commission" kickbacks and other payments Aon received from insurers on such placements;

B.    Directing that Aon pay all restitution and damages caused, directly or indirectly, by its breaches of the fiduciary duty;

C.    Directing that the Aon pay to NCW's costs;

D.    Awarding punitive damages against Aon;

E.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

F.    Granting such other and further relief as may be just and proper.

## COUNT IX
## Inducement of Breach Fiduciary Duty Against the Insurer Defendants
## <u>(By All of the Plaintiffs)</u>

544.    The Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 543.

545.    This claim is brought by the Plaintiffs against the Insurer Defendants for inducement of breach of fiduciary duties owed to the Plaintiffs by Marsh and Aon (the "Broker Defendants").

546.    As alleged in this complaint, a fiduciary relationship existed between each Broker Defendant, on the one hand, and each of the Plaintiffs, on the other. The Insurer Defendants were aware of these relationships.

547.    The Broker Defendants breached these fiduciary duties as described in this complaint.

548.    The Insurer Defendants knowingly participated in and/or induced that breach by, among other things, engaging in the conspiratorial conduct described in this complaint.  These acts were not privileged.

549.    The Plaintiffs have suffered damages proximately caused by the Insurer Defendants' participation in and inducement of the Broker Defendants' breaches of fiduciary duties to the Plaintiffs.

550.    The Insurer Defendants' conduct was intentional, willful, wanton and justifies an award of punitive damages.

WHEREFORE, the Plaintiffs demand judgment against the Insurer Defendants as follows:

154

A.      Directing that the Insurer Defendants to pay all restitution and damages caused, directly or indirectly, by the participation in and inducement of the Broker Defendants' breaches of fiduciary duties;

B.      Directing that the Insurer Defendants disgorge all profits they obtained on account of the Plaintiffs' business, including all policyholder premiums collected on account of the Plaintiffs' purchase of Insurance Products from the Insurer Defendants;

C.      Directing that the Insurer Defendants pay the Plaintiffs' costs;

D.      Awarding punitive damages against the Insurer Defendants;

E.      Directing such other equitable relief as may be necessary to redress illegal conduct; and

F.      Granting such other and further relief as may be just and proper.

**COUNT X**
**Breach of Contract Against Marsh**
**(By All of the Plaintiffs)**

551.    The Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 550.

552.    This claim is brought by the Plaintiffs against Marsh for breach of its contractual duties to the Plaintiffs.

553.    As alleged in this complaint, Marsh undertook contractual obligations to represent the Plaintiffs' interests in recommending Insurance Products to the Plaintiffs and in negotiating with the insurers on behalf of the Plaintiffs.  Moreover, Marsh agreed to "[u]se its best efforts to place insurance on behalf of" the Plaintiffs.

554.    Marsh also agreed to recommend and assist in placing certain insurance product lines for the Plaintiffs for a flat fee and promised that it would not

155

accept commissions on these lines—or, to the extent it did, that it would credit the

commissions to the Plaintiffs.  Marsh further promised to disclose any commissions that

it received relating to the Plaintiffs' accounts.

> 555.    Marsh's contractual obligations are informed by the implied

covenant of good faith and fair dealing.

> 556.    As alleged in this complaint, Marsh violated its contractual

obligations to the Plaintiffs by, *inter alia*:

> > a.    Failing to represent the Plaintiffs' best interests in dealing with the insurers, including failing to seek the best prices for Insurance Products;
> >
> > b.    Failing to use its best efforts to place insurance on the Plaintiffs' behalf;
> >
> > c.    Failing to disclose to the Plaintiffs the existence of significant "contingent commission" kickbacks and other payments relating to the brokerage and/or placement of the Plaintiffs' insurance by Marsh;
> >
> > d.    Failing to disclose to the Plaintiffs the existence of straight commissions on the Plaintiffs' fee-only accounts; and
> >
> > e.    Accepting, or failing to remit to the Plaintiffs, straight commissions, "contingent commission" kickbacks and other payments received for insurance placements on the Plaintiffs' fee-only accounts.

> 557.    As a direct and proximate result of Marsh's wrongful conduct, the

Plaintiffs have suffered damages because they paid more for their Insurance Products

than they would have if Marsh had not violated its contractual duties.

