# UNITED STATES DISTRICT COURT FOR
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| Henley Management Company, Big Bear Properties, Inc., Northbrook Properties, Inc., RCK Properties, Inc., Kitchens, Inc., Aberfeldy Properties, Inc., as successor in interest to, Aberfeldy LP, and Payroll & Insurance Group, Inc., | ) ) ) ) ) ) ) | Master Docket No. 04-5184 (CCC) Hon. Claire C. Cecchi Hon. Magistrate Patty Shwartz |
| Plaintiffs, | ) | |
| | ) | MDL No. 1663 |
| v. | ) ) | |
| Marsh & McLennan Companies, Inc., Marsh Inc., Marsh USA Inc., Marsh Placement, Inc.; Marsh Global Broking, Inc., Fireman's Fund Insurance Co., American Guarantee Insurance Co., American International Group, Inc., National Union Fire Insurance Co. of Pittsburgh, St. Paul Travelers Co., Inc., St. Paul Guardian Insurance Co., St. Paul Mercury Insurance Co., St. Paul Fire and Marine Insurance Co., Travelers Property Casualty Co. of America f/k/a Travelers Indemnity Insurance Co. of Illinois, The Travelers Indemnity Co. f/k/a Gulf Insurance Co., Fidelity and Guaranty Insurance Co., ACE USA, Inc., CNA Financial Corp., The Continental Insurance Company f/k/a The Fidelity and Casualty Company of New York, Valley Forge Insurance Company, Continental Casualty Company, Transcontinental Insurance Company, Hartford Steam Boiler Inspection Company, Arch Insurance Co., Kemper Insurance Companies, XL Winterthur International, XL Insurance America and Unnamed Co-conspirators, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## <u>PLAINTIFFS' FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Henley Management Company ("Henley Management"), Big Bear Properties, Inc. ("Big Bear Properties"), Northbrook Properties, Inc. ("Northbrook Properties"), RCK Properties, Inc. ("RCK Properties"), Kitchens, Inc. and Aberfeldy Properties, Inc., as successor in interest to Aberfeldy LP, (collectively, "Kitchens, Inc."), and Payroll & Insurance Group, Inc. ("Payroll & Insurance Group") (all collectively, "Plaintiffs"), by their attorneys, bring this complaint against Marsh & McLennan Companies, Inc., Marsh Inc., Marsh USA Inc., Marsh Placement, Inc., and Marsh Global Broking, Inc. (collectively, "Marsh"), and Fireman's Fund Insurance Co. ("Fireman's Fund"), American Guarantee and Liability Insurance Co. ("American Guarantee"), American International Group Inc. and National Union Fire Insurance Co. of Pittsburgh (collectively, "AIG"), St. Paul Travelers Co., Inc., St. Paul Guardian Insurance Co., St. Paul Mercury Insurance Co., St. Paul Fire and Marine Insurance Co., Travelers Property Casualty Co. of America f/k/a Travelers Indemnity Insurance Co. of Illinois, The Travelers Indemnity Co. f/k/a Gulf Insurance Co., and Fidelity and Guaranty Insurance Co. (collectively, "St. Paul Travelers"), ACE USA, Inc. ("ACE"), CNA Financial Corp., The Continental Insurance Company f/k/a The Fidelity and Casualty Company of New York, Continental Casualty Company, Valley Forge Insurance Company, and Transcontinental Insurance Company (collectively, "CNA"), Hartford Steam Boiler Inspection Company ("Hartford"), Arch Insurance Co. ("Arch"), Kemper Insurance Companies ("Kemper"), XL Winterthur International and XL Insurance America (collectively, "XL"), and unnamed co-conspirators (all collectively, "Insurer Defendants") for a trial by jury and state as follows:

## PARTIES

### Plaintiffs

1.      Henley Management Company ("Henley Management") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Illinois.

2.      Big Bear Properties, Inc. ("Big Bear Properties") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Illinois.

3.      Northbrook Properties, Inc. ("Northbrook Properties") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois.

4.      RCK Properties, Inc. ("RCK Properties") is a corporation organized and existing under the laws of the State of Colorado, with its principal place of business in Illinois.

5.      Kitchens, Inc. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Texas.

6.      Aberfeldy Properties, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Texas.  It is the successor in interest to Aberfeldy LP, which was a limited partnership with its principal place of business in Texas.  Because Kitchens, Inc. was the general partner of Aberfeldy LP, Kitchens, Inc. and Aberfeldy Properties, Inc. will collectively be referred to as "Kitchens Inc."

7.      Payroll & Insurance Group, Inc. ("Payroll & Insurance Group") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois.

### Broker Defendants

8.      At all relevant times herein, Marsh & McLennan Companies, Inc., Marsh Inc., Marsh USA Inc., Marsh Placement, Inc., and Marsh Global Broking, Inc.  (collectively, "Marsh") dealt with Plaintiffs together as related accounts through the New York and California offices.

9.      Marsh & McLennan Companies, Inc. ("MMC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York.  Employees of MMC knew of, acquiesced to, and participated in the wrongful acts described in this Complaint.

10.     Marsh Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1166 Avenue of the Americas, New York, NY 10036.  Marsh Inc. developed, originated, and planned many of the wrongful acts described in this Complaint, which were implemented and executed by Marsh Global Broking, Inc.  On information and belief, Marsh Inc. is a wholly-owned subsidiary of MMC.

11.     Marsh USA Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1166 Avenue of the Americas, New York, NY 10036.  Marsh USA Inc. entered into the agreements with Plaintiffs to provide insurance brokerage services.  On information and belief, Marsh USA Inc. is a wholly-owned subsidiary of MMC.

12.     Marsh Placement, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New Jersey.  On information and belief, Marsh Placement, Inc. is a wholly-owned subsidiary of MMC.

13.     Marsh Global Broking, Inc. is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in New Jersey.  Marsh Global Broking, Inc. implemented and executed the wrongful acts described in this Complaint.  On information and belief, Marsh Global Broking, Inc. is a wholly-owned subsidiary of MMC.

