# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

                               :

IN RE: INSURANCE BROKERAGE        :    Master Docket No. 04-5184 (CCC)
ANTITRUST LITIGATION             :

                               :    Hon. Claire C. Cecchi

                               :

_____

                               :    (filed in the United States District

SEARS, ROEBUCK & CO.; SEARS     :    Court for the Northern District of
HOLDINGS CORPORATION; KMART :    Georgia as Case No. 1:07-CV-2535
CORPORATION AND LANDS' END,  :    and transferred for pre-trial purposes
INC.,                           :    by the Judicial Panel on Multidistrict
                               :    Litigation under MDL 1663)

                  PLAINTIFFS,    :

                               :

        v.                     :

                               :

MARSH & MCLENNAN COMPANIES,  :
INC.; MARSH INC.; MARSH        :
PLACEMENT, INC.; MARSH GLOBAL :
BROKING, INC.; MARSH USA, INC.  :
AON CORPORATION;          :
ACE AMERICAN  INSURANCE    :
COMPANY; ACE BERMUDA       :
INSURANCE, LTD; ACE USA, INC.;  :
WESTCHESTER SURPLUS :
LINES INSURANCE COMPANY;     :
CHUBB & SON, INC.; CHUBB      :
ATLANTIC INDEMNITY, LTD;     :
FEDERAL INSURANCE COMPANY;  :
THE HARTFORD FINANCIAL     :
SERVICES GROUP, INC.; TWIN CITY :
FIRE INSURANCE COMPANY;     :
THE TRAVELERS COMPANIES, INC.; :
TRAVELERS CASUALTY & SURETY :
COMPANY OF AMERICA; GULF   :
INSURANCE COMPANY; TRAVELERS :
PROPERTY CASUALTY INSURANCE :
COMPANY; ST. PAUL FIRE & MARINE :
INSURANCE COMPANY; XL      :
INSURANCE (BERMUDA) LTD.,   :
XL INSURANCE COMPANY LTD.; XL :
INSURANCE AMERICA; XL       :
SPECIALTY; LIBERTY MUTUAL   :

INSURANCE CO.; LIBERTY MUTUAL   :
GROUP; ARCH CAPITAL GROUP   :
(U.S.) INC.; ARCH CAPITAL GROUP   :
LTD.; ARCH REINSURANCE LTD.,   :
HCC INSURANCE HOLDINGS INC.;   :
HOUSTON CASUALTY COMPANY,   :
LIBERTY INSURANCE   :
UNDERWRITERS INC.;   :
ALLIANZ SE;  FIREMAN'S FUND   :
INSURANCE CO.;   :
LUMBERMENS  MUTUAL CASUALTY; :
AND UNNAMED CO-CONSPIRATORS,  :
   :
          DEFENDANTS.   :
_____:

## AMENDED COMPLAINT
## OF THE SEARS PLAINITFFS

## TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................ 5

I.   THE PARTIES ....................................................................................................... 6

     A.   The Plaintiffs ................................................................................................. 6

     B.   The Broker Defendants ............................................................................. 7

     C.   The Insurer Defendants ............................................................................ 8

II.  JURISDICTION AND VENUE ........................................................................ 15

III. BACKGROUND .................................................................................................. 16

     A.   The Plaintiffs are corporate insurance customers. ..................... 17

     B.   Defendants and Co-Conspirators were Sears' Brokers and
          Insurers. ....................................................................................................... 17

     C.   The Relevant Market ............................................................................... 19

     D.   Trade and Interstate Commerce ........................................................ 19

     E.   The Genesis of the Illegal Conspiracies ........................................ 20

IV.  MARSH COORDINATED AN EXTENSIVE CUSTOMER
     ALLOCATION SCHEME. ............................................................................... 21

     A.   Marsh Made Promises to Sears to Act in Their Best
          Interests, to Disclose Commissions and, on Some Product
          Lines, Not to Accept Payments from the Insurers. ................... 21

     B.   As Early as the Mid-1990s, Marsh Established a "Pay-to-
          Play" System in Which It Directed Business to Insurers in
          Exchange for Secret Kickbacks. ........................................................ 26

     C.   The Scheme Expanded to Include Customer Allocation and
          Steering, which Marsh Controlled and Policed. ......................... 33

          1.   Without Permitting Competition, Marsh Slated the Insurers to Win
               Each Layer of Its Customers' Business and Set the Prices. ............... 33

          2.   Marsh Obtained Fake B Bids and Sham Declinations to Create the
               Illusion of Competition. .................................................................. 37

          3.   Marsh Policed the Scheme and Disciplined Dissonance.................... 38

     D.   The Conspiring Insurers Knew of and Agreed to the
          Conspiracy. ................................................................................................. 40

          1.   The Conspiring Insurers Knew the Terms of Each Others' Kickback
               Agreements. ...................................................................................... 42

          2.   The Conspiring Insurers Provided False B Bids and Sham
               Declinations to Protect Each Others' Business. ............................... 45

3.  The Conspiring Insurers Occasionally Communicated Directly with One Another. ................................................................................ 57

4.  Agents of Marsh and Many of the Conspiring Insurers Were Convicted of Criminal Conduct Relating to the Conspiracy.............. 59

E.  Marsh and the Conspiring Insurers Secreted the Kickback Arrangements from Marsh's Customers, Including Sears. ....................... 60

1.  Marsh and the Insurers Kept the Kickback Arrangements Secret...... 60

2.  When Marsh Eventually Divulged the Existence of Contingent Commissions to Sears, the Disclosures were Inaccurate and Misleading. ........................................................................................ 63

F.  Marsh's Scheme Directly Affected Sears' Insurance Placements. ............................................................................................ 64

G.  Marsh's Scheme Inflated Sears' Premiums. ............................................. 66

H.  The Defendants Contemporaneously Tracked the Kickbacks Marsh Earned on Each Customer's Insurance Placements. ............................................................................................ 69

I.  Marsh Accepted Illicit Payments, Even on Sears' Fee-Based Accounts. ......................................................................................... 70

V.  AON AND THE CONSPIRING INSURERS AGREED TO STIFLE COMPETITION BY ALLOCATING INSURANCE BUSINESS TO THE INSURERS IN EXCHANGE FOR THE INSURERS' PAYMENT OF SECRET KICKBACKS TO AON. ................................................................. 74

A.  Aon Promised to Act in Sears Best Interests and, for Certain Product Lines, Not to Accept Payment from the Insurers.................................................................................................. 74

B.  As Early as 1997, Aon Systematically Allocated its Customers' Policies to the Insurers that Paid Maximum Secret Kickbacks................................................................................... 77

C.  Aon Expanded Its Scheme of Allocating Its Customers' Business to the Insurers that Paid the Highest Kickbacks. ........................ 81

1.  Aon Placed Its Customers' Business Without Competition in Exchange for Kickbacks. .................................................................. 81

2.  Aon Developed Internal Corporate Mandates to Maximize Its Kickback Revenue. ........................................................................... 85

3.  Aon Ensured that the Insurers Understood Aon Controlled the Flow of Insurance Business. ................................................................. 89

4.  For Certain Business of Aon's Customers, the Insurers' *Quid Pro Quo* for Allocation of the Business Included Using Aon Re to Reinsure the Business. ........................................................................................... 92

D.    Aon and the Conspiring Insurers Contemporaneously Tracked the Kickbacks Earned on Each Customer's Insurance Policies, including Sears' Policies ............................................94

E.    Aon Grew Fat on the Kickbacks. ...............................................96

F.    Aon and the Conspiring Insurers Secreted Their Kickback Arrangements. ...............................................99

G.    With the Conspiring Insurers' Assistance, Aon Violated Its Obligations to Sears' Wireless ...............................................101

1.    Aon Did Not Act in Sears' Best Interests and Failed to Disclose the Kickbacks. ...............................................101

2.    Aon Accepted Payment on Sears' Fee-Only Placements. ...............................................102

H.    The Conduct of Aon and the Conspiring Insurers Harmed Sears. ...............................................103

Causes of Action ...............................................105

**COUNT I** ...............................................105

*Per Se* Horizontal Marsh-Centered Conspiracy in Violation of Section 1 of the Sherman Act Against Marsh, Ace, Chubb, Fireman's Fund, Liberty, St. Paul/Travelers and XL ...............................................105

**COUNT II** ...............................................107

Marsh-Centered Conspiracy in Violation of Section 1 of the Sherman Act Against Marsh and All Insurer Defendants Under the "Rule of Reason" Analysis ...............................................107

**COUNT III** ...............................................110

Aon-Centered Conspiracy in Violation of Section 1 of the Sherman Act Against Aon Ace, Arch, Chubb, Fireman's Fund, Hartford, Travelers, XL and Zurich Under the "Rule of Reason" Analysis ...............................................110

**COUNT IV** ...............................................112

Marsh-Centered Conspiracy in Violation of the RICO Act, 18 U.S.C. §§ 1962(c) & (d), Against Marsh, Ace, Chubb, Fireman's Fund, Liberty, St. Paul/Travelers and XL ...............................................112

**COUNT V** ...............................................123

Eleven Bilateral Conspiracies Between Aon and Certain Insurer Defendants in Violation of the RICO Act, 18 U.S.C. §§ 1962(c) & (d), Against Aon, Ace, Arch, Chubb, Fireman's Fund, Hartford, Travelers, XL and Zurich ...............................................123

**COUNT VI** ...............................................128

Breach of Fiduciary Duty Against Marsh ...............................................128

**COUNT VII** ...............................................131

Breach of Fiduciary Duty Against Aon ...............................................131

**COUNT VIII**.................................................................................................... 134

Inducement of Breach Fiduciary Duty Against the Insurer Defendants........................ 134

**COUNT IX**...................................................................................................... 135

Breach of Contract Against Marsh .............................................................................. 135

**COUNT X** ...................................................................................................... 137

Breach of Contract Against Aon.................................................................................. 137

**COUNT XI**...................................................................................................... 139

Tortious Interference with Contract Against the Insurer Defendants............................ 139

**COUNT XII** .................................................................................................... 141

Tortious Interference with Prospective Business Relations Against
the Broker Defendants ................................................................................................ 141

**COUNT XIII**................................................................................................... 142

Unjust Enrichment Against All Defendants .................................................................. 142

**COUNT XIV** ................................................................................................... 143

Common Law Fraud Against the Broker Defendants.................................................... 143

**COUNT XV** .................................................................................................... 146

Statutory and Consumer Fraud Against All Defendants................................................ 146

SUSPENSION OF THE STATUTES OF LIMITATION DUE TO
FRAUDULENT CONCEALMENT............................................................................ 151

JURY TRIAL DEMANDED ....................................................................................... 154

Plaintiffs Sears, Roebuck & Co., Sears Holdings Corporation, Kmart Corporation and Lands' End, Inc. ("Lands' End") (collectively, "Sears" or "Plaintiffs"), by and through their attorneys, complain against Defendants Marsh & McLennan Companies, Inc., Marsh Inc., Marsh Placement, Inc., Marsh Global Broking, Inc., Marsh USA, Inc., Aon Corporation, ACE American Insurance Company, ACE Bermuda Insurance, Ltd, ACE USA, Inc., Westchester Surplus Lines Insurance Company, Chubb & Son, Inc., Chubb Atlantic Indemnity, Ltd., Federal Insurance Company, The Hartford Financial Services Group, Inc., Twin City Fire Insurance Company, The Travelers Companies, Inc., Travelers Casualty & Surety Company of America, Gulf Insurance Company, Travelers Property Casualty Insurance Company, St. Paul Fire & Marine Insurance Company, XL Insurance (Bermuda) Ltd., XL Insurance Company Ltd., XL Insurance America, XL Specialty, Liberty Mutual Insurance Co., Liberty Mutual Group, Arch Capital Group (U.S.) Inc., Arch Capital Group Ltd., Arch Reinsurance Ltd., HCC Insurance Holdings Inc., Houston Casualty Company, Liberty Insurance Underwriters Inc., Allianz SE, Fireman's Fund Insurance Co., Lumbermens Mutual Casualty, and unnamed co-conspirators as follows:

## NATURE OF THE ACTION

1.      This is an action by Sears, corporate insureds, against the Defendants, Sears' insurance brokers and the named insurers, for actual, treble, and punitive damages, disgorgement, restitution, other injunctive and equitable relief, and attorneys' fees and costs for Defendants' (1) violations Section 1 of the Sherman Act, (2) violations of Sections 1962(c) & (d) of RICO, (3) breach of fiduciary duty, (4) inducement to breach fiduciary duty, (5) breach of

contract, (6) tortious interference with contract, (7) unjust enrichment, (8) fraud and

(9) consumer fraud.

2. The conduct forming the basis of this complaint involves the Defendants' use of a variety of illegal schemes and practices designed to, among other things, allocate customers, steer business, and raise the prices of insurance products paid by Sears for insurance products. In addition, the Broker Defendants steered policyholders' business to the Insurer Defendants—or refrained from moving the policyholders' business to other insurers—in exchange for the Insurer Defendants payment of substantial kickbacks. The net result of these practices is that competition for policyholders' business did not occur, and that Sears, as policyholders, either paid more for insurance products or received less beneficial terms than the competitive market would have provided. The Insurer Defendants also induced the Broker Defendants to breach their contractual and fiduciary obligations to Sears by making substantial payments to the Broker Defendants for placing Sears' insurance with them, *even where* Sears had paid the Broker Defendants a fee in lieu of the Broker Defendants accepting payments from the Insurance Defendants. The Defendants deceived and misled Sears to prevent them from learning of the illegal practices.

I.    **THE PARTIES**

A.    **The Plaintiffs**

3. Plaintiff Sears, Roebuck and Co. ("Sears, Roebuck") is a New York corporation with its principal place of business in Illinois, and is registered with the Georgia Secretary of State to transact business as a foreign corporation in the State of Georgia.

4.      Plaintiff Sears Holdings Corporation ("Sears Holdings") is a Delaware corporation with its principal place of business in Illinois, and is registered with the Georgia Secretary of State to transact business as a foreign corporation in the State of Georgia.

5.      Plaintiff Kmart Corporation ("Kmart") is a Michigan corporation with its principal place of business in Michigan, and is registered with the Georgia Secretary of State to transact business as a foreign corporation in the State of Georgia.

6.      Plaintiff Lands' End, Inc. ("Lands' End") is a Delaware corporation with its principal place of business in Wisconsin, and is registered with the Georgia Secretary of State to transact business as a foreign corporation in the State of Georgia.

**B.      The Broker Defendants**

7.      On information and belief, Defendant Marsh & McLennan Companies, Inc. ("MMC") is a Delaware corporation with its principal place of business in New York.

8.      On information and belief, Defendant Marsh Inc. ("Marsh Inc.") is a Delaware corporation with its principal place of business in New York.  On information and belief, Marsh Inc. is a wholly-owned subsidiary of MMC.

9.      On information and belief, Defendant Marsh Placement Inc. is a Delaware corporation with its principal place of business in New Jersey.

10.      On information and belief, Defendant Marsh Global Broking Inc. is a Texas corporation with its principal place of business in New Jersey.

11.      On information and belief, Defendant Marsh USA Inc. is a Delaware corporation with its principal place of business in New York.

12.     Defendants MMC, Marsh Inc., Marsh Placement Inc., Marsh Global Broking Inc., and Marsh USA Inc. are collectively referred to here as "Marsh."

13.     On information and belief, Defendant Marsh Global Broking Inc. ("Global Broking") d/b/a Marsh Placement Inc. is a subsidiary of MMC, an Illinois Corporation, with its principal place of business in New York.  (Global Broking, Marsh Inc. and MMC are collectively referred to here as "Marsh.")

14.     On information and belief, Defendant Aon Corporation ("Aon") is a Delaware corporation with its principal place of business in Illinois.

### C.     The Insurer Defendants

15.     On information and belief, Defendant ACE American Insurance Company ("Ace American") is a subsidiary of ACE Limited, and is incorporated under the laws of Pennsylvania with its principal place of business in Pennsylvania.

16.     On information and belief, Defendant ACE Bermuda Insurance Limited ("Ace Bermuda") is a subsidiary of ACE Limited, a Bermuda Corporation, with its principal place of business in Bermuda.  At all times pertinent to this complaint, Ace Bermuda transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

17.     On information and belief, Defendant ACE USA, Inc. ("Ace USA") is a Delaware corporation with its principal place of business in Pennsylvania.

18.     On information and belief, Defendant Westchester Surplus Lines Insurance Company ("Westchester") is a subsidiary of ACE Limited and is incorporated under the laws of Georgia with its principal place of business in Georgia.

19.    Defendants ACE American, ACE Bermuda, ACE USA and Westchester are collectively referred to as "Ace."

20.    On information and belief, Defendant Chubb & Son, Inc. ("Chubb & Son") is a division of Federal Insurance Company, which is a subsidiary of The Chubb Corporation, and is incorporated under the laws of Indiana with its principal place of business in New Jersey.

21.    On information and belief, Defendant Chubb Atlantic Indemnity, Ltd. ("Chubb Atlantic") is a subsidiary of The Chubb Corporation, a Bermuda Corporation, with its principal place of business in Bermuda.

22.    On information and belief, Defendant Federal Insurance Company ("Federal") is a subsidiary of The Chubb Corporation, and is incorporated under the laws of Indiana with its principal place of business in New Jersey.

23.    Defendants Chubb & Son, Chubb Atlantic and Federal are collectively referred to as "Chubb."

24.    On information and belief, Defendant The Hartford Financial Services Group, Inc. ("Hartford Financial") is incorporated under the laws of Delaware with its principal place of business in Connecticut.

25.    On information and belief, Defendant Twin City Fire Insurance Company ("Twin City") is a subsidiary of Hartford, and is incorporated under the laws of Indiana with its principal place of business in Connecticut.

26.    Defendants Hartford Financial and Twin City are collectively referred to as "Hartford."

9

27.     On information and belief, Defendant The Travelers Companies, Inc. ("Travelers Companies") is incorporated under the laws of Minnesota with its principal place of business in Minnesota.

28.     On information and belief, Defendant Travelers Casualty & Surety Company of America ("Travelers Casualty") is a subsidiary of Travelers, and is incorporated under the laws of Connecticut with its principal place of business in Connecticut.

29.     On information and belief, Defendant Gulf Insurance Company ("Gulf") is a subsidiary of Travelers, and is incorporated under the laws of Connecticut with its principal place of business in New York.

30.     On information and belief, Defendant Travelers Property Casualty Insurance Company ("Travelers Property Casualty") is a subsidiary of Travelers, and is incorporated under the laws of Connecticut with its principal place of business in Connecticut.

31.     On information and belief, Defendant St. Paul Fire & Marine Insurance Company ("St. Paul F&M") is a subsidiary of Travelers, incorporated under the laws of Minnesota with its principal place of business in Minnesota.

32.     Defendants Travelers Companies, Travelers Casualty, Gulf, Travelers Property Casualty and St. Paul F&M, are collectively referred to as "Travelers" or "St. Paul/Travelers."

33.     On information and belief, Defendant XL Insurance (Bermuda) Ltd. ("XL Bermuda") is a subsidiary of XL Capital Ltd, and is incorporated under the laws of Bermuda with its principal place of business in Bermuda.

34.     On information and belief, Defendant XL Insurance Company Limited ("XL Insurance Ltd.") is a subsidiary of XL Group, domiciled in the United Kingdom, with its headquarters at 70 Gracechurch Street, London, EC3V 0KL United Kingdom.  At all times pertinent to this complaint, XL Insurance Company Limited transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

35.     On information and belief, Defendant XL Insurance America, Inc. ("XL Insurance America") is a subsidiary of XL Capital Ltd, and is incorporated under the laws of Delaware with its principal place of business in Connecticut.

36.     On information and belief, Defendant XL Specialty Insurance Company ("XL Specialty") is a subsidiary of XL Capital Ltd, and is incorporated under the laws of Delaware with its principal place of business in Connecticut.

37.     Defendants XL Bermuda, XL Insurance Ltd., XL Insurance America and XL Specialty are collectively referred to as "XL."

38.     On information and belief, Defendant Liberty Mutual Insurance Co. ("Liberty Mutual") is a corporation incorporated under the laws of Massachusetts with its principal place of business in Massachusetts.  On information and belief, it purchased Wausau Insurance Companies ("Wausau").

39.     On information and belief, Defendant Liberty Mutual Group ("Liberty Group") is incorporated under the laws of New Jersey with its principal place of business in Massachusetts.

40.     Upon information and belief, Defendant Liberty Insurance Underwriters Inc. ("LIU") is a New York company with its principal place of business in New York.

41.     Defendants Liberty Mutual, Liberty Group and LIU are collectively referred to as "Liberty."

42.     On information and belief, Defendant Arch Capital Group Ltd. ("Arch Capital") is a Bermuda public limited liability company with its headquarters at 45 Reid Street, Hamilton HM 12 Bermuda.  At all times pertinent to this complaint, Arch Capital Group transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

43.     On information and belief, Defendant Arch Reinsurance Limited ("Arch Reinsurance") is a subsidiary of Arch Capital Group and is a Bermuda company with its principal place of business in Hamilton, Bermuda.  At all times pertinent to this complaint, Arch Reinsurance Limited transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

44.     On information and belief, Defendant Arch Insurance Company ("Arch Insurance") is a subsidiary of Arch Capital Group and is a Missouri corporation with its principal place of business in New York.

45.     On information and belief, Defendant Arch Insurance (Bermuda) ("Arch Bermuda") is a subsidiary of Arch Capital Group and is a Bermuda company with its principal place of business in Hamilton, Bermuda.  At all times pertinent to this complaint, Arch Bermuda transacted business in the Northern District of Georgia by, including but not limited to, providing insurance products.

46.     Defendants Arch Capital, Arch Reinsurance, Arch Insurance and Arch Bermuda are collectively referred to as "Arch."

12

47.    On information and belief, Defendant HCC Insurance Holdings, Inc. ("HCC Insurance Holdings") is incorporated under the laws of Delaware, with its principal place of business in Texas.  On information and belief, Defendant Houston Casualty Company ("Houston Casualty") is a subsidiary of HCC Insurance Holdings, Inc. and is incorporated under the laws of Texas with its principle place of business in Texas.  On or about June 30, 2005, Aon informed Sears that HCC Insurance Holdings had issued insurance policies between 2001 and 2004 to Sears on which HCC Insurance Holdings paid Aon contingent commissions, as more fully described herein.  Sears, however, believes HCC Insurance Holdings' subsidiary, Houston Casualty, actually issued these policies and, thus, alleges in the alternative that either HCC Insurance Holdings or Houston Casualty is the insurer.  At all times pertinent to this complaint, both HCC Insurance Holdings and Houston Casualty transacted business in the Northern District of Georgia.  Defendants HCC Insurance Holdings and Houston Casualty are collectively referred to as "HCC."

48.    On information and belief, Defendant Allianz SE ("Allianz") is incorporated under the laws of Germany, with its principal place of business in Germany.  On information and belief, Defendant Fireman's Fund Insurance Co. ("Fireman's Fund Insurance") is a subsidiary of Allianz, and is incorporated under the laws of California, with its principal place of business in California.  On or about June 30, 2005, Aon informed Sears that Allianz had issued six insurance policies between 2001 and 2004 to Sears on which Allianz paid Aon contingent commissions, as more fully described herein.  Sears paid more than $1 million in premiums for these policies.  Sears, however, believes that Allianz's, Fireman's Fund Insurance, actually issued these policies and, thus, alleges in the alternative that either Allianz or Fireman's

13

Fund Insurance is insurer.  At all times pertinent to this complaint, both Allianz and Fireman's Fund Insurance transacted business in the Northern District of Georgia.  Defendants Allianz and Fireman's Fund Insurance are collectively referred to as "Fireman's Fund."

49.    On information and belief, Defendant Lumbermens Mutual Casualty ("Kemper") is a subsidiary of Kemper Corporation and is incorporated under the laws of Illinois with its principal place of business in Illinois.

50.    The parent companies that did not issue insurance policies are named as Defendants in this complaint because they had knowledge of, acquiesced to, and participated in the conduct of their insurance carrier affiliates, as alleged in this complaint.  In fact, many of the employees of the insurance carrier affiliates that committed the wrongful acts alleged herein were also employees of the affiliates' parent companies. Thus, each such employee's actions are attributable to the affiliate's parent company.  Furthermore, the Broker Defendants often aggregated the kickbacks (as alleged herein) from the affiliated insurance carriers under each parent company's name in accounting for the kickbacks.  On information and belief, the Broker Defendants invoiced the parent companies for the kickbacks and the parent companies paid the kickbacks on behalf of their insurance carrier affiliates.  Representatives of the parent companies also participated in the negotiation the so-called "contingent commission agreements" and tracking of the kickbacks payable to the Broker Defendants under such arrangements.

51.    The parent companies that did not issue insurance policies are named as Defendants in this complaint because they had knowledge of, acquiesced to, and participated in the conduct of their insurance carrier affiliates, as alleged in this complaint.  In fact, many of the employees of the insurance carrier affiliates that committed the wrongful acts alleged herein

were also employees of the affiliates' parent companies. Thus, each such employee's actions are attributable to the affiliate's parent company.  Furthermore, the Broker Defendants often aggregated the kickbacks (as alleged herein) from the affiliated insurance carriers under each parent company's name in accounting for the kickbacks.  On information and belief, the Broker Defendants invoiced the parent companies for the kickbacks and the parent companies paid the kickbacks on behalf of their insurance carrier affiliates.  Representatives of the parent companies also participated in the negotiation the so-called "contingent commission agreements" and tracking of the kickbacks payable to the Broker Defendants under such arrangements.

## II.    JURISDICTION AND VENUE

52.    The United States District Courts have subject-matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331 and 1337.

53.    The United States District Court for the Northern District of Georgia has personal jurisdiction over each Defendant because each Defendant transacted business in the Northern District of Georgia by, among other things, providing either insurance brokerage services or general, property, casualty, excess, D&O, or a variety of other Insurance Products as defined herein.

54.    The United States District Court for the District of New Jersey has personal jurisdiction for pretrial proceedings under 28 U.S.C. § 1407(a).

55.    The United States District Court for the Northern District of Georgia is the proper venue pursuant to Sections 4, 12 & 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 & 26, 18 U.S.C. § 1965(a), and 28 U.S.C. § 1391(b), (c) & (d) because Defendants reside, transacted business, were or had agents in the Northern District of Georgia, and because a substantial

portion of the affected interstate trade and commerce described herein, is and has been carried out in the Northern District of Georgia.

56.     The United States District Court for the District of New Jersey is the venue for pretrial proceedings under 28 U.S.C. § 1407(a).

## III.    BACKGROUND

57.     There are basically three types of entities in the corporate insurance market. First, there are the customers: companies such as Sears that seek to purchase Insurance Products for their businesses. Second, there are brokers, consultants, and independent agents that customers hire to advise them as to needed coverage and to find insurers offering that coverage. The brokers obtain price quotations, and present the quotations to the client. Brokers—as opposed to consultants or independent agents—represent the customer. Third, there are insurers. They submit quotes to the brokers and, if selected by the customer, enter into a contract to provide insurance for that customer's risk.

58.     A company's primary insurance coverage—such as commercial general liability (CGL), property insurance or FINPRO (such as D&O)—will pay losses only to a specific limit. To protect itself from higher losses, a large company will frequently buy an umbrella policy over the primary insurance that protects the company from losses in excess of the primary limits. The first layer of umbrella coverage is often called the "lead umbrella" or "lead excess" policy and typically offers $25 million to $50 million of coverage beyond the primary insurance. The lead umbrella for casualty insurance sits atop general commercial, auto liability and certain other types of insurance. Similarly, the lead umbrella for property insurance sits atop of the primary property. A large company will usually purchase additional layers of

16

excess coverage above the lead umbrella to protect it in the event losses exceed the combined

limits of the primary and the lead umbrella coverage.

**A.      The Plaintiffs are corporate insurance customers.**

59.      The Plaintiffs are corporate insurance customers.  They purchased

multiple layers of excess insurance over the primary insurance to protect themselves in the event

of large losses.

60.      All of the Plaintiffs were clients of Marsh.

61.      Plaintiff Sears, Roebuck, was also a client of Aon and is pursuing claims

against Aon, as well as against Marsh and the Insurer Defendants.

62.      During the relevant time period covered by this Complaint, the Plaintiffs

paid hundreds of millions of dollars in premiums to ACE, Chubb, Travelers, XL, Fireman's

Fund, Liberty, Arch, Hartford, HCC, Kemper, and the other Insurer Defendants for insurance

policies brokered by the Broker Defendants.

**B.      Defendants and Co-Conspirators were Sears' Brokers and Insurance Insurers.**

63.      For purposes of this Complaint, Marsh and Aon will be referred to

collectively as the "Broker Defendants."

