ROBBINS GELLER RUDMAN
    & DOWD LLP
JOHN J. STOIA, JR.
RACHEL L. JENSEN
THOMAS R. MERRICK
CARMEN A. MEDICI
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re INSURANCE BROKERAGE ANTITRUST LITIGATION | Master Docket No. 04-5184(CCC) |
| | REVISED FIRST AMENDED CLASS ACTION COMPLAINT |
| This Document Relates To: | |
| *Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's London Members of Syndicates, et al.,* No. 2:08-cv-00235-CCC-PS | DEMAND FOR JURY TRIAL |

789197_1

Plaintiffs Lincoln Adventures, LLC ("Lincoln Adventures") and Michigan Multi-King, Inc. ("MMK" collectively "Plaintiffs") by and through their undersigned attorneys, bring this action against: Those Certain Underwriters at Lloyd's, London, members of Syndicates 0033, 0102, 0382, 0435, 0510, 0570, 0609, 0623, 0727, 0958, 1003, 1084, 1096, 1183, 1245, 1886, 2001, 2003, 2020, 2488, 2623, 2791, 2987 ("Defendants" or the "Defendant Lloyd's Syndicates") and Does 1-100, on their own behalf and on behalf of a class of similarly-situated persons or entities (the "Class" or "Class Members"). Plaintiffs allege the following upon their own knowledge, or where there is no personal knowledge, upon the investigation of counsel and/or upon information and belief:

## NATURE OF THE CASE

1.     Plaintiffs bring this action pursuant to the Section 1 of the Sherman Act, 15 U.S.C. §1; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(a)-(d); and various state statutory and common law.

2.     Plaintiffs' claims arise out of Defendants' scheme and conspiracy to manipulate the market for commercial insurance in the United States through Lloyd's of London ("Lloyd's").

3.     Lloyd's is a "society of members" based in London. Lloyd's is not an insurance company but rather an insurance marketplace in which a variety of member insurance companies, limited partnerships, individuals and other entities ("Members")

- 1 -

join together to form syndicates to underwrite insurance, and the syndicates are run by "Managing Agents" (collectively, "Lloyd's Market").

4.     The Members supply the capital to the syndicates for underwriting the risks.  In 2007, 66 syndicates were underwriting insurance within the Lloyd's Market. http://www.lloyds.com/About_Us/ (last visited June 8, 2007).  In 2012, 88 syndicates were underwriting insurance within the Lloyd's Market. http://www.lloyds.com/lloyds/About_Us (last visited Oct. 29, 2012).

5.     The scheme, as more fully described below, involves the payment of kickbacks to certain brokers by entities in the Lloyd's Market (including the Defendant Lloyd's Syndicates), undisclosed to the insureds, in exchange for those brokers steering their customers and the resulting premiums to those paying entities, as well as other anti-competitive practices aimed at protecting market share and incumbent accounts, including no-bid contracts.[1]

---

[1]     Though discovery recently commenced, the evidence to date supports Plaintiffs' allegations that the Syndicates entered into the Compensation Agreements with the Lloyd's Brokers, sometimes with multiple Syndicates involved in single agreements. Mindful of the Court's Order regarding the public filing of this Complaint without redactions, however, Plaintiffs have refrained from including certain details about the Compensation Agreements which Defendants claim are confidential, proprietary and/or attorneys eyes only and therefore cannot be filed on the public docket. Plaintiffs are prepared to file a  more detailed complaint under seal or can make available *in camera* documents supporting Plaintiffs' allegations as to Syndicates 0033, 0102, 0435, 0510, 0609, 0623, 1003, 1084, 1096, 1183, 2001, 2003, 2020, 2488, 2623 and 2791.

6.     The Lloyd's Market is a market for many of the world's largest commercial insurers, and much of that insurance covers risks in the United States.  In 2006, 39% of the insurance written in the Lloyd's Market covered risks in the United States.  In 2011, 39% of insurance written in the Lloyd's Market covered risks in the United States.

7.     Insurance risks are brought to the Lloyd's Market by a worldwide network of brokers working with brokers that are based in London.  Throughout the Class Period, much of the business done in the Lloyd's Market is still done face-to-face in the Lloyd's Building at One Lime Street in London, EC3.

8.     Lloyd's consents to the jurisdiction of the United States.

9.     With London-based brokers, such as MMC Marsh Services ("Marsh MMC"), Marsh UK, Marsh Ltd., Marsh Global Broking Ltd ("MGB"), Aon Corp. ("Aon"), Aon UK, Willis Group ("Willis") and Willis UK and U.S.-based brokers and wholesalers such as Marsh USA, Inc. ("Marsh USA), Aon Corp., Swett Insurance Managers ("Swett"), Swett & Crawford ("S&C"), Atlass Insurance Group ("Atlass"), Miller Insurance Services ("Miller") and other accredited Lloyd's brokers (collectively the "Lloyd's Brokers"), the Defendant Lloyd's Syndicates and their Members, along with other syndicates in the Lloyd's Market not named in this complaint (the "Other Syndicates," and collectively with the Defendant Syndicates, the "Syndicates"), have engaged in an unlawful conspiracy and scheme to allocate customers in markets in the United States through agreements whereby the Lloyd's

- 3 -

Brokers direct their business and protect it on renewal from competition among the Syndicates in exchange for undisclosed bonuses, overrides and kickbacks – often referred to as "contingent commissions." This practice distorts the true and fair free-market dynamics.

10.    The agreements are known as, among other names, Placement Service Agreements ("PSAs"), Marketing Service Agreements ("MSAs"), Carrier Service Agreements ("CSAs"), Preferred Market Agreements ("PMAs"),  Insurer Services Brokerage Agreements ("ISBAs"), Portfolio Service Agreements, Market Service Lineslip Agreements, Contingent Income Agreements, Binding Authority Statements, Overrider Agreements, Overriders, Compensation for Services Agreements, Service Fee Agreements, Supplemental Compensation Agreements, Additional Revenue Payments, Additional Remuneration Payments, Enhanced Remuneration Agreements, Compensation for Services to Underwriters, Lineslip Agreements, Market Service Lineslip Agreements, Facilitation Agreements or Lineslips that provide for the payment of contingent commissions (collectively, "Compensation Agreements").

11.    These agreements guarantee that Lloyd's Brokers receive additional compensation or "overriders" from Defendant Lloyd's Syndicates and Other Syndicates to improperly allocate and steer business to them, securing for the Syndicates large volumes of business and more importantly profits for which they do not have to compete with other insurers as to terms or price.

- 4 -

12.     An underwriter from one Defendant Lloyd's Syndicate described PSAs as "off slip payments from underwriters to broker in return for a guaranteed proportion of business or profit."

13.     The Syndicates have paid kickbacks to Lloyd's Brokers, including Marsh MMC, Marsh UK, J&H Marsh & McLennan Global Broking Ltd., Marsh USA, Guy Carpenter Facultative, Marsh & McLennan Global Broking Ltd. ("MGB" and collectively, "Marsh"); Aon, AON Limited – Global Risks Division and Aon UK (collectively, "Aon"); and Willis and Willis UK (collectively, "Willis"), pursuant to Compensation Agreements.  Compensation Agreements whereby the Lloyd's Broker promised to steer certain volumes of business or entire classes of business in exchange for a kicker.  The Lloyd's Brokers threatened to take away business if the Syndicates refused to agree to pay kickbacks and sign off on the Compensation Agreements.

14.     The Lloyd's Brokers represent to their clients that they will provide unbiased advice and assistance in the selection of insurance products and related services, and represent the best interests of Plaintiffs and the Class in the purchase and renewal of insurance.  These brokers purport to offer independent expert brokering advice on coverage types and amounts, financial stability of carriers and overall cost of the insurance products, and thus act as a fiduciary of the client in this relationship.

15.     Instead, Lloyd's Brokers' selection, pricing and placement of insurance products are the result of anti-competitive conduct, which impaired the functioning of a competitive marketplace.

- 5 -

16.    The Syndicates and Lloyd's Brokers have acted in concert to reduce or eliminate competition for insurance and participated in the affairs of a RICO enterprise.  This enterprise operated to conceal the Compensation Agreements from Plaintiffs and the Class so as not to alert them to the conflict of interest created thereby, to secure market share and protect business accounts through bid manipulation, and/or to increase profits for Defendant Lloyd's Syndicates and their co-conspirators, *e.g.* the Other Syndicates and Lloyd's Brokers, at the expense of policyholders who bear the cost through increased premiums and less competitive and less favorable terms and conditions of coverage.

17.    The Syndicates and the Lloyd's Brokers implemented the scheme through a variety of methods, including, *inter alia:*

- PSAs whereby the Syndicates pay contingent commissions in exchange for Lloyd's Brokers steering business to the Syndicates;

- The Compensation Agreements (in addition to PSAs) whereby  the Syndicates pay contingent commissions in exchange for Lloyd's Brokers steering business to the Syndicates;

- Inadequate disclosure of the contingent commissions that the Syndicates pay to both U.S.- and London-based brokers based on the volume of insurance placed by a particular Lloyd's Broker, as well as its profitability to the Syndicates; and

- The consolidation and allocation of the commercial insurance market through a conspiracy to engage in anti-competitive conduct, including bid manipulation.

18.    The Lloyd's Market is not alone.   The payment of contingent commissions in exchange for the steering of business has implicated many of the

- 6 -

largest U.S.-based and London-based brokerage and insurance companies in the industry and came to light following investigations undertaken by various state insurance departments and attorneys general.

19.    Approximately 25 individuals, including former employees of Marsh (in the United States), have pled guilty or have been indicted and convicted for participating in schemes to deceive clients through a sham bidding process driven by the goal to increase contingent commission receipts.[2]

20.    At least one Marsh UK employee, Julian Taylor, was dismissed in connection with misconduct surrounding contingent commission payments.

21.    U.S. regulators have entered into settlement agreements, totaling over $1 billion, with many U.S. brokers including Lloyd's Brokers Marsh, Aon and Willis.

22.    Lloyd's acknowledged that contingent commissions create a conflict of interest, yet the Syndicates still paid them.  On April 18, 2005, Lloyd's Chairman, Lord Peter Levene ("Levene"), stated in an address to the Philadelphia Club:

> [I]t's the issue of the broker receiving payment from both the client and the insurance carrier . . . .

---

[2]    Because of prosecutorial misconduct, the convictions were overturned and many of the pleas were vacated.  However, the testimony was not found to be unreliable.  *See* MARSH-MDL 015510370 (Hon. James A. Yates, J.S.C.  *The People of the State of New York v. Gilman*, 28 Misc. 3d 1217(A) (July 2, 2010)).  In fact, the criminal testimony was not recanted by any witness in the independent discovery conducted in MDL No. 1663.

789197_1

Suddenly the question of who is working for whom is blurred and confusing. But if we are to retain the confidence of the key player in all of this – the customer – we need full disclosure and complete transparency about who is doing what exactly, for whom, on what terms, and at precisely what cost. . . .

In the insurance industry, the world's largest brokers have now taken decisive action and abandoned the practice of contingent commissions. They have done this not because contingent commissions are illegal, but because they cloud things and create a situation where conflict of interest can occur. ***After all, the broker is an agent of the policyholder, not of the insurance company***.

As for Lloyd's, our view is that we must have full, mandatory disclosure of commissions, not just at Lloyd's, but globally, because this is a global business. And the wider lesson is one which applies across all industry sectors. Conflicts of interest will always occur, but we need to ensure that company management acts in the best interest of the shareholders.

(Emphasis added.)

23.    The Syndicates continue to fail to provide adequate disclosures to prospective and current policyholders that the policyholders are paying contingent commissions to the Lloyd's Brokers based on the volume, profitability, and sometimes exclusivity, of the business. In April 2011, Tom Bolt, performance director at Lloyd's, told chief executives to be extremely careful about the status of their contracts with brokers if they agreed to pay additional contingent commissions: "Lloyd's believes that such insurer charges can carry significant regulatory risks for managing agents and for the reputation of the Lloyd's market."

- 8 -

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962, and 1964, 28 U.S.C. §§1331, 1332 and 1367, and 15 U.S.C. §§15(a) and 26.  The aggregate amount in controversy exceeds $5,000,000 and less than one-third of all Class Members reside in any state.

25.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

26.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§1965(b) and (d), as well as Fed. R. Civ. P. 4(k)(2) and Florida's long-arm statute (Fla. Stat. Ann. §48.193), as this action was originally filed in the United States District Court for the Southern District of Florida before being transferred to this Court as a tag-along action to MDL 1663.[3]

27.    Pursuant to the terms and conditions of the Lincoln Adventures Policy and the MMK Policy and similar terms found in the polices of other Class Members, and pursuant to the applicable law, the Defendant Lloyd's Syndicates have agreed to and are subject to the personal jurisdiction of this Court.

---

[3]    By filing this First Amended Class Action Complaint, Plaintiffs do not intend to waive their rights under *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, (1998), to return to the transferor court at the conclusion of pre-trial proceedings in MDL No. 1663.

28.    At all times material hereto, Defendant Lloyd's Syndicates sold insurance policies and engaged in substantial business in the United States.

29.    Venue is proper in this district pursuant to 18 U.S.C. §1965(a), 28 U.S.C. §§1391(b) and (d), 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d).

30.    At all times material hereto, Defendant Lloyd's Syndicates were registered with the Florida Department of Financial Services, and/or engaged in substantial business within the District of the transferor court.

31.    Lloyd's is a "person" within the meaning of Fla. Stat. Ann. §624.04.

32.    Defendants have conducted interstate trade and commerce within the District of the transferor court, including the underwriting and sale of insurance policies and related services to Lincoln Adventures and certain Class Members.  The acts and events giving rise to such claims occurred in substantial part within the District of the transferor court.

33.    The activities of Defendants and their co-conspirators, as described in this complaint, were within the flow of, and had a substantial effect on, interstate commerce.

## PARTIES

### I.    Plaintiffs

34.    Lincoln Adventures is a Delaware Limited Liability Company which owned and operated a "2000 Queenship 68" motor yacht known as the "Caps II,"

- 10 -

which was purchased in Palm Beach, Florida and had a home mooring of Fort Lauderdale, Florida. The yacht was sold in September of 2006.

35.    MMK is a Michigan corporation, which owns and operates fast food restaurants in the states of Michigan and Illinois (the "MMK Properties").

## II.    Defendant Lloyd's Syndicates

36.    Defendant Lloyd's Syndicate 0033 is managed by Hiscox Syndicates Limited. In 2011, Defendant Lloyd's Syndicate 0033 received nearly 50% of its gross premium in North America. *See* Syndicates Combined annual and underwriting year accounts    2011    (http://www.lloyds.com/lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts (last visited Oct. 29, 2012)).

37.    Defendant Lloyd's Syndicate 0102 is managed by R&Q Managing Agency Limited (formerly known as Cavell Managing Agency Ltd). Before May 11, 2004, Syndicate 0102 was managed by Goshawk Syndicate Management Limited ("GSML"). The day-to-day management of the Syndicate was outsourced to GSML to Cavell Management Services Limited on February 25, 2004. This Syndicate wrote a broadly spread account of marine, non-marine and other specialty areas. *See* Syndicate 102 – Syndicate annual accounts 2011 (http://www.lloyds.com/lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts? (last visited Oct. 29, 2012)).

38.    Defendant Lloyd's Syndicate 0382 is managed by Hardy (Underwriting Agencies) Limited and underwrites aviation, marine and non-marine business. *See*

- 11 -

Syndicate 0382 Combined annual and underwriting year accounts 2011 (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=2 (last visited Oct. 29, 2012)).

39.     Defendant Lloyd's Syndicate 0435 is managed by Faraday Underwriting Limited ("Faraday") and underwrites aviation, casualty and property insurance and reinsurance. *See* Syndicate 0435 – Syndicate annual accounts 2011 (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/ Syndicate-reports-and-accounts?page=2 (last visited Oct. 29, 2012)).

40.     Defendant Lloyd's Syndicate 0510 is managed by R.J. Kiln & Co. Limited ("Kiln").  This syndicate specializes in accident and health, aviation, marine, property, special lines, reinsurance, and risk solutions insurance. *See* Syndicate 0510 Combined annual and underwriting year accounts (http://www.lloyds.com/ Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=2 (last visited Oct. 29, 2012)).

41.     Defendant Lloyd's Syndicate 0570 is managed by Atrium Underwriters Limited ("Atrium").  Syndicate 0570 one of the oldest non-marine syndicates in the Lloyd's Market, which specializes in U.S. professional liability, property and casualty insurance and reinsurance, and accident and health. *See* Syndicate 0570 – Syndicate underwriting year accounts 2011 (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=2 (last visited Oct. 29, 2012)).

- 12 -

42.     Defendant Lloyd's Syndicate 0609 underwrites marine risks, aviation risks, non-marine property, energy, war, financial, political risks and terrorism insurance.  *See* Syndicate 0609 – Syndicate underwriting year accounts 2011 (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=3 (last visited Oct. 29, 2012)).

43.     Defendant Lloyd's Syndicates 0623 and 2623 are managed by Beazley Furlonge Limited ("Beazley").  Beazley established Syndicate 2623 to underwrite in parallel with Syndicate 0623.  Within these two syndicates all business is split Syndicate 2623 (82%), Syndicate 0623 (18%).  *See* Syndicate 0623 – Combined annual and underwriting year accounts 2011 (https://www.beazley.com/about_beazley/ beazley_at_lloyds.html (last visited Oct. 29, 2012)).

44.     Defendant Lloyd's Syndicate 0727 is managed by S.A. Meacock & Company Limited.  *See* Syndicate 0727 – Combined annual and underwriting accounts    2011    (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=3 (last visited Oct. 29, 2012)).

45.     Defendant Lloyd's Syndicate 0958 is managed by Omega Underwriting Agents and underwrites primarily short-tail property insurance and reinsurance business.  *See* Syndicate 0958 – Syndicate annual year accounts 2011 (http://www.lloyds.com/LLoyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=3 (last visited Oct. 29, 2012)).

- 13 -

46.     Defendant Lloyd's Syndicate 1003 and its successor Lloyd's Syndicate 2003 are managed by Catlin Underwriting Agencies Limited ("Catlin").  Catlin writes specialty insurance and reinsurance business for 25 business classes.  *See* Syndicate 1003 – Syndicate annual accounts 2011 (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=6 (last visited Oct. 29, 2012).

47.     Defendant Lloyd's Syndicates 1084 is managed by Chaucer Syndicates Limited ("Chaucer").  In 2003, Syndicate 0587 and Defendant Lloyd's Syndicate 1096 were merged into Defendant Lloyd's Syndicate 1084.  Defendant Lloyd's Syndicate 1084 provides motor, marine, aviation, property and specialist lines insurance.  *See* Syndicate 1084 – Syndicate annual reports 2011 (http://www.lloyds.com/lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=4 (last visited Oct. 29, 2012)).

48.     Defendant Lloyd's Syndicate 1183 is managed by Talbot Underwriting Limited.  It writes a wide range of marine and offshore energy classes of business, as well as war, political violence and political risk, commercial property including constructions, financial institutions, contingency, treaty reinsurance and airlines.  *See* Syndicate 1183 – Syndicate annual account 2011 (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=4 (last visited Oct. 29, 2012)).

- 14 -

49.    Defendant Lloyd's Syndicate 1245 was managed by Heritage Managing Agency Limited.  Defendant Lloyd's Syndicate 1245 was merged into Syndicate 1200 in 2004.  *See* Syndicate 1245 – Combined annual and underwriting year accounts (http://www.lloyds.com/Lloyds/Investor-Relations/Financial-performance/Syndicate-reports-and-accounts?page=5 (last visited Oct. 29, 2012)).

50.    Defendant Lloyd's Syndicate 1886 is managed by QBE Underwriting Limited.  QBE Underwriting Limited is a wholly owned subsidiary of the QBE Insurance Group.  Defendant Lloyd's Syndicate 1886 writes property, international liability, environmental impairment liability, professional and motor lines.  *See* (http://www.qbeeurope.com/1886 (last visited Oct. 29, 2012)).

51.    Defendant Lloyd's Syndicate 2001 is managed by Amlin Underwriting Limited and provides aviation, marine and property and casualty as well as reinsurance.  *See* (http://www.amlin.com/aml/corporate/about_amlin/faqs/#5 (last visited Oct. 29, 2012)).

52.    Defendant Lloyd's Syndicate 2020, managed by Wellington Underwriting Agencies Limited merged with Defendant Lloyd's Syndicate 2003 managed by Catlin.  Defendant Lloyd's Syndicate 2020's assets were moved to Catlin. *See* http://www.catlin.com/en/About/OurHistory?&p=1 (last visited Oct. 29, 2012).

53.    Defendant Lloyd's Syndicate 2488 is managed by ACE Underwriting Agencies Limited ("ACE Underwriting Agencies").  *See* Syndicate 2488 – Syndicate

- 15 -

annual accounts 20011 (http://lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=8 (last visited Oct. 29, 2012)).

54.   Defendant Lloyd's Syndicate 2791 is managed by Managing Agency Partners Limited ("MAP") and its lines of business include property and casualty insurance and reinsurance. It also writes policies in auto, accident and health, marine and offshore energy, terrorism and political risks. *See* Syndicate 2791 – Combined annual and underwriting year accounts 2011 (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/ syndicate-reports-and-accounts?page=8 (last visited Oct. 29, 2012)).

55.   Defendant Lloyd's Syndicate 2987 is managed by Brit Syndicates Limited. *See* http://www.britinsurance.com/en/about/structure/brit-syndicates-limited.aspx (last visited Oct. 29, 2012).

