# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------------

| | |
|---|---|
| IN RE:  INSURANCE BROKERAGE ANTITRUST LITIGATION | :  **MDL No. 1663** |
| | : |
| | : |
| This Document Relates to: | :  **Master Docket 04-cv-5184** |
| | : |
| *Lincoln Adventures, LLC, et al. v. Certain* | : |
| *Underwriters of Lloyd's of London, et al.,* | : |
| Civ. No. 2:08-cv-00235- CCC-PS | :  **Return Date:  Feb. 19, 2013** |
| | : |

-------------------------------------------------------------

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
CERTAIN UNDERWRITERS AT LLOYD'S MOTION TO DISMISS
THE REVISED FIRST AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ..................................................................................... 5

    A.   Plaintiffs' Tag-Along Action and Amended Complaint ............... 5

    B.   The Third Circuit Decision............................................................ 9

    C.   The Lloyd's Insurance Marketplace............................................ 10

ARGUMENT ........................................................................................ 12

I.    PLAINTIFFS' ANTITRUST CLAIM MUST BE DISMISSED
    BECAUSE IT IS INDISTINGUISHABLE FROM THOSE THE
    THIRD CIRCUIT REJECTED ....................................................... 14

    A.   Allegations of Parallel Broker-Syndicate Contingent
        Commission Agreements Do Not Plausibly Allege a
        Horizontal Agreement Among the Syndicates............................ 14

    B.   Plaintiffs Fail In Their Attempts To Avoid The Third Circuit
        Decision...................................................................................... 18

        1.   The Amended Complaint Fails to Plead Facts Sufficient
            to Show that the Lloyd's Marketplace Structurally
            Violates the Sherman Act...................................................... 18

            a.   Lloyd's Structure and Communication Among
                Syndicates .................................................................. 19

            b.   Binding Authority Agreements.................................... 22

        2.   The Amended Complaint's Threadbare Allegations of Bid
            Rigging Do Not Cure Plaintiffs' Failure to Allege a
            Horizontal Agreement......................................................... 26

        3.   The Amended Complaint Does Not State a Claim for
            Vertical Restraints Under a Rule-of-Reason Analysis......... 29

        4.   Plaintiffs' Allegations of a London-Based Conspiracy Fail
            to Plead Facts to Support this Court's Subject Matter
            Jurisdiction under the FTAIA ............................................. 33

    C.   Plaintiffs Fail To Satisfy the Heightened Pleading Standard

i

**TABLE OF CONTENTS (continued)**

**Page**

Under Rule 9(b) ....................................................................... 35

II.    THE THIRD CIRCUIT DECISION REQUIRES DISMISSAL OF
       PLAINTIFFS' RICO COUNT ......................................................... 37

       A.    Plaintiffs Fail Adequately To Plead A RICO Enterprise ............ 38

       B.    Plaintiffs Fail Adequately to Allege that the Syndicates
             Conducted Any Enterprise .......................................................... 41

       C.    Plaintiffs' Allegations Regarding the "Lloyd's Enterprise" Are
             Inadequate .................................................................................. 43

       D.    Plaintiffs Fail Adequately To Allege a Pattern of Racketeering
             Activity ....................................................................................... 45

III.   THE STATE LAW CLAIMS SHOULD BE DISMISSED ................. 50

CONCLUSION ............................................................................................ 50

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Animal Sci. Prod., Inc. v. China Minmetals Corp.*,
   654 F.3d 462 (3d Cir. 2011), *cert denied*, 132 S. Ct. 1744 (2012)......... 34, 35

*Arista Records LLC v. Lime Group LLC*,
   532 F. Supp. 2d 556 (S.D.N.Y. 2007) ........................................................ 20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................... 12, 13, 27

*Banxcorp v. Apax Partners, L.P.*,
   No. 10-Civ-4769 (SDW), 2011 WL 1253892
   (D.N.J. Mar. 28, 2011)............................................................................ 36, 37

*Beck v. Prupis*,
   529 U.S. 494 (2000)................................................................................ 45, 50

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................ *passim*

*Borough of West Mifflin v. Lancaster*,
   45 F.3d 780 (3d Cir. 1995) ......................................................................... 50

*Boyle. v. United States*, 556, U.S. 938, 946 (2009)  .................................... 38, 39

*CareOne, LLC v. Burris*,
   No. 10-Civ-2309, 2011 WL 2623503
   (D.N.J. June 28, 2011) ............................................................................... 47

*Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*,
   177 F.3d 210 (3d Cir. 1999) ....................................................................... 11

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984)..................................................................................... 21

*Damiano v. Sony Music Entm't*,
   975 F. Supp. 623 (D.N.J. 1996).................................................................. 46

# TABLE OF AUTHORITIES (continued)

**Page**

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ........................................................... 16, 32, 33

*E. & G. Gabriel v. Gabriel Bros., Inc.*,
   No. 93-Civ-0894, 1994 U.S. Dist. LEXIS 9455
   (S.D.N.Y. July 12, 1994) .............................................................................. 31

*E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*,
   160 F.3d 925 (2d Cir. 1998) ........................................................................ 11

*Elsevier Inc. v. W.H.P.R., Inc.*,
   692 F. Supp. 2d 297 (S.D.N.Y. 2010) ................................................... 39, 41

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
   542 U.S. 155 (2004) ..................................................................................... 34

*Gordon v. Lewistown Hosp.*,
   423 F.3d 184 (3rd Cir. 2005) ....................................................................... 32

*Grant v. Turner*,
   No. 09-Civ-2381(GEB), 2011 WL 1775682
   (D.N.J. May 9, 2011), *aff'd in part, vacated in part by*,
   2012 WL 5928145 (D.N.J. Nov. 27, 2012) ........................................... 48, 49

*Great Lakes Dredge & Dock Co. v. Commercial Union Assurance Co.*,
   57 F. Supp. 2d 525 (N.D. Ill. 1999), *aff'd in part, vacated in part by*
   *Great Lakes Dredge & Dock Co. v. City of Chicago*,
   260 F.3d 789 (7th Cir. 2001) .................................................................. 11, 12

*Hinds County, Miss. v. Wachovia Bank N.A.*,
   620 F. Supp. 2d 499 (S.D.N.Y. 2009) .......................................................... 21

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) .......................................................................... 21

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004) ........................................................................ 15

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ....................................................... 20

# TABLE OF AUTHORITIES (continued)

**Page**

*In re Insurance Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ................................................................ *passim*

*In re Insurance Brokerage Antitrust Litig.*,
    Nos. 04-Civ-5184 (FSH), 04-Civ-1079(FSH),
    2006 WL 2850607 (D.N.J. Oct. 3, 2006) ..................................................... 13

*In re Insurance Brokerage Antitrust Litig.*,
    Nos. 04-Civ-5184 (GEB), 05-Civ-1079(GEB),
    2007 WL 1100449 (D.N.J. Apr. 5, 2007),..................................................... 13

*In re Insurance Brokerage Antitrust Litig.*,
    Nos. 04-Civ-5184(GEB), 05-Civ-1079(GEB),
    2007 WL 2892700 (D.N.J. Sept. 28, 2007),
    *aff'd in part, vacated in part*, 618 F.3d 300 (3d Cir. 2010)................. *passim*

*In re Pharmacy Benefit Managers Antitrust Litig.*,
    582 F.3d 432 (3d Cir. 2009) ......................................................................... 14

*In re Proposed Acquisition of Control of or Merger with Travelers
    Property Casualty Corp. by The St. Paul Cos., Inc.*,
    No. EX 04-20, at 28-31 (Conn. Ins. Dept. Mar. 2, 2004)............................ 31

*In re Schering-Plough Corp Intron/Temodar Consumer Class Action*,
    No. 06-Civ-5774(SRC), 2009 WL 2043604 (D.N.J. July 10, 2009)........... 49

*Inst. Investors Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ......................................................................... 36

*Int'l Transp. Mgmt. Corp. v. Brooks Fitch Apparel Group, LLC*,
    No. 11-Civ-1921(DMC), 2012 WL 295847 (D.N.J. Feb. 1, 2012).............. 48

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) , *abrogated on other grounds*,
    *Illinois Tool Works Inc. v. Independent Ink, Inc.*,
    547 U.S. 28 (2006)........................................................................................ 32

*Jennings v. Emry*,
    910 F.2d 1434 (7th Cir. 1990) ..................................................................... 45

## TABLE OF AUTHORITIES (continued)

**Page**

*Lum v. Bank of Am.*,
361 F.3d 217 (3d Cir. 2004) ................................................................ *passim*

*Maio v. Aetna, Inc.*,
221 F.3d 472 (3d Cir. 2000) ........................................................ 49

*Medtech Prods. Inc. v. Ranir, LLC*,
596 F. Supp. 2d 778 (S.D.N.Y. 2008) .................................................... 27, 35

*Muti v. Schmidt*,
96 F.App'x 69 (3d Cir. Apr. 21, 2004), *superceded by*,
118 F.App'x 646 (3d Cir. 2004) ................................................ 23

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.*,
93-Civ-07493, 1995 WL 632031 (N.D. Ill. Oct. 25, 1995),
*aff'd*, 103 F.3d 42 (7th Cir. 1996) ................................................ 33

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ........................................................ 27

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) ........................................................ 31

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*,
899 F.2d 951 (10th Cir. 1990) ........................................................ 31

*Redtail Leasing Inc. v. Bellezza*,
No. 95-Civ-5191(JFK), 1997 WL 603496
(S.D.N.Y. Sept. 30, 1997) ........................................................ 42, 43

*Reves v. Ernst & Young*,
505 U.S. 170 (1993) ........................................................ 41, 43

*Roby v. Corp. of Lloyd's*,
796 F. Supp. 103 (S.D.N.Y. 1992) ........................................................ 11

*Rolo v. City Investing Co. Liquidating Trust*,
155 F.3d 644 (3d Cir. 1998),
*abrogation on other grounds recognized*,
*Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2000) ........................................ 47

iv

## TABLE OF AUTHORITIES (continued)

**Page**

*Schafer v. State Farm Fire & Cas. Co.*,
   507 F. Supp. 2d 587 (E.D. La. 2007).............................................................. 21

*Schoenbaum v. E.I. Dupont De Nemours & Co.*,
   517 F. Supp. 2d 1125 (E.D. Mo. 2007) ....................................................... 46

*Spanish Broad. Sys. Of Fla. v. Clear Channel Commc'ns, Inc.*,
   376 F.3d 1065 (11th Cir. 2004) ..................................................... 30

*Texaco, Inc. v. Dagher, et al.*,
   547 U.S. 1 (2006)........................................................................ 25

