# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

------------------------------------------------------------

| | |
|---|---|
| IN RE:  INSURANCE BROKERAGE ANTITRUST LITIGATION | :   **MDL No. 1663** |
| | : |
| This Document Relates to: | :   **Master Docket 04-cv-5184** |
| | : |
| *Lincoln Adventures, LLC, et al. v. Certain* *Underwriters of Lloyd's of London, et al.,* Civ. No. 2:08-cv-00235- CCC-JAD | : : : |
| | : |

------------------------------------------------------------


# DEFENDANTS CERTAIN UNDERWRITERS AT LLOYD'S
## OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE
## TO FILE THE SECOND AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT .................................................................1

BACKGROUND ...................................................................................5

    A.    Plaintiffs' FAC Alleges Broker-Centered Conspiracies and Mirrors
    the Allegations in the Commercial Case .......................................5

    B.    Plaintiffs' Proposed SAC Seeks To Pursue A Completely Different
    Theory of the Case And Add Many New Parties .............................7

    A.    The Facts Underlying Plaintiffs' SAC Allegations Were Available
    To Plaintiffs When They Filed Their FAC ....................................13

        1.    New Parties ....................................................................13

        2.    Subscription Model Allegations ........................................14

        3.    Corporation of Lloyd's/FPD Allegations ............................15

        4.    Lloyd's Market Association Allegations ..............................16

ARGUMENT ......................................................................................16

I.    GRANTING PLAINTIFFS' AMENDMENT WOULD UNDULY
    PREJUDICE DEFENDANTS ..........................................................17

    A.    Plaintiffs' New Case Theory Would Require The Syndicates To
    Start From Scratch With Extensive New Discovery And
    Investigation ..........................................................................17

    B.    The Proposed Amended Complaint Would Significantly Delay
    Resolution of the Case .............................................................21

    C.    Plaintiffs' Discovery Complaints Have No Bearing on the Motion ...25

II.    PLAINTIFFS' AMENDED PLEADING HAS NO LEGAL BASIS ...........27

    A.    Plaintiffs' Proposed Sherman Act Claims Fail the Rule-of-Reason
    Test ......................................................................................28

        1.    Plaintiffs' Claims Are Evaluated Under The Rule-of-Reason
        Test .............................................................................28

        2.    Plaintiffs' Claims Cannot Satisfy the Rule-of-Reason Test .....31

i

B.     Plaintiffs' Amended Complaint Improperly Seeks To Regulate Foreign Conduct ................................................................34

    1.    The SAC Fails To Meet The Requirements Of The FTAIA ....34

    2.    The SAC Would be Subject to Dismissal on Comity Grounds ...................................................................35

    3.    The SAC Would be Subject to Dismissal on Forum Non Conveniens Grounds .............................................36

C.     Plaintiffs' Claims Are Time-Barred ....................................38

CONCLUSION .........................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
    483 U.S. 143 (1987)...........................................................................38

*Allen v. Lloyd's of London*,
    94 F.3d 923 (4th Cir. 1996) ...........................................................36

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
    654 F.3d 462 (3d Cir. 2011) ...........................................................35

*Berger v. Edgewater Steel Co.*,
    911 F.2d 911 (3d Cir. 1990) ..........................................17, 18, 20, 23

*Berkshire Fashions, Inc. v. M.V. Hakusan II*,
    954 F.2d 874 (3d Cir. 1992)...........................................................17

*Bremen v. Zapata Off-Shore Co.*,
    407 U.S. 1 (1972)...........................................................................34

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
    485 U.S. 717 (1988).......................................................................29

*Capital Currency Exch. v. Nat'l Westminster Bank , PLC*,
    155 F.3d 603 (2d Cir. 1998) ..........................................................36

*Capuano v. Kenneth Eisen & Assocs. Ltd.*,
    No. CV-11-02395, 2012 WL 2376675 (D. Ariz. June 22, 2012) .....................20

*Carr v. New Jersey*,
    No. 09-cv-913, 2012 WL 1574286 (D.N.J. May 3, 2012) ................................18

*Cavlam Bus. Ltd. v. Certain Underwriters at Lloyd's, London*,
    No. 08-cv-2225, 2009 WL 667272 (S.D.N.Y. Mar. 16, 2009) .........................37

*Coulson v. Town of Kearny*,
    No. 07-5893, 2010 WL 331347 (D.N.J. Jan. 19, 2010) ...................................23

*Cureton v. Nat'l Collegiate Athletic Ass'n*,
    252 F.3d 267 (3d Cir. 2001) ..........................................................17, 18, 22

iii

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
  100 F.3d 462 (6th Cir. 1996) ...................................................................40

*Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*,
  500 F. Supp. 2d 437 (D.N.J. 2007)........................................................35

*Eurofins Pharma US Holdings v. BioAlliance Pharma SA*,
  623 F.3d 147 (3d Cir. 2010) ...................................................36, 37, 38

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004)..................................................................................34

*Foman v. Davis*,
  371 U.S. 178 (1962)..................................................................................17

*Ford Motor Co. v. Edgewood Properties, Inc.*,
  Civ. No. 06-1278 ...............................................................................18, 24

*Genentech, Inc. v. Abbott Labs.*,
  127 F.R.D. 529 (N.D. Cal. 1989)............................................................20

*Glover v. FDIC*,
  698 F.3d 139 (3d Cir. 2012) ...................................................................39

*Hartford Fire Ins. Co. v. California*,
  509 U.S. 764 (1993)..................................................................................35

*In re Bristol-Myers Squibb Securities Litigation*,
  228 F.R.D. 221 (D.N.J. 2005).........................................................22, 23

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ............................................................29, 33

*In re Pharmacy Benefit Managers Antitrust Litig.*,
  582 F.3d 432 (3d Cir. 2009) ...................................................................29

*In re Proposed Acquisition of Control of or Merger with Travelers Property
  Casualty Corp. by The St. Paul Cos., Inc.*
  (Conn. Ins. Dept. Mar. 2, 2004)..........................................................33

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984)......................................................................................29

*Klehr v. A.O. Smith Corp.*,
     521 U.S. 179 (1997)..............................................................................40

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
     551 U.S. 877 (2007)........................................................................28, 29

*Long v. Wilson*,
     393 F.3d 390 (3d Cir. 2004) ....................................................17, 20, 22

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
     No. 07-cv-8455, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ........40

*Nat'l Collegiate Athletic Ass'n v. Board of Regents*,
     468 U.S. 85 (1984) ............................................................................30

*Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*,
     325 F.3d 712 (6th Cir. 2003) ..............................................................30

*Princeton Football Partners LLC v. Football Ass'n of Ireland*,
     No. 11-cv-5227, 2012 WL 2995199 (D.N.J. July 23, 2012)........36, 37

*Queen City Pizza, Inc. v. Domino's Pizza Inc.*,
     124 F.3d 430 (3d Cir. 1997) ...............................................................32

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*,
     899 F.2d 951 (10th Cir. 1990) ...........................................................33

*Roby v. Corp. of Lloyd's*,
     996 F.2d 1353 (2d Cir. 1993) .............................................................36

*Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*,
     796 F.2d 821 (5th Cir. 1986) ..............................................................37

*Todd v. Exxon Corp.*,
     275 F.3d 191 (2d Cir. 2001) ...............................................................31

*Turicentro, S.A. v. Am. Airlines, Inc.*,
     303 F.3d 293 (3d Cir. 2002) ...............................................................35

*U.S. v. Realty Multi-List, Inc.*,
     629 F.2d 1351 (11th Cir. 1980) ..........................................................30

*United States v. United States Gypsum Co.*,
   438 U.S. 423 (1978)................................................................31

*United States v. UnitedHealth Group, Inc.*,
   No. 05-CV-02436 (D.D.C. Mar. 3, 2006) ........................................33

*Urdinaran v. Aarons*,
   115 F. Supp. 2d 484 (D.N.J. 2000) ..................................................31

*West Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ............................................................40

**STATUTES**

15 U.S.C. § 6a ..........................................................................................34

15 U.S.C. § 15b ........................................................................................38

RICO ..............................................................................................*passim*

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 15(a)......................................................16

Federal Rule of Civil Procedure Rule 15(c)(1).........................................39

Federal Rule of Civil Procedure Rule 30(b)(6) .........................................7

## PRELIMINARY STATEMENT

In 2007, Plaintiffs filed this action asserting claims that mirrored the claims asserted in the original class action in this MDL.  Plaintiffs alleged that the Syndicates entered into compensation agreements with three large U.S. insurance brokers whereby the brokers steered business to the Syndicates in exchange for "contingent commissions," and then concealed their anti-competitive conduct through the use of false bids to create the appearance of a competitive market. More than six years later, Plaintiffs now seek leave to amend their complaint to plead an entirely new claim: that a non-insurer, the Corporation of Lloyd's – a proposed new defendant that is authorized by U.K. statute to regulate the business of insurance at Lloyd's – controls capacity and that the subscription basis on which insurance business is often placed at Lloyd's "eliminates the incentive for Syndicates to compete for business."  Plaintiffs' proposed Second Amended Complaint ("SAC"), Dkt. 2604, ¶ 14.  According to Plaintiffs' latest theory, the manner in which U.K. authorities regulate the insurance business at Lloyd's (ensuring the solvency of those who sell insurance there and thereby safeguarding the interests of those who purchase insurance there), as well as the basic manner in which insurance has been sold at Lloyd's for hundreds of years, are an antitrust conspiracy.  Ironically, given the 2008-2009 financial crisis, Plaintiffs claim that these regulations are *more* frequent and detailed than is necessary for prudential

1

regulation.

