ROBBINS GELLER RUDMAN
  & DOWD LLP
JOHN J. STOIA, JR.
RACHEL L. JENSEN
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re INSURANCE BROKERAGE ANTITRUST LITIGATION | ) ) ) ) | Master Docket No. 04-5184(CCC) |
| | | SECOND AMENDED CLASS ACTION COMPLAINT |
| This Document Relates To: | ) ) | |
| *Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's London Members of Syndicates, et al.*, No. 2:08-cv-00235-CCC-JAD | ) ) ) ) ) ) ) | |

Plaintiffs Lincoln Adventures, LLC ("Lincoln Adventures") and Michigan Multi-King, Inc. ("MMK") (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this lawsuit against: Those Certain Underwriters at Lloyd's, London who are members of Syndicates 0033, 0102, 0382, 0435, 0510, 0570, 0609, 0623, 0727, 0958, 1003, 1084, 1096, 1183, 1245, 1886, 1967, 2001, 2003, 2020, 2488, 2623, 2791, 2987, 4020, 4040, 4141, and 4472 (collectively, "Defendants" or the "Defendant Lloyd's Syndicates"), on their own behalf and on behalf of a class of similarly-situated persons or entities (the "Class" or "Class Members"). Plaintiffs allege the following upon their own knowledge as to the allegations that pertain to them, or where there is no personal knowledge, upon the investigation of counsel and/or upon information and belief:

## NATURE OF THE CASE

1. Plaintiffs bring this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1962(c)-(d), and the common law.

2. This nationwide class action arises out of Defendants' scheme and conspiracy to increase their revenues and profits by concealing the lack of competition for insurance sold in the United States through Lloyd's of London (the "Lloyd's Market").

3. Lloyd's is not one insurance company. Rather, it is the self-proclaimed "World's Specialist Insurance Market" in which insurers, called "Syndicates,"

purportedly "compete for business."[1]  The Syndicates are, in turn, comprised of "members" – insurance companies, limited partnerships, individuals and other entities that join together to form the Lloyd's of London Syndicates, such as Defendants.  And these members supply the capital to the Syndicates for underwriting risks.

4.    The Corporation of Lloyd's ("Lloyd's Corporation" or "Lloyd's") is a legal entity, which constitutes a RICO Enterprise through which Defendants and their co-conspirators have conducted a pattern of racketeering activity.  Through Lloyd's, Defendants maintain the façade of a competitive process in which brokers operating in the Lloyd's Market represent to insureds that they will shop out insurance risks to a market of independent competitors, rather than an organization dedicated to delivering premium volume and profits to entities that function more like divisions of one corporation.

5.    The Syndicates utilized:  (a) London-based Lloyd's brokers;[2] (b) U.S.-based brokers and wholesalers[3] (sometimes referred to as "coverholders" or

---

[1]    https://www.lloyds.com/lloyds/about-us/what-is-lloyds/the-lloyds-market (last visited on Jan. 7, 2016).

[2]    Such Lloyd's Brokers include MMC Marsh Services ("Marsh MMC"), Marsh UK, Marsh Ltd., Marsh Global Broking Ltd. ("MGB"), Aon Corp. ("Aon"), Aon UK, Willis Group ("Willis"), and Willis UK.

[3]    Such coverholders include  Marsh USA, Inc. ("Marsh USA), Aon Corp., Swett Insurance Managers ("Swett"), Swett & Crawford ("S&C"), Atlass Insurance Group ("Atlass"), and Miller Insurance Services ("Miller").

"delegated authorities"); and (c) other accredited Lloyd's sales agents (collectively, the "Lloyd's Brokers"), to further their scheme through agreements whereby the co-conspiring Lloyd's Brokers defrauded the Class in exchange for undisclosed bonuses and kickbacks from the Syndicates. This practice distorts the true and fair free-market dynamics that would have existed absent the scheme.

6.      Moreover, behind the scenes, Defendants used the Lloyd's Market to create an environment of cooperation, rather than competition. Among other things, the Defendant Lloyd's Syndicates enter into various "subscription" agreements for risks with other so-called competitors, whereby a lead underwriter, selected by the Lloyd's Broker, sets the price and terms pursuant to which a risk, book of business, class, or line of business is to be underwritten. Other Syndicates "follow the leader" and align their pricing and terms on a percentage of that risk, book of business, class or line. These Syndicates are called "followers" or the "following market." This lack of competition enabled all of the Defendant Lloyd's Syndicates to charge premiums that were higher than they would have been absent their misconduct.

7.      The Lloyd's Brokers play a critical role in facilitating and concealing the conspiracy. Unlike in the U.S. insurance market, the only way for an insured to access coverage in the Lloyd's Market is through a Lloyd's Broker. In exchange for their role in selecting the "leader" and concealing the lack of competition among the Syndicates in the pricing and terms of policies, including the alignment of pricing by

- 3 -

"followers," the Syndicates made secret payments to the Lloyd's Brokers – payments of compensation far in excess of normal brokerage commissions, often in excess of 40% – and agreed, for their part, to conceal the Lloyd's Brokers' breach of fiduciary duties owed to Plaintiffs and Class Members.

8.     These secret payments to Lloyd's Brokers were described by different names, including: Placement Service Agreements ("PSAs"), Marketing Service Agreements ("MSAs"), Carrier Service Agreements, Preferred Market Agreements, Portfolio Remuneration Allowance, Insurance Service Brokerage Agreements ("ISBAs"), Compensation for Services to Underwriters Agreements ("CSUs"), Services Fee Agreements, Non-Risk Specific Carrier Service Agreements, Volume Agreements, Volume Overriders, Enhanced Remuneration, Contingent Income Agreements, Additional Broker Remuneration Agreements, Market Service Slip Agreements, Market Service Lineslip Agreements, Lineslip Agreements, and Facilitation Agreements (collectively, the "Compensation Agreements"). Regardless of the name given, these agreements took strikingly similar forms throughout the Lloyd's Market, often involved multiple Syndicates, and were implemented and processed in the same way across Syndicates. These payments were the means by which Syndicates shared their supracompetitive profits with the Lloyd's Brokers.

9.     The Syndicates exploited Lloyd's Corporation's (the Enterprise's) structure and mandatory-participation Lloyd's Market Association (the "LMA") to

- 4 -

share a vast array of market and sensitive financial information; coordinate their underwriting by standardizing policy terms and underwriting practices; coordinate and conceal broker compensation; share detailed information regarding pricing, kickbacks, risk sharing; and avoid legal liability.

10.     Through these mechanisms, Syndicates discussed, shared and disclosed detailed forward-looking data.  This data, which included premium volume, market share, current and future prices and price increases, enabled the Syndicates to track and monitor their market shares, premiums, financial performance, ratings and average prices for each line of business against their putative "competitors," and facilitated the stabilization of price and market share that, in turn, enabled Defendants to hide the lack of a competitive marketplace and charge supracompetitive premiums.

11.     As a direct result of their conduct, Defendants were able to conceal their misconduct, increase the premium revenues and profit margins for all the Syndicates, and reduce or eliminate competition among the Syndicates – all to the detriment of Plaintiffs and the Class.

12.     The concealment of uncompetitive, high-brokerage compensation raised the prices for insurance coverage procured by U.S. policyholders in the Lloyd's Market and thus had a "substantial effect" in the United States.

13.     Plaintiffs bring this action pursuant to RICO and the common law, on behalf of themselves and all others similarly-situated, to recover treble damages,

enjoin Defendants' continuing misconduct, and obtain equitable and other available relief.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because Plaintiffs' claims arise under the RICO statute, 18 U.S.C. §1961, *et seq*.  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

15.    This Court also has original jurisdiction pursuant to 28 U.S.C. §1332, as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

16.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§1965(b) and (d), as well as Fed. R. Civ. P. 4(k)(2), because they have minimum contacts with the United States and this State.

17.    Pursuant to the terms and conditions of each of the Plaintiffs' policies, and the applicable law, Defendants have agreed to, and are subject to, the personal jurisdiction of this Court.

18.    At all material times, Defendants intentionally availed themselves of the laws of the United States and of this State by transacting substantial business

throughout the United States and New Jersey, including but not limited to, the promotion, marketing, advertising and sale of insurance policies in the United States and this State and through the Internet and *via* Lloyd's Corporation, its brokers and its subsidiary, Lloyd's America, Inc. ("Lloyd's America"), to consumers located throughout the United States and this State.

19.    The Syndicates engaged in substantial acts in furtherance of the conspiracy and enterprise in the United States and in this State by selling insurance to Plaintiffs and the Class in all 50 states, including this State.

20.    Defendants also engaged in marketing and promoting Lloyd's through Lloyd's Corporation, Lloyd's America, "coverholders" (entities to whom Syndicates delegate the authority to bind insurance) and producers, and their websites, which target prospective insureds in the United States.  In fact, during the Class Period, between 40-44% of Lloyd's business was written in the United States, amounting to £8.9-11 billion in gross written premiums per year.

21.    The activities of Defendants and their co-conspirators had a substantial effect on interstate commerce.

22.    Venue is proper in this district pursuant to 18 U.S.C. §1965(a), and 28 U.S.C. §§1391(b), (c) and (d).  Defendants have transacted substantial business within this District within the meaning of 28 U.S.C. §1391(a), as defined in 28 U.S.C. §1391(c), as described above.  Venue is proper under 18 U.S.C. §1965(a) because

- 7 -

Defendants are subject to personal jurisdiction in this District, and Defendants have agents located in this District. Additionally, Defendants requested that this case be transferred to this District as part of MDL 1663.

## PARTIES

### I.    Plaintiffs

23.    Lincoln Adventures is a Delaware Limited Liability Company which owned and operated a "2000 Queenship 68" motor yacht known as the "Caps II," which was purchased in Palm Beach, Florida and had a home mooring of Fort Lauderdale, Florida. The yacht was sold in September of 2006.

24.    MMK is a Michigan corporation, which, during the Class Period, owned and operated fast food restaurants in the states of Michigan and Illinois (the "MMK Properties").

### II.    Defendant Lloyd's Syndicates

### Syndicate 33

25.    Defendant Lloyd's Syndicate 33 is managed by Hiscox Syndicates Limited. ("Hiscox") and underwrites a mixture of reinsurance, property and energy business, as well as a range of specialty lines. During the Class Period, Syndicate 33 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.

1118746_1

**Syndicate 102**

26.    Defendant Lloyd's Syndicate 102 is managed by R&Q Managing Agency Ltd. (formerly known as Cavell Managing Agency Limited ("R&Q")).  Before May 11, 2004, Syndicate 102 was managed by Goshawk Syndicate Management Limited ("Goshawk").  The day-to-day management of this Syndicate was outsourced by Goshawk to Cavell Management Services Ltd. on February 25, 2004.  This Syndicate wrote a broadly-spread account of marine, non-marine and other specialty areas.[4] During the Class Period, Syndicate 102 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[5]

**Syndicate 382**

27.    Defendant Lloyd's Syndicate 382 is managed by Hardy (Underwriting Agencies) Limited and underwrites aviation, marine, energy and non-marine business, as well as specialty lines, such as political risk and terrorism.[6]  During the Class

---

[4]    *See* Syndicate 102 – Syndicate annual accounts 2011 (http://www.lloyds.com/lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts/2006/06/0102 (last visited Jan. 7, 2016)).

[5]    *See* Syndicate 102 – 2008 Annual Reports and Accounts at 21: (http://www.lloyds.com/~/media/Lloyds/SyndicateReportsAndAccounts/Syndicate%20reports%20gallery/2008_0102a.pdf (last visited Jan. 7, 2016)); *See* Syndicate 102 – 2012 Annual Report (http://www.lloyds.com/lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts/2006/06/0102 (last visited Jan. 8, 2016)).

[6]    *See* Syndicate 0382 Combined annual and underwriting year accounts (http://www.lloyds.com/lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts/2006/06/0382 (last visited Jan. 7, 2016)); *See* Syndicate 0382 –

Period, Syndicate 382 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.

**Syndicate 435**

28.    Defendant Lloyd's Syndicate 435 is managed by Faraday Underwriting Limited and underwrites aviation, casualty and property insurance and reinsurance.[7] During the Class Period, Syndicate 435 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[8]

**Syndicate 510**

29.    Defendant Lloyd's Syndicate 510 is managed by R.J. Kiln & Co. Limited.  Syndicate 510 specializes in accident and health, aviation, marine, property, special lines, reinsurance and enterprise risk insurance.[9]  During the Class Period,

---

2013 Annual Report (http://www.lloyds.com/~/media/files/lloyds/ investor%20relations/syndicate%20reports%20and%20accounts/2013/0382a.pdf (last visited Jan. 7, 2016)).

[7]    *See* Syndicate 0435 – Syndicate annual accounts (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/Syndicate-reports-and-accounts?page=2 (last visited Jan. 7, 2016)).  FAR_E00008347; Syndicate 435 – 2014 annual report (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/Syndicate-reports-and-accounts/2006/06/0435 (last visited Jan. 7, 2016)).

[8]    Syndicate 435 – 2014 annual report at 19 (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/Syndicate-reports-and-accounts/2006/06/0435 (last visited Jan. 7, 2016)).

