NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE INSURANCE BROKERAGE ANTITRUST LITIGATION | Civil Action No.: 04-5184  (CCC) |
| MDL-1663 | OPINION |
| TAG-ALONG ACTION: | |
| INTERNATIONAL RISK INSURANCE CO., et al., | |
| Plaintiffs, | |
| v. | |
| MARSH USA INC., et al., | |
| Defendants. | |

CECCHI, District Judge.

## I.    INTRODUCTION

This matter comes before the Court on the motion of Defendants Marsh & McLennan Companies, Inc., Marsh USA Inc., and Marsh Inc. (collectively, "Marsh" or "Defendants") to dismiss the Second Amended Complaint [ECF No. 2209] of Plaintiffs International Risk Insurance Company, Huntsman Corporation, Huntsman Holdings, LLC (n/k/a Huntsman Corporation), Huntsman LLC (n/k/a Huntsman International LLC), and Huntsman Advanced Materials LLC (collectively, "Plaintiffs"). [ECF No. 2722.]  The Court has considered the submissions made in support of and in opposition to the instant motion.  The Court has also considered the arguments

1

made on the record during oral argument held on March 7, 2016.  For the reasons set forth below, Defendants' motion is denied.

## II.    **BACKGROUND**

The action is part of the consolidated pretrial proceedings of the multidistrict litigation In re Insurance Brokerage Antitrust Litigation, MDL No. 1663.  Plaintiffs are businesses, individuals, and other purchasers of insurance.  [Second Amended Complaint ("SAC"), ECF No. 2209 ¶ 15.] Marsh is a provider of insurance brokerage and consulting services—i.e., Marsh stands between businesses and individuals that want to buy insurance and the insurers who sell it.  [Id.]  Plaintiffs claim Marsh illegally rigged bids, limited competition, and fixed prices for insurance products in the United States in violation of § 1 of the Sherman Act, 15 U.S.C. § 1; the Racketeering Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c)-(d); and various state statutes and common law.

The Second Amended Complaint posits the existence of a Marsh-centered conspiracy: namely, a horizontal agreement among Marsh's insurance carrier partners not to compete for one another's incumbent business in the marketplace for excess casualty insurance (the "excess-casualty-based conspiracy").  [SAC ¶¶ 25, 27.]  Specifically, the Second Amended Complaint alleges "[a]s part of the conspiracy, the participants agreed that each insurer would be permitted to keep its incumbent business, and that Marsh would protect that business from competition, both from insurers inside and outside the arrangement."  [Id. ¶ 27.]  Plaintiffs allege "bid-rigging" plans were used to accomplish this customer allocation/incumbent protection scheme.  Plaintiffs contend Marsh arranged for fictitious quotes (referred to as "A quotes," "B quotes," and "C quotes") to be submitted to the client.  "A quotes" refers to quotes solicited by Marsh when Marsh had an incumbent carrier for one of its clients whose insurance policy was up for renewal; if the insurer

agreed to make a quote at the targeted premium and policy terms demanded by Marsh, the insurer was guaranteed the policy renewal. [Id. ¶ 31.] "B quotes" (also known as "backup quote" or "protective quote") refers to high quotes solicited from non-incumbent insurers with the understanding these insurers would not submit a competitive bid; "B quotes" were used to ensure the incumbent carrier would get its policy renewed. [Id. ¶¶ 32, 33, 34, 36.] In other words, in "B quote" situations, a non-incumbent insurer would provide bids that were intentionally higher than the bids of the insurer to which Marsh wished to award the business. "C quotes" refers to quotes solicited from insurers where "there was no incumbent carrier to protect." [Id. ¶ 35.] Plaintiffs claim as a result of these agreements, the "[p]rices paid by Plaintiffs for insurance were raised, maintained or stabilized at artificially high, supra-competitive levels" and "Plaintiffs were deprived of the benefits of free and open competition in the purchase of insurance." [Id. ¶ 103.]

The Second Amended Complaint appears to allege other conspiracy claims as well. At the March 7, 2016 oral argument, Brian Dumesnil, counsel for Plaintiffs, represented that with respect to Plaintiffs' federal antitrust and RICO claims, Plaintiffs only intended to plead the excess-casualty-based conspiracy described above:

> The Court:  You are saying that you are alleging bid rigging only
> . . . with respect to the excess casualty lines?
>
> Mr. Dumesnil:  That's correct.

