**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| International Risk Insurance Company, Huntsman Corporation, Huntsman Holdings, LLC (n/k/a Huntsman Corporation), Huntsman LLC (n/k/a Huntsman International LLC), Huntsman Advanced Materials LLC | § § § § § § | C.A. No. 2:06-cv-237 |
| | § | *In re Insurance Brokerage Litigation* |
| | § | MDL No. 1663 |
| Plaintiffs, | § § | Civil Action No. 04-5184 Pending in The United States District Court |
| | § | for New Jersey |
| v. | § | |
| | § | |
| Marsh & McLennan, Inc., Marsh USA, Inc., and Marsh, Inc. | § § | |
| | § | |
| Defendants. | § | JURY TRIAL DEMANDED |
| | § | |
| | § | |
| | § | |

## PLAINTIFFS' THIRD AMENDED COMPLAINT

On September 28, 2012, Plaintiffs International Risk Insurance Company, Huntsman Corporation, Huntsman Holdings, LLC (n/k/a Huntsman Corporation), Huntsman LLC (n/k/a Huntsman International LLC), and Huntsman Advanced Materials LLC (collectively, "Plaintiffs"), filed their Second Amended Complaint against Defendants Marsh & McLennan Inc., Marsh USA Inc., Marsh, Inc., Marsh Ltd. (London), J&H Marsh & McLennan of Utah, Inc., Marsh USA Risk & Insurance Services, Inc., and Marsh Global Markets (Bermuda) Ltd. (collectively, "Marsh" or "Defendants") (Dkt. No. 2209). Pursuant to the September 20, 2016, (Dkt. Nos. 2812 & 2813) and November 3, 2016, (Dkt. No. 2829) orders of the Honorable Judge Claire C. Cecchi of the U.S. District Court for the District of New Jersey, Plaintiffs hereby replead and state the following for their Third Amended Complaint against Marsh & McLennan, Inc., Marsh USA, Inc., and Marsh Inc.:

## PARTIES

1.      Plaintiff International Risk Insurance Company is a corporation organized under the laws of Utah.

2.      Plaintiff Huntsman Corporation is a corporation organized under the laws of Delaware.

3.      Plaintiff Huntsman Holdings, LLC was a limited liability company organized under the laws of Idaho.  Huntsman Holdings, LLC merged into Huntsman Group, Inc. on February 16, 2005.  Huntsman Group, Inc. merged into Huntsman Corporation on February 28, 2005.  Huntsman Corporation is a corporation organized under the laws of Delaware.

4.      Plaintiff Huntsman LLC was a limited liability company organized under the laws of Utah.  Huntsman LLC merged into Huntsman International LLC on August 16, 2005.  Huntsman International LLC is a limited liability company organized under the laws of Delaware.

5.      Plaintiff Huntsman Advanced Materials LLC is a limited liability company organized under the laws of Delaware.

6.      Defendant Marsh & McLennan, Inc. is a Delaware corporation with its principal place of business in New York, New York, and has been served.

7.      Defendant Marsh USA, Inc. is a Delaware corporation and is the parent company of Marsh & McLennan Incorporated, with its principal place of business in New York, New York, and has been served.

8.      Defendant Marsh Inc. is a Delaware corporation with its principal place of business in New York, New York, and has been served.

-2-

## JURISDICTION AND VENUE

9.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 and under 15 U.S.C. §§ 4 and 15.  This Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.  This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d).

10.     Venue is proper in this Court pursuant to 15 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2).

## PRELIMINARY STATEMENT

11.     Marsh is the largest provider of insurance brokerage and consulting services in the world.  It holds itself out to its clients as a trusted expert in the analysis and placement of insurance policies.  Businesses and individuals such as Plaintiffs who need insurance retain Marsh to help them design an insurance plan and negotiate with insurance companies to get the best mix of coverage, service, financial security and price.

12.     Marsh, acting in concert with various insurance carriers, manipulated the market for excess casualty insurance by creating and executing an elaborate bid-rigging scheme. Through this scheme, Marsh created the illusion of a competitive market for excess casualty insurance when, in fact, the excess casualty insurance products were selected, priced, and placed through collusive conduct.  Marsh benefited from the illegal bid-rigging scheme by reaping increased commission revenue in connection with the placement of excess casualty insurance and by selling excess casualty insurance to Marsh's clients, including Plaintiffs, at prices in excess of what should have been charged in a fair and efficient marketplace.

13.     Marsh solicited – and obtained – fictitious high quotes on  excess casualty insurance from insurance companies in order to deceive its clients into believing that true competition had taken place.  Marsh promised to protect insurance companies from competition

and did so.  Marsh also threatened to hurt the business of those insurers who thought of truly competing for particular pieces of business.

14.    Acting as Plaintiffs' trusted insurance broker and fiduciary, Marsh promised to represent Plaintiffs in the marketplace for insurance, advise them as to the best available insurance coverage, and to seek the lowest practicable premiums for insurance.  As a result of their confidential relationship, Marsh owed a fiduciary duty to Plaintiffs.  Unknown to Plaintiffs, Marsh was not acting in the interests of Plaintiffs but, rather, in its own self-interest and in the interests of insurance companies.

15.    Marsh has designed and executed a business plan under which insurance companies have agreed to pay Marsh more than a billion dollars in so-called "contingent commissions" to steer these insurers' business.  Styled as payments for nebulous "services," the agreements to pay these commissions were called "placement service agreements" ("PSAs"), override agreements, and, most recently, "market services agreements" ("MSAs") by Marsh.

16.    Whatever the agreements were named, they created an improper incentive for Marsh.  As one Marsh executive told his subordinates, the size of the contingent commission payments to Marsh determines "who [we] are steering business to and who we are steering business from."  In another instance, during discussions with an insurance company president seeking to expand her firm's sales, a Marsh executive did not advise her to provide a better product to Marsh's clients; instead, he told her that she would need to enter into a contingent commission agreement paying Marsh an amount that was "above market."

17.    This business plan was phenomenally profitable.  For example, it has been reported that in 2003 alone, approximately $800 million of Marsh's earnings were attributable to contingent commission payments.  That year, Marsh overall reported approximately $1.5 billion

in net income. Marsh, however, has never disclosed to its shareholders how contingent commissions constitute the lifeblood of its business. Jeffrey Greenberg, The Chief Executive Officer of Marsh, has stated: "We don't break out contingent commissions. This is not separately enumerated because it is part of our business model. . . ." [July 28, 2004 Analyst Conference Call Transcript].

18.    Through this scheme, Marsh deprived Plaintiffs of the benefits of independent, non-biased insurance brokerage services, as well as free and open competition in the market for insurance. Marsh received and retained kickbacks for insurance placements, creating an undisclosed conflict of interest that adversely impacted Marsh's objectivity as Plaintiffs' fiduciary.

19.    Marsh fraudulently concealed from Plaintiffs, and otherwise misrepresented, the true nature of the kickbacks Marsh received from the insurance carriers while falsely representing to Plaintiffs that Marsh's exclusive source of compensation for its work in connection with Plaintiffs would be fees and disclosed commissions charged for that work. Marsh intended that Plaintiffs rely on Marsh's representations and Plaintiffs did so rely, to its detriment, as it overpaid for insurance, received inappropriate and biased advice from its fiduciary, and was otherwise damaged in an amount as yet undetermined.

## FACTUAL ALLEGATIONS

### A.    Bid-Rigging and Manipulation of the Market

20.    Marsh participated in an unlawful conspiracy, the purpose and effect of which was to reduce or eliminate competition among members of the conspiracy. Specifically, Marsh participated in a conspiracy with excess casualty insurance carriers, described more fully below. The excess casualty insurance carriers with which Marsh conspired also conspired horizontally with each other.

