**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE INSURANCE BROKERAGE ANTITRUST LITIGATION<br><br>MDL-1663<br><br>TAG-ALONG ACTION:<br><br>LINCOLN ADVENTURES, LLC, <u>et al.</u>,<br><br>       Plaintiffs,<br><br>    v.<br><br>CERTAIN UNDERWRITERS OF LLOYD'S OF LONDON, <u>et al.</u>,<br><br>       Defendants. | Civil Action No.: 04-5184 (CCC)<br><br><br>**OPINION** |

**CECCHI, District Judge.**

## I.    <u>INTRODUCTION</u>

This matter comes before the Court on the motion (ECF No. 2763) of Defendants Those Certain Underwriters at Lloyd's, London who are members of Syndicates 0033, 0102, 0382, 0435, 0510, 0570, 0609, 0623, 0727, 0958, 1003, 1084, 1096, 1183, 1245, 1886, 2001, 2003, 2020, 2488, 2623, 2791, and 2987 (collectively, the "Syndicates" or "Defendants")[1] to dismiss the Second Amended Class Action Complaint (ECF No. 2737, hereafter "SAC") of Plaintiffs Lincoln Adventures, LLC ("Lincoln Adventures"), and Michigan Multi-King, Inc. ("MMK," collectively, "Plaintiffs"), for failure to state a claim. The Court has considered the submissions made in support

---

[1] Four contemporaneous motions to dismiss by other former Defendants (ECF Nos. 2762, 2765, 2767, 2770) are now moot because of settlements. (ECF Nos. 2801, 2809, 2831, 2836). The above-named Syndicates are the only remaining Defendants in this action.

of and in opposition to the instant motion. The Court has also considered the arguments made on the record during oral argument on January 19, 2017. (ECF No. 2847, hereafter, "Or. Arg. Tr."). For the reasons set forth below, Defendants' motion is DENIED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367(a).

## II.     <u>BACKGROUND</u>

### A.    **Factual Background**

In deciding the pending motion, the Court accepts as true all well-pleaded factual allegations in the SAC and draws all reasonable inferences in Plaintiffs' favor.

This putative class action is part of the consolidated pretrial proceedings of the multidistrict litigation <u>In re</u> <u>Insurance Brokerage Antitrust Litigation</u>, MDL No. 1663. Plaintiffs are United States business entities that purchased insurance from Defendants through the London-based insurance marketplace Lloyd's of London (the "Lloyd's Market"), operated by the Corporation of Lloyd's ("Lloyd's"). Defendants are insurance syndicates that underwrite insurance sold in the Lloyd's Market. (SAC ¶ 3). Plaintiffs contend Defendants' business practices violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and § 1962(d), as well as state common law, because Defendants conspired with insurance brokers to conceal the allegedly non-competitive nature of the Lloyd's Market. (<u>Id.</u> ¶¶ 1-2).

Unless otherwise specified, the following factual allegations concern conduct taking place during the SAC's "Class Period," that is, from January 1, 1997 until the date of class certification, for which Plaintiffs have not yet moved. (SAC ¶ 183).

### 1.    <u>The Lloyd's Market</u>

Lloyd's of London itself is not an insurance company. (SAC ¶ 69). Rather, it describes itself as the "World's Specialist Insurance Market" whose members—insurance companies,

limited partnerships, individuals, and other entities—form syndicates, including Defendants, which underwrite insurance policies. (Id.). Each syndicate maintains and staffs a physical office or stall on the premises of the Lloyd's Market at Lloyd's headquarters in London. (Id. at ¶ 72). Syndicates do not sell insurance directly to customers; rather, customers access the Lloyd's Market through authorized broking firms ("Lloyd's Brokers") or other intermediaries of which Lloyd's approves.[2] (Id. ¶ 73). Lloyd's Brokers meet face-to-face with the syndicates at their stalls on the Lloyd's Market premises or at locations in the surrounding area. (Id. ¶¶ 72-73). Only Lloyd's Brokers are allowed "onto the floor" in the physical marketplace. (Id. ¶ 73).

Much of the insurance sold in the Lloyd's Market is for customers in the United States. For example, in 2015, U.S. customers purchased 44% of the insurance sold there, accounting for approximately £10 billion in gross premiums. (SAC ¶ 70). Lloyd's subsidiary, Lloyd's America, connects U.S. customers and their U.S. brokers with Lloyd's Brokers. (Id. ¶¶ 71, 73). Defendants allegedly exercise some measure of control over Lloyd's America. (Id. ¶ 210).

According to Plaintiffs, Lloyd's represents to its customers that the Lloyd's Market is competitive. As of January 7, 2016, the Lloyd's website stated that its syndicates "compete for business, thus offering choice, flexibility and continuing innovation." (SAC ¶ 69). However, the SAC describes several mechanisms the syndicates use to collaborate, rather than compete, with each other to determine pricing: open market placements, lineslips, and binding authorities. (Id. ¶¶ 74-75).

An open market placement is a process by which multiple syndicates each agree to insure a portion of a customer's risk on identical price and terms. (Id. ¶ 76). A Lloyd's Broker selects a

---

[2] The SAC uses "Lloyd's Brokers" as a term to encompass both the authorized broking firms and the approved intermediaries. For clarity, the Court uses "Lloyd's Brokers" only to refer to the firms authorized to do business on the floor of the physical Lloyd's Market.

syndicate to be the "lead" syndicate—one that conducts negotiations with the broker, collects and disburses money, and usually takes the largest portion of the risk—and the broker and lead syndicate agree to a price and terms of a policy. (Id. ¶¶ 76, 82). Then, other syndicates "follow the leader" by agreeing to insure other portions of the risk for the same price and on the same terms. (Id.). "Follower" syndicates almost never deviate from the leader's pricing because they are "just 'tak[ing their] participations on a placement'" and because this allows them to charge a higher price than they otherwise could. (Id. ¶¶ 82-83). Additionally, follower syndicates rarely bid against the leader to lower the price of a policy when it is being renewed. (Id. ¶ 86).