> 558.    By virtue of the foregoing, the Plaintiffs should be awarded

damages in an amount to be determined at trial.

> 559.    As a result of the breach of contractual duties owed to them by

Marsh, the Plaintiffs are entitled to damages equal to the difference in what they did pay

for Insurance Products and they would have paid for the same Insurance Products if Marsh had fulfilled its contractual obligations. Furthermore, the Plaintiffs are also entitled to an amount equal to all straight commissions, "contingent commission" kickbacks and other payments that Marsh received from insurers relating to the placement of the Plaintiffs' insurance on their fee-only accounts.

WHEREFORE, the Plaintiffs demand judgment against Marsh as follows:

A.    Directing that Marsh pay damages caused, directly or indirectly, by its breaches of the contract;

B.    Directing that Marsh pay to the Plaintiffs' costs; and

C.    Granting such other and further relief as may be just and proper.

## COUNT XI
## Breach of Contract Against Aon
## (By NCW)

560.    NCW restates and incorporates by reference as if fully set forth herein paragraphs 1 through 559.

561.    This claim is brought by NCW against Aon for breach of its contractual duties to NCW.

562.    As alleged in this complaint, Aon undertook contractual obligations to act in NCW's best interests in negotiating and recommending Insurance Products, that it would disclose its compensation to NCW and, on certain product lines, that it would not accept payment from the insurers for placing NCW's insurance policies.

563.    Aon's contractual obligations are informed by the implied covenant of good faith and fair dealing.

157

564.     As alleged in this complaint, Aon violated its contractual

obligations to NCW by, *inter alia*:

      a.    Failing to represent the NCW's best interests in dealing with the insurers, including failing to seek the best prices for Insurance Products;

      b.    Failing to use its best efforts to place insurance on NCW's behalf;

      c.    Failing to disclose to NCW the existence of significant "contingent commission" kickbacks and other payments relating to the brokerage and/or placement of NCW's insurance by Aon;

      d.    Failing to disclose to NCW the existence of straight commissions on NCW's fee-only accounts; and

      e.    Accepting, or failing to remit to NCW, straight commissions, "contingent commission" kickbacks and other payments received for insurance placements on NCW's fee-only accounts.

565.     As a direct and proximate result of Aon's wrongful conduct, NCW has suffered damages because it paid more for its Insurance Products than it would have if Aon had not violated its contractual duties.

566.     By virtue of the foregoing, NCW should be awarded damages in an amount to be determined at trial.

567.     As a result of the breach of contractual duties owed to it by Aon, NCW is entitled to damages equal to the difference in what it did pay for Insurance Products and would it would have paid for the same Insurance Products if Aon had fulfilled its contractual obligations.  Furthermore, NCW is also entitled to an amount equal to all straight commissions, contingent commission kickbacks and other payments that Aon received from insurers relating to the placement of the NCW's insurance on its fee-only accounts.

WHEREFORE, NCW demands judgment against Aon as follows:

158

      A.     Directing that Aon pay damages caused, directly or indirectly, by its breaches of contract;

      B.     Directing that Aon pay NCW's costs; and

      C.     Granting such other and further relief as may be just and proper.

### COUNT XII
### Tortious Interference with Contract Against the Insurer Defendants
### (By All of the Plaintiffs)

568.    The Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 567.

569.    This claim is brought by the Plaintiffs against the Insurer Defendants for tortiously interfering with contractual duties owed to the Plaintiffs by Marsh and Aon (the "Broker Defendants").

570.    As alleged in this complaint, each Broker Defendant owed contractual duties to each of the Plaintiffs, including contractual obligations to act in the Plaintiffs' best interests in negotiating and recommending Insurance Products, to disclose the Broker Defendant's compensation to the Plaintiffs and, on certain product lines, to not accept payments from the insurers for placing the Plaintiffs' insurance policies.

571.    The Insurer Defendants were aware of the Broker Defendants' contractual obligations.

572.    The Insurer Defendants willfully and maliciously interfered with the Broker Defendants' contractual obligations to the Plaintiffs by, *inter alia*:

      a.     offering and paying significant kickbacks and other payments to the Broker Defendants in exchange for allocating the Plaintiffs' policies to the Insurer Defendants;

      b.     assisting the Broker Defendants in secreting these kickbacks and other payments; and

c.      paying the Broker Defendants straight commissions on the
Plaintiffs' fee-only accounts and assisting the Broker Defendants
in hiding such payments from the Plaintiffs;

573.    The Broker Defendants breached their contractual obligations to
the Plaintiffs due to the Insurer Defendants willful and malicious actions.