14.     MMC, Marsh Inc., Marsh Placement Inc. and Marsh Global Broking Inc. are collectively referred to as "Marsh."

**Insurer Defendants**

15.     Fireman's Fund Insurance Co. ("Fireman's Fund") is a corporation organized and existing under the laws of the State of California, with its principal place of business at 777 San Marin Drive, Novato, CA 94998.  Fireman's Fund provided excess casualty insurance to Henley

3

Management, RCK Properties, and Kitchens Inc., as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

16.     American Guarantee and Liability Insurance Co. ("American Guarantee") is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 1400 American Lane, Schaumburg, IL 60196.  American Guarantee provided excess casualty insurance to Henley Management and Big Bear Properties.

17.     American International Group, Inc. ("AIG") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 70 Pine Street, New York, NY 10028.  National Union Fire Insurance Company is a subsidiary of AIG and is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 70 Pine Street, New York, NY 10028.  AIG, acting by itself or through its subsidiary, provided excess casualty insurance to Kitchens Inc., as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

18.     St. Paul Travelers Co., Inc. ("St. Paul Travelers") is a corporation organized and existing under the laws of the State of Minnesota, with its principal place of business at 385 Washington Street, St. Paul, MN 55102.  St. Paul Guardian Insurance Co., St. Paul Mercury Insurance Co., and St. Paul Fire and Marine Insurance Co. are all subsidiaries of St. Paul Travelers and are also corporations organized and existing under the laws of the State of Minnesota with their principal place of business 385 Washington Street, St. Paul, MN 55102. Travelers Property Casualty Co. of America (f/k/a Travelers Indemnity Insurance Co. of Illinois) and The Travelers Indemnity Co. (f/k/a Gulf Insurance Co.) are also subsidiaries of St. Paul Travelers, and are corporations organized and existing under the laws of the State of Connecticut, with their principal place of business at One Tower Square, Hartford, CT 06183. Fidelity and Guaranty Insurance Co. is also a subsidiary of St. Paul Travelers, and is a corporation organized and existing under the laws of the State of Iowa, with its principal place of business at 385 Washington Street, St. Paul, MN 55102.  St. Paul Travelers, acting by itself or

through its subsidiaries, provided excess casualty insurance to Kitchens Inc. and RCK Properties, provided general and auto liability insurance to Big Bear Properties, Henley Management, Kitchens Inc, RCK Properties and Payroll & Insurance Group, provided foreign g/l insurance to Henley Management and Payroll & Insurance Group, provided crime insurance to Kitchens Inc., Big Bear Properties, and Henley Management, and provided machinery insurance to Kitchens Inc., as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

19.     ACE USA, Inc. ("ACE") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 436 Walnut Street, Philadelphia, PA 19106-3703.  ACE provided foreign g/l insurance to Kitchens Inc. and Henley Management, as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

20.     CNA Financial Corp. ("CNA") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 333 S. Wabash Avenue, Chicago, IL 60604.  The Continental Insurance Company (f/k/a The Fidelity and Casualty Company of New York) and Valley Forge Insurance Company are subsidiaries of CNA and are corporations organized and existing under the laws of the State of Pennsylvania, with their principal place of business at 333 S. Wabash Avenue, Chicago, IL 60604.  Continental Casualty Company is also a subsidiary of CNA and is a corporation organized and existing under the law of the State of Illinois, with its principal place of business at 333 S. Wabash Avenue, Chicago, IL 60604.  Transcontinental Insurance Company is another subsidiary of CNA and is a corporation organized and existing under the laws of the State of New York with its principal place of business at 333 S. Wabash Avenue, Chicago, IL 60604.  CNA, by itself or through its subsidiaries, provided foreign g/l insurance to Henley Management and Kitchens Inc., boiler and machinery insurance to Henley Management, and auto and general liability insurance to Kitchens Inc, as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

21.     Hartford Steam Boiler Inspection Company ("Hartford") is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business at One State Street, Hartford, CT 06103.  Hartford provided boiler and machinery insurance to Henley Management.

22.     Arch Insurance Co. ("Arch") is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business at One Liberty Plaza, 53rd Floor, New York, NY 10006.  Arch provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

23.     Kemper Insurance Companies ("Kemper") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business at 1 Kemper Drive, Long Grove, IL 60049.  Kemper provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

24.     XL Winterthur International ("XL") is a corporation organized and existing under the laws of Bermuda, with its principal place of business at XL House, One Bermudiana Road, Hamilton, Bermuda  HM 11, Bermuda.  XL Insurance America is a subsidiary of XL Group and is incorporated under the laws of Delaware with its principal place of business in Connecticut. XL provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

25.     The parent companies that did not issue insurance policies are named as Defendants in this complaint because they had knowledge of, acquiesced to, and participated in the conduct of their insurance carrier affiliates, as alleged in this complaint.  In fact, many of the employees of the insurance carrier affiliates that committed the wrongful acts alleged herein were also employees of the affiliates' parent companies. Thus, each such employee's actions are attributable to the affiliate's parent company.  Furthermore, the Broker Defendants often aggregated the kickbacks (as alleged herein) from the affiliated insurance carriers under each parent company's name in accounting for the kickbacks.  On information and belief, the Broker Defendants invoiced the parent companies for the kickbacks and the parent companies paid the kickbacks on behalf of their insurance carrier affiliates.  Representatives of the parent companies

also participated in the negotiation the so-called "contingent commission agreements" and tracking of the kickbacks payable to the Broker Defendants under such arrangements.

## JURISDICTION AND VENUE

26.    Because the civil action arises under the Sherman Act, 15 U.S.C. § 1, this Court has subject matter jurisdiction pursuant to section 4 of the Clayton Act, 15 U.S.C. § 5, and 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367.

27.    MMC, Marsh Inc., Marsh USA Inc., Marsh Placement, Inc., Marsh Global Broking, Inc., Fireman's Fund, American Guarantee, AIG, St. Paul Travelers, ACE, CNA, Hartford, Arch, Kemper, and XL are subject to personal jurisdiction in this district because they engage in systematic and regular business in this district and because this is a claim related to litigation pending in this district in *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663.