64.      Marsh was and is the largest provider of insurance brokerage and

consulting services in the world.  Marsh's insurance brokerage business alone employed 42,000

employees in 410 offices located in over 100 countries during the relevant time covered by this

Complaint. According to its 2003 financial statement, Marsh's insurance brokerage business

generated annual revenues of over $6.9 billion.

65.     Aon is the second largest provider of insurance brokerage and consulting services in the world.  Aon employed approximately 47,000 employees in offices located across the world during the relevant time covered by this Complaint.  According to its 2004 annual report, Aon's risk and insurance brokerage business generated annual revenues of over $5.7 billion.

66.     The remaining Defendants are insurers from whom Sears purchased insurance policies during the relevant time and, for the purposes of this complaint, are collectively referred to as the "Insurer Defendants."

67.     Sears paid significant amounts of money in premiums during the relevant time to each of the Insurer Defendants and each of the Insurer Defendants paid illegal kickbacks to the Broker Defendants in the form of so-called "contingent commissions."

68.     For purposes of this complaint, the Broker Defendants and the Insurer Defendants will be referred to collectively as the "Defendants."

69.     Various other persons, corporations, and other legal entities, not named as Defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

70.     Whenever reference is made in this complaint to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through one or more of its respective officers, directors, agents, employees or representatives while he, she, or they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

### C.    The Relevant Market

71.    For purposes of this complaint, the term "Insurance Products" means commercial insurance policies, including, without limitation, excess casualty (including excess commercial general liability, workers' compensation and automobile) insurance, excess property insurance, and FINPRO (including directors and officers insurance, errors and omissions insurance and employment practices liability insurance) insurance.

72.    For purposes of this complaint, the relevant market is the market for Insurance Products and insurance brokerage services for Insurance Products.

73.    For purposes of this Complaint, the relevant geographic market is the United States and its territories as a whole, as well as insurance issued from abroad (such as from Bermuda and the United Kingdom) to cover the risks of U.S. companies and properties.

### D.    Trade and Interstate Commerce

74.    At all relevant times, the Insurer Defendants sold, and the Broker Defendants brokered, the sales of substantial quantities of Insurance Products in a continuous and uninterrupted flow of interstate commerce.

75.    The activities of Defendants and their co-conspirators, as described in this complaint, were within the flow of and substantially affected interstate commerce. The conduct of the Defendants and their co-conspirators foreseeably restrained interstate commerce.

76.    At all times pertinent to this complaint, the Defendants entered into agreements and engaged in conduct directly and as co-conspirators which unreasonably restrained trade in the relevant market and geographic markets.

E.      The Genesis of the Illegal Conspiracies

77.     Since at least the early 1990s, the Broker Defendants have solicited and
the Insurer Defendants have offered payments based upon the volume of the customers' business
the Broker Defendants steer to the Insurer Defendants.  The amount of these so-called
"contingent commissions" grew steadily until late 2004 and have resulted the Insurer Defendants
paying the Broker Defendants in excess of a billion dollars.

78.     Over the years, the agreements by the Insurer Defendants to pay these
illegal kickbacks to the Broker Defendants have gone by various names, including without
limitation "contingent commission agreements," "placement service agreements" ("PSAs"),
"market services agreements" ("MSAs"), "underwriter service agreements" ("USAs"), "special
producer agreements," "quality business incentives awards," "preferred broker compensation
plans," "competitive bonus programs," "extra compensation agreements," "professional
enhancement fund" ("PEFs"), "overrides," and/or "bonuses."  Despite the name or title, these
agreements are kickbacks from the Insurer Defendants to the Broker Defendants.

79.     In the early 1990s, Marsh developed a plan designed to centralize the
marketing of its insurance brokering services – the Global Broking Division ("Global Broking").
Global Broking determined the placement of all of Marsh's major business lines, which includes
Excess Casualty, Property, FinPro (Financial Products) and Middle Market (businesses paying
less that $1 million in annual insurance premiums).  Global Broking was based out of Marsh's
New York office, with regional centers set up around the country to ensure that field agents and
brokers were placing their clients' insurance business with Global Broking's preselected
insurers.  Over time, the Global Broking groups at Marsh consolidated all of Marsh's insurance

20

placement activity for large commercial policyholders, such as Sears.  Marsh placed the

allocated business with the Insurer Defendants that paid the biggest kickbacks.

80.    Aon soon followed suit, establishing "Syndication Plans" to centralize its

insurance placement and negotiate broad, global kickback agreements with the Insurer

Defendants.  Aon also directed its customers' insurance business to those Insurer Defendants that

paid the biggest kickbacks.

81.    Aon created lists of insurers whose products its employees were to sell

more vigorously to customers, including Sears.  These lists were not based on price or service,

but on the amount of kickbacks the Insurer Defendants would pay Aon.

82.    The net results of the conduct were that (a) the Broker Defendants

increased their net revenue through their receipt of undisclosed kickback payments; (b) the

Insurer Defendants secured and retained policyholder business without actual competition and

increased their premiums to build in the costs of these undisclosed kickback payments; (c) the

Insurer Defendants secured even greater increases in premiums due to the absence of

competition, and (c) policyholder customers, including Sears, paid higher premiums for less

advantageous coverage than that which would have been available in a competitive market.

## IV.    MARSH COORDINATED AN EXTENSIVE CUSTOMER ALLOCATION SCHEME.

### A.    Marsh Made Promises to Sears to Act in Its Best Interests, to Disclose Commissions and, on Some Product Lines, to Not to Accept Any Payments from the Insurers.

83.    Marsh sought to become and remain Sears' commercial insurance broker.

On many occasions, Marsh assured its customers, including Sears, that its "guiding principal is

to consider our client's best interest in all placements."  Marsh represented to its customers,

21

including Sears, that "[w]e are our clients' advocates, and we represent them in negotiations. We don't represent the [insurance companies]."

84. Marsh further said that it was the world's largest insurance broker and cited its size and sophistication as a primary reason to hire the company. Marsh held itself out to its customers, including Sears, as a trusted expert in the analysis and placement of Insurance Products and claimed to have the sophistication and market expertise to advise Sears in selecting its insurance policies.

85. Once Sears retained Marsh as its broker, Marsh worked closely with it to identify its insurance needs, communicated with insurers on Sears' behalf and provided advice to Sears on which insurance policies it should purchase.

86. Sears, in turn, relied on Marsh to assist and advise it in securing commercial insurance. Most significantly, Sears trusted Marsh and relied upon it to advise it on which insurance policies to purchase, including with regard to the premiums it should pay and the coverage that would be appropriate.

87. Sears began working with Marsh many years ago. Sears' relationship with and reliance on Marsh started before the illegal behavior alleged in this complaint began.

88. Marsh entered into brokerage agreements, or "Service Agreements," with Sears (in which Sears is identified as the "Client") for Marsh to broker and place insurance products on Sears' behalf. Marsh offered Sears the option of entering into annual fee-based brokerage agreements for various insurance product lines under which Marsh would broker and place the particular insurance product lines for a flat fee and promised that it would not accept commissions.

22

89.    For example, in 1997 Sears agreed to pay Marsh a fee of $900,000 to broker its casualty insurance effective October 1997 to October 1998 and $650,000 to broker its property insurance effective June 1997 to June 1998.  The agreement was dated January 1, 1997 and signed by Steven H. Kerr, Managing Director of Marsh USA Inc.  Mr. Kerr caused the signed agreement to be transmitted to Pamela G. Rogers, Director of Risk Management for Sears.

90.    The following year, Marsh again agreed to broker Sears' casualty and property insurance lines for a flat fee of $900,000 and $600,000, respectively.  In 1999, Sears contracted with Aon to broker its property insurance and with Marsh to broker its excess liability insurance.  As with Sears' casualty insurance, Marsh agreed to broker Sears' excess liability for a flat fee.

91.    Although the specific fee varied, this fee-based brokerage agreement for Sears' casualty and excess liability insurance remained in place for years.  For example, Sears paid Marsh $775,000 to broker its casualty and excess liability insurance from June 2000 through June 2001.  The following year, Sears agreed paid Marsh $1 million to broker the same lines, although the agreement was amended mid-term.

92.    Both Marsh and Sears understood that Marsh would not accept commissions from the carrier for placing Sears' policies subject to the fee.  In fact, Marsh Managing Director Steven Kerr felt the need to clarify in a cover letter to the 2001 amendment to the fee-based agreement that the prohibition on accepting commissions would not apply to compensation a carrier paid to Marsh for acting as the carrier's broker on reinsurance of the risk. He stated, "I have signed the attached Agreement but am clarifying that the Amendment does not

23

apply to compensation received as a reinsurance intermediary.  I cannot tell if it is in the scope of the contract so, the purpose of my writing this note is to clarify that should we receive any revenue in this area, it is not included" in the appendix that specified the fee for brokerage of casualty and excess liability lines.

93.    Likewise, in an August 15, 2002 letter agreement from Mr. Kerr, Marsh agreed to "disclose to [Sears] any commissions received by Marsh and credit them against the annual fee."

94.    Each year, Marsh promised in each to "work with Sears to negotiate terms and conditions on all contracts of insurance and service between Sears and insurance companies and various service companies."   Marsh also agreed to recommend "[m]arket strategy" to Sears for contract negotiation with insurers and to "prepare a comparative analysis of coverage, quotations and service proposals by insurers that shall include recommendations as to cost, coverage and service."  Marsh was also integral to Sears' financial planning and agreed to provide Sears with "premium projections included in Sears' business and long range plans."

95.    Marsh promised to utilize its "national and international facilities to assure all expertise within [Marsh] is effectively employed in the placement and administration of all policies for the insurance coverages" and to "provide appropriate assistance to Sears operations wherever located. . . ."  And, Marsh was responsible for assisting "Sears in identifying and evaluating exposure risk including reviews of Sears' contracts to help identify insurance issues."

96.    In the August 19, 2002 letter agreement, Marsh also promised to "design and develop" Sears' insurance program and to "[d]evelop a mutually agreeable renewal action plan" that "meets [Sears'] objectives."  Marsh further promised to "negotiate on [Sears'] behalf

with insurers," to "[u]se its best efforts to place insurance" on Sears' behalf, and to "act as a liaison between" Sears and the insurers.

97.    On or about the effective date stated in each of the customer agreements with Sears, Marsh sent the customer agreement to Sears' risk management personnel.  On most occasions, Marsh sent the customer agreements by email, but on a few occasions may have sent the agreements by U.S. mail or by facsimile.  For example, on February 16, 2001, Marsh's Mr. Kerr mailed an amendment to the Customer Service Agreement that he had signed to Sears' Ms. Wagner.  Sears received the document a few days later.

98.    Marsh owed Sears an implied covenant of good faith and fair dealing under brokerage agreements.

99.    In interacting with Sears, Marsh personnel indicated that they had been and would continue to seek the best insurance for Sears at the lowest premium.  Indeed, this is the primary reason for engaging a broker.

100.    Sears reasonably understood that Marsh's had promised that it would act in Sears' best interest in seeking insurance for Sears and that Marsh would not abuse its ability to control information and bidding to Sears' detriment.

101.    Sears reasonably understood Marsh would not accept compensation other than the fee for broking or placing any insurance policies for which Marsh had entered a fee-only brokerage agreement.

102.    Under the circumstances, Marsh owed Sears a fiduciary duty to act in its best interests in placing their insurance policies.

103.     Contrary to Marsh's representations and promises, as well as its fiduciary obligations, Marsh sought to enrich itself at the cost of its customers, including Sears, by engaging in an extensive customer allocation scheme with certain insurers that focused on the excess insurance lines above various primary lines, including excess casualty (*i.e.,* the insurance over CGL), EPL, property and D&O insurance.  The conspiring insurers cooperated and encouraged Marsh and were, in turn, rewarded by Marsh at further expense to Marsh's customers, including Sears.

104.     Furthermore, Sears would not have used Marsh as its insurance broker—and, certainly, not paid Marsh a flat fee to act as its insurance broker—if it had known about the true nature and scope of the contingent commission kickbacks and Marsh's breaches of its contractual and fiduciary obligations.

**B.     As Early as the Mid-1990s, Marsh Established a "Pay-to-Play" System in Which It Directed Business to Insurers in Exchange for Secret Kickbacks.**

105.     Marsh was effectively the sole communication conduit between its customers and the insurers with regard to the insurance product lines that it brokered for those customers.

106.     As early as the mid-1990s, Marsh began entering into agreements with so-called "preferred" insurers for the specific purpose of securing kickbacks in exchange for allocating increased and more profitable business to the selected insurers.  Marsh and the participating insurers often referred to these kickbacks as contingent commissions, overrides, profit sharing agreement payments or PSA payments.

107.     These kickbacks were in addition to any regular – also called "brokerage" or "straight" – commission Marsh received on the accounts.  ACE, Chubb, Travelers, XL,

Fireman's Fund, Liberty, Arch, Hartford, and the other conspiring insurers each entered a

kickback agreement with Marsh.

108.    As a *quid pro quo* for conspiring insurers to kick back substantial portions

of the customers' premiums, Marsh placed its customers' business with the conspiring carrier.

And, the bigger the kickback the more business would be placed with that carrier at an inflated

rate.  As one Marsh executive explained to his subordinates, the size of the kickback payments to

Marsh determined "who [we] are steering business to and who we are steering business from."

Marsh did this without its customers' knowledge or consent, and with an express strategy of

secreting this practice from its customers.

109.    For example, in October 1996, Marsh's William Gilman explained in an

internal memorandum that he had signed so-called contingent commission agreements with

Zurich, Tamarack and Fireman's Fund for the excess casualty insurance lines placed in 1997.

He directed that Marsh require all excess casualty business be placed with these insurers,

"[p]lease mandate these insurers for all excess casualty business through" Marsh's Global

Broking Unit.

110.    Likewise, Marsh's Kathryn Winter testified that at a meeting with Marsh

employees, it was decided to "[t]ry to funnel new business" to an unnamed insurer.  She also

further testified that Marsh directed its employees to "not place business with [insurers] with

which [Marsh] did not have [PSAs] unless [it] had to."

111.    Marsh continued to enlist insurers to pay significant kickbacks in

exchange for allocating increased and desirable business.  For example, Marsh enlisted AIG into

the scheme.  In October 1999, Marsh's Leslie Nylund remarked to her colleagues in Marsh's

Global Broking Unit that "[w]e SHOULD be feeding AIG on excess umbrella. . . . It is VERY lucrative."  (capitalization in original.)

112.    Also in 1999, Marsh attempted to enlist Chubb into its kickback scheme. Marsh demanded from Chubb a 9% kickback—referred to at the time as an "over-ride"—on all umbrella business, which would have left Chubb paying 17-1/2% of customers' premiums to Marsh.  Chubb initially refused to acquiesce to Marsh's demand.  Marsh's Mr. Gilman responded by threatening Chubb that Marsh would pull all excess coverage renewals from Chubb, worth at least $55 million.

113.    Mr. Gilman was true to his word.  Marsh established a boycott of Chubb that lasted about three months.  Marsh quickly moved renewal and potential new business away from Chubb to those insurers who had agreed to pay the kickbacks, mostly AIG and Zurich.  In fact, in just the three days from September 30, 1999 through October 1, 1999, Marsh moved $3 million of Chubb's $3.6 million in renewal business away from Chubb.  One of Sears' policies, an excess policy issued to IBP was among the renewals that Marsh moved from Chubb to pressure Chubb to agree to pay kickbacks.

114.    Chubb learned its lesson:  if it did not pay substantial kickbacks to Marsh, it would be cut out of all of Marsh's insurance programs.  In early November 1999, after enduring Marsh's punishment for only three months, Chubb changed its position and agreed to pay Marsh a kickback of 15% on all "the 'Gilman' excess umbrella book" retroactively back to January 1, 1999.

115.    Marsh used its ability to control which insurers would even have an opportunity to bid on business to maintain its grip on the conspiracy.  As Marsh's William

Gilman explained, "If we had control over the business then we could make the insurance companies give us lucrative placement service agreements we would have the ability to reward them or take the business way. We had control over whether or not they got the business."

116.    Marsh ensured that the insurers understood they would have to pay kickbacks to receive desirable business—a classic "pay to play" scheme. Marsh was aggressive in broadcasting the story of its boycott of Chubb in the excess casualty line among the insurers. The insurers quickly understood this "pay to play" arrangement.

117.    Fireman's Fund executive Gil Benjamin succinctly described the Marsh's approach as "[p]ay us for the book [of business], or suffer the consequences" and assessed Fireman's Fund's decision to pay the kickbacks as "does FFIC [Fireman's Fund] want to play or not under these apparent rules of engagement?"

118.    As XL's Chief Underwriter for Excess Casualty-Americas, Diane Amodeo, explained to her colleagues in a 2001 internal email, "Generally speaking, Marsh Global Braking [sic] considers the establishment of a PSA the minimum entry requirement to placing Excess business."

119.    Likewise, as the year closed in 2003, Marsh's Joseph Peiser approached Ace about paying higher kickbacks under the PSA agreement. In his words, he "made it clear that if ACE wants us to meet significant premium growth targets then ACE will have to pay 'above market' for such stretch." He further noted that Ace had indicated it was "open to above market percentages for dramatic growth which is [its] goal."

120.    Also, in discussing Liberty's recent poor performance in umbrella product lines, Liberty's Vice President of its National Market Umbrella Unit, Doug Cauti, reported on

January 10, 2003 that Marsh had told him it "won't do business with us without a volume

agreement."  Mr. Cauti referred to the 2003 PSA agreement Liberty was negotiating with Marsh,

but explained that Marsh covered product lines other than umbrella lines.

      121.    Marsh had various names by which it referred to the conspiring insurers,

including so-called "partner markets" and "strategic partners."  Marsh allocated its customers'

business among the conspiring insurers in exchange for kickbacks in not only the excess casualty

product lines, but in other lines as well.  As Marsh's Joseph Peiser explained in an internal

memorandum, ACE provided PSA kickbacks to Marsh "across multiple lines."

      122.    Marsh's Mark Rice made a presentation on September 23, 2002 in

Marbella, Spain to the Executive Committee of Marsh's Global Broking group.  The presentation

included a chart entitled "2002 PSA Inventory" that detailed the product lines in which each

carrier had agreed to pay kickbacks to Marsh.  For example, the chart showed that Ace and its

Bermuda affiliate, Arch Bermuda, CNA, St. Paul, XL Bermuda, Zurich and other unnamed

conspiring insurers had agreed to pay the PSA kickbacks on the excess casualty, property and

FINPRO (which includes D&O) product lines.  Others, such as Arch, Chubb, Hartford, Kemper,

Liberty, and XL had agreed to pay the kickbacks on one or two of these product lines.

      123.    Zurich admitted in its Assurance of Discontinuance & Voluntary

Compliance that it signed with, among others, the New York, Illinois and Connecticut Attorneys

General that its "participation and manipulation of the bidding process was not limited to either

excess casualty insurance or its use of Marsh as the broker for the coverage."

      124.    As with the excess casualty product lines, the insurers understood that

Marsh would not steer other lines of business to them unless they had a PSA kickback

agreement.  For example, as XL's Ms. Amodeo explained in a 2003 business plan, Marsh

"controls 40% of the excess workers compensation market.  As with umbrella, PSA would be

mandatory."

125.    Likewise, on May 11, 1999, Marsh's Ms. Nylund (the same Marsh

representative who worked to enlist AIG into the conspiracy) and six of her Marsh colleagues

met with Chubb personnel to discuss having Chubb pay kickbacks to Marsh on the "multiline"

insurance products.  In an "open and candid" discussion about how the two companies could go

about "retaining business and growing together" in multiline insurance products, Chubb tellingly

explained that its primary needs were to avoid competition and increase rates.  Marsh told Chubb

that having the new "profit sharing agreement" or "PSA" kickback agreement in place "removes

a major obstacle from our relationship."  As a result of the meeting, Marsh agreed to "action

steps to address Chubb's needs," including eliminating competition.   Specifically, Marsh agreed

to work with "Chubb, Client Execs, and clients" to ensure that Marsh would "not to take these

accounts to market."  At the same time, Marsh stated that it could secure a "3-5% aggregate rate

increase" on Chubb's book of business.  Despite Ms. Nylund's meeting with Chubb, however,

Chubb did not sign a kickback agreement that was acceptable to Marsh until November 1999.

126.    LIU, a business unit of Liberty that provides specialty lines of insurance,

did not have a PSA kickback agreement with Marsh in late 2003 for specialty lines.  Thus, Marsh

sent an unmistakable message to LIU.  The day before a scheduled meeting with LIU to discuss

providing insurance to Marsh's chemical industry customers, Marsh canceled the meeting and

told LIU that the reason for the cancelation was that it "did not have a PSA."

127.    In 2002, Liberty's chief underwriting officer for its property lines, Patrick O'Connor, came to recognize that "we need a psa" for Liberty's property lines when he learned that Marsh had been "steering business away" from Liberty because it had refused to pay kickbacks to Marsh on property lines.  In January 2003, Mr. O'Connor announced that Liberty had finalized a PSA kickback agreement with Marsh covering excess property lines and explained to his colleagues that "we agreed to a very, very attractive and lucrative plan and expect preferential treatment in return."

128.    Liberty received the preferential treatment for which it paid kickbacks. On February 23, 2003, Mr. O'Connor sent an internal email to his colleagues explaining that the head of Marsh "is steering business our way."  Just a few months later, Mr. O'Connor reiterated his understanding that payments to Marsh were the *quid pro quo* for obtaining business.  On May 23, 2003, he sent an email stating that Liberty "is the; [sic] broker friendly, commission paying, psa paying, underwriting/engineering with the common sense alternative to fmg [Farmers' Mutual Group].  we should be seeing every current marsh fmg account. . . ."

129.    The kickback scheme was highly lucrative for Marsh.  Marsh's Director of Global Property Placements, Bob Howe, and its Head of Market Relations, Adam Kagan, announced at a March 3, 2004 meeting with Liberty that Marsh's kickback scheme was "EXTREMELY successful in 2003" and that Marsh's revenue from the kickbacks had tripled from 2000 to 2003.  Just with regard to excess property lines booked through Marsh in 2003, about $3.8 billion of the $4.5 billion in premiums were subject to the kickback scheme.

130.    In 2003 alone, approximately $800 million of Marsh's net income were attributable to so-called "contingent commission" kickbacks.  That year, Marsh overall reported

32

approximately $1.5 billion in net income.  Marsh, however, has never disclosed to its

shareholders how the contingent commission kickbacks constitute the lifeblood of its business.

Jeffrey Greenberg, the Chief Executive Officer of Marsh, stated:  "We don't break out contingent

commissions.  This is not separately enumerated because it is part of our business model. . . ."

**C.**    **The Scheme Expanded to Include Customer Allocation and Steering, which Marsh Controlled and Policed.**

**1.**    **Without Permitting Competition, Marsh Slated the Insurers to Win Each Layer of Its Customers' Business and Set the Prices.**

131.    Marsh's scheme expanded into a conspiracy among its conspiring insurers

to allocate business and limit competition.  The conspiring insurers participating in the scheme

included AIG, Ace, Chubb, CNA, Fireman's Fund, Liberty, St. Paul/Travelers, XL and Zurich.

132.    Without seeking competitive bids, Marsh determined the insurance

program for each customer, including which insurance carrier would get the business for each

layer.  On renewals, Marsh generally selected the incumbent carrier when it was a conspiring

insurer.  Marsh also set the "target prices" at which each layer of the excess coverage would

receive its allocated business.  Marsh slated the target prices to be higher than a competitive

market would have generated, but not so high as to raise serous suspicion among Marsh's

customers or its Client Advisory Services, the portion of Marsh that dealt directly with

customers.

133.    In fact, Marsh's Joshua Bewlay testified that the head of Marsh Global

Broking's excess casualty group told him "that the right price is the highest bindable number.

And by that it means we wouldn't go for the lowest possible number we could get."

134.    Within Marsh, Global Broking Coordinators, or "GBCs," were responsible for running the scheme on a day-to-day basis.  They determined which conspiring insurer would win each layer of business and set the target prices for each customer's insurance layer.  The plan for each customer's insurance was called a "broking plan," which Marsh personnel sometimes called a "game plan."

135.    The GBC responsible for an insurance renewal would send the broking plan to Local Broking Coordinators, or "LBCs," at Marsh who communicated with the conspiring insurers to coordinate the bids.  Marsh assigned a small group of LBCs to be responsible for each conspiring insurer.  The LBCs provided the relevant portion of the broking plan, including the target prices for a given layer, to the conspiring carrier.  Often, the LBCs sent the entire broking plan to the conspiring insurers.

136.    As long as a given conspiring carrier bid the target price slated by Marsh, Marsh did not seek competitive bids for the layer.  As Marsh's Ms. Winter explained, "if the incumbent markets meet their target price and do[] the coverage we want, [Marsh] will protect them and make sure they get the business."

137.    Mark Manzi of Marsh, who has pled guilty to a scheme to defraud in a criminal investigation of Marsh regarding the conspiracies alleged herein, testified that conspiring insurers "were told what coverages on a whole they needed to provide, what policy forms, the timing that the quotes needed to be provided.  Business would be steered to them and they would be protected when they quoted per targets on their incumbent renewals."

138.    Initially, the broking plans were not formal documents and were often prepared solely in email form.  By 2001, however, Marsh was generally using a one- to two-page form for the broking plans.

139.    The use of broking plans or game plans to eliminate competition and fix prices became a standardized process.  For example, a May 19, 2003 presentation involving Marsh's Greg Doherty, Edward McNenney, Peter Anderson and Regina Fitzgerald (f/k/a Regina Hatton) described "how the process should work" for game plans.  In the "'Perfect World' Process," the "GBC creates the Game Plan" and the "LBC reviews the Game Plan."  Then, the "Markets follow the Game Plan and quotes are delivered to the GBC."  It is only when events do not go according to plan—termed "Variables to Successful Placements" that the "GBC declares open season on all markets."

140.    Likewise, Kevin Bott—an employee of Marsh who later went to work for Liberty—was told to make sure insurance companies without PSAs did not get business. Mr. Bott testified that, while at Marsh, "[m]y job was to insure that once I did receive a renewal quote, I would pass it off to whomever was deemed to win that bid and to make sure that they had everything they needed in order to accomplish that.  I was told that I would be – my [expletive] ass would be fired if I placed a piece of business with [the insurers without PSAs]."

141.    During the criminal trial of Marsh's Mr. Gilman, AIG's Karen Jacobson (f/k/a Karen Radke) confirmed the scheme and explained how Marsh caused the customer to place its insurance with the carrier Marsh had slated to win.  She testified that, in 2001, she spoke with Mr. Gilman about the scheme.  Mr. Gilman told her about the "Marsh system" and lectured that it was very important AIG "stay in line" and "not compete for other business."  She

35

further testified that Marsh would make quotes by AIG that were slated to win look like winning bids to customers by soliciting quotes from other insurers that were not competitive.

142.    The broking plans, of course, were kept secret from Marsh's customers and, often, even from Marsh's Client Advisory Services.  As Mr. Manzi testified, Marsh had a policy throughout the company that Marsh personnel "were not allowed to share or disclose details of the PSA to anybody."  Rather, to the extent any inquiries arose, Marsh funneled them to a single point of contact in the company who, in turn, avoided providing any real information through obfuscation.

143.    Similarly, in an internal Marsh document entitled "GBC Renewal Process/Timeline," GBCs were warned "[i]f face to face client meeting [will be] involved, send out Broking Plan with target pricing to follow after meeting.  LCB's have a bad habit of pulling these out in front of clients."

144.    In exchange for limiting competition and protecting its conspiring insurers' business, Marsh received handsome compensation in the form of kickbacks, high commissions on re-insurance placed with Marsh's affiliates, and other payments.

145.    All of Marsh's conspiring insurers were aware of the scheme and agreed to participate in it.  They were also aware of the participation of the other conspiring insurers, who were ostensibly their competitors.

146.    At each insurance renewal, Marsh showed to Sears quotations at or near target prices for the renewal.  Sears did not know that Marsh had obtained the quotations without competition, but rather understood that the quotations represented the best insurance at the lowest premium.

>        2.      **Marsh Obtained Fake B Bids and Sham Declinations to Create the Illusion of Competition.**

147.    On certain occasions, Marsh felt the need to maintain the illusion for its customers or for its Customer Advisory Services that Marsh was diligently marketing its clients' business to competing insurers.   As Ms. Winter from Marsh testified, "in the event the client required additional quotations from other markets, we would ask those other markets to quote non-competitive quotes, protective quotes or B-quotes."