56.   Defendants Doe 1 through Doe 100 are Other Syndicates and other Lloyd's Brokers that participated in the misconduct alleged in this complaint.

57.   Each of the Defendant Lloyd's Syndicates resides in London, England, and is a foreign agent of undisclosed principles.

58.   All of the Defendant Lloyd's Syndicates are eligible to write surplus insurance and reinsurance in the United States. *See* http://www.lloyds.com/lloyds/offices/americas/us-homepage (Oct. 29, 2012).

- 16 -

## CO-CONSPIRATORS[4]

59.    Does 1-100, who participated in the misconduct alleged in this complaint.

60.    MMC is incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York, Chicago and London stock exchanges and has its corporate headquarters in New York City, New York.   MMC is a global corporation and the parent of various subsidiaries that provide clients with analysis, advice and transactional services in connection with the procurement and servicing of contracts of insurance, as well as investment management and consulting.

61.    Marsh Services is a subsidiary of MMC, located in Southampton, England.   Marsh Services' Wholesale Yacht Division issued the Certificate of Insurance for Lincoln Adventures under its cover.

62.    Marsh UK is a subsidiary of MMC, located in London, England.  Marsh UK communicated with plaintiff Lincoln through policy documents and Lincoln's U.S. broker, Atlass.

63.    In this complaint, MMC, Marsh Services, Marsh UK and all other Marsh affiliates are referred to collectively as "Marsh."

---

[4]    Plaintiffs' Class Action Complaint was originally brought against the following Lloyd's Brokers: MMC Marsh Services, Marsh UK, Aon Corp., Aon UK, Willis Group and Willis UK.  Based upon the Stipulations of Settlement entered in *In re Insurance Brokerage Antitrust Litig.*, MDL No. 1663, Case No. 04-5184 (GEB), these Lloyd's Brokers are no longer named as Defendants in this action.

- 17 -

64.     Aon is incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois. Aon is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

65.     Aon UK is a subsidiary of Aon, located in London, England. Aon UK provides commercial brokerage and risk management services.

66.     In this complaint, Aon Corp., Aon UK, and all other Aon affiliates are referred to collectively as "Aon."

67.     Willis is incorporated under the laws of Bermuda and has its corporate headquarters in London, England. Its shares are listed and publicly traded on the New York Stock Exchange. Willis Group is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting. According to Willis' 2006 Annual Report, Willis is a global brokerage firm with over $2.428 billion in total revenues in 2006 alone. Willis touts itself as a leading insurance broker in the retail sector.

68.     Willis UK is a subsidiary of Willis, located in London, England.

69.     In this complaint, Willis, Willis UK, and all other Willis affiliates are referred to collectively as "Willis."

70.     Various entities in the United States are authorized to place risks with Syndicates without actually doing business on the Lloyd's floor. These entities have a contractual agreement with a Syndicate or Syndicates or managing general agent (see

- 18 -

below for definition) to issue certain lines of insurance under certain underwriting conditions in the United States. They must be registered with Lloyd's. These agreements between the Syndicate and the insurance salesperson in the United States (or other countries) are known as "coverholders" "binders" "binding authority" and "binding agreements."

71.    Professional Liability Insurance Services ("PLIS") and Marsh Private Client Services are examples of coverholders. They are named as co-conspirators because they engage in the same contingent-commission practices alleged in this complaint.

## PLAINTIFFS' INSURANCE POLICIES

72.    Lincoln Adventures procured a Yacht Insurance Policy (the "Lincoln Adventures Policy") through Atlass in Fort Lauderdale, Florida. The Lincoln Adventures Policy was underwritten by Defendant Lloyd's Syndicates 0609, 0958 and 2488, and Axis Specialty Europe Limited ("AXIS").

73.    The Lincoln Adventures Policy is identified as ACE Global Yacht Policy No. YS40000L2003, with an effective date of April 15, 2004.

74.    For the Lincoln Adventures Policy, Lloyd's Syndicates underwrote 60% of the coverage and AXIS underwrote 40% of the coverage.

75.    The Lincoln Adventures Policy was issued under cover of the Wholesale Yacht Division of Marsh Services in Southampton.

76.    Marsh UK communicated with Lincoln Adventures through policy documents and Lincoln Adventures' U.S. broker, Atlass.

77.    MMK procured miscellaneous property insurance and/or food borne illness insurance for the MMK Properties (the "MMK Insurance Coverage") from the following Defendant Lloyd's Syndicates as indicated below:

(a)    For the period June 21, 2000 through June 21, 2001, MMK procured the MMK Insurance Coverage (policy number FBI 790000) through Aon and Swett, a Lloyd's Correspondent, underwritten by Syndicates within Lloyd's Market, the identities of which are presently unknown to MMK;

(b)    For the period June 21, 2001 through June 21, 2002, MMK procured the MMK Insurance Coverage (policy number FBI-790000A) through Aon and S&C, a Lloyd's Correspondent, underwritten by Syndicates within Lloyd's Market, the identities of which are presently unknown to MMK;

(c)    For the period June 21, 2002 through June 21, 2003, MMK procured the MMK Insurance Coverage (policy number 330030-02-1331) through Aon and PLIS, a Lloyd's Correspondent, and underwritten by Defendant Lloyd's Syndicates 0102, 0510, 0570, 0623, 0727, 1003, 1245, 2003, and 2020;

(d)    For the period June 21, 2003 through June 21, 2004, MMK procured the MMK Insurance Coverage (policy number 330030-03-1642) through Aon and PLIS, a Lloyd's Correspondent, and underwritten by Defendant Lloyd's Syndicates 0102, 0510, 0570, 0623, 0727, 1096, 1245, 2003, 2020, 2623 and 2791;

- 20 -

(e)    For the period June 21, 2004 through June 21, 2005, MMK procured the MMK Insurance Coverage (policy number 330030-04-1969) through Aon and PLIS, a Lloyd's Correspondent, underwritten by Defendant Lloyd's Syndicates 0382, 0510, 0570, 0623, 0727, 0958, 1084, 1183, 1245, 2001, 2003, 2020, 2488, 2623 and 2791;

(f)    For the period June 21, 2005 through June 21, 2006, MMK procured the MMK Insurance Coverage (policy number 330030-05-2287) through Aon and PLIS, a Lloyd's Correspondent, underwritten by Defendant Lloyd's Syndicates 0382, 0510, 0570, 0623, 0727, 0958, 1084, 1183, 2001, 2003, 2020, 2488, 2623, 2791 and 2987;

(g)    For the period June 21, 2006 through June 21, 2007, MMK procured the MMK Insurance Coverage (policy number 330030-06-2638) through Aon and PLIS, a Lloyd's Correspondent, underwritten by Defendant Lloyd's Syndicates 0033, 0382, 0510, 0570, 0623, 0727, 0958, 1084, 1183, 1886, 2001, 2003, 2020, 2488, 2623, 2791 and 2987.

## FACTUAL ALLEGATIONS

## I.    The Structure of the Lloyd's Market

78.    Lloyd's is the self-proclaimed "world's leading specialist insurance market," providing insurance services to businesses in over 200 countries.

79.    Lloyd's is not an insurance company. It is a Society of members, both corporate and individuals, which underwrite insurance in syndicates. These

- 21 -

syndicates can comprise one single corporate member or any number of corporate and individual members, underwriting severally for their own account. *See* Lloyd's 2005 Annual Report at 37.

80.     Lloyd's advertises that it provides the market for many of the world's largest commercial insurers. Much of that insurance covers risks in the United States. *See* http://www.lloyds.com/lloyds/offices/americas/us-homepage (last visited Oct. 29, 2012) ("[s]ince the 1990s, almost 40% of Lloyd's global annual premium has come from the U.S.").

81.     The Lloyd's Market accounted for approximately $1.25 billion in premiums in the U.S. in 2006.

82.     The Lloyd's Market is the second largest surplus line insurance provider in the United States.

83.     Each Syndicate is capable of underwriting the risks that Lloyd's Brokers bring to the Lloyd's Market. The Members supply the capital to the Syndicates, which in turn underwrite the risks.

84.     Underwriters in the Lloyd's Market cannot deal directly with policyholders. All business transacted in the Lloyd's Market has to be via Lloyd's-accredited brokers (and other intermediaries), such as registered open market correspondents. *See* http://www.lloyds.com/lloyds/about-us/what-is-lloyds/the-lloyds-market (last visited Oct. 29, 2012).

- 22 -

85.    Lloyd's has five contact offices in the United States – New York; Chicago; Los Angeles; Frankfort, Kentucky; Atlanta; and the U.S. Virgin Islands. According to Lloyd's, these offices aid in building relationships with Lloyd's Brokers, other insurers and insurance industry associations, as well as provide Lloyd's underwriters with extensive local commercial knowledge and market information. *See* http://www.lloyds.com/lloyds/offices/americas/us-homepage/Lloyds-US-offices (last visited Oct. 29, 2012).

86.    Lloyd's is an eligible surplus lines insurer in all states and territories except Kentucky.  Lloyd's underwriters are also accredited reinsurers in all states in the United States.  *See* http://www.lloyds.com/lloyds/offices/americas/us-homepage (last visited Oct. 29, 2012).  Lloyd's is a licensed (or admitted insurer) in Illinois, Kentucky and the U.S. Virgin Islands.    *See*    http://www.lloyds.com/ lloyds/offices/americas/us-homepage/placing-risk/risks-lloyds-underwrites    (last visited Oct. 29, 2012) ("This means that Lloyd's can write the same business in these jurisdictions as other licensed U.S. insurers.").

87.    Each Syndicate is regulated by UK law and further regulated by both Lloyd's itself and the Financial Services Authority ("FSA").

## A.    Lloyd's History

88.    Lloyd's began at a small coffee house in Tower Street, in the City of London around 1688.  After the English Civil War, the growing importance of London as a center of trade, led to a steady increase in demand for insurance of ships

- 23 -

and cargo. A merchant with a ship to insure would request a broker to take the policy from one wealthy merchant to another in the coffee house until the risk was fully covered. From the very beginning the Lloyd's Market was a consortium of competitors. *See* http://www.lloyds.com/about-us/history/lloyds-history (last visited Oct. 29, 2012).

89.    In 1771, 79 merchants, bankers, ship owners and brokers subscribed £100 each toward a new building. Lloyd's became the property of several owners, a "society of underwriters." *See* http://www.lloyds.com/lloyds/about-us/history/lloyds-history (last visited Oct. 29, 2012).

90.    As the appetite for insurance increased, so did the number of investors that were willing to invest money to insure risk. These investors were called "Names" because they subscribed their own name – the entirety of their wealth with unlimited liability – to insurance risks. Over time, "Names" grouped together and formed "Syndicates" who served as larger capital pools to underwrite risk.

91.    For roughly 300 years, though Lloyd's grew, the joint ownership, open communication and sharing of information and risk continued. Brokers brought risks to the Lloyd's Market, and sold portions of the risks to one or more syndicate-insurers.

92.    This process continues to this day. Today, at Lloyd's headquarters in London, each Syndicate maintains a manned stall (called a "box") in the same building at One Lime Street with up to 20 underwriters and various staff working at them at all times. They meet with clients and brokers who buy and sell part or all of

- 24 -

their risk to various Syndicates, all under one roof.  *See infra*, "The Lloyd's Market is

a Structural Conspiracy."

93.     In the late 1980s, Lloyd's underwent extraordinary change.  In addition to

a number of risks going bad and many Names being completely bankrupted, the

insurance market was deregulated, causing a dramatic shift in market practices.  In

1993, unlimited liability for Names was phased out and corporations and institutional

investors were permitted to underwrite policies and replaced individual Names.  This

led to an enormous influx of available capital to insure risks and a huge increase in the

amount of premium underwritten by the Syndicates.

94.     The massive increase in capital available in the Lloyd's Market drew

much larger risks to market, which resulted in hyper-competition among the

Syndicates.  The Syndicates lowered the price charged to the broker and margins

thinned.  As a result, the profitability of many Syndicates plummeted.

95.     This changed the balance of power between the Lloyd's Brokers and the

Syndicates.  Previously, the brokers needed the Syndicates to place their risk; they

would have to sell the underwriter on the merits of the client's risk.  Now, the

Syndicates were begging the brokers for business.  This was the genesis of the

conduct alleged in this complaint.  Without some mechanism to guarantee a steady

supply of business with profitable margins, the Syndicates were becoming

unprofitable.

96.     The Syndicates were desperate to return to profitability.  They began approaching the Lloyd's Brokers – who listened with a willing ear and quickly adopted the practices – to "buy" entire books of business from the brokers, in exchange for a payment.  For that payment, which could be based on volume or profitability, the Lloyd's Brokers agreed to bring all risks to particular Syndicates or groups of Syndicates.  These anti-competitive exclusive-dealing arrangements or "facilities" robbed the Lloyd's Brokers' clients of the benefits of competition, and resulted in the insured paying supracompetitive prices.

97.     Because of these exclusive dealing provisions, the Syndicates were free to charge as much as they could to the Lloyd's Broker, as long as they did not get caught by the insured.  Any additional money that the Syndicates charged to the brokers meant additional profit.  And because of that additional profit, the Syndicates would pay additional money under the Compensation Agreements back to the Lloyd's Brokers.  Thus, the Syndicates and Lloyd's Brokers' interests were aligned: the more money that they could charge the insured, the more money they would make.

98.     This also had the perverse effect of incentivizing the Lloyd's Brokers to mislead Plaintiffs and other Class Members about the cost of placing the risk on the Lloyd's Market, not only to protect their secret kickbacks, but to protect knowledge about the *extent* of the secret kickbacks.

99.     The only act that could slow down the unending upward spiral of premium was the client itself, who would have to question his or her Lloyd's Broker's

- 26 -

motives.  As a result Plaintiffs and other Class Members were not only damaged by exclusivity of Compensation Agreements, which mandated the Lloyd's Broker would not shop their risk and decreased their options of insurers (which resulted in inflated premiums), but also they were damaged by paying inflated premiums.

100.  Over time, this payment was standardized into Compensation Agreements, which served to govern the terms of the kickback agreement.  These agreements contained the lines of business the Compensation Agreement was to cover, *e.g.*, maritime, property and casualty, political and terror, FINPRO (financial and professional) or aviation.

101.  On information and belief, some agreements covered all lines of insurance that a particular Syndicate would issue.

102.  Every Compensation Agreement shared at least one feature: it served as a mechanism to build hidden fees into the premium that the U.S. insured was forced to pay.

**B.    The Lloyd's Market Is a Structural Conspiracy**

103.  The Lloyd's Market is a unique insurance market.  By its very nature, competitors are in constant contact and communication with each other.  Without tight cooperation, the market does not function as designed.  Using the near-constant contact that the Syndicates had with each other, the Syndicates communicated and agreed amongst themselves to the bid-rigging and market allocation schemes alleged in this complaint.

- 27 -

789197_1

104.   Physically, the Lloyd's Market is highly susceptible to collusion and information sharing.  Lloyd's Brokers and the Syndicates and their representatives are afforded unlimited access to each other.  Business is conducted face-to-face between brokers and underwriters in a single room as well as in the coffee shops and pubs surrounding the Lloyd's building.  *See* http://www.lloyds.com/lloyds/about-us/what-is-lloyds (last visited Oct. 29, 2012).

105.   Lloyd's Benelux County Manager, Ralph Van Helden, described the "Lloyd's Room" as a place "where people can come and trade, [it] provides a centre for the London insurance market."  "As a result, what is a multi-billion-pound industry is transformed into a village industry, because everyone knows and sees each other every week.  It's what makes Lloyd's and the London insurance market so unique."  *See*  http://www.lloyds.com/lloyds/offices/americas/us-homepage/news-center/2011-us-news/lloyds-at-the-heart-of-insurance (last visited Oct. 29, 2012).

106.   Much of the Lloyd's Market's business works by subscription, where more than one syndicate takes a share of the same risk on the exact same terms.  *See* http://www.lloyds.com/lloyds/about-us/what-is-lloyds (last visited Oct. 29, 2012).  This presents an unlimited opportunity for insurers to see the terms on which its purported competitors are agreeing to write insurance, as well as with whom its competitors are doing business and at what price.

107.   As a result, the horizontal competitors must necessarily communicate with each other when premium is being distributed or when claims must be paid for a

- 28 -

789197_1

risk they jointly insured.  The terms of these contracts allow the Syndicates to request information from each other regarding the risk, which gives them additional opportunity to exchange information about each other's business, the terms of the PSA contracts each has and to allocate markets.

108.    Many Syndicates joined together and have the same company manage its affairs, called "managing agents" or "managing general agents."  For instance, Defendant Syndicates 570 and 609 together use Atrium to manage their affairs. Similarly, Defendant Syndicates 0623 and 2623 have the same managing agent, Beazley.  Defendant Syndicates 1003 and 2003 also have the same managing agent, Catlin.  These joint ventures between horizontal competitors provide yet another conduit for information sharing.  In fact, as alleged in this complaint, there are Compensation Agreements among multiple Syndicates and Lloyd's Brokers.

109.    Managing general agents frequently have both a broking arm and an insurance arm, which is an inherent conflict of interest.

110.    Only broking firms, not individuals, who have been accepted by Lloyd's to do business with Lloyd's Members "at Lloyd's" are allowed on the floor at Lloyd's. Thousands of non-brokers from all over the world send business to brokers at Lloyd's for them to place in the Lloyd's Market.  The result of this was that there were a limited number of Lloyd's Brokers and a limited number of Syndicates.  The limited participants enabled the Lloyd's Brokers and Syndicates to manage the conspiracy throughout the entire Lloyd's Market.

789197_1

111.   There are two ways to place a risk at Lloyd's: through a Lloyd's Broker or through a Lloyd's coverholder.  As of January 1, 2010, there were 180 accredited firms of brokers working at Lloyd's.  Coverholders are firms worldwide who are authorized by Lloyd's Syndicates to enter into contracts of insurance and/or issue insurance documentation on their behalf.  *See* www.lloyds.com/lloyds/ offices/americas/us-homepage/placing-risk/how-to-access-lloyds (last visited Oct. 29, 2012).  Both entities purport to be agents of the insured and have a direct contractual relationship with Syndicates.  For the purposes of this complaint, they are collectively referred to as "Lloyd's Brokers."

## C.    The Commercial Insurance Marketplace

112.   The market for commercial property and casualty insurance covers different insurance lines.

113.   The market for commercial insurance brokering is highly concentrated, with Marsh, Aon and Willis accounting for about 60% of the global commercial brokerage market.

114.   The Defendant Lloyd's Syndicates, along with Other Syndicates in the Lloyd's Market, are among a handful of insurers that dominate the Lloyd's Market for commercial insurance.

115.   The Lloyd's Market provides steady portion of market share and flow of premium by paying contingent commissions to Lloyd's Brokers which, in return, steer volumes of business to the Lloyd's Market including the Syndicates.

789197_1

116.    The payment of contingent commissions and conspiracy with the Lloyd's Brokers protects the Lloyd's Market share and book of business from what would otherwise be open competition.

**D.    Lloyd's Brokers' Representations to Plaintiffs and the Class**

117.    The market for commercial insurance has become global and grown increasingly complex and sophisticated.  Thus, businesses, government agencies and other entities often turn to insurance consultants, brokers or agents (collectively, "brokers") to help them select, negotiate and procure insurance policies and other services on their behalf.

118.    Brokers serve a critical intermediary function in the commercial insurance marketplace, matching their clients – insurance purchasers – with sellers, the insurers.  Brokers are retained to act as expert advisors in procuring insurance and obtaining the best coverage at the lowest price.  Brokers analyze the risk; assess the type of insurance needed; compare and interpret policies; and provide unbiased, sound and accurate advice regarding the insurance marketplace and insurers.

119.    Lloyd's Brokers such as Aon, Marsh and Willis all represent that they will provide independent and objective analysis of risk and insurance options on which their clients seeking commercial insurance can rely.

120.    Marsh's Mission Statement is "[t]o be the best at what we do for clients through a team made of the best professionals in each of our markets."  Its website also adds:

- 31 -

Marsh & McLennan Companies is the premier global professional services firm providing advice and solutions in risk, strategy and human capital. Through our market leading brands, colleagues in more than 100 countries help clients identify, plan for and respond to critical business issues and risks.

\*        \*        \*

Marsh is the world leader in delivering risk and insurance services and solutions to clients. It provides global risk management, risk consulting, insurance broking, alternative risk financing, and insurance program management services for businesses, public entities, associations, professional services organizations, and private clients. Marsh is organized by client, industry, and risk categories to facilitate the global delivery of highly specialized products and services covering a wide spectrum of risks.

121.   Marsh UK represented to Lincoln Adventures in the Certificate of Insurance respecting the Lincoln Adventures Policy:

In the conduct of business and in the choice of an insurer, including any with which we or our affiliates are connected, we aim to provide advice objectively and independently *in our client's best interests* . . . [w]here we become aware of any actual or potential conflicts of interests, we inform our clients of the situation and their options and act upon their instructions.

(Emphasis added.)

122.   Aon UK represented on its website:

*Experienced coordination of the selected methods of treatment is essential to effect real change and to accurately monitor results*.

No one organization can house the broad scope of expertise needed to address the full spectrum of risk faced in an evolving economy and marketplace, it is essential to select business partners who can provide a breadth and depth of expertise when and where you need it. In seeking to support our clients in this critical area, Aon has built a

- 32 -

powerful and strategically focused risk management and insurance practice that will bring you a wealth of expertise.

www.aon.com/uk/en/risk_management/default.jsp (last visited June 8, 2007).