*Tunis Bros. Co., Inc. v. Ford Motor Co.*,
   952 F.2d 715 (3d Cir. 1991) ................................................ 29, 30

*TV Comms. Network, Inc. v. Turner Network Television, Inc.*,
   964 F.2d 1022 (10th Cir. 1992) ..................................................... 31

*United States v. UnitedHealth Group, Inc.*,
   No. 05-Civ-02436 at 4-6 (D.D.C. Mar. 3, 2006)........................................ 31

*Univ. of Md. v. Peat, Marwick, Main, Co.*,
   996 F.2d 1534 (3d Cir. 1993) ........................................ 42, 43, 44

*Urdinaran v. Aarons*,
   115 F. Supp. 2d 484 (D.N.J. 2000).............................................. 32

*V.E.C. Corp. of Delaware v. Hilliard*,
   No. 10-Civ-2542, 2012 WL 4051293 (S.D.N.Y. Sept. 14, 2012)................ 27

*Warden v. McLelland*,
   288 F.3d 105 (3d Cir. 2002) .................................................. 37, 47

### STATUTES AND RULES

15 U.S.C. § 1 ............................................................................. *passim*

15 U.S.C. § 6a .............................................................................. 33, 34

18 U.S.C. § 1961 .................................................................. 37, 45, 46

## TABLE OF AUTHORITIES (continued)

**Page**

18 U.S.C. § 1962...........................................................................*passim*

28 U.S.C. § 1367 .................................................................................... 50

Fed. R. Civ. P. 9 .......................................................................*passim*

Fed. R. Civ. P. 8 .................................................................. 26, 27, 36

**OTHER AUTHORITIES**

Gregory P. Joseph, *Civil RICO: A Definitive Guide* 106
   (3d ed. 2010) ................................................................................ 41

The Certain Underwriters at Lloyd's, London named as defendants in the above-referenced putative class action (the "Syndicates") respectfully submit this memorandum in support of their motion to dismiss the Revised First Amended Class Action Complaint of Plaintiffs Lincoln Adventures, LLC and Michigan Multi-King (the "Amended Complaint"), Dkt. No. 2312.[1]

## PRELIMINARY STATEMENT

As this Court is well aware, this multi-district litigation arises from suits filed on the heels of investigations by U.S. regulators into (i) the payment of so-called "contingent commissions" by many major U.S. insurers to insurance brokers and (ii) alleged "bid rigging" by a small subset of U.S. insurers and brokers in one line of business, excess casualty. The present action is among the later-filed "tag-along" actions in which Plaintiffs assert substantially the same antitrust, RICO, and related state-law claims alleged in the original "commercial" action. Plaintiffs' theories have already been exhaustively briefed, considered and rejected in this Court and by the Third Circuit. As recently as 2010, the Third Circuit affirmed the dismissal of these same claims when alleged against U.S.-based insurers. *See In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) (the "Third Circuit Decision"). Plaintiffs' allegations differ from those that were rejected by

---

[1] The twenty-three defendants in *Lincoln Adventures*, all of which join this motion, are Lloyd's Syndicates 33, 102, 382, 435, 510, 570, 609, 623, 727, 958, 1003, 1084, 1096, 1183, 1245, 1886, 2001, 2003, 2020, 2488, 2623, 2791, and 2987. Am. Compl. ("AC") ¶¶ 36-58.

the Third Circuit only in that these Plaintiffs challenge conduct in London.  As this distinction does not change the substantive analysis at all, the Third Circuit's comprehensive 2010 decision controls and requires dismissal of Plaintiffs' Amended Complaint.

Here, Plaintiffs allege the same scheme rejected by the Third Circuit.  As in the "commercial" class action, Plaintiffs allege that the Syndicates (1) participated in an unlawful scheme with each other and certain insurance brokers to allocate the market for insurance among the Syndicates and (2) rewarded the brokers with contingent commission payments.  As a result, Plaintiffs contend, insureds allegedly paid higher premiums.  The Third Circuit rejected this supposed "hub-and-spoke" theory as insufficient absent plausible allegations of any anti-competitive agreement between the insurers.  Mere parallel conduct, with insurers behaving consistently with their individual interests in a competitive market, did not plausibly imply an actionable horizontal agreement.  Just as the Third Circuit previously held, Plaintiffs' allegations are inadequate as a matter of law.

Plaintiffs' efforts to evade the conclusion that the present allegations fall squarely within the Third Circuit Decision are meritless.

### 1.    Failed Antitrust Arguments

*First*, Plaintiffs contend that the Lloyd's marketplace is itself a "structural conspiracy."  This characterization does not rest on any specific transactions

between the Syndicates, but rather on long-established and accepted practices, such as face-to-face broking of insurance in a common room.  Plaintiffs also rely on features of the insurance business that are not unique to Lloyd's, such as the use of subscription policies, the delegation in some instances of underwriting authority to a third party in so-called "coverholder" agreements, and the existence of trade groups and industry organizations.   None of these forms of doing business demonstrates price fixing, market allocation, or bid rigging.  The Third Circuit considered these arguments regarding American-based insurers and rejected them because it is well recognized that an *opportunity* to conspire – in the absence of specific facts showing actual conspiracy – does not state a claim on which antitrust relief can be granted.  The structure and operation of Lloyd's, and the interactions of the Syndicates there, do not differ from the U.S. insurance market in any material way that takes this case outside the Third Circuit's reasoning.

*Second*, Plaintiffs also attempt to evade the Third Circuit Decision by alleging *vertical* restraints of trade.  However, the Amended Complaint does not plead sufficient facts to satisfy the required "rule of reason" analysis applicable to alleged vertical restraints, which requires Plaintiffs to come forward in their pleading with plausible factual allegations showing market power and adverse, anti-competitive effects in the relevant product and geographic market.   The Amended Complaint does not.  Plaintiffs instead rely on insufficient and cursory

assertions of anticompetitive effects and inadequate and unfounded allegations of market power that come nowhere near meeting the pleading standard.

*Third,* Plaintiffs attempt to invoke the sole antitrust theory that the Third Circuit found potentially actionable – the bid rigging allegations involving Marsh and certain U.S. excess casualty insurers.  Plaintiffs attempt to allege collusion in London, but simply parrot the allegations from the commercial class complaint regarding isolated alleged instances of bid rigging in Marsh's U.S. operations, none of which involved the Syndicates in any way.   Plaintiffs rest on the unsupported assertion based on "information and belief" that the same thing must have been occurring in London.  These conclusory allegations, devoid of any facts whatsoever to suggest bid rigging in London, are inadequate to survive dismissal.

*Finally,* Plaintiffs' claims must be dismissed for the additional reason that they fail to plead facts to meet the requirements of the Foreign Trade Antitrust Improvements Act ("FTAIA").

### 2.     Failed RICO Arguments

Plaintiffs' RICO claims likewise fail.  Plaintiffs' allegations again mimic the claims that the Third Circuit already rejected.  Just as in the commercial class case, Plaintiffs here fail to allege horizontal collusion between the Syndicates, thus dooming the alleged RICO enterprise.  Moreover, Plaintiffs' allegations fail to adequately allege the conduct of the alleged enterprise, a nexus between the

alleged predicate acts and the conduct of the enterprise, or a pattern of racketeering activity, all of which this Court held required the dismissal of the commercial class action.  Plaintiffs' allegations as to Lloyd's do not save their claims.  Additionally, Plaintiffs fail to adequately specify an actionable injury under RICO.

### 3.     Failure to Plead with Particularity

Further, because it sounds in fraud, the Amended Complaint should be dismissed because it fails to meet the heightened pleading standard set by Fed. R. Civ. P. 9.  Plaintiffs do not detail when any allegedly fake bid or fraudulent mailing occurred, what exactly it was or how it happened, or even which of the 23 Syndicate defendants allegedly was responsible for such conduct.

### 4.     Failure of State Law Claims

Because the Third Circuit Decision applies equally to Plaintiffs' Amended Complaint, all federal law claims must be dismissed, and the Court should decline to exercise supplemental jurisdiction over the remaining state law claims.

## BACKGROUND

### A.     Plaintiffs' Tag-Along Action and Amended Complaint

This tag-along action was filed in the Southern District of Florida in July 2007 and transferred to this Court to join these MDL proceedings in January 2008. *Lincoln Adventures* thus arrived in the MDL after the dismissal of the antitrust and RICO counts in the Class Plaintiffs' Second Consolidated Amended Commercial

Class Action Complaint (the "Commercial Complaint" or "MDL SAC"), Dkt. No. 1240, in August and September 2007.  As a result, *Lincoln Adventures* was subject to the Court's stay of proceedings pending the appeal of those rulings to the Third Circuit.  Following the Third Circuit Decision, the Court lifted the stay (Dkt. No. 1922), entered its May 4, 2012 scheduling order (Dkt. No. 1987), and commenced discovery in *Lincoln Adventures*.  Plaintiffs had the opportunity to amend their complaint in light of the Third Circuit Decision, and with the benefit of access to all MDL discovery and to class discovery materials produced by the Syndicates. The current Amended Complaint was filed on November 14, 2012.  Dkt. No. 2312. The counts in the Amended Complaint are (1) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) violation of RICO, 18 U.S.C. § 1962(a)-(d); and (3) various state law causes of action, including the violation of state antitrust statutes, breach of contract and the implied covenant of good faith and fair dealing, civil conspiracy, and unjust enrichment.

Plaintiffs' Amended Complaint duplicates the core features of the Commercial Complaint.  Just like that pleading, the centerpiece of the Amended Complaint is the allegations that the Syndicates, through their involvement in contingent commission agreements, [2] supposedly participated in an unlawful

---

[2] Plaintiffs' own allegations show that the term "contingent commission" is not one used in the London insurance market in the manner Plaintiffs contend.  There, agreements providing for an insurer's payment of compensation to a broker that

scheme with each other and brokers to allocate the market for insurance among the Syndicates and allegedly rewarded the brokers with contingent commission payments, and that insureds allegedly paid higher premiums as a result.  *Compare* MDL SAC ¶ 64 *with* AC ¶¶ 9, 11, 17, 319.

Just as the commercial class plaintiffs did, Plaintiffs here center their antitrust and RICO claims on three specific brokers, Marsh, Aon, and Willis.[3] *Compare* MDL SAC ¶¶ 85, 129, 159, 264-65 (describing contingent commission agreements between the class defendants and each of Marsh, Aon, and Willis) *with* AC ¶¶ 5, 13, 129 (same as to the Syndicates); AC ¶ 268 (alleging the Syndicates formed bilateral "broker-centered" RICO conspiracies with each of Marsh, Aon, and Willis).  Like the commercial class plaintiffs, Plaintiffs allege that Marsh, Aon and Willis threatened to deny access to their books of business if the insurers refused to pay contingent commissions.  *Compare* MDL SAC ¶¶ 135-140 (alleging that Marsh routinely threatened to withdraw business and incumbent protections to U.S. insurers if no contingent commissions were paid) *with* AC ¶ 13 (alleging that brokers in London "threatened to take away business if the Syndicates refused to agree to pay kickbacks . . .");  ¶¶ 171, 211, 215 (same).