More than six years after commencing this action, after two previous attempts at pleading a viable complaint, and after more than a year of protracted and expensive class-wide discovery, Plaintiffs seek a fresh start they do not deserve.  They want to start over because:

- Extensive discovery has disproven their original claims;

- The Third Circuit ruled in the "commercial" class action, after Plaintiffs initiated this action, that the legal theories they asserted had no merit; and

- Plaintiffs want to force the Syndicates to continue this baseless litigation for several more years.

The Court should not grant Plaintiffs the "do-over" they seek.  Permitting Plaintiffs to begin again with a completely new theory and sixteen new parties at this stage of the litigation would cause substantial prejudice to the Syndicates and undue delay to this Court.  Plaintiffs' Motion to Amend should be rejected.

In 2005, this MDL was created to handle several dozen cases that were filed in the wake of civil and criminal allegations that the U.S. operations of three large brokers (Marsh, Aon, and Willis) and various insurers unlawfully allocated U.S. insurance markets by rigging bids and entering into volume-based compensation agreements in certain lines of business.  The criminal cases collapsed after two long trials resulted in acquittals of almost all defendants.  The original consolidated

putative civil class action in this MDL (the "commercial case") was dismissed by this Court (a decision that was affirmed by the Third Circuit with narrow exceptions), and the limited case that remained has now settled. Nearly all of the tag-along actions in this MDL have similarly either been dismissed or settled. This case is one of only three that remain in the MDL and the only one where the plaintiffs are looking to amend their pleading to an entirely different case theory.

Plaintiffs filed this case in 2007 in an attempt to assert copycat claims against 23 London-based syndicates on the assumption that bid-rigging and anticompetitive activity "must" have occurred at Lloyd's through the U.K. operations of the same three brokers whose U.S. arms were at issue in the U.S. investigations. More than a year of class-wide discovery specific to the allegations in this case has now disproven Plaintiffs' original assumptions.

As a result, Plaintiffs now seek to amend their complaint for a second time, bringing entirely new allegations more than six years after they commenced this action, adding sixteen new parties, and seeking wide-ranging injunctive relief. The new theory in Plaintiffs' proposed amendment centers on facts regarding the Corporation of Lloyd's statutorily mandated regulatory role (pursuant to Byelaws and requirements the operation of which are overseen by the U.K. financial

3

regulators[1]), all or substantially all of which facts were available to them when they filed their first complaint in 2007 and certainly by the time of the first amended complaint in 2012.  Plaintiffs, however, waited until discovery confirmed the lack of any merit to their original allegations and now ask the Court to allow them to start over, thereby extending this MDL into its second decade.

Plaintiffs' request for leave to amend their complaint should be rejected for multiple reasons.  First, the amendment would result in substantial prejudice to the Syndicates by subjecting them to extensive additional discovery and factual investigation.  Plaintiffs propose to pursue an entirely new case and add multiple new plaintiffs and defendants, all of which would result in the parties repeating the long and expensive discovery process that is nearly complete.  Indeed, one of the proposed new defendants is the Corporation of Lloyd's, which purportedly stands at the very heart of the wholly new conspiracy now alleged by Plaintiffs.  Second, the proposed amendment would substantially delay the resolution of the case, prejudicing the Syndicates and resulting in undue delay for the Court.  In addition, as would be demonstrated by the Syndicates if the SAC is allowed to reach the motion to dismiss stage, Plaintiffs' latest theory is even less viable than the one they have jettisoned.  Crucially, Plaintiffs' new allegations focus on *vertical* relationships between the Syndicates and the Corporation of Lloyd's and are thus

---

[1] Pursuant to the Lloyd's Act 1982, passed by Parliament, the Council of Lloyd's is authorized to establish Byelaws with respect to the conduct of business at Lloyd's.

4

subject to a "rule of reason" analysis and not any *per se* liability standard.

Plaintiffs, however, have not plausibly alleged a rule-of-reason claim.[2]  Based both

on this and other independent grounds described below, Plaintiffs do not have a

sustainable legal basis for their new allegations.  Leave to amend should be denied.

## BACKGROUND

This tag-along action was filed in July 2007 and transferred to this Court to

join the MDL proceedings in January 2008.  Since it arrived in the MDL after the

dismissal in the commercial case, it was subject to the Court's stay of proceedings

pending the appeal of those rulings to the Third Circuit.  On October 20, 2011,

after the Third Circuit rendered its decision in the commercial case, this Court

lifted the stay (Dkt. 1922), and the parties later commenced discovery in this action.

Plaintiffs were given the opportunity to amend their complaint in light of the Third

Circuit decision, and with the benefit of access to all MDL discovery and to

discovery materials produced by the Syndicates.  Plaintiffs took this opportunity,

filing the current Amended Complaint ("FAC") on November 14, 2012.  Dkt. 2312.

### A.    Plaintiffs' FAC Alleges Broker-Centered Conspiracies and Mirrors the Allegations in the Commercial Case

Plaintiffs' FAC asserts substantially the same antitrust, RICO, and related

---

[2] In addition, if leave is granted, these defendants and the new defendants, including the Corporation of Lloyd's, will present a vigorous challenge to the SAC, which offers the novel theory that the regulation of insurance at Lloyd's, as authorized and overseen by U.K. regulators, violates U.S. antitrust laws and RICO.

state-law claims as in the commercial case, simply seeking to apply the same theories (and using much of the same language) to the Syndicates in London.   Just as the commercial class plaintiffs did, Plaintiffs here centered their antitrust and RICO claims on the conduct of Marsh, Aon, and Willis.  *Compare* Class Plaintiffs' Second Consolidated Amended Commercial Class Action Complaint ("Comm. Cmplt."), Dkt. No. 1240, ¶¶ 85, 129, 159, 264-65 (describing contingent commission agreements between the class defendants and each of Marsh, Aon, and Willis) *with* FAC ¶¶ 5, 13, 129 (same as to the Syndicates); ¶ 268 (alleging the Syndicates formed bilateral "broker-centered" RICO conspiracies with each of Marsh, Aon, and Willis).  Identical to the commercial class plaintiffs, Plaintiffs here alleged in the FAC that Marsh, Aon and Willis threatened to deny access to their books of business if the insurers refused to pay contingent commissions. *Compare* Comm. Cmplt. ¶¶ 135-140 (alleging that Marsh routinely threatened to withdraw business and incumbent protections to U.S. insurers if no contingent commissions were paid) *with* FAC ¶ 13 (alleging that brokers in London "threatened to take away business if the Syndicates refused to agree to pay kickbacks . . ."); ¶¶ 171, 211, 215 (same).  Similarly, both the commercial class plaintiffs and Plaintiffs here alleged that brokers and insurers participated in bid rigging.  *Compare* Comm. Cmplt. ¶¶ 67-68 (alleging that insurer-defendants agreed not to compete with each other and brokers facilitated this agreement via

"last looks" and other protective devices) *with* FAC ¶¶ 215-219 (same).

Discovery has proceeded in this case since October 20, 2011 and class-wide discovery began, over the Syndicates' objections, on September 26, 2012.  After repeated extensions of the deadline, fact discovery closed on September 30, 2013. *See, e.g.*, Dkt. 2397; Dkt. 2424; Dkt. 2547.  Defendants completed the majority of their document production by December 2012.  The Syndicates have produced millions of pages of documents and hundreds of thousands of lines of policy-level data from their proprietary underwriting systems, and they have responded to broad and far-ranging written discovery.  Additionally, Plaintiffs have taken over 40 depositions, including Rule 30(b)(6) depositions of the Syndicates on eleven different broad topics, as well as individual depositions of underwriters, compliance personnel, and employees responsible for broker relations at the Syndicates.  Despite this extensive discovery, Plaintiffs have not developed evidence of any horizontal conspiracy or anticompetitive agreement among the Syndicates, a prerequisite to their antitrust and RICO claims.  Nor have they found a single instance of any Syndicate underwriter issuing a sham or bogus quote, or even knowing of such practices occurring at Lloyd's.