[9]    *See* Syndicate 510 Combined annual and underwriting year accounts (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts/2006/06/0510 (last visited Jan. 7, 2016)); Syndicate 510 – 2013

- 10 -

Syndicate 510 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[10]

**Syndicate 570**

30.    Defendant Lloyd's Syndicate 570 is managed by Atrium Underwriters Ltd. ("Atrium").  Syndicate 570 is a non-marine syndicate in the Lloyd's Market, which specializes in U.S. professional liability, property and casualty insurance and reinsurance and accident and health.[11]  During the Class Period, Syndicate 570 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[12]

---

Annual Report (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/ syndicate%20reports%20and%20accounts/2013/0510c.pdf (last visited Jan. 7, 2016)).

[10]    Syndicate 510 – 2013 Annual Report, at 42 (http://www.lloyds.com/~/ media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/ 2013/0510c.pdf (last visited Jan. 6, 2016)).

[11]    *See* Syndicate 570 – Syndicate underwriting year accounts (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=3 (last visited Jan. 8, 2016)); Syndicates 570 & 609 – 2013 Annual Report, at 16 (http://www.lloyds.com/~/media/files/lloyds/ investor%20relations/syndicate%20reports%20and%20accounts/2013/0570%20 and%200609a.pdf (last visited Jan. 8, 2016)).

[12]    Syndicates 570 & 609 – 2013 Annual Report, at 16 (http://www.lloyds.com/~/ media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/ 2013/0570%20and%200609a.pdf (last visited Jan. 7, 2016)).

- 11 -

**Syndicate 609**

31.    Defendant Lloyd's Syndicate 609 is managed by Atrium.  It underwrites marine risks, aviation risks, non-marine property, energy, war, financial, political risks and terrorism insurance.[13]  During the Class Period, Syndicate 609 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[14]

**Syndicates 623 and 2623**

32.    Defendant Lloyd's Syndicates 623 and 2623 are managed by Beazley Furlonge Limited ("Beazley").  Beazley established Syndicate 2623 to underwrite in parallel with Syndicate 623.  Within these two Syndicates, all business is split: Syndicate 2623 (82%), Syndicate 623 (18%).[15]  They underwrite mainly marine,

---

[13]    *See* Syndicate 609 Syndicate underwriting year accounts (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=3 (last visited Jan. 7, 2016)); Syndicates 570 & 609 – 2013 Annual Report, at 29 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2013/0570%20and%200609a.pdf (last visited Jan. 7, 2016)).

[14]    Syndicates 570 & 609 – 2013 Annual Report, at 29 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2013/0570%20and%200609a.pdf (last visited Jan. 7, 2016)).

[15]    *See* Syndicate 623 – Combined annual and underwriting year accounts (https://www.beazley.com/about_beazley/beazley_at_lloyds.html (last visited Jan. 7, 2016)); Syndicate 623 2014 Annual Report, at 46, available at (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_0623_c.pdf (last visited Jan. 7, 2016)).

- 12 -

property and specialty risks.[16]  During the Class Period, Syndicates 2623 and 623 received a substantial percentage of their gross premium from insurance sold to U.S. insureds.[17]

**Syndicate 727**

33.    Defendant Lloyd's Syndicate 727 is managed by S.A. Meacock & Company Ltd. and underwrites mainly property, third party liability and motor risks.[18] During the Class Period, Syndicate 727 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[19]

---

[16]    Syndicate 623 – 2014 Annual Report, at 3, 26, 46 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_0623_c.pdf (last visited on Dec. 14, 2015)); Syndicate 2623 2014 Annual Report, at 3, 22 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2623_a.pdf (last visited Jan. 7, 2016)).

[17]    Syndicate 623 – 2014 Annual Report, at 10 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_0623_c.pdf (last visited Jan. 7, 2016)).

[18]    *See* Syndicate 727 – Combined annual and underwriting accounts 2011 (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=3 (last visited Jan. 7, 2016)); Syndicate 0727 – 2014 Annual Report, at 7, 17, 26, 43 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_0727_c.pdf (last visited Jan. 7, 2016)).

[19]    Syndicate 727 – 2014 Annual Report, at 7, 17, 26, 43 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_0727_c.pdf (last visited Jan. 8, 2016)).

- 13 -

**Syndicate 958**

34.    Defendant Lloyd's Syndicate 958 was managed by Omega Insurance Holdings Limited.  On August 21, 2012, it was purchased by Canopius Group Ltd., who currently manage the Syndicate and underwrites primarily short-tail property insurance and reinsurance business.[20]   During the Class Period, Syndicate 958 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.

**Syndicate 1003 and 2003**

35.    Defendant Lloyd's Syndicate 1003 and its successor Defendant Lloyd's Syndicate 2003 are managed by Catlin Underwriting Agencies Limited ("Catlin"). These Syndicates write specialty insurance and reinsurance for 25 business classes.[21]

---

[20]    *See* Syndicate 958 – Syndicate annual year accounts (http://www.lloyds.com/LLoyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=3 (last visited Jan. 8, 2016)).

[21]    *See* Syndicate 1003 – Syndicate annual accounts (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=7 (last visited Jan. 8, 2016)); Syndicate 1003 – 2014 Annual Report at 31-32 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2003_a.pdf (last visited Jan. 6, 2016)).

- 14 -

During the Class Period, Syndicates 1003 and 2003 received a substantial percentage of their gross premium from insurance sold to U.S. insureds.[22]

**Syndicates 1084 and 1096**

36.    Defendant Lloyd's Syndicate 1084 is managed by Chaucer Syndicates Limited ("Chaucer").  In 2003, Syndicate 587 and Defendant Lloyd's Syndicate 1096 were merged into Defendant Lloyd's Syndicate 1084.  Defendant Lloyd's Syndicate 1084 provides motor, marine, aviation, property and specialist lines of insurance.[23] During the Class Period, Syndicates 587, 1084 and 1096 received a substantial percentage of their gross premium from insurance sold to U.S. insureds.[24]

**Syndicate 1183**

37.    Defendant Lloyd's Syndicate 1183 is managed by Talbot Underwriting Ltd. ("Talbot").   It writes a wide range of marine and offshore energy classes of

---

[22]    Syndicate    1003    –    2014    Annual    Report    at    32 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2003_a.pdf (last visited Jan. 6, 2016)).

[23]    *See*    Syndicate    1084    –    Syndicate    annual    reports (http://www.lloyds.com/lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=4 (last visited Jan. 8, 2016)); Syndicate 1084 2014 Annual Report,    at    22-23    (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_1084_a.pdf (last visited Jan. 8, 2016)).

[24]    Syndicate    1084    –    2014    Annual    Report,    at    22-23 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_1084_a.pdf (last visited Jan. 8, 2016)).

business, as well as war, political violence and political risk, commercial property including construction, financial institutions, contingency, treaty reinsurance and airlines.[25]  During the Class Period, Syndicate 1183 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.

## Syndicate 1245

38.     Defendant Lloyd's Syndicate 1245 was managed by Heritage Managing Agency Ltd.  Syndicate 1245 was merged into Syndicate 1200 in 2004.  It underwrote property and North America casualty business.[26]  In 2007, the Syndicate was closed *via* an external reinsurance to close.  During the Class Period, Syndicate 1245 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[27]

---

[25]    *See* Syndicate 1183 – Syndicate annual accounts (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts?page=4 (last visit Jan. 8, 2016)); Syndicate 1183 2014 Annual Report, at 3, 19-20 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_1183_a.pdf (last visited Jan. 8, 2016)).

[26]    *See* Syndicate 1245 – Combined annual and underwriting year accounts (http://www.lloyds.com/Lloyds/Investor-Relations/Financial-performance/Syndicate-reports-and-accounts?page=5 (last visited Jan. 8, 2016)).

[27]    Syndicate 2999 Annual Account Rpt for 2014 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2999_a.pdf (last visited Jan, 7, 2016)).

- 16 -

**Syndicate 1886**

39.    Defendant Lloyd's Syndicate 1886 is managed by QBE Underwriting Ltd. ("QBE").  QBE is a wholly-owned subsidary of the QBE Insurance Group. Syndicate 1886 writes property, international liability, environmental impairment liability, professional and motor lines.[28]  During the Class Period, Syndicate 1886 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.

**Syndicate 1967**

40.    Defendant Lloyd's Syndicate 1967 commenced operations in 2009 and is managed by W.R. Berkley Syndicate Management Ltd.  Syndicate 1967 underwrites primarily property, crisis management, consortia, marine, aviation and personal accident business.[29]

**Syndicate 2001**

41.    Defendant Lloyd's Syndicate 2001 is managed by Amlin Underwriting Limited ("Amlin") and provides aviation, marine, property and casualty, as well as

---

[28]    *See* http://www.qbeeurope.com/lloyds (last visited Jan. 8, 2016).

[29]    Syndicate 1967 – 2012 Annual Report (https://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_1967_a.pdf (last visited Jan. 8, 2016)).

- 17 -

reinsurance.[30]  During the Class Period, Syndicate 2001 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[31]

## Syndicate 2020

42.  Defendant Lloyd's Syndicate 2020, managed by Wellington Underwriting Agencies Ltd. ("Wellington") merged with Defendant Lloyd's Syndicate 2003 managed by Catlin.  Syndicate 2020's assets were moved to Syndicate 2003.[32] Syndicate 2020 underwrote mainly energy, marine and war and political risks. During the Class Period, Syndicate 2020 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[33]

## Syndicate 2488

43.  Defendant Lloyd's Syndicate 2488 is managed by ACE Underwriting Agencies Limited and underwrites a diverse portfolio of business, including aviation,

---

[30]  *See* http://www.amlin.com/about_amlin.aspx/ (last visited Jan. 8, 2016); Syndicate 2001 – 2014 Annual Report at 19 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2001_a.pdf (last visited Jan. 8, 2016)).

[31]  Syndicate 2001 – 2014 Annual Report at 19 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2001_a.pdf (last visited Jan. 8, 2016)).

[32]  *See* http://www.catlin.com/en/About/OurHistory?&p=1 (last visited Jan. 8, 2016).

[33]  Syndicate 2020 Annual Account for 2007 (http://www.lloyds.com/~/media/lloyds/syndicatereportsandaccounts/syndicate%20reports%20gallery/2007_2020c.pdf (last visited Jan. 7, 2016)).

1118746_1

property, financial lines, marine and political risk, as well as reinsurance.[34]  During the Class Period, Syndicate 2488 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[35]

**Syndicate 2791**

44.    Defendant Lloyd's Syndicate 2791 is managed by Managing Agency Partners Ltd. and its lines of business include property and casualty insurance and reinsurance.  It also writes policies in auto, accident and health, marine and offshore energy, terrorism and political risks.[36]  During the Class Period, Syndicate 2791

---

[34]    *See* Syndicate 2488 – Syndicate Annual accounts (http://lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts/2006/06/2488 (last visited Jan. 8, 2016)); Syndicate 2488 – 2014 Annual Report, at 5, 25 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2488_a.pdf (last visited Jan. 8, 2016)).

[35]    Syndicate 2488 – 2014 Annual Report, at 5, 25 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2488_a.pdf (last visited Jan. 8, 2016)).

[36]    *See* Syndicate 2791 – 2011 Report and Financial Statements (http://www.lloyds.com/Lloyds/investor-relations/financial-performance/syndicate-reports-and-accounts/2006/06/2791 (last visited Jan. 8, 2016)); Syndicate 2791 – 2014 Annual Report, at 7, 20, 29, 47-48 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2791_c.pdf (last visited Jan. 8, 2016)).

received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[37]

**Syndicate 2987**

45. Defendant Lloyd's Syndicate 2987 is managed by Brit Syndicates Ltd. and underwrites property and casualty, marine and aviation risks.[38] During the Class Period, Syndicate 2987 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[39]

**Syndicate 4020**

46. Defendant Lloyd's Syndicate 4020 is managed by Ark Syndicate Management Ltd. Syndicate 4020 writes principally reinsurance, accident and health

---

[37] Syndicate 2791 Annual Account Report for 2014 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2791_c.pdf (last visited Jan. 8, 2016)).

[38] *See* http://www.britinsurance.com/ (last visited Jan. 8, 2016); Syndicate 2987 – 2014 Annual Report at 17-18 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2987_a.pdf (last visited Jan. 8, 2016)).

[39] Syndicate 2987 – 2014 Annual Report at 17-18 (http://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_2987_a.pdf (last visited Jan. 8, 2016)).

1118746_1

and specialty programs.[40]   During the Class Period, Syndicate 4020 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[41]

**Syndicate 4040 and 4141**

47.    Defendant Lloyd's Syndicates 4040 and 4141 are managed by HCC Underwriting Agency Ltd.   The business of Syndicate 4040 was renewed into Syndicate 4141 for year-ended 2010.[42]

**Syndicate 4472**

48.    Defendant Lloyd's Syndicate 4472 is managed by Liberty Syndicate Management Limited ("Liberty").   It writes principally property, marine and contingent lines.[43]   During the Class Period, Syndicate 4472 received a substantial percentage of its gross premium from insurance sold to U.S. insureds.[44]

---

[40]    https://arkunderwriting.com/ (last visited on Jan. 8, 2016).

[41]    https://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_4020_c.pdf (last visited on Jan. 8, 2016).

[42]    https://www.lloyds.com/~/media/files/lloyds/investor%20relations/syndicate%20reports%20and%20accounts/2014/2014_4141_a.pdf (last visited on Jan. 8, 2016).