[Tr.[1] at 39:25-40:1-6.]

> Mr. Dumesnil:  The [Third Circuit's] opinion [in In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300 (3d Cir. 2010)] did indicate that the other [conspiracy] allegations of contingent commissions and steering and things like that were not viable in terms of bringing antitrust claims or RICO claims. So I am not telling you here today that they are.

---

[1] "Tr." refers to the transcript of the March 7, 2016 oral argument.

> The Court: Okay. So, just to break it down—
>
> Mr. Dumesnil: Yes.
>
> The Court: —you are saying the bid rigging should survive. You are saying the contingent commissions and the steering should not survive?
>
> Mr. Dumesnil: Not that I like it, your Honor, but, in terms of what the Third Circuit has said, I understand it and I am not going to deny it.

[Tr. at 81:23-25-82:1-10.] As such, the Court will only analyze the plausibility of the excess-casualty-based conspiracy and will disregard references to other conspiracy claims.

On April 30, 2013, Marsh filed its original motion to dismiss. [ECF No. 2504.] That motion was administratively terminated on November 25, 2013 to allow the parties to pursue settlement. [ECF No. 2613.] On November 25, 2015, Marsh was granted permission to refile its motion to dismiss. [ECF No. 2714.] On December 18, 2015, Marsh filed the instant motion. [ECF No. 2722.] Plaintiffs opposed the motion on January 4, 2016. [ECF No. 2723.] Defendants submitted a reply on January 19, 2016. [ECF No. 2725.] The Court held oral argument on March 7, 2016. After oral argument, both parties filed supplemental submissions. [ECF Nos. 2777, 2778.]

## III.    LEGAL STANDARD

For a complaint to survive dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

4

"Factual allegations must be enough to raise a right to relief above the speculative level."
Twombly, 550 U.S. at 555. "A pleading that offers labels and conclusions will not do. Nor does
a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." Iqbal,
556 U.S. at 678 (internal citations omitted). However, "the tenet that a court must accept as true
all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare
recitals of the elements of a cause of action, supported by mere conclusory statements, do not
suffice." Id. Thus, when reviewing complaints for failure to state a claim, district courts should
engage in a two-part analysis: "First, the factual and legal elements of a claim should be
separated . . . . Second, a District Court must then determine whether the facts alleged in the
complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" See Fowler
v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted).

## IV.  DISCUSSION

Defendants argue the Second Amended Complaint does not state a claim under § 1 of the
Sherman Act or § 1962(c) or (d) of the RICO Act. Each argument will be discussed in turn.

### A.    Motion to Dismiss Federal Antitrust Claims[2]

#### 1.    Applicable Law

##### a.    The Sherman Act

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust

---

[2] In addition to their argument that the Second Amended Complaint fails to state a claim
under § 1 of the Sherman Act, Defendants argue Plaintiffs' federal antitrust claims fail because the
conspiracies alleged in the Second Amended Complaint are far broader than the excess-casualty-
based conspiracy the Third Circuit held was pleaded adequately under Federal Rule of Civil
Procedure 8(a) in In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300 (3d Cir. 2010).
[See Marsh Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs'
Second Amended Complaint ("Def. Mot."), ECF No. 2722 at 17-21.] As discussed above, the
Court will disregard references to any other conspiracy claims and will only analyze the
plausibility of the excess-casualty-based conspiracy.

5

or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared illegal." 15 U.S.C. § 1. To plead a violation of Section 1, a plaintiff must allege "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997). Thus, an antitrust plaintiff must meet two essential requirements. "First, the plaintiff must show that the defendant was a party to a 'contract, combination . . . or conspiracy.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d at 315 (quoting Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 218 (3d Cir. 2008)). Second, "the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." Id. (internal quotation marks omitted).