21.    Marsh and each of its co-conspirators agreed, and Marsh's conspiring insurers horizontally agreed among themselves, that Marsh would "consolidate" its excess casualty business by directing as much as 80-95% of its excess casualty business to its "preferred carriers," co-conspirators American International Group, Inc., ACE Group, CNA Insurance Services, Chubb Group of Insurance Companies, Crum & Forster Holdings, The Hartford Financial Services Group, Liberty Mutual Insurance Co., Travelers, Zurich, Fireman's Fund, Munich, XL and Axis.  As a second step in the unlawful scheme, Marsh's conspiring insurers horizontally agreed, to reduce or eliminate competition among the conspiring insurers themselves as to that secured book of excess casualty business.

22.    As part of the conspiracy, the participants agreed that each excess casualty insurer would be permitted to keep its incumbent business, and that Marsh would protect that business from competition, both from insurers inside and outside the arrangement.  Marsh facilitated this horizontal agreement among the insurer conspirators using the solicitation of collusive, protective quotes.  As described below, Marsh and its co-conspirators understood and agreed that incumbent protection was a necessary element in its scheme to allocate its premium volume in the manner calculated to achieve the highest profits, both for itself and its co-conspirators.

23.    Former Marsh employee Kathryn Winter admitted that "the primary goal of th[e] scheme was to maximize Marsh's profits by controlling the market, and protecting incumbent insurance carriers when their business was up for renewal."  Winter stated that the agreement among Marsh and its co-conspirators to protect the incumbent required the participating carriers to "artificially" get "quotes from other markets that were non-competitive."

24.    The insurer conspirators were aware of and agreed horizontally to participate in the incumbent protection scheme.  For example, according to a former ACE employee, ACE

understood that Marsh would protect the incumbent of an excess casualty risk by not sending submissions on that risk "out to competition," or by getting "quotes from other carriers that would support the incumbent as being the best price." ACE indicated its willingness to accept these terms from Marsh and provided losing quotes, so long as "the Ace renewals with Marsh will be equally 'protected.'"

25.    American International Group ("AIG") is a publicly traded company with approximately 86,000 employees and over $81 billion in annual revenues. Among its insurance lines is excess insurance, which covers losses over and above the amounts covered by the insured's primary insurance policies. Beginning in or around 2001, until at least the summer of 2004, Marsh Global Broking's Excess Casualty Group and AIG's American Home Excess Casualty division (AIG's principal provider of commercial umbrella or excess liability and excess worker's compensations insurance) engaged in systematic bid manipulation.

26.    When AIG was the incumbent carrier and a policy was up for renewal, Marsh solicited what was called an "A Quote" from AIG, whereby Marsh provided AIG with a target premium and the policy terms for the quote. If AIG agreed to quote the target provided by Marsh, AIG kept the business, regardless of whether it could have quoted more favorable terms or premium.

27.    In situations where another carrier was the incumbent, Marsh asked AIG for what was variously referred to as a "backup quote," "protective quote" or "B Quote," telling AIG that it would not get the business. In many instances, Marsh provided AIG with a target premium and the policy terms of these quotes. In these cases, it was understood that the target premium set by Marsh was higher than the quote provided by the incumbent, and that AIG should not bid below the Marsh-supplied target. For example, in October 2003, an underwriter at AIG

described a particular quote that he had provided thusly:  "This was not a real opportunity. Incumbent Zurich did what they need to do at renewal.  We were just there in case they defaulted.  Broker . . . said Zurich came in around $750K & wanted us to quote around $900K." [Undated AIG email] Even when AIG could have quoted a premium lower than the target, it rarely did so.  Instead, AIG provided a quote consistent with the target premium set by Marsh, thereby throwing the bid.

28.     In other instances, Marsh asked AIG to provide B Quotes where AIG was not supposed to get the business, but Marsh did not set a particular premium target.  In these instances, AIG looked at the expiring policy terms and premium and provided a quote high enough to ensure that (1) the quote would not be a winner, and (2) in the rare case where AIG did get the business, it would make a comfortable profit.

29.     In B Quote situations, AIG did not do a complete underwriting analysis.  In those few situations when AIG inadvertently won B Quote business (because the incumbent was not able or willing to meet Marsh's target), AIG personnel would "back fill" the underwriting work on the file – that is, prepare the necessary analysis after the fact.

30.     Finally, Marsh came to AIG for a "C Quote" when there was no incumbent carrier to protect.  Although Marsh often provided premium targets in these situations, it was understood that there was the possibility of real competition.

31.     The "A, B, C" quote system was strictly enforced by Marsh through William Gilman, Executive Director of Marketing at Marsh Global Broking and a Managing Director. Gilman refused to allow AIG to put in competitive quotes in B Quote situations, and, on more than one occasion, warned that AIG would lose its entire book of business with Marsh if it did not provide B Quotes.  Gilman likewise advised AIG of the benefits of the system.  As he put it,

Marsh "protected AIG's ass" when it was the incumbent carrier, and it expected AIG to help Marsh "protect" other incumbents by providing B Quotes.

32.    ACE Ltd. is a Bermuda corporation that trades on the New York Stock Exchange. ACE is a part of a group of subsidiaries that forms the ACE Insurance North America business division of ACE Ltd.  In 2002, ACE decided to enter the excess casualty market by creating a separate division, called the Casualty Risk Department.  ACE signed a contingent commission agreement in order to gain access to the business Marsh controlled.  ACE also repeatedly provided the same type of B Quotes that AIG provided.

33.    The B Quotes given to Marsh were often in amounts requested by Marsh, even though a lower quote would have been justified by an underwriting analysis.  As ACE's President of Casualty Risk summarized:

> Marsh is consistently asking us to provide what they refer to as "B" quotes for a risk.  They openly acknowledge we will not bind these "B" quotes in the layers we are be [sic] asked to quote but that they 'will work us into the program' at another attachment point.  So for example if we are asked for a "B" quote for a lead umbrella then they provide us with pricing targets for that "B" quote.  It has been inferred that the 'pricing targets' provided are designed to ensure underwritings 'do not do anything stupid' as respects pricing.  [ACE-INA-01909].

In this same email, the Casualty Risk president wrote that he "support[ed]" Marsh's business model, which he described as "unique."

34.    An example of the operation of this system is evident in the bidding for the excess casualty insurance business of Fortune Brands, Inc., a holding company engaged in the manufacture and sale of home products, office products, golf products, and distilled spirits and wine.  On December 17, 2002, an ACE assistant vice president of underwriting sent a fax to Greg Doherty, a senior vice president in Marsh Global Broking's Excess Casualty division, quoting an annual premium of $990,000 for the policy.  Later that day, ACE revised its bid

upward to $1,100,000. On the fax cover sheet with the revised bid, ACE's assistant vice president wrote: "Per our conversation attached is revised confirmation. All terms & conditions remain unchanged." An email the next day from the assistant vice president to an ACE vice president of underwriting explained the revision as follows: "Original quote $990,000 . . . . We were more competitive than AIG in price and terms. MMGB requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business. . . ."

35.     This arrangement inured not only to Marsh's benefit, but also to ACE's. As Doherty wrote in a June 20, 2003 email to the same ACE vice president: "Currently, we have about $6M in new business [with ACE] which is the best in Marsh Global Broking so I do not want to hear that you are not doing 'B' quotes or we will not bind anything."

36.     The bidding process for excess casualty insurance for Brambles, USA, a manufacturer of commercial industrial pallets and containers (among other products), further demonstrates the bid-rigging scheme. In June of 2003, ACE learned that Brambles was unhappy with the incumbent carrier. Despite this, Marsh asked ACE to refrain from submitting a competitive bid because Marsh wanted the incumbent, AIG, to keep the business. An ACE vice president of underwriting wrote to the ACE President of Risk and Casualty:

> Our rating has a risk at $890,000 and I advised MMGB NY that we could get to $850,000 if needed. Doherty gave me a song & dance that game plan is for AIG at $850,000 and to not commit our ability in writing.