Lineslips are documents through which syndicates agree in advance to insure similar risks for the same price and terms as each other, including broker compensation. (SAC ¶ 77). If a customer's risk fits a lineslip's description, the broker automatically places all or part of the risk with any syndicates that have agreed to the price and terms set forth in the lineslip. (Id.).

Binding authorities are agreements between a "coverholder," i.e., a Lloyd's Broker or other authorized intermediary, and one or more syndicates. (SAC ¶¶ 79-80). In such agreements, syndicates delegate authority to coverholders to write insurance on pre-agreed terms. (Id.). So long as the insurance policies conform to these terms, the syndicates are bound automatically by the policies that the coverholders write. (Id.). According to the SAC, "[t]he relationship of the intermediary to the insurer in the case of a coverholder agreement is ordinarily not adequately disclosed to the policyholder." (Id. ¶ 79).

### 2. Information Sharing

The SAC highlights several mechanisms through which Defendants allegedly shared sensitive business information to facilitate collaboration on pricing and terms.

First, common to the features of the market described above (open market placements, lineslips, and binding authorities) is "subscription," that is, when multiple syndicates agree to insure part of a risk on identical terms. (SAC ¶ 81). According to the SAC, the effect of subscription is to increase transparency among syndicates because syndicates, by subscribing to terms set by other syndicates, see the exact price and terms of the insurance agreements into which the other syndicates have entered. (Id. ¶¶ 81, 86). Moreover, syndicates who have subscribed to cover a portion of the same risk communicate with each other regarding premiums received and potential claim distributions. (Id. ¶ 89). To share this information, syndicates use Xchanging Information Services ("Xchanging"), an entity Lloyd's owns in part. (Id. ¶ 90).

Second, syndicates share information through the Council of Lloyd's. (SAC ¶¶ 92-93). The Council of Lloyd's acts as a board of directors for Lloyd's, and is made up of current and former syndicate representatives and members of the Society of Lloyd's. (Id. ¶ 91). The syndicates, including Defendants, select the Council of Lloyd's members, and Defendants both have served as Council members and chairs and have funded the Council's activities. (Id. ¶¶ 91, 210). The Franchise Performance Directorate ("FPD"), an administrative arm of the Council of Lloyd's, collects various reports and forecasts from the syndicates, some of which it makes available to other syndicates. (Id. ¶ 92). These reports include syndicates' sensitive business information, such as "forward-looking data reporting premium volume, market share, current and future prices and price increases . . . broker compensation . . . financial performance and average prices for each line of business against their putative competitors[.]" (Id. ¶ 93).

Third, syndicates share information when current or former employees of one syndicate sit on the board of another syndicate's managing agent. (SAC ¶ 94-95).

Fourth, syndicates share information through the Lloyd's Market Association ("LMA"), an organization in which the syndicates' membership is mandatory. (SAC ¶ 9, 98). According to the SAC, "[t]hrough the LMA, Defendants and their co-conspirators share sensitive information and discuss, coordinate and agree on virtually every aspect of how the Lloyd's Market functions, including pricing, terms, broker compensation, risk sharing and avoidance of legal liability." (Id. ¶ 99). The LMA is governed by a board comprised of representatives from Defendants and other syndicates, and funded by Defendants and other syndicates. (Id. ¶¶ 102, 210). The LMA "processes and disseminates a vast array of market information collected by Lloyd's and allows access to reports detailing the performance in various lines of business of each of the insurers that operates in the Lloyd's Market." (Id. ¶ 103). Defendants use the LMA to create standard policy terms, underwriting practices, and broker compensation terms, and to agree on future business strategy. (Id. ¶¶ 104-05).

### 3. Lloyd's Brokers and Other Intermediaries

Measured by premiums paid, 70% of the insurance sold to putative class members in this action was brokered by one of three Lloyd's Brokers or their subsidiaries: Marsh MMC (with subsidiaries, "Marsh"), Aon Corp. (with subsidiaries, "Aon"), and Willis Group[3] (with subsidiaries, "Willis"). (SAC ¶ 51-61, 115). The SAC's allegations about Lloyd's Brokers mainly focus on these entities. The SAC also discusses coverholders—U.S.-based brokers and wholesalers—including certain Marsh and Aon subsidiaries; Swett Insurance Managers; Swett & Crawford ("S&C"); Atlass Insurance Group ("Atlass"); Miller Insurance Services; and Professional Liability Insurance Services ("PLIS"). (Id. ¶¶ 5 n.3, 63).

---

[3] As of January 4, 2016, the Willis Group became Willis Towers Watson Public Limited Company through a merger. (SAC ¶ 59).

Lincoln Adventures purchased yacht insurance in the Lloyd's Market, effective April 15, 2004, that was underwritten primarily by Syndicates 0609, 0958, and 2488 (the "Yacht Policy"). (SAC ¶¶ 54, 64-66). Both Atlass and Marsh were involved in brokering the deal. (Id. ¶¶ 64, 67). Between 2000 and 2012, MMK purchased a series of roughly annual insurance policies for "miscellaneous property insurance and/or food borne illness insurance" in the Lloyd's Market through Aon, PLIS, and S&C (the "MMK Insurance Coverage"). (Id. ¶ 68). Each of the Syndicates named as Defendants in the SAC underwrote one or more of these policies. (Id.).