574.    The Plaintiffs have suffered damages proximately caused by the
Insurer Defendants' participation in and inducement of the Broker Defendants' breaches
of contractual duties to the Plaintiffs.

575.    The Insurer Defendants' conduct was intentional, willful, wanton
and justifies an award of punitive damages.

WHEREFORE, the Plaintiffs demand judgment against the Insurer
Defendants as follows:

A.      Directing that the Insurer Defendants pay damages caused, directly
or indirectly, by the Broker Defendants breaches of contract;

B.      Directing that the Insurer Defendants pay the Plaintiffs' costs;

C.      Awarding punitive damages against the Insurer Defendants;

D.      Directing such other equitable relief as may be necessary to redress
illegal conduct; and

E.      Granting such other and further relief as may be just and proper.

## COUNT XIII
### Tortious Interference with Prospective Business Relations Against
### the Broker Defendants
### (By All of the Plaintiffs)

576.    The Plaintiffs restate and incorporate by reference as if fully set
forth herein paragraphs 1 through 575.

577.    This claim is brought by the Plaintiffs against the Broker Defendants for tortiously interfering with prospective business relations that the Plaintiffs would have enjoyed with insurers.

578.    As alleged in this complaint, the Plaintiffs had a reasonable expectation of entering into a valid business relationship with competitive insurers upon the insurers' submission of competitive bids.  With the knowledge and understanding of the Plaintiffs' expectations, the Broker Defendants wrongfully interfered with the Plaintiffs' prospective business relations.

579.    As alleged in this complaint, the Broker Defendants interfered by engaging in wrongful acts that caused the insurers not to enter into competitive insurance contracts with the Plaintiffs.  The Broker Defendants knew their acts would harm the Plaintiffs.  As a result of this interference, the Plaintiffs suffered harm.

WHEREFORE, the Plaintiffs demand judgment against the Broker Defendants as follows:

A.    Directing that the Broker Defendants pay damages caused, directly or indirectly, by the failure of insurers to enter into competitive insurance contracts with the Plaintiffs;

B.    Directing that the Brokers Defendants pay the Plaintiffs' costs;

C.    Awarding punitive damages against the Broker Insurer;

D.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

E.    Granting such other and further relief as may be just and proper.

161

**COUNT XIV**
**Unjust Enrichment Against All Defendants**
**(By All of the Plaintiffs)**

580.    The Plaintiffs restate and incorporate by reference as if fully set

forth herein paragraphs 1 through 579.

581.    As alleged in this complaint, the Plaintiffs conferred a financial

benefit upon the Broker Defendants as a result of the Plaintiffs' purchasing Insurance

Products from the Broker Defendants.  This benefit not only consisted of the fees that

they paid to the Broker Defendants for their services, but also the additional kickbacks

and other payments that the Broker Defendants were able to receive from the Insurer

Defendants with which the Broker Defendants had kickback agreements.

582.    As alleged in this complaint, the Plaintiffs conferred a financial

benefit upon the Insurer Defendants as a result of their purchasing of the Insurer

Defendants' Insurance Products.  This benefit not only consists of the premiums they

paid to the Insurer Defendants for Insurance Products, but also amounts consisting of

inflated premiums over and above what the Plaintiffs would have paid, and on terms less

favorable than would have been available, in a competitive market.

583.    The Broker Defendants have been financially enriched by the

brokerage fees received from Plaintiffs and by the kickbacks and other payments received

from the Insurer Defendants for providing those insurers' Insurance Products to the

Plaintiffs.

584.    The Insurer Defendants have been financially enriched by the

excessive premiums received from the Plaintiffs.

585.    The Defendants obtained this financial enrichment to the detriment

and at the expense of the Plaintiffs.  As a result of the Defendants' wrongful conduct, the

Plaintiffs paid more for Insurance Products than they would have otherwise had to pay and/or received less beneficial Insurance Products.

586.    Allowing the Defendants to retain the payments and proceeds that they derived and received, indirectly or directly, from the wrongful described in this complaint would offend equity and good conscience.