28.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because MMC, Marsh Inc., Marsh USA Inc., Marsh Placement, Inc., Marsh Global Broking, Inc., Fireman's Fund, American Guarantee, AIG, St. Paul Travelers, ACE, CNA, Hartford, Arch, Kemper, and XL are subject to personal jurisdiction in this district and because this is a claim related to litigation pending in this district in *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663.

## SUMMARY OF CLAIMS

29.    This is an action for treble damages and attorneys' fees under the Sherman Act and forfeiture of compensation under state law.  Beginning as early as 1998 and continuing through 2005, Marsh received compensation for serving as Plaintiffs' insurance broker. Plaintiffs paid millions of dollars in insurance premiums for insurance policies to Fireman's Fund, American Guarantee, AIG, St. Paul Travelers, ACE, CNA, and Hartford placed by Marsh during this period.  Marsh promised Plaintiffs during this period that it would act in the best interests of Plaintiffs to obtain cost-effective insurance but failed to do so.

30.     Through the actions of its Global Broking department in New York, Marsh orchestrated and participated in a wide-spread customer allocation and bid rigging scheme for a wide array of insurance products, including excess casualty, general liability, auto liability, property, boiler and machinery, homeowner's, crime, foreign g/l, and terrorism insurance policies by coordinating with the Insurer Defendants.  The customer allocation and bid rigging scheme harmed Plaintiffs as consumers of insurance.  As Marsh knew, the direct effect of the scheme was to inflate the price that commercial policyholders paid for insurance.

31.     Contemporaneous business records show clearly the illegal actions described in this complaint.  The business records expose the illegal actions and their purpose and effect.  As the records show, Marsh orchestrated a bid rigging scheme in order to enhance its profits and to insulate the Insurer Defendants from price competition.

32.     As a result of its bad faith conduct, Marsh should return the compensation it kept for serving as a broker on behalf of Plaintiffs.  Marsh and the Insurer Defendants should also be held accountable for the damages caused by the customer allocation and bid rigging scheme.

## FACTS

### Plaintiffs' Relation with Marsh

33.     Marsh served as Plaintiffs' insurance broker for many years.  As Plaintiffs' insurance broker, Marsh claimed to act in Plaintiffs' best interest for the express purpose of purchasing cost-effective insurance.

34.     Plaintiffs entered into client service agreements with Marsh with the understanding that Marsh had a responsibility to provide services and advice for the benefit of Plaintiffs, including finding the most favorable insurance coverage available.  For example, in a June 2, 2003 engagement letter to Kitchens Inc., Marsh committed to "use its best efforts to place insurance on your behalf, if so instructed by you."  (Exhibit 1.)

35.     Pursuant to the client service agreements, Marsh agreed to represent Plaintiffs and not the insurance companies.  Marsh further agreed that it would negotiate on Plaintiffs' behalf with the insurance companies and keep Plaintiffs informed of any significant developments.

36.     Marsh improperly allocated customers and unlawfully rigged bids and fixed prices for commercial insurance.  Conspiring insurers included AIG, Zurich, Fireman's Fund, and St. Paul Travelers (d/b/a Gulf Insurance Co.), as well as the other Insurer Defendants and unnamed insurance carriers.  Marsh orchestrated the scheme to achieve the singular goal of maximizing the amount of the kickbacks it would receive from insurers.

### Customer Allocation and Bid Rigging

37.     Marsh has coordinated an unlawful customer allocation and bid rigging scheme with the Insurer Defendants for the provision of excess casualty, general liability, auto liability, property, boiler and machinery, homeowner's, crime, foreign g/l, and terrorism policies to Plaintiffs.  Current and former Marsh employees have already admitted to their participation in these schemes in pleas with the State of New York.

38.     Excess casualty insurance accounts for a significant portion of the insurance premiums that Plaintiffs paid to insurance companies during the period covered by this Complaint.  Companies purchase excess casualty insurance to protect themselves from large liability claims by third parties that exceed the limits of their primary liability insurance.  It is necessary for companies such as Plaintiffs to purchase excess casualty insurance in order to control the risks to their business from large liability claims.

39.     For example, for the time period December 31, 2001 to December 30, 2002, Marsh had a program in place that established the price that Plaintiffs paid for excess casualty insurance.  Plaintiffs Kitchens Inc., RCK Properties, Big Bear Properties, and Henley Management, all purchased their lead layer of excess casualty insurance from an unnamed insurer during that period.  Plaintiffs also purchased additional layers of excess casualty insurance from many of the other Insurer Defendants.

40.     In the fall of 2001, Plaintiffs met with and held discussions with Marsh concerning Plaintiffs' renewal of excess casualty insurance effective after December 30, 2001.  Plaintiffs explained to Marsh during these discussions that it wanted Marsh to act as its representative in seeking competitively priced insurance.  Plaintiffs told Marsh that Plaintiffs

expected Marsh to solicit several competitive quotes from various insurance carriers, in addition to the incumbent carrier for the purchase of excess casualty insurance.

41.    Because of the importance of the excess insurance policies that they sought to purchase, Plaintiffs told Marsh to disclose all bid submissions from the carriers solicited by Marsh.

42.    Marsh understood what Plaintiffs expected of them.  In an internal communication, Marsh recognized that Plaintiffs asked Marsh that the "renewal program be marketed to as many carriers that would be interested in quoting this account."  The internal communication continued on, stating that Plaintiffs "will be looking to receive copies of the carriers emails or faxes that you receive **DIRECTLY FROM THE CARRIER** that either state the carrier declining to quote or what the high pricing indication is that is provided and unacceptable to Marsh."  (emphasis in original.)  (Exhibit 2.)

43.    In response to Plaintiffs' request, Marsh misrepresented to Plaintiffs that it would seek competitive bids to meet Plaintiffs' need for competitively priced insurance.