148.    To do this, Marsh sought and obtained false "B bids" or sham declinations from its conspiring insurers.  In fact, Marsh often included instructions in its broking plans asking the LBCs to obtain false B bids or sham declinations on business from conspiring insurers not slated to win that layer of business.  Marsh sometimes even provided the pricing at which the sham B bids were to be placed by one or more conspiring insurers, which were not slated to win. In exchange for providing the false B bids or sham declinations, conspiring insurers received assurances that their renewals would be protected when they were incumbents and they also often received placements in the excess layers of the coverage.

149.    The internal Marsh document entitled "GBC Renewal Process/Timeline" explains that "Back-up Quotes and B Quotes" are "Formal quotes/email indications to protect incumbent."  It directs GBCs to "Request 'B' quotes early b/c last week of every month markets only focus on 'live' opportunities vs. quoting B's" and reminds GBCs to be "careful that alternative 'B' doesn't beat incumbents['] quote—it's not always price, it could be attachment point or coverage."

150.    The insurers understood the scheme.  For example, as Ace's Geoffrey Gregory explained it in a November 3, 2002 email, Marsh personnel had been

consistently asking us [Ace] to provide what they refer to as "B" quotes for risk. They openly acknowledge we will not bind these "B" quotes in the layers we are be[ing] asked to quote but they "will work us into the program" at another attachment point.  So for example if we are asked for a "B" quote for a lead umbrella then they provide us with pricing targets for that "B" quote.  It has been inferred that the "pricing targets" provided are designed to ensure underwriters "do not do anything stupid" as respects pricing.

151.    Prior to producing this email in discovery to the CaseCentral MDL database, the Defendants redacted all information identifying the individuals involved in this incriminating email discussion.[1]  Sears' counsel was only able to view an unredacted copy of the email upon obtaining discovery material in early 2012 that had been produced by five of the defendants in the *Office Depot v. Marsh* action, a closed suit that had been filed in Florida state court.

### 3.    Marsh Policed the Scheme and Disciplined Dissonance.

152.    On the rare occasions when a conspiring insurer failed to act in accordance with the customer allocation scheme, Marsh acted as a vicious, swift, and unrelenting enforcer, immediately disciplining dissension.

153.    When a conspiring insurer even suggested that it might not want to go along with the scheme, Marsh was quick to threaten it, as demonstrated by Marsh's treatment of

---

[1]  Some of the documentary evidence cited in this Complaint comes from an on-line database maintained by CaseCentral under an order of this Court.  The Court's order requiring the use of this database, and all of the Defendants' production of documents into it, occurred before Sears filed its lawsuit.  At the time this pleading was drafted, the Defendants had not produced any documents that deal specifically with Sears' insurance.  Moreover, Sears has had no opportunity to question the form of the production.  As shown by Mr. Gregory's email, the Defendants extensively redacted many of the documents.  Likewise, the database contains improperly gathered documents, making the documents uninformative:  much of the production fails to identify attachments (parent/child relationships); spreadsheets and databases are often produced so that each cell is a single page; and entire file cabinets of paper documents have often been produced as a single electronic document.

38

Chubb's excess casualty renewals in the Fall of 1999. Likewise, when Ace's James Williams hesitated to provide a sham B bid requested by Marsh, Marsh's Greg Doherty forcefully responded, "[c]urrently we have about $6M in business which is the best in Marsh Global Broking so I do not want to hear that you are not doing 'B' quotes or we will not bind anything."

154. Mr. Williams also testified that Marsh's Mr. Gilman told him that Marsh "intended to punish those who didn't go along with their structure" and described as an example how Marsh had punished Chubb for refusing to go along with the scheme.

155. Not surprisingly, conspiring insurers rarely provided competitive quotations on accounts where they were not slated by Marsh to win the business. Marsh colorfully explained what would happen if a so-called "alternative market"—*i.e.*, a conspiring insurer that is not slated win the bid—departed from the broking plan and provided a competitive quotation:

> if alternative [market] quotes below [the target price] then they
> have made a conscious decision to quote below the market and pull
> the market down. If that happens, then (according to Bill
> [Gilman]) we will put this guy in open competition on every acct.
> and CRUCIFY him. Further, we must make sure the incumbent
> keeps this (or another market) and NOT give it to the alternative
> and reward them.   (capitalization in original.)

156. Andrew Lennox, who worked for an unnamed conspiring insurer, clearly explained the scheme to his insurer colleagues, observing "the incumbent protection racket works great when you're the one being protected. Conversely, when you're on the outside looking in, it creates a barrier to entry on new accounts."

**D.    The Conspiring Insurers Knew of and Agreed to the Conspiracy.**

157.    AIG, Ace, Chubb, CNA, Fireman's Fund, Liberty, Travelers (which
includes St. Paul), XL, Zurich and other co-conspirators all agreed to participate in the customer
allocation and steering conspiracy and each was aware of the other conspiring insurers'
participation in the scheme.

158.    All of the conspiring insurers understood that Marsh would coordinate the
conspiring insurers' cooperation to allocate the insurance business of Marsh's customers.  On
renewals, Marsh generally allocated its customers' business to the incumbents when the
incumbent was a conspiring carrier.

159.    Ace, however, was a relatively late entry into the excess casualty market
and, hence, did not have the incumbent position on many policies.  As James Williams, Vice
President of Ace's excess casualty broking group, acknowledged, Marsh had "a 100% carrier
retention goal.  Thus, ACE will not get on the 'Game Plan' until the account is written or the
incumbent decides to abandon the plan."  In a telephone conversation on March 17, 2003,
Marsh's Mr. Doherty assured Mr. Williams that Marsh would find business opportunities to
allocate to Ace and would then protect Ace's position as the incumbent.  On the basis of this and
other promises, Ace agreed to participate in the scheme.  As Mr. Williams put it, "I assume then
the ACE renewals with Marsh will equally be 'protected' and we will be on the game plan."
Elsewhere, Ace acknowledged the general conspiracy, that Marsh would not send submissions
"out to competition" and would get "quotes from other insurers that would support the
incumbent as being the best price."

160.    Mr. Doherty began sharing with Ace—as well as with Ace's supposed competitors—the essentials of upcoming broking plans.  For example, on June 16, 2003, Mr. Doherty forwarded an email to Mr. Williams and several other Ace employees along with a spreadsheet entitled "Doherty July August Account Log."  Mr. Doherty also included as recipients on the email underwriters at an unnamed insurer, Ohio Casualty Group and Liberty, including Mr. Bott.  The email was sent such that all of the recipients could all see that their supposed competitors were also recipients.  The attached spreadsheet identified Marsh customers that had casualty insurance renewals in July and August 2003 and specified the "assigned markets"—*i.e.*, which insurer was slated to receive the business.  It also included "comments" for many, including instructions as to which of the four insurers were to receive various layers of the business and what the target prices were to be.  Mr. Doherty also specified for some of the entries whether the bid would be a "backup."  On many, Mr. Doherty informed the supposed competitors that slated winners were "TBD" [an acronym for "to be determined"] because he was "awaiting Broking Plan."

161.    About half a year later, some Ace personnel questioned the legitimacy and legality of the so-called Marsh Global Broking "model."  At a dinner in late October or early November 2003, Marsh's Joshua Bewlay, Edward McNenney and Greg Doherty discussed the scheme with Ace's Mr. Gregory and Jonathan Zaffino.  The following week, on November 3, 2003, Mr. Gregory wrote an email labeled "Confidential" to the President of Ace USA, Susan Rivera, that the scheme had left him and Mr. Zaffino "feeling uneasy" and made them concerned "about potential legal issues for ACE."  Mr. Gregory further explained that "our actions on 'B' quotes could potentially be construed as simply creating the appearance of competition."

Mr. Gregory requested a meeting with Ms. Rivera and Ace's general counsel, stating his position that "[i]n my opinion, ACE cannot be seen as aiding [Marsh Global Broking] in providing quotations for 'competitive appearance purposes' only." Despite Mr. Gregory's articulated concerns, however, Ace remained a knowing and willing participant in the customer allocation and protection scheme.

162.    Proof of the conspiring insurers' knowledge of and agreement to the conspiracy may be found in several forms. The conspiring insurers knew of the terms of each others' kickback arrangements, they occasionally provided fake B bids or sham declinations to protect each others' business, they occasionally communicated directly with each other, and employees of many of the conspirators even pled guilty to their participation in the antitrust conspiracy.

### 1.    The Conspiring Insurers Knew the Terms of Each Others' Kickback Agreements.

163.    Marsh provided its conspiring insurers with information about the identity of other insurers that had entered into the kickback arrangements. For example, Marsh not only informed Ace's Bermuda affiliate that its competitor, XL, had entered into a kickback agreement with Marsh, Marsh actually sent a "sanitized" copy of the XL kickback agreement to it.

164.    The sharing of competitors' kickback agreements were not isolated events. Marsh's Bill Roeder told representatives of Fireman's Fund in 2000 that exactly what Hartford, Travelers, St. Paul, Chubb and Zurich were paying to Marsh in PSA kickbacks and how much business Marsh had allocated to each carrier.

165.    Also, in a December 28, 2000 email, Mr. Roeder recounted to Fireman's Fund representative Joe Maher, "I have shared details regarding our total book of Excess, the top

ten Markets, and what [Marsh] is receiving in Compensation from these Markets.  [Fireman's

Fund] current proposal places you at a distinct 'disadvantage', and I am concerned that your

current Excess book will not only not grow, but may even shrink."  Mr. Roeder concludes that if

Fireman's Fund agrees to the kickbacks proposed by Marsh, Marsh "will work with [Fireman's

Fund] very aggressively to achieve both increased rate and retention goals."

      166.    Numerous other examples exist of Marsh informing its conspiring insurers

of the terms and conditions of Marsh's kickback agreements with the other conspiring insurers,

including the identity of such conspirators.  For example, in April 2001, when Marsh was

negotiating a PSA kickback for the business of its customer, Healthspectrum, Marsh told an

unnamed conspiring insurer that AIG paid Marsh a kickback of 4.5% in gross premium and that

most of its kickback arrangements were in the "6% to 6.5% range."  About a year later, in March

2002, the unnamed insurer's manager noted that the PSA kickback arrangements Marsh had with

other insurer conspirators for excess liability lines "tend to run in a fairly tight band between

15% and 18%."  This statistic presumably combines the contingent commission kickback and the

straight commission under a "gross up" provision, which had become common in the PSA

kickback agreements.

      167.    Similarly, in a November 2000 meeting about the 2001 PSA agreement,

Marsh provided Fireman's Fund with information on the deals it had cut with Fireman's Fund's

competitors.  According to a November 30, 2000, internal Fireman's Fund email reporting on the

meeting—which the Defendants redacted prior to producing in discovery—Marsh informed

Fireman's Fund of the details of its arrangements with other conspiring insurers:

> Hartford will write $200 M[illion] with GB [Marsh's Global
> Broking] in 2000 and has offered a "guaranteed" override of 3%

43

on the book for 2001, plus specific product incentives . . .
Travelers will do $150 M[illion] with GB . . . next year they
"guarantee" 3% on their GB book.  St. Paul writes $75 M[illion]
bolstered by their high tech product segment push … Chubb is
back in [Marsh's] good graces and is guaranteeing [redacted] on
next year's book.  They do $135M[illion] down from
$220M[illion] in '99 and are making money with GB.

      168.    Likewise, as part of an attempt to convince Ace to pay higher kickbacks at

the end of 2003, Marsh's Mr. Peiser planned to tell Ace exactly what the other conspiring

insurers were paying in PSA kickbacks and how Ace would be punished if it failed to make

similar payments:

We will be candid and absolutely honest about where their PSA
stands relative to similar partners in terms of both %'s and growth
thresholds.  We will also be VERY CLEAR to the ACE product
line managers what the impact will be if they are below market in
terms of PSA.

      169.    An executive at St. Paul (now part of Travelers) also admitted under oath

that brokers such as Marsh gave his company the opportunity to review the kickback agreements

between Marsh and other insurers, including in July 2002.

      170.    St. Paul went so far as to keep a library of the other conspiring insurers'

"agency contracts, profit sharing contracts, commissions [sic] schedules and preferred

programs."  It obtained copies of the agreements directly from Marsh.  St. Paul's Charles Orbann

instructed St. Paul employees that "[a] good time to ask your agents" for the latest contracts

between St. Paul's supposed competitors and the broker was "when you are delivering their

profit sharing checks."  He cynically added, "they should be very accommodating since you are

there to drop off a check."

171. In 2004, Fireman Fund's John Hosbein told a colleague that he had copies of the so-called "profit sharing plans" for Fireman Fund's competitors. Recognizing that such horizontal communication might be improper, he wrote "I don't distribute this to ANYONE in electronic form so it does not get out of [my] control."

### 2. The Conspiring Insurers Provided False "B Bids" and Sham Declinations to Protect Each Others' Business.

172. Although fake B bids and sham declinations are not central to the customer allocation scheme, Marsh used them to prevent the discovery of the scheme. Thus, Marsh occasionally sought fake B bids or sham declinations to create the illusion that it was actively marketing its customers' business to a competitive marketplace.

173. As alleged above, a "B bid" is a rigged bid designed to make the slated winning bid look competitive. A sham declination serves the same purpose. It is when Marsh would ask a carrier to decline to write the insurance, often upon a false basis. As Mr. Belay admitted during his deposition, declinations serve "the purpose of a B quote or to show that we went out and tried to market the account competitively. A declination serves the same purpose as a quote that comes in higher or less competitive. It shows that you marketed it and the underwriter said, no."

174. Insurers have no reason to provide fake B bids or sham declinations absent a conspiracy among them. To the contrary, such conduct is strong evidence of a horizontal agreement among insurers to participate in an illegal customer allocation and steering scheme. Here, Marsh obtained false B bids and sham declinations to mislead those of its personnel who were not privy to the scheme or a customer, particularly when a customer might ask to see multiple bids or faced an exceptional premium increase on renewal.

175. Marsh's conspiring insurers shared this understanding of the false B bids and sham declinations. As Mr. Bott was Liberty's Assistant Vice President for Excess Casualty from January 2001 until he was forced to resign on June 24, 2005. He candidly explained the use of B bids, or "B quotes," in sworn testimony: "My understanding of a B-quote was a quote that would never win a piece of business. At times, they were referred to as alternative quotes, backup quotes, protective quotes. . . ."

176. Mr. Bott further testified to the Defendants' understanding of the *quid pro quo* nature of false B bids:

> The terminology B-quote meant that if there was again a predetermined winner for an insurance bid, a B-quote – if we were asked to provide a B-quote at Liberty, it was to be less attractive than that incumbents or understood winner of that bid. Terms and conditions wise, coverage wise, limits wise, pricing wise…We would have the same protection, if you will, afforded to us on future deals.

177. Examples of fake B bids and sham declinations by Marsh's conspiring insurers abound.

178. Liberty overtly participated in the conspiracy. Mr. Bott admitted to repeatedly providing sham B bids on behalf of Liberty in response to requests from Marsh. He testified that in November 2003, Marsh's Mr. Doherty requested a sham B bid from Liberty on a cosmetic company's insurance business that Marsh's Ed Keane had already slated to go to AIG. Mr. Doherty provided Mr. Bott with a false target price that was higher than AIG's bid. In response, Mr. Bott provided Mr. Doherty a noncompetitive bid.

179. Mr. Bott pled guilty in New York state court to acting in a combination of restraint of trade. In his allocution, he admitted under oath that many times between January

2001 and June 2005, he provided fake B bids at Marsh's request.  Mr. Bott also explained that he

understood the sham bids "were intended to allow Marsh to maintain control of the market and to

protect the incumbent."

180.    For example, on October 21, 2003, Marsh's Nicole Michaels, forwarded

an email to Mr. Bott regarding a November 1, 2003 renewal for Orius Corporation's lead

umbrella excess and the fact that Marsh had slated AIG to win.  She told Mr. Bott to "[s]ee

below and just say no, I mean give me a reason but say no (wink wink)."  Later that day,

Mr. Bott complied by providing a sham declination.  He responded to Ms. Michaels, "[p]lease be

advised that we aren't comfortable with quoting the lead umbrella in excess of the suggested"

attachment points.

181.    Mr. Bott was by no means a maverick at Liberty.  For example, on

February 27, 2001, Marsh slated the winners of Hexcel Corporations Marsh 1, 2001 excess

casualty insurance renewal.  Marsh slated AIG to win the lead layer and Zurich to win the next

excess layer at pre-determined target prices.  Marsh's Joshua Bewlay instructed Kathleen Drake,

a Marsh LBC, to obtain a false bid from Chubb.  He told her that he needed "Chubb to say no

thank you on a lead basis and excess basis at the numbers" Marsh had already determined for

AIG and Zurich.  He also told Mark Manzi, another LBC, "I need another bad indication from

Liberty."  Mr. Manzi promptly called Liberty's Jason Monteforte to ask him to offer a B bid on

the excess layer to protect Zurich's slated price.  Later the same day, Mr. Monteforte complied,

writing in an email to Mr. Manzi "[a]s per our telecom this morning we can offer the following

quotation" and providing a price that was more than three times higher than Zurich's slated price.

182.    In another incident in March 2002, Marsh's Mr. Bewlay developed a broking plan for the excess casualty renewal of a large customer, Signature Fruit, and slated Zurich to win the lead layer.  According to Mr. Bewlay, the target price at which he slated Zurich to win the lead layer represented a 72% increase over the previous year's policy.  This was an especially surprising increase, given that the company's revenues and work force had shrunk and its insurance needs were unremarkable.  As Mr. Bewlay explained, the customer is "a smaller company now" and its insurance coverage was "nothing crazy."  To provide protection for Zurich's high renewal, Marsh wrote that "Liberty is for type B only.  Lets [sic] send to ACE for B as well."  After Zurich bid the target price, Marsh requested the sham B bid from Liberty.  As requested, Liberty provided Marsh with a B bid that exceeded Zurich's bid.

183.    Ace also overtly participated in the conspiracy.  For example, in placing the renewal business for Fortune Brands' excess casualty insurance in December 2002, Marsh slated AIG to be the lead insurance layer.  Ace inadvertently underbid AIG at $900,000 and Marsh immediately returned to Ace asking it to ***raise*** its bid to allow AIG to be the low bidder.  Ace's Patricia Byrne complied on December 12, 2002, faxing a "revised confirmation" to Marsh's Mr. Doherty seeking a $1.1 million premium for the lead layer.  The following day, Ms. Byrne summarized the events in an email to her supervisor, Ace's James Williams, stating "We were more competitive than AIG in price and terms.  MMGM [Marsh's Global Broking] requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business."

184.    Likewise, in conjunction with an August 1, 2003 renewal on a large account, Marsh's Mr. Keane instructed his subordinate Heidi Haber to obtain a "B quote from

48

ACE." On July 29, 2003, Ms. Haber informed Curt Pontz at Ace that St. Paul had been allocated the lead position on the client's renewal business because St. Paul had "hit target of $200,000." Ms. Haber requested that Ace provide a "back-up indication" at "approx. $460,000." Later that same day, Mr. Pontz used a fresh email string and responded by stating that Ace's bid for the lead layer was at "about $450,000"—significantly higher than the $200,000 target hit by St. Paul.

185. A similar situation occurred the following month with another renewal. On August 26, 2003, Marsh's Mark Kaufman informed Mr. Pontz at Ace that AIG had bid $545,000 to be the lead insurer on a client's business and requested that Ace provided "an alternative lead" quotation. The following day, Mr. Pontz sent email to Mr. Kaufman—in a fresh email string—that Ace would agree to be lead "in the $650-$700mm range."

186. After the several state Attorneys General began their criminal investigations, one Ace employee made the self-serving and incredible claim that he understood a request for a "B bid" to merely mean that Marsh was informing Ace that Ace had a low "minimal" chance of winning the policy. This same employee, however, admitted under oath that he also had understood Ace would win any insurance layer that Marsh had slotted Ace to receive in the game plan at the target price set in that game plan, and he did not expect any supposed competitor of Ace to underbid Ace's target price. In other words, he knew that the game plan protected Ace from competition on its assigned layers.

187. Ace entered the conspiracy later than most of the other conspiring insurers and, therefore, it was not the incumbent insurer on most renewals. Marsh had to find opportunities for Ace to secure noncompetitive business and convince Ace that its kickbacks were well spent. Therefore, Marsh's Mr. Doherty regularly sent a "report card" to Ace

49

identifying the number of times when Ace had been slated to write business at above-market rates, which he identified as "Excellent Opportunities."  For example, Mr. Doherty steered Tyson's 2002 lead excess casualty renewal to Ace, netting Ace a premium of $1,720,450. Mr. Doherty referred to the ratio of accounts actually written to "Excellent Opportunities" as the "Real Hit Ratio."  Mr. Doherty also tracked the number of false "'B' Quotations" Ace had provided at his request.  In July 2002, for example, Mr. Doherty showed Ace that Ace had a "Real Hit Ratio" of 100% and that Ace had offered 5 "'B' Quotations."

188.    Similarly, on January 16, 2003, Mr. Doherty circulated by email an account log to, among others, underwriters at both Liberty and Ace.  The account log included a list of client accounts on which Marsh would ask Liberty and/or Ace to bid in the coming months (although the attached document bears a date in 2002, the accounts were up for renewal in 2003). The list included an explanation as to whether Marsh was seeking a B bid or providing a real opportunity for each part of the clients' business.  Importantly, both Liberty and Ace received copies of the email and attached account log and the personnel at each insurer could see that the other insurer had also received the material.

189.    XL overtly participated in the conspiracy.  For example, on April 5, 2003, XL's Chief Underwriter for Excess Casualty-Americas, Diane Amodeo, wrote to Marsh's Keith Fisher and Gary Bakalar in preparation for an upcoming meeting with Marsh's Joe Pieser at the next Risk and Insurance Management Society (RIMS) conference.  Ms. Amodeo bluntly stated "[w]e are generally cooperative in providing 'backup' quotes to protect incumbents when required to do so."

190.    XL regularly delivered on its offer.  On March 6, 2003, Marsh's
Mr. Keane allocated a large insurance client's policy to AIG at a target price of $200,000.
However, Marsh's Client Advisory Services asked to see a competing bid from XL.
Recognizing that AIG has "hit the target premium of $200,000," Mr. Keane told his subordinate,
LBC Leslie Lafrano, to "get a B Quote from [XL Insurance] for $230,000 or higher."  A few
business days later, XL's Assistant Vice President for Excess Casualty, Jackie Petito, complied.
She provided an indication to Mr. Keane that XL would want a premium of at least $275,000 on
the policy.  Mr. Keane forwarded this false bid to the broker Marsh's Client Advisory Services.

191.    St. Paul/Travelers also overtly participated in the conspiracy.  It regularly
provided false bids to Marsh to protect its co-conspirators.  For example, on September 28, 2001,
Marsh's Mr. Bewlay distributed a broking plan for a large real estate broker's excess casualty
renewal to, among others, Marsh LBC William McBurnie.  The broking plan called for Marsh to
obtain "alternative quotes" from an unnamed insurer, St. Paul/Travelers, Liberty, Zurich and
Gulf.  Mr. McBurnie understood that a request for an alternative quotes means "B-quotes or
losing bids."  Thus, he forwarded the broking plan to St. Paul/Travelers' Rick Rollins instructing
Mr. Rollins "[d]on't do anything with this as yet" because AIG was slated to win the business. A
few business days later, Mr. McBurnie—acting on Mr. Bewlay's instruction—asked Mr. Rollins
to supply a false quote from St. Paul/Travelers to protect the incumbent, AIG, on the account.  In
doing so, Mr. McBurnie told Mr. Rollins the exact amount of the AIG bid that needed protection.
He further explained that Zurich was also providing a false b bid, writing "[n]eed your
quote/indication (e-mail is fine for now) for 25 X P on this large real estate developer . . . .  AIG,
which is expiring at $42,500 for 25 X P, has quoted $79,750.  Zurich has quoted $110,000."  Mr.

Rollins promptly complied, responding by email the next morning, "I can authorize 25 mil x/s U/L for a premium of $100,000"—which was substantially less competitive than the AIG $79,750 bid he was to protect.

192.     Likewise, on February 28, 2002, Marsh's Todd Murphy emailed a broking plan to a number of other Marsh employees, including Mr. Mark Conklin.  Mr. Murphy ordered Mr. Conklin to obtain a false bid from St. Paul/Travelers for the purpose of protecting Zurich's bid.  Mr. Murphy instructed, "[p]lease sent [sic] to St. Paul for a B."  Mr. Conklin sent the request to Mr. Rollins, who promptly responded by email with a B bid.

193.     On another occasion, Marsh's Annemarie Tobin wrote a March 5, 2004, internal email about insurance renewal for a large chemical manufacturer to, among others, Marsh LBC Ms. Michaels.  Ms. Tobins explained that Zurich was slated to win the lead layer and had met its target price of $110,000.  She attached the quotation from Zurich and requested, "[p]lease share with you [sic] markets.  In addition to your excess quotes, I am looking for an alternative lead from St. Paul."  Ms. Michaels then forwarded this internal email to Mr. Rollins and attached Zurich's on-target quotation.  Ms. Michaels instructed Mr. Rollins to "drop me an email that outprices you or gives smaller scope of coverage on the lead, then we can proceed on the excess."  Mr. Rollins complied, providing a false quotation from St. Paul/Travelers of $125,750, which was more than $15,000 higher than the Zurich quotation he had received.  He also offered less attractive coverage than Zurich quotation.

194.     Likewise, during a policy renewal for a large bakery, Marsh's Nilda Janacek emailed St. Paul/Travelers' Francesca D'Angelo on January 21, 2003, asking St. Paul/Travelers to supply a false quotation to protect XL on the account.  Ms. Janacek wrote,

"The Lead was quoted by XL Winterthur 25x25 at $140,000. The coordinator, Maryann Baret, has asked that I get an e:mail price from you as an alternative 'b'."  The next morning, Ms. Janacek forwarded the email to Mr. Rollins asking him to handle the request.  Mr. Rollins complied almost immediately, providing a B bid to Ms. Janacek that was more than 40% higher than the XL bid he was protecting.

195.    An unnamed conspiring insurer overtly participated in the conspiracy, although some individuals at the insurer superficially bristled at it.  One manager wrote notes in preparation for an April 2001 meeting with Marsh in which he complained that he was being asked to participate in an illegal conspiracy and lie to Marsh's customers.  He explained:

> I am not some Goody Two Shoes who believes that truth is absolute but I do feel I have a pretty strict ethical code about being truthful and honest with people.  And when I am told I have to say certain things I know to be untrue . . . it is not I feel I should be asked to do or what this company stands for.  Yet it has already happened several times. . . .

The manager went on to describe the scheme in which the insurer was participating in a horizontal, illegal conspiracy that was orchestrated by Marsh:

> And this idea of "throwing the quote" by quoting artificially high numbers in some predetermined arrangement for us to lose is repugnant to me, not so much because I hate to lose, but because it is basically dishonest. And I basically agree with the comments of others that it comes awfully close to collusion or price fixing in the broader usage at GB [Marsh's Global Broking].

Later in the same document, he notes that Marsh will be setting the target prices and asks, "Are we to quote our numbers or what MGB wants us to quote"?

196.    Despite the manager's misgivings, the insurer continued to participate in the conspiracy.  In connection with an October 2001 renewal of The Adams Companies account,

the insurer provided a false bid to allow AIG to keep the business.  On September 4, 2001, Marsh's Mr. Bewlay sent an internal email to Messrs. McBurnie and Conklin informing them that "AIG came in with a lead $25 million for $175,000."  He then ordered them to get "a B quote from St. Paul and [an unnamed insurer].  Email will suffice."  Mr. McBurnie duly sent an email to the insurer's Brian Shea providing him with AIG's quote and asking him for an "indication."  Mr. Shea complied just 90 minutes later, providing a false bid that was $50,000 higher than the AIG quote that he was to protect.

197.    An unnamed conspiring insurer provided numerous other false bids to protect AIG.  For example, Marsh's Mr. Murphy created a November 16, 2001, broking plan in connection with the December 31, 2001, renewal of a large electronics company's account.  Mr. Murphy designated AIG to win the lead umbrella coverage at a targeted premium of $230,000, and slated Chubb and Zurich winning the excess coverage.  He called on conspiring insurers Kemper, Liberty and the unnamed conspiring insurer as "Type B" alternatives.  Marsh's Mr. McBurnie then asked the unnamed insurer for a false bid, and the insurer complied.  Marsh's Ms. Michaels did the same with Liberty, which also provided a false bid.