123.   Aon's website stated: "One of our core values is always maintaining a client focus. . . .  By truly listening to our clients and working with them as a partner, we can best develop solutions that work seamlessly with their business." www.aon.com/about/aon_corporation/default.jsp (last visited June 8, 2007).

124.   Aon has promised:  "Our mission is simply this, 'to provide our clients with the highest level of service.'  Our employees work for you with your goals and objective always at the forefront."  Aon insists that its clients' goals are realized "by placing our clients first at all times."

125.   Aon, in its Insurance and Risk Management Proposal for MMK's Insurance Coverage for the period June 21, 2003 through June 21, 2004, states in its "Summary" of the insurance:

> It is the goal of Aon Risk Services to provide the most cost-effective portfolio with financially stable companies, based upon your selection of coverages.

Proposal at 11.

126.   Willis represented on its website's home page: "We are one of the world's leading risk management and insurance intermediaries.  Our expertise in many industries allows us to create customized solutions unique to a client's business. Our insurance products and solutions combined with global skills enables us to

- 33 -

provide unrivalled services to our clients." http://www.willis.com (last visited June 5, 2007).

127.   Willis' website features a "Client Bill of Rights," which states: "Willis represents the client's best interests through our Client Advocacy Model.  Willis' global resources and services are committed to understanding the client's company, its industry and its individual needs.  Willis' customized recommendations and solutions will be driven by what is in the client's best interests.  This is the centerpiece of the value Willis provides its clients."    http://www.willis.com/about_Willis/ The_Willis_Way/Client_Bill_of_Rights/ (last visited Oct. 29, 2012).

**E.    Syndicates Pay Kickbacks to Lloyd's Brokers in Return for Protecting Market Share and the Ability to Charge Supracompetitive Premiums**

128.   Although Lloyd's Brokers receive a flat fee or standard commission from either their clients and/or the Syndicates, they have also conspired to enter into Compensation Agreements – kickback agreements with the Syndicates for additional commissions.

129.   Pursuant to the Compensation Agreements, Defendant Lloyd's Syndicates pay commissions – undisclosed to the insured – to the Lloyd's Brokers, including Marsh, Aon and Willis, based on: (a) the volume of premiums generated by the broker's sales of its products; (b) the growth of business and renewal of existing business; and (c) the profitability of the book of business purchased by broker's clients, *i.e.*, agreed upon favorable total claims/loss ratios.

- 34 -

130.    These contingent commissions can range from 3% to 15% of the total premium paid or more.

131.    Contingent commission payments were made by Syndicates to the Lloyd's Brokers both in open market placements and through Binding Authority Agreements.

132.    The Syndicates not only pay the contingent commissions to the U.S. brokers, but also paid an additional amount to the UK broker or correspondent, such as Marsh UK for the Lincoln Adventures Policy, and Swett, S&C, Miller and PLIS for the MMK Insurance Coverage.  Often, such undisclosed payments can amount to a 20% commission or more for the Lloyd's Broker in the UK.  This practice is known as "double dipping."  Even worse is that the second contingent commission is frequently charged on the total amount of premium *plus* the original contingent commission. This practice is known as "towering."

133.    The Lloyd's Brokers receive kickbacks from the Syndicates pursuant to profit- or volume-based Compensation Agreements.  In many cases the use of these agreements exploded; a Syndicate or Syndicates would have to enter into one as a condition of doing business with the Lloyd's Broker.

134.    Clients in the United States were only aware of the standard commission paid to the U.S.-based broker, not the contingent commission payments paid under the Compensation Agreements.

135.    Syndicates had PSAs with Marsh dating at least back to 1998.

- 35 -

789197_1

136.    Compensation Agreements between Syndicates and the Lloyd's Brokers frequently provide for additional commission based on the volume of premium placed or the profit of the book of business.

137.    Many or nearly all of the Syndicates in the Lloyd's Market entered into Compensation Agreements.   The cost of the kickback payments built into the Compensation Agreements was withheld from disclosure to the insured by confidentiality provisions in the agreement itself.   Insureds were rarely, if ever, told about Compensation Agreements.

138.    Frequently, more than one Syndicate would join together with other Syndicates to enter into Compensation Agreements.   This would necessarily require horizontal communication about the allocation of business between the Syndicates.

139.    A "Binding Authority Agreement" between Marsh UK and the Lloyd's Market which provides that syndicates will pay contingent compensation based on the entire book of business placed by Marsh UK in the given year.   To qualify, Marsh UK must maintain a certain profitability on the business.   Section 27 of the agreement provides:

[SECTION] 27.2   Contingent or Profit Commission

PROFIT COMMISSION CLAUSE

*     *     *

The Underwriters hereon will allow the Coverholder [Marsh UK] an overriding Profit Commission of 5% based on the absolute nett [sic] result of the cover resulting from business bound hereunder.   The profit

- 36 -

commission statement in respect of each annual period and of this
Binding Authority shall be prepared as follows after liability has expired
and all outstanding claims have been settled.

Income

1.    Premiums for the year (*i.e.* Nett [sic] Premiums less Nett [sic]
Returns).

Outgo

1.    Commission and/or Coverholders expenses;

3.    Losses paid and Loss expense, and outstanding claim.

4.    Deficit from previous year's or years profit, commission account.

5.    7.5% Underwriters expenses based on net absolute premium
income.

The excess of income over outgo shall be in the sum of which the profit
commission shall be paid.

The profit commission statement for each year shall embrace the
business of all classes accepted by the Coverholder hereunder during that
year and the Profit Commission, shall be calculated on the nett [sic]
result of the said classes of business.

140.    Notably, provisions for contingent commission payments were contained
in the above-alleged "coverholder" agreement between Defendant Lloyd's Syndicates
and Marsh UK.  Lloyd's Syndicates sometimes paid extra compensation twice on
policies if they were placed through coverholder agreements as well as PSAs.

141.    On or about January 2001, Syndicate 0033 entered into a PSA with
MGB.  The agreement contained provisions for the payments of contingent
commission as well as a confidentiality clause.  The confidentiality clause stated that

- 37 -

"[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law or in accordance with Lloyd's regulations and practice."

142.    For years 2002, 2003, 2004 and 2005, Syndicate 0033 entered into similar agreements with MGB.

143.    On or about July 2003, Syndicate 0033 entered into an ISBA with AON Limited – Global Risks Division.   The agreement contained provisions for the payments of contingent commission.

144.    In 2004, Syndicate 0033 entered into similar agreements with AON Limited – Global Risks Division.

145.    On or about July 2003, Syndicate 0102 entered into an ISBA with Aon Limited-Marine, Energy and Global Risks Divisions.   The agreement contained provisions for the payments of contingent commission.

146.    On or about January 2003, Syndicate 0435 entered into a Compensation for Services to Underwriters Agreement with Aon Limited - Marine, Energy and Global Risks Divisions.   The agreement contained provisions for the payments of contingent commission.

147.    On or about January 2001, Syndicate 0510 entered into a PSA with MGB.   The agreement contained provisions for the payments of contingent commission as well as a confidentiality clause.  The confidentiality clause stated that "[t]he terms of this Agreement are confidential and shall not be disclosed by either

- 38 -

party except as may be required by law or in accordance with Lloyd's regulations and practice."

148.   On or about October 2002, Syndicate 0609 entered into a PSA with MGB.   The agreement contained provisions for the payments of contingent commission as well as a confidentiality clause.  The confidentiality clause stated that "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law or in accordance with Lloyd's regulations and practice."

149.   In 2004, Syndicate 0609 entered into similar agreements with MGB.

150.   On or about July 2004, Syndicate 0609 entered into a Compensation for Services to Underwriters Agreement with Aon Limited - Global Risks Division.  The agreement contained provisions for the payments of contingent commission.

151.   On or about January 2004, Syndicate 1084 entered into an ISBA with Aon Limited - Global Risks, & Energy Division.   The agreement contained provisions for the payments of contingent commission.

152.   On or about January 2001, Syndicate 1096 entered into a PSA with MGB.   The agreement contained provisions for the payments of contingent commission as well as a confidentiality clause.  The confidentiality clause stated that "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law or in accordance with Lloyd's regulations and practice."

153.  On or about April 2002, Syndicate 1183 entered into a PSA with MGB. The agreement contained provisions for the payments of contingent commission as well as a confidentiality clause.  The confidentiality clause stated that "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law or in accordance with Lloyd's regulations and practice."

154.  For years 2003 and 2004, Syndicate 1183 entered into similar agreements with MGB.

155.  For years 2002, 2003 and 2004, Syndicate 2001 entered into similar agreements with MGB.

156.  On or about July 2003, Syndicate 2001 entered into an ISBA with Aon Limited – Global Risks Division.  The agreement contained provisions for the payments of contingent commission.

157.  On or about January 2004, Syndicate 2001 entered into a Compensation for Services to Underwriters Agreement with Aon Limited – Global Risks and Onshore Energy Divisions.  The agreement contained provisions for the payments of contingent commission.

158.  From 2001 through 2004, Syndicate 2020 entered into similar agreements with MGB.

159.  On or about July 2003, Syndicate 2020 entered into an ISBA with Aon Limited – Marine, Energy and Global Risks Division.  The agreement contained provisions for the payments of contingent commissions.

- 40 -

789197_1

160.   On or about January 2004, Syndicate 2020 entered into an ISBA with Aon Limited - Global Risks Energy, Marine & Construction and Special Risks Division.    The agreement contained provisions for the payments of contingent commission.

161.   On or about August 2000, Syndicate 2488 entered into a PSA with MGB. The agreement contained provisions for the payments of contingent commission as well as a confidentiality clause.  The confidentiality clause stated that "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law or in accordance with Lloyd's regulations and practice."

162.   For years 2001, 2002, 2003 and 2004, Syndicate 2488 entered into similar agreements with MGB.

163.   On or about January 2003, Syndicate 2488 entered into a PMA with Willis Limited Global Markets.

164.   On or about January 2003, Syndicate 2623 entered into a PSA with MGB.    The agreement contained provisions for the payments of contingent commission as well as a confidentiality clause.  The confidentiality clause stated that "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law or in accordance with Lloyd's regulations and practice."

165.   On or about January 2002 and January 2003, Syndicate 2791 entered into PSAs with MGB.  The agreement contained provisions for the payments of contingent

commission as well as a confidentiality clause. .  The confidentiality clause stated that "[t]he terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law or in accordance with Lloyd's regulations and practice."

166.   The Compensation Agreements provide a vehicle through which the Lloyd's Brokers and the Defendant Lloyd's Syndicates structure, maintain and enforce their anti-competitive arrangements through customer allocation and protection on renewal from competition, and by which they share the resulting supracompetitive profits.

167.   The Syndicates build the cost of the contingent commissions into the cost of insurance.  They also charged higher premiums to Plaintiffs and Class Members because of the exclusivity of the agreements.

**F.    Market Allocation Practices**

168.   The Syndicates, with input from the Lloyd's Brokers, agreed amongst themselves to allocate the market in order to protect the Syndicates' profit margins.

169.   Unbeknownst to Plaintiffs and the Class, the Lloyd's Brokers already had Compensation Agreements in place with Syndicates on lines of insurance business that mandate the Lloyd's Broker bring the risk to a certain Syndicate or Syndicates and prohibit the Lloyd's Brokers from bringing the risk to the open market for it to be competitively bid on.

- 42 -

170.   Marsh's own internal investigation conducted by the English law firm, Freshfields Bruckhaus Deringer, found that contingent commissions had dictated and influenced Marsh's individual brokers or agents' decisions where to place their clients' business.

171.   Syndicates also understood that if they did not enter into a Compensation Agreement they would be disadvantaged and unable to get business.

172.   The Compensation Agreements only work if the Syndicates who are a party to them receive a level of profitable business greater than what it would otherwise expect.   If Compensation Agreements did not result in the Syndicates collectively receiving more money from the insureds, then there would be no incentive to ever enter into them.

173.   Through the Compensation Agreements, the Syndicates have disregarded the duties that brokers owe their clients.

174.   The volume of contingent commissions that the Syndicates pay favorably impacted their profitability and that of the Lloyd's Brokers, and had a direct relationship to the amount of premium steered to or the profit made by the Syndicate.

175.   The Compensation Agreements were intended to and did create an incentive for both Lloyd's Brokers and the Syndicates to: (a) maximize the volume of insurance placed within the Lloyd's Market; (b) maximize the volume of renewal business retained with the Lloyd's Market; (c) minimize competition bidding and

- 43 -

engage in bid manipulation; and (d) fail to negotiate reductions of premiums payable through adjustments of terms, such as deductibles.

176.  To maximize their contingent commission revenues, certain of the Lloyd's Brokers established dedicated units to monitor their contingent commission targets, consolidate markets and steer business to the Lloyd's Market and other preferred carriers and protect incumbent accounts with the Lloyd's Syndicates through bid manipulation.

177.  Marsh created the Global Broking Division ("MGB").   MGB concentrated Marsh's marketing and negotiating power to one office in New York City and an affiliated office in London, which was responsible for monitoring and overseeing the placement of Marsh clients with the Syndicates, including the Defendant Lloyd's Syndicates.  MGB was at least partially responsible for PSAs and allocation of premium to partner markets, including the Defendant Lloyd's Syndicates.

178.  On April 7, 2005, Willis entered the Assurance of Discontinuance with the New York Attorney General (the "Willis Assurance of Discontinuance").  As revealed by the Willis Assurance of Discontinuance and as further described below, Willis centralized its push to maximize overrider revenues through its Willis Global Markets Unit.

179.  According to the Willis Assurance of Discontinuance, in an April 4, 2004 e-mail, James Drinkwater, Managing Director of Willis Global Markets, explained

- 44 -

that "our [PSAs] are a reward for services that we provide to carriers such as carrier advocacy . . . . Carrier Advocacy includes transparency into our organization and our book, access to our leadership and our clients, ***an unfair competitive advantage*** as well as other benefits that partnership brings."  In a May 15, 2003 e-mail, he further explained that Willis would attract greater contingency commission revenue by "driving business to these carriers."

180.  Willis' goal for increasing contingent commissions was constantly pushed on its brokers.  As revealed in the Willis Assurance of Discontinuance, a November 11, 2003 e-mail from the Chief Marketing Officer of Willis North America emphasized: "Don't forget the advantages of placing as much business as possible with the carriers we have negotiated special deals with, as you look for ways to maximize revenues the last few months of this year and into 2004."

181.  In December 2003 the CEO of Willis North America, Mario Vitale, instructed Willis brokers to stay consistent with our mantra to maximize contingent income.

182.  Aon created the Syndication Group to concentrate control over its PSAs and placement of insurance.  Aon's brokers were encouraged by the Syndication Group to "drive further market consolidation to achieve . . . improved revenue management . . . [and] greater market leverage."

## G.    Defendant Lloyd's Syndicates Hid the Existence of Contingent Commissions from Their Clients, Plaintiffs and the Class

183.    The Syndicates and Lloyd's Brokers failed to adequately disclose the Compensation Agreements to Plaintiffs and the Class.

184.    One method by which the Syndicates and Lloyd's Brokers concealed their Compensation Agreements was to treat them as confidential.  For example, MGB instructed employees to include the following language in all PSAs: "Confidentiality: The terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law and to a party's respective legal and accounting advisers."

185.    The practice of entering into Compensation Agreements is contrary to Lloyd's statements about the duties owed to the insurance.  As Lloyd's represents on its website "Brokers bring business to the Lloyd's market, taking a particular risk they want covered around the market to try to find the best price, terms and conditions." *See* http://www.lloyds.com/lloyds/press-centre/press-releases/2006/08/dealing_with_ distribution_is_key_say_uk_brokers (last accessed Oct. 28, 2012).

186.    A study commissioned by Lloyd's and conducted with the British Insurance Brokers' Association published in 2006 found that Lloyd's Brokers feel that they have adequately addressed the key issues of client money, contract certainty and conflict management, although they feel more work needs to be done.  *Id.*

- 46 -

187.    In a presentation available on its website, Lloyd's represents that Lloyd's Brokers visit Lloyd's Underwriting Room and "meet interested underwriters face to face and 'shop around' to negotiate the best package."

188.    Confidentiality clauses included in Compensation Agreements between the Syndicates and Lloyd's Brokers required that the terms of the agreement were confidential and not to be disclosed by any party except as may be required by law or in accordance with Lloyd's regulations and practice.

189.    The non-disclosure of PSAs was an important issue to the Syndicates. Since at least 2001, Syndicates entered into indemnification agreements with the Lloyd's Broker whereby the Lloyd's Broker agreed to indemnify the Syndicate if the broker failed to disclose the contingent commissions and the Syndicate suffered a loss from that failure to disclose.

190.    The Syndicates and the Lloyd's Brokers' self-serving confidentiality policies facilitated their improper non-disclosure practices.    An internal Marsh document entitled "PSA Primer" dated July 1999 stated that employees were not to divulge the particulars of Marsh PSAs either to clients or even other individuals within Marsh Inc. who were not involved in the negotiation or administration.    Marsh justified this policy as a breach of the confidentiality clause contained in the PSAs and referred client requests to the appropriate U.S. regional head.

- 47 -

191.    Responding to clients' questions about possible contingent commissions paid by insurers, Marsh stated that as a matter of corporate policy it did not make available any specific information relating to PSAs.

192.    When faced with a client inquiry regarding its commissions, Aon stated "we do not disclose the national amounts we received . . . .[T]hat is extremely confidential information."

193.    The insurance industry has recognized that undisclosed PSAs compromising the client/broker relationship.  As the Risk and Insurance Management Society, Inc. ("RIMS") stated in a press release dated August 24, 2004:

> We believe that undisclosed contingency fees have the potential to compromise the very basis upon which this relationship is built.  In an effort to preserve the integrity of this relationship, RIMS strongly advocates for complete and full disclosure of compensation agreements without client request.

194.    RIMS reiterated its position in a press release dated May 30, 2007:

> However, for brokers and independent agents to accept these fees in transactions that are made on behalf of the buyer represents an inherent conflict of interest.
>
> *        *        *
>
> RIMS support a business model for the insurance industry which does not provide for, offer or make available contingent commission arrangements for the brokerage industry.
>
> *        *        *
>
> RIMS believes that broker compensation and insurer selection should be governed by the principles of complete transparency and full disclosure

- 48 -

without client request.  Only then can risk managers make full and informed decisions . . . .

195.    The fact that Lloyd's Brokers Marsh, Aon and Willis had a policy of misleading clients about the payment and receipt of contingent commissions and that Compensation Agreements are the basis for Syndicates and Lloyd's Broker's scheme to ensure receipt of premium volume and protection of business from competitors was revealed in the testimony of a former Marsh Managing Director, Joshua M. Bewlay ("Bewlay"), who pled guilty to a felony charge of scheming to defraud on February 14, 2005. *See* above n.2.

196.    Bewlay's testimony revealed that Marsh established a procedure or a "protocol" intended to discourage the client from obtaining an answer on how Marsh received compensation from insurance companies and deliberately misled customers regarding the significance of PSAs.  Bewlay testified:

> [D]uring my employment, I was made aware of a Marsh protocol designed to prevent Marsh's clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client in addition to any fee or commission paid. ***The protocol required multiple layers of inquiry to discourage the client from obtaining an answer***.  Also that all inquiries be channeled through a single Marsh employee who directed the answer to the inquiry.
>
> Finally, the percentage or ratio that Marsh used when it responded to a client's inquiry concerning placement service or PSA or MSA revenue significantly understated the amount of PSA or MSA revenue earned with respect to a particular client.  In my department, Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a particular client.

- 49 -

> When I was told that a client inquired as to the amount of PSA revenue
> Marsh earned from an insurance carrier, I responded that the Marsh
> employee follow Marsh's protocol, including that the client only speak
> to the Marsh employee designated to respond to such inquiries.

*People of the State of New York v. Joshua Bewlay*, Plea Testimony at 11-12 (Feb. 14,

2005).  (Emphasis added).

197.    According to the criminal complaint against Bewlay, the "protocol,"

directed Marsh employees to tell inquiring clients that Marsh received up to 1% to 2%

in contingent commission as a bonus from insurers, when, in fact, Marsh sometimes

earned as much as 10% to 15%.  *People of the State of New York v. Joshua Bewlay*

Complaint (filed Feb. 22, 2005).

198.    Internal Marsh e-mails illustrate the concealment of PSAs to clients: "It's

not a matter of client's knowing about PSAs, it's about how much $$ we make on

them & don't disclose.  The issue is not that we disclose the PSAs, but that we give

clients such a shady answer when we do."

199.    For example, Whirlpool was misled as to commissions received by

Marsh UK from Lloyd's Syndicates in connection with its Excess D&O policies.

## H.    Bid-Rigging and Bid Manipulation

200.    In the wake of state regulatory investigations (described further below) it

came to light that Marsh and several large insurers in the United States engaged in

bid-rigging as a means of implementing their anti-competitive allocation of business

pursuant to PSAs.

- 50 -

201.   In carrying out their bid-rigging scheme, Marsh employees sought alternative and bogus quotes to protect the incumbent status of a particular insurer or to support the placement of the business with another conspiring insurer.  The insurers that acquiesced to Marsh's request for non-competitive bids engaged in this conduct with the understanding that their turn would come for future business and protection on renewal.  The scheme effectively reduced or eliminated competition for the bulk of Marsh's business.