---

depend on business volumes instead are referred to as marketing services ("MSAs") or placement services agreements ("PSAs").  *See* AC ¶ 10.

[3] Due to class action settlements with Marsh, Aon, and Willis, the Amended Complaint does not name those brokers as defendants.  *See* AC n.4.

Plaintiffs' attempt to render viable legal theories already rejected by the Third Circuit is not any more availing merely because they have changed the setting of their allegations from the United States to London.  Instead, the allegations here are even weaker than those put forward by the commercial class plaintiffs.  Both the commercial class plaintiffs and *Lincoln Adventures* Plaintiffs allege that brokers and Syndicates participated in bid rigging and other incumbent-protection devices.  *Compare* MDL SAC ¶¶ 67-68 (alleging that insurer-defendants agreed not to compete with each other and brokers facilitated this agreement via "last looks" and other protective devices) *with* AC ¶¶ 215-219 (same).  But here, *Plaintiffs fail to identify a single specific instance of bid rigging alleged to have occurred at Lloyd's*.  *See* AC ¶¶ 200-219.  Instead, Plaintiffs' allegations of bid rigging are limited to Marsh's *United States* operations, with an accompanying allegation that Marsh and other brokers likewise solicited false bids from unnamed Lloyd's syndicates to ensure that incumbent Lloyd's syndicates retained their respective accounts on renewal.  AC ¶¶ 201, 211-212.  These allegations are made "[o]n information and belief," identify no specific Syndicate, and are supported only by conclusory references to broking plans prepared by Marsh.  AC ¶¶ 208-209, 211-212.  The broking plans, however, do not contain any reference to bid rigging, but merely suggest that syndicates at Lloyd's be approached for quotes as a back up to the quotes already being sought from others.  *See* Declaration of Anne

8

Johnson Palmer in Support of Defendants Certain Underwriters at Lloyd's Motion to Dismiss the Revised First Amended Class Action Complaint ("Palmer Decl."), Exs. 1-3.

### B.     The Third Circuit Decision

By orders dated August 31 and September 28, 2007 (Dkt. Nos. 1298 and 1315), Chief Judge Brown granted the original defendants' motions to dismiss the commercial class action.  The Third Circuit largely affirmed this Court's decisions.

As to the antitrust claims, the Third Circuit held that plaintiffs must meet *at least* the pleading standard set forth in *Bell Atlantic Corp. v. Twombly* and had failed to sufficiently plead a claim under § 1 of the Sherman Act.[4]  In particular, the court held that allegations of parallel conduct, without more, were insufficient.  Third Circuit Decision at 327-334.  The allegedly pervasive use of contingent commissions and efforts to conceal their use did not establish an industry-wide conspiracy to restrain trade because a contingent commission agreement "alone does not signify an agreement to unreasonably restrain trade, let alone a horizontal agreement to unreasonably restrain trade."  *Id.* at 330; *accord id.* at 327-334, 348.  Thus, the Third Circuit held, "plaintiffs have failed to plead facts plausibly supporting their allegations of horizontal conspiracies to unreasonably restrain

---

[4] The Third Circuit held open the possibility that the bid rigging allegations must further survive the heightened pleading standard for claims that sound in fraud under Federal Rule of Civil Procedure 9(b), and remanded that issue for this Court's consideration.  Third Circuit Decision at 347-48 & n.51.

trade, notwithstanding their conclusory assertions of agreement." *Id*. at 362. The lone exception to this dismissal was for those insurers against which specific allegations of bid rigging were made. *Id*. at 336-348. As to those insurers, the case was remanded to this Court for further proceedings. See *supra*, note 4.

As to the RICO claims, the Third Circuit held that plaintiffs had failed to allege a RICO enterprise for the same reason that their antitrust allegations failed:

> In seeking to establish a "rim" enclosing the insurer partners in the alleged RICO enterprises, plaintiffs rely on the same factual allegations we found deficient in the antitrust context: that each insurer entered into a similar contingent-commission agreement in order to become a "strategic partner"; that each insurer knew the identity of the broker's other insurer-partners and the details of their contingent-commission agreements; that each insurer entered into an agreement with the broker not to disclose the details of its contingent-commission agreements; that the brokers utilized certain devices, such as affording "first" and "last looks," to steer business to the designated insurer; and that, in the Employee Benefits Case, insurers adopted similar reporting strategies with regard to Form 5500. As noted, these allegations do not plausibly imply concerted action – as opposed to merely parallel conduct – by the insurers, and therefore cannot provide a "rim" enclosing the "spokes" of these alleged "hub-and-spoke" enterprises.

*Id*. at 374. The lone exception again was those insurers against which specific allegations of bid rigging had been made. *Id*. at 378-79.

## C.   The Lloyd's Insurance Marketplace

Lloyd's has openly conducted its business in London for literally hundreds of years. Lloyd's syndicates are associations of individual and/or entity investors

who provide capital to "managing agents," which are "responsible for the underwriting and management of each individual [syndicate's] investments." *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 177 F.3d 210, 221 (3d Cir. 1999); *see* AC ¶ 3. The Syndicates are authorized by the Lloyd's Corporation to underwrite insurance. "Like the New York Stock Exchange, Lloyd's does not participate in individual decisions made by its brokers, members, or underwriters." *Roby v. Corp. of Lloyd's*, 796 F. Supp. 103, 104 (S.D.N.Y. 1992); AC ¶¶ 3, 6.

Also like the New York Stock Exchange, the Lloyd's building is a marketplace where individuals and entities gather to conduct a particular type of business. When accepting a proposed insurance policy, a syndicate at Lloyd's commonly chooses to underwrite a share of the policy and not the entire policy. Such percentage arrangements are common to bank loan and real estate syndications and are entirely legal and essential to complete business transactions that would not otherwise be made. Far from constituting any type of "structural conspiracy," courts have recognized that subscription markets in fact promote competition for investment capital. *See, e.g., E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 929 (2d Cir. 1998) (describing how the subscription structure at Lloyd's spreads risk); *Great Lakes Dredge & Dock Co. v. Commercial Union Assurance Co.*, 57 F. Supp. 2d 525, 530-31 (N.D. Ill. 1999), *aff'd in part,*

11

*vacated in part by*, *Great Lakes Dredge & Dock Co. v. City of Chicago*, 260 F.3d 789 (7th Cir. 2001) (describing Lloyd's as a "subscription market").   The Syndicates themselves operate in a highly competitive environment, competing against each other, and insurers outside the Lloyd's market, for business.   *See* AC ¶¶ 93-94 (alleging that an influx of corporate capital into Lloyd's in the late 1980s and early 1990s "resulted in hyper-competition among the Syndicates").   Nor is the Lloyd's subscription structure unique in the insurance industry – most large commercial insurance programs are underwritten in percentage layers or shares by many American, European, Bermudian and Japanese companies, as they could not be placed without a subscription share structure.

## ARGUMENT

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint unless it "contain[s] sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   Under the "two-pronged" approach established by the Supreme Court in *Twombly* and *Iqbal*, a court filters out allegations that "are no more than conclusions" and thus are "not entitled to the assumption of truth."  *Id.* at 679.   Although well-pleaded allegations in the complaint are assumed as true, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."   *Twombly*, 550 U.S. at 555

(citation and internal quotations omitted).  Considering only the "well-pleaded factual allegations," a court "then determine[s] whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.  A complaint made up of factual allegations that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* at 678 (internal quotations omitted) (quoting *Twombly*, 550 U.S. at 557).[5]

Particularly where, as the Third Circuit held, there are allegations of a complex antitrust conspiracy, the court must "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558.  Where a claim is predicated on fraud, it is subject to the heightened pleading standard of Rule 9(b), as this Court held in dismissing the commercial class plaintiffs' pleadings and as has been previously affirmed by the Third Circuit.  *See In re Insurance Brokerage Antitrust Litig.*, Nos. 04-Civ-5184 (GEB), 05-Civ-1079(GEB), 2007 WL 1100449 (D.N.J. Apr. 5, 2007), at *8; *In re Insurance Brokerage Antitrust Litig.*, Nos. 04-Civ-5184 (FSH), 04-Civ-1079(FSH), 2006 WL 2850607 (D.N.J. Oct. 3, 2006), at *11; *Lum v. Bank of Am.*, 361 F.3d 217, 228 (3d Cir. 2004).

---

[5] In *Twombly*, the Supreme Court reasoned that the plausibility standard was appropriate, in part, because of the extremely high costs that accompany defending antitrust actions, and the concern that "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases."  550 U.S. at 559.  Given the broad scope of the Plaintiffs' allegations, such concerns indisputably are present here.

As demonstrated below, the Third Circuit's rejection of the commercial class plaintiffs' claims in this MDL compels dismissal of the Amended Complaint.  The allegations in support of Plaintiffs' antitrust and RICO counts fail to state a claim.

## I.   PLAINTIFFS' ANTITRUST CLAIM MUST BE DISMISSED BECAUSE IT IS INDISTINGUISHABLE FROM THOSE THE THIRD CIRCUIT REJECTED

### A.   Allegations of Parallel Broker-Syndicate Contingent Commission Agreements Do Not Plausibly Allege a Horizontal Agreement Among the Syndicates

The Amended Complaint is premised on allegations of broker-centered conspiracies among the Syndicates to allocate the market for insurance, carried out through each Syndicate's participation in a similar contingent commission agreement with a given broker.  *See* AC ¶¶ 9, 11, 17, 319.  Such allegations of "horizontal agreements among competitors to fix prices or to divide markets" are reviewed as a potential "per se" violation of the Sherman Act.  *See* Third Circuit Decision at 316; *accord In re Pharmacy Benefit Managers Antitrust Litig.,* 582 F.3d 432, 436 n.5 (3d Cir. 2009).  Plaintiffs' theory is virtually identical to that advanced by the Commercial Complaint the Third Circuit rejected:  that a broker at the center of a supposed hub-and-spoke conspiracy somehow facilitated horizontal collusion between the Syndicates along the wheel's "rim" via contingent commission agreements.  *See* Third Circuit Decision at 374-75.