### B.    Plaintiffs' Proposed SAC Seeks To Pursue A Completely Different Theory of the Case And Add Many New Parties

Faced with a record that disproves their original claims, Plaintiffs now move the Court for leave to amend their complaint yet again.  *See* Dkts. 2603, 2604.

7

Plaintiffs' SAC not only seeks to add three new plaintiffs and thirteen new defendants, it also seeks to transform their entire case, de-emphasizing the allegations that have been disproven by discovery and focusing instead on an entirely new theory of liability which has no basis in the FAC. Simply put, the proposed SAC is a brand new case.

First, Plaintiffs seek to add Harry Weiss, Inc., Elie Jewelry Inc., and E.W. International Diamonds Inc. (SAC ¶¶ 35-37) as named plaintiffs in addition to original plaintiffs Lincoln Adventures and Michigan Multi-King ("MMK"). In addition to the 23 Syndicates that are already named, Plaintiffs would add thirteen further defendants: the Corporation of Lloyd's and Syndicates 457, 1200, 1206, 1209, 1221, 1967, 2007, 4000, 4020, 4040, 4141, and 4472. SAC ¶¶ 38-73.

Second, the SAC proposes an entirely new theory of the case arising under different principles of antitrust law. While the FAC primarily alleges broker-centered conspiracies where premiums were supposedly inflated due to the payment of volume-based "contingent commissions" and bid-rigging, the SAC alleges a conspiracy centered on the Corporation of Lloyd's that supposedly increased premiums through an entirely different mechanism. Plaintiffs' FAC focuses on alleged "broker-centered or bilateral enterprises" yet there is no mention of such enterprises in the SAC. *Compare* FAC ¶¶ 268-79; 298-305 *with* SAC *passim*. The SAC instead focuses on the Corporation of Lloyd's, alleging

that it is at the center of a new alleged conspiracy, setting the individual syndicates' capacity and allocating business among them.  *See, e.g.,* SAC ¶¶ 3-9, 117-122, 125. The Corporation of Lloyd's allegedly accomplishes this through its Franchise Performance Directorate ("FPD"), an entity not even mentioned in the FAC.

This shift in theories is evidenced by a comparison of the allegations in the FAC and SAC.  The FAC claims that the "balance of power" has shifted to the brokers with the Syndicates "begging the brokers for business."  FAC ¶ 95.  The SAC, however, alleges that the Corporation of Lloyd's (through the FPD) "systematically operated the Lloyd's market" and coordinated Syndicate output to "achieve optimum profitability."  *See* SAC ¶¶ 2-9.  Indeed, the SAC alleges that the Corporation of Lloyd's would not "permit" a broker "to use the Lloyd's brand" if a broker was not placing a "reasonable volume of business."  *Id*. ¶ 200.

The FAC further alleges that the Syndicates had to enter into "contingent commission" agreements in order to ensure that brokers gave them business.  FAC ¶¶ 13, 94-95, 171.  The SAC, by contrast, avers that brokers sent business to the Syndicates "as directed by Lloyd's authorization of each Syndicate's allocated underwriting capacity."  SAC ¶ 206.[3]  Moreover, while the FAC alleges broker-

---

[3] In an apparent (and unsuccessful) attempt to invoke the relation-back doctrine, Plaintiffs maintain some allegations concerning brokers and the U.S. investigations of them in the SAC.  *See, e.g.*, SAC ¶¶ 228-243.  Compared to the FAC, however, such allegations get light treatment at best in the SAC and are in fact inconsistent with the majority of the allegations in the SAC.  *Compare, e.g.*, SAC ¶ 237

requested "bid-rigging" and "bid manipulation" at Lloyd's, those allegations in the SAC have been reduced to a single paragraph, asserted "on information and belief." *Compare* FAC ¶¶ 200-18 *with* SAC ¶ 243.  In their place, the SAC focuses on the Syndicates' alleged use of the subscription model at Lloyd's to "discourage competition" and "ensure[] supra-competitive pricing" (SAC ¶¶ 155-164), an allegation that is conspicuously absent from the FAC.[4]

The named parties in the SAC further illustrate this shift in Plaintiffs' theory. In the FAC, the named Plaintiffs all allegedly purchased their insurance in question through one of the "big three" brokers (Marsh, Aon, or Willis) which supposedly ran Plaintiffs' conspiracies.  *See, e.g.*, FAC ¶ 268 (identifying three association-in-fact enterprises "between the Syndicates and Marsh, the Syndicates and Aon, and the Syndicates and Willis, respectively"); *id.* ¶ 209 ("On information and belief, the big three brokers, Marsh, Aon and Willis requested 'no bids' or 'no quotes' from the Lloyd's Syndicates").  In the SAC, however, the new named plaintiffs purchased their insurance from non-"big three" brokers.  *See, e.g.*, SAC ¶ 84 (Harrison, Dillion, Bond & Williams); *id.* ¶ 85 (S.J. International Brokers); *id.* ¶ 86

---

("Syndicates also offered other inducements to incentivize brokers to steer premium their way") *with* SAC ¶ 206 (alleging that brokers provide Syndicates with premium volume "as directed by Lloyd's authorization").

[4] The subscription model is mentioned in just one paragraph in the FAC.  *See* FAC ¶ 106.  The FAC alleges that the subscription model through which insurance often is written at Lloyd's provided an opportunity for Syndicates to learn information about their competitors, but there is no mention in the FAC about the subscription model hindering competition or resulting in higher prices.

(Steinmetz International Limited).  Because the SAC shifts focus from broker-centered conspiracies to a Corporation of Lloyd's-centered one, Plaintiffs seem to believe this limitation to the "big three" brokers is no longer necessary.  Likewise, the FAC lists Marsh, Aon, Willis and all their affiliates as individually identified co-conspirators.  *See* FAC ¶¶ 60-69.  Tellingly, the SAC does not.  SAC ¶ 78.

Plaintiffs' radical shift in theory carries through to their causes of action in the SAC.  Count I of the FAC asserts liability based on agreements between the Syndicates and *brokers* to reduce competition.  *See, e.g.*, FAC ¶ 318 ("the Defendant Lloyd's Syndicates and Lloyd's Brokers agreed to reduce and/or eliminate competition . . .").  There is no mention of the Corporation of Lloyd's or the FPD.  The SAC's Count I, in contrast, alleges liability based on agreements only between the defendant Syndicates and the Corporation of Lloyd's – with no mention of the brokers.  *See, e.g.*, SAC ¶ 362 ("The Defendants agreed to reduce and/or eliminate competition . . .").  Indeed, because all the key parties to Plaintiffs' new conspiracy theory are now named defendants, Plaintiffs seek to enjoin the Corporation of Lloyd's and the Syndicates' alleged violations of the Sherman Act. SAC Count II (¶¶ 369-78).  There is no parallel count in the FAC.  This pattern repeats itself in Plaintiffs' "Class Action Allegations."  The FAC's proposed class includes those individuals who purchased insurance "through a Lloyd's Broker." FAC ¶ 241.  In the SAC, however, the proposed class includes individuals who

purchased insurance "with a Defendant Syndicate," without any mention of brokers.  SAC ¶ 292.