[43]    http://www.lloyds.com/~/media/Files/Lloyds/Investor%20Relations/Syndicate%20reports%20and%20accounts/2012/4472a_20130315105959_1967H_4472a.pdf; Syndicate 4472 – 2014 Annual Report, at 19-21, available at file:///N:/LLOYDS%20OF%20LONDON/Complaint/Proposed%202nd%20Amended%20Complaint-RICO%20only/Sources/2014_4472_a.pdf (last visited Dec. 14, 2015).

[44]    http://www.lloyds.com/~/media/Lloyds/SyndicateReportsAndAccounts/Syndicate%20reports%20gallery/2007_4472a.pdf; Syndicate 4472 – 2014 Annual

49.    Each of the Defendant Lloyd's Syndicates resides in London, England, and is a foreign agent of undisclosed principals.

50.    All of the Defendant Lloyd's Syndicates are eligible to write surplus insurance in the United States. *See* http://www.lloyds.com/lloyds/offices/americas/us-homepage/about-us (last visited Jan. 8, 2016).

## CO-CONSPIRATORS

51.    Marsh MMC is incorporated under the laws of Delaware. Its shares are listed and publicly traded on the New York, Chicago, and London stock exchanges and it has its corporate headquarters in New York City.

52.    Marsh MMC is a global corporation and the parent of various subsidiaries that provide clients with analysis, advice and transactional services in connection with the procurement and servicing of contracts of insurance, as well as investment management and consulting.

53.    Marsh Services is a subsidiary of Marsh MMC, located in Southampton, England. Marsh Services' Wholesale Yacht Division issued the Certificate of Insurance for Lincoln Adventures under its "cover."

---

Report, at 19-21, available at file:///N:/LLOYDS%20OF%20LONDON/Complaint/Proposed%202nd%20Amended%20Complaint-RICO%20only/Sources/2014_4472_a.pdf (last visited Dec. 14, 2015).

54.    Marsh UK is a subsidiary of Marsh MMC, located in London, England. Marsh UK communicated with Lincoln Adventures through policy documents and Lincoln Adventures' U.S. broker, Atlass Insurance Group ("Atlass").

55.    In this Complaint, Marsh MMC, Marsh Services, Marsh UK and all other Marsh affiliates are referred to collectively as "Marsh."

56.    Aon is incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois.  Aon is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

57.    Aon UK is a subsidiary of Aon, located in London, England.  Aon UK provides commercial brokerage and risk management services.

58.    In this Complaint, Aon Corp., Aon UK, and all other Aon affiliates are referred to collectively as "Aon."

59.    Willis is incorporated under the laws of Bermuda and has its corporate headquarters in London, England.  On January 4, 2016, Willis Group became Willis Towers Watson Public Limited Company following completion of a merger between Willis Group Holdings and Towers Watson. The new entity, trades on the NASDAQ under the symbol WLTW.[45]

---

[45]    For purposes of this Complaint, the entity will continue to be referred to as "Willis" or "Willis Group."

60.    Willis Group is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting and insurance underwriting.

61.    In this Complaint, Willis, Willis UK, and all other Willis affiliates are referred to collectively as "Willis."

62.    Various entities in the United States are authorized to place risks with Syndicates without actually doing business on the Lloyd's floor.  These entities have a contractual agreement with a Syndicate or Syndicates to issue certain lines of insurance under certain underwriting conditions in the United States.  They must be registered with Lloyd's.  These agreements are known as "coverholders," "binders," "binding authority," and/or "binding agreements."

63.    Professional Liability Insurance Services ("PLIS"), Swett & Crawford ("S&C"), and Marsh Private Client Services are examples of coverholders.  These entities facilitated the conspiracy alleged in this Complaint.

## PLAINTIFFS' INSURANCE POLICIES

64.    Lincoln Adventures procured a Yacht Insurance Policy (the "Lincoln Adventures Policy") through Atlass.

65.    The Lincoln Adventures Policy was underwritten primarily by Defendant Lloyd's Syndicates 609, 958 and 2488.

- 24 -

66.    The Lincoln Adventures Policy is identified as ACE Global Yacht Policy No. YS40000L2003, with an effective date of April 15, 2004.

67.    The Lincoln Adventures Policy was issued under cover of the Wholesale Yacht Division of Marsh.

68.    MMK procured miscellaneous property insurance and/or food borne illness insurance for the MMK Properties (the "MMK Insurance Coverage") from the Defendant Lloyd's Syndicates as indicated below:

- For the period June 21, 2000 through June 21, 2001, MMK procured the MMK Insurance Coverage (policy number FBI 790000) through Aon and S&C, a Lloyd's correspondent, underwritten by Syndicates within the Lloyd's Market, the identities of which are presently unknown to MMK;

- For the period June 21, 2001 through June 21, 2002, MMK procured the MMK Insurance Coverage (policy number FBI-790000A) through Aon and S&C, underwritten by Syndicates, the identities of which are presently unknown to MMK;

- For the period June 21, 2002 through June 21, 2003, MMK procured the MMK Insurance Coverage (policy number 330030-02-1331) through Aon and PLIS, a Lloyd's correspondent, and underwritten by Defendant Lloyd's Syndicates 102, 435, 510, 570, 623, 727, 1003, 1245, 2003, and 2020;

- For the period June 21, 2003 through June 21, 2004, MMK procured the MMK Insurance Coverage (policy number 330030-03-1642) through Aon and PLIS, and underwritten by Defendant Lloyd's Syndicates 102, 435, 510, 570, 609, 623, 727, 1096, 1245, 2003, 2020, 2623, and 2791;

- For the period June 21, 2004 through June 21, 2005, MMK procured the MMK Insurance Coverage (policy number 330030-04-1969) through Aon and PLIS, underwritten by Defendant Lloyd's Syndicates 382, 435,

510, 570, 623, 727, 958, 1084, 1183, 1245, 2001, 2003, 2020, 2488, 2623, 2791, and 2987;

- For the period June 21, 2005 through June 21, 2006, MMK procured the MMK Insurance Coverage (policy number 330030-05-2287) through Aon and PLIS, underwritten by Defendant Lloyd's Syndicates 382, 435, 510, 570, 623, 727, 958, 1084, 1183, 2001, 2003, 2020, 2488, 2623, 2791 and 2987;

- For the period June 21, 2006 through June 21, 2007, MMK procured the MMK Insurance Coverage (policy number 330030-06-2638) through Aon and PLIS, underwritten by Defendant Lloyd's Syndicates 33, 382, 435, 510, 570, 623, 727, 958, 1084, 1183, 1886, 2001, 2003, 2020, 2488, 2623, 2791 and 2987;

- For the period June 21, 2007 through June 21, 2008, MMK procured the MMK Insurance Coverage (policy number 330030-07-2023) through Aon and PLIS, underwritten by Defendant Lloyd's Syndicates 33, 382, 435, 510, 570, 623, 727, 958, 1084, 1183, 1886, 2001, 2488, 2623, 2791, 2987, 4040 and 4472;

- For the period June 21, 2008 through June 21, 2009, MMK procured the MMK Insurance Coverage (policy number 330030-08-3447) through Aon and PLIS, underwritten by Defendant Lloyd's Syndicates 33, 382, 435, 510, 570, 623, 727, 958, 1084, 1183, 1200, 1206, 2001, 2488, 2623, 2791, 2987, 4020, 4040 and 4472;

- For the period June 21, 2009 through June 21, 2010, MMK procured the MMK Insurance Coverage (policy number 330030-09-3858) through Aon and PLIS, underwritten by Defendant Lloyd's Syndicates 33, 435, 510, 570, 623, 727, 958, 1084, 1183, 1200, 1206, 2001, 2488, 2623, 2791, 2987, 4020, 4040, and 4472;

- For the period June 21, 2010 through October 1, 2011, MMK procured the MMK Insurance Coverage (policy number 330030-10-4264) through Aon and PLIS, underwritten by Defendant Lloyd's Syndicates 33, 435, 510, 570, 623, 727, 958, 1084, 1183, 1200, 1206, 1967, 2001, 2488, 2623, 2791, 2987, 4020, 4141 and 4472;

- For the period December 21, 2011 through December 21, 2012, MMK procured the MMK Insurance Coverage (policy number 330030-11-

- 26 -

4790) through Aon and PLIS, underwritten by Defendant Lloyd's Syndicates 33, 435, 510, 0570, 623, 727, 958, 1084, 1183, 1206, 1967, 2001, 2488, 2623, 2791, 2987, 4020, 4141 and 4472; and

- For the period December 21, 2012 through December 21, 2013, MMK procured the MMK Insurance Coverage (policy number 330030-12-5218) through Aon and PLIS, underwritten by Defendant Lloyd's Syndicates 33, 435, 510, 0609, 623, 727, 958, 1084, 1183, 1206, 1967, 2001, 2488, 2623, 2791, 2987, 4020, 4141 and 4472.

## FACTUAL ALLEGATIONS

### I.    The Lloyd's "Market"

69.    The Corporation of Lloyd's is an organization authorized by its members to operate the Lloyd's insurance "marketplace" based in London.  It is not one insurance company.  Rather, it is the self-proclaimed "World's Specialist Insurance **Market**" in which members – a variety of insurance companies, limited partnerships, individuals and other entities – join together to form "Syndicates" that purportedly "**compete for business**, thus offering choice, flexibility and continuing innovation."[46] The members supply the capital to the Syndicates for underwriting the risks.  In 2015, 96 Syndicates were underwriting insurance within the Lloyd's Market.[47]

70.    Much of the insurance sold in the Lloyd's Market covers risks in the United States.  In 2015, 44% of the insurance written in the Lloyd's Market covered

---

[46]    https://www.lloyds.com/lloyds/about-us/what-is-lloyds/the-lloyds-market; http://www.lloyds.com/lloyds/offices/americas/us-homepage (last visited December 17, 2015) (emphasis added).

[47]    http://www.lloyds.com/lloyds/about-us/what-is-lloyds (last visited on Jan. 7, 2016).

- 27 -

risks in the United States, representing more than £8.9-11 billion in gross insurance premium written.

71.    Lloyd's America, a subsidiary of Lloyd's Corporation, acts as the liaison between Lloyd's and U.S. brokers that bring business to the Syndicates.  Lloyd's America provides information on the market to stakeholders and approves brokers and correspondents in the United States.  Lloyd's America has offices in New York, Georgia, Massachusetts, Kentucky, Illinois, California and the U.S. Virgin Islands.[48]

72.    A worldwide network of brokers and other sellers work with the Lloyd's Brokers to bring insurance risks to the Lloyd's Market.  At Lloyd's headquarters at One Lime Street in London, each Syndicate maintains a manned stall or stalls (the "box") with up to 20 underwriters and various staff working at them at all times.  There, they meet with Lloyd's Brokers to buy and sell part or all of a risk along with other Syndicates, all under one roof.  In the Lloyd's Market, business is conducted face-to-face between Lloyd's Brokers and underwriters in the box as well as in the offices, coffee shops and pubs surrounding the Lloyd's building.[49]

73.    Underwriters in the Lloyd's Market cannot conduct business directly with potential insureds.  All business transacted in the Lloyd's Market is required by

---

[48]    https://www.lloyds.com/lloyds/offices/americas/us-homepage/lloyds-us-offices (last visited on Jan. 8, 2016).

[49]    *See* https://www.lloyds.com/lloyds/about-us/what-is-lloyds (last visited on Jan. 8, 2016).

Lloyd's mandate to go through authorized brokers or other Lloyd's approved intermediaries, Lloyd's correspondents and service companies. Only broking firms, not individuals, who have been accepted by Lloyd's to do business with Lloyd's Syndicates "at Lloyd's" are allowed onto the floor at Lloyd's. Thousands of non-brokers from all over the world send business to Lloyd's Brokers for them to place insurance in the Lloyd's Market. The result of this process is that there are a limited number of Lloyd's Brokers placing insurance with a limited number of Syndicates. Lloyd's Corporation's rules mandating limited participants enable the Lloyd's Brokers and Syndicates to manage and conceal the conspiracy within the Lloyd's Market.

74.    In the Lloyd's Market, supposed competitors are in constant contact and communication with each other. At the box, underwriters from the Syndicates meet with Lloyd's Brokers, and each other, to discuss and conduct the business of insuring policyholder risk by way of subscription. This face-to-face business model affords the participants access to each other's confidential and competitively-sensitive information, and assures virtual transparency among these putative competitors.[50]

75.    The Syndicates use different facilities unique to the Lloyd's Market to execute their scheme, primarily: (a) an open market placement; (b) through lineslips; and (c) through binding authorities.

---

[50]    *See* https://www.lloyds.com/lloyds/about-us/what-is-lloyds (last visited on Jan. 8, 2016).

- 29 -

76.    An open market placement is when a Lloyd's Broker, on behalf of an insured, takes a risk directly to the Syndicates, and the parties agree on the terms of the policy.  The lead Syndicate takes its share of the risk and the Syndicates in the "following market" take their share of the risk on identical price and terms.  Generally speaking, the lead Syndicate has the largest share of the risk and is the point entity for negotiations, questions, collections and disbursements of money related to the risk.  Other Syndicates "follow the leader" and agree to insure a percentage of the risk at the same terms as the leader.  These Syndicates are called "followers" or the "following market."