Typically, the so-called "rule of reason" applies to determine if a challenged practice unreasonably restrains trade. Id. Under the rule of reason, "'the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited.'" Id. (quoting Mack Trucks, 530 F.3d at 225). Significantly, under the rule of reason, the plaintiff "bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market." Gordon v. Lewistown Hosp., 423 F.3d 184, 210 (3d Cir. 2005). In certain circumstances, however, a class of restraints has "redeeming competitive benefits so rarely that their condemnation does not require application of the full-fledged rule of reason." Id. at 316. If a challenged practice falls into such a class, "it is subject to a 'per se' standard." Id. Under the per se standard, the plaintiff is relieved of its obligation to define a market and prove market power. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984) (citing N. Pac. Ry. Co. v. United States, 365 U.S. 1, 5 (1958)); Rossi v. Standard Roofing,

Inc., 156 F.3d 452, 464-65 (3d Cir. 1998).

Plaintiffs' position in this matter is that Marsh's insurance carrier partners entered into a horizontal agreement, facilitated by Marsh, in the alleged excess-casualty-based conspiracy to allocate customers and that such conduct is subject to per se condemnation.   [SAC ¶ 101.] Alternatively, Plaintiffs contend Marsh's conduct violates the Sherman Act under a rule of reason analysis.  [Id.]

b.     Pleading Standard

The parties dispute the pleading standard applicable to Plaintiffs' federal antitrust claims. Defendants argue the Third Circuit's decision in Lum v. Bank of America, 361 F.3d 217 (3d Cir. 2004) establishes that Federal Rule of Civil Procedure 9(b) applies to Plaintiffs' federal antitrust claims.   Plaintiffs argue Federal Rule of Civil Procedure 8(a) applies to their federal antitrust claims because the claims are, at their core, claims of bid-rigging, not fraud.  The Court agrees with Plaintiffs.  Because the Sherman Act claim does not primarily sound in fraud, Plaintiffs' federal antitrust claims are not subject to the heightened pleading standard of Rule 9(b).  Rather, the claims are governed by Rule 8(a).

In Lum, the Third Circuit held "while antitrust complaints are not subject to especially stringent pleadings, neither are they exempt from the federal rules" and where plaintiffs allege "fraud as a basis for their antitrust cause of action, th[e] claim is subject to the heightened pleading requirement of Rule 9(b)."  Id. at 228-29 (internal citation omitted).  The plaintiffs in Lum sued nine major banks, alleging violations of the Sherman Act and RICO, as well as fraud claims.  Id. at 221.  The plaintiffs alleged the banks violated the Sherman Act by agreeing to misrepresent that the "prime rate" is the lowest rate available to their most creditworthy borrowers, when in fact they had offered some large borrowers financing at interest rates below the prime rate.  Id. at 220.  The

7

alleged misconduct was the fraudulent reporting of data to third-party publications so the banks could indirectly manipulate market prime rates.  Because the banks could not directly manipulate the prime rates, the fraudulent reporting of their individual numbers was what caused the plaintiffs' damages; each bank unilaterally "falsely report[ed] the Bank's individual prime rates to the various publications." Id. at 220.  Because the banks decided to commit their individual fraud in concert, they violated the federal antitrust laws.  The banks, however, could have committed the fraud by reporting false numbers to the publications without any conspiracy.

This case is distinguishable from Lum.  Plaintiffs allege Marsh violated the Sherman Act by conspiring with the insurance companies to rig bids.  This conspiracy is at the heart of Plaintiffs' claims—any fraudulent acts taken in furtherance of the conspiracy were only a by-product of the collusive conduct.  As such, this case is more closely aligned with Hinds County v. Wachovia Bank N.A., 700 F. Supp. 2d 378 (S.D.N.Y. 2010).  In Hinds County, purchasers of municipal derivatives alleged that various banks and other corporate defendants "conspired to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, municipal derivatives in violation of § 1 [of the Sherman Act]." Id. at 385-86.  The court found that concerted action, rather than fraud, was the core of the plaintiffs' antitrust claims.  Id. at 392 ("Named Plaintiffs' claims assert bid-rigging, price-fixing, and other collusive communications as the primary unlawful means Defendants used.  The alleged agreements among Broker and Provider Defendants to rig bids and fix prices do not sound in fraud, but instead represent classic § 1 conduct subject to Rule 8(a) pleading standards.").  The court stated in some cases "fraudulent acts may inevitably constitute an inherent by-product of defendants' collusive conduct, or else a collateral means they employed to carry out the alleged conspiracy." Id.  However, "[f]or the purposes of antitrust pleadings . . . what counts as decisive are the primary and anticompetitive activities that

comprise plaintiffs' theory as pled in the complaint, and not necessarily any ancillary offshoots of other unlawful conduct." Id.