37.     ACE continued to provide Marsh with inflated quotes into 2004.

38.     Liberty Mutual also provided protective quotes when the broking plan called for it. According to Kevin M. Bott, an Assistant Vice President Underwriter in the excess casualty division at Liberty Mutual, Marsh brokers asked Mr. Bott "to submit protective quotes on certain pieces of business where Marsh had predetermined which insurance carrier would win the bid."

Mr. Bott "understood that such quotes were intended to allow Marsh to maintain its control of the market and to protect the incumbent."   Additionally, Mr. Bott "understood that Liberty benefited from this scheme; when Liberty submitted a 'B quote' on the lead layer of insurance, Marsh often allowed Liberty either to renew its place on the excess layer or to gain new business."   In furtherance of the scheme, Liberty Mutual provided losing quotes at Marsh's request.

39.    XL also provided protective quotes when necessary.   The head of XL's U.S. Excess Casualty Unit, Diane Amodeo, described her unit's working relationship with Marsh as follows: "We [XL Excess Casualty] are generally cooperative in providing 'backup' quotes to protect incumbents when required to do so."   Indeed, XL was repeatedly asked by Marsh to provide "B quotes" to support the proposed insurer in the broking plan and often did.

40.    Throughout 2001 and early 2002, the Marsh Global Broking Excess Casualty Group repeatedly requested that Munich provide "favors" designed to assist Marsh in its bid rigging process.   The panoply of market-manipulative "favors" that Marsh requested from Munich included:

- Requests to submit "false quotes" to allow Marsh to manipulate market pricing and present other carriers' quotes in a more favorable light;

- A request on a particular account that Munich either decline the risk altogether or submit a quote higher than the incumbent quote [December 18, 2001 email from a Marsh senior vice president to a Munich regional manager];

- Requests that Munich not bid on a renewal because Marsh owed the incumbent a favor and didn't want Munich to come in with a lower quote [December 6, 2001 email from Marsh senior vice president to a Munich regional manager]; and

- A request for an artificially inflated initial quote so that Marsh could look good to the client when it "negotiated" the quote down.

-11-

41.    Throughout 2001, Marsh also asked Munich to act as "back-up or wait in the wings" at several client presentations.  That is, Marsh asked Munich to attend presentations for prospective clients with whom Munich was already out of the running.  One Munich regional manager characterized these presentations as mere "Drive bys."  For example, in 2001, Marsh sent to Munich an email request explaining that it "needed to introduce competition" at a prospective client presentation and needed Munich to send a "live body."  Frustrated with Marsh's continuous requests for "live bodies," one Munich regional manager responded, "WE DON'T HAVE THE STAFF TO ATTEND MEETINGS JUST FOR THE SAKE OF BEING A 'BODY.'  WHILE YOU MAY NEED 'A LIVE BODY,' WE NEED A 'LIVE OPPORTUNITY.'"  These business practices were known to Munich management.

**B.    Racketeering**

42.    Marsh and its co-conspirator insurance carriers collectively constitute an enterprise (the "Enterprise").  The Enterprise is an ongoing organization which has existed continuously since at least the mid to late 1990s.

43.    The purpose of the Enterprise is (1) to make money through the creation of a defined and limited group of excess casualty insurance carriers to which Defendants steer the insurance business of excess casualty consumers in the market with limited or no competition in exchange for sharing increased profits and (2) to conceal this scheme from customers.

44.    The structure for decision-making within the Enterprise includes the following: (1) one or more broker executives who have responsibility and authority for interfacing with the excess casualty insurers to determine compensation, to plan for the steering or retention of excess casualty business, and to monitor and direct that business; (2) broker account executives who implement direction regarding the retention or steering of excess casualty business; (3) one

or more executives at each excess casualty insurer who have the responsibility and authority to plan with the broker, to monitor the placement of excess casualty business and to determine compensation for the steering or retention of excess casualty business; (4) an employee or employees of the excess casualty insurer who monitor and report placement volume to insurer executives as well as the broker; (5) an employee or employees of the broker who keeps track of reports received from the excess casualty insurers regarding placement volume; (6) an employee or employees who implement decisions regarding the placement of excess casualty business; and (7) an employee or employees who factor the cost of the kickbacks into the insurance premiums paid by consumers of excess casualty insurance, including Plaintiffs.

45.     The Enterprise engaged in bid-rigging, as detailed above.

46.     In order to carry out their scheme to defraud or obtain money by false pretenses, Defendants placed in post offices and/or official depositories of the United States Postal Service matters and things to be delivered by the Postal Service, caused matters and things to be delivered by commercial interstate carriers or knew that the mail would be used in furtherance of their scheme.  Matters sent by mail included but were not limited to correspondence, marketing materials, contracts, agreements, insurance quotes, contingent commission agreements, insurance binders, commission schedules, invoices to clients, and payments from insurers to brokers.

47.     In order to carry out their scheme to defraud or obtain money by false pretenses, Defendants transmitted and received by wire, matters and things or knew that wire would be used in furtherance of their scheme.  Matters sent by wire included but were not limited to correspondence, emails, faxes, marketing materials, contracts, requests for proposals, policies and policy materials, insurance quotes, contingent commission agreements, insurance binders, commission schedules, invoices to clients and payments from insurers to brokers.

**C.      Plaintiffs' Relationship With Marsh**

48.     From 1996 until 2005, Plaintiffs entered into a series of "Client Service Agreements," ("CSAs") with Marsh.  In these agreements, Marsh promised to "act as [Plaintiffs'] representative" with "the objective of presenting to [Plaintiffs] an insurance placement opportunity which [Plaintiffs] regard as appropriate considering cost, coverage and continuity." Marsh declared itself to be "first and foremost [Plaintiffs'] representatives in this function."

49.     The CSAs made Marsh responsible to negotiate on behalf of Plaintiffs with insurance companies and to "keep [Plaintiffs] informed of significant developments in those negotiations which are likely to have a bearing on [the] insurance program."  Marsh promised "We do not speak for and are not bound to utilize any particular insurance company."

50.     Marsh acknowledged the necessity of full transparency between the two parties in the Huntsman Insurance Proposal and Risk Management Services Comparative Review dated February 22, 1999.  Prepared by Marsh, the proposal states:

> The Aon proposal quotes premiums on a gross basis and does not provide any detail on broker compensation.  **It is critical that an insured such as Huntsman know every element of broker compensation in advance** and how much of the premium dollar goes to support the ultimate risk bearer, the underwriter.  There are several methods brokers can utilize to enhance their income at the expense of underwriters or the insured when a full disclosure is not agreed.

51.     The CSAs generally included language requiring Marsh to disclose the existence of any compensation received as a result of the CSA.  For example, the July 1, 1999 Client Service Agreement titled "U.S.-Based Services – Global Property and Liability Insurance Program" between J&H Marsh & McLennon of Utah, Inc. and Huntsman Corporation states

> Our annual compensation for services to be performed by us hereunder will be as follows: $1,240,000 annually and funded to us as commissions aggregately capped at $1,240,000 annually.  **Full disclosure of all compensation received by us will be made in advance**, annually and/or whenever you wish.  Compensation will only change as service requirements dictate changes in the service team as agreed mutually between us.

-14-

52.    Over the course of its relationship with Marsh, between the years 1996-2005, Plaintiffs promised to pay, and did pay, compensation in exchange for Marsh's services in an amount exceeding $24 million.

53.    Beyond merely a contractual relationship, Marsh held itself out as having superior knowledge of the facts and conditions in the insurance market, intending for Plaintiffs to place confidence in Marsh to act as their insurance broker.  Plaintiffs did place confidence in Marsh, and allowed Marsh to exercise complete influence over their insurance decisions.