Marsh, Aon, and Willis each have made representations about their role as an intermediary between customers and the syndicates. Willis's website stated:

> Willis represents the client's best interests through our Client Advocacy Model. Willis' global resources and services are committed to understanding the client's company, its industry and its individual needs. Willis' customized recommendations and solutions will be driven by what is in the client's best interests. This is the centerpiece of the value Willis provides its clients.

(SAC ¶ 117). Marsh made the following representation in the Certificate of Insurance for the policy it brokered for Lincoln Adventures in 2004:

> Where we become aware of any actual or potential conflicts of interests, we inform our clients of the situation and their options and act upon their instructions.
>
> In the conduct of business and in the choice of an insurer, including any with which we or our affiliates are connected, we aim to provide advice objectively and independently in our client's best interests.

(Id. ¶ 118). Aon made the following representation in its Insurance and Risk Management Proposal for MMK's insurance policy covering June 21, 2003 through June 21, 2004: "It is the goal of Aon Risk Services to provide the most cost-effective portfolio with financially stable companies, based upon your selection of coverages." (Id. ¶ 119). The Lloyd's website states, "Brokers bring business to the Lloyd's Market, taking a particular risk they want covered around

the market to try to find the best price, terms and conditions" and brokers "meet interested underwriters face to face and 'shop around' to negotiate the best package." (Id. ¶ 158).

Plaintiffs contend the Lloyd's Brokers and coverholders contribute to and conceal the anticompetitive nature of the Lloyd's Market in exchange for commissions that they do not disclose to their clients. (SAC ¶¶ 120-21). In the Lloyd's Market, broker compensation can account for nearly 40% of the insurance premiums, and these costs are passed on to insureds. (Id. ¶¶ 139-140, 167, 169). Indeed, according to Defendants' data, on average, brokerage and commission payments during the relevant timeframe were 22% in the Lloyd's Market, compared to 12% in the United States property and casualty market. (Id. ¶ 167). According to Plaintiffs, the syndicates can only pass on the costs of these commissions and fees because of the anticompetitive nature of the market. (Id. ¶ 182).

Brokerage commissions are governed by agreements between one or more syndicates and the brokers and/or coverholders with which they do business. (SAC ¶ 123). Brokers and coverholders earn commissions by achieving volume and/or profit targets, and for placing insurance pursuant to lineslips and binding authorities as described above. (Id. ¶ 123). Plaintiffs claim each type of commission exceeds standard insurance brokerage fees. (Id.). In particular, the SAC lists a number of lineslips and binding authorities agreements between several Defendants and either a Lloyd's Broker or a coverholder that provide for large brokerage commissions; all Defendants except for Syndicates 0033, 0382, and 1886 were a party to one or more of these agreements. (Id. ¶¶ 129-31, 133-38). Moreover, all Defendants had individual compensation agreements with Marsh, Aon, and/or Willis that were substantively similar. (Id. ¶¶ 148-51).

Many of the agreements between syndicates and brokers contain confidentiality clauses that prevent all parties from disclosing the terms of the agreements to anyone, including potential

insurance customers. (SAC ¶ 124). Thus, clients in the United States, including Plaintiffs, were not aware these commissions were being paid. (Id. ¶ 153). According to Plaintiffs, Marsh, Aon, and Willis concealed the fact or amount of the commissions from clients, and Marsh intentionally misinformed clients about the percentage commission it would receive from deals in the Lloyd's market. (Id. ¶¶ 154-56, 161-64).

      4.     Racketeering Allegations

Based on the foregoing, Plaintiffs claim the Lloyd's Corporation is a RICO enterprise through which Defendants and their co-conspirators—the Lloyd's Brokers, coverholders, and other syndicates—conducted a pattern of racketeering activity. (SAC ¶¶ 203-17). Alternatively, Plaintiffs claim the network of syndicates, including Defendants, together with the Lloyd's Brokers and coverholders, comprise an association-in-fact enterprise for RICO purposes. (Id.).

Plaintiffs claim Defendants committed multiple acts of mail fraud and wire fraud under 18 U.S.C. § 1341 and § 1343 through these enterprises. (SAC ¶ 222). Plaintiffs claim Defendants disseminated "false and misleading marketing materials, advertisements, insurance policies, statements, and websites" and caused the Lloyd's Brokers and coverholders to do the same, purposely causing U.S. policyholders "to unwittingly pay premiums that included the cost of Defendants' kickbacks to the Lloyd's Brokers and/or were otherwise supra[-]competitive[.]" (Id. ¶ 223). In furtherance of Defendants' scheme to defraud, the SAC lists six specific communications sent by brokers and coverholders to Plaintiffs and other entities regarding Plaintiffs' insurance policies using the U.S. mail, a private or commercial interstate carrier, facsimile message, and email between the years 2004 and 2007. (Id. ¶¶ 227-28). These include an "[i]nvoice for renewal of Yacht Policy[,]" a "[l]etter re renewal of Yacht [P]olicy[,]" a "Letter enclosing agency binders for insurance policies and finance agreement for premium payments[,]"

a "[f]acsimile representing that [a Marsh entity] is acting on behalf of Lincoln Adventures with regard to claim[,]" an "[e]mail re insurance binders, invoices and premium finance agreement[,]" and an "[e]mail re copy of carrier renewal[.]" (Id.).

As a result of this scheme, Plaintiffs claim they paid more for insurance than they otherwise would have, accounting both for supra-competitive pricing and the unusually large brokerage fees associated with the Lloyd's Market. (SAC ¶ 237).

## B. Procedural History

Plaintiffs filed this action in the United States District Court for the Southern District of Florida on July 13, 2007. Lincoln Adventures, LLC v. Certain Underwriters at Lloyd's, London, No. 07-60991-WJZ (S.D. Fl.). On January 14, 2008, the case was transferred to this Court and joined to MDL No. 1663. Lincoln Adventures, LLC v. Certain Underwriters at Lloyd's, London, No. 08-235 ECF No. 1 (D.N.J. Jan. 14, 2008). The original complaint is available at ECF No. 1-1 on the docket for No. 08-235 (hereafter, "Complaint" or "Compl.").