587.    The Defendants unjustly enriched themselves and deprived policyholders, including the Plaintiffs, of a fair marketplace for Insurance Products.

WHEREFORE, the Plaintiffs demand judgment against the Defendants as follows:

A.    Directing that the Defendants disgorge all profits obtained, including fees collected, and pay all restitution and damages caused, directly or indirectly, by their wrongful acts;

B.    Directing such other equitable relief as may be necessary to redress wrongful conduct; and

C.    Granting such other and further relief as may be just and proper.

## COUNT XV
### Common Law Fraud Against the Broker Defendants
### (By All of the Plaintiffs)

588.    The Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 587.

589.    As alleged in the complaint, the Broker Defendants had a duty to fully disclose to the Plaintiffs the facts concerning the services provided by the Broker Defendants to the Plaintiffs.

590.    In fact, the Broker Defendants concealed and omitted material facts concerning their participation in their illegal schemes described in this complaint.

163

In addition, the Broker Defendants affirmatively misrepresented material facts

concerning their conduct.

591.    As alleged in this complaint, the Broker Defendants falsely

represented, *inter alia*, that:

a.    The Broker Defendants were securing the best coverage for Plaintiffs at the best price when, in fact, they did not;

b.    The Broker Defendants would act in the best interests of the Plaintiffs when, in fact, they did not;

c.    The Broker Defendants would be remunerated solely for their service either through a flat fee paid by the client or disclosed commissions paid by the Insurer Defendants when, in fact, they received significant additional, undisclosed compensation for other sources;

d.    The Broker Defendants would act as a fiduciary solely for the Plaintiffs' interests when, in fact, they would not;

e.    The Insurer Defendants' Insurance Products had been recommended to the Plaintiffs based solely on the products' price and quality, in fact, they had not been; and

f.    The Plaintiffs would receive a competitively determined price for an array of Insurance Products when, in fact, little or no competition occurred.

592.    The Broker Defendants' silence in failing to inform the Plaintiffs

of the material omissions and misrepresentations of facts were intended by the Broker

Defendants to induce, and did in fact induce, the Plaintiffs to reasonably rely on the

material omissions and misrepresentations of material facts.

593.    The Broker Defendants knew that their false communications and

material omissions would induce reliance by the Plaintiffs.

594.    The Plaintiffs reasonably and justifiably relied on the

misrepresentations and omissions of the Broker Defendants.  Had the Plaintiffs known of

164

the Broker Defendants' illegal conduct and the misrepresentations and omissions, they would not have purchased their Insurance Products through the Broker Defendants.

595.    Such reliance was to the detriment of the Plaintiffs and proximately caused damage to the Plaintiffs.

596.    The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under the law of the State of Arkansas.

597.    The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under the law of the State of Georgia.

598.    The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under the law of the State of Iowa.

599.    The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under the law of the State of Nebraska.

600.    The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under the law of the State of New Jersey.

601.    The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under the law of the State of South Dakota.

602.    The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under the law of the State of Texas.

603.    The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under the law of the State of Washington.

604.    The Broker Defendants' conduct was intentional, willful, wanton, and specifically intended to cause harm to the Plaintiffs, and justifies an award of punitive damages.

WHEREFORE, the Plaintiffs demand judgment against the Broker Defendants, jointly and severally, as follows:

      A.      Awarding damages against the Broker Defendants;

      B.      Awarding punitive damages against the Broker Defendants;

      C.      Directing such other equitable relief as may be necessary to redress wrongful conduct complained of herein; and

      D.      Granting such other and further relief as may be just and proper.

## COUNT XVI
### Statutory and Consumer Fraud Against All Defendants
### (By All of the Plaintiffs)

605.    The Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 604.

606.    The Broker Defendants are providers of insurance brokerage services.

607.    The Insurer Defendants are providers of Insurance Products.

608.    The Plaintiffs are consumers of Insurance Products and insurance brokerage services.

609.    As alleged in this complaint, the Broker Defendants falsely represented, *inter alia*, that:

      a.      The Broker Defendants were securing the best coverage for the Plaintiffs at the best price when, in fact, they did not;

      b.      The Broker Defendants would act in the best interests of the Plaintiffs when, in fact, they did not;

      c.      The Broker Defendants would be remunerated solely for their service either through a flat fee paid by the client or disclosed commissions paid by the Insurer Defendants when, in fact, they received significant additional, undisclosed compensation for other sources;

166

d.  The Broker Defendants would act as a fiduciary solely for the Plaintiffs' interests when, in fact, they would not;

e.  The Insurer Defendants' Insurance Products had been recommended to the Plaintiffs based solely on the products' price and quality, in fact, they had not been; and

f.  The Plaintiffs would receive a competitively determined price for an array of Insurance Products when, in fact, little or no competition occurred.