44.    Since 2001 or earlier, Marsh and carriers, including the Insurer Defendants, agreed to rig the bids that the carriers made for excess casualty insurance coverage in the United States.  Specifically, the Insurer Defendants agreed with Marsh that they would each submit fake bids (sometimes referred to as "B Quotes") to guarantee that the incumbent insurance carrier would retain the business of a particular customer seeking to purchase excess casualty insurance.  Marsh implemented this bid rigging agreement among the carriers because it resulted in the payment of substantial contingent commissions to Marsh.

45.    Instead of acting on Plaintiffs' demands to obtain competitive bids, Marsh managers, including Todd Murphy, Mark Manzi, Kathy Drake, and Joshua Bewlay in Marsh's Global Broking Excess Casualty department in New York and Barbara Llewellyn in Marsh's Los Angeles office, orchestrated and implemented the issuance of fictitious and artificially inflated "B quotes" from the Insurer Defendants, including AIG, Zurich, St. Paul Travelers (d/b/a Gulf Insurance Co.), Fireman's Fund, and an unnamed insurance carrier for the lead layer in

Plaintiffs' excess casualty insurance programs.  Marsh's intention was for the incumbent carrier on the lead excess layers to retain the business while providing the illusion of competitive bidding in order to satisfy Plaintiffs' demands.

46.     Marsh managers directed carriers to prepare and submit false records consisting of inflated and fictitious bids so that Marsh could then pass these fictitious bids along to Plaintiffs.  In its internal communications, Marsh stated that "[w]e will offer the renewal to the incumbent carriers and need type B alternatives from the remaining carriers."  (Exhibit 3.)

47.     Knowing that Marsh would prevent the submission of any competitive bids, an unnamed insurer submitted an artificially high bid with a significantly higher premium than the year before, fully confident that it would retain the lead excess layers on Plaintiffs' accounts. Other Insurer Defendants submitted fictitious "B Quotes" with the understanding that Marsh would reward them, either through new business or retaining the policies to which they served as the incumbent.

48.     Relying on Marsh's misrepresentations about the bids received, Plaintiffs instructed Marsh in December 2001 to accept the unnamed insurer bid.  The unnamed insurer served as Plaintiffs' lead excess casualty insurer during 2002.

49.     A year later, in the fall of 2002, when Plaintiffs' excess casualty insurance policies were expiring, Plaintiffs again met and held discussions with Marsh to seek renewals of these policies effective after December 30, 2002.  Just as Plaintiffs did the year prior, Plaintiffs told Marsh that they expected Marsh to solicit several competitive quotes from various insurance carriers in addition to an unnamed insurer for the purchase of excess casualty insurance. Plaintiffs again told Marsh to disclose all bid submissions from carriers solicited by Marsh.

50.     Again, Marsh understood what Plaintiffs expected of them.  In an internal communication, Marsh recognized that Plaintiffs asked Marsh that the "renewal program be marketed to as many carriers that would be interested in quoting this account."  (Exhibit 4.) Another Marsh manager wrote that "the client is extremely concerned about a full-blown marketing effort."  (Exhibit 5.)

51.      However, in response to Plaintiffs' request, Marsh again misrepresented to Plaintiffs that it would seek competitive bids to meet Plaintiffs' need for competitively priced insurance.  Internal communications show that Marsh planned to secure renewal of the incumbent carrier as the lead excess casualty insurer for Plaintiffs RCK Properties, Big Bear Properties, and Kitchens Inc.  For each Plaintiff, Joshua Bewlay directed Marsh's Global Broking employees to obtain "FORMAL indications from carriers too regarding any pricing indications for B quotes."  (Exhibit 6.)

52.      The following year, during the process of renewing Plaintiffs' excess insurance policies commencing on December 31, 2003, a company that was an affiliate of Plaintiffs became dissatisfied with Marsh's performance and decided to hire a different broker in addition to Marsh to solicit bids on Plaintiffs' behalf.  The local broker obtained quotes from CNA, Gulf, Fireman's Fund, and an unnamed insurer that were significantly lower than the bids disclosed by Marsh.

53.      Upon learning of the carriers' bid submissions to the new broker, Marsh sought retaliation on those carriers by excluding them from the Henley Management, RCK Properties, Kitchens Inc., Big Bear Properties, and Payroll & Insurance Group's excess casualty renewals. In an email dated December 24, 2003, Edward Keane, under directions from Joshua Bewlay, ordered Marsh brokers to "[p]lease go to CNA, GULF, [an unnamed insurer] & FIREMAN'S FUND and try to block the market for these accounts.  Hopefully it [*sic*] not too late and please let me know if they have been approached by another broker."  (Exhibit 7.)  Far from representing Plaintiffs' best interests, Marsh misused its position to punish those carriers that submitted lower priced bids, thereby cutting into revenues Marsh stood to gain from contingent commissions it would receive from insurers.

54.      The customer allocation and bid rigging that Marsh orchestrated generally involved the excess insurance purchased by Plaintiffs.  As Marsh and the carriers fully understood, an increase in the price charged by the lead excess casualty insurer resulted in an increase in the price of additional layers of excess casualty insurance.  Therefore, Marsh's

customer allocation scheme caused Plaintiffs to pay an inflated amount in excess casualty premiums on lead layers and other layers from 2002 through 2004.

55.     In plea agreements with the State of New York, current or former employees of Marsh admitted that they agreed to rig bids in a scheme Marsh coordinated.  This includes the plea agreements of Joshua Bewlay and Mark Manzi, both former Managing Directors of Marsh's Global Broking department, and Robert Stearns and Todd Murphy, both former Marsh Senior Vice Presidents.  All of these Marsh employees were involved in offering brokerage services to Plaintiffs through Marsh's Global Broking department in New York.  Former Managing Director of Marsh's Global Broking department, Kathryn Winter, also agreed to a plea agreement.

56.     The customer allocation and bid rigging scheme coordinated by Marsh caused harm to Plaintiffs in connection with the transactions described above, as well as in transactions for other insurance products.  Plaintiffs paid artificially high prices to purchase excess insurance from Fireman's Fund, American Guarantee, AIG, Zurich, St. Paul Travelers, and other unnamed insurance carriers from 1999 through 2005.