198.    Similarly, on October 3, 2001—a Wednesday—Marsh's Mr. Bewlay pushed a Marsh LBC to get AIG to "quote by Friday" on a renewal for Thomas Development.  Mr. Bewlay explained that if he received the quote by then "we can do a Type B on it and protect you."  A week later, on October 10, 2001, Mr. Bewlay had grown concerned about the lack of false documentation for his renewal and sent an internal email to Messrs. McBurnie and Conklin, demanding "I need those emails from [an unnamed conspiring insurer] and St. Paul.  This dates

54

[sic] on Friday!"  The very next day, Mr. McBurnie came through with a false $135,000 B bid from the unnamed insurer, noting "[t]hey are not competitive with either AIG or Zurich."

199.    An unnamed insurer also provided sham declinations as part of the conspiracy.  For example, the insurer produced an incomplete spreadsheet to the MDL database that internally tracked requests for quotations from Marsh in 2001.  According to the partial spreadsheet, the insurer declined to provide quotations and sometimes included the reasons for such declination.  The insurer's stated reason for one of the declinations was to "Protect Chubb."

200.    As alleged above, Chubb initially resisted joining Marsh's "pay to play" scheme in 1999 with regard to the excess casualty product lines.  After enduring Marsh's punishment for only three months, however, Chubb became an enthusiastic member of and willing participant in the customer allocation conspiracy.

201.    For example, in February 2001, Mr. Bewlay had prepared the broking plan for renewal of insurance for a carbon fiber manufacturing client and he slated AIG to win the lead umbrella.  By email, Mr. Bewlay circulated the plan and asked his subordinates to obtain sham declinations from Chubb and Liberty.  Marsh's Ms. Drake forwarded the email chain, including Mr. Bewlay's request for a sham declination, to John Updyke at Chubb.  Within the hour, Mr. Updyke replied to Ms. Drake, declining on behalf of Chubb to bid.  Ms. Drake forwarded Mr. Updyke's reply, which had attached the email string calling for a sham declination, to Mr. Bewlay.  Knowing that the email string calling for a sham declination would reveal that Marsh had prevented competition for the business, Mr. Bewlay deleted the attached email string containing his instruction to obtain a sham declination.  He then forwarded Chubb's sham declination to the Customer Advisory personnel who worked with the client.

202.    Likewise, in November, 2001, Mr. Bewlay prepared a broking plan for a trucking company that called for Zurich to win the business.  He instructed Marsh personnel, including Ms. Drake, to obtain "Type B" bids from Chubb, Kemper, St. Paul/Liberty, AIG and an unnamed conspiring insurer.  Ms. Drake stated that "[t]his will be a quick no from both Kemper and Chubb" and assigned the task to Marsh's Mike Yovino.  Just over one business day later, Chubb's Grace Hoffner complied by sending an email to Marsh stating that it was declining to bid.

203.    In mid-February 2002, Marsh's Mr. Bewlay prepared a broking plan for a new account.  As part of the plan, Marsh assigned the lead layer to St. Paul/Travelers.  To create an illusion of competition, the plan called for Marsh personnel to approach Liberty, Zurich, Kemper, Chubb and AIG for B bids on the lead.  Upon receiving the plan, Marsh LBC Mr. McNenney, humorously responded, "Smells like honey…."  Marsh personnel then forwarded the broking plan—which included both the target prices for the insurance business and the instruction to obtain B bids from Liberty, Zurich, Kemper, Chubb and AIG—to Chubb. The email, complete with the instruction to obtain B bids, was found in Chubb's files.

204.    Fireman's Fund overtly participated in the conspiracy.  In preparing for the January 2002 renewal of Union Bank of California account, Marsh's Mr. Murphy asked Marsh LBC Leslie Lafrano, to get a "type B alternative" from Fireman's Fund and Chubb. Ms. Lafrano sent a December 19, 2001 fax to Millie Valentine at Fireman's Fund providing the lead umbrella and asking for a quotation from Fireman's Fund.  Five minutes later, Ms. Lafrano sent an email to Ms. Mvalenti asking her to provide a false declination to give the ficticious appearance that the account was placed in competition.  Specifically, Ms. Lafrano wrote: "Can

you send me an email that you are not interested in the $20m x $5m layer."  Unsurprisingly, all incumbents renewed their respective layers.

205.    Similarly, when the Grosvenor account was up for renewal in December 2001, Marsh's Mr. Murphy requested false quotes from St. Paul/Travelers, Zurich, Fireman's Fund and Liberty.  Fireman's Fund complied, providing a sham declination.

206.    When the Golden Gate Bridge account was up for renewal in July 2002, Marsh again asked Fireman's Fund, along with Ace, XL, Chubb, Zurich and an unnamed conspiring insurer, to provide false quotes.  Fireman's Fund again issued a sham declination.

207.    Although not named as a Defendant in this complaint, AIG also participated in the conspiracy.  For example, in March 2002, Marsh turned to AIG to provide a protective bid on excess casualty insurance for Intel that would be shown to the customer.  In an internal email, Marsh's Mr. Murphy wrote that "Zurich quoted 50 x P [*i.e.,* $50 million of insurance in excess of the primary layer] for $400,000. . . . We need a type B alternative from AIG for 50 x P at same attachments for $600,000.  We need an actual quote for this client. . . ."

### 3.    The Conspiring Insurers Occasionally Communicated Directly with One Another.

208.    In addition, Marsh's conspiring insurers occasionally communicated directly with each other about the conspiracy.  For example, Andrew Lennox, who worked for an unnamed conspiring insurer, shared with his colleagues that he had had discussions with supposed competitors about the Marsh-centered scheme: "AIG does it this way and I spoke with ACE and they do something similar."  Indeed this type of detailed information was routinely provided in the context of contingent commission kickback negotiations and permitted each

57

conspirator to understand not only what its co-conspirators were paying for their premium

volume, but also, what they were receiving in return.

209.    Similarly, in June 2004, Wausau Commercial Market, a division of

Liberty, was preparing for a meeting with Marsh to discuss commercial business.  Marsh told

Wausau that it had "struck a deal" with some insurers that in exchange for only a small decrease

in pricing—which was necessary in the face of a widely acknowledged "softening" market—

Marsh would "not shop the risk."  In other words, Marsh knew that its customers expected a

decline in pricing across the board due to market conditions.  Rather than open the customers'

policies to competition, however, Marsh engineered a small, pre-set reduction with its conspiring

insurers, avoiding a more significant decrease in pricing.  Wausau then contacted several of its

supposed competitors to confirm Marsh's representations about the pricing scheme.  In a June 1,

2004, email, Wausau's Edward Hanlon wrote that "Hartford & Atlantic Mutual confirmed" the

scheme.

210.    Marsh and its conspiring insurers also had many opportunities to

communicate in person about the conspiracy.  For example, in 1999, Marsh held a "Marsh

Global Broking 2000 Planning Meeting" in Destin, Florida among Marsh and certain conspiring

insurers.  Representatives from St. Paul/Travelers, Chubb, CNA, Hartford, Fireman's Fund, and

Liberty participated in the meeting.  During the meeting, the putative competitors discussed how

they could increase insurance prices.  Minutes of the meeting included statements that a

particular insurer is "trying to get rate increased" or "[t]rying to get 'step' increases by year."

Liberty commented that it had "low growth goals" and Marsh "asked if that was true of all

insurers in room.  Comment was made that growth goals have been slashed for 2000 – profit is

[sic] what companies are focusing upon in 1999 and 2000.  **All companies agreed** that was their strategy going forward." (emphasis added.)

211.    Likewise, at industry and trade association meetings, Marsh arranged high-level meeting with each of its conspiring insurers. The meetings occurred in a single conference room and, one after another, the conspiring insurers met with Marsh.

### 4.    Employees of Marsh and Employees of Many of the Conspiring Insurers Were Convicted of Criminal Conduct Relating to the Conspiracy.

212.    The State of New York indicted numerous individuals at the co-conspiring Defendants for crimes relating to the customer allocation scheme.  Specifically, Patricia Abrams of Ace, Kevin Bott of Liberty, Edward Coughlin of Zurich, James Spiegel of AIG and formerly Zurich, John Keenan of AIG and formerly Zurich, Karen Radke of AIG, Jean-Baptiste Tateossian of AIG, John Mohs of AIG, Carlos Coello of AIG, Peter Anderson of Marsh, Joshua Bewlay of Marsh, MaryAnn Brainard-Baret of Marsh, Greg Doherty of Marsh, Kathleen Drake of Marsh, William Gilman of Marsh, Thomas Green of Marsh, Regina Hatton of Marsh, Edward Keane of Marsh, Mark  Manzi of Marsh, William McBurnie of Marsh, Edward McNenney of Marsh, Nicole Michaels of Marsh, Jason Monteforte of Marsh, Todd Murphy of Marsh, Joseph Peiser of Marsh, Robert Stearns of Marsh and Katherine Winter of Marsh all faced criminal charges.

213.    As part of cooperation agreements, Ms. Abrams, Mr. Anderson, Mr. Bewlay, Mr. Bott, Ms. Brainard-Baret, Mr. Coello, Mr. Coughlin, Ms. Hatton, Mr. Keane, Mr. Keenan, Mr. Manz of Marsh, Ms. Michaels, Mr. Mohs, Mr. Monteforte, Mr. Murphy, Ms. Radke, Mr. Spiegel, Mr. Stearns, Mr. Tateossian, and Ms. Winter all pled guilty to criminal

activity arising from the criminal charges and made admissions on the record of criminal

behavior on behalf of their employers.  In several of these guilty pleas, the Defendants'

employees specifically admitted to forming illegal combinations in restraint of trade and

competition.

214.    Messrs. Gilman and McNenney stood trial and were convicted of

conspiring to restrain trade and competition.  Although the charges have since been reversed on

the basis of prosecutorial misconduct, the evidence gathered by the New York Attorney General,

as well as the admissions by those defendants who pled guilty, provide compelling evidence of a

conspiracy among Marsh and its conspiring insurers to restrain competition.

215.    Additional evidence of each conspiring insurers' knowledge of the

conspiracy and conduct in furtherance of it exists, but need not be exhaustively listed at the

pleadings stage.

**E.    Marsh and the Conspiring Insurers Secreted the Kickback Arrangements
from Marsh's Customers, Including Sears.**

216.    With the assistance and cooperation of its conspiring insurers, Marsh

secreted its kickbacks and other compensation from its customers.  Marsh required that the

insurers keep the kickback payment arrangements secret and, when reports of them later began to

surface, Marsh under-reported the extent of the compensation it received from insurers.

**1.    Marsh and the Insurers Kept the Kickback Arrangements Secret.**

217.    Marsh and the insurers agreed to keep the kickbacks confidential.  In fact,

Marsh emphasized to its personnel that the kickback arrangements were to be kept secret.  In a

PowerPoint presentation from meeting on May 12 and 13, 2003 of team leaders of Marsh's

Global Broking Environmental group, the group's leader, Chris Smy, forcefully reminded his

subordinates that "**PSA AGREEMENT DETAILS ARE STRICKLY** [sic]

**CONFIDENTIAL**." (bold & capitalization in original.)

218.    Marsh also ensured that ACE, Chubb, Travelers, XL, Fireman's Fund,

Liberty, Arch, Hartford, and the other Insurer Defendants kept the kickback arrangements secret.

Virtually every so-called "contingent commission" agreement—or, in Marsh's parlance,

"Placement Service Agreement" or "PSA"—contained a secrecy provision requiring the parties

to keep the terms of the agreement secret or confidential.

219.    For example, in the 2003 kickback agreement between Marsh and

Liberty's umbrella division, the parties agreed that "[t]he terms of this agreement are confidential

and shall not be disclosed by either party except as may be required by law."  Likewise, Marsh

and Zurich agreed in their 2001 PSA kickback agreement for umbrella, excess and buffer

insurance product lines that "the terms of this Agreement are confidential and shall not be

disclosed by either party except as may be required by law."  The 2003 PSA kickback agreement

between Marsh and AWAC contained an identical provision.

220.    The secrecy provision of the contracts was more than a boilerplate.  Marsh

scolded insurers that divulged any of the terms of the kickback arrangements, even to colleagues

at the carrier or Marsh.  For example, in March 2000, an unnamed conspiring insurer mistakenly

divulged the existence of a PSA agreement during discussions about re-negotiating a Marsh

customer's insurance business.  In an apologetic email from the insurer to Marsh, a senior vice

president at the insurer admitted that "certain references were made to the MMGB [Marsh

Global Broking] PSA, and otherwise documented in correspondence to Marsh."  The insurer's

senor vice president then acknowledged "that this was inappropriate behavior" and promised to

destroy the evidence.  Specifically, the executive wrote that we "will do the [sic] necessary to

eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the

PSA."  Prior to producing a hard copy of the email in this MDL proceeding, the insurer redacted

all names, such that one cannot tell which senior vice president sent the email or which Marsh

representative received it.

221.    An unnamed insurer repeatedly warned its personnel that the PSA

kickback agreements were to be kept confidential.  In an May 8, 2002, email with the subject line

"Marsh Placement Services Agreements," the insurer's John Schumacher warned his personnel

that "[i]t is important to recognize and underscore the 'confidentiality' provisions that govern

this Agreement."  He went on to explain, "[w]e should not discuss these Agreements with

anyone within Marsh, which would include Client Advisory personnel."

222.    Likewise, Craig Smiddy, who worked for an unnamed conspiring insurer,

sent an May 15, 2003, email to the insurer's underwriters that "PSA's are never to be discussed

with retail producers [i.e., Client Advisory Services] or clients."  Later, in an on August 12,

2003, email, he reminded a colleague that "PSA agreements have confidentiality agreements, so

you cannot discuss the PSA with the retail producer or the client."

223.    In an internal April 2004 email, Liberty's Fred Frey candidly described the

so-called PSA payments as *quid quo pro* payments for allocating business to insurers and

explained both Marsh's justification for hiding the arrangements from their customers:

> Ten or so years ago, a trend developed of clients and prospective
> clients asking brokers to fully disclose commission income derived
> from their business. That's when all the new "fancy" terms of
> Placement Service Agreements, Management Fee Agreements, etc.
> came into being. The common theme accompanying all of them
> was the word "commission" disappeared.

The argument brokers could make in replying to clients inquiries is that they were no longer "commissions", the revenue they received from PSA's, et al. was not tied to any one client and they further muddied the waters by creating a laundry lists of services and efficiencies that earned them the payments. **Fact is, nothing really changed. To the best of my knowledge, in some fashion all of these agreements and payouts are based on favorable overall business outcomes between a broker and a carrier. The extra services and efficiencies are hocus pocus.** (emphasis supplied.)

224.    Clearly, Mr. Frey and his colleagues at Liberty knew that the kickbacks were inappropriate and made a concerted effort to keep them secret. In fact, as word of investigations by state regulators began to surface, Mr. Frey sent an August 25, 2004, email to two of his superiors, Greg Lamb and Ellen Pishenin, "suggest[ing] you completely avoid the subject [of kickback agreements]. If asked, you are 'vaguely aware' that we have a few in place, but know nothing of the details. That's not only our corporate and SBU position, but a position that will help protect you from being subpoenaed."

225.    The other insurers also kept the contingent commission kickback agreements secret.

### 2.    When Marsh Eventually Divulged the Existence of "Contingent Commission" Kickbacks to Sears, the Disclosures were Inaccurate and Misleading.

226.    Marsh continued to mislead its customers, including Sears, about the true nature and extent of the kickback arrangements even as late as September 2004.

227.    For example, Marsh provided its customers with a misleading estimation of the overall kickbacks it received in 2003, calling it an "average contingency factor," and claiming that it was only 1.8%.

228.    Although Marsh did not explain how it supposedly calculated this statistic, this statistic does not fairly represent the kickbacks Marsh received on its customers' accounts— including on Sears' accounts.  For example, the statistic uses Marsh's revenue from all insurance lines and products as the denominator, rather than just those insurance lines that were subject to the so-called contingent commissions, such as Sears' policies.  Likewise, the statistic omits numerous kickbacks paid by the oversea affiliates of the conspiring insurers and further ignores the fact that Marsh received additional kickbacks in the form of lucrative reinsurance brokerage commissions.

229.    In fact, XL, one of Marsh's conspiring insurers noted that Marsh personnel "are telling their clients that their average fee is 1.8%--very distorted since that seems to include lines of business that are not subject [to the kickback programs] and I suspect whole books of business from insurers that do not participate."

230.    On February 15, 2005, Marsh's Mr. Bewlay admitted in his guilty plea that during the 1999 to 2004 period Marsh gave clients misleading information when they asked Marsh about the amount of contingent commissions Marsh had received.

F.    **Marsh's Scheme Directly Affected Sears' Insurance Placements.**

231.    Not only did Marsh's scheme generally drive up the cost of insurance in the market, Marsh placed Sears' policies without meaningful competition on its accounts.  Even though Sears has had no opportunity to develop evidence from the Defendants specific to its insurance policies, Sears' counsel has already identified specific examples of the Defendants' conduct causing Sears' direct harm.

232.    Marsh created broking plans for Sears' insurance renewals.  As previously alleged above, the broking plans slated which of Marsh's conspiring insurers would win each layer of business without competition and what the target prices should be for the business.  On a few occasions, Marsh even sought fake B bids or sham declinations on Sears' insurance policies.

233.    For example, Marsh GBC Michael Bauer created a broking plan for Kmart's June 1, 2002, renewal of its excess casualty coverage.  As with other broking plans, Mr. Bauer's plan slated the insurers that would win Kmart's business and identified the target prices at which they would get it.  Notably, the broking plan called for almost a 50% increase in Kmart's insurance premiums over the prior year for the same amount of coverage, despite the fact that Kmart had 10% less employees and 13% less stores.  The broking plan also called on four insurers, including Liberty, to provide "backup" bids, which is another term of B bids. Chubb was slated to win the second layer of excess coverage, which insured $50 million in excess of the first $25 million over primary.  On May 15, 2002, Marsh's Vanessa Sarao faxed the broking plan and other documents relating to Kmart's renewal to Chubb's Grace Heffner, informing her that "attached is revised renewal program and pricing."

234.    Likewise, Marsh's Mr. Doherty distributed an email on April 2, 2003, to a lengthy list of his colleagues at Marsh describing Ace's participation in the customer allocation scheme and identifying where Ace had been successful in its participation, including where it had provided B bids.  Notably, Mr. Doherty described Sears, Roebuck's April 2003 excess casualty renewal as one of the accounts that had been in play in the conspiracy.  Recognizing that such a broad distribution—even  an internal one at Marsh—was unwise given the illegality of the conduct, Marsh's Tom Martin wrote to all recipients:

65

I would ask that nobody forward this e-mail. This clearly is not intended for distribution. I will ask Greg [Doherty] to revise certain comments.

**G.     Marsh's Scheme Inflated Sears' Premiums.**

235.     There is no question that Marsh's scheme for obtaining and accepting secret kickbacks harmed its customers, including Sears, in multiple ways.

236.     ACE, Chubb, Travelers, XL, Fireman's Fund, Liberty, Arch, Hartford, and HCC inflated the premiums they charged the customers, such as Sears, by at least the amount they kicked back to Marsh. Indeed, in March 2000, Marsh's Mr. McBurnie and Mr. Moll of an unnamed conspiring insurer tried to settle on the amount the insurer owed Marsh for its 1999 PSA kickback in the excess casualty line. The discussion became complicated, in part, due to the merger of earlier in the year of the insurer and another insurance carrier. As part of his argument for why two of Tyson's insurance policies and one for Wynn Dixie should not be included in the kickback calculation, Mr. Moll explained that the insurer needed to know before quoting whether "an individual insured's Buffer layer [was] included in the PSA" because "we would need to be able to gross-up our pricing by 16 - 17%. You, in turn, would need to be able to sell this increase to our joint client."

237.     A few years later, an unnamed insurer's Andrew Lennox bluntly acknowledged that "if we didn't have to factor in the PSA, I believe we would have been much more competitive…"

238.     As a further proof that the kickbacks inflated premiums, XL's Chief Casualty Underwriter for the Americas, Ms. Amodeo, wrote a June 15, 2002 email to her colleagues that Marsh was requesting a 15% contingent commission kickback, which "[i]n combination with [a] contractual commission arrangement, [XL] would be paying close to 20%."

She expressed her agreement to pay this kickback "if all other insurers on the placement" were also paying it, "but only if our premiums are adjusted to contemplate the additional acquisition cost." (emphasis original.)

239.    Likewise, as Liberty's Mr. Cauti explained in an October 2003 email, his excess casualty unit's PSA kickback agreement could lead Liberty to pay Marsh as much as 18% of the gross written premium. Mr. Cauti explained that to fund this kickback, "we have been including broker comm[ission] in our pricing even on those deals where we aren't paying one, the $$ will go towards the PSA payment."

240.    Liberty's property lines unit likewise folded the PSA kickbacks into the premiums. In contemplating the PSA kickback agreement for 2003 property lines, Liberty's John Lawlor wrote that "[w]e will need to either increase the price we charge Marsh customers and/or reduce the retail where appropriate to recover these additional costs."

241.    In a May 2001 internal discussion at an unnamed insurer about future kickback arrangements with Marsh, the insurer's Mr. Redington wrote to his colleague John Alfieri that "[w]e could only include premiums which are loaded for such, not from 1/1/2001 as suggested. . . ." Mr. Alfieri agreed, stating that "we are trying to push it on new and renewal only where we can price for it." Leaving no doubt of the insurer's intention to pass on the cost of the kickbacks to its insureds—and Marsh's knowledge of this intention—Mr. Alfieri wrote the next month to Marsh's Manuel Ribot that the new kickback agreement could only include future business because "[i]t is not possible for us to include in force existing business that we have not made provisions to increase the cost. . . ." He further explained that applying the kickbacks only

67

to future business, "it would give us the ability to price for and monitor the agreement over time for our mutual benefit."

242.    An unnamed insurer's Mr. Schumacher also explained in May 2002 that he had distributed the PSA kickback agreement to underwriters "so that we can make a provision for the same in the pricing of 'subject' business."

243.    Later, on May 15, 2003, Mr. Smiddy of an unnamed conspiring insurer instructed the insurer's underwriters that "[q]uotes we provide to any production source should not reference any applicable PSA percentage we included in our pricing."

244.    Additionally, Marsh's practice of placing insurance without meaningful competition generally drove up the market rates for insurance, injuring all consumers of insurance, including Sears.  In fact, Marsh's Mr. Bewlay testified that "throughout his entire career at Marsh" he had been instructed to place customers' insurance at "the highest bindable number that you can get—that you'll get the order to bind from the client."  After all, he explained, "that's why [insurers] signed a PSA with us."

245.    The harm caused to Sears by the artificial inflation of the market may be quantified through expert testimony.  Even in the absence of such testimony, one can see quantitative evidence of the harm in the notes of Marsh's own Ms. Winter.  According to her notes, the price of insurance to the Marsh customers in her group increased by roughly 5 to 10% every year leading up to the New York Attorney General's investigation of anticompetitive behavior.  The trend then reversed, with Marsh's customers seeing a 5 to 10% annual decrease in prices.

> **H.    The Defendants Contemporaneously Tracked the Kickbacks Marsh Earned on Each Customer's Insurance Placements.**

246.    Contrary to Marsh's pretention, the contingent commission kickbacks can be attributed to individual customers' policies.  For example, the 1999 merger of two insurance carriers led to a disagreement between an unnamed insurer and Marsh about whether or not specific insurance policies—including two issued to Tyson—should be included in the calculation of American Re's 1999 PSA kickback to Marsh.  Marsh's William McBurnie argued that Tyson's $168,000 premium for its 1999 general liability excess and its $592,000 premium for automobile excess should be included in the calculation.  Mr. McBurnie recognized later in the argument that discussion of specific policies undermined Marsh's pretention that contingent commission could not be attributed to specific policies.  Thus, he warned the insurer's William Moll that "we must avoid account-specific discussions regarding PSAs."  Ultimately, Marsh and the insurer eventually "agreed to disagree" over whether to include the premiums from Tyson and another company in the 1999 PSA kickback calculation by having the insurer make a compromise payment.

247.    Likewise, in a February 3, 1999, email, Marsh's Mr. McBurnie wrote that he had reviewed Marsh's spreadsheet tracking excess casualty policies that Marsh had steered to an unnamed insurer.  Mr. McBurnie concluded that Marsh should include a $1.5 million placement for Shell Oil in the business it allocated to an unnamed conspiring insurer under the contingent commission kickback agreement:

> A thorough reading of the [PSA] verbiage and the Excel file [tracking premium placements with American Re] . . . leads to the following one-word conclusion:
>
> SHELL   SHELL   SHELL   SHELL   SHELL   SHELL   SHELL   SHELL
> SHELL   SHELL   SHELL   SHELL   SHELL   SHELL   SHELL SHELL

> SHELL SHELL SHELL SHELL SHELL SHELL SHELL [repeats "SHELL" 285 times]
>
> Or, put another way:  With $1.5M Shell premium added to the pot, we make approximately $3M PSA.

248.    The conspiring insurers also kept track of contingent commission kickbacks that Marsh earned on accounts directly attributable to each of Marsh's customers, including Sears.

249.    For example, XL tracked on an individual basis—attributed to each specific customer—the policies on which it would owe Marsh contingent commissions.  In calculating the 2003 contingent commission kickbacks on umbrella policies placed with XL by Marsh, XL listed the specific renewals by customer.

250.    Similarly, Marsh provided spreadsheets to Lloyds Syndicate 2488 AGM detailing the PSA kickbacks the syndicate owed to Marsh for property placements under the companies' 2003 PSA agreement.  The spreadsheet tracked the kickbacks for October through December 2003, identifying the exact amount of kickbacks attributable to each customers' policy.

251.    Likewise, an unnamed insurer contemporaneously tracked, down to the penny, the "PSA Commissions" that it would be required to pay Marsh on each insurance policy, including policies for the Plaintiffs.

## I.    Marsh Accepted Illicit Payments, Even on Sears' Fee-Based Accounts.

252.    Marsh secretly earned money on Sears' accounts that it did not disclose to Sears.  And, as alleged above, Marsh agreed to broker a number of Sears' insurance lines for on

a fee-only basis. With the insurers' acquiescence and cooperation, Marsh also surreptitiously accepted commissions and other payments on these placements.

253.    For example, Marsh accepted contingent commission kickbacks on its placement of Sears' fee-only accounts. These kickbacks were directly attributed to Sears' account.

254.    In fact, the Defendants contemporaneously maintained spreadsheets tracking the contingent commission kickbacks by each particular insurance placement. Many of Sears' insurance placements, even where they had a fee-only brokerage agreement, appear on these spreadsheets.

255.    While the percentage of the contingent commission kickbacks could theoretically change based upon the book of business' overall volume or profitability, Marsh controlled and directed the amount and type of business it would steer to each conspiring carrier to ensure it would meet specific targets to trigger pre-set percentages. Thus, the Defendants' public claims that so-called contingent commissions are not attributable to specific insurance policies are sophistry.

256.    Additionally, many of Marsh's PSA kickback agreements contained so-called "gross up" or "true up" provisions, under which the carrier agreed to pay Marsh contingent commission kickbacks and to also "gross up" the combined straight and contingent commissions to a higher percentage. The higher percentage was generally equivalent to the percentage Marsh would have received if every placement (both fee- and commission-based) had been subject to a straight commission as well as the contingent commission kickback. This had

71

the effect of allowing Marsh to collect straight commissions on every insurance policy, even where Marsh had agreed not to collect commissions.

257.    For example, the 2002 PSA agreement between Liberty and Marsh for casualty insurance lines called for Liberty to pay a 16% "gross up" of all casualty policies to Marsh.  Even though many of Marsh's customers had "fee-only" brokerage agreements with Marsh, Liberty was required to pay this gross up on all policies.  This had the effect of adding a straight commission to Sears' fee-only accounts.  The 2003 kickback agreement between Marsh and Liberty's umbrella division had a similar "gross up" provision, called for kickbacks combining the "straight" and "contingent" commissions as high as 19% of the gross written premium.

258.    Marsh steered a layer of Sears, Roebuck's 2002 excess casualty insurance to Liberty.  While Marsh did not collect a straight commission at the time it steered the policy to Liberty, Liberty paid Marsh the full 16% "gross up" on the coverage at the end of the quarter.

259.    At least one Liberty employee recognized the gross-up provision for what it was.  After noting that the PSA in place for 2003 for excess and environmental insurance products lines would give Marsh an "effective total commission at 15.5%, before any placements done net of brokerage," Liberty's David Cohen wrote, "I have a hard enough time swallowing nondisclosed overrides on fee business, much less [an] effective override which would amount to a hidden retail brokerage commission."