202.   Marsh's preferred insurers colluded with Marsh to supply these losing quotes so that they would be protected from competition when their own business was up for renewal.   These non-competitive fictitious quotes were also known as, "accommodation quotes," "alternative quotes," "B Quotes," "B's," "phony quotes," "false quotes," "fake quotes,"  "protective quotes," "throwaway quotes," "bullshit quotes" "no quotes" and "backup quotes."

203.   As a result of the investigations, eighteen individuals formerly employed by Marsh and other U.S. insurers have pled guilty to criminal charges for participating in bid-rigging, and eight additional individuals have been indicted for their involvement in bid-rigging.  *See* above n.2.

204.   Marsh's Kathryn Winter ("Winter") who was a Managing Director in the Global Broking Unit of Marsh, Inc. admitted that "the primary goal of th[e] scheme was to maximize Marsh's profits by controlling the market, and protecting incumbent

- 51 -

insurance carriers when their business was up for renewal."  Winter Plea Agreement (filed Feb. 18, 2005).

205.    Winter also stated that the agreement among Marsh and its preferred carriers to protect the incumbent required the conspiring insurers to provide "quotes . . . that were non-competitive."  *Id.*

206.    Plaintiffs are informed and believe that the Lloyd's Syndicates also engaged in bid-rigging with Lloyd's Brokers, such as Marsh.  In fact, Lloyd's Syndicates were one of the "top five markets" for MGB during the Class Period.[5]

207.    For example, on certain lines Marsh used Broking Plans to identify (among other things) the insurers that were designated to "win" the business on each level of the excess tower, the target price at which the insurer was supposed to write the business and the identity of other insurers that would be requested to supply "B" quotes, "backup quotes" or alternative quotes that were designed to make the quote of the targeted insurer appear more competitive.

208.    As evidenced by certain Broking Plans, as well as on information and belief, Marsh requested on certain accounts "backup" and/or "alternative leads" from

_____

[5]    As Plaintiffs have not yet obtained full discovery from Defendants or any discovery from third-party co-conspirators mentioned in this complaint, Plaintiffs reserve their rights to later seek to amend their pleadings to allege the particulars concerning Defendant Lloyd's Syndicates participation in the enterprises and conspiracies to protect business through bid rigging or manipulating bids with Lloyd's Brokers, including Marsh, Aon and Willis.

- 52 -

the Syndicates.   Documents reveal Marsh requested an alternative lead from "Lloyd's", said send to "London markets for backup" and that it needed "alternatives from AWAC and Lloyd's of London."

209.   On information and belief, the big three brokers, Marsh, Aon and Willis requested "no bids" or "no quotes" from the Lloyd's Syndicates.

210.   In order to demonstrate to their clients that there was actual competition in the marketplace, although in reality, they were steering their clients' business to market partners with whom they stood to make the most compensation pursuant to the Compensation Agreements.

211.   These brokers would force the Syndicates to engage in this behavior with the threat of withholding future business.  The Syndicate would participate in the "no quote" sham bidding process knowing that its business with the Lloyd's Broker would be protected by "no quotes" from other Syndicates in the future.

212.   On information and belief, the practices described in the preceding paragraphs occurred throughout the Lloyd's Market, with each Syndicate participating and understanding that every other Syndicate was participating with the end goal to inflate the premium costs that they could charge to Plaintiffs and the Class.

213.   The Syndicates agreed to pay the Lloyd's Brokers these contingent commission payments because that allowed the Syndicates to receive higher premiums because there was diminished competition in the Lloyd's Market.  It also provided the Syndicates with a steady and predictable stream of revenue.  The

- 53 -

Syndicates agreed to this arrangement because they knew that the other Syndicates were doing it and everyone's participation meant that the Lloyd's Syndicates could raise premium prices to supracompetitive levels.

214.    The contingent commission payments were a mechanism that benefitted both Lloyd's Broker and the Lloyd's Syndicates.  The Compensation Agreements gave the Lloyd's Brokers a steady place to bring their risks, without the cost of actual brokering and the Syndicates knew that they would be receiving.

215.    Plaintiffs are informed and believe that Marsh allocated its customer base to and among co-conspirator insurers, including Syndicates, in two steps.  First, Marsh and each of the conspiring Syndicate agreed, and the conspiring insurers horizontally agreed among themselves, that Marsh would "consolidate" its business by directing as much as 80%-95% of its commercial business to its "preferred carriers," including Syndicates and others, thereby eliminating hundreds of other insurers from competing equally with the conspiring insurers for a substantial portion of Marsh's business.  As a second step in Defendants' unlawful scheme, Marsh and each of the conspiring Syndicate agreed, and conspiring insurers horizontally agreed, to reduce or eliminate competition among the conspiring insurers themselves as to that secured book of business.  The key aspect of these Syndicates' agreement in this regard was that each conspiring insurer would be permitted to keep its own incumbent business, and that Marsh would protect that business from competition, using a variety of incumbent

- 54 -

protection devices, including the solicitation of false bids, last looks and other bid manipulation.

216.  As described below, Marsh and the conspiring insurers each understood and agreed that incumbent protection was a necessary element in its scheme to allocate Marsh's premium volume in the manner calculated to achieve the highest profits, both for Marsh and conspiring insurers.  Because, on average, more than 70% of Marsh's premium volume was renewal business, the conspiring insurers' "incumbent protection racket" effectively reduced or eliminated competition for the bulk of Marsh's business.

217.  The conspiring Syndicates were aware of and agreed horizontally to participate in the incumbent protection scheme.  An email between employees at Zurich, bearing the subject "Protection," demonstrates this complicity:  "We need and expect to be protected on our renewals just like AIG is protected on theirs."  The email further states:

> The only solution I see if we can not get protection against the AWAC's and ACE's of the world who have not been there for MMGB in the past when needed favors, is to go after AIG leads which we are very prepared to do.  If we can not get proper protection, we will go hard after AIG leads that we feel you are protecting.  We will no longer provide you with protective quotes for AIG but will put out quotes that you will be forced to release, just like you tell me you are forced to release AWAC and ACE quotes.

> I do not think we are asking for the moon.  We just want the same protection given to AIG and MMGB is definitely not doing that for Zurich now.

218.   A former ACE employee also acknowledged that Marsh's system of protecting the incumbent allowed insurer carriers, like ACE, to obtain last looks on placements and avoid real competition.  According to this former ACE employee, "Marsh [Global Broking] preferred incumbents to remain on placements, so . . . if you were the incumbent on the game plan, you would get last shot," meaning that the incumbent would be "protect[ed] from competition."

219.   Upon information and belief, the Syndicates similarly participated in bilateral enterprises and conspiracies with the Lloyd's Brokers.

## I.    Syndicates' and Lloyd's Brokers' Participation in Trade Associations Provided Further Opportunity to Collude

220.   In addition to the structure of the Lloyd's Market, there was ample opportunity for Lloyd's Brokers, the Syndicates and other entities within the Lloyd's Market to collude.

221.   For example, Lloyd's Market Association ("LMA") provided an opportunity for The Syndicates to communicate and share intelligence about the Compensation Agreements and the other anti-competitive practices alleged herein.

222.   The Syndicates, Lloyd's Brokers, and other entities within the Lloyd's Market participate in certain industry trade groups such as the Council of Insurance Agents & Brokers (the "CIAB") – in which Lloyd's participates as a "gold member."

223.   CIAB, an otherwise legitimate trade association, provided the Syndicates and Lloyd's Brokers opportunities to communicate, share vital intelligence, and reach

agreement to conceal the broker compensation arrangements. Professional networking is a major part of what the CIAB does.

224.  The Defendant Lloyd's Syndicates, Other Syndicates and certain co-conspirators are represented in CIAB, as are Lloyd's Brokers, Marsh, Willis and Aon.

225.  The Council of Insurance Company Executives ("CICE"), is comprised of more than 65 large commercial insurers. Collectively, CICE members are responsible for writing more than 75% of the nation's commercial business insurance premiums. The Syndicates participated as members of the CICE.

226.  The Insurance Leadership Forum ("Leadership Forum") at The Greenbrier is the joint annual conference of CIAB and the CICE. The Leadership Forum connects the leaders of the commercial insurance marketplace annually, including the leading executives from the largest insurance companies and brokerage firms. Lloyd's has been represented at the Leadership Forum every year during the Class Period.

227.  Lloyd's has "sponsored" CIAB, the Leadership Forum at the Greenbrier and other CIAB activities during the Class Period, including a special event targeting industry leaders on October 7-11, 2006.

228.  CIAB hosts "Executive Forums" where members "can brainstorm and share ideas about business opportunities and challenges" and "discuss common problems and solutions."

229.   In 2000, when "[m]embers discussed the issue of possible conflicts in sharing information with competitors" they "agreed that anyone who does not participate fully should be asked to leave the sessions."

230.   CIAB also conducts "Executive Liaison Roundtable" meetings – "private, off-the-record conversations" between insurance company "brethren" and select members of CIAB to discuss "critical issues."  Lloyd's Brokers – Marsh, Aon and Willis – have all served on the Executive Liaison Roundtable.

231.   Issues discussed at Executive Liaison Roundtable meetings have included "industry consolidation," "contingency contracts," "agent/company relationships," "how the relationships were changing due to downsizing and consolidations throughout the industry."

232.   CIAB members have discussed and opposed any proposal that might alter "the nature of the relationship" between brokers and insurers.

233.   In 1999, CIAB's members discussed and opposed the guidelines issued by the New York Department of Insurance regarding disclosure of broker compensation arrangements.

234.   In 2004, the CIAB adopted "crisis communication plans" to respond to issues raised by the 2004 New York Attorney General's investigation into broker compensation practices.

235.    CIAB members have held joint meetings with other insurance trade associations to consider the "industry-wide responses" to regulators' investigations into PSAs and the anti-competitive conduct associated therewith.

## J.    Governmental Investigation into Defendants' Contingent Commission Practices

236.    Starting in the spring of 2004, many attorneys general and state regulators began conducting investigations concerning PSAs and the brokers' collusive relationship with commercial insurers in the United States.

237.    These investigations resulted in assurances of discontinuance, settlements and apologies from Lloyd's Brokers, including Marsh, Aon and Willis (as described above).

238.    Aon's CEO, Patrick G. Ryan stated: "As these investigations have revealed, Aon and other insurance brokers and consultants entered into PSAs and other arrangements that created conflicts of interest.  I deeply regret that we took advantage of those conflicts.  This conduct violated the longstanding principle embodied in our Code of Ethics and Aon's Values Statement that our clients must always come first.  Such conduct was improper and I apologize for it."

239.    As detailed above, in the wake of the regulatory investigations, Levene also acknowledged that the PSAs create a conflict of interest.

240.    Following the regulatory investigations, some Lloyd's Brokers stated that the receipt or payment of contingent commissions is inherently wrong.  Joe Plumeri,

- 59 -

the CEO of Willis, who previously had been an active proponent of his company's

expanding use of contingent commissions, said in an April 2005 speech to RIMS:

> For too long, this business has been about the placement only –
> what I've come to call manufacturing.  Under this model, getting the
> placement at the right price and the right coverage is all that matters.
> But this approach leads to the commoditization of insurance, and I don't
> think anyone in this room would equate insurance to soy beans.

> This approach also invites the perception of conflict that comes
> with contingent commissions; that's inconsistent with the principle of
> client advocacy and therefore is unacceptable.

> It must be 100% clear who the broker is working for.  That means
> a broker can only be paid by one party in any transaction.

> It's time we step up to a higher standard.  Contingents should be
> abolished throughout the industry.  Carriers shouldn't pay them. Brokers
> shouldn't accept them.

> If anyone says, "But we're an agent (rather than a broker): surely
> we can get contingents based on the profitability of the carrier's book?"
> To them I say, "That's fine, just make it 100% clear – up front – that you
> are acting for the carrier, and not the client."

> Some times when you are up against it, you have to get creative.

> Faced with the loss of contingent commissions, the sight of the
> gallows should focus our minds.  Brokers should focus less on finding a
> way to simply replace the lost revenue and more on what is really
> important – having the integrity to work harder to deliver creative
> solutions and bring real value.  Anybody think that's a big idea?

> And, if contingents create the appearance of a conflict for some
> brokers, they create that appearance for every broker. Why is my
> cholesterol bad but for the others it is good? It doesn't matter whether
> the broker is global, regional or local – based in the U.S., London, or
> anywhere around the world. It's time to say "enough."

> Contingent commissions.  Over.  Done.  Finished.

## CLASS ACTION ALLEGATIONS

241.  Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and
(B), (b)(2), and/or (b)(3), on behalf of a nationwide class consisting of all persons in
the United States who between January 1, 1997 and the date of class certification (the
"Class Period") purchased or renewed a contract of insurance with a Lloyd's of
London Syndicate through a Lloyd's Broker.  Excluded from the Class are Defendants
and the co-conspirators and their officers, affiliates, directors, employees, and any
governmental employees or entities.

242.  All Class Members have suffered injury to their business or property by
reason of Defendants' unlawful conduct as alleged herein.

243.  There are numerous questions of law and fact that are common to the
claims of all Class Members as set forth above, including:

(a)    whether the Syndicates and Lloyd's Brokers and their co-
conspirators entered into a contract, combination or conspiracy to manipulate the price
and other terms of insurance purchased by Plaintiffs and Class Members and to
allocate the market for the sale of insurance the premiums flowing therefrom;

(b)    whether the Syndicates and Lloyd's Brokers contract, combination
or conspiracy had the purpose and effect of reducing and unreasonably restraining
competition in the sale of insurance;

(c)    the identity of the participants to the contract, combination or
conspiracy;

- 61 -

789197_1

(d)    the duration and extent of the contract, combination or conspiracy alleged in this complaint;

(e)    the mechanisms used to accomplish the contract, combination or conspiracy;

(f)    whether Defendant Lloyd's Syndicates and Lloyd's Brokers conduct violated §1 of the Sherman Act, 15 U.S.C. §1;

(g)    whether Defendant Lloyd's Syndicates and Lloyd's Brokers conduct violated the antitrust laws of the various states;

(h)    the effect upon and the extent of injuries sustained by Plaintiffs and Class Members;

(i)    the appropriate type and/or measure of damages;

(j)    whether injunctive relief is necessary to restrain future violations

(k)    whether the contingent commissions created conflicts of interests for the Defendant Lloyd's Syndicates and Lloyd's Brokers which gave them a disincentive to fulfill their legal and contractual duties to their clients;

(l)    whether the Defendant Lloyd's Syndicates directed their participants, subsidiaries and affiliates to engage in the conduct alleged;

(m)    whether Defendant Lloyd's Syndicates and their co-conspirators fraudulently concealed or failed to disclose the contingent commissions and/or their amount, extent, and impact upon the Lloyd's Brokers' ability to fulfill their legal and contractual duties to clients;

- 62 -

(n)     whether the Defendant Lloyd's Syndicates owed a fiduciary duty to Plaintiffs and the Class and whether their conduct breached such fiduciary duties to Plaintiffs;

(o)     whether Defendant Lloyd's Syndicates and Lloyd's Brokers engaged in mail and/or wire fraud;

(p)     whether Defendant Lloyd's Syndicates and Lloyd's Brokers engaged in a pattern of racketeering activity;

(q)     whether the Broker-Centered Enterprises, and/or Lloyd's Corporation, and/or Lloyd's Enterprise constitutes one or more enterprise(s) within the meaning of 18 U.S.C. §1961(4);

(r)     whether Defendant Lloyd's Syndicates and Lloyd's Brokers conducted or participated in the conduct of the affairs of the alleged Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

(s)     whether Defendant Lloyd's Syndicates and Lloyd's Brokers conspired to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d);

(t)     whether Defendant Lloyd's Syndicates and Lloyd's Brokers engaged in overt and predicate acts in furtherance of a conspiracy and/or direct acts in violation of 18 U.S.C. §1962(a) and (c) proximately caused injury to Plaintiffs and the Class Members' business or property;

(u)    whether Plaintiffs and the Class are entitled to an award of attorneys' fees and expenses against Defendants;

(v)    whether Defendant Lloyd's Syndicates violated RICO; and

(w)    whether Defendant Lloyd's Syndicates fully disclosed the nature and extent of contingent commissions and/or insurance policies incorporating the cost of same in their insurance products and services.

244.    All Class Members have been damaged by the wrongful conduct of Defendant Lloyd's Syndicates.  Through contingent commissions and/or steering, Defendants and their co-conspirators manipulated the applicable marketplace for insurance products and services and increased premiums paid.

245.    The Class is so numerous that joinder of its members is impracticable.

246.    The exact number of Class Members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery.  Plaintiffs believe that the number of Class Members is in excess of 10,000.

247.    The Class is ascertainable in that the names and addresses of all Class Members can be identified in business records maintained by the Defendants and co-conspirators.

248.    Plaintiffs' claims are typical of the Class.  All Class Members including Plaintiffs sustained injury as a result of Defendants' conspiracy, contract or combination in restraint of trade, as well as the alleged Enterprises.

- 64 -

249.   Plaintiffs and Class Members were damaged as a result of purchasing insurance from the Defendant Lloyd's Syndicates or their co-conspirators at prices that were artificially inflated by the market allocation scheme.

250.   The claims of the Plaintiffs and the Class Members have a common origin and share a common basis.  Their claims originate from the same illegal conspiracy on the part of Defendants and Defendants' and their co-conspirators' acts in furtherance of that conspiracy, including Defendants' own conduct, as well as conduct by Defendants that aided and abetted the conduct of other co-conspirators.

251.   Plaintiffs' state claims for which relief may be granted are typical of those of the absent Class Members.  If brought and prosecuted individually, the claims of each Class Member would require proof of the same material and substantive facts.

252.   The claims of the Plaintiffs are sufficiently aligned with the interests of the absent members of the Class to ensure that the claims of the Class will be prosecuted with diligence and care by Plaintiffs as representatives of the Class.

253.   The interests of the Plaintiffs are co-extensive with and not antagonistic to those of the absent Class Members.

254.   The Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other members of the Class.

255.   The Plaintiffs are willing and prepared to serve the proposed Class in a representative capacity with all of the obligations and duties material thereto.

789197_1

256.   The Plaintiffs have retained the services of counsel who are experienced in complex insurance, antitrust and RICO class action litigation, will adequately prosecute this action, and will assert, protect and otherwise represent the Plaintiffs and all absent Class Members.

257.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(1)(B).  The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

258.   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class.  Such incompatible standards of conduct and varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow the existence of inconsistent and incompatible rights within the Class.

259.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that Defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

- 66 -

260.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the questions of law and fact that are common to members of the Class predominate over any questions affecting only individual members.

261.   A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this complaint in that:

(a)     individual claims by the Class Members will be impracticable as the costs of pursuit would far exceed what Plaintiffs or any one Class Member has at stake;

(b)     little individual litigation has been commenced over the controversies alleged in this complaint, and individual members are unlikely to have an interest in prosecuting and controlling separate individual actions;

(c)     the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

(d)     the proposed class action is manageable.

## RICO ALLEGATIONS

262.   Defendants engaged in a fraudulent scheme, common course of conduct and conspiracy to increase revenues and market share for Defendants and their co-conspirators in the market for insurance as alleged herein.

263.   To achieve these goals, Defendants entered into Compensation Agreements with the Lloyd's Brokers and Other Syndicates, which were not adequately disclosed to Plaintiffs and the Class, nor was the anti-competitive impact

- 67 -

of such Agreements. As a direct result of their conspiracy and fraudulent scheme, Defendants were able to extract revenues in the amount of hundreds of millions of dollars from Plaintiffs and the Class in supracompetitive rates for insurance.

## A.    Pattern of Racketeering Activity

264.   Plaintiffs, Class Members and Defendants are "persons" within the meaning of 18 U.S.C. §1961(3).

265.   Each Defendant has knowingly, willfully and unlawfully participated in the conduct of one or more of the alleged Enterprise's affairs through a pattern of racketeering activity involving a scheme to defraud Plaintiffs and Class Members in violation of §1962(c), as described in detail below.

266.   Each Defendant has violated federal laws including mail and wire fraud, 18 U.S.C. §§1341 and 1343 by utilizing or causing the use of the United States postal service, commercial interstate carrier, wire or other interstate electronic media in furtherance of their fraudulent scheme.

267.   These predicate acts of mail and wire fraud were not isolated, but rather were related in that they had the same or similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and members of the Class. The predicate acts of racketeering activity were related to each other in furtherance of the scheme described above, amount to and pose a threat of continuing racketeering activity and therefore

- 68 -

constitute a pattern of racketeering through which Defendants have violated 18 U.S.C. §1962(c).

### B.    Enterprise Allegations

#### 1.    Broker-Centered or Bilateral Enterprises

268.   Upon information and belief, three association-in-fact bilateral Enterprises exist between the Syndicates and Marsh, the Syndicates and Aon, and the Syndicates and Willis, respectively.  Each of the foregoing constitutes an "enterprise" within the meaning of 18 U.S.C. §1961(4), through which Defendants conducted the pattern of racketeering activity described herein.  Throughout its existence, the Broker-Centered Enterprises (or, the "Enterprise" or "Enterprises") engaged in, and their activities affected interstate commerce, including the sale and renewal of insurance policies throughout the United States.

269.   The purpose of each Broker-Centered Enterprise is: (1) to make money through the creation of a limited group of insurance carriers to which the Lloyd's Broker steers the insurance business of Class Members with limited competition in exchange for sharing increased profits; and (2) to conceal this scheme from customers.