Plaintiffs' allegations therefore must fail for precisely the same reason: there is no plausible allegation of a horizontal agreement among the Syndicates to provide the "rim" to connect the spokes on the wheel of the alleged conspiracy. At most the Plaintiffs allege that the Syndicates engaged in parallel conduct when the Syndicates entered into similar contingent commission agreements with brokers. But as the Supreme Court declared in *Twombly*, an antitrust complaint must do more to survive a motion to dismiss than "open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 550 U.S. at 561.  Plaintiffs must allege facts that provide "plausible grounds to infer an agreement" that would be unlawful under the antitrust laws, and "not merely parallel conduct that could just as well be independent action." *Id.* at 556, 557.  The Third Circuit underscored that parallel conduct, standing alone, is equally consistent with a "wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *See* Third Circuit Decision at 321.  To sufficiently allege an actionable agreement among competitors, the Amended Complaint must allege at least one "plus factor" indicating that the parallel conduct was not the product of independent action, such as motive, action by the defendant contrary to its interests, or evidence implying a traditional conspiracy. *Id.* at 322; *accord In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 360 (3d Cir. 2004).  Otherwise, no facts support a hub-and-spoke conspiracy

15

because there is no "rim," and the complaint must be dismissed.  *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002) ("[A] wheel without a rim is not a single conspiracy . . . .").

Here, Plaintiffs do not allege any of these "plus factors."  The Amended Complaint rests on mere assertions as to the existence of contingent commission agreements between the Syndicates and the brokers.  There are no allegations of any communications reflecting a horizontal agreement among the Syndicates and no allegations regarding the contingent commission agreements evidencing motive, actions by the Syndicates contrary to their interests, or any traditional conspiracy by the Syndicates.[6]

The Third Circuit ruled that no cognizable antitrust claim arises from contingent commission agreements alone, as there is an obvious alternative explanation for why an insurer would agree to pay contingent commissions.  *See* Third Circuit Decision at 322-23 ("Put differently, allegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged."

---

[6] Much like the Commercial Complaint, the Amended Complaint emphasizes the confidentiality provisions in the so-called "contingent commission" agreements, suggesting they are supportive of Plaintiffs' allegations of a horizontal conspiracy. AC ¶¶ 137, 141, 147-48, 152-53, 161, 164-65, 184.  The Third Circuit rejected these same allegations, concluding that they did not "qualify under *Twombly* as a basis for a plausible inference of horizontal agreement among the brokers or insurers," and did not suggest anything more than that brokers "adopt[ed] sub-par disclosure methods to protect their own, lucrative agreements."  Third Circuit Decision at 351.

(quoting *Twombly*, 550 U.S. at 567)).  The Amended Complaint itself provides that same obvious alternative explanation here:  Plaintiffs allege that the global market for commercial insurance broking is "highly concentrated" and, with insurance coverage having become "increasingly complex and sophisticated," brokers occupy a "critical intermediary function" in directing potential clients to insurers. AC ¶¶ 117-118.  They further allege that the brokers at Lloyd's threatened to deny the Syndicates access to their books of business if the Syndicates refused to pay contingent commissions, the Syndicates "were begging the brokers for business," and the infusion of corporate capital into Lloyd's had "resulted in hyper-competition among the Syndicates."  *See* AC ¶¶ 13, 93-95, 215.  The Amended Complaint itself thus suggests a compelling reason why the Syndicates each would agree to pay contingent commissions: to preserve and grow their business in the face of increasing influence of the brokers.  As the Third Circuit held in evaluating equivalent allegations about U.S. insurers, "each insurer independently calculated that it would be more profitable to be within the pool than without."  Third Circuit Decision at 328.  Since Plaintiffs emphasize "hyper-competition" among the Syndicates and the brokers' vital role at Lloyd's, the Amended Complaint's allegations are inconsistent with any horizontal conspiracy and even more implausible than those the Third Circuit rejected.  AC ¶ 94.

In sum, the Amended Complaint lacks any factually supported allegations to plausibly plead a horizontal agreement among the Syndicates.  As the Third Circuit held in rejecting virtually identical allegations, "one cannot plausibly infer a horizontal agreement among a broker's insurer-partners from the mere fact that each insurer entered into a similar contingent commission agreement with the broker."  Third Circuit Decision at 327.  This ruling compels the dismissal of Plaintiffs' antitrust allegations.

**B.  Plaintiffs Fail In Their Attempts To Avoid The Third Circuit Decision**

Plaintiffs make various efforts to plead around the Third Circuit Decision.  Notwithstanding the roadmap provided by that decision and ample subsequent opportunity to re-plead their complaint, Plaintiffs have failed to distinguish their claims from those rejected by the Third Circuit.

**1.  The Amended Complaint Fails to Plead Facts Sufficient to Show that the Lloyd's Marketplace Structurally Violates the Sherman Act**

In search of a rim to complete their conspiracy, Plaintiffs focus on allegedly "unique" aspects of how Lloyd's is organized and operates in an attempt to distinguish it from the U.S. insurance market.  Plaintiffs point to organizational features of Lloyd's that allow for *communication* among the Syndicates, such as the subscription participation of multiple Syndicates in a policy or program and the

role of the Lloyd's Market Association ("LMA"),[7] as evidence of conspiracy.  AC

¶¶ 103-104, 221, 281.   Plaintiffs also point to binding authority agreements to

allege that Syndicates "join together" to enter into multilateral contingent

commission agreements.  *Id.* ¶¶ 138-140.   None of these allegations is true, but

even if they were, they are not the "plus factor" the Third Circuit requires.

### a.   *Lloyd's Structure and Communication Among Syndicates*

Generic allegations about the "constant contact and communication"

between Syndicates do not meet the pleading standard necessary to assert a

horizontal antitrust agreement.  *See, e.g.*, AC ¶ 103.  Plaintiffs allege no more than

that "[p]hysically, the Lloyd's Market is highly susceptible to collusion and

information sharing" and that the subscription nature of the market allows "the

Syndicates to request information from each other regarding the risk, which gives

them additional opportunity to exchange information about each other's business."

*Id.* ¶¶ 104-07.  Plaintiffs further allege, as in the Commercial Complaint, that the

Syndicates participated along with brokers in trade associations as well as a trade

group known as the Council of Insurance Agents and Brokers (the "CIAB"), and

those organizations gave the Syndicates "ample opportunity to collude."  *Id.*

---

[7] Like many other trade associations, the LMA provides administrative services
and information to its members and is not remotely involved in the negotiation or
terms – including commission payments – under any insurance contract.  Plaintiffs
do not allege otherwise.

¶¶ 220-23.  Each of these allegations is wholly conclusory and not entitled to any weight under *Twombly*, much less under Rule 9(b).  Even if they are entitled to any weight, these allegations at most present situations that, in Plaintiffs' own words, might provide "opportunities" for collusion.  *Id.* ¶¶ 106, 107, 220, 221, 223, 281.

The Third Circuit already squarely rejected such "opportunity" allegations. Third Circuit Decision at 349.   Alone, mere opportunity to conspire cannot demonstrate a conspiracy.  *See, e.g., Twombly*, 550 U.S. at 567, n.12 (participation in industry group does not suffice to plausibly allege agreement).   Without any "plus factors" or other allegations as to how an opportunity to conspire gave rise to an actual conspiracy, Plaintiffs' allegations of mere opportunity to conspire are insufficient to withstand dismissal.  *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (dismissing complaint where plaintiffs failed to plead that "defendants ever met and agreed to fix prices; they plead at most that defendants had the opportunity to do so because they attended many of the same meetings"); *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 579 n.30 (S.D.N.Y. 2007) (rejecting allegation that joint ventures provided forum for competitors to meet to compare their respective pricing, stressing that "the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred") (internal citation

omitted).[8]  Absent from the Amended Complaint is any allegation as to how these structural features and industry groups actually were used by any of the Syndicates in any manner to form or further an illegal agreement.[9]

---

[8] *See also In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 n.5 (2d Cir. 2007) (holding insufficient allegations that defendants participated in industry meetings in the United States and Europe); *Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (allegation that defendants had the opportunity to interact and make an agreement does not "nudge[ ] claims across the line from conceivable to plausible" with respect to their claims against these defendants) (citing *Twombly*); *Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 597 n.33 (E.D. La. 2007) (holding plaintiffs' allegations that defendant "insurance companies have actively coordinated their actions through various organizations and associations" insufficient to raise an inference of conspiracy).

[9] Plaintiffs also allege that some managing agents manage more than one Syndicate, suggesting that this provides another structural basis for collusion between such jointly-managed Syndicates. *See* AC ¶ 108 ("These joint ventures between horizontal competitors provide yet another conduit for information sharing.").  But Plaintiffs' own allegations make clear that jointly-managed syndicates can no more illegally collude than can two sister divisions of the same corporation – as they are in no way "horizontal competitors."  Lloyd's syndicates are pools of capital that are operated wholly by their managing agents, and an agent managing two syndicates by definition deploys that capital in tandem when underwriting risks on behalf of both syndicates. *See, e.g.*, AC ¶ 43 (alleging that Syndicate 2623 was established to "underwrite in parallel with Syndicate 0623" by the same managing agent, and that "[w]ithin these two syndicates all business is split Syndicate 2623 (82%), Syndicate 0623 (18%)"); AC ¶ 46 (describing Syndicate 2003 as the "successor" to Syndicate 1003, managed by the same managing agent).  Any "information sharing" between jointly-managed syndicates is wholly intramural, and in no way resembles "joint ventures between horizontal competitors." *See generally Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) ("[A] rule that punished coordinate conduct [under § 1 of the Sherman Act] simply because a corporation delegated certain responsibilities to autonomous units might well discourage corporations from creating divisions with their presumed benefits.  This would serve no useful antitrust purpose ….").

Plaintiffs' attempt to paint the London insurance market as a structural conspiracy ignores the reality that the market-based purchase and sale of insurance at Lloyd's is no different than in-person marketplaces for the purchase and sale of securities or commodities, such as the New York Stock Exchange or the Chicago Mercantile Exchange.  Likewise, the subscription nature of the Lloyd's market is no different for purposes of Plaintiffs' claims than the syndication of a commercial loan among multiple banks or commercial insurance among multiple world-wide insurers.   There is nothing suspect about such structures. They are widely recognized commercially and legally and serve to create products that may not otherwise exist.  These structures promote – rather than restrict – competition.