      Recognizing how stark their shift in theories is, and the risk it presents, Plaintiffs attempt to argue that the new factual allegations are "not entirely new" to this action and were addressed in the FAC, albeit in a "more limited" fashion.  Mot. at 3.  This is clearly not the case.  That the FAC mentions the Corporation of Lloyd's and the Lloyd's Market Association ("LMA") (Mot. at 3) does not change the fact that the majority of Plaintiffs' SAC allegations are new.  While the FAC does mention the Corporation of Lloyd's, it does not once mention the FPD – the alleged locus of anti-competitive conduct in the SAC.  Nor does the FAC even suggest that the Corporation of Lloyd's restricted competition and controlled output.  Instead, the majority of Plaintiffs' allegations in the FAC concerning the Corporation of Lloyd's describe a passive entity, one that performed administrative functions and allegedly provided a forum where the Syndicates had an opportunity to collude.  *See, e.g.*, FAC ¶ 284 ("[T]he Lloyd's Floor has provided the Syndicates and Lloyd's Brokers the opportunity to discuss and reach agreement").[5]

---

[5] Similarly, the LMA is mentioned in only four unconnected paragraphs in the FAC. FAC ¶¶ 221, 281, 326, 340.   The LMA is portrayed as a passive entity providing an opportunity for the Syndicates to allegedly conspire.  *See, e.g.*, FAC ¶ 281 ("[T]he Lloyd's floor, the structure of the Lloyd's Market and the [LMA] provide Defendants and their co-conspirators with numerous opportunities to communicate . . . .").  The SAC, by contrast, alleges that the LMA actively helps control the conspiracy, by "process[ing] and disseminat[ing] a vast array of market

**A.    The Facts Underlying Plaintiffs' SAC Allegations Were Available To Plaintiffs When They Filed Their FAC**

Plaintiffs claim that "[t]he majority of the facts underlying these amendments were not known prior to Plaintiffs obtaining access to the discovery materials" (Mot. at 14), but fail to identify with the required specificity these purportedly recently-discovered facts. Indeed, virtually all of the facts on which the SAC relies were known to Plaintiffs or publicly available in 2007 (the date of the original complaint), and certainly by November 2012 (the date of the FAC).

**1.    New Parties**

Seven of the proposed new Syndicate defendants (Syndicates 1200, 1206, 1967, 4020, 4040, 4141, 4472) were insurers of original named plaintiff MMK between 2007 and 2010. *See* SAC ¶ 83. Plaintiffs clearly knew that MMK was insured by these Syndicates before they filed the FAC in 2012. They simply chose not to name them as defendants. Similarly, the SAC's three new named plaintiffs all purchased their policies before Plaintiffs filed their FAC, if not before the original complaint. Plaintiffs offer no reason why these proposed defendants and plaintiffs were not added in 2007 or 2012. The reason is transparent: because the

---

information", creating a "joint set of underwriting guidelines", "coordinat[ing] action among the Syndicates", and "facilitat[ing] market responses to regulatory scrutiny to avoid liability." *See* SAC ¶¶ 183-184, 191, 194. This is quite distinct from the broker-centered conspiracy allegations in the FAC.

new plaintiffs did not purchase their coverage through Marsh, Aon or Willis' broking services, these parties did not fit Plaintiffs' prior theory of the case.[6]

Similarly, as Plaintiffs themselves note, the Corporation of Lloyd's was referenced in the FAC (and even the original 2007 complaint). Plaintiffs cannot claim not to have known about the Corporation of Lloyd's or its role previously. *See infra* at 15-16. Instead, it is apparent that the radical shift in Plaintiffs' alleged theory of the case renders the Corporation of Lloyd's now a sufficiently significant actor to warrant being named.

### 2.     Subscription Model Allegations

Unlike the FAC, Plaintiffs now seek to allege that the subscription method for writing insurance is central to their alleged conspiracy. *See* SAC ¶¶ 155-64. The underwriting of insurance at Lloyd's has been structured as a subscription model since its inception centuries ago, and Plaintiffs cannot plausibly contend that they just learned about this fundamental aspect of the Syndicates' business during discovery. Indeed, Plaintiffs' own SAC alleges that the European Commission investigated competition concerns about the subscription model starting in 2005. *See, e.g.*, SAC ¶¶ 276-280 (quoting the European Commission that "the

---

[6] Plaintiffs' continued efforts to allege any claim possible against any defendant have lead them to sue syndicates related to insurers, such as XL and Liberty, that have already been released from this MDL. Plaintiffs themselves recognize that they have no claim against Willis, for example, due to the very same document that released XL and Liberty from the case. *See* SAC p. 25 n.2.

subscription practice in the way that it currently works may act, at least in theory, to underpin collusion"). Despite such statements being publicly available, Plaintiffs instead focused their theories on broker-centered conspiracies. They waited approximately six years before making entirely new allegations regarding the supposed anti-competitive nature of the subscription model.[7]

### 3. Corporation of Lloyd's/FPD Allegations

Similarly, the facts underlying Plaintiffs' allegations regarding the Corporation of Lloyd's and the FPD were available to Plaintiffs long before they filed their SAC. For example, multiple publicly available documents disclosed prior to 2007 (1) that the Corporation of Lloyd's transitioned to a "franchise" model in 2003[8] (as alleged at SAC ¶ 108); (2) the structure of the Corporation of Lloyd's[9] (SAC ¶ 111); and (3) the structure and role of the Council of Lloyd's (SAC ¶¶ 112-16) and the FPD[10] (SAC ¶¶ 117-120). That Syndicates provided certain business information to the Corporation of Lloyd's such as Syndicate

---

[7] Notably, Plaintiffs did *not* reference the more recent 2013 Ernst and Young report produced for the European Commission that dismissed the potential concerns expressed in earlier reports. Ernst and Young emphasized that they "did not identify any agreements or concerted practices between undertakings, to align premiums." *See* Declaration of Anne Johnson Palmer in Support of Defendants Opposition to Plaintiffs' Motion for Leave to Amend ("Palmer Decl."), Ex. 1 at iii.

[8] *See, e.g.*, Palmer Decl. Ex. 2 at 33; Ex. 3 at 75; Ex. 4 at 76; and Ex. 5 at 28.

[9] *See, e.g.*, Palmer Decl. Ex. 4 at 10-11; Ex. 5 at 28-31; Ex. 6; Ex. 7.

[10] *See, e.g.*, Palmer Decl. Ex. 2 at 30-35; Ex. 3 at 75-76; Ex. 4 at 14-15, 76-77; Ex. 5 at 31-32; Ex. 8; Ex. 9.

Business Forecasts, Syndicate Quarterly Monitoring Reports, etc. (SAC ¶¶ 120-52) was also public knowledge prior to 2007.[11]  Indeed, many of the quotes Plaintiffs use concerning the role of the FPD come directly from pre-2007 publicly available documents.[12]  *See, e.g.*, SAC ¶¶ 118, 138, 146.

### 4.    Lloyd's Market Association Allegations

Finally, Plaintiffs' allegations in the SAC concerning the role of the LMA are also based on facts available before discovery started.  Plaintiffs' statements concerning the LMA's role and purpose come directly from the LMA's website.[13] *See* SAC ¶ 181.  Similarly, the LMA discloses publicly that it provides (1) quarterly loss data such as loss ratio triangulations and premium settlement reports (SAC ¶¶ 185-187); and (2) model wordings for use in underwriting.[14]  SAC ¶ 191. In short, the facts underlying most of Plaintiffs' new allegations were available to them for years.  Although the conclusions that Plaintiffs draw from these facts are illogical and unsupportable, it is beyond dispute that Plaintiffs could have made these allegations in their original complaint in 2007 or the FAC in 2012.

### ARGUMENT

Motions for leave to amend are governed by Federal Rule of Civil Procedure

---

[11] *See, e.g.*, Palmer Decl. Ex. 2 at 5; Ex. 4 at 15; Ex. 5 at 28-30; Ex. 9; 10; 11.

[12] *See, e.g.*, Palmer Decl. Ex. 2 at 31, 5; Ex. 12 at 3.

[13] *See, e.g.*, Palmer Decl. Ex. 13.

[14] *See, e.g.*, Palmer Decl. Ex. 14, 15, 16.

15(a).  A district court may deny a motion to amend if there is undue delay, bad faith, undue prejudice to the opposing party, or if the amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 886 (3d Cir. 1992).

## I.   GRANTING PLAINTIFFS' AMENDMENT WOULD UNDULY PREJUDICE DEFENDANTS

### A.   Plaintiffs' New Case Theory Would Require The Syndicates To Start From Scratch With Extensive New Discovery And Investigation

Granting Plaintiffs leave to amend, after more than a year of protracted and expensive discovery, would cause the Syndicates substantial prejudice.  As Plaintiffs' own cases acknowledge, the Syndicates are prejudiced if the amendment would "require the [Syndicates] to expend significant additional resources to conduct discovery and prepare for trial."  Mot. at 18; *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004); *see also Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001) ("substantial or undue prejudice" and denial of leave to amend exist where "allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories").