77.    Lineslips are agreements among Syndicates that allow groups of Syndicates to insure similar risks at an identical price and with identical terms and conditions agreed upon in advance by the Syndicates, including compensation for the Lloyd's Broker.  As with an open market placement, there are following Syndicates that agree to the identical terms to which the lead Syndicate agreed.  Every time a risk fitting the description in the lineslip agreement is brought to the Lloyd's Broker, that risk can be automatically placed with the Syndicates subscribing to the lineslip.

78.    In practice, the Syndicates agree with each other to insure wide sets of similar risks on their own terms and agree with Lloyd's Brokers what the Lloyd's Market for those risks will be. This effectively allows the lead Syndicates to buy the

Lloyd's Broker's entire book of business for that line in exchange for a (frequently undisclosed) commission.

79.    Like a lineslip, a binding authority is negotiated between a "coverholder" and the lead Syndicate prior to placing insurance, and relates to risks in a particular line of insurance.  Under this agreement, the Syndicate delegates its authority to enter into a contract of insurance to be underwritten to the coverholder in accordance with the terms of the agreement.  Frequently, multiple insurers will join together on a subscription basis to delegate the authority to write insurance.  The relationship of the intermediary to the insurer in the case of a coverholder agreement is ordinarily not adequately disclosed to the policyholder.  Nearly 30% of the insurance business written in the Lloyd's Market is through binding authority agreements.

80.    Each time an insured purchases a policy from a coverholder that meets the criteria set forth in the binding authority agreement, the risk is bound (and binds the Syndicates who have agreements with the coverholder) based on parameters predetermined by the terms of the binding authority.

81.    The vast majority of insurance underwritten in the Lloyd's Market is placed by subscription, where more than one Syndicate takes a share of the same risk on identical terms.  This provides complete transparency among so-called competitors about the precise terms for insurance coverage, as well as with whom Syndicates' "competitors" are doing business and at what price.

- 31 -

82.    As detailed above, under the subscription model of underwriting insurance practiced at Lloyd's during the Class Period, a lead underwriter is selected by the Lloyd's Broker and sets the price and terms pursuant to which the risk is underwritten.  Other Syndicates "follow the leader" and agree to insure a percentage of the risk at the same price and terms.  Although following insurers are ostensibly allowed flexibility in pricing their share of the risk, they never or almost never deviate from the leader's pricing, an indication that price flexibility exists in name only.  One underwriter characterized it as just "tak[ing] our participations on a placement."

83.    Contrary to public representations on the Lloyd's website and elsewhere, Syndicate representatives have admitted in discovery in this case that they do not consider each other to be competitors.   This makes sense given the fact that Syndicates do not need to compete for risks because they can all get a piece of the business through the subscription process.  As one underwriter put it, Syndicates do not undercut quotes by a lead because it "protect[s] underwriting margin" by participating as a following market at a higher price than one would have otherwise quoted.  Indeed, to do otherwise would be tantamount to "shoot[ing] ourselves in the foot."

84.    Even if a Syndicate is not the lead, it can participate as a follower on the lineslip.  Aside from actually underwriting the risk, there is no real advantage to being the leader, as the leader gets the same price and terms as the other participating

Syndicates, and it is not guaranteed a larger share of the risk. Indeed, it is not unusual for the following Syndicates to have the same share or a larger share of the risk than the leader.

85.    The result is that followers on a subscription-based facility can either get the terms they would negotiate if they were themselves the lead Syndicate, or terms that are more favorable than what they would have asked for if they were the lead. This allows the following Syndicates to reap extra profit because the lead chosen by the Lloyd's Broker does not price as low as the following Syndicates could have.

86.    The subscription model numbs competition by incentivizing Syndicates to not bid against the lead underwriter because following Syndicates are guaranteed a percentage of business at the lead underwriter's negotiated price, which, in turn, ensures supracompetitive pricing. Moreover, once the lead is set, the Syndicates rarely bid against the leader on renewal, as doing so would only reduce a Syndicate's profit margin. This practice of not bidding against the "leader" is the functional equivalent of bid manipulation, which has been condemned in the United States. Even Defendants have recognized that "[t]he Lloyd's market process of a price agreed by a lead underwriter and then agreed by a subscription market could be open to interpretation of a cartel." The subscription model allows the sharing of sensitive information among all Syndicates on the facility as to the lead underwriter's underwriting procedure, including how the lead underwriter prices an individual risk

- 33 -

and the terms of any coverage, because following Syndicates are able to access and assess the terms of each risk placed under the facility.

87.    For example, upon renewal of the Aon Aviation War lineslip, which Defendant Lloyd's Syndicate 33 led, an underwriter from another Defendant Lloyd's Syndicate included a note in his Syndicate's risk entry form that, in addition to renewal terms, there was a side commission agreement to remunerate Aon 20% on gross plus in addition to the broker remuneration on the slip and that the ***entire lineslip market agreed to the same terms***.

88.    The following image is an example of the signature page on a single agreement between certain Syndicates and Lloyd's Brokers.



89.     Further, as a result, supposed competitors communicate with each other when premium is being distributed or when claims must be paid for a risk they jointly insured.  The terms of these contracts allow the Syndicates to request information from each other regarding the risk, which is the method the Syndicates use to control and manipulate the Lloyd's Market into one of collaboration rather than competition.

### A.    The Syndicates Exploit Lloyd's Corporate Structure to Share Sensitive Business Data in Order to Facilitate the Conspiracy

90.     The Syndicates use Lloyd's to exchange payments and data:  All payments relating to Lloyd's Market policies, including premiums, claims, payments under the Compensation Agreements, return premium, discount, credits and rebates are, and have been, processed since at least 2001 by Xchanging Information Services ("Xchanging"), an entity owned at least in part by Lloyd's, and before that time, by Lloyd's central accounting office.

91.     Lloyd's is managed by the Council of Lloyd's (the "Council"), which functions as a board of directors and manages the Lloyd's affairs as it sees fit.  The majority of the Council is comprised of current and former Syndicate representatives and members nominated from the Society of Lloyd's (the "Society"), which are selected by the Syndicates and their investors.

92.     For many of its functions, the Council acts through directorates, including the Franchise Performance Directorate ("FPD"), whose members are

appointed by the Council and are primarily comprised of Syndicate representatives, as well as other parties with interests in the Lloyd's Market. Syndicates submit various reports to the FPD, such as Syndicate Business Forecasts ("SBFs"), Syndicate Quarterly Reports ("SQRs"), Quarterly Monitoring Reports ("QMRs"), Performance Management Data Return and Premium Income Monitoring Returns ("PIMs"). Some of these reports, such as the SBFs, are available to Syndicates before (and after) they are finalized by the FPD and contain forward-looking business plans.

93.    The data exchanged, and particularly the detailed forward-looking data reporting premium volume, market share, current and future prices and price increases enable the Syndicates to monitor and collaborate in the Lloyd's Market, including market shares, broker compensation, premiums, financial performance and average prices for each line of business against their putative competitors, and facilitates the stabilization of prices and market share. This exchange of sensitive business information is important to the execution of Defendants' conspiracy so that the Syndicates ensure that they enjoy maximized revenues, profits and market share in their 'all for one, one for all' approach.

94.    The information exchange between Syndicates was further facilitated by the fact that employees or retired employees from one Syndicate could (and did) sit on the board for another Syndicate's managing agent.

- 36 -

95.     For example, when Syndicate 609's "Active Underwriter" retired, she became a non-executive board member for Syndicate 2791's managing agent.  In that role, she attended committee meetings wherein she was provided Syndicate 2791's business plans and underwriting data (including claims, profits, forecasts and income levels) and presented with compliance issues.

96.     There was no policy that would prohibit an underwriter, who transferred from one Syndicate to another, from using prior underwriting experience (and data) obtained at the previous Syndicate at the new Syndicate.

97.     Syndicates also engaged retired or former members of Syndicates (including their own retired employees) to conduct the Lloyd's mandated biannual "independent" expert reviews.

**B.     The Syndicates Use the LMA to Facilitate the Conspiracy**

98.     The LMA provided an opportunity for the Syndicates to communicate and share intelligence about broker compensation and facilitate the concealment of the lack of competition and breaches of fiduciary duty alleged herein.

99.     Every Syndicate that operates in the Lloyd's Market is required by Lloyd's to be a member of the LMA.  The LMA's operations are virtually all funded by the Syndicates, with its annual budget totaling millions of dollars.  Through the LMA, Defendants and their co-conspirators share sensitive information and discuss, coordinate and agree on virtually every aspect of how the Lloyd's Market functions,

- 37 -

including pricing, terms, broker compensation, risk sharing and avoidance of legal liability.

100.    As the LMA recognized in May 2005, the organization was fertile ground for anticompetitive behavior: "The relevance of the cartel offence to the LMA is not that the LMA is likely to commit the offence but that it could be found to have aided and abetted the commission of the offence by its members. This might occur, for example, if the LMA assisted its members to align their rates in respect of a particular type of risk perhaps by collating and circulating information in respect of each member's own rates."

101.    The mission of the LMA is "to provide a single voice for the Lloyd's underwriting market and a range of quality services that improve members' profitability."  According to the LMA, "[t]hrough the LMA, [the interests of Lloyd's underwriters, managing agents and members' agents] are represented wherever decisions need to be made that affect the market."  The LMA further describes itself:

> The purpose of the LMA is to identify and resolve issues which are of particular interest to the Lloyd's Market.  We work in partnership with the Corporation of Lloyd's and other market-related associations to influence the course of future market initiatives.
>
> Our agenda is driven by and on behalf of our members – [the Lloyd's underwriting and claims community –] many of whose staff freely give up their time to participate on committees and business panels, as well as other groups who are essential to the strength of the association.

- 38 -

102.   The LMA is governed by a board that is comprised of the Syndicates, typically senior representatives of the Syndicates that have greater capacity.

103.   The LMA processes and disseminates a vast array of market information collected by Lloyd's and allows access to reports detailing the performance in various lines of business of each of the insurers that operates in the Lloyd's Market.

104.   Through the LMA, Defendants promote coordination and uniformity among the Syndicates by standardizing policy terms, underwriting practices and coordinating broker compensation, among other things.  For example, the LMA, through the Underwriting and Claims Committee, with executive-representatives from 18 Syndicates, created a joint set of underwriting guidelines for the entire market.

105.   Through LMA committees, the Syndicates discussed the Compensation Agreements and worked out a common agreed-upon strategy.  In the minutes for one meeting, a committee member stated: "If Marsh argue that we are the only ones wanting to portfolio transfer they are wrong as all underwriters are being encouraged to do this and as I sit on the Joint Rig Committee I can safely say that all members are doing the same."

106.   The LMA also coordinated action among the Syndicates by providing standard wording for particular classes of business and establishing the Beazley Working Group, whose sole purpose was for the Syndicates to agree to a standard front for the avoidance of antitrust and other liability.

- 39 -

107.   The LMA's predecessor association entered into "Market Agreements" that the LMA itself recognized "could be considered anti-competitive."

108.   Through the LMA, the Syndicates enter into similar agreements to coordinate exclusions and other terms in policies issued by the Lloyd's Market.

109.   The LMA also facilitated market responses to regulatory scrutiny to avoid liability.   For example, when the European Commission investigated "distortion[s] of competition" in the insurance sector, including Lloyd's, the LMA CEO's Report for the Board of Directors meeting in June 2005 observed that the LMA would likely compile the "market's response as we did for the aviation investigation [by the EC]."   Likewise, when New York Attorney General Elliot Spitzer's investigation hit, the LMA coordinated the action of the Syndicates to avoid legal liability.   Defendants have to date avoided producing many of the documents regarding the LMA's response to the Spitzer investigation by asserting a purported common legal privilege through the LMA.[51]

## II.    The Lloyd's Brokers Play a Critical Role in the Conspiracy

110.   Lloyd's Brokers serve an intermediary function in the commercial insurance marketplace, matching insurance purchasers with the insurers.

111.   Lloyd's Brokers are retained to act as expert advisors for potential insureds in procuring insurance and obtaining the best coverage at the lowest price.

---

[51]    These documents are currently the subject of a motion to compel.

112.   Lloyd's Brokers are retained to analyze the risk; assess the type of insurance needed; compare and interpret policies; and are relied on to provide unbiased, sound and accurate advice regarding the insurance marketplace and insurers.

113.   The Lloyd's Market is a closed market.  The only way for an insured to access coverage in the Lloyd's Market is through a Lloyd's Broker.  Insureds cannot seek insurance coverage directly from a Syndicate.

114.   To be authorized to place insurance with a Syndicate, a broker must register and be approved by Lloyd's Corporation and by its payment processing agent, Xchanging.  In order to obtain approval, a broker must, among other things, provide confirmation from three managing agents of their willingness to enter into a Terms of Business Agreement ("TOBA") with the broker.  To remain authorized, brokers must bring a steady flow of business to the Lloyd's Market and "[t]ake all reasonable steps to protect and maintain [Lloyd's] reputation."  If the Lloyd's Broker is "not placing a reasonable volume of business at Lloyd's (e.g., over a 6 month period, [it] will not be permitted to use the Lloyd's brand."  If a broker places "no business at Lloyd's within a 12 month timeframe," Lloyd's is "likely to withdraw [its] registration as a registered Lloyd's broker."