Here, concerted action among Marsh's insurance carrier partners, facilitated by Marsh, forms the basis of Plaintiffs' antitrust claims. Without a horizontal agreement between Marsh's insurance carrier partners, Plaintiffs would not have suffered the harm alleged. It was the cooperation among the insurers to all submit "B quotes" that allowed the customer allocation/incumbent protection scheme to be successful. Accordingly, because the conspiracy is at the heart of Plaintiffs' claims, this is classic bid-rigging subject to Rule 8(a) pleading standards.

> ### 2.     Plausibility Analysis

> #### a.     Plausibility under Rule 8(a)

As established above, Rule 8(a) governs Plaintiffs' federal antitrust claim. In antitrust cases, Rule 8 is interpreted to mean the plaintiff must plead enough factual allegations to show an agreement was plausibly made. Twombly, 550 U.S. at 556. Factual allegations plausibly show an agreement when it is reasonable to conclude that discovery will yield evidence of an illegal agreement. See id. Plaintiffs must then either allege the agreement "produced an adverse, anticompetitive effect within the relevant geographic market" or allege per se non-beneficial competitive actions, such as the existence of a "horizontal agreement" to engage in anti-competitive behavior. In re Ins. Brokerage Antitrust Litig., 618 F.3d at 315-16.

The Second Amended Complaint adequately describes the conspiracy between Marsh and the insurance companies. Plaintiffs allege "[a]s part of the conspiracy, the participants agreed that each insurer would be permitted to keep its incumbent business, and that Marsh would protect that business from competition, both from insurers inside and outside the arrangement." [SAC ¶ 27.] Plaintiffs further assert "Marsh and its co-conspirators understood and agreed that incumbent

protection was a necessary element in its scheme to allocate its premium volume in the manner calculated to achieve the highest profits, both for itself and its co-conspirators." [Id. ¶ 27.]

The Second Amended Complaint describes the mechanisms by which the conspiracy was carried out.   Plaintiffs allege "Marsh solicited—and obtained—fictitious high quotes from insurance companies" and "Marsh promised to protect insurance companies from competition, and did so." [Id. ¶ 17.] Plaintiffs further aver "the agreement among Marsh and its co-conspirators to protect the incumbent required the participating carriers to 'artificially' get 'quotes from other markets that were non-competitive.'" [Id. ¶ 28.]

The Second Amended Complaint provides multiple allegations regarding the horizontal agreement between the insurance companies themselves.   For example, Plaintiffs allege "[t]he insurer conspirators were aware of and agreed horizontally to participate in the incumbent protection scheme." [Id. ¶ 29.] Plaintiffs also assert "Marsh and each of its co-conspirators agreed, and Marsh's conspiring insurers horizontally agreed, to reduce or eliminate competition among the conspiring insurers themselves as to that secured book of business." [Id. ¶ 27.]

Moreover, the Third Circuit, addressing the very conduct at issue, found Marsh's alleged bid-rigging to be "quintessentially collusive behavior subject to per se condemnation under Section 1 of the Sherman Act." In re Ins. Brokerage Antitrust Litig., 618 F.3d at 336. In In re Insurance Brokerage Antitrust Litigation, the Third Circuit found the plaintiffs' allegations regarding bid-rigging sufficient under Rule 8(a) to plead a horizontal agreement among the insurance carriers, facilitated by Marsh, "not to compete for one another's incumbent business" in the excess casualty line of insurance, in violation of the federal antitrust laws. Id. at 340.   In examining the plaintiffs' averments, the Circuit held the alleged bid-rigging behavior "does plausibly suggest concerted action by the insurers, it proffers enough fact to raise a reasonable expectation that discovery will

10

reveal evidence of illegal agreement—more specifically, a horizontal agreement among the insurers not to compete for one another's incumbent business." Id. at 336-37. The Court found "the alleged willingness of those partners not only to refrain from competing with one another, but also actively to assist in the deceptive steering practices, plausibly suggests that customer allocation could be the result not only of vertical collusion, but also of a horizontal agreement among the insurers." Id. at 338. The Second Amended Complaint here contains substantially the same allegations as the complaint at issue in In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300. For similar reasons given by the Third Circuit, the alleged bid-rigging behavior in this case plausibly suggests concerted action by the insurers not to compete for one another's incumbent business in the excess casualty line of insurance.