**D.    Contingent Commissions**

54.    There are basically three types of entities in the insurance market.  First, there are clients: companies and individuals, like Plaintiffs, seeking to purchase insurance for their businesses, employees or themselves.  Second, there are brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage.  Brokers represent the client, obtain price quotes, present the quotes to the client, and make recommendations to the client that include factors other than price, such as differences in coverage, an insurance company's financial security, or an insurance company's reputation for service or claims payment.  Third, there are insurance companies.  They submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

55.    In this structure, the client makes two types of payments:  (1) it pays its broker an advisory fee or a commission for locating the best insurer; and (2) it pays the chosen insurance company premiums for the coverage itself.  When the client pays a commission, this is usually accomplished in one check to the broker, with the broker deducting the commission and

forwarding the premium to the insurance company.  Fee-based clients, like Plaintiffs, break out the broker's fee and pay it directly to the broker.

56.    In addition to the first commission payment described above, brokers sometimes receive other payments, as well, but not from their clients.  Some of these payments are called contingent commissions and come from insurance companies pursuant to arrangements generally known as contingent commission agreements.  The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following:  (1) how much business the broker's clients place with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and (3) the profitability of the business placed by the broker.  Moreover, on information and belief, certain brokers receive additional payments from insurance companies or their affiliates that are also not disclosed to their clients.  Such payments are inappropriate in all cases, but especially where the broker's client is fee-based and pays the broker directly for its undivided loyalty in brokering the best available insurance.

57.    In the late 1990s, Marsh began to call the contingent commission agreements "Placement Service Agreements" or "PSAs."  After increased public scrutiny, it has renamed them "Market Services Agreements" or "MSAs," contending that they do not reflect payment for "a specific transaction or placement" but relate instead to the "services we provide" to insurance companies.  Unbeknownst to Marsh's clients, these "services" include steering business to complicit and profiting insurance companies by, among other things, rigging bids and fixing prices.

58.    Marsh's insurance brokerage business alone has approximately 42,000 employees in 410 offices located in over 100 countries.  Marsh cites its size and sophistication as a primary

reason to hire the company.  Marsh holds itself out as a trusted advisor that can help its clients assess their insurance needs and locate the best available insurance.  Marsh acts as an agent and fiduciary for its clients in performing this function.

59.    Marsh emphasizes that it works for its client, not for the insurance companies, and this purported "guiding principle" figures prominently in Marsh's marketing materials.  However, Marsh does not, as it contends, always "consider their client's best interest."  Nor is Marsh truly its clients' disinterested "advocate."  To the contrary, Marsh primarily represents its own interests and those of its favored insurance companies.  Both the insurance companies and Marsh profit because of their common interest, a common interest created by the contingent commission agreement and other payment schemes.

60.    Marsh further instructs its employees to describe the company as an advisor and honest conduit for information, but one that leaves the final decision to the client:  "In fact, Clients are the only ones who have the authority to make the decisions on the terms and conditions of a program and the [insurance companies] selected to handle the program. . . . In all cases, clients make the final decision on the [insurance company] chosen to handle their business."

61.    In many instances, however, the client is making a <u>misinformed</u> "final decision" on insurance coverage.  Marsh has repeatedly provided clients with false and inflated quotes.  Marsh frequently designates a winner, and then solicits inflated bids from other insurance companies, who provide such bids, knowing that later they themselves will have a turn to get business without meaningful competition.  A choice made by a client under these circumstances has been made under false pretenses created by both Marsh and the complicit insurance companies.

-17-

62.    Apparently aware of the conflict of interest posed by an agent taking payments from vendors (the insurance companies) seeking to sell a service to its master (the client), Marsh asserts that it has erected an information barrier to prevent contingent commission agreements from influencing its recommendations:   "Our Client Executives and advisory staff is [sic] unaware of our specific [contingent commission agreements], thereby further removing their ability to have these arrangements influence their recommendations."

63.    Marsh's "information barrier" simply does not exist.  To the contrary, steering business to contingent commission-paying insurance companies is fundamental to Marsh's business plan.

64.    While Marsh claims it has disclosed the existence of contingent commission agreements since at least 1998, it has consistently concealed their true nature.  Marsh describes contingent commission agreements (recently renamed "MSAs") to its clients and the public as follows:

> Market Services Agreements (MSAs) are agreements that cover payment for the value brokers provide to insurance carriers and are based primarily on premium volume or growth.  Brokers principally provide insurers with distribution networks, which facilitate the delivery of business, and are also uniquely positioned to provide insurers with intellectual capital, product development, technology, and other administrative and information services.  These capabilities make the overall marketplace more efficient and competitive, which, in turn, benefits Marsh's clients.

65.    These "services" are illusory.  The "distribution" Marsh cites is not a service but rather a necessary concomitant of Marsh going to the market on behalf of its clients, something that Marsh is duty bound to do as its clients' agent and fiduciary – and for which Marsh is compensated by legitimate fees and commissions from the client.  The fact that Marsh's clients ultimately buy from the insurers creates no additional "service" by Marsh to the insurers.  Nor

does the other vague "services" mentioned (such as "intellectual capital") justify any of the $800 million that Marsh received in a single year in contingent commissions.

66.    In fact, the "service" that Marsh provides pursuant to its contingent commission agreements is to steer business to the insurance carriers.   As explained below, contingent commissions have an enormous impact on where Marsh places business on behalf of its clients. Yet Marsh's disclosure is silent as to the actual purpose and effect of its contingent commission agreements.

67.    As of 2001, Munich had entered into separate contingent commission agreements with Marsh's Excess Casualty, Property, and FINPRO (Financial Products).  Munich adjusted its rates to pass the costs of these agreements on to its clients.   When pricing Marsh business, Munich determined the base premium for the policy, added a percentage to reflect the expected contingent commission and sent the quote to Marsh.

68.    In 2000, Munich disclosed the existence of its contingent commission agreement with Marsh to a significant client to explain the contingent commissions that were being passed on to the client.  Marsh was furious, and chastised Munich.  A senior vice-president of Munich apologized to Marsh in an email:  "We acknowledge that this was inappropriate behavior. . . ." He told Marsh that Munich would "do the necessary to eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the [contingent commissions].  I apologize for the consternation that has caused within the Marsh organization."

69.    Marsh's disclosure to investors is no better.  Marsh has never revealed to the investing public the true nature of contingent commissions or the huge role they play in Marsh's earnings.   This is illustrated by CEO Greenberg's answer to a question about the role of contingent commissions in Marsh's earnings:   "We don't break out contingent commissions.

That is not separately enumerated because it is part of our business model and so I can't really help you there."  When asked about the impact on Marsh of a possible "drastic change" in how it receives contingent commissions, Mr. Greenberg said:

> We think that the most important issue and I have said this before is that we provide services for which we expect to be compensated and there are various ways that one can be compensated.  The way in which we handle it today is [contingent commissions] but if we found that we needed to change the method of compensation, we would do so.  The principal being that we are going to be compensated for our services.

70.    According to Marsh's public filings, in 2003 it had profits of over $1.5 billion. Marsh does not disclose how much of that amount was generated through fees paid by clients and how much was generated by insurance company contingent commission payments.  A Marsh official has stated to the Attorney General's Office of the State of New York that, in 2003, contingent fees paid by insurance companies amounted to approximately $800 million.  These payments, for which there is little or no overhead, are extremely profitable.

71.    The enormous size of these profits is not happenstance, but the result of careful planning.  Marsh reconfigured its brokerage business, centralizing power in a group based in Manhattan.  It rewarded those employees who sold clients more insurance from these complicit insurance companies, and it chastised those who did not.

72.    By way of brief background, during the 1980s and 1990s, the insurance brokerage industry underwent a period of consolidation.  Through acquisition and internal growth, Marsh became one of the world's dominant insurance brokers.  Until the late 1990s, each of Marsh's numerous branch offices throughout the United States signed its own separate contingent commission agreements with insurance carriers.

73.    Beginning in the late 1990s, Marsh centralized its organization and assumed greater control of both business placement and contingent commission agreements.  Marsh

created an office in Manhattan that came to be called Marsh Global Broking, which oversaw policy placement decisions in Marsh's major business lines.  These included Excess Casualty and FINPRO (Financial Products).  Global Broking (also known as MMGB and MGB) was given authority over all of Marsh's contingent commission agreements and began to replace smaller local and regional contingent agreements with large national ones, called Placement Service Agreements, or "PSAs."