Discovery in this action and others in the MDL was stayed until October 20, 2011. (ECF No. 1922). Plaintiffs filed a "Revised First Amended Class Action Complaint" on November 14, 2012 (ECF No. 2312, hereafter, "FAC").[4] The parties attempted mediation, but failed, (ECF No. 2585), and on November 4, 2013, Plaintiffs moved to amend the FAC. (ECF No. 2603). After discussion at multiple status conferences between Court and counsel, on February 11, 2016, the Court granted Plaintiffs leave to file a revised version of its proposed second amended class action complaint. (ECF No. 2736). This revised version, now the SAC, was filed on February 12, 2016, and is the subject of the present motion. (ECF No. 2737).

---

[4] Plaintiffs originally filed a First Amended Complaint under seal on October 29, 2012 (ECF No. 2282), but were ordered to revise that complaint to omit confidential information so that the new complaint, ECF No. 2312, could appear on the public docket. (ECF No. 2299).

## III.  LEGAL STANDARD

For a complaint to survive dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In evaluating the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  See Phillips v. Cty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  "A pleading that offers labels and conclusions will not do.  Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." Iqbal, 556 U.S. at 678 (internal citations omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.  Thus, when reviewing complaints for failure to state a claim, district courts should engage in a two-part analysis:  "First, the factual and legal elements of a claim should be separated . . . .  Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" See Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted).

## IV.  DISCUSSION

### A.  RICO Claims

Section 1962(c) of the RICO Act makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful for anyone to conspire to violate § 1962(c). Id. § 1962(d). To plead a RICO claim under § 1962(c), a plaintiff must describe "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 362 (3d Cir. 2010) (internal quotation omitted). "[A] pattern of racketeering activity" requires at least two predicate acts of racketeering activity within a ten-year period. 18 U.S.C. § 1961(5). Acts of racketeering may include federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343. See 18 U.S.C. § 1961(1) (defining "racketeering activity").

The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud. See 18 U.S.C. §§ 1341, 1343. To plead mail or wire fraud, a plaintiff must describe: "(1) the existence of a scheme to defraud; (2) the use of the mails [or wires] . . . in furtherance of the fraudulent scheme; and (3) culpable participation by the defendant, that is, participation by the defendant with specific intent to defraud." United States v. Dobson, 419 F.3d 231, 237 (3d Cir. 2005). When mail and wire fraud are the basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pleaded with particularity. Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004), abrogated in part on other grounds by Twombly, 550 U.S. 544. A plaintiff can meet this requirement "by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Id. at 224 (internal quotations omitted).

Defendants argue the SAC insufficiently alleges: (1) a pattern of racketeering activity in that it does not show a scheme to defraud, the use of mails or wires in furtherance of the scheme, or culpable participation by any Defendant; (2) that Defendants conducted the affairs of a RICO

12

enterprise through such a pattern; (3) the existence of an association-in-fact enterprise; (4) a RICO injury; and (5) conspiracy to commit a RICO violation. Defendants also contend the RICO claim should be dismissed on statute of limitations grounds, and to avoid extraterritorial application of the RICO statute. The Court discusses each argument separately.

        1.    <u>Pattern of Racketeering Activity</u>

Plaintiffs have adequately pleaded that Defendants participated in a pattern of racketeering activity through multiple instances of mail and wire fraud.

        a.    Scheme to Defraud

"A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." <u>Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.</u>, 140 F.3d 494, 528 (3d Cir. 1998) (internal quotation omitted). In other words, although "[t]he scheme need not involve affirmative misrepresentation," <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406, 1415 (3d Cir. 1991) (internal quotation omitted), mail fraud and wire fraud involve "the deprivation of something of value by trick, deceit, chicane or overreaching." <u>Id.</u> (quoting <u>McNally v. United States</u>, 483 U.S. 350, 358 (1987)).

Here, Plaintiffs adequately allege a scheme to defraud, with two types of misrepresentation.

First, Defendants allegedly represented on the Lloyd's website that syndicates "compete for business" in the Lloyd's Market. (SAC ¶ 69). Plaintiffs attribute this statement on the Lloyd's website to Defendants by pleading that Defendants control Lloyd's through their membership in the Council of Lloyd's. (<u>Id.</u> ¶ 91).[5] However, Plaintiffs contend the Lloyd's market is not

---

[5] Plaintiffs made this connection more explicitly at oral argument. (<u>See</u> Or. Arg. Tr. at 25 ("[T]he syndicates are operating Lloyd's Corp. And so when it sends [the representation] out on its website it is an instrumentality of the syndicates[.]")).

competitive. Syndicates collaborate to set uniform pricing and terms through collective agreements with brokers and coverholders on standard pricing and terms for similar risks, agreements to "follow the leader," and sharing sensitive information. See supra Part II.A.1-2.

Second, Lloyd's, Marsh, Willis, and Aon have each represented to some degree to the public and/or Plaintiffs in particular that brokers act in their clients' best interest with respect to insurance price and terms and/or without conflict of interest. See supra Part II.A.3. However, pursuant to agreements between one or more syndicates and brokers and/or coverholders, brokers and coverholders received sizable commissions. Allegedly at Defendants' behest, these entities did not disclose the terms of these agreements to clients, and Marsh misrepresented these terms outright. See supra Part II.A.3.

These misrepresentations allegedly were made to induce Plaintiffs and others to buy insurance whose price secretly reflected excess commissions and a lack of competition among syndicates. (SAC ¶¶ 229-30). This meets the definition of a scheme to defraud.

Defendants make several arguments to the contrary, but none are persuasive.