610.  The Insurer Defendants had actual or constructive knowledge that the Broker Defendants were representing to the Plaintiffs that the bids, quotes, and terms of insurance for Insurance Products provided by the Insurer Defendants were in fact legitimate and not the product of the illegal and wrongful acts described above.

611.  The Insurer Defendants knowingly facilitated the misrepresentations and omissions by the Broker Defendants concerning the Insurance Products provided by the Insurer Defendants to the Plaintiffs.

612.  The Defendants' acts and practices, as alleged in this Complaint, constitute material misrepresentations and omissions.

613.  These misrepresentations and omissions were negligent or intentional.

614.  The Plaintiffs reasonably and justifiably relied on the Defendants' misrepresentations and omissions.

615.  These acts proximately caused damages to the Plaintiffs.

616.  The Defendants' acts and practices, as alleged in this complaint, are immoral, unethical, oppressive or unscrupulous and have caused substantial injury.

167

617.    The Defendants' acts or practices constitute consumer fraud or deceptive acts or practices in violation of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101 to 4-88-115.

618.    The Defendants' acts or practices constitute deceptive acts or practices in violation of the Georgia Unfair and Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370 to 10-1-375.

619.    The Defendants' acts or practices constitute consumer fraud or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601 to 59-1623.

620.    The Defendants' acts or practices constitute consumer fraud or deceptive acts or practices in violation of the New Jersey Unfair Trade Practices Act, N.J. Stat. Ann. § 56:8, *et seq*.

621.    The Defendants' acts or practices constitute consumer fraud or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practice and Consumer Protection, S.D. Codified Laws §§ 37-24-1 to 37-24-40.

622.    The Defendants' acts or practices constitute consumer fraud or deceptive acts or practices in violation of the Texas Deceptive Trade Practices - Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41 to 17.62.

623.    The Defendants' acts or practices constitute consumer fraud or deceptive acts or practices in violation of the Washington Consumer Protection Act, Wash. Ann. §§ 19.86.010 to 19.86.920.

624.    The conduct described herein entitles the Plaintiffs to an award of punitive damages.

WHEREFORE, the Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

A.      Enjoining and restraining the Defendants, their affiliates, assignees, subsidiaries, successors and transferees, their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from engaging in any conduct, conspiracy, contract, agreement, arrangement or combination, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

B.      Awarding the Plaintiffs damages caused, directly or indirectly, by their fraudulent and deceptive acts;

C.      Directing that the Defendants pay the Plaintiffs' costs, including attorneys' fees as provided by law;

D.      Awarding punitive damages against the Defendants;

E.      Awarding multiple damages to the Plaintiffs, as permitted by state law;

F.      Directing such other equitable relief as may be necessary to redress illegal conduct; and

G.      Granting such other and further relief as may be just and proper.

## COUNT XVII
### Civil Conspiracy Against All Defendants
### (By All of the Plaintiffs)

625.    The Plaintiffs restate and incorporate by reference as if fully set forth herein paragraphs 1 through 624.

626.    The Plaintiffs allege civil conspiracies against all of the Defendants.  One conspiracy is centered on Marsh; the other, on Aon.

627.    As described above, Marsh conspired with Ace, Chubb, CNA, Travelers, Zurich, XL, Fireman's Fund, Liberty, AWAC, Arch, Kemper, Hartford, and Certain Underwriters at Lloyd's.  Acting in concert or after a meeting of the minds, these Defendants purposefully engaged in conduct that was criminal, unlawful, wrongful, tortious, injurious, oppressive or immoral, or accomplished by criminal, unlawful, wrongful, tortious, oppressive or immoral acts, including the following: (1) allocating without competition the opportunities to sell, and the sale of, Insurance Products to customers; (2) creating a scheme to pay Marsh to organize, implement and police the unlawful conspiracy; (3) providing customers seeking to purchase Insurance Products, as well as Marsh's Customer Advisory Services, with collusive and non-competitive bids or other terms of sale to prevent discovery of the conspiracy; (4) secretly providing for compensation to Marsh for placing insurance on its customers' fee only accounts; and (5) engaging in a "pay to pay" scheme in which Marsh sold customers' business to conspiring insurers to maximize the kickbacks the insurers offered and without regard for the price or quality of the Insurance Product.