57.     Upon information and belief, the customer allocation and bid rigging coordinated by Marsh with the participation of the Insurer Defendants also caused harm to Plaintiffs in their purchases of homeowner's and crime insurance from an unnamed insurer, purchases of general and auto liability, foreign g/l, crime, and machinery insurance from St. Paul Travelers, purchases of foreign g/l insurance from ACE, purchases of foreign g/l, boiler and machinery, auto, and general liability insurance from CNA, and purchases of boiler and machinery insurance from Hartford.

## CLAIMS AGAINST DEFENDANTS

### Count 1: *Per Se* Illegal Violation of Sherman Act § 1 (All Defendants)

58.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

59.     The activities of Marsh and the Insurer Defendants that participated in the customer allocation and bid rigging scheme as described in this Complaint are within the flow of, and substantially affected, interstate commerce.

60.     The Plaintiffs allege a *per se* violation of Section 1 of the Sherman Act against Marsh and Fireman's Fund, American Guarantee, AIG, St. Paul Travelers, ACE, CNA, Hartford, Arch, Kemper and XL for conspiring to restrain competition.  This count does not rely upon fraud or misrepresentation by any of the Defendants, although such events occurred, as described in other counts.

61.     These Defendants engaged in continuing illegal contracts, combinations or conspiracies with respect to the sale of Insurance Products in the United States in an unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by, among other things:  (1) allocating without competition the opportunities to sell, and the sale of, Insurance Products to customers; (2) creating a scheme to pay Marsh to organize, implement and police the unlawful conspiracy; and (3) providing customers seeking to purchase Insurance Products, as well as Marsh's Customer Advisory Services, with collusive and non-competitive bids or other terms of sale to prevent discovery of the conspiracy.

62.     As described above, Fireman's Fund, Zurich, American Guarantee, AIG, St. Paul Travelers, ACE, CNA, Hartford, Arch, Kemper, XL, and their co-conspirators overtly participated in the conspiracy and took acts in furtherance of it.

63.     Marsh, in agreement with the Insurer Defendants, orchestrated and supervised a scheme among competing Insurer Defendants to engage in a customer allocation and bid rigging conspiracy.  The scheme included the agreement to preselect the insurers that would be awarded Plaintiffs' business, fix the price that Plaintiffs paid for insurance, empowering the winning bidder to charge a non-competitive rate for the products it sold to Plaintiffs, secreting and covering up the scheme, and presenting false, non-competitive bids and taking other steps to create the illusion of competition.  The customer allocation and bid rigging agreement is a per se illegal agreement.

64.     The customer allocation agreement established the price that insurance carriers would bid for Plaintiffs' excess casualty, general liability, auto liability, property, boiler and machinery, homeowner's, crime, foreign g/l, and terrorism policies coverage.  The scheme artificially inflated the insurers' bids and thereby inflated the price that Plaintiffs paid for insurance coverage.

65.     The contracts, combinations or conspiracies described above were naked restraints of trade among horizontal competitors and are a *per se* violation of the Sherman Act. Alternatively, the Defendants' acts violate the Sherman Act under a rule of reason analysis.

66.     The purpose and effect of the illegal contracts, combinations or conspiracies was to increase Marsh's profits by suppressing or eliminating competition and, thus, increasing prices for Insurance Products in the United States or maintaining them at artificially high levels.

67.     During and throughout the period of the conspiracies alleged in this Complaint, Plaintiffs purchased Insurance Products from the participating insurer Defendants (or their subsidiaries or controlled affiliates) and their co-conspirators at inflated and supra-competitive prices.

68.     Various persons, not named as Defendants, participated as co-conspirators in the violations, and performed acts and made statements in furtherance of that conspiracy.

69.     As a direct and proximate result of the agreement in restraint of trade, Plaintiffs suffered injury to their business and property.

**Count 2: Unreasonable Restraint of Trade in Violation of Sherman Act § 1**
**(All Defendants)**

70.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

71.     The activities of Marsh and the Insurer Defendants that participated in the bid rigging scheme as described in this Complaint are within the flow of, and substantially affected, interstate commerce.

72.    For each insurance product, the sale of excess casualty, general liability, auto liability, property, boiler and machinery, homeowner's, crime, foreign g/l, and terrorism insurance are the respective relevant product markets.  The relevant geographic market in which Marsh's antitrust violation occurred is the United States.  Other insurance products or risk management products are not reasonably interchangeable with or economic substitutes for each type of insurance sold in the United States.  Plaintiffs and other customers require insurance products in the United States for protection from large insurance claims by third parties and for indemnification for loss of its property.  They would not substitute for other products in response to an appreciable and lasting price increase imposed by insurers with market power.

73.    The Insurer Defendants that participated in the scheme are leading competitors in the relevant market and collectively have market power.  Together they account for a substantial share of the sales of insurance coverage in each relevant product market and have the ability to restrain trade to the detriment of consumers.

74.    Marsh orchestrated and supervised a scheme among competing insurers to engage in customer allocation and bid rigging.  To cover up the scheme, Marsh and the participating Insurer Defendants engaged in bid rigging. Marsh and the participating Insurer Defendants agreed to fix the price that Plaintiffs and other consumers paid for insurance coverage.

75.    The participating Insurer Defendants knew the terms of the contingent commission kickback agreements that their supposed competitors had entered into with Marsh. Furthermore, as also alleged in this complaint, the participating Insurer Defendants generally refrained from attempting to win business that Marsh allocated to a supposed competitor.

76.    Marsh and the participating Insurer Defendants engaged in continuing illegal contracts, combinations or conspiracies with respect to the sale of Insurance Products in the United States in an unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by, among other things, engaging in a customer allocation scheme in which Marsh assigned its customers' business to the participating excess insurers without competition.  As a result, Marsh and the participating Insurer Defendants

increased the price of their Insurance Products knowing that they would face no competition due to the scheme.