260.    Marsh's Mr. Manzi revealed yet another method through which Marsh charged its customers additional hidden commissions, even on fee-only accounts.  Under questioning from Marsh's own counsel, Mr. Manzi acknowledged that Marsh's Global Broking

division "may have, from time to time, received a wholesale commission" and that this payment

could vary "anywhere from two-and-a-half to seven-and-a-half percent, but probably [was] in the

five percent or lower range."  Marsh justified such commissions on the ephemeral basis that its

customers dealt with Marsh's Client Advisory Services and, therefore, Global Broking

division—which ran the placement of excess coverage—was a broker "in between the retail

broker and the market itself."  Still, Mr. Manzi had to admit that "Marsh spent a lot of time

trying to define what a wholesale market was."  Such hidden wholesale commissions were, of

course, in addition to any PSA kickback payments and any retail commissions that Marsh

received.

      261.    Even under enforcement agency scrutiny in late 2004, Marsh continued to

mislead its customers, including Sears, about the nature and extent of its kickback arrangements

with insurers.  For example, Marsh claimed that it had revamped its so-called contingent

commission arrangements to avoid creating a direct conflict of its interests in maximizing its

revenue with its customers' interests in getting competitive insurance coverage.  However, as

one of its conspiring insurers noted, the new program "is nothing more then [sic] the old program

with a new look that would be less objectionable if someone looked under the covers at Marsh."

      262.    Moreover, on information and belief, Marsh accepted straight

commissions on Sears' fee-only accounts.  In support of this allegation, Sears refers to and

adopts the numerous specific instances pled in the second amended complaint of the *New

Cingular Wireless* Plaintiffs revealing Marsh's practice of secretly accepting straight

commissions on fee-only accounts.  As of the drafting of this pleading, however, Sears had not

had the benefit of any discovery specific to its insurance accounts and, thus, the material

revealing this practice on Sears' accounts is solely within the control of the Defendants.

**V.     AON AND THE CONSPIRING INSURERS AGREED TO STIFLE
        COMPETITION BY ALLOCATING INSURANCE BUSINESS TO THE
        INSURERS IN EXCHANGE FOR THE INSURERS' PAYMENT OF SECRET
        KICKBACKS TO AON.**

   **A.     Aon Promised to Act in Sears' Best Interests and, for Certain Product Lines,
            Not to Accept Payment from the Insurers.**

   263.    Aon sought to become and remain Sears' commercial insurance broker.

On many occasions, Aon told Sears that it worked for its customers and not the insurance

companies.

   264.    Aon held itself out to be an expert in commercial insurance and further

represented to Sears that it had the sophistication and market expertise to advise Sears in

selecting its insurance policies.  Once Sears retained Aon as its broker, Aon worked closely with

them to identify its insurance needs, communicated with insurers on its behalf and provided

advice to Sears on which insurance policies it should purchase.

   265.    Aon made promises to Sears, both in written brokerage agreements and in

other representations.  Aon's promises included that it would act in Sears' best interests and, on

certain product lines, that it would not accept payment from the insurers for placing Sears'

insurance policies.

   266.    For example, on or about April 1, 1998, Patricia DeLeonardis, Senior

Vice President of Aon Risk Services, Inc. of Illinois sent a Services Agreement to Sears'

Ms. Rogers.  Both Ms. DeLeonardis and Ms. Rogers signed the Agreement.

267.    In the Services Agreement, Aon promised "that all Services performed by Contractor shall be consistently of the highest quality." It further agreed that it would "not intentionally do or perform an act or omission injurious or prejudicial to Sears or contrary to the best interest of Sears."

268.    Aon further promised to "establish strategy for renewal" of Sears' various insurance policies and represented that it would "[d]iscuss with Sears renewal strategy and changes in the marketplace."

269.    Aon warranted that it would "comply with all applicable federal, state and local laws, rules, regulation and orders."

270.    Aon also agreed to broker several lines of Sears' insurance coverage for a flat fee. Aon specifically agreed that "[a]ny fee [Aon] receives or is entitled to receive from Sears . . . shall be [Aon's] sole form of compensation" for Sears' D&O/Fiduciary/EPL coverage and for its Property coverage.

271.    Aon further agreed to "promptly report to Sears any commission or other payment it receives in addition to the Fee for any given insurance coverage and the commission or payment shall be credited against any Fee (or portion thereof) paid to [Aon] by Sears for the coverage."

272.    The Services Agreement was extended twice by written agreement to cover the period ending December 31, 2001. The amendment for the period December 31, 1999, to December 31, 2000, was signed by Ms. Leonardis for Aon on February 24, 2000, and by Ms. Rogers for Sears on March 2, 2000.  The amendment for the period December 31, 2000, to

December 31, 2001, was signed on or about December 31, 2000, by Ms. DeLeonardis for Aon

and Ms. Rogers for Sears.

273.    Ms. Leonardis caused these documents to be sent to Sears' Ms. Rogers by

U.S. mail or email on or about the dates they were signed.

274.    Aon's agreements with Sears included an implied covenant of good faith

and fair dealing.

275.    Aon intended for Sears to rely on these promises and representations to

induce it to designate Aon as its broker of record and to continue to retain Aon to broker its

insurance.

276.    In interacting with Sears, Aon personnel indicated that they had been and

would continue to seek the best insurance for Sears at the lowest premium.  Indeed, this is the

primary reason for engaging a broker.

277.    Sears reasonably relied on these promises and representations in agreeing

to have Aon broker its insurance policies Sears reasonably understood that Aon would seek the

best insurance coverage at the lowest prices.

278.    Moreover, under the circumstances, Aon owed Sears a fiduciary duty to

act in its best interest in placing its insurance policies.

279.    Aon gave no indication to Sears that it planned to receive kickbacks from

the insurers to whom it would steer Sears' insurance policies, nor that the kickback payments

would far exceed the traditional "straight" commissions Aon had agree to forego.  Aon also

failed to disclose the existence of "gross up" provisions (more fully described herein) in its PSA

kickback agreements whereby the insurers would end up paying Aon the equivalent of straight commissions even on Sears' fee-only accounts.

280.    Aon betrayed the confidence and trust its customers placed in it by trading their business in exchange for secret kickbacks. Aon enlisted willing insurers in the scheme – these insurers were eager to pay a kickback to Aon in exchange for Aon protecting them from competition and permitting them to increase insurance premiums to policyholders. Aon also crafted and policed a plan to conceal its conduct, and it even fabricated stories to deceive inquiring policyholders, such as Sears. Aon's conduct on all fronts became bolder, more abusive, and more damaging over time.

**B.    As Early as 1997, Aon Systematically Allocated its Customers' Policies to the Insurers that Paid Maximum Secret Kickbacks.**

281.    Aon was effectively the sole communication conduit between its customers and the insurers with regard to the insurance product lines it brokered for those customers.

282.    At least as early as 1997, Aon began entering into so-called contingent commission agreements with "preferred" insurers for the specific purpose of securing various forms of kickbacks in exchange for allocating increased and more profitable business to the selected insurers.

283.    These kickbacks were in addition to any regular – or "straight" – commissions that Aon received on the accounts. Aon drove business to the conspiring insurers as the *quid pro quo* for these insurers kicking back substantial portions of the customers' premiums. Aon did this without its customers' knowledge or consent, and with an express strategy of secreting this practice from its customers.

284.    For example, in a September 12, 1997, memo, an executive at the Hartford wrote about a meeting he had had with Aon nine days earlier, explaining that "[w]e signed an incentive contract to pay AON Corporation a three point bonus commission . . . [*a*]*ll lines of business are included* with the agreement ending December 31, 1999."  (emphasis added.)

285.    In the years following the start of Aon's campaign to enter lucrative national kickback agreements, Aon continued on what it described internally in 1999 as an "aggressive program of increasing average commissions, market consolidation and contingent commission increase[s]" to maximize its profit.

286.    Aon's growing practice of allocating customers' business for the purpose of maximizing its kickbacks was widespread throughout Aon and ordered by many high-ranking executives of Aon.  Aon's management repeatedly directed its personnel to place insurance with so-called "Strategic Partners" –its term for the conspiring insurers who agreed to kickback the highest percentage of premiums to Aon.  As Aon's Greg Golden explained Aon's motivation at January 11, 2000 internal executive meeting:  "by doing so, we will always get the best agency contract, have more leverage, *and receive the largest commission possible*."  (emphasis added.)

287.    Aon met with each of the conspiring insurers in late 1999 or very early 2000 and described the kickback scheme.  Aon then sent letters documenting the insurers' promises to give kickbacks to Aon.  In these letters, Aon disclosed to the conspiring insurers how other conspiring insurers had responded.  For example, on February 4, 2000, Aon's Executive Vice President, Bruce O'Neil, wrote to the Hartford's Rex Sprunger explaining that Mr. O'Neil expected to see "written confirmation that you agreed to give Aon your best agency contract," a euphemism for the heightened kickbacks.  Mr. O'Neil then pasted into the letter responses from

two other insurers documenting their agreements to give Aon the enhanced kickbacks.  On

information and belief, Aon mailed this letter through the United States mails on or about

February 4, 2000.

288.    Likewise, on February 17, 2000, Mr. O'Neil, wrote an internal email

divulging his plan to approach Chubb for a national agreement to kick back "override" payments

to Aon.  Mr. O'Neil explained that Aon should "press hard" for such an agreement "because I

believe folks like [Aon personnel] Mike Prins and John Sullivan would move business to

strategic partners who pay more"—in short, a prototypical "pay-to-play" kickback scheme.

289.    Chubb joined the scheme and agreed to pay Aon large kickbacks for Aon

to steer business to it.  In August 2000, Aon executive Bruce O'Neil suggested to Aon's most

senior executives, Patrick Ryan and Michael O'Halleran, that Aon move its customers' business

away from two non-conspiring insurers to maximize the kickback from Chubb:

> Suggest we use Atlantic Mutual and CGU to "payoff" Chubb to
> secure $4,300,000 agreement or 1% override (see May 18, 2000
> agreement) for our entire Chubb ARS book.

290.    Aon formalized the allocating of its customers' business as the company's

business strategy.  Across Aon, its business units followed "syndication master plans" to move

their customers' business to the insurers willing to pay the highest kickbacks.  For example, on

June 6, 2001, Aon's Senior Vice President of Aon Private Risk Management, Bruce Macbeth,

wrote a memorandum about the "Syndication Master Plan."  In his memorandum, Mr. Macbeth

divided Aon's customers into A, B and C categories based on premium amount and profitability

and he described how the more desirable customers' accounts should be moved to Aon's so-

called "Strategic Insurance Partners," Chubb and Fireman's Fund.  Mr. Macbeth distributed the

memorandum by email on June 6, 2001.

291.    About half a year later, on November 24, 2001, Mr. Macbeth instructed

one of his subordinates that Aon was to "steer all submissions to Chubb.  I am finding that most

submissions are submitted to all three insurers [AIG, Chubb and Fireman's Fund] and we all

[k]now what AIG will do to buy market share.  We need to emphasize that AIG should only be

used if there is an underwriting issue with Chubb, which we can address."    Days later, he

ordered several of his subordinates to "direct all new business exclusively" to Chubb and

Fireman's Fund because of "our override agreements with" them.  He acknowledged that AIG

had the ability to provide better prices for Aon's customers.  Yet, he insisted that AIG not be

given an opportunity to bid because it had not agreed to pay Aon additional "overrides for

growth" and instead paid "just standard brokerage commissions."

292.    Only after the New York Attorney General's investigation of Aon, Aon

acknowledged that Mr. Macbeth's allocation of the business of Aon's customers to maximize its

contingent commissions was illegal and fired Mr. Macbeth in March 2005.  Aon, however,

inaccurately and self-servingly claimed that its employees had ignored the instructions of the

Senior Vice President and that Mr. Macbeth's illegal conduct had not "harmed any client or in

any way affected market placement behaviors. . . ."  In fact, customer allocation became

widespread at Aon and was encouraged by its highest executives.

293.    By the end of 2003, Aon had entered into contingent commission kickback

agreements with Ace, Arch, AWAC, Chubb, CNA, Fireman's Fund, Hartford, Kemper,

Liberty/Wausau, St. Paul/Travelers, XL, Zurich and/or their affiliates.

**C.    Aon Expanded Its Scheme of Allocating Its Customers' Business to the
Insurers that Paid the Highest Kickbacks.**

294.    As Aon's revenue from the kickbacks grew, it refined and expanded the

kickback scheme.  In doing so, Aon created an environment that eliminated or substantially

reduced competition for its customers' insurance business.  To push insurers to join the scheme,

Aon ensured that the insurers understood it controlled the flow of its customers' insurance

business and that it would direct this business to ensure Aon received maximum revenue.

**1.    Aon Placed Its Customers' Business Without Competition in
Exchange for Kickbacks.**

295.    Aon offered an environment that eliminated or substantially reduced

competition for the policies as an additional *quid pro quo* for kicking back substantial portions of

the clients' premiums to Aon.

296.    In a redacted June 19, 2003, letter, an Aon representative outlined the

conspiracy to an unnamed conspiring insurer to induce it to join.  The author wrote that

becoming a so-called Strategic Partner meant that "First, you would enjoy favored treatment over

non-strategic partners."  Aon also offered other benefits to insurers participating in this

conspiracy, including "the first opportunity to quote and participate" in new customers'

insurance programs and Aon's commitment to ensure that Strategic Partners keep the renewal

business they desire.  Of note, the Defendants redacted the author's and addressee's names from

the letter prior to production and, thus, Sears is currently unable to plead these details.  Tellingly,

however, this letter appears in Chubb's document production even though it is a letter from Aon

to the insurer.

297.    Another example of such "favored treatment" occurred in September 2003 when Zurich became concerned that it had provided coverage to a customer of Aon that Zurich later deemed to be too risky.  Thus, Zurich bought a $18,000 excess insurance policy on the risk.  Aon promised to make up the $18,000 to Zurich in a future transaction.  Shortly thereafter, Zurich bid on another customer's account.  Aon informed Zurich that it could raise its bid and still win the account.  Zurich therefore issued a revised bid, raising its quotation by more than $18,000 on the workers' compensation portion of customer's insurance.  As promised by Aon, Zurich still won the account at the inflated premium.

298.    On July 23, 2003, Rob Bednarik of Aon's Syndication Group met with Chubb's John Mizzi and Kenneth Chung.  Mr. Bednarik reports directly to Mr.  Needle, the head of Aon Risk Services.  Mr. Bednarik told the Chubb representatives that Aon had "placed a moratorium on placing any new business with Atlantic" and "that Chubb is Aon's preferred market for all new business."  Furthermore, Mr. Bednarik promised that Chubb would "get first look and be guided as to how [Chubb] stack[ed] up against the competition."  Mr. Bednarik and Mr. Mizzi "struck" an agreement that Chubb could call Aon's Mr. Bednarik "on any piece of new business" where Chubb felt "that a little pressure from him will swing the deal" to Chubb.  Also, Mr. Bednarik would give Chubb advance warning "on any renewal that might be in jeopardy."

299.    Likewise, in late 2003, Aon's Bermuda affiliate was "on the cusp of hitting the minimum threshold on the excess casualty PSA with ACE."  In a November 4, 2003 email Aon's Bill Kasbeer turned to Mr. Needle for help in allocating just "another $2 million" of

customers' business to Ace so that Aon could "collect a PSA of $1.4 million. . . ."  Mr. Kasbeer copied Aon's CEO, Michael O'Halleran, on the email.

300.     The insurers, for their part, understood that kickbacks were a part of the deal with Aon.  If the carrier paid the right amount to Aon, Aon allocated customers to it and the carrier would be immune from competition on this business.  Stated another way, the conspiring insurers would not compete for each other's business, as long as the incumbent carrier had agreed to pay Aon sufficient kickbacks.

301.     Aon used its control over bidding opportunities to allocate customers amongst the conspiring insurers.  Evidence of this can be found in the insurers' tracking of their bidding opportunities on Aon-brokered insurance.  For example, Liberty, one of Aon's so-called Strategic Partners, maintained spreadsheets of its business opportunities.  In these spreadsheets, Liberty identified numerous Aon-brokered renewals where Liberty acknowledged that it was being protected from competition explaining, "no competition on this renewal" or "[r]enewed this account with accelerated payment and double digit rate increase.  No competition."

302.     The insurers' internal records also show the flip side of this allocation scheme.  Their records are riddled with explanations that Aon refused to allow the companies to bid because Aon had slated the business to go to another carrier.  For example, XL tracked these dead opportunities in various "activity summary reports," often noting that it did not submit bids because it was "dead – per AON will not move at this time," "dead - brokker [sic] didn't need us," or because it was "advised by broker [Aon] to 'deep six' the submission."

303.     Moreover, because Aon was in exclusive control of the customers' information, it could prevent insurers from bidding on a customers' policy by simply not giving

them the file or not responding to the insurers' requests to bid.  Time and again, XL's activity

reports note that leads were dead because Aon cut off XL's ability to prepare a bid, giving

explanations such as:

- "Dead –no response from broker"
- "Insufficient underwriting info"
- "Dead – UW [underwriting] strategy"
- "Dead – Broker did not forward complete submission"
- "Dead – never heard from broker"

304.    Aon's other conspiring insurers, including Chubb and [an unnamed

insurer] maintained similar charts extensively documenting incidents where Aon preventing

them from bidding.

305.    Significantly, Aon did not limit the "sale" of its customers' business at

inflated premiums to the excess casualty product lines.  Rather, this practice crossed all product

lines, including property.  For example, Senior Vice President of an unnamed insurer's Direct

Property Insurance Operations, Tom Bonarrigo, revealed the purpose of the kickbacks [an

unnamed insurer] proposed to pay Aon during his negotiation of the 2003 PSA agreement with

Gary Marchitello and Arquita Trott, Aon's Senior Vice President/Property Manager.  As

Mr. Bonarrigo explained, the insurer's proposed kickbacks to Aon were "an attempt to

significantly increase your [Aon's] revenue and our [an unnamed insurer's] premium."

Mr. Bonarrigo offered an additional kickback of up to five percent of total premiums, which was

"in addition to the current PSA" that paid another one percent of total premium.  This particular

kickback agreement related to lines of property insurance.

306.    At each insurance renewal, Aon showed Sears quotations that had not been competitively marketed, but rather that were the result of its practice of allocating customers' policies among the insurers that had agreed to pay the kickbacks. Sears did not know that Aon had obtained the quotations without competition, but rather understood that the quotations represented the best insurance at the lowest premium.

**2.    Aon Developed Internal Corporate Mandates to Maximize Its Kickback Revenue.**

307.    Aon had become reliant upon the extra income it received from the kickback scheme and the desire for continued kickbacks drove Aon's behavior. Aon also ensured that its personnel were motivated to continue and grow the scheme.

308.    Aon institutionalized the practice of customer allocation in exchange for kickbacks. According to notes from the July 1, 2003, meeting of Aon's Syndication Operations—which Aon partially redacted before producing—Mr. Needle, explained that "[w]e should continue to grow our book with Chubb and also Hartford and Wausau based on our favorable contingency agreements." Wausau was a brand of Liberty.

309.    When Aon was presented with an offer from Aon to steer at least $12 million in new business to Wausau in exchange for a lucrative kickback, Wausau entered a PSA agreement with Aon. To ensure that Aon met its end of the bargain, Aon's Carol Spurlock emphasized to Aon personnel the importance of ensuring the allocation of at least $12 million in business to Wausau. In an otherwise internal October 23, 2003 email that she shared with Wausau's Mr. Braxton, Ms. Spurlock ordered Aon employees to move insurance business from an unnamed insurer to Wausau to "push Wausau [policies] to hit that $12M new business number. This is a MEANINGFUL kick in our compensation when we hit $12M."

310.    In December 2003, the Harford moved its own D&O policy away from Aon without explanation.  Aon's President & Chief Operating Officer, Michael O'Halleran—in what he later claimed was "a fit of anger at the Hartford"—ordered Mr. Needle to punish the Hartford by moving commercial coverage business of Aon's customers away from the carrier.  Mr. Needle promptly advised against this action, explaining that Aon received favorable financial payoffs from the Hartford on commercial coverage lines and, thus, Aon should leave those lines in place.  Mr. Needle noted, however, that the Hartford paid lower kickbacks on D&O insurance, and thus, proposed disciplining the Hartford by moving the business of Aon's customers in that product line away from the Hartford.

311.    In an email exchange in 2004, Aon's Regional Operations Manager/Director of Financial Services Group, Anna Adams, asked for the "top ten" list of the insurers offering the most lucrative kickbacks (termed PSA payments, in this instance) to Aon so that she could disseminate the information throughout the company.  She further explained that she would need to tell Aon personnel "what is in it for them."  An Aon Managing Director, Ronald Moyer, responded that the funds from the PSA arrangements constituted a large amount of money and provided for much of Aon's success; they entirely funded its bonus pool, "as well as our investment hires and still contributed significantly to the bottom line of the company."  He reacted sharply to those individuals who had asked the question "what's in it for me," demanding to see "the names of the people that actually ask" because they were "looking through the wrong end of their telescope."  Eric Andersen, another Aon Managing Director, then emphasized Aon's dependence on the PSA payments kicked back from the insurers, saying that Ms. Adams'

questions would be "a good opp[ortunity] to see just how far down we can drill the PSA goals to the teams."

312.    Allocating customers to the insurers offering the most lucrative payments even drove employees' compensation. For example, Aon's Gary Marchitello held a meeting on November 8, 2002 "with the management of the property group and other key senior property brokers to emphasize the importance of placing the maximum amount of business with our key partner markets."

313.    In an April 14, 2003 email entitled "AON Professional Enhancement Funds (PEF)," Aon's Carol Spurlock offered an unnamed insurer's McLaughlin the opportunity for the insurer to become a so-called "premiere market," telling him that the insurer would have to "[p]ay us percentages on the remainder of the book placed with [an unnamed insurer]." She proposed a national contingent commission kickback agreement, but stated that Aon was willing to enter into a series of regional agreements. Ms. Spurlock then assured Mr. McLaughlin that Aon could deliver on her promise of more desirable business for the insurer, explaining that Aon's brokers—called syndicators—were compensated based upon their ability to allocate business to maximize Aon's kickbacks. In her words, "[l]et me further confirm our ability to effect placement behaviors. Our syndicators are evaluated on the percentage of their books that are with our 'premiere' [sic] markets. Each Regional Director is held accountable as well. This is a measurable, compensated item that each syndicator is financially motivated to drive."

314.    Likewise, in 2002, Aon Risk Services Managing Director, Gerald Brown – a central figure in Aon's efforts to obtain the highest possible kickbacks – explained to Aon's

employees the importance of sending business to the insurers paying Aon the most money in

kickbacks:

> There is nothing more important than enjoying a favored status with the
> marketplace strategic partners as increased monetary rewards,
> enhancement of client's coverages and pricing, and gratuitous gestures are
> by-products of an executed strategy and business discipline.  It is so vital
> that the execution of the PEF [the so-called "Professional Enhancement
> Fund" plans by the assigned Aon FSG [Financial Services Group]
> designee should be a component of the Bonus pool.

Notably, the Aon Financial Services Group offered products outside of excess casualty lines,

including Property and specialty lines.

315.    Similarly, in April 2003, Ms. Spurlock told Wausau's Keith Braxton that

she would "influence the behaviors of the group" at Aon to meet or surpass the goal of allocating

$5 million of new business to Wausau, provided Wausau would agree to pay an "incentive"

kickback of five percent of all new business for the first half of the year.  After some negotiation

over the exact amount of the kickback, Ms. Spurlock also disclosed to Mr. Braxton that Aon had

allowed Chubb and Hartford to cherry pick business because they had entered "more favorable"

kickback agreements.

316.    Aon also punished those of its employees who did not comply with the

corporate mandate to allocate its customers' business to maximize its kickbacks.  For example,

around May 1, 2003, one of Aon's brokers awarded Trump's insurance policy to AIG without

giving Chubb "a chance to get a last look."  Aon's Managing Director of Aon Risk Services-

Private Risk Management, Carter Brydon, reacted strongly, telling Mr. Macbeth to "block the

placement with AIG until CHubb [sic] gets a chance to look at it."  He also stated that the

situation was "unacceptable" and that Aon's brokers needed a "very stern" message to give

preferential treatment to Chubb over AIG.  To drive home the message and make sure that other

Aon brokers understood the consequences of such conduct, Mr. Brydon punished the offending

broker by taking away his personal commission on the insurance placement.  The discipline to

this Aon employee was direct, swift and painful, and the intended effect was obvious—play by

Aon's corporate rules or you will be reprimanded and financially punished.

### 3. Aon Ensured that the Insurers Understood that Aon Controlled the Flow of Insurance Business.

317.    Aon made sure that insurers understood that Aon was able to control the

flow of insurance to prevent the insurers from even getting a chance to compete for given

business.  Insurers that did not conspire had no chance of acquiring business.  The conspiring all

accepted this arrangement and agreed to its essential terms.  This is a classic customer allocation

scheme.

318.    In late September 2000, Aon sent form letters to its potential so-called

"Strategic Partners" in advance of October 2, 2000, meetings with them at The Greenbrier

Resort.  Aon arranged for the meetings to occur one after another in the same conference room at

the resort.  As of August 2000, Aon had already confirmed that it would meet with AID, an

unnamed insurer, Travelers and St. Paul between 7:00 and 10:30 a.m., and Aon was trying to

arrange for Hartford, Chubb, Zurich, Kemper and CNA to also join the meetings.

319.    In The Greenbrier meetings, Aon explained the concept of a "Strategic

Partner" and that it included an insurer receiving preferential treatment in exchange for

kickbacks.  Aon also disclosed that all of the conspiring insurers (*i.e.*, the insurers' supposed

competitors) were kicking back an average of 14% of their premiums to Aon.  Aon's form letters

further informed each insurer that efforts "to expand our relationship together" would be

"enhanced with additional assistance" from the insurer and proposed that the insurer pay an additional "override" back to Aon on the insurers' entire book of business with Aon.

320.    Although the kickback arrangements were often discussed orally, Aon usually reduced them into writing under the guise of a contingent commission or "PSA" agreement. One Aon executive threatened an insurer that had been slow to sign a contingent commission kickback agreement to which it had orally agreed:

> We have been operating on the good faith that this [contingent commission agreement] would be mutually agreed quickly after our meeting here in NY. Based on the fact that we are almost halfway through the year, I will be advising our people in the field that we in fact don't have a [contingent commission agreement] with [Industrial Risk].

Aon heavily redacted the document before producing it, removing all names other than Bob Needle

321.    Likewise, in April 2002, Aon invited its so-called "lead umbrella markets" to a high-level meeting in Chicago. Aon told an unnamed insurer that it had invited St. Paul, Zurich, CNA, and Kemper because these insurers paid the highest kickbacks to Aon. Aon also told the insurer that it was not invited because it had not paid kickbacks to Aon in the form of "PSA" or "PEF" payments. Arguing that it had indeed been paying kickbacks to Aon, the insurer protested. The insurer claimed that it had provided large kickbacks directly to Aon's London affiliate and that it should not be penalized if Aon's London affiliate refused to share the kickbacks with Aon's U.S. operations.

322.    Another time, Aon told an unnamed insurer that Aon had stopped sending property insurance business to another insurance carrier–initially thought to be Arch–because it had not agreed to make lucrative kickbacks, then called "PSA payments," to Aon. On October 3,

2003, the insurer's Business Development Officer, Larry Sorensen, reported that Aon's

Managing Director for the National Property Syndication Group, Gary Marchitello, had

instructed "his team that they avoid making any placement with one particular carrier (I guessed

Arch, but Arch does give Aon a PSA – Bill [Kasbeer, of Aon] would not identify the company)

that refuses to provide a PSA agreement."  Mr. Kasbeer, however, did lead Mr. Sorensen to

believe he would share with an unnamed insurer a summary of what other insurers paid in

kickbacks.

        323.    Similarly, Aon threatened an unnamed insurer to force it to pay more in

kickbacks.  Mr. Marchitello wrote in a March 11, 2004 email to the insure that Aon would "make

serious adjustment to the way [Aon] do[es] business with [an unnamed insurer]" unless the

insurer made material progress in finding "ways to enhance the compensation level" to Aon.

The insurer's personnel understood the threat exactly as Aon intended:  Aon would direct its

customers' business away from the insurer unless the insurer agreed to pay kickbacks to Aon in

the form of "PSA," or profit sharing agreement, payments.  The insurer received the message.

Just two days later, the insurer's Robert Mescher wrote to Vice President John Schumacher,

"Looks like they are getting serious about relegating [an unnamed insurer's] RiskPartners to the

bottom of the pile if we aren't able to agree to a PSA of some sort."

        324.    From time to time, Aon would tell its various insurance carrier contacts

exactly what its plan was with another insurer carrier and even provide copies of those kickback

agreements.  For example, in early 2003, Mr. Needle provided to Chubb copies of kickback

agreements Aon had entered with Chubb's competitors and offered to provide additional ones.