270.   The structure for decision-making within each Enterprise includes the following:  (1) one or more broker executives who have responsibility and authority for interfacing with the Syndicates to determine compensation, to plan for the steering or retention of business, and to monitor and direct that business be retained or steered to insurer members of the Enterprise; (2) broker account executives who implement

- 69 -

direction regarding the retention or steering of business; (3) one or more executives at each Syndicate or group of affiliated Syndicates who have the responsibility and authority to plan with the broker, to monitor the placement of business and to determine compensation for the steering or retention of business; (4) an employee or employees of the Syndicates who monitor(s) and reports placement volume to Syndicate executives (or managing agent) as well as the broker; (5) an employee or employees of the broker who keeps track of reports received from the insurers regarding placement volume; (6) an employee or employees who implement decisions regarding the placement of business, including the protection of incumbent markets; and (7) an employee or employees who factor(s) the cost of the kickbacks into the insurance premiums paid by Plaintiffs and Class Members. In addition, the broker assumes primary responsibility for concealment of the scheme with support and assistance from the Syndicate-members of the Enterprise.

271.   Each Lloyd's Broker and Syndicate are associated with, participate in and control the affairs of the broker-centered or bilateral Enterprise identified above.

272.   The Syndicates have participated in the operation or management of each Enterprise in at least the following ways:

(a)   reaching agreement with the Lloyd's Brokers regarding amount of contingent commissions to be paid to the Broker and the level of business to be steered to each Syndicate;

(b)   monitoring and reporting of business levels;

- 70 -

(c)    computation of premium levels or rates to encompass contingent commissions;

(d)    payment of kickbacks to the Lloyd's Brokers;

(e)    agreement to cooperate in the anti-competitive conspiracy and scheme with the respective Lloyd's Broker in order to protect incumbent business with the expectation of reciprocity, providing "no quotes" or otherwise engaging in bid-rigging or bid manipulation; and

(f)    coordinating concealment of the scheme and/or aiding and abetting the non-disclosure of information to customers.

273.    Defendants have conducted or participated in the conduct of the affairs of the Enterprises through a pattern of racketeering activity as described herein.  While these Defendants participate in and are members of the Enterprises, they have an existence separate and distinct from the Enterprise.

274.    Each Enterprise oversees, coordinates and facilitates the commission of numerous predicate offenses.

275.    The Enterprises are separate and distinct from the pattern of racketeering activity.  The members of each Enterprise share a common purpose and each Enterprise is continuing and has a structure for decision-making and for oversight, coordination and facilitation of the predicate offenses.  The pattern of racketeering activity includes numerous acts of mail and wire fraud in furtherance of a fraudulent

scheme whereby the Lloyd's Broker steers business to the insurer members in exchange for kickbacks in the form of contingent commissions and/or other payments.

276.   At all relevant times, each participant in each Enterprise was aware of the scheme, was a knowing and willing participant in the scheme and reaped revenues and/or profits there from.

277.   The Broker-Centered Enterprises have ascertainable structures separate and apart from the pattern of racketeering activity in which Defendants have engaged.

278.   Defendants have directed and controlled the ongoing organization necessary to implement their scheme and illicit business practices at meetings and through communications of which Plaintiffs cannot now know because all such information lies in Defendants' hands.

279.   Each Enterprise operates on a nationwide basis and utilizes interstate communications including United States mail and wire across state lines.   The activities of the Enterprises are national and international in scope, affecting most of the commercial insurance market in the United States, as well as in the UK.   The Enterprises have a substantial impact upon the economy and upon interstate commerce.

## 2.    The Lloyd's Enterprise

280.   Upon information and belief, the Lloyd's Corporation is a legal entity which constitutes a RICO enterprise, through which Defendants conducted the pattern of racketeering activity described herein.   Alternatively Defendants, Other Syndicates

- 72 -

and the Lloyd's Brokers form an association-in-fact enterprise which are referred to in this complaint as the "Lloyd's Enterprise."

281.    The Syndicates and the Lloyd's Brokers were able to devise and implement their scheme through their participation in the Lloyd's Enterprise.  As described *infra*, the Lloyd's floor, the structure of the Lloyd's Market and the London Market Association ("LMA") provide Defendants and their co-conspirators with numerous opportunities to communicate, meet, use vital intelligence on market conditions that is shared with its partner members, and reach agreement on how they will address challenges in the marketplace, including the allocation of insurance business in the market.  Defendants and their co-conspirators used vital intelligence gained through communications and meetings at the Lloyd's Floor, in the surrounding coffee shop and pubs, including information about decreased profits and demand to devise a scheme using strategic partnerships – where each Lloyd's Broker restricted the insurers who obtained the vast majority of the Broker's book of business, and each insurer then shared the increased profits that resulted from reduced competition with the Broker through increased contingent commissions – to replace competition.  The partners operating the Lloyd's Enterprise reached consensus on how they would change the market and regarding non-disclosure.

282.    Each participant in the Lloyd's Enterprise had a systematic linkage because there are corporate ties, contractual relationships, financial ties, ongoing relationships and continuing coordination of activities.   Through the Lloyd's

- 73 -

Enterprise, Defendants engaged in consensual decision making to implement their fraudulent scheme and to function as a continuing unit for the common purpose of exacting revenues and market advantage.  Furthermore, the Lloyd's Enterprise functions as a continuing unit with the purpose of assisting with, perfecting and furthering their wrongful scheme to sell insurance to the consuming public.

283.   Defendants are associated with, participate in and control the affairs of the Lloyd's Enterprise.

284.   As alleged above, the Lloyd's Floor has provided the Syndicates and Lloyd's Brokers the opportunity to discuss and reach agreement or joint action regarding disclosure issues.

285.   The purpose of the Lloyd's Enterprise is to further the interests of the Syndicates and larger brokers generally and to further the Defendants' scheme specifically including implementation and concealment of the scheme.

286.   The Syndicates have participated in the operation or management of the Lloyd's Enterprise, and exercised substantial control over the same, in at least the following ways:

(a)    reaching agreement with the Lloyd's Brokers regarding amount of contingent commissions to be paid to the Broker and the level of business to be steered to each Syndicate;

(b)    monitoring and reporting of business levels;

(c)    computation of premium levels to encompass contingent commissions;

(d)    by kicking back revenues and profits to Lloyd's Brokers;

(e)    by aiding and abetting or otherwise coordinating the non-disclosure of information to customers;

(f)    by providing or withholding quotes or otherwise agreeing to cooperate with bid manipulation practices as directed by Lloyd's Brokers; and

(g)    by sharing information relating to such matters as market conditions, placements and payments.

(h)    Defendants have conducted or participated in the conduct of the affairs of the Lloyd's Enterprise through a pattern of racketeering activity.

(i)    While the Defendants participate in and are members of the Lloyd's Enterprise, they have an existence separate and distinct from the Enterprise.

(j)    Defendants have been enabled to commit the predicate offenses solely by virtue of their position in the Lloyd's Enterprise or involvement in or control over the affairs of the Lloyd's Enterprise. Defendants were able to devise, implement and conceal their scheme through the structure and handshake culture of the Lloyd's Floor. Absent the Defendants' participation in and control of Lloyd's, the Defendants would have been unable to perpetrate the fraudulent scheme and the attendant predicate acts. The Lloyd's Enterprise provided Defendants the necessary mechanism for decision-making regarding the fraudulent scheme, regarding concealment of

- 75 -

Defendants' relationships and activities, and regarding controlled and coordinated representations and disclosures.

287.   The Lloyd's Enterprise is separate and distinct from the pattern of racketeering activity.  However, the predicate offenses are related to the activities of Lloyd's.  The purpose of the Lloyd's Enterprise is in furtherance of the interest of the Syndicates and large Lloyd's Brokers generally and in furtherance of the Defendants' scheme more specifically. Accordingly, the predicate acts taken in furtherance of the Defendants' interests and in furtherance of the scheme necessarily relate to the Enterprise.

288.   At all relevant times, each participant in the Lloyd's Enterprise was aware of the scheme, was a knowing and willing participant in the scheme and reaped revenues and/or profits there from.

289.   The Lloyd's Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

290.   Defendants have directed and controlled the ongoing organization necessary to implement their scheme and illicit business practices at meetings and through communications of which Plaintiffs cannot now know because all such information lies in Defendants' hands.

291.   The activities of the Lloyd's Enterprise are national in scope, affecting much of the commercial insurance market in the United States.  The Lloyd's Enterprise has a substantial impact upon the economy and upon interstate commerce.

- 76 -

C.    **Predicate Acts**

292.    Section 1961(1) of RICO provides that "racketeering activity" includes

any act indictable under 18 U.S.C. §1341 or 18 U.S.C. §1343.  As set forth herein,

Defendants have engaged and continue to engage in conduct violating each of these

laws.

293.    The Syndicates, in order to carry out their scheme to defraud or to obtain

money by false pretenses, placed or caused to be placed in post offices and/or official

depositories of the United Sates Postal Service matters and things to be delivered by

the Postal Service, commercial interstate carriers, or by wire, or knew that the mail or

wires would be used in furtherance of their scheme in violation of 18 U.S.C. §§1341

and 1343.  Matters sent by mail and/or the wires included but were not limited to

correspondence, marketing materials, contracts between the Syndicates and the

Lloyd's Brokers, agreements between Syndicates, insurance contracts with Plaintiffs

and other members of the Class, requests for proposals, policies and policy materials,

insurance quotes, Compensation Agreements, insurance binders, commission

schedules, invoices to clients and payments from insurers to brokers.

294.    Defendants knowingly and intentionally made misrepresentations and

concealed material facts in furtherance of their scheme and for the purpose of

deceiving Plaintiffs and Class Members.  The Lloyd's Brokers regularly disseminated

materials by mail and/or wire wherein they routinely represented that they would act

in the best interests of their clients in providing unbiased advice and assistance in the

- 77 -

selection of insurance products and services relating thereto and that they would act as fiduciaries of their clients in placing insurance on the best terms possible and at the best price available. They also represented that they would access the market in placing insurance business. To the extent Defendants provided any information regarding contingent commission income or regarding the Lloyd's Brokers' relationships with the Syndicates, the information was materially false and misleading. Further, Defendants concealed the fact that the insurance premiums paid by Plaintiffs and the Class constituted supracompetitve rates and/or incorporated the costs of the Compensation Agreements and payments made in connection thereto.

295.  Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material.

296.  Misrepresentation of the Lloyd's Brokers' allegiance as well as concealment of their relationships with, and steering of business to, the Syndicates was necessary to encourage retention of the brokers, to conceal the scheme, to lull clients, including Plaintiffs and Class Members, into a false sense of security and to assure payment of the excess premiums. Likewise, inclusion of the excess amount of premium resulting from Defendants' scheme in invoices forwarded to each Plaintiff without explanation or a separate accounting for the excess premium was necessary to conceal the scheme and to assure payment of the entire invoice amount.

297.  Defendants' fraudulent schemes and the conspiracies in furtherance of the schemes proximately caused the cost of insurance obtained by Plaintiffs and Class

- 78 -

Members to increase because the kickbacks paid to Lloyd's Brokers were included in the price of insurance premium paid by Plaintiffs and Class Members. In addition, Plaintiffs and Class Members reasonably relied on the misrepresentations and omissions in paying higher premiums that included the kickbacks to the Lloyd's Brokers. As a result, Plaintiffs and Class Members have been injured in their business or property by Defendants' fraudulent scheme and overt acts of mail and wire fraud.

### D.    Conspiracy Allegations

298.   Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. The objects of the conspiracy are: (a) to sell insurance; (b) to maximize profits and revenues for Defendants.

299.   The Syndicates conspired with Marsh, Aon and Willis (respectively) to facilitate the scheme being operated through each of the Broker-Centered or Bilateral Enterprises identified above and to further their common purpose of preventing detection of these schemes through misrepresentations, concealment and coordinated and controlled disclosures. Defendants also conspired with other Syndicates and the Lloyd's Brokers through the conspiracy described above to further their common purpose.

300.   The conspiracy has been conducted, implemented and facilitated through the sharing of information among the Lloyd's Brokers and their participation at the Lloyd's Market.

301.   The purpose and effect of each conspiracy was to engage in a scheme whereby each broker would steer business to its strategic (or "facultative") partners and protect them from competition in exchange for increased compensation paid to the broker in the form of contingent commissions, and to conceal the existence of the scheme from the broker's clients.  Further, the purpose and effect of the conspiracy was to prevent Plaintiffs and members of the Class from becoming aware of the terms and significance of the contingent commission agreements between Defendants and the conflicts of interest arising out of the Broker's strategic partnerships with the Defendants, thereby allowing the Broker to increase the compensation they received from the Defendants.

302.   The Lloyd's Brokers accomplished the goals of the conspiracy by adopting substantially similar vague and incomplete disclosure (or non-disclosure) policies regarding contingent compensation.  As described above, through their coordinated efforts, the Lloyd's Brokers successfully were able to prevent insurance purchasers from becoming aware of the true nature of the relationships between the Lloyd's Brokers and the Syndicates and from obtaining actual and complete disclosure of the manner in which the Lloyd's Brokers were compensated by Defendants.

303.   Each Defendant was aware of the general nature of the conspiracy and its role in facilitating the objectives of the conspiracy.  Further, each Defendant has agreed to the overall objective of the conspiracy.

789197_1

304.   Each Defendant has committed overt acts in furtherance of the alleged conspiratorial objectives.

305.   As a result of the conspiracy, Plaintiffs and other members of the Class have paid more than they otherwise would have for insurance procured through the Lloyd's Brokers.

### E.    Plaintiffs' Injury

306.   The fraudulent scheme and conspiracy proximately caused the cost of insurance obtained by Plaintiffs and Class Members to increase because the kickbacks paid to the Lloyd's Brokers were included in the price of insurance paid by Plaintiffs and Class Members, as well as the cost of non-competitive bidding and protection of higher incumbent pricing.  In addition, Plaintiffs and Class Members reasonably relied on the Lloyd's Brokers' misrepresentations and Defendants' concealment of the fraudulent scheme in paying higher premiums that included the kickbacks to the Lloyd's Brokers.

### FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

307.   Defendants and Lloyd's Brokers have concealed their unlawful scheme, course of conduct and conspiracy from Plaintiffs and Class Members.

308.   As part of the conspiracy, Defendants and Lloyd's Brokers created the appearance of a competitive market for insurance coverage, where no such competitive market existed.

- 81 -

309.   Plaintiffs had no knowledge of Defendants' scheme and could not have discovered that Defendants' representations were false or that Defendants had concealed information and materials until at least the Spring of 2004 when New York Attorney General Elliott Spitzer and other state regulators announced their investigations into contingent commission practices.

310.   Further, upon information and belief, Defendants' conduct has been continuing in nature.  There is a substantial nexus between the fraudulent conduct that occurred within the statute of limitations and the misconduct that occurred prior to, and since, that time.  The acts involve the same type of illicit practices and are recurring, continuous events.   Defendants' wrongful conduct and fraudulent concealment tolls the running of any statute of limitations.  Furthermore, Defendants are estopped from asserting any statute of limitations defense in this matter because of its conduct in concealing the fraud claims of Plaintiffs and the Class and concealing the damages incurred by Plaintiffs and the Class.

311.   Defendants' fraudulent, criminal and wrongful behavior occurred nationwide, and did not stop at the borders of any individual states.  The filing of the original complaint and this First Amended Class Action Complaint serves to toll and preserve the claims of the Class Members and other purchasers who were defrauded by Defendants' and their co-conspirators' (including Does 1-100) wrongful and unlawful acts.

- 82 -

## THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF

312.   Defendants' scheme to reduce or eliminate competition, earn higher premium revenues and profit from the contingent commissions creates an ongoing problem that will continue to cause Plaintiffs and members of the Class economic losses and threaten their ability to obtain appropriate insurance coverage at a fair price.

313.   A monetary judgment in this case will only compensate Plaintiffs and members of the Class for past losses.

314.   A monetary judgment will not restore competition, nor cure the inherent and irreconcilable conflict of interest created by the existence of the contingent commissions.

315.   No individual client of any defendant has an adequate remedy at law.

## COUNT I

## (Violation of §1 of the Sherman Act, 15 U.S.C. §1)

316.   Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

317.   Defendants have engaged in unlawful contracts, combinations, and/or conspiracies in restraint of interstate trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1.

318.   The Defendant Lloyd's Syndicates and Lloyd's Brokers agreed to reduce and/or eliminate competition among members of the conspiracy, by among other

- 83 -

things, allocating customers to and among members of the conspiracy and protecting

those co-conspirators from competition for those customers on renewal.

319.    Defendants have engaged in one or more overt acts in furtherance of their

unlawful contract, combination and/or conspiracy.    Defendants implemented the

unlawful scheme by the following acts, among others:

(a)    entering into PSAs and other Compensation Agreements that

constituted a blatant conflict of interest;

(b)    having the Lloyd's Brokers steer business to the Syndicates in

exchange for fees, kickbacks and other payments;

(c)    agreeing to engage in activities that give the appearance of

competition where none or little existed, including protection of incumbent markets

through anti-competitive bidding practices;

(d)    passing through the cost of supracompetitive profits, revenues, and

contingent commissions and other broker compensation to Plaintiffs and the Class;

and

(e)    agreeing to allocate insurance customers – thereby denying such

customers, including Plaintiffs and other members of the Class – the benefits of free

and open competition.

320.    The combinations, contracts and/or conspiracies described above were

naked restraints of trade among horizontal competitors, the purpose and effect of

which were to raise prices and/or reduce output in order to increase profits for the co-

conspirators. The anti-competitive effects of the behavior described above outweigh any precompetitive benefits.

321. The combinations, contracts and/or conspiracies between the brokers/coverholders and the Syndicates also functioned as vertical restraints, the purpose and effect of which were to raise prices and reduce output in order to increase profits for the co-conspirators. The anti-competitive effects outweigh any precompetitive justifications.

322. Defendants would not have undertaken the practices alleged herein absent an agreement among the co-conspirators.

323. Paying brokers contingent commissions is not in the best individual economic interest of the Lloyd's Market or the Defendant Lloyd's Syndicates. They would only agree to pay such contingent commissions in exchange for a corresponding agreement of increased premium revenue and market share.

324. Also, they would only make such payment if they knew that such payments would be offset by the increased premiums they could charge as a result of not having to compete for business. The Lloyd's Market and/or the Defendant Lloyd's Syndicates knew that with these contingent commission payments they would maintain and/or increase their market share and they knew that other insurance companies were likewise paying such commissions.

- 85 -

325.    The conduct described herein would not have occurred absent either an explicit or tacit agreement among the Defendant Lloyd's Syndicates, Lloyd's Brokers and others.

326.    The conspiracy has been conducted, implemented and facilitated through various mechanisms, including direct communications between and among the Defendant Lloyd's Syndicates, the Lloyd's Brokers, insurers and other co-conspirators; sharing of information through the Lloyd's organization; and through other means, such as industry trade groups such as the CIAB, CICE and LMA.

327.    As described above, the Lloyd's Market was one such mechanism used by Defendants to facilitate the conspiracy.

328.    The Lloyd's Floor provided the Lloyd's Market, Lloyd's Brokers and the Defendant Lloyd's Syndicates a forum to discuss and reach agreement about their compensation arrangements and other aspects of their relationships, what each wants and needs from the relationship, the market and market conditions, consolidation and disclosure.

329.    As a direct and proximate result of the contracts, combinations, and/or conspiracies alleged in this complaint, Plaintiffs and Class Members were injured in their business or property in that they paid higher prices than they would have paid in a competitive market.

# COUNT II

## (Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(a)-(d))

330.  Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

331.  This Count is brought by Plaintiffs against Defendants pursuant to 18 U.S.C. §1962(a)-(d).

332.  Defendants, Plaintiffs, and other Class Members are "persons" within the meaning of 18 U.S.C. §1961(3), because each was "capable of holding a legal or beneficial interest in property."

333.  Defendant Lloyd's Syndicates and Marsh, Aon and Willis, respectively, constituted an three associate-in-fact Broker-Centered or Bilateral Enterprises within the meaning of 18 U.S.C. §1961(4).

334.  The Lloyd's Corporation constitutes an enterprise within the meaning of 18 U.S.C. §1961(4).  Alternatively, the Defendant Lloyd's Syndicates, other Lloyd's Syndicates, and the Lloyd's Brokers function as an association-in-fact enterprise within the meaning of 18 U.S.C. §1961(4).  The "Lloyd's Enterprise" constituted a single enterprise or multiple enterprises.

335.  The Enterprises alleged herein constitute an ongoing and continuing organization which engages in, and whose activities affect, interstate commerce.

336.    The Enterprises have ascertainable structures separate and apart from the pattern of racketeering activity in which Defendants have engaged.

337.    Through the Enterprises, Defendants and their co-conspirators engage in consensual decision making regarding the implementation of their scheme and function as a continuing unit for the common purpose of increasing compensation for the Lloyd's Brokers, as well as the premium revenues and profits for the Defendant Lloyd's Syndicates and to reduce or eliminate competition for the insurance coverage business of the members of the Class.

338.    While Defendants and their co-conspirators participate in and are members of the alleged Enterprises, they also have an existence separate and distinct from the Enterprises.

339.    To establish and maintain the system of contingent commissions and the anti-competitive conduct that was part and parcel with such payments, as well as concealing from Plaintiffs and Class Members the system and the inherent conflicts of interest it creates, Defendants and their co-conspirators are required to exercise substantial control over the direction of the alleged Enterprises.