### b.    *Binding Authority Agreements*

Plaintiffs' attempts to classify "binding authority agreements" as illegal agreements similarly fail.   Under a binding authority, syndicates underwrite percentages of an agreement issued to a "coverholder" authorized to bind certain types of risk and up to certain limits.  Coverholders are not brokers acting for insureds but agents appointed and paid by Syndicates.  The coverholder stands in the shoes of the syndicate when a broker acting for the prospective insureds present the insured's request for insurance.  The authority levels are limited and thus suited to smaller risks that could not be underwritten cost-efficiently in London.[10]  *See*

_____

[10] The coverholder may be located in the United States.  For instance, one named

Lloyd's.com,  http://www.lloyds.com/the-market/i-am-a/coverholder/coverholders-mga-us/tell-me-more-about-coverholders   (last   visited   Dec.   3,   2012) ("Coverholders   enable   syndicates   to   underwrite   locally   without   the   need   for expensive local infrastructure.").

The   very   documents   on   which   Plaintiffs'   allegations   are   based   show   that binding   authorities   are   not   contingent   commission   agreements   among   the Syndicates.[11]   The Lloyd's public website Plaintiffs cite states that coverholders are empowered to enter into insurance contracts on behalf of a *syndicate* and that any insured wanting   to   purchase   a   policy   through   a   coverholder   should   do   so   via   a broker.       *See*     Lloyd's.com,       www.lloyds.com/lloyds/offices/americas/us-homepage/placing-risk/how-to-access-lloyds   (last   visited   Dec.   3,   2012). Coverholders are not and do not purport to be agents of the insured.  *Cf.* AC ¶ 111. Illustrating this is Plaintiffs' example of a binding authority agreement (AC ¶ 139), which is   an   agreement   for   the   coverholder   to   act   on   behalf   of   syndicates,   by

---

Plaintiff, Michigan Multi-King ("MMK"), bought insurance for food-borne illness from a coverholder in Texas, Professional Liability Insurance Services ("PLIS"). AC ¶¶ 70-71, 77.  MMK retained Aon in the United States to approach PLIS and obtain a quote for this type of insurance, and Plaintiffs do not allege that either MMK or Aon dealt directly with Lloyd's Syndicates on these placements.  *Id.*

[11] The Court need not accept as true factual allegations in the Amended Complaint that are contradicted by the very documents that Plaintiffs have incorporated in the pleadings. *Muti v. Schmidt*, 96 F.App'x 69, 74 n.2 (3d Cir. Apr. 21, 2004), *superceded by*, 118 F.App'x 646 (3d Cir. 2004), citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363, at 464-65 (2d ed.1995).

authorizing the coverholder "to issue . . . documents evidencing cover," such as certificates of insurance and endorsements, and "to adjust claims in accordance with the terms and conditions contained herein and endorsed hereon."  *See* Palmer Decl., Ex. 4 (Underwriters at Lloyd's London Binding Authority Agreement) at § 1.[12]

Plaintiffs also attempt to misconstrue a portion of the coverholder's compensation known as a "Profit Commission" to be the equivalent of a contingent commission that an insurer may pay to a broker.  *See* AC ¶ 139.  But this characterization is also directly contradicted by Plaintiffs' own allegations, which demonstrate that a Profit Commission is payment to the coverholder based on the profitability of the coverholder's sound underwriting on behalf of the syndicates of risks presented to it by insurance brokers.  *See id.*  These arrangements bear no resemblance to the contingent commission agreements at the heart of this action by which the Syndicates allegedly provide additional compensation to a broker based upon the volume of its client business the broker presents to the insurer.

---

[12] The agreement cited by Plaintiffs, despite being memorialized on a standard Lloyd's "Binding Authority Agreement" form, does not in fact operate as a typical binding authority, as the parties struck the language from the form agreement delegating underwriting authority to the Marsh entity named as the "Coverholder" in the agreement.  *See id.* § 1.1.  But even taking as true Plaintiffs' characterization of this agreement as a binding authority agreement, it is clear from the face of the document cited by Plaintiffs that it is no way a "contingent commission" agreement providing additional compensation to a broker based upon the volume of its client business steered by the broker to the participating insurers.

Binding authority agreements are, on their face, agreements among insurers, but contrary to Plaintiffs' suggestion, that fact alone does not render them "horizontal agreements" in violation of antitrust law.  By using the generic term "Compensation Agreements" to refer to both contingent commission agreements (entered between a broker and a Syndicate) and binding authorities, Plaintiffs seek to conflate these distinct types of arrangements – and thereby imply that binding authorities supply the requisite horizontal element otherwise lacking in their allegations concerning contingent commission agreements.  A binding authority, however, is nothing more than a type of subscription that applies to more than one policy meeting the terms and limitations of that agreement, and as such it has nothing whatsoever to do with contingent commission agreements.  Rather, these binding authorities function to bring competitors together as a single entity to share in risks bound by the coverholder.  Such an agreement is not a per se violation of the Sherman Act.  *See Texaco, Inc. v. Dagher, et al.*, 547 U.S. 1, 5-6 (2006) (rejecting claim that a joint venture agreement between two oil companies constituted a *per se* illegal agreement, reasoning that "the pricing policy challenged here amounts to little more than price setting by a single entity" and emphasizing that *per se* liability is reserved only for "plainly anticompetitive" agreements). And, as discussed above, Plaintiffs do not state a claim by merely alleging an opportunity to conspire.

25

### 2. The Amended Complaint's Threadbare Allegations of Bid Rigging Do Not Cure Plaintiffs' Failure to Allege a Horizontal Agreement

Plaintiffs allege a conspiracy among the Syndicates to protect their incumbent business on renewal by engaging in alleged bid rigging on excess casualty policies brokered through Marsh in the U.S.[13]  AC ¶¶ 5, 176, 201, 215. These allegations attempt to reach the single antitrust claim the Third Circuit sustained in the commercial case as sufficiently pled, under Rule 8 only, to allege a broader agreement among certain insurer defendants "not to compete for one another's incumbent business."  Third Circuit Decision at 340.  The bid rigging allegations in the Amended Complaint, however, fall far short of those in the Commercial Complaint.

Plaintiffs' only specific bid rigging allegations concern indictments of employees of Marsh and U.S. insurers.  They do not include *any* bids rigged by any Syndicate in London.  Indeed, there were no indictments or any alleged bid rigging in the Lloyd's marketplace.  The only allegations Plaintiffs make are that (1) the Syndicates were "one of the top five markets" for Marsh's Global Broking

---

[13]As in the commercial class action, the Amended Complaint alleges in support of its incumbency protection theory that the brokers provided the Syndicates with "last looks" in bidding on placements.  AC ¶¶ 215, 218.  As the Third Circuit held, these allegations of broker steering of business to the Syndicates – which are confined to two paragraphs in the complaint baldly alleging that "last looks" occurred – "do not give rise to a plausible inference of horizontal conspiracy."  Third Circuit Decision at 334-35.

Unit, (2) based on information and belief, the "Syndicates also engaged in bid-rigging with Lloyd's Brokers, such as Marsh," and (3) also based on information and belief, "the big three brokers, Marsh, Aon and Willis requested 'no bids' or 'no quotes' from the Lloyd's Syndicates." AC ¶¶ 206, 209, 212.

These guilt-by-association suggestions – that because the Syndicates individually had business relationships with Marsh, they too "must" have engaged in alleged bid rigging – do not even satisfy Rule 8, let alone Rule 9(b).  In particular, pure conclusion is not transformed into a plausible factual allegation simply by adding the phrase "upon information and belief."[14]  *Twombly* and *Iqbal* require that Plaintiffs' factual allegations must "raise a right to relief above the speculative level."  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555; *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion, of entitlement to relief.").  The Third Circuit permitted the commercial plaintiffs to proceed only to the extent they alleged "multiple, detailed incidents of bid rigging in the Marsh-centered Commercial conspiracy," allegations that, among other things, identified the bids the plaintiffs alleged were fake and the insurer who made each allegedly fake bid.  Third Circuit Decision at 337 n.32; MDL SAC ¶¶ 275, 336.  Plaintiffs here, in

---

[14] *See, e.g.*, *Medtech Prods. Inc. v. Ranir, LLC,* 596 F. Supp. 2d 778, 794-95 (S.D.N.Y. 2008); *V.E.C. Corp. of Delaware v. Hilliard*, No. 10-Civ-2542, 2012 WL 4051293, at *4 (S.D.N.Y. Sept. 14, 2012).

sharp contrast, do not present any such factual allegations of bid rigging. They merely offer speculation. *Again, the Amended Complaint does not include any factual allegations regarding bid-rigging involving any Lloyd's Syndicate*.

At most, Plaintiffs would have the Court infer nefarious meaning from Marsh "Broking Plans" stating Marsh's intent to seek "alternative" or "backup" quotes from unnamed Lloyd's syndicates. AC ¶ 208. These allegations are legally insufficient:  a broker expressing the intent to seek "alternative" quotes from syndicates at Lloyd's is entirely consistent with standard broking of any insurance policy where a broker approaches multiple carriers for coverage beyond just the incumbent. This is competition in the marketplace, and there is nothing illegal about it. None of these allegations, or any others in the Amended Complaint, assert facts that, if proven, would show that Marsh sought non-competitive quotes from any of the Syndicates. And more important still, Plaintiffs do not allege that any of the 23 Syndicates named as defendants in this lawsuit, or any of the other syndicates not named, actually ever supplied any such non-competitive quotes.

These allegations also fail under Rule 9(b). *See infra* at 35-37. Plaintiffs fail to plead the circumstances under which the alleged bid rigging took place (the when, how, to whom), and Plaintiffs do not even allege which Syndicates provided the alleged false quotes, which brokers solicited them, the individuals who were involved, which insured allegedly was affected, and when this supposed activity

occurred.  Plaintiffs also fail to plead with particularity the circumstances of the incumbent protection conspiracy they allege the bid rigging served, including how the incumbency protection conspiracy was formed, how it operated to protect the Syndicates' incumbent business, and other requisite facts.[15]

### 3.     The Amended Complaint Does Not State a Claim for Vertical Restraints Under a Rule-of-Reason Analysis

The Amended Complaint makes a weak attempt at alleging unlawful vertical agreements, averring generally that the Syndicates "participated in bilateral enterprises and conspiracies" with the brokers.  AC ¶ 219.  In contrast to horizontal agreements among competitors, vertical agreements – here, the alleged agreements between the Syndicates and the brokers – are subject to a more stringent rule-of-reason analysis.  *See* Third Circuit Decision at 318-19 (noting that the commercial class plaintiffs had "disclaimed" any rule of reason theory).  A rule of reason claim requires Plaintiffs to allege:

> (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and

---

[15] Given the paucity of Plaintiffs' bid rigging allegations, the Syndicates do not address in detail here the other aspects in which the Amended Complaint's allegations of an incumbency protection conspiracy are not pled with the particularity Rule 9(b) demands.  For efficiency, the Syndicates incorporate by reference the Excess Casualty Insurer Defendants' omnibus brief in support of their dismissal motion on these grounds.  *See* Dkt. No. 1679 at 12-20.