The Third Circuit repeatedly has upheld a trial court's discretion to deny leave to amend because of undue prejudice where the proposed amendment would necessitate extensive additional discovery.  For example, in *Berger v. Edgewater Steel Co.*, 911 F.2d 911 (3d Cir. 1990), the Third Circuit affirmed denial of leave

17

to amend on grounds of substantial prejudice where the amendment "would inject new issues into the case requiring extensive discovery" and "would entail extensive factual investigation." *Id.* at 924; *see also Cureton*, 252 F.3d at 274 (affirming denial of leave where proposed amendment "would lead to further discovery requests and significant new preparation" and "'would essentially force the [defendant] to begin litigating this case again'") (internal quotation omitted). Likewise, district courts in New Jersey have rejected motions to amend due to prejudice to defendants in cases analogous to the instant case. In *Ford Motor Co. v. Edgewood Properties, Inc.*, Civ. No. 06-1278, the district court noted that the "need for extensive additional discovery can constitute undue prejudice to the opposing party" and upheld the finding of such prejudice because (1) documents would have to be re-reviewed with claims by the additional parties in mind; and (2) new depositions would be necessary, even if it was possible that the additional discovery could be completed by the scheduled end of fact discovery. 2011 WL 1599609, at *4 (D.N.J. Apr. 27, 2011); *see also Carr v. New Jersey*, No. 09-cv-913, 2012 WL 1574286, at *3 (D.N.J. May 3, 2012) (prejudice to defendants because plaintiff "seeks to bring an entirely new claim and theory" and defendants "would be required to defend against (and take discovery relating to) a . . . claim, which differs in type and scope from the claims in this case to date").

18

Consistent with these authorities, Plaintiffs' motion for leave should be denied. Plaintiffs' proposed new allegations would require the Syndicates to expend significant additional resources both to conduct new discovery and to prepare for trial. As detailed above, the Syndicates have already presented dozens of witnesses and produced millions of pages of documents and hundreds of thousands of lines of data, and now Plaintiffs seek to replace the theory of their case with an entirely new theory.

Plaintiffs seek to change their case from one based on broker-driven conspiracies to an alleged conspiracy that directly challenges both the Lloyd's business model and the UK's regulatory framework, including the manner in which solvency is regulated, and centers on the Corporation of Lloyd's and its FPD. In fact, Plaintiffs seek to add the Corporation of Lloyd's as a defendant. Not only will Plaintiffs seek new "extensive discovery" to support these claims – indeed, Plaintiffs already served 33 deposition notices just days before the September 30 fact discovery deadline in an attempt to find support for their new allegations – but it is likely Plaintiffs will seek to re-depose witnesses on this new case theory.

Moreover, Defendants would have to undertake "extensive factual investigation" of Plaintiffs' new allegations and re-review previous depositions and discovery materials with the new theory, parties and allegations in mind. Previous work will be wasted and valuable time and resources will be needed to redo this

19

work as part of a defense of (1) the subscription model under which insurance is often written at Lloyd's, and (2) the FPD's regulation of the financial solvency of Lloyd's syndicates pursuant to a Byelaw, the operation of which is overseen by the U.K. financial regulators.  Furthermore, Plaintiffs also seek to add three new plaintiffs, each of which will require Defendants to pursue new discovery and take additional depositions.  All of this constitutes undue prejudice to the Syndicates.

In the face of ample Third Circuit and New Jersey precedent to the contrary, Plaintiffs cite to two cases from district courts in other jurisdictions for the supposed proposition that "additional expense and disruption" are not prejudicial (Mot. at 18), but neither decision is binding or persuasive.  First, the Third Circuit makes clear that significant additional discovery *is* prejudicial.  *See Long*, 393 F.3d at 400; *Berger*, 911 F.2d at 924.  Second, the cases cited by Plaintiffs are factually distinct.  In *Capuano v. Kenneth Eisen & Assocs. Ltd.*, No. CV-11-02395, 2012 WL 2376675 (D. Ariz. June 22, 2012) (Mot. at 18), the Arizona district court acknowledged that significant new discovery may constitute prejudice but held that such prejudice was not present where depositions had not even started and only "minimal" discovery had occurred.  *Id*. at *5.  Similarly, in *Genentech, Inc. v. Abbott Labs.*, 127 F.R.D. 529 (N.D. Cal. 1989), "discovery [had] been limited" prior to the amendment.  *Id*. at 531.  Here, in contrast, the Syndicates already have conducted extensive discovery on claims that Plaintiffs have now abandoned and

would be forced to conduct burdensome new discovery on Plaintiffs' new claims.

Contrary to Plaintiffs' suggestion, the limited references to the Corporation of Lloyd's in the FAC (Mot. at 19) do not eliminate the prejudice to the Syndicates. The FAC noted the role of the Corporation of Lloyd's generally and focused on the centralized and face-to-face manner of conducting business, which allegedly provides an opportunity for the Syndicates to meet and confer, and thus collude. *See, e.g.*, FAC ¶¶ 284, 328. The substantive allegations in the FAC, however, centered on the brokers. *See* FAC ¶¶ 94-95. Conversely, the SAC focuses on the Corporation of Lloyd's, largely through the FPD, as the supposed driving force in an alleged conspiracy to allocate the capacity and share information at Lloyd's. SAC ¶¶ 3-9, 117-122, 125. Notably, the FPD is not mentioned even once in the FAC. The few references to the Corporation of Lloyd's in the FAC do not in any way change the fact that the proposed complaint represents a fundamental change in what Plaintiffs allege. Nor do they lessen the additional discovery that Plaintiffs would demand and the significant additional investigation the Syndicates would be forced to undertake to rebut allegations of a conspiracy allegedly masterminded by an entity that is not even mentioned in the FAC.

## B. The Proposed Amended Complaint Would Significantly Delay Resolution of the Case

The substantial additional discovery and investigation required if leave is granted constitutes substantial prejudice and is a sufficient basis, in and of itself, on

which to deny Plaintiffs' Motion to Amend. Undue prejudice also exists if a proposed amendment would "significantly delay the resolution of the dispute." Mot. at 18; *Long*, 393 F.3d at 400. Similarly, a proposed amendment should be denied if it places an undue burden on the Court. *See Cureton*, 252 F.3d at 273. Plaintiffs' proposed complaint would do both.

This action is one of the last remaining actions in an MDL that was formed almost nine years ago. If Plaintiffs' Motion to Amend is denied, a ruling on the Syndicates' motion to dismiss, filed over a year ago, should dispose of the case. If the Motion to Amend is granted, however, Plaintiffs will seek to begin fact discovery anew for a putative class period commencing in 1997 and continuing until 2013. To support their new case theory and purported 17-year class period, Plaintiffs propose to add the Corporation of Lloyd's and 12 additional syndicates as defendants and to name three additional plaintiffs. In addition to the new discovery that Plaintiffs will demand from the existing defendants, Plaintiffs will insist that discovery is required from all new parties. Moreover, Defendants also will need new discovery and there will likely be extensive additional briefing necessary on extending the class period, new discovery requests and other issues. All of this would substantially delay the resolution of the litigation, prejudice defendants, and burden the Court by keeping the MDL alive for years past the date it would otherwise terminate. *See, e.g.*, *In re Bristol-Myers Squibb Securities*

*Litigation*, 228 F.R.D. 221, 229 (D.N.J. 2005) ("permitting such an 'eleventh hour' amendment would necessarily delay the commencement of an already very complex and lengthy class action trial" and force defendants "to examine each new claim and conduct discovery to fairly defend themselves against these new allegations"); *Berger*, 911 F.2d at 924 (amendment adding "new and substantially broader claim would put an unwarranted burden on the trial court and be likely to result in prejudice to [defendants]").

Plaintiffs make a number of arguments regarding their delay (*see, e.g.*, Mot. at 15-17), but none of these arguments acknowledges the inevitable prejudice to the Syndicates and undue burden on the Court and its docket.  First, Plaintiffs cite extensively to *Coulson v. Town of Kearny*, No. 07-5893, 2010 WL 331347 (D.N.J. Jan. 19, 2010).  Mot. at 15-16.  In *Coulson*, however, the defendants "fail[ed] to advance a single piece of evidence to demonstrate that the amendment would be prejudicial," merely arguing that plaintiffs did not follow the Scheduling Order. 2010 WL 331347 at *4.  In contrast, Plaintiffs here seek to bring an entirely new case, which will cause substantial prejudice to the Syndicates and undue burden to the Court if leave is granted.  Moreover, in *Coulson*, the only source of necessary documents was the defendants' belated production.  *Id*. at *3.  Here, not only did the Syndicates produce the vast majority of their documents almost a year ago, but Plaintiffs' new case theory is not based on recently discovered evidence but rather

23

on public sources available to Plaintiffs for years.  Plaintiffs obliquely refer to "necessary" information that they allegedly only recently received (Mot. at 16-17), but provide no detail on what this information is.  Such generalities do not justify a motion to amend.  *See, e.g.*, *Ford*, 2011 WL 1599609 at *3 (finding undue delay because Plaintiff "failed to provide any detail as to what it discovered in the course of recent depositions and written discovery that would warrant this Court allowing the proposed amendments at this late stage in the litigation").  Virtually all, if not all, of the information underlying Plaintiffs' new allegations was available in 2012, if not 2007.  *See supra* at 13-16.