115.   The three main Lloyd's Brokers are Marsh, Aon, and Willis, who, collectively, during the Class Period, accounted for approximately 70% of the premium paid by Class Members in the Lloyd's Market.

116.    Marsh, Aon and Willis all represent on their websites and in statements directed to U.S. policyholders, such as Plaintiffs and other Class Members, that they provide independent and objective analysis of risk and insurance options on which policyholders seeking commercial insurance can safely rely.

117.    For example, during the Class Period, Willis' website has featured a "Client Bill of Rights," stating: "Willis represents the client's best interests through our Client Advocacy Model. Willis' global resources and services are committed to understanding the client's company, its industry and its individual needs. Willis' customized recommendations and solutions will be driven by what is in the client's best interests. This is the centerpiece of the value Willis provides its clients."

118.    Marsh UK represented to Lincoln Adventures in the Certificate of Insurance respecting the Lincoln Adventures Policy:

> Where we become aware of any actual or potential conflicts of interests, we inform our clients of the situation and their options and act upon their instructions.

> In the conduct of business and in the choice of an insurer, including any with which we or our affiliates are connected, we aim to provide advice objectively and independently *in our client's best interests*.

119.    Aon, in its Insurance and Risk Management Proposal for MMK's Insurance Coverage for the period June 21, 2003 through June 21, 2004, stated in its "Summary" of the insurance:  "It is the goal of Aon Risk Services to provide the most

- 42 -

cost-effective portfolio with financially stable companies, based upon your selection of coverages."

120.    But, unbeknownst to Plaintiffs and the Class, the Lloyd's Brokers played and continue to play a critical role in facilitating and concealing the lack of competition among the Syndicates in the Lloyd's Market.

121.    In exchange for their role in concealing the lack of competition between the Syndicates, the Syndicates made secret payments to the Lloyd's Brokers – payments of compensation in excess of normal brokerage commissions, which certain Defendants themselves characterized as "kickbacks," or "hidden profits."

122.    These Compensation Agreements – or kickbacks – were the means by which Syndicates shared their supracompetitive profits with the Lloyd's Brokers – profits achieved because of the reduced competition among the Syndicates.

123.    As detailed above and borne out by the discovery produced to date, kickbacks were denominated by numerous labels.  As described above, some were separate agreements called PSAs or MSAs and provided "off slip" payments to the Lloyd's Brokers for achieving volume and/or profit targets.  Others were made pursuant to lineslips and binding authorities.  Many were collectively entered into by a group of Syndicates.  Even where the Syndicates were not all on the same agreements, they met to coordinate their positions as to those agreements.  The agreements shared common characteristics:  payment of additional compensation (in excess of standard

- 43 -

brokerage) to the Lloyd's Broker by the Syndicate(s) contingent upon achieving specified business target(s) or goal(s), such as: (a) premium volume; (b) growth of business and/or renewal of existing business; and/or (c) profitability of the book of business, *i.e.*, agreed-upon favorable total claims/loss ratios.

124.    These payments were concealed from policyholders, and the Syndicates and played a key role in concealing this breach of fiduciary duty by the Lloyd's Brokers.    Many agreements contained a confidentiality clause.    For example, Syndicate 2488 entered into a compensation agreement with Marsh that contained a confidentiality clause stating "the terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law or in accordance with Lloyd's regulations and practice."    Clauses like this were commonplace in the agreements that the Lloyd's Brokers entered into with the Syndicates.

125.    In addition to making payments through open market placements, the payments were also paid via lineslips and binding authorities for entire books of business that often contained volume and/or profit targets.

126.    Through lineslips, Syndicates agreed to terms, conditions, premium rates and kickback rates with other Syndicates and Lloyd's Brokers for entire lines of business.

127.    For example, all airline hull war risks were placed through lineslips with one of the three major Lloyd's Brokers – Marsh, Aon and Willis, and three Syndicates

- 44 -

shared the lead underwriter position on those lineslips. These lineslips were subject to hidden commissions of up to 25% of gross premiums.

128.   Marsh alone had 17 lineslips for facilities in operation within the aviation and aerospace class of business in 2003 – all of which provided for kickbacks and which all following Syndicates agreed to pay.

129.   Defendant Lloyd's Syndicates 1183, 623, 1084, 2001, 2003, 2020, and 2791, along with non-Defendant Lloyd's Syndicate 1243, entered into a lineslip with Marsh for the placement of certain war risks in 2003, which contained profit and volume-based commission clauses.

130.   Also, in connection with a lineslip for the placement of aviation risk, Defendant Lloyd's Syndicates 435, 609, 1084, 2001, 2020, 2488, and 2791 entered into Compensation Agreements with a division of Marsh "to make additional revenue payments to Marsh Ltd." of 7.50% based on total premium written.

131.   Defendant Lloyd's Syndicates 1003 and 2003, along with non-Defendant Lloyd's Syndicates 1218 and 2000, entered into a lineslip with a division of Marsh for the placement of certain commercial crime risk in 2002, which contained profit and volume-based commission clauses.

132.   Kickbacks were also paid (and continue to be paid) under binding authorities. In these agreements, the Syndicates ceded power to Lloyd's Brokers to write business sight unseen based on pre-arranged terms. Multiple Syndicates would

- 45 -

sign on to these agreements, sharing risk on a *pro rata* basis under the same exact terms and conditions, knowing each Syndicate would get its share of profits.

133.   For example, under a "Binding Authority Agreement" between and among Marsh and Syndicates 1221, 1036, 2488, 609, 1243, 1861, 1183, 1200, 1084, 102, and 1007, Marsh acted both as the coverholder and Lloyd's Broker.   The Syndicates all agreed to pay 25% as coverholder commission, 5% as management fee, 5% as profit commission and up to 5% if certain volume levels were met.

134.   Under another "Binding Authority Agreement" between Miller Insurance Services, Ltd. and Syndicates 623, 2623, 2020, 2791, 2488, 2001, 510, 570, 435 and 2003, Miller Services, Ltd. acted as the Lloyd's Broker. The Syndicates agreed to pay 22.5% as a coverholder commission with an additional 20% paid on gross premium as a "contingent or profit commission" and an additional 5% brokerage fee paid to Miller.

135.   Under another "Binding Authority Agreement" between Miller Insurance Services, Ltd. and Syndicates 623, 2623, 510, 2791, 1183, 958, 570 and 727, Miller Services, Ltd. acted as the Lloyd's Broker. The Syndicates agreed to pay 22.5% as a coverholder commission with an additional 20% paid on gross premium as a "contingent or profit commission" and an additional 5% brokerage fee paid to Miller.

136.   Under another "Binding Authority Agreement" between Miller Insurance Services, Ltd. and Syndicates 623, 2623, 2020, 510, 2987, 727, 958, 1183, 2001, 570,

435, 1084 and 2791, Miller Services, Ltd. acted as the Lloyd's Broker. The Syndicates agreed to pay 22.5% as a coverholder commission with an additional 20% paid on gross premium as a "contingent or profit commission" and an additional 5% brokerage fee paid to Miller.

137.   Under another "Binding Authority Agreement" between Miller Insurance Services, Ltd. and Syndicates 623, 2623, 2020, 510, 2791, 102, 570, 727, 2003, 609, 435, 1245, 1096 and 2488, Miller Services, Ltd. acted as the Lloyd's Broker. The Syndicates agreed to pay 22.5% as a coverholder commission with an additional 22.5% paid on gross premium as a "contingent or profit commission" and an additional 5% brokerage fee paid to Miller.

138.   Another example, under "Monkey Master Cover" between Marsh and Syndicates 2001, 1084 and 3000, Marsh again acted both as the coverholder and Lloyd's Broker and the Syndicates agreed to pay, in addition to 20% standard commission, a volume-based and profit commission.

139.   In the Lloyd's Market, the cost for brokerage and commissions (including contingent commissions) is extremely high, sometimes 40% or more of premium.

140.   Kickbacks and other secret payments are considered "acquisition costs" for premium pricing and rate-making purposes, and were built into the premium charged for the risk.  Thus, the cost of the secret kickbacks was, and continues to be, recovered from policyholders through higher payments for insurance.

141. Despite the duties owed to policyholders, and without adequate disclosure, the Syndicates paid contingent commissions to incentivize the Lloyd's Brokers into concealing the lack of competition among the Syndicates.

142. For example, Syndicate 33 entered into an agreement with Marsh to double the size of its marine and energy lines within the next year.

143. Similarly, Syndicate 1183 entered into an agreement with Marsh that paid up to 8% in additional kickbacks to incentivize Marsh to place more property business.

144. One underwriter from one Defendant Lloyd's Syndicate described the Compensation Agreements as "off slip payments from underwriters to brokers in return for a guaranteed proportion of business or profit."

145. Marsh, in fact, threatened or refused to show business in absence of such an agreement. In the terrorism line, for example, Marsh gave clear instruction to its brokers that they should not place terrorism business with Syndicates that did not enter into Compensation Agreements.

146. Syndicates knew that other Syndicates were paying additional compensation because they all signed on to the same lineslip and binder agreements to pay the kickbacks at the same rate and on the same terms as each other.

147. With these pay-to-play and pay-to-conceal arrangements, Syndicates assured their access to supracompetitive pricing.

148.   The Defendant Lloyd's Syndicates entered into various Compensation Agreements with Marsh and made payments pursuant to those agreements dating at least back to 1998.

149.   The Defendant Lloyd's Syndicates entered into various Compensation Agreements with Aon and made payments pursuant to those agreements dating at least back to 2003.

150.   The Defendant Lloyd's Syndicates entered into various Compensation Agreements with Willis and made payments pursuant to those agreements dating at least back to 1999.

151.   Syndicates 33, 102, 382, 435, 510, 570, 609, 623, 727, 958, 1003, 1084, 1096, 1183, 1245, 1886, 1967, 2001, 2003, 2020, 2488, 2623, 2791, 2987, 4020, 4040, 4141, and 4472 entered into similar Compensation Agreements that called for hidden payments to be made without the insured's knowledge.

152.   With these pay-to-play arrangements in the subscription market context, Syndicates assured their collective access to premium volume.  These payments of kickbacks also occurred in the U.S. market, and Marsh, Aon and Willis were all the subject of regulatory investigations relating to nefarious practices arising from the warped incentives created by those kickbacks.  Those regulatory investigations uncovered evidence that Marsh and certain insurers engaged in bid rigging, bid manipulation and other improper and illegal conduct in furtherance of the scheme.  At

- 49 -

Lloyd's, the subscription market led to different forms of bid manipulation, such as the Syndicates not bidding against the leader as described herein.  Additionally, internal documents discussing the regulatory probes in the U.S. market discuss practices that appear to have the indicia of the bid rigging and/or bid manipulation condemned in the United States – practices such as "no quotes," "dummy quotes," "favours," "obliges" and "desk quoting."  Although discovery into these practices has been thwarted by Defendants' refusal to provide documents relating to these terms, each of these practices appears to describe conduct that is intended to create an appearance of competition where none exists.

## III.    Defendants' Agreements Were Concealed from Policyholders

153.   The Syndicates and the Lloyd's Brokers conspired to conceal these agreements from the insureds.  Clients in the United States were only aware of the standard commission paid to the U.S.-based broker, not the kickback payments paid under the various Compensation Agreements described above.

154.   As mentioned above, one method by which the Syndicates and Lloyd's Brokers concealed their Compensation Agreements was to treat them as confidential.  For example, Marsh instructed employees to include the following language in all PSAs: "The terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law or in accordance with Lloyd's regulations and practice."  Furthermore, an internal Marsh document entitled "PSA

- 50 -

Primer" dated July 1999 stated that employees were not to divulge the particulars of Marsh PSAs either to clients or even other individuals within Marsh Inc. who were not involved in the negotiation or administration. Marsh justified this policy as a breach of the confidentiality clause contained in the Compensation Agreements and referred client requests to the appropriate U.S. regional head.

155.   Responding to clients' questions about possible contingent commissions paid by insurers, Marsh stated that as a matter of corporate policy it did not make available any specific information relating to the Compensation Agreements.

156.   When faced with a client inquiry regarding its commissions, Aon stated "we do not disclose the national amounts we received . . . .[T]hat is extremely confidential information."

157.   The Syndicates did not adopt any mechanism for ensuring clients were aware of the Compensation Agreements in the face of the confidentiality clauses and the knowledge that they were not being disclosed.

158.   The practice of entering into agreements providing for additional hidden commissions is contrary to Lloyd's representations about the duties owed to the insureds. As Lloyd's proclaims on its website: "Brokers bring business to the Lloyd's market, taking a particular risk they want covered around the market to try to find the best price, terms and conditions." In a presentation available on its website, Lloyd's

- 51 -

represents that Lloyd's Brokers visit Lloyd's Underwriting Room and "meet interested underwriters face to face and 'shop around' to negotiate the best package."

159.   The insurance industry has recognized that undisclosed compensation agreements compromise the client/broker relationship.  As the Risk and Insurance Management Society, Inc. ("RIMS") stated in a press release dated August 24, 2004:

> We believe that undisclosed contingency fees have the potential to compromise the very basis upon which this relationship is built.  In an effort to preserve the integrity of this relationship, RIMS strongly advocates for complete and full disclosure of compensation agreements without client request.

160.   RIMS reiterated its position in a press release dated May 30, 2007:

> However, for brokers and independent agents to accept these fees in transactions that are made on behalf of the buyer represents an inherent conflict of interest.