Even though the Court finds that Plaintiffs plausibly allege a violation of the Sherman Act under the per se standard, the Court notes that Plaintiffs plausibly allege a violation of the Sherman Act under a rule of reason analysis as well. Under the rule of reason, a plaintiff must identify both a relevant product market and the geographic market in which the alleged restraint injured competition. See Queen City Pizza, Inc., 124 F.3d at 436. A plaintiff must also demonstrate anticompetitive effects in the relevant market. See In re Ins. Brokerage Antitrust Litig., 618 F.3d at 362 n.60. Plaintiffs have adequately pleaded Marsh is liable under the rule of reason—Plaintiffs identify the relevant product market as "insurance brokerage and consulting services," [SAC ¶ 15], and the geographic market as all participants in the insurance market, but centered in Manhattan, Los Angeles, and Florida, [id. ¶¶ 83, 46, 48]. Plaintiffs allege that due to the conspiracy, the "[p]rices paid by Plaintiffs for insurance were raised, maintained or stabilized at artificially high, supra-competitive levels" and "Plaintiffs were deprived of the benefits of free and open competition in the purchase of insurance." [Id. ¶ 103.] Because Plaintiffs have identified a

11

relevant product and geographic market and alleged anticompetitive effects, Plaintiffs have plausibly alleged a violation of the Sherman Act under a rule of reason analysis.

b.    Particularity under Rule 9(b)

Even if Plaintiffs' federal antitrust claim fell under the purview of Rule 9(b), the claim is pleaded with sufficient specificity to survive Defendants' motion to dismiss.  Rule 9(b) requires "all averments of fraud or mistake" to "be stated with particularity."  Fed. R. Civ. P. 9(b).  To comply with Rule 9(b), the circumstances surrounding the alleged fraud must be sufficiently pleaded to put the defendant on notice of the "precise misconduct with which [it is] charged." Lum, 361 F.3d at 223-24.  A plaintiff can meet this requirement by specifying "the who, what, when, where, and how:  the first paragraph of any newspaper story."  See Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quotation omitted).  A plaintiff can either identify "the date, place or time of the fraud," or may use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."  Id. (citations omitted).  A plaintiff must allege "who made a misrepresentation to whom and the general content of the misrepresentation." Id. (citations omitted).

The Second Amended Complaint sufficiently alleges the "who," "what," "where," "when," and "how" of the excess-casualty-based conspiracy.  With regard to the "who," Plaintiffs specifically describe which of Marsh's insurance carrier partners participated in the conspiracy, by averring the conspiracy existed between Marsh and its "co-conspirators American International Group, Inc., ACE Group, CAN Insurance Services, Chubb Group of Insurance Companies, Crum & Forster Holdings, The Hartford Financial Services Group, Liberty Mutual Insurance Co., Travelers, Zurich, Fireman's Fund, Munich, XL, and Axis."  [SAC ¶ 26.]

With regard to the "what," the Second Amended Complaint alleges an incumbent

12

protection scheme, whereby Marsh's insurance carrier partners horizontally agreed not to compete for one another's incumbent business.  [Id. ¶ 27.]  Plaintiffs further aver "Marsh would protect [each insurer's incumbent] business from competition, both from insurers inside and outside the arrangement . . . using the solicitation of collusive, protective quotes."  [Id.]  Plaintiffs specify internal documents of the insurance carriers and Marsh (including emails), as well as statements by employees that describe the alleged incumbent protection scheme.  [Id. ¶¶ 28-29, 32, 36, 38-41, 43-44, 47, 50.]  For example, Plaintiffs quote an AIG's underwriter as stating "even when AIG could have quoted a premium lower than the target, it rarely did so.  Instead, AIG provided a quote consistent with the target premium set by Marsh, thereby throwing the bid."  [Id. ¶ 32.]  Plaintiffs similarly quote a Liberty Mutual underwriter as stating that Marsh brokers had asked Liberty Mutual "to submit protective quotes on certain pieces of business where Marsh had predetermined which insurance carrier would win the bid [and that Liberty Mutual] understood that such quotes were intended to allow Marsh to maintain its control of the market and to protect the incumbent." [Id. ¶ 43.]