74.    In addition, Marsh began internally rating the insurance companies based on how much they paid Marsh pursuant to their contingent commission agreements.  In February 2002, a Marsh Global Broking managing director in the Healthcare group provided nine of his colleagues with a list of the insurance companies that were paying Marsh pursuant to contingent commission agreements.   He cautioned, however, that "Some [contingent commission agreements] are better than others," and said that soon Marsh would formally "tier" the insurance companies.  Then, he said, "I will give you clear direction on who [we] are steering business to and who we are steering business from."

75.    A "tiering report" was later circulated to Global Broking executives, listing insurance companies as belonging to tiers depending on how advantageous their contingent commission agreement was to Marsh.  The instructions to the managers who received the list included a direction that they were to "monitor premium placements" to assure that Marsh obtained "maximum concentration with Tier A & B" insurance companies, those with contingent commission agreements most favorable to Marsh.  In a September 2003 email, a Global Broking executive was even more direct:  "We need to place our business in 2004 with those that have superior financials, broad coverage and ***pay us the most***" (emphasis added).

76.     Marsh executives have issued directions about specific companies as well.  For example, in April 2001, a Global Broking managing director in the Excess Casualty group in New York wrote to the heads of regional centers.  She asked for "twenty accounts that you can move from an incumbent [insurance company]" to a company that had just extended its contingent commission agreement.  She warned, however, "You must make sure that you are not moving business from key [contingent commission companies]."  Highlighting the incentive represented by her directive, she concluded, "This could mean a fantastic increase in our revenue."

77.     The benefit of the steering system to the paying insurance companies was clear.  In July 2000, an executive in Marsh Global Broking wrote to four of her colleagues to discuss "BUSINESS DEVELOPMENT STRATEGIES" with a particular "preferred" insurance company that had signed a contingent commission agreement with Marsh.  In describing what Marsh had done for that company, she wrote, "They have gotten the 'lions [sic] share' of our Environmental business PLUS they get an **_unfair 'competitive advantage'_** as our preferred [sic] [insurance company]" (emphasis added).

78.     Marsh has been explicit with insurance companies about how contingent commission agreements more favorable to Marsh would result in Marsh selling more of their policies.  For example, a Global Broking executive recounted in an email dated November 7, 2003, how he told the president of a major insurance company, ACE USA, that she could meet her firm's sales goals by agreeing to a fatter contingent commission agreement:  "I made it clear that if ACE wants us to meet significant premium growth targets then ACE will have to pay 'above the market' for such [a] stretch…."  In addition to carrots, Marsh also used sticks.  The

notes of one insurance company executive record that Marsh threatened to "kill" the company if it did not "get to [the] right number" on the contingent commission agreement.

79.    Marsh has recognized and rewarded employees who "moved" clients to insurance companies with contingent commission agreements.  For example, in February 2003, a Marsh senior vice president in the Global Broking Healthcare group nominated a subordinate to become vice president.  On the nomination form, under the heading "Financial Success," he noted that the nominee had increased Marsh's revenue "by moving" a renewing client to an insurance company with a contingent commission agreement.  He concluded:  "Neighborhood Health Partnership Estimated Revenue - $390,000."  That nominee's 2002 performance review, similarly noted that the nominee "was responsible for the renewal of a large HMO in Miami and was successful with placing of this account with a [contingent commission insurance company] – increased revenue from $120,000 to $360,000 (estimated)."  A 2003 self appraisal form by that same nominee – now a vice president – stated:  "Renewed large account with [contingent commission insurance company] to demonstrate our willingness to continue our relationship.  Moved a number of accounts to [contingent commission agreement carriers] for the sole reason to demonstrate partnership."  Other employees were similarly praised in performance evaluations for increasing Marsh's contingent commission income from insurance companies "by achieving budgeted tiering goals."

80.    In the same vein, Marsh employees have been criticized for bucking the system.  Initially, when Marsh began signing national contingent commission agreements, Global Broking not only negotiated all of the agreements but also kept all of the revenue.  Many of Marsh's local and regional offices, which had previously had their own contingent commission agreements with insurance carriers, resented the loss of revenue to the central Global Broking

office and refused to have Global Broking pass on all of their placements.  Eventually, Global Broking initiated a "revenue repatriation" program under which some of Global Broking's national contingent commissions were shared with local and regional offices.  In June 2003, the head of Global Broking's Excess Casualty group wrote to an employee in Marsh's Seattle office to chastise her for placing insurance directly with a carrier on behalf of a client, thus denying a contingent commission to Global Broking:  "The GB repatriation dollars are no small component of your office's budget.  You have lowered that amount with this placement.  You may want to consider this in the future."

81.     Marsh's rewards to employees for steering – and its admonitions to employees who failed to steer – put the lie to Marsh's statement that a barrier prevents Global Broking from influencing placement decisions.

82.     Marsh also has entered into contingent commission agreements that create incentives to favor the incumbent carrier when a policy came up for renewal.  At the time of a renewal, Marsh's clients expect it to give unbiased advice on whether to stay with the incumbent or sign with a new carrier.  Meanwhile, incumbent insurance companies have paid Marsh to recommend their own renewals.  For example, a 2003 contingent commission agreement with AIG provided Marsh with a bonus of 1% of all renewal premiums if its clients renewed with AIG at a rate of 85% or higher.  If the renewal rate was 90% or higher, Marsh received 2% of the renewal premium, and if the rate was 95% or higher, Marsh received 3%.  Marsh even negotiated (though it ultimately did not enter into) a $1 million "no shopping" agreement whereby Marsh would have recommended to its top individual clients who had bought personal insurance policies from Chubb that they renew those policies – a paid abdication of Marsh's duty to its clients.

83.    Marsh's steering harms its clients in at least two ways.  First, Marsh specializes in complex insurance placements where all things are rarely equal, and where subjective judgment calls have to be made among competitors with varying coverages, financial security, and price. A client relies on Marsh to make these calls strictly based on the client's best interest, without the corrupting influence of incentive payments.  Clients who have been steered have not received the service they paid for.  Second, insurance carriers pass the cost of contingent commissions directly on to the clients in the form of higher premiums.  Munich American Risk Partners ("Munich"), a division of American Reinsurance, for example, maintains a separate schedule of higher prices for Marsh clients because of the contingent commission it pays.  Effectively, Marsh is secretly raising the price of insurance for its clients and putting at least some of the increase in its own pocket.

84.    A cast of the world's largest insurance companies have participated in Marsh's steering scheme.  They have paid hundreds of millions of dollars for Marsh to steer business their way.  At times, the insurance companies have gone much further, colluding with Marsh to rig bids and submit false quotes to unwitting clients throughout New York and across the United States.

85.    On information and belief, Plaintiffs paid more in premiums for insurance than it would have paid in the absence of this conduct, because Defendants manipulated the market to their own advantage by negotiating secretly to exchange millions of dollars in undisclosed commissions with co-conspirators, while facilitating the placement of insurance business without full and fair price competition, and in total disregard of Marsh's fiduciary and contractual obligations to Plaintiffs.

## COUNT ONE

A.    **Violation of Section 1 of the Sherman Act – Unlawful Restraint of Trade and Commerce**

86.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85 as they specifically relate to bid rigging in the placement of excess casualty insurance.

87.    Marsh, with its co-conspirators (namely the insurance companies that participated in bid-rigging in the placement of excess casualty insurance), engaged in unlawful contracts, combination or conspiracies in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

88.    Specifically, Marsh entered into agreements with its co-conspirators, the purpose and effect of which were to suppress or eliminate competition, and to raise, maintain or stabilize prices for excess casualty insurance in the United States at artificially high levels.