First, Defendants argue this conduct cannot constitute a scheme to defraud because the business practices of Lloyd's were public knowledge. (ECF No. 2763-1 at 13-15, hereafter, "Defs.' Br."). The Court disagrees. At this stage, the Court is limited to considering the SAC and any "document integral to or explicitly relied upon in the complaint[.]" In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). Neither the SAC's paragraphs that Defendants cite (see Defs.' Br. at 13-14 (citing SAC ¶¶ 69, 72, 74, 159-60)), nor the Lloyd's website pages Defendants submit as exhibits (ECF No. 2763-5 Exs. 1-3[6]) indicate that the details

---

[6] Moreover, it is not clear to the Court that these webpages are the same versions upon which the SAC relies. The versions cited in the SAC were last visited on December 17, 2015, and January 7, 2016. (See, e.g., SAC nn. 47-50). Defendants submitted versions dated March 28,

of the scheme to defraud—particularly the agreements among syndicates to charge supra-competitive pricing and pay large undisclosed brokerage commissions—were publicly available.[7]

Next, Defendants argue that the statements described above are "business puffery" such that they "cannot support an allegation of mail or wire fraud." (Defs' Br. at 14 n.7 (citing United States. v. Pearlstein, 576 F.2d 531, 540 n.3)). But in the case Defendants cite, the statements in question were that a company was "nationally known," and that its pens were "among the finest writing instruments in the world," both of which are statements of opinion. See Pearlstein, 576 F.2d at 540 n.3. Here, the brokers and Lloyd's allegedly made false factual statements about the brokers' relationships to their clients, the syndicates, and the Lloyd's Market, and the Lloyd's website allegedly misrepresented the nature of Defendants' business practices.

Finally, Defendants argue that the nondisclosure of the compensation agreements is not actionable because "Plaintiffs fail to allege that Defendants owed any duty to disclose broker compensation or [] any fiduciary relationship between Defendants and policyholders[,]" and the agreements only required syndicates "to keep confidential a particular contract's terms, not the practice of paying contingent commissions." (Defs.' Br. at 15). This misapprehends the scheme described in the SAC. The scheme is not based on Defendants' failure to disclose information to insurance customers that it had a duty to disclose. Rather, as described above, the alleged scheme is based on Defendants' affirmative misrepresentations through the website as well as the Lloyd's

---

2016. (ECF No. 2763-5). Plaintiffs' counsel indicated the website's statement—that syndicates compete for business—was removed at some point after the SAC was filed. (Or. Arg. Tr. at 13).

[7] Similarly, Defendants are incorrect that the SAC reflects that the compensation agreements between the brokers and/or coverholders and the syndicates were public knowledge because they "were the subject of significant public debate during the alleged class period." (Defs.' Br. at 15 (citing SAC ¶¶ 159-60)). The cited paragraphs only reflect that issues related to similar compensation agreements **in general** were the subject of discourse in the industry.

Brokers' misleading statements at Defendants' behest. The compensation agreements are relevant to the scheme because the allegation that Lloyd's Brokers received substantial undisclosed compensation from Defendants shows that they may have misled clients when they represented that they had no conflicts of interest. See supra Part II.A.3. Thus, whether Defendants themselves had an obligation to disclose anything to Plaintiffs is not essential to this theory.[8]

### b. Use of Mails and Wires

Plaintiffs also adequately allege the use of mails and wires to further the scheme to defraud.

> Mail fraud occurs ... whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting to do so.' The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contains no false information.'

Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647 (2008) (internal citations omitted). Mail and wire fraud do not require that a defendant personally mailed or wired the communication, but rather that its transmission be reasonably foreseeable to the defendant. United States v. Tiller, 302 F.3d 98, 101 (3d Cir. 2002).

Here, the SAC lists three uses of mails and three of wires to send communications from

---

[8] The Court also rejects Defendants' argument that the confidentiality agreements "are equally consistent with standard business practices and do not plausibly imply any scheme to defraud." (ECF No. 2788 at 6, hereafter, "Defs.' Reply Br."). The case Defendants cite, Cervantes Orchards & Vineyards, LLC v. Am. W. Bank, held that a confidentiality provision in a settlement agreement did not, by itself, evince an intent to conceal the settlement agreement from a bankruptcy court because the district court could take "judicial notice of the fact that settlement agreements commonly include confidentiality provisions." See No. 1:14-cv-3125-RMP, 2015 WL 4429054, at *7 (E.D. Wash. July 17, 2015). Here, Plaintiffs plead both the existence of confidentiality agreements and the brokers' affirmative misrepresentations about their roles in the marketplace—misrepresentations that their clients may have questioned had the confidentiality agreements not kept the brokers from disclosing the extent of the commissions they received. See supra Part II.A.3. Moreover, at this stage, the Court has no basis to find that the confidentiality agreements in this case constitute "standard business practices" outside of the Lloyd's Market.

the Lloyd's Brokers and coverholders to Plaintiffs and other entities pertaining to Plaintiffs' insurance policies—i.e., billing, renewal, claims, etc.—during the time Plaintiffs were paying supra-competitive premiums. (SAC ¶¶ 227-28). In other words, these communications were allegedly sent "for the purpose of executing" the scheme in that they allowed Defendants and their co-conspirators to continue servicing the policyholders and collecting supra-competitive premiums. Bridge, 553 U.S. at 647. Moreover, it was reasonably foreseeable to Defendants, located in London, that their intermediaries would use the U.S. mails and wires to administer these insurance policies with clients located in the United States. See Tiller, 302 F.3d at 101.[9]