628.    As described above, Aon conspired with Ace, Arch, AWAC, Chubb, CNA, Hartford, Liberty, XL and Zurich (these insurers were previously defined as the "Aon Insurer Defendants").  Acting in concert or after a meeting of the minds, Aon and the Aon Insurer Defendants purposefully engaged in conduct that was criminal, unlawful, wrongful, tortious, injurious, oppressive or immoral, or accomplished by criminal, unlawful, wrongful, tortious, oppressive or immoral acts, including the

170

following: (1) engaging in a customer allocation scheme in which Aon assigned its customers' business to conspiring insurers without competition; (2) creating a scheme to pay Aon to organize, implement and police the unlawful conspiracy; (3) secretly providing for compensation to Aon for placing insurance on its customers' fee only accounts; and (4) engaging in a "pay to pay" scheme in which Aon sold customers' business to conspiring insurers to maximize the kickbacks the insurers offered and without regard for the price or quality of the insurance product.

629.    The Defendants in the Marsh-centered and Aon-centered conspiracies accomplished the objects of their respective conspiracies, which was to, among other things, increase their revenue by participating in a "pay to play" scheme, allocating customers, artificially inflating premiums for Insurance Products, secretly paying commissions on Insurance Products placed pursuant to annual fee-based brokerage agreements, and paying kickbacks to the Broker Defendants.

630.    The acts of the Marsh-centered conspiracy proximately caused damages to the Plaintiffs.

631.    The acts of the Aon-centered conspiracy proximately caused damages to NCW.

632.    The conduct described herein entitles the Plaintiffs to an award of punitive damages.

WHEREFORE, the Plaintiffs demand judgment against the Defendants, jointly and severally, as follows

A.    Awarding damages against the Defendants;

B.    Awarding punitive damages against the Defendants; and

171

C.      Granting such other and further relief as may be just and proper.

## SUSPENSION OF THE STATUTES OF LIMITATION
## DUE TO FRAUDULENT CONCEALMENT
## (BY ALL OF THE PLAINTIFFS)

633.     The Defendants engaged in successful, illegal, price-fixing and customer allocation conspiracies that, by their nature, were inherently self-concealing. Marsh, Ace, Chubb, CNA, Fireman's Fund, Liberty, St. Paul/Travelers, XL and Zurich also engaged in bid-rigging, which is also inherently self-concealing.

634.     Since the inherently self-concealing contracts, combinations or conspiracies were kept secret by the Defendants, the Plaintiffs were unaware of the anti-competitive and illegal agreements.

635.     The Plaintiffs had no knowledge prior to the announcement by the Attorney General of the State of New York on October 14, 2004, of the Defendants' unlawful self-concealing conspiracies.

636.     As described in this complaint, the illegal contracts, conspiracies, or combinations were fraudulently concealed by the Defendants by various means and methods, including, *inter alia*, secret meetings, minimization of written records, failure to disclose bid-rigging, price-fixing and customer allocations to clients and surreptitious communications between the Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records. The Defendants also agreed to keep their so-called "contingent commission" agreements secret and took affirmative steps to prevent policyholders, including the Plaintiffs, from learning the true scope and nature of the kickbacks and other payments by the Insurer Defendants to the Broker Defendants.