77.    The purpose and effect of the illegal contracts, combinations or conspiracies was to increase their profits by suppressing or eliminating competition and, thus, increasing prices for Insurance Products in the United States or maintaining them at artificially high levels.

78.    Consumers in the relevant market suffered harm as a direct result of the illegal agreements described in the Complaint.  The agreements injured competition in the respective markets for excess casualty, general liability, auto liability, property, boiler and machinery, homeowner's, crime, foreign g/l, and terrorism insurance by artificially inflating the price consumers paid for insurance coverage.

79.    During and throughout the period of the conspiracies alleged in this Complaint, Plaintiffs purchased Insurance Products from the participating Insurer Defendants at inflated and supra-competitive prices.

80.    As a direct and proximate result of an agreement in restraint of trade, Plaintiffs suffered injury to its business and property.

81.    Various persons, not named as Defendants, participated as co-conspirators in the violations, and performed acts and made statements in furtherance of that conspiracy.

82.    The acts complained of herein do not constitute the business of insurance regulated under state law.

### Count 3: Fraudulent Misrepresentation (Marsh)

83.    Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

84.    Marsh and Plaintiffs had a relationship of trust in which Marsh had a responsibility to communicate accurate information.

85.    Marsh had a duty to fully disclose to Plaintiffs the facts concerning the services it provided to Plaintiffs.

86.     Marsh intentionally misrepresented material facts to Plaintiffs and concealed material facts from Plaintiffs.

87.     Marsh falsely represented, *inter alia*, that:

a.     Marsh was securing the best coverage for Plaintiffs at the best price when, in fact, it did not;

b.     Marsh would act in the best interests of Plaintiffs when, in fact, it did not;

c.     Marsh would act as a fiduciary solely for Plaintiffs' interests when, in fact, it would not;

d.     Plaintiffs' Insurance Products had been recommended to Plaintiffs based solely on the products' price and quality, in fact, they had not been; and

e.     Plaintiffs would receive a competitively determined price for an array of Insurance Products when, in fact, little or no competition occurred.

88.     Marsh's silence in failing to inform Plaintiffs of the material omissions and misrepresentations of facts were intended by Marsh to induce, and did in fact induce, Plaintiffs to reasonably rely on the material omissions and misrepresentations of material facts.

89.     Marsh knew that the facts it misrepresented and concealed were false and that Plaintiffs would rely upon them.

90.     Plaintiffs reasonably relied on Marsh's misrepresentations and omissions and suffered harm as a result.  Had Plaintiffs known of Marsh's illegal conduct and the misrepresentations and omissions, they would not have purchased their Insurance Products through Marsh.

91.     Such reliance was to the detriment of Plaintiffs and proximately caused damage to them.

92.     Marsh's conduct was intentional, willful, wanton, and specifically intended to cause harm to Plaintiffs, and justifies an award of punitive damages.

## Count 4: Negligent Misrepresentation (Marsh)

93.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

94.     Marsh and Plaintiffs had a relationship of trust in which Marsh had a responsibility to communicate accurate information.

95.     Marsh intentionally or negligently misrepresented material facts to Plaintiffs and concealed material facts from Plaintiffs.

96.     Marsh intentionally or negligently represented, *inter alia*, that:

    a.    Marsh was securing the best coverage for Plaintiffs at the best price when, in fact, it did not;

    b.    Marsh would act in the best interests of Plaintiffs when, in fact, it did not;

    c.    Marsh would act as a fiduciary solely for Plaintiffs' interests when, in fact, it would not;

    d.    Plaintiffs' Insurance Products had been recommended to Plaintiffs based solely on the products' price and quality, in fact, they had not been; and

    e.    Plaintiffs would receive a competitively determined price for an array of Insurance Products when, in fact, little or no competition occurred.

97.     Marsh's silence in failing to inform Plaintiffs of the material omissions and misrepresentations of facts induced Plaintiffs to reasonably rely on the material omissions and misrepresentations of material facts.

98.     Plaintiffs reasonably relied on Marsh's misrepresentations and omissions and suffered harm as a result.  Had Plaintiffs known of Marsh's illegal conduct and the misrepresentations and omissions, they would not have purchased their Insurance Products through Marsh.

99.     Such reliance was to the detriment of Plaintiffs and proximately caused damage to them.

## Count 5: Negligence (Marsh)

100.    Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

101.    As Plaintiffs' insurance broker, Marsh failed to exercise reasonable diligence and perform with the skill or care ordinarily possessed by companies acting in its capacity.  Marsh failed to act with reasonable diligence and failed to perform with the skill or care ordinarily possessed by companies acting in its capacity.

102.    As a result of Marsh's negligence, Plaintiffs suffered harm.

## Count 6: Breach of Fiduciary Duty (Marsh)

103.    Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

104.    Marsh and Plaintiffs had a fiduciary relationship in which Marsh had a responsibility to provide services and advice for the benefit of Plaintiffs.

105.    Marsh knowingly and willingly assumed a fiduciary responsibility to Plaintiffs. As the broker for Plaintiffs, Marsh acted as a representative, agent and fiduciary.  Plaintiffs reasonably relied on Marsh to inform them of the best possible competitively determined price for the Insurance Products they sought to purchase, any compensation Marsh would receive for its services, and what expenses Plaintiffs would incur.

106.    Marsh was in a confidential fiduciary relationship with Plaintiffs and owed Plaintiffs the highest duties of due care, loyalty, honesty, and good faith and fair dealing.  Marsh was obligated to refrain from favoring its own interests or those of its co-conspirators over and to the detriment of Plaintiffs' interests.

107.    Plaintiffs placed trust and confidence in Marsh to deal fairly with them and to employ due diligence in obtaining Insurance Products for them.

108.    Federal and/or state common law required Marsh to deal fairly with Plaintiffs in the procurement of Insurance Products.

109.    As the broker for Plaintiffs, acting as their representative, agent, and fiduciary, Marsh had a duty to disclose material facts to Plaintiffs that were relevant to the parties' relationships.  Marsh was obligated to fully disclose to Plaintiffs the existence of customer allocation and bid rigging schemes, contingent commission kickbacks and other payments made by insurance carriers which were material facts relating to and affecting the subject matter of the parties' relationships and the procurement of Insurance Products.