In negotiating the 2003 kickback agreement with Chubb, Mr. Needle wrote to Chubb's William

Tully that Chubb's most recent kickback proposal was "not competitive with any arrangements we have with our other major insurers. I think you know that, from the agreements that were sent earlier. I would be glad to forward any of the others."

325.    Aon's efforts worked. Its so-called Strategic Partners clearly understood the kickback scheme: Aon would "sell" the customer's business to them in exchange for a payoff. For this reason, Chubb's Chief Operating Officer, Tom Motamed, argued in an September 13, 2000 internal Chubb email that Chubb should pay **even higher** sums to Aon so that Chubb could tell Aon "we are open for business (e.g., their new business production) and are paying them [Aon] extra for it." (emphasis in original.)

326.    Likewise, in September 2001, XL's Diane Amodeo explained to her colleagues that she had gathered "some market intelligence" and learned that "a PSA with AON will ultimately be required to ensure a healthy submission flow for lead umbrella and first layer excess."

**4.    For Certain Business of Aon's Customers, the Insurers' *Quid Pro Quo* for Allocation of the Business Included Using Aon Re to Reinsure the Business.**

327.    The so-called Strategic Partners' kickbacks to Aon were not limited to commissions. Aon's strategic partners also provided kickbacks to Aon through another mechanism, high reinsurance brokerage fees to Aon's reinsurance affiliates, Aon Re. Aon placed its customers' business with its strategic partners in exchange for their agreement to use Aon Re to provide reinsurance on the risks—and, of course, pay Aon Re additional commissions on the reinsurance placements. Indeed, according to Aon, one of the criteria for defining a carrier as a so-called "Strategic Partner" is that the carrier is a "[s]ubstantial client of Aon Re."

328.    As early as March 31, 2000, Chief Marketing Officer and Managing

Director of Aon's Casualty Syndication, Joe Lombardo, humorously summarized this part of the

kickback scheme:

> "What do you call a carrier who buys a little reinsurance from Aon
> Re?"  -----  "A strategic partner!"

329.    Acknowledging that Aon had been trading its customers' retail business in

exchange for the carrier placing reinsurance with Aon's affiliate, Mr. Lombardo cautioned his

colleagues that Aon should act strategically in coordinating the scheme.  In his words:

> More than once the success of a reinsurance effort imposed a
> commitment on the retail operations that was unrealistic and
> problematic. . . . The more troublesome activities have been where
> a reinsurance "hit" with a 2nd tier retail market is linked to a retail
> "promise."  These activities need to be better staged from the onset
> to avoid delivery failures.  If we could choreograph them to fill
> retail product/niche needs, we would turn these into win-wins [for
> Aon and the conspiring insurer].

330.    In a February 23, 2000 email, Aon's Scott Clark informed Mr. O'Halleran

that he had met with representatives from Liberty and "told them Aon Specialty Re must place

the fac [facultative reinsurance] on Aon produced business."  He went on to tell the Liberty

personnel, "if we don't get their reinsurance there is no point to these 'love ins.'"  In short, a

condition of getting the specialty insurance business of Aon's customers was the promise to

place all of their reinsurance through Aon, giving Aon another set of commissions.

331.    Likewise, Aon allotted retail business to AIG in exchange for AIG's

promise to use Aon Re to reinsure a risk, even though AIG had initially decided to retain the risk

itself.  Aon promised to steer $10 million in new business to AIG in exchange for AIG agreeing

to pay Aon Re $750,000 in reinsurance brokerage fees. As an Aon executive explained the *quid pro quo* to Aon's CEO, Mike O'Halleran and its Chairman, Patrick Ryan:

> In return for a commitment of $10,000,000 in new gross premium from ARS US [Aon Risk Services], AIG has agreed to appoint Aon Re for an additional 2.5% placement of the CCA program, which [AIG] has indicated is worth $750,000 in commission for Aon Re.

332.    Attempts to sell of the business of Aon's customers went to the very top of Aon. Heavily redacted notes of a telephone conference between Aon's Chairman Patrick Ryan and Chubb Chairman and Chief Executive Officer Dean O'Hare show that Chubb promised Aon that "Aon will get the lion['s] share" of the reinsurance for one particularly large account. Mr. Ryan told Mr. O'Hare that Aon's handling of the reinsurance "is critically important to Aon" and that Chubb would enjoy "positive relations" with Aon "if Chubb give[s] r/i [reinsurance] to Aon." Mr. Ryan further stated that he was "willing to put his personal credibility and friendship w/Dean on the line to make sure Chubb receive[s] preferential treatment from Aon."

**D.    Aon and the Conspiring Insurers Contemporaneously Tracked the Kickbacks Earned on Each Customer's Insurance Policies, including Sears' Policies.**

333.    Despite Aon's claims to the contrary in the *Daniels* litigation[2], Aon and the conspiring insurers contemporaneously tracked, often by customer and by policy, the exact amount of contingent commission kickbacks Aon would be owed.

---

[2] *Daniels v. Aon* was a lawsuit in Illinois state court by a putative class of Aon's customers challenging the contingent commissions kickbacks. In the lawsuit, Aon maintained to the state court that Aon could not determine what contingent commissions were attributable to each customer's policy. Aon eventually settled with the class and NCW opted out of the settlement.

334.    For example, Aon contemporaneously maintained a spreadsheet tracking the net premiums on its professional policy lines for its June 1, 2002 to June 1, 2003 PSA with one of the conspiring insurers.  Aon tracked the customer, the policy and the exact amount each policy contributed toward its "net written premium" goals for the kickback payments.  Sears appears on the chart, with three different policies contributing a total of $2,070,720 in net written premiums for the kickback calculation.  That year, Aon achieved an additional kickback of 2% of this amount, which was added to the other commissions for a total of 8.76%.

335.    Aon kept numerous additional spreadsheets showing, by customer and policy, the amount of kickbacks Aon earned from its so-called Strategic Partners, including XL, Liberty, and other unnamed conspiring insurers.  Sears' policies appear in many of these spreadsheets.

336.    For example, Aon placed a portion of Sears' 2004 D&O insurance with an unnamed conspiring insurer at a premium of $179,080.  According to Aon's contemporaneous spreadsheet, the insurer booked and paid Aon a six percent "Compensation for Services to Underwriters" ("CSU") kickback of $10,745 on the premium directly attributed to this portion of the policy.  Likewise, Aon placed a portion of Sears' EPL insurance with XL Insurance Bermuda at $86,847 premium.  The spreadsheet shows that XL paid Aon Bermuda a straight 5% commission of $4,342 plus another 10% "resource commission" kickback of $8,685.

337.    The insurers maintained similar spreadsheets.  For example, XL kept contemporaneous spreadsheets for its property, casualty, and professional lines of insurance calculating how each dollar of premium it received—including premiums from Sears— contributed toward the contingent commission kickbacks it would pay Aon.  The spreadsheet

tracked the customer, policy number, policy dates, and each policy's gross premium, as well as various ceding and brokerage commissions (which were deducted from the gross premium before calculating the kickback). XL then calculated the kickback amount it owed Aon for having steered the policies to XL.

338.    Similarly, Zurich prepared a spreadsheet tracking by policy the exact amount of the kickbacks it owed Aon in its 2003 kickback agreement. Policies for Sears, Roebuck (and for its affiliated company, Kmart) repeatedly appear on the chart, contributing $4,823,197 in net written premiums toward the kickback goals Zurich would owe Aon for that year.

**E.    Aon Grew Fat on the Kickbacks.**

339.    Over time, Aon received more and more money in illicit kickbacks. These kickback payments were in addition to "customary" or "straight" commissions and could equate to 15% or more of the customer's total premium. For example, in an early kickback agreement with Zurich, Aon was to receive a straight commission of 13.5% on all D&O, Fiduciary, Fidelity/Crime, Real Estate E&O and employment practices liability insurance (EPLI) policies. Zurich further would pay an additional 2.5% as a "contingent commission" kickback, regardless of the amount of premiums, for a total of 16% premium flowing back to Aon. If Aon allocated $25 million in business to Zurich during the year, the "contingent commission" kickback would increase to 3.5%, netting Aon a whopping 17% kickback of the customers' premiums.

340.    Examples of similar arrangements with other insurers abound. Aon promised not to reduce the overall volume of business with Ace's Bermuda affiliate during the 2000 calendar year. In exchange, the carrier agreed to pay a half-million dollar kickback to Aon.

In addition to this payment, Ace's Bermuda affiliate promised to pay Aon another 15% in commissions on new and renewal business (with the exception of excess renewal business, on which it would pay between 12% and 15%). On top of those hefty kickbacks, the carrier promised Aon up to another 7% commission on excess liability policies and 2 or 3% on professional policies. In exchange, Aon promised the carrier that Aon would "ensure that ACE has the last right of refusal on any renewal business."

341.    The agreement with Ace also exposes another practice developed by Aon and the insurers—many of the contingent commission kickback agreements included a "true up" or "gross up" provision in which the carrier agreed to pay Aon contingent commission kickbacks and to also "gross up" the combined straight and contingent commissions to a higher percentage. This had the effect of allowing Aon to collect straight commissions on every insurance policy, even where Marsh had agreed not to collect commissions. Aon's kickback agreement with Ace's Bermuda affiliate for the 2000 calendar year included such a "gross up" provision that required the insurer to kick back to Aon up to another 6% of all property policies until Aon received an across-the-board 15% kickback, even on policies that Aon had promised to its customers that it would broker on a "fee-only" basis.

342.    Similarly, Aon arranged commissions for itself on the fee-based accounts it placed with XL's "Insurance American" division, violating the fee-based agreements it had made with many of its customers to not accept commissions on their lines of business. In its 2003 PSA kickback agreement with Aon, XL agreed to pay Aon up to 7% in "wholesale" commissions on fee-based written premiums, which the agreement defined as "gross written premium on umbrella and excess liability policies written through XL Insurance Global Risk

Excess Casualty Department where an agreement exists between the Broker and an Insured with respect to Broker Compensation and commission is not otherwise paid to the Broker by the Company." While Aon may not have accepted "retail" commissions on the fee-based premiums it passed on to XL, Aon still collected "wholesale" commissions from XL without its customers' knowledge or consent. Aon also gathered up to 17.5% in commission payments on gross written premiums garnered from new business that were not restricted to a fee.

343. Knowing that these types of provisions violated its fee-only brokerage agreements, Aon took steps to ensure its customers did not learn of these commissions by including a confidentiality provision in the agreement that required the conspirators to keep the kickbacks secret.

344. The January 1, 2003, PSA kickback agreement for placements with AWAC by Aon's Bermuda office also called for Aon to receive a "gross up" on excess casualty, property and professional lines (including D&O, EPLI and professional liability) of insurance. This agreement, too, called for Aon and AWAC to keep the kickbacks secret. This gross up was as high as 16% on property lines and 15% on the others.

345. By 2004, the kickbacks had become so central to Aon's business model that Aon depended upon them for its profitability. When Aon announced in October 2004 that "it would stop collecting so-called contingent commissions," it admitted that it had collected a stunning $200 million in such kickbacks in 2003 alone. Aon also admitted that it had already collected $117 million in contingent commissions in just the first nine months of 2004 and expected to collect another $50 million in the fourth quarter of 2004. This sum does not even include income Aon received under other programs with different names, including Aon's

practice of allocating retail business to insurers that had agreed to have Aon Re, in turn, handle the wholesale brokerage.

346.    In February 2005, a few months after it stopped collecting the contingent commission kickbacks, Aon reported a double-digit percentage drop in its fourth quarter 2004 profits.  Aon attributed most of the loss to its discontinuance of the contingent commission kickbacks.

**F.    Aon and the Conspiring Insurers Secreted Their Kickback Arrangements.**

347.    Even though Aon and the conspiring insurers closely tracked the kickbacks Aon was to receive, they kept the existence and terms of their kickback agreements secret from customers.  In fact, virtually every one of the so-called contingent commission agreements, or PSAs, contain a secrecy provision that prohibits the parties from revealing the terms of the agreement unless compelled to do so by a court.

348.    For example, Roland Bonitati of an unnamed conspiring insurer signed an agreement effective on January 1, 2002, in which the insurer and Aon agreed that "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law."  Likewise, the PSA kickback agreement between AWAC and Aon effective January 1, 2003, included an identical provision.

349.    In an October 23, 2003 meeting of Aon's most senior executives, Mr. O'Halleran discussed the fact that Marsh had been raking in more money in contingent commission kickbacks than Aon.  Implicitly recognizing the illicit nature of these contingent commission kickbacks, Mr. O'Halleran addressed the question, "if we can't make up the difference, shouldn't we take the high ground and blow the whistle on them?"  He argued,

however, that Aon should not "take the high ground," because "if we 'blow the whistle' all relationships, all contingents and overrides will be out there for review."  Although he self-servingly suggested Aon act "legitimately" to increase its kickbacks, he also recognized that customers would not approve of the kickbacks if they were to learn of them and explained that the a plan to increase the kickbacks should be undertaken "without highlighting it."

350.    Aon also instructed the conspiring insurers to avoid showing the PSA kickback percentages on insurance quotes—even though the insurers attributed them to every policy—and directed the conspiring insurers never to disclose the existence of the kickback agreements to customers or even Aon's retail brokers.  For example, in May 2003, an unnamed insurer's Craig Smiddy sent an email to his colleagues instructing them to:

> Please discuss with your team:
> Quotes we provide to any production source should not reference any applicable PSA percentage we included in our pricing. Furthermore, PSA's are never to be discussed with retail producers or clients.

351.    Even as knowledge of the New York Attorney General's investigation began to spread, Aon continued to mislead its customers about the extent and nature of the kickbacks.  Aon made superficial changes to the kickback program to mislead its customers their true nature.  For example, on March 1, 2004, Aon's David Bolger instructed that the contingent commission kickbacks would now be called "Compensation for Services to Underwriters (CSUs)," which falsely suggests that the payments were for some service provided by Aon to the so-called Strategic Partners and unrelated to the amount of premiums Aon drove to these insurers.  Mr. Bolger internally explained the real reason for the name change, "[w]e would like to get away from the use of terms like 'contingents,' 'overrides,' and 'PSAs' throughout Aon."

In fact, notwithstanding the new name, the CSUs payments were still kickbacks by Aon's

Strategic Partners for allocating the business of Aon's customers to them.  Aon's Chairman and

CEO, Patrick Ryan, participated in this email conversation.

> ### G.    With the Conspiring Insurers' Assistance, Aon Violated Its Obligations to Sears.
>
> #### 1.    Aon Did Not Act in Sears' Best Interests and Failed to Disclose the Kickbacks.

352.    Aon did not act in Sears' best interests.  Aon did not provide high quality

work, nor did it did seek the best insurance coverage at the lowest prices.  To the contrary, Aon

allocated Sears' insurance business to the insurers that had agreed to pay the highest kickbacks to

Aon.

353.    Aon also violated its agreed that it would "not intentionally do or perform

an act or omission injurious or prejudicial to Sears or contrary to the best interest of Sears."

354.    Aon likewise did not inform Sears of the compensation, including the

kickbacks, Aon received from the insurers in exchange for placing Sears' business with those

insurers.

355.    One of Aon's so-called Strategic Partners even pointed out that Aon's

approach was not in its customers' best interests.  Even after New York Attorney General

Spitzer's antitrust investigation of the insurance industry had become public, Aon's Joe Rego

became angry on December 3, 2004 when XL informed him that it would only pay a 4%

commission on insurance for MARTA, Atlanta's public transportation system.  Mr. Rego

threatened XL that "4% is unacceptable and therefore we will either have to gross up the quote to

reflect our minimum requirement of 5% (which will be fully transparent) or market it to other

insurers who hold us in higher value…."  XL pointed out that Aon was acting against its

customer's interest, stating that it was "surprised to hear you say [] that you would market this to

other insurers based on the fact that they pay a higher commission. . . ."  In what XL personnel

later described as Mr. Rego "getting witty in his old age," Mr. Rego ironically shot back "[i]t's

called competition. . . ."  Later, XL's Beth Piggott soberly described Mr. Rego's approach to

brokering insurance as "just the sort of 'competition' that has gotten brokers and some insurers

in the midst of 'Hurricane Spitzer'.  What Joe [Rego] fails to realize is that he should be working

in the best interest of the client, and that does not always equate to who pays the most

commission to Aon."

356.    Furthermore, because Aon was keeping so much information from Sears,

Aon did not provide "proper" renewal strategies or discuss these strategies or changes in the

marketplace with Sears in any meaningful way.  Indeed, Aon did not even act in compliance with

applicable law.

### 2.    Aon Accepted Payment on Sears' Fee-Only Placements.

357.    Aon also violated its promises not to accept payments from the insurers

for the placement of certain lines of Sears' insurance policies.  To the contrary, Aon secretly

accepted both "straight" commissions and "contingent commission" kickbacks on such policies.

358.    For example, on the two Sears' 2003 - 2004 D&O policies placed with

Arch, Aon accepted a 4% straight commission of $81,880 on $2,047,000 of premiums (plus

another 2% contingent commission) without informing Sears.  Aon took a 4% straight

commission on three of Sears' 2003 Professional insurance policies—amounting to $86,280 on

$2,157,000 of premiums—plus another two percent "PSA" kickback, despite having agreed not to accept commissions on those product lines.

### H.    The Conduct of Aon and the Conspiring Insurers Harmed Sears.

359.    There is no question that Aon's scheme for obtaining and accepting secret kickbacks harmed its customers, including Sears, in multiple ways.

360.    First, the conspiring insurers increased the premiums they charged customers, such as Sears, by at least the amount they kicked back to Aon.  As an unnamed insurer's Anthony Kuczinski explained to his colleague, John Phelan, when budgeting for the kickbacks the insurer planned to pay to the brokers in upcoming year, "you should be aware that [an unnamed conspiring insurer] also has agreements with Aon and others and you should also be aware that *these are priced into our products* within the pricing guidelines."  (emphasis supplied.)

361.    Aon and the conspiring insurers were well aware that the hidden kickbacks served to inflate the premiums of Aon's customers but provided no added benefit to its customers.  For example, as early as March 31, 2000, Mr. Lombardo, candidly acknowledged in an internal Corporate Marketing Memo:

> I'm concerned with even my own ability to put a positive, bullet proof, spin on some of what we'd like to do. Whether it's contingencies, profit-sharing, increased rates of commission, enhanced payment terms, "expense reimbursement" or expanded interdependent support – how does it translate to a client benefit?

Mr. Lombardo went on to admit that it had become "more difficult to deny that most of this is coming out of premium dollars."

362.     Mr. Lombardo likewise acknowledged that Aon regularly engaged in "favors" or "accommodations" for the insurers that paid large kickbacks that were to the customers' detriment.  As he explained in an internal email, "'[p]aybacks' often introduce an element of conflict with another of our strong relationships, or worse, with a client objective."

363.     <u>Second</u>, the reduction or absence of vigorous competition caused by Aon's customer allocation scheme permitted the insurers to charge supra-competitive premiums.  This was true because the insurers knew that they would be shielded from competition and also caused premium inflation across the market, affecting all customers.  As Aon's Mr. Brown explained, the scheme permitted Aon's strategic partners to enjoy "increased monetary rewards. . . ."  Moreover, Aon prevented vigorous competition—and, thus, better products at lower prices—when it allocated business based on which insurers would best line its pockets.

364.     The harm caused to Sears by the artificial inflation of the market may be quantified through expert testimony.

365.     <u>Third</u>, Sears was deprived of the benefit of having paid Aon a flat fee in exchange for broking Sears' insurance without commissions.  As shown, Aon continued to secretly accept both "straight" and "contingent" commissions for placing Sears' policies with the conspiring insurers.  Additionally, Aon accepted other forms of payments from the insurers, including "gross ups" and wholesale brokerage commissions through Aon Re, in exchange for "selling" Sears' insurance placements.

## CAUSES OF ACTION

### COUNT I
### *Per Se* Horizontal Marsh-Centered Conspiracy in Violation of
### Section 1 of the Sherman Act Against Marsh, Ace, Chubb, Hartford, Fireman's Fund,
### Liberty, St. Paul/Travelers and XL

366.    Sears restates and incorporates by reference as if fully set forth herein paragraphs 1 through 365.

367.    Sears alleges a *per se* violation of Section 1 of the Sherman Act against Marsh, Ace, Chubb, Fireman's Fund, Hartford, Liberty, St. Paul/Travelers and XL for conspiring to restrain competition.  This count does not rely upon fraud or misrepresentation by any of the Defendants, although such events occurred, as described in other counts.

368.    These Defendants engaged in continuing illegal contracts, combinations or conspiracies with respect to the sale of Insurance Products in the United States in an unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by, among other things:  (1) allocating without competition the opportunities to sell, and the sale of, Insurance Products to customers; (2) creating a scheme to pay Marsh to organize, implement and police the unlawful conspiracy; and (3) providing customers seeking to purchase Insurance Products, as well as Marsh's Customer Advisory Services, with collusive and non-competitive bids or other terms of sale to prevent discovery of the conspiracy.

369.    As described above, Marsh, Ace, Chubb, Fireman's Fund, Hartford, Liberty, St. Paul/Travelers and XL, and their co-conspirators, overtly participated in the conspiracy and took acts in furtherance of it.

370.    The contracts, combinations or conspiracies described above were naked restraints of trade among horizontal competitors.

371.    The Defendants' acts complained of herein do not constitute the business of insurance regulated under state law.

372.    The purpose and effect of these Defendants' illegal contracts, combinations or conspiracies was to increase their profits by suppressing or eliminating competition and, thus, increasing prices for Insurance Products in the United States or maintaining them at artificially high levels.

373.    During and throughout the period of the conspiracies alleged in this Complaint, Sears purchased Insurance Products from the participating insurance carrier Defendants (or their subsidiaries or controlled affiliates) and their co-conspirators at inflated and supra-competitive prices.

374.    As a direct and proximate result of the contracts, combinations or conspiracies alleged above, Sears was injured in its business in that it paid higher prices than it would have paid for Insurance Products in a competitive market.

375.    These Defendants' acts are a *per se* violation of the Sherman Act. Alternatively, the Defendants' acts violate the Sherman Act under a rule of reason analysis.

376.    Various persons, not named as Defendants, participated as co-conspirators in the violations, and performed acts and made statements in furtherance of that conspiracy.

WHEREFORE, Sears demands judgment against Marsh, Ace, Chubb, Fireman's Fund, Hartford, Liberty, St. Paul/Travelers and XL, jointly and severally, as follows:

A.    For damages caused by these Defendants' violation of the Section 1 of the Sherman Act;

B.    For treble damages;

C.    Directing that these Defendants pay Sears' costs, including attorneys' fees as provided by law;

D.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

E.    Granting such other and further relief as may be just and proper.

**COUNT II**
**Marsh-Centered Conspiracy in Violation of**
**Section 1 of the Sherman Act**
**Against Marsh and All Insurer Defendants Under the "Rule of Reason" Analysis**

377.    Sears restates and incorporates by reference as if fully set forth herein paragraphs 1 through 376.

378.    Sears alleges in this count a violation of Section 1 of the Sherman Act against all Defendants other than Aon for conspiring to restrain competition. This count does not rely upon fraud or misrepresentation by any of the Defendants, although such events occurred, as described in other counts.

379.    Each Defendant other than Marsh and Aon (*i.e.*, an "Insurer Defendant") is an insurance carrier that (1) agreed to pay Marsh kickbacks in exchange for Marsh allocating its customers' business to them, (2) received very significant sums – usually in the millions of dollars – of Sears' insurance premiums brokered by Marsh as a result of the customer allocation scheme, (3) paid Marsh kickbacks in exchange for allocating the insurance business of Marsh's customers, including Sears, to them without competition, (4) was aware that other insurers were also engaged in the scheme, (5) agreed to keep the scheme secret from Marsh's customers and, often, Marsh's Customer Advisory Services, and (6) did keep the scheme secret.

380.    As alleged in this complaint, the Insurer Defendants knew the terms of the contingent commission kickback agreements that their supposed competitors had entered into with Marsh.  Furthermore, as also alleged in this complaint, the Insurer Defendants generally refrained from attempting to win business that Marsh allocated to a supposed competitor.

381.    Marsh and the Insurer Defendants engaged in continuing illegal contracts, combinations or conspiracies with respect to the sale of Insurance Products in the United States in an unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by, among other things:  (1) engaging in a customer allocation scheme in which Marsh assigned its customers' business to conspiring insurers without competition and (2) engaging in a "pay to pay" scheme in which Marsh sold customers' business to conspiring insurers to maximize the kickbacks the insurers offered and without regard for the price or quality of the insurance product.  As a result, the Insurer Defendants increased the price of their Insurance Products knowing that they would face little or no competition due to the schemes.

382.    These acts complained of herein do not constitute the business of insurance regulated under state law.

383.    The purpose and effect of these Defendants' illegal contracts, combinations or conspiracies was to increase their profits by suppressing or eliminating competition and, thus, increasing prices for Insurance Products in the United States or maintaining them at artificially high levels.

384.    During and throughout the period of the conspiracies alleged in this complaint, Sears purchased Insurance Products from the Insurer Defendants (or their subsidiaries or controlled affiliates) and their co-conspirators at inflated and supra-competitive prices.

385.    As a direct and proximate result of the contracts, combinations or conspiracies alleged above, Sears was injured in its business in that it paid higher prices than it would have paid for Insurance Products in a competitive market.

386.    Various persons, not named as Defendants, participated as co-conspirators in the violations alleged, and performed acts and made statements in furtherance of that conspiracy.

WHEREFORE, Sears demands judgment against Marsh and the Insurer Defendants, jointly and severally, as follows:

F.    For damages caused by violation of the Section 1 of the Sherman Act by Marsh and the Insurer Defendants;

G.    For treble damages;

H.    Directing that Marsh and the Insurer Defendants pay Sears' costs, including attorneys' fees as provided by law;

I.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

J.    Granting such other and further relief as may be just and proper.

**COUNT III**
**Aon-Centered Conspiracy in Violation of**
**Section 1 of the Sherman Act**
**Against Aon Ace and All Insurer Defendants Under the "Rule of Reason" Analysis**

387.    Sears restates and incorporates by reference as if fully set forth herein paragraphs 1 through 386.

388.    Sears alleges in this count a violation of Section 1 of the Sherman Act against Aon and all of the Insurer Defendants for conspiring to restrain competition. This count does not rely upon fraud or misrepresentation by any of the Defendants, although such events occurred, as described in other counts.

389.    Ace, Arch, Chubb, Fireman's Fund, Hartford, HCC, Kemper, Liberty, Travelers, and XL (the "Aon Insurer Defendants") are each an insurance carrier that (1) agreed to pay Aon kickbacks in exchange for Aon allocating its customers' business to them, (2) received significant sums of Sears' insurance premiums brokered by Aon as a result of the customer allocation scheme, (3) paid Aon kickbacks in exchange for allocating the insurance business of Aon's customers, including Sears, to them without competition, (4) was aware that other insurers were also engaged in the scheme, (5) agreed to keep the scheme secret from Aon's customers, and (6) did keep the scheme secret.

390.    As alleged in this complaint, the Aon Insurer Defendants knew the terms of the contingent commission kickback agreements that the other Aon Insurer Defendants had entered into with Aon. Furthermore, as also alleged in this complaint, the Insurer Defendants generally refrained from attempting to win business that Aon allocated to another Aon Insurer Defendant.

391.    Aon and the Aon Insurer Defendants engaged in continuing illegal contracts, combinations or conspiracies with respect to the sale of Insurance Products in the United States in an unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by, among other things:  (1) engaging in a customer allocation scheme in which Aon assigned its customers' business to conspiring insurers without competition and (2) engaging in a "pay to pay" scheme in which Aon sold customers' business to conspiring insurers to maximize the kickbacks the insurers offered and without regard for the price or quality of the insurance product.  As a result, the Aon Insurer Defendants increased the price of their Insurance Products knowing that they would face little or no competition due to the schemes.

392.    These acts complained of herein do not constitute the business of insurance regulated under state law.

393.    The purpose and effect of these Defendants' illegal contracts, combinations or conspiracies was to increase their profits by suppressing or eliminating competition and, thus, increasing prices for Insurance Products in the United States or maintaining them at artificially high levels.

394.    During and throughout the period of the conspiracies alleged in this complaint, Sears purchased Insurance Products from the Aon Insurer Defendants (or their subsidiaries or controlled affiliates) and their co-conspirators at inflated and supra-competitive prices.

111

395.    As a direct and proximate result of the contracts, combinations or conspiracies alleged above, Sears was injured in its business in that it paid higher prices than it would have paid for Insurance Products in a competitive market.

396.    Various persons, not named as Defendants, participated as co-conspirators in the violations, and performed acts and made statements in furtherance of that conspiracy.