340.    Defendants and their co-conspirators have participated in the conduct of and have exercise control over and operated the affairs of the alleged Enterprises as follows:

(a)    by entering into PSAs and other Compensation Agreements surrounding the bidding of accounts with the expectation and understanding that both

- 88 -

the Lloyd's Brokers and the Defendant Lloyd's Syndicates would realize increased profits and that the Defendant Lloyd's Syndicates would have insurance business steered to them and maintained as incumbent accounts without having to compete for that business or with reduced competition for the same;

    (b)    by sharing and disseminating information;

    (c)    by formalizing relationships among participants in the Lloyd's Market for the payment of compensation;

    (d)    by uniformly recommending insurance products of the Defendant Lloyd's Syndicates to maximize the value of contingent commissions;

    (e)    by sharing management, employees, resources and advertising channels between and among the Lloyd's Syndicates and Lloyd's Brokers;

    (f)    by utilizing and supporting industry associations, such as the LMA and CIAB, as vehicles for communication and the exchange and dissemination of information necessary to carry out Defendants' scheme; and

    (g)    by submitting false or misleading information to policyholders regarding the existence and nature of compensation paid by Defendant Lloyd's Syndicates to Lloyd's Brokers, and the insurance rates charged by Defendants.

341.   Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) or 18 U.S.C. §1343 (relating to wire fraud).  Defendants and their co-conspirators have engaged in and

continue to engage in conduct violating each of those laws to effectuate their scheme, including aiding and abetting violations of same.

342.    To carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants and their co-conspirators, in violation of 18 U.S.C. §§1341 and 1343, caused to be mailed by the United States Postal Service, delivered by commercial interstate carrier, or sent by wire (and/or received matters and things through the same means), matters and things including, but not limited to, the PSAs and other Compensation Agreements, payments made pursuant thereto, correspondence, policy materials, binders, fee schedules, bids, requests for proposal, payments from clients and to brokers that constituted the fruits of Defendants' and its co-conspirators' wrongful conduct, claims, responses to claims, and coverage letters.

343.    The matters and things sent and received by Defendants and their co-conspirators via the Postal Service, commercial carrier, wire or other interstate electronic media include, among other things:

(a)    materials containing false and fraudulent misrepresentations that the Lloyd's Brokers would represent their clients' best interests in the placement of insurance;

(b)    materials that concealed or failed to disclose the existence and effect of the contingent commissions and other compensation, including the conflict of interest that Defendants and their co-conspirators had created between their legal and

- 90 -

contractual obligations to their clients and the economic disincentives to honor those

obligations;

(c)    materials intended to induce clients to accept more expensive

coverage from the Defendant Lloyd's Syndicates than less expensive coverage that

might be otherwise available, in order to maximize premium revenue and to maximize

contingent commissions and other compensation to the brokers;

(d)    materials designed to encourage acceptance of new coverage or

renewal of existing coverage;

(e)    materials designed to create the appearance of an active, open and

free marketplace for retail coverage and reinsurance;

(f)    correspondence concerning bids on placement of business;

(g)    PSAs and other Compensation Agreements between and among

the Syndicates and Lloyd's Brokers;

(h)    agreements between and among the Syndicates; and

(i)    invoices and payments related to Defendants' and their co-

conspirators' improper scheme.

344.    Many of the precise dates of Defendants' and their co-conspirators'

fraudulent uses of the U.S. mail and wire facilities have been deliberately hidden and

cannot be alleged without access to Defendants' books and records.  Indeed, the

success of Defendants' scheme depends upon secrecy, and Defendants have withheld

details of the scheme from Plaintiffs and Class Members.  Generally, however,

Plaintiffs describe herein the occasions on which the predicate acts of mail and wire fraud would have occurred, and how those acts were in furtherance of a scheme. They include thousands of communications to perpetuate and maintain the scheme, including, among other things, the materials described herein.

345.    Defendants' and their co-conspirators' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and Class Members and assuring the Defendant Lloyd's Syndicates of the placement and retention of business and enabling the Lloyd's Brokers to collect contingent commissions and other compensation.

346.    These misrepresentations, acts of concealment, and failures to disclose include, *inter alia*:

(a)    the Lloyd's Brokers holding themselves out as trusted advisors that can help clients assess their insurance needs and locate the best available insurance while in fact participating in self-dealing, conspiratorial activities aimed at maximizing profits at the expense of their clients;

(b)    the Lloyd's Brokers' representations that they work for the clients and not the Lloyd's Syndicates;

(c)    the failure to disclose the Lloyd's Brokers' conflicts of interest;

(d)    the failure to disclose that an integral part of the Lloyd's Brokers' business philosophy is to promote the interest of Defendant Lloyd's Syndicates to maximize revenue from PSAs and other Compensation Agreements;

- 92 -

(e)     the failure to disclose the nature of the services the Lloyd's Brokers provide in order to warrant their contingent commissions;

(f)     the failure to disclose that the cost of the contingent commissions and other payments to the brokers are built into the cost of the insurance; and

(g)     the failure to disclose that the Lloyd's Brokers are directing their clients to Defendant Lloyd's Syndicates based not on merit, but rather on the web of kickbacks and contingent commissions and other compensation they are able to structure.

347.    Defendants and their co-conspirators either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and Class Members relied on the misrepresentations and omissions.  Plaintiffs and the Class relied upon Defendants' and their co-conspirators' misrepresentations and omissions by retaining and continuing to retain the Lloyd's Brokers and by purchasing the Defendants Lloyd's Syndicates' insurance products at higher rates than Plaintiffs and the Class would have paid absent the conspiracy.

348.    As a result, Plaintiffs and Class Members have been injured in their business or property by Defendants' overt acts of mail and wire fraud and each other co-conspirators' acts of mail and wire fraud in furtherance of the conspiracy.

349.    Defendants and their co-conspirators committed and/or aided and abetted in the commission of thousands of acts of racketeering activity.

789197_1

350.   Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including Plaintiffs and Class Members.

351.   The multiple acts of racketeering activity, which Defendants and their co-conspirators committed and/or conspired to or aided and abetted in the commission of, were related to each other in furtherance of the scheme described above, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as described in 18 U.S.C. §1961(5).

352.   Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any Enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such Enterprise's affairs through a pattern of racketeering activity."

353.   Through the pattern of racketeering activity described above, Defendants and their co-conspirators have conducted or participated in the conduct of the affairs of the alleged Enterprises.

354.   In violation of 18 U.S.C. §1962(d), Defendants have conspired to violate 18 U.S.C. §1962(c).  Various other persons, firms and corporations, not named as defendants in this complaint, have participated as co-conspirators with Defendants and performed acts in furtherance of the conspiracy.

789197_1

355.    The Defendant Lloyd's Syndicates and their co-conspirators engaged in a conspiracy and common course of conduct as described herein to increase or maintain premium revenues and market share.  The conspiracy restrained trade in the market for commercial insurance by reducing or eliminating competition, including through the use of Compensation Agreements, the steering of business, and/or bid manipulation.  The conspiracy is clearly at odds with the Lloyd's Brokers' representations regarding the services they would provide as well as the duties inherent in the relationship which exists between Plaintiffs, other Class Members and Defendants.  Although Defendants have created the illusion of a competitive market for insurance, the selection, pricing and placement of the insurance products at issue were designated to minimize competition.

356.    The purpose and effect of the conspiracy was to prevent Plaintiffs and the Class from becoming aware of the Compensation Agreements, the payment of contingent commissions and the conflicts arising there from, thereby allowing Defendants to allocate the market, increase the premium revenues and profit margins for the Defendant Lloyd's Syndicates, increase the brokers' compensation, and reduce competition for the Lloyd's Syndicates.

357.    As a result of the conspiracy, the Defendant Lloyd's Syndicates did not have to compete, or compete as rigorously, for insurance business and premium revenue on the basis of price or other terms; this lack of competition enabled the

Defendant Lloyd's Syndicates to charge premiums that were higher than they would have been absent the conspiracy.

358.    Defendants and each of their co-conspirators have agreed with the overall objective of the conspiracy and they participated in the common course of conduct. Defendants were aware of the general nature of this scheme and its role in facilitating the objectives of the conspiracy.  Each received supracompetitive premiums or other compensation as a result of the conspiracy, to the detriment of Plaintiffs and the Class.

359.    To carry out their scheme, Defendants and their co-conspirators agreed to create and implement the same or similar new mechanisms, or utilized existing mechanisms, to facilitate the exchange of information and the monitoring of the participants' compliance with the scheme.

360.    The same pattern and course of conduct and activity and similar facts, which evidence the existence of a conspiracy, exist among Defendants and co-conspirators, including:

(a)    Compensation Agreements between and among Defendant Lloyd's Syndicates, other Syndicates and the Lloyd's Brokers;

(b)    agreements and policies between and among Defendant Lloyd's Syndicates, the Lloyd's Market and Lloyd's Brokers regarding concealment of their conflicts of interest and wrongful conduct;

(c)    agreements which include either no language or vague, misleading, and incomplete language purporting to disclose contingent commissions and/or the

789197_1

PSAs between and among Defendant Lloyd's Syndicates, the Lloyd's Brokers, and others;

       (d)    practices regarding the reporting of their arrangements respecting contingent commissions and/or PSAs;

       (e)    tactics for steering policyholders and for placement of insurance and the payment of premiums;

       (f)    tactics for steering policyholders, allocation of markets and customers, and stabilizing, raising or maintaining premium prices above competitive levels;

       (g)    anti-competitive conduct in protecting incumbent markets, including bid manipulation; and/or

       (h)    boycotting or refusing to deal with brokers or insurers that refuse to participate in the conspiracy.

361.   As a direct and proximate result of Defendants' violations of 18 U.S.C. §1962(a)-(d), Plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.

362.   Plaintiffs and Class Members have been injured by, among other things, paying excessive premiums for insurance and other "services" than they would have in the absence of the conspiracy.  Plaintiffs relied, to their detriment, on Defendants' and their co-conspirators misrepresentations and omissions, as evidenced by their purchase and/or renewal of insurance.

- 97 -

789197_1

363.   Under the provisions of 18 U.S.C., Plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorneys' fees.  Defendants are thus liable to Plaintiffs and the Class for three times their actual damages as proven at trial plus interest and attorneys' fees.

## COUNT III

### (Violation of State Antitrust Laws)

364.   Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

365.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Alaska Stat. §45.50.562 *et seq.*

366.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §44-1401 *et seq.*

367.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arkansas Stat. Ann. §4-75-309 *et seq.* and Arkansas Stat. Ann. §4-75-201 *et seq.*

368.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of California Bus. & Prof. Code §16700 *et seq.*, §16720 *et seq.*, and Cal. Bus. & Prof. Code §17000 *et seq.*

369.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Colorado Rev. Stat. §6-4-101 *et seq.*

- 98 -

370.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Connecticut Gen. Stat. §35-26 *et seq.*

371.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code Ann. §28-4503 *et seq.*

372.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Delaware Code Ann. tit. 6, §2103 *et seq.*

373.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Florida Stat. §501.201 *et seq.*

374.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Georgia Code Ann. §16-10-22 *et seq.* and Georgia Code Ann. §13-8-2 *et seq.*

375.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Rev. Stat. §480-1 *et seq.*

376.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Idaho Code §48-101 *et seq.*

377.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Comp. Stat. §10/1 *et seq.*

378.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Indiana Code Ann. §24-1-2-1 *et seq.*

379.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1 *et seq.*

380.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §50-101 *et seq.*

381.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kentucky Rev. Stat. §367.175 *et seq.*, and relief can be granted in accordance with Kentucky Rev. Stat. §446.070.

382.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Louisiana Rev. Stat. §51:137 *et seq.*

383.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §1101 *et seq.*

384.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maryland Code Ann. Title 11, §11-201 *et seq.*

385.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Massachusetts Ann. Laws ch. 92 §1 *et seq.*

386.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §445.773 *et seq.*

387.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §325D.52 *et seq.*

388.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §75-21-1 *et seq.*

389.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Missouri Stat. Ann. §416.011 *et seq.*

390.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Montana Code Ann. §30-14-101 *et seq.*

391.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §59-801 *et seq.*

392.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §598A *et seq.*

393.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Rev. Stat. Ann. §356:1 *et seq.*

394.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Jersey Stat. Ann. §56:9-1 *et seq.*

395.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §57-1-1 *et seq.*

396.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law §340 *et seq.*, and N.Y. Ins. Law § 2316(a).

397.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §75-1 *et seq.*

398.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §51-08.1-01 *et seq.*

399.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ohio Rev. Code §1331.01 *et seq.*

- 101 -

400.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oklahoma Stat. tit. 79 §203(A) *et seq*.

401.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Rev. Stat. §646.705 *et seq*.

402.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Rhode Island Gen. Laws §6-36-1 *et seq*.

403.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Carolina Code §39-3-10 *et seq*.

404.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §37-1 *et seq*.

405.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §47-25-101 *et seq*.

406.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Texas Bus. & Com. Code §15.01 *et seq*.

407.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §76-10-911 *et seq*.

408.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §2453 *et seq*.

409.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Virginia Code §59-1-9.2 *et seq*.

410.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Washington Rev. Code §19.86.010 *et seq*.

411.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §47-18-1 *et seq*.

412.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §133.01 *et seq*.

413.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wyoming Stat. §40-4-101 *et seq*.

414.    As described above, Defendants and their co-conspirators have entered into agreements, the purpose and effect of which were to suppress or eliminate competition, and to raise, maintain or stabilize prices for insurance products in the United States at artificially high levels.

415.    As a direct and proximate result of the contracts, combinations or conspiracies alleged in this complaint, Plaintiffs and Class Members were injured in their business or property in that they purchased insurance at supracompetitive prices and on terms less favorable than would have been available in a competitive market.

## COUNT IV

## (Breach of Contract)

416.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

789197_1

417.   This Count is alleged by the Plaintiffs on behalf of the Class Members who purchased or renewed insurance with the Defendant Lloyd's Syndicates using the services of one or more of the Lloyd's Brokers.

418.   Certain Defendant Lloyd's Syndicates (hereafter in this Count the "Defendants") entered into contracts of insurance with the Plaintiffs and the Class to provide insurance coverage for a specified risk.

419.   Plaintiff Lincoln Adventures entered into a contract with Defendant Lloyd's Syndicates issued under cover of Marsh UK.  The contract represented that Defendants would disclose remuneration paid by the insurer.  The contract also represented that the Defendant Lloyd's Syndicates would protect Plaintiff Lincoln Adventures from risk of damage for the value paid.

420.   Plaintiff MMK entered into various insurance contracts with various Defendant Lloyd's Syndicates issued under cover with Aon.  The contract represented that Defendants would disclose remuneration paid by insurer.  The contract also represented that the Defendants Lloyd's Syndicates would protect Plaintiff MMK from risk of damage for value paid.

421.   Defendants breached the terms of the insurance contract by, *inter alia*, paying inadequately disclosed contingent commissions and other kickbacks to two-levels of brokers, one in the United States and one in the United Kingdom for steering business to the Lloyd's Syndicates; charging supracompetitive rates; incentivizing the

789197_1

brokers to discourage claims; and passing the cost of such undisclosed compensation through to Plaintiffs and the Class.

422.   Plaintiffs and other Class Members have performed all conditions precedent under their contracts.

423.   As a result of Defendants' breach of contract, Plaintiffs and the Class have suffered damages.  Accordingly, Defendants are liable to Plaintiffs and the Class for breach of contract damages in an amount to be proved at trial.

## COUNT V

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

424.   Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

425.   The law implies a covenant of good faith and fair dealing in every contract.

426.   Defendants violated this covenant of good faith and fair dealing in their insurance contracts with Plaintiffs Class Members by, *inter alia,* paying inadequately disclosed compensation pursuant to the PSAs and other Compensation Agreements for steering business to the Lloyd's Syndicates; charging supracompetitive rates; incentivizing the brokers to discourage claims; and passing the cost of such undisclosed compensation through to Plaintiffs and the Class.  Plaintiffs and the Class Members performed all, or substantially all, of the significant duties required under their agreements with the Defendant Lloyd's Syndicates.

- 105 -

789197_1

427.   The conditions required for Defendants' performance under the contract agreements had occurred.

428.   Defendants did not provide and/or unfairly interfered with the right of Plaintiffs and Class Members to receive the benefits under their agreements.  Plaintiffs and the Class have been damaged by Defendants' breach of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

## COUNT VI

### (Civil Conspiracy)

429.   Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

430.   Defendants and all of their unnamed co-conspirators engaged in the above described wrongful acts and practices as part of a common scheme and conspiracy.

431.   As described above, the Defendant Lloyd's Syndicates and their co-conspirators, with knowledge and intent, agreed to the overall objective of the conspiracy. They agreed to, and actually committed, the acts of fraud and unlawful conduct set forth in this complaint with the goal of increasing their profits and market share at the expense of Plaintiffs and the Class.

432.   In performing the wrongful acts set forth in this Count, Defendants and each co-conspirator either acted as agent of one or more Defendant, or Defendants ratified such acts, or both.

433.   Plaintiffs and the Class have suffered and continue to suffer economic and non-economic loses because of Defendants' wrongful conduct. The amount of such losses will be determined according to proof at trial.

434.   The wrongful acts of Defendants set forth in this complaint were done with the intent to mislead and defraud, and Plaintiffs and Class Members are entitled to punitive and exemplary damages to be ascertained according to proof.

435.   Furthermore, Plaintiffs and Class Members seek an order rescinding the insurance policies purchased and renewed by Plaintiffs and Class Members and granting them any further equitable relief the Court finds appropriate.

## COUNT VII

### (Unjust Enrichment)

436.   Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

437.   Defendants and their co-conspirators have benefited from their unlawful acts by receiving excessive premium revenues and payments made pursuant to Compensation Agreements.

438.   These payments have been paid and received at Plaintiffs' expense, under circumstances where it would be inequitable for Defendants to be permitted to retain the benefit.

439.   Plaintiffs and Class Members are entitled to the establishment of a constructive trust consisting of the benefit conferred upon Defendants in the form of

their excessive premium revenue and contingent commissions from which Plaintiffs and the other Class Members may make claims on a pro rata basis for restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the Class, and designating their counsel as counsel for the Class;

B.    A declaration that Defendants have committed the violations alleged herein;

C.    Jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and Class Members as proven at trial plus interest and attorneys' fees and expenses;

D.    Any additional damages, penalties and other monetary relief provided by applicable law;

E.    Punitive and exemplary damages to be ascertained according to proof, rescission and any further equitable relief the Court finds appropriate;

F.    Disgorgement of Defendants' unjust enrichment and/or imposing a constructive trust upon Defendants' ill-gotten monies, freezing Defendants' assets, and requiring Defendants to pay restitution to Plaintiffs and the Class and to restore to all funds acquired by means of any act or practice declared by this Court to be

unlawful, deceptive, fraudulent or unfair, and/or a violation of laws, statutes or regulations;

G.     An injunction preventing Defendants from engaging in future illegal practices;

H.     Costs of this action, including reasonable attorneys' fees and expenses;

I.     Pre-judgment interest; and

J.     Any such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

DATED:  November 14, 2012          ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                                   JOHN J. STOIA, JR.
                                   RACHEL L. JENSEN
                                   THOMAS R. MERRICK
                                   CARMEN A. MEDICI


                                          s/ Rachel L. Jensen
                                   ———————————————————
                                       RACHEL L. JENSEN

                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101
                                   Telephone:  619/231-1058
                                   619/231-7423 (fax)

789197_1

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
DAVID J. GEORGE
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

ZWERLING, SCHACHTER
  & ZWERLING, LLP
ROBERT S. SCHACHTER
ANA M. CABASSA
41 Madison Avenue
New York, NY  10010
Telephone:  212/223-3900
212/371-5969 (fax)

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN
2325 E. Camelback Road, Suite 300
Phoenix, AZ  85016
Telephone:  602/274-1100
602/274-1199 (fax)

WHATLEY KALLAS, LLC
JOE R. WHATLEY, JR.
EDITH M. KALLAS
380 Madison Avenue, 23rd Floor
New York, NY 10017
Telephone: 212/447-7060
800/922-4851 (fax)

FOOTE, MEYERS, MIELKE
  & FLOWERS
ROBERT M. FOOTE
416 South Second Street
Geneva, IL 60134
Telephone: 630/232-6333
630/845-8982 (fax)

DAVID M. FOSTER, P.C.
DAVID M. FOSTER
30833 North Western Hwy., Suite 209
Farmington Hills, MI 48334
Telephone: 248/855-0940
248/855-0987 (fax)

Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 14, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be e-mailed the foregoing document or paper via the email distribution service list to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 14, 2012.

s/ Rachel L. Jensen
RACHEL L. JENSEN

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:        rachelj@rgrdlaw.com

CM/ECF LIVE - U.S. District Court for the District of New Jersey-    Page 1 of 16
Case 2:04-cv-05184-CCC-SDA    Document 2312    Filed 11/14/12    Page 114 of 129
PageID: 52082

## Mailing Information for a Case 2:04-cv-05184-CCC-PS

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **DOUGLAS A. ABRAHAMS**
  dabrahams@kohnswift.com,joanb@kohnswift.com

- **ROBERT A. ALESSI**
  ralessi@cahill.com

- **DANIEL B. ALLANOFF**
  dallanoff@mcgslaw.com

- **ROBIN L. ALPERSTEIN**
  robin.alperstein@wilmerhale.com

- **GUY V. AMORESANO**
  gamoresano@gibbonslaw.com,litefiling@gibbonslaw.com

- **MITCHELL JAY AUSLANDER**
  mauslander@willkie.com,mao@willkie.com,rhutcheon@willkie.com,twhitehouse@willkie.com,kmonin@willkie.com,afitzpatrick@willkie.com,ebower@willkie.com,v

- **HARVEY JOEL BARNETT**
  hbarnett@sperling-law.com,bturcsany@sperling-law.com

- **NATALIE FINKELMAN BENNETT**
  nfinkelman@sfmslaw.com,pleadings@sfmslaw.com,smoss@sfmslaw.com,pmauger@sfmslaw.com

- **PHILIP J. BEZANSON**
  phillip.bezanson@bracewellgiuliani.com

- **PETER RICHARD BISIO**
  peter.bisio@hoganlovells.com,daniel.metroka@hoganlovells.com,bonnie.carpenter@hoganlovells.com,david.foster@hoganlovells.com,Michelle.Kisloff@hoganlovells.