(4) that the plaintiffs were injured as a proximate result of that conspiracy.

*Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991).  To the extent Plaintiffs assert any rule-of-reason theory, the Amended Complaint fails to plead unlawful vertical agreements for at least three reasons.

*First*, as the Third Circuit emphasized, a rule-of-reason analysis requires the plaintiff to show that "the alleged agreement produced an adverse, anticompetitive effect within the relevant geographic market."  Third Circuit Decision at 315 (internal alterations omitted).  The Amended Complaint advances nothing more than bald assertions of "increased premiums" and "less favorable terms and conditions of coverage."  AC ¶¶ 16, 99, 102.  Such generic allegations cannot withstand dismissal.  *See Spanish Broad. Sys. Of Fla. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1079 (11th Cir. 2004) (holding that "conclusory allegations" of "supra-competitive prices" "unsupported by specific factual allegations" states no claim "under the antitrust laws").

*Second*, Plaintiffs fail to adequately define a relevant market.  Instead, they assert that the relevant market is "the market for commercial insurance" or "the market for commercial property and casualty insurance," which they acknowledge "covers different insurance lines." AC ¶¶ 2, 112.  Plaintiffs offer no factual basis to support this market definition, and it makes no sense to include in a single market such disparate and non-substitutable insurance products.   Indeed, every court,

30

antitrust enforcement agency, and insurance regulator that has examined the markets for insurance products has reached the contrary, common-sense conclusion that each individual line of insurance is a separate product market and that the geographic scope of these markets varies depending on the line of insurance.[16] Complaints, like Plaintiffs', that allege a "market" that on its face is too broad must be dismissed. *See, e.g., Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *TV Comms. Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992); *E. & G. Gabriel v. Gabriel Bros., Inc.*, No. 93-Civ-0894, 1994 U.S. Dist. LEXIS 9455, at *11 (S.D.N.Y. July 12, 1994).

*Third*, although anticompetitive effects in certain circumstances may be inferred from allegations of a higher market share coupled with high entry barriers and anticompetitive conduct, the Amended Complaint fails to allege that the brokers, through which the Syndicates supposedly carried out the alleged market allocation scheme, had sufficient market power to achieve any anti-competitive

---

[16] *See, e.g., Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 959, 971 (10th Cir. 1990) (finding separate market for private health care financing in Kansas); Palmer Decl. Ex. 5 (*Competitive Impact Statement of U.S. Dep't of Justice, United States v. UnitedHealth Group, Inc.*, No. 05-Civ-02436 at 4-6 (D.D.C. Mar. 3, 2006) (defining market as "the sale of commercial health insurance to small-group employers" in Tucson)); Palmer Decl. Ex. 6 (Order, *In re Proposed Acquisition of Control of or Merger with Travelers Property Casualty Corp. by The St. Paul Cos., Inc.*, No. EX 04-20, at 28-31 (Conn. Ins. Dept. Mar. 2, 2004) (evaluating market share by commercial insurance product line in the Connecticut market)).

effect.  *Urdinaran v. Aarons*, 115 F. Supp. 2d 484, 489 (D.N.J. 2000) ("For a restraint of trade to be anti-competitive, defendants must possess market power in the relevant markets.").  A market share of greater than thirty percent is typically required to infer market power.  *See, e.g.*, *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26 & n.43 (1984), *abrogated on other grounds*, *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006) (holding, as a matter of law, that thirty percent share of the relevant market is insufficient to confer market power); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 213 (3rd Cir. 2005) (market share of 39% insufficient to establish market power).  Plaintiffs do not allege the individual market share of Marsh, Aon, or Willis, or any of the other brokers or intermediaries identified in the Amended Complaint.

Plaintiffs' sole allegation in this regard is that, *collectively*, Marsh, Aon, and Willis – not any of the Syndicates or any of the alleged individual contingent commission agreements – account for "about 60%" of the global commercial broking market.  This allegation is made in the present tense, not with respect to Plaintiffs' alleged class period, which began fifteen years ago in 1997.  AC ¶ 113.  Moreover, Plaintiffs cannot show market power by adding up the share of brokers that are not alleged to have been acting in concert, as each broker's market share must be considered individually.  *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 209 (4th Cir. 2002) (in alleged hub-and-spoke conspiracy, the appropriate inquiry

32

was whether "the two licensing agreements at issue, *when considered individually*, are likely to foreclose a significant share of the relevant software markets" (emphasis added)); *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 93-Civ-07493, 1995 WL 632031, at *5 (N.D. Ill. Oct. 25, 1995), *aff'd*, 103 F.3d 42 (7th Cir. 1996) (rejecting consideration of "the aggregate effects of competitors' exclusive contracts to establish an unreasonable restraint of trade in the absence of a conspiracy between the competitors").

In short, the Amended Complaint does not allege the essential components required to satisfy the rule of reason for a Sherman Act claim premised on vertical agreements, that the contested restraint produced adverse, anti-competitive effects within the relevant market.

### 4. Plaintiffs' Allegations of a London-Based Conspiracy Fail to Plead Facts to Support this Court's Subject Matter Jurisdiction under the FTAIA

Finally, the antitrust claim must be dismissed for the additional reason that Plaintiffs fail to plead facts to meet the requirements of the FTAIA.[17]  Plaintiffs

---

[17] The FTAIA, 15 U.S.C. § 6a, provides, in relevant part, that:

> [The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect—
> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

charge the Syndicates with antitrust violations on the basis of alleged conduct that occurred entirely in the United Kingdom, including compensation agreements between the Syndicates and Lloyd's brokers; the alleged payment of contingent commissions by the Syndicates to those brokers; and the allocation of customers within Lloyd's.  *See* AC ¶¶ 9, 10, 11, 13, 96, 97, 100, 129-30, 133, 168-69. Because the Amended Complaint challenges conduct that occurred overseas, the FTAIA applies.  *See F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158-9 (2004); *see also Animal Sci. Prod., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 466 (3d Cir. 2011), *cert denied*, 132 S. Ct. 1744 (2012) ("[T]he FTAIA imposes a substantive merits limitation rather than a jurisdictional bar.").

Plaintiffs, however, come nowhere close to meeting the statute's requirement that the Syndicates' conduct had "a direct, substantial and foreseeable effect" on imports or domestic U.S. commerce.  15 U.S.C. § 6a.  Plaintiffs merely allege that some portion of the insurance underwritten at Lloyd's "covered risks in the United States."  AC ¶ 6.  The Amended Complaint nowhere explains what this means, let alone how it meets the statutory requirement.  In particular, the

---

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
(2) such effect gives rise to a claim under the provisions of [the Sherman Act], other than this section.

If [the Sherman Act] appl[ies] to such conduct only because of the operation of paragraph (1)(B), then [the Sherman Act] shall apply to such conduct only for injury to export business in the United States.

allegations that the Syndicates allocated customers in markets in the United States through so-called contingent commission agreements cannot fill this gap. Plaintiffs plainly do not allege conduct in markets within the United States; rather, as they stress, the conduct occurred instead in London. Such allegations do not suffice to satisfy FTAIA's "direct, substantial and foreseeable effect" test.

### C. Plaintiffs Fail To Satisfy the Heightened Pleading Standard Under Rule 9(b)

Plaintiffs' allegations also fail to satisfy Federal Rule of Civil Procedure 9(b). As this Court and the Third Circuit have held, where an antitrust claim sounds in fraud, Rule 9(b) applies and requires the Plaintiffs to plead that fraud with particularity. *See, e.g., Lum*, 361 F. 3d at 228; *Animal Sci. Prods.*, 596 F. Supp. 2d at 877-78.

Plaintiffs' conspiracy allegations are undeniably fraud-based. Plaintiffs allege that the Syndicates (i) failed to disclose the existence of contingent commissions to insureds and (ii) fraudulently concealed their alleged conspiracy with brokers, and that this conduct amounts to a violation of RICO and mail and wire fraud. *See, e.g.,* AC ¶¶ 189-90, 307-311, 341. But Rule 9(b) requires Plaintiffs to "plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum*, 361 F.3d at 223-24 (citation omitted). Plaintiffs must

"inject[] precision and some measure of substantiation into their allegations of fraud." *Id*. at 224 (citation omitted).  This includes pleading "the who, what, when, where, and how: the first paragraph of any newspaper story."  *Inst. Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (citation omitted).

Plaintiffs' allegations do not approach, much less clear, this Rule 9(b) bar. There are no allegations describing when, where, or by what means any horizontal conspiracy among the Syndicates was formed, let alone how the conspiracy operated.  *Critically, Plaintiffs fail to allege any meeting, communication, or other interaction among the Syndicates at all.*  The Amended Complaint instead relies on superficial allegations that lump the Syndicates together with generic allegations of misconduct and fail to allege as to any defendant what role that Syndicate played in the alleged conspiracy.  *See, e.g.,* AC ¶ 215 (alleging that "Marsh and each of the conspiring Syndicate[s] agreed, and the conspiring insurers horizontally agreed among themselves . . . . to reduce or eliminate competition among the conspiring insurers").  Such undifferentiated allegations do not state a claim for an antitrust conspiracy sufficient to survive *Twombly* and Rule 8, much less one with the particularity needed to satisfy Rule 9(b).  *See Banxcorp v. Apax Partners, L.P.*, No. 10-Civ-4769 (SDW), 2011 WL 1253892, at *3, 4 (D.N.J. Mar. 28, 2011) (dismissing complaint lacking "facts . . . specifically pointing to [defendant's] involvement in the alleged antitrust violation" and failing to allege that "each

individual defendant joined the conspiracy and played some role in it") (internal quotations and citation omitted).

## II.  THE THIRD CIRCUIT DECISION REQUIRES DISMISSAL OF PLAINTIFFS' RICO COUNT

Plaintiffs also fail to plead adequately the required elements of a RICO claim for the reasons set forth in the Third Circuit Decision.  A RICO violation requires Plaintiffs to allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lum*, 361 F.3d at 223 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  Racketeering activity based on fraud must be pled with specificity under Rule 9(b).  *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002).  An "enterprise" includes (1) any individual, partnership, corporation, association, or other legal entity, and (2) any union or group of individuals associated in fact although not a legal entity.  18 U.S.C. § 1961.