Finally, Plaintiffs' argument that there are no existing deadlines set for class certification or expert reports (Mot. at 19) does not change the fact that discovery on Plaintiffs' existing theory of the case is complete or largely so.  Thus, permitting Plaintiffs to start fresh with a new theory would cause substantial prejudice to the Syndicates and undue delay for the Court, which alone are determinative here.  Moreover, the reality is that there currently are no deadlines for class certification or expert reports because of Plaintiffs' continued attempts to expand the scope of discovery.  These efforts by Plaintiffs to wear down the Syndicates through a discovery war of attrition have forced multiple extensions of the fact discovery deadline that effectively mooted the deadlines for class certification and expert reports previously set by the Court.  If the Motion to

24

Amend is denied, those deadlines can be reset pending a resolution of the

Syndicates' motion to dismiss and this matter may proceed towards conclusion.

Plaintiffs' proposed amendment setting forth an entirely new case theory and

claims, however, would constitute a restart of the case and significantly delay any

resolution.

### C.   Plaintiffs' Discovery Complaints Have No Bearing on the Motion

Plaintiffs seek to excuse their delay by claiming that Defendants have

"hampered" their discovery efforts by refusing to produce relevant materials.  Mot.

at 5.  As Defendants have explained in their opposition to Plaintiffs' discovery

motions, Plaintiffs are not entitled to this discovery.  More importantly, these

discovery disputes purportedly related to Plaintiffs' existing theory of the case are

a red herring.

Disagreements over documents relating to Plaintiffs' *previous* allegations

have no bearing on an amendment that would bring *new* allegations and parties

into the case, especially since the facts underlying the new allegations are publicly

available.  In other words, Plaintiffs' undue delay in bringing these new allegations

cannot be justified by their demands for more discovery regarding prior allegations.

For example, Plaintiffs focus on the parties' dispute concerning lineslips and

binding authority agreements.  *See* Dkt. 2495.  The central disagreement is whether

these facilities fall properly within the scope of "contingent commission"

agreements such that they are relevant to the FAC's allegations.  *See, e.g.*, Dkt. 2495 at 4.  But these are the very broker-centered conspiracy allegations that have been de-emphasized by Plaintiffs in the SAC.  Moreover, despite the dispute over whether Plaintiffs should be entitled to discovery of *all* such lineslips and binding authority agreements, Plaintiffs in fact received many of these agreements during discovery.  *See id.* at 8.  They also questioned multiple witnesses about both types of agreements and marked the agreements as deposition exhibits.  *See, e.g.*, Palmer Decl. Ex. 17 (Deposition of Ian Bridge) at 54:19-20; Palmer Decl. Ex. 18 (Deposition of Paul Toomey) at 73:13-14.  Simply put, this discovery dispute did not prevent Plaintiffs from bringing their new allegations.

Additionally, a number of Plaintiffs' discovery "disputes" are simply non-existent.  For example, Plaintiffs' assertion that Defendants have "refused to allow their witnesses to testify about matters relating to the Lloyd's Corporation" (Mot. at 9) is demonstrably false.  While two witnesses were unable to testify about the Corporation of Lloyd's due to pre-existing confidentiality agreements, Plaintiffs asked questions and received answers from many witnesses about the Corporation of Lloyd's.  *See, e.g.*, Palmer Decl. Ex. 19 (Deposition of Mervyn Sugden) at 126:2-127:18; Palmer Decl. Ex. 20 (Deposition of Jason Jones) at 23:3-29:7; Palmer Decl. Ex. 21 (Deposition of Neil Maidment) at 252:16-264:3; Palmer Decl.

26

Ex. 22 (Deposition of Bob Stuchbery) at 35:22-38:7.[15]

Finally, Plaintiffs' self-serving descriptions of the discovery disputes do not negate the undue prejudice that the amendment would cause.  These disputes have nothing to do with the discovery that Plaintiffs will seek if the Motion is granted. Thus, regardless of how these discrete discovery issues may be resolved, the amendment will result in both extensive further discovery and significant delay to the resolution of the dispute.   As such, the amendment should be denied.

## II.     PLAINTIFFS' AMENDED PLEADING HAS NO LEGAL BASIS

For the reasons set forth above, Plaintiffs' request for leave should be denied. In fact, if Plaintiffs were allowed to file the SAC, it would not survive motions to dismiss by the existing and proposed new defendants.  While it is not necessary for the Court to resolve these issues in deciding the motion for leave to amend, for the Court's benefit, the Syndicates outline below some of the legal deficiencies that would be presented in full in a motion to dismiss or for summary judgment if leave

---

[15] Plaintiffs also claim that the Syndicates "refuse[d] to define headers like "WNPI," "Dkt Bkg," and "Wrt Order %" (Mot. at 8 n.9) in the data extracts.  This is simply not true.  The Syndicates answered Plaintiffs' questions concerning these data extracts on multiple occasions.  *See, e.g.*, Palmer Decl. Ex. 23 at 5 ("Written Net Premium Income ('WNPI') is the estimated written premium income after any deductions for brokerage commissions or payments to coverholders"), 6 ("Dct Bkg is the percentage of the premium that was paid or is due to the broker"); and 8 ("[Wrt Order%] reflects the percentage of the risk underwritten by all subscribers in the Lloyd's market").

were to be granted.  The Syndicates expressly reserve all of their positions with respect to the legal sufficiency of the SAC, whether or not summarized below.

For the reasons previously briefed, Plaintiffs' FAC fails to state a claim.  *See* Memorandum of Law in Support of Defendants Certain Underwriters at Lloyd's Motion to Dismiss the Revised First Amended Class Action Complaint ("MTD"), Dkt. 2500, at 14-35, 37-49.  The allegations in Plaintiffs' proposed SAC will not strengthen Plaintiffs' claims in the face of the Syndicates' motion to dismiss when Plaintiffs simply abandoned the FAC's theory of broker-centered conspiracies in favor of a different theory that is no more viable than the old one.

## A.    Plaintiffs' Proposed Sherman Act Claims Fail the Rule-of-Reason Test

### 1.    Plaintiffs' Claims Are Evaluated Under The Rule-of-Reason Test

Plaintiffs' SAC challenges alleged restraints between the Corporation of Lloyd's (through the FPD) and each Syndicate.  *See, e.g.*, SAC ¶ 4 (alleging that the FPD "acts as a restraint" on each Syndicate's output), ¶ 5 (alleging that the Corporation of Lloyd's requires each Syndicate to share certain information with it).  These are vertical agreements.  The Corporation of Lloyd's is not an insurer but rather an entity authorized by statute to regulate the offering of insurance at Lloyd's.  And under the Supreme Court's decision in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), vertical restraints are evaluated

28

only under the rule of reason.  *Id*. at 907; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 318 (3d Cir. 2010) ("Under the Supreme Court's jurisprudence, virtually all vertical agreements now receive a traditional rule-of-reason analysis.").[16]

The SAC has no allegations of *horizontal* agreements that might be subject to *per se* condemnation.  For a restraint to be horizontal, it must be an agreement between "competitors at the same market level."  *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 436 n.5 (3d Cir. 2009).  That is not the case here.  Nowhere do Plaintiffs claim that the Corporation of Lloyd's and any Syndicate are competitors at the same market level.[17]  Instead, Plaintiffs allege that the Lloyd's Corporation "oversees" and "manages" the activity at Lloyd's (SAC at ¶ 107-08) and that it is "an oversight entity or regulatory entity."  *Id*. at ¶ 141.  Similarly, there are no allegations that the Corporation of Lloyd's underwrites any insurance or competes with any of the Syndicates – nor could there be, as the

---

[16] Plaintiffs assert that their allegations amount to a "per se condemnation under the federal antitrust laws" (SAC ¶¶ 363, 373) but offer no explanation or support for this conclusory statement.  The exception for certain tying arrangements imposed by firms with market power that cause foreclosure, *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984), is inapplicable here.

[17] Any of Plaintiffs' placeholder allegations concerning alleged agreements with the so-called Lloyd's Brokers (*see* SAC ¶¶ 228-243) also have to be evaluated under a rule-of-reason test since they are clearly between entities at different levels of the distribution chain.  *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 318 ("Agreements between brokers and insurers . . . are vertical and would have to be analyzed under the traditional rule of reason.").

29

Corporation of Lloyd's is not an insuring entity.  As such, any relationship between the Corporation of Lloyd's and a Syndicate is a vertical one.