*      *      *

> RIMS supports a business model for the insurance industry which does not provide for, offer or make available contingent commission arrangements for the brokerage industry.

*      *      *

> RIMS believes that broker compensation and insurer selection should be governed by the principles of complete transparency and full disclosure without client request.  Only then can risk managers make full and informed decisions . . . .

161.   The fact that Lloyd's Brokers Marsh, Aon and Willis had a policy of misleading clients about the payment and receipt of kickbacks and that the Compensation Agreements were the vehicle for ensuring receipt of premium volume

and protection of business from competition was revealed in the testimony of a former

Marsh Managing Director, Joshua M. Bewlay ("Bewlay"), who pled guilty to a felony

charge of scheming to defraud on February 14, 2005.

162.    Bewlay's testimony revealed that Marsh established a procedure or a

"protocol" intended to discourage the client from obtaining an answer on how Marsh

received compensation from insurance companies and deliberately misled customers

regarding the significance of the Compensation Agreements.  Bewlay testified:

> [D]uring my employment, I was made aware of a Marsh protocol
> designed to prevent Marsh's clients from obtaining accurate information
> concerning the amount of placement service or PSA or MSA revenue
> Marsh earned from carriers with respect to a particular client in addition
> to any fee or commission paid. ***The protocol required multiple layers of
> inquiry to discourage the client from obtaining an answer***.  Also that
> all inquiries be channeled through a single Marsh employee who directed
> the answer to the inquiry.
>
> Finally, the percentage or ratio that Marsh used when it responded to a
> client's inquiry concerning placement service or PSA or MSA revenue
> significantly understated the amount of PSA or MSA revenue earned
> with respect to a particular client.  In my department, Global Brokerage
> and Excess Casualty significantly understated the amount of PSA or
> MSA revenue earned by Marsh with respect to a particular client.
>
> When I was told that a client inquired as to the amount of PSA revenue
> Marsh earned from an insurance carrier, I responded that the Marsh
> employee follow Marsh's protocol, including that the client only speak
> to the Marsh employee designated to respond to such inquiries.

*People of the State of New York v. Joshua Bewlay*, Plea Testimony at 11-12 (Feb. 14,

2005) (emphasis added).

- 53 -

163.   According to the criminal complaint against Bewlay, the "protocol," directed Marsh employees to tell inquiring clients that Marsh received up to 1% to 2% in contingent commission as a bonus from insurers, when, in fact, Marsh sometimes earned as much as 10% to 15%.  *People of the State of New York v. Joshua Bewlay* Complaint (filed Feb. 22, 2005).

164.   Internal Marsh e-mails illustrate the concealment of Compensation Agreements to clients: "It's not a matter of client's knowing about PSAs, it's about how much $$ we make on them & don't disclose.  The issue is not that we disclose the PSAs, but that we give clients such a shady answer when we do."

## IV.   Plaintiffs and the Class Were Injured by the Scheme

165.   The Syndicates build the cost of the Compensation Agreements into the cost of insurance.

166.   The cost of intermediation in the Lloyd's Market is extremely high; much higher than it is in other insurance markets.  These high costs of intermediation are not justified as legitimate services by the Lloyd's Brokers; even Defendants have characterized payments to the brokers as "fees for hokum services."

167.   Data produced by the Defendants in this action indicates that brokerage and commission payments (not even including contingent commissions) were, on average, nearly twice as high in the Lloyds Market (22%) than they were in the U.S. property and casualty market (12%) during the comparable time period.  The data also

show that in some cases these payments are nearly 40% of premium.  Contingent commissions and other payments pursuant to the Compensation Agreements were not included in the data produced by most Defendants thus far, but if they were added in, they would increase the brokerage and commission percentage further.

168.    These costs, be they standard brokerage commissions or payments through MSAs, PSAs, lineslips, binding authorities, and the other Compensation Agreements are all considered "acquisition costs."  As such, these payments directly increased the amounts that insurers charged and were built into the premium calculations insurers internally performed for products similar to the policies that Plaintiffs and Class Members purchased in this case.

169.    Because the cost of the Compensation Agreements is built into the formulas used to determine all rates, the costs are passed through to all policies, regardless of whether a commission was collected on a specific policy.  In other words, basic ratemaking principles dictate that insurers do not absorb these acquisition costs as deductions from their own profits, but instead recover them from policyholders through increased premium.

170.    For example, Tim Griffin, Compliance Officer at Syndicate 382, stated: "[I]f the standard commission is 15 percent and at some point in the future at the end of the year they are going to add another 3 on, then the underwriter will have in mind that's going to cost 18 percent commission, so when he is working out how much he

thinks he needs to charge to get the right return for the risk he will take that into account."

171.    Tim Prifti, an underwriter at Syndicate 510, testified:  "So when an underwriter quotes a price, they have a gross price, which is the price including acquisition costs. . . .   Acquisition costs are commissions, and in this case an acquisition cost of 30 was deemed to be made up of 22.5 percent brokerage and 7.5 percent MSA."  "[T]he brokerage was 20 percent and there was an MSA of 7.5 percent, so from a Kiln point of view when we are quoting the risks we know that we are writing the business less 27.5 percent deductions in total."

172.    When asked how a "difference in commissions [would] affect the premium," Ben Garston, an underwriter at Syndicate 2791, stated: "It was part of the premium."

173.    Mervyn Sugden, Head of Marine and Aviation for Syndicate 382, testified:  "[When] we come to the premium at the bottom, which is what the client is interested in, it includes all acquisition costs, and therefore the gross premium being charged to the bottom is affected by the amount of brokerage being taken."

174.    Jane Clouting, Compliance Officer at Syndicate 1183, stated that the "fields on the system for brokerage" and "other deductions" (*i.e.*, contingent commissions) are "all part of the premium."

175.    Bill Katesmark, assistant underwriter at Syndicate 33 from 1998 to 2000, and "Underwriting Partner" at Syndicate 2791 from 2000 to the present, agreed that it was a "basic principle" that an underwriter would build expenses, such as brokerage payments, into the price of the premium.

176.    Andrew James Groom, an underwriter at Syndicate 2791, testified that once the PSA was entered into, "[i]t would form part of my calculations of the overall commissions, yes. . . .  My pricing includes a factor for commission. . . .  The pure rate would then be loaded for commissions, including PSA in this instance and the margin, and that is the way you get to your technical pricing."

177.    Andrew Laing, an Aon broker with more than 20 years experience working with underwriters in the box testified that, in his experience, underwriters "will contemplate any brokerage or commissions, [including profit commission] that are upon the proposal."

178.    The foregoing is consistent with documents that reflect the simple fact that, as for-profit businesses, the Syndicates "add [the cost of extra brokerage] to our price and we have made it clear [to the brokers] that we will quote different gross premiums if the commissions are different. *i.e.* the client pays the additional amount."

179.    Academic research confirms that contingent commissions paid by insurers are included in the final premium demanded from policyholders.  In a peer-reviewed study published in September 2006, Cummins and Doherty ("C&D")

performed a regression analysis on a large commercial insurance dataset and concluded that "contingent commissions are passed on to policyholders in the premium."

180.    C&D estimated the industry-wide contingent pass-through rate for property and casualty insurance, meaning the dollar impact upon premium of a single dollar in contingent commissions.  This study was funded by the American Insurance Association, the main trade organization for property and casualty insurers, and was published in *The Journal of Risk and Insurance*, which is a well-respected peer-reviewed academic journal.  The study spans the years 1993 to 2004.  The practice continued (and continues) unabated, as reflected in the testimony cited above.

181.    Because of the pass-through of brokerage payments into the formulas for determining pricing, the excessively-high cost of brokerage payments in the Lloyd's Market causes insureds to pay higher premiums than they would otherwise pay.

182.    The excessively high brokerage compensation is also a reflection of the anticompetitive operation of the Lloyd's Market because recovering these costs through higher premium pricing is possible only because the Syndicates do not have to compete with one another for business.

## CLASS ACTION ALLEGATIONS

183.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (b)(1)(B), (b)(2), and/or (b)(3), on behalf of a nationwide class consisting of all

persons in the United States who, between January 1, 1997 and the date of class certification (the "Class Period"), purchased or renewed a contract of insurance with a Defendant Lloyd's Syndicate. Excluded from the Class are Defendants and their co-conspirators and their officers, affiliates, directors, employees, and any governmental employees or entities.

184.    All Plaintiffs and Class Members have suffered injury to their business or property by reason of Defendants' unlawful conduct as alleged herein.

185.    There are numerous questions of law and fact that are common to the claims of all Class Members as set forth above, including:

(a)    whether Defendants engaged in conduct actionable under the RICO statute;

(b)    whether Defendants were and are each a "person," as that term is defined in 18 U.S.C. §1961(3);

(c)    whether the Lloyd's Corporation constitutes a RICO enterprise within the meaning of 18 U.S.C. §1961(4);

(d)    whether, alternatively, the Defendants, other Lloyd's Syndicates and the Lloyd's Brokers constitute an association-in-fact within the meaning of 18 U.S.C. §1961(4);

(e)    whether Defendants are "persons" that conducted the affairs of the "Lloyd's Enterprise" through the "pattern of racketeering activity;"

(f)　　whether Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5);

(g)　　whether Defendants have engaged in "racketeering activity" indictable under any of the provisions of 18 U.S.C. §1341 (mail fraud) and §1343 (wire fraud);

(h)　　whether Plaintiffs and each member of the Class were and are each a "person injured in his or her business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. §1964(c);

(i)　　whether Defendants fully disclosed the nature and extent of the Compensation Agreements and/or insurance policies incorporating the cost of same in their insurance products and services;

(j)　　whether Plaintiffs and each member of the Class have been injured in his or her business or property as a direct and proximate result of Defendants' illegal conduct in violation of 18 U.S.C. §1962(c);

(k)　　whether the Syndicates are liable for damages to Plaintiffs and Class Members for conduct actionable under the RICO statute;

(l)　　whether the Syndicates are liable for civil conspiracy; and

(m)　　whether the Syndicates were unjustly enriched.

186.　The Class is so numerous that joinder of its members is impracticable.

187.   The exact number of Class Members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery.  Plaintiffs believe that the number of Class Members numbers in the thousands or more.

188.   The Class is ascertainable in that the names and addresses of all Class Members can be identified in business records maintained by the Defendants and their co-conspirators.

189.   Plaintiffs' claims are typical of the Class.  All Class Members, including Plaintiffs sustained injury as a result of Defendants' scheme, common course of conduct and RICO conspiracy.

190.   Plaintiffs and Class Members were damaged as a result of purchasing insurance from the Defendant Lloyd's Syndicates at prices that were higher due to the broker compensation agreements, kickbacks and concealed lack of competition.

191.   The claims of the Plaintiffs and the Class Members have a common origin and share a common basis.  Their claims originate from the same illegal acts on the part of Defendants and their co-conspirators taken in furtherance of that conspiracy, including Defendants' own conduct, as well as conduct by Defendants that aided and abetted the conduct of other co-conspirators.

192.   Plaintiffs' state claims which are typical of those of the absent Class Members.  If brought and prosecuted individually, the claims of each Class Member would require proof of the same material and substantive facts.

193.    The claims of Plaintiffs are sufficiently aligned with the interests of the absent members of the Class to ensure that the claims of the Class will be prosecuted with diligence and care by Plaintiffs as representatives of the Class.

194.    The interests of the Plaintiffs are co-extensive with and not antagonistic to those of the absent Class Members.

195.    The Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which directly and irrevocably conflict with, the interests of other members of the Class.

196.    The Plaintiffs are willing and prepared to serve the proposed Class in a representative capacity with all of the obligations and duties material thereto.

197.    The Plaintiffs have retained the services of counsel who are experienced in complex class action litigation and will adequately represent the interests of Plaintiffs and all absent Class Members in the prosecution of their claims.

198.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(1)(B).  The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

199.   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class.  Such incompatible standards of conduct and varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow the existence of inconsistent and incompatible rights within the Class.

200.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(2), in that Defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

201.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(3), in that the questions of law and fact that are common to members of the Class predominate over any questions affecting only individual members.

202.   A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this complaint in that:

(a)    individual claims by the Class Members will be impracticable as the costs of pursuit would far exceed what Plaintiffs or any one Class Member has at stake;

(b)     little individual litigation has been commenced over the controversies alleged in this Complaint, and individual members are unlikely to have an interest in prosecuting and controlling separate individual actions;

(c)     the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

(d)     the proposed class action is manageable.

## RICO ALLEGATIONS

### A.     The Lloyd's Enterprise

203.    The Lloyd's Corporation is a legal entity, which constitutes a RICO enterprise, through which Defendants conducted the pattern of racketeering activity described herein.  Alternatively Defendants, other Lloyd's Syndicates and the Lloyd's Brokers constitute an association-in-fact enterprise.  These alternative enterprises are referred to collectively herein as the "Lloyd's Enterprise."

204.    The Syndicates and the Lloyd's Brokers were able to devise and implement their scheme through their participation in the Lloyd's Enterprise.  As described *infra*, Defendants and their co-conspirators used the Lloyd's Market and the LMA to communicate, meet, share information, collaborate and reach agreements essential to their scheme and common course of conduct.