With regard to the "when and where," the Second Amended Complaint adequately alleges the time period of the conspiracy, as well as specific dates and places of various conduct which furthered the scheme.  For example, Plaintiffs allege "[b]eginning in or around 2001, until at least the summer of 2004, Marsh Global Broking's Excess Casualty Group and AIG's American Home Excess Casualty division . . . engaged in systematic bid manipulation" and "[t]hroughout 2001 and early 2002, the Marsh Global Broking Excess Casualty Group repeatedly requested that Munich provide 'favors' designed to assist Marsh in its bid rigging process."  [Id. ¶¶ 30, 50.]  Plaintiffs aver that the conspiracy was operated and controlled out of Marsh's global brokering offices in New York City.  [Id. ¶¶ 36, 83.]

The crux of the parties' dispute regards whether Plaintiffs have adequately pleaded the "how" of the conspiracy. Plaintiffs contend they have offered sufficient details regarding how the Marsh-centered conspiracy was conducted to satisfy Rule 9(b). Defendants argue Plaintiffs' allegations lack the requisite particularity because Plaintiffs do not plead how the excess-casualty-based conspiracy was operated, how it was formed, what its rules were, and how those rules were enforced. Defendants also argue Plaintiffs' allegations lack particularity because Plaintiffs do not allege details of meetings and communications among the insurers themselves.

The Court's review of the Second Amended Complaint reveals that, with respect to the "how," Plaintiffs proffer multiple allegations describing the mechanisms by which the excess-casualty-based conspiracy was carried out. Plaintiffs posit Marsh's insurance carrier partners carried out the conspiracy by engaging in bid-rigging. Plaintiffs aver the insurance carriers furnished intentionally uncompetitive sham bids on renewal policies on the understanding that other insurer-partners would later reciprocate. [Id. ¶ 28.] Plaintiffs allege "Marsh would protect the incumbent of an excess casualty risk by not sending submissions on that risk 'out to competition,' or by getting 'quotes from other carriers that would support the incumbent as being the best price.'" [Id. ¶ 29.] Aside from general averments, Plaintiffs proffer specific statements and instances when bid-rigging occurred, as described above.

Defendants argue the Second Amended Complaint is deficient because it lacks specific examples of bid-rigged quotes directed at Plaintiffs. Plaintiffs allege such proof is not required because Defendants concealed their conduct specifically directed at Plaintiffs. In Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644 (3d Cir. 1998), the Third Circuit held "[c]ourts should . . . apply [Rule 9(b)] with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." Id. at 658. The standard under Rule 9(b)

14

requires the plaintiff to either plead the date, place, or time of the fraud, or use another means of "injecting precision and some measure of substantiation into their allegations of fraud." Lum, 361 F.3d at 224. Because Plaintiffs have injected precision into their antitrust claims by pleading the specifics of the conspiracy and the acts taken in furtherance of the conspiracy, as discussed above, Plaintiffs adequately pleaded their antitrust claims under Rule 9(b).[3]

### B.      Motion to Dismiss RICO Claims

####       1.      Applicable Law

Section 1962(c) of the RICO Act makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful for anyone to conspire to violate § 1962(c). Id. § 1962(d).

To plead a RICO claim under § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." In re Ins. Brokerage Antitrust Litig., 618 F.3d at 362 (quoting Lum, 361 F.3d at 223). Under the RICO statute, "a pattern of racketeering activity" requires at least two acts of racketeering activity within a ten-year period. 18 U.S.C.

---

[3] Defendants also argue that because Plaintiffs provide no factual allegations that their own excess casualty purchases were bid-rigged, Plaintiffs have not plausibly alleged an antitrust injury sufficient to create standing. [Def. Mot. at 28.] In In re Warfarin Sodium Antitrust Litigation, 214 F.3d 395 (3d Cir. 2000), the Third Circuit noted "[i]t is difficult to imagine a more formidable demonstration of antitrust injury" than supra-competitive overcharges. Id. at 401. Here, Plaintiffs allege as a result of Marsh's anticompetitive conduct, the "[p]rices paid by Plaintiffs for insurance were raised, maintained or stabilized at artificially high, supra-competitive levels" and thus "Plaintiffs were injured in their business or property in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market." [SAC ¶¶ 103-104.] As such, Plaintiffs' Second Amended Complaint alleges facts sufficient to confer standing.