89.    Marsh engaged in one or more overt acts in furtherance of the unlawful contract, combination or conspiracy.  Marsh implemented the unlawful scheme by the following acts, among others:

- Agreeing, through the use of collusive, fictitious, and inflated bid prices and other terms of sale, to manipulate bids for excess casualty insurance contracts;

- Agreeing to rig excess casualty insurance bids, so that certain excess casualty insurer participants in the conspiracy would receive Plaintiffs' excess casualty business, in exchange for undisclosed fees, kickbacks and other payments from the excess casualty insurers;

- Agreeing to engage in activities that give the appearance of competition regarding the placement of excess casualty insurance where none existed;

- Agreeing to allocate excess casualty insurance customers among the excess casualty insurers, denying such customers – such as Plaintiffs – the benefits of free and open competition; and

- Agreeing on the prices and the other terms to be submitted in collusive, fictitious and inflated bids for excess casualty insurance contracts.

90.    Marsh's activities as described above do not constitute the business of insurance regulated under state law, as they do not have the effect of transferring or spreading policyholder risk, nor are they an integral part of the policyholder relationship between insurer and insured. Moreover, Marsh's acts of rigging bids in the participating excess casualty insurance carriers' favor constitute coercion within the meaning of the McCarran-Ferguson Act.[1]  In addition, by engaging in the bid-rigging scheme described above, insurers participated in an illegal boycott of certain customers in order to obtain or protect their incumbent status with respect to a wholly different book of business.

91.    Marsh's unlawful conspiracy constitutes a *per se* violation of section 1 of the Sherman Act, 15 U.S.C. § 1.  Alternatively, Marsh's conduct violates the Sherman Act under a rule of reason analysis.

92.    Various persons, not named as defendants, participated as co-conspirators in the conspiracy, and performed acts and made statements in furtherance of that conspiracy.

93.    The aforesaid combination and conspiracy each had the following effects, among others:

- Price competition among insurers and their co-conspirators for excess casualty insurance was restrained and suppressed;

- Prices paid by Plaintiffs for excess casualty insurance were raised, maintained, or stabilized at artificially high, supra-competitive levels; and

- Plaintiffs were deprived of the benefits of free and open competition in the purchase of excess casualty insurance.

---

[1] *See* 15 U.S.C.A. § 1013(b) (West).

94.     As a direct and proximate result of the foregoing, Plaintiffs were injured in their business or property in that they purchased excess casualty insurance at higher prices and on terms less favorable than would have been available in a competitive market.

## COUNT TWO

**B.      Conspiracy / Aiding and Abetting – Violation of the Sherman Act**

95.     Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 94 as they specifically relate to bid rigging in the placement of excess casualty insurance.

96.     To the extent that the Court finds that any Defendant did not directly violate the Sherman Act as described in Count One, such Defendant knowingly conspired with and/or aided and abetted the other Defendants' violation of Count One.

97.     Defendants agreed to and intended a common objective or course of action that resulted in the damages to Plaintiffs.  The object of the course of action was to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means.  As evidenced herein, Defendants had a clear meeting of the minds on the object or course of action.  As described by this Complaint, Defendants committed an unlawful, overt act to further the object or course of action.

98.     Defendants conspired with the specified excess casualty insurance companies to illegally restrain trade and commerce.  Any Defendant found not to have directly conspired with these excess casualty insurance companies knowingly participated in the other Defendants' illegal conspiracy by engaging in fraudulent and conspiratorial conduct with the other Defendants.

99.     Defendants knowingly conspired to commit and/or aided and abetted the violation of the Sherman Act and are therefore jointly liable with the violating Defendants for damages.

100.    As a direct and proximate result of the foregoing, Plaintiffs were injured in their business or property in that they purchased excess casualty insurance at higher prices and on terms less favorable than would have been available in a competitive market.

## COUNT THREE

**C.    Violation of the Racketeering Influence and Corrupt Organization Act**

101.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85 as they specifically relate to bid rigging in the placement of excess casualty insurance.

102.    As a direct and proximate result of the foregoing acts identified in Count One, Marsh has entered into agreements in restraint of trade and in violation of 18 U.S.C. § 1962(c).

103.    Specifically, Marsh and its co-conspirators have participated in the Enterprise through a pattern of racketeering activity.

104.    As a direct and proximate result of Marsh's acts of rigging bids in the participating excess casualty insurance carriers' favor, Plaintiffs have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity, including by paying more for excess casualty insurance than they would have absent the Enterprise's illegal conduct.

105.    Accordingly, Defendants are liable to Plaintiffs for three times their actual damages as proven at trial, plus interest and attorneys' fees.

# COUNT FOUR

**D.    Conspiracy / Aiding and Abetting – Racketeering**

106.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85 and 101 through 105 as they specifically relate to bid rigging in the placement of excess casualty insurance.

107.    To the extent that the Court finds that any Defendant did not directly violate 18 U.S.C. § 1962(c) as described in Count Three, such Defendant knowingly conspired with and/or aided and abetted the other Defendants' violation of 18 U.S.C. § 1962(d).

108.    Defendants agreed to and intended a common objective or course of action that resulted in the damages to Plaintiffs.  The object of the course of action was to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means.  As evidenced herein, Defendants had a clear meeting of the minds on the object or course of action.  As described in this Complaint, Defendants committed an unlawful, overt act to further the object or course of action.

109.    Defendants conspired with the excess casualty insurance companies to form the Enterprise through a pattern of racketeering activity.  Any Defendant found not to have directly conspired with the excess casualty insurance companies knowingly participated in the other Defendants' illegal conspiracy by engaging in fraudulent and conspiratorial conduct with the other Defendants.

110.    Defendants knowingly conspired to commit and/or aided and abetted the violation of 18 U.S.C. § 1962(c) and are therefore jointly liable with the violating Defendants for damages.

111.    As a direct and proximate result of Marsh's acts of rigging bids in the participating excess casualty insurance carriers' favor, Plaintiffs have been injured in their

business or property by the predicate acts constituting the pattern of racketeering activity, including by paying more for excess casualty insurance than they would have absent the Enterprise's illegal conduct.

112.    Accordingly, Defendants are liable to Plaintiffs for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## COUNT FIVE

**E.    Breach of Fiduciary Duty – Failure to Disclose Material Information**

113.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85.

114.    Marsh's actions described herein constitute a breach of fiduciary duty to fully disclose material information.  Marsh had a fiduciary duty to disclose material information because of the relationship of confidence between Marsh and Plaintiffs and because of the agreements to act as Plaintiffs' insurance broker. Marsh also specifically had a fiduciary duty to disclose conflicts of interests under Utah Code Ann. §31A-23a-401(1)(a)(ii) and under the CSAs.

115.    Marsh failed to disclose (1) the nature, extent and amount of all remuneration it was receiving from insurance carriers; (2) the existence and extent of the inherent conflict of interest the acceptance of such commissions created; and (3) its bid-rigging schemes.

116.    As a direct and proximate result of the foregoing, Plaintiffs were injured in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

117.    Plaintiffs demand their actual damages, including, but not limited to, the increased premiums paid as a result of Marsh's conduct.  Plaintiffs also demand a return of the payments and a constructive trust on proceeds obtained as a result of this breach of fiduciary duty and the equitable remedy of forfeiture of the fees Marsh collected from Plaintiffs from these transactions.

Further, Marsh's conduct was intentional, willful, and malicious thereby warranting an award of exemplary damages.

## COUNT SIX

**F.    Conspiracy / Aiding and Abetting – Breach of Fiduciary Duty – Failure to Disclose Material Information**

118.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85 and 113 through 117.

119.    To the extent that the Court finds that any Defendant did not have a fiduciary relationship with any Plaintiff, such Defendant knowingly conspired with and/or aided and abetted the other Defendants' breaches of fiduciary duty.

120.    Marsh's confidential relationship with Plaintiffs, in addition to contractual relationship between the parties, gave rise to a fiduciary duty.  As described above, Marsh breached this fiduciary duty by failing to disclose material information to Plaintiffs.  Any Defendant found not to have a direct fiduciary duty to Plaintiffs knowingly participated in Marsh's breach by engaging in the fraudulent and conspiratorial conduct described above.