### c.  Culpable Participation

Plaintiffs adequately allege "participation by [all Defendants] with specific intent to defraud." See United States v. Dobson, 419 F.3d at 237. Under Rule 9(b), unlike other elements of fraud, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The SAC states repeatedly that Defendants acted with intent to defraud Plaintiffs. (SAC ¶¶ 218-30). Moreover, each Defendant allegedly participated in the scheme by adhering to the anti-competitive business practices, see supra Part II.A.1, and entering

---

[9] For this reason, Defendants are incorrect that the SAC's mail and wire fraud allegations constitute impermissible "group pleading" that fails the Rule 9(b) particularity standard. (Defs.' Br. at 16). All Defendants participated in the same scheme to defraud, in part by underwriting Plaintiffs' insurance policies, which foreseeably required the use of mails and wires to administer those policies. Thus, as pleaded, these six communications were foreseeable to all Defendants. The cases Defendants cite are not to the contrary, and are distinguishable. See Ottilio v. Valley Nat'l Bancorp, No. 13-7154, 2014 WL 906138, at *2 (D.N.J. Mar. 7, 2014) (no particularity pleaded where complaint claimed that defendants made fraudulent misrepresentations through the mails or wires but did not identify particular representations or defendant(s) that made them); Eclectic Props. E., LLC v. Marcus & Millichap Co., No. C-09-00511, 2011 WL 1375164, at *5 (N.D. Cal. Apr. 12, 2011) (no particularity where plaintiffs pleaded that the use of mails and wires "was foreseeable in the course of defendants' business generally"); Sterling Interiors Grp., Inc. v. Haworth, Inc., No. 94-cv-9216, 1996 WL 426379, at *8 (S.D.N.Y. July 30, 1996) (no particularity because only pleading defendants' high-ranking positions in a company was insufficient to show how their actions foreseeably led to use of mails or wires).

into compensation agreements with brokers and coverholders, often collectively, <u>see</u> <u>supra</u> Part II.A.3.

      2.    <u>RICO Enterprise</u>

Plaintiffs have adequately pleaded the enterprise element of their § 1962(c) claim.

An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiffs contend that Lloyd's Corporation itself is an enterprise for the purposes of RICO, and alternatively that the network of syndicates, together with the Lloyd's Brokers and coverholders, comprise an association-in-fact enterprise. (SAC ¶ 203).

Defendants appear not to contest that Lloyd's Corporation constitutes an enterprise for the purposes of RICO, but argue that Plaintiffs have not adequately pleaded the existence of an association-in-fact enterprise. (Defs.' Br. at 30-32). To the contrary, the Court finds the association-in-fact enterprise is adequately pleaded.

An association-in-fact enterprise must have three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." <u>Boyle v. United States</u>, 556 U.S. 938, 946 (2009). "[T]he very concept of an association in fact is expansive[,]" in keeping with RICO's directive that "its terms are to be 'liberally construed to effectuate its remedial purposes.'" <u>Id.</u> (quoting § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961).

Here, all three features are met. First, the "relationships" feature is satisfied. The SAC details a network of syndicates, including Defendants, as well as Lloyd's Brokers and coverholders, connected by agreements between individual syndicates and brokers and/or coverholders, as well as horizontal agreements between multiple syndicates (1) setting the terms

of lineslips and binding authorities, including broker compensation, and (2) agreeing not to contest the terms of "follow-the-leader" insurance policies.[10]   See supra Parts II.A.1, II.A.3.   All Defendants are party to one or more of these agreements. See supra Part II.A.1, II.A.3. Second, the "purpose" feature is satisfied: Plaintiffs claim these agreements exist to facilitate the sale of insurance, in particular, the sale of insurance at supra-competitive rates to compensate both brokers and syndicates above what a competitive market would dictate. Third, the "longevity" feature is satisfied because these entities have done business this way for years, and in particular sold MMK insurance according to this model annually for twelve years. See supra Part II.A. Thus, Plaintiffs adequately plead that the association-in-fact functioned as a "single entity." See In re Ins. Brokerage Antitrust Litig., 618 F.3d at 364.

### 3.     Conduct of a RICO Enterprise

Plaintiffs have adequately pleaded that Defendants conducted the affairs of the association-in-fact enterprise.  "[O]ne is not liable under [§ 1962(c)] unless one has participated in the operation or management of the enterprise itself." Reves v. Ernst & Young, 507 U.S. 170, 183 (1993).  If members of an association-in-fact enterprise "band together to commit violations they cannot accomplish alone[,] then they cumulatively are conducting the association-in-fact enterprises's affairs, and not simply their own affairs." In re Ins. Brokerage Antitrust Litig., 618 F.3d at 378 (internal quotations and alterations omitted).

Here, the Court has already found the SAC describes a pattern of racketeering by all

---

[10] Because the SAC pleads the existence of explicit agreements between Defendants, this case is distinguishable from the associations discussed in In re Ins. Brokerage Antitrust Litig., 618 F.3d at 374-75, upon which Defendants primarily rely to argue that no association-in-fact enterprise is pleaded here. (Defs.' Br. at 30-32). There, plaintiffs "allegations [did] not plausibly imply concerted action—as opposed to merely parallel conduct—by the insurers." Id. at 374 (emphasis added).  Here, by contrast, the SAC does not depend solely on conduct to imply agreement.  Rather, it pleads actual written agreements between the syndicates not to compete.

Defendants through multiple acts of mail fraud and wire fraud, that is, by engaging in a scheme to defraud insurance customers into paying supra-competitively priced insurance. See supra Part IV.A.1. The Court has also found the SAC plausibly shows that all Defendants were members of an association-in-fact enterprise whose purpose was to sell Plaintiffs and other customers supra-competitively priced insurance. See supra Part IV.A.2. It follows, therefore, that Defendants' alleged instances of mail and wire fraud were done to "conduct[] the association-in-fact enterprise's affairs." In re Ins. Brokerage Antitrust Litig., 618 F.3d at 378. Indeed, the scheme could not have been accomplished alone because it involved agreements between Defendants both to maintain supra-competitive pricing and to pay large brokerage fees to prevent brokers and coverholders from telling customers their premiums reflected a lack of competition.