637.    In addition, certain of the Broker Defendants' former employees have admitted that they engaged in deception to hide the existence, nature, and effect of illegal conduct.  Marsh's policy of misleading clients about the payment and receipt of so-called "contingent commissions" came to light in the guilty plea of a former Marsh Managing Director, Mr. Bewlay, to a felony charge of scheming to defraud on February 14, 2005.  Mr. Bewlay's testimony revealed that Marsh established a procedure or a "protocol" intended to "discourage the client from obtaining an answer" about how Marsh received compensation from insurance companies.  Mr. Bewlay's testified:

> during my employment, I was made aware of a Marsh protocol designed to prevent Marsh's clients form obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client in addition to any fee or commission paid.  ***The protocol required multiple layers of inquiry to discourage the client from obtaining an answer.***  Also that all inquiries be channeled through a single Marsh employee who directed the answer to the inquiry.
>
> Finally, the percentage or ratio that Marsh used when it responded to a client's inquiry concerning placement service or PSA or MSA revenue significantly understated the amount of PSA or MSA revenue earned with respect to a particular client.  In my department, Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a particular client.
>
> When I was told that a client inquired as to the amount of PSA revenue Marsh earned from an insurance carrier, I responded that the Marsh employee follow Marsh's protocol, including that the client only speak to the Marsh employee designated to respond to such inquiries. (Emphasis added.)

638.    Mr. Bewlay similarly admitted in his plea agreement that he made misleading statements about the amount of compensation Marsh received from insurers. Mr. Bewlay's plea agreement states, in relevant part:

> From in and before 1999 through 2004, Mr. Bewlay engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property, namely insurance premiums,

173

commissions and fees, from ten or more persons, to wit, clients of Marsh,
by false and fraudulent pretenses, representations and promises, to wit,
misleading statements about the amount of compensation Marsh derived
from insurance carriers, and so obtained property form one or more such
persons, in that ***Mr. Bewlay referred client inquiries for disclosure of
such compensation to a designated Marsh employee, knowing that said
employee would provide misleading information concerning Marsh's
compensation to the clients.***  (Emphasis added).

639.    As alleged in this complaint, the Defendants also fraudulently

concealed their illegal contracts, conspiracies or combinations in other ways as well.  For

example, the Broker Defendants led their customers to falsely believe that prices for

Insurance Products were arrived at competitively when, in fact, these price increases were

the direct result of collusive activity among the Defendants.  The Broker Defendants also

disseminated false and misleading information concerning their use of MSAs, PSAs, and

CSUs.  The Insurer Defendants understood that the Broker Defendants were making

misleading and false representations to the policyholders concerning the illicit kickback

payments.

640.    The Plaintiffs could not have discovered the illegal contracts,

conspiracies or combinations at an earlier date by the exercise of reasonable diligence

because of the deceptive practices, fraudulent concealment, and techniques of secrecy

employed by the Defendants and their co-conspirators to avoid detection of their illegal

conduct.

WHEREFORE, for the foregoing reasons, the Plaintiffs request a finding

that because of the Defendants' fraudulent concealment, the running of any statute of

limitations has been tolled and suspended with respect to any claims that the Plaintiffs

have as a result of the Defendants' conduct as alleged in this complaint.

174

**JURY TRIAL DEMANDED**

The Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated: October 1, 2012                       Respectfully submitted,

By:  /s/ Patrick J. Heneghan

William G. Schopf
Patrick J. Heneghan
Ian H. Fisher
SCHOPF & WEISS LLP
One South Wacker Drive, 28th Floor
Chicago, IL 60606
Telephone: 312.701.9300
Facsimile:  312.701.9335

*Counsel for Plaintiffs NEW CINGULAR
WIRELESS PCS, LLC, as successor in
interest to AT&T WIRELESS SERVICES
INC.; TYSON FOODS, INC.; TYSON
FRESH MEATS, INC. as successor in
interest to IBP inc.; TYSON
INTERNATIONAL CO., LTD.;
FOODBRANDS AMERICA, INC.; PUBLIC
SERVICE ENTERPRISE GROUP; PUBLIC
SERVICE ELECTRIC & GAS CO., INC.;
PSEG RESOURCES, INC.; TEXAS
INDEPENDENT ENERGY, LLP; and
TEXAS INDEPENDENT ENERGY
OPERATING CO., LLC*

## CERTIFICATE OF SERVICE

I, Patrick J. Heneghan, an attorney, hereby state that I caused a copy of the attached **Second Amended Complaint of the New Cingular Wireless Plaintiffs** to be filed electronically with the Clerk of the Court using the CM/ECF system on this 1st day of October, 2012, which will automatically send email notifications of such filing to registered parties and by electronically serving all counsel of record listed on service@gcg.mdl1663.com.


/s/ Patrick J. Heneghan