110.    As the broker for Plaintiffs, acting as their representative, agent, and fiduciary, Marsh had a duty to remit to Plaintiffs any undisclosed profit Marsh collected in connection with or because of the procurement of Insurance Products on behalf of Plaintiffs.

111.    Marsh violated the trust of its customers, including Plaintiffs.  Marsh did not consider the best interests of its customers, including Plaintiffs, in all placements of Insurance Products.  Marsh did not act as the disinterested advocate of its customers, including Plaintiffs, in its brokerage and/or placement of Insurance Products.

112.    Marsh breached the fiduciary duties it owed to Plaintiffs, including the duties of good faith, loyalty, and trust, the duty to disclose material facts and the duty to remit undisclosed profits by, *inter alia*:

a.    Entering into undisclosed agreements with insurance carriers for significant "contingent commission" kickbacks and other payments, thereby knowingly creating an obvious conflict of interest;

b.    Secretly profiting at the expense of Plaintiffs;

c.    Failing to disclose to Plaintiffs the existence of agreements with insurance carriers for the payment of significant "contingent commission" kickbacks and other payments relating to the brokerage and/or placement of Plaintiffs' insurance by Marsh;

d.    Failing to remit to Plaintiffs the undisclosed profits collected in connection with or because of the procurement of Insurance Products on behalf of Plaintiffs; and

e.    Facilitating Plaintiffs' procurement of more expensive Insurance Products and services than necessary for the purpose of secretly profiting.

113.    As a direct and proximate result of Marsh's wrongful conduct, Plaintiffs has suffered damages because they paid more for their Insurance Products than they would have if Marsh had not violated its duties.

114.    By virtue of the foregoing, Plaintiffs should be awarded damages in an amount to be determined at trial.

115.    As a result of the breach of fiduciary duties owed to it by Marsh, Plaintiffs are entitled to the disgorgement of all profits or benefits received by Marsh in contingent fee kickbacks and other undisclosed payments by insurance carriers.  Furthermore, Plaintiffs are entitled to the disgorgement of the fees they paid to Marsh for advising and assisting Plaintiffs in selecting their insurance policies.

116.    Marsh's conduct was intentional, willful, wanton, and specifically intended to cause harm to Plaintiffs, and justifies an award of punitive damages.

**Count 7: Tortious Interference with Prospective Business Relations (Marsh)**

117.    Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

118.    Plaintiffs had a reasonable expectation of entering into a valid business relationship with a competitive insurance carrier upon submission of a competitive bid.

119.    With knowledge and understanding of Plaintiffs' expectation, Marsh wrongfully interfered with Plaintiffs' prospective business relations.

120.    Marsh interfered by engaging in wrongful acts that caused the participating Insurer Defendants not to enter into competitive insurance contracts with Plaintiffs.  Marsh knew that its wrongful conduct that it knew would harm Plaintiffs.  As a result of Marsh's interference, Plaintiffs suffered harm.

## Count 8: Deceptive Business Practices (Marsh)

121.    Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

122.    Plaintiffs acted as a consumer for purposes of its purchase of insurance broking services through Marsh.

123.    In misrepresenting and concealing the actual amount of commissions received from insurers, Marsh employed deceptive acts and practices.  Marsh intended to induce Plaintiffs to rely upon Marsh's misrepresentations concerning the amount of commissions received.

124.    Marsh's conduct violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*

125.    Marsh's conduct violated New York General Business Law Section 349.

126.    Plaintiffs were injured as a result of Marsh's violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and/or the New York General Business Law Section 349.

127.    A finding of liability would serve the interests of consumers by creating disincentives for insurance brokers to deceive their clients and to conceal material facts concerning insurance.

## Count 9: Breach of Contract (Marsh)

128.    Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

129.    Marsh and Plaintiffs entered into contracts.

130.    Plaintiffs performed its conditions of the contracts.

131.    Marsh breached the contracts by, *inter alia*, failing to provide proper advice to assist Plaintiffs in managing insurance costs; by failing to represent the interests of Plaintiffs rather than the insurers; by failing to recommend, negotiate, and implement cost-effective insurance; by failing to negotiate on Plaintiffs' behalf; by failing to keep Plaintiffs informed of

significant developments; by failing to use its best efforts to place insurance on behalf of Plaintiffs.

132.   As a result of Marsh's obvious and flagrant breaches, Plaintiffs suffered harm.

## Count 10: Civil Conspiracy (All Defendants)

133.   Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

134.   Plaintiffs allege civil conspiracies against all of the Defendants.

135.   As described above, Marsh conspired with Fireman's Fund, Zurich, American Guarantee, AIG, St. Paul Travelers, ACE, CNA, Hartford, Arch, Kemper, XL and at least one unnamed insurance carrier.  Acting in concert or after a meeting of the minds, Defendants purposefully engaged in conduct that was criminal, unlawful, wrongful, tortious, injurious, oppressive or immoral, or accomplished by criminal, unlawful, wrongful, tortious, oppressive or immoral acts, including the following: (1) allocating without competition the opportunities to sell, and the sale of, Insurance Products to customers; (2) creating a scheme to pay Marsh to organize, implement and police the unlawful conspiracy; (3) providing customers seeking to purchase Insurance Products, as well as Marsh's Customer Advisory Services, with collusive and non-competitive bids or other terms of sale to prevent discovery of the conspiracy; and (4) engaging in a "pay to pay" scheme in which Marsh sold customers' business to conspiring insurers to maximize the kickbacks the insurers offered and without regard for the price or quality of the Insurance Product.

136.   The Defendants accomplished the objects of their conspiracies, which was to, among other things, increase their revenue by participating in a "pay to play" scheme, allocating customers and artificially inflating premiums for Insurance Products, and paying kickbacks to Marsh.