WHEREFORE, Sears demands judgment against Aon and the Aon Insurer Defendants, jointly and severally, as follows:

A.    For damages caused by violation of the Section 1 of the Sherman Act by Aon and the Aon Insurer Defendants;

B.    For treble damages;

C.    Directing that Aon and the Aon Insurer Defendants pay Sears' costs, including attorneys' fees as provided by law;

D.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

E.    Granting such other and further relief as may be just and proper.

## COUNT IV
## Marsh-Centered Conspiracy in Violation of the
## RICO Act, 18 U.S.C. §§ 1962(c) & (d), Against Marsh,
## Ace, Chubb, Fireman's Fund, Hartford, Liberty, St. Paul/Travelers and XL

397.    Sears restates and incorporates by reference as if fully set forth herein paragraphs 1 through 396.

398.    Sears alleges a violation of 18 U.S.C. § 1962(c) against Marsh, Ace, Chubb, Fireman's Fund, Hartford, Liberty, St. Paul/Travelers and XL (together, the "Marsh RICO Defendants") for conducting or participating in a criminal enterprise through a pattern of

112

racketeering activity. Sears also alleges that each of the Marsh RICO Defendants' agreement to participate in the unlawful operation of the enterprise to increase commissions and premiums, allocate customers, and to rig bids is a violation of 18 U.S.C. § 1962(d).

399.    The Marsh RICO Defendants formed an association-in-fact enterprise that provided Insurance Products to Marsh's customers sufficient to meet the customers' commercial insurance needs. This enterprise, however, had a hidden purpose: to maximize the participants' profits by eliminating competition in the market for Insurance Products, as described in this complaint.

400.    The enterprise essentially had a "hub and spokes" structure, with Marsh acting as the hub and coordinating most communication and the remaining Marsh RICO Defendants acting as spokes. Each of the Marsh RICO Defendants knew of the existence and participation of the others—supplying the "rim"—as evidenced by the allegations in this complaint, including the sharing of information through Marsh about the terms of the co-conspirators participation in the conspiracy, the conspiring insurers' agreement to abstain from competitive bidding on business slated to go to co-conspirators, the occasional provision of false B bids and sham declinations to protect co-conspirators, and even direct communication among the conspiring insurers.

401.    As described in this complaint, Marsh coordinated the enterprise and drove most decision making, including slating which Marsh RICO Defendant would win each layer of its customers' insurance. Marsh also established the target prices at which each policy would be placed. When necessary, Marsh solicited false B bids or sham declinations to give the fictitious appearance of competition. Marsh monitored and policed the conspiracy and

occasionally disciplined or threatened to discipline other Marsh RICO Defendants that stepped

out of line.  While Marsh was the primary decision maker, it occasionally accepted feedback

from the other Marsh RICO Defendants.

402.    As set forth in this complaint, Ace, Chubb, Fireman's Fund, Hartford,

Liberty, [an unnamed insurer], St. Paul/Travelers and XL—as well as other, unnamed co-

conspirators—were insurance insurers that participated in the conspiracy.  Their role in the

conspiracy consisted of (a) refraining from providing quotations for the business of Marsh's

customers unless told to do so by Marsh, (b) providing quotations at or near Marsh's the target

price selected by Marsh on business Marsh allocated to the carrier, (c) providing false B bids or

sham declinations when requested by Marsh on accounts that Marsh had allocated to other

conspiring insurers, (d) providing Marsh with significant contingent commission kickbacks and

other payments, (e) illicitly providing Marsh with straight commissions on flat-fee accounts, and

(f) secreting the existence of the conspiracy, including obscuring the true nature and extent of the

contingent commission kickbacks and other payments.

403.    The enterprise was an ongoing organization engaging in activities that

were within the flow of, and substantially affected, interstate commerce.

404.    The enterprise began in the mid- to late-1990s, although it continued

became more defined and organized over time and, by 2001, had a very well defined and

organized structure.  The enterprise existed for several years, ending only in 2004 after the

Marsh RICO Defendants learned of investigations launched by state attorneys general.

405.    As set forth in this complaint, the Marsh RICO Defendants committed at

least two acts of racketeering activity within a ten year period, including numerous acts of mail

and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343 in furtherance of the conspiracy.  For

example, as set forth in this complaint and in furtherance of the scheme, Marsh used wire and

mail:

    a)    to distribute the broking plans to insurers;

    b)    to solicit false B bids and sham declinations from insurers;

    c)    to obtain insurers' agreements to join the conspiracy;

    d)    to ensure that its personnel and its co-conspirators were secreting the contingent commission kickbacks and other payments;

    e)    to inform insurers of the amount of contingent commission kickbacks and other payments they owed;

    f)    to seek insurers' assistance in deceiving Sears as to the existence of commissions payable to Marsh on the Sears' policies;

    g)    to communicate with Sears to recommend the policies at inflated prices;

    h)    to mislead Sears into believing competition had occurred for its insurance policies;

    i)    to mislead Sears as to the amount of straight commissions, contingent commission kickbacks and other payments the insurers had or would make on Sears' policies; and

    j)    to place Insurance Products with Sears at inflated prices.

Marsh undertook these communications as part of its intentional scheme to defraud Sears, and its

other customers.  The communications either contained material misrepresentations, or the

omission or concealment of material facts, or were in furtherance of them.  The communications

were reasonably calculated to deceive Sears, and Marsh's other customers, and did, in fact,

deceive them.

       406.    Likewise, as set forth in this complaint and in furtherance of the scheme,

the Marsh RICO Defendants who were insurance insurers used wire and mail:

    a)    to respond to the broking plans with inflated bids;

    b)    to provide false B bids and sham declinations;

c)  to agree to join the conspiracy;

d)  to agree (and sometimes disagree) with Marsh on the amount of the contingent commission kickbacks and other payments they owed;

e)  to ensure that its personnel were secreting the contingent commission kickbacks and other payments;

f)  to provide bids and quotations designed to deceive Sears as to the existence of commissions payable to Marsh on Sears' policies; and

g)  to provide Insurance Products at inflated prices to Sears.

The Marsh RICO Defendants who were insurance insurers undertook these communications as part of their intentional scheme to defraud Sears, and Marsh's other customers.  The communications either contained material misrepresentations, or the omission or concealment of material facts, or were in furtherance of them.  The communications were reasonably calculated to deceive Sears, and Marsh's other customers, and did, in fact, deceive it.

407.    The Marsh RICO Defendants also aided and abetted each other in acts of mail and wire fraud in violation of 18 U.S.C. § 2.  These violations constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).

408.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including Sears.  For example, as alleged in this complaint, Marsh made misrepresentations in materials it disseminated by mail and wire wherein it routinely represented that it would act in the best interests of its customers, including Sears, in providing unbiased advice and assistance in selecting and placing Insurance Products and that it would act as a fiduciary of its customers, including Sears, negotiating and placing insurance on the best terms possible and at the best price available.  All of the Marsh RICO Defendants also knowingly and intentionally concealed facts material to the conspiracy, including the facts that

116

would reveal Marsh was allocating its customers' business in order to maximize the profits of the

Marsh RICO Defendants and Marsh was not acting in the best interests of its customers,

including Sears.  Furthermore, the insurers in the conspiracy occasionally provided B bids and

sham declinations by mail or wire to assist Marsh in keeping the conspiracy secret.

409.    As described in the complaint, Marsh, Ace, Chubb, Fireman's Fund,

Hartford, Liberty, St. Paul/Travelers and XL, and their co-conspirators, overtly participated in

the pattern of racketeering activity and took acts in furtherance of the conspiracy.

410.    Each of the Plaintiffs is a "person" within the meaning of 18 U.S.C.

§ 1961(3).

411.    During and throughout the period of the conspiracy alleged in this

complaint, Sears purchased Insurance Products from Ace, Chubb, Fireman's Fund, Hartford,

Liberty, St. Paul/Travelers and XL (or their subsidiaries or controlled affiliates) and their co-

conspirators at inflated and supra-competitive prices.  As a result, Sears has been injured in its

business or property by the Marsh RICO Defendants' overt acts of mail and wire fraud and by

their aiding and abetting others to commit such acts.

WHEREFORE, Sears demand judgment against Marsh, Ace, Chubb, Fireman's

Fund, Hartford, Liberty, St. Paul/Travelers and XL, jointly and severally, as follows:

A.    For damages caused by the Marsh RICO Defendants' violation of 18

U.S.C. §§ 1962(c);

B.    For damages caused by the Marsh RICO Defendants' violation of

18 U.S.C. § 1962(d);

C.    For treble damages;

D.    Directing that the Marsh RICO Defendants pay Sears' costs, including attorneys' fees as provided by law;

E.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

F.    Granting such other and further relief as may be just and proper.

### COUNT V
**Multiple Bilateral Conspiracies Between Marsh and the Insurer Defendants in Violation of the RICO Act, 18 U.S.C. §§ 1962(c) & (d), Against Marsh and Each of the Insurer Defendants**

412.    Sears restates and incorporates by reference as if fully set forth herein paragraphs 1 through 411.

413.    Sears alleges a violation of 18 U.S.C. § 1962(c) against Marsh and each of the Insurer Defendants for conducting or participating in criminal enterprises through a pattern of racketeering activity.  Sears also alleges that Marsh and the Insurer Defendants each agreed to participate in the unlawful operation of the enterprises to increase commissions and premiums and allocate customers is a violation of 18 U.S.C. § 1962(d).

414.    Marsh coordinated a "pay to play" scheme in which the insurance insurers agreed to provide Marsh contingent commission kickbacks and other payments in exchange for allocating a portion of the business of Marsh's customers to them.  The insurers involved in the scheme were aware that Marsh had entered similar arrangements with their so-called competitors.  The Insurer Defendants each agreed with Marsh to participate in the pay to play scheme.

415.    Marsh and each Insurer Defendant formed a separate association-in-fact enterprise that provided Insurance Products to Marsh's customers sufficient to meet the

customers' commercial insurance needs. Each enterprise was had a bilateral structure, with Marsh acting as the leader and coordinating which business the carrier would receive. Each of the Insurer Defendants knew of the existence and participation of the others in similar enterprises, although they may not have communicated directly with the members of the other bilateral enterprises about their scheme.

416.    The purpose of each enterprise was to maximize the participants' profits by reducing or eliminating competition in the market for Insurance Products, as described in this complaint.

417.    As described in this complaint, Marsh coordinated each bilateral enterprise and made most of the decisions for that enterprise, including slating which Insurer Defendant would win each layer of its customers' insurance. As the broker, Marsh had the ability to prevent any insurers from bidding on the insurance for Marsh's customers and could steer its customers toward any carrier it chose.

418.    Each Insurer Defendant participated in an enterprise with Marsh by agreeing to pay Marsh "contingent commission" kickbacks and other payments in exchange for allocating a portion of the business of Marsh's customers to it. Each Insurer Defendant also knew that it would face little or no competition for the business that Marsh steered toward it. Each Insurer Defendant received significant insurance premiums from Sears during the relevant time period, with most receiving well over $1 million in Sears' premiums during the relevant time period.

419.    Each bilateral Marsh enterprise was an ongoing organization engaging in activities that were within the flow of, and substantially affected, interstate commerce.

420.    The bilateral enterprises began in the mid- to late-1990s and continued in existence for several years, ending only in 2004 after Marsh and the Insurer Defendants learned of investigations launched by state attorneys general.

421.    As set forth in this complaint, the participants in each of the bilateral enterprises committed at least two acts of racketeering activity within a ten year period, including numerous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343 in furtherance of the enterprise's conspiracy.  For example, as set forth in this complaint and in furtherance of the scheme, Marsh used wire and mail:

a)    to obtain insurers' agreements to join the conspiracy;

b)    to inform insurers of the amount of contingent commission kickbacks and other payments they owed;

c)    to seek insurers' assistance in deceiving Sears as to the existence of commissions payable to Marsh on Sears' policies;

d)    to ensure that its personnel and its co-conspirators were secreting the contingent commission kickbacks and other payments;

e)    to communicate with Sears to recommend the policies at inflated prices;

f)    to mislead Sears into believing competition had occurred for its insurance policies;

g)    to mislead Sears as to the amount of straight commissions, contingent commission kickbacks and other payments the insurers had or would make on Sears' policies; and

h)    to place Insurance Products with Sears at inflated prices.

Marsh undertook these communications as part of its intentional scheme to defraud Sears, and its other customers.  The communications either contained material misrepresentations, or the omission or concealment of material facts, or were in furtherance of them.  The communications were reasonably calculated to deceive Sears, and Marsh's other customers, and did, in fact, deceive them.

422.    Likewise, as set forth in this complaint and in furtherance of the scheme, the Insurer Defendants used wire and mail:

    a)    to agree with Marsh on the amount of the contingent commission kickbacks and other payments they owed;

    b)    to ensure that its personnel were secreting the contingent commission kickbacks and other payments;

    c)    to provide bids and quotations designed to deceive Sears as to the existence of commissions payable to Marsh on Sears' policies; and

    d)    to provide Insurance Products at inflated prices to Sears.

The Insurer Defendants undertook these communications as part of their intentional scheme to defraud Sears, and Marsh's other customers. The communications either contained material misrepresentations, or the omission or concealment of material facts, or were in furtherance of them. The communications were reasonably calculated to deceive Sears, and Marsh's other customers, and did, in fact, deceive them.

423.    Marsh, on the one hand, and each Insurer Defendant, on the other, also aided and abetted each other in acts of mail and wire fraud in violation of 18 U.S.C. § 2. These violations constitute patterns of racketeering activity as defined in 18 U.S.C. § 1961(5).

424.    Each enterprise's acts of racketeering activity were related, had a similar purpose, involved the same two participants and method of commission, had similar results, and impacted similar victims, including Sears. For example, as alleged in this complaint, Marsh made misrepresentations in materials it disseminated by mail and wire wherein it routinely represented that it would act in the best interests of its customers, including Sears, in providing unbiased advice and assistance in selecting and placing Insurance Products and that it would act as a fiduciary of its customers, including Sears, negotiating and placing insurance on the best terms possible and at the best price available. Marsh and each of the Insurer Defendants also

knowingly and intentionally concealed facts material to each of their conspiracies, including the facts that would reveal Marsh was allocating its customers business in order to maximize their profits and Marsh was not acting in the best interests of its customers, including Sears. Furthermore, the Insurer Defendants each assisted Marsh in keeping their conspiracy secret.

425.    As described in the complaint, the Insurer Defendants, and their co-conspirators, overtly participated in the pattern of racketeering activity and took acts in furtherance of the conspiracy.

426.    Sears is a "person" within the meaning of 18 U.S.C. § 1961(3).

427.    During and throughout the period of the conspiracies alleged in this complaint, Sears purchased Insurance Products from the Insurer Defendants (or their subsidiaries or controlled affiliates) at inflated and supra-competitive prices.  As a result, Sears have been injured in its business or property by Marsh's and the Insurer Defendants' overt acts of mail and wire fraud and by their aiding and abetting others to commit such acts.

WHEREFORE, Sears demands judgment against Marsh and the Insurer Defendants, jointly and severally as between Marsh and each insurer, as follows:

A.    For damages caused by the Marsh's and the Insurer Defendants' violation of 18 U.S.C. § 1962(d);

B.    For treble damages;

C.    Directing that Marsh and the Insurer Defendants pay Sears' costs, including attorneys' fees as provided by law;

D.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

E.       Granting such other and further relief as may be just and proper.

**COUNT VI**
**Multiple Bilateral Conspiracies Between Aon and Certain Insurer Defendants**
**in Violation of the RICO Act, 18 U.S.C. §§ 1962(c) & (d),**
**Against Aon and the Insurer Defendants**

428.    Sears restates and incorporates by reference as if fully set forth herein

paragraphs 1 through 427.

429.    Sears alleges a violation of 18 U.S.C. § 1962(c) against Aon and Ace,

Arch, Chubb, Fireman's Fund, Hartford, HCC, Kemper, Liberty, Travelers, and XL (these

insurance insurers were previously defined as the "Aon Insurer Defendants") for conducting or

participating in eleven criminal enterprises through a pattern of racketeering activity.  Sears also

alleges that Aon and the Aon Insurance Defendants each agreed to participate in the unlawful

operation of the enterprises to increase commissions and premiums and allocate customers is a

violation of 18 U.S.C. § 1962(d).

430.    Aon coordinated a "pay to play" scheme in which the insurance insurers

agreed to provide Aon contingent commission kickbacks and other payments in exchange for

allocating a portion of the business of Aon's customers to them.  The insurers involved in the

scheme were aware that Aon had entered similar arrangements with their so-called competitors.

The Aon Insurer Defendants each agreed with Aon to participate in the pay to play scheme.

431.    Aon and each Aon Insurer Defendant formed a separate association-in-fact

enterprise that provided Insurance Products to Aon's customers sufficient to meet the customers'

commercial insurance needs.  Each enterprise was had a bilateral structure, with Aon acting as

the leader and coordinating which business the carrier would receive.  Each of the Aon Insurer

Defendants knew of the existence and participation of the others in similar enterprises, although

they may not have communicated directly with the members of the other bilateral enterprises about their scheme.

432.    The purpose of each enterprise was to maximize the participants' profits by eliminating competition in the market for Insurance Products, as described in this complaint.

433.    As described in this complaint, Aon coordinated each bilateral enterprise and made most of the decisions for that enterprise, including slating which Aon Insurer Defendant would win each layer of its customers' insurance.  As the broker, Aon had the ability to prevent any insurers from bidding on the insurance for Aon's customers and could steer its customers toward any carrier it chose.

434.    Each Aon Insurer Defendant participated in an enterprise with Aon by agreeing to pay Aon contingent commission kickbacks and other payments in exchange for allocating a portion of the business of Aon's customers to it.  Aon Insurer Defendant also knew that it would face little or no competition for the business that Aon steered toward it.  Each Aon Insurer Defendant received significant sums in insurance premiums from Sears during the relevant time period, with most receiving well over $1 million.

435.    Each bilateral Aon enterprise was an ongoing organization engaging in activities that were within the flow of, and substantially affected, interstate commerce.

436.    The bilateral enterprises began in the mid- to late-1990s and continued in existence for several years, ending only in 2004 after Aon and the Aon Insurer Defendants learned of investigations launched by state attorneys general.

437.    As set forth in this complaint, the participants in each of the bilateral enterprises committed at least two acts of racketeering activity within a ten year period,

including numerous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343 in

furtherance of the enterprise's conspiracy.  For example, as set forth in this complaint and in

furtherance of the scheme, Aon used wire and mail:

a)      to obtain insurers' agreements to join the conspiracy;

b)      to inform insurers of the amount of contingent commission kickbacks and other payments they owed;

c)      to seek insurers' assistance in deceiving Sears as to the existence of commissions payable to Aon on the Sears' policies;

d)      to ensure that its personnel and its co-conspirators were secreting the contingent commission kickbacks and other payments;

e)      to communicate with Sears to recommend the policies at inflated prices;

f)      to mislead Sears into believing competition had occurred for its insurance policies;

g)      to mislead Sears as to the amount of straight commissions, contingent commission kickbacks and other payments the insurers had or would make on Sears' policies; and

h)      to place Insurance Products with Sears at inflated prices.

Aon undertook these communications as part of its intentional scheme to defraud Sears, and its

other customers.  The communications either contained material misrepresentations, or the

omission or concealment of material facts, or were in furtherance of them.  The communications

were reasonably calculated to deceive Sears, and Aon's other customers, and did, in fact, deceive

them.

438.    Likewise, as set forth in this complaint and in furtherance of the scheme,

the Aon Insurance Defendants used wire and mail:

a)      to agree with Aon on the amount of the contingent commission kickbacks and other payments they owed;

b)      to ensure that its personnel were secreting the contingent commission kickbacks and other payments;

    c)       to provide bids and quotations designed to deceive Sears as to the existence of commissions payable to Aon on Sears' policies; and

    d)       to provide Insurance Products at inflated prices to Sears.

The Aon Insurer Defendants undertook these communications as part of their intentional scheme to defraud Sears, and Aon's other customers. The communications either contained material misrepresentations, or the omission or concealment of material facts, or were in furtherance of them. The communications were reasonably calculated to deceive Sears, and Aon's other customers, and did, in fact, deceive them.

        439.    Aon, on the one hand, and each Aon Insurer RICO Defendant, on the other, also aided and abetted each other in acts of mail and wire fraud in violation of 18 U.S.C. § 2. These violations constitute patterns of racketeering activity as defined in 18 U.S.C. § 1961(5).

        440.    Each enterprise's acts of racketeering activity were related, had a similar purpose, involved the same two participants and method of commission, had similar results, and impacted similar victims, including Sears. For example, as alleged in this complaint, Aon made misrepresentations in materials it disseminated by mail and wire wherein it routinely represented that it would act in the best interests of its customers, including Sears, in providing unbiased advice and assistance in selecting and placing Insurance Products and that it would act as a fiduciary of its customers, including Sears, negotiating and placing insurance on the best terms possible and at the best price available. Aon and each of the Aon Insurer Defendants also knowingly and intentionally concealed facts material to each of their conspiracies, including the facts that would reveal Aon was allocating its customers business in order to maximize their profits and Aon was not acting in the best interests of its customers, including Sears.

126

Furthermore, Aon and the Aon Insurer Defendant each assisted Aon in keeping their conspiracy secret.

441.    As described in the complaint, Ace Ace, Arch, Chubb, Fireman's Fund, Hartford, Travelers, XL and Zurich, and their co-conspirators, overtly participated in the pattern of racketeering activity and took acts in furtherance of the conspiracy.

442.    The Plaintiffs here are a "persons" within the meaning of 18 U.S.C. § 1961(3).

443.    During and throughout the period of the conspiracies alleged in this complaint, Sears purchased Insurance Products from Ace, Ace, Arch, Chubb, Fireman's Fund, Hartford, HCC, Kemper, Liberty, Travelers, and XL (or their subsidiaries or controlled affiliates) at inflated and supra-competitive prices.  As a result, Sears has been injured in its business or property by Aon's and the Aon Insurer Defendants' overt acts of mail and wire fraud and by their aiding and abetting others to commit such acts.

WHEREFORE, Sears demands judgment against Aon, Ace, Arch, Chubb, Fireman's Fund, Hartford, Travelers, XL and Zurich, jointly and severally as between Aon and each carrier, as follows:

A.    For damages caused by the Aon's and the Aon Insurer Defendants' violation of 18 U.S.C. § 1962(c);

B.    For damages caused by the Aon's and the Aon Insurer Defendants' violation of 18 U.S.C. § 1962(d);

C.    For treble damages;

D.      Directing that Aon and the Aon Insurer Defendants pay Sears' costs, including attorneys' fees as provided by law;

E.      Directing such other equitable relief as may be necessary to redress illegal conduct; and

F.      Granting such other and further relief as may be just and proper.

## COUNT VII
## Breach of Fiduciary Duty Against Marsh

444.    Sears restates and incorporates by reference as if fully set forth herein paragraphs 1 through 443.

445.    This claim is brought by Sears against Marsh for breach of fiduciary duty.

446.    Marsh knowingly and willingly assumed a fiduciary responsibility to its customers, including Sears.  As the broker for Sears, Marsh acted as a representative, agent, and fiduciary.  Sears reasonably relied on Marsh to inform it of the best possible competitively determined price for the Insurance Products it sought to purchase, any compensation Marsh would receive for its services, and what expenses Sears would incur.

447.    Marsh was in a confidential fiduciary relationship with Sears and owed Sears the highest duties of due care, loyalty, honesty, and good faith and fair dealing.  Marsh was obligated to refrain from favoring its own interests or those of its co-conspirators over and to the detriment of Sears' interests.

448.    Sears placed trust and confidence in Marsh to deal fairly with it and to employ due diligence in obtaining Insurance Products for it.

449.    Federal and/or state common law required Marsh to deal fairly Sears in the procurement of Insurance Products.

450.    As the broker for Sears, acting as its representative, agent and fiduciary, Marsh had a duty to disclose material facts to Sears that were relevant to the parties' relationships.  Marsh was obligated to fully disclose to Sears the existence of customer allocation and bid rigging schemes, and contingent commission kickbacks and other payments made by insurance insurers which were material facts relating to and affecting the subject matter of the parties' relationships and the procurement of Insurance Products.

451.    As the broker for Sears, acting as its representative, agent and fiduciary, Marsh had a duty to remit to Sears any undisclosed profit Marsh collected in connection with or because of the procurement of Insurance Products on behalf of Sears.

452.    Marsh violated the trust of its customers, including Sears.  As alleged in this complaint, Marsh did not consider the best interests of its customers, including Sears, in all placements of Insurance Products.  Marsh did not act as the disinterested advocate of its customers, including Sears, in its brokerage and/or placement of Insurance Products.

453.    As alleged in this complaint, Marsh breached the fiduciary duties it owed to Sears, including the duties of good faith, loyalty and trust, the duty to disclose material facts and the duty to remit undisclosed profits by, *inter alia*:

a)    Entering into undisclosed agreements with insurance insurers for significant "contingent commission" kickbacks and other payments, thereby knowingly creating an obvious conflict of interest;

b)    Secretly profiting at the expense of Sears;

c)    Failing to disclose to Sears the existence of agreements with insurance insurers for the payment of "contingent commission" kickbacks and other payments relating to the brokerage and/or placement of Sears' insurance by Marsh;

     d)      Failing to remit to Sears the undisclosed profits collected in connection with or because of the procurement of Insurance Products on behalf of Sears; and

     e)      Facilitating Sears' procurement of more expensive Insurance Products and services than necessary for the purpose of secretly profiting.

454.    As a direct and proximate result of Marsh's wrongful conduct, Sears has suffered damages because it paid more for their Insurance Products than it would have if Marsh had not violated its duties.

455.    By virtue of the foregoing, Sears should be awarded damages in an amount to be determined at trial.

456.    As a result of the breach of fiduciary duties owed to it by the Marsh, Sears is entitled to the disgorgement of all profits or benefits received by Marsh in "contingent commission" kickbacks and other undisclosed payments by insurance insurers.  Furthermore, Sears is entitled to the disgorgement of the fees it paid to Marsh for advising and assisting Sears in selecting its insurance policies.

457.    Marsh's conduct was intentional, willful, wanton, and specifically intended to cause harm to Sears, and justifies an award of punitive damages.

WHEREFORE, Sears demands judgment against Marsh as follows:

A.    Directing that Marsh disgorge to Sears all fees collected from any source whatsoever that relate in any way to Insurance Products purchased by Sears, including all fees paid by Sears to Marsh and "contingent commission" kickbacks and other payments Marsh received from insurance insurers on such placements;

B.    Directing that Marsh pay all restitution and damages caused, directly or indirectly, by its breaches of the fiduciary duty;

C.    Directing that the Marsh pay Sears' costs;

D.    Awarding punitive damages against Marsh;

E.    Directing such other equitable relief as may be necessary to redress illegal

conduct; and

F.    Granting such other and further relief as may be just and proper.

## COUNT VIII
## Breach of Fiduciary Duty Against Aon

458.    Sears restates and incorporates by reference as if fully set forth herein

paragraphs 1 through 457.

459.    This claim is brought by Sears against Aon for breach of fiduciary duty.

460.    Aon knowingly and willingly assumed a fiduciary responsibility to its

customers, including Sears.  As broker for Sears, Aon acted as a representative, agent and

fiduciary.  Sears reasonably relied on Aon to inform it of the best possible competitively

determined price for the Insurance Products it sought to purchase, any compensation Aon would

receive for its services, and what expenses Sears would incur.

461.    Aon was in a confidential fiduciary relationship with Sears and owed

Sears the highest duties of due care, loyalty, honesty, and good faith and fair dealing.  Aon was

obligated to refrain from favoring its own interests or those of its co-conspirators over and to the

detriment of Sears' interests.

462.    Sears placed trust and confidence in Aon to deal fairly with it and to

employ due diligence in obtaining Insurance Products for it.

463.    Federal and/or State common law required Aon to deal fairly with Sears in

the procurement of Insurance Products.

131

464.     As the broker for Sears, acting as its representative, agent and fiduciary, Aon had a duty to disclose material facts to Sears that were relevant to the parties' relationships. Aon was obligated to fully disclose to Sears the existence of contingent fee kickbacks and other payments made by insurance insurers which were material facts relating to and affecting the subject matter of the parties' relationships and the procurement of Insurance Products.

465.     As the broker for Sears, acting as its representative, agent and fiduciary, Aon had a duty to remit to Sears any undisclosed profit Aon collected in connection with or because of the procurement of Insurance Products on behalf of Sears.