- **MICHAEL R. BLANKSHAIN**
  blankshain@wildmanharrold.com,radziwon@wildmanharrold.com

- **AMY T. BRANTLY**
  abrantly@SusmanGodfrey.com

- **SONYA RAE BRAUNSCHWEIG**
  sonya.braunschweig@dlapiper.com

- **ROBERT J. BRENER**
  Robert.Brener@leclairryan.com,Patricia.Gaglioti@leclairryan.com

- **STEPHEN BRODSKY**
  sbrodsky@zsz.com

- **MARK ANTHONY BULGARELLI**
  mbulgarelli@foote-meyers.com,cspring@foote-meyers.com

- **ANDREW O. BUNN**
  andrew.bunn@dlapiper.com,DocketingNewYork@dlapiper.com

- **ROBERT J. BURNS**
  robert.burns@hklaw.com

- **THOMAS F. BUSH**
  tbush@edwardswildman.com,dtaylor@edwardswildman.com,pfrye@edwardswildman.com,ecffilings@edwardswildman.com

- **JOHN C. CABANISS**
  john@cabanisslaw.com,nina@cabanisslaw.com

- **ANNA MARIE CABASSA-TORRES**
  acabassa@zsz.com

- **MATTHEW JOSEPH CACCAMO**
  caccamo@wildmanharrold.com

- **JOHNNY W. CARTER**
  jcarter@susmangodfrey.com

- **MICHAEL SCOTT CARUCCI**
  michael.carucci@shearman.com

- **JOANNE M. CICALA**
  jcicala@kmllp.com,lmorris@kmllp.com

- **JAMES B. CLARK , III**
  james.clark@usdoj.gov

- **WILLIAM F. CLARKE , JR**
  william.clarke@beazley.com

- **JOANNA J. CLINE**
  clinej@pepperlaw.com

- **BRYAN L. CLOBES**
  bclobes@caffertyclobes.com,ktucker@caffertyclobes.com

- **LOUIS G. CORSI**
  lcorsi@lcbf.com,lcbflit@lcbf.com

- **TRAVIS SCOTT CRABTREE**
  tcrabtree@lrmlaw.com,jreed@lrmlaw.com

- **PATRICIA C. CROWLEY**
  pcrowley@paulweiss.com

- **PAUL C. CURNIN**
  pcurnin@stblaw.com

- **STEVEN P. DEL MAURO**
  sdelmauro@mdmc-law.com,bkliesh@mdmc-law.com

- **G. RICHARD DODGE , JR**
  grdodge@mayerbrown.com

- **AMY GRAHAM DOEHRING**
  adoehring@mwe.com

- **RICHARD E. DONOVAN**
  rdonovan@kelleydrye.com

- **THOMAS P. DOVE**
  tdove@furth.com

- **LARRY D. DRURY**
  ldrurylaw@aol.com

- **BRYAN S. DUMESNIL**
  bryan.dumesnil@bgllp.com,cindy.rodriguez@bgllp.com,elisabeth.taylor@bgllp.com,beth.elliott@bgllp.com,maria.kimbrough@bgllp.com,heath.novosad@bgllp.com

- **KENNETH W. ERICKSON**
  kenneth.erickson@ropesgray.com,courtalert@ropesgray.com

- **LEO L. ESSES**
  lesses@ctswlaw.com

- **BETH L. FANCSALI**
  bfancsali@edwardswildman.com,jwiltscheck@edwardswildman.com

- **STACEY SEXTON FARRELL**
  sfarrell@fieldshowell.com

- **KEVIN JOSEPH FEE**
  kfee@kvwmail.com,eslavina@kvwmail.com

- **CAROLYN H. FEENEY**
  carolyn.feeney@dechert.com

- **DAVID U. FIERST**
  dfierst@steinmitchell.com

- **IAN HOWARD FISHER**
  fisher@sw.com,central@sw.com,swcourts@yahoo.com

- **MARTIN FLUMENBAUM**
  mflumenbaum@paulweiss.com

- **ROBERT M. FOOTE**
  rmf@foote-meyers.com

- **GEORGE BENNET FORBES**
  gforbes@georgeforbeslaw.com,georgef@spevacklegalteam.com

- **CHARLENE P. FORD**
  cford@whatleydrake.com,ecf@whatleydrake.com

- **CHRISTOPHER G. FRETEL**
  cfretel@lcbf.com,lcbflit@lcbf.com

- **BRYCE L. FRIEDMAN**
  bfriedman@stblaw.com

- **JOHN B.M. FROHLING**
  jcfrohling@aol.com

- **FREDERICK P. FURTH**
  fpfurth@furth.com

- **KENNETH A. GALLO**
  kgallo@paulweiss.com

- **MICHAEL J. GARVEY**
  mgarvey@stblaw.com

- **RACHEL L. GERSTEIN**
  rgerstein@akingump.com,nymco@akingump.com

- **NEIL KEITH GILMAN**
  ngilman@hunton.com

- **KELLY M. GLYNN**
  glynn@sw.com,connor@sw.com

- **JAYNE ARNOLD GOLDSTEIN**
  jgoldstein@sfmslaw.com,pmauger@sfmslaw.com

- **ROBERT GERARD GOODMAN**
  rgg@palmisanogoodman.com,amk@palmisanogoodman.com

- **DAVID GRAIS**
  dgrais@graisellsworth.com

- **STEVEN J. GREENFOGEL**
  sgreenfogel@litedepalma.com,alee@litedepalma.com

- **MARK SCOTT GREGORY**
  mgregory@martinchioffi.com

- **MARC D. HAEFNER**
  mhaefner@connellfoley.com

- **SARAH EMILY HAGANS**
  sarahhagans@paulhastings.com

- **JAMES HALLOWELL**
  jhallowell@gibsondunn.com,aarias@gibsondunn.com

- **STEVEN P. HANDLER**
  shandler@mwe.com

- **DAVID HUGHES HARRIS**
  dhhesq@gmail.com

- **BARRY HASSELL**
  bhassell@cctb.com

- **PATRICK J. HENEGHAN**
  heneghan@sw.com,hadley@sw.com,central@sw.com,miner@sw.com,swcourts@yahoo.com

- **JOHN HERFORT**
  jherfort@gibsondunn.com,aarias@gibsondunn.com

- **MICHELLE T. HESS**
  michelle.hess@hklaw.com

- **KATHRYN P. HOEK**
  khoek@susmangodfrey.com

- **CHRISTOPHER R. HUNT**
  christopher.hunt@myfloridalegal.com

- **FRED TAYLOR ISQUITH**
  isquith@whafh.com

- **STEPHEN JACOBS**
  sjacobs@lcbf.com,lcbflit@lcbf.com

- **RACHEL LYNN JENSEN**
  rachelj@rgrdlaw.com,cmedici@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **KAREN LOUISE JONES**
  kjones@furth.com,gmgray@furth.com

- **EDITH M. KALLAS**
  ekallas@whatleykallas.com,ecf@whatleykallas.com

- **ROBERTA A. KAPLAN**
  rkaplan@paulweiss.com

- **JON STEPHEN KENNEDY**
  skennedy@bakerdonelson.com

- **ALAN L. KILDOW**
  alan.kildow@dlapiper.com

- **JON T. KING**
  jking@hausfeldllp.com

- **RANDI F. KNEPPER**
  rknepper@mdmc-law.com,cmcgough@mdmc-law.com

- **KYMBERLY KOCHIS**
  kkochis@nldhlaw.com

- **WILLIAM J. KOLASKY**
  william.kolasky@wilmerhale.com

- **KENNETH EMANUEL KRAUS**
  kraus@sw.com

- **LAYNE EDWIN KRUSE**
  lkruse@fulbright.com,skhan@fulbright.com,dkjackson@fulbright.com

- **DEVON MCKECHAN LARGIO**
  devon.largio@kirkland.com

- **DANIEL EDWARD LAYTIN**
  dlaytin@kirkland.com

- **DANIEL J. LEFFELL**
  dleffell@paulweiss.com

- **MICHAEL P. LEHMANN**
  mlehmann@hausfeldllp.com,clebsock@hausfeldllp.com

- **ADAM J LEVITT**
  levitt@whafh.com,leason@whafh.com

- **ROY H. LIDDELL**
  royliddell@wellsmar.com,jwilson@wellsmar.com

- **WENDY JEANNE LINDSTROM**
  wendy.lindstrom@wilsonelser.com

- **ALLYN ZISSEL LITE**
  alite@litedepalma.com,epalomino@litedepalma.com

- **KEVIN C. LOGUE**
  kevinlogue@paulhastings.com

- **THOMAS M. LOUIS**
  tlouis@wellsmar.com,spuckett@wellsmar.com

- **JEFFREY J. LOWE**
  jeff@jefflowepc.com,brenda@jefflowepc.com

- **STEPHEN V. MASTERSON**
  smasterson@glaserweil.com,aramos@glaserweil.com

- **MARY MCCANN**
  MMccann@cahill.com

- **JAMES G. MCCARNEY**
  jmccarney@sheppardmullin.com,NY-Docketing@sheppardmullin.com

- **MICHAEL LEE MCCLUGGAGE**
  mccluggage@wildmanharrold.com,radziwon@wildmanharrold.com

- **MICHAEL GLENN MCLELLAN**
  mmclellan@finkelsteinthompson.com

- **CARMEN A. MEDICI**
  cmedici@rgrdlaw.com

- **CARMEN A. MEDICI**
  cmedici@rgrdlaw.com,e_filesd_@rgrdlaw.com

- **WILLIAM F. MEGNA**
  wmegna@mmmlaw.com,kshaw@mmmlaw.com

- **ELLEN MERIWETHER**
  emeriwether@caffertyclobes.com

- **THOMAS R. MERRICK**
  tmerrick@rgrdlaw.com

- **SCOTT L. METZGER**
  metzger@dsmwlaw.com

- **KEITH J. MILLER**
  kmiller@rwmlegal.com

- **DENIS C. MITCHELL**
  dmitchell@steinmitchell.com

- **ROBERT F. MUSE**
  rmuse@steinmitchell.com

- **W. TIMOTHY NEEDHAM**
  tneedham@janssenlaw.com

- **DAVID MARC NIEPORENT**
  dnieporent@stein-firm.com,davidnieporent@gmail.com

- **ABIGAIL NITKA**
  abigail.nitka@wilsonelser.com

- **EAMON O'KELLY**
  okelly.eamon@arentfox.com

- **CASEY THOMAS O'NEILL**
  casey.oneill@shearman.com

- **DAVID H. OROZCO**
  dorozco@SusmanGodfrey.com

- **MARIO ANTHONY PACELLA**
  mpacella@stromlaw.com,dblount@stromlaw.com

- **ANNE JOHNSON PALMER**
  anne.johnsonpalmer@ropesgray.com,courtalert@ropesgray.com

- **PETER S. PEARLMAN**
  PSP@njlawfirm.com,gv@njlawfirm.com

- **NYRAN ROSE PEARSON**
  nrasche@caffertyclobes.com,snyland@caffertyclobes.com

- **MOLLY LEHR PEASE**
  mpease@graisellsworth.com

- **ROBERT HARDY PEES**
  rpees@akingump.com,nymco@akingump.com,abarnes@akingump.com

- **JOHN J. PENTZ**
  clasaxn@earthlink.net

- **RICHARD C. PEPPERMAN , II**
  peppermanr@sullcrom.com,breaud@sullcrom.com,s&cmanagingclerk@sullcrom.com

- **LAYN R. PHILLIPS**
  LPhillips@irell.com

- **RUSSELL PICCOLI**
  rxp@mwmf.com,carol.thorne@mwmf.com

- **Donald R. Pierson**
  fsturkish@aol.com

- **JULIO J. RAMOS**
  jramos@furth.com

- **LAZAR P. RAYNAL**
  lraynal@mwe.com,yporter@mwe.com

- **R. DOUGLAS REES**
  drees@jenner.com

- **SHAWN PATRICK REGAN**
  sregan@hunton.com

- **GREGORY M. REISER**
  gregory.reiser@wilmerhale.com

- **JONATHAN E. RICHMAN**
  jrichman@dl.com,courtalert@llgm.com

- **MARK C. RIFKIN**
  rifkin@whafh.com

- **ANDREA ROBINSON**
  andrea.robinson@wilmerhale.com,stacy.frazier@wilmerhale.com

- **DONALD A. ROBINSON**
  drobinson@rwmlegal.com,graffield@rwmlegal.com

- **BRIAN E. ROBISON**
  BRobison@gibsondunn.com,CFitzgerald@gibsondunn.com

- **TAMMY L. ROY**
  troy@cahill.com

- **ROBERT S. SCHACHTER**
  rschachter@zsz.com,wgonzalez@zsz.com

- **JOSEPH J. SCHIAVONE**
  jschiavone@budd-larner.com

- **WILLIAM G. SCHOPF**
  schopf@sw.com,miner@sw.com,swcourts@yahoo.com

- **JEFFREY T. SCOTT**
  scottj@sullcrom.com,s&cmanagingclerk@sullcrom.com

- **HOWARD J. SEDRAN**
  hsedran@lfsblaw.com

- **PATRICK SHEA**
  patrickshea@paulhastings.com

- **BARRY G. SHER**
  barrysher@paulhastings.com

- **PATRICK T. SHILLING**
  pshilling@stblaw.com,swilson@stblaw.com

- **BARBARA T. SICALIDES**
  sicalidesb@pepperlaw.com,bassmanb@pepperlaw.com

- **ROBERT A. SKINNER**
  robert.skinner@ropesgray.com,courtalert@ropesgray.com

- **LESLIE M. SMITH**
  lsmith@kirkland.com,nshea@kirkland.com

- **JENNIFER W. SPRENGEL**
  jsprengel@caffertyclobes.com

- **CHRISTOPHER J. ST. JEANOS**
  cstjeanos@willkie.com,mao@willkie.com

- **MAE AMELIA STILES**
  stiles.mae@arentfox.com

- **JOHN J. STOIA**
  johns@rgrdlaw.com,e_file_sd@rgrdlaw.com,tmerrick@rgrdlaw.com

- **JOSEPH PRESTON STROM**
  petestrom@stromlaw.com,dblount@stromlaw.com

- **BONNY ELAINE SWEENEY**
  bonnys@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **MICHAEL STEVEN TARRINGER**
  mtarringer@caffertyfaucher.com

- **JUSTIN MICHAEL TARSHIS**
  jtarshis@zsz.com,ssalvetti@zsz.com,ddrachler@zsz.com

- **JOHN L. THURMAN**
  thurman@ftlaw.net,alamberti@cahill.com,admin@ftlaw.net

- **JOHN M. TORIELLO**
  john.toriello@hklaw.com,glenn.huzinec@hklaw.com,elvin.ramos@hklaw.com

- **ROBERT W. TRENCHARD**
  robert.trenchard@wilmerhale.com

- **GEOFFREY A. VANCE**
  gvance@mwe.com

- **GENEVIEVE VOSE**
  gvose@susmangodfrey.com

- **LIZA M. WALSH**
  lwalsh@connellfoley.com,jbrandon@susmangodfrey.com,mhogan@connellfoley.com,tvanek@SusmanGodfrey.com

- **JENNIFER A. WATERS**
  waters@sw.com,connor@sw.com

- **HENRY WEISBURG**
  hweisburg@shearman.com

- **LEDA DUNN WETTRE**
  lwettre@rwmlegal.com

- **JOE R. WHATLEY**
  jwhatley@whatleykallas.com,ecf@whatleykallas.com

- **CAROLINE SPINDLER WHITTEMORE**
  cwhittemore@cahill.com

- **ALEXANDER W. WOOD**
  alexanderwood@paulhastings.com

- **MARGARET O'ROURKE WOOD**
  mwood@wolffsamson.com

- **FREDERICK BARTLETT WULFF , SR**
  bwulff@shacklaw.net

- **KATHRYN K. WYCOFF**
  kathryn.wycoff@lovells.com

- **RICHARD F. YARBOROUGH**
  ryarborough@bakerdonelson.com,jcraft@bakerdonelson.com

- **nefmednwk**
  njdnefmed@njd.uscourts.gov

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
GREGG           ABBOTT
COUNSEL NOT ADMITTED TO USDC-NJ BAR
OFFICE OF THE TEXAS ATTORNEY GENERAL
300 W. 15TH STREET
9TH FLOOR
AUSTIN, TX 78701

ROBERT          G. ABRAMS
HOWREY LLP
1299 PENNSYLVANIA AVE NW
WASHINGTON, DC 20004-2402

FRANCIS         A. ANANIA
COUNSEL NOT ADMITTED TO USDC-NJ BAR
ANANIA, BANDKLAYDER, BLACKWELL & BAUMGARTEN
NATIONSBANK TOWER
100 SE 2ND STREET
SUITE 4300
MIAMI, FL 33131-2144

JILL            CHRISTINE ANDERSON
COUNSEL NOT ADMITTED TO USDC-NJ BAR
FREEBORN & PETERS
311 SOUTH WACKER DRIVE
SUITE 3000
CHICAGO, IL 60606

ANASTASIA       ANGELOVA
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SULLIVAN & CROMWELL, LLP
125 BROAD STREET
NEW YORK, NY 10004

MARK            A. ARONCHICK
COUNSEL NOT ADMITTED TO USDC-NJ BAR
HANGLEY ARONCHICK SEGAL & PUDLIN
ONE LOGAN SQUARE
27TH FLOOR
PHILADELPHIA, PA 19103

ANDREW          D. ARONS
COUNSEL NOT ADMITTED TO USDC-NJ BAR
CHILDRESS, DUFFY & GOLDBLATT, LTD.
515 N. STATE STREET
```

```
SUITE 2200
CHICAGO, IL 60610
```

**VICTORIA      ASHWORTH**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
PAUL, HASTINGS, JANOFSKY & WALKER, LLP
75 EAST 55TH STREET
NEW YORK, NY 10022
```

**Aberfeldy Properties Inc.**
```
,
```

**GUY      BURDETTE BAILEY                              , JR**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BAILEY & DAWES, LC
CONTINENTAL PLAZA
3250 MARY STREET
SUITE 100
COCONUT GROVE, FL 33133-2623
```

**AMY      E. BARABAS**
```
CAHILL, GORDON & REINDELL, LLP
80 PINE STREET
NEW YORK, NY 10005-1702
```

**MARVIN      E. BARKIN**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
TRENAM, KEMKER, SCHARF, BARKIN, FRYE, O'NEILL & MULLIS,
101 E KENNEDY BOULEVARD
SUITE 2700
PO BOX 1102
TAMPA, FL 33601-1102
```

**MICHAEL      W. BAXTER**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
COPELAND, COOK, TAYLOR & BUSH
PO BOX 6020
RIDGELAND, MS 39158-6020
```

**P.      RYAN BECKETT**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
PO BOX 22567
JACKSON, MS 39225-2567
```

**OWEI      BELLEH**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BAILEY & DAWES, LC
CONTINENTAL PLAZA
3250 MARY STREET
SUITE 100
COCONUT GROVE, FL 33133-2623
```

**ANDREW      T. BERRY**
```
MCCARTER & ENGLISH, LLP
FOUR GATEWAY CENTER
100 MULBERRY STREET
PO BOX 652
NEWARK, NJ 07101-0652
```

**VINEET      BHATIA**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SUSMAN GODFREY LLP
1000 LOUISIANA STREET
SUITE 5100
HOUSTON, TX 77002
```

**DONALD      ARTHUR BLACKWELL**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
ANANIA, BANDKLAYDER, BLACKWELL & BAUMGARTEN
NATIONSBANK TOWER
100 SE 2ND STREET
SUITE 4300
MIAMI, FL 33131-2144
```

**JOHN      ARMANDO BOUDET**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
GREENBERG TRAURIG, PA
PO BOX 4923
ORLANDO, FL 32802-4923
```

**JEREMY      J BRANDON**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SUSMAN GODFREY, LLP
901 MAIN STREET
SUITE 4100
DALLAS, TX 77202-3775
```

**ROBIN      BREWER**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BONSIGNORE & BREWER
23 FOREST STREET
MEDFORD, MA 02155
```