Plaintiffs assert RICO claims based on two separate types of enterprises, both of which must be dismissed pursuant to the Third Circuit Decision.  *First*, Plaintiffs allege "association-in-fact" broker-centered enterprises between the Syndicates and each of Marsh, Aon, and Willis respectively.  AC ¶ 268.  *Second*, Plaintiffs allege that the Lloyd's Corporation is a legal entity constituting a RICO enterprise or, alternatively, that the Lloyd's brokers, the Syndicates, and other unnamed syndicates formed a massive association-in-fact enterprise centered in the

Lloyd's marketplace.  AC ¶ 280.[18]  Plaintiffs' RICO allegations fail for many of the same reasons as their antitrust claims do, and their London-specific allegations do not cure the defects identified in the Third Circuit Decision.

### A.    Plaintiffs Fail Adequately To Plead A RICO Enterprise

The Third Circuit stated that the enterprise element of a RICO claim is a "close analogue" of the "agreement" element of a claim for violation of Section 1 of the Sherman Act.  Third Circuit Decision at 370.  Plaintiffs have not alleged, and cannot credibly allege, that the Syndicates were acting in concert rather than out of their own self interest.  Thus, broker-centered enterprise allegations (and those allegations concerning the alternate association-in-fact allegedly centered on the Lloyd's market) must be dismissed for the same reasons as Plaintiffs' antitrust claims. *See supra* at 14-18.

Association-in-fact enterprises must include a "group of persons associated together for a common purpose of engaging in a course of conduct" and present certain attributes such as a "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle. v. United States*, 556, U.S. 938, 946 (2009).

---

[18] To the extent the Amended Complaint could be read to assert implicitly a RICO claim based on bilateral enterprises between a broker and a single Syndicate, Plaintiffs have failed to adequately allege the other required elements.  Plaintiffs offer no allegations regarding how each individual Syndicate would conduct its bilateral enterprise and no predicate acts at all specific to each bilateral enterprise.

Plaintiffs must "allege something more than the fact that individuals were all engaged in the same type of illicit conduct during the same time period;" otherwise the association-in-fact enterprise part of the RICO statute would become an "open gateway to the imposition of potentially massive costs on numerous defendants, regardless of whether there is even a hint of the collaboration necessary to trigger liability." Third Circuit Decision at 370 (quotations omitted) (relying on *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010).[19]

Plaintiffs fail to allege any association or agreement among all members of the alleged enterprise. At best, Plaintiffs allege individual agreements between a broker and a Syndicate, but do not provide factually supported allegations of any collaboration *among* the Syndicates. As the commercial class plaintiffs did, Plaintiffs allege that each Syndicate entered into agreements with each broker regarding the payment of contingent commissions and the subsequent "steering" of business to the Syndicate by the broker. *Compare* Third Circuit Decision at 374 *with* AC ¶¶ 17, 272. These allegations do not show horizontal collaboration between the Syndicates. As the Third Circuit noted, Third Circuit Decision at 327-328, it was in each insurer's self-interest to enter into these contingent commission

---

[19] In a decision cited multiple times in the Third Circuit's opinion, the *Elsevier* Court concluded that the complaint in that action did not "tie[] together the various defendants allegedly comprising the association in fact into a single entity that was formed for the purpose of working together." 692 F. Supp. 2d at 307. So too here.

agreements regardless of what any of the other insurers was doing.[20]  The Third Circuit's reasoning applies with equal force here.

Similarly, Plaintiffs allege that the devices used to steer business to the Syndicates and conceal the scheme (such as first and last looks and non-disclosure agreements) *imply* the existence of association between the insurers.  AC ¶¶ 215, 301.  The Third Circuit found that such allegations do not imply a horizontal agreement among the insurers as opposed to simple parallel conduct.  Third Circuit Decision at 374.  The Lloyd's brokers could steer clients to certain Syndicates without any need for a horizontal agreement among the Syndicates.  *Id.* at 335.[21]

As such, Plaintiffs' allegations fail to plead adequately an association-in-fact enterprise.  *See* Third Circuit Decision at 374-75;[22] *Boyle* at 947 n.4 (holding that individuals who engaged in a pattern of predicate acts "independently and without

---

[20] *See, e.g.*, AC ¶ 13 (noting that brokers threatened to take away business from a Syndicate that refused to sign off on a compensation agreement); AC ¶¶ 94-95 (noting that the Syndicates had to "beg[] the brokers for business").

[21] The Amended Complaint's Lloyd's-specific allegations (AC ¶¶ 103-107) do not remove Plaintiffs' allegations from the dispositive application of the Third Circuit Decision.  *See supra* at 19-22.  The structural aspects of Lloyd's cited by Plaintiffs at best provide an *opportunity* for Syndicates to communicate, and are not sufficient allegations of any association to establish a RICO enterprise.

[22] The Third Circuit did find that Class Plaintiffs' bid rigging allegations in that case might be able to meet this test since they implied active collaboration by the insurers.  As explained in more detail in Section I.C., *supra*, the *Lincoln Adventures* Plaintiffs' bid rigging allegations are far weaker than those of the Class Plaintiffs.  As discussed above, they are conclusory, not specific to the Lloyd's Syndicates, dependent on "guilt by association," and fail to meet Rule 9(b).

coordination" would not establish the existence of an enterprise"); *see also Elsevier*, 692 F. Supp. 2d at 307 (noting that, as with a Sherman Act claim, pleading "nothing more than parallel conduct by separate actors" is not sufficient to support a RICO claim); Gregory P. Joseph, *Civil RICO: A Definitive Guide* 106 (3d ed. 2010) (stating that a rimless hub-and-spoke configuration would not satisfy the 'relationships' part of the RICO statute's enterprise standard).

### B.   Plaintiffs Fail Adequately to Allege that the Syndicates Conducted Any Enterprise

In addition to the absence of an adequately pled RICO enterprise, Plaintiffs fail to sufficiently allege that each defendant "conducted" the enterprise in question. *See Reves v. Ernst & Young*, 505 U.S. 170, 179, 184-85 (1993). Mere association with the enterprise is not sufficient. Judge Brown found that virtually identical allegations in the commercial class plaintiffs' case failed to show that the defendants there conducted the affairs of any enterprise rather than merely conducting their own affairs. *In re Insurance Brokerage Antitrust Litig.*, Nos. 04-Civ-5184(GEB), 05-Civ-1079(GEB), 2007 WL 2892700, at *31 (D.N.J. Sept. 28, 2007), *aff'd in part, vacated in part*, 618 F.3d 300 (3d Cir. 2010) ("2007 Decision"); *Reves*, 505 U.S. at 185.[23]

---

[23] Having affirmed this Court's dismissal of the contingent commission RICO claim based on the failure to plead a RICO enterprise, the Third Circuit did not reach this question of the conduct of the RICO enterprise with respect to those insurers against which there were no specific bid rigging allegations.

Plaintiffs claim that the Syndicates conducted the affairs of the alleged broker-centered enterprises by reaching agreements regarding commissions, monitoring and reporting business levels, computing premium levels, and paying the broker. *See* AC ¶¶ 272(a)-(d).[24] Despite Plaintiffs' use of pejorative terms such as "kickback," all of the referenced conduct takes place in the normal course of each Syndicate's business.  In assessing the commercial class plaintiffs' mirror allegations, Judge Brown concluded that each insurer-defendant would be "expected to perform exactly the same activities while conducting its *own* business." 2007 Decision at 31 n.27 (emphasis in original).  The Court also found that the commercial class plaintiffs could not meet their pleading burden by merely alleging that these "normal" activities of the insurers were performed in a dishonest fashion.  *Id.*; *see also Univ. of Md. v. Peat, Marwick, Main, Co.*, 996 F.2d 1534, 1538-39 (3d Cir. 1993) (providing goods or services that benefit an enterprise does not create RICO liability except when the person knowingly engages in 'directing the enterprise's affairs' through a pattern of racketeering activity") (emphasis in original) (quoting *Reves*, 113 S. Ct. at 1170)); *Redtail Leasing Inc. v. Bellezza*, No. 95-Civ-5191(JFK), 1997 WL 603496, at *5

---

[24] Paragraph 272(e) of the Amended Complaint refers to conclusory bid rigging allegations that do not meet Plaintiffs' pleading requirement. *See supra* at 35-37. Paragraph 272(f) references confidentiality clauses but the Third Circuit held that the confidentiality clauses were not adequate to allege any improper conduct by insurers. *See supra* at n.6.

(S.D.N.Y. Sept. 30, 1997) ("A defendant does not 'direct' an enterprise's affairs under s. 1962(c) merely by engaging in wrongful conduct that assists the enterprise.").  The same rules and outcome apply here.  The Syndicates did not participate in the conduct of any enterprise merely by undertaking normal activities in the ordinary course of their business.

This Court's prior rejection of similar allegations regarding the purported conduct of a RICO enterprise is reinforced by Plaintiffs' own allegations.  They contend that, if the Syndicates did not enter into an agreement with the brokers, they would be disadvantaged and frozen out of opportunities to get business.  *See, e.g.*, AC ¶¶ 94-95, 171.  Given this dynamic, the Syndicates could hardly be said to be conducting any enterprise's business.  Plaintiffs' allegations instead suggest that the Syndicates were more like outsiders or secondary parties, providing goods and services that benefitted the alleged enterprise but not directing its affairs.  *See, e.g.*, *Reves*, 505 U.S. at 185-186; *Peat, Marwick, Main*, 996 F.2d at 159 ("[S]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result.").

## C.    Plaintiffs' Allegations Regarding the "Lloyd's Enterprise" Are Inadequate

The sole basis for alleging a RICO enterprise through the Lloyd's Corporation is the provision of an opportunity for defendants to discuss and advance the claimed schemes.  *See, e.g.*, AC ¶ 107 (alleging that Lloyd's structure

gives Syndicates "opportunity to exchange information").[25]  As the Third Circuit held, Plaintiffs must allege more than mere opportunity, and instead must show a nexus between the defendants' participation in the conduct of the enterprise's affairs and the alleged pattern of racketeering activity.  Third Circuit Decision at 372.  Merely "availing oneself of a forum provided by an enterprise does not, without more, plausibly imply that one has participated in the conduct of that enterprise's affairs."  Third Circuit Decision at 381; *see also Peat, Marwick, Main*, 996 F.2d at 1539.  Otherwise, as both this Court and the Third Circuit recognized, any coffee house could be a RICO enterprise simply because defendants used the facility to meet.  Third Circuit Decision at 380.  And any stock or merchandise exchange could be a RICO enterprise because it provides a space and opportunity for actual or potential competitors to communicate directly with each other.

More is required to establish the required nexus, and Plaintiffs' remaining allegations do not sustain this element of a RICO claim. Plaintiffs allege that the purpose of the Lloyd's enterprise is to "further the interests of the Syndicates and larger brokers generally and to further the Defendants' scheme specifically including implementation and concealment of the scheme."  AC ¶ 285.  The Third

---

[25] *See also*, AC ¶ 281 (alleging again that the structure of the Lloyd's market provides Syndicates with "numerous opportunities to communicate, meet, . . . and reach agreement on how they will address challenges in the marketplace"); AC ¶ 284 ("[T]he Lloyd's Floor has provided the Syndicates and Lloyd's Brokers the opportunity to discuss and reach agreement or joint action regarding disclosure issues.").