Even if the SAC is somehow read to allege horizontal restraints between the Syndicates, the *per se* rule would be inapplicable as a matter of law.  Courts have repeatedly held that the rule-of-reason analysis should be used on practices that allow a product to be offered and/or promote market efficiency.  *See, e.g.*, *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719 (6th Cir. 2003) ("[T]he Supreme Court has recognized that in cases involving industries 'in which horizontal restraints of competition are essential if the product is to be available at all', the rule of reason analysis should apply.") (quoting *Nat'l Collegiate Athletic Ass'n* v. *Board of Regents*, 468 U.S. 85, 101); *U.S. v. Realty Multi-List, Inc.*, 629 F.2d 1351 (11th Cir. 1980) (using rule-of-reason analysis to evaluate practice that allegedly reduced competition but also increased efficiency via better resource allocation).

Here, the SAC attacks conduct that produces significant efficiencies and, therefore, at best is evaluated under the rule of reason.  Notably, Plaintiffs do not allege that the Syndicates agreed with each other to artificially fix prices.  Instead, at most Plaintiffs allege the Syndicates (1) participated in lineslips and binding authority agreements; and (2) shared information when subscribing on the same risks.  But lineslips and binding authority agreements allow insurance to be offered

30

efficiently in lines of business, markets, and volumes that any one individual Syndicate would not otherwise be able to underwrite.  Similarly, these facilities provide market efficiencies by eliminating the need for a broker to negotiate with multiple syndicates on each individual policy.  Indeed, Plaintiffs' allegation that the so-called "Lloyd's market" is superior to alternatives (SAC ¶ 287) concedes efficiencies that defeat *per se* condemnation.

Likewise, alleged sharing of information − even pricing information − between competitors is not a *per se* violation.  In *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001), plaintiffs alleged that defendants regularly shared detailed information regarding compensation paid to employees and that each defendant used this information to set the salaries of these employees at artificially low levels. The Second Circuit held that the dissemination of price information is not itself a *per se* violation of the Sherman Act and instead evaluated the practice under the rule-of-reason test.  *Id*. at 198; *see also United States v. United States Gypsum Co.*, 438 U.S. 423, 441 n.16 (1978).

### 2.    Plaintiffs' Claims Cannot Satisfy the Rule-of-Reason Test

Because the rule of reason applies, Plaintiffs must allege market power in a well-defined relevant market.  *See, e.g.*, *Urdinaran v. Aarons*, 115 F. Supp. 2d 484, 489 (D.N.J. 2000) ("For a restraint of trade to be anti-competitive, defendants must possess market power in the relevant markets.").   The SAC fails to do so.

First, Plaintiffs have the burden of defining the relevant market, and if they fail to do so "with reference to the rule of reasonable interchangeability and cross-elasticity of demand,"[18] the complaint is legally insufficient. *Queen City Pizza, Inc.*, 124 F.3d at 436. Plaintiffs claim that "the Lloyd's Market is a plausible relevant market" (SAC ¶ 283) yet offer no explanation for why the many insurance products offered by the Syndicates are not reasonably interchangeable with or responsive to price changes in similar insurance products offered by insurers around the world. The SAC claims that Lloyd's insures "new, unusual or complex risks" (SAC ¶ 285) yet the insurance products purchased by the named plaintiffs are neither new, unusual, nor complex. (SAC ¶¶ 79, 83-86). The SAC fails to allege how the market for any of these insurances is limited to Lloyd's – which of course, it is not.

Moreover, the SAC also fails to allege why these disparate insurance products as well as many others offered by the Syndicates (that vary greatly by line and geographic market) would be substitutable for each other. Not surprisingly, courts, antitrust enforcement agencies, and insurance regulators that have

---

[18] Interchangeability "implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." Cross-elasticity of demand "is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product to changes in the price of a different product." *Queen City Pizza, Inc. v. Domino's Pizza Inc.*, 124 F.3d 430, 437, 438 n.6 (3d Cir. 1997).

32

examined insurance markets have found that each individual line of insurance is a
separate product market and that the geographic scope of these markets varies
depending on the line of insurance.[19]  In many if not all of the lines of insurance in
which they do business, insurers at Lloyd's compete not only with each other but
also with insurers from around the world.  In most of those lines, insurers at
Lloyd's have only a slight overall share of the insurance written in that line.
Plaintiffs' shotgun allegations thus have no legal basis.

Second, Plaintiffs rely on conclusory allegations concerning entry barriers at
Lloyd's (SAC ¶¶ 289-90), but never adequately allege the participating Syndicates'
market share or market power.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d
at 315 ("[S]uccessful attempts to meet this burden typically include a
demonstration of defendants' market power, as a judgment about market power is
[a] means by which the effects of the [] conduct on the market place can be
assessed.") (internal quotation omitted).  Nor could they in such a broadly defined
market as "Lloyd's."  Demand and capacity for insurance will necessarily vary

---

[19] *See, e.g., Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 959,
971 (10th Cir. 1990) (finding separate market for private health care financing in
Kansas); Palmer Decl. Ex. 24 (Competitive Impact Statement of U.S. Dep't of
Justice, *United States v. UnitedHealth Group, Inc.*, No. 05-CV-02436 (D.D.C. Mar.
3, 2006)) at 4-6 (defining market as "the sale of commercial health insurance to
small-group employers" in Tucson); Palmer Decl. Ex. 25 (Order, *In re Proposed
Acquisition of Control of or Merger with Travelers Property Casualty Corp. by
The St. Paul Cos., Inc.*, No. EX 04-20 (Conn. Ins. Dept. Mar. 2, 2004)) at 28-31
(evaluating market share by commercial insurance product line in the Connecticut
market).

based on the line of business.  Attempting to argue that Defendants' market power is the same across all lines is nonsensical.

**B.    Plaintiffs' Amended Complaint Improperly Seeks To Regulate Foreign Conduct**

Americans "cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts."  *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9 (1972).  Every claimed "anticompetitive" act happened an ocean away in London.

**1.    The SAC Fails To Meet The Requirements Of The FTAIA**

The Sherman Act applies to "[c]onduct involving trade or commerce with foreign nations" only if that conduct has a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce.  15 U.S.C. § 6a.  Because the SAC takes issue with contracts made on the trading floors of the Lloyd's Building in London, it must plead that this process in London has a "direct, substantial, and reasonably foreseeable effect" on commerce in the U.S.  The proposed SAC does not make allegations that support this conclusion.[20]  Thus, the FTAIA applies to bar applicability of the Sherman Act.  *See F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158-9 (2004).

---

[20] That the Corporation of Lloyd's is alleged to operate in the United States (SAC at ¶¶ 39-42) does not mean the conduct at issue – the key to determining the Sherman Act's applicability under the FTAIA – occurred in the U.S.

As the Third Circuit has made clear, the required effect must "directly affect[] the competitiveness of domestic markets." *Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 305 (3d Cir. 2002).[21]  The fact that Plaintiffs themselves are Americans is irrelevant.  *See Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*, 500 F. Supp. 2d 437, 447 (D.N.J. 2007).  The SAC does not suggest that any U.S. market is less competitive because of Lloyd's.  At most, the SAC alleges that Lloyd's derives substantial revenue from the United States, which is not legally sufficient.  Any effect in the U.S. is tangential, attenuated, and no different from the effect anywhere else in the world.[22]

### 2.    The SAC Would be Subject to Dismissal on Comity Grounds

If leave to amend were granted, the Syndicates and, in all likelihood, the Corporation of Lloyd's, would present to this Court the reasons why comity requires dismissal of the SAC.  Plaintiffs ask this Court to enjoin actions taking place entirely in London and find liable for such actions the very entity that, by

---

[21] *Turicentro* was later overruled on its holding that the FTAIA imposed a jurisdictional rather than a substantive rule.  *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 466 (3d Cir. 2011).  Its construction of the FTAIA, however, remains binding precedent.

[22] *Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993) does not save Plaintiffs' claims.  That case involved an alleged antitrust violation directly affecting domestic insurance markets.  There, London reinsurers allegedly conspired with U.S. insurers to eliminate certain policy language in the U.S. market, thus manipulating the availability of non-conforming insurance in the domestic market.  The instant case is inapposite.

35

powers vested in it by Acts of Parliament, oversees and regulates the writing of insurance at Lloyd's.  The proper course would be to decline jurisdiction.  *See*, *e.g.*, *Allen v. Lloyd's of London*, 94 F.3d 923, 930 (4th Cir. 1996) ("Imposing United States securities law on this foreign market would directly contravene the very rules and regulations adopted in Britain for the creation and operation of the Lloyd's market . . . .").