205.    The activities of the Lloyd's Enterprise affect interstate commerce because they involve commercial activities across state boundaries, such as the

marketing, promotion, advertisement, sale and renewal of insurance products throughout the United States, and the receipt of monies from the sale of same from Plaintiffs and the Class, which represent nearly half of the entire Lloyd's Market in terms of premium volume (£25.5 billion in gross written premium in 2012, over $40 billion).

206.    The Lloyd's Enterprise is an ongoing and continuing organization, with the alternative association-in-fact enterprises consisting of legal entities, such as an association, limited liability companies, managing agents and individuals and other entities associated for the common purpose of deriving revenues and profits from the sale of insurance in the Lloyd's Market to Plaintiffs and the Class.

207.    Each participant in the Lloyd's Enterprise has a systematic linkage because there are shared risks, corporate ties, contractual relationships, financial ties, sharing of sensitive business information and continuing coordination of activities. Due to the interconnected structure of Lloyd's as a market housed in one common room and in which business is still done face-to-face, the shared ownership, shared fate through the subscription market, "follow the leader" pricing, Compensation Agreements and rotating nature of many of the individuals' employment and board membership with the various Syndicates, Lloyd's, and the Lloyd's Brokers, there are strong ties and longstanding relationships among those associated with the Enterprise.

208.   Within the Lloyd's Enterprise, there were common communication networks through which Defendants and their co-conspirators shared information on a regular and sustained basis as described herein.

209.   The Syndicates used the above common communication network(s) for the purpose of, *inter alia*, concealing the lack of competition among the Syndicates and the secret kickbacks paid to Lloyd's Brokers, both of which increased or stabilized Defendants' revenues and profits through the sale and renewal of insurance to Plaintiffs and the Class.

210.   Defendants and their co-conspirators participated in, and exercised control over, the affairs of the Lloyd's Enterprise through, among other methods and means: (a) selecting representatives to sit on the Council of Lloyd's; (b) serving as chairs and members of the Council, Lloyd's Directorates, the LMA and various committees at Lloyd's and related entities and associations; (c) funding the operations of Lloyd's and the LMA; (d) entering into common agreements and participating on the same risks through the subscription model, lineslips and binding authorities; (e) entering into market agreements and otherwise coordinating their positions and strategies through the LMA and/or its predecessor organizations; (f) exchanging detailed financial information; (g) "following the leader" on pricing; (h) entering into kickback agreements with Lloyd's Brokers; (i) using Lloyd's America to promote and market Lloyd's insurance to U.S. consumers and policyholders, communicate with

- 66 -

U.S. brokers and coverholders, and monitor regulatory matters in the United States; (j) concealing the lack of, or stifled competition in the Lloyd's Market; and (k) collecting revenues and profits from the sale and renewal of insurance.

211.    Through the Lloyd's Enterprise, Defendants and their co-conspirators have engaged in a pattern of racketeering activity, which involves a deceptive scheme to increase revenues and profits for Defendants and their co-conspirators through the sale and renewal of insurance at supracompetitive rates to Plaintiffs and the Class, while maintaining a façade of competition to U.S. consumers and policyholders.

212.    While Defendants participate in, and/or are members of, the Lloyd's Enterprise, they also have a separate and distinct existence, including separate and distinct legal entities, "boxes," offices, websites, bank accounts, managing agents, directors and officers, employees and financial statements.

213.    Defendants have been able to commit the predicate offenses by virtue of their involvement in, or control over, the affairs of the Lloyd's Enterprise. Defendants were able to devise, implement and conceal their scheme through the structure and handshake culture of the Lloyd's Market.

214.    Absent the Defendants' participation in and control of Lloyd's, the Defendants would have been unable to perpetrate the fraudulent scheme and the predicate acts. The Lloyd's Enterprise provided Defendants the necessary mechanism for hatching and executing their scheme, including:  misrepresenting on its website

- 67 -

and in other public statements that the Lloyd's Market is an insurance marketplace in which Defendants compete, ensuring the profitability of all Syndicates, facilitating the exchange of detailed information, granting access only to authorized "Lloyd's Brokers" into the Market, and allowing collaboration among so-called competitors.

215.   At all relevant times, each participant in the Lloyd's Enterprise was aware of the scheme, was a knowing and willing participant in the scheme, and reaped revenues and/or profits therefrom.

216.   Defendants have directed and controlled the ongoing organization necessary to implement their scheme through communications of which Plaintiffs cannot now know because such information lies in Defendants' hands.

217.   The activities of the Lloyd's Enterprise are national in scope, affecting the commercial insurance market throughout the United States.   The Lloyd's Enterprise has a substantial impact upon the economy and upon interstate commerce.

### B.    Pattern of Racketeering Activity

218.   Defendants, each of whom is a person associated-in-fact with the Lloyd's Enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise(s) through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c).  The racketeering activity was made possible by Defendants' regular and repeated use of the

- 68 -

communication networks, facilities, services, distribution channels and representatives and/or employees of the Lloyd's Enterprise.

219.   Defendants each committed multiple "Racketeering Acts," as described below, including aiding and abetting such acts.  This pattern of fraudulent acts directly contributed to the Lloyd's Enterprise's scheme.

220.   The Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims and methods of commission.  Further, the Racketeering Acts were continuous, occurring on a regular basis during the Class Period.

221.   Defendants participated in the operation and management of the Lloyd's Enterprise by directing its affairs, as described above.

222.   In devising and executing the scheme, Defendants committed acts constituting indictable offenses under 18 U.S.C. §§1341 and 1343, in that they devised and knowingly carried out a material scheme or artifice or to obtain money from Plaintiffs and the Class by means of misrepresentations, concealments, and/or omissions of material facts.  For the purpose of executing the scheme or artifice, Defendants committed these Racketeering Acts intentionally, and knowingly with, the specific intent to advance the scheme.

223.   Defendants used (or caused to be used) the mail and interstate wire communications to create and manage their scheme or artifice through

- 69 -

misrepresentations, concealments and/or material omissions.  Defendants' scheme includes, but is not limited to:  disseminating (or causing to be disseminated) to U.S. policyholders false and misleading marketing materials, advertisements, insurance policies, statements, and websites; aiding and abetting similar materials and statements by the Lloyd's Brokers; paying kickbacks to the Lloyd's Brokers; causing U.S. policyholders to unwittingly pay premiums that included the cost of Defendants' kickbacks to the Lloyd's Brokers and/or were otherwise supracompetitive; sending invoices for premium payments; and receiving supracompetitive premiums, revenues, and profits from the sale and renewal of insurance to U.S. policyholders.

224.   The use of the mails and wires included the following items and communications sent to Plaintiffs and third parties *via* U.S. mail, commercial carrier, interstate wire, and/or other interstate electronic media that were essential to carrying out the scheme:

(a)     misrepresentations, concealments, and/or material omissions to U.S. policyholders about the competitive nature of the Lloyd's Market, the placement of insurance therein, the secret kickbacks, and the nature of their relationships with each other and the Lloyd's Brokers as alleged herein in promotional and marketing materials; advertisements; on the Lloyd's website (including the Lloyd's America webpages); social media on the Internet, including, but not limited to, YouTube, Facebook, Twitter, LinkedIn;  and statements by the brokers and policy materials;

- 70 -

    (b)    "confidential" Compensation Agreements, including binders, coverholder agreements, and lineslips;

    (c)    distribution and receipt of the policies;

    (d)    fee schedules and invoices;

    (e)    premium payments related to Defendants' scheme;

    (f)    claims;

    (g)    responses to claims;

    (h)    coverage statements;

    (i)    correspondence, including correspondence about the items above;

    (j)    other agreements;

    (k)    deposits of proceeds; and

    (l)    other documents and things.

225.   Defendants and/or their co-conspirators have communicated by U.S. mail, by interstate facsimile and by interstate electronic mail with policyholders, brokers, coverholders, subsidiaries, regional offices, affiliates and other entities in the United States in furtherance of their scheme. These acts were done in violation of 18 U.S.C. §§1341 and 1343.

226.   Defendants and third parties have exclusive, or primary, custody or control over the records reflecting the precise dates and time of the mailings and wire transmissions described above.

227.   During the Class Period, including on/in or about the dates or months below, Defendants and/or their co-conspirators, for the purpose of executing the above-described scheme caused to be delivered by U.S. mail or by a private or commercial interstate carrier, or received therefrom, according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, the items described above, including those alleged below:

| To | From | Date | Description |
|---|---|---|---|
| Conrad Schuberth, Lincoln Adventures, Chicago, Illinois | Atlass Insurance Group, Ft. Lauderdale, Florida | On or around March 2005 | Invoice for renewal of Yacht Policy |
| Atlass Insurance Group, Ft. Lauderdale, Florida | Marsh UK Limited, U.K. | On or around April 2005 | Letter re renewal of Yacht policy |
| Robert Nicolai, MMK Michigan | Aon Risk Services, Michigan | On or around June 2005 | Letter enclosing agency binders for insurance policies and finance agreement for premium payments |

228.   Throughout the Class Period, including on/in or about the dates or months set forth below, Defendants and/or their co-conspirators, for the purpose of executing the above-described scheme caused to be transmitted in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those alleged below:

| To | From | Date | Description |
|---|---|---|---|
| Michael McLeod, Seiden & Alder Matthewman, Florida | Paul Fuller, Marsh UK Limited, U.K. | On or about November 2004 | Facsimile representing that Marsh UK is acting on behalf of Lincoln Adventures with regard to claim |
| Robert Nicolai, MMK, California | Jo Ellen, Corpe-Walker, Aon Risk Services, Missouri | On or about June 2005 | Email re insurance binders, invoices and premium finance agreement |
| Robert Nicolai | Mary Studebaker, Aon Risk Services, Missouri | On or around June 2007 | Email re copy of carrier renewal |

Defendants and third parties have exclusive control over the documents reflecting the precise dates and times of many of the mailings and wire transmissions described above.

229.   Defendants' uniform acts of concealment and omissions were knowing and intentional and made for the purpose of deceiving the Class, executing the scheme, and obtaining revenues and profits as a result thereof.

230.   Defendants knew and recklessly disregarded that their misrepresentations and omissions were material and were relied upon by Plaintiffs and the Class as shown by their payment for the purchase and/or renewal of insurance.

### C.    Conspiracy

231.   Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.

- 73 -

232.   The objects of the conspiracy are: (a) to maximize profits and revenues for all Defendants; (b) stabilize prices for all Defendants; and/or (c) minimize losses to all Defendants.

233.   To achieve these goals, Defendants agreed to participate in illicit practices, such as agreements not to compete, sharing of sensitive business information, coordinated actions, market agreements, deceptive representations or material omissions and/or agreements for secret kickbacks with the Lloyd's Brokers.

234.   Each Defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and participated in the scheme and/or common course of conduct.

235.   Indeed, for the conspiracy to succeed, each Defendant and co-conspirator had to agree to implement and use the similar devices and tactics.

236.   As a result of Defendants' scheme and conspiracy, Plaintiffs and the Class paid more for insurance than they otherwise would have.  Therefore, the damages that Defendants caused Plaintiffs and the Class amounts to hundreds of millions of dollars.

### D.    Plaintiffs' Injuries

237.   The fraudulent scheme and conspiracy proximately caused the cost of insurance obtained by Plaintiffs and Class Members to increase because the kickbacks paid to the Lloyd's Brokers were included in the price of insurance paid by Plaintiffs

and Class Members.  In addition, Plaintiffs and Class Members reasonably relied on the Lloyd's Brokers' misrepresentations on their websites, in public statements, agreements, and policies that they would shop out their risks to the market in which the Syndicates purportedly competed and that they would shop those risks out in the best interest of the clients, and Defendants' concealment of the conspiracy, by paying higher premiums that included the kickbacks to the Lloyd's Brokers and reflected the lack of, or stifled, competition in the Lloyd's Market.

### FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

238.   Defendants and Lloyd's Brokers have concealed their unlawful scheme, course of conduct and conspiracy from Plaintiffs and Class Members.

239.   As part of the scheme alleged, Defendants and Lloyd's Brokers created the appearance of a competitive market for insurance coverage.

240.   Plaintiffs had no knowledge of Defendants' scheme and could not have discovered that Defendants' representations were false or that Defendants had concealed information and materials until at the earliest in the spring of 2004 when New York Attorney General Elliott Spitzer and other state regulators announced their investigations into contingent commission practices in the U.S. market.

241.   Further, upon information and belief, Defendants' conduct has been continuing in nature.  There is a substantial nexus between the fraudulent conduct that occurred within the statute of limitations and the misconduct that occurred prior to,

and since, that time. The acts involve the same type of illicit practices and are recurring, continuous events. Defendants' wrongful conduct and fraudulent concealment tolls the running of any statute of limitations. Furthermore, Defendants are estopped from asserting any statute of limitations defense in this matter because of its conduct in concealing the fraud claims of Plaintiffs and the Class and concealing the damages incurred by Plaintiffs and the Class.

242. Defendants' fraudulent, criminal and wrongful behavior occurred nationwide, and did not stop at the borders of any individual states. The filing of the original complaint on July 13, 2007, serves to toll and preserve the claims of Plaintiffs, Class Members, and other purchasers who were defrauded by Defendants' and their co-conspirators' wrongful and unlawful acts.

## THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF

243. Defendants' scheme to maintain the façade of competition in the Lloyd's Market in order to obtain higher premium revenues and profits, or to minimize their losses, creates an ongoing problem that will continue to cause Plaintiffs and members of the Class economic losses and threaten their ability to obtain the best insurance coverage at a fair price.

244. A monetary judgment in this case will only compensate Plaintiffs and members of the Class for past losses.

245.    A monetary judgment will not restore competition, nor cure the inherent and irreconcilable conflict of interest created by the existence of the Compensation Agreements described herein.

246.    No individual Plaintiff or Class Member has an adequate remedy at law.

## COUNT I
### (Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c)-(d))

247.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

248.    This Count is brought by Plaintiffs against Defendants pursuant to 18 U.S.C. §§1962(c)-(d).

249.    Defendants, Plaintiffs, and other Class Members are "persons" within the meaning of 18 U.S.C. §1961(3), because each was "capable of holding a legal or beneficial interest in property."

250.    The Lloyd's Corporation constitutes an enterprise within the meaning of 18 U.S.C. §1961(4).  Alternatively, the Defendants, other Lloyd's Syndicates, and the Lloyd's Brokers function as an association-in-fact enterprise within the meaning of 18 U.S.C. §1961(4).  The "Lloyd's Enterprise" constitutes a single enterprise or multiple enterprises.

- 77 -

251.   The Lloyd's Enterprise alleged herein constitutes an ongoing and continuing organization which engages in, and whose activities affect, interstate commerce.

252.   The Lloyd's Enterprise exists separate and apart from the pattern of racketeering activity in which Defendants have engaged.

253.   Through the Lloyd's Enterprise, Defendants and their co-conspirators function as a continuing unit for the common purpose of maintaining the façade of competitiveness in the Lloyd's Market, increasing compensation for the Lloyd's Brokers at the expense of Plaintiffs and the Class, increasing premium revenues and profits for the Defendant Lloyd's Syndicates and/or reducing or eliminating competition for the insurance coverage sold through the Lloyd's Market.

254.   While Defendants and their co-conspirators participate in the affairs of the alleged Lloyd's Enterprise as described herein, they also have an existence separate and distinct from the Lloyd's Enterprise.

255.   To establish and maintain the system of undisclosed broker compensation and the anti-competitive conduct that was part and parcel with such payments in the Lloyd's Market, as well as concealing from Plaintiffs and Class Members the lack of competition in the Lloyd's Market, Defendants and their co-conspirators had to exercise control over the direction of the Lloyd's Enterprise.

256.   Defendants and their co-conspirators have participated in the conduct of and have exercised control over the affairs of the alleged Lloyd's Enterprise as described herein.

257.   Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) or 18 U.S.C. §1343 (relating to wire fraud).  Defendants and their co-conspirators have engaged in and continue to engage in conduct violating each of those laws to effectuate their scheme, including aiding and abetting violations of the same as detailed above.

258.   To carry out or attempt to carry out their scheme to conceal the lack of competition among Syndicates and the Syndicates' payment of secret kickbacks to Lloyd's Brokers for the purpose of increasing premium revenues and profit margins for the Defendant Lloyd's Syndicates and their co-conspirators, and reducing competition for the  Syndicates, Defendants and their co-conspirators, in violation of 18 U.S.C. §§1341 and 1343, caused to be mailed by the United States Postal Service, delivered by commercial interstate carrier, or sent by wire (and/or received matters and things through the same means), matters and things as alleged above.

259.   Many of the precise dates of Defendants' and their co-conspirators' fraudulent uses of the U.S. mail and wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.  Indeed, the success of Defendants' scheme depends upon secrecy, and Defendants have withheld

- 79 -

details of the scheme from Plaintiffs and Class Members. Generally, however, Plaintiffs describe herein some of the occasions on which the predicate acts of mail and wire fraud would have occurred, and how those acts were in furtherance of a scheme. They include thousands of communications to perpetuate and maintain the scheme, including, among other things, the materials described herein.

260. Defendants' and their co-conspirators' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and Class Members and assuring the Defendant Lloyd's Syndicates of the placement and retention of business and enabling the Lloyd's Brokers to collect the secret kickbacks and excessive brokerage.

261. Defendants and their co-conspirators either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and Class Members relied on the misrepresentations and omissions. Plaintiffs and the Class relied upon Defendants' and their co-conspirators' misrepresentations and omissions by retaining the Lloyd's Brokers and by purchasing the Defendants Lloyd's Syndicates' insurance products at higher rates than Plaintiffs and the Class would have paid absent the conspiracy.

262. As a result, Plaintiffs and Class Members have been injured in their business or property by Defendants' overt acts of mail and wire fraud and co-conspirators' acts of mail and wire fraud in furtherance of the conspiracy.

263.   Defendants and their co-conspirators committed and/or aided and abetted in the commission of thousands of acts of racketeering activity.

264.   Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including Plaintiffs and Class Members.

265.   The multiple acts of racketeering activity, which Defendants and their co-conspirators committed and/or conspired to or aided and abetted in the commission of, were related to each other in furtherance of the scheme described above, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as described in 18 U.S.C. §1961(5).

266.   Section 1962(c) of RICO provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

267.   Through the pattern of racketeering activity described above, Defendants and their co-conspirators have conducted or participated in the conduct of the affairs of the alleged Enterprise.

268.   In violation of 18 U.S.C. §1962(d), Defendants have conspired to violate 18 U.S.C. §1962(c).  Various other persons, firms and corporations, not named as

defendants in this complaint, have participated as co-conspirators with Defendants and performed acts in furtherance of the conspiracy.

269.   The Defendant Lloyd's Syndicates and their co-conspirators engaged in a conspiracy and common course of conduct as described herein to increase or maintain premium revenues and/or profits and market share.   The conspiracy reduced or eliminated competition and facilitated the breach of fiduciary duty by the Lloyd's Brokers.   The scheme and conspiracy is clearly at odds with the representations regarding the competitive market place at Lloyd's, the services provided as well as the duties inherent in the special and fiduciary relationship which exists between Plaintiffs and the Lloyd's Brokers, other Class Members and Defendants.  Although Defendants have created the illusion of a competitive market for insurance, the agreements and common course of conduct at issue were designated to minimize competition and either raise or stabilize prices and/or profits and/or market share for Defendants and their co-conspirators.

270.   The purpose and effect of the conspiracy was to prevent Plaintiffs and the Class from becoming aware of the agreements, the payment of kickbacks and the conflicts arising therefrom, thereby allowing Defendants to, increase the premium revenues and profit margins for the Defendant Lloyd's Syndicates, increase the Lloyd's Brokers' compensation, and reduce competition for the  Syndicates.

271.   As a result of the conspiracy, the Defendant Lloyd's Syndicates did not have to compete, or compete as rigorously, for insurance business and premium revenue on the basis of price or other terms; this lack of competition enabled the Defendant Lloyd's Syndicates to charge premiums that were higher than they would have been absent the conspiracy.

272.   Defendants and each of their co-conspirators have agreed with the overall objective of the conspiracy and they participated in the common course of conduct. Defendants were aware of the general nature of this scheme and its role in facilitating the objectives of the conspiracy.  Each received supracompetitive premiums or other compensation as a result of the conspiracy, to the detriment of Plaintiffs and the Class.

273.   To carry out their scheme, Defendants and their co-conspirators agreed to create and implement the same or similar new mechanisms, or utilized existing mechanisms, to facilitate the exchange of information and the monitoring of the participants' compliance with the scheme.

274.   The same pattern and course of conduct and activity and similar facts, which evidence the existence of a conspiracy, exist among Defendants and co-conspirators.

275.   As a direct and proximate result of Defendants' RICO violations, Plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.

- 83 -

276.    Plaintiffs and Class Members have been injured by, among other things, paying excessive premiums for insurance and other "services" than they would have in the absence of the conspiracy.  Plaintiffs relied, to their detriment, on Defendants' and their co-conspirators misrepresentations and omissions, as evidenced by their purchase and/or renewal of insurance from Defendants.

277.    Under the provisions of 18 U.S.C. §1964(c), Plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorneys' fees.  Defendants are thus liable to Plaintiffs and the Class for three times their actual damages as proven at trial plus interest and attorneys' fees.

278.    Plaintiffs are entitled to a declaration that Defendants have committed the violations alleged herein.

## COUNT II
### (Civil Conspiracy)

279.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

280.    Defendants and their co-conspirators constitute a combination of two or more persons.

281.    As described herein, the Defendant Lloyd's Syndicates agreed or had an understanding with their co-conspirators as to the general overall objectives of the conspiracy, and one or more of Defendants' co-conspirators actually committed, an act of fraud and/or at least one act of other unlawful conduct set forth herein with the

- 84 -

goal of increasing or maintaining their revenues, profits, or market share at the expense of Plaintiffs and the Class.

282.    The acts and omissions of the Defendants and/or their co-conspirators caused, and continue to cause, injury and loss to Plaintiffs and the Class.  The amount of such losses will be determined according to proof at trial.

283.    Plaintiffs and Class Members are entitled to compensatory and punitive damages to be ascertained according to proof at trial, pre-judgment interest, costs and attorneys' fees, and such other and further relief as this Court deems just.  Plaintiffs are also entitled to injunctive relief and a declaration that Defendants have committed the violations alleged herein.

## COUNT III
### (Unjust Enrichment)

284.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

285.    Defendants and their co-conspirators have benefited from their unlawful acts by through payments of premiums from Plaintiffs and the Class.

286.    These payments have been paid and received at Plaintiffs' expense, under circumstances where it would be inequitable for Defendants to be permitted to retain the benefit.

287.    Plaintiffs and Class Members are entitled to the establishment of a constructive trust consisting of the benefit conferred upon Defendants in the form of

their excessive premium revenue from which Plaintiffs and the other Class Members may make claims on a pro rata basis for restitution.

288.    Plaintiffs are entitled to injunctive relief and a declaration that Defendants have committed the violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the Class, and designating their counsel as counsel for the Class;

B.    A declaration that Defendants have committed the violations alleged herein;

C.    Jointly and severally in an amount equal to treble the amount of damages suffered by Plaintiffs and Class Members as proven at trial plus interest and attorneys' fees and expenses;

D.    Any additional damages, penalties and other monetary relief provided by applicable law;

E.    Punitive and exemplary damages to be ascertained according to proof, rescission and any further equitable relief the Court finds appropriate;

F.    Disgorgement of Defendants' unjust enrichment and/or imposing a constructive trust upon Defendants' ill-gotten monies, freezing Defendants' assets,

1118746_1

and requiring Defendants to pay restitution to Plaintiffs and the Class and to restore all funds acquired by means of any act or practice declared by this Court to be unlawful, deceptive, fraudulent or unfair, and/or a violation of laws, statutes or regulations;

G.     An injunction preventing Defendants from engaging in future illegal practices;

H.     Costs of this action, including reasonable attorneys' fees and expenses;

I.     Pre- and post-judgment interest at the highest rate allowed by law; and

J.     Any such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

DATED:  February 12, 2016          ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                   JOHN J. STOIA, JR.
                                   RACHEL L. JENSEN
                                   ALEXANDRA S. BERNAY
                                   CARMEN A. MEDICI


                                        s/ Rachel L. Jensen
                                   RACHEL L. JENSEN

                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101
                                   Telephone:  619/231-1058
                                   619/231-7423 (fax)

- 87 -

ROBBINS GELLER RUDMAN
   & DOWD LLP
PAUL J. GELLER
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

ZWERLING, SCHACHTER
   & ZWERLING, LLP
ROBERT S. SCHACHTER
DAN DRACHLER
ANA M. CABASSA
41 Madison Avenue
New York, NY  10010
Telephone:  212/223-3900
212/371-5969 (fax)

WHATLEY KALLAS, LLP
JOE R. WHATLEY, JR.
EDITH M. KALLAS
1180 Avenue of the Americas, 20th Floor
New York, NY  10036
Telephone:  212/447-7060
800/922-4851 (fax)

COHN LIFLAND PEARLMAN
   HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

- 88 -

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN
H. SULLIVAN BUNCH
2325 E. Camelback Road, Suite 300
Phoenix, AZ  85016
Telephone:  602/274-1100
602/274-1199 (fax)

FOOTE, MIELKE, CHAVEZ
  & O'NEIL, LLC
ROBERT M. FOOTE
KATHLEEN C. CHAVEZ
ALEX J. DRAVILLAS
10 West State Street, Suite 200
Geneva, IL  60134
Telephone:  630/232-7450
630/232-7452 (fax)

CAFFERTY CLOBES MERIWETHER
  & SPRENGEL LLP
ELLEN MERIWETHER
1101 Market Street, Suite 2650
Philadelphia, PA  19107
Telephone:  (215) 864-2800
215/864-2810 (fax)

CAFFERTY CLOBES MERIWETHER
  & SPRENGEL LLP
NYRAN ROSE RASCHE
30 North LaSalle Street, Suite 3200
Chicago, IL  60602
Telephone:  312/782-4880
312/782-4485 (fax)

AULO I. GONANO, P.C.
AULO I. GONANO
1932 Ford Avenue
Wyandotte, MI  48192
Telephone:  734/285-3333

- 89 -

DAVID M. FOSTER, P.C.
DAVID M. FOSTER
30833 Northwestern Hwy., Suite 209
Farmington, MI  48334
Telephone:  248/855-0940
248/855-0987 (fax)

Attorneys for Plaintiffs