§ 1961(5). "These predicate acts of racketeering may include, inter alia, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343." Lum, 361 F.3d at 223; see also 18 U.S.C. § 1961(1) (defining "racketeering activity").

The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud. See 18 U.S.C. §§ 1341, 1343. The scheme to defraud, however, does not have to "be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Lum, 361 F.3d at 223. Where plaintiffs rely on mail and wire fraud as the basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be plead with particularity. Id.

Plaintiffs' allege Marsh and its insurer-partners composed an association-in-fact enterprise. [SAC ¶ 52.]   Plaintiffs assert Defendants committed acts of mail fraud in furtherance of the enterprise to which they allegedly belonged. [Id. ¶¶ 56-57.] Because Plaintiffs rely on mail fraud as the basis for Defendants' RICO violation, Rule 9(b) governs Plaintiffs' RICO claims.

### 2.     Particularity Analysis

In their motion to dismiss, Defendants argue Plaintiffs fail to adequately plead the enterprise and conduct elements of their § 1962(c) claims, and fail to adequately plead predicate acts of racketeering.  Defendants also argue because Plaintiffs fail to allege adequately that Defendants violated § 1962(c), the Court must dismiss the claims of conspiracy under § 1962(d).

### a.     Section 1962(c)

#### 1.     The "enterprise" and "conduct" elements.

Plaintiffs have adequately pleaded the enterprise and conduct elements of their § 1962(c)

claim.  An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  As for the "conduct" element, the Supreme Court has held that "one is not liable under [§ 1962(c)] unless one has participated in the operation or management of the enterprise itself."  Reves v. Ernst & Young, 507 U.S. 170, 183 (1993).  As such, a plaintiff must allege "something more than the fact that individuals were all engaged in the same type of illicit conduct during the same time period."  In re Ins. Brokerage Antitrust Litig., 618 F.3d at 370.  A plaintiff must show the individuals "associated together for a common purpose of engaging in a course of conduct."  Id. at 374.

Here, the Second Amended Complaint sufficiently pleads a Marsh-centered enterprise. The Second Amended Complaint alleges Marsh facilitated a bid-rigging scheme among its insurer-partners to govern the placement of insurance contracts that came up for renewal.  According to Plaintiffs, "Marsh solicited—and obtained—fictitious high quotes from insurance companies in order to deceive its clients into believing that true competition had taken place" and "facilitated this horizontal agreement among the insurer conspirators using the solicitation of collusive, protective quotes."  [SAC ¶¶ 17, 27.]  This agreement "required the participating [insurance] carriers to 'artificially' get 'quotes from other markets that were non-competitive.'"  [Id. ¶ 28.] The Second Amended Complaint alleges the reasons why the insurers agreed to provide sham bids. For example, Plaintiffs point to statements by an employee of one of Marsh's insurance carrier partners who indicated the insurance company's willingness to comply with the bid rigging scheme and provide losing quotes, as long as "[its own] renewals with Marsh will be equally 'protected.'" [Id. ¶ 27.]  Plaintiffs also include statements by an employee of another insurer who was asked by Marsh "to submit protective quotes on certain pieces of business where Marsh had predetermined

which insurance carrier would win the bid," and he "understood that such quotes were intended to allow Marsh to maintain its control of the market and to protect the incumbent." [Id. ¶ 43.] These statements demonstrate cooperation among Marsh's insurance carrier partners in the excess-casualty-based conspiracy.[4]

           2.       The "through a pattern of racketeering activity" elements.

Moreover, Plaintiffs have adequately pleaded the "through a pattern of racketeering activity" elements of their § 1962(c) claim. To plead acts of mail or wire fraud, a plaintiff must allege: "(1) the existence of a scheme to defraud; (2) the use of the mails [or wires] . . . in furtherance of the fraudulent scheme; and (3) culpable participation by the defendant, that is, participation by the defendant with specific intent to defraud." United States v. Dobson, 419 F.3d 231, 237 (3d Cir. 2005); United States v. Antico, 275 F.3d 245, 261 (3d Cir. 2001), abrogated on other grounds by Skilling v. United States, 561 U.S. 358 (2010).