121.    Defendants agreed to and intended a common objective or course of action that resulted in the damages to Plaintiffs.  The object of the course of action was to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means.  As evidenced herein, Defendants had a clear meeting of the minds on the object or course of action.  Defendants committed an unlawful, overt act to further the object or course of action.

122.    Defendants knowingly conspired to commit and/or aided and abetted the fiduciary and are therefore jointly liable with the fiduciary for damages.

123.    As a direct and proximate result of the foregoing, Plaintiffs were injured in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.

124.    Plaintiffs demand their actual damages, including, but not limited to, the increased premiums paid as a result of Marsh's conduct.  Plaintiffs also demand a return of the payments made, a constructive trust on proceeds obtained as a result of this breach of fiduciary duty and the equitable remedy of forfeiture of the fees Marsh collected from Plaintiffs from these transactions.  Further, Marsh's conduct was intentional, willful, and malicious thereby warranting an award of exemplary damages.

## COUNT SEVEN

**G.    Breach of Fiduciary Duty – Secret Profit**

125.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85.

126.    Marsh's actions described herein constitute a breach of fiduciary duty.   As Plaintiffs' agent, Marsh owed Plaintiffs a fiduciary duty.  Marsh had a duty of loyalty and utmost good faith; a duty of candor; a duty to refrain from self-dealing; and a duty of full disclosure to Plaintiffs.

127.    Under Utah law, a producer for the insured may not recommend or encourage the purchase of insurance from or through an insurer to which the producer has the type of relationship that a material benefit would accrue to the producer for the insured as a result of the purchase.

128.    Marsh breached its fiduciary duty by directing Plaintiffs to companies which paid commissions to Marsh, failing to disclose to Plaintiffs any commissions received from insurance companies involving transactions with Plaintiffs, and retaining the contingent commissions from

the insurance carriers after improperly placing Plaintiffs' business with insurance carriers that resulted in a material benefit to Marsh.

129.    As a direct and proximate result of the foregoing, Plaintiffs were injured in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.  Plaintiffs demand their actual damages, including, but not limited to, the increased premiums paid as a result of Marsh's conduct.

130.    When an agent breaches its fiduciary duty to its principal by obtaining inappropriate commissions, the Court may disgorge the profits received by the agent as a result of the breach and the agent must forfeit the fees it collected from the principal.  Therefore, Plaintiffs demand return of all such commissions and payments made, a constructive trust on the proceeds Marsh obtained from the commissions from insurance companies and the equitable remedy of forfeiture of the fees Marsh collected from Plaintiffs.  Marsh's conduct was also intentional, willful, and malicious thereby warranting an award of exemplary damages.

## COUNT EIGHT

**H.    Conspiracy / Aiding and Abetting – Breach of Fiduciary Duty – Secret Profits**

131.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85 and 125 through 130.

132.    To the extent that the Court finds that any Defendant did not have a fiduciary relationship with any Plaintiff, such Defendant knowingly conspired with and/or aided and abetted the other Defendants' breaches of fiduciary duty.

133.    Marsh's confidential relationship with Plaintiffs, in addition to the contractual relationship between the parties, gave rise to a fiduciary duty.  As described above, Marsh breached this fiduciary duty.  Any Defendant found not to have a direct fiduciary duty to

Plaintiffs knowingly participated in Marsh's breach by engaging in the fraudulent and conspiratorial conduct described above.

134.    Defendants agreed to and intended a common objective or course of action that resulted in the damages to Plaintiffs.  The object of the course of action was to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means.  As evidenced herein, Defendants had a clear meeting of the minds on the object or course of action.  Defendants committed an unlawful, overt act to further the object or course of action.

135.    Defendants knowingly conspired to commit and/or aided and abetted the fiduciary to make secret profits and are therefore jointly liable with the fiduciary for secret profits.

136.    As a direct and proximate result of the foregoing, Plaintiffs were injured in that they purchased insurance at higher prices and on terms less favorable than would have been available in a competitive market.  Plaintiffs demand their actual damages, including but not limited to, the increased premiums paid as a result of Marsh's conduct.

137.    When an agent breaches its fiduciary duty to its principal by obtaining inappropriate commissions, the Court may disgorge the profits received by the agent as a result of the breach and the agent must forfeit the fees it collected from the principal.  Therefore, Plaintiffs demand return of all such commissions and payments and a constructive trust on the proceeds Marsh obtained from the commissions from insurance companies and the equitable remedy of forfeiture of the fees Marsh collected from Plaintiffs.  Marsh's conduct was also intentional, willful, and malicious thereby warranting an award of exemplary damages.

## <u>COUNT NINE</u>

I.    **Fraudulent Nondisclosure / Concealment**

138.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85.

139.    Marsh had a legal duty to disclose its commissions under Utah Code Ann. § 31A-23a-401(1)(a)(ii), under the CSAs, and as a result of its fiduciary relationship with Plaintiffs.

140.    Marsh failed to disclose (1) the nature, extent and amount of all remuneration it was receiving from insurance carriers; (2) the existence and extent of the inherent conflict of interest the acceptance of such commissions created; and (3) its bid-rigging schemes.

141.    The information not disclosed to Plaintiffs was material because it constituted a conflict of interest on the part of Marsh that prohibited Marsh from objectively performing its duties to Plaintiffs.

142.    As a proximate result of Marsh's fraudulent nondisclosure, Plaintiffs have suffered damages in an amount in excess of this Court's jurisdiction.

## COUNT TEN

**J.    Conspiracy / Aiding and Abetting – Fraudulent Nondisclosure / Concealment**

143.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85 and 138 through 142.

144.    To the extent that the Court finds that any Defendant did not fail to disclose material information under Count Nine, such Defendant knowingly conspired with and/or aided and abetted the other Defendants' fraudulent nondisclosure.

145.    Marsh had a legal duty to disclose its commissions, failed to disclose, and the information not disclosed was material.  Any Defendant not directly liable under Count Nine knowingly participated in Marsh's fraudulent nondisclosure by engaging in the fraudulent and conspiratorial conduct described above.

146.    Defendants agreed to and intended a common objective or course of action that resulted in the damages to Plaintiffs.  The object of the course of action was to accomplish an

unlawful purpose or to accomplish a lawful purpose through unlawful means. As evidenced herein, Defendants had a clear meeting of the minds on the object or course of action. Defendants committed an unlawful, overt act to further the object or course of action.

147.    Defendants knowingly conspired to commit and/or aided and abetted the Defendants that committed fraudulent nondisclosure and are therefore jointly liable for damages.

148.    As a proximate result of Marsh's fraudulent nondisclosure, Plaintiffs have suffered damages in an amount in excess of this Court's jurisdiction.

## COUNT ELEVEN

**K.      Breach of Contract**

149.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85.

150.    There were valid and enforceable contracts between Plaintiffs and Marsh, and Plaintiffs have standing to sue for breach of these contracts.

151.    Plaintiffs performed, tendered performance, or were excused from performance under the contracts.

152.    The CSAs entered into between Marsh and Plaintiffs required Marsh to fully disclose all compensation received as a result of the CSA. The CSAs provided that compensation to Marsh would "only change as service requirements dictate changes in the service team as agreed mutually between [Marsh and Plaintiffs]."

153.    Marsh repeatedly advised Plaintiffs that the only compensation Marsh received, or was to receive, under the CSA and in connection with Marsh's relationship with Plaintiffs, was the amount disclosed and stated in the agreement.

154.    In 2004, Marsh changed the CSA to describe "Market Service Agreements," but continued to fail to adequately disclose the true nature of the contingent commissions, in direct violation of the CSA.

155.    By failing to disclose the compensation at all, and by failing to adequately disclose the compensation in later years, Marsh wrongfully breached the CSAs.  As a result, Plaintiffs have sustained damages in an amount in excess of this Court's jurisdiction.