Because the Court finds the "conduct" element of Plaintiffs' § 1962(c) claim is met with respect to the association-in-fact enterprise, it need not determine at this stage whether it would also be met with respect to the Lloyd's Corp. enterprise.

   4. RICO Injury

Plaintiffs have adequately pleaded a RICO injury. Under § 1964(c), "[a]ny person injured in his business or property by reason of a violation of [RICO] may sue." 18 U.S.C. § 1964(c). To recover, a plaintiff must show proximate causation. Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Id. In § 1962(c) cases, the "compensable injury flowing from a violation of [§ 1962(c)] necessarily is the harm caused by [the] predicate acts" constituting the pattern of racketeering. Id. at 457 (internal quotation omitted).

Here, Plaintiffs have adequately pleaded that they were injured because Defendants'

scheme to defraud using mails and wires led them to pay supra-competitive prices for insurance premiums. (SAC ¶¶ 165-82). Specifically, Plaintiffs purchased insurance in the Lloyd's Market during the time they assert the scheme was occurring, (see id. ¶¶ 64-68), and thus Plaintiffs contend the prices they paid reflected the cost of the compensation agreements they claim were part of the scheme. (Id. ¶¶ 169-81). Plaintiffs also claim they paid prices reflecting Defendants' anti-competitive practices consistent with Lloyds' Market practices. (Id. ¶ 237). See also In re Avandia Mktg., Sales Practices & Prod. Liab. Litig., 804 F.3d 633, 639-40 (3d Cir. 2015) (payment of supra-competitive prices due to "illegal or deceptive marketing practices" constitutes RICO injury).[11]

### 5. Conspiracy

Defendants contend that, because Plaintiffs have not pleaded a § 1962(c) claim against Defendants, they also have not pleaded a § 1962(d) claim for conspiracy to violate § 1962(c). (Defs.' Br. at 34-35). But for the reasons set forth above, see Part IV.A.1-IV.A.4, Plaintiffs have pleaded a § 1962(c) claim. Therefore, Defendants' argument lacks merit.

### 6. Statute of Limitations

Defendants contend the RICO claim in the SAC is so "factually distinct" from what Plaintiffs pleaded in the Complaint and the FAC that it does not "relate back" to the Complaint or FAC under Fed. R. Civ. P. 15(c)(1)(B). (Defs.' Br. at 35-36). As such, Defendants argue, this is

---

[11] Defendants contend proximate cause is not pleaded because Plaintiffs do not claim their own insurance policies were subject to broker compensation agreements, and because Plaintiffs' theory of causation is implausible absent facts suggesting Plaintiffs would have paid lower premiums if the alleged misrepresentations or omissions had been disclosed. (Defs.' Br. at 33-34). However, the SAC sets forth facts describing how the commissions governed by these compensation agreements affects an insurance marketplace as a whole, such that these costs are passed on to all customers, including Plaintiffs. (See, e.g., SAC ¶ 169). At this stage, the Court finds these allegations sufficient to link the scheme to Plaintiffs' increased insurance costs.

21

a new claim barred by RICO's four-year statute of limitations. (Id.). The Court disagrees.

Under Rule 15(c)(1)(B), "an amendment to a pleading relates back to the date of the original pleading where '[it] asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.'" Glover v. Fed. Deposit Ins. Co., 698 F.3d 139, 145 (3d Cir. 2012) (quoting Fed. R. Civ. P. 15(c)(1)(B)). This rule "allows a plaintiff to sidestep an otherwise-applicable statute of limitations, thereby permitting resolution of a claim on the merits, as opposed to a technicality." Id. "[T]he touchstone for relation back is fair notice, because Rule 15(c) is premised on the theory that 'a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide.'" Id. at 146 (citing Baldwin Cty. Welcome Ctr. v. Brown, 466 U.S. 147, 149 n.3 (1984)). "Thus, only where the opposing party is given fair notice of the general fact situation and the legal theory upon which the amending party proceeds will relation back be allowed." Id. (internal quotation omitted).

Like the SAC, the Complaint and FAC bring RICO claims under 18 U.S.C. § 1962(c) and § 1962(d), based on mail and wire fraud. (Compl. ¶¶ 203-51; FAC ¶¶ 330-63). Both indicate Lloyd's syndicates paid undisclosed commissions to brokers in exchange for help obtaining supra-competitively priced insurance without customers' knowledge. (See, e.g., Compl. ¶ 2; FAC ¶ 5). Both discuss brokers' misrepresentations to clients that they were acting in clients' best interests. (See, e.g., Compl. ¶¶ 84-94; FAC ¶¶ 118-27). Both discuss several of the allegedly anti-competitive features the Lloyd's Market, including lineslips and binding authority agreements. (Compl. ¶ 9-10; FAC ¶ 10, 131). Although the SAC places different emphases on what, exactly, the brokers were paid to misrepresent and cover up, the Court finds the allegations in the SAC sufficiently similar as to provide "fair notice of the general fact situation and the legal theory" of

the amended RICO claim.  See Glover v. Fed. Deposit Ins. Co., 698 F.3d at 146.

### 7.    Extraterritorial Application

Finally, the Court rejects Defendants' argument that Plaintiffs' RICO claim impermissibly applies the RICO statute extraterritorially.  A foreign enterprise may be held liable under RICO if it "engage[s] in, or affect[s] in some significant way, commerce directly involving the United States—e.g., commerce between the United States and a foreign country."  RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2105 (2016).  For this reason, a § 1962(c) claim can be brought against a foreign enterprise if the pattern of racketeering "consist[s] entirely of predicate offenses that were either committed in the United States or committed in a foreign country in violation of a predicate statute that applies extraterritorially."  Id.