137.   The acts of the Defendants' conspiracy proximately caused damages to the Plaintiffs.

138.     The conduct described herein entitles the Plaintiffs to an award of punitive damages.

## SUSPENSION OF THE STATUTES OF LIMITATION
## DUE TO FRAUDULENT CONCEALMENT

139.     Defendants Marsh Inc. and Marsh USA Inc. engaged in successful, illegal, price-fixing and customer allocation conspiracies that, by their nature, were inherently self-concealing.

140.     Since the inherently self-concealing contracts, combinations or conspiracies were kept secret by Marsh, Plaintiffs were unaware of the anti-competitive and illegal agreements.

141.     Plaintiffs had no knowledge prior to the announcement by the Attorney General of the State of New York on October 14, 2004, of Marsh's unlawful self-concealing conspiracies.

142.     As described in this Complaint, the illegal contracts, conspiracies, or combinations were fraudulently concealed by Marsh and its co-conspirators by various means and methods, including, *inter alia*, secret meetings, minimization of written records, failure to disclose bid-rigging, price-fixing and customer allocations to clients and surreptitious communications between Marsh and its co-conspirators by the use of the telephone or in-person meetings in order to prevent the existence of written records.  Marsh also agreed with its co-conspirators to keep their so-called contingent commission agreements secret and took affirmative steps to prevent policyholders, including Plaintiffs, from learning the true scope and nature of the contingent commission kickbacks and other payments by insurers to Marsh.

143.     In addition, certain of Marsh and the co-conspirators' former employees have admitted that they engaged in deception to hide the existence, nature, and effect of illegal conduct.  Marsh's policy of misleading clients about the payment and receipt of contingent commission kickbacks came to light in the guilty plea of a former Marsh managing director,

Mr. Bewlay, to a felony charge of scheming to defraud on February 14, 2005. Mr. Bewlay's testimony revealed that Marsh established a procedure or a "protocol" intended to "discourage the client from obtaining an answer" about how Marsh received compensation from insurance companies. Mr. Bewlay's testified:

> Finally, during my employment, I was made aware of a Marsh protocol designed to prevent Marsh's clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client in addition to any fee or commission paid. ***The protocol required multiple layers of inquiry to discourage the client from obtaining an answer.*** Also that all inquiries be channeled through a single Marsh employee who directed the answer to the inquiry. (Emphasis added.)

> Finally, the percentage or ratio that Marsh used when it responded to a client's inquiry concerning placement service or PSA or MSA revenue significantly understated the amount of PSA or MSA revenue earned with respect to a particular client. In my department, Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a particular client.

> When I was told that a client inquired as to the amount of PSA revenue Marsh earned from an insurance carrier, I responded that the Marsh employee follow Marsh's protocol, including that the client only speak to the Marsh employee designated to respond to such inquiries.

144.    Mr. Bewlay similarly admitted in his plea agreement that he made misleading statements about the amount of compensation Marsh received from insurers. Mr. Bewlay's plea agreement states, in relevant part:

> From in and before 1999 through 2004, Mr. Bewlay engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property, namely insurance premiums, commissions and fees, from ten or more persons, to wit, clients of Marsh, by false and fraudulent pretenses, representations and promises, to wit, misleading statements about the amount of compensation Marsh derived from insurance carriers, and so obtained property from one or more such persons, in that ***Mr. Bewlay referred client inquiries for disclosure of such compensation to a designated Marsh employee, knowing that said employee would provide misleading information concerning Marsh's compensation to the clients.*** (emphasis added).

145.    Marsh and its co-conspirators also fraudulently concealed their illegal contracts, conspiracies or combinations in other ways as well. For example, Marsh and its co-conspirators

led their customers to falsely believe that prices for insurance products were arrived at competitively when, in fact, these price increases were the direct result of collusive activity with insurers.  Marsh and their co-conspirators also disseminated false and misleading information concerning their use of MSAs, PSAs, and CSUs.

146.    Plaintiffs could not have discovered the illegal contracts, conspiracies or combinations at an earlier date by the exercise of reasonable diligence because of the deceptive practices, fraudulent concealment, and techniques of secrecy employed by Marsh and their co-conspirators to avoid detection of their illegal conduct.

WHEREFORE, for the foregoing reasons, Plaintiffs request a finding that because of Marsh's fraudulent concealment, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiffs have as a result of Marsh's conduct alleged in this complaint.

## PRAYER FOR RELIEF

Plaintiffs ask the Court to grant the following:

A.    Treble damages and attorneys' fees as remedies for Defendants' violations of the Sherman Act;

B.    Forfeiture of compensation retained by Marsh; restitution of payments received from Plaintiffs; damages caused by Defendants' conduct; punitive damages owing to the malicious, willful, and wanton nature of Defendants' conduct; prejudgment interest; and attorneys' fees as remedies for Defendants' violations of state law; and

C.    All other relief that the Court deems just and proper.

## JURY TRIAL

Plaintiffs demand a trial by jury.

Dated:  October 1, 2012     Respectfully submitted,

            By:  /s/ Patrick J. Heneghan

            William G. Schopf
            Patrick J. Heneghan
            Ian H. Fisher
            SCHOPF & WEISS LLP
            One South Wacker Drive, 28th Floor
            Chicago, IL 60606
            Telephone: 312.701.9300
            Facsimile:  312.701.9335

            *Counsel for Plaintiffs Henley Management Company, Big Bear Properties, Inc., Northbrook Properties, Inc., RCK Properties, Inc., Kitchens, Inc., Aberfeldy Properties, Inc.*, as successor in interest to Aberfeldy LP, and *Payroll & Insurance Group, Inc.*

**CERTIFICATE OF SERVICE**

I, Patrick J. Heneghan, an attorney, hereby state that I caused a copy of the

attached **Amended Complaint of the Henley Plaintiffs** to be filed electronically with the Clerk

of the Court using the CM/ECF system on this 1st day of October, 2012, which will automatically

send email notifications of such filing to registered parties and by electronically serving all

counsel of record listed on service@gcg.mdl1663.com.


/s/ Patrick J. Heneghan