466.     Aon violated the trust of its customers, including Sears.  As alleged in this complaint, Aon did not consider the best interests of its customers, including Sears, in all placements of Insurance Products.  Aon did not act as the disinterested advocate of its customers, including Sears, in its brokerage and/or placement of Insurance Products.

467.     As alleged in this complaint, Aon breached fiduciary duties it owed to Sears, including the duties of good faith, loyalty and trust, the duty to disclose material facts and the duty to remit undisclosed profits by, *inter alia*:

    a)    Entering into undisclosed agreements with insurance insurers for significant "contingent commission" kickbacks and other payments, thereby knowingly creating an obvious conflict of interest;

    b)    Secretly profiting at the expense of Sears;

    c)    Failing to disclose to Sears the existence of agreements with insurance insurers for the payment of significant "contingent commission" kickbacks and other payments relating to the brokerage and/or placement of Sears' insurance by Aon;

    d)    Failing to remit to Sears the undisclosed profits collected in connection with or because of the procurement of Insurance Products on behalf of Sears; and

     e)     Facilitating Sears' procurement of more expensive Insurance Products and services than necessary for the purpose of secretly profiting.

468.     As a direct and proximate result of Aon's wrongful conduct, Sears has suffered damages.

469.     By virtue of the foregoing, Sears should be awarded damages in an amount to be determined at trial.

470.     As a result of the breach of fiduciary duties owed to it by the Aon, Sears is entitled to the disgorgement of all profits or benefits received by Aon in contingent fee kickbacks and other undisclosed payments by insurance insurers.  Furthermore, Sears is entitled to the disgorgement of the fees it paid to Aon for advising and assisting Sears in selecting its insurance policies.

471.     Aon's conduct was intentional, willful, wanton, and specifically intended to cause harm to Sears, and justifies an award of punitive damages.

WHEREFORE, Sears demands judgment against Aon as follows:

A.     Directing that Aon disgorge to Sears all fees collected from any source whatsoever that relate in any way to Insurance Products purchased by Sears, including all fees paid by Sears to Aon and "contingent commission" kickbacks and other payments Aon received from insurance insurers on such placements;

B.     Directing that Aon pay all restitution and damages caused, directly or indirectly, by its breaches of the fiduciary duty;

C.     Directing that the Aon pay to Sears' costs;

D.     Awarding punitive damages against Aon;

E.      Directing such other equitable relief as may be necessary to redress illegal conduct; and

F.      Granting such other and further relief as may be just and proper.

## COUNT IX
## Inducement of Breach Fiduciary Duty Against the Insurer Defendants

472.    Sears restates and incorporates by reference as if fully set forth herein paragraphs 1 through 471.

473.    This claim is brought by Sears against the Insurer Defendants for inducement of breach of fiduciary duties owed to Sears by Marsh and Aon (the "Broker Defendants").

474.    As alleged in this complaint, a fiduciary relationship existed between each Broker Defendant, on the one hand, and each of the Plaintiffs on the other.  The Insurer Defendants were aware of these relationships.

475.    The Broker Defendants breached these fiduciary duties as described in this complaint.

476.    The Insurer Defendants knowingly participated in and/or induced that breach by, among other things, engaging in the conspiratorial conduct described in this complaint.  These acts were not privileged.

477.    Sears suffered damages proximately caused by the Insurer Defendants' participation in and inducement of the Broker Defendants' breaches of fiduciary duties to Sears.

478.    The Insurer Defendants' conduct was intentional, willful, wanton and justifies an award of punitive damages.

WHEREFORE, Sears demands judgment against the Insurer Defendants as follows:

A.      Directing that the Insurer Defendants to pay all restitution and damages caused, directly or indirectly, by the participation in and inducement of the Broker Defendants' breaches of fiduciary duties;

B.      Directing that the Insurer Defendants disgorge all profits they obtained on account of Sears' business, including all policyholder premiums collected on account of the Sears' purchase of Insurance Products from the Insurer Defendants;

C.      Directing that the Insurer Defendants pay Sears' costs;

D.      Awarding punitive damages against the Insurer Defendants;

E.      Directing such other equitable relief as may be necessary to redress illegal conduct; and

F.      Granting such other and further relief as may be just and proper.

## COUNT X
## Breach of Contract Against Marsh

479.    Sears restates and incorporates by reference as if fully set forth herein paragraphs 1 through 478.

480.    This claim is brought by Sears against Marsh for breach of its contractual duties to Sears.

481.    As alleged in this complaint, Marsh undertook contractual obligations to represent Sears' interests in recommending Insurance Products to Sears and in negotiating with the insurance insurers on behalf of Sears.  Moreover, Marsh agreed to "[u]se its best efforts to place insurance on behalf of" Sears.

482.    Marsh also agreed to recommend and assist in placing certain insurance product lines for Sears for a flat fee and promised that it would not accept commissions on these lines—or, to the extent it did, that it would credit the commissions to Sears.  Marsh further promised to disclose any commissions that it received relating to Sears' accounts.

483.    Marsh's contractual obligations are informed by the implied covenant of good faith and fair dealing.

484.    As alleged in this complaint, Marsh violated its contractual obligations to Sears by, *inter alia*:

a)    Failing to represent Sears' best interests in dealing with the insurance insurers, including failing to seek the best prices for Insurance Products;

b)    Failing to use its best efforts to place insurance on Sears' behalf;

c)    Failing to disclose to Sears the existence of significant "contingent commission" kickbacks and other payments relating to the brokerage and/or placement Sears' insurance by Marsh;

d)    Failing to disclose to Sears the existence of straight commissions on Sears' fee-only accounts; and

e)    Accepting, or failing to remit to Sears, straight commissions, contingent commission kickbacks and other payments received for insurance placements on Sears' fee-only accounts.

485.    As a direct and proximate result of Marsh's wrongful conduct, Sears suffered damages because it paid more for their Insurance Products than it would have if Marsh had not violated its contractual duties.

486.    By virtue of the foregoing, Sears should be awarded damages in an amount to be determined at trial.

487.    As a result of the breach of contractual duties owed to them by Marsh, Sears is entitled to damages equal to the difference in what it did pay for Insurance Products and

it would have paid for the same Insurance Products if Marsh had fulfilled its contractual

obligations.  Furthermore, Sears is also entitled to an amount equal to all straight commissions,

contingent commission kickbacks and other payments that Marsh received from insurance

insurers relating to the placement of Sears' insurance on its fee-only accounts.

WHEREFORE, Sears demands judgment against Marsh as follows:

A.      Directing that Marsh pay damages caused, directly or indirectly, by its

breaches of the contract;

B.      Directing that Marsh pay to Sears' costs; and

C.      Granting such other and further relief as may be just and proper.

### COUNT XI
### Breach of Contract Against Aon

488.    Sears restates and incorporates by reference as if fully set forth herein

paragraphs 1 through 489.

489.    This claim is brought by Sears against Aon for breach of its contractual

duties to Sears.

490.    As alleged in this complaint, Aon undertook contractual obligations to act

in Sears' best interests in negotiating and recommending Insurance Products, that it would

disclose its compensation to Sears and, on certain product lines, that it would not accept payment

from the insurers for placing Sears' insurance policies.

491.    Aon's contractual obligations are informed by the implied covenant of

good faith and fair dealing.

492.     As alleged in this complaint, Aon violated its contractual obligations to

Sears by, *inter alia*:

a)     Failing to represent the Sears' best interests in dealing with the insurance
insurers, including failing to seek the best prices for Insurance Products;

b)     Failing to use its best efforts to place insurance on Sears' behalf;

c)     Failing to disclose to Sears the existence of significant "contingent
commission" kickbacks and other payments relating to the brokerage
and/or placement of Sears' insurance by Aon;

d)     Failing to disclose to Sears the existence of straight commissions on
Sears' fee-only accounts; and

e)     Accepting, or failing to remit to Sears, straight commissions, kickbacks
and other payments received for insurance placements on Sears' fee-only
accounts.

493.     As a direct and proximate result of Aon's wrongful conduct, Sears has

suffered damages because it paid more for its Insurance Products than it would have if Aon had

not violated its contractual duties.

494.     By virtue of the foregoing, Sears should be awarded damages in an

amount to be determined at trial.

495.     As a result of the breach of contractual duties owed to it by Aon, Sears is

entitled to damages equal to the difference in what it did pay for Insurance Products and would it

would have paid for the same Insurance Products if Aon had fulfilled its contractual obligations.

Furthermore, Sears is also entitled to an amount equal to all straight commissions, contingent

commission kickbacks and other payments that Aon received from insurance insurers relating to

the placement of the Sears' insurance on its fee-only accounts.

WHEREFORE, Sears demands judgment against Aon as follows:

A.    Directing that Aon pay damages caused, directly or indirectly, by its

breaches of contract;

B.    Directing that Aon pay Sears' costs; and

C.    Granting such other and further relief as may be just and proper.

### COUNT XII
### Tortious Interference with Contract Against the Insurer Defendants

496.    Sears restates and incorporates by reference as if fully set forth herein

paragraphs 1 through 495.

497.    This claim is brought by Sears against the Insurer Defendants for

tortiously interfering with contractual duties owed to Sears by Marsh and Aon (the "Broker

Defendants").

498.    As alleged in this complaint, each Broker Defendant owed contractual

duties to each of Sears, including contractual obligations to act in Sears' best interests in

negotiating and recommending Insurance Products, to disclose the Broker Defendant's

compensation to Sears and, on certain product lines, to not accept payments from the insurers for

placing Sears' insurance policies.

499.    The Insurer Defendants were aware of the Broker Defendants' contractual

obligations.

500.    The Insurer Defendants willfully and maliciously interfered with the

Broker Defendants' contractual obligations to Sears by, *inter alia*:

a)    offering and paying contingent commission kickbacks and other payments
to the Broker Defendants in exchange for allocating Sears' policies to the
Insurer Defendants;

b)    assisting the Broker Defendants in secreting these contingent commission kickbacks and other payments; and

c)    paying the Broker Defendants straight commissions on Sears' fee-only accounts and assisting the Broker Defendants in hiding such payments from Sears;

501.    The Broker Defendants breached their contractual obligations to Sears due to the Insurer Defendants willful and malicious actions.

502.    Sears suffered damages proximately caused by the Insurer Defendants' participation in and inducement of the Broker Defendants' breaches of contractual duties to Sears.

503.    The Insurer Defendants' conduct was intentional, willful, wanton and justifies an award of punitive damages.

WHEREFORE, Sears demands judgment against the Insurer Defendants as follows:

A.    Directing that the Insurer Defendants pay damages caused, directly or indirectly, by the Broker Defendants breaches of contract;

B.    Directing that the Insurer Defendants pay Sears' costs;

C.    Awarding punitive damages against the Insurer Defendants;

D.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

E.    Granting such other and further relief as may be just and proper.

**COUNT XIII**
**Tortious Interference with Prospective Business Relations Against**
**the Broker Defendants**

504.    Sears restates and incorporates by reference as if fully set forth herein paragraphs 1 through 503.

505.    This claim is brought by Sears against the Broker Defendants for tortiously interfering with prospective business relations that Sears would have enjoyed with insurance insurers.

506.    As alleged in this complaint, Sears had a reasonable expectation of entering into a valid business relationship with competitive insurance insurers upon the insurers' submission of competitive bids.  With the knowledge and understanding of Sears' expectations, the Broker Defendants wrongfully interfered with Sears' prospective business relations.

507.    As alleged in this complaint, the Broker Defendants interfered by engaging in wrongful acts that caused the insurers not to enter into competitive insurance contracts with Sears.  The Broker Defendants knew their acts would harm Sears.  As a result of this interference, Sears suffered harm.

WHEREFORE, Sears demand judgment against the Broker Defendants as follows:

A.    Directing that the Broker Defendants pay damages caused, directly or indirectly, by the failure of insurance insurers to enter into competitive insurance contracts with Sears;

B.    Directing that the Brokers Defendants pay Sears' costs;

C.    Awarding punitive damages against the Broker Insurer;

D.      Directing such other equitable relief as may be necessary to redress illegal

conduct; and

E.      Granting such other and further relief as may be just and proper.

## COUNT XIV
## Unjust Enrichment Against All Defendants

508.    Sears restates and incorporates by reference as if fully set forth herein

paragraphs 1 through 507.

509.    As alleged in this complaint, Sears conferred a financial benefit upon the

Broker Defendants as a result of Sears' purchasing Insurance Products from the Broker

Defendants.  This benefit not only consisted of the fees that it paid to the Broker Defendants for

their services, but also the additional kickbacks and other payments that the Broker Defendants

were able to receive from the Insurer Defendants with which the Broker Defendants had

kickback agreements.

510.    As alleged in this complaint, Sears conferred a financial benefit upon the

Insurer Defendants as a result of their purchasing of the Insurer Defendants' Insurance Products.

This benefit not only consists of the premiums they paid to the Insurer Defendants for Insurance

Products, but also amounts consisting of inflated premiums over and above what Sears would

have paid, and on terms less favorable than would have been available, in a competitive market.

511.    The Broker Defendants have been financially enriched by the brokerage

fees received from Sears and by the kickbacks and other payments received from the Insurer

Defendants for providing those insurers' Insurance Products to Sears.

512.    The Insurer Defendants have been financially enriched by the excessive

premiums received from Sears.

513.    The Defendants obtained this financial enrichment to the detriment and at the expense of Sears.  As a result of the Defendants' wrongful conduct, Sears paid more for Insurance Products than it would have otherwise had to pay and/or received less beneficial Insurance Products.

514.    Allowing the Defendants to retain the payments and proceeds that they derived and received, indirectly or directly, from the wrongful described in this complaint would offend equity and good conscience.

515.    The Defendants unjustly enriched themselves and deprived policyholders, including Sears, of a fair marketplace for Insurance Products.

WHEREFORE, Sears demands judgment against the Defendants as follows:

A.    Directing that the Defendants disgorge all profits obtained, including fees collected, and pay all restitution and damages caused, directly or indirectly, by their wrongful acts;

B.    Directing such other equitable relief as may be necessary to redress wrongful conduct; and

C.    Granting such other and further relief as may be just and proper.

## COUNT XV
## Common Law Fraud Against the Broker Defendants

516.    Sears restates and incorporates by reference as if fully set forth herein paragraphs 1 through 515.

517.    As alleged in the complaint, the Broker Defendants had a duty to fully disclose to Sears the facts concerning the services provided by the Broker Defendants to Sears.

518.    In fact, the Broker Defendants concealed and omitted material facts concerning their participation in their illegal schemes described in this complaint.  In addition, the Broker Defendants affirmatively misrepresented material facts concerning their conduct.

519.    As alleged in this complaint, the Broker Defendants falsely represented, *inter alia*, that:

a)    The Broker Defendants were securing the best coverage for Sears at the best price when, in fact, they did not;

b)    The Broker Defendants would act in the best interests of Sears when, in fact, they did not;

c)    The Broker Defendants would be remunerated solely for their service either through a flat fee paid by the client or disclosed commissions paid by the Insurer Defendants when, in fact, they received significant additional, undisclosed compensation for other sources;

d)    The Broker Defendants would act as a fiduciary solely for Sears' interests when, in fact, they would not;

e)    The Insurer Defendants' Insurance Products had been recommended to Sears based solely on the products' price and quality, in fact, they had not been; and

f)    Sears would receive a competitively determined price for an array of Insurance Products when, in fact, little or no competition occurred.

520.    The Broker Defendants' silence in failing to inform Sears of the material omissions and misrepresentations of facts were intended by the Broker Defendants to induce, and did in fact induce, Sears to reasonably rely on the material omissions and misrepresentations of material facts.

521.    The Broker Defendants knew that their false communications and material omissions would induce reliance by Sears.

522.    Sears reasonably and justifiably relied on the misrepresentations and omissions of the Broker Defendants.  Had Sears known of the Broker Defendants' illegal conduct and the misrepresentations and omissions, it would not have purchased its Insurance Products through the Broker Defendants.

523.    Such reliance was to the detriment of Sears and proximately caused damage to Sears.

524.    The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under the law of the State of Illinois.

525.    The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under the law of the State of Michigan.

526.    The acts and practices of the Broker Defendants alleged herein constitute actual and/or constructive fraud under the law of the State of Wisconsin.

527.    The Broker Defendants' conduct was intentional, willful, wanton, and specifically intended to cause harm to Sears, and justifies an award of punitive damages.

WHEREFORE, Sears demands judgment against the Broker Defendants, jointly and severally, as follows:

a)    Awarding damages against the Broker Defendants;

b)    Awarding punitive damages against the Broker Defendants;

c)    Directing such other equitable relief as may be necessary to redress wrongful conduct complained of herein; and

d)    Granting such other and further relief as may be just and proper.

**COUNT XVI**
**Statutory and Consumer Fraud Against All Defendants**

528.    Sears restates and incorporates by reference as if fully set forth herein

paragraphs 1 through 527.

529.    The Broker Defendants are providers of insurance brokerage services.

530.    The Insurer Defendants are providers of Insurance Products.

531.    Sears is a consumer of Insurance Products and insurance brokerage

services.

532.    As alleged in this complaint, the Broker Defendants falsely represented,

*inter alia*, that:

a)    The Broker Defendants were securing the best coverage for Sears at the
best price when, in fact, they did not;

b)    The Broker Defendants would act in the best interests of Sears when, in
fact, they did not;

c)    The Broker Defendants would be remunerated solely for their service
either through a flat fee paid by the client or disclosed commissions paid
by the Insurer Defendants when, in fact, they received significant
additional, undisclosed compensation for other sources;

d)    The Broker Defendants would act as a fiduciary solely for Sears' interests
when, in fact, they would not;

e)    The Insurer Defendants' Insurance Products had been recommended to
Sears based solely on the products' price and quality, in fact, they had not
been; and

f)    Sears would receive a competitively determined price for an array of
Insurance Products when, in fact, little or no competition occurred.

533.    The Insurer Defendants had actual or constructive knowledge that the

Broker Defendants were representing to Sears that the bids, quotes, and terms of insurance for

146

Insurance Products provided by the Insurer Defendants were in fact legitimate and not the

product of the illegal and wrongful acts described above.

534.    The Insurer Defendants knowingly facilitated the misrepresentations and

omissions by the Broker Defendants concerning the Insurance Products provided by the Insurer

Defendants to Sears.

535.    The Defendants' acts and practices, as alleged in this Complaint,

constitute material misrepresentations and omissions.

536.    These misrepresentations and omissions were negligent or intentional.

537.    Sears reasonably and justifiably relied on the Defendants'

misrepresentations and omissions.

538.    These acts proximately caused damages to Sears.

539.    The Defendants' acts and practices, as alleged in this complaint, are

immoral, unethical, oppressive or unscrupulous and have caused substantial injury.

540.    The Defendants' acts or practices constitute consumer fraud or deceptive

acts or practices in violation of the Illinois Consumer Fraud and Deceptive Practices Act,

815 ILCS §§ 505, *et seq.*

541.    The Defendants' acts or practices constitute deceptive acts or practices in

violation of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901, *et seq.*

542.    The Defendants' acts or practices constitute consumer fraud or deceptive

acts or practices in violation of the Wisconsin Marketing and Trade Practices Act, Wis. Stat.

§§ 100.01, *et seq.*

543.    The conduct described herein entitles Sears to an award of punitive damages.

WHEREFORE, Sears demands judgment against the Defendants, jointly and severally, as follows:

A.    Enjoining and restraining the Defendants, their affiliates, assignees, subsidiaries, successors and transferees, their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from engaging in any conduct, conspiracy, contract, agreement, arrangement or combination, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

B.    Awarding Sears damages caused, directly or indirectly, by their fraudulent and deceptive acts;

C.    Directing that the Defendants pay Sears' costs, including attorneys' fees as provided by law;

D.    Awarding punitive damages against the Defendants;

E.    Awarding multiple damages to Sears, as permitted by state law;

F.    Directing such other equitable relief as may be necessary to redress illegal conduct; and

G.    Granting such other and further relief as may be just and proper.

## COUNT XVII
## <u>Civil Conspiracy Against All Defendants</u>

544.    Sears restates and incorporates by reference as if fully set forth herein paragraphs 1 through 543.

545.    Sears alleges civil conspiracies against all of the Defendants.  One conspiracy is centered on Marsh; the other, on Aon.

546.    As described above, Marsh conspired with Ace, Chubb, Hartford, St. Paul/Travelers, XL, Liberty, Arch, HCC, Fireman's Fund and other unnamed insurers.  Acting in concert or after a meeting of the minds, Marsh and these insurers purposefully engaged in conduct that was criminal, unlawful, wrongful, tortious, injurious, oppressive or immoral, or accomplished by criminal, unlawful, wrongful, tortious, oppressive or immoral acts, including the following: (1) allocating without competition the opportunities to sell, and the sale of, Insurance Products to customers; (2) creating a scheme to pay Marsh to organize, implement and police the unlawful conspiracy; (3) providing customers seeking to purchase Insurance Products, as well as Marsh's Customer Advisory Services, with collusive and non-competitive bids or other terms of sale to prevent discovery of the conspiracy; (4) secretly providing for compensation to Marsh for placing insurance on its customers' fee only accounts; and (5) engaging in a "pay to pay" scheme in which Marsh sold customers' business to conspiring insurers to maximize the kickbacks the insurers offered and without regard for the price or quality of the Insurance Product.

547.    As described above, Aon conspired with Ace, Arch, Chubb, Fireman's Fund, Hartford, Travelers, XL, and other unnamed insurers.  Acting in concert or after a meeting of the minds, Aon and these Defendants purposefully engaged in conduct that was criminal, unlawful, wrongful, tortious, injurious, oppressive or immoral, or accomplished by criminal, unlawful, wrongful, tortious, oppressive or immoral acts, including the following: (1) engaging in a customer allocation scheme in which Aon assigned its customers' business to conspiring

149

insurers without competition; (2) creating a scheme to pay Aon to organize, implement and police the unlawful conspiracy; (3) secretly providing for compensation to Aon for placing insurance on its customers' fee only accounts; and (4) engaging in a "pay to pay" scheme in which Aon sold customers' business to conspiring insurers to maximize the kickbacks the insurers offered and without regard for the price or quality of the insurance product.

548.    The Defendants in the Marsh-centered and Aon-centered conspiracies accomplished the objects of their respective conspiracies, which was to, among other things, increase their revenue by participating in a "pay to play" scheme, allocating customers, artificially inflating premiums for Insurance Products, secretly paying commissions on Insurance Products placed pursuant to annual fee-based brokerage agreements, and paying kickbacks to the Broker Defendants.

549.    The acts of the Marsh-centered conspiracy proximately caused damages to Sears.

550.    The acts of the Aon-centered conspiracy proximately caused damages to Sears.

551.    The conduct described herein entitles Sears to an award of punitive damages.

WHEREFORE, Sears demands judgment against the Defendants, jointly and severally, as follows

A.    Awarding damages against the Defendants;

B.    Awarding punitive damages against the Defendants; and

C.    Granting such other and further relief as may be just and proper.

## SUSPENSION OF THE STATUTES OF LIMITATION
## DUE TO FRAUDULENT CONCEALMENT

552.    The Defendants engaged in successful, illegal, price-fixing and customer allocation conspiracies that, by their nature, were inherently self-concealing.  Marsh, Ace, Chubb, Fireman's Fund, Liberty, St. Paul/Travelers and XL also engaged in bid-rigging, which is also inherently self-concealing.

553.    Since the inherently self-concealing contracts, combinations or conspiracies were kept secret by the Defendants, Sears was unaware of the anti-competitive and illegal agreements.

554.    Sears had no knowledge prior to the announcement by the Attorney General of the State of New York on October 14, 2004, of Defendants' unlawful self-concealing conspiracies.

555.    As described in this complaint, the illegal contracts, conspiracies, or combinations were fraudulently concealed by the Defendants by various means and methods, including, *inter alia*, secret meetings, minimization of written records, failure to disclose bid-rigging, price-fixing and customer allocations to clients and surreptitious communications between the Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records.  The Defendants also agreed to keep their so-called contingent commission agreements secret and took affirmative steps to prevent policyholders, including the Sears, from learning the true scope and nature of the contingent commission kickbacks and other payments by the Insurer Defendants to the Broker Defendants.

556.    In addition, certain of the Broker Defendants' former employees have admitted that they engaged in deception to hide the existence, nature, and effect of illegal

151

conduct.  Marsh's policy of misleading clients about the payment and receipt of so-called

'contingent commissions" came to light in the guilty plea of a former Marsh Managing Director,

Mr. Bewlay, to a felony charge of scheming to defraud on February 14, 2005.  Mr. Bewlay's

testimony revealed that Marsh established a procedure or a "protocol" intended to "discourage

the client from obtaining an answer" about how Marsh received compensation from insurance

companies.  Mr. Bewlay's testified:

> [During] my employment, I was made aware of a Marsh protocol designed to
> prevent Marsh's clients form obtaining accurate information concerning the
> amount of placement service or PSA or MSA revenue Marsh earned from insurers
> with respect to a particular client in addition to any fee or commission paid.  ***The
> protocol required multiple layers of inquiry to discourage the client from
> obtaining an answer.***  Also that all inquiries be channeled through a single Marsh
> employee who directed the answer to the inquiry.
>
> Finally, the percentage or ratio that Marsh used when it responded to a client's
> inquiry concerning placement service or PSA or MSA revenue significantly
> understated the amount of PSA or MSA revenue earned with respect to a
> particular client.  In my department, Global Brokerage and Excess Casualty
> significantly understated the amount of PSA or MSA revenue earned by Marsh
> with respect to a particular client.
>
> When I was told that a client inquired as to the amount of PSA revenue Marsh
> earned from an insurance carrier, I responded that the Marsh employee follow
> Marsh's protocol, including that the client only speak to the Marsh employee
> designated to respond to such inquiries. (Emphasis added.)

557.    Mr. Bewlay similarly admitted in his plea agreement that he made

misleading statements about the amount of compensation Marsh received from insurers.  Mr.

Bewlay's plea agreement states, in relevant part:

> From in and before 1999 through 2004, Mr. Bewlay engaged in a scheme
> constituting a systematic ongoing course of conduct with intent to defraud ten or
> more persons and to obtain property, namely insurance premiums, commissions
> and fees, from ten or more persons, to wit, clients of Marsh, by false and
> fraudulent pretenses, representations and promises, to wit, misleading statements
> about the amount of compensation Marsh derived from insurance insurers, and so

obtained property from one or more such persons, in that ***Mr. Bewlay referred
client inquiries for disclosure of such compensation to a designated Marsh
employee, knowing that said employee would provide misleading information
concerning Marsh's compensation to the clients.*** (Emphasis added).

558.    As alleged in this complaint, the Defendants also fraudulently concealed
their illegal contracts, conspiracies or combinations in other ways as well.  For example, the
Broker Defendants led their customers to falsely believe that prices for Insurance Products were
arrived at competitively when, in fact, these price increases were the direct result of collusive
activity among the Defendants.  The Broker Defendants also disseminated false and misleading
information concerning their use of MSAs, PSAs, and CSUs.  The Insurer Defendants
understood that the Broker Defendants were making misleading and false representations to the
policyholders concerning the illicit kickback payments.

559.    Sears could not have discovered the illegal contracts, conspiracies or
combinations at an earlier date by the exercise of reasonable diligence because of the deceptive
practices, fraudulent concealment, and techniques of secrecy employed by the Defendants and
their co-conspirators to avoid detection of their illegal conduct.

WHEREFORE, for the foregoing reasons, Sears requests a finding that because of
the Defendants' fraudulent concealment, the running of any statute of limitations has been tolled
and suspended with respect to any claims that Sears has as a result of the Defendants' conduct as
alleged in this complaint.

**JURY TRIAL DEMANDED**

Sears respectfully demand a trial by jury of all issues so triable.

Dated:  October 1, 2012                    Respectfully submitted,

                                           By:  /s/ Patrick J. Heneghan

                                           William G. Schopf
                                           Patrick J. Heneghan
                                           Ian H. Fisher
                                           SCHOPF & WEISS LLP
                                           One South Wacker Drive, 28th Floor
                                           Chicago, IL 60606
                                           Telephone: 312.701.9300
                                           Facsimile:  312.701.9335

                                           *Counsel for Plaintiffs SEARS, ROEBUCK*
                                           *& CO., SEARS HOLDINGS*
                                           *CORPORATION, KMART CORPORATION*
                                           *and LANDS' END, INC.*

**CERTIFICATE OF SERVICE**

I, Patrick J. Heneghan, an attorney, hereby state that I caused a copy of the attached **Amended Complaint of the Sears Plaintiffs** to be filed electronically with the Clerk of the Court using the CM/ECF system on this 1st day of October, 2012, which will automatically send email notifications of such filing to registered parties and by electronically serving all counsel of record listed on service@gcg.mdl1663.com.

/s/ Patrick J. Heneghan