**STEVEN      J BRODIE**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
CARLTON FIELDS, PA
4000 BANK OF AMERICA TOWER
100 SE 2ND STREET
PO BOX 19101
```

MIAMI, FL 33131-9101

**RUSSELL          THOMAS BURKE**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
NEXSEN PRUET JACOBS & POLLARD
PO DRAWER 2426
COLUMBIA, SC 29202

**KATHLEEN         CURRIE CHAVEZ**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
CHAVEZ LAW FIRM
 416 SOUTH SECOND STREET
GENEVA, IL 60134

**AUSTIN           B COHEN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106

**JEFFREY          MICHAEL COHEN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
CARLTON FIELDS
100 SE 2ND STREET
SUITE 4000
PO BOX 019101
MIAMI, FL 33131-9101

**GREGORY          K. CONWAY**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
WILLKIE, FARR & GALLAGHER, LLP
1875 K STREET NW
WASHINGTON, DC 20006-1238

**CHARLES          GREG COPELAND**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
COPELAND, COOK, TAYLOR & BUSH
PO BOX 6020
RIDGELAND, MS 39158-6020

**C.               LARRY CORBO                                    , III**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
JACKSON WALKER LLP
1401 MCKINNEY
SUITE 1900
HOUSTON, TX 77010

**CHRIS            S. COUTROULIS**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
CARLTON FIELDS, PA
4221 WEST BOY SCOUT BOULEVARD
SUITE 1000
TAMPA, FL 33607

**SHAFFIN          ABDUL DATOO**
THOMPSON WIGDOR & GILLY LLP
85 FIFTH AVENUE
NEW YORK, NY 10003

**DUSTIN           E DEESE**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
TRENAM, KEMKER, SCHRARF, BARKIN, FRYE, O'NEILL & MULLIS
101 E KENNEDY BOULEVARD
SUITE 2700
PO BOX 1102
TAMPA, FL 33601-1102

**MIRIAM           THERESA DOWD**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BINGHAM MCCUTCHEN, LLP
399 PARK AVENUE
NEW YORK, NY 10022

**ELTON            F DUNCAN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
DUNCAN, COURINGTON & RYDBERG
400 POYDRAS STREET
SUITE 1200
NEW ORLEANS, LA 70130

**DENIS            L. DURKIN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BAKER & HOSTETLER, LLP
200 S ORANGE AVENUE
SUITE 2300
PO BOX 112
ORLANDO, FL 32801

**MARCI            A EISENSTEIN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SCHIFF HARDIN, LLP
223 SOUTH WACKER DRIVE
660 SEARS TOWER
CHICAGO, IL 60606

**DAVID            T. EMANUELSON**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
HOWREY, LLP
321 N. CLARK STREET

```
SUITE 3400
CHICAGO, IL 60610
```

**MARY JANE          EDELSTEIN FAIT**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
WOLF HALDENSTEIN ADLER FREEMAN & HERTZ LLP
656 WEST RANDOLPH STREET
SUITE 500W
CHICAGO, IL 60661
```

**PAUL             L. FIELDS                              , JR**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
191 PEACHTREE STREET NE
SUITE 4600
ATLANTA, GA 30309
```

**MELODY           FORRESTER**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
MILLER, FAUCHER & CAFFERTY, LLP
ONE LOGAN SQUARE
18TH & CHERRY STREETS
SUITE 1700
PHILADELPHIA, PA 19103
```

**JAMES            E. FOSTER**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
AKERMAN SENTERFITT
255 S. ORANGE AVENUE
PO BOX 231
ORLANDO, FL 32802-0231
```

**THOMAS           A. FRENCH**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
DUNCAN, COURINGTON & RYDBERG
400 POYDRAS STREET
SUITE 1200
NEW ORLEANS, LA 70130
```

**MICHAEL          P. GEISER**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SUSMAN GODFREY LLP
1000 LOUISIANA STREET
SUITE 5100
HOUSTON, TX 77002
```

**NED              GELHAAR**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
HANCOCK, ROTHERT & BUNSHOFT, LLP
515 SOUTH FIRUEROA STREET
17TH FLOOR
LOS ANGELES, CA 90071
```

**CHRISTOPHER      C. GILBERT**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
UNGER LAW GROUP, PL
PO BOX 4909
ORLANDO, FL 32802-4909
```

**JUSTIN           M. GIOVANNELLI**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
CAHILL, GORDON & REINDEL, LLP
80 PINE STREET
NEW YORK, NY 10005
```

**H.               LEE GODFREY**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SUSMAN GODFREY, LLP
1000 LOUISIANA STREET
SUITE 5100
HOUSTON, TX 77002-5096
```

**RICHARD          C GODFREY**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
KIRKLAND & ELLIS LLP
200 E. RANDOLPH DRIVE
CHICAGO, IL 60601
```

**WILLIAM          F. GRACE**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
CHAFFE MCCALL
1100 POYDRAS STREET
SUITE 2300
NEW ORLEANS, LA 70163-2300
```

**M.               DUNCAN GRANT**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
PEPPER HAMILTON LLP
3000 TWO LOGAN SQUARE
18TH & ARCH STREETS
PHILADELPHIA, PA 19103-2799
```

**DAVID            C GUSTMAN**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
FREEBORN & PETERS
311 SOUTH WACKER DRIVE
SUITE 3000
CHICAGO, IL 60606
```

**RYAN             A. HAAS**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
```

CHILDRESS, DUFFY & GOLDBLATT, LTD.
515 N. STATE STREET
SUITE 2200
CHICAGO, IL 70610-8190

**WILLIAM        M HANNAY**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SCHIFF HARDIN LLP
223 SOUTH WACKER DRIVE
6600 SEARS TOWER
CHICAGO, IL 60606

**AMY        D HARMON**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
NEXSEN, PRUET, JACOBS & POLLARD
PO DRAWER 2426
COLUMBIA, SC 29202

**MICHAEL        S HILICKI**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BEELER, SCHAD & DIAMOND, PC
332 S. MICHIGAN AVENUE
SUITE 1000
CHICAGO, IL 60604

**KEVIN        F HORMUTH**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
GREENSFELDER & HEMKER
EQUITABLE BUILDING
10 SOUTH BROADWAY
SUITE 2000
ST LOUIS, MO 63102

**JEFFREY        D. HORST**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
KREVOLIN & HORST
1175 PEACHTREE STREET, NE
100 COLONY SQUARE
SUITE 2150
ATLANTA, GA 30361

**DEBORAH        E HYRB**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
PAUL HASTINGS, JANOFSKY & WALKER, LLP
1055 WASHINGTON BOULEVARD
9TH FLOOR
STAMFORD, CT 06901

**SAMUEL        BAYARD ISAACSON**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
DLA PUPER RUDICK GRAY CARY US LLP
203 N. LASALLE STREET
SUITE #1900
CHICAGO, IL 60603

**DANIEL        L. JOHNS**
WESTERVELT JOHNSON NICOLL & KELLER
FIRST FINANCIAL PLAZA
14TH FLOOR
411 HAMILTON BLDV
PEORIA, IL 61602-1114

**DANIEL        P. JORDAN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
PO BOX 22567
JACKSON, MS 39225-2567

**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**
CLERK OF THE PANEL
ONE COLUMBUS CIRCLE, NE
THURGOOD MARSHALL FEDERAL JUDICIARY BUIDLING
ROOM G-255 - NORTH LOBBY
WASHINGTON, DC 20002-8004

**STEVEN        A. KANNER**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
MUCH, SHELIST, FREED, DENENBERG, AMENT & RUBENSTEIN, PC
191 N. WACKER DRIVE
SUITE 1800
CHICAGO, IL 60606

**TONY        KIM**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BEELER, SCHAD & DIAMOND, PC
332 S. MICHIGAN AVENUE
SUITE 1000
CHICAGO, IL 60604

**RACHEL        ROSS KRAUSE**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
OGDEN & SULLIVAN, PA
113 S ARMEIA AVENUE
TAMPA, FL 33609

**ROBERT        J KRISS**
COUNEL NOT ADMITTED TO USDC-NJ BAR
MAYER, BROWN, ROWE & MAW LLP
190 S. LASALLE STREET
CHICAGO, IL 60603

**EDWIN          MICHAEL LARKIN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
VENABLE LLP
1270 AVENUE OF THE AMERICAS, 25TH FL
NEW YORK, NY 10020

**THOMAS          LARKIN**
1 SHELDRAKE LANE
PALM BEACH GARDENS, FL 33418

**ELIZABETH          A. LARSEN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP
200 E. RANDOLPH DRIVE
CHICAGO, IL 60601

**ANDREA          J. LAWRENCE**
COHEN TAUBER SPIEVACK & WAGNER P.C.
420 LEXINGTON AVENUE
24TH FLOOR
NEW YORK, NY 10170

**CHRISTOPHER          L. LEBSOCK**
HAUSFELD LLP
44 MONTGOMERY STREET, SUITE 3400
SAN FRANCISCO, CA 94111

**PETER          S. LINDEN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
KIRBY MCINERNEY LLP
825 THIRD AVENUE
16TH FLOOR
NEW YORK, NY 10022

**WILLIAM          HENRY LONDON**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
MUCH, SHELIST, FREED, DENENBERG, AMENT & RUBENSTEIN, PC
191 N. WACKER DRIVE
SUITE 1800
CHICAGO, IL 60605-1615

**ERIC          NEAL MACEY**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
NOVACK & MACEY, LLP
303 WEST MADISON STREET
SUITE 1500
CHICAGO, IL 60606

**NEAL          S. MANNE**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SUSMAN GODFREY, LLP
1000 LOUISIANA STREET
SUITE 5100
HOUSTON, TX 77002-5096

**GREGORY          L. MAST**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
FIELDS, HOWELL, ATHANS & MCLAUGHLIN
ONE MIDTOWN PLAZA
SUITE 800
1360 PEACHTREE STREET
ATLANTA, GA 30309

**H.          ALAN MCCALL**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
STOCKWELL SIEVERT
PO BOX 2900
LAKE CHARLES, LA 70601

**FREDRICK          H. MCCLURE**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
PIP RUDNICK LLP
101 E. KENNEDY BOULEVARD
SUITE 2000
TAMPA, FL 33602-5148

**DONNA          L. MCDEVITT**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
333 WEST WACKER DRIVE
SUITE 2100
CHICAGO, IL 60606

**JENNIFER          BATES MCINTYRE**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
PERKINS COIE LLC
131 SOUTH DEARBORN
SUITE 1700
CHICAGO, IL 60603-5559

**JOHN          R. MIDDLETON**
LOWENSTEIN SANDLER, PC
65 LIVINGSTON AVENUE
ROSELAND, NJ 07068

**DOUGLAS          A. MILLEN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
MUCH, SHELIST, FREED, DENENBERG, AMENT & RUBENSTEIN, PC
191 N. WACKER DRIVE

```
SUITE 1800
CHICAGO, IL 60605-1615

MICHELE        A. MILLER
WESTERVELT JOHNSON NICOLL & KELLER
FIRST FINANCIAL PLAZA
14TH FLOOR
411 HAMILTON BLVD
PEORIA, IL 61602-1114

DONALD         JAMES MOONEY
ULMER & BERNE
NOT ADMITTED TO THE NJ BAR
600 VINE STREET
SUITE 2800
CINCINNATI, OH 45202-2409

TIMOTHY        ALAN NELSEN
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
333 WEST WACKER DRIVE
SUITE 2100
CHICAGO, IL 60606

DARREN         K. NELSON
COUNSEL NOT ADMITTED TO USDC-NJ BAR
PARR, WADDOUPS, BROWN, GEE & LOVELESS
185 S STATE STREET
SUITE 1300
PO BOX 11019
SALT LAKE CITY, UT 84111

KEVIN          F. O'MALLEY
COUNSEL NOT ADMITTED TO USDC-NJ BAR
GREENSFELDER & HEMKER
EQUITABLE BUILDING
10 SOUTH BROADWAY
SUITE 2000,
ST LOUIS, MO 63102

ROSEANN        OLIVER
COUNSEL NOT ADMITTED TO USDC-NJ BAR
PERKINS COIE LLC
131 S. DEARBORN
SUITE 1700
CHICAGO, IL 60603-5559

JOHN           ROBERT OLLER
COUNSEL NOT ADMITTED TO USDC-NJ BAR
WILKIE, FARR & GALLAGHER, LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019-6099

DANIEL         A. OSBORN
BEATIE & OSBORN LLP
521 FIFTH AVENUE
34TH FLOOR
NEW YORK, NY 10175

BRIAN          J OSIAS
MCCARTER & ENGLISH, LLP
,

BENJAMIN       R. OSTAPUK
COUNSEL NOT ADMITTED TO USDC-NJ BAR
KIRKLAND & ELLIS LLP
555 CALIFORNIA STREET
SAN FRANCISCO, CA 94104

HOUSTON        S. PARK                              , III
COUNSEL NOT ADMITTED TO USDC-NJ BAR
STEPHENS, LYNN, KLEIN, LA CAVA, HOFFMAN
NORTHBRIDGE CENTER
515 N. FLAGLER DRIVE
SUITE 1600
WEST PALM BEACH, FL 33401-4390

ROBERT         M. PARKER
COUNSEL NOT ADMITTED TO USDC-NJ BAR
PARKER CLAYTON
100 E. FERGUSON
SUITE 1114
TYLER, TX 75702

RONALD         RICHARD PARRY
PARRY DEERING FUTSCHER & SPARKS PSC
NOT ADMITTED TO NEW JERSEY BAR
411 GARRARD STREET
P.O. BOX 2618
COVINGTON, KY 41012-2618

GREGORY        J. PHILLIPS
ULMER & BERNE LLP
NOT ADMITTED TO THE NJ BAR
1660 WEST 2ND STREET
SUITE 1100
CLEVELAND, OH 44113

CARL           H POCDTKE
COUNSEL NOT ADMITTED TO USDC-NJ BAR
```

DLA PIPER RUDNICK GARY CARY US LLP
203 N. LASALLE STREET
SUITE 1900
CHICAGO, IL 60601

**ALAN**                **SETH RABINOWITZ**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SHEARMAN & STERLING LLP
599 LEXINGTON AVENUE
NEW YORK, NY 10022

**L.**                  **JANE RAY**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SUSMAN GODFREY, LLP
1000 LOUISIANA STREET
SUITE 5100
HOUSTON, TX 77002-5096

**JAMES**               **L REED**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
LOOPER REED & MCGRAW
1300 POST OAK BOULEVARD
SUITE 2000
HOUSTON, TX 77056

**ANDREW**              **M REIDY**
HOWREY LLP
1299 PENNSYLVANIA AVE NW
WASHINGTON, DC 20004-2402

**PAUL**                **JEFFREY RIEHLE**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SEDGWICK DETERT MORAN & ARNOLD
ONE EMBARCADERO CENTER
 16TH FLOOR
SAN FRANCISCO, CA 94111-3628

**JESSICA**             **G ROUX**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
DUNCAN, COURINGTON & RYDBERG
400 POYDRAS STREET
SUITE 1200
NEW ORLEANS, LA 70130

**THOMAS**              **LOUIS RUFFNER**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
HOWREY LLP
321 NORTH CLARK STREET
SUITE 3400
CHICAGO, IL 60610

**GEOFFREY**            **C. RUSHING**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SAVERI & SAVERI
706 SANSOME STREET
SAN FRANCISCO, CA 94111

**ALAN**                **N. SALPETER**
COUNEL NOT ADMITTED TO USDC-NJ BAR
190 SOUTH LASALLE STREET
39TH FLOOR
CHICAGO, IL 60603

**ELIZABETH**           **BARRY SANDZA**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
LEBOEUF, LAMB, GREENE & MACRAE, LLP
1101 NEW YORK AVE., NW
SUITE 1100
WASHINGTON, DC 20005-4213

**GUIDO**               **SAVERI**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SAVERI & SAVERI, INC.
706 SANSOME STREET
SAN FRANCISCO, CA 94111

**RICHARD**             **ALEXANDER SAVERI**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SAVERI & SAVERI, INC.
706 SANSOME STREET
SAN FRANCISCO, CA 94111

**LAWRENCE**            **WILEY SCHAD**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BEELER, SCHAD & DIAMOND, PC
332 SOUTH MICHIGAN AVENUE
SUITE 1000
CHICAGO, IL 60604

**KEVIN**               **R.J. SCHROTH**
Cole, Schotz, Meisel, Forman & Leonard
900 Third Avenue
16th Floor
NEW YORK, NY 10022

**STEPHEN**             **W SCHWAB**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
DLA PIPER RUDICK GRAY CARY US LLP
203 NORTH LASALLE STREET
SUITE #1900

```
CHICAGO, IL 60601-1293
```

**JEFFREY          R. SEELY**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SUSMAN GODFREY, LLP
1000 LOUISIANA STREET
SUITE 5100
HOUSTON, TX 77002
```

**KELLEY          SEVIN**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
DUNCAN, COURINGTON & RYDBERG
400 POYDRAS STREET
SUITE 1200
NEW ORLEANS, LA 70130
```

**PAULA          G. SHAKELTON**
```
ULMER & BERNE LLP
NOT ADMITTED TO THE NJ BAR
1660 WEST 2ND STREET
SUITE 1100
CLEVELAND, OH 44113
```

**JAMES          S. SHEDDEN**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BELLER, SCHAD & DIAMOND, PC
332 S. MICHIGAN AVENUE
SUITE 1000
CHICAGO, IL 60604
```

**PHILIP          RITCHEY SIMS**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
CHAFFE MCCALL
1100 POLYDRAW STREET
SUITE 2300
NEW ORLEANS, LA 70163-2300
```

**DAVID          ANTHONY SIRNA**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
KREVOLIN & HORST
1175 PEACHTREE STREET, NE
100 COLONY SQUARE
SUITE 2150
ATLANTA, GA 30361
```

**J. ANDREW          SJOBLOM**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
HOLME, ROBERTS & OWEN, LLP
299 SOUTH MAIN STREET
SUITE 1800
SALT LAKE CITY, UT 84111-2263
```

**ALAN          PATRICK SMITH**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
CAHILL, GORDON & REINDEL, LLP
80 PINE STREET
NEW YORK, NY 10005
```

**LAYALIZA          KLEIN SOLOVEICHIK**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019
```

**FREDERIC          STANLEY                    , JR**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
STANLEY, DEHLINGER & RASCHER
260 MAITLAND AVENUE
SUITE 1500
ALTAMONTE SPRINGS, FL 32701
```

**JILL          M. STEINBERG**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ
FIRST TENNESSEE BANK BUILDING
165 MADISON AVENUE
SUITE 2000
MEMPHIS, TN 39103
```

**RICHARD          L. STONE**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
KIRBY MCINERNEY LLP
825 THIRD AVENUE
16TH FLOOR
NEW YORK, NY 10022
```

**LISA          COLLEEN SULLIVAN**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
HOWREY, SIMON, ARNOLD & WHITE, LLP
321 NORTH CLARK STREET
SUITE 3400
CHICAGO, IL 60610
```

**TIMON          V SULLIVAN**
```
COUNSEL NOT ADMITTED TO USDC-NJ BAR
OGDEN & SULLIVAN, PA
113 S ARMENIA AVENUE
TAMPA, FL 33609-1006
```

**SUPREME AUTO TRANSPORT, LLC**

,

**GRETHCHEN        S. SWEEN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SUSMAN GODFREY, LLP
901 MAIN STREET
SUITE 4100
DALLAS, TX 77202-3775

**VIRGINIA         B. TOWNES**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
AKERMAN SENTERFITT
255 S. ORANGE AVENUE
17TH FLOOR
PO BOX 231
ORLANDO, FL 32802-6610

**KENNETH          I. TRUJILLO**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
1717 ARCH STREET
SUITE 3838
PHILADELPHIA, PA 19103

**STEPHEN          TSAI**
,

**MICHAEL          N. UNGAR**
ULMER & BERNE LLP
NOT ADMITTED TO THE NJ BAR
1660 WEST 2ND STREET
SUITE 1100
CLEVELAND, OH 44113-1448

**MARTIN           B. UNGER**
UNGER LAW GROUP, PL
PO BOX 4909
ORLANDO, FL 32802-4909

**JOHN             L. WARDEN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SULLIVAN & CROMWELL
125 BROAD STREET
NEW YORK, NY 10004

**JAMES            PAUL WEHNER**                    **, JR**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SQUIRE, SANDERS & DEMPSEY, LLP
1201 PENNSYLVANIA AVENUE NW
PO BOX 407
WASHINGTON, DC 20044-0407

**IRA              E. WEINER**
66 PARK STREET
MONTCLAIR, NJ 07042

**DOROTHY          L. WHITE-COLEMAN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
WHITE, COLEMAN & ASOCIATES, LLC
ONE FINANCIAL PLAZA
500 WASHINGTON AVENUE
SUITE 1080
ST. LOUIS, MO 63101-1236

**RENEE            WICKLUND**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
KIRKLAND & ELLIS, LLP
200 EAST RANDOLPH STREET
CHICAGO, IL 60601

**JONATHAN         MICHAEL WILAN**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
HUNTON & WILLIAMS LLP
1900 K STREET NW
WASHINGTON, DC 20006

**MARGUERITE       S. WILLIS**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
NEXSEN, PRUET, JACOBS & POLLARD
PO DRAWER 2426
COLUMBIA, SC 29202

**JACK             LOUIS WUERKER**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SQUIRE, SANDERS & DEMPSEY, LLP
8000 TOWERS CRESCENT DRIVE
14TH FLOOR
VIENNA, VA 22182

**RICHARD          B. ZABEL**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
AKIN, GUMP, STRAUSS, HAVER & FELD, LLP
590 MADISON AVENUE
42ND FLOOR
NEW YORK, NY 10022

**CADIO            ZIRPOLI**
COUNSEL NOT ADMITTED TO USDC-NJ BAR
SAVERI & SAVERI
706 SANSOME STREET
SAN FRANCISCO, CA 94111