Circuit rejected allegations regarding the CIAB that are indistinguishable from these because they fail to satisfy *Twombly*'s requirement of well-pled factual allegations.  *Compare* Third Circuit Decision at 381 with AC ¶ 285.  Further, the fact that an entity exists to promote the interests of its members does not mean that its members participate in the conduct of that entity's affairs if they plot illegal activities at a meeting.  Third Circuit Decision at 381.  There must be some plausibly alleged nexus between the alleged racketeering activity and the conduct of the enterprise in question.  To hold otherwise would mean that every Chamber of Commerce and union risked being held as RICO violators under Plaintiffs' interpretation of the RICO statute.  *See id.*

### D.   Plaintiffs Fail Adequately To Allege a Pattern of Racketeering Activity

Plaintiffs' RICO claims also must be dismissed for failure to allege a pattern of racketeering activity.  The RICO statute requires Plaintiffs to adequately allege at least two acts of racketeering activity within a ten-year period. 18 U.S.C. § 1961 provides an exhaustive list of those acts that qualify as predicate acts.  Antitrust violations are *not* included.  *See* 18 U.S.C. § 1961(1); *Beck v. Prupis*, 529 U.S. 494, 497 n.2 (2000) (noting that the list of predicate acts is exhaustive); *Jennings v. Emry*, 910 F.2d 1434, 1438 (7th Cir. 1990) (noting that a RICO claim based on antitrust violation predicate act is an "irrelevant allegation").

Plaintiffs fail to meet this requirement, despite their attempt to reformulate their antitrust claim as one for mail and wire fraud.  AC ¶¶ 267-268 (alleging mail and wire fraud).  Mail and wire fraud require proof of a "scheme to defraud" which "must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence or comprehension." *Lum*, 361 F.3d at 223.  Non-included predicate acts like antitrust violations cannot be shoehorned into the statute by simply asserting that the mail or wires were used to carry out the act. *See, e.g.*, *Damiano v. Sony Music Entm't*, 975 F. Supp. 623, 632 (D.N.J. 1996) (dismissing the plaintiff's RICO counts since they were "actually nothing more than copyright infringement claims presented as mail fraud and copyright infringement is not a predicate act under RICO").  Here, Plaintiffs allege nothing beyond their antitrust allegations (allegedly non-disclosed contingent commissions and alleged bid-rigging) as the basis for mail or wire fraud.  Such repackaging of claims cannot be the basis for a RICO violation; otherwise the exhaustive list in 18 U.S.C. § 1961 would serve no purpose. *See Schoenbaum v. E.I. Dupont De Nemours & Co.*, 517 F. Supp. 2d 1125, 1148 (E.D. Mo. 2007), *vacated in part*, No. 05-Civ-01108, 2007 WL 3331291 (E.D. Mo. Nov. 6, 2007) (emphasizing that predicate acts must be able to "stand alone" and not be dependent on a non-predicate act claim to constitute "racketeering activity").

Moreover, the RICO claims must be dismissed because Plaintiffs fail to allege them with the requisite specificity. Where mail and wire fraud constitute the alleged predicate racketeering acts, those acts are subject to the heightened pleading requirement of Rule 9(b). *Warden*, 288 F.3d at 114. Rule 9(b) requires that a party state with particularity the circumstances constituting the fraud (such as by specifying the time, place, speaker, and content of the alleged misrepresentation) to provide notice of the precise misconduct with which defendants are charged so as to allow them to respond meaningfully to the complaint. *CareOne, LLC v. Burris*, No. 10-Civ-2309, 2011 WL 2623503, at *8 (D.N.J. June 28, 2011). The Amended Complaint does not allege when any of the materials in question were sent, by whom, to whom, or the manner in which they allegedly were false. *Compare, e.g.*, AC ¶¶ 293-294, 343 (listing many materials allegedly sent via mail/wire but omitting these essential details) *with Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658-59 (3d Cir. 1998), *abrogation on other grounds recognized*, *Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2000) (dismissing the complaint for not specifying "when, by whom, and to whom a mailing was sent, and the precise content of each particular mailing").

Plaintiffs also fail to specify which Syndicates were responsible for which acts of mail or wire fraud. *See, e.g.*, AC ¶ 343 (listing all the materials sent "by Defendants and their co-conspirators" via the mail/wire). Such group pleading

fails to meet the requirements of Rule 9(b).  *See, e.g.*, *Grant v. Turner*, No. 09-Civ-2381(GEB), 2011 WL 1775682, at *9 (D.N.J. May 9, 2011), *aff'd in part, vacated in part by*, 2012 WL 5928145 (D.N.J. Nov. 27, 2012) (by lumping all defendants together, each defendant had not been placed on notice of the exact nature of the claims asserted); *Int'l Transp. Mgmt. Corp. v. Brooks Fitch Apparel Group, LLC*, No. 11-Civ-1921(DMC), 2012 WL 295847, at *5 (D.N.J. Feb. 1, 2012) (allegations set forth against both Defendants do not place each defendant on notice of the "precise misconduct with which they are charged").

Plaintiffs attempt to circumvent Rule 9(b)'s express requirements by pleading that required dates of alleged fraudulent mailings by the Syndicates have been deliberately hidden and cannot be properly alleged.  AC ¶ 344.  The Amended Complaint does not state any facts supporting this alleged subterfuge, which is flatly contradicted by the simultaneous assertion that the alleged scheme depends on the Syndicates sending "thousands of communications" to potential insureds to encourage them to place insurance through the Lloyd's brokers.  AC ¶ 344.  Plaintiffs presumably received at least some of these communications, and the Amended Complaint does not allege that the communications are in the exclusive control of defendants.  In these circumstances, Plaintiffs cannot avoid the express requirements of Rule 9(b).  *See Grant*, 2011 WL 1775682, at *9 (rejecting

argument that plaintiffs could not know who was responsible for mailings at issue and dismissing the complaint for failure to comply with Rule 9(b)).

Finally, Plaintiffs fail to adequately specify an actionable injury under RICO, and instead rest on conclusory allegations that the putative class suffered injury as a result of having to pay higher premiums for insurance. *See, e.g.*, AC ¶¶ 297, 306, 362 (alleging injury as a result of higher premiums); *In re Schering-Plough Corp Intron/Temodar Consumer Class Action*, No. 06-Civ-5774(SRC), 2009 WL 2043604, at *11 (D.N.J. July 10, 2009) (stating that merely alleging an injury to property resulting from an alleged RICO violation is not sufficient; plaintiffs must plead a cognizable injury which requires proof of a concrete financial loss).   Generic allegations of injury resulting from paying higher premiums are not enough to survive a motion to dismiss. *See, e.g.*, *Maio v. Aetna, Inc.*, 221 F.3d 472, 488 (3d Cir. 2000) (rejecting RICO theory of injury that plaintiffs paid too high a premium for inferior health insurance due to alleged fraudulent omissions, finding that such claims did not allege a sufficiently direct and concrete injury); *In re Schering-Plough*, 2009 WL 2043604, at *19 (plaintiffs did not allege a cognizable claim for "concrete financial loss" under RICO based on assertions that they paid more for their "product" than they would have otherwise for defendants' alleged misrepresentations).[26]

---

[26] Plaintiffs allegations that Defendants have conspired to violate RICO under 18

## III.   THE STATE LAW CLAIMS SHOULD BE DISMISSED

Supplemental jurisdiction under 28 U.S.C. § 1367 is the only possible basis for subject matter jurisdiction over Plaintiffs' state claims.   Once the federal antitrust and RICO claims are dismissed as required by the Third Circuit Decision, this Court should decline to exercise supplemental jurisdiction and dismiss the state law claims as well, as Judge Brown did in his prior rulings dismissing the commercial class plaintiffs' claims.  *See* 2007 Decision at *35 (after previously dismissing the federal claims in this action, this Court "declin[ed] to exercise supplemental jurisdiction over … solely state law claims"); *see also Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (explaining that in interests of judicial economy and comity, if federal causes of action are dismissed before trial, state claims should also be dismissed).

## CONCLUSION

Based on the foregoing points and authorities, the Amended Complaint should be dismissed with prejudice in its entirety without leave to further amend.

---

U.S.C. § 1962(d) (AC ¶ 388) similarly fail because a conspiracy claim exists only if a viable substantive RICO claim is alleged.  Since all substantive RICO claims must be dismissed based on the Third Circuit decision, Plaintiffs cannot bring a valid § 1962(d) claim. *See Beck v. Prupis*, 529 U.S. 494, 505 (2000).

Dated: December 4, 2012     By their attorneys,

            *Certain Underwriters at Lloyd's, London Organized as Syndicates 33, 102, 382, 435, 510, 623, 727, 958, 1003, 1084, 1096, 1183, 1245, 1886, 2003, 2020, 2623 and 2987*

            /s/ Anne Johnson Palmer
            Kenneth W. Erickson
            Robert A. Skinner
            Anne Johnson Palmer
            ROPES & GRAY LLP
            Prudential Tower
            800 Boylston Street
            Boston, MA 02199-3600
            Telephone: (617) 951-7000
            Fax: (617) 951-7050

            *Certain Underwriters at Lloyd's, London Organized as Syndicate 2791 MAP*

            /s/ Thomas F. Bush
            Thomas F. Bush
            Edwards Wildman Palmer LLP
            225 West Wacker Drive, Suite 3000
            Chicago, IL 60606-1229
            Telephone: (312) 201-2000
            Fax: (312) 201-2555

*Certain Underwriters at Lloyd's, London Organized as Syndicate 2001 (AML)*

/s/ John M. Toriello
John M. Toriello
Robert J. Burns
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York  10019
Telephone: (212) 513-3200
Facsimile: (212) 385-9010

*Certain Underwriters at Lloyd's, London Organized as Syndicates 570 and 609*

/s/ James T.H. Deaver
Wendy Jeanne Lindstrom
James T.H. Deaver
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
150 East 42nd Street
New York, New York 10017
Tel:  (212) 490-3000
Fax: (212) 490-3038

*Certain Underwriters at Lloyd's,*
*London Organized as Syndicates 2488*

By its attorneys,

/s/ Johnny W. Carter
Neal S. Manne
Johnny W. Carter
Genevieve Vose
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Ste. 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

Marc D. Haefner
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  (973) 535-0500
Facsimile:  (973) 535-9217

53