### 3.    The SAC Would be Subject to Dismissal on Forum Non Conveniens Grounds

Under the doctrine of forum non conveniens ("FNC"), "a district court may, in the exercise of its sound discretion, dismiss the case where: (1) an alternative forum has jurisdiction to hear the case; and (2) when trial in the plaintiff's chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to the plaintiff's convenience . . ." *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 159 -60 (3d Cir. 2010).

First, English courts provide an adequate forum for Plaintiffs' antitrust and RICO claims.  *See, e.g.*, *Capital Currency Exch. v. Nat'l Westminster Bank , PLC*, 155 F.3d 603, 609-10 (2d Cir. 1998) (finding that Plaintiffs could litigate subject matter of Sherman Act claims in England and FNC dismissal was appropriate); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1366 (2d Cir. 1993) (English courts provide adequate alternative potential remedies for RICO claim); *see also* *Princeton Football Partners LLC v. Football Ass'n of Ireland*, No. 11-cv-5227,

36

2012 WL 2995199, at *5-6 (D.N.J. July 23, 2012) (lack of RICO statute in alternative forum does not preclude FNC dismissal).

Second, the relevant private and public interest factors favor litigating this action in the U.K. and outweigh any deference owed to Plaintiffs' choice of forum. *See Eurofins*, 623 F.3d at 161-62 (listing factors). The SAC's 36 defendants are in London. The alleged conduct in question occurred in the U.K., and the vast majority of witnesses and sources of proof are located there. Fourty-four of the 45 witnesses that Plaintiffs have deposed live or work in London. Moreover, English courts would have the ability to compel witness attendance and document productions; indeed, Plaintiffs complain of the difficulty of compelling third-party documents in London. *See* Mot. at 9; *see also Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F.2d 821, 831 (5th Cir. 1986) (upholding FNC dismissal where most evidence and witnesses were located in England and an American court would be unable to compel witnesses' appearances).

In addition, the U.K. has a strong interest in having a controversy regarding Lloyd's insurers heard in its own courts rather than in the U.S. *See, e.g., Cavlam Bus. Ltd. v. Certain Underwriters at Lloyd's, London*, No. 08-cv-2225, 2009 WL 667272, at *9 (S.D.N.Y. Mar. 16, 2009) (dismissing action on FNC grounds, finding that "defendants' practices in underwriting insurance policies are plainly of interest to the community in which the defendants are located"); *Eurofins*, 623

F.3d at 161-62 (plaintiff's forum choice outweighed by the fact that all sources of proof were located in France, a key third party was there, and France had a more significant interest in resolving the dispute than Delaware).  Finally, the relief Plaintiffs seek is most appropriately considered by an English court.  Here, where Plaintiffs seek the extraordinary remedy of enjoining and forcibly restructuring a centuries-old, heavily regulated English institution created by an Act of Parliament, this Court should defer to the English courts.

### C.   Plaintiffs' Claims Are Time-Barred

Finally, some, if not all, of Plaintiffs' claims in the SAC would be time-barred.  Plaintiffs challenge the structure of an institution that has existed for hundreds of years.  The relevant statute of limitations for both antitrust and RICO claims is four years.  *See* 15 U.S.C. § 15b (antitrust claims); *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987) (RICO claims).  Allegations brought for the first time in 2013 would thus be too late.  Plaintiffs seek to avoid this result by attempting to allege fraudulent concealment, but this barebones and unsupported allegation is insufficient to meet Plaintiffs' pleading burden.  Moreover, the facts underlying Plaintiffs' new allegations have been publicly available for years.  *See supra* at 13-16.  In any event, Plaintiffs concede they should have known about their claims by 2004, long before 2013.  SAC ¶ 352.

The SAC does not relate back to the original complaint because the SAC

alleges entirely new legal theories.  Relation back is governed by Rule 15(c)(1).

As the Third Circuit has stated, application of this rule "entails a search for a

common core of operative facts in the two pleadings. . . . Though not expressly

stated, it is well-established that the touchstone for relation back is fair notice."

*Glover v. FDIC*, 698 F.3d 139, 145-46 (3d Cir. 2012) (internal quotation omitted).

Relation back is allowed only where defendants are given "fair notice of the

general fact situation and the legal theory upon which the amending party

proceeds."  *Id*.  "Conversely, amendments that significantly alter the nature of a

proceeding by injecting new and unanticipated claims are treated far more

cautiously."  *Id*. (internal citations omitted).  Plaintiffs' proposed SAC does exactly

that.  *See supra* at 7-12.  If allowed, the SAC would "significantly alter the nature

of the proceeding by injecting new and unanticipated claims" based on a supposed

Corporation of Lloyd's/FPD-centered conspiracy theory.  Relation back is not

supportable and Plaintiffs' claims are be untimely.  *See, e.g., Glover*, 698 F.3d 146.

Plaintiffs' allegation that they challenge "recurring, continuous events"

(SAC ¶ 353) does not save their amendment.  Although some overt acts can "start[]

the statutory period running again," the commission of a separate new overt act

"generally does not permit the plaintiff to recover for the injury caused by old

overt acts outside the limitations period" because a plaintiff should not be allowed

to "sleep[] on their right" as damages accumulate. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187, 189 (1997).

Moreover, courts have held that not all acts qualify as an "overt act" under *Klehr*. To "restart the statute of limitations, the act (1) must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-cv-8455, 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008) (citing *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467-68 (6th Cir. 1996)).[23]  Here, Plaintiffs allege no "new and independent acts" between 2009 and 2013 that would restart the limitations period.  Nor could they:  Plaintiffs' complaint alleges that a Corporation of Lloyd's/FPD conspiracy was implemented in 2003, and any acts after 2009 would be mere reaffirmations of the conspiracy. As such, Plaintiffs' proposed SAC would be time-barred.

## CONCLUSION

For these reasons, Plaintiffs' Motion for Leave to Amend should be denied.

---

[23] This so-called "reaffirmation doctrine" is applicable in cases like this one, where customers claim damages from a structure that has existed for many years and about which they had ample notice.  Plaintiffs cannot simply wait for years while their alleged damages accumulate, relying on the "continuing events" doctrine to save their claims.  *See Klehr*, 521 U.S. at 189.  In contrast, the reaffirmation doctrine may not bar claims by competitors who challenge their ongoing exclusion from the market (which is inapplicable here).  *See West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010).

Dated: December 6, 2013

*Certain Underwriters at Lloyd's,*
*London Organized as Syndicates 33,*
*102, 382, 435, 510, 623, 727, 958,*
*1003, 1084, 1096, 1183, 1245, 1886,*
*2003, 2020, 2623 and 2987*

By their attorneys,

/s/ Matthew M. Burke
Matthew M. Burke
Robert A. Skinner
Anne Johnson Palmer
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Fax: (617) 951-7050

*Certain Underwriters at Lloyd's,*
*London Organized as Syndicate 2791*
*MAP*

By its attorneys,

/s/ Thomas F. Bush
Thomas F. Bush
Patrick Frye
Edwards Wildman Palmer LLP
225 West Wacker Drive, Suite 3000
Chicago, IL 60606-1229
Telephone: (312) 201-2000
Fax: (312) 201-2555

*Certain Underwriters at Lloyd's,*
*London Organized as Syndicate 2001*
*(AML)*

By its attorneys,

/s/ John M. Toriello
John M. Toriello
Michelle Hess
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York  10019
Telephone: (212) 513-3200
Facsimile: (212) 385-9010

*Certain Underwriters at Lloyd's,*
*London  Organized as Syndicates 570*
*and 609*

By their attorneys,

/s/ Jean Claude Mazzola
Jean Claude Mazzola
Abigail Nitka
MESSNER REEVES LLP
733 Third Avenue
New York NY 10017
Telephone: (646) 663-1860
Facsimile: (646) 663-1985-9010

*Certain Underwriters at Lloyd's,*
*London  Organized as Syndicates*
*2488*

By its attorneys,

/s/ Johnny W. Carter
Neal S. Manne
Johnny W. Carter
Genevieve Vose Wallace
Susman Godfrey L.L.P.
1000 Louisiana St., Ste. 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366

42

Fax: (713) 654-6666

Liza M. Walsh
Marc D. Haefner
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  (973) 535-0500
Facsimile:   (973) 535-9217

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew M. Burke, certify that on the 6th day of December, 2013, I caused

the foregoing document to be electronically filed with the Clerk of Court using the

CM/ECF system, and served all counsel who consented to receive filings in the

above litigation via electronic mail at service@gcg.mdl1663.com.


   /s/ Matthew M. Burke
      Matthew M. Burke

44