First, Plaintiffs adequately allege the existence of a scheme to defraud. Plaintiffs contend Marsh and its insurer-partners engaged in a scheme whereby Marsh allocated business to a limited number of insurers by the use of bid rigging plans. Defendants argue Plaintiffs' RICO claims are deficient because the Second Amended Complaint alleges no facts supporting Marsh's specific intent to defraud Plaintiffs. The necessary intent in a mail fraud prosecution, however, is "the defendant's intent to engage in the scheme to defraud." United States v. Tiller, 302 F.3d 98, 101 (3d Cir. 2002). As described above, for their RICO claim, Plaintiffs allege Marsh intended to defraud its clients by misrepresenting the nature of its relationship with the insurance companies.

---

[4] Defendants also argue the Second Amended Complaint is deficient because Plaintiffs do not plead facts establishing the "rim" enclosing Marsh's insurer-partners in the alleged RICO enterprise. As described above, the alleged facts are pleaded with sufficient particularity to show cooperation among Marsh's insurance carrier partners. As such, Plaintiffs adequately pleaded more than just mere parallel conduct among the conspirators in the alleged enterprise.

Plaintiffs have injected precision into their RICO claims by pleading the specifics of the enterprise and the conduct taken in furtherance of the enterprise. Accordingly, Plaintiffs adequately plead Marsh's intent to engage in the scheme to defraud for their RICO claim.

Second, Plaintiffs adequately plead that Marsh used the interstate mail to further this scheme to defraud:

> Mail fraud occurs ... whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting to do so.' The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contains no false information.'

Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647 (2008) (internal citations omitted). The Second Amended Complaint alleges Marsh "placed in post offices" matters delivered by interstate carriers, including but not limited to, "correspondence, marketing materials, contracts, agreements, insurance quotes, contingent commission agreements, insurance binders, commission schedules, invoices to clients, and payments from insurers to brokers." [SAC ¶ 56.] Further, the Second Amended Complaint avers Marsh "transmitted and received by wire" matters in furtherance of their scheme including "correspondence, emails, faxes, marketing materials, contracts, requests for proposals, policies and policy materials, insurance quotes, contingent commission agreements, insurance binders, commission schedules, invoices to clients and payments from insurers to brokers." [Id. ¶ 57.] Plaintiffs allege these items were used in furtherance of Marsh's scheme to manipulate the insurance market. As such, Plaintiffs adequately pleaded mail fraud as a predicate racketeering activity.

### 3. RICO injury and causation.

Defendants argue Plaintiffs fail to plead adequately RICO injury and causation, and

therefore Plaintiffs do not have standing to assert their RICO claim. Under Section 1964(c), "[a]ny person injured in his business or property by reason of a violation of [RICO] may sue." 18 U.S.C. § 1964(c). To have standing to assert a RICO claim, the violation must be the proximate cause of the plaintiff's injury. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (1991).

Here, the Second Amended Complaint alleges Marsh's scheme to defraud injured Plaintiffs because Plaintiffs "pa[id] more for insurance than they would have absent the Enterprise's illegal conduct." [SAC ¶ 114.] Specifically, Plaintiffs assert "Marsh solicited—and obtained—fictitious high quotes from insurance companies in order to deceive its clients into believing that true competition had taken place." [Id. ¶ 17.] Plaintiffs allege that, because Marsh concealed the bid rigging scheme, Plaintiffs "overpaid for insurance, received inappropriate and biased advice from [Marsh], and [were] otherwise damaged in an amount as yet undetermined." [Id. ¶ 24.] As such, Plaintiffs' Second Amended Complaint alleges facts sufficient to confer standing.

### b.    Section 1962(c)

Defendants argue if the Court dismisses Plaintiffs' RICO conspiracy claim under § 1962(c), the Court must also dismiss Plaintiffs' RICO conspiracy claim under § 1962(d). [See Def. Mot. at 39.] Because the Court finds Plaintiffs have adequately pleaded their RICO conspiracy claim under § 1962(c), Defendants' motion to dismiss Plaintiffs' § 1962(d) claim is likewise denied.

V.    **CONCLUSION**

Based on the reasons set forth above, Defendants' motion to dismiss is denied.   An appropriate order accompanies this Opinion.


Dated: September 20, 2016


_____

**CLAIRE C. CECCHI, U.S.D.J.**

21