## COUNT TWELVE

**L.    Conspiracy / Aiding and Abetting – Breach of Contract**

156.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85 and 149 through 155.

157.    To the extent that the Court finds that any Defendant did not have a contractual relationship with Plaintiffs or did not breach any contract with Plaintiffs, such Defendant knowingly conspired with and/or aided and abetted the other Defendants' breach of contract.

158.    As described in Count Eleven, Defendants breached the contracts with Plaintiffs. Any Defendant found not to have directly breached any contract knowingly participated in Marsh's breach by engaging in the fraudulent and conspiratorial conduct described above.

159.    Defendants agreed to and intended a common objective or course of action that resulted in the damages to Plaintiffs.  The object of the course of action was to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means.  As evidenced herein, Defendants had a clear meeting of the minds on the object or course of action. Defendants committed an unlawful, overt act to further the object or course of action.

160.    Defendants knowingly conspired to commit and/or aided and abetted the breach of contract and are therefore jointly liable with the breaching parties for damages.

161.    By failing to disclose the compensation at all, and by failing to adequately disclose the compensation in later years, Marsh wrongfully breached the CSAs.  As a result, Plaintiffs have sustained damages in an amount in excess of this Court's jurisdiction.

## COUNT THIRTEEN

**M.    Fraud**

162.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85.

163.    Marsh and Plaintiffs had a relationship of trust in which Marsh had a responsibility to communicate accurate information and disclose material information.

164.    Over the course of their relationship, Marsh concealed its conduct of accepting contingent commissions and kickbacks from insurance carriers from Plaintiffs.  These misrepresentations, acts of concealment, and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and assuring Marsh's co-conspirators of the placement of business so that Marsh could collect contingent commission fees.

165.    Specifically, Marsh acted in the following fraudulent ways:

(1)    Marsh held itself out as a trusted advisor that could help clients assess their insurance needs and locate the best available insurance.

(2)    Marsh represented that it works for clients and not the insurance companies.  For example, Marsh stated, "Our guiding principle is to consider our clients' best interest in all placements.  We are our clients' advocates and we represent them in negotiations.  We don't represent [insurance companies]."

(3)    Marsh failed to disclose that an integral part of Marsh's business philosophy was to promote the interest of insurance companies in order to maximize premium revenue and insurance company profitability, thereby maximizing Marsh's earnings from contingent commission agreements. Marsh steered business to its co-conspirator insurance companies, from which it received higher fees.

(4)    Marsh failed to disclose the nature of the services it provided to warrant the commission payments.

(5)    Marsh, acting in concert with its co-conspirators, falsified and other manipulated insurance bids to create the illusion of a fair and competitive bidding process.

(6)    Marsh concealed the true nature of contingent commissions that it received.

166.    Marsh entered into CSAs with Plaintiffs stating "full disclosure of all compensation received by us will be made in advance."  Marsh made this representation knowing its falsity and materiality, and intending Plaintiffs to act upon on it by entering into the CSAs and allowing Marsh to be their trusted insurance broker.  Plaintiffs reasonably relied thereon to their financial detriment.

167.    Marsh intentionally misrepresented material facts to Plaintiffs and concealed material facts from Plaintiffs.    Marsh intended for Plaintiffs to rely on Marsh's misrepresentations and Plaintiffs reasonably relied thereon to their financial detriment.

168.    As a result, Plaintiffs have sustained damages in an amount in excess of this Court's jurisdiction.

## COUNT FOURTEEN

**N.    Conspiracy / Aiding and Abetting – Fraud**

169.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 11 through 85 and 162 through 168.

170.    To the extent that the Court finds that any Defendant did not commit fraud as described in Count Thirteen, such Defendant knowingly conspired with and/or aided and abetted the other Defendants' fraud.

171.    Marsh intentionally misrepresented material facts to Plaintiffs and concealed material facts from Plaintiffs.    Marsh intended for Plaintiffs to rely on Marsh's misrepresentations and Plaintiffs reasonably relied thereon to their financial detriment.    Any Defendant found not to have directly committed fraud knowingly participated in Marsh's fraud by engaging in the conspiratorial conduct described above.

172.    Defendants agreed to and intended a common objective or course of action that resulted in the damages to Plaintiffs.    The object of the course of action was to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means.    As evidenced herein, Defendants had a clear meeting of the minds on the object or course of action. Defendants committed an unlawful, overt act to further the object or course of action.

173.    Defendants knowingly conspired to commit and/or aided and abetted the fraudulent Defendants and are therefore jointly liable with the fraudulent Defendants for damages.

174.    As a result, Plaintiffs have sustained damages in an amount in excess of this Court's jurisdiction.

## ATTORNEYS' FEES

175.    In addition to actual and exemplary damages, Plaintiffs are entitled to recover their attorneys' fees incurred in this matter under Utah law.

## CONDITIONS PRECEDENT

176.    All conditions precedent to Plaintiffs' rights of recovery have been performed or have occurred.

## STATUTES OF LIMITATION

177.    Plaintiffs assert that applicable statutes of limitation have been tolled based upon the discovery rule, fraudulent concealment and *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), and its progeny.

## DEMAND FOR JURY

178.    Plaintiffs hereby demand a trial by jury of any and all issues triable of right by a jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER

Based on the foregoing, Plaintiffs request that Defendants be cited to appear and upon final judgment the Court grant the following relief:

1.    that Plaintiffs be awarded actual damages, including, but not limited to, the increased premiums paid as a result of Marsh's conduct;

2.    that Marsh be disgorged of the value of all remuneration from any insurance company that issued a policy or policies of insurance to Plaintiffs;

3.    that Marsh forfeit anything of value received from or because of Plaintiffs;

4.    that Plaintiffs be awarded exemplary damages;

5.    that Plaintiffs be awarded prejudgment and post-judgment interest at the maximum rated allowed by law;

6.      that Plaintiffs be awarded their costs of court;

7.      that Plaintiffs be awarded their reasonable and necessary attorneys' fees; and

8.      Plaintiffs further request all relief to which they are entitled.

                              Respectfully submitted,

                              BRACEWELL LLP


                              By: /s/ Bryan S. Dumesnil
                                   Bryan S. Dumesnil
                                   Bar Card No. 00793650
                                   Ralph D. McBride
                                   Bar Card No. 13332400
                                   Heath A. Novosad
                                   Bar Card No. 24037199
                                   711 Louisiana Street, Suite 2900
                                   Houston, Texas 77002-2781
                                   Telephone: (713) 223-2300
                                   Facsimile: (713) 221-1212

                              ATTORNEYS FOR PLAINTIFFS
                              INTERNATIONAL RISK INSURANCE
                              COMPANY, HUNTSMAN CORPORATION,
                              HUNTSMAN HOLDINGS, LLC (N/K/A
                              HUNTSMAN CORPORATION), HUNTSMAN
                              LLC (N/K/A HUNTSMAN INTERNATIONAL
                              LLC), HUNTSMAN ADVANCED MATERIALS
                              LLC

OF COUNSEL:

BENCKENSTEIN & OXFORD, LLP
Hubert Oxford, III
Benckenstein & Oxford, LLP
3525 Calder Avenue, 3rd Floor
Beaumont, Texas 77706
Telephone: (409) 833-9182
Facsimile: (409) 839-8971

LAW OFFICE OF L. DEWAYNE LAYFIELD
L. Dewayne Layfield
P.O. Box 3829
Beaumont, Texas 77704-3829
Telephone: (409) 832-1891
Facsimile (409) 280-3004
PARKER & BUNT, P.C.
Robert M. Parker
Bar Card No. 15498000
100 E. Ferguson, Suite 1114
Tyler, Texas 75702
Telephone (903) 531-3535
Facsimile (903) 533-9687

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 5, 2016, Plaintiffs' Third Amended

Complaint was served upon counsel of record via electronic mail.


*/s/ Bryan S. Dumesnil*
Bryan S. Dumesnil


#5345380.5

-44-