Wire fraud punishes transmissions "by means of wire, radio, or television communication in interstate or foreign commerce[.]"  18 U.S.C. § 1343 (emphasis added).  "Foreign commerce" for purposes of RICO means commerce between the United States and a foreign country.  RJR Nabisco, Inc., 136 S. Ct. at 2105.  Thus, the wire fraud statute applies to conduct partially outside the United States to the extent a defendant causes "a communication [to] be transmitted through interstate or foreign commerce for the purpose of executing a scheme to defraud."  United States v. Georgiou, 777 F.3d 125, 138 (3d Cir. 2015); cf. Pasquantino v. United States, 544 U.S. 349, 371-72 (2005) ("[T]he wire fraud statute punishes frauds executed in interstate or foreign commerce . . . so this is surely not a statute in which Congress had only domestic concerns in mind." (internal quotations omitted)).  Here, Defendants caused communications to be sent via wires across state lines and from the United Kingdom to the United States.  (SAC ¶ 228).  Thus, the requirement of domestic conduct in the wire fraud statute is satisfied.

As for mail fraud, the Court finds Plaintiffs have adequately pleaded that Defendants

committed acts of mail fraud, as Defendants' "scheme or artifice to defraud" foreseeably caused communications to be sent through the U.S. Mail and/or a "private or commercial interstate carrier[.]" 18 U.S.C. § 1341; see supra Part IV.A.1.b. Moreover, even though Defendants were located in the United Kingdom, the scheme was directed in large part at customers in the United States because the insurance these customers purchase account for such a large share of the gross premiums in the Lloyd's Market. (SAC ¶ 70). Thus, the Court is satisfied that, for extraterritoriality purposes, the acts of mail fraud took place in the United States.

### B.    Civil Conspiracy

Defendants move to dismiss Plaintiffs' civil conspiracy claim for failure to state a claim.

Civil conspiracy under state law requires showing the "combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or an injury upon another, and an overt act that results in damage." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177 (2005) (internal quotation omitted).[12]

Defendants contend dismissal is warranted for three reasons: Plaintiffs' claims are not plausibly pleaded under Iqbal; absent an underlying tort, there is no separate state law action for

---

[12] In evaluating Plaintiffs' civil conspiracy claim, the Court applies New Jersey law. "[A] federal court sitting in diversity must apply the forum state's choice of law rules." Snyder v. Farnam Cos., 792 F. Supp. 2d 712, 717 (D.N.J. 2011) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). Under New Jersey choice of law rules, "[t]he first step is to determine whether an actual conflict of law exists, for if no conflict exists, the law of the forum state applies." Id. Defendants contend the laws of several different states, or that of the United Kingdom, may apply to this action. (Defs.' Br. at 39 n.20). With respect to Defendants' arguments for dismissal of the civil conspiracy claim, however, Defendants argue there is no difference between the laws of any of these states or the United Kingdom. (Id. at 39-40). The Court agrees, and thus applies the law of the forum state, New Jersey. See also In re Orthopedic Bone Screw Prods. Liab. Litig., 193 F.3d 781, 789 (3d Cir. 1999) ("The established rule is that a cause of action for civil conspiracy requires a separate underlying tort as a predicate for liability." (citing cases applying several different states' laws)).

civil conspiracy; and civil conspiracy requires horizontal agreement. All three of Defendants' arguments fail because, as discussed above, see supra Part IV.A, Plaintiffs have plausibly pleaded both an underlying tort—civil RICO—and a horizontal conspiracy between Defendants to commit this tort. Therefore, dismissal is not warranted on these grounds.

### C.   Unjust Enrichment

Defendants move to dismiss Plaintiffs' unjust enrichment claim for failure to state a claim. To state a claim for unjust enrichment under state law, a plaintiff must show "(1) at plaintiff's expense (2) defendant received [a] benefit (3) under circumstances that would make it unjust for defendant to retain [the] benefit without paying for it." Snyder v. Farnam Cos., 792 F. Supp. 2d 712, 723 (D.N.J. 2011) (internal quotation omitted).[13] Unjust enrichment is a quasi-contractual remedy to prevent one party from unjustly benefiting at the other's expense, despite the lack of a formal, enforceable contract. See Castro v. NYT Television, 370 N.J. Super. 282, 299 (App. Div. 2004).

Defendants' sole ground for dismissal is that "there is no claim for unjust enrichment where, as here, the claim at issue is covered by a valid contract between the parties." (Defs.' Br. at 40 (citing Suburban Transfer Serv., Inc. v. Beech Holdings, Inc., 716 F.2d 220, 226-27 (3d Cir. 1983)). However, a plaintiff may plead a quasi-contract claim even if it is factually inconsistent with other claims or theories premised on the existence of a contract. Fed. R. Civ. P. 8(d)(2) - (3); see Pauly v. Houlihan's Rests., Inc., No. 12-25, 2012 WL 6652754, at *7 (D.N.J. Dec. 20, 2012) (allowing contract and unjust enrichment claims in the alternative at the pleading stage). Accordingly, at this early stage, dismissal is not warranted on this ground.

---

[13] "[U]njust enrichment law[] do[es] not vary in any substantive manner from state to state." Snyder v. Farnam Cos., 792 F. Supp. 2d at 723 (collecting cases). Thus, the Court applies New Jersey law. Id. at 717.

## V.  **CONCLUSION**

Based on the reasons set forth above, Defendants' motion to dismiss is DENIED.  An appropriate order accompanies this Opinion.

_____

**CLAIRE C. CECCHI, U.S.D.J.**

Dated: August 22, 2017